EXECUTION COPY

## STANDARD MANUFACTURING AND REPRESENTATION AGREEMENT

**THIS STANDARD MANUFACTURING AND REPRESENTATION AGREEMENT** is dated as of March 1, 2012 and is entered into by and among **JIANGMEN BENLIDA PRINTED CIRCUIT CO., LTD. (江门市奔力达电路有限公司)**"***Benlida***"), a Hong Kong company whose principal place of business is located at 江门市高新区龙溪路 76 号 (76, Longxi Road, High-tech Industrial Park, Jiangmen, Guangdong, China), and **ROK PRINTED CIRCUIT CO., LTD.( 江门市凯禹电路有限公司)("*ROK*")**, a Hong Kong company whose principal place of business is located at 江门市江海区东南工业区（高新区）8 号地 21 号厂房 (21 Workshop, 8, High-tech Industrial Park, Dongnan Industrial Park, Jianghai District, Jiangmen, Guangdong ,China) (Benlida and ROK are collectively referred to herein as the "***Manufacturer***") and **CIRCUITRONIX, LLC**, a Florida limited liability company whose principal place of business is located at 2 South Biscayne Blvd, Suite 3800, Miami, Florida 33131 ("***Circuitronix***").

**WHEREAS**, Manufacturer is engaged in manufacturing of "Bare Printed Circuit Boards."

**WHEREAS**, subject to the terms and conditions as set forth in this Agreement, Manufacturer desires to engage Circuitronix to assist it in the development of, and the creation of demand for, Bare Printed Circuit Boards.

**NOW, THEREFORE,** in consideration of the mutual covenants and promises contained herein, and other consideration, the receipt and adequacy of which is hereby acknowledged by the parties, Circuitronix and Manufacturer agree as follows:

1. **CIRCUITRONIX REPRESENTATION RIGHTS**

   **1.1 Appointment.** Subject to the terms and conditions of this Agreement, Manufacturer hereby appoints Circuitronix as its representative during the Term (as defined below) for the purpose of identifying potential customers that may be interested in purchasing Products. For purposes hereof, "Product" shall mean any contract manufacturing related work or services provided by Manufacturer or any associated entities.

   **1.2 Diligent Efforts.** Circuitronix will diligently solicit and promote sales of Product and shall not offer any price quotations, accept any orders, or make any commitments on behalf of the Manufacturer, without the Manufacturer's prior approval. Circuitronix shall also undertake responsibility for releasing a Purchase Order to Manufacturer, along with necessary specifications or drawings, etc., as may be required for providing full and clear inputs for manufacturing, packaging, and forwarding supplies.

   **1.3 Conduct of Business; Expenses; Signage at Factory.** Circuitronix shall conduct all of its business in its own name, shall maintain its own sales staff and offices, and shall bear all office costs related thereto.





1.4    **Marketing Period.**

(a)   *Identified Potential Customers.* Circuitronix shall, from time to time, provide a list to Manufacturer of potential customers. Manufacturer shall promptly review such list and, within three (3) business days after delivery thereof, shall provide written notification to Circuitronix if Manufacturer objects to Circuitronix representing a potential customer appearing on such list. Manufacturer may only object to a potential customer if such person or entity is already a customer of Manufacturer or if a bona-fide conflict exists. If the Manufacturer does not timely object to a potential customer (each an "*Identified Potential Customer*"), Circuitronix shall have the exclusive right, for a period of twelve (12) months thereafter (the "*Marketing Period*") to promote and solicit the sale of Products to the Identified Potential Customers, including their respective successors or assigns. **Schedule A** attached hereto contains a current list of Identified Potential Customers. **Schedule A** shall be updated from time to time by Circuitronix to include additional Identified Potential Customers (and a copy of any such updated schedule shall be promptly provided to Manufacturer).

(b)   *Extension of Marketing Period.* The Marketing Period shall be extended if, in the opinion of Circuitronix, the Manufacturer (i) performed poorly during any audit or visit by an Identified Potential Customer audit or (ii) submitted a poor or sub-standard Product sample. In such case, the Marketing Period shall be extended by a timeframe equal to (i) the period between the Identified Potential Customer's first audit and the follow up audit; and/or (ii) the time between the first sample submission and the next sample submission.

1.5    **Exclusive Sales Period.** If Circuitronix procures a Purchase Order (as defined below) from an Identified Potential Customer during the Marketing Period (any such Identified Potential Customer being hereinafter referred to as a "*Circuitronix Customer*"), Circuitronix shall have the exclusive right, for a period of two (2) years from the date of the last Purchase Order submitted by the Circuitronix Customer (the "*Exclusive Sales Period*"), to deal exclusively with such Circuitronix Customer, including handling such account and procuring Purchase Orders for the Products. Each current Circuitronix Customer shall be listed on **Schedule A**, which schedule shall be updated from time to time by Circuitronix to include any additional Circuitronix Customers (and a copy of any such updated schedule shall be promptly provided to Manufacturer). For purposes of this Agreement, a Circuitronix Customer shall be deemed to mean and include the respective successor or assign of each Circuitronix Customer.

1.6    **No Solicitation, Communications or Sales.** Manufacturer agrees that it shall not directly or indirectly (i) solicit any Identified Potential Customer during the Marketing Period or any Circuitronix Customer during the Exclusive Sales Period; or (ii) contract with or otherwise sell or deliver any Product to any Identified Potential Customer during the Marketing Period or any Circuitronix Customer during the Exclusive Sales Period. Manufacturer further agrees that should any Identified Potential Customer or Circuitronix Customer have any communication with Manufacturer or any of its affiliates for the purpose of doing any business with, or purchasing any Product from, Manufacturer or any of its affiliates, Manufacturer shall (i) immediately refer said such Identified Potential Customer or Circuitronix Customer to Circuitronix and (ii) provide written notice to Circuitronix of same. Likewise, Circuitronix

agrees to not interfere in any business relationship that Manufacturer may have with its customers.

**1.7 Manufacturer's Acknowledgement.** Manufacturer acknowledges that Circuitronix has and will expend substantial monies on advertising, marketing, technology, and in the development of potential customers. Manufacturer further agrees that the identity of Circuitronix customers, the specifications of their orders and pricing thereof, are considered confidential and proprietary in nature, a valuable asset of Circuitronix, are deemed to be "Trade Secrets" of Circuitronix and are subject to the protections of Section 8 hereof.

## 2. PRICING; PURCHASE ORDERS

**2.1 Pricing Matrix.** All business will be conducted as per the pricing matrix as outlined in **Schedule B** ("*Pricing Matrix*"). The pricing matrix will clearly state the assumptions which will constitute the base of the pricing including but not limited to laminate costs, copper price, gold price, silver price, RMB-US Dollar exchange rate and labor costs.

**2.2 Price Increases.** Notwithstanding anything herein to the contrary, the Manufacturer will not increase pricing without first providing no less than four (4) months prior written notice to Circuitronix. Any proposed price increases must be adequately justified by demonstrating a price increase in the parameters which form the base of the Pricing Matrix.

## 3. DELIVERY

**3.1** Manufacturer shall use best commercial efforts to ensure timely delivery of all Products in accordance with the delivery requirements set forth in the "Lead-Time" schedule attached hereto as **Schedule C** or as otherwise set forth in an accepted Sales Contract or Purchase Order (the "*Lead-Time Schedule*").

**3.2** Delivery date shall imply date of delivery at port of entry. If Manufacturer fails to adhere to quality standards and/or to the Lead-Time Schedule, Circuitronix reserves the right to procure the Product elsewhere and to recover from Manufacturer all such procurement costs and expenses and consequential damages suffered by Circuitronix as a result of Manufacturer's failure.

**3.3** Manufacturer and Circuitronix shall agree to Lead-Time Schedule flexibility requirements specific to the Product as documented in any addenda.

**3.4** Upon learning of any potential delivery delays, Manufacturer shall immediately notify Circuitronix as to the cause and extent of such delay.

**3.5** If Manufacturer fails to make deliveries at the specified time and such failure is caused by Manufacturer, Manufacturer will, at no additional cost to Circuitronix, employ accelerated measures such as material expediting fees, premium transportation costs, or labor overtime required to meet the specified delivery schedule or minimize the lateness of deliveries.

4. **PAYMENT TERMS**

    4.1    Manufacturer and Circuitronix agree to payment terms of AMS 60 days from the date of invoice.

    4.2    Currency will be in U.S. Dollars unless specifically negotiated and reflected in any addenda hereto.

5. **QUALITY; PACKAGING AND DOCUMENTATION**

    5.1    **Quality Requirements.**  Manufacturer shall manufacture and deliver the Products in accordance with the specifications provided to Manufacturer by Circuitronix (the "*Product Specifications*"). In the event that a quality specification is ambiguous, Manufacturer shall conform to the standards set forth in IPC 600 G Class II.

    5.2    **Packaging and Documentation.**  Product packaging shall conform to Circuitronix's documentation specifications, including but not limited to, markings on the cartons, weight restrictions, documentation, etc. Export worthy containers or corrugated boxes shall be used, and each carton shall contain a packaging slip clearly marked. Copies of AWB, Packing List and Invoice shall be faxed to Circuitronix upon shipment of Product.

6. **ENGINEERING CHANGES**

    6.1    Circuitronix may, upon advance written notice to Manufacturer, submit engineering changes for incorporation into the Products. It is important that this notification include documentation of the change to effectively support an investigation of the impact of the engineering change. Manufacturer will make a reasonable effort to review the engineering change and report to Circuitronix. If any such change affects the price, delivery, or quality performance of said Product, an equitable adjustment will be negotiated between Manufacturer and Circuitronix prior to implementation of the change. Irrespective, any proposed price increase must conform to the Pricing Matrix attached hereto as **Schedule B** and remains subject to the requirement of Section 2.2 hereof.

    6.2    Manufacturer agrees not to undertake significant process changes, design changes, or process step discontinuance affecting electrical performance and/or mechanical form and fit without prior written notification and concurrence of the Circuitronix.

7. **INVENTORY MANAGEMENT**

    7.1    Manufacturer agrees to use laminates according to the Circuitronix approved vendor list ("*AVL*") including any sourcing plans as provided by any addenda hereto.

    7.2    All Circuitronix tooling/equipment furnished to Manufacturer or paid for by Circuitronix in connection with this Agreement shall:

        (a)    Be clearly marked and remain the personal property of Circuitronix.

        (b)    Be kept free of liens and encumbrances.

Unless otherwise agreed, Circuitronix is responsible for the general maintenance of Circuitronix tooling/equipment. Manufacturer shall hold Circuitronix property at its own risk and shall not modify the property without the written permission of Circuitronix. Upon Circuitronix's request, Manufacturer shall redeliver the property to Circuitronix in the same condition as originally received by Manufacturer with the exception of reasonable wear and tear. In the event the property is lost, damaged or destroyed, Manufacturer' shall be liable for the replacement cost of such property. Manufacturer shall return all Circuitronix property to Circuitronix or its agent within forty-eight (48) hours of being directed to do so in writing by Circuitronix.

## 8. CONFIDENTIAL INFORMATION

8.1 Each party agrees not to make any commercial use of confidential information and/or trade secrets of the other party regarding customer specifications or otherwise without obtaining prior written consent from such other party. Each party recognizes that immediate and irreparable damage will result to the non-breaching party if one of the parties breaches any of the terms and conditions of this Section 8, and accordingly, each party consents to the entry by any court of competent jurisdiction of an injunction in favor of the non-breaching party (without bond or other security being required) to restrain any such breach, in addition to any other remedies or claims which the non-breaching may seek. This Section of the Agreement is considered by the parties to be an integral part of this Agreement, and shall survive for a period of two (2) years from the date of termination of this Agreement.

8.2 Subject to the terms hereof and the proprietary rights of the parties, Manufacturer and Circuitronix agree to exchange, at least semi-annually, relevant process development information and business plans to include market trends, process technologies, product requirements, new product developments, available capacity and other information to support technology advancements by both Manufacturer and Circuitronix.

## 9. WARRANTY

9.1 Except as expressly set forth in Section 9.2 below, Manufacturer unconditionally warrants that (i) the Product will conform to the specifications applicable to such Product at the time of its manufacture, which are furnished in writing by Circuitronix and accepted by Manufacturer; (ii) such Product will be of good material (supplied by Manufacturer) and workmanship and free from defects for which Manufacturer is responsible in the manufacture; (iii) such Product will be free and clear of all liens and encumbrances and that Manufacturer will convey good and marketable title to such Product. In the event that any Product manufactured shall not be in conformity with the foregoing warranties, Manufacturer shall, at Manufacturer's option, credit Circuitronix for any such nonconformity or, at Manufacturer's expense, replace, repair or correct such Product.

9.2 Manufacturer shall have no responsibility or obligation to Circuitronix under warranty claims with respect to Products that have been subjected to abuse, misuse, accident, alteration, neglect or unauthorized repair. In addition, Manufacturer's warranty shall be limited to one year from the date of manufacture of the Product for any feature of the Product that characteristically deteriorates over time (e.g., solder).

THE WARRANTIES CONTAINED IN THIS SECTION ARE IN LIEU OF, AND MANUFACTURER EXPRESSLY DISCLAIMS AND CIRCUITRONIX WAIVES ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR ARISING BY COURSE OF DEALING OR PERFORMANCE, CUSTOM, USAGE IN THE TRADE OR OTHERWISE, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY, TITLE AND FITNESS FOR A PARTICULAR USE.

9.3     An *"Epidemic Condition"* shall exist when failure reports or statistical samplings show that more than one percent (1%) of the same Product installed or shipped during any one month contain an identical, repetitive defect in Manufacturer supplied material and/or workmanship. If during the warranty period of one year, the same Product shows evidence of an Epidemic Condition, Circuitronix shall promptly notify Manufacturer of such condition. Upon notification, Circuitronix shall have the right, pending correction of the Epidemic Condition, to postpone further shipments of such Product by giving written notice of such postponement to Manufacturer. Both parties shall work together to prepare and propose a corrective action plan addressing implementation and procedure milestones for remedying such Epidemic Condition(s). Both parties shall use best efforts to implement the remedy in accordance with the agreed upon schedule. In the event of Epidemic Failure, Manufacturer will:

(a)     Incorporate the remedy in the affected Product in accordance with Circuitronix engineering change order procedures.

(b)     Ship all subsequent Products incorporating the required modification.

9.4     Manufacturer shall have no liability or responsibility under Sections 9.1 and 9.3 above for any losses or damages to the extent that any such Epidemic Failure claims are the direct result of:

(a)     Manufacturer's compliance with Circuitronix specifications;

(b)     the negligence of Circuitronix or any other person providing goods or services in connection with the design, development, production, and distribution of the Product (with the exception of Manufacturer's manufacture of the Product);

(c)     modification or alteration of the Product by a party other than Manufacturer; or

(d)     defects in Circuitronix's products or components thereof (with the exception of the Products and Manufacturer supplied components thereof).

## 10.    TERM; TERMINATION; DISPUTE RESOLUTION

10.1    **Term.** This Agreement shall commence on the date hereof and shall continue in full force and effect until terminated in accordance with the terms set forth in this Agreement (the "*Term*").

10.2    **Termination.**

**(a)** If either party fails to meet any one or more of the terms and conditions as stated in either this Agreement or any addenda hereto, Manufacturer and Circuitronix agree to negotiate in good faith to resolve such default. If the defaulting party fails to cure such default or submit an acceptable written plan to resolve such default within thirty (30) days following notice of default, the nondefaulting party shall have the right to terminate this Agreement by furnishing the defaulting party with thirty (30) days written notice of termination.

**(b)** This Agreement shall immediately terminate should either party; (i) become insolvent; (ii) enter into or file a petition, arraignment or proceeding seeking an order for relief under the bankruptcy laws of its respective jurisdiction; (iii) enter into a receivership of any of its assets or; (iv) enter into a dissolution of liquidation of its assets or an assignment for the benefit of its creditors.

**10.3  Post Expiration or Termination Rights.** Notwithstanding the expiration of the Term or earlier termination thereof pursuant to Section 10.2 hereof, Manufacturer agrees that it shall continue to perform, manufacture and deliver Products hereunder in accordance with the terms hereof, including the Price Matrix and Lead-Time Schedule, with respect to (i) all Purchase Orders for Circuitronix Customers that were pending or in the process of manufacturing or delivery at the time of such expiration or earlier termination of the Term or (ii) all future Purchase Orders with respect to existing Circuitronix Customers at the time of such expiration or earlier termination that Circuitronix may decide to submit to Manufacturer for fulfillment in accordance with the terms hereof, including the Price Matrix and Lead-Time Schedule.

**10.4  Dispute Resolution**

**(a)** In the spirit of continued cooperation, the parties intend to and hereby establish the following dispute resolution procedure to be utilized in the event any controversy should arise out of or concerning the performance of this Agreement.

**(b)** It is the intent of the parties that any dispute be resolved informally and promptly through good faith negotiation between Manufacturer and Circuitronix. Either party may initiate negotiation proceedings by written notice to the other party setting forth the particulars of the dispute. The parties agree to meet in good faith to jointly define the scope and a method to remedy the dispute. If these proceedings are not productive of a resolution, then senior management of Manufacturer and Circuitronix are authorized to and will meet personally to confer in a bona fide attempt to resolve the matter.

**(c)** Should any disputes remain existent between the parties after completion of the two-step resolution process set forth above, then the parties shall promptly submit any dispute to mediation with an independent mediator. In the event mediation is not successful in resolving the dispute, the parties may agree to submit the dispute to arbitration as provided by their respective jurisdiction.

**11.  LIMITATION OF LIABILITY**

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT (INCLUDING SECTION 12 HEREOF) OR IN THE SETTLEMENT AGREEMENT

BETWEEN CIRCUITRONIX AND BENLIDA ENTERED INTO ON OR ABOUT THE DATE HEREOF, IN NO EVENT, WHETHER AS A RESULT OF BREACH OF CONTRACT, WARRANTY, OR TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, PRODUCT LIABILITY, OR OTHERWISE, SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES OF ANY KIND, WHETHER OR NOT EITHER PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

## 12. INDEMNIFICATION

**12.1** Manufacturer shall defend, indemnify, and hold Circuitronix, its officers, directors, employees, and agents (the *"Circuitronix Indemnified Parties"*) harmless against any and all claims, demands, proceedings, losses, damages, obligations, liabilities, deficiencies, fines, costs, or expenses (including, without limitation, reasonable attorneys' fees) (collectively, *"Losses"*) arising directly or indirectly as a result of, or relating to, (a) any material breach of this Agreement by Manufacturer or its officers, trustees, employees, or agents; (b) any negligence by Manufacturer in the manufacture of the Product or any failure to manufacture the Product in accordance with the Product Specifications; or (c) any negligence or wrongful acts of Manufacturer or its officers, trustees, employees, or agents, except to the extent that any such Losses are due to the negligence or wrongful acts of Circuitronix, its officers, trustees, employees, or agents.

**12.2** Circuitronix shall defend, indemnify, and hold Manufacturer, its officers, directors, employees, and agents harmless against any and all Losses arising directly or indirectly as a result of, or relating to defects in the Product Specifications,, except to the extent that any such Losses are due to the negligence or wrongful acts of the Manufacturer, its officers, trustees, employees, or agents.

## 13. GENERAL

**13.1 Insurance.** Each party to this Agreement will maintain insurance to protect itself from claims (i) by the party's employees, agents and subcontractors under Worker's Compensation and Disability Acts, (ii) for damages because of injury to or destruction of tangible property resulting out of any negligent act, omission or willful misconduct of the party or the party's employees or Contractors, (iii) for damages because of bodily injury, sickness, disease or death of its employees or any other person arising out of any negligent act, omission, or willful misconduct of the party or the party's employees, agents or subcontractors.

**13.2 Assignment.** Neither party shall delegate, assign or transfer its rights or obligations under this Agreement, whether in whole or part, without the written consent of the other party.

**13.3 Force Majeure.** Neither party shall be liable for any failure or delay in its performance under this Agreement due to acts of God, acts of civil or military authority, fires, floods, earthquakes, riots, wars or any other cause beyond the reasonable control of the delayed party provided that the delayed party: (i) gives the other party written notice of such cause within fifteen (15) days of the discovery of the event; and (ii) uses its reasonable efforts to remedy such delay in its performance.

**13.4    Governing Law; Venue.** This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, excluding its conflict of laws provisions thereof. Each of the Parties hereto irrevocably (a) accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the Florida State Courts or United States Federal District Courts located in Miami-Dade County, Florida with respect to any legal action brought in connection with the enforcement of this Agreement, and (b) waives any objection that it may have to the laying of venue of any such action in the aforesaid courts and waives and agrees not to plead or claim that any action in such courts was brought in an inconvenient forum.

**13.5    Attorneys' Fees.** In any action to enforce this Agreement, the prevailing party shall be awarded all court costs and reasonable attorney fees incurred.

**13.6    No Waiver.** Any waiver of any provision of this Agreement or the full and timely performance of any duties arising hereunder shall be in writing and shall be effective only in the specific instance and only for the purpose for which given. No failure or delay on the part of either party in exercising any right, power or privilege arising hereunder shall operate as a waiver thereof, nor shall any partial exercise of any right, power or privilege arising hereunder preclude any other or further exercise thereof or the exercise of any right, power or privilege. Except where otherwise specified herein, the provisions of this Agreement may be waived, varied, modified or amended only by a written instrument executed by and on behalf of Circuitronix and Manufacturer.

**13.7    No Oral Understandings.** This Agreement embodies the entire agreement between the parties hereto with respect to the subject matter hereof and cancels and supersedes any and all prior or contemporaneous, oral or written understandings, negotiations or communications on behalf of such parties. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, the remaining provisions of this Agreement will nevertheless continue in full force and effect.

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be signed on its behalf by a duly authorized individual or officer and has caused its seal to be hereunto affixed, the day and year first written above.

**CIRCUTRONIX, LLC**

By: _____
Name: ANIMESH DUTTA
Title: BUSINESS MANAGER

**JIANGMEN BENLIDA PRINTED CIRCUIT CO., LTD.**

By: _____  2012.06.08.
Name:
Title:

**ROK PRINTED CIRCUIT CO., LTD.**

By: _____  2012.06.08.
Name:
Title:

## SCHEDULE A

## Identified Potential Customers and Circuitronix Customers

**[LAST UPDATE : 03/12/2012]**

- a) Preco Electronics, USA
- b) MSI Manuafacturing, USA
- c) Electrolux, Global Locations
- d) PKG, USA
- e) Curtis Instruments
- f) First Alert/BRK
- g) Gecko
- h) Seveco
- i) MicroCraft / Niles
- j) Universal Lighting
- k) Logican
- l) Trico
- m) Lear Corporation
- n) Alps Automotive
- o) Magna Electronics
- p) Saturn Electronics
- q) Panasonic: All Global Locations and Contract Manufacturers
- r) Cherry: All Global Locations and Contract Manufacturers
- s) Honeywell Corporation: All Global Locations.
- t) Cooper Electronics: All Global Locations besides MTL in Europe.
- u) Checkpoint System: All Global Locations.
- v) Celestica: All Global Locations
- w) SMTC: All Global Locations
- x) Emerson: All Global Locations beside China and as agreed as per e-mail between the Parties
- y) Tyco Electronics: All Global Locations
- z) Osram Industries: All Global Locations
- aa) Ingersoll Rand: All Global Locations
- bb) Kimball Electronics: All Global Locations
- cc) Helbakao: All Global Locations.



## SCHEDULE B

### Pricing Matrix

1. **Base Pricing**:

| Layer Count | Base Price | NRE |
|---|---|---|
| DS | 0.039 | 150 |
| 4L | 0.058 | 200 |
| 6L | 0.087 | 300 |
| 8L | 0.115 | 400 |
| 10L | 0.16 | 500 |

- General Specification of P/N : FR4, 0.062", 1oz. Copper base for Outer Layers and Inner Layers; 5 mil line; 5mil spacing; smallest drill hole size 8mil, hole density < 45holes per sq. inch", routing, PCB Spec. IPC 600 Class 2 as default. There is no cost adder for 2oz./2oz. finish as long as the copper thickness is as per IPC 600 Class 2.
- For any P/N where the Annual Dollar Spend is more than US$25K, the NRE Cost is waived or will be returned if paid.
- Base price including 2500 linear inches routing length per sq meter.
- For other S/M color, black, red, white or blue no additional cost

2. **Adders**:

   A. Finishes

| Finish | Cost Adder | |
|---|---|---|
| OSP | 0.00/sq. inch | |
| LF HASL | 0.001/sq inch | |
| Im Tin | 0.0035/sq inch | |
| In Silver | 0.0044/sq inch | |
| Im Gold (2u" min) | 0.01/sq inch | |
| Im Gold (3u" min) | 0.012/sq inch | |



### B. TG

|     | Tg 150         | Tg 170         |
|-----|----------------|----------------|
| DS  | 0.003/sq inch  | 0.006/sq inch  |
| 4L+ | 0.004/sq inch  | 0.007/sq inch  |

### C. Thickness

|     | 0.039 thickness | 0.093 thickness    | 0.125 thickness     |
|-----|-----------------|---------------------|---------------------|
| DS  | - $3/sq mtr     | TBD based on RFQ    | TBD based on RFQ    |
| 4L+ | - $3/sq mtr     | TBD based on RFQ*   | TBD based on RFQ*   |

\* Should be less than DS

### D. Stand-alone Cost Adders

| Carbon Ink: | $4/sq mtr | |
| Line Space: | 5/5 mil (standard) | 0% |
|  | 4/4 mil | 2% |
| Routing: | 2500 linear inches/sq mtr standard | Additional: 0.0018 / lin inch |
| Drilling: | 45 holes/sq inch standard | Additional: 0.15 per 1000 holes |
| Peelable S/M: | $3/sq mtr | |
| Control Impedance: | 3.00% | |
| IPC Class 3: | 2.50% | |
| Cost adder for extra layer prepeg is: | 0.01 per sq. inch | |
| Manual V-Scoring: | $0 | |
| CNC & Jump V-Scoring: | 0.001/lin inch | |



3. <u>Cu Adders</u>:

| **Outer Layer** | **Base** | **Finish** |
|---|---|---|
| H/H (0.5/0.5 oz) | -2.5 | -4 |
| 1oz/1oz | 0 | 0 |
| 2oz/2oz | 13 | 0 |
| 3oz/3oz | TBD | 13 |
| 4oz/4oz | TBD | TBD |

- For inner layers the cost will correspond to the cost of the base copper thickness outlined above
- Costs are in sq. meters.
- For boards requiring 2oz./2oz.

4. <u>Discount Structure</u>

| Monthly Order Value/ Applicable Price Discount | 2L | 4L | 6L | 8L |
|---|---|---|---|---|
| $300k-$399k/(2% discount) | 0.078cent/sqi | 0.116cent/sqi | 0.174cent/sqi | 0.23cent/sqi |
| $400k-$499k/(3% discount) | 0.117cent/sqi | 0.174cent/sqi | 0.261cent/sqi | 0.345cent/sqi |
| $500k-$599k/(4.0% discount) | 0.156cent/sqi | 0.232cent/sqi | 0.348cent/sqi | 0.46cent/sqi |
| $600k-$749k/(4.5% discount) | 0.175cent/sqi | 0.261cent/sqi | 0.391cent/sqi | 0.517cent/sqi |
| $750k-$899k/(5.0% discount) | 0.195cent/sqi | 0.29cent/sqi | 0.435cent/sqi | 0.575cent/sqi |
| $900k-$1049k/(5.5% discount) | 0.214cent/sqi | 0.32cent/sqi | 0.478cent/sqi | 0.632cent/sqi |
| $1050k-$1199k/(6.0% discount) | 0.234cent/sqi | 0.348cent/sqi | 0.522cent/sqi | 0.69cent/sqi |
| $1200k-$1399k/(6.5% discount) | 0.253cent/sqi | 0.377cent/sqi | 0.565cent/sqi | 0.747cent/sqi |
| $1400k and over/(7.0% discount) | 0.266cent/sqi | 0.406cent/sqi | 0.609cnet/sqi | 0.805cent/sqi |

- Above mentioned discount will be applied to the payment on a monthly basis
- Order volume will be based on calendar months, i.e. 1st Jan to 31st Jan etc.
- Monthly order volume will be evaluated at the end of every month. Discount will be applied to every Purchase Order released in the following month based on the above criteria.

**SCHEDULE C**

**Lead-Time Schedule**

1. Benlida shall update the Standard Lead Times on the 15th (or nearest business day) of every month

2. If Benlida fails to update the Standard Lead Times as required above, the Parties agree that the following Lead Times shall apply and shall be deemed the Standard Lead Times, unless otherwise agreed to by the Parties in writing:

| | |
|---|---|
| SS: | 10 days |
| DS: | 14 days |
| 4L to 6L: | 21 days |
| 8L and above: | 28 days |

3. The above Standard Lead Times includes 2 days to allow for EQ response time from Circuitronix, assuming that nothing is pending from Benlida and that Benlida is solely waiting for Circuitronix

4. In case Circuitronix takes more than 2 days to resolve EQ's, Standard Lead Times will increase by the number of days over 2 days

5. The above Standard Lead Times apply to an order of 3000 square meters per week. For each increase of 400 square meters per week, the Standard Lead Time will be increased by 1 day.

