**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-60125-CIV-SCOLA/GOODMAN**

JIANGMEN BENLIDA PRINTED
CIRCUIT CO., LTD., *et al.*

Plaintiffs,

v.

CIRCUITRONIX LLC,

Defendant.
_______________________________________/

**CIRCUITRONIX, LLC'S RESPONSE TO MOTION**
**TO REOPEN AND ENFORCE SETTLEMENT AGREEMENT**

## INTRODUCTION

Benlida's ("BLD's") motion to enforce, Docket Entry ("DE") [104], relies on nothing more than abject conjecture about Circuitronix's ("CTX's") motives for exercising its contractually conferred right to terminate the parties' settlement agreement. Contrary to BLD's meritless speculation, CTX's internal assessment of BLD's dubious financial stability caused CTX to exercise its contractually conferred "sole discretion" to declare the settlement void.

On November 17, 2022, CTX exercised its contractual right to terminate the parties' settlement agreement. CTX exercised this clear and unambiguous contractual right after carefully reviewing BLD's financial statements and determining, in its sole discretion, that BLD faced an unacceptable risk of financial instability, including the prospect of short- to medium-term insolvency or financial collapse.

CTX's concerns were well founded. BLD has a long history of running short on cash, often relying on CTX to borrow additional cash to keep the BLD operation afloat. BLD, and its related companies, are no strangers to insolvency and financial collapse. According to testimony from BLD's principal, Huang Hanchao, submitted under oath in this case, BLD's affiliate corporation, ROK Printed Circuit Co., Ltd. ("ROK"), went out of business and ceased operations in 2018. DE [29-3] at 2. In large part, BLD's desperate financial condition, and need for more cash from CTX, is what caused this meritless lawsuit in the first place.

Further, after agreeing to settle this case, BLD withheld its financial statements from CTX until nearly the last possible moment. Contrary to the inaccurate and self-serving recitation contained in BLD's motion, the parties first agreed to settle this lawsuit during mediation held on June 1, 2022, with retired Judge Joseph Farina. Although the parties spent months negotiating specific terms thereafter, one essential requirement of the settlement that remained constant, and was included in the original settlement term sheet, was that BLD would have to provide proof of its financial stability by turning over its financial statements to CTX for review and approval.

Despite being aware of this requirement for many months, BLD chose not to reveal the information until November 9, 2022, at 6:40 pm, when it finally made its financial statements available to CTX for review, for the first time. CTX immediately began a diligent and thorough review of BLD's financial statements upon receipt.

This review, conducted principally by Celin Astudillo, CTX's Corporate Controller, and Rishi Kukreja, CTX's CEO, revealed numerous red flags. Among other things, critical financial data appeared to be incomplete or missing from the financial statements, and major concerns emerged regarding BLD's cash flow and cash position. In particular, the financial statements revealed what appeared to be a major shortfall between BLD's short-term accounts payable and accounts receivable, indicating that BLD might currently be in a state of insolvency.

Based on this review alone, CTX was well within its rights to immediately exercise the right to terminate the agreement. However, in a good faith effort to try to work with BLD to salvage the deal, CTX requested a video conference meeting of senior management be conducted on the morning of November 17, 2022, to discuss the financial statements in greater detail.

CTX's objective in requesting and conducting this meeting was to try to get more information and disclosure from BLD about vague and/or missing information in the financial statements, as well as to better understand, from BLD staff, the overall financial condition of BLD. The hope was that with more information, some of the concerns revealed by the financial statements could be addressed or explained, such that CTX's concerns about the potential collapse of BLD could be alleviated.

Unfortunately, the meeting resulted in more questions than answers about how BLD could continue to pay its debts and obligations as they became due and avoid insolvency. Among other things, the meeting made it clear that BLD's short-term debts and obligations exceed its current revenue and receivables. Further concerns were illuminated regarding the amount and ratio of

BLD's short-term and long-term debts. In addition, BLD failed to adequately and credibly explain 29 "pledged" transactions for the period 2019 to 2022.

Perhaps most alarming, during the call, BLD disclosed for the first time that its new factory in Jiangxi, China ***was not accounted for in its financial statements at all*** because it is being operated by a separate legal entity under the direction and control of BLD's principal owner, Huang Xianjiang. As a practical matter, the operation of the Jiangxi factory by a different company adds significantly to the prospect of BLD being financially unstable. This is because there is a significant risk that once the new factory is up and running, BLD could begin funneling resources to the new operation, and/or formally dissolve, while the new company (with no formal affiliation with BLD aside from the common control of Mr. Huang) and new factory continue to operate.

Accordingly, in view of the unacceptable risks concerning BLD's financial stability, on November 17, 2022, CTX exercised its contractual right to void the parties' settlement agreement by timely providing a written termination notice to BLD.

After having terminated the agreement, CTX did express to BLD a genuine desire to continue settlement discussions, with the aim of achieving a satisfactory resolution of the case. As CTX informed BLD, one required component of such an effort would be further financial disclosures and assurances, including written certifications, that would address and satisfy CTX's concerns about the risk of BLD's financial collapse. Another would be to bring the entity that owns the Jiangxi factory within the umbrella of the settlement agreement. However, after the termination notice was provided, BLD chose to break off further discussions and pursue the present motion to enforce instead.

BLD now argues—without offering any credible evidence—that CTX exercised its right to terminate the agreement in bad faith, with an ulterior motive. BLD speculates that CTX did not actually want to terminate the agreement, but did so as a "pretext" to accomplish some undefined alternative objective that BLD does not specify. BLD's arguments are wrong, factually and legally. Accordingly, its motion to enforce should be denied.

In addition to the factual and substantive deficiencies noted above, BLD's motion is also procedurally improper and should be denied for that additional independent reason. The parties agree that they entered into a Settlement Agreement, with its incorporated Revised Manufacturing Agreement, on November 7, 2022. Even assuming *arguendo* that BLD were correct that CTX's declaration of the Settlement Agreement as void was invalid, such that the contract remains in

effect, BLD has, by filing its motion, violated the mandatory alternative dispute-resolution procedures to which it agreed in the contract. If the contract remains in force, as BLD contends, all disputes arising out of the agreement had to be resolved first by negotiation, and failing that, mediation, before resort to court may be had. CTX called this inconsistency to BLD's attention the day after it filed its motion, but BLD refused to withdraw its motion and engage in further discussions.

## BACKGROUND

### A. The Parties' History of Dealing Before this Litigation

CTX and BLD have had a long history of dealing before the present lawsuit. They entered their first manufacturing agreement back in 2005, whereby CTX agreed to utilize BLD's factory to manufacture printed circuit boards for CTX's customers. During the course of the parties' relationship, CTX became well aware of BLD's history of cash-flow problems. Over the years, BLD's principals on multiple occasions had turned to CTX for special cash infusions, and CTX agreed to send BLD money to ensure that the factory would remain up and running to maintain quality standards and capacity sufficient to meet BLD's obligations to CTX's customers. BLD's former affiliate company, ROK, ran out of cash and ceased operations in 2018. DE [29-3] at 2 (testimony of Huang Hanchao).

It is against that backdrop that the current efforts to settle the accounting dispute that arose between the parties—which is the subject of this lawsuit—must be understood.

### B. The Parties Reach a Settlement After Prolonged Negotiations

After the parties reached an agreement in principle during mediation in this case on June 1, 2022, they commenced the effort to paper the deal. That proved to be a taxing and time-consuming experience, in part because the settlement involved the creation of a new, Revised Manufacturing Agreement ("RMA"), which would govern in great detail the terms of the business between the parties into the future, and because the negotiations took place during a period of unprecedented market volatility and unpredictability due to the effects of the global COVID-19 pandemic and resulting supply chain crisis. The precise history of those negotiations, and the many drafts and proposals exchanged, are mostly immaterial to the motion before the Court. However, the drafting history of one provision is worth mention, governing CTX's option to terminate the agreement after review of BLD's finances, a deal point that remained an essential term all the way from the date of mediation, and we address it in Section C, below.

The parties finally reached an agreement as to all terms of both the Settlement Agreement and the RMA on November 7, 2022. The Settlement Agreement contains a confidentiality provision, and incorporates the RMA, so CTX shall seek to file these documents under seal so that the Court has access to them. *See generally* Exhibit 1 (Declaration of Chauncey Cole, Esq.) and Exhibit A thereto (Settlement Agreement) and Exhibit B thereto (RMA).[1]

**C. CTX Retained the Right to Void the Settlement Agreement in Its Discretion**

The crux of the current dispute is whether CTX validly exercised its right to terminate pursuant to Paragraph 3(a) of the Settlement Agreement. Because the text of that provision is central to the present dispute, CTX has obtained BLD's consent to recite it openly and in full within this response, to facilitate the Court's review. Paragraph 3 is entitled "Proof of BLD's Financial Stability." Paragraph 3(a) states:

> No later than 5 business days after the Effective Date, BLD shall provide CTX with its auditor certified financial statements for 2021, and financial statements for Q1, Q2, and Q3 2022. The financials must include a balance sheet, income statement and cash flow statement and must be translated in English. This requirement is necessary to demonstrate proof of BLD's financial stability, demonstrating a lack of short to medium term risk of insolvency or financial collapse. This is an essential and necessary term of this Agreement and, within 5 business days after receiving the BLD financial statements, **<u>if CTX determines in its sole discretion that BLD faces an unacceptable risk of instability, this Agreement becomes immediately voidable at CTX's sole discretion</u>.** All financial data provided by BLD in connection with this section shall be kept strictly confidential by CTX and shall not be disclosed to third-parties, other than CTX's attorneys, accountants, or other professional advisors.

Settlement Agreement, ¶ 3(a) (emphasis added).

The parties previously gave the Court some context about the reason for this proof-of-financial-stability provision in a joint motion for extension of time:

> an important term of the settlement agreement is that after execution, Circuitronix has a right to review Benlida's certified financial documents, as Circuitronix is making a substantial up-front payment, in consideration of entering into a long-term manufacturing agreement.

DE [99] at 4, ¶ 10; *see also* Settlement Agreement, ¶ 1 (explaining payments CTX would make to BLD). CTX agreed to make an up-front investment in BLD in the settlement because it knew

[1] The exhibits to this response, identified by letter, are all attached to the Cole Declaration (Exhibit 1 hereto).

BLD needed cash to maintain its operation, and CTX is in a position to provide the funds that could assist BLD's factory to continue operating throughout the life of the RMA. The deal was structured to give CTX favorable pricing terms on future PCB purchase orders that would allow CTX to recoup, over time, the payments it was agreeing to give BLD. As the parties explained in a joint motion for extension of time filed on November 14, 2022,

> [t]he … settlement is, by agreement, contingent upon CTX's review and approval of Benlida's … financial statements …. The parties have agreed that this requirement is necessary to demonstrate proof of Benlida's financial stability …. This term is essential because CTX has agreed to make a substantial cash investment in Benlida in connection with the settlement.

DE [101] at 1-2.

Although the text of Paragraph 3(a) is unambiguous, the drafting history underscores the error in BLD's effort to read into it constraints that its language, in context, does not support. BLD sought to modify the language of Paragraph 3(a) to insert the word "reasonably" and to delete the word "sole" in the operative sentence, as follows:

> This is an essential and necessary term of this Agreement and, within 5 business days after receiving the BLD financial statements, if CTX reasonably determines in its ~~sole~~ discretion that BLD faces an unacceptable risk of instability, this Agreement becomes immediately voidable at CTX's sole discretion.

*See* Exhibit C (Oct. 25, 2022 email from JC Mazzola) at 1 and attached Settlement Agreement draft (also to be filed under seal), ¶ 3(a). CTX definitively rejected this request to cabin its discretion:

> Benlida's request to modify the language in Section 3.a. of the Settlement Agreement—where Benlida is giving CTX threshold assurances of its financial health—in a way that would limit CTX's discretion to decide that this long-term deal presents too great a financial risk for it, has unfortunately been counterproductive. Your proposed changes have conveyed an unhelpful message to CTX that only increases its concern.

*See* Exhibit D (Oct. 25, 2022 email from S. Rosenthal) at 1. CTX also invited BLD to "provide CTX with the requested financials right away, in advance of the signing of the Agreement, to give CTX appropriate assurances." *Id.* BLD then withdrew its request to modify that language in Paragraph 3(a). *See* Exhibit E (Oct. 26, 2022 email from JC Mazzola) at 1. However, it did not share its financial information with CTX prior to the Effective Date of the agreement, despite repeated requests from CTX that it do so earlier.

**D. CTX Exercised Its Discretion to Void the Settlement Agreement**

There is no dispute concerning the date that the Settlement Agreement was entered into and became effective, November 7, 2022. *See* Motion at 7, ¶ 22. Two days later, on November 9, 2022, BLD finally provided CTX with "its auditor certified financial statements for 2021, and financial statements for Q1, Q2, and Q3 2022," as required by Paragraph 3(a). BLD transmitted those documents to CTX, through counsel, on November 9, 2022, at approximately 6:40 p.m. DE [101] at 2, ¶ 4; *see* Exhibit F (Nov. 9, 2022 email from JC Mazzola).[2]

That triggered the five-business-day period during which CTX could review and evaluate BLD's financials pursuant to Paragraph 3(a). CTX reserved the "sole discretion" to determine whether BLD "faces an unacceptable risk of instability." *Id*. There is no dispute that "CTX had until November 17 to complete its review and make its determination." Motion at 8, ¶ 29.

CTX's CEO, Mr. Kukreja, tasked the company's Corporate Controller, Mr. Astudillo, with reviewing and evaluating BLD's financial documents. Mr. Astudillo quickly encountered difficulty in reviewing BLD's materials because of the non-standard format in which they were presented. To facilitate CTX's review, Mr. Astudillo painstakingly input the data from the PDF documents into several Excel spreadsheets using accepted accounting principles. *See* Exhibit G (spreadsheets attached to Nov. 17, 2022 email).[3]

By November 14, the second business day of the five-business-day evaluation period, it was clear to Mr. Astudillo that the data BLD had supplied was incomplete, making it difficult to ascertain BLD's true financial status. He summarized his initial findings, along with a host of problems and red flags he had identified, to Mr. Kukreja in a detailed email on November 14, 2022.

Mr. Kukreja, the ultimate decision-maker at CTX, found the degree of risk presented by BLD's financials to be unacceptable; the financial statements raised numerous questions about BLD's business and its future as a going concern. Among other things, critical financial data appeared to be incomplete or missing from the financial statements, and major concerns emerged regarding BLD's cash flow and cash position. In particular, the financial statements revealed what appeared to be a major shortfall between BLD's short-term accounts payable and accounts

---

[2] The parties agreed to treat Benlida's financials as confidential, so CTX shall seek leave to file the attachments to Exhibit F under seal.

[3] These spreadsheets are also the subject of CTX's motion to file documents under seal, since they restate Benlida's confidential financial information.

receivable, indicating that BLD might currently be in a state of insolvency (both cash-flow insolvency and balance-sheet insolvency). Based on this review alone, CTX was well within its rights to immediately exercise the right to terminate the agreement.

Nonetheless, in a good faith effort to avoid that outcome, on November 16, 2022, CTX requested an opportunity for Mr. Kukreja and Mr. Astudillo to speak directly with the principals of BLD, and someone at BLD familiar with the financial documents, to answer questions CTX had about BLD's financials. *See* Exhibit H (Nov. 16, 2022 email from C. Cole). CTX's objective in requesting and conducting this meeting was to try to get more information and disclosure from BLD about vague and/or missing information in the financial statements, as well as to better understand, from BLD staff, the overall financial condition of the company. The hope was that with more information, some of the concerns revealed by, or unexplained in, the financial statements could be addressed or explained, such that CTX's concerns about the potential collapse of BLD could be alleviated.

BLD agreed, and a videoconference was arranged for the next morning, November 17, 2022. To facilitate discussion on that call, CTX sent BLD a number of spreadsheets Mr. Astudillo had created to reformat and correctly display the financial data BLD had shared. *See* Exhibit G.

The CEO and Controller of CTX both attended the November 17 videoconference, along with Chauncey Cole, Esq., CTX's counsel. The leadership of BLD also attended, along with their controller and counsel. *See* Motion [104] at 9, ¶ 31. The conference lasted almost three hours, and concluded around midnight in China. See DE [102] at 2, ¶ 6. Contrary to the assertions in BLD's motion, the meeting concluded because of the lateness of the hour in China, and not because CTX's concerns had been adequately addressed or resolved.

The subject of the 3-hour discussion was CTX's concerns about BLD's cash flow, debt, and ability to pay its obligations as they become due (i.e., solvency). The discussions primarily focused on cash flow and how BLD would be able to satisfy its short-term debt. Unfortunately, the meeting resulted in more questions than answers about how BLD could continue to pay its debts and obligations as they became due and avoid insolvency. Among other things, the meeting made it clear that BLD's short term debts and obligations exceed its current revenue and receivables. Further concerns were illuminated regarding the amount and ratio of BLD's short-term and long-term debts. In addition, BLD failed to adequately and credibly explain 29 "pledged" transactions for the period 2019 to 2022. Perhaps most alarming, during the call,

BLD disclosed for the first time that its new factory in Jiangxi, China was not accounted for in its financial statements at all because it is being operated by a separate legal entity under the direction and control of BLD's principal owner, Huang Xianjiang.

The lack of accounting for the development and operation of the Jiangxi factory added significantly to CTX's concerns about the current and future financial stability of BLD. The operation of the new factory outside the BLD umbrella presents a very real practical risk that the BLD legal entity will become expendable once the new factory is up and running in March 2023. Once the new factory ramps up to full production, BLD could formally dissolve, with no obvious impact on the operation of the new factory, or the company that controls it. Even worse, there are no obvious practical barriers to BLD funneling its limited resources to the new operation, and leaving CTX and other creditors holding the bag when it formally dissolves. Such an outcome would result in a total loss of CTX's contemplated up-front cash investment in BLD, and the loss of the long-term benefits of the RMA that CTX had bargained for.

Accordingly, on November 17, 2022, CTX timely exercised its contractual right to terminate the parties' settlement agreement by providing a written termination notice to BLD. *See* Exhibit I (Nov. 17, 2022 email from C. Cole, attaching Notice of Termination).

Nonetheless, following formal termination of the settlement agreement, CTX wished to convey to BLD that CTX remained interested in attempting to achieve an acceptable settlement, and was open to the possibility that BLD might be able to alleviate CTX's concerns about BLD's finances through additional disclosures, further due diligence, written certifications from BLD management, and the inclusion of the entity that owns the Jiangxi factory in the settlement agreement. CTX's counsel conveyed this message to BLD's counsel and proposed a joint motion to the Court asking for 30 days in which to ascertain whether the settlement could be resuscitated. *See* Exhibit J (Nov. 17, 2022, 7:31 p.m. email from C. Cole); *see also* Exhibit K (Nov. 21, 2022, 2:46 p.m. email from C. Cole).

That night, BLD's counsel conveyed that his client was willing to give CTX "3 business days" to continue discussions, despite CTX having sent the notice to terminate. *See* Exhibit L at 2 (Nov. 17, 2022, 11:01 p.m. email from JC Mazzola). Counsel collaborated in filing another joint motion for extension of time before midnight, which set forth their clients' respective positions. *See* DE [102] at 3. In particular, even though CTX had terminated and BLD asserted that the termination was a nullity, "the parties … agreed in principle to proceed on the same settlement terms, with a

modification to allow additional time for financial due diligence," and to "coordinate further Zoom meetings with the aim of answering CTX's questions and addressing its concerns regarding B[enlida]'s finances." *Id.* at 3, ¶ 6.

Since both sides indicated a willingness to continue the discussion, on Monday, November 21, CTX advised that it would have Mr. Astudillo prepare a list of key points BLD represented during the November 17 videoconference with the aim of having Benida "confirm the information" and "certify in writing" the facts CTX is relying on. *See* Exhibt K. CTX further communicated that its concerns about the financing and operation of the Jiangxi factory would need to be resolved through modifications to the proposed RMA. *Id.* CTX then furnished BLD with Mr. Astudillo's list of key points discussed during the videoconference. *See* Exhibit M (Nov. 22, 2022, 12:41 a.m. email from C. Cole). This memorandum memorialized and reiterated that the main focus of those discussions had been concerns about how BLD could satisfy its short-term debts, and manage its cash-flow problems.

At that point, BLD refused to discuss the issue further. Several days later, it filed the instant motion to enforce the settlement.

**E. The Alternative-Dispute-Resolution Mechanism in the Settlement Agreement**

In view of BLD's decision to file the present motion, the dispute-resolution provision in the parties' contract is also relevant. Section 10.4 of the RMA contains the parties' agreed dispute-resolution procedure, which requires a three-step process to be exhausted before litigating a dispute:

> (a) In the spirit of continued cooperation, the parties intend to and hereby establish the following dispute resolution procedure to be utilized in the event any controversy should arise out of or concerning the performance of this Agreement.
>
> (b) It is the intent of the parties that any dispute be resolved informally and promptly through **[1]** good faith negotiation between BLD and CTX. Either party may initiate negotiation proceedings by written notice to the other party setting forth the particulars of the dispute. The parties agree to meet in good faith to jointly define the scope and a method to remedy the dispute. **[2]** If these proceedings are not productive of a resolution, then senior management of BLD and CTX or CTX-HK are authorized to and will meet personally to confer in a bona fide attempt to resolve the matter.
>
> (c) Should any disputes remain existent between the parties after completion of the two-step resolution process set forth above, then the parties shall promptly **[3]** submit any dispute to mediation with an independent mediator. In the event

> mediation is not successful in resolving the dispute, the parties may commence legal action in accordance with Section 13.4 of this Agreement.

RMA, ¶ 10.4 (emphasis added).[4] After BLD filed the present motion, resorting to the Court instead of following this procedure, on December 1, 2022, CTX requested that BLD withdraw its motion and adhere to the alternative dispute-resolution procedure, based on the inconsistency of BLD's position that the contract remains in effect and without prejudice to CTX's position that it validly terminated the agreement. BLD refused that overture.

## ARGUMENT

There are two grounds on which the Court can and should deny BLD's motion to enforce the settlement.

*First*, BLD is simply wrong; its whole premise that CTX acted in bad faith when it exercised its discretionary right to void the agreement after seeing BLD's financials is based on abject conjecture. BLD was not privy to CTX's internal deliberations, so it is left to speculate that CTX must have had some ulterior motive other than a legitimate concern that BLD had failed to present sufficient evidence of its financial soundness for CTX to bind itself to a long-term deal that presented too much of a risk that CTX would not be able to recoup, through future manufacturing business with BLD, the millions of dollars it was agreeing to pay BLD largely up front.

*Second*, BLD's motion actually violates the dispute-resolution mechanism in the very Settlement Agreement it seeks to enforce. For that reason alone, the Court should deny the motion, at least without prejudice to reconsideration if necessary after BLD exhausts the alternative-dispute-resolution procedure it chose. Lest the Court think CTX lacks confidence in its defense to the merits of BLD's motion, we address that first even though it may be mooted by the second deficiency in the motion.

### I. BLD CANNOT CARRY ITS BURDEN OF PROVING THAT CTX ACTED IN BAD FAITH

First, we begin by noting that BLD admits, as it must, that CTX had the contractual right to terminate the parties' settlement agreement if "CTX determines **<u>in its sole discretion</u>** that BLD

[4] Benlida's counsel also consented to CTX reciting the text of Section 10.4 in this response.

faces an **unacceptable** risk of instability." Settlement Agreement, ¶ 3(a) (emphasis added). BLD also admits that CTX timely exercised this right by delivering written notice of termination on November 17, 2022. *See* Motion at 8, ¶ 29.

Thus, although not clearly articulated in the motion, BLD's only argument seems to be that CTX's exercise of its termination right should be disregarded because it was done in bad faith, in violation of the implied covenant of good faith and fair dealing. This argument is untenable.

**A. The Implied Covenant of Good Faith and Fair Dealing Presents a Low Bar that CTX Easily Surmounts**

As a matter of Florida law, the "implied covenant of good faith exists in virtually all contractual relationships." *Sepe v. City of Safety Harbor*, 761 So. 2d 1182, 1184 (Fla. 2d DCA 2000). This implied covenant dictates that parties cannot act in bad faith and that "one party cannot capriciously exercise discretion accorded it under a contract so as to thwart the contracting parties' reasonable expectations." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001) (citing *Sepe*, 761 So. 2d at 1185 (holding that, even where one party has "sole discretion" under a contract, that party, in exercising its discretion, must act in good-faith)); *see also Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097-98 (Fla. 1st DCA 1999) ("[W]here the terms of the contract afford a party substantial discretion ..., the duty to act in good faith ... limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.").

"However, under Florida law, ***the limit placed on a party's discretion 'is not great***.'" *Burger King Corp. v. Ashland Equities, Inc.*, 217 F. Supp. 2d 1266, 1278 (S.D. Fla. 2002) (*quoting Ernie Haire Ford*, 260 F.3d at 1291) (emphasis added), *aff'd*, 103 F. App'x 666 (11th Cir. 2004). "'Unless no reasonable party … would have made the same discretionary decision …, it seems unlikely that [the party's] decision would violate the covenant of good faith[.]'" *Ernie Haire Ford*, 260 F.3d at 1291 (quoting *Sepe*, 761 So. 2d at 1185).

The question before the Court, then, is not whether CTX made a wise decision, or even the right decision, to terminate the settlement agreement. *See Mt. Sinai Med. Ctr. of Greater Miami, Inc. v. Heidrick & Struggles, Inc.*, 329 F. Supp. 2d 1309, 1313 (S.D. Fla. 2004) (The moving party must "demonstrate a failure or refusal to discharge contractual responsibilities, prompted not by

an honest mistake, bad judgment or negligence; but rather by a conscious and deliberate act [of bad faith].") (quotations marks omitted), *aff'd*, 188 F. App'x 966 (11th Cir. 2006).

Rather, the operative question is whether BLD has carried its burden of proving that CTX acted in bad faith by making a discretionary decision that "no reasonable party" in CTX's position could possibly have made. *Ernie Haire Ford*, 260 F.3d at 1291. In other words, BLD must prove that CTX's decision to terminate was prompted not by an honest mistake, bad judgment or negligence, but rather by a conscious and deliberate act of bad faith, *Mt. Sinai*, 329 F. Supp. 2d at 1313, indicating that CTX acted arbitrarily and capriciously to thwart the contract, *Ernie Haire Ford*, 260 F.3d at 1291.

Under Florida law, bad faith generally requires "proof of 'an improper motive or dishonest purpose[.]'" *Great Am. Ins. Co. v. Brewer*, No. 6:16-CV-63-ORL-37KRS, 2017 WL 8314689, at *7 (M.D. Fla. Aug. 23, 2017) (*quoting Auto–Owners Ins. Co. v. SE Floating Docks, Inc.*, 571 F.3d 1143, 1146 (11th Cir. 2009)). Standing alone, evidence of "lack of diligence, negligence, and even gross negligence," is not evidence of bad faith. *Id.*; *Liberty Mut. Ins. Co. v. Aventura Eng'g & Constr. Corp.*, 534 F. Supp. 2d 1290, 1316 (S.D. Fla. 2008) (same). Further, under Florida law, mere frustration or disagreement with a course of action "'is not evidence of bad faith.'" *Brewer*, 2017 WL 8314689, at *8 (quoting *Fid. & Deposit Co. of Md. v. C.E. Hall Constr., Inc.*, 627 F. App'x 793, 796 (11th Cir. 2015)).

Importantly, the "'[e]xercise of a contractual right is not evidence of bad faith.'" *Int'l Fid. Ins. Co. v. Kerri A. Noyes Constr., Inc.*, No. 17-CV-80937, 2018 WL 11419655, at *13 (S.D. Fla. Apr. 17, 2018) (quoting *C.E. Hall Constr.*, 627 F. App'x at 796); *see Shuster v. S. Broward Hosp. Dist. Physicians' Pro. Liab. Ins. Tr.*, 570 So. 2d 1362, 1368 (Fla. 4th DCA 1990) (observing that "where a party to a contract is merely exercising its clear right under the contract, whether it acts in good faith or bad faith is irrelevant"), *approved*, 591 So. 2d 174 (Fla. 1992).

When viewed in light of these legal principles, it is clear that BLD's motion falls woefully short of meeting the heavy evidentiary burden required to sustain it. While the motion drones on for 18 pages with a rambling and frequently inaccurate recitation of the history of the parties' contract negotiations, almost none of that is even relevant to the question at hand: whether CTX exercised its sole discretion to terminate the agreement in good faith.

The only portions of the motion that are relevant to this question are found at paragraphs 32-36, in which counsel for BLD proceeds to mischaracterize statements made by Mr. Kukreja at

the end of the videoconference held on November 17, and statements made by undersigned counsel (Mr. Cole) during a phone call advising that CTX intended to exercise its contractual right to terminate. BLD's report of these conversations is not accurate. Being as generous as we reasonably can be to counsel for BLD, perhaps Mr. Mazzola misunderstood.

As a matter of common courtesy, Mr. Kukreja did express his thanks to his counterparts at BLD for attending the meeting and attempting to address the outstanding issues, but he certainly never stated or even implied that all of his concerns about BLD's financial condition had been "allayed" as BLD now claims. Motion at 9, ¶ 32. Further, Mr. Cole called Mr. Mazzola following the meeting as a courtesy, ***to let him know that CTX intended to exercise its right to terminate the contract***, but nevertheless remained interested in trying to explore the possibility of settlement. BLD's motion acknowledges this fact. Motion at 10, ¶ 35 ("I was advised that CTX might be required to 'terminate' the settlement agreement but in doing so, I was cautioned to explain to my clients, to the effect, that the decision to terminate should not be understood as an unwillingness to go forward."). Certainly, the fact that November 17 was the last day for CTX to exercise this termination right was also discussed, which is a perfectly valid and reasonable consideration under the circumstances. If CTX had not exercised its rights that day, it would have become permanently bound by the settlement agreement, despite its significant concerns about the risks of BLD's financial instability. Counsel's further assertions, comparing this situation to someone "feigning injury" because they are out of "time outs" are just his own half-baked analogy and do not reflect anything that was actually stated during that phone call.[5]

Based on nothing more than these tepid assertions, BLD then proceeds to speculate that CTX's choice to terminate the agreement ***must*** have been pretextual and in bad faith. According to BLD, CTX didn't ***really*** have concerns about BLD's financial condition, but chose to terminate the agreement anyway. Yet BLD never even offers any plausible or coherent explanation of why CTX would choose to terminate the agreement if it was actually satisfied that BLD was in sound financial condition. What possible motive would CTX have to do that after going to so much effort and expense to hammer out all the minutiae in the RMA and Settlement Agreement? We are left to wonder.

[5] Mr Cole is prepared to testify regarding these representations concerning the phone call between counsel, should it be necessary.

BLD states vaguely that this maneuver was "a pretext to buy more time." Motion at 11, ¶ 40. But to buy more time for what? BLD never bothers to explain. Assuming for purposes of argument only that CTX did subjectively believe that BLD was in good financial shape, why would CTX want to terminate the contract it had just spent months negotiating? How would voiding the agreement benefit CTX in any way? Why would CTX not want to close the deal with a healthy business partner on terms beneficial to CTX? BLD never offers any sensible explanation.

BLD also seemingly makes much of the fact that CTX's termination notice did not contain a detailed description of all the financial inadequacies and red flags identified by CTX during its review process, or expound on the reasons for its conclusion, in its sole discretion, that BLD faced an unacceptable risk of instability. However, nothing in the contract required CTX to do that, and even the implied covenant of good faith and fair dealing cannot be applied to rewrite the express terms of the contract. *Ernie Haire Ford*, 260 F.3d at 1290–91 (explaining that "a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties" and that "the implied covenant cannot override an express contractual term") (internal quotation marks omitted).

Yet, BLD baselessly seeks to infer some bad faith, ulterior motive from the fact that CTX did not voluntarily go above and beyond its contractual obligation and spell out its specific financial concerns to BLD. *See* Motion at 3, ¶ 7 (arguing that "CTX *identified no specific risks*. None.") (emphasis added); *id*. ¶ 8 (stating that "CTX had .. *failed to identify any specific basis* to believe … that Benlida faced a *specific* risk of … insolvency or financial collapse") (emphasis added); *id*. at 4, ¶ 11 (repeating that CTX "failed to *identify any specific risks* of short- to mid-term insolvency or financial collapse for Benlida …") (emphasis added); *id*. at 11, ¶ 41 (arguing that "pretext[]" could be inferred from the fact that "nowhere in the Notice of Termination does CTX *articulate any facts* to show Benlida 'faces an unacceptable risk of instability' …") (emphasis added); *id*. at 14, ¶ 48 (arguing about CTX's counsel's post-termination email, "nowhere does it *articulate those concerns*, nor does it *particularize the facts* on which CTX has a[] … basis to believe that Benlida is at … risk") (emphasis added); *id*. at 15, ¶ 52 (arguing that "there has been no good-faith termination of the settlement agreement, *inasmuch as there has been no particularized basis* to believe that Benlida faces a … risk") (emphasis added).[6]

[6] BLD also appears to assume that CTX could only base its decision about BLD's financial stability on the "financials" BLD sent. But that's not what Paragraph 3(a) says.

The contract simply did not require CTX to identify for BLD *what* its financial concerns were, just to communicate the fact that, in its sole discretion, it wanted to exercise the option to void the agreement. *See* Settlement Agreement, ¶ 3(a). CTX did precisely that in its notice of termination. *See* Exhibit I. That is all it needed to do under the contract.

Nothing in the Settlement Agreement required CTX to "identify," "articulate, or "particularize" any "facts" or "specific risks" or "basis" in order to exercise its option to terminate the agreement. The entire thrust of this argument, which appears to be the essence of BLD's motion, lacks any grounding in the language of the contract.

Moreover, even though CTX did not have to, **CTX did provide BLD with detailed information concerning specific points about BLD's financials that caused it concern**, in a good faith effort to try to work past the risks evident in BLD's financials. *See* Exhibits K, M. Rather than agree to put the representations it made during the videoconference in writing and confirm their truthfulness with signed certifications, BLD instead broke off all further communication and filed this motion to enforce the settlement. That maneuver itself speaks volumes.

The truth is that CTX terminated the agreement for one very simple reason. Its careful review of BLD's financial statements, coupled with the (remote) face-to-face discussion about those financial statements on November 17, caused CTX reasonably and appropriately to have substantial concerns about BLD's continued financial stability. Critical financial data was incomplete or missing from the financial statements, and important questions were not answered satisfactorily at the meeting. Major concerns emerged, and remain, regarding BLD's cash flow and cash position. There was a significant shortfall between BLD's short-term accounts payable and accounts receivable, indicating an inability to pay debts as they became due. Further, the meeting made it clear that BLD's short-term debts and obligations exceed its current revenue and receivables, and the amount and ratio of BLD's short-term and long-term debts were not acceptable. In addition, BLD failed to adequately and credibly explain 29 "pledged" transactions for the period 2019 to 2022, and BLD disclosed for the first time that its new factory, under development in Jiangxi, and scheduled to begin production in March 2023, ***was not accounted for in its financial statements at all***.

CTX's exercise of its option to terminate the agreement in light of these facts was nowhere close to an act of bad faith. To the contrary, it was perfectly reasonable, appropriate, and

understandable given the circumstances. BLD's self-serving innuendo, speculation, and conjecture cannot serve as a substitute for the required evidence of bad faith.

### B. The Implied Covenant of Good Faith and Fair Dealing May Not Even Apply to CTX's Binary Option to Terminate the Settlement Agreement

All of the above arguments assume that an implied obligation of good faith and fair dealing even inheres, as a matter of law, in the contractual provision in question. However, there is case law in Florida that strongly suggests that is not even the case here.

While it is true that "[t]he implied covenant of good faith exists in *virtually* all contractual relationships," *Sepe*, 761 So. 2d at 1184 (emphasis added) (Motion at 15), it does not apply in some contracts with provisions very much like Paragraph 3(a) of the Settlement Agreement. The court in *Sunshine Gasoline Distributors, Inc. v. Biscayne Enterprises, Inc.*, 139 So. 3d 978, 980 n.1 (Fla. 3d DCA 2014), explained why:

> We recognize that the term 'sole discretion' in some contracts can impose a duty of good faith and fair dealing despite the ostensibly absolute grant of authority in the contract language. *Sepe* [*supra*]. The duty of good faith, however, is imposed in these instances only to protect the reasonable expectations of the parties to the contract when a broad range of authority is reposed in one of those parties. Where, as here, a contract simply provides ***a binary choice***—to renew the lease or not—the duty of good faith and fair dealing is unnecessary to protect the parties' interests[.]

(emphasis added; other citations omitted). *See also Shuster*, 570 So. 2d at 1368 (observing that "where a party to a contract is merely exercising its clear right under the contract, whether it acts in good faith or bad faith is irrelevant").[7] Paragraph 3(a) gives CTX just such a "binary choice": to "determine[] in its sole discretion that BLD faces an unacceptable risk of instability" or does not. Settlement Agreement, ¶ 3(a).

Thus, the inquiry before the Court, as a matter of law, should only be whether or not CTX duly exercised its option under this provision, not the searching inquisition into alleged ulterior motive that BLD wants the Court to undertake. There is no dispute concerning the only

---

[7] To the extent there is any tension within Florida law on this "binary choice" exception, decisions of the Third District Court of Appeal supply the governing decisional law, since that is "the Florida appellate court that would have had jurisdiction over an appeal in this case had it been filed in state court." *Bravo v. United States*, 532 F.3d 1154, 1164 (11th Cir. 2008), *on reh'g*, 577 F.3d 1324 (11th Cir. 2009).

inquiry the Court need make to deny the motion: (1) that the contract placed the burden on BLD "to demonstrate proof of [its] financial stability," Settlement Agreement, ¶ 3(a); (2) that the same provision gave CTX the option to determine, with the benefit of that showing, whether the degree of risk of BLD's instability was "unacceptable" to CTX, *id.*; and (3) that CTX exercised its option to make that determination within the specified time period. CTX determined that BLD failed to meet its burden to demonstrate a degree of risk that was acceptable to CTX and so declared its intent to terminate in a timely fashion. *See* Exhibit I (notice of termination). The 5-business-day deadline following BLD's provision of its financial documents fell on November 17. CTX timely sent its notice of termination, at 4:31 p.m. on November 17. *See id*. BLD does not contend otherwise. Nor could BLD reasonably contest the standard established by the plain language of Paragraph 3(a). Accordingly, the motion should be denied on this basis, without need for an evidentiary hearing.

## II. ASSUMING *ARGUENDO* THAT THE CONTRACT REMAINS IN EFFECT, THE MOTION SHOULD BE DENIED AS PREMATURE BECAUSE BLD FAILED TO COMPLY WITH ITS ALTERNATIVE-DISPUTE-RESOLUTION PROCEDURES.

Under BLD's theory, CTX's termination of the contract was invalid and the agreement remains in effect. If that is so, then the alternative-dispute-resolution ("ADR") provision remains in effect. The present controversy over the effect of CTX's termination of the contract "arise[s] out of or concern[s] the performance of this Agreement." RMA, ¶ 10.4. The term "Agreement" in the RMA refers to the RMA (*id*. at 1), but the Settlement Agreement expressly incorporates the terms of the RMA. Settlement Agreement, ¶ 2. Therefore, a dispute over whether or not CTX validly terminated the Settlement Agreement is a controversy that "arise[s] out of" or "concern[s] the performance of" the RMA.

Upon BLD being notified of the inconsistency of its position that the contract remains binding yet it need not adhere to the ADR procedure in the contract, BLD asserted that the ADR provision was inapplicable because the word "Agreement" in Paragraph 10.4 of the RMA referred only to the RMA, not the Settlement Agreement, and the controversy concerns compliance with a provision that's located in the Settlement Agreement. This is splitting hairs and plainly inconsistent with the intent of the parties. The Settlement Agreement expressly incorporates the RMA and its terms. Settlement Agreement, ¶ 2. The only ADR provision is

located in the RMA; the Settlement Agreement itself contains none. It would make no sense to incorporate the ADR provision by reference and then construe it narrowly only to apply to disputes that somehow relate only to provisions housed within the RMA as opposed to those in the Settlement Agreement. The two contracts were plainly designed to be integrated with one another. The RMA is an exhibit to the Settlement Agreement, and the latter expressly adopts and incorporates the provisions of the former. Reading the word "Agreement" in Paragraph 10.4 to relate only to the RMA would ignore this context. "[C]ontracts are to be reviewed as a whole, viewing all words in context"; "the pertinent provisions should be read *in pari materia*." *Express Damage Restoration, LLC v. Citizens Prop. Ins. Corp.*, 320 So. 3d 305, 308–09 (Fla. 3d DCA 2021).

And even if BLD's acontextual reading of "Agreement" were appropriate, the present dispute over CTX's exercise of its right under Paragraph 3(a) of the Settlement Agreement to void the contract *does* "arise[] out of" or "concern[] the performance of" the RMA. It arises out of the RMA in the sense that CTX's assessment of the risk that BLD will not remain financially solvent in the short to medium term was not made in a vacuum, but with an eye toward BLD's ability to operate as a reliable partner able to deliver on its end of the bargain, the detailed terms of which are set forth in the RMA, which were the subject of protracted negotiation. *See, e.g.*, RMA, ¶ 2 (pricing & Schedule B ((pricing matrix)), ¶ 3 (delivery terms & Schedule C (lead-time schedule)). In that sense as well, the present controversy "concerns" BLD's ability to perform its obligations under the RMA.[8]

Thus, the Court could assume without deciding for purposes of resolving this motion that if BLD is correct that the contract remains in effect, BLD must resort to the ADR procedure it agreed to before turning to the Court. That approach may bear fruit, given that both parties, even after CTX voided the contract, expressed a willingness to continue talking through CTX's remaining concerns and questions about BLD's finances. The disagreement appeared to have been over how much time to give such talks.

---

[8] To anticipate an argument, the fact that BLD has merely filed a motion to enforce the settlement rather than file a new lawsuit is merely a product of the posture in which the parties' new contract was born (through settlement negotiations in the context of litigation arising under an older, different Manufacturing Agreement). The new ADR procedure would still apply.

**CONCLUSION**

For the foregoing reasons, the Court should deny the motion to enforce the settlement, either without prejudice to being revisited after the parties exhaust the ADR procedure set forth in the contract, or on its merits, whether before or after an evidentiary hearing.

Dated: December 19, 2022

Respectfully submitted

**PODHURST ORSECK, P.A.**
*Co-Counsel for Circuitronix, LLC*
One S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
Tel.: 305-358-2800

*By: /s/ Stephen F. Rosenthal*
Stephen F. Rosenthal
Florida Bar No. 0131458
srosenthal@podhurst.com
Robert C. Josefsberg
Florida Bar No. 040856
rjosefsberg@podhurst.com
Matthew Weinshall
Florida Bar No. 84783
mweishall@podhurst.com
Christina H. Martinez
Florida Bar No. 1029432
cmartinez@podhurst.com

**CHAUNCEY COLE, PA**
*Co-Counsel for Circuitronix, LLC*
9100 South Dadeland Blvd., Suite 1553
Miami, Florida 33156
Tel.: (786) 497-7053

By: */s/ Chauncey D. Cole IV*
Chauncey D. Cole, IV, Esq.
Florida Bar No. 102184
chauncey.cole@coletrial.com




**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing has been served via transmission of Notices of Electronic Filing generated by CM/ECF on December 19, 2022 as filed with the Clerk of the Court using CM/ECF.

By: */s/ Stephen F. Rosenthal*
Stephen F. Rosenthal