# United States District Court
# Southern District of Florida

### Case No. 21-60125-CIV-Scola/Goodman

---------------------------------------------------
JIANGMEN BENLIDA PRINTED
CIRCUIT CO., LTD.,

                Plaintiff,

v.

CIRCUITRONIX, LLC,

                Defendant.
---------------------------------------------------

## Benlida's Reply to Circuitronix's Opposition to the Motion to Enforce the Settlement Agreement

**MAZZOLA LINDSTROM LLP**
*Attorneys for Plaintiff Benlida*
Jean-Claude Mazzola
1350 Avenue of the Americas, 2nd Floor
New York, NY 10019
646.250.6666
jeanclaude@mazzolalindstrom.com

December 27, 2022

Plaintiff Benlida, by the law firm of Mazzola Lindstrom LLP, hereby submits its reply on its motion to enforce the settlement agreement executed by the parties hereto, to deem the case terminated, and to award attorneys' fees and costs in accordance with the settlement agreement. The facts set forth herein are stated under penalty of perjury, pursuant to 28 U.S.C. § 1746.

1.   In the moving papers, I set forth (also under penalty of perjury) a timeline demonstrating that, in sum, at every turn defendant CTX has sought to renegotiate the deal; that is, on several occasions, Benlida had already accepted CTX's terms, and said, in sum, "we have a deal," only to have CTX come back with (in sum), "wait up – would you agree to some further conditions, like making it a ten-year contract instead of a five-year contract." In opposition to this motion, CTX submits utterly unsworn assertions, which – being unsworn – should be disregarded, and this motion should be granted, as it is well established that unsworn assertions lack probative value. See *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003); see also *Gaither v Secretary, Dept. of Corr.*, 2015 US Dist LEXIS 89228, at *4, n 4 [MD Fla July 9, 2015, No. 8:12-CV-889-T-27TGW]) ("All of the facts and legal analysis on which the Defendant relies to support his motion, however, are contained in an unsworn memorandum attached to the Defendant's post conviction motion. Because the memorandum is not adequately sworn to, the Court will not entertain the merits of the allegations raised in the memorandum.")

2.   While CTX has submitted a sworn declaration of attorney Chauncey Cole annexing emails and other documents, Mr. Cole merely attests to the authenticity of such documents, which no one would dispute. But the "facts" set forth in the unsworn CTX memorandum in opposition to this motion – purporting to explain why CTX's counsel said that CTX just needed more time to review the financials, and why CTX served its notice of termination of the settlement agreement to buy it more time – are not derived from any sworn statements. There is no declaration from CTX, either from its

principal Rishi Kukreji or its "Corporate Controller" Celin Astudillo, attesting that there is a basis to believe that Benlida faces a short- or medium-term risk of financial instability or collapse (which was the *sine qua non* for terminating the settlement agreement). Nor is there a declaration from attorneys Cole or Rosenthal denying that they told Benlida attorney Jean-Claude Mazzola that CTX just wants more time to make a decision whether to proceed with the settlement.

3. In fact, all that is offered that might be considered evidentiary is a declaration of Benlida principal Huang Hanchao, which was submitted in opposition to CTX's unrelated, 18-months-old motion to dismiss. In his declaration, Huang Hanchao stated in paragraph 2, "none of the invoices identified are ROK invoices. Rather, Benlida issued all of the invoices. All of the moneys owed by CTX are owed to Benlida, not ROK. In fact, ROK ceased manufacturing and selling goods to CTX by mid 2018." (See DE 29-3). Citing to this single paragraph in Mr. Huang's declaration as "evidence," CTX states in its opposition to this motion to enforce the settlement: (Def. Mem at pp.1 & 4)

> CTX's concerns were well founded. BLD has a long history of running short on cash, often relying on CTX to borrow additional cash to keep the BLD operation afloat. BLD, and its related companies, are no strangers to insolvency and financial collapse. According to testimony from BLD's principal, Huang Hanchao, submitted under oath in this case, BLD's affiliate corporation, ROK Printed Circuit Co., Ltd. ("ROK"), went out of business and ceased operations in 2018. DE [29-3] at 2. In large part, BLD's desperate financial condition, and need for more cash from CTX, is what caused this meritless lawsuit in the first place.
> ***
> CTX and BLD have had a long history of dealing before the present lawsuit. They entered their first manufacturing agreement back in 2005, whereby CTX agreed to utilize BLD's factory to manufacture printed circuit boards for CTX's customers. During the course of the parties' relationship, CTX became well aware of BLD's history of cash-flow problems. Over the years, BLD's principals on multiple occasions had turned to CTX for special cash infusions, and CTX agreed to send BLD money to ensure that the factory would remain up and running to maintain quality standards and capacity sufficient to meet BLD's obligations to CTX's customers. BLD's former affiliate company, ROK, ran out of cash and ceased operations in 2018. DE [29-3] at 2 (testimony of Huang Hanchao). [¶] It is against that backdrop that the current efforts to settle the accounting dispute that arose between the parties—which is the subject of this lawsuit—must be understood.

4. CTX uses this one brick – the phony (and indeed, easily proven false) proposition that Mr. Huang admitted in his his declaration that Benlida affiliate ROK ran out of cash – to build a

2

cathedral of claptrap. There is simply no evidence that ROK, or any other Benlida-affiliated entity, has ever shut down due to insolvency. (See declaration of Huang "Tracy" Sulan, exhibit "1," to be filed under seal). CTX was also aware of Mr. Huang's testimony when it entered into the settlement agreement, and its reliance upon that stale testimony itself proves its bad faith in terminating the agreement. Moreover, CTX's idea that "BLD's desperate financial condition, and need for more cash from CTX, is what caused this meritless lawsuit in the first place" is belied by what CTX states in its next breath, wherein it acknowledges that this case arises, in essence, from an "accounting dispute … between the parties." The accounting dispute is, as Benlida alleged, that CTX owes Benlida about $13 million due to unpaid invoices. CTX agreed to settle that dispute pursuant to a confidential settlement agreement, which it now seeks to renegotiate, as it has done again and again and again.[1]

5. Even if the court were to disregard the fatal defects in CTX's papers – *viz.*, its reliance upon unsworn "facts" and a demonstrably false premise that Mr. Huang admitted that Benlida's affiliate ROK was shut down due to insolvency – the unsworn opposition papers prove Benlida's case: CTX has terminated the settlement agreement in bad faith.

6. Under the settlement agreement, CTX could terminate the agreement if the financial disclosures demonstrated a short- to medium-term risk of insolvency or financial collapse. Rather than demonstrate *any* basis to believe that there is such a risk, CTX argues that:

(a) It was "concerned" that Benlida might pull the rug out from under CTX after the settlement, by shutting down and transferring all of its operations over to a "newco."
(b) Benlida should have provided the financial information prior to the execution of the settlement agreement, rather than the agreed-upon five days, because, as it turned out, five days was not enough for CTX.   It needed another thirty days to conduct its due

---

[1] Throughout the opposition memorandum, CTX refers to the settlement payments as "investments" in Benlida's future business, and argues that Benlida in the past had repeatedly requested funding from CTX in order to pay its suppliers. We trust that the court will understand that paying what one owes is not an "investment." Benlida and CTX are not partners; rather, Benlida is a supplier of goods, and CTX is purchaser.

3

diligence, yet Benlida would only agree to an additional three beyond the originally bargained-for five days.

(c) Benlida's counsel ultimately agreed to CTX's "sole discretion" language in the termination clause, backing off Benlida's request that the clause use the term "reasonable" discretion.

(d) The enforceability of the settlement agreement must be arbitrated.

7. Notwithstanding the lack of any sworn-to facts to support these arguments, we will address each of these arguments in turn.

### A. CTX's concern that Benlida might shut down and transfer its business entirely to a new factory is both unfounded and irrelevant to the issue whether Benlida poses a risk of short- to medium-term risk of insolvency or collapse.

8. Commerce would come to a close if good faith and fair dealing were not elemental to every commercial agreement, and there is manifestly an implicit obligation on the part of Benlida not to shut down its business. This has nothing to do with the risk of insolvency. As E.A. Farnsworth wrote in his seminal article, "Good Faith Performance and Commercial Reasonableness Under The Uniform Commercial Code," Chicago Law Review, Vol. 30:666 at 670 & 671 n.31 (1963): (emphasis added)

> Concern with "good faith" in relations among commercial men found its way into the English law merchant-both in connection with purchase and performance. In Holdsworth's view it was the canon law that "put into legal form the religious and moral ideas which, at this period, colored the economic thought of all the nations of Europe," and thus "contributed to enforce those high standards of good faith and fair dealing which are the very life of the trade." But by the eighteenth century, when the law merchant had been absorbed into the common law, the attention of the King's courts began to be concentrated upon the development of a body of doctrine to encourage the free circulation of goods and commercial paper.
>
> ***
>
> /n.31/ In an illustrative New York case, a producer of cattle food agreed to install, at considerable expense, a machine for drying and salvaging wet grains that were the by-product of a brewery. In exchange it received the brewery's promise to sell it the used grain that it produced and salvaged for a period of five years or until half a million barrels had been brewed, after which the brewery was to become the owner of the machine. The brewery sold out its business before either of these events occurred. The New York Court of Appeals held it liable to the producer of cattle food for damages. ***A promise to remain in business for five years or until half a million barrels had been brewed was implied.*** "Every contract," said the court, "implies good faith and fair dealing between the parties to it." *Wigand v. BachmannBechtel Brewing Co.*, 222 N.Y. 272, 277, 118 N.E. 618, 619 (1918). See also *Universal Sales Corp. v. California Press Mfg. Co.*, 20 Cal. 2d 751, 128 P.2d 665 (1942).

9.      CTX has presented no factual basis for its concern that Benlida might shut down its business after CTX pays the first installment of the moneys that it has agreed to pay to settle this lawsuit, and such concern has no bearing whatsoever upon the financial wherewithal of Benlida. Moreover, the Benlida group of companies, headed by Mr. Huang, are manifestly doing well enough that they are building an entirely new production line, which belies the idea that it is at risk of short- to medium-term financial collapse. Indeed, as noted in the moving papers, one of CTX's requests – made on November 3, 2022 after Benlida had already executed the settlement agreement and RMA on November 1st – was that the RMA be for a ten-year term, rather than a five-year term. Benlida agreed to the request, and re-executed both sets of documents – *viz.*, the settlement agreement and the RMA – and turned over the execution pages to CTX's counsel.

10.     Benlida submits that CTX's concern that Benlida will shut down and shift its business to another entity is entirely divorced from the bedrock principle (derived from the law merchant) of good faith and fair dealing, and that CTX's overall "concerns" are predicated upon a subjective suspicion that Benlida is trying to cheat CTX at every turn. In sum, CTX is acting in bad faith because it has presupposed that Benlida is acting in bad faith. Moreover, CTX's suspicions are belied by the fact that, notwithstanding that CTX has purported to terminate the settlement, and notwithstanding its concerns that Benlida will shut down operations entirely, CTX has continued to place orders. Since the agreements were executed on November 7, CTX has paid $352,635.25 for circuit boards ordered from Benlida, and prior to shipping the circuit boards currently on order, the $337,309.12 total (which is now mostly pre-paid) will be totally pre-paid. (See exhibit "1, " Decl. of Tracy Huang).

**B.   CTX agreed to the 5-day review period, and shouldn't be heard to complain that Benlida should have given it the financial information prior to execution, or given an additional 30 days for it to complete its review after it served the termination notice.**

11.     Throughout its unsworn memorandum, CTX argues "a deal is a deal," and yet argues that Benlida could have allayed CTX's concerns earlier by giving it the financial statements before

5

execution of the settlement agreement, or given CTX an additional thirty days to conduct its due diligence after CTX had served its purported notice of termination. In response to CTX's argument, we need only note that, though CTX believes it should have requested more time to review the financials, "[i]t is well settled that courts may not rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto in order to relieve one of the parties from the apparent hardship of an improvident bargain." *Beach Resort Hotel Corp. v. Wieder*, 79 So.2d 659, 663 (Fla.1955). That CTX is arguing that it needed more than five days to conduct its due diligence is quite telling indeed, as it demonstrates that its purported decision to terminate was not thought through, but was instead – as CTX's own attorneys admitted – an effort to buy time.

12. While CTX argues that there could be no reasonable motive for its desire to delay and to buy time, Benlida will not be able to probe the motives of the CTX witnesses until they take the stand. At this juncture, all that can be shown is CTX's history of renegotiating and renegotiating the deal at every turn; whether that is due to, *e.g.*, a cash-flow problem on CTX's side remains to be seen.

13. Throughout the opposition memorandum, CTX's counsel argues that the financials and the three-hour Zoom conference presented CTX with more questions than answers about Benlida's finances. But if there were a basis to terminate the settlement agreement because of a good-faith belief that Benlida was at short- to medium-term risk of financial insolvency or collapse, there would be no need to continue asking questions. That they issued the termination notice, whilst desiring to continue asking questions and continue the negotiations, demonstrates that CTX lacked a good-faith basis to issue the termination notice in the first place.

    **C. Benlida acceded to CTX's requirement that it have "sole discretion" because it assumed, as one must, good faith on the part of CTX, and the law imposed a requirement of good faith upon CTX in any event.**

14. It is also quite telling that CTX hangs its hat on the notion that it had the right to terminate the agreement for any reason in its sole discretion, and that Benlida backed off the

requirement that its exercise of such discretion be "reasonable." However, when CTX indicated that it would not agree to the modification to make its exercise dependent upon reasonableness, we did our research and determined that under Florida law, when a party to a contract has "sole discretion" to perform or not perform, such must be in accordance with good faith, as *Sepe* holds. See *Sepe v City of Safety Harbor*, 761 So 2d 1182, 1184 (Fla Dist Ct App 2000). At the evidentiary hearing, it will be demonstrated that CTX failed to exercise good faith, and thus the settlement must be enforced.

15. Moreover, these negotiations were conducted under the guise of court-mandated mediation, which must be conducted in good faith. Indeed, the court order of May 26, 2021 that directed the parties to mediate (DE 22) provided: "¶5. Pursuant to Local Rule 16.2(e), the appearance of counsel and each party or representatives of each party with full authority to enter into a full and complete compromise and settlement is mandatory…. ¶8. The Court may impose sanctions against parties and/or counsel who do not comply with the attendance or settlement authority requirements in this Order, or who otherwise violate the terms of this Order…." The court issued an order on January 19, 2022 scheduling mediation for June 1, 2022. (DE 49). The mediation took place, as scheduled, and on June 2, 2022, the report of mediator Joseph P. Farina was duly docketed (DE 80), stating: "The mediator reports that the parties entered into a settlement agreement, and their attorneys are preparing the final settlement documents. /s/ Joseph P. Farina, JAMS Mediator/Neutral."

16. One would expect that CTX would not have the temerity to argue to this court that it could treat the mediation process as an asymmetric exercise, such that – while Benlida must act reasonably – CTX could ultimately decide to walk away from the settlement even if its decision were "an honest mistake, bad judgment or negligence." But that is exactly what CTX does argue, that its decision to terminate could result from an utter misunderstanding of the financials, or from rank negligence, and that, if so, then its decision must be respected by the court. (See Def. Mem. pp. 12-13).

Benlida submits that not only does CTX owe it a duty of good faith, such that its decision to terminate in its "sole discretion" must be reasonable, but it also owes this duty to the court.

### D. The arbitration clause is contained in the RMA, not the settlement agreement. Benlida has moved to enforce the settlement agreement, not the RMA and CTX purported to terminate the settlement agreement, not the RMA.

17. CTX's argument that Benlida should follow the dispute resolution provisions of the RMA is belied by both the termination notice itself and by CTX's own behavior. CTX's "Notice of Termination *of Settlement Agreement*" (emphasis added)[2] – as the notice of termination was self-styled by CTX – says plainly that it was being provided "in accordance with Section 3a of the Settlement Agreement and General Release," which section of the settlement agreement is then block-quoted.

18. Indeed, the entirety of the five-sentence notice (exclusive of the recitation of Section 3a of the Settlement Agreement) states that: (1) counsel for CTX writes on its behalf; (2) to provide notice of termination "in accordance with Section 3a of the Settlement Agreement"; (3) which section 3a required Benlida to demonstrate "a lack of short to medium term risk of insolvency or financial collapse" as an essential and necessary term of "this Agreement" (*i.e.*, the settlement agreement); (4) that "CTX has carefully reviewed the BLD financial statements and determined that BLD faces an unacceptable risk of instability, and has failed to demonstrate that BLD does not face a short to medium term risk of insolvency or financial collapse;" and (5) that CTX thus "hereby elects to immediately void and terminate the Agreement." But nowhere does the CTX termination notice mention the RMA, Benlida's performance under the RMA, Sections 10.2 or 10.4 of the RMA or *any* kind of ADR process that CTX now faults Benlida for not engaging in. Separate from Section 3a of the settlement agreement, the RMA contains a Section 10.2 concerning the termination thereof. Section 10.4 of the RMA then states that, "(e)ither party may initiate negotiation proceedings by written notice to the other

---

[2] The November 17 notice of termination is submitted as exhibit I to CTX's opposition papers.

party setting forth the particulars of the dispute."[3] If CTX believed that Section 10.4 of the RMA (regarding ADR) was applicable to its termination, then CTX would not have sent a "Termination Notice of Settlement Agreement…in accordance with Section 3a of the Settlement Agreement," but rather a letter notifying Benlida of the particulars regarding Benlida's alleged failure to demonstrate a lack of short- to medium-term risk of insolvency of financial collapse – the very absence of particulars being one of the reasons that Benlida was forced to bring CTX's pretextual termination to the court!

19. CTX's "Notice of Termination *of Settlement Agreement*" also does not "arise out of" or "concern" performance under the RMA, as performance thereunder had not begun when CTX pretextually terminated the settlement. Indeed, CTX argues that the present dispute "arises out of the RMA in the sense that CTX's assessment of the risk that BLD will not remain financially solvent in the short to medium term, but with an eye toward BLD's ability to operate as a reliable partner able to deliver on its end of the bargain, the detailed terms of which are set forth in the RMA, which were the subject of protracted negotiation." (Def. Mem. at p.19). The court should take CTX at its word – that performance under the RMA were, at most, a twinkle in its eye when it issued the termination notice, but performance under the RMA had not yet begun, and the ADR procedures thus were not triggered.

20. The real purpose of CTX raising such a specious argument is one and the same with CTX's true objective throughout the settlement process – delay, delay, delay: (see Def. Mem. at p.19)

> Thus, the Court could assume without deciding for purposes of resolving this motion that if BLD is correct the contract remains in effect, BLD must resort to the ADR procedure it agreed to before turning to the Court. *That approach may bear fruit, given that both parties, even after CTX voided the contract, expressed a willingness to continue talking through CTX's remaining concerns and questions about BLD's finances.* (Emphasis added).

21. While CTX states that further and future discussions may bear fruit, if it had truly desired to walk away from the settlement agreement, it would have no interest in continuing the

---

[3] The RMA is submitted as exhibit B, under seal, with CTX's opposition papers.

9

negotiations, and trying the patience of the court and the Benlida over and over, not just taking repeated bites of the apple, but continuing to nibble down the core.

22.     CTX claims that Benlida is "splitting hairs" in stating that the term "this Agreement" in Section 10.4b of the RMA refers to the RMA, and not to both the settlement agreement and RMA simultaneously. However, the settlement agreement and the RMA each begin by self-defining as "this Agreement" without any reference to the other. (See exhibits A and B to CTX's opposition papers). And while Benlida agrees with CTX that the RMA is an exhibit to the settlement agreement and is expressly incorporated therein, there can be no dispute that where both the settlement agreement and the RMA contain inconsistent sections (sections 3a and 10.2, 10.4 respectively) concerning the grounds and mechanisms for terminating each respectively, and CTX sends a notice terminating the "Settlement Agreement" pursuant to Section 3a thereof, Benlida cannot be expected to adhere to the alternate dispute resolution mechanisms laid out in Section 10.4 of the RMA and concerning a termination under Section 10.2 of the RMA.

## Conclusion

Accordingly, plaintiff Jiangmen Benlida Printed Circuit Co., Ltd. respectfully requests that the court issue an order: (1) enforceing the settlement agreement with its incorporated RMA; (2) declaring CTX's termination notice of November 17 a nullity; (3) awarding Belinda attorney's fees and costs, pursuant the settlement agreement; (4) terminating and closing the action; and (5) awarding such further relief as is just and proper.

Dated: December 27, 2022

Respectfully submitted,
**MAZZOLA LINDSTROM LLP**
*Attorneys for Plaintiff Benlida*
By: */s/ Jean-Claude Mazzola*
Jean-Claude Mazzola
1350 Avenue of the Americas, 2nd Floor
New York, NY 10019
646.250.6666
jeanclaude@mazzolalindstrom.com

**Certificate of Service**

I HEREBY CERTIFY that a true copy of the foregoing has been served via electronic mail on a registered CM/ECF user on December 27, 2022.

By: /s/ *Jean-Claude Mazzola*
Jean-Claude Mazzola

**Exhibit 1**
**Declaration of Tracy Huang**
**[confidential and to be filed under seal]**