# United States District Court
# Southern District of Florida

Case No. 21-60125-CIV-Scola/Goodman

JIANGMEN BENLIDA PRINTED
CIRCUIT CO., LTD.,

       Plaintiff,

v.

CIRCUITRONIX, LLC,

       Defendant.

## Declaration of Huang Sulan

I, Huang Sulan, state under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the director of sales of Jiangmen Benlida Printed Circuit Co., Ltd., and am familiar with the facts stated herein. In English, I am referred to as "Tracy Huang."

2. I submit this declaration in opposition to the motion for summary judgment submitted by defendant Circuitronix, LLC ("CTX-US").

3. Annexed hereto as exhibit "A" are collected emails, wherein defendant CTX-US and its affiliate Circuitronix (Hong Kong), Ltd. ("CTX-HK"), acting as agent for CTX-US, request that certain customers be added to the CTX-US "Exclusive Customer List."

4. Indeed, for the most part, the emails requesting that particular customers be added to the list bore the name of the customer in the subject line, along with the words "Exclusive Customer List." (See, *id.*) They never requested that the customer be designated as a customer of CTX-HK. There has never been a CTX-HK list, as CTX-HK is not actually a party to the 2012

1

contract between Benlida and CTX-US, a copy of which is annexed to the defendant's moving papers, at DE 177-1.

5. Notably, in the sample emails attached hereto, CTX-HK (by its manager Akshay Koul) requested that North American companies be added to the CTX-US exclusive customer list, notwithstanding that he testified that CTX-HK did not deal with North American customers. (See Exhibit "A").

6. Accordingly, it has always been understood by Benlida that orders placed by CTX-HK were placed for CTX-US customers, in accordance with CTX-US's "Exclusive Customer List," as such list was "exclusive" to CTX-US, not CTX-HK (unless CTX-HK and CTX-US are one and the same).

7. From time to time, CTX-US and CTX-HK would update Benlida as to the code numbers of their customers on the list, which numbers were placed on their purchase orders. Although there are more customers on the Exclusive Customer List than there are code designations, this is generally because CTX-US and CTX-HK haven't actually placed orders for these uncoded customers. CTX-US's customer codes are as follows:

| Customer on CTX-US Exclusive Customer List | CTX-US Customer Code |
|---|---|
| Tomar | X1 |
| Sitronics | X4 |
| Ametek | X5 |
| Bourns | X7 |
| Cooper Electronics: All Global Locations besides MTL in Europe. | X8 |
| EBW | X9 |
| Epictech | X10 |
| Heliox | X11 |
| KSR | X12 |
| Magna | X14 |
| Touch Sensor | X15 |
| Napco | X16 |

| | |
|---|---|
| Theben | X17 |
| Leesys | X18 |
| Leoni | X19 |
| Arcelik | X20 |
| Arcelik | X20 |
| Alps | X21 |
| Ayrshire | X22 |
| Wellex | X23 |
| Jabil (except China, North America & Europe location - 2015/11/16) | X24 |
| Yazaki | X26 |
| Yazaki | X26 |
| Methode | X27 |
| UTEC | X29 |
| Automated Logic | X30 |
| Trane | X31 |
| Syncro | X32 |
| Helbakao: All Global Locations. | X33 |
| Airborn | X35 |
| BBM | X36 |
| KABA | X37 |
| MLS | X38 |
| Star Micro Electronics | X39 |
| Invensys | X41 |
| Gecko | X43 |
| PNY | X45 |
| Xolutronics | X46 |
| Emerson: All Global Locations beside China and as agreed as per e-mail between the Parties | X47 |
| Viscount | X48 |
| Marquardt | X51 |
| Novita | X52 |
| Firstronic | X53 |
| Calcomp | X55 |
| Lear | X57 |
| Lear Cebu | X57 |
| Curtis | X61 |
| UTC | X63 |
| Peavey | X64 |
| Tyco | X65 |
| APAG | X66 |
| Creation Technology | X68 |

| | |
|---|---|
| Kimball Electronics: All Global Locations | X70 |
| Lutron | X72 |
| Phelon | X73 |
| Flextronics (Mexico, Canada & Singapore) | X74 |
| Maxway Tech | X80 |
| Robertshaw[1] | X41 |
| Generac | X81 |
| Osram Industries: All Global Locations | X82 |
| Enertrak Instrument | X83 |
| Indigrid | X84 |
| EMZ | X85 |
| Nvision | X86 |
| Deltec | X87 |
| MTA | X88 |
| WILO: All locations and subcontractors (will be specified) | X89 |
| Genie Company | X90 |
| TSE | X91 |
| SVI | X92 |
| Progressive Dynamics | X93 |
| Yanfeng | X94 |
| WAHL | X95 |
| Add Group | X97 |
| TE Connectivity Brasil Indústria DE | X98 |
| WalBro | X99 |
| Viessmann | X100 |
| SMR Automotive | X101 |
| SICK | X102 |
| Keba | X104 |
| Tecnimaster | X105 |
| Zes Zollner | X106 |
| Thomas magnate | X107 |
| Katek | X108 |
| Sunair | X109 |
| Acuity | X110 |

---

[1] Invensys, above, also has the Exclusive Customer code X41. Robertshaw and Invensys are the same company. See link.

8. The customers on the above list are based worldwide. Many are based in North America, many based in Europe and Asia, and some in South America. There was never a division as to whether certain of the exclusive customers would actually be customers of CTX-HK.

9. When CTX-US and CTX-HK would place orders, they would normally include in the purchase orders an "X" number, identifying the customer on the "Exclusive Customer List" for whom the goods were being purchased. Exemplar copies of these purchase orders, with the "x" numbers highlighted, are attached hereto as exhibit "B."

10. Demonstrating that CTX-HK and CTX-US serviced the same "exclusive" customers, exhibit "C" hereto shows that they each designate the same customers, by "X" code, on their respective purchase orders.

11. Each actual and not just potential customer on the list had its own code. The absence of a CTX-US customer code on a CTX-HK purchase order did not necessarily indicate that the goods were being purchased for customers who were not on the exclusive list; the code instructed Benlida how to package the goods purchased, and if there was no code then generic packaging could be used, rather than packaging specific to a particular customer's needs. If no code was put in with the purchase order, then Benlida still understood that the goods ordered by CTX-HK were ordered for customers on the Exclusive Customer List, who – again – were exclusive to CTX-US, in accordance with the Manufacturing Agreement, to which CTX-US was a party, and CTX-HK was not.

12. Further demonstrating Benlida's understanding that orders placed by CTX-HK were placed for CTX-US customers is the fact that Benlida would identify the CTX-US customer code on the invoices that it created. (See exemplars, attached hereto as exhibit "D").

13. As CTX-HK did not have its own customers, and as CTX-US's customer list was indeed an "Exclusive Customer List," and exclusive to CTX-US, when orders were placed by CTX-HK, it was always understood by Benlida generally, and me specifically, that CTX-HK was placing the orders either as an agent for CTX-US or as a division of CTX-US.

14. On myriad occasions, CTX-US made clear that it would not countenance sales of products by Benlida to customers on the exclusive customer list, other than through CTX-US, thus manifesting to Benlida in general, and to me specifically, that it understood that purchase orders issued by CTX-HK were indeed made on behalf of CTX-US.

15. It was always understood by Benlida generally, and by me specifically, that orders placed by CTX-HK were placed for CTX-US, as they were placed for customers on the CTX-US Exclusive Customer List.

16. The attached exhibit "E" provides examples of CTX-HK invoices from Benlida paid by CTX-US from before execution of the Business Authorizations in 2014, demonstrating that Benlida generally, and I specifically, properly understood that CTX-US was responsible for the purchase orders placed by CTX-HK.

17. The attached exhibit "F" provides exemplars of post-Business Authorization CTX-HK invoices from Benlida that CTX-US declared itself responsible for, further demonstrating that Benlida generally, and I specifically, properly understood that CTX-US remained responsible for the purchase orders placed by CTX-HK.

18. The attached exhibit "G" provides exemplars of CTX-HK invoices from ROK that CTX-US declared itself responsible for, further demonstrating that Benlida generally, and I specifically, properly understood that CTX-US remained responsible for the purchase orders placed by CTX-HK.

19. Both CTX-US and CTX-HK released purchase orders to both Benlida and ROK. (See exhibits "B" and "C").

20. On November 23, 2015, Mr. Kukreja sent to Benlida an email about a Turkish customer called Arçelik that was planning to audit Benlida's factory in November of 2015. (Exhibit "J"). As this was a Eurasian, and if only CTX-HK dealt with Eurasian customers, then the email should have come from CTX-HK. That it did not constitutes further evidence that the two allegedly separate companies were really one and the same.

21. I understand that CTX-US argues that the 2016 Letter Agreement relieved it of the obligation to make payment to Benlida for goods ordered by CTX-HK. To the contrary, however, the Letter Agreement states that CTX-US would continue to make payments to Benlida. It states:

> Due to discrepancies between CTX USA and Manufacturer with respect to the balance of certain accounts under the Existing Agreement Existing Agreement (the "Discrepancy"), CTX USA, CTX HK, and Manufacturer have agreed to negotiate in good faith a new manufacturing and representation agreement (the "Secondary Manufacturing Agreement"). However, until such time as CTX USA, CTX HK and Manufacturer enter into the Secondary Manufacturing Agreement or this Agreement otherwise terminates pursuant to Section 7 hereof, **CTX USA has agreed to continue to make payments to Manufacturer** (emphasis added) irrespective of the Discrepancy, in accordance with the payment schedule set forth in the Existing Agreement (even if the payments would result in CTX USA having overpaid under the Existing Agreement) ("Regularly Scheduled Payments.")

22. As it does not say that CTX-US *and CTX-HK* agreed to continue to make payments, it was understood by Benlida that CTX-US remained responsible for paying for orders placed by itself and CTX-HK as its agent. Indeed, it says clearly that CTX-US would continue to make the payments, which means that it was mutually understood that CTX-US would continue to be responsible to pay orders placed by CTX-HK.

7

23. In an email of February 16, 2022 (the "Info-Tek" email, attached in Exhibit "A"), Mr. Kukreja acknowledged that the Exclusive Customer List continued under the same terms after the parties entered into the 2016 Letter Agreement as before, and thus that CTX-HK was not to be treated as a party to it, corroborating what Benlida understood – that, just as before the 2016 Letter Agreement CTX-HK functioned as an agent for CTX-US when CTX-HK placed orders, so too after the 2016 Letter Agreement, CTX-HK continued to place orders as CTX-US's agent.

24. Attached hereto as exhibit "K" are collected monthly statements, putting CTX-US on notice that Benlida had a running account.

25. CTX-US was on notice that Benlida expected payment from CTX-US, as Benlida would routinely chase it for payment of the CTX-HK and CTX-HK invoices. CTX-US never responded to such requests with anything like, "Why are you looking to us to pay the CTX-HK invoices? Go ask CTX-HK for the money."

26. From time to time, CTX-US and CTX-HK would issue "Debit Memos," claiming a right to an offset due to allegedly late deliveries. For example, in September 2015 CTX-US issued a "Debit Memo" as to goods ordered by CTX-HK. (See exhibit "H"). Since CTX-HK was not a party to the Manufacturing Agreement, it had no right itself to an offset, and thus CTX-US's requests for offsets as to goods ordered by CTX-HK were understood by Benlida genererally, and by me specifically, to be a claim for an offset from CTX-US's total outstanding receivables.

27. CTX-US would calculate the lead-time penalties for both CTX-US and CTX-HK purchase orders. In August of 2017, CTX-HK put in a Hong Kong purchase order called A19-VA6264EU-X57(HK), with customer code X57, for customer Lear. Benlida then sent CTX-HK

8

invoice "BLDCCT-HK1708022." Due to a claim of late delivery to CTX-HK, *CTX-US* calculated a lead-time penalty for it, on line 66 of a chart called "Jiangmen Benlida & ROK Penalty for Lead-Time Exceedances for Aug 2017 Purchase Orders." (See exhibit "I")

28. This chart calculated and listed the lateness penalties on Benlida and ROK shipments for both CTX-US and CTX-HK purchase orders. But CTX-HK – being a non-signatory to the Manufacturing Agreement – never had a right to claim its own offsets, and it was generally understood by Benlida, and by me specifically, that such claimed offsets were for the benefit of CTX-US, the actual signatory to the contract.

29. I understand that CTX-US argues that a "Letter Authorization for Payment Entrust" that was sent to CTX-US in 2018 manifests an understanding by Benlida that the 2014 Business Authorizations were no longer in force. However, as the covering email of October 5, 2018 explains (see exhibit "D" to Martinez Decl., DE 177-1), the "Letter Authorization for Payment Entrust" was sent to CTX-US because the Chinese customs authorities had pressed for it; however, as the customs authority dropped the request, Benlida did as well.

I declare under penalty of perjury under the laws of the United States of America, and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on June 26, 2023, Jiangmen, China

_____
Huang Sulan

9