UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 21-60125-Civ-Scola/Goodman**

-------------------------------------------------------x
JIANGMEN BENLIDA
PRINTED CIRCUIT CO., LTD.,

Plaintiff,

v.

CIRCUITRONIX, LLC,

Defendant.

-------------------------------------------------------x

**Plaintiff Jiangmen Benlida Circuit Co., Ltd.'s Memorandum of Law in
Opposition to Circuitronix, LLC's Motion for Summary Judgment**

**MAZZOLA LINDSTROM LLP**
Jean-Claude Mazzola
1350 Avenue of the Americas, 2nd Fl.
New York, New York 10019
646.250.6666
jeanclaude@mazzolalindstrom.com

*Attorneys for plaintiff Jiangmen
Benlida Printed Circuit Co., Ltd.*

June 26, 2023

## Table of Contents

Table of Authorities.................................................................................................................ii

Preliminary Statement............................................................................................................ 1

Argument ............................................................................................................................... 2

    Point I:      Under the Parties' Agreement, Only CTX-US Had the Right to Submit Orders for the CTX-US "Exclusive" Customers. CTX-HK's Orders for the Exclusive Customers Were Thus Placed as CTX-US's Agent....................................................... 2

    Point II:     Monies Paid to a Creditor by a Debtor Are Properly Attributed to the Oldest Invoices. Benlida Was Not Required to Apply Payments to the TAC-Listed Invoices...........................................................................................................13

Conclusion .......................................................................................................................... 20

## Table of Authorities

**Cases**                                                                                      **Page(s)**

*6-F Corp. v. BDP Int'l Fin. Corp.*,
   29 So. 3d 352, (Fla. Dist. Ct. App. 2010) ................................................................. 18

*Amy v. Carnival Corp.*,
   961 F.3d 1303 (11th Cir. 2020) ........................................................................ Passim

*AT&T Corp. v. Next Communs., Inc.*,
   2016 U.S. Dist. LEXIS 164342 (S.D. Fla. 2016) ...................................................... 17

*AW Denver Feed Co. v. Ireland*,
   38 Colo. App. 64, 551 P.2d 1091 (1976) ................................................................. 14

*Berene v. Nationstar Mortgage LLC*,
   2016 WL 3787558 (S.D. Fla. June 15, 2016) ............................................................11

*Capten Trading Ltd. v. Banco Santander Int'l*,
   No. 17-20264-Civ, 2017 U.S. Dist. LEXIS 217427 (S.D. Fla. Nov. 9, 2017) ......................... 17

*Chase v. Sullivan*,
   99 Fla. 202 (1930) ............................................................................................. 6

*Font v. Stanley Steemer Int'l, Inc.*,
   849 So. 2d 1214 (Ct. App. Fl. 5th Dist. 2003) ........................................................... 1

*Frieslander v. Mahon*,
   400 So. 2d 41 (Ct. App. Fl., 2d Dist. 1981) ............................................................. 15

*Ganley v. Pipestone*,
   154 Minn. 193, 191 N.W. 738 (1923) .................................................................... 14

*Greens at Hilton Run v. Rollin Bldg. Supply*,
   87 Md. App. 220, (Md. Ct. Spec. App. 1991) ........................................................... 14

*Harris v. Hooper*,
   50 Md. 537 (Md. Ct. App. 1879) .......................................................................... 14

*Haynes v. Carnival Corp.*,
   No. 20-21921, 2020 U.S. Dist. LEXIS 243251, (S.D. Fla. Dec. 29, 2020) ............................ 18

*In re Bartlett*,
   367 B.R. 21 (Bankr. D. Mass. 2007) ..................................................................... 14

*Lake Union Drydock Co. v. M/V Polar Viking*,
    446 F. Supp. 1286, (W.D. Wash. 1978) .................................................................... 14

*Manicini Enters. v. Am. Express Co.*,
    236 F.R.D. 695, (S.D. Fla. 2006) ............................................................................. 17

*McElwain Assocs. v. Culbreth*,
    417 So. 2d 838 (Ct. App. Fl., 1st Dist. 1982)........................................................... 15

*Randall v. Pettes*,
    12 Fla. 517, 534, 1868 Fla. LEXIS 20 (Fl. Sup. Ct. 1868) ................................. 1, 2, 14, 15, 19

*Roe v. Aware Woman Ctr. for Choice, Inc.*,
    253 F.3d 678, (11th Cir. 2001) ............................................................................... 18

*Tampa Sand & Material Co. v. Davis*,
    125 So. 2d 126 (Fla. Dist. Ct. App. 1960).................................................................. 6

**Statutes**

Florida Statute § 671.205(1) ........................................................................................ 13

Florida Statute § 672.208(1) ........................................................................................ 13

Florida Statute § 95.11(2)(b).......................................................................................... 20

**Rules**

Federal Rule of Civil Procedure 8(a) ........................................................................... 17

**Preliminary Statement**

Plaintiff Jiangmen Benlida Printed Circuit Co., Ltd., hereby opposes defendant

Circuitronix, LLC's motion for summary judgment.

The primary ground for denial is that by its own admission and conduct, Circuitronix,

LLC ("CTX-US") is responsible for the debts of Circuitronix (Hong Kong), Ltd. ("CTX-HK") as

to orders placed by CTX-HK for CTX-US customers. CTX-US's Rishi Kukreja testified that

"Circuitronix Hong Kong never placed orders for Circuitronix LLC. Simple and straight. Never."

(Kukreja Dep. at 108, exhibit H to Mazzola Decl.) But the documentary evidence shows that

every purchase CTX-HK made was necessarily for CTX-US. Only CTX-US – not CTX-HK –

was a party to the Manufacturing Agreement. (See DE 177-1, exhibit A to Martinez Decl.) Every

customer on the list created by the Manufacturing Agreement was an "Exclusive Customer" of

CTX-US. CTX-HK never had its own customer list. Thus, CTX-HK could not have purchased

circuit boards from Benlida for the customers on the CTX-US "exclusive" list without CTX-

HK's being an agent of CTX-US or a *de facto* constituent part of CTX-US.

CTX-US has failed to prove that orders placed by CTX-HK could have been placed for

an independent principal CTX-HK, and the evidence presented by Benlida in the accompanying

declarations and exhibits must be viewed in the light most favorable to Benlida. *Amy v. Carnival

Corp.*, 961 F.3d 1303, 1308 (11th Cir. 2020). The record demonstrates that there is a "reasonable

inference" concerning whether CTX-HK acted as the agent for CTX-US (or as a constituent part

of CTX-US), and therefore summary judgment must be denied. *Id.*; see also *Font v. Stanley

Steemer Int'l, Inc.*, 849 So. 2d 1214, 1216 (Ct. App. Fl. 5th Dist. 2003) ("The existence of an

agency relationship is normally one for the trier of fact to decide.")

CTX-US's motion should also be denied because its objection to Benlida's use of FIFO

accounting is baseless: It is well understood that FIFO is the norm given that generally, when a

1

payment is made in business, such payments are properly attributed by the creditor (here

Benlida) to the oldest invoices first unless – *at the time of payment*, and not sometime afterwards

– the debtor identifies a particular invoice other than the oldest to which the payment should be

attributed. This has been black-letter law in Florida for more than a century. See, *e.g*., *Randall v.*

*Pettes*, 12 Fla. 517, 534, 1868 Fla. LEXIS 20, at **26 (Fl. Sup. Ct. 1868). Benlida applied

accepted bookkeeping practices and thus the reasonable inference may be drawn (see *Amy v.*

*Carnival Corp*., supra) that monies paid by CTX-US and CTX-HK were properly applied by

Benlida to the oldest debts first. And because the debt that CTX-HK was unable or unwilling to

pay was ultimately owed by the principal CTX-US, it was proper for Benlida to apply CTX-US's

payments to old CTX-HK debts before more recent CTX-US debts.

Finally, CTX-US has neither been surprised nor prejudiced by its feigned belated notice

of Benlida's reliance on (industry-standard) FIFO accounting. CTX-US's original interrogatories

were timely objected to only four days after they were served, on the ground of numerosity –

CTX-US, quite simply, served too many interrogatory requests. (See Mazzola Decl., exhibit B

(Benlida's April 27, 2022, objections)). CTX-US did not request a "meet and confer" until May

1, 2023. (Mazzola Decl., exhibit C). On May 4, 2023, after the parties had conferred, CTX-US

propounded its amended interrogatories (*id*., exhibit D), which Benlida agreed to respond to on

an expedited basis, by May 18th, which it did. (*Id*., exhibit E). There was no delay by Benlida;

rather, Benlida timely responded to the interrogatories after proper ones were served.

**Argument**

**Point I:      Under the Parties' Agreement, Only CTX-US Had the Right to Submit
          Orders for the CTX-US "Exclusive" Customers. CTX-HK's Orders for
          the Exclusive Customers Were Thus Placed as CTX-US's Agent.**

The Manufacturing Agreement defines the relationship between Benlida and Benlida's

affiliate ROK (collectively, "Manufacturer") on the one side, and only CTX-US, *i.e*.,

2

"Circuitronix, LLC," on the other. The Manufacturing Agreement states:

> **1.1 Appointment.** Subject to the terms and conditions of this Agreement, Manufacturer hereby appoints Circuitronix as its representative during the Term … for the purpose of identifying potential customers that may be interested in purchasing Products. …
>
> **1.2 Diligent Efforts.** Circuitronix will diligently solicit and promote sales of Product and … shall also undertake responsibility for releasing a Purchase Order to Manufacturer …. (DE 177-1, exhibit A).

In Paragraph 1.1 above, the Manufacturer agrees that CTX-US shall be "its

representative" for the purpose of identifying what the Manufacturing Agreement will later call

"Identified Potential Customers." The word "representative" here is grammatically definite:

CTX-US is to be *the* representative of the Manufacturer for identifying potential customers.

The Manufacturing Agreement later makes clear that once a purchase order is put in for

an Identified Potential Customer, CTX-US gains exclusivity as the *only* entity allowed to place

orders to Benlida or ROK for that customer:

> **1.4 Marketing Period. (a)** *Identified Potential Customers.* Circuitronix shall, from time to time, provide a list to Manufacturer of potential customers. Manufacturer shall … provide written notification to Circuitronix if Manufacturer objects to Circuitronix representing a potential customer …. If the Manufacturer does not timely object to a potential customer (each an "***Identified Potential Customer***"), Circuitronix shall have the exclusive right, for a period of twelve (12) months thereafter (the "***Marketing Period***") to promote and solicit the sale of Products to the Identified Potential Customers. … **Schedule A** attached hereto contains a current list of Identified Potential Customers. **Schedule A** shall be updated from time to time ….
>
> **1.5 Exclusive Sales Period.** If Circuitronix procures a Purchase Order … from an Identified Potential Customer during the Marketing Period (any such Identified Potential Customer being hereinafter referred to as a "***Circuitronix Customer***"), Circuitronix shall have the exclusive right, for a period of two (2) years … (the "***Exclusive Sales Period***"), to deal exclusively with such Circuitronix Customer ….
>
> **1.6 No Solicitation, Communications or Sales. (a)** Manufacturer agrees that it shall not … (i) solicit any Identified Potential Customer during the Marketing Period or any Circuitronix Customer during the Exclusive Sales Period; or (ii) contract with or otherwise sell or deliver any Product to any Identified Potential Customer during the Marketing Period or any Circuitronix Customer during the Exclusive Sales Period ….(*Id.*)

Thus, once an "Identified Potential Customer" becomes an actual customer, that customer

becomes "exclusive" to CTX-US. Benlida cannot go around CTX-US and sell to that customer

directly, or through any unauthorized intermediary.

Under the Manufacturing Agreement, only CTX-US had the right to amend the "exclusive customer list." (*Id.*, ¶¶1.4; 1.5). But both Mr. Kukreja **and** CTX-HK's Akshay Koul[1] (cc'ing Mr. Kukreja) would request that Benlida add new customers to what they both routinely called the "Exclusive Customer List." (See Huang Decl. ¶ 4). When CTX-US entered into the Manufacturing Agreement, there were 29 "Identified Potential Customers." (DE 177-1, exhibit A). CTX-US eventually designated 189 companies worldwide on its exclusive customer list.[2]

From 2012 on, both CTX-US and CTX-HK submitted purchase orders for customers on the exclusive customer list.[3] While CTX-US could submit a purchase order to Benlida on its own behalf, CTX-HK could not – because CTX-HK had none of the exclusivity rights granted to CTX-US in the Manufacturing Agreement. Accordingly, CTX-HK functioned either as CTX-US's agent when it placed orders,[4] or the two entities functioned as one and the same company

---

[1] Mr. Koul was an employee of CTX-HK, and worked in Hong Kong. His email address AkshayK@Circuitronix.co.in used an Indian domain address; this was a holdover from when he had formerly worked for CTX-India. (Kukreja Dep. at 51, exhibit H to Mazzola Decl.)

[2] CTX-US's original April 2022 Interrogatory No.15 (Mazzola Decl., exhibit A, at PDF p. 9 asked that Benlida, "[i]dentify all communications you had with any of the customers on the attached ***Exclusive Customer list*** …." (Emphasis added.) The list was designated in the covering email as the "Exclusive Customer List.pdf." (See *id.* at PDF p. 2, and list at PDF pp. 11-18).

[3] When orders were placed by CTX-HK (and CTX-US), the purchase orders usually contained code numbers which identified to Benlida which customer on the list the goods were being purchased for. (Huang Decl., exhibit B). These codes show that CTX-HK was making purchases for customers on CTX-US's "Exclusive Customer List." CTX-US-designated purchase orders and CTX-HK-designated purchase orders also often bore the same code because they were servicing the same exact customer. (*Id.*, exhibit C). Benlida also put the codes on the invoices that it created, thereby demonstrating that Benlida understood that the order was placed for a customer on the CTX-US Exclusive Customer List. (*Id.*, exhibit D).

[4] CTX-US argues that "Benlida actively opposed joining CTX-HK as an indispensable party in this action." (Def. Br., DE 178 at 2). CTX-US, however, fails to note that Benlida opposed the joinder of CTX-HK because CTX-HK was acting as an agent for CTX-US when it placed orders. CTX-US cannot claim to be surprised that Benlida holds it responsible under principles of agency law, as the very memorandum that it cites (DE 28), argues that "CTX-HK is Not a

for practical purposes, despite CTX-HK's being a separate legal entity on paper. If CTX-HK was neither an agent for CTX-US nor *de facto* part of the same company, then CTX-US would not have countenanced CTX-HK's placing such orders with Benlida directly. It was, therefore, entirely reasonable for Benlida to understand, and Benlida always did understand – such being a reasonable adverse inference that must be drawn (*Amy v. Carnival Corp.*, supra) – that orders placed by CTX-HK were indeed placed for CTX-US *because such purchases were for CTX-US's exclusive customers*. (Huang Decl. ¶ 15).

In addition to the evidence cited above, the record reflects other ample evidence of CTX-US's and CTX-HK's conduct that raises a triable issue of material fact concerning whether CTX-HK was CTX-US's agent: "Essential to the existence of an actual agency relationship is (1) acknowledgement by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Goldschmidt v. Holman*, 571 So. 2d 422, 424 n.5 (Fla. Sup. Ct. 1990).

*First*, as evidenced by the parties' course of dealing in connection with the Manufacturing Agreement and as expressly manifested in the Business Authorization, CTX-US repeatedly acknowledged to Benlida that CTX-HK would act for it. Paragraph 1.2 of the Manufacturing Agreement states, "Circuitronix shall ... undertake responsibility for releasing a Purchase Order to Manufacturer ...." Both CTX-US and CTX-HK released purchase orders to both Benlida and ROK during the exclusive periods set forth in the agreement. (Huang Decl., exhibits B and C). Hence, when CTX-HK released purchase orders with respect to CTX-US's exclusive customers, it did so by virtue of CTX-US having delegated to it the responsibility for releasing such

---

Necessary Party Because CTX Agreed to be Responsible for its Obligations and Liabilities, and **Because CTX-HK Acted as an Agent for CTX**." (Emphasis added.)

purchase orders to Benlida and ROK. CTX-HK was therefore acting as CTX-US's agent. At least

such a reasonable inference may be drawn in Benlida's favor:

> The power of an agent to bind his principal may rest on real or actual authority conferred in fact by the principal or may be founded on apparent or ostensible authority arising when the principal allows or causes others to believe the agent possesses such authority, as where the principal knowingly permits the agent to assume such authority or where the principal by his actions or words holds the agent out as possessing it.

*Tampa Sand & Material Co. v. Davis*, 125 So. 2d 126, 127 (Fla. Dist. Ct. App. 1960) (citations omitted); see also *Amy v. Carnival Corp.* (supra).

CTX-US signed two "Business Authorizations" on January 1, 2014, whereby CTX-US

agreed to be liable for the debts of CTX-HK, one in favor of Benlida and the other in favor of

ROK. (Mazzola Decl., exhibit I). The one issued by CTX-US to Benlida states:

> For the purposes of our company's business, Circuitronix, LLC hereby authorize CIRCUITRONIX (HONG KONG), LIMITED to place orders to your company on our behalf. CIRCUITRONIX , LLC assumes all CIRCUITRONIX (HONG KONG) , LIMITED's debts due to these orders.

The "Business Authorization" reflects the principal-agent relationship between the

entities, whereby goods are ordered by CTX-HK for the benefit of CTX-US, and CTX-US agrees

to be responsible for such debts.[5] See *Chase v. Sullivan*, 99 Fla. 202, 204-05 (1930) ("When an

agent acts for his principal and the principal accepts the fruits of the agent's efforts, the principal

must be deemed to have adopted the methods employed, and he may not, even though innocent,

receive the benefits and at the same time disclaim responsibility for the means by which they

were acquired." (Citation omitted)).

CTX-US argues that the Business Authorization covers only a subset of CTX-HK's

purchase orders – specifically, only those purchase orders that CTX-HK submitted "on CTX-

US's behalf, not on any order CTX-HK placed with Benlida." (DE 178 at 9). However, orders

---

[5] This is unless CTX-US and CTX-HK were *de facto* the same company, in which case, exclusive customers of CTX-US would also have been exclusive customers of CTX-HK.

that CTX-HK placed with Benlida contain coding to indicate that they were for CTX-US's exclusive customers; orders placed by CTX-HK were therefore orders placed on CTX-US's behalf. It may reasonably be inferred (see *Amy v. Carnival Corp.*, supra) that Mr. Kukreja, having been cc'ed on correspondence adding such customers to the exclusive list (see supra, n. 3), and not having objected thereto, manifested to Benlida that CTX-HK would be acting for CTX-US as its agent with respect to such orders.

Mr. Kukreja testified that, contrary to the documentary evidence, under the terms of the Business Authorization, CTX-US was only responsible for paying for those boards which were (i) ordered by CTX-US, (ii) sent to a CTX-HK subcontractor, and (iii) also happened to get lost or damaged by that subcontractor.[6] CTX-US, however, has failed to show that Benlida was given notice that CTX-US would ***only*** be responsible for CTX-HK's orders if they passed through the eye of this needle. Such convoluted and self-serving testimony is insufficient to demonstrate the lack of a material issue of fact concerning the import of the Business Authorization.

*Second*, there is evidence in the record showing that CTX-US delegated to, and that

---

[6] "*Q.* [Did CTX-HK place orders] [o]n its own behalf? *A.* Yes. And then there was these orders, Circuitronix LLC orders, which required some sort of secondary operation in China. As an example, [there are] boards which required PTF, so Circuitronix Benlida was expected to build the boards and ship it to a PTF subcontractor. *Q.* Who was expected to build the boards and ship it to the subcontractor? *A.* Benlida was expected. *Q.* To build and ship to subcontractor for additional work? *A.* Yes. But the subcontractor was not their subcontractor, it was a Circuitronix subcontractor. [¶] So initially what was decided was for those specific orders, Circuitronix LLC would place the purchase order in Benlida, Benlida -- Circuitronix Hong Kong -- Benlida would ship those boards to Circuitronix Hong Kong. [¶] So the order for that -- for that specific was supposed to come from two places, because -- because the boards, when they were released to a subcontractor -- let's assume a hundred thousand dollars worth of boards were released to our subcontractor -- if something got lost, those boards got lost, Benlida wanted a way to get -- be made whole for those boards. [¶] And so -- because it was our subcontractor. They were not working with that subcontractor. So there was -- this was put in place that Circuitronix -- since those boards were being consigned to Circuitronix Hong Kong, if those boards got lost before being returned to Benlida, we [CTX-US] would be responsible for Circuitronix Hong Kong's debt on those boards." (Kukreja Dep. at 102-104, Mazzola Decl., exhibit H.)

CTX-HK accepted, authority to submit orders to Benlida on behalf of CTX-US's exclusive customers. Most obviously, CTX-HK's placing orders with Benlida on behalf of CTX-US's exclusive customers demonstrated this.

In addition, CTX-HK's management would defer to CTX-US in crucial respects. Akshay Koul held the highest position within CTX-HK – namely, general manager – and reported to Mr. Kukreja. (Koul Dep. at 11-12, 14, Mazzola Decl., exhibit F). Given his role as general manager, his lack of knowledge as to the Manufacturing Agreement and his degree of deference to CTX-US are jaw-dropping. Mr. Koul testified that he had never even seen the Manufacturing Agreement before in all of his years as general manager. (*Id.*, at 106-108). This was because, in reality, CTX-HK had no agenda other than to carry out CTX-US's business and was entirely under CTX-US's control. To illustrate: Mr. Koul, unfamiliar with how the Manufacturing Agreement's pricing matrix operated, testified that the pricing matrix was negotiated by and could be changed only by Mr. Kukreja. (*Id.,* at 108). If a customer buying from CTX-HK requested a discount on the pricing matrix, Mr. Koul would not handle that in-house, but would kick the decision up to Mr. Kukreja in Florida. (*Id.*, at 110). Similarly, any decision whether lead-time penalties on CTX-HK purchase orders should decrease the amount owed on Benlida's invoices was deferred to Mr. Kukreja. (*Id.*, at 112). Thus, though Mr. Koul held the title of general manager of CTX-HK, the record reflects that in actuality the company was managed by CTX-US. This management arrangement was also clear to third parties such as Benlida: Mr. Koul acknowledged that Benlida would go over his head to ask Mr. Kukreja about adjustments to lead-time penalties for CTX-HK orders: "*Q.* [W]ho is authorized to make the decision on updates regarding lead times? Is that you or would it be Rishi? *A.* It should be Rishi, because he was the one who was dealing with all this, you know?" (*Id.*, at 114).

Even beyond the Manufacturing Agreement, it was Mr. Kukreja, not CTX-HK's in-house management, that made decisions concerning CTX-HK's daily operations. Mr. Kukreja decided which warehousing company CTX-HK would use. (*Id.*, at 50-51). CTX-US and CTX-HK were also both supported by the same inside-sales team at CTX-India. Sometimes, CTX-US and CTX-HK would jointly take an order from a customer, and would leave to the CTX-India team the job of assigning the purchase-order document to CTX-US or CTX-HK. (*Id.*, at 97).

The record also shows significant commingling of operational and financial aspects of CTX-US and CTX-HK. Before the Business Authorizations were signed on January 1, 2014 (Mazzola Decl., exhibit I), CTX-US would pay CTX-HK invoices, and this, in itself, establishes a justifiable basis for Benlida to have believed that CTX-US understood that it was responsible for CTX-HK's debts, and for Benlida to have understood that CTX-HK was authorized to place orders as CTX-US's agent. (See Huang Decl., exhibit E). CTX-US explicitly took on responsibility for payment of CTX-HK invoices after the Business Authorizations and 2016 Letter Agreement were signed. (*Id.*, exhibit F). And CTX-US explicitly took on responsibility for payment of virtually all of ROK's CTX-HK invoices from 2012 onwards, notwithstanding any supersession that allegedly resulted from the 2016 Letter Agreement. (*Id.*, exhibit G).

In September 2015 CTX-HK issued to Benlida a late-shipment penalty "Debit Memo" as to goods ordered by CTX-HK, reducing CTX-HK's bill. (Huang Decl., exhibit H). As Ms. Huang explains, since CTX-HK, being a non-signatory to the Manufacturing Agreement, had no right to offsets, Benlida always understood that such offsets were attributed to CTX-HK by, and imposed for the benefit of, CTX-US. (See Huang Decl., ¶26). Indeed, CTX-US took it upon itself to calculate these "lead-time penalties" for both CTX-US and CTX-HK purchase orders. (*Id.*, exhibit I). Benlida's understanding that CTX-HK acted as the agent for CTX-US, and thus that

CTX-US was financially responsible for CTX-HK's orders was accordingly entirely reasonable based on CTX-US's course of dealing. This reasonable inference requires denial of CTX-US's motion for summary judgment. (See *Amy v. Carnival Corp*., supra).

Mr. Koul testified that CTX-US and CTX-HK existed to sell to different locales: CTX-US purchase orders were issued for North American customers and CTX-HK purchase orders were for Europe and Asia Pacific. (See Koul Dep. at 79-80, 87-88, 98, Mazzola Decl., exhibit F). However, the single customer list that both CTX-US and CTX-HK used included both North American and Eurasian customers, and both Mr. Kukreja and Mr. Koul made requests for customers from different areas of the world to be added to the list.[7] Customers from all over the world also came to Benlida to audit its factory, including customers from the territory ascribed to CTX-HK, but which were on the CTX-US exclusive customer list. For example, in November of 2015, Mr. Kukreja – *not Mr. Koul* – emailed Benlida about a Turkish customer called Arçelik that planned to audit Benlida's factory. (See Huang Decl., exhibit J).

In view of all of CTX-US's conduct described above, Benlida reasonably understood, as CTX-US must have as well, that orders placed by, and debts incurred by, CTX-HK, were indeed placed for and incurred by CTX-US, because such purchases were for CTX-US's exclusive customers, and because CTX-US and CTX-HK functioned as, respectively principal and agent, or as different sales offices of the same business organization. Summary judgment must therefore be denied. (See *Amy v. Carnival Corp*., supra).

---

[7] See, e.g., 6/25/16 email from Mr. Kukreja ("We would like to add Becom Hochstrass, Austria to our exuvice customer list"); 9/11/17 email from Mr. Koul ("Please review and add Gemphil Technologies Inc. which is in Laguna, Philippines to Exclusive customer list"). Such requests came both before and after the July 2016 Letter Agreement. The common customer list also used such language as (emphasis added): "Helbakao: *All Global Locations*" and "Panasonic: *All Global Locations* and Contract Manufacturers" and "Canon Hi Tech: *Thailand*," thus including customers in CTX-HK's alleged territory.

CTX-US's reliance upon *Berene v. Nationstar Mortgage LLC*, 2016 WL 3787558 (S.D. Fla. June 15, 2016) (Scola, J.), is misplaced. In that case, the plaintiffs pled a complaint that was dead on arrival, because by statute the defendants were not required to act until the plaintiffs had submitted a complete loan application by a certain date, but they submitted an incomplete application, and were late. The plaintiffs fled from their original complaint and, instead of amending it, called facts pled in the complaint "irrelevant" and propounded different facts, asserting a new theory that they argued only in papers responsive to the defendant's motions:

> The submission of the May 5th documents [wa]s not merely an additional fact, supporting the RESPA violation already pleaded in the complaint. The sole basis relied upon in the Complaint for Nationstar's RESPA violation was its mishandling of the Borrowers' February 7th application. Shifting the attention instead to encompass only the Borrowers' May 5th submissions represents a 'fundamental change' in the focus of the Borrowers' allegations. *Id.*, at 7-8.

By contrast, Benlida is neither abandoning allegations contained in the TAC, nor shifting attention elsewhere. Rather, Benlida proceeds on the bases alleged in the TAC. As to the Manufacturing Agreement, the TAC alleges, that CTX-US "ordered circuit boards from plaintiffs" (DE 26, ¶7), including the circuits boards ordered that the TAC ***lists as invoiced to CTX-HK***; and as to the Business Authorization, the TAC alleges that CTX-US "expressly agreed to pay the amounts specified in the invoices." (*Id*., at ¶448).[8] These are still the bases of recovery today. There is no change of position; there is no surprise. By operation of principal-agent law, CTX-US is liable for the goods purchased by CTX-HK, and by the language of the Business Authorization and the 2016 Letter Agreement (see below), it is liable as well.

---

[8] Incidentally, paragraph 13 of the TAC is incorrect; only $13,548.66 remains due. It is the first CTX-US invoice identified in the TAC, and, based upon FIFO, that earliest invoice has been partially paid off. So too, the first three CTX-HK invoices identified in the complaint have now also been paid off. Accordingly, the following paragraphs of the complaint are withdrawn: ¶261; ¶262; and ¶263. Accordingly, the *ad damnum* in the TAC is hereby reduced by $230,744.78.

CTX-US's arguments concerning the July 21, 2016 Letter Agreement fare no better. CTX-US has insisted (see DE 178 at 3; DE 177 ¶9) that the Letter Agreement formally added CTX-HK as a party to the Manufacturing Agreement.[9] To the contrary, however, the Letter Agreement merely provided that CTX-HK was a party to the negotiations to create a future Secondary Manufacturing Agreement, and that CTX-HK would be a party to that Secondary Manufacturing Agreement when it would be created. But it was never created.

Curiously, the Letter Agreement wrongly says that CTX-HK *already was* a party to the Manufacturing Agreement. This could only have been so if CTX-HK was not a separate entity from CTX-US; *i.e.*, that it was a *de facto* constituent of CTX-US. Unless it was really one and the same with CTX-US, then stating that it was a party to the original Manufacturing Agreement didn't make it so, particularly as the Letter Agreement didn't identify any separate rights and obligations of CTX-HK. Because the original Manufacturing Agreement has never been superseded, it has continued throughout the period when the invoices in the TAC were issued, until today. Since CTX-HK has never been a party to the Manufacturing Agreement, all purchase orders issued by CTX-HK for customers on the exclusive customer list in 2018 and 2019 were necessarily for CTX-US.[10]

---

[9] CTX-HK is mentioned in paragraph 2 of the Letter Agreement as an "affiliate" of CTX-US that is covered by a non-compete clause that never became effective because the condition precedent to its effectiveness was the termination of the original 2012 Manufacturing Agreement, which remains in force to this day. Contrary to CTX-US's claims, CTX-HK was not made a party to the original Manufacturing Agreement by the Letter Agreement. Rather, the Letter Agreement merely recited, incorrectly, that CTX-HK *was* a party to the original agreement.

[10] CTX-US argues that it did not sign a newly proposed "Letter Authorization for Payment Entrust," and that Benlida's sending of a request that CTX-US execute it constituted an acknowledgement that the 2014 Business Authorization was a nullity. But the Business Authorization is **not necessary** to establish a legal basis for CTX-US's liability for CTX-HK's debts, and thus its being superseded (if it was superseded) **changed nothing**. As Ms. Huang explains in her affidavit, however, and as the covering email of October 5, 2018 explains (see Huang Decl. at ¶29 and Martinez Decl. (DE 177-1), the document was sent to CTX-US because

Finally, in the Letter Agreement itself, CTX-US agreed to continue to make payments for goods ordered by CTX-HK, as it provides: (emphasis added)

> Due to discrepancies between CTX USA and Manufacturer with respect to the balance of certain accounts under the Existing Agreement (the "Discrepancy"), CTX USA, CTX HK, and Manufacturer have agreed to negotiate in good faith a new manufacturing and representation agreement (the "Secondary Manufacturing Agreement"). However, until such time as CTX USA, CTX HK and Manufacturer enter into the Secondary Manufacturing Agreement or this Agreement otherwise terminates pursuant to Section 7 hereof, *CTX USA has agreed to continue to make payments to Manufacturer*, irrespective of the Discrepancy, in accordance with the payment schedule set forth in the Existing Agreement (even if the payments would result in CTX USA having overpaid under the Existing Agreement) ("Regularly Scheduled Payments.")

It does not say that CTX-US *and CTX-HK* agreed to continue to make payments. Rather, it clearly says that it is CTX-US that would continue to do so, meaning that it was mutually understood that CTX-US would continue to be responsible for orders placed by CTX-HK.

**Point II:    Monies Paid to a Creditor by a Debtor Are Properly Attributed to the Oldest Invoices.  Benlida Was Not Required to Apply Payments to TAC-Listed Invoices.**

CTX-US argues that Benlida should be penalized for failing to disclose that it had been applying payments to its oldest unpaid invoices, and that "[d]iscovery has very recently revealed that Benlida claims to have been secretly … applying monies CTX sent for payment of those invoices to older debts Benlida contends CTX owed it, such that Benlida considers the invoices in the TAC unpaid." (DE 178 at 11). CTX-US also contends that Fla. Stat. §§ 672.208(1) and 671.205(1) support its position that payment instructions that were sent in "Payment Details" should be applied, due to the parties' course of performance.

However, under Florida law a creditor's attribution of payments to the oldest debts is,

---

the Chinese customs authorities pressed for it; however, as the customs authority dropped the request, Benlida did as well. In any event, the form, if signed, would have been superfluous – at least under Florida law – because its operative language was consistent with the common law: "Our company will bear all the legal consequences and liabilities of the agent's actions." (See DE 177-1, exhibit D).

quite simply, the way business is done. Applying payments to the oldest debt has been

recognized in Florida since at least 1868:

> It is a well-settled general rule that if one owes two or more separate debts and pays
> money to his creditor, the debtor has a right to apply the payment to which of the debts he
> pleases, ***provided he elects <u>at the time of payment</u> the purpose for which it is made***. If he
> does not so designate, the payee may elect how it shall be applied. It has been held in
> some cases that the creditor may appropriate at a future day, even at the time of bringing
> his action, and is not compelled to make the ***<u>appropriation immediately, like the debto</u>****r*.

*Randall v. Pettes*, 12 Fla 517, 534 (1868)  (Emphasis added).[11]

As Benlida bookkeeper Chen Zhanjiao testified, and as exhibits introduced during her

deposition show (see Mazzola Decl., exhibit G), payments from CTX-US and CTX-HK were

received by wire, with no direction in the wire instructions that the payments were to be

attributed to any particular invoice. Rather, weeks or months after the payments had been made,

CTX-US and CTX-HK would send emails with "Payment Details," and thus belatedly and

ineffectively (see *Randall v. Pettes*, supra) attributing the payments to specific invoices. (See *id.*,

Chen Dep. at 141:17-20, 169:1-4 (testifying that payment details were not regularly sent); Chen

Dep., exhibit 85 (an email dated September 6, 2018, transmitting "Payment Details" for wire

transfers that had been made months earlier, in June 2018; but the attached bank slips show that

---

[11] This is not just the law in Florida. Around the country, courts hold that a creditor may properly
apply payments to the oldest unpaid invoices, if, at the time of payment, the debtor does not
direct that payment be attributed to a specific invoice. See, *e.g.*, *In re Bartlett*, 367 B.R. 21, 28
(Bankr. D. Mass. 2007) ("In the absence of any direction from the Debtors as to the application
of payments *at the time they were made*, Rinella was free to apply the payments to the oldest
outstanding invoices. Likewise, if the Court were to find that neither party directed a particular
application of payments at the time they were made, it would hold that the Debtor's payments
should be allocated to the earliest outstanding invoices, in accordance with the Restatement
(Second) § 260 and applicable case law.") (citations omitted); *AW Denver Feed Co. v. Ireland*, 38
Colo. App. 64, 68, 551 P.2d 1091, 1094 (1976); *Ganley v. Pipestone*, 154 Minn. 193, 197, 191
N.W. 738, 739 (1923); *Greens at Hilton Run v. Rollin Bldg. Supply*, 87 Md. App. 220, 230 (Md.
Ct. Spec. App. 1991); *Harris v. Hooper*, 50 Md. 537 (Md. Ct. App. 1879); *Lake Union Drydock
Co. v. M/V Polar Viking*, 446 F. Supp. 1286, 1294 (W.D. Wash. 1978) ("Applying payments to
the oldest charges first is a common method of handling an open account.")

no instructions were given at the time); see also *id.*, Chen Dep., exhibit 92 (an email dated June 29, 2018, transmitting "Payment Details" purportedly as to April 2 through June 21 invoices; again attached bank slips show that, at the time of actual payment, no instructions were given that the funds being wired be attributed to particular invoices)). Mr. Kukreja also acknowledged at his deposition that instructions for payment are not sent with the bank wire transfer details themselves, but are only sent afterwards. (See Kukreja Dep. at 71:19-72:9, Mazzola Decl., exhibit H).[12]

Moreover, the parties' course of dealing put CTX-US on notice that Benlida treated amounts owed on CTX-US and CTX-HK purchases as a lump sum. Benlida did not keep its amalgamation of CTX-US and CTX-HK debt a secret: for years, Benlida sent to CTX-US, every month, a statement listing all of the most recent month's invoices incurred by both CTX-US and CTX-HK, with their total debt being demanded against CTX-US. (See for example the entire year of 2015 in Huang Decl., exhibit K). The parties' course of dealing does not, therefore, reflect that Benlida customarily applied payments to the specific invoices that were listed in the "Payment Details" sent weeks and months after the wire transfers were made. Rather, their course of dealing evidences Benlida's use of FIFO. And since neither CTX-US nor CTX-HK "elect[ed] ***at the time of payment*** the purpose for which it [was] made, the payee [Benlida] may elect how it shall be applied." *Randall v. Pettes*, at 534 (emphasis added).[13] Thus, Mr. Kukreja's testimony that applying payments first to the oldest invoices violates "GAAP" – generally

---

[12] Technically, a payment detail does not match a specific payment up with a specific invoice anyway. The payment details keep a running tally of invoices incurred along with payments from around the same time. It is possible for a so-called payment detail to list only invoices and no payments, or vice versa.

[13] Lower Florida courts have cited *Randall v. Pettes* as binding precedent in more recent cases, such as *McElwain Assocs. v. Culbreth*, 417 So. 2d 838 (Ct. App. Fl., 1st Dist. 1982); and *Frieslander v. Mahon*, 400 So. 2d 41 (Ct. App. Fl., 2d Dist. 1981).

accepted accounting principles – and "international accounting rules" (see Kukreja Dep. at 86-87, Mazzola Decl., exhibit H) is properly disregarded, as Mr. Kukreja's understanding of "international accounting rules" cannot trump Florida law, which CTX-US agreed was to be applied to any dispute between it and Benlida. (See DE 177-1, exhibit A to Martinez Decl., at PDF p. 15, ¶13.4).

Attribution of payments to the oldest invoices is, as the case law makes clear, quite customary. It is not a practice invented to deceive debtors, but is a time-honored and practical way to keep books.[14] Benlida's bookkeeper Chen Zhanjiao testified that she checks the company bank account six days a week, and logs each payment received. If there were no invoice details on the actual bank notice of wire payment then the payment would be attributed to the oldest invoices. She could not recall a single instance in which CTX-US or CTX-HK designated *at the time of payment* that a particular invoice was to be marked paid. (Mazzola Decl., exhibit G, Chen Dep. at 167:13-169:4). Benlida's application of monies received to the oldest debts does not circumvent the statute of limitations, because when the payments were attributed, none of the debts were so old as to be outside the limitations period; at least no such showing has been made by CTX-US. Benlida clearly notes in the TAC that CTX-US has unpaid invoices from 2018, and 2019. These invoices are the only invoices at issue.

CTX-US's claim that Benlida did not provide a breakdown of how much was owed on each invoice in the complaint or provide the methodology for calculating damages is another red herring. Not only does Benlida's complaint itself provide the breakdown – invoice by invoice –

---

[14] CTX-US's approach is woefully impractical, as it would require that upon receiving a payment, Ms. Chen would mark the oldest invoices as having been paid; then she would – weeks and months later, when the "payment details" were received – have to go back and reverse the bookings of the oldest invoices, and reattribute the money to invoices designated by CTX-US.

with the only methodology required being simple math, but such itemization is unnecessary for a

claim of account stated:

> This is an action for a sum certain. AT&T claims, based on its invoices, that Next [Communications] owes it $1,030,263.44, consisting of $586,498.52 due under the AVOICS Account and $443,764.92 due under the ANC Account. Next argues that AT&T's invoices utterly lack the detail of the underlying charges necessary to apprise Next of what it is supposed to or had legal obligation to object or respond to. But an account stated claim does not require proof of an itemized statement of charges. An itemized statement of underlying charges is not required to establish a claim for an account stated. It is not necessary to show the books of original entries from which the account is made up since the very object in rendering, stating, and settling accounts is to avoid the necessity of making such proof.

*AT&T Corp. v. Next Communs., Inc.*, 2016 U.S. Dist. LEXIS 164342 at *8-9 (S.D. Fla. 2016) (citations omitted).

Here, the record is clear that Benlida sent CTX-US monthly statements of account,

showing the running balances due. (Huang Decl., exhibit K). Benlida also adequately alleged the

elements of the cause of action for an account stated, thereby putting CTX-US on notice that it

was seeking recovery for a balance due on a running account, for an aggregate total of

$13,655,335.93. (DE 26 ¶¶ 451-457). Benlida also regularly followed up with CTX-US for

payment of CTX-US and CTX-HK invoices. CTX-US did not respond to such requests by

saying, "Why are you looking to us to pay the CTX-HK invoices? Go ask CTX-HK for the

money." (See Huang Decl. ¶ 25). The idea that CTX-US has not been given notice that FIFO

principles have been applied by Benlida is both an irrelevancy and a red herring.

Even if a claim of account stated required the itemization CTX-US argues was lacking,

the purpose of a pleading is to give the opposing party notice of the claims, not set forth the legal

support for those claims. "The Federal Rules of Civil Procedure require only notice pleading."

*Capten Trading Ltd. v. Banco Santander Int'l*, No. 17-20264-Civ, 2017 U.S. Dist. LEXIS

217427, at *3 n.1 (S.D. Fla. Nov. 9, 2017) (Scola, J.), citing Fed. R. Civ. P. 8(a); *Manicini*

*Enters. v. Am. Express Co.*, 236 F.R.D. 695, 698 (S.D. Fla. 2006). This "[n]otice pleading does

not require the pleader to allege a 'specific fact' to cover every element or to plead 'with precision' each element of a claim; instead, it requires a complaint to 'contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory'." *Haynes v. Carnival Corp.*, No. 20-21921, 2020 U.S. Dist. LEXIS 243251, at *5 (S.D. Fla. Dec. 29, 2020) (Scola, J.), quoting *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001). Here, Benlida gave sufficient notice that it was seeking from CTX-US payment for goods ordered by CTX-HK.

Benlida alleged in the TAC that "defendant Circuitronix ordered circuit boards from plaintiffs." (DE 26 ¶7). Benlida also alleged that "the goods ordered by defendant Circuitronix were delivered to defendant, and accepted without complaint as to the quality of the goods, but defendant has failed to pay for such goods, thus owing plaintiffs at the time of the filing of this complaint $13,655,335.93." (*Id.*, ¶8). This total notably included invoices issued to CTX-HK and to CTX-US. CTX-US, therefore, cannot plausibly argue that Benlida was not looking to it for payment of the CTX-HK invoices. Under Florida law, it is sufficient if, from the pleadings, the defendant can infer that he is being asked to be responsible for another. *6-F Corp. v. BDP Int'l Fin. Corp.*, 29 So. 3d 352, 353 (Fla. Dist. Ct. App. 2010).

As to the argument that Benlida failed to disclose that it was applying payments to the oldest invoices on a "FIFO" basis until May 18, 2023,[15] what CTX-US fails to state is that it did not serve proper interrogatories on Benlida until May 4, 2023 (Mazzola Decl., exhibit D). No motion to preclude the response as untimely was filed, nor would any such motion have been tenable, given that CTX-US did not propound the interrogatories until May 4, 2023. If CTX-US

---

[15] They were timely served on May 18th, uncertified, which was followed by the client's certification of the interrogatories several days later, on May 24th (Mazzola Decl., exhibit E), within 20 days of service of CTX-US's interrogatories.

wanted responses sooner, it should have propounded *proper* interrogatories *sooner*. It cannot

now use its own delay as a basis to claim a lack of sufficient notice by Benlida.

     CTX-US claims that, according to an audit document, on December 31, 2019, CTX-US

owed Benlida $0.00. (DE 178 at 11). Benlida's chief financial officer Wu Yukun explains in his

accompanying declaration that, in point of fact, CTX-US and CTX-HK together owed over

$12 million on December 31, 2019, and that – from the standpoint of the audit – it was irrelevant

how the debt was divvied up as between CTX-US and CTX-HK given that the total amount was

due from CTX-US. When the audit confirmation request was sent to CTX-US, there were two

documents included, one for CTX-HK (for $12 million) and one for CTX-US (for $0). As Mr.

Wu explains, what mattered was, 'How much was owed?' For audit purposes, the issue was not,

'Is it CTX-HK and/or CTX-US that owes the money?' Moreover, CTX-US and CTX-HK

declined to even confirm the audit request, presumably because they realized the error in

designating CTX-HK as owing the money rather than CTX-US. The forms should have stated

that it was CTX-US that owed the money, ***but it has never been disputed that the money was***

***actually owed***.

     CTX-US argues that, "it is uncontested that CTX paid Benlida some $2.4 million more

than the face value of the invoices Benlida claims were not paid!" (DE 178 at 11). However, this

argument is negated by *Randall v. Pettes*, because Benlida had the right to apply CTX-US and

CTX-HK payments to the earliest invoices owed because at the time that each of the wire

transfers were sent to Benlida, totaling $10,058,195.91, they did not designate particular invoices

on the wire instructions. But even if CTX-US's theory were correct, and Benlida should have

applied the payments to 2018 and 2019 invoices, then Benlida would have sued on earlier

invoices, with the same total amount owed, as the claim would have looked back five years

(based upon Florida's five-year statute of limitations for breach of contract, Fla. Stat. § 95.11 (2)

(b)) to January 19, 2015.

### Conclusion

Because the debt that CTX-HK was unwilling or unable to pay was ultimately owed by

the principal CTX-US, it was proper for Benlida to apply CTX-US's payments to old CTX-HK

debts before applying payments to more recent CTX-US debts. Viewing the evidence presented

in the accompanying declarations of Jean-Claude Mazzola, Huang Sulan, and Wu Yukun, and the

exhibits thereto, as well as the exhibits submitted by CTX-US, in the light most favorable to

plaintiff Jiangmen Benlida Printed Circuit Co., Ltd., and drawing all reasonable inferences in its

favor (see A*my v. Carnival Corp*., 961 F.3d 1303, 1308 (11th Cir. 2020)), this Court must deny

defendant Circuitronix, LLC's motion for summary judgment.

Dated:  June 26, 2023
            New York, New York                                    Respectfully submitted,

                                                                      **MAZZOLA LINDSTROM LLP**

                                                                      By: Jean-Claude Mazzola
                                                                      1350 Avenue of the Americas, 2nd FL
                                                                      New York, New York 10019
                                                                      646.250.6666
                                                                      jeanclaude@mazzolalindstrom.com

                                                                      *Attorneys for plaintiff Jiangmen*
                                                                      *Benlida Printed Circuit Co., Ltd.*

**Service via ECF**