Exhibit A

# Expert Report

**To:**  Mr. Stephen Rosenthal and Ms. Christina Martinez, Podhurst Orseck, P.A.

**From:** Wei Cui, Allard School of Law, University of British Columbia

**Date:** 6/7/2023

**Re:**  Preliminary expert report on Chinese regulatory issues arising from Circuitronix dispute

---

This report offers an initial assessment of certain Chinese regulatory issues implicated in a contractual dispute between Jiangmen Benlida Printed Circuit Co., Ltd. ("BLD") and Circuitronix, LLC ("CTX"), which you, as defense counsels, have brought to my attention on June 2, 2023. The following discussion is based on a very limited review of certain materials you have shared: a list of documents that I have reviewed and that form the basis of this report is given below.

Specifically, the report addresses the following questions regarding whether BLD, as a manufacturer in China that exports goods to CTX and CTX's Hong Kong affiliate ("CTX HK"), has failed to comply with Chinese foreign exchange regulations. Concerns have been raised about two aspects of BLD's conduct. First, BLD sometimes instructed CTX and/or CTX HK to make payments to BLD's Chinese affiliate company Kaiyu Electric Circuit Co., Ltd., also known as ROK Printed Circuit Co., Ltd. ("ROK") for outstanding amounts payable to BLD, relating to export shipments made by BLD in its own name. Second, issues regarding price and product quality have resulted in delayed or reduced payments by CTX for the amounts BLD invoiced for shipped goods. BLD may not have reported such gaps between declared export value and payment receipt to Chinese governmental authorities as required.

The transactions between BLD/ROK and CTX are complex and under dispute. This report only seeks to articulate some of the Chinese regulatory issues posed by the two aspects of BLD's conduct described above. The precise nature of such conduct needs to be further understood to allow the correct application of Chinese law and governmental instructions, and to determine the likelihood and magnitude of any governmental sanctions for non-compliance.

At least two principles in China's foreign exchange regulatory practice are potentially relevant to the evaluation of BLD's conduct above. The first is the principle that the party that is the legal exporter of goods should be the recipient of foreign currency payments for the export (hereinafter the "Exporter-Payee Identity Principle"). The principle has been repeatedly stated in agency guidance issued by the State Administration of Foreign Exchange (SAFE). It has also been recognized in some Chinese court decisions as a principle that relevant subjects should comply with. Non-compliance with the principle, possibly in connection with other violations, has led to the imposition of penalties in some reported cases. Therefore, whether BLD may be sanctionable for violations of the Exporter-Payee Identity Principle, when it instructed amounts due BLD to be paid to ROK, deserves further examination.

A second principle in China's foreign exchange regulatory practice relevant to the evaluation of BLD's conduct is that exporters, who are entitled to receive foreign currency payments, must make

*June 7, 2023*

timely reports of the receipt or extension of trade credit in the form of deferred payments, advanced payments, and other transactions (hereinafter the Trade Credit Reporting Requirement). This reporting requirement has been in place since 2012, and the government's position is that persistent failure to report outstanding trade credit could lead to monetary penalties or the downgrading of the exporter's compliance status with SAFE, which would in turn lead to more careful scrutiny of a firm's foreign exchange transactions. Some instances of monetary penalties imposed on exporters for the failure to periodically report trade credit have been reported.  Whether BLD may be sanctionable for violations of the Trade Credit Reporting Requirement thus also deserves further examination.

It should be noted that it is not clear whether Chinese government authorities would sanction BLD's violations of the Exporter-Payee Identity Principle and the Trade Credit Reporting Requirement *per se*. Any government sanction may depend on whether such violations lead to other consequences that the government deems undesirable or sanctionable. For example, in some correspondence between BLD and CTX, BLD stressed that it has hidden from Chinese governmental authorities and other third parties the causes of gaps between the invoiced value of goods exported and the payment received. The reasons for BLD's decision to withhold information from government agencies and third parties are not clear. An examination of this issue may be aided by materials I have not yet been privy to, such as communications between BLD and Chinese governmental authorities and the deposition testimony of BLD witnesses, which I understand have not yet been transcribed (hereinafter the Discovery Materials). Such further examination may also reveal other Chinese legal rules and regulatory practices that BLD's conduct may be in violation of. This report does not address such other issues.

In relation to determining BLD's (non-)compliance with the Trade Credit Reporting Requirement, if an exporter like BLD is deemed to be a Type B or Type C firm (which are firms with detected irregularities under the foreign exchange management rules) by the local SAFE branch, there may be relevant communications with government agencies. Further, some exporters are selected for an annual survey regarding international payments and the use of trade credits. If BLD had been selected for such survey in some of the years under dispute, records may exist for its trade credit survey reports for those years.  I have not yet been privy to such records, but if they are provided, further examination may be warranted.

This report merely identifies some features of the Chinese regulatory framework in light of which BLD's conduct may be assessed. In view of the outstanding nature of the Discovery Materials, I am unable to reach any conclusions regarding BLD's compliance (or lack thereof) with such framework. Nor does this report purport to identify all features of Chinese regulations that may be implicated by the dispute between BLD and CTX.

### List of documents forming the basis of this report

Factual material reviewed: Documents BLD_59, CTX_1376-1389, CTX_1390-1403, CTX_2070, CTX_2173, CTX_2196, CTX_3490, CTX_2018-2019, CTX_3495-3496, CTX_4078 (all received June 2, 2023)

Chinese regulatory guidance: Regulation of the People's Republic of China on Foreign Exchange Administration (State Council Decree No. 532, 2008); SAFE Notice on Matters concerning the Issuance of Foreign Exchange Administration Rules for Trade in Goods (*Huifa* [2012] 38); SAFE Notice on the Issuance of Guidance on Foreign Exchange Operations under Current Accounts (*Huifa* [2020] 14); other associated agency manuals and instructions; associated judicial decisions.

2

*June 7, 2023*

**Ancillary information**

The fees I receive for services provided to you in connection with the BLD-CTX litigation are not contingent on the outcome of the case. My billing rate is USD 650 per hour. I have not testified as an expert by trial or deposition within the previous four years. My CV is attached to this report.

Wei Cui

Professor, Peter A. Allard School of Law

The University of British Columbia

1822 East Mall, Vancouver, BC, Canada V6T 1Z1

3