# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
----------------------------------------x
JIANGMEN BENLIDA PRINTED CIRCUIT CO.,
LTD.,

                            Plaintiff,  :

          - against -

CIRCUITRONIX LLC,

                       Defendant.   :
----------------------------------------x

                 1350 Avenue of the Americas
                 New York, New York

                 July 20, 2023
                 9:40 a.m.


      EXAMINATION BEFORE TRIAL of RANDALL M.

PAULIKENS, CPA/AVB/CFF/CITP, and Expert

Witness on behalf of the Plaintiff herein,

taken by the Defendant, pursuant to Court

Order, held at the above-mentioned time and

place, before Michelle Lemberger, a Notary

Public of the State of New York.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 2

1
2   A P P E A R A N C E S :
3
4   MAZZOLA LINDSTROM, LLP
    Attorneys for Plaintiff
5       1350 Avenue of the Americas, 2nd Floor
        New York, New York 10019
6   BY:  RICHARD LERNER, ESQ.
7
    A/P J.C. MAZZOLA, ESQ.
8
        Adam Wiener
9
10
11  PODHURST ORSECK, P.A.
    Attorneys for Defendant
12      One S.E. 3rd Avenue, Suite 2300
        Miami, Florida 33131
13  BY:  STEPHEN F. ROSENTHAL, ESQ.
14      Srosenthal@podhurst.com
15
16
                *     *     *     *     *
17
18
19
20
21
22
23
24
25

Page 3

1
2       S T I P U L A T I O N S
3
4       IT IS HEREBY STIPULATED AND AGREED
5   by and between the attorneys for the
6   respective parties herein, that filing,
7   sealing and certification be and the same are
8   hereby waived.
9       IT IS FURTHER STIPULATED AND AGREED
10  that all objections, except as to the form of
11  the question shall be reserved to the time of
12  the trial.
13      IT IS FURTHER STIPULATED AND AGREED
14  that the within deposition may be signed and
15  sworn to before any officer authorized to
16  administer an oath, with the same force and
17  effect as if signed and sworn to before The
18  Court.
19
20
21
22
23
24
25

Page 4

1
2   R A N D A L L   M.   P A U L I K E N S, having
3       been first duly sworn by a Notary
4       Public of the State of New York, was
5       examined and testified as follows:
6   BY THE REPORTER:
7       Q.  Please state your name for the
8   record.
9       A.  Randall Martin Paulikens.
10      Q.  What is your current business
11  address?
12      A.  36 East Main Street, Somerville, New
13  Jersey 08876.
14  EXAMINATION BY
15  MR. ROSENTHAL:
16      Q.  Good morning, Mr. Paulikens.
17      A.  Good morning.
18      Q.  My name is Stephen Rosenthal.  I
19  represent Circuitronix LLC in this
20  litigation.
21      A.  Okay.
22      Q.  I know you've been deposed many
23  times before, so if at any point I ask a poor
24  question please ask me to rephrase it and
25  I'll do my best.

Page 5

1               R. Paulikens
2       A.  Okay.
3       Q.  Prior to beginning today, you handed
4   me a USB drive that was produced by you in
5   response to our subpoena for your deposition
6   today?
7       A.  Yes.
8       Q.  So I put this into my laptop
9   computer; we're in an office where it is
10  projected on a screen.  I want to ask you
11  some sort of housekeeping questions about
12  that before we get into your report and
13  opinions.
14      A.  Okay.
15      Q.  So on the drive there's a
16  document --
17      A.  Can I go up and stand there so I can
18  read the screen?
19      Q.  Of course.  Whatever is comfortable
20  for you.
21      A.  Thank you.
22      Q.  There's a folder that is called,
23  Documents sent to counsel for deposition,
24  right?
25      A.  Yes.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 6

R. Paulikens

1
2    Q.   What is that?
3    A.   That was in response to a request
4 you made last week.  There's two tranches of
5 information sent in my report.  One is the
6 documents from your expert report, and there
7 was additional documents and you had asked
8 for those additional documents.  That's what
9 was sent to you last week --
10   Q.   Okay.
11   A.   -- I think via e-mail.  So that is a
12 duplicate of that.
13   Q.   Okay.  While we're talking about
14 this document sent to counsel for deposition
15 folder that you just described, I'm opening
16 it on the screen.  And I'll scroll down so
17 you can see it.  That's the documents within
18 that folder that you sent to my office last
19 week or so?
20   A.   Yes.
21   Q.   And I have printed that list out on
22 paper.
23        Let me hand it to you and you can
24 assure yourself that it is the same thing
25 that's on the screen that is on your USB.

Page 7

R. Paulikens

1
2        (Witness peruses document.)
3    A.   Yes, it looks pretty --
4    Q.   Is there anything missing?
5    A.   It looks pretty -- it looks like the
6 same list.
7        MR. ROSENTHAL:  Just for
8    housekeeping purposes, we're up to
9    Exhibit 141, I think, is the next one
10   that I wrote down.
11        So we're going to mark that, if
12   I can, as Exhibit 141.
13        (Whereupon, at this time, the
14   above-mentioned printout of documents
15   sent to counsel was marked as Exhibit
16   141 for identification.)
17        MR. ROSENTHAL:  That's
18   basically a printout of the documents
19   sent to counsel for deposition.
20        MR. LERNER:  I just want to
21   note, Stephen, that on the thumb
22   drive it has a different filing
23   folder name when I sent it to you.  I
24   renamed it for clarification because
25   there were further documents reviewed

Page 8

R. Paulikens

1
2 by Mr. Paulikens but they weren't the
3 ones that were necessarily referenced
4 in the report.
5        I renamed it so that it would
6    be clear and distinct from those
7    other documents.
8        MR. ROSENTHAL:  Right.  And so
9    what you were just talking about, Mr.
10   Lerner, at the top of 141 shows the
11   renamed file name that you just
12   mentioned?
13        MR. LERNER:  Yes.  And I am the
14   one who renamed it.
15        MR. ROSENTHAL:  Okay.  We will
16   hold you responsible for that.
17 BY MR. ROSENTHAL:
18   Q.   Okay.  So let's return back to the
19 USB that we were looking at on the computer
20 screen.  I will get out of that folder that
21 we just looked at.
22        So the first other folder says,
23 Agreements.  I will open that.
24        Are any of these PDF files in here
25 marked up or annotated by you?

Page 9

R. Paulikens

1
2    A.   No.
3    Q.   And that contains the manufacturing
4 agreement, the letter agreement from 2016, a
5 second document called second agreement from
6 2016.
7        Do you know if that second agreement
8 from 2016 is different from the 2016 letter
9 agreement without me opening it?
10   A.   As I'm standing here, I don't
11 recall.
12   Q.   Okay.  Let me open that for a
13 moment.  I'm opening --
14        MR. ROSENTHAL:  It says the
15   file has been damaged, all right.  So
16   I won't open that.
17   Q.   And the Circuitronix contract, do
18 you know what that is?  Should I open it?
19   A.   You should open it.
20        MR. ROSENTHAL:  Same thing.
21   That's odd.  It says it's a PDF but
22   it's not a supported file type or
23   it's been damaged.  Okay.
24   Q.   Do you know if you've been able to
25 open these when you were doing it?

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 10

R. Paulikens

2  A. I had no problem opening them, so I
3  don't know what happened.
4  Q. Okay. Let me try another one out of
5  curiosity, the complaint. Okay. Same thing.
6  So there's a folder called analysis.
7  I'm going to open that.
8  A. Yes.
9  Q. It has two Excel spreadsheets?
10 A. Yes.
11 Q. Do you know what those are?
12 A. Yes. These are working copies of
13 documents that were produced from one of the
14 parties in the case, and you see the name
15 FLLP?
16 Q. Yes.
17 A. It was the firm I was with when I
18 started this engagement, Friedman, LLP.
19 Q. Okay.
20 A. And AJ Santye is the current firm
21 I'm with. And I rename -- if I open up a
22 copy of a document, I rename it so that -- to
23 keep the metadata pure.
24 Q. Okay. Do you know whether these,
25 either of these is marked up in a way that

Page 11

R. Paulikens

2  would show -- indicate your work?
3  A. There may have been formatting
4  differences. There's no notes and stuff,
5  but, you know, we open them, copy them,
6  format them for printing so we can read
7  what's there.
8  Q. Okay. Let me just out of, you know,
9  in the interest of completeness, open the
10 first one, which is called Benlida payment
11 details, CTX dash HK underscore 2015 to 2019,
12 underscore V2.1002 AJS.
13 Okay. I'm opening this up. Mr.
14 Paulikens, is there anything when I open it
15 up that I should potentially look at that may
16 or may not contain your notes, any tab?
17 A. No. There wouldn't -- I typically
18 wouldn't -- don't put notes in something like
19 that. Any analysis that we did on this file
20 would have some sort of -- a tab that says,
21 like, working analysis or some sort of
22 delineation that is separate from the source
23 data.
24 Q. Okay. So like sheet number 1, that
25 tab is not --

Page 12

R. Paulikens

2  A. That came from them. That's not
3  from us.
4  Q. Although it says in yellow, Per
5  Benlida payment details, with some codes and
6  then it says Worksheet.
7  A. Well, that's the name of the file.
8  And OO2. And this looks like -- I don't want
9  you to hit enable content.
10 Q. Right.
11 A. But this looks like a formula where
12 it references the name of the files to where
13 they got it. So that's why I think that says
14 that there.
15 Q. Okay. But you're saying that's not
16 stuff that you added to this file?
17 A. No.
18 Q. Or your firm. Okay.
19 There's a lot of different tabs at
20 the bottom over time.
21 A. It was years summary and then
22 monthly summary for multiple years.
23 Q. Okay. I'll get out of that.
24 Let me go to -- let me get out of
25 this then. Now we're back to your USB drive

Page 13

R. Paulikens

2  and it says, Court documents folder. I'll
3  just open that. Those are self-explanatory
4  names?
5  A. Yes.
6  Q. And then there's one called
7  Documents, which is a general name?
8  A. Correct.
9  Q. Am I correct to generalize that
10 these -- the stuff in this folder was related
11 to work you had done in this case connected
12 to a hearing that was held in January 2023 in
13 Miami?
14 A. These actually predate that. My
15 retention began in May of '22, a little more
16 than a year ago. And this was some of the
17 initial documents we were provided back then,
18 hence the dates.
19 Q. Okay. So let me just open 053122,
20 is that May 31, '22 folder?
21 A. Correct.
22 Q. It contains a bunch of Excel
23 spreadsheets. Just out of curiosity, is it
24 possible to address this folder called
25 documents that we're looking at in general;

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 14

1                R. Paulikens
2   did you rely upon or look at items in this
3   folder for purposes of your report?
4       A.  Not this specific folder, but some
5   of the documents within these were, like the
6   ones that say payments for HK, this and that,
7   which were also used by your expert, they're
8   duplicated here.
9           So to be candid, I didn't look at
10  these specifically but there were duplicates
11  of the same file.
12      Q.  They ended up somewhere else?
13      A.  Yes.
14      Q.  There's a folder called -- not a
15  folder, sorry, an Excel spreadsheet file
16  called Benlida versus CTX accounting event.
17  Do you see that?
18      A.  Yes.
19      Q.  I'm going to open that.  Do you know
20  who generated that document?
21      A.  I believe this came from the client.
22      Q.  I think I have printed one of these
23  out.  So let me see if I can find that.  Yes.
24          MR. ROSENTHAL:  Let me hand you
25      what I will mark as the next exhibit,

Page 15

1                R. Paulikens
2   which is 142.
3           (Whereupon, at this time, the
4           above-mentioned Benlida v. CTX
5           accounting event was marked as
6           Exhibit 142 for identification.)
7   BY MR. ROSENTHAL:
8       Q.  The title of that is Benlida versus
9   CTX accounting event.
10          Mr. Paulikens, is that a document
11  that I've handed you marked as Exhibit 142,
12  the same as the one that's on the screen that
13  was from your USB drive?
14      A.  Certainly looks to be.
15      Q.  And your understanding is that was
16  prepared by Benlida?
17      A.  I believe so.
18      Q.  Okay.  I'm going to open a PDF
19  that's on -- I'm going to attempt to open a
20  PDF that's on the USB, but it's not letting
21  me open it.
22          That was the e-mail correspondence I
23  was trying to open.  Let me try to open the
24  meeting minutes one.  Same thing.
25          MR. ROSENTHAL:  Off the record.

Page 16

1                R. Paulikens
2           (Discussion held off the
3           record.)
4       Q.  We're now looking at Mr. Lerner's
5   computer with another USB that's the same --
6   a copy of the same stuff that we were looking
7   at the USB that you gave to me.
8       A.  Yes.
9       Q.  So now we're back in the documents
10  folder and there's a PDF that's called e-mail
11  correspondence.  I'm just going to click on
12  that.
13          That brings up an e-mail dated at
14  the top July 14, 2016 from Rishi Kukreja to
15  Tracy at Benlida, correct?
16      A.  Yes.
17      Q.  And it is a long string e-mail.
18  There may actually be several e-mails,
19  correct?
20      A.  There's multiple e-mails back and
21  forth on it.
22      Q.  Okay.  We're not going to belabor
23  it, just identify it.
24          Mr. Paulikens, you see there's a
25  folder called Documents to be sent to counsel

Page 17

1                R. Paulikens
2   with Chinese character not able to compress?
3       A.  Yes.
4       Q.  Okay.  I recognize those as ones
5   that were sent to us in a separate folder.
6       A.  Yes.
7       Q.  Other than the folder that Mr.
8   Lerner subsequently called, Further documents
9   to rely upon?
10      A.  Correct.
11      Q.  Okay.  And it seems to me that those
12  are primarily compilations of data that
13  related to work that I assume you did in
14  connection with the hearing that was in
15  January of 2023; is that right?
16      A.  Yes.  The settlement hearing and
17  that, you know, experience.
18      Q.  Right.  Okay.  There's another
19  folder called Expert report.  That contains
20  in it a folder called Documents, CTX
21  documents relied upon by CTX's expert CPA.
22      A.  Yes.
23      Q.  Now there's another folder and if
24  you open that, Mr. Lerner, thank you, that
25  contains a list of items you received through

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 18

R. Paulikens

1  R. Paulikens
2  my office, correct?  Indirectly through
3  counsel?
4      A.  Yes.
5      Q.  Okay.  And those are all things from
6  the Kapila Mukamal, K-A-P-I-L-A,
7  M-U-K-A-M-A-L, report?
8      A.  The KM report.
9      Q.  The KM report.
10     So there are some additional Excel
11 spreadsheets in this expert report.  Let me
12 show Mr. Lerner where we are.
13     In the expert report folder --
14     A.  Okay, wait, where are we?
15     Q.  We're in the expert report folder.
16     A.  No, we're on the drive, okay.  We're
17 on the flash drive.
18     Q.  Correct.  This is all about the
19 flash drive.  I'm just trying to understand
20 what's in here.
21     There's an Excel spreadsheet that's
22 called Benlida payment details CTX U.S. 2015
23 to 2019 version 2.1 AJS working copy.
24     Do you see that?
25     A.  Yes.

Page 19

R. Paulikens

1  R. Paulikens
2      Q.  And is that another copy of
3  something we saw with a similar name already?
4      A.  As I said, every time I get a file
5  that I open up that's from somebody else, I
6  put an extension on it called Working copy
7  with a firm name so as to not to corrupt the
8  original document.
9      So I probably opened this up and
10 then so I didn't mess up what was sent from
11 your expert.
12     Q.  Okay.  And so the same thing with
13 the one below that says AJS working copy
14 2023?
15     A.  Yes.
16     Q.  And the one below that says AJS
17 working copy?
18     A.  Correct.
19     Q.  Okay.  There's a Word document
20 called Mukamal Parisi report?
21     A.  Yes.
22     Q.  Word convert for citation, what's
23 that?
24     A.  What I do is if I get a PDF report,
25 in order if I'm going to take quotes out of

Page 20

R. Paulikens

1  R. Paulikens
2  it, I convert it to a Word document so I can
3  easily cut and paste it, which is why I
4  called it such as it is.
5      Q.  Okay.  I will go out of that folder.
6      The financials for settlement folder
7  has about seven documents in it.  Is that all
8  related to the earlier discussion about
9  settlement of the case?
10     A.  Yes, this was from the fall.  You
11 can tell from the dates that was original
12 information that came in to me, hence the
13 Chinese characters.
14     Q.  See the folder that's called New
15 documents, May 31, '22?
16     A.  Yes.
17     Q.  Again, based upon the dates, those
18 are related to the beginning of your
19 retention, I guess, in the case?
20     A.  Yes.  Those are duplicated from what
21 we talked about 15 minutes or so ago.
22     Q.  So we have a lot of copies of the
23 same stuff.
24     A.  This is the way things were produced
25 and when they were produced.

Page 21

R. Paulikens

1  R. Paulikens
2      Q.  Okay.  There's a folder called
3  Response report next.
4      A.  Yes.
5      Q.  If you can open that, all right.
6      So that's all related to the report
7  that we're going to be talking about today
8  for your deposition, right?
9      A.  Yes.
10     Q.  Okay.  So the first subfolder in
11 that -- actually let me ask you generally.
12 Is everything -- what is the purpose of this
13 folder and the way you organized it?
14     A.  This is a copy of my file.  This is
15 the way I kept it.  So there's lead time
16 penalty support, which is all the documents
17 from the lead time penalties.  If you click
18 on that you can see these were copies of
19 documents that we got from your expert and we
20 opened them up and may have copied them,
21 reformatted them, so we could print, include
22 them as a PDF in the report, hence you see
23 the two duplicate names.
24     So you see a version that's the
25 Excel version and a PDF version.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 22

1          R. Paulikens
2      Q.  Let me just ask you if we go to the
3  bottom of this list in this file, which is
4  called, Excel spreadsheet called Summary,
5  dated July 6, 2023.
6      A.  Okay.
7      Q.  I'm going to open that a sec on the
8  screen.
9          And can you describe what this
10  document is?
11      A.  Scroll up to the top, please?  Yes.
12  This was the sum of our work where they
13  literally just took a -- summarized the
14  totals from each of the lead time penalty
15  worksheets that were prepared by your expert,
16  or I'm sorry, that were produced by your
17  expert, not prepared.
18      MR. ROSENTHAL:  Okay.  So I'll
19      tell you, this is not a document that
20      I saw as something that was provided
21      to me before today.  So it would be
22      good to somehow mark this.  And I
23      don't think we can do it physically
24      because of the setup we have here.
25          So let me just be real clear

Page 23

1          R. Paulikens
2  for the record.  I'd like to call
3  this Exhibit 143, and this is the
4  Excel spreadsheet called Summary, and
5  it resides in a folder on Mr.
6  Paulikens's USB, which is called LTP
7  support, which is within a folder
8  called response report, which is
9  within a folder called Benlida
10  documents for deposition.
11          And after the deposition, we'll
12  figure out how to generate a piece of
13  paper.
14      MR. MAZZOLA:  Do you want to
15      just make a A, B, C, D, Es to that
16      exhibit?
17      MR. ROSENTHAL:  No.
18      (Whereupon, at this time,
19      Summary was marked Exhibit 143 for
20      identification.)
21  BY MR. ROSENTHAL:
22      Q.  It's basically the summary of lead
23  time penalty data, right?
24      A.  Yes.
25      Q.  So let me ask you to, I mean, I

Page 24

1          R. Paulikens
2  could actually do this part, if you want.
3      Right above that, Mr. Paulikens,
4  you're seeing on the screen there's two Excel
5  files that say BLD penalty summary with
6  dates.
7      A.  Yes.
8      Q.  Like the one that Mr. Lerner has
9  hovering over says, BLD penalty summary FEB
10  2016 to July 2021 KM.
11      A.  Um-hum.
12      Q.  Is that a document that your office
13  prepared or is that something you received
14  from someone else?
15      A.  I think that this is a -- it's
16  hidden, but this document was one that I
17  believe was sent to us, but you have to open
18  it, if you don't mind.
19      Q.  You're referring to the one that
20  doesn't have KM next to it?
21      A.  Correct.
22      Q.  So you want to open that one.
23      Can you tell whether that was --
24      A.  Yes.  This looks like it's one of
25  the files that your expert -- KM prepared and

Page 25

1          R. Paulikens
2  when we opened it up, we named a copy KM so
3  that we didn't corrupt it.
4      Q.  So, basically, those two files are
5  the same except for that designation?
6      A.  Yes.
7      Q.  Let's go back out to the folder, if
8  we can.
9      So there's a folder that says, PDF
10  for report.
11      A.  Yes.
12      Q.  Let's open that.  And it's got a
13  bunch of different files with names like E2
14  and E2A.
15      What are those?
16      A.  Those, as I printed the documents
17  that are in the exhibits in my report,
18  they're printed from Excel.  So in order to
19  include them in the PDF, I have to print them
20  to PDF, and my shorthand -- so when I put
21  them in populate the final expert report is
22  Exhibit 2, Exhibit 2A.
23      Q.  Okay.  So if we just click on E2 for
24  a second, let's see if that opens.  This is
25  what I can't do on the drive you gave me.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 26
R. Paulikens
1
2     A.  Right.
3     Q.  That opens up a document that became
4  Exhibit 2 in your report?
5     A.  Correct.
6     Q.  Okay.  There is -- let's go back out
7  to the folder.
8        So you see the file called, the
9  second one AJ Santye response report
10  7-8-23-F?
11     A.  Yes.
12     Q.  What is the F, final?
13     A.  Yes.
14     Q.  Okay.  Do you have any drafts of the
15  report saved?
16     A.  I deleted the drafts.  I had a
17  corruption problem myself so I put in
18  separation on it after I fixed it.
19     Q.  And I assume that's your practice
20  anyway, to delete drafts?
21     A.  Yes.  And they get overwritten
22  anyway in the ordinary course.
23     Q.  Okay.  Going back to the folder tree
24  of your USB drive, so now we're looking at
25  just documents, we've explored those first

Page 27
R. Paulikens
1
2  three folders.
3        The Excel spreadsheet that's 2012 to
4  2019 reconciliation analysis?
5     A.  Okay.
6     Q.  That, again, doesn't contain any
7  working notes or calculations by your office,
8  or does it?
9     A.  No.  I think we called it working
10  copy, again, to separate it from the original
11  copy.  Because that, I believe, we can
12  certainly open it, was the source for one of
13  the exhibits in my report.  And as I'm
14  standing here, that one -- one of the
15  exhibits we had to -- we noted on it that we
16  moved some of the data to make it reasonably
17  comparable to the other exhibits in terms of
18  dating.
19     Q.  Okay.  So let me -- there's two
20  Excel spreadsheets that we're looking at that
21  are titled the same title, Benlida payment
22  details CTX U.S. 2012 to 2021 version 5
23  working copy.
24     A.  Um-hum.
25     Q.  It actually looks like there's three

Page 28
R. Paulikens
1
2  of them.  What happened?
3     A.  What happened was, similar to what
4  you had with the flash drive, I had an issue
5  and you'll see by the dates, this was the one
6  that was finally used for the report because
7  things got corrupted, which is why I changed
8  the name, but you asked for my file.
9     Q.  The one that says working copy 2 is
10  the one that was used for the report?
11     A.  Yes.  And I think that they all
12  translated to what was in the report.  But at
13  one point that's all you see fixed.
14     Q.  Okay, got it.
15        Let me just scroll down.  There's
16  something called -- a PDF document called,
17  how do you pronounce it, Santye?
18     A.  Santye.
19     Q.  Santye expert report?
20     A.  Yes.
21     Q.  Is that your report?
22     A.  I think that's the whole report.
23  Yeah, it looks like the whole PDF of the
24  report.
25     Q.  Just another version -- I mean,

Page 29
R. Paulikens
1
2  another copy of this final report?
3     A.  It looks like it.
4     MR. LERNER:  It's 140 pages.
5     Q.  And then there's a final -- let's go
6  back out of that.  A final document, an Excel
7  spreadsheet called Working analysis.  What is
8  that?
9     A.  Open it?  Okay.  This is some of our
10  work product, and you'll see a start feed
11  into the exhibits or actually cut and pasted
12  into our working copy, which you'll see this
13  is, I think, on page 1 or page 2 of our
14  report.
15     Q.  And this is actually something taken
16  from -- this page we're looking at called
17  inserts tabs is taken from the KM report,
18  right?
19     A.  No.
20     Q.  What?
21     A.  No.  This is work that we did
22  recreating the tables as published in the KM
23  report so that we could insert them as
24  appropriate in our report.  And we inserted
25  this column here because it was a math error

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 30

R. Paulikens

1    in the KM report.  Which is why it's
2    highlighted in yellow.
3         Q.   The column that's called difference
4    per KM report?
5         A.   Yes.  Yes, that was what was in the
6    KM report without the shading.  But there was
7    a math error in the report.  So we added this
8    column here, column P.
9         Q.   And since we don't have this
10   document necessarily in the record with the
11   columns, it's called, Difference with math
12   correction?
13        A.   Yes.
14        Q.   Okay.  So just to be clear, the
15   column -- and I'm now, you've referenced your
16   report, which I'm holding, and I'm going to
17   give you a copy of that so that we can both
18   be on the same page literally.
19             MR. ROSENTHAL:  I'd like to
20        mark your report as Exhibit 144.
21             That's Mr. Paulikens's report.
22             (Whereupon, at this time, the
23        above-mentioned Paulikens expert
24        report was marked as Exhibit 144 for

Page 31

R. Paulikens

1        identification.)
2    BY MR. ROSENTHAL:
3         Q.   So if you turn to page 2 of your
4    report, does that chart that we have just
5    been talking about on the screen appear there
6    as well?
7         A.   Yes.  That's when we called it -- we
8    printed a copy of the penultimate conclusion.
9         Q.   Okay.  So now, returning to the
10   screen, there's a tab, Grand summary 2023.
11        A.   Yes.
12        Q.   Is this material that your office
13   prepared or in part prepared?
14        A.   This was drawn from other source
15   documents, and this was literally -- so we
16   didn't do it automatically by linking.  We
17   did it by just reinserting certain things so
18   they didn't get changed as we were putting
19   the report together.  So this is partly our
20   work product, partly a compilation of other
21   documents in the report.
22        Q.   Okay.  And this tab, grand summary
23   2023, has a bunch of blue colored tables,
24   right?

Page 32

R. Paulikens

1         A.   There's blue highlights in the
2    tables, yes.
3         Q.   Blue highlights sort of.  I'm just
4    trying to describe how they appear.
5         A.   Okay.
6         Q.   Do these, I'd say, seven different
7    blue highlighted tables appear in your
8    report?
9         A.   In different places they do.  And we
10   reference the source document, where it came
11   from.
12             MR. ROSENTHAL:  Okay.  Just in
13        the interest of completeness, I'm
14        going to make an attempt to mark this
15        folder, or sorry, this document,
16        called Working analysis, this Excel
17        spreadsheet as Exhibit 145.  Because
18        if we don't mark it this way we'll
19        never find it again.
20             (Whereupon, at this time, the
21        above-mentioned working analysis
22        spreadsheet was marked as Exhibit 145
23        for identification.)
24   BY MR. ROSENTHAL:

Page 33

R. Paulikens

1         Q.   So while we're waiting for that
2    to -- for the computer to catch up, there's
3    another one that's -- another tab in this
4    same Excel spreadsheet called, Grand summary
5    2012 to 2021.  Is that --
6         A.   Scroll up.
7         Q.   -- also something --
8         A.   That may have wound up as part of
9    our report, too.  These were, again, we were
10   summarizing information for easy inclusion in
11   the narrative section of our report.
12        Q.   Thank you.  Okay.
13             Well, that concludes the exciting
14   tour of your USB drive.
15             Actually, I'm just going to check
16   two other things before I finish it.
17             I spoke too soon.  There's two other
18   documents which will take a moment.
19             So we're looking now, Mr. Paulikens,
20   at your USB drive and there's two Word
21   documents at the very bottom of it.  One is
22   called 01-21 Benlida audited financial
23   statements draft.
24             Do you know what that is?

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 34

R. Paulikens

2  A.  Yes.  Benlida sent their audited
3  financials and various quarterly financials
4  in the fall of '22.  That -- and they were
5  literally in Chinese.  And that was the
6  translated version that I could use.
7  Q.  Okay.  And that -- your involvement
8  with that was related to the hearing held in
9  Miami in January 2023?
10  A.  Yes.  That was about, yeah, the
11  settlement, whatever, move to maintain it,
12  whatever.
13  Q.  Not related to your current report?
14  A.  No.
15  Q.  Okay.  Let me just open the last
16  file which is dated February 23rd of this
17  year, Benlida report and recommendation.
18  That's a court filing, right?
19  A.  Correct.  That was received.
20  MR. ROSENTHAL:  All right.
21  That concludes the exciting traipse
22  through your USB.  I think we can now
23  get out of that.
24  Let's take a quick break.
25  (Whereupon, a brief recess was

Page 35

R. Paulikens

2  taken.)
3  BY MR. ROSENTHAL:
4  Q.  Mr. Paulikens, how many lawsuits are
5  you presently serving as a retained expert
6  in?
7  A.  Active and inactive, I've never
8  counted, but I would have to estimate between
9  15 and 25 cases that are in various stages of
10  litigation process.
11  Q.  And what percentage of your time is
12  presently spent serving as an expert witness
13  for lawsuits?
14  A.  In my profession, roughly 80 percent
15  of my time is spent in the litigation support
16  form.  20 percent is traditional accounting,
17  roughly.  I didn't track it to the hour.
18  Q.  So by that you mean roughly
19  80 percent of your time is spent working as
20  an expert witness?
21  A.  Right, or consulting as part of the
22  litigation process.
23  Q.  Okay.  Have you ever been retained
24  to work for Benlida before?
25  A.  No.

Page 36

R. Paulikens

2  Q.  Have you ever been retained to work
3  for a company known as Sinosure before?
4  A.  Not that I recall, no.
5  Q.  The China credit insurance entity?
6  A.  No, not that it rings any bells.
7  Q.  Have you ever served as an expert in
8  a case with either of these gentlemen at
9  Mazzola Lindstrom?
10  A.  Yes.
11  Q.  What case was that?
12  A.  It was Fred --
13  MR. LERNER:  Faust.
14  A.  Faust.
15  Q.  What did that involve?
16  A.  It was --
17  Q.  You can't look to them to answer.
18  A.  It was a wrongful termination case,
19  and the client -- we represented plaintiff
20  who was seeking damages for various
21  allegations he had against his former
22  employer.
23  Q.  Okay.  And what court was that in,
24  do you recall?
25  A.  I believe that was New York Supreme.

Page 37

R. Paulikens

1  I forget the county as I'm sitting here.
3  Q.  Do you recall who the other party
4  was, the counterparty?
5  A.  It was, as I'm sitting here, I'm
6  embarrassed, I actually don't remember the
7  other side's name and it was not that long
8  ago.
9  Q.  Is that the only case you can think
10  of that you worked with the Mazzola Lindstrom
11  firm in?
12  A.  As of right now, it's the only other
13  case I've been formally retained at.  There
14  may be -- there's another case that may or
15  may not go forward.  It's a small case in New
16  Jersey, still hasn't gotten very far.
17  Q.  Okay.  So other than those two
18  cases, this is the only other case that you
19  worked with the Mazzola Lindstrom firm in?
20  A.  To the best of my knowledge right
21  now, yes.
22  Q.  Is that Faust case, I know you list
23  your prior cases, do you have that listed on
24  the prior case list somewhere?
25  A.  No.  I only list my prior testimony

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 38

R. Paulikens

1
2  deposition or trial or arbitration.  Faust
3  never got to deposition, trial or arbitration
4  so it is not listed.
5      Q.  Have you ever been disqualified or
6  stricken by a court as an expert?
7      A.  No.
8      Q.  Has a court ever limited the scope
9  of your expert testimony?
10     A.  No.
11     Q.  Has the court ever rejected your
12 expert opinions as unreliable?
13     A.  No.
14     Q.  Has your methodology that you've
15 used in your expert reports in other cases
16 ever been deemed unrealistic?
17     A.  There was a case that my client
18 lost, it was on Long Island.  The judge
19 didn't agree with my position.  The case is
20 under appeal.  I said the company was worth
21 29 million, the other expert said 6.  The
22 judge chose 6.
23         Shortly after the decision, the
24 company was sold for $103 million in cash
25 plus 50 million in earn-outs.  It's under

Page 39

R. Paulikens

1
2  appeal.
3      Q.  So I think you answered this
4  question.  I think you gave that answer to a
5  question that I asked, whether a court had
6  called your methodology unrealistic.  Is that
7  what happened in that case?
8      A.  He was critical of the assumptions
9  and following the forecasts that I made,
10 which turned out to be pretty reliable.  But
11 there was criticism and it was written up, I
12 think, in a couple of trade journals and
13 nobody mentioned the sale of the company and
14 the appeal.
15     Q.  But I guess the question is, do you
16 know whether the Court in that case called
17 your opinion unrealistic or not?
18     A.  No.  I think he thought the
19 forecasts that I relied upon were
20 unrealistic, and I'm not trying to nuance it
21 too much, but I think that's what he said.
22     Q.  Okay.  Has any court ever found that
23 you have relied on considerations that are
24 not appropriate in your opinions?
25     A.  No, not that I remember.

Page 40

R. Paulikens

1
2      Q.  Okay.  When you were first retained
3  in this case, in I think you told us
4  May 2022?
5      A.  Correct.
6      Q.  Who were you retained by?
7      A.  JC Mazzola and Rich -- the two of
8  them.  And Mr. Richard Lerner.
9      Q.  We previously marked your report as
10 Exhibit 144.  I'll just refer to it as your
11 report.
12         I'm going to go through this in
13 detail to understand what you've written and
14 your opinions.  Okay?
15     A.  Okay.
16     Q.  On page 1, the very beginning you
17 say, As part of our retention, we have
18 prepared this response report.
19     A.  Yes.
20     Q.  So I'm just going to focus on that
21 part.
22         What else were you retained to do by
23 the Mazzola Lindstrom firm for this case?
24     A.  Well, as I said, we were initially
25 retained in May of '22, so a little more than

Page 41

R. Paulikens

1
2  a year ago.  And we started working on and
3  understanding the issues at hand.  And
4  roughly, I think it was mid June we were told
5  the case was settled, pencils down.
6         So my first portion of my work was,
7  you know, whether it was a consultant or
8  expert, we were going to, you know, prepare
9  some level of analysis for them.  Then the
10 case settled, at least --
11     Q.  Nominally?
12     A.  -- nominally settled, thank you.
13 And it went quiet until the fall.  And then
14 worked on, you know, the enforcement of the
15 settlement action, for lack of a better term,
16 I became involved in the financial analysis.
17 So kind of three distinct portions of work.
18     Q.  And returning to page 1 of your
19 report, the sentence I read continues to say,
20 We've prepared this response report to the
21 expert report prepared by Barry Mukamal and
22 Mark Parisi, I'm leaving out their acronyms.
23     A.  Yes.
24     Q.  So what is a response report in your
25 practice, in general?

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 42

1                    R. Paulikens
2        A.  It's basically, some people call it
3    a response report, some people call it a
4    rebuttal report.  But another expert will
5    produce a report that, and this sounds
6    cliche, but we'll respond to, and/or answer
7    or address what we either agree or disagree
8    with that response report.  So it's a
9    response to another expert's report.
10       Q.  Okay.  And would you consider this
11   response report to be a full response or a
12   full-throated response or something like that
13   or is it a partial response?
14       A.  I believe it's a full-throated
15   response to what was included in the four
16   corners of the KM report.  So, yes, it would
17   be a full response to that.  They had some
18   waivers that they might want to amend in
19   their report, and I also reserve the right to
20   amend as the need arises.
21       Q.  So you were not instructed, you
22   know, don't touch certain issues that are in
23   the KM report, respond to it in its entirety
24   as best you can?
25       A.  Yes.

Page 43

1                    R. Paulikens
2        Q.  Okay.  You were never asked to
3    prepare an affirmative report on behalf of
4    Benlida before the KM report was created?
5        A.  That's correct.
6        Q.  Okay.  And did you work on this
7    report alone or did you have the assistance
8    of other professionals?
9        A.  I had assistance of certain
10   professionals, but the lion's share of all
11   the work was done by me.
12       Q.  And how many other folks helped you
13   with the report?
14       A.  Probably two people.  One of them
15   probably was mostly proofreading type of
16   work, because I always try to have a cold set
17   of eyes proofread.  I had a junior,
18   first-year student do some of the
19   accumulations for me.  But this particular
20   report I probably did 90 percent of the man
21   hours myself.
22       Q.  Okay.  And the junior person that
23   you mentioned, is that an employee of the
24   company?
25       A.  Right, yes.

Page 44

1                    R. Paulikens
2        Q.  But you said a first-year student?
3        A.  I'm sorry, I said first-year staff
4    member, I'm sorry.
5        Q.  Does that person have a professional
6    degree?
7        A.  He's an accountant, he's a degreed
8    accountant.  Bachelor's degree, I think he's
9    sitting for the exam.  But we call them first
10   years nowadays as opposed to junior and
11   senior.
12       Q.  Okay.  Just so it is clear, what is
13   that person's name?
14       A.  I believe it was Michael Barry who
15   helped me on this matter.
16       Q.  B-A-R-R-Y?
17       A.  Yes.
18       Q.  Let me ask you a couple of questions
19   about finances.
20            Your hourly rate that you're
21   charging for your work, I think you listed in
22   your report?
23       A.  It's 550.
24       Q.  Okay.  And did you charge a flat
25   rate for this report or did you just do it

Page 45

1                    R. Paulikens
2    hourly?
3        A.  It's hourly.
4        Q.  Do you know how many hours you did
5    that went into creating this report?
6        A.  I haven't looked at my timesheets
7    so I couldn't -- I mean, it's a significant
8    amount of hours, but I couldn't tell you if
9    it's 30 or 50 as I'm sitting here.  I haven't
10   looked.
11       Q.  Do you have those records somewhere?
12       A.  We have the records, I just don't
13   know them.
14       Q.  Okay.  If we wanted to get those
15   records as part of your total work on this
16   case, can we get those through your counsel
17   potentially?
18       A.  Potentially.  I'll leave it to them
19   what they're willing to produce.
20       Q.  Do you know the total amount you've
21   been paid so far in this case representing
22   Benlida or working as an expert for Benlida?
23            MR. LERNER:  Objection.
24            You could answer.
25       A.  I have to bifurcate the answer.  The

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 46

1          R. Paulikens
2  work I did at Friedman, which started in May
3  of '22, and I was with Friedman, technically
4  I still am, the work we did ended by the end
5  of June.  I believe there was $25,000 that
6  was ultimately paid to Friedman.
7     Q.  You said it went until June of 2023?
8     A.  No, June of 2022.
9     Q.  Okay.
10    A.  And then at Santye and Company, I
11 believe we billed and have been paid 60,000
12 from September through, I guess, through the
13 hearing.  That was the billing.  And then we
14 were paid within the last couple of months.
15    Q.  So from September of 2022 until the
16 last couple of months?
17    A.  The hearing, which would have been
18 January of '23.
19    Q.  Okay.  Just to be clear.  So from
20 that time period, September 22nd to
21 January 2023, you believe was about $60,000?
22    A.  Something like that.
23    Q.  And then since January 2023,
24 obviously, it was, as you described, pencils
25 down for a period of time.  When you picked

Page 47

1          R. Paulikens
2  the pencils back up, since that time have you
3  billed?
4     A.  Let me clarify.  It was pencils down
5  on the settlement back in June of '22.  So a
6  year ago.  The case was quiet until circa
7  October -- September, October of '22.  So
8  three months or so.  And then after the
9  hearing in January, there hasn't -- I don't
10 recall there being a lot of work that I've
11 done until we started responding to the KM
12 report.
13    Q.  Okay.  And I guess then that last
14 interval of time where you were engaged to
15 respond to the KM report, you don't have a
16 sense of whether it's 30 or 50 or however
17 manhours, right?
18    A.  Not as I'm sitting here right now.
19 I haven't billed it yet.
20    Q.  So prior to that time, about
21 $85,000?
22    A.  Yeah.
23    Q.  Your firms have been paid?
24    A.  Yeah, something like that.
25    Q.  In terms of preparation for today's

Page 48

1          R. Paulikens
2  deposition, what did you review to refresh
3  your recollection?
4     A.  I reviewed the KM report.  I
5  reviewed my report.  Clearly putting the
6  documents together on the thumb drive, it was
7  also part of review.  I reviewed, you know,
8  some of the financials, some of the other
9  information just to fully try to, you know,
10 get my recollection up as much as I could.
11 But I focused principally on my report and
12 the KM report and the documents that were
13 involved in that.
14    Q.  Did you review anything that's not
15 been listed in the materials we looked at on
16 your USB drive or the two reports you just
17 described; anything sort of extraneous or
18 exogenous to that set of data?
19    A.  No.  Because I think our report was
20 issued on the 7th or so of July, so maybe
21 about two weeks ago.  So I don't think there
22 was a lot of opportunity to see anything not
23 listed on the report.
24    So as I'm sitting here, I can't
25 remember a particular document that I may

Page 49

1          R. Paulikens
2  have looked at since.
3     Q.  But I mean, there's nothing that
4  stands out in your mind that you looked to as
5  a resource that's, essentially, new, not from
6  the documents you had reviewed for preparing
7  your report, solely in preparation for
8  today's deposition?
9     A.  Yes.  No, there's nothing new in the
10 last two weeks that I recall.
11    Q.  Okay.  So in your report, you used
12 the term -- I'm going to direct you to page 2
13 at the top.  On the third line, you use the
14 term CTX.
15    A.  Yes.
16    Q.  Okay.  Just about defining terms,
17 what does that refer to when you say CTX in
18 your report?
19    A.  CTX, I think I defined earlier on.
20 There's CTX, which when I just use CTX it's a
21 broad description of Circuitronix.  I
22 understand there's Circuitronix entities,
23 Circuitronix Hong Kong and there's others
24 that I am tangentially aware of.  But when I
25 say CTX, it's meaning the defendant.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 50

R. Paulikens

1
2      Q.  Well, who is the defendant in this
3  case, what entity?
4      A.  I believe it's CTX U.S.
5      Q.  It's also known as CTX LLC?
6      A.  Yes.  I believe the name is on
7  the -- yes, Circuitronix LLC.
8      Q.  And you're referring to the cover of
9  your report?
10      A.  Yes.
11      Q.  So let me be clear.
12          When you use CTX, do you mean CTX
13  LLC or do you mean CTX broadly?
14      A.  Different parts in the report I
15  tried to define CTX as broadly, because I
16  know there's multiple entities that are at
17  issue.
18      Q.  Okay.
19      A.  You know, when I was specifically
20  referring to one or the other, it was CTX's
21  particular paragraph is more of a setting the
22  table.
23      Q.  Okay.
24      A.  It was just, you know, what we were
25  talking about kind of thing.

Page 51

R. Paulikens

1
2      Q.  Okay.  So you weren't being precise
3  in that --
4      A.  No.  I was just trying to set the
5  table as to what we were doing and looking
6  at.
7      Q.  Okay.  Have you calculated the
8  amount of damages being sought by Benlida
9  anywhere in this lawsuit?
10      A.  No, not as formal calculation.  It's
11  an accounts receivable issue more than
12  anything.
13      Q.  Can you explain to me what those two
14  terms mean in your mind so I understand what
15  you -- how you distinguish formal calculation
16  from an accounts receivable issue?
17      A.  Well, in order to do a formal
18  calculation, you would need -- literally it's
19  related.  But in order to come to a precise
20  number that Benlida is entitled to, you know,
21  6,632,000 yadda, yadda, dollars, you'd have
22  to do a fairly detailed calculation which
23  incorporates an analysis in reconciliation of
24  the accounts receivable from day one, in
25  order to come to the specific finite numbers

Page 52

R. Paulikens

1  at a point in time because it's a fluid
2  number in general because they continue to do
3  business together.  Plus, you know, if you --
4  because of the way accounts receivable work,
5  you need to start from day one, you can't
6  just pick an arbitrary start date and say
7  we're going to measure it from here without
8  an agreement as to what the beginning balance
9  or opening balance was, if you're going to
10  try to truncate a long-term relationship.
11      Q.  Okay.
12      A.  I have not done that calculation.
13  So when you said do we calculate amounts due,
14  I put illustrations in depending upon the
15  data source of the magnitude that could be
16  found, because multiple data sources of
17  multiple different numbers because they cover
18  multiple different time periods.
19      Q.  Okay.  You mentioned that a formal
20  calculation like that would require a
21  reconciliation of accounts receivable from
22  day one, right?
23      A.  Because the way I understand it --
24      Q.  Let me just -- I correctly recited
25

Page 53

R. Paulikens

1  what you had said, right?  That --
2      A.  Go back?
3      Q.  -- part of the formal calculation
4  requires a reconciliation of accounts
5  receivable from day one?
6      A.  Right.  Because my understanding of
7  the case is Benlida seeking payment on its
8  accounts receivable.
9      Q.  Okay.
10      A.  Broadly speaking.
11      Q.  Just on that point of the
12  reconciliation of accounts receivable, is it
13  correct to say that both Circuitronix LLC and
14  Benlida, prior to this litigation, engaged in
15  a back and forth attempting to do just that,
16  this reconciliation of their accounts
17  receivable?
18      A.  Yes.  And I absolutely reference
19  that in my report, that there was a lot of
20  information transmitted between both sides as
21  they were trying to develop a number or an
22  agreement or resolution.
23      Q.  Right.  So in other words, they
24  were -- we'll talk about this in detail, but
25

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 54

1                    R. Paulikens
2    the reconciliation effort that happened in
3    2019 between the parties was the type of work
4    that you would agree, if you were hired to do
5    an independent formal calculation, you would
6    be doing similar stuff, correct?
7        A.  Similar, yes.  Because you want to
8    see, you know, what literally what does one
9    owe the other.
10       Q.  Right.  And to do that you have to
11   look at invoices and payments among other
12   things, right?
13       A.  Among other things.
14       Q.  Okay.  In a granular fashion,
15   presumably?
16       A.  Potentially, yes.
17       Q.  Okay.  So we were just talking --
18           MR. LERNER:  Can you read that
19       back.
20       (Whereupon, at this time, the requested
21   portion was read by the reporter.)
22       Q.  So we were just -- I was asking you
23   a series of questions starting from the
24   premise that you had distinguished between a
25   formal calculation and an accounts -- I can't

Page 55

1                    R. Paulikens
2    read my own handwriting.  I think maybe it's
3    accounts reconciliation.  Maybe you'll be
4    able to help me because I can't read my own
5    writing.
6            You had distinguished between, when
7    I asked you did you do a formal calculation
8    or -- strike that.
9            I had asked you whether you had
10   calculated the amount of damages that Benlida
11   is owed in this case, you said, no, that
12   would require a formal calculation, which you
13   didn't do, right?
14       A.  Not a formal -- correct, not a
15   formal calculation.
16       Q.  And you distinguished that from
17   something else, and I just can't recall the
18   words you used.
19       A.  I will distinguish it again so we
20   can be clear.
21       Q.  Thank you.
22       A.  From my chair, the dispute is an
23   accounts receivable dispute.
24       Q.  Receivable, that was the word I
25   couldn't read.

Page 56

1                    R. Paulikens
2        A.  And, therefore, the damages, to use
3    your word, is what Benlida is seeking in the
4    lawsuit to be paid.
5        Q.  What are its accounts receivable
6    that's owed?
7        A.  Right.  So when you say damages,
8    there could be other elements of damages.
9    It's a very broad category from my side of
10   the table.
11       Q.  Right.
12       A.  In this case, it's a receivables
13   issue, which is why I try to clarify that you
14   need to look at accounts receivable.
15       Q.  Thank you.
16           So having clarified that term, have
17   you done that?  Have you looked at the
18   accounts receivable independently to
19   determine how much Benlida is owed in your
20   view?
21       A.  Not independently.  My role is to
22   respond to the four corners of the KM report.
23       Q.  Okay.  Could you have done it
24   independently, based upon the data that you
25   had?

Page 57

1                    R. Paulikens
2        A.  Could it be done, the data, I know,
3    there is tens and tens of thousands of pages
4    that were available in May '22 before the
5    settlement, and I haven't looked at them,
6    maybe even at all since then, because the
7    case settled.
8            So the information ought to be in
9    there.  And certainly to diligently go
10   through the CTX reconciliation, the Benlida,
11   and then the HK and all of that, I believe
12   the information is in the universe to do
13   that; it would be an undertaking.
14       Q.  Is it fair to summarize what you
15   just said to say that you believe that the
16   data exists in the reconsolidation documents
17   sent forth between Benlida and CTX but it
18   would be a major undertaking to do it?
19       A.  Without knowing the full population
20   of documents that were sent back and forth
21   because the documents sent back and forth,
22   reconciliations and summaries that the
23   individual parties did, so to answer your
24   question, if an Excel sheet bounces between
25   both parties that references debit memos,

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 58

1              R. Paulikens
2    invoices, and payments, that's not going to
3    be part of the Excel worksheet.  They may be
4    referenced, but the data might be elsewhere,
5    you know, the bank drafts and that other type
6    of stuff.
7        Q.  So when you refer to data, you mean
8    like the underlying documents that are
9    summarized in those Excel spreadsheets?
10       A.  Correct, yeah.  There could be a
11   great deal of underlying data.  There's a lot
12   of invoices, for example.  So that, I
13   believe, must exist.  But when you use the
14   term that was transmitted between the
15   parties, that normally doesn't -- that
16   underlying data is not included in an Excel
17   spreadsheet.
18       Q.  But you understand that in the
19   ordinary course of business between Benlida
20   and Circuitronix, that Benlida would send
21   invoices to Circuitronix, right?
22       A.  Yes.
23       Q.  So, therefore, both parties
24   presumably have those invoices, right?
25       A.  That's what I kind of thought I just

Page 59

1              R. Paulikens
2    said.
3        Q.  Okay.  And also then if Circuitronix
4    would issue debit memos to Benlida that both
5    parties would have a copy of the debit memos
6    that Circuitronix issued to Benlida, correct?
7        A.  You would think both parties had the
8    same data.
9        Q.  And, likewise, that if Circuitronix
10   made payments to Benlida, that there would be
11   records of those payments on both sides of
12   the transaction as well?
13       A.  You would expect that.
14       Q.  So that underlying data that you
15   just described presumably is held by both
16   companies, right, one would expect?
17       A.  One would expect.  One would -- I'm
18   not trying to be -- they have access to the
19   data.  Whether it's held or how it is held
20   because part of the issue in the
21   reconciliations was neither party -- and I
22   say this in my report, seem to have a
23   complete document set.
24           And, again, this is by way of
25   illustration, but there was debit memos that

Page 60

1              R. Paulikens
2    Benlida didn't have in their file that CTX
3    issued, and I understand there were some
4    invoices that were missing.
5           So while you said they had that
6    information, my understanding from their
7    whole reconciliation process is they kept
8    finding things that one side didn't have.
9        Q.  And during that 2019 reconciliation
10   process, part of what it surfaced was which
11   documents each side seemed to be missing,
12   right, from each other?
13       A.  That's a fair summarization.
14       Q.  And then they worked collaboratively
15   to try to fill in those blanks, right?
16       A.  And I mentioned that in my report.
17       Q.  So at the end of that reconciliation
18   process, which I think is, like, if I'm
19   recalling correctly, November of 2019?
20       A.  Something like that.
21       Q.  They've gone back and forth several
22   times and sort of evolved their effort to
23   find the answer, right, on their accounts
24   reconciliation?
25       A.  Yeah, they had gone back and forth,

Page 61

1              R. Paulikens
2    and I believe they were narrowing in on at
3    least that they each had the same amount of
4    data.  I'm sorry, the same data.  And then my
5    understanding is disputes began about cutoffs
6    and other things, and that's more the legal
7    side of the issue.  But my understanding,
8    they were working towards at least to agree
9    on a population.
10       Q.  So in summary, if you had access to
11   the underlying data, that makes up the
12   spreadsheets that are in the account
13   reconciliation documents that Benlida and
14   Circuitronix exchanged with one another in
15   2019, you would presumably have been able to
16   do an accounts receivable calculation
17   independently, correct?
18       A.  If you had all of the data and it
19   was all agreed to, presumably you could.
20       Q.  And if you had 95 percent of it, you
21   could do 95 percent of an accounts
22   receivable, independent calculation?
23       A.  Certainly the more data -- the more
24   complete your data, the more comprehensive
25   and accurate your result would be.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 62

R. Paulikens

2  Q.  But assuming that the end of the
3  process of both companies working to try to
4  find the complete picture with all the data
5  resulted in, and I'm making up a number,
6  95 percent of it being located, if you had
7  that 95 percent of the data hypothetically,
8  you could produce an independent accounts
9  receivable analysis that would represent that
10  95 percent, right?
11      A.  If it was 95 percent of all of the
12  relevant data that the parties believe is
13  accurate, you could.  But I understand part
14  of the dispute is that different parties have
15  a different involvement in the data.  So if
16  you had 95 percent of half of the
17  information, your receivable -- your
18  reconciliation may not necessarily tell the
19  whole picture.
20      Q.  So let's go back to your report on
21  page 1, I think.  The bottom paragraph.  I
22  think you just alluded to this.
23          You say, as we will discuss in the
24  following pages, It is not what is in the KM
25  report that should be instructive to the

Page 63

R. Paulikens

2  trier of fact, it is what is not in the KM
3  report that actually informs the reader of
4  the order of magnitude of the amount being
5  sought by the plaintiff, the Benlida, and why.
6  Right?
7      A.  Yes, you read that correctly.
8      Q.  Is your response report attempting
9  to show the amount being sought by the
10  plaintiff, Benlida?
11      A.  No.  My response report is
12  responding to the KM report, which only
13  discussed the U.S. -- Circuitronix U.S. and
14  it ignored the Hong Kong issue.  And my
15  report specifically discusses, there's a
16  whole other portion of a -- of a dispute
17  here, and the results of the KM report taken
18  on its face don't make commercial sense.
19      Q.  So help me with this.  If your
20  report is not making an affirmative statement
21  or if you don't intend to testify as to how
22  much money Benlida should be owed -- let me
23  stop right there.
24          Do you intend to testify in this
25  case how much money Benlida is owed by

Page 64

R. Paulikens

2  Circuitronix, if asked by counsel?
3      A.  If asked by counsel and I prepare a
4  report, then I would be asked to do that, but
5  I wasn't asked to do that in preparing the
6  response report.  I was pointing out the
7  shortcomings, my opinion, in the KM report
8  because of the missing pieces.
9      Q.  Okay.  So do you have -- have you
10  formed an opinion of the amount being sought
11  by the plaintiff Benlida, as you write on
12  page 1 of your report?
13      A.  No, not a formal number.  As I put
14  out in my report on various pages, I said,
15  using the phrase, Depending on the data
16  source Benlida is owed, I think, anywhere
17  from the low 3 millions to as much as
18  $8 million, depending upon the data source.
19  And, again, all the data that was cited, some
20  of it started in 2012, went through '19, and
21  then some of it started in '15 and then went
22  through '21.
23          So when you compared the running
24  totals of each, you had a significant order
25  of magnitude difference.  Benlida is over --

Page 65

R. Paulikens

2  owes CTX on one set of data by -- and I'll
3  use 5 million for simple illustration, but
4  the Hong Kong entity is owed 13 million.  So
5  it's a net 8 million that Benlida owes.
6          And I was pointing out that the KM
7  report didn't cover that issue, didn't
8  address it, didn't even mention it.  So
9  that's why I put different examples and
10  caveated them, was dependent upon the data
11  source.
12      Q.  So on page 4 of your report, there's
13  a paragraph that begins, The significant
14  disparity.
15          Do you see that?
16      A.  Yes.
17      Q.  Three lines down at the right side
18  it begins a sentence that says, quote, As we
19  will show information from KM and others show
20  that CTX HK owes about $13 million, close
21  quote.
22      A.  Yes.
23      Q.  That's the high-end range -- well,
24  no, that's the highest number I think I've
25  seen in your report that you refer to,

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 66

R. Paulikens

1          R. Paulikens
2   correct?
3       A.  That might be.
4       Q.  Okay.
5       A.  That might be.  And could I make a
6   correction?  The date of the e-mail that I
7   referenced, I typed wrong.
8       Q.  Let's -- we'll get to that later.
9   Let's just stay on this issue.
10      A.  Okay.
11      Q.  So with respect to the statement you
12  say, As we will show, information from KM and
13  others show that CTX HK owes about
14  $13 million, have you done an independent
15  calculation to come up with that figure?
16      A.  No.  What I did was I took one of
17  the files that we went through on the thumb
18  drive that was produced to your expert, which
19  was from his files that showed the HK -- I'll
20  call it the HK portion.
21      Q.  You're referring to the Circuitronix
22  Hong Kong?
23      A.  Yes.
24      Q.  Okay.
25      A.  It showed the same blue highlighted

Page 67

R. Paulikens

1          R. Paulikens
2   amounts, it showed invoices, debit memos,
3   payments, and it showed that the running
4   total at one point was $13 million.  It's
5   reprinted as part of a report and that came
6   directly from the KM files.
7       Q.  Let me direct you to page 8 of your
8   report, to the blue highlighted chart, and
9   ask you whether that's the one you're
10  referring to.
11          (Witness peruses document.)
12      Q.  At the top of the page.
13      A.  Yes.  And there's the 13 million.
14      Q.  That's the one that says, Balance
15  due slash credit balance, and it's got 13.492
16  million?
17      A.  Correct.  And that was -- the source
18  document came from CTX Hong Kong was part of
19  the reconciliations that they were doing in
20  2019, and that particular file came from your
21  expert's files.
22      Q.  So let me do this, because I know
23  that you marked certain of these charts with
24  the blue highlighting as exhibits to your
25  report, right?

Page 68

R. Paulikens

1          R. Paulikens
2       A.  Yes.  We printed some of them.
3       Q.  If we look on the screen, I have
4   your PDF right here.  It says, Paulikens'
5   open report.
6           MR. LERNER:  Also, note for the
7       record Exhibit 144 does not include
8       all of the attachments.
9           MR. ROSENTHAL:  Correct.
10      Otherwise it would be ten times as
11      long.
12          THE WITNESS:  Can we take a
13      five-minute break?
14          MR. ROSENTHAL:  Sure.
15          (Whereupon, a brief recess was
16      taken.)
17  BY MR. ROSENTHAL:
18      Q.  Mr. Paulikens, I'm showing you a
19  copy of your report on the computer screen
20  because this copy of it, digital copy, has
21  the exhibits which are voluminous.
22      A.  Okay.
23      Q.  They are not printed out in
24  Exhibit 144.
25          So I want to ask you whether the

Page 69

R. Paulikens

1          R. Paulikens
2   blue highlighted chart that appears at the
3   top of page 8 of your report that you were
4   just talking about is the same one that
5   appears as Exhibit 3?
6       A.  I have to get up.
7       Q.  Please.  And then I'll scroll down
8   and rotate this.  The top says, Source,
9   Benlida shipment and payment details CTX-HK
10  2012 to 2019.
11          And you might want to take your
12  report with you, just to --
13      A.  That looks like the same chart.
14  Because it was brought forward from the
15  exhibit, certainly the numbers agree.
16      Q.  Okay.  So those are the same two
17  things, right?
18      A.  Yes.  And this is the exact -- this
19  is the exhibit?
20      Q.  You're asking me?
21      A.  Yes.
22      Q.  Yes, see, it says Exhibit 3?
23      A.  Exhibit 3, and is there pages behind
24  it?
25      Q.  Yes.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 70

1              R. Paulikens
2      A.  Okay, there's detail, yes.
3      Q.  So I want to just ask you something
4  else about the source document for this chart
5  that is Exhibit 3 to your report, and also
6  appears on page 8 of it.
7          In your document that you provided
8  us, and I'm pulling it up on the screen, I'm
9  going into the folder called, Further
10  documents reviewed by Randall Paulikens.  I
11  want to show you the document that matches
12  that title, which is Benlida shipment and
13  payment details.  Bear with me a second.
14      A.  Right here?
15      Q.  You're pointing to the one that says
16  CTX HK 2012 to 2019?  Let me open that then,
17  it's an Excel spreadsheet.
18          This brings up a blue highlighted --
19  the summary tab brings up a blue highlighted
20  chart, right?
21      A.  Correct.
22      Q.  And it doesn't have additional
23  columns like you had done where it says
24  payment type?
25      A.  We had spread it out to show the

Page 71

1              R. Paulikens
2  payment type and show the debit memos, but it
3  still gets to the same $13,492,000, which I
4  referenced it as the source of the
5  information.  So I spread it out to make it
6  easier to compare the other tables.
7      Q.  Okay.  So, okay, so this is the
8  source file for --
9      A.  Right, there is a few versions of
10  it, and if we click on that -- and there was
11  also similar information.  Again, there was a
12  lot of Excel files going back and forth, but
13  that is the source for that $13 million we
14  just saw that it agreed.
15      Q.  Okay.  So I don't recall whether we
16  made this an exhibit previously, but so just
17  for the purpose of clarity, the Excel
18  spreadsheet file that we're looking at, which
19  I'm going to make this the next exhibit which
20  will be 146, is entitled Benlida shipment and
21  payment details, CTX HK 2012 to 2019, right?
22      A.  Correct.
23      Q.  And then I will close out of it, Mr.
24  Paulikens and you can look at where it
25  resides on the folder.  This is the one you

Page 72

1              R. Paulikens
2  directed us to?
3      A.  Correct.  That was the source
4  document and then --
5      Q.  Let me just for the record be clear.
6  That's dated on the computer file 7/14/2023?
7      A.  Which would have been the date that
8  it was sent to you.
9      Q.  Okay.  And it is 256 kilobytes,
10  right, just to identify it?
11      A.  I think that's correct, yeah.
12      Q.  Okay.
13          MR. ROSENTHAL:  So at the end
14      of the deposition, we'll print this
15      one out as, at least that summary
16      page, and mark that as Exhibit 146.
17          (Whereupon, at this time, the
18      above-mentioned file entitled Benlida
19      shipment and payment details CTX HK
20      2012 to 2019 was marked as Exhibit
21      146 for identification.)
22          MR. LERNER:  So only the
23      summary page will be 146?
24          MR. ROSENTHAL:  We can make the
25      whole exhibit that, but we can print

Page 73

1              R. Paulikens
2  out just the summary page.
3          MR. MAZZOLA:  What is the whole
4      exhibit?
5          MR. ROSENTHAL:  It's 146, it's
6      called Benlida payment and shipment
7      details CTX HK.
8          MR. MAZZOLA:  Off the record.
9          (Discussion held off the
10      record.)
11  BY MR. ROSENTHAL:
12      Q.  The last one was Chinese?
13      A.  Yes.
14      Q.  All right.  So I'll go back.
15  Anyway, this Excel spreadsheet is in the
16  folder called -- that Mr. Lerner sent,
17  Further documents reviewed by Randall
18  Paulikens.
19          Do you see that?
20      A.  Yes.  And that came out of -- that's
21  it from your expert's production, which is
22  why it's that name and it looks a little
23  different.  So that's your expert's file --
24      Q.  Okay.
25      A.  -- not mine.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 74

R. Paulikens

2    Q.  Okay.  Just to be clear, that's
3 the -- we've established that is the Excel
4 spreadsheet that becomes the source for this
5 chart that's on page 8 of your report and
6 also Exhibit 3 of your report, correct?
7    A.  Yes.  The file you just looked at
8 was from your expert, but the source
9 information --
10    Q.  Is what you used?
11    A.  -- is what we used, which is from
12 his file.
13    Q.  Okay.  All right.
14       Going back to page 4 of your report,
15 the line that I asked you about a few minutes
16 ago before the break, where you talked about
17 the $13 million number?
18    A.  Yes.
19    Q.  Are you with me?  You said we will
20 show information from KM and others show that
21 CTX HK owes about $13 million?
22    A.  Yes.
23    Q.  The information from KM, is that the
24 document that we just looked at on the
25 screen?

Page 75

R. Paulikens

2    A.  That's the document, because that
3 came from KM.  That came from KM's file and
4 the others is, that was one of the documents
5 that was bounced back and forth during
6 reconciliation process.
7    Q.  Okay.  So let me -- you're ahead of
8 me because what I wanted to ask you what does
9 and "others" mean in your report, information
10 from KM and others?
11    A.  So that document was attached to one
12 of the e-mails as they were -- the parties
13 were trying to resolve their dispute.
14    Q.  Okay.  So in other words, when you
15 say, We will show information from KM and
16 others that CTX HK owes about $13 million,
17 this is KM and others is one unit that's
18 referring to the document that we just looked
19 at which is Exhibit 3 to your report?
20    A.  Right.
21    Q.  And that Excel spreadsheet that we
22 just marked as Exhibit 146?
23    A.  Right.  That was the information I
24 was citing that it came from other people.
25    Q.  Okay.  I wasn't sure if it was two

Page 76

R. Paulikens

2 different sources, that's why I was asking
3 that question.
4    A.  No, no.  It's that same basic file
5 that's been shared multiple times.
6    Q.  Okay.  Let me go back to page 3 of
7 your report.
8       There's a small one-sentence
9 paragraph above the words, The dispute, that
10 subheading.
11    A.  Okay.
12    Q.  And you say that, quote, To fully
13 understand the economic relationship between
14 the parties and where the state of the
15 ultimate economic relationship lies, correct?
16    A.  You didn't read the whole sentence.
17    Q.  Okay.  This fact, as well as the
18 actions of all sides, needs to be considered
19 to fully understand the economic relationship
20 between the parties and where the state of
21 the ultimate economic relationship lies.
22       Did I read that correctly?
23    A.  Yes, you did.
24    Q.  Okay.  So who are the parties in
25 that sentence?

Page 77

R. Paulikens

2    A.  The parties -- I was referring to
3 the paragraph above, which talked about the
4 hearing from January.  And I was simply
5 saying that certainly the two litigants are
6 doing -- have been doing business together
7 for a long period of time.  And my
8 understanding from the testimony is that
9 there is a relationship, and I said it in the
10 paragraph, that is not -- they're friends.
11 Friendly.
12       So there's a long relationship,
13 there was testimony about business dealings,
14 and I said to look at the whole picture
15 between them you need to look at the whole
16 picture between them.  That's all I was
17 saying.
18    Q.  I'm asking a narrower question.
19    A.  Okay.
20    Q.  Who are the parties when you refer
21 to that it is necessary to look at the
22 economic relationship between the parties?
23 Who do you mean?
24    A.  Well, I was talking about the key
25 members of the litigants have a long

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 78

R. Paulikens

1 relationship outside of business as neither
2 side denied a level of familiarity. So
3 that's what I was referring to.
4 **Q. So you're referring to the people,**
5 **not the companies?**
6 A. I was referring to people, and the
7 people who run the companies.
8 **Q. Which people were you referring to?**
9 A. There's Tracy, there's Rishi, and
10 I'm not going to try the luck at the last
11 names. There's Richard, that's -- there was
12 other -- there's other managers. But
13 there's -- my understanding from the
14 testimony was there was a certain level of
15 familiarity.
16         MR. LERNER: Hold on, you said
17         Richard. You didn't mean -- the only
18         Richard I know of in this case is me.
19         THE WITNESS: No. The
20         accountant, I think the title is CFO.
21         MR. LERNER: Are you thinking
22         of Roger?
23         THE WITNESS: Roger, I'm sorry,
24         Roger.

Page 79

R. Paulikens

1 BY MR. ROSENTHAL:
2 **Q. So you say you became aware of that**
3 **from the testimony. Did you read a**
4 **transcript of the testimony of that hearing?**
5 A. I was in the hearing towards the end
6 of the day. I was sequestered for six or so
7 hours of it. And the latter two hours, I was
8 in the courtroom and I did hear part of
9 Tracy's -- I'm not going to get her last name
10 right, and Rishi's testimony as well as the
11 CFO for Circuitronix.
12 **Q. So you were in the courtroom during**
13 **that --**
14 A. I was in the courtroom for the
15 latter two hours or so.
16 **Q. In that sentence on page 3 of your**
17 **report that I had originally focused on, you**
18 **used the terms, The economic relationship and**
19 **then you say, The ultimate economic**
20 **relationship.**
21 A. Correct.
22 **Q. What do you mean by ultimate as**
23 **distinguished from just the economic**
24 **relationship?**

Page 80

R. Paulikens

1 A. Okay. Two issues. One, the KM
2 report only focused on the CTX U.S. portion
3 and ignored the Hong Kong portion. So from
4 my chair as an accountant, that's an
5 incomplete picture, and we discussed with
6 that chart why it is an incomplete picture.
7         Secondly, there was discussions in
8 the testimony that there were -- there's
9 claims that they were -- that one party was
10 fronting money to another, you know. And so
11 it sounded like if we're going to understand
12 what the ultimate economic truth is we need
13 to look at all of this information, including
14 all of these, I'll call it, side details,
15 because they may feed into the behavior of
16 the parties, which drives the ultimate
17 economics, which wasn't covered in the KM
18 report.
19 **Q. And when you refer to a discussion**
20 **in the testimony that one party was fronting**
21 **money to another, can you be more specific to**
22 **what you're referring to?**
23 A. Yeah, there was discussions about
24 moneys that were sent from one entity to

Page 81

R. Paulikens

1 another, having to do with regulatory issues
2 in China. I couldn't -- I don't know the
3 specific cites, but there was a certain
4 amount of cooperation between the parties
5 that was testified to. And all I'm saying in
6 that paragraph is, we need to look at
7 everything to get to a definitive number and
8 not a snapshot of a particular piece.
9 **Q. You had in your documents that you**
10 **reviewed excerpts of deposition testimony I**
11 **noticed. Did you have entire depositions as**
12 **well or just excerpts that were provided?**
13 A. Just the excerpts, as they were made
14 as part of the record for the motion hearing
15 in January.
16 **Q. Okay. So I assume that that's the**
17 **source that you're drawing upon for what you**
18 **were just testifying?**
19 A. It was that there was some of the
20 other moving papers from the court documents
21 and I think is what was covered in the testimony
22 that I heard at least portions of the ones
23 that were actually in the hearing.
24 **Q. So there's another place where you**

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 82

R. Paulikens

1    R. Paulikens
2    refer to the entire economic picture as
3    you've just testified to on page 4 of your
4    report at the top, the top paragraph, let me
5    direct you to that.
6         Do you see the paragraph that
7    starts, As a result?
8    A.  Okay.
9    Q.  You have a parentheses there that
10   says, Since the KM report did not produce any
11   information or analysis with regard to CTX HK
12   or ROK, the KM report is not a source as to
13   the entire economic picture either, right?
14   A.  Correct.
15   Q.  And that's what you were just
16   testifying about, a part of the picture,
17   versus the entirety, right?
18   A.  Correct.  There's a Hong Kong
19   picture, there's the U.S. picture, and I know
20   it's a legal dispute and I'm speaking as an
21   accountant, but those are some big disputes
22   and the KM report didn't cover the other
23   half, if you will.
24   Q.  What companies are involved in the
25   entire economic picture, in your view?

Page 83

R. Paulikens

2    A.  A definitive list, I can't generate
3    as I'm sitting here.  But there's certainly
4    Circuitronix, the parent, in Miami, there's
5    Circuitronix Hong Kong, there's Benlida and
6    then there's ROK.  And then there's a new
7    Benlida entity that's building a factory.
8         They all seemingly work together in
9    terms of communication.  Again, that's a
10   legal issue.  I'm not trying to prejudge it,
11   but there is a certain amount of cooperation
12   between the entities.
13   Q.  So your view is that all of those, I
14   think you named five entities, need to be
15   considered as the, quote, entire economic
16   picture, close quote?
17   A.  Correct.  Because the individual
18   pieces don't necessarily make economic sense
19   in a vacuum.
20   Q.  Let me take you back to page 2 of
21   your report.  If you can turn there, I'm
22   going to ask you about something you wrote.
23        At the top, first line, you write,
24   The limitations of the KM report are properly
25   spelled out on page 3 of the KM report.

Page 84

R. Paulikens

2    Do you agree that they properly
3    express limitations in their report?
4    A.  Well, they were fairly clear that
5    they did this and this and did not do that
6    and that.  And I'm not trying to be vague,
7    but I'm trying to answer the question
8    quickly.
9    Q.  Right.
10   A.  And I think when an expert doesn't
11   do something and communicate it basically
12   upfront, that's proper.  Because then you
13   don't hold them responsible for something
14   they didn't do or weren't asked to do.  So
15   that's what I was saying here.
16        They were fairly clear, we only
17   looked at this, we didn't look at the source
18   documents, we compared the two
19   reconciliations and some other information,
20   and that's all that we did.
21        And from my chair as another expert,
22   I believe that's an appropriate, call it a
23   limitation, but it's an appropriate
24   communication of what they did or did not do.
25   Q.  So the KM report was clear about

Page 85

R. Paulikens

2    what they were considering and what they
3    weren't considering, right?
4    A.  From my chair, the short answer,
5    yes.  And I think I basically said that.
6    Q.  Okay.  And you also say on page 3 of
7    your report, at the top line, We take issue
8    not as much with what is included in the KM
9    report, close quote, I'm going to stop right
10   there.
11   A.  Okay.
12   Q.  Does that mean that you don't take
13   issue with what they didn't choose to include
14   in their report, that analysis?
15   A.  Well, as I say later on in my
16   report, their report was a summary and they,
17   you know, summarized the information, they
18   didn't include the exhibits.  So I said words
19   to the effect, since they didn't produce
20   their file, a more comprehensive report, we
21   couldn't recreate their work.  But we weren't
22   in the position to fully agree or disagree,
23   but we noted some congruence with what we had
24   seen with what they had done, and we said we
25   are not taking issue with certain analyses

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 86

1                      R. Paulikens
2    they had actually been done for purposes of
3    our response report.  I'm paraphrasing but I
4    think it's almost a quote.
5        Q.  What does it mean to not take issue
6    when you are a rebuttal expert?
7        A.  For purposes -- when I say that, I'm
8    saying, okay, I can accept what they're
9    saying, at least insofar as this whatever
10   piece I'm discussing.  And if I don't have a
11   position to disagree with them, then I won't
12   necessarily take issue, because maybe they're
13   right on this piece of what they did.  And
14   I'm not going to argue it if there's nothing
15   to argue.  And I said that, I think, very
16   clearly in the report.
17       Q.  Okay.  I mean, in other words, just
18   to be more concrete, what you're referring to
19   now, the part of their report that you don't
20   take issue with, correct me if I'm misstating
21   this, is the 2019 reconciliation part; is
22   that right?
23       A.  Well, a little bit more granular.
24   The way they did their report, they compared
25   invoices and tried to locate the exceptions,

Page 87

1                      R. Paulikens
2    which I don't have a problem with from a
3    methodology perspective.  And they came out
4    with the 600-odd-thousand dollar difference.
5    I wasn't offended by that result, for the
6    piece that they did do in their report.
7        So that's what I'm saying.  We're
8    not taking issue with that portion of their
9    report.  I took issues with the stuff that
10   wasn't in the report.
11       Q.  All right, and you make that clear?
12       A.  I tried to.
13       Q.  Okay.  I may come back to the part
14   that you don't take issue with, but I'm going
15   to try to proceed in a different way for a
16   moment.
17       Just looking at your language in
18   your report on page 2, forgive me for
19   bouncing around, I'll just try to direct you
20   clearly to what I'm speaking to specifically
21   in your report.
22       At the top again, you say the KM
23   report simply reconciled the claims of the
24   litigants, et cetera.  I want to ask you
25   about what you mean by "simply" there.  Was

Page 88

1                      R. Paulikens
2    that meant as criticism or just description
3    of what they did?
4        A.  Just a description.  And I don't
5    think they used the word simply.  But in
6    their report they said, and I'm paraphrasing,
7    we compared the CTX reconciliation to the
8    Benlida reconciliation.  And they did not
9    look to the source documents, they didn't
10   seek to validate the underlying data.
11       They were pretty descriptive in the
12   report that they can -- they compared this to
13   this, and produced what they produced.  And
14   that's what they did.  Perhaps that's what
15   they were asked to do.  But what I'm saying
16   here is, that's what they did, they didn't go
17   through and do a forensic analysis of the
18   underlying documents.  They didn't go to
19   provide assurance that the CTX source
20   information was correct.  They relied upon
21   what was given to them by CTX and Benlida,
22   and didn't go any further to vet or validate
23   the underlying data, and they said that
24   clearly.
25       Q.  And part of the reason that you

Page 89

1                      R. Paulikens
2    don't take issue with that part of their
3    report is that the data that they relied on
4    from CTX was also passed through Benlida
5    during that reconciliation process, right?
6        A.  Well, part of it is that, well, I
7    don't take issue with it because they were
8    very clear that what they didn't do.  So I'm
9    not going to jump up and down when somebody
10   says I didn't do something to say that they
11   didn't do it, you know, to blame them, for
12   lack of a more eloquent term, that they
13   didn't do it because they were clear.  But
14   they still didn't do it.
15       Q.  Now, one of the things they did do,
16   though, right, is that they verified the
17   numbers at a transactional level, right?
18       A.  They verified, they compared the
19   two.  You know, when you use the word verify,
20   is that going back to the invoices?  I don't
21   believe they did that, the way I read the
22   report.
23       Q.  I'm saying in terms of looking at
24   each transaction that's logged somewhere in
25   the data that was exchanged between

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 90

1                R. Paulikens
2    Circuitronix and Benlida in the
3    reconciliation process?
4        A.  All right, perhaps I'm not following
5    your question.  So maybe let's try it again
6    so I can answer it.
7        Q.  So I'm asking you whether they
8    verified the numbers in the reconciliation
9    documents at a transactional level?
10       A.  I don't believe they verified the
11   numbers at the transactional level.  The way
12   I understood what they did, they compared,
13   and I'm going to use this by way of example,
14   the list of information.
15           For example, the invoices was
16   67-million-odd dollars of invoices, that the
17   parties agreed on.  And so they compared that
18   and said, okay, Circuitronix agrees with
19   Benlida.  We're done with that.  And then
20   they show it in their report.  And they did
21   the same thing with the payments and then
22   they look for the discrepancies.
23           So you say verified.  They compared
24   the two data sources or the two party's data.
25   Verify to me maybe also goes a little

Page 91

1                R. Paulikens
2    further.  Did they go to the actual invoices,
3    did they go to shipping documents, and they
4    did not.
5        Q.  So let's use a different verb.
6            Are you aware that they looked at
7    the numbers reported for individual
8    transactions in Excel spreadsheets which
9    summarized those numbers?
10           MR. LERNER:  Objection.
11           You can answer.
12       Q.  Do you follow me?
13       A.  Can you repeat?  No, I don't.
14       Q.  Okay, I think his objection was
15   vagueness, too, so let me try to be clear.
16           You received their supporting
17   documents, correct?
18       A.  Yes.
19       Q.  And you've incorporated those into
20   the USB, that's what we've gone over.
21           You're aware that a lot of these
22   Excel spreadsheets that were exchanged
23   between Circuitronix and Benlida during their
24   reconciliation process in 2019 had not just
25   summary pages but then also individual time

Page 92

1                R. Paulikens
2    period tabs which listed by transaction
3    amounts, correct?
4        A.  Reams of them, yes.
5        Q.  Right.  That's what I'm referring
6    to.
7            Are you aware that what Kapila
8    Mukamal and Parisi -- the names of our
9    experts are Barry Mukamal and Mark Parisi --
10   for the benefit of our court reporter.  So
11   we'll call it the KM report for short.
12       A.  Um-hum.
13       Q.  You are aware that for purposes of
14   the KM report that they went to the
15   transactional level in those reconciliation
16   spreadsheets and worked from the ground up to
17   assess those numbers?
18           MR. LERNER:  Objection.
19       A.  They didn't disclose that's what
20   they did.  They provided summaries in the
21   four corners of the report and they did not
22   provide their work product to show the
23   analysis that they did.  And I said that I
24   didn't disagree with their analysis, I said
25   you didn't show your work product so I could

Page 93

1                R. Paulikens
2    agree with their analysis.
3            They -- I believe they did exactly
4    what you said.  They used Excel and dated
5    extraction tools, but they didn't put a
6    trail.  They put a table in their report and
7    said, here's the total, and that's what I
8    commented on.
9        Q.  So you haven't seen that, but you
10   don't dispute that that's what they did, if
11   that's what they say they did?
12       A.  I believe that's what they did.
13       Q.  Okay.
14       A.  That's why I say, I can't agree or
15   disagree.  Because I think that's exactly
16   what they did, but they didn't provide the
17   work product -- I'm sorry, yeah, work product
18   in order to trace it.  But I didn't -- that's
19   why I said, I don't take issue with it.
20   Because what they resulted in made sense, at
21   least as far as they took it.
22           MR. LERNER:  At least in terms
23       of --
24   (Whereupon, at this time, the requested
25   portion was read by the reporter.)

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 94

1                    R. Paulikens
2       A.  At least as far as they, meaning KM,
3  took their analysis.
4       Q.  KM also independently identified
5  some discrepancies between the two companies'
6  reconciliations, right?
7       A.  Yes.
8       Q.  You don't take issue with that?
9       A.  No, because again, they were
10  comparing two data sources that ought to
11  agree so their methodology should have kicked
12  out things that didn't.
13       Q.  And one of the things that you don't
14  fault them for doing was emphasizing that
15  they didn't perform any other analysis of the
16  underlying claims?
17       A.  Repeat that?
18       Q.  So let me look at page 2 of your
19  report, I'm quoting you.
20            Are you with me?  Page 2, the
21  paragraph that begins Further.
22       A.  Um-hum.
23       Q.  You wrote, The KM report emphasized
24  that it did not perform any other analysis of
25  the underlying claims, period, right?

Page 95

1                    R. Paulikens
2       A.  Yes.
3       Q.  But they actually did perform some
4  additional analysis, didn't they?
5       A.  Well, on the italicized portions
6  they relied upon the records of CTX as
7  produced, the reconciliation, the Benlida
8  recon, and this is a quote from them.  And
9  they did not perform any additional
10  procedures to provide assurance as to the
11  reliability beyond the procedures enumerated
12  herein.
13            So what they're saying is, we did
14  what we did, we've communicated what we did,
15  and that's all that we did.
16       Q.  But they say, Beyond the procedures
17  enumerated herein, right?
18       A.  Yes.
19       Q.  And they did do some things to
20  ensure reliability, correct?
21            MR. LERNER:  Objection.
22       A.  Again, we're getting into what's
23  reliable.  They compared two lists together
24  to come up with a list that has the totality
25  of the information.  Did they dig behind the

Page 96

1                    R. Paulikens
2  numbers to determine that the list, the
3  sources that populated both lists are, in
4  fact, accurate and complete?  My
5  understanding is they did not do that step.
6       Q.  At all?
7       A.  At all.  And I think they say that
8  reasonably clearly.  That's all I'm saying
9  here.  They didn't go -- they took the list,
10  they compared the list, that's a certain
11  amount of analysis and verification.  But
12  they didn't go behind those lists in their
13  work.
14            MR. ROSENTHAL:  Do you have a
15       copy of their report?  Did you print
16       one, Rich?  The Kapila Mukamal
17       report?
18            MR. LERNER:  No.
19            MR. ROSENTHAL:  Off the record.
20       (Discussion held off the
21       record.)
22       Q.  So referencing the KM report?
23       A.  Okay.
24       Q.  Take a look at paragraph 15 on page 6.
25            MR. ROSENTHAL:  And we will

Page 97

1                    R. Paulikens
2       mark a clean copy of the KM report as
3       Exhibit 147.
4       (Whereupon, at this time, the
5       above-mentioned KM report was marked
6       as Exhibit 147 for identification.)
7  BY MR. ROSENTHAL:
8       Q.  Mr. Paulikens, do you see where they
9  say, We compiled the detailed database and
10  identified transaction level of discrepancies
11  between the two reconciliations?
12       A.  Yes.
13       Q.  Did you ever see that detailed
14  database that they're referencing?
15       A.  To me, that's a database that they
16  created and I haven't seen their work
17  product.
18       Q.  So did you look through the
19  materials that we produced that was their
20  work product to see if that detailed database
21  was there?
22       A.  I didn't see that database when I
23  went through their documents and I was
24  responding to the report here.  Because I
25  didn't see exactly where these numbers

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 98

1                    R. Paulikens
2   specifically came from.
3       Q.   Okay.
4       A.   But --
5       Q.   Let me ask you.
6            MR. LERNER:  He pointed in the
7       document to certain numbers.  Can we
8       just identify for the record what
9       those numbers were?
10           THE WITNESS:  That was Table 1.
11      Q.   Of page 7 of the KM report?
12      A.   Yes.
13      Q.   Okay.  Let me ask you to turn to
14  paragraph 24 of the KM report, which is on
15  page 10 at the top.
16           Do you see that they say, To
17  investigate further, we judgmentally selected
18  DMs with an amount in excess of $10,000?
19      A.   Yes.
20      Q.   Do you see that?
21      A.   Yes.
22      Q.   So they actually did do a judgmental
23  sample of debit memos to check the accuracy
24  of Circuitronix's numbers listed in its
25  reconciliation, correct?

Page 99

1                    R. Paulikens
2       A.   They judgmentally selected them and
3   traced numbers, yes.
4       Q.   So that's beyond just accepting the
5   numbers face value from the reconciliation
6   report, correct?
7       A.   No.  From my chair, they simply
8   traced one set of numbers to the other set of
9   numbers.  When you talk about validate --
10      Q.   Sorry, I didn't say validate.  Just
11  to be clear to what you're testifying --
12      A.   Okay.
13      Q.   -- they traced one set of numbers to
14  another set of numbers.  What specific --
15  what sets of numbers do you understand they
16  did?
17      A.   I'll read what they said.  They
18  judgmentally, which is a specific auditing
19  term, selected debit memos, DMs, with an
20  amount in excess of 10,000.  Fine, that's a
21  scope, which were claimed on one
22  reconciliation which is largely an Excel
23  sheet, from Circuitronix's side.
24      Q.   Okay.
25      A.   Which is not listed there.  But

Page 100

1                    R. Paulikens
2   it's -- and they said they agreed.  So the
3   debit memos that Circuitronix claimed also
4   showed up on Circuitronix's reconciliation,
5   that's the way I interpret that first
6   sentence.
7       Q.   Okay.  But is it -- do you
8   understand it also to mean that they looked
9   at individual debit memo documents and
10  compared what was said on those individual
11  debit memo documents to the spreadsheet that
12  listed those debit memos?
13      A.   It said judgement is like the debit
14  memos.  To me it's not clear if they actually
15  looked at the debit memo or the electronic
16  support for the debit memo.
17      Q.   Okay.
18      A.   And it doesn't say that they went
19  back beyond the debit memo itself to
20  determine if the information that is
21  summarized in the debit memo is correct.
22      Q.   And if you look at footnote 18 of
23  that report, right there they said they
24  yielded a sample of 11 debit memos with an
25  aggregate amount of a certain amount of

Page 101

1                    R. Paulikens
2   money?
3       A.   Right.
4       Q.   So you don't know one way or another
5   from reading this whether they looked at an
6   individual 11 debit memos, the amounts that
7   were listed on them or not, right?
8       A.   Well, it says they selected a
9   sample, fine.  But it doesn't say how far
10  they went to validate the information
11  contained within the debit memo.
12      Q.   The debit memo, as you're familiar
13  with in this case?
14      A.   I've seen copies of them.
15      Q.   And they are -- they list a, like a
16  reason and then an amount of money, right?
17      A.   Correct.
18      Q.   So do you question whether or not
19  the KM report, the experts actually look at
20  the 11 debit memos that they say they
21  sampled?
22      A.   No.  I don't dispute that they
23  looked.
24      Q.   Okay.
25      A.   What I -- what's unclear is did --

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 102

R. Paulikens

1
2  what, if any, steps they did to validate that
3  the reason for your example was appropriate.
4  And I'll use the term agreed in quotes, that
5  it was an appropriate reason.  They compared
6  the numbers, they compared the debit memo,
7  they compared it to the CTX reconciliation,
8  they compared it, all good, all appropriate.
9  But how far they went to determine if the
10  debit memo itself was valid, they didn't say.
11  **Q.  Okay.**
12          MR. LERNER:  Just for clarity,
13      I just want to make sure for the
14      record that we understand that this
15      is Table 4 of the KM report.
16  **Q.  So if you would take a look at**
17  **Exhibit 147, the KM report, paragraph 33.**
18  **It's on page 12.**
19  **Do you see that they say that they**
20  **selected a judgmental sample of 8 lead time**
21  **penalty spreadsheets and confirmed the**
22  **accuracy of CTX's computations of lead time**
23  **penalty?**
24  A.  Yes.
25  **Q.  So you don't dispute that they did a**

Page 103

R. Paulikens

1
2  **judgmental sample of that data either, right?**
3  A.  No.  I don't believe that they did,
4  you know, they took eight of the -- I'm not
5  sure what the population of spreadsheets are,
6  there's a lot of them, and they checked to
7  make sure they calculated correctly.
8  **Q.  They being Circuitronix?**
9  A.  Well, I'm sorry, let me be clear.
10      I don't dispute that KM did exactly
11  what they said.  They looked at 8
12  spreadsheets and reviewed that the math
13  calculated.  So if it was late by two weeks,
14  it was "X" percent penalty.  I don't doubt
15  that they did that for the eight
16  spreadsheets, and that they did check the
17  math, I don't doubt that at all.
18  **Q.  And here they footnote paragraph --**
19  **footnote 22, that they didn't validate the**
20  **inputs used to compute the lead time**
21  **penalties?**
22  A.  Correct.
23  **Q.  And that's appropriate to disclose?**
24  A.  It's absolutely appropriate to
25  disclose, which is why I said that very much

Page 104

R. Paulikens

1
2  upfront in my report.  They were clear what
3  they did or did not do.
4  **Q.  So let's come back to page 2 of your**
5  **report.**
6  **You reprinted this chart, this**
7  **table, which is designated Table 7 from the**
8  **KM report, right?**
9  A.  Correct.  We made a change, because
10  we noticed there was a math error, which is
11  why I highlighted it in yellow, which is what
12  their report was.  So their report cut off
13  immediately to the right of the yellow
14  portion.
15  **Q.  Right.  So you added, and we talked**
16  **about this when we were looking through your**
17  **materials on the USB, the last column that**
18  **says, Difference with math correction?**
19  A.  Correct.
20  **Q.  And so what is the math error that**
21  **you identified?**
22  A.  If you look across, and I'm looking
23  at the payments from Table 2, which is for
24  CTX, it was $67,623,456.  Compare that to
25  the one for Benlida next door, there's a

Page 105

R. Paulikens

1
2  $12,000 -- $12,614 difference.
3          Same math for the next column.  662,
4  they cover that in the report.  And then
5  debit memos are comparing the two totals
6  here.  And they go from 2.3, 2.13 --
7  $2.313 million, excuse me.  And for Benlida
8  it was a million 843.  And they said it was,
9  97,000 was the difference.  And that's not
10  the difference between those two numbers.
11  It's actually a much bigger difference than I
12  pointed out.
13  **Q.  That's the 470,000?**
14  A.  The 470,000.  And I just pointed
15  that out.  So if it's a simple math error,
16  okay, it happens.  But following their table,
17  I got, you know, a significantly different
18  number.  And that's all I'm pointing out.  I
19  don't know if there's anything else behind
20  the 97,000, as to why that's the number and
21  there's just a piece that's not clear.
22  **Q.  What is the import of that**
23  **difference?**
24  A.  It makes -- it means that the
25  amounts due to Circuitronix are higher than,

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 106

```
1              R. Paulikens
2    all things held equal, than KM had in their
3    report.  So they had a difference of 747,000
4    in their report, and the difference here is a
5    million -- $1,120,000 and change.
6         Q.  And that number represents the sort
7    of delta between what Circuitronix says it is
8    owed, Circuitronix U.S. says it's owed, and
9    what Benlida says it owes to Circuitronix
10   U.S.?
11             MR. LERNER:  Objection.
12        A.  Between the two formulas, yes.  What
13   one party admits it owes or doesn't owe and
14   it's probably the reason why we're here.  But
15   for purposes of this table, that's what you
16   said is -- that's the difference between what
17   CTX says Benlida owes it versus what Benlida
18   says it owes Circuitronix.
19        Q.  And we're talking about Circuitronix
20   U.S. in that particular?
21        A.  Yes, yes.
22             THE WITNESS:  Can we take
23        another quick break?
24             (Whereupon, a brief recess was
25        taken.)
```

Page 107

```
1              R. Paulikens
2    BY MR. ROSENTHAL:
3         Q.  I want to ask you about some
4    limitations on the scope of your opinion or
5    work that you've done.
6         A.  Okay.
7         Q.  I believe on page 3 of your
8    report -- well, I'll do this generally and
9    you can tell me if there's a specific part of
10   your report that we should look at.
11             But my understanding is you've not
12   been engaged to opine on the validity or
13   appropriateness of debit memos between the
14   companies; is that correct?
15        A.  Yes, yes.  There is -- part of the
16   dispute is there's debit memos that would
17   reduce potentially amounts owed, and we nor
18   KM were engaged to opine whether those debit
19   memos were appropriate or agreed or
20   supported.  So I did not provide that
21   opinion.
22        Q.  Okay.  And what is the function, in
23   your understanding, of the function of debit
24   memos that Circuitronix U.S. issued to
25   Benlida?
```

Page 108

```
1              R. Paulikens
2         A.  Well, the function would be a
3    reduction of the amounts that Circuitronix
4    owed.  Let me be a little more clear.
5             In a typical accounts receivable
6    where a customer owes the supplier money, a
7    debit memo is the reduction of the amounts
8    that are owed.  And I know there's -- we're
9    kind of in the opposite world here so I just
10   want to be clear.
11            So the debit memos that Circuitronix
12   U.S. claimed against Benlida would certainly
13   reduce, would go against whatever amounts are
14   owed or would add if there's an overpayment.
15        Q.  Right.
16        A.  They function almost as an -- almost
17   like a payment functionally.
18        Q.  So have you taken -- undertaken any
19   analysis of the debit memos in this case?
20        A.  No, we have not.
21        Q.  We touched on earlier some
22   information that you gleaned from your
23   attendance at the hearing in Miami back in
24   January of 2023?
25        A.  Yes.
```

Page 109

```
1              R. Paulikens
2         Q.  Do you recall that?  And at the top
3    of page 3 of your report, you reference that
4    at the very top paragraph.
5             Do you see that?
6         A.  Yes.
7         Q.  So the second paragraph on page 3,
8    you say, This fact as well as the actions
9    both sides needs to be considered to fully
10   understand?
11        A.  Yes.
12        Q.  What are you referring to, what is
13   "this fact"?
14        A.  The fact that there was a long-term
15   business relationship, but as well as the key
16   members of a long relationship.  My
17   understanding is the principals know each
18   other, they're friendly, that they are --
19   that because they are friendly, you know,
20   it's not quite the same as the true
21   unrelated, you know, adverse parties in a
22   typical economic transaction.
23            There's a certain level of
24   familiarity, and all I'm saying is, based on
25   some of the testimony you need to incorporate
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 110

R. Paulikens

2  that before you say, you know, before you
3  opine that one piece of the information is
4  absolutely correct when there's other pieces
5  that affect it.  You know?
6      **Q.  So what is your understanding -- you**
7  **write in your report, A long relationship**
8  **outside of business.  What are you referring**
9  **to there?**
10     A.  They've known each other for a
11  number of years.
12     **Q.  You say outside of business?**
13     A.  Well, exactly.  Outside of business,
14  they talked about, there was familiarity,
15  they've had dinners and other things
16  together.  Tracy discussed that a little bit.
17  Rishi discussed he was helping out Mr. -- I
18  believe it's Huang is the right way to say
19  his name within his testimony.
20         It certainly sounded like there was
21  more familiarity than simple supplier and
22  customer.  And all I'm saying is, they talked
23  about it.  They didn't deny it.  That's just
24  a fact that one ought to consider when you're
25  looking at the overall relationship.

Page 111

R. Paulikens

2      **Q.  Do you recall hearing, perhaps,**
3  **Rishi's testimony at that hearing that he**
4  **considers Tracy Huang a friend?**
5      A.  I believe that's a recollection I
6  absolutely have.  How he specifically said
7  it, I couldn't -- but, yes.
8      **Q.  I'm paraphrasing as well.**
9      A.  Yes.  The intent, absolutely, that
10  they were friendly.
11     **Q.  Do you believe that people engaged**
12  **in a traditional business relationship are**
13  **not usually friends with one another?**
14     A.  You can be friends with the people
15  you transact business with.  My impression
16  was there -- it was more than just the
17  familiarity of somebody you do business with
18  on a daily basis.  That was my impression of
19  his testimony.
20     **Q.  Are you suggesting anything beyond**
21  **the fact that they just seem to be friendly**
22  **with one another?**
23     A.  No.  But as I recall his testimony,
24  he was indicating that, and I am
25  paraphrasing, you know, that he had helped

Page 112

R. Paulikens

2  out Benlida or Mr. Huang in earlier stages,
3  which suggested maybe a little bit more than
4  just a commercial relationship.
5      **Q.  Helped out how?**
6      A.  I believe there was money, Rishi
7  said, that was advanced.  And I'm not
8  specific on exactly the story, but a part of
9  his testimony he talked about that there was
10 a certain familiarity that he considered all
11 of them friends.  And maybe I think he used
12 the word mentor or something else.
13     **Q.  And how does your understanding of**
14 **that relationship play into your evaluation**
15 **of the financial dispute between these**
16 **companies?**
17     A.  It plays into the inverse
18 relationship towards the end of my report
19 that discusses that one entity claims it
20 overpaid its supplier by 5-million-odd
21 dollars and that another entity that's
22 clearly related was underpaid by 13 million
23 from the chart we talked about.  And
24 individually, you wouldn't have those kind of
25 transactions.

Page 113

R. Paulikens

2         Ordinarily, a supplier doesn't
3  over -- a customer doesn't overpay its
4  supplier ever.  Or certainly not by months
5  worth of revenue.  And you don't have another
6  supplier that may have one year of sales --
7  one year of transactions being owed.
8         I mean, individually, those are odd
9  transactions.  And I covered that in my
10 report, which is simply wanting to say why is
11 that.  It doesn't make sense that these two
12 pieces are so isolated and disparate.
13     **Q.  So you're saying what might explain**
14 **it is the fact that there is some close**
15 **personal relationship between the principals**
16 **of the two sides?**
17     A.  Right.  It could be a close personal
18 relationship, but you need to understand how
19 one half can have such an odd relationship in
20 terms of an overpayment of accounts
21 receivable, and then the other side has a
22 significant underpayment of accounts
23 receivable, when you take into consideration
24 the whole.  And it's just an odd situation.
25 And when you look at the whole, the

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 114

1           R. Paulikens
2    relationship makes sense how the individual
3    parts got off.  There has to be a reason for
4    it.
5        Q.  Do you fault the KM report authors
6    for not giving some credit to this
7    relationship that you're describing between
8    the principals?
9        A.  No, I'm not -- I'm not faulting
10   them.  I'm not giving credit for their
11   relationship.  What I said is, KM didn't
12   discuss anything other than in a footnote of
13   the existence of another issue, which is the
14   KM issue -- I'm sorry, the HK issue.
15          I'm sorry, the KM report didn't
16   discuss, other than in a footnote, the HK
17   issue.  That's what I was faulting KM on.
18   Because they didn't mention it at all, other
19   than in a footnote that they might come up
20   with a report if so asked later on.
21       Q.  Looking again at page 3 of your
22   report, second to last paragraph, the last
23   line.  I'll give you a second to look at that
24   paragraph.
25          (Witness peruses document.)

Page 115

1           R. Paulikens
2        A.  Okay.
3        Q.  You are referring to these detailed
4    lists of invoices and payments that were
5    exchanged by the parties during their
6    reconciliation process.  And you say, Those
7    records provide useful insight as to the
8    payment status of the business transactions
9    between the parties.
10       A.  Yes.
11       Q.  You agree that relying upon those
12   reconciliation spreadsheets does provide
13   useful insight as to where things stood in
14   2019 ultimately, correct?
15       A.  Yes.
16       Q.  Okay.  But then you say that -- I'm
17   looking for where you say this.  The next
18   page, page 4, I think, somewhere you say,
19   It's difficult for either side to know which
20   source is the final word.
21       A.  Top paragraph of page 4?
22       Q.  Right.  What do you mean by that?
23       A.  Sure.  In this particular case, the
24   case was at one point settled.  At least
25   nominally, I think, was the phrase you used.

Page 116

1           R. Paulikens
2    And as an accountant, I understand settlement
3    talks are not discoverable.  Understood.
4    Certainly the parties working to reconcile
5    their differences.
6          As an accountant, when somebody
7    might say that's a settlement discussion,
8    somebody else might say, that's just two
9    businesses trying to get to the right answer.
10   And all I'm saying in that paragraph is, this
11   information is useful, it's discoverable, and
12   it provides useful information.  Perhaps not
13   definitive, because each of the -- you know,
14   I didn't say this, but it provides useful
15   insight, which I chose those words because
16   it's useful to get to the ultimate
17   conclusion.
18       Q.  I read this and understood you to be
19   saying, so maybe I'm incorrect, that with
20   respect to the sort of ping-ponging back and
21   forth in 2019 of different reconciliation
22   reports between Benlida and Circuitronix
23   U.S., that the last one exchanged can't be
24   regarded as sort of the final word in that
25   exchange; is that what you meant?

Page 117

1           R. Paulikens
2        A.  That's partially what I meant.  And
3    because with each ping-pong, to use your
4    phrase, there was more information that came
5    to light, and I don't know that there has
6    been a definitive answer that at a point in
7    time there is a specific amount due, whatever
8    measure that the parties can agree to because
9    then the disputes as to who owed what to whom
10   took over and statute of limitations issues
11   take over.
12          So all I was saying is, with all the
13   information going back and forth, which was
14   somewhat disparate they were working to
15   clarify, I don't know that anyone knows at
16   this moment what the absolute final agreed
17   upon dataset between all of the related
18   parties is.
19       Q.  You'll agree that the last one of
20   those reconciliation spreadsheets exchanged
21   between the parties at least reflects the one
22   with the most input from both sides as of
23   that time period, didn't you?
24       A.  I would agree that that would make
25   the logical inference that was whatever was

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 118

R. Paulikens

1 R. Paulikens
2 contained was as complete as the parties had
3 available to them.  But then there's, you
4 know, there may be other claims that were
5 added such as the lead time penalties that
6 were, I think, after.  But, again, there's a
7 bouncing back and forth, information maybe
8 was coming together.
9 **Q.  But with respect -- I'm sorry.**
10 A.  But with that last piece, it
11 probably was, at least at that moment, the
12 up-to-date of what they were exchanging.  But
13 it is also unclear if that up-to-date also
14 went back to day one.
15 **Q.  Well, they originally did, if I'm**
16 **remembering correctly, a 2015 to 2019**
17 **reconciliation, right?**
18 A.  That covered that time period, yes.
19 **Q.  And then Benlida sought earlier**
20 **records from Circuitronix going back to 2012,**
21 **the inception of the relationship, right?**
22 A.  Correct.
23 **Q.  And then the reconciliation then**
24 **encompassed 2012 to, I think, 2021, right?**
25 A.  There were spreadsheets that

Page 119

1 R. Paulikens
2 obviously evolved after '19, yes.
3 **Q.  But they went back to 2012 as well,**
4 **correct?**
5 A.  They did.  But what's unclear from
6 the spreadsheets, and you saw when we had
7 that exhibit on the screen, was that they
8 showed the running balance for each year and
9 I put a cumulative column in.  It's unclear
10 if it went -- if the 2012 went all the way
11 back to invoice zero.
12 **Q.  Do you know whether it did or not?**
13 A.  As I'm sitting here, I don't know.
14 But as I was saying in that paragraph,
15 there's a lot of information back and forth
16 for disparate time periods.  And so it's, you
17 know, with what I've seen, it's impossible to
18 know that we have a definitive answer today
19 as to what both parties can agree on.
20 **Q.  You make a comment on page 4 of your**
21 **report that at the end of the first full**
22 **paragraph, It is difficult to appreciate why**
23 **there was so much information missing from**
24 **each other's records; close quote?**
25 A.  Yes.

Page 120

1 R. Paulikens
2 **Q.  Are you -- what's the point of**
3 **saying that?  Why do you flag that?**
4 A.  Because you've got two fairly
5 substantial companies that have a significant
6 disagreement on accounts receivable and
7 accounts payable.  And it's just odd in
8 35 years of accounting that you would be that
9 far off, that they didn't have this going on
10 all the time.  It just seemed to me odd that
11 they would be -- one side would be missing so
12 much information from the other.
13 **Q.  Do you intend to offer an opinion**
14 **about it being odd in this case, like tie in**
15 **to anything germane to the numbers that we're**
16 **talking about?**
17 MR. LERNER:  Objection.
18 A.  I haven't been asked to give a
19 formal opinion on that, but as we're looking
20 at reconciliations, you know, when you have
21 your millions of dollars being, you know,
22 bounced back and forth between them for two
23 sophisticated companies, it's just not
24 typical.  You know, what I've seen, you would
25 normally have a little bit better control on

Page 121

1 R. Paulikens
2 each side to know what the other was talking
3 about.
4 **Q.  Do you intend to offer an opinion**
5 **about the controls on Circuitronix's side of**
6 **its records?**
7 MR. LERNER:  Objection.
8 You could answer.
9 A.  I have not been engaged to do a
10 study of Circuitronix's internal control
11 mechanisms.  That would be part of their
12 audit.  So I'm not going to give you an
13 opinion on something I haven't been engaged
14 to do.  So I'm not, at this point going to
15 give an opinion, because I haven't been
16 asked.
17 **Q.  Same thing with respect to Benlida.**
18 **Have you been asked to evaluate its internal**
19 **control methods for its documentation of its**
20 **finances?**
21 MR. LERNER:  Objection.
22 A.  I have not been asked.  That would
23 be part of their audit process.
24 **Q.  Do you intend to offer any opinion**
25 **in this case about the state of**

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 122

R. Paulikens

1           R. Paulikens
2    Circuitronix's records compared to the state
3    of Benlida's records?
4           MR. LERNER:  Objection.
5           MR. ROSENTHAL:  What's your
6       objection?
7           MR. LERNER:  Is it going to
8       come up as a direct opinion?  It may
9       come up as part of an explanation of
10      his opinion -- of other opinions he
11      may give.  But it's not going to be
12      an ultimate opinion that he provides.
13          MR. ROSENTHAL:  Okay.
14      Q.  In light of Mr. Lerner's response,
15   can you answer whether you intend to offer an
16   opinion about the state of Circuitronix's
17   records compared to Benlida's records in this
18   case?
19      A.  Other than the fact that they're
20   different, and that the actions of the
21   parties showed that there were significant
22   differences, and that to me is just an odd
23   oddity, given the, I think, sophistication of
24   the parties, at least my perceived -- my
25   perception of their sophistication.

Page 123

R. Paulikens

1           R. Paulikens
2          It might be an explanation to a
3    question that comes up, but I'm not studying
4    the internal controls of Circuitronix or
5    Benlida.
6       Q.  What is your perceived -- what is
7    your perception of the comparative state of
8    the two company's records, Benlida and
9    Circuitronix U.S.?  Do you have one or not?
10      A.  No, no.  I think you misheard what I
11   was saying.
12      Q.  Okay.
13      A.  I said perception of their
14   sophistication.  Circuitronix is a
15   substantial company.  I believe they do
16   business in multiple continents.  Benlida is
17   a substantial company.  And the fact that
18   they were missing as much as they did between
19   the two, is just not something I normally see
20   at companies that significant and, I believe,
21   sophisticated when you are doing business in
22   multiple continents.
23      Q.  Okay.  Take a look at page 4.
24   There's a paragraph that starts -- you're
25   talking about this issue, I believe.

Page 124

R. Paulikens

1       A.  Yes.
2       Q.  You say, The significant disparity
3    in information in the implication that any
4    one source is better is best illustrated by
5    an e-mail.  And we'll leave that for a
6    moment.
7          I want to ask you, the implication
8    that any one source is better, what are you
9    getting at there?  Are you saying that there
10   is an implication that one source is better
11   than the other or you shouldn't assume that?
12   I don't understand the language.  That's why
13   I want to ask you, what do you mean by the
14   implication that any one source is better?
15      A.  Sure.  It can be a bit of an
16   explanation.
17      Q.  Okay.
18      A.  Typically, if you have, you know, a
19   customer, you know what they owe you.  And
20   that customer knows what it owes you.  And
21   within some, you know, ordinary economic
22   timing differences, you have a pretty good
23   handle as to where you stand.  And usually
24   your customer owes you money not the other

Page 125

R. Paulikens

1    way around.
2          And because of the functions, even
3    as I said in the e-mail, that one entity has
4    a $13 million balance due and the other
5    entity has a $5 million amount due, on some
6    set of records, then his e-mail talks about
7    CTX U.S. overpaid Benlida by 5.3 million, and
8    then Hong Kong also was overpaid by 2
9    million, shows there's a huge swing there.
10         Because -- so one set of information
11   produced showed 13 million that Hong Kong
12   owed Benlida.  And -- but Rishi in his e-mail
13   says, no, at least in sequence, no, Hong Kong
14   actually is owed 2 million, that's a
15   $15 million swing.
16         All I'm saying is, there's a lot of
17   pieces moving here.  And taking one
18   particular chart or another particular chart
19   as gospel is not advised.
20      Q.  That's what you mean by, if I'm
21   understanding you correctly, you can't say
22   any one particular source is better?
23      A.  That's really what I tried to say,
24   is because it's -- and there are disparate

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 126

1              R. Paulikens
2   pieces of time which are disparate.  So to
3   say one is better than the other right now, I
4   don't think is appropriate for anybody.
5       Q.  Okay.  And then when you say,
6   Significant disparate information, you're
7   alluding to what I think you just explained,
8   which is that Mr. Kukreja thought in an
9   e-mail, which we'll talk about in more
10  detail, that Circuitronix Hong Kong was
11  actually owed by Benlida 2.179 million, when
12  there's another view of the evidence in a
13  spreadsheet that shows a $15 million swing
14  from that.
15      A.  Correct.  And all I'm saying is,
16  this is some big movements.
17      Q.  I understand what you've written
18  now.
19          Let's talk about that e-mail.  I
20  know you volunteered earlier in the
21  deposition that there's an error in the date.
22  Correct?
23      A.  Yes.
24      Q.  What is the correct date?
25      A.  It's November 1, 2019.

Page 127

1              R. Paulikens
2       Q.  Is there a November 11, 2012 e-mail
3   that you were talking about?
4       A.  No.  It was me making -- I wrote --
5   I marked this up.  I apologize.
6       Q.  That's okay.
7       A.  The document, I marked it.
8           MR. LERNER:  The actual
9       exhibit.
10          MR. ROSENTHAL:  We'll just note
11      for the record that the handwritten
12      mark is Mr. Paulikens indicating a
13      typographical error that was in the
14      report.
15      A.  Yes.  Now, I don't -- if there is an
16  e-mail from 2012, I'm not aware of it.  I
17  wrote that e-mail.  It was -- it had Chinese
18  characters around it.  When I typed it in, I
19  just typed it badly, and I didn't notice that
20  until yesterday.
21      Q.  Okay.  Let me just pull up on our
22  screen -- let me show you what I understand
23  you to be referring to.
24      A.  I'm going to stand up.
25      Q.  Sure.  Looking at the screen of the

Page 128

1              R. Paulikens
2   documents that you reviewed that were
3   produced to us, there's a document on here
4   that is marked with a Bates number CTX 1993
5   to 1994.
6           I'm just going to open that and ask
7   you whether the e-mail that is in that
8   document, which is dated November 14, 2019,
9   at the top but then scrolling down,
10  November 1, 2019 --
11      A.  Right.  This is the e-mail that I
12  was referring to here.  And that shows, if
13  you scroll down, some of the numbers that I
14  cite in the report and that's where I messed
15  up the date.
16      Q.  Okay.  So just for clarity sake
17  you're referring to the e-mail that is at the
18  bottom of page CTX 1993 from Rishi Kukreja
19  dated November 1, 2019, correct?
20      A.  Yes.
21      Q.  And that e-mail contains the two
22  dollar figures that are referenced in your
23  report?
24      A.  I believe so, if you scroll down.
25      Q.  Why don't you take your report, just

Page 129

1              R. Paulikens
2   so you can follow along with me because you
3   talk about this e-mail there on page 4.
4           Just looking at your report, Mr.
5   Paulikens, you say with reference to that
6   e-mail, that the e-mail claims that CTX U.S.
7   overpaid Benlida by $5,314,868.
8       A.  Yes.  Can you scroll down on the
9   next page?
10      Q.  Yes.
11      A.  Yes.  Right there.  (Indicating).
12      Q.  So that's on page CTX 1994, that
13  number?
14      A.  Yes.
15      Q.  Okay.  And then that CTX, you say in
16  your report CTX HK overpaid by $2,179,988.74.
17  And that's the number that is shown in yellow
18  on page CTX 1994.
19      A.  Correct.  These are disparate
20  numbers.  What I'm saying is, over the
21  whole -- there's just -- it's a moving target
22  as to what the right number is, and I'm just
23  saying I'm not sure what the final complete
24  picture is.  That's all that paragraph was
25  saying.

Randall M. Paulikens, CPA/ABV/CFF/CITP
July 20, 2023

Page 130

```
 1                  R. Paulikens
 2      Q.  Okay.  Got it.
 3          Continuing on page 4 of your report,
 4   you referred to a response to Mr. Kukreja's
 5   e-mail.
 6      A.  Yes.
 7      Q.  And that it contains an Excel file
 8   with a name 2012 to 2019?
 9      A.  Right CCT.
10      Q.  Reconciliation analysis 2019,
11   November 15th, CCT?
12      A.  Yes.
13      Q.  Let me ask you again just looking at
14   your materials on the computer screen.  Hang
15   on a second, I'll pull it back up.
16          That's -- you're referring to the
17   e-mail that is right here at the top of the
18   page?
19      A.  I believe that file was included and
20   it was included in both your expert and the
21   various things, that CCT analysis.
22      Q.  And that's on page CTX 1993?
23      A.  That's the reference in the e-mail.
24      Q.  Okay.
25          MR. ROSENTHAL:  For the record,
```

Page 131

```
 1                  R. Paulikens
 2      that e-mail that we're looking at has
 3      been previously marked as Exhibit 79.
 4      Just so you know.
 5      Q.  That attachment that ends with 2019
 6   dot 11 dot 15 CCT, is actually in your report
 7   as an exhibit, right?
 8      A.  I believe excerpts of it are.
 9      Q.  Let me flip to your report, the
10   exhibits to your report, which we don't have
11   printed out but we can look at here on the
12   computer screen.
13          Let me pull up your report and show
14   you Exhibit 1, and ask you whether that's --
15   let me turn it sideways.  --
16      A.  That was part of the -- yeah, part
17   of the file.  And I reprinted part of it in
18   my report, and it was at Exhibit 1.  And that
19   was part of the parties working toward
20   resolution.
21      Q.  Okay.  And I believe that's actually
22   reproduced in your report at page 5?
23      A.  Yeah.
24      Q.  So, basically, that same
25   reconciliation analysis report, 2012 to 2019
```

Page 132

```
 1                  R. Paulikens
 2   that's on page 5 of your report, is also at
 3   Exhibit 1 to your report?
 4      A.  Yeah, and I believe the file, as I
 5   recall, is quite comprehensive.  Because this
 6   is a summary and there's files drawing from
 7   various sub tabs.
 8      Q.  Why did you place that in your
 9   report at page 5, that table?
10      A.  Just showing that the parties were
11   working to try to resolve and figure out why
12   they were so disparate in their beliefs as to
13   what the status was.  And it was, you know, a
14   process they went through.
15      Q.  Calling your attention back to page
16   4 of your report, where you're talking about
17   the e-mail in which Benlida sent this file to
18   Circuitronix.
19          You write toward the bottom of that
20   page, quote, Many of the largest
21   discrepancies were from the earlier years of
22   the relationships, close quote.
23      A.  Yes.
24      Q.  What years are you referring to?
25      A.  If you look at the table on the next
```

Page 133

```
 1                  R. Paulikens
 2   page, you'll see, if you go to the left it
 3   says year 12 -- 2012 to 2014.  You'll see
 4   there's, you know, significantly large
 5   numbers in those years and prior.
 6          Going to the middle of the table
 7   there's a million eight difference on the
 8   2014, and you see the numbers kind of drop
 9   off in the subsequent years.
10          So all I'm saying is while they
11   had -- and I'm looking at the payment
12   discrepancy, which is 2,569,000, right, I
13   guess, where your pen is, you know, the vast
14   majority of that was from 2014 and prior.
15          So all I was saying in that, you
16   know, part of the issue here, maybe was the
17   earlier part of the relationship, because
18   some of the bigger numbers here, you know,
19   were from a period of time before.
20      Q.  So if I understand what you're
21   saying correctly, at least according to this
22   effort between the two companies, between the
23   parties to reconcile their differences back
24   in 2019, this chart, as you observed, was
25   showing that at least between Benlida and
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 134

1           R. Paulikens
2 Circuitronix U.S., on the left side of that
3 chart, the largest difference between their
4 assessments of who owes whom what, occurred
5 in 2014?
6      A.  It's actually a little bit more.
7 It's the differences -- there seemed to be
8 more differences in the earlier years, '14
9 and prior.  And I used the million eight as
10 in my answer a few minutes ago.
11      Q.  Eight million eight?
12      A.  A million eight.  I thought I said a
13 million eight.  Some of the numbers are
14 larger from the prior period, and then they
15 sort of get smaller as they, you know, as
16 they got more recent.  So maybe they got
17 better.
18      Q.  And that discrepancy represents
19 what, a difference between the two companies'
20 books about how much has been paid?
21      A.  Again, this was them trying to marry
22 their two -- I'll call it perceptions of the
23 data.  And from looking at the table and
24 looking at the backup to this table, it
25 looked like the differences were earlier in

Page 135

1           R. Paulikens
2 the relationship.  That's what I simply said.
3      Q.  Have you logged those differences
4 anywhere else independently or were they
5 basically payment discrepancies that the
6 parties had identified themselves in this
7 chart?
8      A.  Yeah, what I was referencing in the
9 report, and this -- that was the state of the
10 data in response to those e-mails, circa
11 November 2019, that they were -- again, this
12 is one of the ping-pong balls that went back
13 and forth there.  And I just noticed, as I
14 said, that the discrepancies were earlier,
15 the bigger discrepancies were earlier.
16      Q.  And you didn't separately catalogue
17 those discrepancies independent of, like,
18 what the parties had identified themselves
19 in, for example, this chart?
20      A.  I don't follow what you're asking.
21 Maybe it's an easier question than I think it
22 is.
23      Q.  It's designed to be easy.  Did you
24 keep a separate list of the payment
25 discrepancies?

Page 136

1           R. Paulikens
2      A.  No, no.  We looked at -- I was
3 looking at this as to partly upsetting the
4 table going, well, how do we know which one
5 is right when neither of the parties have a
6 consistent set of data, and how can the trier
7 of fact know what the ultimate resolution is
8 if there's an inconsistent dataset between
9 the parties.
10      Q.  Okay.  But this table at the top of
11 page 5 of your report is something that
12 Benlida sent to Circuitronix, correct?
13      A.  Yeah, I believe it was their -- a
14 response to Rishi's e-mail.
15      Q.  And they, in this chart, at the top
16 of page 5 of your report, reported two sets
17 of transactions, right?  On the left side
18 they reported transactions between Benlida
19 and Circuitronix U.S., correct?
20      A.  Yes.
21      Q.  And in the right side they reported
22 transactions between ROK and Circuitronix
23 U.S. slash HK?
24      A.  Yes.
25      Q.  Okay.  Do you know why they did

Page 137

1           R. Paulikens
2 that?
3      A.  Why they did that?  I mean, as I
4 said, there's other entities related to both
5 parties.  And so, you know, I think
6 Benlida -- from the e-mail, I think the top
7 of the e-mail chain was asking, well, what
8 about HK?  And I saw e-mails that said, well,
9 Circuitronix U.S., what about HK?  And I
10 remember seeing e-mails that were asking,
11 hey, what about this other piece?
12      Q.  Okay.  Let me pull up that e-mail so
13 you can see it.
14           This is Circuitronix 1993, which has
15 that e-mail you're referring to.
16      A.  Yes.  So here it says, Please
17 provide DMs details for those we cannot find
18 in our records and also check the invoices
19 and payments again.  Besides the
20 reconciliation, CTX HK should also be checked
21 so that we can come to the whole picture.
22           And this was in response to Rishi's
23 e-mail of about two weeks prior.  So I said,
24 they're talking about the whole picture.  And
25 so from what I'm looking at is, one piece is

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 138

1           R. Paulikens
2   not the whole picture, because they even
3   reference, hey, what about this other piece.
4       Q.  Okay.  So still on page 5 of your
5   report, beneath that chart, you referenced
6   this before, you say, We're unable to
7   recreate KM report's results and are not in a
8   position to fully agree or disagree with
9   portions of their findings.
10      Are there portions of their findings
11  that you are in the position to fully agree
12  or disagree with?
13      A.  No.  Because they did what they did,
14  and that doesn't sound right, but they did
15  their work.  I think their analysis that they
16  said that they did, they did.  And it gave a
17  result.  And I didn't take issue with it.
18  I'm not, for now, disputing that the payments
19  were 67 million, and I'm not disputing that
20  the invoices, there were some slight
21  differences, I'm not disputing that.
22      And I'm not disputing, you know,
23  that the debit memos that have been
24  circulated, there is a difference, forget the
25  math error.  You know, I'm not disputing

Page 139

1           R. Paulikens
2   that.  I think they probably did an accurate
3   job.
4       It's the underlying implication that
5   that is the only piece, that is why I can't
6   fully agree or disagree.  But as I said, I'm
7   accepting, for purposes of this response
8   report, that I'm not taking issue with what
9   they did.
10      Q.  And you are gesturing to the chart
11  that's on the center of page 5 --
12      A.  Yes.
13      Q.  -- of your report, which is Table 7
14  from the KM report?
15      A.  Right.
16      Q.  In general, you're saying you don't
17  take issue with what's in that chart?
18      A.  Correct.
19      Q.  Okay.  Is that why you say fully
20  agree or disagree, you're not in a position
21  to fully disagree or agree, but you can
22  partly agree?
23      A.  As I think I used the word
24  congruence in the next paragraph.  I said,
25  look, they're kind of coming together and

Page 140

1           R. Paulikens
2   it's not where the dispute is.
3       Q.  Okay.  I'm trying to understand your
4   language so I understand what your testimony
5   is going to be.
6       Below that chart on page 5, you say,
7   We have not been able to recreate exactly the
8   KM report's results.
9       Do you see that?
10      A.  Yes.
11      Q.  Did you attempt to recreate their
12  results?
13      A.  No.  We didn't attempt to actually
14  redo their work.  But in other parts of
15  our -- when we initially started, we saw
16  similar type of trends that they came up
17  with, you know, that CTX, you know, payment
18  levels and other things.  And for purposes of
19  this, I said, actually, this kind of makes
20  some sense.  But there's more than one piece.
21      So without the detail I said -- but
22  the multitude of data source says, The
23  ongoing work with respect to litigants we
24  don't take issue with the reconciliation
25  period.  So I'm not taking issue with it.  I

Page 141

1           R. Paulikens
2   think it says fairly what they did and I
3   don't know that it's wrong.  I can't agree
4   with certainty that it's completely right
5   within that table.  I think I was clear, but
6   maybe not.
7       Q.  You used the term, There's a certain
8   amount of consistency.
9       A.  Yes.
10      Q.  Okay.  By which I understand you to
11  mean that the table above is sufficiently
12  reliable that you don't question it, correct?
13      A.  We're accepting it for purposes of
14  what I'm communicating here, yes.
15      Q.  And you're also accepting it for
16  purposes of the trial, I assume?
17      A.  Well, for purposes of the trial, I'm
18  saying the two data sources suggest the 5 --
19  I'm rounding for conversation -- the
20  $5 million here --
21      Q.  Wait, let me --
22      A.  -- which is the 4.7.
23      Q.  Sorry for interrupting you.  You're
24  talking about the 4.760 figure?
25      A.  Right.  And I said, for purposes of

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 142

1            R. Paulikens
2   the invoices, the payments and the debit
3   memos such as they are, there's a certain
4   consistency that up until that subset or
5   subtotal or stopping point, I'm not going to
6   question that.
7      Q.   Okay.
8      A.   I later on say, the lead time
9   penalties, you know, is, you know, they
10  calculate them, they recalculate them --
11  recalculated them, but I'm not necessarily
12  agreeing that they are appropriate or they're
13  valid, because that's a legal question beyond
14  either expert.
15         And, obviously, the total that KM is
16  showing is the sum of their two numbers.  And
17  I'm saying -- all I'm saying is the subtotal
18  here, for purposes of where we are, I'm not
19  going to quibble with but it's only part of
20  the big picture.
21     Q.   Got it.  So just to oil all that
22  down, we'll talk about lead time penalty
23  separately, but for purposes of the
24  reconciliation of accounts receivable through
25  2019 for Circuitronix U.S., you're not going

Page 143

1            R. Paulikens
2   to quibble with the 4.7 million figure that
3   KM came up with; is that correct?
4      A.   Not at this point, no.
5      Q.   Okay.  Well at what point are you
6   going to quibble with it?
7      A.   If, in fact, we have to -- there
8   comes a need that I have to supplement my
9   report or something else happens between now
10  and trial, I may -- whatever work I do then
11  may change what I'm prepared to say today.
12     Q.   Okay.
13     A.   With that caveat, at this moment,
14  the 4.7 million, based on what they did, I
15  can live with.
16     Q.   As you sit here today, based on all
17  the work you've done to date on July 20,
18  2023, you have no basis to question the
19  reliability of that figure, 4,760,847 that's
20  listed on the chart on page 5 of your report
21  for the accounts receivable for Circuitronix
22  U.S. through July 2019, correct?
23         MR. LERNER:  Objection.
24     A.   Right.  As I said, as the subtotal
25  or stopping point, yes.  Because that's only

Page 144

1   one part of the whole picture.
2      Q.   As a subtotal or stopping point,
3   yes, you would quibble with it because
4   it's -- or no, you're not quibbling with it?
5   I want to understand your testimony.
6      A.   I'm sorry.  As a subtotal or
7   stopping point, I'm not quibbling with it as
8   of today.
9      Q.   Got it.  I understand your testimony
10  that it is only a part of the full picture.
11     A.   That is correct.
12     Q.   So that's the basis of your
13  criticism, correct?
14     A.   Correct.
15     Q.   Okay.  And as of today, you're not
16  aware of any other data that would call into
17  question that $4.76 million figure, right?
18     A.   I'm not aware as I sit here today of
19  other data that could, but it is possible
20  that more data may come up that may
21  materially change that number.
22     Q.   Okay, but as of now that's just a
23  hypothetical possibility?
24     A.   It's a possibility.  And given the

Page 145

1            R. Paulikens
2   multitude of data exchanges between the
3   parties, it might be a little bit more than
4   hypothetical that there would be data that
5   would change that number.  Materially, I
6   don't know.
7      Q.   Are you aware that discovery in this
8   case has ended?
9      A.   Understood.  But you said what I'm
10  aware of.  There could be data that could
11  change the number.
12     Q.   Okay.  So at the bottom of page 5 of
13  your report, the last paragraph, you
14  transition to a different subject.  You
15  say -- you write that the KM report does not
16  include any discussion of how common or
17  uncommon it is for a customer to overpay on
18  its account to the level concluded to in the
19  KM report, close quote, right?
20     A.   Yes.
21     Q.   I take it from your prior testimony
22  today that you are referring here to what you
23  described as an unusual situation based upon
24  your experience that Circuitronix U.S. had,
25  even according to Benlida's own books, an

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 146

R. Paulikens

2  overpaid situation to the tune of something
3  like $4.7 million; is that right?
4            MR. LERNER:  Objection.
5      A.  Repeat that?  I'm sorry.
6            MR. ROSENTHAL:  I am going to
7      have to ask Michelle to read that
8      back.
9      (Whereupon, at this time, the requested
10  portion was read by the reporter.)
11      A.  Yes.  It's -- that kind of, that
12  magnitude of overpayment is strange or
13  unusual.  Sorry, unusual.
14      Q.  So how is the unusual nature of that
15  situation relevant to how much they have or
16  have not paid?  In other words, the fact that
17  it is unusual, that you flagged it in your
18  report, how, if at all, does that relate to
19  the magnitude of that difference?
20      A.  I'm not following your question, and
21  I'm sorry.
22      Q.  Let me ask it in a simpler way.
23           The fact that it is unusual doesn't
24  bear on the sort of veracity of the numbers
25  themselves, right?  They are what they are?

Page 147

R. Paulikens

2      A.  Okay.  It's unusual that you have an
3  overpayment to that magnitude, which would be
4  multiple months of sales.  When you have a
5  customer, the customer ordinarily either owes
6  you, meaning the supplier, money, or they
7  don't owe you anything.  And even in
8  accounting and auditing, you look for
9  significant overpayments for potential
10  reclassification within the books of the
11  financial statements.
12           So what I'm saying is, and I'll use
13  a simple example.  If your law firm invoiced
14  $9,500 to a client, you would know they owed
15  you 9,500.  That's the typical relationship.
16  If they happened to pay your firm 10,000,
17  they would have an overpayment of $500, you
18  know, not a big deal.  If they sent $50,000
19  where you had an over -- your client overpaid
20  you by $40,000, that is unusual, forgetting
21  retainers, for attorneys, you know, for that
22  matter.
23           That's unusual in a commercial
24  setting where you have that magnitude of
25  overpayment from an unrelated third party to

Page 148

R. Paulikens

2  a supplier.  That's why I thought it was
3  unusual and uncommon.
4      Q.  And you, in your report, at the top
5  of page 6, you refer to a table on the next
6  page about a prepaid balance.
7      A.  Yes.
8      Q.  And there wasn't a table on the next
9  page, so I'm assuming you mean the one below
10  it?
11      A.  The pagination changed at the very
12  end.
13      Q.  Okay.  And so when you're talking
14  about CTX U.S. maintaining a prepaid balance
15  approaching three to six months of invoices,
16  you're referring to the table immediately
17  below it?
18      A.  Yes.
19      Q.  Okay.  And that's on page 6 of your
20  report.  Correct?
21      A.  Yes.
22      Q.  Okay.  And you note that KM was
23  silent on this issue, right?
24      A.  Correct.
25      Q.  And what is the issue you're

Page 149

R. Paulikens

2  referring to?
3      A.  The issue is how common it is for a
4  third -- unrelated customer to consistently
5  have three to six months of prepayments.  And
6  if you look right down the chart you can, you
7  know, take the revenue, divide it by the
8  receivable, and it was anywhere between three
9  and six months.  That's very, very unusual in
10  my 30-something years of accounting.
11           And KM didn't mention it at all,
12  positive or negative.  It just -- and it's
13  odd.  It's not $500 as in my example with
14  your law firm.  It's six months of revenue,
15  consistently, or three to six months of
16  revenue.  It's just odd.
17      Q.  So let me ask you, just so I can
18  follow along, too.  We're looking at the
19  chart on page 6 of your report, and you write
20  at the top a source, right?
21      A.  Um-hum.
22      Q.  And that's Benlida payment details
23  CTX U.S. 2012 to 2021 V5, right?
24      A.  Yes.
25      Q.  I can show you your report, but this

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 150

R. Paulikens

1    R. Paulikens
2  also attaches Exhibit 2 to your report?
3      A.  I believe so.  And some of this
4  information was also shown separately because
5  this table we used to try to marry certain
6  other exhibits.  Because the timing and
7  dating was just different.
8      Q.  Okay.  Let me just pull up your
9  report to make sure I'm able to follow.
10         So I am showing you on the computer
11  screen your report, Exhibit 2.
12         Here is Exhibit 2, you may have to
13  look up to look at it, but you may want to
14  compare the chart that's in your report to
15  make sure I'm right.
16     A.  It looks good.  Yeah, it looks good
17  from here.  253, the 195, yeah, it looks like
18  the same chart.
19     Q.  Okay.  So basically the chart -- I
20  see in your report below it you reference
21  Exhibit 2?
22     A.  Yes.
23     Q.  I just wasn't sure if that is the
24  same thing.
25     A.  That is the same thing.

Page 151

R. Paulikens

2      Q.  Okay.  And you write in your report
3  on page 6, This file that is the source came
4  from the KM report's documents; is that
5  correct?
6      A.  Yes.
7      Q.  And did you see where they got it
8  from?  Like do you know if it came from
9  Benlida or CTX?
10     A.  As I'm sitting here, I don't know
11  where they got it from.  But I think this
12  file was one of the ping-pong balls.
13     Q.  In the reconciliation process?
14     A.  In the reconciliations.
15     Q.  Okay.  And you write that this was
16  reprinted with -- here at the top, Reprinted
17  with formatting changes and additional
18  analysis from you, right?
19     A.  Yes.
20     Q.  I recognize that the last three
21  columns that start Cumulative, and then the
22  payment types are new on the chart?
23     A.  Yes.
24     Q.  That's what you all added?
25     A.  Yes.

Page 152

R. Paulikens

2      Q.  Okay.  Is there anything else that
3  you guys changed from the source document on
4  this?
5      A.  No.  The only thing that on one
6  group we did was some of the original
7  documents netted debit memos against
8  invoices.  In other words, instead of having
9  two columns like we show here total invoices
10  and total debit memos by year, some of the
11  earlier versions netted them as one number.
12     Q.  And what was it called, total?
13     A.  I think it was called total.  And
14  what we did was, we simply expanded it in
15  order to show a little bit more consistency
16  as to what we were talking about.  And so
17  that's why we had some formatting changes.
18  And then, of course, additional analysis is
19  this three right-hand columns.
20     Q.  Okay.  So let me just go take the
21  time to try to trace the Exhibit 1 chart,
22  which is, I understand, the same one that's
23  on page 6 of your report to the source
24  document for a minute.
25         So I'm going to open up on the

Page 153

R. Paulikens

2  computer screen the KM Citrin reliance
3  documents.  You want me to start first on
4  yours, what you guys have provided us?  We're
5  looking for something called Benlida payment
6  details CTX U.S. 2012 to 2021 version 5.  I
7  didn't see it.
8      A.  All right.  This was documents
9  further reviewed.  My work product wouldn't
10  have been in here.  So go to --
11     Q.  This is from the USB that you guys
12  provided?
13     A.  Yes.  Remember, there was two
14  tranches of production.  There was documents
15  that we had that you asked for last week and
16  then there was some other working file that
17  we gave you today.  So there's a working file
18  that would trace to what actually was
19  produced.
20         MR. ROSENTHAL:  So let's do it
21      this way.  Perhaps Mr. -- we'll go
22      off the record and Mr. Lerner could
23      perhaps find it, you can e-mail it to
24      me and then I can project it up here.
25         (Discussion held off the

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 154

1           R. Paulikens
2     record.)
3          (Whereupon, a brief recess was
4     taken.)
5   BY MR. ROSENTHAL:
6     Q.  Mr. Paulikens, what we've done is
7   during the break, your counsel, Mr. Lerner,
8   went to your USB that you brought with you
9   and I think you identified this file as the
10  one that we --
11    A.  Yes.  I think the one that's coming
12  up.
13    Q.  So I've now gotten the e-mail from
14  him.  I'm saving it over here to my computer
15  and I will open it up in a second.  Okay?
16         I think we're going to mark this as
17  Exhibit 148, but let's double check that it
18  is the correct one.
19         The file is called Benlida payment
20  details CTX U.S. 2012-2021 V5, and then it
21  says July 2023 report, correct?
22    A.  Yes.
23    Q.  And I understand that you are the
24  one that added or your firm added the
25  July 2023 report to the file name?

Page 155

1           R. Paulikens
2     A.  Right.
3     Q.  Okay.  I'm going to open it up.  And
4   I'll go to the summary report tab.  Is that
5   where we should look?
6     A.  Yes.
7     Q.  Okay.  And can you just satisfy
8   yourself that that is the source that you
9   used for Exhibit 2 to your report?  It's on
10  page 6.
11    A.  Yes, that looks correct.
12    Q.  Are you satisfied that --
13    A.  Yes, this matches the table.
14         MR. ROSENTHAL:  Okay so we'll
15  mark that as Exhibit 148.
16         (Whereupon, at this time, the
17  above-mentioned Benlida payment
18  details CTX U.S. 2012-2021 V5 July
19  2023 report was marked as Exhibit 148
20  for identification.)
21         MR. ROSENTHAL:  And to make
22  that easier for us afterwards, I will
23  e-mail it back to Mr. Lerner with the
24  title Exhibit 148.
25         I may be at the end of this

Page 156

1           R. Paulikens
2     line of questioning and we can take a
3     break for lunch.  But let me just
4     check real quick.
5          Let me just ask a couple of
6     questions on this chart which appears
7     on page 6 on your report where you
8     designate the types of payments.
9   BY MR. ROSENTHAL:
10    Q.  What was your purpose in doing that?
11    A.  My purpose in doing that was
12  twofold.  I understand there's a dispute that
13  whether the payments were payments on account
14  or otherwise, and this ties into what is the
15  starting point.  And I understand, and I
16  mention it, there's statute of limitations
17  issues in question.
18         And what I wanted to see is how did
19  we arrive at these balances and how were the
20  payments made.  And because the spreadsheets
21  that was provided not only showed the details
22  of the invoices and debit memos, et cetera,
23  but there was a tab that listed the payments.
24         And what I have shown is almost all
25  of the payments, and I gave you a breakdown

Page 157

1           R. Paulikens
2   of which ones were in even ten thousands of
3   dollars.  And up through 2018 -- I'm sorry,
4   2019, almost all of the payments every year
5   were in very even amounts.  Seemingly
6   payments on account.  250,000, 300,000.
7   There's a detail in the exhibits.
8          And it wasn't until 2019 that the
9   payments started, you know, having much more
10  specific dollars and cents amounts.  And that
11  clearly changed in 2019.
12         And that may affect whatever
13  starting point you might use, if you pick an
14  arbitrary middle date.  And I'm picking a
15  date for, you know, '16 -- 2016 to start,
16  what's the outstanding balance at that point
17  in time?
18         Because if you truncate it when you
19  have payments on account, you know, you need
20  to determine an agreed upon starting point
21  when you're tracing ins and outs.
22    Q.  Okay.  You mentioned that sometime
23  in 2019 the payments for Circuitronix, and
24  this is Circuitronix LLC, changed from
25  rounded even amounts, rounded to a $10,000

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 158

R. Paulikens

2 amount to specific dollars and cents?

3     A. Right. And it was circa August, and

4 it's in the exhibit. And it was in the file

5 and it lists out all the payments.

6     Q. Do you know why that change

7 occurred?

8     A. Why that -- it was concurrent when

9 they were trying to reconcile, you know,

10 grand reconciliation was in the fall of 2019,

11 at least started. And all I'm noting is they

12 started making those payments -- I'm sorry,

13 the payment structure changed at that point

14 in time.

15     Specific reason why they did it that

16 way, I don't know. But there was a profound

17 change in the way that part of the

18 relationship worked.

19     Q. So your understanding was it had

20 something to do with the fact that they were

21 engaged in this reconciliation process at

22 that time?

23     A. The change happened concurrently

24 with the reconciliation. If that was the

25 gravamen for, you know, change in the payment

Page 159

R. Paulikens

2 structure or there was some other issue, I

3 simply noted there was a significant change

4 in that dynamic of the relationship as they

5 were trying to reconcile.

6     Q. So other than your awareness that at

7 the same time there was this reconciliation

8 effort going on between the companies, you're

9 not aware of any other reason, as you sit

10 here today, why Circuitronix U.S. started

11 paying in specific amounts in August 2019,

12 correct?

13     A. No, not as I'm sitting here today.

14 Other than the timing, which I discussed in

15 the report. And the fact that it was a

16 significant change, circa August of 2019.

17     Q. You are answering my question no,

18 but, yes, you're not aware of any other

19 reason, right?

20     A. I'm not aware of any other reason,

21 I'm sorry.

22     Q. That's fine. And closely related to

23 this subject, at the very bottom of page 6 of

24 your report, you say -- three lines from the

25 bottom, We also note that much of the Excel

Page 160

R. Paulikens

2 files were created at around this time when

3 the parties were trying to reconcile the

4 amounts owed to one another, which was in the

5 later half of 2019.

6     What was the point of bringing that

7 up?

8     A. It was a profound change in how

9 literally that dynamic of the relationship

10 worked. I didn't speculate in the report

11 that they may have had an agreement that they

12 were going to do things differently. But it

13 was, from my chair, it was just a noteworthy

14 profound change on what was an odd result,

15 which we talked about about a half hour ago

16 as to the relationship.

17     So something changed in August. And

18 I know they were trying to reconcile.

19     MR. ROSENTHAL: This is a good

20     point for a break if that makes sense

21     to everybody.

22     (Whereupon, a brief recess was

23     taken.)

24 BY MR. ROSENTHAL:

25     Q. Mr. Paulikens, we left off before

Page 161

R. Paulikens

2 lunch on page 6 of your report, we were

3 talking about the analysis you did which

4 showed the rounded payments that were being

5 made?

6     A. Yes.

7     Q. And then the transition to

8 non-rounded in August of 2019; do you recall

9 that?

10     A. Yes.

11     Q. Okay. At the bottom of page 6 of

12 your report you say, This is noteworthy.

13     A. Yes.

14     Q. What is noteworthy? What are you

15 talking about?

16     A. The change. Because I talked -- I

17 mean, again, it was flowing from the

18 paragraph above it, when I said in fact it

19 was not until the payments -- not until

20 August 8, 2019 that the payments ceased being

21 rounded even amounts and the payments were

22 made in very specific dollar and cents, and I

23 said this is noteworthy.

24     Q. And the noteworthy part is?

25     A. The change.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 162

R. Paulikens
2   Q.  And then you go on to say that, in
3   your view this is consistent with ongoing
4   payments on account.  Right?
5   A.  Yes.
6   Q.  Can you define for us what payments
7   on account is customary?
8   A.  Sure.  Typically, when you have an
9   ongoing relationship where you're constantly
10  buying from a vendor, you can wait until you
11  get the invoice that says, you know, $12,123
12  yadda, and pay it.  But frequently, people
13  will simply just send $10,000 or 13,000, even
14  amounts, because they know they're going to
15  owe it and they just send it.  That's payment
16  on account.  And so that's different as
17  opposed to specific invoice payment.
18         And when I see round payments like
19  that, when you have an ongoing relationship,
20  that is, I'll say, almost always a payment on
21  account type of relationship.
22  Q.  Do you know whether there was a
23  payment on account relationship between
24  Circuitronix U.S. and Benlida?
25  A.  I don't know if they -- I know

Page 163

R. Paulikens
2   there's discussion and dispute about that and
3   that there's discussion about when the
4   specific payments may or may not be
5   identified.  But the mere fact that for
6   multiple years substantially payments were
7   even 10,000s, that's the data and the actions
8   that are suggestive of payment on account.
9   Q.  You say in your report that
10  ordinarily it is customary to apply payments
11  on account to the oldest invoice first unless
12  in a timely manner specific invoices are
13  identified, right?
14  A.  Yes.
15  Q.  Where is that customary, in your
16  experience?
17  A.  It's customary in every business
18  that I've been involved in.  I mean,
19  sometimes somebody will say, I'm paying these
20  invoices and not this one because I'm
21  disputing it, fine.
22         But ordinarily, any firm and company
23  I've been in, we apply it to the oldest
24  first.  And every business -- I mean, I can't
25  think of a business as I'm sitting here that

Page 164

R. Paulikens
didn't apply, you know, payments on account
2   to the oldest invoice.  Otherwise you get
3   your aging messed up.  Because if you don't,
4   your aging is going to have the oldest one
5   still out there which may wreck your debt
6   covenants so it's customary -- it may wreck
7   your covenants with your banks and all.
8   
9         So you typically pay the oldest one
10  first, FIFO.  That's what I've always seen,
11  unless there's specific identification.
12  Q.  Of invoices?
13  A.  Of invoices.
14  Q.  The custom of applying payments on
15  account presumes the existence of an account
16  that the parties both know about, right?
17  A.  Say that again, please?  I'm sorry.
18  Q.  The custom that you were referring
19  to of paying -- of applying payments on
20  account presumes the existence of an account
21  that both parties know about, right?
22  A.  Well, an account, yeah, it would
23  presume an obligation.  I'm not sure how to
24  answer your question.  I mean, normally you
25  don't pay an invoice for no reason.  I'm just

Page 165

R. Paulikens
2   not following your question, I'm sorry.
3   Q.  Well, have you had a case where one
4   party applies payment to an account that's
5   different from the one the party that's
6   making the payment thinks that it is making
7   payments towards?
8   MR. LERNER:  Objection.
9   A.  Repeat that again?  Please.
10  Q.  Have you ever had a case where one
11  party applies payments it receives to an
12  account that is different from the one that
13  the paying party thinks it is making the
14  payment towards?
15  MR. LERNER:  Objection.
16  A.  When you say have I ever had a case,
17  a litigation matter, not that I can think of
18  on that specific fact.  In terms of a broad
19  general question, at some point the totality
20  of the relationship, it would get corrected.
21         So if there was two affiliates, and
22  I paid a million dollars to one and I should
23  have paid it to another, sooner or later it
24  would get corrected and reconciled.  I
25  haven't had a case like that in litigation,

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 166

R. Paulikens
1
2    and I don't, as I'm sitting here, can't think
3    of just a commercial situation that I became
4    involved in.
5        Q.  Well, yeah, so let me broaden it.
6    Because you were -- when I said case, you
7    thought litigation?
8        A.  Yes.
9        Q.  Let me ask you as broadly as
10   possible.  In your experience as an
11   accountant, and as broader than just as an
12   expert advising companies and doing various
13   financial work for companies over your
14   career, have you had a situation, have you
15   ever been aware of a situation where one
16   party was applying payments to an account
17   that's different from the one that the paying
18   party thinks it's making its payments for?
19       A.  I won't say never, because I've
20   never thought of that.  But that situation
21   would wash out in the reconciliation process
22   because then you get the divergent outcomes
23   such as we have here.
24           We have one -- one is getting
25   favored by payments and another is being

Page 167

R. Paulikens
1
2    starved of payments.  Sooner or later if
3    they're related, they're going to try to
4    figure it out.
5        Q.  I didn't ask you whether in this
6    hypothetical they would wash out or not.  I'm
7    just asking you in your experience, have you
8    ever had a situation that you're aware of
9    where one party was applying payments to an
10   account that was different from the one that
11   the party making the payments thought it was
12   making payments toward?
13           MR. LERNER:  Objection.
14       A.  It's difficult to answer because
15   ordinarily that would be reconciled, fixed in
16   the ordinary course of business.  And, again,
17   when you say in your hypothetical, you are
18   suggesting that there's two accounts, I think
19   was your words or two entities, maybe I'm
20   reaching, sooner or later they're going to
21   talk to each other because the disparate
22   treatment is going to get abnormal.
23       Q.  Can you think of a single example in
24   your experience where this has happened?
25       A.  No.  Because in my experience sooner

Page 168

R. Paulikens
1
2    or later it would have been caught.
3        Q.  It would be very unusual for it to
4    happen?
5        A.  It would be unusual and I can't
6    think of one, and ordinarily it would be
7    caught at some point.
8        Q.  Let me come back to what you were
9    writing about on page 6 of your report that
10   we talked about a few minutes ago, which is
11   this custom of payment on account being
12   applied to the -- on a FIFO basis unless
13   there's a specification of specific invoices.
14       A.  Yes.
15       Q.  Is it your intention to offer an
16   opinion in this case that that custom is
17   applicable to the relationship between the
18   parties in this case?
19           MR. LERNER:  Objection.
20           You could answer.
21       A.  Because, I mean, a formal opinion,
22   it's customary, again -- let me start the
23   answer again.
24           To give a formal opinion, I'm
25   unsure.  Because it's such a strange -- the

Page 169

R. Paulikens
1
2    payments on account to me is just basic
3    business, that that's norm and I've seen that
4    in every business I've seen in 35 years.  So
5    if that's an opinion you're asking, yes, I've
6    seen that.  You know, payments on account,
7    apply the oldest one first.  I've seen that
8    consistently for 35 years.
9           If that's the opinion you're asking,
10   yes, that's the opinion I would give on the
11   witness stand.
12       Q.  Okay.  Let me ask you a similar
13   question about the timely specification of
14   invoice exception to that custom.
15           Are you planning to give an opinion
16   in this case whether Circuitronix made timely
17   identification of invoices that it wanted its
18   payments applied to Benlida or not?
19           MR. LERNER:  Objection.
20       A.  At this point, I don't know that I'm
21   going to give an opinion specifically on what
22   is considered appropriate of a delay.  I
23   mean, ordinarily, if somebody is applying a
24   specific invoice -- I'm sorry, a payment to a
25   specific invoice, they would send the check

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 170

1                   R. Paulikens
2    old school and say, invoice 12345.  Or they
3    would send wiring instructions with the
4    follow up e-mail in short order so that the
5    recipient knows that that payment is going to
6    be specifically applied.
7          It's my understanding, as an
8    accountant, that it is up to the recipient to
9    determine how to apply the payment unless
10   specifically instructed by the payor as to
11   where to put the payment.  And whether three
12   days, ten days, you know, is a reasonable
13   amount of time that may be acceptable, two,
14   three, four months might become commercially
15   cumbersome.
16       **Q.  I didn't see in your report anything**
17   **specific about this issue to the facts of**
18   **this case.  In other words, I didn't see you**
19   **take a position one way or the other on**
20   **whether or not Circuitronix did or didn't**
21   **make timely designations of the invoices it**
22   **wanted its money applied to; is that correct,**
23   **it's not in your report?**
24       A.  Correct.  I didn't specifically take
25   a position on that.  I noted that that issue

Page 171

1                   R. Paulikens
2    is actually a dispute.
3        **Q.  You're aware of that from reading**
4    **summary judgment papers?**
5        A.  Right.  And there is a dispute,
6    there is a question, it goes back to starting
7    dates, it goes back to everything, because
8    everything gets intertwined.  So I'm aware of
9    it and it is a dispute, I didn't take a
10   position on it.
11       **Q.  And you just referenced starting**
12   **dates so I want to ask you about that.**
13   **Because in your report on page 7, you say --**
14   **you have a sentence and I'm pointing up here,**
15   **that says, This impacts the starting point of**
16   **when to start the analysis.**
17       **What are you referring to when you**
18   **say this, this impacts?**
19       A.  We were talking about the FIFO
20   arrangement, and I can answer it better
21   perhaps by an illustration.
22       **Q.  Okay.**
23       A.  If you start on day zero and it was
24   a $10,000 invoice, a $9,000 payment there's a
25   running balance of $1,000.  And then if

Page 172

1                   R. Paulikens
2    there's a $9,000 payment and a $20,000
3    payment maybe there's an overpayment of
4    11,000.  And that's going to continue on when
5    you're making round payments on account.
6          And at some point you're going to
7    have at some later date an actual amount due.
8    And if you start with that actual amount due
9    on a date certain, fine, but if you
10   arbitrarily pick July 1, 2018, to pick a date
11   out of the air, and you don't know which one,
12   if they have specific invoice charges or FIFO
13   charges, that starting date balance could be
14   very wrong because depending on where you
15   apply the FIFO payments it may be older
16   invoices due.
17         You may -- if you decide that you
18   don't want to have payments applied to 2013
19   invoices by way of illustration, you know,
20   they could still be outstanding, it doesn't
21   change what's due.  But I mean, so when you
22   have a dynamic relationship like the
23   receivable and payable relationship between
24   customer and supplier, and you have payments
25   on account or unspecified -- unspecific, you

Page 173

1                   R. Paulikens
2    have to be very careful as to where you start
3    your analysis to make sure your beginning
4    starting point is reasonable and even agreed
5    upon.  That's what I was talking about there.
6        **Q.  Okay.  Given that this is a rebuttal**
7    **report that you've written, I'm struggling**
8    **with how that commentary applies to the KM**
9    **report.**
10       **Are you saying that they picked an**
11   **arbitrary start date?**
12       A.  No.  What I said was the sentence
13   above it, I said they didn't discuss the
14   issue at all.  And so in some aspects of the
15   report they started at 2015, at other aspects
16   they start at 2012.
17         I know there is a -- there is a
18   debate as to what the starting point has got
19   to do with the statute of limitations.  And
20   what I'm saying is, even the charts that are
21   in the report that just showed running
22   balances, in other words, invoices less
23   payments gave you a running balance, we
24   talked about the chart before lunch.
25         And we just need to know where we're

Randall M. Paulikens, CPA/ABV/CFF/CITP
July 20, 2023

Page 174

R. Paulikens

1  going to start and what the balance was,
2  because otherwise if you don't discuss the
3  starting balance and you simply look at ins
4  and outs of invoices and payments without
5  properly accounting for where you started,
6  you may get a misleading result if you do
7  anything that truncates part of the
8  relationship, because the accounts receivable
9  balance issue goes from day one of the
10  relationship through current.
11
12  Q.  Okay.  With respect to the KM
13  report's opinions relating to the
14  reconciliation period through 2019, they
15  started in 2012, didn't they?
16  A.  I believe that's when they started
17  their analysis, which may be day zero.
18  Q.  Right.  So at least for that portion
19  of their analysis, that starts essentially
20  like the right place, don't you agree?
21  A.  I believe so.  But I also understand
22  there is a statute of limitations and payment
23  applicability being debated in the case.  But
24  for purposes of your question, KM looked like
25  they went back to day zero.

Page 175

R. Paulikens

1
2  Q.  But that statute of limitations
3  issue has no bearing in your understanding on
4  Circuitronix U.S.'s credit vis-a-vis Benlida,
5  at least for that reconciliation period,
6  right?
7  A.  There's no bearing -- I hate to use
8  the word no bearing.
9  Q.  Okay.
10  A.  Because depending upon if you looked
11  at, and I'm going to use 2015 as an
12  illustration.  If there was a balance due to
13  Circuitronix as of the end of the 2015 of a
14  million dollars --
15  Q.  Hypothetically?
16  A.  Hypothetically, and you don't take
17  that into consideration, it may have a
18  bearing -- if the statute of limitations says
19  that is irrelevant, it may have a bearing on
20  the final outcome.  Because some of the
21  disputes we talked about about an hour ago
22  were early in the relationship.
23  So maybe I'm making the answer more
24  complicated than it needs to be.  I don't
25  want to say never, because whenever you

Page 176

R. Paulikens

1  truncate a relationship that has to go back
2  to day zero, you run the risk of a result
3  that doesn't make sense coming towards the
4  end.
5
6  Q.  Okay.  Let me ask it this way and I
7  think it may wrap up the point.  But are you
8  aware, as you sit here today, of any argument
9  that Benlida has asserted that any amounts
10  that Circuitronix U.S. is owed for the
11  reconciliation period from Benlida, is --
12  should be offset because of a statute of
13  limitations, because it's older than a
14  statute of limitations date?
15  A.  As I'm sitting here, I'm not aware
16  that Benlida has made that claim.  I
17  understand that they were asking, because we
18  talked about it in the e-mail we saw, what
19  about HK, in the e-mails as they were trying
20  to reconcile the entire relationship, they
21  kept saying, what about HK.  And I know
22  that's a dispute in the case.
23  Q.  Okay.  And you are aware that
24  Circuitronix HK is not a party to the
25  lawsuit, right?

Page 177

R. Paulikens

1
2  A.  That's my understanding, you know,
3  as the current state of the case.
4  Q.  Okay.  On page 7 of your report
5  again, I'm just keying off of what you've
6  written, you say that, An arbitrary start
7  date that does not consider the running
8  balance is misleading.  I'm taking a fragment
9  of your sentence.
10  A.  Yes.  Where?
11  Q.  I'm here.
12  A.  I found it, okay.
13  Q.  Third paragraph or second full
14  paragraph on page 7.
15  Are you contending that anything in
16  the KM report involved an arbitrary start
17  date and if so which parts?
18  A.  No.  All I'm saying is that, you
19  know, again, all of the issues here overlap
20  and perhaps are influenced by the other.  The
21  KM relationship, based on the data that they
22  presented seems to go back to day zero.  And
23  it was a congruency or consistency between
24  the 4-odd-million dollars that CTX showed and
25  the -- a different number, but Benlida had a

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 178

R. Paulikens

1  R. Paulikens
2  substantially consistent number.  And that
3  went back to day zero, that's a number.
4      But I understand that one of the
5  disputes is where do we start comparing
6  payments.  And all I'm saying here is, unless
7  we're careful as to what the beginning
8  balance we agree to start with, there could
9  be a misleading end result if we start in the
10  middle and just have ins and outs after.
11     Q.  Okay.  So the word arbitrary that's
12  used in your report is not designed to, like,
13  label something that KM did, you're just
14  making a general point?
15     A.  I'm making a general point.  If you
16  start on August or September, it may change.
17  You have to get a consistent agreed-upon
18  amount.
19     Q.  Understood.
20     Same question with respect to the
21  word misleading, which is a powerful word on
22  page 7 of your report.
23     You're not making an allegation that
24  anything in the KM report is misleading,
25  you're just saying, as I understand you, in

Page 179

R. Paulikens

1  R. Paulikens
2  general, if you were to try to make certain
3  calculations based upon an improper arbitrary
4  start date it would lead to a misleading
5  result?
6      A.  If you change the beginning number,
7  it could change the ending number.  And that
8  may not be what the parties believe, it may
9  not even be the correct number, but the
10  results, however you did the analysis may, in
11  fact, change.
12     Q.  Are you saying there was anything
13  misleading in the KM report?
14     A.  No.  As I said, I didn't take issue
15  with what they did and I said five minutes
16  ago that they didn't, you know, the four or
17  five million was congruent with a lot of the
18  data.  But it was only part of the issue,
19  which is what my biggest criticism was.
20     Q.  So your report, just wrapping this
21  part up, says -- acknowledges that KM did not
22  discuss the issue of the payment pattern and
23  what you view as something consistent with
24  payment on account, right?
25     A.  Correct.  They didn't discuss it.

Page 180

R. Paulikens

1  R. Paulikens
2      Q.  Nor did they issue an opinion on how
3  Circuitronix intended its payments to be
4  applied, did they?
5      A.  Correct.  I don't think they covered
6  that in the report either.
7      Q.  And they didn't cover how Benlida
8  should have applied them or -- number one,
9  right?
10     A.  Yeah, they didn't -- they did a
11  reconciliation between the two parties, they
12  didn't opine whose was right.
13     Q.  Are you critical of their not having
14  opined about that issue?
15     A.  No, not in the vacuum in that what
16  they did, they said what they did.  They
17  communicated what they did.  And, you know,
18  from what I can tell, what they did was
19  correct.  And I used the term, I'm not going
20  to disagree with it.
21     Q.  Okay.
22     A.  It was the pieces that were not in
23  the report that I think are important.
24     Q.  Okay.  So that's the next subheading
25  in your report.  What is not in the KM report

Page 181

R. Paulikens

1  R. Paulikens
2  on page 7.
3      I'm looking now at your next --
4  withdrawn.
5      You say, We reprint a portion of a
6  spreadsheet that was included in the KM
7  report documents relied upon.  Right?
8      A.  Yes.
9      Q.  On page 7.  And you reference
10  Exhibit 3, we already talked about -- I think
11  we have, and you already previously told us
12  that that Exhibit 3 is what appears on the
13  top of page 8.
14     A.  Yes.
15     Q.  That blue highlighted chart?
16     A.  Right.
17     Q.  We already talked about that, didn't
18  we?
19     A.  Yes, we did.
20     Q.  And on page 7 you write in reference
21  to that spreadsheet, quote, This shows the
22  information that was not included in the KM
23  report as it related to the invoicing and
24  payments made to ROK, close quote, right?
25     A.  Yes.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 182

1                    R. Paulikens
2      Q.  Okay.
3           MR. ROSENTHAL:  Off the record
4      for one moment.
5           (Discussion held off the
6      record.)
7      Q.  Look at page 8 of your report there.
8    Underneath that chart you say, As shown
9    previously, CTX U.S.'s and Benlida's data
10   indicate that CTX overpaid Benlida by
11   approximately $5.4 million, depending upon
12   the data source.  Right?
13     A.  Yes.
14     Q.  Is that a recapitulation of the
15   testimony you've already given?
16     A.  Yes.  In fact, since I'm referring
17   back to a table earlier in my report, and I
18   think we discussed that kind of at length.
19     Q.  We did.  And can you just show me
20   which report that table is that you're
21   referring to?
22     A.  I think it's the table on page 6
23   which is 5.6 million and then the e-mail from
24   Rishi was 5.4 million, which is why I say,
25   depending upon the data source.

Page 183

1                    R. Paulikens
2      Q.  Okay.
3      A.  You know, there's an overpayment
4    floating out there.
5      Q.  Okay.  So just, the chart that you
6    just referred to on page 6 of your report is
7    the one that's got the blue highlighting
8    right in the middle of the page?
9      A.  Yes.  And it's like 5.6 million in
10   the pretty much center.
11     Q.  The specific number is 5,633,674.51,
12   correct?
13     A.  Correct.
14     Q.  Below, this is on page 8 of your
15   report of where it says, you state, CTX
16   has underpaid the Benlida Group by
17   $13.5 million, right?
18     A.  Correct.
19     Q.  What is the Benlida Group, you
20   capitalize that?
21     A.  I call -- well, I'm talking about
22   the 13.5 million, which is the HK.  So I
23   guess I could have said Benlida, CTX HK
24   underpaid by 13.5 million.  So that whole
25   paragraph is on the one hand there's a

Page 184

1                    R. Paulikens
2    $5.4 million overpayment and on the other
3    hand there's a $13.5 million underpayment.
4    There's a net balance due with those numbers
5    of 8 million.  That's what that paragraph
6    says.  It's all dependent upon the data
7    source.
8      Q.  Okay.  And just to be real precise,
9    in the sentence before when you said that CTX
10   overpaid Benlida by approximately
11   $5.4 million, the CTX entity that you're
12   specifically referring to is U.S., right?
13     A.  Wait, say that again, I'm sorry?
14     Q.  (Indicating)?
15     A.  Oh, that paragraph, I'm sorry.
16     Q.  In your report on page 8, it's okay,
17   where you say that, The data indicates that
18   CTX overpaid Benlida by approximately
19   $5.4 million, what I'm asking you is
20   specifically the CTX entity you're referring
21   to there is the U.S. entity?
22     A.  Yes.
23     Q.  Dropping back down to the next
24   paragraph after the $13.5 million reference,
25   you say, This has been studiously not covered

Page 185

1                    R. Paulikens
2    by KM, referring to $13.5 million?
3      A.  Yes.
4      Q.  When you say "studiously not
5    covered," I interpret that to mean that they
6    were deliberately avoiding it.  Is that what
7    you mean to convey?
8      A.  Yes.  Because not only did they not
9    cover it in the body of their report, they
10   specifically mention in footnotes that they
11   have the analysis or they have the data to do
12   the analysis and they are not, I'm
13   paraphrasing what they said in their report,
14   but they're not going to provide that
15   analysis until after a response report to
16   their report, and I cover that actually in
17   two paragraphs.
18          So they actually, they had the
19   information, they know they have the
20   information, and they are -- did not cover it
21   at all, except to say in a footnote, we're
22   not covering it.
23     Q.  Right.  And they say why, correct?
24     A.  Yeah, they said -- they said it's
25   just -- they're not covering it.  And I

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 186

R. Paulikens

1       R. Paulikens
2   understand as you said earlier, the debate is
3   to who is in the case, who meaning the
4   entity.
5       Q.  But they say why, they say they're
6   saving it for rebuttal?
7       A.  Well, why, yes, saving it for
8   rebuttal, yes.
9       Q.  So they weren't deceptive or tricky
10  as to why they're not revealing that
11  information in their report, right?  They
12  said they're reserving it in their rebuttal?
13      A.  Yes.  They said -- they're saying
14  they're reserving it for rebuttal, but they
15  didn't cover that issue.  And it's a
16  substantial issue.
17      Q.  You say in page 8 that, you know,
18  why it is intentionally left out of the KM
19  report is interesting, to use your phrase?
20      A.  Yes.
21      Q.  Why did you find it interesting, if
22  you read that they're holding it for
23  rebuttal?
24      A.  Because the penultimate conclusion
25  of their report that says that a customer has

Page 187

R. Paulikens

1       R. Paulikens
2   overpaid their supplier by three to six
3   months' sales is an economically very strange
4   occurrence as an accountant, where you don't
5   have overpayments of months of sales.
6           If you are audited and if you have
7   financial statements, you have to reclass it
8   differently as a negative accounts payable,
9   it would be receivable.  It's just an oddity
10  that to look and stop there was such an
11  abnormal inverse relationship to what's the
12  norm, strikes me as odd.
13          And interesting is why did you stop
14  there?  Have you ever seen that in your
15  career that somebody overpays by six months
16  and again, forgetting legal retainers aside.
17      Q.  You go on to say in that same part
18  of your report, that, To ignore the CTX HK
19  slash Benlida slash ROK issue as KM does
20  makes the entire conclusion of the KM report
21  difficult to accept, close quote.  I want to
22  ask you about that.
23          What exactly is the conclusion of
24  the report, as you understand it?
25      A.  The conclusion of their report is

Page 188

R. Paulikens

1       R. Paulikens
2   that dependent upon where you stop,
3   Benlida -- I'm sorry, Benlida owes CTX U.S.
4   $4 million or $7.9 million; depending on the
5   final disposition with time penalties, that's
6   a debate and they measured it.
7           But the issue, as far as our case is
8   the parties are intertwined, and as I said a
9   couple of minutes ago.  The commercial
10  relationship where a customer overpays to
11  that magnitude is odd to me when they know
12  there's a claim that a related party is
13  underpaid to an even greater amount.  And if
14  we stop there, you're going to -- the
15  economic conclusion doesn't make sense to me.
16      Q.  When you use the term "it's an
17  untenable theory," right in your report --
18      A.  Correct.  Because you have two
19  entities that seemingly work somewhat in
20  tandem.  And you've got a combined commercial
21  relationship that hits the norms and makes
22  perfect sense and are covered on the next
23  page, you know, that said if you net the two,
24  for purposes of this question, they have
25  between three and four months -- about three

Page 189

R. Paulikens

1       R. Paulikens
2   months of revenue in accounts receivable or
3   payable depending which side, and given
4   that's kind of an ordinary commercial
5   relationship because it takes time to process
6   payments.
7           So on the combined basis, the
8   commercial relationship makes sense.  But the
9   two pieces were so disparate from the norm,
10  it strikes me as odd that they didn't cover
11  it.
12      Q.  You understand that the authors of
13  the KM report, Circuitronix's experts in this
14  case, may have made a legal assumption that
15  this case doesn't implicate the CTX Hong Kong
16  account, right?
17      A.  Correct.
18      Q.  In fact, that's what they did,
19  right, to your understanding?
20      A.  They may have made a legal
21  assumption or they may have been told to
22  assume that legal assumption.  But
23  regardless, the conclusion in their report,
24  knowing they had the data strikes me as
25  curious.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 190

R. Paulikens

2  Q.  Well, does making such an
3  assumption, assuming they did, that the CTX
4  HK account is not legally relevant to CTX
5  U.S.'s claim against Benlida, its
6  counterclaim in this case, does that
7  assumption, if they made it, automatically
8  make their theory untenable?
9  A.  No.  It's -- they're allowed to make
10 an assumption based on perhaps a direction
11 from counsel, a finding, that's a common
12 thing.  But what strikes me as odd is the
13 ultimate conclusion that they come to just
14 doesn't make sense, that two parties who were
15 largely unrelated, or unrelated, maybe
16 friendly, we discussed that a long time ago,
17 you know, would have such an abnormal
18 relationship when the other half of the
19 transaction suggests the total would be net.
20      It just doesn't make economic sense
21 that you ought to stop there.  Maybe they
22 were told to, but it certainly, as I said in
23 my thesis of my report, it's what is not in
24 the report that I took issue with.  And that
25 wasn't in their report.

Page 191

R. Paulikens

2      If it's proper for them to not
3  include it, that's on -- that's okay, the
4  judge will make that decision.
5  Q.  If they were to testify that the
6  reason they didn't include the Circuitronix
7  Hong Kong accounts in their report and
8  instead reserved them for rebuttal waiting to
9  hear what Benlida asserted for its claim for
10 the Circuitronix Hong Kong account and that
11 counsel instructed them to make that choice,
12 you wouldn't say that that was an
13 unreasonable thing for them to have done as
14 experts in the case, would you?
15 A.  No, not in a vacuum, you know,
16 following their marching orders for that, not
17 at all.  It's just odd because of the
18 magnitude in the inverseness, if that's a
19 word, of the relationship.
20 Q.  The magnitude that you're talking
21 about, though, is from an accounting
22 perspective, right?
23 A.  Yes.
24 Q.  The assumption would be driven by a
25 legal perspective that is just looking at

Page 192

R. Paulikens

2  different considerations, correct?
3  A.  Understanding there's a difference
4  of a way of looking at things that an
5  accountant would and they're accountants,
6  too, and lawyers would, and understanding
7  there's a dispute.  It's -- their conclusion
8  that there's such a big -- is just odd from
9  an accounting perspective when you know what
10 the other side of --
11 Q.  You freely acknowledge that their
12 report expressly focused on really one
13 dynamic --
14 A.  Facet of the report.
15 Q.  One facet.  It was Circuitronix U.S.
16 vis-a-vis Benlida, right?
17 A.  Yes.
18 Q.  And they said, we know that there's
19 Circuitronix Hong Kong.  We didn't address
20 that, correct?
21 A.  That's all I'm pointing out.
22 Q.  So you're pointing out something
23 that's not in your report?
24 A.  Exactly.  That's what I said I was
25 going to do at the outset.

Page 193

R. Paulikens

2  Q.  I want to ask you about a term you
3  use.  On page 8 in the paragraph in the
4  middle you have a sentence that says, Thus,
5  even if the offsets claimed by CTX are
6  ultimately proved at trial and accounted for,
7  the CTX Group would still owe the Benlida
8  Group as much as $8 million depending upon
9  the data source, right?
10 A.  Um-hum.
11 Q.  What are you referring to by the
12 offsets?
13 A.  Again, it's an issue.  There are
14 certain lead time penalties.  There's, you
15 know, they calculated lead time -- they,
16 meaning KM, calculated lead time penalties,
17 you know.  So some of the offsets and, again,
18 depending on the data source because it's
19 going to change, you know, there's still an
20 amount due.
21      If there's a million dollars or $4
22 million that's going to change it.  But it's
23 a dynamic relationship, what gets included
24 into the final result, what's in and out of
25 the case.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 194

1            R. Paulikens
2       Q.  Okay.  Do you -- have you formulated
3  an opinion about the value of those offsets
4  for purposes of your report?
5       A.  No.  Because the offsets, you know,
6  rights now, I think that are in play, in
7  part, are the lead time penalties, which
8  accumulated to the 4-million-odd dollars.
9       Q.  And the $8 million figure, I know
10  you've talked about it, but I'm being
11  thorough so forgive me for repeating things.
12  But the $8 million figure you write on page 8
13  of your report, you calculate simply by
14  looking at the $13.5 million number that you
15  have said certain reconciliation documents
16  say that Circuitronix Hong Kong owes to
17  Benlida, right?  And subtracting the roughly
18  $5 million that you concede, you're not
19  taking issue with, that reconciliation
20  numbers show that Circuitronix U.S. has a
21  credit with Benlida for, right?
22       A.  Yes.  You know, I've said it that
23  way, and if you look at the data chart above
24  it in that report, when you simply look at
25  the current year change, the balance due, if

Page 195

1            R. Paulikens
2  you look in the column there, you'll see in
3  the last, you know, '17, '18, and '19, there
4  was big increases in the balance due on that
5  one chart.  So all I'm saying is --
6       Q.  And that chart is the one that's on
7  page 8?
8       A.  On page 8.
9       Q.  Okay.
10       A.  So it's a dynamic relationship
11  depending on where you start, what you
12  include, and that's all I'm saying.  There's
13  a lot of math, a lot of numbers that have to
14  be decided, what we're starting with and
15  what's in the mix and what's out of the mix.
16  Because we can go in circles.
17       Q.  I'm not asking you --
18       A.  I'm not saying you are.
19       Q.  That's how you got the $8 million
20  number?
21       A.  Yes.
22       Q.  Just turning to page 9 of your
23  report, talking about the statute of
24  limitations issue.
25            I note that the end of the first

Page 196

1            R. Paulikens
2  paragraph there you write what you have said
3  today, correct, that the KM report appears to
4  begin its analysis with a lookback to 2012?
5       A.  Yes.
6       Q.  And you put in the section here
7  about statute of limitations for what reason?
8       A.  My understanding is, again, it's a
9  legal dispute, and I'm not trying to handicap
10  it as an accountant.  But I'm emphasizing
11  that the start amount, which we've covered in
12  multiple ways today, may be influenced by
13  what the judge may rule and what the statute
14  of limitations, we still need to get the
15  right beginning balance, we covered that, I
16  think a couple of hours ago.
17            And I'm just saying that, you know,
18  there's issues that all influence what the
19  final number is.  You know, if we start at a
20  hard date that nothing before 2015 matters,
21  just to pick an example, you know, that may
22  change the ending number.
23       Q.  So on the next paragraph of your
24  report, you reference worksheets within the
25  files KM produced to illustrate the amounts

Page 197

1            R. Paulikens
2  due from the period of 2015 through
3  July 2019.
4            You see that?
5       A.  Yes.
6       Q.  Okay.  And then you say, Included in
7  Exhibit 3 and Exhibit 4, excerpts from two
8  files.  Let me make sure that I've got the
9  right ones because I had a little difficulty
10  with this.
11            So I'm going to pull up your report
12  on the computer and go to Exhibit 3.  I don't
13  know why it always rotates.
14            So Exhibit 3 has a document that has
15  a source name, right?
16       A.  Yes.
17       Q.  Can you just read that source name
18  up there?  What's the one on the screen?
19       A.  Okay.  Except this is --
20       Q.  Just if you can follow my question.
21       A.  This is 2012 to 2019.
22       Q.  Mr. Paulikens, I just need you to
23  answer my question.
24            The one that I pulled up on the
25  screen that's Exhibit 3, the source says

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 198

R. Paulikens

1    what?
2
3         A.  Benlida shipment and payment
4    details, CTX-HK 2012 to 2019.
5         Q.  Okay.  I know you were going to
6    this, but in your report on page 9 you say
7    that Exhibit 3 says CTX-HK -- sorry, Benlida
8    payment details, CTX HK 2015 to 2019 version
9    2.1, right, in your report?
10        A.  Yes.
11        Q.  So which is it?  Because these don't
12   match.  Exhibit 3 says 2012 to 2019?
13        A.  Right.
14        Q.  And your report says 2015 to 2019?
15        A.  What does Exhibit 4 have?  What does
16   Exhibit 4 say?  Because I don't have that.
17        Q.  Yes.  Exhibit 4 says CTX-HK 2015 to
18   2019 version 2.1.
19        A.  Right.  So my exhibit numbers
20   changed from the narrative in your hands to
21   the actual exhibits.  So that's why I
22   reference the file name which is that source
23   file.  And so the next one, which I said is
24   Exhibit 4, probably is Exhibit 5.
25        Q.  Okay, wait, so then staying with one

Page 199

R. Paulikens

1
2    thing at a time.  On page 9 of your report
3    where it says parentheses Exhibit 3.
4         A.  Right.
5         Q.  That --
6         A.  Should be 4.
7         Q.  That should say Exhibit 4?
8         A.  Yes.
9         Q.  So that's a mistake.  And then it
10   says in your report, And Benlida payment
11   details CTS, which is probably just a typo,
12   it should be CTX, right?
13        A.  Yes.
14        Q.  U.S. 2015 to 2019 version 2.1, and
15   it says Exhibit 4.
16        A.  If you could click on Exhibit 5.
17        Q.  Okay, so right now we're looking at
18   Exhibit 4 on the screen, and that says it's
19   called -- its source is CTX HK not CTX U.S.,
20   right?
21        A.  No.  This says CTX HK, which is
22   exhibit -- should say Exhibit 4 in a
23   narrative in my report.  That gives you the
24   million -- the $8 million balance shown on
25   the next paragraph.

Page 200

R. Paulikens

1
2         Q.  Okay.  Hold on, because this is
3    still not clear to me.
4              We've established that where your
5    report said Exhibit 3, that was incorrect and
6    it should have said Exhibit 4?
7         A.  4.
8         Q.  Because we're now looking at
9    Exhibit 4 on the screen, and Exhibit 4 is CTX
10   HK figures, right, from 2015 to 2019?
11        A.  Yes.
12        Q.  Okay.  Now I'm just trying to follow
13   you.  Looking at your report, the next one
14   you list says, Benlida payment details CTS
15   U.S., 2015 to 2019, Exhibit 4.  But since
16   we're looking at Exhibit 4 on the screen,
17   that's also not --
18        A.  No, it should be Exhibit 5.
19        Q.  Your report should have said
20   Exhibit 5?
21        A.  Yes.
22        Q.  All right.  So let me click to
23   Exhibit 5.
24             Exhibit 5 says the source is Benlida
25   payment details CTX U.S. 2012 to 2021 version

Page 201

R. Paulikens

1
2    5.  That's not it either, is it?
3         A.  That's version 5 -- click on
4    Exhibit 6.  It should be -- I must have moved
5    them.  Where it says Exhibit 4 in my
6    narrative, it should say Exhibit 6.  I moved
7    it.
8         Q.  Okay.  So that's why I had trouble
9    following.
10        A.  I'm sorry.
11        Q.  All right.  So where it says
12   Exhibit 3, it should say Exhibit 4.  And
13   where it says Exhibit 4, it should say
14   Exhibit 6?
15        A.  Correct.
16        Q.  Okay.  So let me ask you this.
17             Your point in flagging what you've
18   now shown are the two exhibits you were
19   trying to reference on page 9 of your report
20   was that the KM files produced to you
21   illustrates the -- illustrate the amounts due
22   for the period from 2015?
23        A.  Correct -- I'm sorry.
24        Q.  Right.  And so that's the point in
25   time you were sort of trying to focus us on?

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 202

R. Paulikens

2  A.  Right.  So the statute of
3  limitations and the static start point
4  changes based upon whatever file source
5  you're using.  The two numbers I have here
6  and included in my report as exhibits, even
7  though they're mislabeled, show different
8  outcome than the 8 million we talked about
9  ten minutes ago.  This is 3 million when you
10  are truncating the early years off.
11      Q.  Okay.
12      A.  So all I'm saying is that is a big
13  issue.
14      Q.  Okay.  And I know you were trying to
15  fast forward ahead of my trying to figure out
16  which exhibit was which when you referenced a
17  dollar figure earlier?
18      A.  Yes.
19      Q.  And in your report it says for the
20  periods shown, which I now understand to be
21  2015 through 2019 --
22      A.  Yes.
23      Q.  -- CTX owes Benlida slash ROK
24  approximately $8.8 million, and Benlida owes
25  CTX approximately $5.7 million?

Page 203

R. Paulikens

2      A.  Right.  Which are the totals.
3      Q.  So using Exhibits 4 and 6 to your
4  report, the corrected numbers, that's the
5  data?
6      A.  Yes.
7      Q.  Got it.  And when you say CTX in
8  that sentence, the first CTX is CTX Hong
9  Kong, correct?
10      A.  Owes.  Yes.
11      Q.  And the second CTX, Benlida owes
12  CTX?
13      A.  U.S.
14      Q.  CTX U.S.?
15      A.  Yes.
16      Q.  Okay.  And you say in your next
17  sentence, As shown in the files relied upon
18  by KM, Benlida is owed approximately a net
19  amount of $3.119 million?
20      A.  Correct.
21      Q.  When you say, The files relied upon
22  by KM, where did they rely upon them?
23      A.  Well, they include -- it was
24  information relied upon in the report, that
25  was the -- it was produced to me, these were

Page 204

R. Paulikens

2  files.  So it was information available to
3  them.  All I'm saying is this information in
4  their file for these dates give you this
5  result.
6      Q.  And you supplied a bunch of
7  materials equally when we asked for your
8  files, correct?
9      A.  Yes.
10      Q.  Including bringing a USB here today?
11      A.  Yes.
12      Q.  Did you rely upon everything that's
13  in those computer files to produce your
14  report?
15          MR. LERNER:  Objection.
16      A.  Well, rely is a very broad subject,
17  you know.  It's information that was
18  available to me in my work, some of which was
19  more relevant than others, like the financial
20  statements which I sent you from the
21  settlement work that I did.  I gave that to
22  you because it obviously influences my
23  understanding of the case.
24      Q.  Well, I'm just asking you this
25  question because you used the words "relied

Page 205

R. Paulikens

2  upon" in your report.  And I want to
3  understand what you mean by that.
4      A.  Oh, okay.
5      Q.  So these materials that you are
6  saying were relied upon by KM related to the
7  2015 to 2019 time period were things that
8  were in their materials that they had, right,
9  in their possession?
10      A.  Yes.
11      Q.  Were they relied upon in their
12  report, per se?
13      A.  The specific exhibit, no.  But
14  remember, as we discussed earlier, they went
15  from day zero 2012 through 2019 or '21.  So
16  by default this information is at least
17  subsumed in some of those numbers.  It's
18  different excerpting of information,
19  depending on the dates.  So how much they
20  relied upon it, but it was in their
21  information.
22      Q.  But you, yourself, have testified
23  that you can't just have something subsume
24  within a time period, that the start time
25  matters?

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 206

1                    R. Paulikens
2      A.  And that was the purpose of this
3   section of the report, to say the start time
4   does matter, because you get a different
5   result if you start at 2015 and go to '21
6   than if you do, if you start at 2012 and go
7   to 2019.
8      Q.  And in the KM report, we've already
9   established they start at 2012?
10     A.  Yes.  I said that in my report about
11  two pages ago.
12     Q.  When you said they relied upon this
13  2015 to 2019 database, they didn't really
14  rely upon it, like use it as some evidence
15  that they formed an opinion in their report
16  based upon.  They just had it in the
17  materials that they considered among many,
18  correct?
19     A.  Well, among many, and because they
20  didn't discuss the HK issue, other than to
21  say they're not discussing the HK issue, this
22  was available and I know it's circular.
23     Q.  My point is, you have materials that
24  are within your materials for this file, for
25  this case, that you didn't specifically rely

Page 207

1                    R. Paulikens
2   upon to draw opinions from for your report,
3   correct?
4      A.  That's correct.
5      Q.  Okay.  You come up with this 3.119
6   number?
7      A.  Yes.
8      Q.  And you say, As shown on the next
9   page.  So let's go there to page 10 of your
10  report.
11         I see that figure in the third blue
12  highlighted chart at the bottom right.
13     A.  Um-hum.
14     Q.  Is that where it is?
15     A.  Yes.
16     Q.  Okay.  And you created that chart?
17     A.  Yes.  This is -- we created this
18  chart using those source information in order
19  to try to get to a consistent end point in
20  2019 where the balances could be.  And the
21  purpose was, and I use this phrase
22  throughout, depending upon the data source.
23         So the top chart was the CTX HK
24  cutoff at 2019.  Then the second piece was
25  the CTX U.S. cutoff at '19.  You know, so I'm

Page 208

1                    R. Paulikens
2   trying to get some level of comparability.
3   And then the third piece of the chart is
4   simply the mathematical totals of each of
5   those.
6          So the running total in the top of
7   the chart is HK in this chart owes Benlida
8   8.8 million.  In this chart, Benlida owes CTX
9   U.S. 5.7 million.  Simply, the balance due is
10  the 3 million.  It's just an illustration
11  that there's data and start dates matter.
12     Q.  Okay.  So I recognize the top
13  chart --
14     A.  Yes.
15     Q.  -- I believe, as Exhibit 4 you were
16  showing us to your report.  I'll pull it up
17  on the screen.
18         That's the right thing, right, CTX
19  HK 2015 to 2019?
20     A.  Yes.
21     Q.  8,843,225.58.
22     A.  Yes.
23     Q.  And then I believe that the second
24  chart on page 10 of your report is Exhibit 6,
25  as you've identified.

Page 209

1                    R. Paulikens
2          Can you confirm that?
3      A.  Yes.  5.7.  Yes.
4      Q.  Okay.  Got it.
5          So, basically, page 10 has
6   Exhibit 4, Exhibit 6 and then a total?
7      A.  Correct.
8      Q.  Underneath those charts on page 10
9   of your report you say, KM acknowledges that
10  CTX owes Benlida slash ROK approximately
11  $13,492,823.  I'm going to stop there.
12         Where does KM acknowledge that debt?
13     A.  It -- I don't think they
14  specifically acknowledge that debt within
15  their report.  The data that I pulled from
16  their files show the 13 million, we've
17  covered that before.  So the purpose of this
18  is, there's a whole lot of this relationship
19  that's not just the two parties at KM
20  covered.
21     Q.  I'm just focusing on your words, KM
22  acknowledges.  Can you see that they don't
23  acknowledge that?
24     A.  No.  They didn't form any opinion,
25  other than discussing they weren't

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 210

1                R. Paulikens
2    discussing.
3         Q.  And then you continue in that
4    sentence, you say, And maintains -- and
5    you're talking about KM.  KM acknowledges a
6    certain amount and maintains for the purposes
7    of analysis that Benlida owes CTX
8    approximately $9.4 million, right?
9         A.  Correct.
10        Q.  But they don't actually -- KM
11   doesn't actually maintain that in its report,
12   does it?
13        A.  No.  They think it shows that,
14   again, one of the other charts from the other
15   thing shows another larger amount, because,
16   again, depending on which version of the
17   these years, the numbers are all over.
18        Q.  So this narrative that you have in
19   your report is your characterization of
20   documents that happened to be in the
21   materials that KM had access to?
22        A.  Yes.
23        Q.  Okay.  And just to conclude, you
24   then say at the bottom of page 10, As shown
25   in these files, according to KM, Benlida is

Page 211

1                R. Paulikens
2    owed approximately a net amount of 4 million
3    and change, right?
4         A.  Depending upon which data source,
5    yes.
6         Q.  But you didn't write, depending upon
7    which data source, did you?
8         A.  I've said that throughout the
9    report.  So I've said that.  Didn't say it
10   here.
11        Q.  My focus is what you did say here.
12   You said, According to KM, right?
13        A.  Yes.
14        Q.  But it is not according to KM, is
15   it?
16        A.  It's according to files in their
17   file.
18        Q.  Data in their file would support
19   that number, you're saying?
20        A.  Yes.
21        Q.  Okay.
22             THE WITNESS:  Can we take a
23        quick break?
24             MR. ROSENTHAL:  We'll take a
25        break, sure.

Page 212

1                R. Paulikens
2             (Whereupon, a brief recess was
3        taken.)
4    BY MR. ROSENTHAL:
5         Q.  So we're on page 11 of your report,
6    Mr. Paulikens, and I recognize Exhibit 3,
7    because you've labeled it at the top.  That
8    is Exhibit 3, right, just to be clear?
9         A.  I think so.  The '19 version.
10        Q.  Let me just click on Exhibit 3 so we
11   can confirm since some of these things got
12   misnumbered in your report.  Go ahead and
13   take a look.
14        A.  Yes.
15        Q.  Okay.  So 3 is 3 on that page.
16   Let's look at Exhibit 5, because I will note
17   for you that the only time I saw Exhibit 5
18   referenced in your report is the little top
19   middle chart on page 11.  I'll click on
20   Exhibit 5, and I may have to rotate this
21   three times.
22             Showing you Exhibit 5 to your
23   report --
24        A.  That looks like the source of the
25   middle portion of the chart.

Page 213

1                R. Paulikens
2         Q.  Okay.  Let me just ask you this one
3    question about it.
4             You see how the source says that
5    it's Benlida payment details, CTX U.S. 2012
6    to 2021 at the top?
7         A.  Yes.
8         Q.  In your report, and here also on
9    Exhibit 5, it cuts off at 2019.
10            Do you know if the original source
11   had 2020 and '21 in it?
12        A.  I think it did, and I was trying to
13   get some level of matching --
14        Q.  Okay.
15        A.  -- between each of the different
16   data sources so that there was some level of
17   consistency.
18        Q.  Okay.
19        A.  That's why there also was a note
20   that some were done on accrual -- I'm sorry,
21   on a calendar and some were done on a fiscal.
22        Q.  Okay.  And looking back at your
23   report on page 11, the third chart, the blue
24   highlighting, it says total on the top of it.
25        A.  Yes.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 214

1           R. Paulikens
2      Q.  How did you calculate those totals?
3      A.  That's just added up.  So if you
4  look at the first two numbers, so taking 2012
5  is just an illustration, is $50,844 on the
6  top chart.
7      Q.  Yes.
8      A.  And then add that to the 1,168,214
9  in the middle chart?
10     Q.  You mean $1,168,214 middle chart
11  number?
12     A.  Yes.  Gives you $1,219,000 and some
13  change.
14     Q.  And so, basically, for purposes of
15  this part of your report, you added the top
16  chart, which is Circuitronix Hong Kong, the
17  middle chart, which is Circuitronix U.S. and
18  got a total?
19     A.  Yes.
20     Q.  Both total invoices, total debit
21  memos, total payments and then the balance?
22     A.  Running balance.
23     Q.  And I want to look at what you said
24  about that beneath these charts.
25         I'm paraphrasing, you say that it's

Page 215

1           R. Paulikens
2  untenable to separate ROK and Benlida,
3  correct?  I'll read the specific sentence.
4  You say, quote, To show the untenable
5  position that CTX seeks to do by separating
6  Benlida and ROK, parentheses, where Benlida
7  has been overpaid and ROK has been underpaid,
8  we will combine the two balances to show
9  they're combined, Benlida and ROK have a
10  commercially normal relationship with CTX.
11         Did I read that correctly?
12     A.  Yes.
13     Q.  So my first question is, is it
14  untenable to separate ROK out?
15     A.  It's untenable to separate -- I
16  think it's untenable to try to separate
17  either of the parties from each other because
18  they seem to work together.  So all I'm
19  showing here is, on the one hand you got the
20  CTX U.S. that's got a significant
21  overpayment, $9.4 million at the end of 2019.
22  And yet you've got, basically, roughly the
23  same time, CTX Hong Kong underpaid by 13.4.
24         And I'm just saying, and I talked
25  about this earlier, that's just a very odd

Page 216

1           R. Paulikens
2  relationship.  And then you combine them,
3  which is what the bottom did, and it's an
4  illustration that combined is actually a
5  fairly normal typical commercial
6  relationship.
7         That's why trying to separate one
8  from the other I don't think makes economic
9  sense.
10     Q.  Let me ask you about the second line
11  where you say, Where Benlida has been
12  overpaid and ROK has been underpaid.
13         Do you see that?
14     A.  Um-hum.
15     Q.  Where does it show that ROK has been
16  underpaid?
17     A.  It doesn't.  It would be -- it
18  should be -- it should have said HK was
19  under -- what's the word I'm looking for?
20         What did you say?
21     Q.  Go ahead.  Mr. Lerner was
22  volunteering something, but thought better of
23  it.
24     A.  What I'm trying to show in this
25  chart is that when you look at the Hong Kong

Page 217

1           R. Paulikens
2  portion and the CTX U.S. portion, you need to
3  combine them.  And perhaps my draftsmanship
4  was imprecise.
5     Q.  Well, it was wrong, wasn't it?
6     A.  Imprecise or wrong.
7     Q.  You made a mistake by saying ROK,
8  didn't you?
9     A.  It should have said Hong Kong or HK.
10  Because I was trying to show that the two
11  parties -- you can't separate the
12  relationship.
13     Q.  Okay.  But it's also a mistake to
14  say, even if you change it to say, CTX Hong
15  Kong has been underpaid, right?
16     A.  CTX Hong Kong --
17     Q.  Because actually you're saying --
18     A.  Yes.
19     Q.  -- that CTX Hong Kong is the party
20  that underpaid by $13 million?
21     A.  Underpaid, yes.
22     Q.  Right?
23     A.  Correct.
24     Q.  So that's another mistake, isn't it?
25     A.  Yes.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 218

1                    R. Paulikens
2        Q.  So --
3        A.  So what I should --
4        Q.  How should this paragraph be
5    understood properly?
6        A.  It should say, when you look at the
7    HK and CTX HK relationship with Benlida, you
8    need to take them as a whole because of the
9    disparate results.
10       Q.  I understand that.  Okay.
11            Earlier in your report, you, if you
12   look at page 7, right beneath the heading, it
13   says what is not in the KM report?
14       A.  Yes.
15       Q.  You say, quote, There are two
16   Benlida entities, Benlida and ROK.  And there
17   are two Circuitronix entities, CTX U.S. and
18   CTX HK.
19       A.  Yes.
20       Q.  So you are aware that there are two
21   different Benlida entities, one is Benlida
22   and one is ROK?
23       A.  ROK, yes.
24       Q.  When you were referring to ROK on
25   page 11, you conceded that that was an error?

Page 219

1                    R. Paulikens
2        A.  Yes.  Because I was talking -- the
3    charts talk about HK.
4        Q.  Where does ROK fit into this
5    analysis at all?
6        A.  In this particular chart it doesn't
7    fit in the analysis, because I was only
8    talking about the CTX HK.
9        Q.  I understand, on page 11?
10       A.  On page 11.
11       Q.  I'm asking you more broadly.  Where
12   does ROK fit into the entire relationship
13   with the parties, since that's the focus that
14   you said that KM should have focused on?
15       A.  Well my understanding is, and again
16   part of it is a function of the dispute
17   itself, is that the parties are intertwined.
18   The litigants are intertwined in their
19   activities, CTX HK and CTX U.S. are
20   intertwined amongst themselves and Benlida
21   and ROK are intertwined amongst themselves.
22   And it's separating two of them from the
23   others might give an economically
24   unreasonable result which was the whole
25   purpose of this chart, to show there's more

Page 220

1                    R. Paulikens
2    to this story.
3        Q.  Have you taken moneys owed to ROK as
4    opposed to moneys owed to Benlida into
5    consideration at all for purposes of any of
6    your report?
7        A.  No.  The information was from the
8    charts here which was HK.
9        Q.  I'm just trying to get away from
10   this particular page of whatever you were
11   trying to show there.  I'm asking you just
12   more broadly.
13            Did you consider ROK's accounts in
14   anything you did in your report, separate
15   from Benlida's accounts?
16       A.  No.  What I -- no, the numbers I
17   used in my reports were cited for the
18   documents we've already discussed.  They were
19   CTX HK, and if there was an ROK number which
20   I'm not remembering as I'm sitting here, I
21   don't think I did.  I was focusing on this.
22       Q.  In fact, I think that the charts you
23   used with the blue highlighting on them, that
24   look all kind of the same format-wise, were
25   for Benlida not ROK; does that comport with

Page 221

1                    R. Paulikens
2    your understanding?
3        A.  Yes, it does.
4        Q.  The only one that I saw that had ROK
5    on it was going back to page 5 of your report
6    at the top, which was a reconciliation
7    analysis.
8        A.  It was a CCT reconciliation for the
9    one that was called CCT?
10       Q.  I don't remember what it was called.
11   But we have talked about it.
12       A.  We did.  It's referenced the prior
13   page, it was the 11/15 CCT --
14       Q.  Yes.
15       A.  -- spreadsheet.  That was just one
16   of their work product, one of the litigants'
17   ping-pong balls.
18       Q.  Right.  In fact, that was one I
19   believe that was sent from Benlida -- this is
20   the one where you said in the e-mail Benlida
21   created this, their accounting department,
22   and they sent it in that file.  Because CCT
23   is their abbreviation for Circuitronix, I
24   don't know if you're aware of that?
25       A.  No, actually, no.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 222

R. Paulikens

1
2     Q.   And in that chart, at the top of
3  page 5 of your report they actually have
4  transactions between ROK in the right-hand
5  side?
6     A.   Yes.
7     Q.   Do you see that?  Not Benlida but
8  ROK.
9     A.   Right, okay.
10    Q.   And the only -- well, I'll leave it
11 at that.  Okay.
12         Having pointed out that distinction
13 between ROK and Benlida for purposes of
14 discussion, coming back to that chart here at
15 the top of page 5 of your report, you didn't
16 use this right-hand side of that chart --
17    A.   No.
18    Q.   -- for anything?
19    A.   No, I did not.  It was an
20 illustration that the parties were working to
21 reconcile or resolve whatever dispute they
22 had.
23    Q.   Got it.  Globally?
24    A.   Yes.
25    Q.   Okay.  On page 11 of your report --

Page 223

R. Paulikens

1
2  let me pause and just read it.
3         Okay.  So in the bottom paragraph,
4  page 11, you say, In the table above at the
5  end of 2018, there's a combined -- a typo
6  there, there is a combined, I think the word
7  there should be -- there's a combined
8  $5.879 million balance, right?  Owed by CTX
9  entities to Benlida slash ROK.
10        Do you see that?
11    A.   Yes.
12    Q.   That should just say to Benlida,
13 right?
14    A.   Correct.
15    Q.   So the ROK is an error, correct?
16    A.   Correct.
17    Q.   You're just literally referring
18 there to these prior charts on the same page?
19    A.   Yes.
20    Q.   Okay.  And when you did the
21 calculation of the rough monthly amount
22 volume of purchases of 2.1 or $2.2 million a
23 month, which entities were you deriving that
24 from?
25    A.   The combined invoices highlighted in

Page 224

R. Paulikens

1
2  yellow on the left.  It's an illustration,
3  it's 26 million divided by 12.
4     Q.   I understand.  But the 26 million
5  number as you've now explained is the
6  product, is the sum of business between
7  Circuitronix U.S. and Benlida and
8  Circuitronix Hong Kong and Benlida, right?
9     A.   Yes.
10    Q.   Did you do a calculation of what the
11 volume of business of Circuitronix U.S. and
12 Benlida was monthly?
13    A.   Monthly, no.
14    Q.   Okay.  Would it surprise you if it
15 was roughly the same in the $2 million range
16 or would it be substantially less?
17    A.   Repeat your question again?  I'm
18 sorry.
19    Q.   No problem.  Essentially, what I'm
20 asking you is, was the monthly volume of
21 business between Circuitronix U.S. and
22 Benlida in the range of $2 million?
23    A.   Circuitronix U.S. and Benlida, for
24 which period, no, because when you look at
25 the invoices in the middle of that chart, it

Page 225

R. Paulikens

1
2  says there was $9 million of invoices.  I'm
3  looking at 2015 because that's where my
4  finger is.
5     Q.   Okay.
6     A.   You know, that would be one million
7  or less than one million.  So my illustration
8  here was just taking the total, divided by
9  the net receivable, gives you a commercially
10 typical relationship.
11    Q.   I thought that you had previously in
12 your report indicated a monthly, like how
13 many months ahead CTX U.S. was?
14    A.   At one point one of the other charts
15 showed a balance due of $5 million -- of
16 overpayment of $5 million.  And I think there
17 was 8 or $9 million of revenue.  I said there
18 was six months, perhaps, three to six months,
19 I think.  And it was, again, an illustration.
20    Q.   And that was a similar kind of
21 calculation?
22    A.   Yes.
23    Q.   So at the end of page 11 you say,
24 Based on the information in the above table
25 at the end of 2018, there is approximately

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 226

1                R. Paulikens
2    2.7 months of purchases that CTX owes Benlida
3    slash ROK for using 2018 purchases as a
4    guide.
5          We should cross out the ROK again,
6    right?
7      A.  Yes.
8      Q.  Lead time penalties is the next
9    subject.
10         You acknowledge that KM, in its
11   report, did at least mathematically validate
12   the inputs based upon a judgmental sample for
13   lead time penalties, right?
14     A.  No.  I said they recalculated,
15   approximately, eight spreadsheets.  They did
16   not validate the inputs used to calculate it.
17     Q.  You say the following, Since KM by
18   its own report did not seek to validate the
19   inputs, this claim is unsupported, and you
20   say, Other than mathematically in the KM
21   report?
22     A.  Right.  Because I said in the
23   italics version, they did not validate the
24   inputs used to compute the LTPs.
25     Q.  So what do you mean when you say,

Page 227

1                R. Paulikens
2    Other than mathematically?
3      A.  Okay.  What KM did was they checked
4    the math, and I don't want to be pejorative
5    when I say that, but they went into the
6    spreadsheets and we looked at certain of them
7    and said that, okay, shipment one was ten
8    days late.  And there's a lead time penalty
9    of some percentages of sales and they
10   calculated that.  And then the chart itself
11   showed ship date, receive date, and it was
12   all formula driven.  And it calculated if it
13   was on time or if there was a penalty.
14     Q.  Right.
15     A.  And I know that KM did check the
16   math and they said they did it without
17   exception.  But they didn't go back to the
18   documents to say, okay, did it really ship on
19   April 1st, is it really received on a date,
20   was there any other reason why the lead time
21   penalty may have been waived, like a specific
22   lead time penalty, not like a group of them,
23   which then was a discussion about.
24         So they said they checked the math
25   and it was, you know, $4 million for CTX U.S.

Page 228

1                R. Paulikens
2    But they didn't go back to see if Benlida
3    agreed with that or disagreed.  Because my
4    understanding is they haven't been asserted,
5    I don't know if that's the right word.
6      Q.  Okay.  So I understand your
7    testimony, what you're saying is, the lead
8    time penalty amounts in the KM report are at
9    least mathematically supported, just not
10   validated based upon the underlying data; is
11   that correct?
12     A.  Correct, yes.  Because they didn't
13   say, no, this lead time penalty is correct,
14   based on receiving docs, shipping docs,
15   whatever.  They checked -- they didn't
16   check -- they checked the math, they didn't
17   validate the correctness of the inputs.
18   That's what I understand they say they said.
19     Q.  And have you looked at their math as
20   well?
21     A.  We checked some of the worksheets
22   that came there, judgmentally in the math
23   work.  So the spreadsheets certainly seemed
24   to be functioning correctly.
25     Q.  Okay.  And the next sentence in your

Page 229

1                R. Paulikens
2    report in the middle of page 12 says, We are
3    not aware of any acceptance, rejection or
4    waivers that both parties agreed to other
5    than what is spelled out in the KM report at
6    paragraphs 34 to 36, right?
7      A.  Correct.
8      Q.  And that means, as I understand what
9    you're saying, if I understand what you're
10   saying, that where they lay out paragraphs 34
11   and 36, certain evidence of agreements by
12   Circuitronix to waive lead time penalties?
13     A.  Right.
14     Q.  You're not contesting that that
15   happened, correct?  In other words, you don't
16   dispute their summary of those waivers of
17   lead time penalties, do you?
18     A.  I'm not disputing their recitation
19   of that.  What I said was, we're not aware
20   that Benlida -- I know there's a section
21   there that Benlida said there is none.  And
22   under your finger -- I'm trying to read this
23   upside down.
24     Q.  You have a copy of it.
25     A.  I do?

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 230

R. Paulikens

2  Q.  The KM report?
3  A.  No, I don't.
4  Q.  Sorry, I'm looking at page 13.
5  A.  So in paragraph 34 of the report --
6  34 to 36 of their report, they summarize
7  CTX's claim for lead time penalties based
8  upon certain date ranges.  And they recite
9  the second tranche which says they were
10  waived.
11       And my understanding is that there
12  is disputes as to the penalties and whether
13  they are waived or not, it's a legal issue.
14  So, again, I'm not trying to handicap it.
15  Q.  Okay.  I'm just trying to understand
16  your testimony.
17       So, one, you're considering the
18  question of whether or not lead time
19  penalties were waived were not a legal issue?
20  A.  Yes.
21  Q.  And that's something that you didn't
22  venture into, correct?
23  A.  Correct.  That's going to be a
24  determination when -- if they're valid and
25  when you can assert them.  But to me that's

Page 231

R. Paulikens

2  more of a legal question than an accounting
3  question.
4  Q.  Okay.  And you're not aware of any,
5  just looking at your words in your report, we
6  are not aware of any acceptance, rejection,
7  or waivers that both parties agree to other
8  than the ones that are discussed in
9  paragraphs 34 and 36 of the KM report?
10  A.  Correct.
11  Q.  Okay.  Did you make an independent
12  inquiry into that or you just left it at
13  that?
14  A.  I left it at that because I
15  understand it's an issue.  They -- the debit
16  memos were never issued.  I mean, the issue
17  was discussed, but debit memos, as part of
18  the grand reconciliation, were included.  So
19  my understanding is there's a dispute there.
20  Q.  And you comment that you were also
21  provided with the same information that
22  supports KM report's calculations in
23  paragraph 36 and Table 6 of their report?
24  A.  Correct.  We checked, we got the
25  Benlida -- sorry, the lead time penalty

Page 232

R. Paulikens

2  spreadsheets and we were able to, you know,
3  test check ourselves, the spreadsheets to
4  make sure they worked.
5  Q.  And did they work?
6  A.  The ones we checked certainly did
7  work.
8  Q.  Okay.  So you're not going to
9  contest the mathematics from those lead time
10  penalty spreadsheets?
11  A.  Not the ones I -- not the ones we
12  saw.  And like I said, we took a judgmental
13  sample ourselves and it worked, so I know the
14  math works.
15  Q.  That technique of taking a
16  judgmental sample, it's kind of like drilling
17  a bore hole in an area and seeing if it's
18  right in enough places that you feel
19  comfortable that you got a sample to say that
20  this data seems to be reliable; is that
21  right?
22  A.  A judgmental sample is actually an
23  older audit term where instead of using
24  statistical sampling or some other more
25  numerical-based choice, like every 10th every

Page 233

R. Paulikens

2  15th, you use your judgment to figure out
3  which ones might be the best things to look
4  at to cover the sample.
5       So you may use the ten largest, by
6  way of illustration, that's not random,
7  that's not -- that's judgmental, and you may
8  take a few others.  But that's actually an
9  old auditor's term.  Because it's not meant
10  to imply statistical vigor.
11  Q.  But because it's something that you
12  used yourself to sort of test this
13  information that KM was relying upon, I take
14  it you don't take issue with their use of
15  judgmental sampling --
16  A.  No.
17  Q.  -- for certain numbers either?
18  A.  No.  Judgmental, again, it's an old
19  auditor's term.  And it means we looked at
20  certain things but we didn't do a statistical
21  robust sampling.  And I don't -- I'm not
22  offended by that, they said what they did,
23  and I don't -- eight spreadsheets kind of
24  made sense.  They all seemed to work.  The
25  ones we checked worked, too.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 234

1                    R. Paulikens
2        Q.  So you have an illustration here,
3    you say, By way of illustration, the lead
4    time penalties from April 2016 through March
5    of 2018 were calculated in such and such.
6            Do you have a specific source for
7    that that you are referring to?
8        A.  No.  Because I was just talking
9    about -- they didn't provide the analysis.
10   And when we looked at that particular
11   spreadsheet -- spreadsheets, certain lead
12   time penalties for Benlida and ROK were
13   combined and we couldn't tell if there was a
14   separation.  And since they didn't provide
15   how they did it, I couldn't recreate it.
16          And I'm simply saying, if they were,
17   you know, exactly how the parties worked,
18   again, it's more of the interrelationship
19   between the parties, they were combined on
20   the same spreadsheets for a period of time.
21       Q.  Okay.
22           MR. LERNER:  Can we take a
23       break?
24           MR. ROSENTHAL:  Please, go
25       ahead.

Page 235

1                    R. Paulikens
2            (Whereupon, a brief recess was
3        taken.)
4    BY MR. ROSENTHAL:
5        Q.  So Mr. Paulikens, we're looking at
6    the USB that you brought with you inside a
7    folder called Benlida documents for
8    deposition, sub folder called Response report
9    and then a sub folder called LTP support,
10   right?
11       A.  Right.
12       Q.  And then in that, you recall this is
13   actually a bunch of documents that also the
14   KM --
15       A.  Yes.  I was about to say, what was
16   different, I believe, was that we created
17   PDFs.  We printed them to PDF, which is why
18   you see PDF in Excel versions.
19       Q.  Of both?  Of each, rather?
20       A.  Of each.
21       Q.  Okay.  So let me just open one of
22   the Excel versions, which is the original
23   format, okay?  I'll open one that says --
24   they all have the same title, like BLD space
25   ROK penalty for lead time exceedences report

Page 236

1                    R. Paulikens
2    and then a date?
3        A.  And a month, correct.
4        Q.  So I'm just going to open the first
5    one.  You said in your report on page 12,
6    April 2016 through March of 2018.  Right?
7        A.  Correct.
8        Q.  So I'll just pull up the first one,
9    which is April 2016.
10       A.  Wait, that's not right.
11           MR. LERNER:  You just have to
12       scroll down.
13       A.  Okay, so here's the file that we
14   got.  And it said lead time penalties BLD and
15   ROK.
16       Q.  I guess what I'm wondering is, do
17   these lead time penalties that are listed
18   here distinguish between Benlida and ROK?
19       A.  I couldn't find a distinguishment,
20   and when we did this summary of the lead time
21   penalties, which was in your first half hour
22   of the deposition, those amounts we couldn't
23   see exactly how KM got to it.
24          So my point was, I couldn't
25   delineate how they did it.  I couldn't find

Page 237

1                    R. Paulikens
2    like an invoice type of series or some PO
3    type of series that I could separate.  But
4    simply the totals, and we did check the math
5    because this is all formula driven, you know,
6    the penalties and it accumulates up here
7    (indicating).
8        Q.  Okay.
9        A.  And I think, that's as far up as it
10   goes.  Oh, the summary, this is the data dump
11   where they got it from, you clicked off the
12   tab here.  My mistake.
13          So the math here was the math that
14   was checked.  So this tab pulls in from these
15   tabs.
16       Q.  You're referring, just for the
17   record, to the April 2016 tab at the bottom?
18       A.  Right.  Which is, I'll call it the
19   working tab, for lack of a better term, that
20   the lead time penalty was actually calculated
21   for that month.
22       Q.  So there's a total penalty in pink
23   of 92,429.56, right?
24       A.  Yes.
25       Q.  And that was on the document itself

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 238

R. Paulikens

1     R. Paulikens
2  already, correct?  That total?  Or did you
3  guys total it up?
4     A.  This was the formula.  This was the
5  document that was the live file that
6  calculated it.  I'm sorry, go ahead.
7        MR. ROSENTHAL:  Okay.  Thank
8  you, Mr. Lerner for your computer.
9        MR. LERNER:  You're very
10  welcome.  We New York lawyers are
11  very courteous.
12        MR. ROSENTHAL:  You are.
13     Q.  So I see at the bottom of page 12 of
14  your report, the last paragraph, it could
15  raise the question of whether or not the
16  statute of limitation applies to lead time
17  penalties that are dating back more than a
18  certain number of years?
19     A.  Yes.  It's a legal question from my
20  chair.
21     Q.  Not something that you factor in one
22  way or another to your analysis, correct?
23     A.  Correct.  They're calculated,
24  whether there was any information that would
25  say that the calculation should be changed

Page 239

R. Paulikens

1     R. Paulikens
2  such as an agreement that a particular
3  shipment could be late for whatever reason,
4  it was not covered.
5     Q.  And you say, As of the date of both
6  expert reports, it is seven years since the
7  lead time penalties measured by KM in their
8  report, correct?
9     A.  Correct.
10     Q.  So the comment you're making there
11  looks at July 2023 and goes back seven years?
12     A.  To 2016.
13     Q.  You're not offering an opinion as to
14  when the statute of limitations date should
15  be started through the lookback period, are
16  you?
17     A.  No.  I'm simply saying it's a
18  question that may have an effect on the
19  ultimate resolution.
20     Q.  So on page 13 of your report, you
21  start by saying, This provides an interesting
22  insight into the relationship of the CTX
23  entities.
24        What is the "this" in your sentence,
25  I couldn't tell?

Page 240

R. Paulikens

1     R. Paulikens
2     A.  The this is the fact that they have
3  these penalties, which total roughly
4  $4 million.  I'm rounding from the KM report
5  that haven't been assessed, if you will, by
6  CTX against Benlida, even though,
7  theoretically, they've been calculated for a
8  number of years.  And we're not talking a
9  small amount of money.  $4 million is a
10  significant magnitude.
11     Q.  Right.
12     A.  And that, again, suggests that
13  there's something else as a pure adversarial
14  commercial relationship.
15     Q.  Are you aware that Circuitronix --
16  strike that.
17        Are you aware that there is evidence
18  in the case that Benlida asked Circuitronix
19  not to continue to send debit memos for the
20  time penalties after a certain date in 2016?
21     A.  I believe they stopped sending the
22  debit memos.  And the reason why that was, I
23  know it's an issue that is in dispute as to
24  whether it's covered a little bit in the KM
25  report, that there's a dispute as to whether

Page 241

R. Paulikens

1     R. Paulikens
2  they qualify for lead time penalty.  I mean,
3  it's a legal issue, but the debit memos
4  haven't been sent because they had been
5  prior.
6     Q.  My question is a little bit
7  different.
8        Are you aware that there's evidence
9  that Benlida asked Circuitronix not to send
10  those debit memos for the time penalties?
11     A.  As I'm sitting here, I don't know of
12  evidence that said please stop.
13     Q.  If, hypothetically, that were the
14  case, would that change your view that the
15  fact of these lead time penalties accruing
16  but not being sent by Circuitronix to Benlida
17  provides an interesting insight into the
18  relationship of the CTX entities, as you say?
19     A.  Well, the fact that they asked not
20  to have the penalties sent, and if the
21  penalty -- lead time penalties are, I hate to
22  use the word legitimate or bonified, I'm not
23  sure of the right word, I don't know that it
24  would change, because the fact that they're
25  not assessing the penalties, even if they're

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 242

R. Paulikens

1    R. Paulikens
2    entitled to and it's not an insignificant
3    amount of money, suggests there's more to the
4    relationship than meets the eye because
5    $4 million of penalties that could be
6    assessed would be material to the amounts in
7    play here. So it suggests to me, and that's
8    all I'm saying is, there's something here,
9    there's more "here" here.
10       Q. The interesting insight into the
11   relationship that you're talking about is the
12   relationship then between Circuitronix on one
13   side and Benlida on the other?
14       A. Yes. Because there's that --
15   there's a significant magnitude of lead time
16   penalties that -- it's a big number.
17       Q. I understand.
18       A. That's all I'm saying. There's more
19   here.
20       Q. But take a look at your report on
21   page 13. You say, quote, This provides an
22   interesting insight into the relationship of
23   the CTX entities close quote. You don't say
24   between Circuitronix on one side and Benlida
25   on the other side?

Page 243

R. Paulikens

1    R. Paulikens
2       A. Oh.
3       Q. Is that a mistake or were you trying
4    to make a different point than what you just
5    testified about?
6       A. No, I don't think it was a different
7    point. Maybe it wasn't as clear as it could
8    be. It's just there is more here here.
9       Q. Then you say, If the CTX entities
10   are truly separate, and CTX considers Benlida
11   and ROK separate, why does CTX calculate the
12   substantial lead time penalties on the same
13   Excel worksheet file and tabs? There's two
14   things there that I want to ask you about.
15   Two or three.
16           What are you talking about, if the
17   CTX entities are truly separate first?
18       A. Well, if the CTX and their
19   relationship with the parties, because
20   there's this big number and we've just
21   covered that. But then if the entity, the
22   individual entities themselves are all
23   separate, meaning ROK is completely separate
24   from Benlida which is completely separate
25   from HK which is completely separate from CTX

Page 244

R. Paulikens

1    R. Paulikens
2    U.S., this calculation, these worksheets from
3    CTX perspective considers Benlida and ROK the
4    same, because they combined the data, at
5    least from what I can tell they combined the
6    data.
7           And it's just suggestive that the
8    parties don't keep each other, the individual
9    entities completely separate, there is
10   overlap. And it's just suggestive there's
11   more to the relationship than meets the eye.
12       Q. You keep on saying that intriguingly
13   more to the relationship than meets the eye,
14   more than just a business relationship, and
15   it just makes me wonder, like, what are you
16   getting at? I don't know what you're getting
17   at.
18       A. Okay. It makes no economic sense to
19   have one related entity have an overpayment
20   of 5 and a half million dollars dependent on
21   the data source, and then another entity
22   that's clearly related that has the complete
23   opposite, that can -- the disparate
24   relationship is odd on an individual basis.
25           However, as I said the prior page,

Page 245

R. Paulikens

1    R. Paulikens
2    when you combine them, you actually have a
3    commercially reasonable relationship. And I
4    know it's a legal question.
5       Q. Right. I just want to illustrate
6    something to you because it might help keep
7    it clear.
8           Four quadrants, this side is CTX,
9    left side, right side is Benlida. Okay?
10      A. I'm with you.
11      Q. You got CTX U.S., that's one
12   company, right?
13      A. Yes.
14      Q. And you've got CTX Hong Kong, that's
15   another company, to your knowledge, right?
16      A. Yes.
17      Q. On the other side, the Benlida side,
18   you have Benlida is a company, correct?
19      A. Um-hum.
20      Q. And you've got ROK, correct?
21      A. Yes.
22      Q. What you just testified about was, I
23   understand it to be at least, the
24   relationship between Circuitronix U.S. and
25   Circuitronix Hong Kong, correct, when you

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 246

R. Paulikens

1
2 were saying one party has a big amount owing
3 and the other party has a big amount
4 overpaid.
5     A.  Correct.
6     Q.  And you're talking about the
7 relationship between these two parties,
8 correct, CTX HK and CTX U.S.?
9     A.  With Benlida.  Because when I was
10 talking about the receivables, we were
11 talking about one had an overpayment we of, I'll
12 use 13 million because we covered it, and one
13 had an underpayment --
14    Q.  I think you got it backwards, one
15 had under payment of 13 million?
16    A.  I'm sorry, yes, and one had an
17 overpayment of 5 million.
18    Q.  Right.
19    A.  And when CTX is showing was
20 combining Benlida and ROK on the same
21 worksheet it shows a certain familiarity
22 between the two and that's all I was saying
23 on the lead time penalties.
24    Q.  Okay.
25    A.  There's four players here, and they

Page 247

R. Paulikens

1
2 interact differently, they interact in an
3 overlapping way, and to understand the total
4 economics, you need to take the total
5 relationships together.  And that's all I was
6 trying to inartfully say.
7     Q.  I got you, okay.
8         And then on the same vein, you say,
9 you make this additional point at the top of
10 page 13, you say that, quote, Further,
11 arbitrarily not assessing the LTPs, lead time
12 penalties, and then seeking to assess them at
13 the very same time, also is suggestive that
14 CTX considers Benlida and ROK as one economic
15 entity.
16        Can you explain that?
17    A.  It's the same thing; the four
18 quadrants of your chart, you know, they act
19 as a group to some degree, you know,
20 shipments.  I know some of this is legal
21 questions about who is who and who controls
22 what, but I'm saying, these parties don't
23 seem to act completely as four independent
24 business entities.  Their interactions tend
25 to overlap, whether it be management or other

Page 248

R. Paulikens

1
2 things, I'm just saying there's more to the
3 relationship than just what was covered under
4 the KM report.
5     Q.  Okay.  So let me ask you about this
6 factorial piece of what your sentence says.
7 The part that says, Arbitrarily not assessing
8 the lead time penalties and then seeking to
9 assess them at the very same time.
10        What are you referring to there
11 about not assessing them and seeking to
12 assess them at the very same time?
13    A.  Well, they calculated them for each
14 of the months.  And as you said, CTX --
15 Benlida asked them not to.  And it just
16 suggests there's something, you know, why
17 wouldn't you assess a penalty that you're
18 entitled to for that kind of money.
19    Q.  Okay.  And you're not privy to what
20 potential explanation there might be for
21 that?
22    A.  No.  It just -- it's -- the
23 individual relationships are a little
24 different than what is normal.  And I'm
25 saying here, just we need to look at the

Page 249

R. Paulikens

1
2 bigger picture.
3     Q.  If there is testimony in the case
4 that you're not privy to at this time that
5 the reason that Benlida asked Circuitronix
6 not to assess those lead time penalties was
7 because Benlida had problems with the Chinese
8 government about its trade balances, that
9 might explain why Circuitronix did them the
10 favor of not sending them those lead time
11 penalties, might it not?
12        MR. LERNER:  Objection.
13    A.  I'm not aware of the testimony.  It
14 is an explanation.  How far that explanation
15 would go, I can't speculate as I'm sitting
16 here.  How far it would go.
17    Q.  I'm not asking you to engage in
18 speculation.  I'm just saying, that's a
19 potential example posed to you as a
20 hypothetical, because you don't have the
21 data, the information, that if it were found
22 to be true, might explain this otherwise
23 strange looking thing, right?
24    A.  Which, see, also, your hypothetical
25 supports there's more to the relationship

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 250

1          R. Paulikens
2    than necessarily meets the eye.
3         Q.  Well, that Circuitronix is willing
4    to extend a favor to Benlida, for example?
5         A.  I'm just saying there's more to the
6    relationship and it's a big number.
7         Q.  But that's the type of thing you
8    mean by it's more to the relationship.  For
9    example, they might be willing to do them a
10   favor financially to help them out in a
11   situation?
12        A.  On the one hand, yes.  I mean, and
13   that's what I'm saying, you have to look at
14   the totality of everything.
15        Q.  In fact, what you as an accountant
16   might view as economically irrational
17   behavior, by Circuitronix might actually
18   reflect personal friendship and beneficence
19   by its CEO toward Benlida.  Possible, right?
20             MR. LERNER:  Objection.
21        A.  It's a hypothetical, but you'd have
22   to look at the entire relationship to see if
23   there's a positive on the one side and a
24   negative on the other.  And the answer to
25   your question, that that illustrates that

Page 251

1          R. Paulikens
2    there may be more to the relationship than a
3    particular portion of the dollars and cents.
4         Q.  You can have a situation where
5    someone says, I'm going to loan you $20, and
6    the people are friendly, and the person who
7    owes the $20 doesn't pay it back right away.
8    And the person who lent the $20 says, You
9    know what, it's all right, you can pay me
10   back later, don't worry about it now.  I know
11   you'll take care of it later.  That happens
12   in daily life among people who are friends?
13        A.  Yes.
14        Q.  If that extended for a long period
15   of time and it was two companies, you might
16   say that's economically an irrational thing
17   for the company that is owed the money to do,
18   right?  I mean, it's a small amount of money?
19             MR. LERNER:  Objection.
20             Go ahead and answer.
21        A.  Understanding we're just talking
22   illustration, at some point the magnitude of
23   that becomes irrational.
24        Q.  Let's put a real number on it that
25   would be rational for a company's books.

Page 252

1          R. Paulikens
2    Let's say its $25,000.  That's a real number,
3    yes?
4         A.  Well, it depends on the size of the
5    company, but it's certainly not $20.
6         Q.  All right.  Make it $20,000.  And
7    that sits unpaid for an extended period of
8    time.  At some point for the company that is
9    owed that $20,000, as you said earlier today,
10   it could mess up their aging of debt records,
11   right?
12        A.  It could, yes.  I mean, depending on
13   where it's accounted for.
14        Q.  And if that company, for whatever
15   reason, because it enjoys a good relationship
16   with the owners of the other company says,
17   Don't worry about it, I know you'll make it
18   up to me, we've noted it, you owe it, but I'm
19   letting it go for right now.  Like, that
20   could happen, right?
21        A.  That could happen, but it would
22   probably be some other benefit for the
23   company who extended the credit, air quotes.
24        Q.  And they're continuing to do
25   business this whole time?

Page 253

1          R. Paulikens
2         A.  Right.  So there would be some
3    benefit somewhere that they perceived they
4    were getting from that.  And you would have
5    to look at that and as an accountant you look
6    at the whole relationship, because you have
7    customer supplier and then debtor and
8    creditor, and, again, there even overlap.
9         Q.  And the point I'm making is that
10   even corporate entities will sometimes extend
11   each other certain leeway as an act of good
12   faith in an ongoing relationship, right?
13        A.  They would -- they would extend each
14   other some leeway probably within reason.
15   And if they extended it, there had to be a
16   reason somewhere else that they expected to
17   get it, quote, back, unquote.
18        Q.  At some point?
19        A.  At some point.  Or they were already
20   getting it back vis-a-vis something else.
21        Q.  And you don't know exactly what that
22   was between Circuitronix on the one side and
23   Benlida on the other side, do you?
24        A.  No.  I mean, we've been talking
25   about the U.S. piece and we've been not

Randall M. Paulikens, CPA/ABV/CFF/CITP
July 20, 2023

Page 254

```
 1              R. Paulikens
 2   talking a lot about the Hong Kong.  So I
 3   don't know exactly where the meeting of their
 4   minds came to on that issue.
 5      Q.  So you bring up in your report on
 6   page 13 that -- a separate point, that it
 7   seems like CTX has control over CTX HK.
 8   Right?  What do you base that on?
 9      A.  My understanding is that from some
10   of the, you know, papers that some of the
11   decision makers, you know, defer to Rishi,
12   I'm not going to get his name right.  And my
13   understanding is there is aspects of that
14   that, you know, Rishi covers everything.  But
15   he's the president, I think, of the
16   conglomerate.
17      Q.  So you're saying he's the president
18   of --
19      A.  Well, he's the head, I believe of
20   Circuitronix.
21      Q.  What is the Circuitronix?
22      A.  Circuitronix LLC.
23      Q.  And what position does he have at
24   Circuitronix Hong Kong?
25      A.  I don't know.  I've seen, and I
```

Page 255

```
 1              R. Paulikens
 2   can't remember what his specific position is,
 3   but I think, and I'm foggy as I'm sitting
 4   here on the, you know, specific ownership and
 5   roles.  But I understand there's an issue as
 6   to who is calling the shots where.  And
 7   that's a legal issue, kind of beyond my --
 8   it's a legal issue.
 9      Q.  Even though it's beyond the sort of
10   scope of your report or your opinion, you say
11   it would seem that he has control over CTX
12   HK.  So you've sort of taken a position on
13   that, no?
14      A.  Well, I'm saying there's clearly --
15   they're clearly related parties by any
16   definition of accounting.  My understanding
17   is either HK is owned by CTX or they're
18   controlled by the same management company
19   overall.  And I'm talking as broadly as an
20   accountant, related parties in accounting are
21   considered a fairly broad net with which to
22   capture relationships.
23      Q.  And do related parties in accounting
24   usually have a control relationship by one
25   vis-a-vis the other?
```

Page 256

```
 1              R. Paulikens
 2      A.  They can.  But sometimes you have a
 3   related party that they need each other.
 4      Q.  But they're not always in a
 5   controlling relationship?
 6      A.  Yeah, and control is a less precise
 7   term nowadays, you know, 20 percent could be
 8   control of a company.
 9      Q.  So the fact that parties might be
10   related does not necessarily mean that one
11   controls the other?
12      A.  No.  But when they're related in
13   terms of centralized management or combined
14   ownership -- I'm sorry, not combined
15   ownership.  Overlapping ownership, you know,
16   they're considered related parties and you
17   just have a higher level scrutiny in
18   accounting.
19      Q.  But you don't know one way or the
20   other whether the ownership of Circuitronix
21   U.S. overlaps the ownership of Circuitronix
22   Hong Kong, do you?
23      A.  From its pure ownership, no, I don't
24   have that now.  But, again, from an
25   accountant's perspective, related party is
```

Page 257

```
 1              R. Paulikens
 2   not a black and white test.  It's a facts and
 3   circumstances situation as to what, where you
 4   start being considered a related party.
 5      Q.  So what are the facts and
 6   circumstances that make you conclude that CTX
 7   U.S. seemingly has control over CTX HK?
 8      A.  Because my understanding is that
 9   what the claim being made, and my
10   understanding is Mr. Rishi -- Rishi is in
11   charge.  And my understanding, I have seen
12   documents where the -- a manager of HK said
13   they had to go back to Rishi for some
14   approval.  And I forget if it's an e-mail, as
15   I'm sitting here, or motion or moving paper
16   that showed that there is some layer of
17   control over HK.
18      Q.  Okay.  You say in the next line of
19   your report, quote, Put another way, CTX HK
20   and CTX U.S. would appear to be controlled
21   and dominated by CTX.
22          When you say "by CTX," what are you
23   referring to?
24      A.  The parent, CTX LLC.
25      Q.  When you say "the parent," are you
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 258

1              R. Paulikens
2   saying that CTX LLC is a corporate parent of
3   CTX HK?
4        A.  No.  I'm not trying to say in a
5   strict corporate parent.  I'm saying in the
6   way I see the relationship -- the way I
7   understand decisions are being made, there's
8   a control aspect over Hong Kong.  Whether
9   it's by direct ownership interest or whether
10  it's by direct shared management.  Whether
11  it's by direct other issues, there is some
12  layer of influence and control over CTX.
13  And --
14       Q.  Over CTX Hong Kong, to be precise?
15  You said over CTX.  I'm sorry to interrupt
16  you, but I think you meant over CTX Hong
17  Kong, right?
18       A.  Yes.  So, again, from an accounting
19  perspective, when you see disparate
20  relationships like we're seeing in terms of
21  the receivables, it suggests there's more
22  here than the individual pieces might imply.
23       Q.  Does that perception that you have
24  as an accountant influence in any way your
25  opinions set forth in the report, and if so

Page 259

1              R. Paulikens
2   how?
3        A.  No.  Because as I said in my thesis,
4   it wasn't what was in the KM report and what
5   was not.  And these other aspects, such as
6   the HK issue, which we've covered extensively
7   today, you know, suggests there's more to the
8   relationship.  And I understand there's legal
9   disputes around it, but in order to get to
10  the full economic appropriate outcome, you
11  might need to consider all of that.
12       Q.  Okay.  And then there's this other
13  dynamic of the relationship between Benlida
14  and ROK.  What is your understanding of that
15  relationship?
16       A.  They're affiliated companies on the
17  Benlida side.  One is one factory and there's
18  another factory and I forget the towns that
19  they're located in.
20       Q.  You are aware that they're across
21  the street from each other?
22       A.  Yeah, but I mean, there's -- but
23  there's two separate entities.
24       Q.  And do you consider them separate
25  entities for purposes of your analysis?

Page 260

1              R. Paulikens
2        A.  I think they're separate entities,
3   for my analysis I kind of considered them
4   closely similar.  I think their financials
5   were consolidated, but as I'm sitting here, I
6   don't have a perfect recollection of that.
7        Q.  Well, that last point I need to
8   explore with you.  You think that their
9   financials were consolidated.  Your whole
10  report is about Benlida's financials.  So
11  which financials are consolidated that you're
12  talking about?
13       A.  I believe the audited financials
14  that we talked about as part of the
15  settlement litigation.
16       Q.  Earlier in the year?
17       A.  Earlier in the year, the financials,
18  the audited financials as I'm sitting here, I
19  believe were consolidated financials which
20  include the two, I think, but now I'm not
21  sure.
22       Q.  Okay.  Other than that issue, in
23  terms of the financial intercourse between
24  Benlida and Circuitronix, are you aware of
25  there having been consolidated Benlida ROK

Page 261

1              R. Paulikens
2   records, other than the lead time penalty
3   spreadsheets that we looked at a few minutes
4   ago?
5        A.  No.  The consolidated ROK and
6   Benlida documents, not that I am aware of,
7   not that I've seen, that I can recall as I'm
8   sitting here.
9        Q.  In fact, most of the spreadsheets
10  that we've been looking at today that are in
11  the -- that form the basis for charts in your
12  report are Benlida specific, right?
13       A.  Yes.
14       Q.  Okay.  On page 13 of your report, in
15  that center paragraph, one of the things you
16  say is that the patterns of payment behavior
17  with rounded even payments starting and
18  stopping at nearly the same time suggests
19  strong operational control and influence that
20  reduces the separation from CTX's
21  perspective.
22       What do you mean by that?
23       A.  Well, simply, you had two entities,
24  CTX Hong Kong and CTX U.S. that from circa
25  2012 paid in the same pattern, even $10,000

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 262

1                R. Paulikens
2    rounded payments.  Payments on account we
3    discussed.  And suddenly at the same time, or
4    contemporaneous, they have a complete 180 --
5    well, not 180 but a significant change in
6    their payment pattern, suggests that there's,
7    from both of them, suggests that there is
8    some level of influence, control, because
9    they both changed substantially the same
10   time.  It's -- so it's, again, it's just that
11   change at the same time with everything else,
12   it's indicative that there's more here than
13   meets the eye.
14        Q.  So you're drawing the inference from
15   the fact that both Circuitronix U.S. and
16   Circuitronix Hong Kong changed their payment
17   behavior to start paying specific dollars and
18   cents numbers for Benlida's invoices that the
19   inference is that there must be something
20   more to the relationship between Circuitronix
21   U.S. and Circuitronix Hong Kong?
22        A.  Yes.  And as well as the
23   relationship and I understand the legal side
24   that one is not in the case and the other is,
25   understanding that, but, again, all of that

Page 263

1                R. Paulikens
2    is interrelated.
3             So you have a payment series that
4    after multiple years suddenly changes, I
5    think, at a contemporaneous time as they're
6    trying to reconcile receivables and amounts
7    due.  And you have one with a big overpayment
8    and another with a big underpayment.  You
9    know, it suggests that they are all kind of
10   in the same boat.  And I'm not trying to be
11   judgmental to get a legal conclusion in, but
12   there is certainly a relatedness to the
13   group.
14        Q.  You say at the end of that paragraph
15   on page 13 of your report, that you
16   understand it's a legal issue whether orders
17   placed by CTX Hong Kong were actually placed
18   for CTX U.S., right?
19        A.  Yes.
20        Q.  But then you say, However, from an
21   accountant's standpoint, the data clearly
22   supports such a conclusion.
23           How does the data clearly support
24   that conclusion?
25        A.  Because, again, you've got the end

Page 264

1                R. Paulikens
2    result, which is one entity is underpaid by
3    significant amount, the other entity is
4    overpaid, and it's the same type of circuit
5    boards -- same type of circuit boards.  And
6    my understanding is, it disputes as to the
7    customers and who can make a decision.
8             So there's a relationship,
9    obviously, between HK and CTX U.S. that
10   suggests that they are together.  And all I'm
11   saying is, we need to take into consideration
12   the totality of everything, you know, the
13   similar payment terms, the similar payment
14   style, you know, the disparate receivable and
15   payable information.  All suggests there's
16   more to the relationship than necessarily
17   meets the eye on an individual basis.
18        Q.  The KM report does not address the
19   issue of whether orders placed by
20   Circuitronix Hong Kong were placed for
21   Circuitronix United States, right?
22        A.  No, it doesn't.  No.  The KM report
23   does not discuss that issue.
24        Q.  I think we've covered everything you
25   say on page 13.  We can move on to page 14.

Page 265

1                R. Paulikens
2             So on page 14 at the top end of the
3    first paragraph you note, We reserve the
4    right to recalculate lead time penalties once
5    the necessary data is provided to us, right?
6        A.  Correct.
7        Q.  What data do you consider necessary
8    to do that?
9        A.  As I said earlier, when we
10   accumulated the lead time penalties from the
11   spreadsheets that we received from KM, it
12   didn't tie in, that we could tell, into the
13   report paragraph 35 or 36.  I couldn't trace
14   A to B.  And they didn't give me a trail to
15   follow, to go from the spreadsheet, you know,
16   stack of spreadsheets, and you know how they
17   got to that because when we accumulated the
18   penalties that you saw on the top right-hand
19   corner, it came out to a different number.
20        Q.  Let me just ask you something
21   because I'm not sure I understood.
22             We looked on your USB that you
23   brought today that contained -- remember you
24   showed me the 2016 to 2018 lead time penalty
25   spreadsheets which you had copied from Excel

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 266

1              R. Paulikens
2   spreadsheets to PDFs?
3        A.  Yes.
4        Q.  They had the same name as the file,
5   right?
6        A.  Yes.
7        Q.  Those were all received from KM?
8        A.  Yes.
9        Q.  So you received KM's data on lead
10   time penalties that they looked at, right?
11        A.  I received those files and when we
12   accumulated the -- when we accumulated the
13   amounts on the -- each individual Excel sheet
14   and we saw the $92,000 total at the top
15   right-hand corner.
16        Q.  At the top, right?
17        A.  When we accumulated them for all of
18   the months, we got a different number than
19   was reflected in the KM report.
20        Q.  Okay.
21        A.  And all I'm saying is, I don't know,
22   because they didn't say how they got from A
23   to B, and they calculated something like
24   $4 million, and we had a different number,
25   and I couldn't, from what I saw in the report

Page 267

1              R. Paulikens
2   see exactly how they got there.  I'm not
3   saying they did it wrong necessarily, but I
4   couldn't see how they did it.
5        Q.  I don't see a number that you got in
6   your report.  Did you put it in?
7        A.  No.  I didn't put a number, I didn't
8   put a number.  I said I can't trace it.
9        Q.  So when you got a different number,
10   where did you write that down?
11        A.  I believe it was one of the exhibits
12   we looked at today.  I think there was a lead
13   time accumulation sheet.  I think it was one
14   of the exhibits, maybe not.
15        Q.  I don't know that we've seen that.
16   So let's take a moment to understand where
17   that is in your records.
18             Could you -- maybe it would be
19   fastest if you could just take a look at your
20   USB and tell us what you're referring to.
21        A.  Do we have my report handy, the full
22   report?
23        Q.  Yes.  You want me to pull that up on
24   the computer?
25        A.  Yes.

Page 268

1              R. Paulikens
2        Q.  You're talking about your report,
3   which is this, okay.  Is it an exhibit?
4        A.  I think it was an exhibit, and I
5   think it was Exhibit 1.  No, no.  Scroll
6   down.  No, try Exhibit 2.  No, then I am
7   mistaken in my record.  It was one of the
8   documents you opened up from the USB drive
9   this morning.  I think it said summary.
10        Q.  Okay.  So did we mark that?  I don't
11   know if we did.
12        A.  Yes, it was one of the early
13   exhibits we marked.
14        Q.  You're right.  We marked it as 143.
15             MR. LERNER:  I probably
16        e-mailed it to you.
17             MR. ROSENTHAL:  Yes.  Let me
18        save it to my computer real quick and
19        we can pull it open.
20        Q.  So this summary, I'm going to pull
21   on the file name Exhibit 143, okay, so it is
22   clear.
23             Taking a look at Exhibit 143, Mr.
24   Paulikens, let's see if this is what you're
25   talking about.  Do you want me to scroll to

Page 269

1              R. Paulikens
2   the top?
3        A.  Please.
4        Q.  It says summary of lead time penalty
5   spreadsheets from KM files.
6             MR. LERNER:  Can you pause for
7        a minute.  Are you sure that's 143?
8             MR. ROSENTHAL:  I'm pretty
9        sure.  That's how I wrote it down.
10             MR. LERNER:  Okay.
11        A.  So if you scroll to the bottom of
12   that, the totals of these you would need to
13   add up and they add up to a different number
14   than what's shown on their reports.
15        Q.  So let me pause for one second.
16   Since you're gesturing to a screen, the total
17   of these, you mean line 92 --
18        A.  86 to 92, okay.
19        Q.  Well, hold on one second.  Let me
20   ask you something.  Isn't 86 -- so 87 to 90
21   adds up to 92, doesn't it?
22        A.  Say that again?
23        Q.  You are taking --
24        A.  Oh, yes, 87 to 90 adds up to 92,
25   yes.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 270

1                R. Paulikens
2        Q.  So you have bold face totals there
3   for line 92?
4        A.  Right.
5        Q.  Four of them for different, I guess,
6   those are different time periods?
7        A.  You have to go to the top.  You have
8   to go to the top.
9        Q.  Let's -- okay, one of them is
10  Benlida.  Sorry, the first column is Benlida?
11       A.  Benlida slash -- Benlida and ROK.
12       Q.  Second column is just Benlida?
13       A.  Correct.
14       Q.  Third column is Hong Kong?
15       A.  Right.
16       Q.  And the fourth is Shen Zhen?
17       A.  Yes.
18       Q.  So just going down to the bottom
19  with the totals.
20       A.  Right.
21       Q.  Go ahead.
22       A.  So what I'm saying and only saying
23  is, I'm going to gesture to the report, the
24  KM report on page, paragraph 36.  These lead
25  time penalty totals, so the first one is 832.

Page 271

1                R. Paulikens
2        Q.  Yes.
3        A.  The one on the spreadsheet says 14
4   million four, so all I'm saying is, I can't
5   see where these names came from the documents
6   we got from the expert.  That's all I'm
7   saying.  Because I can't -- I couldn't find a
8   way that they separated and got to those
9   numbers -- any of them.  That's all I'm
10  saying.
11          MR. LERNER:  Could we indicate
12       for the record what you are pointing
13       to?
14          MR. ROSENTHAL:  He told us it
15       was paragraph 36 of the KM report,
16       which has been marked as Exhibit 147.
17       Q.  So when you looked at lead time
18  penalty data on what we've now marked as
19  Exhibit 143 -- had previously marked as
20  summary, let me ask you this question.  You
21  had the first column with Benlida and ROK?
22       A.  Because they were combined within
23  the spreadsheets by me.
24       Q.  And then at some point --
25       A.  They were separated.

Page 272

1                R. Paulikens
2        Q.  And that's why you have a column,
3   just Benlida?
4        A.  Right.
5        Q.  And that separation began sometime
6   in 2018, correct?
7        A.  Looks like it.
8        Q.  About August 2018?
9        A.  Yes.
10       Q.  Okay.  And then --
11       A.  Hong Kong.
12       Q.  The Hong Kong column is lead time
13  penalty is Circuitronix Hong Kong had
14  delineated?
15       A.  It's in the document.
16       Q.  So when you go to the totals --
17       A.  Yes.  So all we're saying is when
18  you took the spreadsheets that were produced
19  to us, keyed them into this summary that we
20  created, those numbers are simply different
21  than what's reflected here.  And I couldn't
22  tell from their report how they exactly got
23  to those numbers.
24       Q.  Got it.
25       A.  That's actually all I was saying.

Page 273

1                R. Paulikens
2        Q.  Understand, okay.
3           So are you aware that KM in its
4   report, as it says in paragraph 30, you can
5   take a look on page 12, it's one page back,
6   they talked about issuing, the top line
7   issuing debit memos to Benlida, right?
8        A.  Up until January '16.
9        Q.  Right.  So if you were to remove the
10  lead time penalties, if you had a way of
11  doing it to ROK, from the combined ones,
12  perhaps you could isolate the Benlida ones,
13  right?
14       A.  Perhaps.  And all my point was, I
15  saw what they did, I accumulated it, I
16  couldn't tie to the numbers that they
17  presented, and they didn't give me the
18  roadmap.
19       Q.  Okay.  Got it.  You didn't attempt
20  to individually do it yourself other than
21  this summary chart?
22       A.  We look at it in total, see how did
23  they get it, I can't see how he did it and
24  they didn't give me a roadmap to recreate it.
25       Q.  Okay.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 274

1                   R. Paulikens
2           MR. LERNER:  Let's take five.
3           (Whereupon, a brief recess was
4       taken.)
5   BY MR. ROSENTHAL:
6       Q.  On page 14 of your report, Mr.
7   Paulikens, referring to the second paragraph
8   in the conclusions?
9       A.  Okay.
10      Q.  You make several points I want to
11  ask you about.  You said that, The KM report
12  only seeks to show one side of the economic
13  relationship between the litigants.  Do you
14  see that?
15      A.  Yes.
16      Q.  Namely the side that best suits
17  their client's needs, right?
18      A.  Yes.
19      Q.  Who are the litigants in this case;
20  you use that term?
21      A.  Benlida and Circuitronix.
22      Q.  Benlida and Circuitronix what?
23      A.  LLC.
24      Q.  Right.  And the KM report shows the
25  economic relationship between those two

Page 275

1                   R. Paulikens
2   companies, right?
3       A.  Correct.
4       Q.  And that's the entire side of the
5   economic relationship between those two
6   companies, isn't it?
7       A.  Those two, yes.  That is the entire
8   side within the case, but I understand
9   there's disputes amongst the attorneys as to
10  whether the other entities get pulled in for
11  various legal theories.
12      Q.  Okay.
13      A.  Which is what I was talking about
14  there, that there is more here here.
15      Q.  And they're explicit, as you have
16  said, "they" being KM, about which portions
17  of the economic relationship in general that
18  they're discussing and which ones they're not
19  discussing?
20      A.  Yes.  They were very clear about
21  that.
22      Q.  Okay.  And then you say, however,
23  taking into consideration the CTX HK slash
24  Benlida slash ROK aspects, parentheses -- I'm
25  sorry, comma, which is a substantial portion

Page 276

1                   R. Paulikens
2   of the overall Benlida slash CTX
3   relationship, pause right there, does ROK fit
4   into that picture or is that a mistake?
5       A.  It doesn't necessarily add anything
6   to the sentence.  I'm just trying to say,
7   looking at the total pool.  That's all I'm
8   saying.  There's more here than maybe meets
9   the eye.
10      Q.  Okay.
11      A.  And that's all it's trying to say.
12  There's more here than just those two.  And
13  the results of that relationship, even if
14  accurate, don't tell the entire economic
15  story.
16      Q.  And I assume the numbers here, 3 and
17  8 million, that range is a reference to what
18  we've already talked about earlier in your
19  report?
20      A.  Yes.  Dependent on the data source.
21  There's a totality amount due, but, again,
22  even that depends upon lead time penalties,
23  statute of limitations.  I think they all say
24  that in the rest of that paragraph that
25  there's multiple issues that have to be

Page 277

1                   R. Paulikens
2   decided before a finite number is arrived at.
3       Q.  Okay.  And then you go on to say,
4   another variable is the Court's final
5   decision on whether the payments by CTX to
6   both Benlida and ROK were payments on account
7   of specific invoices?
8       A.  Correct.
9       Q.  Why do you include payments to ROK
10  there?
11      A.  Well, there was payments made and
12  then probably could have eliminated ROK, but
13  the whole specific payment, payment on
14  account issue is an issue that attorneys are
15  disputing.
16      Q.  ROK is actually a mistake there
17  isn't it, it should not be included?
18      A.  I believe so.
19      Q.  In the next paragraph, the biggest
20  word, however, second line at the end says,
21  One affiliate has a large overpayment,
22  parentheses, CTX U.S., close quote.  That's
23  undisputed, correct?
24      A.  Yeah, I mean, maybe the exact
25  amount, but certainly the magnitude at this

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 278

1           R. Paulikens
2    moment is not.
3         Q.  That's something we've already
4    talked about at length?
5         A.  Yes.
6         Q.  So the final paragraph on page 14
7    you say, Our role in this litigation among
8    others is to analyze the KM report and
9    consequently quantify the amounts owed to
10   Benlida, close quote.
11              You're not really quantifying the
12   amounts owed to Benlida as part of your
13   retention, are you?  You're really just
14   critiquing the KM report?
15        A.  I was responding to the KM report.
16   And as I showed in the illustrations which
17   we've covered, depending upon what the
18   rulings are of the Court in terms of what's
19   in or what's out, there's a measurement, a
20   continuum of an amount due between 3 and
21   $8 million, depending upon a lot of sources.
22        Q.  But you are not offering an opinion
23   in this case as to how much money Benlida is
24   owed, correct?
25        A.  No, not yet.  I'm responding -- at

Page 279

1           R. Paulikens
2    this report I'm responding solely to KM.
3         Q.  Okay.  But you say, At this point,
4    so it begs the question, and here's the
5    question, if you are asked, I assume you're
6    saying to offer an opinion as to how much
7    Benlida is owed, then you would do so?
8         A.  If asked.
9         Q.  And you would do so based solely
10   upon the work that you have done for purposes
11   of this report or would you have to do
12   additional work?
13        A.  I'd have to do additional work.
14        Q.  Okay.  Let me ask you a question
15   about behind tab B of your report.  I don't
16   know if you have that there.
17        A.  No.
18        Q.  I'll pull it up on the computer.
19              Tab B, okay, if you look at -- can
20   you see it or should I make it bigger?
21        A.  It's fine.
22        Q.  At the end of the second full
23   paragraph, under your assumptions and
24   limiting conditions, you say, We will be
25   measuring -- I'm highlighting it -- the

Page 280

1           R. Paulikens
2    amount of damage based upon the
3    determinations of existence and magnitude of
4    liability.
5              Is that what you did in this case?
6         A.  Well, we will -- I critique the
7    Benlida -- the KM report.  And if we are
8    asked, and we discussed the magnitude of what
9    Benlida might be owed by the range of the
10   amounts dependent on the data source and
11   dependent upon what's in and out, that's what
12   I'm referring to.
13              Because if it's determined that HK
14   and CTX should be taken as one in this case,
15   legal decision, you know, then that changes
16   the dynamic.  And I gave you a range because
17   there's other questions that would
18   necessarily affect the numbers and it would
19   be a little bit of a Chinese menu where to
20   start.
21        Q.  And that's just not something you've
22   done at this time?
23        A.  Not yet, no.
24        Q.  Two paragraphs down, you say, I've
25   highlighted it for you, it says, Unless

Page 281

1           R. Paulikens
2    otherwise stated in the report, the economic
3    analysis of the amount due to the plaintiffs
4    has not considered various factors.
5              Again, I ask you, are you -- you
6    have not yet calculated in this report, I
7    understand the economic analysis of the
8    amounts due to the plaintiffs, which is
9    Benlida in this case; is that correct?
10        A.  Right.  And it's just the whole
11   sentence is, you know, subsequent events,
12   contingent assets, any other contingencies,
13   either today or after, we did what we did,
14   and that's it.
15              So this is a, you know, it's not
16   whether they sold the company or burned down
17   the company.
18        Q.  Is this just stock language?
19        A.  It's stock language, you know, to,
20   you know, basically we're saying what did we
21   do, what didn't we do.
22        Q.  Okay.  That's not something you've
23   done yet in this report, correct?
24        A.  That's correct.  Because there's, at
25   this point, there's no contingent assets that

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 282

R. Paulikens

1     R. Paulikens
2  we've been asked to analyze, contingent
3  liabilities or events, as of the date of the
4  report.
5        Q.  And there's one line again, I think
6  it's stock language, but I will ask you about
7  it.  You say, We have relied upon
8  representations of counsel as necessary in
9  preparing this report.
10        Is there anything in particular to
11  this case, this report you've done, where
12  you've relied upon the representations of
13  counsel?  I don't think we've talked about
14  it?
15        A.  No.  I don't think there's anything
16  because it's a core accounts receivable case.
17  Obviously, we relied on that counsel informed
18  us there's disputes, you know, and I've
19  discussed that there's a dispute and it's not
20  an account -- it's legal, not accounting.
21        Q.  Let me just ask you about some
22  documents that are in these printouts of what
23  I was given.
24        A.  Okay.
25        Q.  And then I think we'll be able to

Page 283

R. Paulikens

1     R. Paulikens
2  wrap this up.
3        So in your -- at the end of your
4  report, there's a thing called additional
5  documents utilized?
6        A.  Yes.
7        Q.  Here you've numbered them.  Number
8  55, if you just take a look at your list.
9        A.  It didn't come out on the report.
10        Q.  Here, you can -- I'll show you.  It
11  says, Benlida source for complaint.  Do you
12  see that?
13        A.  Yes.
14        Q.  Okay.  Do you recall what that was?
15        A.  That was an Excel document that
16  listed out all of the documents -- I'm sorry,
17  all of the invoices that were included in the
18  complaint.
19        Q.  Okay.
20        A.  It was a lengthy document.  We
21  actually, I think we had it opened up today.
22  There was an Excel file.
23        Q.  Okay.  Yes, you are correct in your
24  memory.  Let me just show you on the computer
25  what I think you're talking about.  In the

Page 284

R. Paulikens

1     R. Paulikens
2  further documents reviewed by Randall
3  Paulikens there's an Excel file which is --
4        A.  I think it's there.
5        Q.  -- Benlida source for complaint.  Is
6  that what you're looking at, right here?
7        A.  Yes.
8        Q.  Let me open that up.  It has a date
9  of December 1, 2020; is that right?
10        A.  I think that's what the date was.
11        Q.  Okay.  So I have actually printed
12  out copies of some of these tabs so that I
13  can make them exhibits so that I can
14  understand them.
15        So did that document -- that Excel
16  file come to you with that title on it?
17        A.  I believe it did.
18        Q.  Okay.  Do you know from whence that
19  came, from whom?
20        A.  It came through counsel.  I believe
21  it came through counsel early in the case,
22  you know, May of '22.
23        Q.  So I'm going to -- we are looking on
24  the screen at a tab at the bottom that says
25  EN, which I think means English.  Because

Page 285

R. Paulikens

1     R. Paulikens
2  there's one that is CN, which when you click
3  on it is in Chinese.
4        A.  Chinese.  That sounds about right.
5        MR. ROSENTHAL:  So I only have
6     two of these, maybe you can share
7     this with Mr. Paulikens.  I'm going
8     to mark Exhibit 149, a printout of
9     that tab, EN tab.
10        (Whereupon, at this time, the
11     above-mentioned EN tab was marked as
12     Exhibit 149 for identification.)
13  BY MR. ROSENTHAL:
14        Q.  And my first question to you is, did
15  you all, your firm, do any of the work that
16  is depicted on this document?
17        A.  No.
18        Q.  Okay.  This is just what was
19  received by you?
20        A.  This was received.
21        Q.  Did this factor -- I mean, did you
22  review this for purposes of your report in
23  this case?
24        A.  Not for the review of the KM.  This
25  was very early in my relationship to this

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 286

1          R. Paulikens
2    case.
3        Q.  Okay.
4        A.  And once it was settled or nominally
5    settled, we put the pencils down.
6        Q.  This is in that tranche of
7    documents?
8        A.  That was in that very initial
9    tranche of documents.
10       Q.  If you look at column D, it says,
11   Cutoff on May 31, 2020 for a number of
12   different variables.
13           Do you see that?
14       A.  Yes.
15       Q.  Do you have any idea what that is?
16       A.  No.  It might be that that's the
17   date they were trying -- they created this
18   schedule, you know, because the other -- the
19   first tab is literally a detailed list of
20   invoices outstanding.
21       Q.  The first tab in the Excel
22   spreadsheets?
23       A.  The Excel file.  If you look at
24   invoice details, if I remember correctly,
25   that's a fairly substantial tab.

Page 287

1          R. Paulikens
2        Q.  You remember correctly.  I
3    apparently have a printout of it here.  This
4    is invoice details tab.
5           MR. ROSENTHAL:  Since you
6           mentioned that, let me mark this as
7           149-A.
8           (Whereupon, at this time, the
9           above-mentioned invoice details tab
10          was marked as Exhibit 149-A for
11          identification.)
12   BY MR. ROSENTHAL:
13       Q.  Since this comes from the same Excel
14   spreadsheets, this is 149-A, do you recognize
15   that as a printout of what we're showing on
16   the computer screen as the invoice details
17   tab?
18       A.  It looks to be.
19       Q.  Let me know if you need me to move
20   it around.
21       A.  Just scroll up.
22       Q.  That's as far as it goes.  I can
23   make it smaller maybe.
24       A.  Grab this and pull it down.
25       Q.  Oh, go down?

Page 288

1          R. Paulikens
2        A.  Go down.
3        Q.  Tell me when to stop.
4        A.  Just go.  Stop.  I mean, based on a
5    quick review, it certainly looks to be the
6    same, a printout of that tab.
7        Q.  I'll go all the way to the bottom a
8    second, too.  Just the last entry is 252, we
9    have a printout all the way through that.
10       A.  Yes.  40,000, yes.
11       Q.  Okay.  Do you know if -- well, at
12   the top of what has now been marked as
13   Exhibit 149-A, has a note that says unpaid
14   invoice breakdown until 5/31/2020.
15       A.  Yes.
16       Q.  Do you know what that says, what
17   that means?
18       A.  I think it's translated from
19   China -- Chinese, that means open accounts
20   receivable.  That's how it translated to,
21   unpaid invoices.
22       Q.  Up to that date?
23       A.  That's what it sounds -- that's what
24   I take that to mean, based on what's here.
25       Q.  And do you recall looking at this

Page 289

1          R. Paulikens
2    listed invoices for any work that you've done
3    in this case?
4        A.  No.  Again, I think we got this very
5    early in our retention.  And before we got
6    very far into it, it was pencils down.
7        Q.  Okay.  And do you see that the green
8    highlighted cell at the top has something
9    called CTX U.S. total?
10       A.  Yes.
11       Q.  And it's got 7.2 million and change?
12       A.  Yes.
13       Q.  And then there's the separate one in
14   column H, CTX Hong Kong total?
15       A.  Yes.
16       Q.  And it lists -- well, it doesn't
17   list a number.
18       A.  It doesn't list a number.  And then
19   there's a reference error all the way in the
20   right.  So I don't know what happened in the
21   file.
22       Q.  Okay.  That's an Excel issue?
23       A.  That's Excel saying something's
24   missing.
25       Q.  And another tab within Exhibit 149

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 290

R. Paulikens

1       R. Paulikens
2    which is a digital exhibit, the Excel
3    spreadsheet called sheet 1, let me scroll to
4    the top.
5          Do you recognize what that is?
6       A.  These amounts -- these amounts look
7    like a printout of these three columns on the
8    left.
9       Q.  The three columns as what we've
10   marked as Exhibit 149-A?
11      A.  Yes.  And it looks like they're the
12   same amounts from what I can tell with a note
13   in column D, as in David.  That, I think,
14   mimics what was in the complaint.
15      Q.  Okay.  Right, that language that no,
16   to date Circuitronix has paid no portion of
17   the amount owed?
18      A.  It mimics the way the complaint was
19   structured.
20          MR. ROSENTHAL:  Okay.  I have a
21      printout of that, too.  So let me
22      mark that.  Let's call that 149-B.
23      149-B is the tab in the Excel
24      spreadsheet which has been marked as,
25      I guess, 149, and that tab is called

Page 291

1       R. Paulikens
2    sheet 1.
3          (Whereupon, at this time, the
4       above-mentioned sheet 1 of Exhibit
5       149 was marked as Exhibit 149-B for
6       identification.)
7          MR. LERNER:  I looked at the
8       metadata on this and it looks like it
9       says Steve Prifti, our paralegal may
10      have, I think he prepared this
11      spreadsheet and provided it.
12          MR. ROSENTHAL:  Okay.  I know
13      that Mr. Paulikens said he didn't
14      prepare it so that makes sense.
15          MR. LERNER:  You'll have the
16      electronic version and it has the
17      metadata.
18   BY MR. ROSENTHAL:
19      Q.  Can you tell, Exhibit 149-B is a
20   printout of what we're looking at on the
21   screen, sheet 1?
22      A.  Yes.
23      Q.  Okay.  Did that document, 149-B,
24   provide you any assistance whatsoever in your
25   work on the case?

Page 292

1       R. Paulikens
2       A.  No.  It was background, it was to
3    show how the complaint was derived or
4    crafted.
5       Q.  Okay.  Let me traipse through a
6    couple of printouts.
7          There is a file, electronic file,
8    among the records that you collected that
9    concerns 2017 monthly statements.  Do you
10   recall that?
11      A.  Not as I'm sitting here.
12      Q.  Okay.
13          MR. LERNER:  Do you want him to
14      look at it?
15          MR. ROSENTHAL:  I want to try
16      to find it.
17      Q.  I will show you the document, that's
18   fine.  And I just don't know if it's
19   something that you're going to recognize by
20   itself.
21          MR. ROSENTHAL:  And Rich,
22      forgive me, I only have -- I have two
23      copies of this.
24          MR. LERNER:  It's all right.
25      You're marking it in?

Page 293

1       R. Paulikens
2          MR. ROSENTHAL:  I'll wait and
3       see if he recognizes it.
4       Q.  I'm handing you a document that
5    says, Benlida in short on top to customer
6    Circuitronix LLC from June 2017.
7          Do you recognize this document?
8       A.  As I'm sitting here, I do not
9    recognize this document.  It looks like an
10   invoice but I don't -- I don't have a
11   specific recollection of this at all as I'm
12   sitting here.
13      Q.  Okay.  So I want to represent to you
14   where I found it in the materials that were
15   provided to me that came from you.  But I
16   need to -- oh, yes, here.  Okay.  Here we go.
17          So let me just show you on the
18   computer.  Actually, here we have a printout
19   of the file.
20      A.  Okay.
21      Q.  If you look at these Excel
22   spreadsheets at the top that say 2017
23   statement reconciliation --
24      A.  Okay.
25      Q.  -- I'll show you on the computer

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 294

1                    R. Paulikens
2    what it looks like.
3            Do you see where I am on the
4    computer?
5        A.  Yes.
6        Q.  I'm going to open the document first
7    that says 2017 statement reconciliation.
8    That's not what you're holding, right?
9        A.  No.  I'm holding the list of
10   documents.
11       Q.  Let me look at the other one, 2017
12   statement reconciliation is the other name,
13   it's similar.
14       A.  It looks like the same document.
15       Q.  That is actually -- let me show you
16   a paper printout of what you're looking at on
17   the screen.
18           Can you see that is the same thing
19   that's on the screen?
20       A.  It looks the same.
21           MR. ROSENTHAL:  Let's mark it
22       so it is clear.  Let's call this 150.
23       And this I will show Mr. Lerner, too,
24       it's the date on line 3 is
25       January 10, 2018.

Page 295

1                    R. Paulikens
2            (Whereupon, at this time, the
3        above-mentioned shipment amount
4        comparison was marked as Exhibit 150
5        for identification.)
6        Q.  Do you see that at the top of the
7    first page?
8        A.  Yes.
9        Q.  And it is to Circuitronix LLC slash
10   Circuitronix Hong Kong Limited from Benlida
11   slash ROK?
12       A.  Yes.
13       Q.  Do you know what this document is?
14       A.  I don't, as I'm sitting here, I
15   don't know.  It's certainly -- it looks like
16   a comparison between the Benlida ROK versus
17   CTX shipment amounts, but I didn't prepare it
18   and it was from 2018.
19       Q.  I mean, this was in the folder of
20   materials that was provided to us that were
21   within your further documents reviewed list.
22       A.  Right.
23       Q.  In your report, it's not ringing a
24   bell, though?
25       A.  No.  It was part of the initial

Page 296

1                    R. Paulikens
2    documents we got in May, a year ago, and then
3    we were pencils down, so it wasn't used in
4    this last cycle.
5        Q.  Okay.  Got it.
6            So the other document you looked at
7    a moment ago over there by your right elbow,
8    that one is something that fell into the
9    category of stuff you were given --
10       A.  Very early on.
11       Q.  And it is not something you dealt
12   with?
13       A.  No.  For purposes of KM --
14       Q.  Report?
15       A.  Yes.
16       Q.  Okay.  Let me just show you
17   something that goes with that document and
18   just for what it is worth, what I'm talking
19   about is this June 2017 Benlida, I believe
20   it's a monthly statement.  With it there is a
21   more specific breakdown, a printout of
22   another database, another spreadsheet.  You
23   see it bears the same -- well, it actually,
24   it doesn't, it says shipment?
25       A.  This says April.

Page 297

1                    R. Paulikens
2        Q.  The top says shipment in June 2017.
3    Do you see that at the top?
4        A.  I see that.
5        Q.  It's dated July 10, 2017 in the
6    center?
7        A.  Yes.
8        Q.  And it is from Circuitronix --
9    sorry, to Circuitronix LLC from Benlida?
10       A.  Yes.
11       Q.  And the subject is monthly statement
12   for delivery?
13       A.  Yes.
14       Q.  Have you reviewed documents like
15   this for purposes of the case?
16       A.  No.  Because this was, again, it was
17   back from '17.  And then the case was
18   settled --
19       Q.  I think you mean not '17, but 2022?
20       A.  No, no.  It says these were
21   shipments from 2017.
22       Q.  I apologize, yes.
23       A.  And when we were started in May of
24   '22, and then the case was settled in June of
25   '22, we put pencils down on reviewing these

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 298

R. Paulikens

1   R. Paulikens
2   documents.
3       Q.  Okay.  I will not belabor this issue
4   then.
5           Are you aware of whether or not
6   Benlida sent separate monthly statements to
7   Circuitronix LLC and Circuitronix Hong Kong?
8       A.  As I'm sitting here, I'm not one way
9   or the other.
10      Q.  Let me show you, we have printed
11  out, you recall the reconciliation analysis
12  report 2012 to 2019 that was copied into your
13  report?
14      A.  One page was, yes, it was an Excel
15  file, yes.
16      Q.  Right.  What I'm showing you now is
17  a paper version of that Excel file that had
18  various other tabs in it.
19      A.  Yes.
20      Q.  We printed them out here.
21      A.  This is the whole --
22      Q.  I believe so, yes.  This stack.
23  What I want to ask you is whether or not, if
24  you recall without looking at the electronic
25  file, your office did any work in those

Page 299

R. Paulikens

1   R. Paulikens
2   spreadsheets or whether those spreadsheets
3   were ones simply received by your office?
4       A.  Those ones were ones that were
5   simply received.  I checked to make sure that
6   the map -- the formulas to the summary were
7   flowing.  And then I went back to the
8   individual tabs to see what they did.  But we
9   didn't do it.  So I reviewed that document, I
10  didn't create it.
11      Q.  Okay.
12          MR. LERNER:  I'm sorry, can you
13      identify that?  Is that one of the
14      exhibits we marked in earlier?
15          MR. ROSENTHAL:  I think it is.
16      Let me see.  It's probably 146 but
17      let me double check.
18      Q.  Mr. Paulikens, you're welcome to
19  take a look at it but these are printouts of
20  that Excel spreadsheet and the question
21  really is just, do these represent work that
22  was presented to you from its source, not
23  work that you did on it?
24      A.  Yes, we did not do the work.  It was
25  given to us.  I reviewed that spreadsheet.

Page 300

R. Paulikens

1   R. Paulikens
2       Q.  Okay, that's what I thought.
3           Let me ask you, for example, in
4   the -- in your documents that were provided
5   to us, there is an Excel spreadsheet right
6   here called Benlida statement reconciliation.
7           I'm hovering over it, do you see
8   that?
9       A.  Yes.
10      Q.  I'm going to open it up.  And it's
11  got a lot of tabs over time.  And do you
12  recall utilizing this for any of your work?
13      A.  No, not for the KM portion of it.
14  Again, I believe that was sent to us as part
15  of the ping-pong balls early in May of '22.
16      Q.  And you see that the column A says
17  company and it says U.S.?
18      A.  Um-hum.
19      Q.  I'm going to scroll down.  And then
20  at line 402 it ends for U.S. and then line
21  405 it picks up and it says company HK?
22      A.  Yes.
23      Q.  Are you aware of the fact that when
24  the companies -- the parties to this case
25  were doing their reconciliation effort in

Page 301

R. Paulikens

1   R. Paulikens
2   2019 that they were segregating the CTX U.S.
3   from CTX HK for calculations?
4       A.  They segregated it.  Can you scroll
5   all the way down?
6       Q.  Yes.
7       A.  Okay.  Yes.
8       Q.  You are aware of that?
9       A.  Yes.  At least in terms of the Excel
10  sheet it was.
11      Q.  And I guess in the interest of
12  completeness, let me see, I just showed
13  you -- I'm not sure which one we're looking
14  at, can you tell?  It's not this one.
15      A.  Well, it is now.
16      Q.  But the default one that it went
17  to -- so we're looking at the January 2017
18  one?
19      A.  Wasn't there more tabs a moment ago?
20      Q.  Let me close it and open it back up.
21          Benlida statement reconciliation.
22  Can you tell what tab we're looking at that
23  it defaults open to?
24      A.  Carefully click on that right arrow.
25      Q.  Okay.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 302

R. Paulikens

1         R. Paulikens
2      A.  Keep going.  We're looking at the
3  November tab.
4      Q.  November 2017?
5      A.  Yes.
6      Q.  Okay.  So if we tab back to the
7  first one on it, which is January 2017, and
8  we scroll down, we see the company is U.S.,
9  there's a note in there, that's not something
10  you did, right?
11      A.  No.
12      Q.  And then it ends at line 133 for
13  U.S. and then shifts to Hong Kong in line
14  136?
15      A.  Yes.
16      Q.  Okay.
17          MR. LERNER:  So we didn't mark
18      anything now?
19          MR. ROSENTHAL:  I don't think
20      we need to mark it.
21      Q.  One more I will ask you about and
22  then we're done.
23          There's one that's called an Excel
24  spreadsheet in your file called BLD ROK
25  shipments plus payments 7-20-2019.

Page 303

1         R. Paulikens
2      Are you familiar with that file?
3      A.  That was one that was provided to us
4  probably as the initial document tranche.
5      Q.  And I guess the question I have for
6  you is, did you do any work in this Excel
7  spreadsheet file?
8      A.  In this one, no.  This was, I
9  believe it's Benlida's work that was sent to
10  us, although it may have been one of the
11  ping-pong balls that was going back and forth
12  when they were trying to reconcile.  The date
13  source suggests it, July of 2019.
14      Q.  Other than what we've discussed
15  today in great detail, are there any opinions
16  that as you sit here today you are planning
17  to offer in this case that we haven't talked
18  about today?
19      A.  As I'm sitting here right now, I
20  don't think so.
21      Q.  Okay.  Do you want to confer with
22  counsel to double check on that?
23          MR. LERNER:  No.
24          MR. ROSENTHAL:  I have no more
25      questions.

Page 304

1         R. Paulikens
2      Thanks for your patience.
3          MR. LERNER:  I have a question.
4          MR. ROSENTHAL:  Okay.
5  EXAMINATION BY
6  MR. LERNER:
7      Q.  Mr. Paulikens, you testified
8  earlier, and it may have been within the
9  first hour or so, that the moneys owed by CTX
10  to Benlida is in the range, I believe you
11  said 3 million to 8 million.
12      A.  Depending on the data source, yes, I
13  believe I did.
14      Q.  And for purposes of making that
15  statement, did you factor in or assume, for
16  sake of analysis, the validity of CTX's late
17  time penalties and debit notes?
18          MR. ROSENTHAL:  Objection to
19      the form.
20      A.  Debit memos up through January '16
21  are subsumed in the numbers because that
22  range I gave you was in the charts that we
23  discussed at length today.  But I don't
24  believe the lead time penalties were included
25  in those charts after January of '16.

Page 305

1         R. Paulikens
2          MR. LERNER:  Okay.  Thank you.
3          MR. ROSENTHAL:  So under at
4      least Florida procedure, which may
5      not apply in this deposition, you
6      have a right to read this transcript.
7      I don't know if under New York
8      stipulations you do or don't.
9          MR. LERNER:  It's ordinarily,
10      you're taking the deposition, you
11      would send him -- us a copy and we
12      convey it to him, the transcript, for
13      review.
14          THE REPORTER:  Because it's
15      federal, you have to order your own
16      copy.
17          MR. LERNER:  That's right.
18      Yes.
19          MR. ROSENTHAL:  So just to
20      instruct the witness, he's probably
21      quite familiar with this, he's an
22      expert in many cases, if he wishes to
23      read the transcript he will have to
24      work with counsel to order a copy.
25          We will order the transcript.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

Page 306

```
 1              R. Paulikens
 2         MR. LERNER:  We will as well.
 3
 4
 5     (Whereupon, at 4:35 p.m., the examination
 6  of this witness was concluded.)
 7
 8  _____
 9  RANDALL M. PAULIKENS, CPA/AVB/CFF/CITP
10
11  Subscribed and sworn to before me
12  this _____ day of _____, 2023.
13
14  _____
15     NOTARY PUBLIC
16
17
18
19
20
21
22
23
24
25
```

Page 308

```
 1
 2          C E R T I F I C A T E
 3     I, MICHELLE LEMBERGER, a shorthand
 4  reporter and Notary Public within and for
 5  the State of New York, do hereby certify:
 6     That the witness(es) whose testimony
 7  is hereinbefore set forth was duly sworn by
 8  me, and the foregoing transcript is a true
 9  record of the testimony given by such
10  witness(es).
11     I further certify that I am not
12  related to any of the parties to this
13  action by blood or marriage, and that I am
14  in no way interested in the outcome
15  of this matter.
16
17
18
19
20
21
22
23
24          MICHELLE LEMBERGER
25
```

Page 307

```
 1
 2              I N D E X
 3
   WITNESS      EXAMINATION BY      PAGE
 4
   Randall M.   Mr. Rosenthal          4
 5  Paulikens    Mr. Lerner          304
 6
                EXHIBITS
 7
   EXHIBIT      DESCRIPTION          PAGE
 8
     141        Printout of documents
 9              sent to counsel        7
10   142        Benlida v. CTX accounting
                event                 15
11
     143        Summary spread sheet  23
12
     144        Paulikens expert report 30
13
     145        Working analysis
14              spreadsheet           32
15   146        File entitled Benlida
                shipment and payment details
16              CTX HX 2012 to 2019   72
17   147        KM report             97
18   148        Benlida payment details
                CTX U.S. 2012-2021 V5 July
19              2023 report          155
20   149        EN tab               285
21   149-A      Invoice details tab  287
22   149-B      Sheet 1 of Exhibit 149 291
23   150        Shipment amount
                comparison           295
24
25  (Exhibits retained with Mr. Rosenthal)
```