Exhibit A

THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

JIANGMEN BENLIDA PRINTED )
CIRCUIT CO., LTD., )
Plaintiff, )
vs. ) Civil Action No.
CIRCUITRONIX, LLC, ) 21-601-125-civ
Defendant. )

ORAL DEPOSITION

MARK PARISI, CPA, CIRA, CFE, CTCE

Monday, July 31, 2023

Reported by:
Rebecca Callow, RMR, CRR, RPR
Job No. 131875

ORAL DEPOSITION OF MARK PARISI, CPA, CIRA, CFE, CTCE, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above-styled and numbered cause on the 31st day of July 2023, from 10:26 a.m. to 4:45 p.m., before Rebecca J. Callow, Registered Merit Reporter, Certified Realtime Reporter, Registered Professional Reporter and Notary Public for the State of Florida, reported by computerized stenotype machine at the offices of Orseck, P.A., One S.E. 3rd Avenue, Suite 2300, Miami, Florida, pursuant to the Federal Rules of Civil Procedure.

APPEARANCES

FOR PLAINTIFF:

Podhurst Orseck, P.A.
One S.E. 3rd Street
Suite 2300
Miami, Florida 33131
(305) 358-2800
By: Stephen Rosenthal, Esq.
srosenthal@podhurst.com
Christina Martinez, Esq.
cmartinez@podhurst.com

FOR DEFENDANT:

Mazzola Lindstrom LLP
1350 Avenue of the Americas
2nd Floor
New York, New York 10019
(646) 216-8300
By: Jean-Claude Mazzola, Esq.
jeanclaude@mazzolalindstrom.com
Richard Lerner, Esq.
richard@mazzolalindstrom.com

ALSO PRESENT:

Jessica Miller
Rishi Kukreja (via Zoom)

INDEX

PAGE

MARK PARISI, CPA, CIRA, CFE, CTCE

Examination by Mr. Mazzola .........................7

Changes and corrections ........................259

Signature Page .................................260

Court Reporter's Certificate ...................261

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 151 | Printout: List of digital materials reviewed | 39 |
| Exhibit 152 | Exhibit 1 to Expert Report - Documents Utilized by Kapila Mukamal | 74 |
| Exhibit 153 | Payment detail: 2012 through 2019 | 87 |
| Exhibit 154 | Reconciliation analysis report: 2012-2019 | 87 |
| Exhibit 155 | 3/10/2015 Debit Memo BEN-DM20150310 | 166 |
| Exhibit 156 | Jiangmen Benlida Penalty for Lead-Time Exceedances for November 2020 Purchase Orders | 189 |
| Exhibit 157 | Jiangmen Benlida Penalty for Lead-Time Exceedances for April 2020 Purchase Orders | 175 |
| Exhibit 158 | Payment Detail: 2012 through 2019 | 179 |
| Exhibit 159 | 3/16/2021 Debit Memo BEN-DM20160321 | 184 |

EXHIBITS (cont.)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 160 | 10/20/2013 Debit Memo BEN-DM20131020 | 185 |
| Exhibit 161 | 9/14/2014 Debit Memo BEN-DM20140520 | 186 |
| Exhibit 162 | 8/18/2022 email: Charlene Yip to Accounting@Benlida.com, Re: Circuitronix(Hong Kong)Limited - Audit Confirmation Request to Jiangmen Benlida Printed Circuit Co Ltd & ROK Printed Circuit Board Co Ltd | 197 |
| Exhibit 163 | 7/24/2023 email chain: Accounting@Benlida.com, Re: Circuitronix(Hong Kong) Limited - Audit Confirmation Request to Jiangmen Benlida Printed Circuit Co Ltd | 200 |
| Exhibit 164 | 05/31/2021 Kapila Mukamal Invoice 7843 | 237 |


PREVIOUSLY MARKED EXHIBITS


| NO. | PAGE |
|---|---|
| Exhibit 140 ................................ | 218 |

P R O C E E D I N G S

\- - - - - -

MARK PARISI, CPA, CIRA, CFE, CTCE,
called as a witness herein, having
been first duly sworn by a Notary Public,
was examined and testified as follows:

EXAMINATION

BY MR. MAZZOLA:

Q. Good morning, Mr. Parisi.

A. Good morning. How are you?

Q. Doing good.

My name is JC Mazzola. I'm an attorney. I'm going to be asking you some questions in connection with a lawsuit that was filed by our clients. It's -- we've been calling it collectively "Benlida against Circuitronix, LLC."

Do you understand that you're here to answer questions in connection with an expert -- expert opinion report that you prepared in connection with that lawsuit?

A. Yes.

Q. You are presently employed with Citrin, I understand. Is that correct?

A. Correct.

Q. Citrin is an accounting firm?

A. Among other things.
Q. Okay. How long have you worked with Citrin?
A. February of this year.
Q. And prior to working with Citrin, were you working with Kapila Mukamal?
A. Yes.
Q. And what were you doing at Kapila Mukamal?
A. My work primarily encompassed forensic accounting investigations, commercial litigation, bankruptcy-related matters, including insolvency, fraudulent transfers, fraudulent conveyance, Ponzi schemes, receiverships, work of that nature.
Q. And you left Kapila -- Kapila Mukamal, you said, in February?
A. Correct.
Q. Why did you leave them?
A. For a bigger runway.
Q. Okay. While at Kapila -- I'm going to call it "the Mukamal firm." Is that okay, Mr. Parisi?
A. Yes.
Q. And if I call it "the Mukamal firm," you'll know that I'm referring to Kapila Mukamal, and Barry Mukamal as well. Okay?
A. Okay.

MR. ROSENTHAL: Can I ask one question? Is it pronounced Mukamal or Mukamal?

THE WITNESS: Mukamal.

A. If you need to distinguish between Mukamal and KM, just let me know.

BY MR. MAZZOLA:

Q. I may go back and forth, but I'm just trying to get my groove here.

So speaking of that, you left them for a better opportunity.

While you were at the Mukamal firm, while you were there, did you work on preparing a report in connection with this case?

A. So after I left and before I was formally retained in Citrin, I did answer a few calls and helped out a little bit. But much of the report writing, from what I recall, didn't begin until I was retained -- or on or about there.

Q. I didn't understand that. Much of the report writing did not begin until you were retained?

A. Much of the -- I'm sorry.

Q. Do you mean until you left?

A. Until after that. The report wasn't

finished, you know, until the very, very end.

Q. The very end of what? Were you still at Mukamal's firm when the report was written?

A. No.

Q. Were you at Mukamal's firm when the report -- when the writing of the report was started?

A. No.

Q. What did you do -- broad picture. We're going to get into some details.

What did you do basically, just a broad picture, in connection with the preparation of the report?

A. So the first component of the report is the damages -- or the balance due through July 2019. That amount is calculated based on three primary sources. Which is, one, the initial email --

Q. What was that? Through June -- what date was it?

You said you prepared a calculation on damages through a date. Was that June, you said?

A. July 2019.

Q. July 29th?

MR. ROSENTHAL: "2019."

A. July 2019.

So that analysis is comprised of three sources. The first is the initial email from Circuitronix to Benlida, which contained the invoices, payments, and debit memos, as identified by Circuitronix. That was on November 1st, 2019.

On November 14th, 2019, Benlida responds and identifies invoices, payments, and debit memos that had disparities with Benlida's records. Those disparities increased and decreased payments in same with invoices and debit memos.

And then, I want to say, on November 19th, there is a second email where Benlida identifies additional payments that CTX did not have in its records that Benlida thought should be in the reconciliation.

BY MR. MAZZOLA:

Q. So --

A. And so the aggregation of those three data points, plus the reconciliation of the meeting minutes, is the primary compilation of the balance through July 2019. And then that is the first component of the report.

The second component of the report --

Q. Well, let's look at your report, so --

A. -- is an aggregation of the --

Q. Let's look at your report --
A. -- lead-time penalties --
MR. ROSENTHAL: Hold on. Hold on.
THE WITNESS: Sorry.
MR. ROSENTHAL: He wants to interrupt you and stop your answer --
BY MR. MAZZOLA:
Q. Let's just put down Exhibit 147. This has been previously marked. Okay?
A. Yes.
Q. Because I think you're talking about different sections of your report.
MR. ROSENTHAL: And 147 is the report. Correct?
BY MR. MAZZOLA:
Q. You see that. That's your report. Right?
A. Yes.
Q. Okay. And before you go into the next section, I think what you're talking about is one of the things you looked at is what I'm seeing in your report referred to as the CTX reconciliation and the Benlida reconciliation.
A. I'm not sure if that was a question.
Q. That's what you're referring to when you're

talking about the Rishi email and then the response from Benlida.

A. Correct.

So the starting point is -- the CTX recon is Rishi's initial email. And then -- so, for example, if Rishi -- or Circuitronix, through Rishi's email said an invoice should be a dollar. And then Benlida comes back and says, No, it should be $1.20.

The dollar would be on the CTX recon, the 20 cents would be on the Benlida recon, and -- or a component of it. And when you add A plus B, you get the Benlida recon amount.

Q. And what I'm trying to understand is, in connection with this report that's in front of you, 147, you testified a few moments ago that this report was drafted -- started, drafted, and completed after you had left the Mukamal firm. Is that correct?

A. So I want to be clear. When you say "drafted," there is the compilation of the numbers, which I don't consider drafting the report. I consider drafting the physical word-writing of the report.

Q. Okay. And the compilation of the numbers,

is that -- let's talk about what you did. It sounds like to me -- let's look at your report -- or the report.

Take a look at page 6. Do you see that? It says "Work Performed and Analysis."

A. Correct.

Q. And then if you see just above paragraph 13, it refers to the reconciliation period.

Do you see that?

A. Correct.

Q. And you were just talking before, I believe, about the review of numbers in connection with this reconciliation period. Is that correct?

A. Correct. When I talk about the reconciliation on November 1st, 2019, that's the same reconciliation as identified on paragraph 13.

Q. Okay. And while we're in this report, let's go to page 9. The bottom of page 9 at paragraph 23. Do you see "Debit Memos"?

A. Yes.

Q. Did you have any involvement in reviewing debit memos? Just, generally speaking.

A. Yes.

Q. Okay. What about lead-time penalties? Did

you look at those?

A. Yes.

Q. How was the work divided up between you and Mr. Mukamal?

A. So Mr. Mukamal is the primary partner at Kapila Mukamal. He developed the initial work plan, you know, did the initial case intake. I assisted with the compilation of the data.

As you're aware, there is a lot of data here, and it's very voluminous. And he was the one who architected the report, and I assisted with the data compilation as necessary.

Q. Okay. So he architected the report.

What does that mean?

A. He meets with counsel, reads the complaint, identifies a preliminary work plan of how to draft the report.

Q. Did you meet with counsel?

A. I've met with counsel.

Q. In preparation for this report, did you meet with counsel?

A. Yes.

Q. Did you meet with counsel in preparation and review of the numbers?

A. I don't understand your question.

Q. Well, I'm trying to understand when you met with counsel. I know you met with counsel today. I know you probably met with counsel prior to today.

But while this report was -- while the -- while you were doing the analysis of these numbers, because it sounds like that's how the work was split up. Is that right?

You did the analysis of the numbers. The crunching. Is that correct?

MR. ROSENTHAL: Object to the form.

BY MR. MAZZOLA:

Q. Do you know what I mean?

A. I compiled the data and assisted with the report as well.

Q. And as you were compiling the data, did you meet with counsel?

A. Yes. We previously met with counsel before.

Q. As you were compiling the data, did you have any communications with counsel?

A. Yes. We communicated with counsel.

Q. As you were compiling the data, did you ever call up counsel and say, The data says this?

Don't tell me what it says, but

communications like that?

A. We discussed preliminary numbers, yes.

Q. Did you discuss preliminary numbers with anyone at CTX?

A. Not that I recall.

Q. Did do you ever -- what do you mean, not that you recall?

A. We met with the Circuitronix staff, you know, to understand the numbers and the business processes. I don't recall saying, Here's our final numbers, to the CTX staff.

Q. When you say you met with staff, who's "we"?

A. Myself and my partner, Barry Mukamal.

Q. And so as we go forward with today's deposition, so that I'm clear, was there anyone else in that "we"?

Was there a junior accountant that was helping out? Was there a -- I don't know if you have -- call them para-accountant, anything like that, helping out, or was all the work done by you and Mr. Mukamal?

A. So there is a third person who is integral to the process. Her name is Sharmila Khanorkar, and she is a partner at Kapila Mukamala.

Q. Sharmila?
A. Yes.
Q. As it sounds.
And how do you spell her last name?
A. K-h-a-n-o-r-k-a-r.
Q. Yeah. I lost that.
MR. ROSENTHAL: Khan-or-kar.
MR. MAZZOLA: Khan-or-kar.
A. Yes. Some junior staff may have helped out, you know, for, you know, clerical-type work. But the three of us were 98 percent of the work, I would say.
BY MR. MAZZOLA:
Q. What did Ms. Khanorkar do?
A. She assisted with the case and also assisted in drafting the report.
Q. What does "assisting with the case" mean?
A. So we -- there's many issues that come up. And her, Barry and I discuss the issues and navigate the path forward.
Q. Okay. What kind of issues would come up?
A. So there's -- the issues in this case aren't complicated. It's very simple. There's invoices, payments, and debit memos.
Q. And so what kind of issues --

A. I'm.
Q. -- came up for Ms. Khanorkar --
A. If you would let me finish my answer, I will --
Q. Okay.
A. -- I am happy to.
So there's a lot of data in this case. The key issue is how to present this data simply so everyone can understand it. And that is the main issue that we grappled with.
Q. So that was the issue.
So Ms. Khanorkar, her involvement was to discuss with you and Mr. Mukamal ways to present the data in a fashion that would make sense in your mind. Is that correct?
MR. ROSENTHAL: Object to the form.
A. Correct. And she assisted with the report drafting.
BY MR. MAZZOLA:
Q. So you met with staff. You said you met with staff from CTX. Is that right?
A. Correct.
Q. And when you would meet with staff at CTX, was Carmila [sic] present?

MR. ROSENTHAL: "Sharmila."
BY MR. MAZZOLA:
Q. Sharmila.
A. No. She is primarily in Orlando or India. I don't believe she's been to Circuitronix.
Q. Does the Mukamal firm have an office in India?
A. I mean, she could be an office by herself, she's so good. But they don't have a physical office out there.
Q. But she just worked in India?
A. Correct.
Q. So regarding meeting with staff at CTX, was Ms. Khanorkar ever present on the phone by Zoom or anything like that?
A. She may have been on Zoom once.
Q. When you had these meetings with staff at CTX, was counsel present at those meetings, either remotely or physically?
A. Yes.
Q. When you had the meetings with staff at CTX, who at CTX was present?
A. Rishi Kukreja. Lina Ochoa. We had a previous accountant person there whose name escapes me. Nicole Donaldson, I met with her. And I can't

remember the names of -- there was one other person. I can't recall his name.

Q. And it was an accountant person you met with there?

A. Correct.

Q. Does the name Celin Astudillo ring a bell?

A. Yes.

You have a good memory. That is it.

Q. That's who it was?

When did these conversations happen?

And it sounds like there was more than one. Is that right, Mr. Parisi?

A. Correct. I'd say well over a year ago.

I mean, when the -- there was a period of time, which I can't recall when the pencils-down order was given. But before that period of time -- I mean, all the work was primarily done for this case before settling, and then we made a few refinements.

But, you know, a lot of the work was done before the case settled. It was just a matter of dusting it off, recalling what we did, simplifying and drafting the report.

Q. So pencils down, I think, was sometime in the spring of -- it's 2023 -- 2022? Is that what

you recall?
A. I don't recall, unfortunately.
Q. Okay. And you left Mukamal's firm in February of this year?
A. Correct.
Q. So you were present when there was that pencils-down time. Is that correct?
A. Yes.
Q. And I assume -- I don't know when -- when your lawyers told you to start writing again. Was that after you left or, was it before you left?
A. I want to say it was mid-April. Early, mid-April, with a June 8th report date. So the time frame was very compressed, but we were able to accomplish the task.
Q. But you had left by then?
A. Yes.
Q. Was a draft report written by the time you left in February?
A. No. We -- before we did the pencils down, we had not started drafting the report.
Q. At the time you put the pencils down, was there any communication between -- like, written communications between you and either counsel or CTX with proposals or drafts or anything of that nature?

A. We emailed counsel.

Q. Did you email them theories that you may have had?

MR. ROSENTHAL: I'm going to object, because I don't think you're permitted to probe into that issue.

I don't think you should answer that question.

BY MR. MAZZOLA:

Q. But there were email communications before pencils down?

A. Yes.

Q. So let's talk a little bit about your background. We just got off on a little bit of a tangent here.

How long have you -- well, tell me what -- what you do. You're an accountant. Right?

A. Correct.

Q. You gave a little example about the type of accounting work you do. Is that correct?

A. Correct.

Q. You did give an example.

You are -- were retained in this case was -- by whom?

A. Circuitronix, LLC.

Q. And who was it that reached out to you?

A. Well, the case had been ongoing for some time. The case was originally retained by Kapila Mukamal. And because of the compressed time frame, I was retained directly to assist and help bring the matter to a close due to the compressed time frame.

Q. What do you mean you were -- you worked at the Mukamal firm. Is that correct?

A. That's --

Q. What do you mean -- what do you mean you were retained separately?

Wasn't the Mukamal firm retained?

A. So Kapila Mukamal was retained, and I left Kapila Mukamala.

Q. In February of this year?

A. In -- at the end of January, I left.

Q. Okay.

A. At the end of this year.

And then they retained -- due to the compressed time frame, instead of Kapila Mukamal finishing the report, they retained me as well to help meet the deadline.

Q. That's now. But I'm going way back to the beginning.

A. Okay.

Q. When all of this first started, who retained you back then? Is it no one, and they actually retained Mr. Mukamal, and you worked for him?

A. I worked at Kapila Mukamal previously. Circuitronix, LLC, had previously engaged Mr. Mukamal and Kapila Mukamal for this matter.

Q. Okay. So you were not present -- you were not involved in the initial retention of the Mukamal firm. Is that correct?

A. I was there with the initial retention of the Mukamal firm, yes.

Q. And when the Mukamal firm was initially retained, who was it that reached out to the Mukamal firm?

A. I'd be speculating.

Q. Okay. Was it Mr. Rosenthal?

A. I believe it's more likely to be Chauncey, based on the timeline.

Q. Do you know if the Mukamal firm has ever worked with Chauncey before?

A. Yes. They have worked together.

Q. In what kind of capacity?

A. In at least one other case for Circuitronix

as an expert.

And then I do not know any cases between Barry and Chauncey previously, but I assume there's probably at least one.

Q. Do you know the circumstances of that one case?

A. No. They just knew each other, so I assumed they worked with each other previously.

Q. Do you know how Chauncey was introduced to Mr. Mukamal?

A. No.

Q. Does Mr. Mukamal have a relationship with CTX independent of Chauncey?

A. Not that I'm aware of.

Q. Does the Mukamal law firm provide any accounting services for -- for CTX other than the preparation of this report?

A. So Kapila Mukamal is a forensic accounting firm as opposed to a law firm.

Q. As opposed to a regular accounting firm.

MR. LERNER: No. You misspoke. You said "law firm."

MR. MAZZOLA: Did I say that?

MR. ROSENTHAL: Yeah.

MR. MAZZOLA: Okay.

BY MR. MAZZOLA:

Q. Has Mr. Mukamal provided any accounting services, other than the preparation of this report and presumably the other report through Mr. Cole, for CTX?

A. Those are the only two engagements I'm aware of with Circuitronix and Kapila Mukamal.

Q. So you're not aware of any connection between the Mukamal firm and CTX other than for forensic accounting services?

A. Correct.

Q. What about Ms. Khanorkar? Do you know if she's ever performed --

MR. ROSENTHAL: I'm sorry. I'm laughing at the pronunciation. It's Khanorkar it ends with an "R." Not like Roca.

MR. MAZZOLA: Khanorkar.

MR. ROSENTHAL: Okay. Khanorkar.

BY MR. MAZZOLA:

Q. With respect to Ms. Khanorkar, do you know if she's provided any accounting services to CTX?

A. I do not believe so.

Yeah. We're forensic accountants, not regular accountants.

Q. Oh. I understand that.
A. Okay. Just making sure.
Q. Okay. So in terms of that, let's talk about your day-to-day at the Mukamal firm. Is it -- is it all forensic accounting work?
A. Well, I'm not at the Mukamal firm. I'm at --
Q. When you were. When you were.
When you were at the Mukamal firm, all your day-to-day accounting was for forensic accounting. Is that correct?
A. Correct. We do not do traditional accounting work at all. Or audit work.
Q. So just forensics.
And as you understand forensics, that means providing things like litigation support. Is that correct?
A. Correct.
Q. It might be valuation services. Is that correct?
A. Occasionally.
Q. It might be providing trial testimony. Is that correct?
A. Yes.
Q. At the Mukamal firm, did the Mukamal firm

have any relationship with Podhurst, the law firm you're at today?

A. We've worked with Podhurst previously.

Q. And how many cases, in your recollection, did the Mukamal firm do with the Podhurst firm?

A. Two, perhaps, that I am aware of.

There could be more, but I'm only involved with -- when I was at Kapila Mukamal in a subset of the cases.

Q. Do you have any recollection of what those case names were?

A. Yes. One of them was PayCargo versus CargoSprint.

Q. So PayCargo versus CargoSprint. And this was work that was done for the Podhurst firm. Right?

A. The Podhurst firm was counsel.

Q. That was one case.

Did you provide deposition testimony on the PayCargo case?

A. I did not.

Q. Did Mr. Mukamal?

A. He did.

Q. Did that PayCargo case go to trial?

A. It did.

Q. Do you know what the result was?
A. PayCargo was successful on its claim and received a judgment against CargoSprint.
Q. Did you work on that case?
A. I did.
Q. What did you do on that case?
A. Data compilation.
Q. Similar to the type of work you did on this case, the CTX case, data compilation?
A. Correct.
Q. There was another case you mentioned that the Mukamal firm worked on in conjunction with the Podhurst firm. What was that case?
A. The name escapes me, but it was a class-action matter that dealt with a tax matter that dealt with foreign tax credits. I believe the defendant was John Hancock, perhaps. But I'm not 100 percent certain.
Q. Did you -- what did you do in that case?
A. Similar to these other issues, which is primarily data compilation.
Q. Did Mr. Mukamal -- did you provide -- were you deposed in that case?
A. No.
Q. Was Mr. Mukamal deposed?

A. I don't recall.

I believe it was a class action, and I can't remember if he was deposed or not.

Q. Has that case been resolved?

A. I believe so.

Q. Did that case go to trial?

A. I don't believe so.

Q. Any other cases that the Mukamal firm worked on with Podhurst?

A. Not that I'm aware of.

Barry's 40 years old, though, and I've only been with him for ten, so there could certainly -- or he's been working for 40 years, so he could certainly -- you know, there could be a lot more in the 30-year gap.

Q. What about you, individually? Do you have a list of cases that you provided testimony on?

Have you ever -- you, personally, ever provided testimony on behalf of any Podhurst clients?

A. No.

Q. Have you ever provided any testimony on behalf of Chauncey Cole's clients?

A. No.

Q. You have given depositions before. Right?

A. Correct.

Q. And if we look at -- towards the back of that Exhibit 147.

MR. ROSENTHAL: I'm not sure if the copy you have given him has that.

MR. LERNER: The marked exhibit didn't have of it.

A. It's okay.

BY MR. MAZZOLA:

Q. It was a list provided to us of cases that you provided deposition testimony for.

MR. ROSENTHAL: I can give him this list, if you want.

MR. MAZZOLA: Sure.

A. I'm familiar with all my cases.

BY MR. MAZZOLA:

Q. I just want to know if that's the complete list. Has anything been added to that since this reports been prepared?

A. That is the current list.

Q. And has anything changed on that list?

Have you provided any trial testimony?

A. Not yet.

Q. When you say "not yet," is that because you've never been proffered as an expert witness in trial?

A. I've not testified at trial yet as an expert witness.

Q. Have you ever been proffered as an expert witness at trial?

Do you know what I mean by that?

A. The cases that I've had expert reports have not made it to the trial phase yet. They have all settled primarily after a deposition or been delayed for many years.

But several of those matters will go to trial soon.

Q. Prior to working at the Mukamal firm, where did you work before that?

A. Cross Country Healthcare.

Q. And what did you do for Cross Country Healthcare?

A. Internal audit.

Q. How did you end up getting into the forensic side of things?

A. Internal audit is like watching paint dry, and so accounting is also a low bar in terms of exciting work. And so this is by far the most interesting accounting work that helps me get through the day-to-day.

Q. Okay. That's a very good answer. That's a

really good answer.

Have you ever been disqualified as an expert witness in any court?

A. No.

Q. Have you ever had any of your professional opinions rejected by a court?

A. No.

Q. What about your -- the methodology that you've used? Have you ever had a court reject your methodology?

A. No.

Q. You've had it disputed, I'm sure. Right?

A. I mean, other experts always dispute.

Q. Yes. But a court has never rejected your methodology?

A. Correct.

Q. What about a court ever concluding that your methodology is unreasonable? Has that ever happened to you?

A. No.

Q. Or a court concluding that you overreached? Has that ever happened?

A. No.

Q. Has a court ever concluded that your opinions were unrealistic?

A. No.
Q. Has a court ever concluded that the assumptions that you've relied on were unrealistic?
A. No.
Q. Do you have any recollection of any judge anywhere saying, Hey, Mr. Parisi, you didn't get this right?
A. No.
Q. Do you have any recollection of any judge anywhere saying, You know, Mr. Parisi was unrealistic?
A. No.
Q. Or that Mr. Parisi overreached?
A. No.
Q. How many -- the list that we have -- it's not very long. I think it's maybe a third of a page. Is that correct?
A. Approximately.
Q. So in terms of how many depositions. How many depositions have you done?
A. As an expert witness?
Q. Yeah.
A. Probably five expert witness depositions.
Q. How many expert witness reports have you prepared in your own name?

A. Eight to ten.
Q. In terms of the -- when I say "expert," we're talking about expert witnesses. So this would be a litigated matter. You understand that. Right, Mr. Parisi?
A. Yes. A filed expert report with conclusions was the answer that I gave.
Q. Okay. So in those eight to ten instances, what courts were those matters filed in where the lawsuits were pending?
A. State court.
Q. Here in Florida?
A. Correct. And one was in bankruptcy court.
Q. Did you ever do any federal courts here in Florida?
A. Yes.
Q. I asked you about those eight reports that you prepared. I think you said eight was the number. Right?
A. Approximately, yes.
Q. Okay. And I asked you in what courts were they in, and you said they were all in Florida, and one was in bankruptcy. Is that what you said?
A. Correct.
Q. And then the next question was, have you

ever filed -- have you ever been involved in any litigations with filed expert reports in federal court. And the answer to that is, yes, too?

A. Yes.

Q. Okay. And is that number subsumed within that eight that you had mentioned before?

A. When you say "that number," what are you referring to?

Q. Well, I asked you how many cases had you been involved in where expert reports were prepared and filed. You said eight.

A. Where I was the expert?

Q. Yes.

A. Okay.

Q. So eight of them. Right?

A. Approximately, yes.

Q. And I asked you what courts they were in, and you said that they were all Florida state, and then you said one bankruptcy.

A. I thought you were saying -- you were referring to the additional cases that we hadn't previously discussed, which -- for which I filed reports but were on my testimony history.

Q. I want to know what your whole list.

A. Okay. Then federal, state, and bankruptcy.

Q. Okay. But you've never testified in open court before. Right?
A. I've testified on hearings, but not at trial.
Q. Okay. So you have testified before a judge?
A. Correct.
Q. And those times you've testified before a judge, I assume the judge qualified you as an expert. Is that correct?
A. I believe I've been qualified as an expert. I don't fully remember. But yes.
Q. Did you ever testify before Judge Scola here in the Southern District?
A. No. Not that I recall.
Q. How many times have you testified in court?
A. I've only testified in court on probably two, maybe three, hearings.
Q. Those were hearings?
A. Correct.
Q. What were the hearings involving?
A. Bankruptcy production disputes.
Q. What's a bankruptcy production dispute?
A. When you're suing someone in bankruptcy and they don't want to produce any documents and say

regularly available accounting records don't exist.

Q. Okay.

MR. MAZZOLA: Let's mark ...

Let's mark this document -- we're going to mark a document. And what -- we're also going to look at the screen. And I'm going to mark it. Is that okay?

MR. ROSENTHAL: Yeah. Is that the next one?

MR. MAZZOLA: Yeah. Did you mark your connection -- your -- yours from the last time?

MR. ROSENTHAL: Yes. So this is going to be 151?

MR. MAZZOLA: Yeah. 151.

(Deposition Exhibit 151 marked for identification.)

BY MR. MAZZOLA:

Q. All right, Mr. Parisi. I'm going to hand you a document. That's a document that we've marked as 151. And this is a printout that I made. And on the screen over here -- can you see the screen, Mr. Parisi?

A. I do.

Q. It's a printout that I made of,

essentially, the folders which purport to contain all the documents that you reviewed. It purports to show all the documents that were provided on -- by your attorney to us. Okay?

A. Okay.

Q. And I wanted to understand -- basically, what I want to understand right now is everything that you reviewed in connection with the preparation of this report. And it may very well be that you didn't review everything here, that only certain items were reviewed by you. Is that fair?

A. That's fair.

Q. Okay. So let's look at -- I guess we can look at these Rishi transmittal emails.

A. Sure.

Q. I don't want to pull them all up because it will take us all day to do that. But by looking at what I'm opening up, can you give me a sense as to whether or not these were things that you would have reviewed.

And I will tell you this: They were provided to us by Mr. Rosenthal as documents that were reviewed and relied upon by the experts in this case.

MR. ROSENTHAL: So before he

answers, if you could just make it clear which ones you're asking about by reading the name and --

MR. MAZZOLA: I will do that.

BY MR. MAZZOLA:

Q. So let's just go back over here.

So there's a Rishi Transmittal Email folder. Is that something you would have reviewed?

A. Yes.

Q. There's a Response From Benlida folder. Do you see that?

A. Yes.

Q. Is that something you would have reviewed?

A. Yes.

Q. There's a Follow-Up Benlida folder. Is that something you reviewed?

A. Yes.

Q. The August 2019 Forward folder. Would you have reviewed that?

A. Yes.

Q. Benlida Complaint Invoices.

A. Yes.

Q. How about Citibank Statements?

A. Yes.

Q. Invoices?

A. Yes.
Q. LTP Support?
A. Yes.
Q. This Received 5/3/23 CTX?
A. I'm not sure what that is, off the top of my head, like I am the others.
Q. How about I open it up a little more?
A. Oh. I know what this is.
Yes.
Q. These say "DM" on them. Do you see that?
A. I do. I know exactly what they are.
Q. These are debit memos. Right?
You have to give a verbal.
A. Yes.
I'm sorry. I apologize.
Q. This reconciliation analysis. Would you have reviewed that?
MR. ROSENTHAL: Wait. Let's be clear. That's a 2012 to 2019 reconciliation analysis. 2019.11.15 CCT.
I say that because there's a lot of different things with those words "reconciliation analysis" in them. That's why.
A. Yeah. I don't remember what that file is,

specifically.

BY MR. MAZZOLA:

Q. If I open it, will this help refresh your recollection?

A. Yes. I think that's the --

Q. I'm just tabbing through the bottom.

A. Yeah. I know what -- yeah. This is -- I think this is the -- Benlida's first response. This looks like the Benlida's first response email -- or no.

Yeah. It looks like their first response email, would be my guess.

Q. So this is what we call 2012 to 2019 reconciliation analysis, 2019.11.15. Is that correct?

A. Correct.

MR. MAZZOLA: Did I get that right, Stephen?

MR. ROSENTHAL: I'm sure you did.

BY MR. MAZZOLA:

Q. Moving down this list, Benlida Payment Details CTX U.S. 2012 to 2021 Version 5. Did you review that?

A. Yes, I reviewed it.

Q. And then there's a Benlida -- it's a

Microsoft Word document. It's got a whole bunch of zeros, but ends in 73.

A. I believe that's meeting minutes.

Q. And you reviewed them?

A. Yes.

Q. They're mentioned in the report?

A. Yes.

Q. This looks like an email, Benlida, ending in 364. Is that something you would have reviewed, too?

A. Yes. I don't remember the specific context of that email, but we reviewed all the items in our documents utilized.

Q. So everything that we're looking at here -- you just said "we" reviewed everything.

A. Yes.

Q. I'm asking about you right now. You reviewed everything. Right?

A. Yes.

Q. Now, the "we" -- does the we include Mr. Mukamal? Did he review everything?

A. Yes.

Q. What about Ms. Khanorkar?

A. Yes.

Q. She reviewed everything as well?

Anyone else that would have reviewed everything at the Mukamal firm?

A. Us three are the primary -- primary people working on the matter. There may be some junior staff doing some clerical-type work, but nothing substantive.

Q. When you moved over to Citrin, did you bring a file over --

When you moved over to Citrin, did you bring the file over with you?

A. No.

Q. All the file materials in connection with this remained with the Mukamal firm?

A. Correct. Nor did I want that treasure.

Q. So if I ask you any question about any of the documents that are contained on this 151, you would have seen that document. Is that correct?

A. Correct.

Q. Did you review any other documents that are not listed on this Exhibit 151?

A. Not for the counterclaim.

Q. What does that mean?

A. Well, we were retained for Circuitronix, LLC's, counterclaim against Benlida. There's also additional transactions between

Circuitronix, LLC, in Hong Kong, and similarly Circuitronix, LLC, and ROK. But those additional parties were not relevant for purposes of the counterclaim or included in the counterclaim.

Q. So you're talking about documents that related to transactions between -- I'm going to call it Hong Kong. Right? CTX Hong Kong.

So between the Hong Kong operation and Benlida, those documents, you did not review for purposes of this report and your testimony today. Is that correct?

A. Correct.

Q. You also referred to ROK. Is that correct?

A. Correct.

Q. Okay. You also referred to documents between -- that relate to the transactions between the Hong Kong entity and ROK and that you did not review those documents for purposes of this report and your testimony today. Is that correct?

A. So I just want to give clear testimony. You said Circuitronix Hong Kong and ROK. The transactions would be between Circuitronix Hong Kong and Benlida and also Circuitronix, LLC, and ROK.

Q. Okay. So we're talking Circuitronix, LLC, and ROK. You didn't review those documents.

MR. ROSENTHAL: Object to form.
A. So I want to be clear. For the counterclaim. I did not review those documents for purposes of the counterclaim.
BY MR. MAZZOLA:
Q. Okay. In connection with the -- but for purposes -- so the report that you created today and for your testimony that you're going to provide today, you did not review those documents.
A. We had the data assembled so we could respond to it -- to a claim and affirm the report if we were going to produce a rebuttal. But we didn't really analyze those transactions as they were not relevant for the counterclaim.
Q. And those transactions are the Hong Kong entity and Benlida. Right?
Correct?
A. Correct.
Q. You're saying the U.S. entity and ROK. Is that the other set you looked at?
A. Correct.
Q. Or that you looked at but they're not referenced in your testimony today or your report today?
A. Well, I would like to be clear. We do have

a footnote --

Q. I know the footnote. Yeah. We're going to get to the footnote. We're just ramping up here -- getting ramped up.

A. I'm excited, too.

Q. Any documents -- any other documents that are out there that you have that are not on this list?

A. For the counterclaim?

Q. For anything connected to the relationship between Benlida CTX, LLC, CTX Hong Kong, CTX Shenzhen. Anything.

MR. ROSENTHAL: I'm sorry. What's the question?

MR. MAZZOLA: Any other documents that he has or has reviewed that are not contained on this list, this 151?

MR. ROSENTHAL: What are you asking? Does he have anything else?

A. Yes. We have additional documents that we received. But we did not utilize them for the report, and they are not included in our documents utilized accordingly.

BY MR. MAZZOLA:

Q. Okay. So we know there's a set of

documents that you received that you did not utilize for your report accordingly. We know that. And that set that you just talked about relates to these things between Hong Kong and Benlida and U.S. and ROK.

Is there any other set of documents?

A. No. These are the primary issues in the case.

Q. So there's no other documents that you were provided that you -- that are not on the list and you did not utilize.

A. We were provided documents that we did not utilize.

Q. And the ones -- I'm trying to understand what you mean "utilize." So what you didn't utilize, it seems to me, is these documents related to the Hong Kong Benlida and the ROK transactions.

A. Correct.

Q. Okay. Is there anything else?

A. Not that I recall.

Q. Okay. The documents. Who gave them to you?

And by that, I mean literally. Did they come from Chauncey?

That's a question.

A. I'm sorry. I was waiting for you to finish.

Q. That's the question. Were -- the documents. Were they provided to you by -- were they provided to you from Chauncey via email or some other way?

A. Primarily through Chauncey. Circuitronix, LLC, may also have sent us some documents.

Q. Did Mr. Rosenthal or anyone that works with Mr. Rosenthal send you any documents?

A. Yes. I believe they sent us documents. Which documents, I can't recall who sent what specifically. Most of the documents were received a long time ago.

Q. So Mr. Rosenthal and his team sent documents. Is that correct?

A. I believe so.

Q. But you don't have a recollection of what they sent, just that they sent you something.

A. Correct.

Q. Mr. Cole, Chauncey Cole, he sent you some documents. Is that correct?

A. Correct.

Q. And CTX, they sent documents, too. Is that

correct?

A. Correct.

Q. Did CTX ever send you documents independent of Mr. Rosenthal or Mr. Cole?

A. Not that I recall.

Q. Who selected the documents that you reviewed?

A. We selected -- I mean, I don't fully understand your question.

There are documents in the litigation. The documents were produced to us as relevant to the litigation. There are many documents.

Q. So the documents that were produced to you were sent to you by CTX, Mr. Rosenthal, or Mr. Cole. Is that correct?

A. Correct.

Q. Did -- is it fair to say, then, that it was either CTX, Mr. Rosenthal, or Mr. Cole that selected the documents for you to review in the first instance?

MR. ROSENTHAL: Object to the form.

A. No.

BY MR. MAZZOLA:

Q. That's not fair to say that?

A. No.
Q. Did you participate in selecting any documents?
A. Yes.
Q. You did?
Did you go back to CTX and say, I want to see this, or I want to see that?
A. Absolutely.
Q. Did you go back to Mr. Cole and say, I want to see this and I want to see that?
A. We requested documents. I don't remember who we specifically requested documents from but counsel.
Q. Did you ever request any documents after reviewing a first set or a second set of documents?
A. Yes.
Q. What I'm getting at is, did you ever go back to CTX, Mr. Cole, or Mr. Rosenthal and say, Hey, we want to see this or that? Anything like that ever happen?
A. Yes.
Q. Can you give me an example of that?
A. So in the report, we selected debit memos for sampling. That would be a primary example.
Q. You selected debit memos for sampling.

A. Correct.
Q. Those debit memos that you selected for sampling would be contained on this 151. Right?
A. Yes.
Q. So if I pulled up a debit -- so you selected them.
What do you mean you selected them?
Did you go back to Mr. Cole and say, Send us a particular debit memo?
A. It might not have been Mr. Cole, but yes.
Q. Well, you may have gone back to Mr. Rosenthal. Right?
A. Correct. I just don't remember if it was Mr. Cole or Mr. Rosenthal or who it was specifically.
Q. Did you ever have direct communications with anyone at CTX requesting any documents?
A. Our communications -- I mean, we primarily communicated through email. But no. I didn't call anyone directly at CTX and request documents, if that's your question.
Q. So direct -- did you have any direct communications with CTX via email?
A. We communicated with CTX and counsel via email.

Q. Did you ever have any direct, independent communications with CTX without counsel?

A. Not that I recall.

Q. Did Mr. Mukamal ever have any direct communications with CTX without counsel that you know?

A. Not that I'm aware.

Q. Did you have any -- ever have any -- "you" ever have any direct telephone calls with anyone at CTX without counsel?

A. Not that I recall.

Q. What about Mr. Mukamal?

MR. ROSENTHAL: Did he have conversations with Mr. Mukamal?

MR. MAZZOLA: Yeah. Mr. -- no, no, no. Conversations with -- he knows.

BY MR. MAZZOLA:

Q. Did Mr. Mukamal have any conversations with anyone at CTX?

A. I don't want to speak for Barry. I have no idea.

Q. Okay. What about Ms. Khanorkar?

A. Not that I'm aware of.

Q. Did you ever have an opportunity to review any -- any documents, spreadsheets, or anything on,

say, Mr. Rosenthal's computer that's not reflected on this list 151?

A. I've not been through Mr. Rosenthal's computer.

Q. Okay. Did he ever show you anything that's not on this list?

A. I mean, did he show us anything ...

Not that I recall.

Q. I'm trying to understand the universe of everything that you have in your file that you've reviewed.

A. Um-hmm.

Q. And what I want to know is, were you ever meeting with Mr. Rosenthal at any time, or anyone that works for him, and they showed you a spreadsheet that you looked at and reviewed, but it's not contained on this list 151?

A. Yes.

Q. There were spreadsheets they showed you.

A. Yes.

Q. That are not on this list.

A. Yeah.

Q. What did those spreadsheets reflect?

A. So recently -- because our report was filed on June 8th, and some of the key depositions had not

yet occurred, or we hadn't had transcripts, and we received a spreadsheet from Benlida. Benlida testified that there were --

Q. What are you reading?

A. I'm not reading anything. This is my report.

Q. It's in your report, then. Right?

A. No.

MR. ROSENTHAL: No. You just interrupted his answer, though.

BY MR. MAZZOLA:

Q. Go ahead and finish.

A. So Benlida said that -- or the testimony says that there was two spreadsheets that -- or two sets of books Benlida kept. Or I may be paraphrasing. But one had the transactions, quote/unquote, commingled, even though you could clearly see the delineation between Circuitronix, LLC, and Hong Kong in the records. And then a second spreadsheet -- or that everywhere was commingled.

And then I was also aware of that there was a second spreadsheet where the books were kept separate, but I haven't seen that separate -- the separate set of books yet. Only the one where

the records of Circuitronix, LLC, and Hong Kong are commingled.

Q. So CTX, LLC, and CTX Hong Kong are commingled?

A. By Benlida.

Q. By Benlida.

Why do you use the word "commingled"?

A. Because all the transactions for Circuitronix, LLC, and Circuitronix Hong Kong are contained on the same spreadsheet. But within the payments, for example, there's a column. And sometimes for each payment, it identifies is this a Circuitronix, LLC, payment; is there a Circuitronix Hong Kong payment.

Q. That's Benlida's records.

A. Correct.

Q. And what does that mean to you?

A. I don't understand your question.

Q. Why did you raise it?

Why is it relevant?

Do you have an opinion based upon that?

MR. ROSENTHAL: Object to the form.

Go ahead.

A. Your question was, did I review any other

spreadsheets?

BY MR. MAZZOLA:

Q. Yes. And now you're raising it, and I'm asking if you have any comments, opinions about that.

A. My only comment was the -- even though the analysis is commingled, you can clearly tell if the payments are attributable to Circuitronix Hong Kong or LLC.

And similarly, the invoices -- Benlida's the one who creates the invoices. The invoice numbers, specifically. And within that invoice number, there's a designation to identify if Benlida created that spreadsheet for -- or that invoice, rather, for Circuitronix Hong Kong or LLC.

And so I did take that spreadsheet, and I separated it to see if the results would be similar to what's in our report, to see if, you know, Benlida's internal records reflected something similar to what our analysis concluded.

Q. What do you mean "concluded"?

A. About the balance due as of July 2019 and the compilation of the lead-time penalties.

Q. And that's in your report?

A. Correct.

Q. So this additional thing that you reviewed, that worked its way into your report. Is that what you're saying?

MR. ROSENTHAL: Object to form.

A. So that is not what I'm saying.

BY MR. MAZZOLA:

Q. Okay. What are you saying, then, about this additional thing that you reviewed on Mr. Rosenthal's computer after the depositions --

MR. ROSENTHAL: Object to the form.

BY MR. MAZZOLA:

Q. -- does that impact your report in any way?

MR. ROSENTHAL: Object to the form.

A. So I just want to be very clear. Mr. Rosenthal sent us a spreadsheet of Benlida's accounting records as represented by Benlida. I analyzed that spreadsheet well after my report had passed. And so that report -- or that spreadsheet, rather, did not change the opinions in my report.

BY MR. MAZZOLA:

Q. It does not change the opinions in your report.

A. Correct.

Q. Does it support the opinions in your report, in your opinion?
A. In a way.
Q. If -- do you have the binders in front of you?
A. Yes.
Q. Can you go to -- there's an Exhibit 21.
MR. ROSENTHAL: JC, just so you know, there's some that may not be in there.
MR. MAZZOLA: No. These are all -- these are nothing. This is the manufacturing agreement, one is the --
MR. ROSENTHAL: I'm just saying there may be some that are not in there, but that should be there.
MR. MAZZOLA: No. These are there.
MR. ROSENTHAL: I'm telling you. You don't know what's in these. Some of these are not, because I haven't put my copies in there.
MR. MAZZOLA: Okay.
MR. ROSENTHAL: I noticed it yesterday.

MR. MAZZOLA: Okay.
BY MR. MAZZOLA:
Q. I saw you stopped at a number of charts.
A. Well, I'm flipping through all three.
Q. Have you ever seen that document that's Exhibit 21?
A. I believe I've seen it before. Yes.
Q. We're going to talk about this later. I'm just trying to clear a few things out here. I'll ask you some questions about that later.
While you're in the binders, can you go to Exhibit 40.
Have you ever seen that document?
A. I don't believe so.
Q. Okay. Let's go to Exhibit 121.
A. 121. That's in the other one.
Q. Mr. Parisi, if you need to take a break at any time, just let us know.
A. I'm good to keep going.
Q. You're a lot younger than me.
This is a document -- this is Exhibit 121. It's an email.
Do you see that?
You're not there yet, are you?
A. Yes.

Q. Have you ever seen that document?
A. Not that I recall.
Q. Okay. From an accounting perspective, this is a little bit more interesting than the other ones. Right?
A. Yes.
Q. Spreadsheets and stuff. But you haven't seen it.
A. Correct.
Q. Okay. Let's look at your report. I'm going to draw your attention to that.
Do you have it in front of you?
You can close the other binders now.
A. Yes.
Q. So I think we -- in talking to you a bit earlier, you're prepared to talk about anything that's contained within this report today. Is that correct?
A. Yes.
Q. Do you anticipate, in answering any of your questions, being -- and I don't know yet if it's not a fair question, but I'm just trying to understand that I can ask you questions about this report, and you're prepared to talk about this report. Is that correct?

A. Absolutely.
Q. Okay. Of course, there may come a moment within the report -- a time in response to the question where you may have to say, Well, no, Mr. Mukamal knows this, or something else. And we'll address that when we get to it. But I just want to roll through this report with you. Okay?
A. Absolutely.
Q. You know, if you look at your first paragraph, your first bullet point, you talk about analyzing accounts payable reconciliations prepared by Benlida and CTX. You have a footnote there, and you distinguish -- you identify it as CTX, LLC.
Do you see that?
A. I do see the footnote.
Q. Why such a distinction?
A. I don't understand your question.
Q. Were you intending to distinguish CTX, LLC, as separate from CTX Hong Kong?
A. They are separate companies.
Q. Who told you they were separate companies?
A. The names.
Q. Anyone else tell you that?
A. I mean, it's obvious they're separate companies.

Q. Do you know how they're organized legally?
A. One is a Hong Kong company, and one is a domestic company.
Q. You're a fine accountant, but are you an attorney?
A. I am not an attorney.
Q. Did you review the corporate documents of CTX, LLC, and the corporate documents of CTX Hong Kong?
A. Not that I recall.
Q. Okay. Did you review any contracts between CTX, LLC, and CTX Hong Kong?
A. I previously saw the manufacturing agreement that we referred to, and I saw meeting minutes as well. But I don't remember additional contracts.
Q. Are you familiar with the organizational structure of CTX Hong Kong?
A. I'm not.
Q. Are you familiar with the organizational structure of CTX, LLC?
A. I'm not.
Q. Are you familiar with the ownership structure of CTX Hong Kong?
A. I'm not.

Q. Are you familiar with the ownership structure of CTX, LLC?

A. I believe Rishi Kukreja owns Circuitronix, LLC.

Q. Are you aware of -- do you know if there's any common control between CTX Hong Kong and CTX, LLC?

A. Common control ...

I'm not sure what you mean by "common control."

Q. It's just a question.

Are you aware if there's any common control between CTX, LLC, and CTX Hong Kong?

MR. ROSENTHAL: Object to the form.

A. I'm aware that Rishi Kukreja is involved in the operations of Circuitronix Hong Kong, but I don't know if that rises to the level of what you mean by "control."

Q. What about -- are there any common interests between CTX Hong Kong and CTX, LLC, if you know?

MR. ROSENTHAL: Object to form.

A. What do you mean "common interests"?

\\\

BY MR. MAZZOLA:
Q. Do you know of related parties?
A. Yes.
Q. From an accounting perspective?
A. Yes.
Q. And do you -- what is a related party from an accounting perspective?
A. So they could physically be related and they're related parties. One person, for example, could own two entirely separate companies, and those companies may or may not do business with each other.
Q. If one person owns two or two separate companies, and you're doing an accounting, would you consider those two companies to be related parties?
A. It depends.
Q. It would depend on a lot of factors. Right?
A. Correct.
Q. And the factors that you would look at in looking at related parties are, from an accounting perspective, would be things like common control. Is that a factor you would look at?
A. It could be.
Q. You would also look at -- a factor might be

common ownership. Isn't that correct?

A. It could be.

Q. Another factor you might look at, when you are looking at related parties from an accounting perspective, are things like do these parties have a common interest. Those are factors you would look at. Is that correct?

A. It could be. Yes.

Q. So when you wrote down Circuitronix, LLC, was that an effort by you to distinguish the Circuitronix U.S. operation from the Circuitronix Hong Kong operation?

A. Yes.

Q. Did you ever do a related-party analysis between CTX U.S. and CTX Hong Kong?

A. Not that I recall.

Q. But if you did, it would be in the report. Right?

A. Correct.

Q. Okay. So if you don't recall it, and it's not in the report, that means you didn't do it. Right?

A. Correct.

Q. Okay. Now, it says you were retained by legal counsel "to." Do you see that?

A. Correct.
Q. And there's two bullet points there.
This was the brief, if you will, or the instruction that you received from legal counsel, and that was to analyze the accounts payable reconciliations prepared by Benlida and CTX U.S. only as of July 31, 2019. Is that correct?
A. Correct.
Q. And then you were also asked to examine and summarize calculations prepared by CTX with respect to lead-time penalties owed from Benlida. Is that correct?
A. Correct.
Q. Now, it looks like when you were asked to examine and summarize calculations, they were only the calculations prepared by CTX with respect to lead-time penalties. Is that correct?
A. No.
Q. But that's what it says.
A. Well, they were prepared, but there's also some meeting minutes where Benlida and CTX agreed to waive some of the lead-time penalty, rather. And so, to me, that involvement means Benlida is somewhat involved in the lead-time penalty calculations.

I mean, there is testimony about it. It appears in the meeting minutes. So it was somewhat a joint effort.

Q. But the calculations that you looked at, you know, the spreadsheets, the numbers that you looked at, those were pursuant to this bullet point prepared by CTX. Is that correct?

A. Correct.

Q. And that's what you wrote. Right?

A. Correct.

MR. MAZZOLA: Can we take a break now? Is that okay with you, Stephen?

MR. ROSENTHAL: It's your depo. I'm happy to take a break.

(Off record: 11:33 a.m. to 11:41 a.m.)

BY MR. MAZZOLA:

Q. So you know, I had asked a question about related parties, and it dawned on me when I'm looking at what you were instructed to do. You were not instructed to do a related-party analysis. Is that correct?

A. Not that I recall.

Q. But if you were instructed to do it, it would have been in the report. Right?

A. I don't remember any discussion of

related-party analysis, nor was it defined in our initial scope.

Q. Okay. Did you or Mr. Mukamal ever suggest to the CTX side that a related-party analysis might be useful?

A. Not that I recall.

Q. You don't recall that?

A. I do not.

Q. You didn't have the conversation. Right?

A. I did not.

Q. Do you know if Mr. Mukamal did?

A. Not that I'm aware.

Q. And what about Ms. Khanorkar?

A. Not that I recall.

Q. Anyone have a conversation with anyone on the CTX side that a related-party analysis would be necessary to do a full picture of this?

A. What do you mean by "this"?

Q. This analysis to provide a full picture.

MR. ROSENTHAL: For the record, you're referring to the report marked as Exhibit 147?

A. Yeah. For CTX's counterclaim.

BY MR. MAZZOLA:

Q. Yes.

A. Not that I recall.
Q. As you sit here today, do you think a related-party analysis would be useful?
A. As I sit here right now, I do not believe so.
Q. Why is that?
A. Because I don't understand how that information would impact the counterclaim.
Q. We'll ask you later, maybe. Okay?
A. Okay.
Q. At paragraph 2, you talk about we have not been requested to perform, nor have we performed, an analysis, which is required beyond -- an analysis beyond what was required for the analysis presented in this report. That's still true, as you sit here today. Right?
A. Correct.
Q. So in terms of the related-party analysis that we were just talking about, you have not been asked to do such, and you have not done such. Is that correct?
A. Correct.
Q. You say that your analysis was performed using records of CTX.
Do you see that?

A. Correct.

Q. And, again, I'm trying to understand that -- you know, when you talk about records you received, these are -- all the records you have here are records that you received from CTX. Is that correct?

A. We also received some meeting minutes. And I think those meeting minutes had Benlida Bates stamp numbers on them.

Q. Okay. Other than those meeting minutes that had a Benlida Bates stamp number on it, as you sit here today, the records that you reviewed, spreadsheets, everything that's in this one -- that's up on the screen over here, and that's Exhibit 151, those were documents that you received from CTX. Is that correct?

A. We received documents from CTX and counsel.

Q. Okay. That side, not from Benlida.

A. We received Benlida documents through counsel.

Q. Is there anything you received -- anything you received or reviewed was filtered through counsel and/or CTX. Is that correct?

MR. ROSENTHAL: Object to form.

A. I'm trying to recall if we did any

independent internet searches.

BY MR. MAZZOLA:

Q. Did you?

A. I don't recall. I'd have to look at the documents utilized.

I don't have it in this report version.

MR. ROSENTHAL: Oh. You want to see the documents?

THE WITNESS: Correct.

MR. ROSENTHAL: Let me do this. Let me tear off the copy I have. I don't think it's marked in any way.

BY MR. MAZZOLA:

Q. What do want to look at?

A. Just the "Documents Utilized" section of the report.

Q. Oh, okay.

A. I just don't recall if there's any sources of data that --

Q. That is -- that's not on my version, either?

A. No. It truncates -- it truncates on page 15 for me.

MR. ROSENTHAL: I don't have an

unmarked page of that, so -- but you could probably bring it up on the screen. I don't know if the report's in there.

MR. MAZZOLA: Mine has it. You can look at mine. I don't care.

I'm going to rip it off. Is that okay? Should we exhibit it? Mark it?

MR. LERNER: Yeah. Mark it as 152.

(Deposition Exhibit 152 marked for identification.)

MR. MAZZOLA: Stephen, that has some of my handwriting on it.

MR. ROSENTHAL: Okay.

(Document review.)

A. Okay. Yes. Everything here appears like it would have come from Circuitronix or through counsel.

BY MR. MAZZOLA:

Q. Okay. And you see at that top -- I actually wrote on it. It says "Documents Utilized." So these would have been documents utilized in the preparation of the report. Is that correct?

A. Correct.

Q. And you'll see my own handwriting there. I

kind of -- a question: Reviewed.

I assume you would have reviewed these as well. Right?

A. Yes.

Q. Okay.

A. Absolutely.

Q. And then this nice lady over here is going to make a photocopy of this for us.

A. Oops. Sorry. I put that in the middle of the table. I apologize.

Q. Moving through your report, you advised that you did not perform any attestation or audit procedures.

What does "attestation" mean?

A. It's a form of review in accounting. It's an accounting term of art.

Q. What does it mean?

A. It's similar to review -- it's similar to an audit.

Q. Okay.

A. Just procedures to verify the financials.

Q. So that -- so you're saying you didn't -- you did not perform an attestation or audit with any of the summary analysis presented herein. Does that mean you didn't check them?

A. No. In accounting, "audit" is a very specific term of art. "Audit" means, in the traditional sense, an audit of the records.

Q. Okay. So you did not audit the records, then.

A. Correct. We did not issue what you would think of as a financial statement report that you're accustomed to.

Q. But what you did do is you did review the numbers. Right?

A. Correct.

Q. You checked the numbers to make sure they added up correctly. Is that correct?

A. That was one of the tasks we performed.

Q. You checked the math is what you did.

A. We checked the math; we compiled the math; we reconciled the sources; we compared it to, you know, the different data sources; and we prepared a big reconciliation and kicked the tires.

Q. But you reviewed the math.

A. Yes. That was one of the things we did is review the math.

Q. Is that the main thing you did?

A. No. The main thing I did is everything I said in my prior answer.

Q. You reconciled. Right?
A. We reconciled.
Q. But you did not audit the numbers.
A. We did not prepare a formal audit report of Circuitronix, LLC.
Q. I know you didn't perform -- prepare a report, but did you audit the numbers?
A. I don't know what you mean when you say "audit."
Q. How do you know the numbers that you were looking at were correct?
A. So which numbers are you referring to specifically?
Q. Any number.
You were looking at spreadsheets that were provided to you by CTX. Did you audit those and dig down behind those numbers to confirm that the numbers were accurate?
A. So you -- I just want to be clear. You said Circuitronix. There's also the Benlida adjustments to the Circuitronix records.
Q. I know that.
So the Circuitronix numbers. Did you check those numbers, other than looking at them and checking the math?

A. Yes.
Q. Okay. Did you go back and look at the source documents for them?
A. For some, yes.
Q. For all of them?
A. For all of them, no.
Q. I know you made judgmental choices to pull certain documents like debit memos. Is that right?
A. Correct.
Q. Did you make judgmental analysis and pull invoices?
A. We did have some invoices. Yes.
Q. Some?
A. Some.
Q. But not all.
A. I know we had all of the complaint invoices, and I believe we had other invoices as well.
Q. Did you pull lead-time penalty data?
A. I didn't pull lead-time penalty data. I compiled the lead-time penalty data provided.
Q. You compiled the lead-time penalty data provided to you.
A. Correct.
Q. Did you ask for any additional lead-time

penalty data from anyone or just reviewed the stuff that was provided to you.

A. We reviewed the lead-time penalty data provided to us by Circuitronix, and then there was also a Benlida production of documents. And contained within that document production were meeting minutes, and we used those meeting minutes to adjust the lead-time penalty calculation.

Q. Because you wrote three lines down that -- and you said, "And did not perform any additional procedures to provide assurance as to their reliability beyond the procedures enumerated herein." Do you see that.

A. I do.

Q. Okay. So you didn't perform an audit. You said that. Right?

A. Correct.

Q. You didn't perform an attestation. You said that. Right?

A. Correct.

Q. And you also wrote that you did not perform any additional procedures to provide assurance as to the reliability of what was contained in the CTX recon and the Benlida recon beyond what's enumerated here in your report. Right?

A. Correct --

MR. ROSENTHAL: Objection. Asked and answered.

You can answer.

A. Correct.

BY MR. MAZZOLA:

Q. So we're going to go through your report, and we're going to examine the procedures that you did to confirm that these number are accurate. Is that correct? We'll do that.

A. I don't know. But I hope we'll do that.

Q. Okay. But it's in your report.

A. Correct.

Q. You make a reference to a footnote, Footnote 4. Do you see that?

You talk about, "We have also conducted a preliminary analysis." And this is what I think you might have been alluding to earlier. Do you see that?

A. I do see Footnote 4.

Q. Where is that preliminary analysis? Is it written down anywhere?

A. It's the -- it's an Excel spreadsheet.

Q. Where's the Excel spreadsheet?

A. It's in our records.

Q. Was it provided counsel?
A. I don't believe so.
Q. And why is it not referenced here in this report or provided in this report?
A. Because it's not relevant for Circuitronix's counterclaim.
We preliminarily compiled the Hong Kong data and ROK data, and we didn't know if we would have to use that data in a rebuttal report. But there was no affirmative report provided, so we did not use such data in the rebuttal report.
Q. And it's not provided -- it sounds to me, because you were not instructed to provide it. Right?
A. I don't understand your question.
Q. Were you instructed to not provide it?
A. I don't understand your question.
Q. Were you instructed to not provide the preliminary analysis?
MR. ROSENTHAL: Do you mean in the report --
MR. MAZZOLA: In the report.
MR. ROSENTHAL: -- in some other place?
A. I'm sorry. I don't understand your --

BY MR. MAZZOLA:

Q. I'm asking where's the preliminary analysis. You it said was a spreadsheet that you have. Is that correct?

A. Correct.

Q. I asked why has that -- why has that preliminary analysis not been provided to me? Why -- first of all, start there.

Why has it not been provided to me?

MR. ROSENTHAL: Objection. Asked and answered.

You can answer.

A. I don't know why it hasn't been provided to you, but it's not relevant for Circuitronix's counterclaim.

BY MR. MAZZOLA:

Q. Has it been provided to the -- your lawyers?

MR. ROSENTHAL: Same objection.

A. We didn't finalize an analysis of Circuitronix Hong Kong or ROK. All we did is preliminarily just compile the basic spreadsheets that we've gone over and the sources.

But that data is not relevant for Circuitronix's counterclaims, so it doesn't -- you

know, we didn't rack up a bunch of fees, you know, going out of scope.

BY MR. MAZZOLA:

Q. Why do you say it's not relevant to their counterclaim?

A. Well, because Circuitronix's counterclaim is between Circuitronix, LLC, and Benlida.

Q. Okay. And that's because you believe that Circuitronix Hong Kong is not a related party.

A. That's a legal issue.

Q. Well, I asked you did you do a related-party analysis; you said, no. Right?

A. Correct.

Q. And that you have no recollection of anyone ever having a communication with anyone at -- on the CTX side about doing a related-party analysis. Is that correct?

MR. ROSENTHAL: Object to form.

A. Correct.

BY MR. MAZZOLA:

Q. So your testimony is that you believe this preliminary analysis is not relevant to CTX's counterclaim.

A. The preliminary analysis of the transactions between Circuitronix Hong Kong and

Benlida and Circuitronix LLC, and ROK. Correct.
Q. Is not relevant in your mind.
A. It's not that it's not relevant. The parties are not in the counterclaim.
Q. Let's look at --
I've just gone into --
MR. MAZZOLA: Did we have this already previously marked?
MR. LERNER: What is this?
MR. MAZZOLA: This is the CTX ...
(Pause in proceedings.)
BY MR. MAZZOLA:
Q. You make reference to a "CTX recon."
MR. ROSENTHAL: Just for the record -- okay. You're doing it now.
MR. MAZZOLA: I'm going to try to pull it up. I just want to make sure that I get to the right one, though.
BY MR. MAZZOLA:
Q. When you refer to the CTX recon, is it the document that says "Benlida Payment Detail CTX U.S."?
Is that what you're referring to, Mr. Parisi?
A. Yes.

Q. So it's the -- and that is up on the screen. Right?
Do you see it?
MR. ROSENTHAL: Would you mind, Mr. Mazzolo, just clicking on the ellipses on the top of the document so we know the title at very top?
It's the -- in the gray bar. I think that shows it. Right? In the gray bar.
A. Yeah. That's it.
MR. MAZZOLA: That's it.
BY MR. MAZZOLA:
Q. So this document that says "Benlida Payment Detail CTX U.S. 2012 to 2019," is what you're referring to as the "CTX recon." Right?
A. Correct.
Q. And that's contained within the folder that says "Rishi Transmittal."
A. Correct.
Q. And is it also fair to say that this CTX recon relates only to -- and I'm going to call it "CTX U.S. transactions." Is that fair to say and correct?
A. Correct.

Q. And you refer to something called the "Benlida recon." And that's contained within a folder that says "Response From Benlida."
And that's a document that's called -- an Excel document that's called "2012 to 2019 Reconciliation Analysis, 2019.11.15."
Do you see that? I'm going to open it up.
A. I do. That's the spreadsheet we reviewed previously that was outside the folder.
Q. Okay. And this reconciliation analysis, where it says, "Reconciliation Analysis Report," this is what you're referring to as the "Benlida recon." Right?
A. Correct.
MR. MAZZOLA: Have these been marked as exhibits?
MR. ROSENTHAL: I'm trying to see. Just one of them was dated 11/15, I saw.
What was the other one dated? Do you recall?
THE WITNESS: November 1st.
MR. ROSENTHAL: So it might be 120. I'm not sure.

MR. MAZZOLA: We can mark them again.

MR. ROSENTHAL: My notes of the 120 are Benlida and ROK, so it's probably a different one.

MR. MAZZOLA: I feel like I've seen them, but let's -- can we can mark them again?

MR. ROSENTHAL: Sure. No problem.

MR. MAZZOLA: So just to fix the record here. "Benlida Payment Detail, CTX U.S. 2012 to 2019," contained within the "Documents Utilized by Expert" folder, the Rishi transmittal, we're going to call 153.

And "2012 to 2019 Reconciliation Analysis, 2019-.11.15" contained within "Documents Utilized" by Mr. Parisi in the "Response from Benlida" file, we're going to call 154.

(Deposition Exhibit 153, 154 marked for identification.)

BY MR. MAZZOLA:

Q. Mr. Parisi, we're looking at page 3. You had another footnote here, Footnote 7, just to state

one example. We have not yet been provided with any transcripts of depositions taken recently.

Did you review the transcripts of any depositions?

A. Not that I recall. The main depositions were Rishi Kukreja and Tracy, and those occurred after our report was issued primarily. We did not -- or we didn't have the transcripts available in time, if they were issued, if the depositions occurred previously, so we had not have the privilege.

Q. But you used the words "just to state" -- "just to state one example." Any other examples?

A. Not that I recall right now.

Q. Okay.

A. But there were deposition transcripts that was also that spreadsheet of the commingled accounting.

Q. What about the transcript of Akshay Koul? Did you review that?

A. I did not.

Q. What about the transcript of Lena Ochoa, did you review that?

A. I did not.

Q. Do you know when they were taken?

A. I do not.
Q. They were taken sometime ago. But you didn't review those?
MR. ROSENTHAL: Object to the form.
A. I did not.
BY MR. MAZZOLA:
Q. And you used the word -- I'm just -- your language, "to state just one example."
MR. ROSENTHAL: What's your question?
BY MR. MAZZOLA:
Q. When people use, "to state just one example," that type of language, it sounds like there were some other examples.
So were there any other examples that fall into relevant information that you have not yet reviewed?
MR. ROSENTHAL: Object to form.
A. The primary data that we were waiting on, as I recall, was the deposition transcripts.
BY MR. MAZZOLA:
Q. Okay. So to state "the example," not just one example, you should have written. Right?
A. That's the one I recall sitting here.

There could also be additional discovery produced in conjunction with those depositions.

Q. Before we move off of these, let's look at what we previously marked as Exhibit 154.

This is the CTX recon.

MR. LERNER: You put up 153; you called it 154.

MR. MAZZOLA: Oh. I beg your pardon. 153. The CTX recon. This is the CTX recon that's on the screen. 153.

MR. ROSENTHAL: And just so you guys know, I think it's the same as 120.

MR. MAZZOLA: Okay.

MR. ROSENTHAL: Jessica has confirmed.

BY MR. MAZZOLA:

Q. Looking at this summary page, do you see these over here?

A. I do.

Q. There's a parenthetical that says 5,314,868.81. And what does that number reflect?

A. That number reflects the net balance after consideration of the invoices, less the debit memos and the payments as relates to the transactions between Circuitronix, LLC, and Benlida.

Q. And that got parentheses around it, so that's a negative number. Right?
A. It's a credit balance.
Q. Credit balance.
And so that is a document -- this spreadsheet is prepared by CTX. Right?
A. Correct.
Q. It wasn't prepared by you. Right?
A. Correct.
Q. It wasn't prepared by Benlida?
A. Correct.
Q. And when an accountant says "a credit balance," what does that mean?
That means that Benlida, pursuant to this spreadsheet, owes CTX the 5.3 million. Right?
A. Correct. Before verification and comments by Benlida.
This is Circuitronix's initial attempt at reconciling the balance between the two parties.
Q. But this is just for the U.S. operation. Is that correct?
A. Correct.
There are separate spreadsheets tracked by Benlida and Circuitronix. And the transactions between Circuitronix and U.S. and

Circuitronix Hong Kong are separate, just like the transactions with Benlida and ROK.

Q. Let's look at what we've marked as Exhibit 121. Do you see that?

(Document review.)

A. I do.

MR. MAZZOLA: What time is lunch going to happen?

MS. MILLER: It's not getting here till 12:30.

MR. ROSENTHAL: Sometime after 12:30, JC.

(Pause in proceedings.)

BY MR. MAZZOLA:

Q. So we're looking at this Exhibit 121.

Have you ever seen this document before?

A. Not that I recall.

Q. And this document, it looks like it's an email that was sent from Rishi. Do you see that?

A. I do see Rishi's name.

Q. And it's dated July 29th, 2019.

A. That is the date.

Q. In the subject, he talks about a final payment reconciliation. Do you see that?

A. I see those words.

Q. And he makes reference to "CTX," and he makes reference to "Hong Kong," "CTX U.S.," and "ROK." Do you see that?

A. I see the words on the page.

Q. And then in the body, he's writing to a person named Douglas at Benlida. Do you know who Douglas is?

A. I know he's involved with -- he's one of the major players at Benlida, or in the upper echelon.

Q. Do you see where Rishi writes, at line A, Benlida for CTX Hong Kong. We owe Benlida U.S. $8.8 million, 843 thousand, 225 dollars and 69 cents. Do you see that?

A. I see those words.

Q. Do you see that's written by Rishi?

A. I see that he sent the email.

Q. Did you ever consider in your analysis, monies owed by CTX Hong Kong to Benlida?

A. We did not.

Q. Is it true that in your analysis you only looked at the transaction -- the transactions between CTX U.S. and Benlida?

A. Those were the transactions we analyzed for

purposes of Circuitronix, LLC's, counterclaim.

Q. Is that the same as answering, "yes," that for purposes of your report -- this report, 147 -- you only looked at transactions between CTX U.S. and Benlida?

A. Our report primarily analyzed transactions between CTX U.S. and Benlida.

Q. Now, you said primarily analyses.

A. Um-hmm.

Q. What other things does it analyze?

A. Well, we also compiled the data that we identified in Footnote 4. But we -- as we anticipated in preparing a rebuttal, but there was no affirmative report filed by the plaintiff where the Circuitronix Hong Kong data and ROK data could have been helpful.

Q. So what you're saying is that you did not provide any data -- any information in this report regarding transactions between CTX U.S. -- beg your pardon. CTX Hong Kong and Benlida. Is that correct?

A. The transactions between CTX Hong Kong and Benlida do not enter into the figures recorded in the report.

Q. It's just the transactions between U.S. and

Benlida that create the figures that are in your report. Is that correct?

A. Correct.

Q. And we had talked a little bit earlier about the related parties, and we asked if you or anyone on the Mukamal side had -- did a related-party analysis. And I think your answer was, no, you did not. Is that correct?

A. We did not prepare a related-party analysis.

Q. And that neither you, as far as you know, or Mr. Mukamal, nor Ms. Khanorkar suggested to Mr. Rosenthal, to Mr. Cole, or anyone at CTX, that you do a related-party analysis. Isn't that correct?

MR. ROSENTHAL: Object to the form.

A. Not that I'm aware.

(Pause in proceedings.)

BY MR. MAZZOLA:

Q. Let me ask this question. How does -- from an accounting perspective, how does an overpayment happen?

A. It's when you send more money than the invoice amount.

Q. I know that. That's the obvious answer.
But have you ever seen that happen before?
A. Yes. I've seen credits before.
Q. To the tune of $5 million?
A. I've seen credit balances before, yes. I don't recall specifically a balance of $5 million.
Q. Have you ever seen one larger than $5 million?
A. I don't recall. I've seen credit balances, if that's your question.
Q. Okay. What's the last credit balance you remember?
A. I have no idea. I see so many numbers, they all kind of blend together.
Q. Okay. But have you ever seen one of $5 million?
A. I don't recall.
Q. But is it normal for businesses to overpay?
A. It happens. Certainly.
Q. But is it normal for businesses to overpay?
A. It depends on the facts and circumstances.
Q. Is it normal for a well-run business, in your professional, experience to overpay?
A. It's not normal for businesses to overpay,

but there can be other reasons for those payments.
Q. For overpayments?
A. Correct.
Q. But it's not normal?
MR. ROSENTHAL: Object to the form.
A. It depends on the facts and circumstances.
BY MR. MAZZOLA:
Q. How is it ever normal for a business to overpay? Why don't you give me some example?
A. Well, it's a -- Circuitronix is a key supplier of Benlida. For example, I've seen emails where Benlida has been directing Circuitronix to send money to other entities.
And Benlida also -- I've seen emails where also Benlida says that they need money into Benlida for one reason or another. So I don't know if the facts and circumstances of this transaction are normal.
Q. How do you reconcile the overpayment of $5 million -- let me ask you this question.
If, in fact, looking at Exhibit 121, and Mr. Kukreja is correct, that -- he writes "we." "We owe Benlida $8.8 million."
Do you see where he writes that?

A. I see those words on the page.

Q. How do you reconcile the fact that he owes them $8.8 million, but in the same breath he's saying that someone owes them $5.7 million?

A. So I just want to be very clear on who we're talking about. There's multiple transactions represented on this page, and we can address each one individually.

But Circuitronix Hong Kong -- the first line is between Circuitronix Hong Kong and Benlida, which is separate from Circuitronix, LLC, and Benlida.

Q. But why would Mr. Kukreja, who is writing on behalf of all three companies, talk about a debit to him of over $8 million -- credit owed to him -- a credit that he has over $8 million, but at the same time, talking about a debit of $8.8 million?

Who does that?

MR. ROSENTHAL: Object to the form.

A. I'm sorry. I don't understand your question.

BY MR. MAZZOLA:

Q. Who would agree to overpay to that extent?

MR. ROSENTHAL: Object to the

form.

A. I don't understand your question.

BY MR. MAZZOLA:

Q. Why would a businessman agree to overpay to another business over $8 million?

MR. ROSENTHAL: Same objections.

A. I'm not focused on the why, I'm strictly focused on what actually happened.

BY MR. MAZZOLA:

Q. And is it fair to say that that kind of overpayment is not normal?

A. It depends on the --

MR. ROSENTHAL: Object to the form.

Sorry.

It's been asked and answered three times.

A. It depends on the facts and circumstances of the case.

I previously told you that I saw emails where Benlida was definitely hungry for money and directing payments. So it's -- you know, there's a lot of transaction history in this case.

BY MR. MAZZOLA:

Q. Just because someone is hungry for money,

why would a prudent business person overpay them just because they're asking for it?

MR. ROSENTHAL: Object --

A. Because Benlida is a key supplier to Circuitronix. If Benlida goes under, presumably, some Circuitronix clients would be harmed as well.

So they have -- Circuitronix has an incentive to make sure Benlida can continue to operate.

BY MR. MAZZOLA:

Q. So you're suggesting that Benlida somehow strong-armed Circuitronix into overpaying?

A. I didn't say that.

But what I said is there's an incentive to make sure Benlida is in business.

Q. And so just based upon that, Mr. Kukreja would permit an overpayment of over $8 million, almost $9 million?

MR. ROSENTHAL: Object to the form.

A. I think you may have mischaracterized what the document reflects.

BY MR. MAZZOLA:

Q. In this case, do you know how the overpayments happened?

A. Yes.
Q. How did they happen?
A. The payments exceeded the invoices.
Q. On your -- page 5 of your report, background and information from counsel. Did you read any of the complaints in this case?
A. I did.
Q. Are they identified on your document description?
It's the first one. The third amended complaint. So that's the one you read?
A. I believe I also read the second amended complaint.
Q. Regarding the reconciliation. Regarding the CTX recon, what did you do to review the CTX recon? Can you talk me through the process? Let me put that up.
A. Let me know when you're ready.
MR. ROSENTHAL: This is 154?
MR. MAZZOLA: 154.
BY MR. MAZZOLA:
Q. There's a number of summaries. Do you see that?
A. You lost the screen, unfortunately.
(Pause in proceedings.)

MR. ROSENTHAL: Do you want to go off the record for a second so we can figure that out?

(Pause in proceedings.)

MR. MAZZOLA: Want to take a break now?

MR. ROSENTHAL: Jessica said we don't have food yet. She's texted Juan to help with this.

MR. MAZZOLA: Let's keep moving.

MR. ROSENTHAL: He's here now. Why don't you wait -- can we go off the record?

(Pause in proceedings.)

BY MR. MAZZOLA:

Q. Mr. Parisi, this is the document we were asking you to look at. This is the CTX recon?

A. Correct.

MR. MAZZOLA: 153.

MR. LERNER: 154.

BY MR. MAZZOLA:

Q. 154. So let's look at this. There's a column C. Do you see that?

A. I do see column C.

Q. There is a column B that says "Total

Invoices."

So what did you do to confirm -- let's look at column B, Total Invoices.

I don't want to click on them. They seem to be clickable. What happens if I click?

A. I don't know.

Q. Okay. It pulls to the invoice summary. Do you see that?

A. The -- it's a year summary.

Q. Okay.

A. For the year.

Q. Let's -- so, I guess, it just did. It went to summary for 2016. And there are invoice totals, debit memo totals.

What did you do to confirm that for October, column A, payment detail date, January 2016, that the invoice total was $581,764.68? Did you pull those invoices and review them?

A. We did review some of the invoices. Yes.

Q. Did you pull all of them?

A. No.

Q. You made a judgmental determination to pull some invoices?

A. We reviewed some invoices. Yes.

Q. And the invoices that you pulled would have

been provided in the documents utilized by you. Right?

A. Correct.

Q. Same thing for the debit memo total. And I'm looking at the summary for 2016 on that same exhibit.

A. Um-hmm.

Q. Let's look at this one that's row 6, January. And it has a debit memo total of $155,924. Do you see that?

A. I see that number.

Q. Did you pull the debit memos to review them -- all of them that add up to $154,500?

A. We only sampled the debit memos in excess of $10,000, which were 11 in number, I believe.

Q. There were 11 debit memos that you reviewed.

How many debit memos were there in total?

A. I don't know off the top of my head. Not a number in millions, though.

Q. So what did you do with respect to -- I moved the cursor down to line 8, and I have it floating over a debit memo total of $273,399.80. Do you see that?

A. I see that number.
Q. What did you do to confirm that that number was accurate?
A. So we compiled the debit memos, and then we sampled the debit memos in excess of $10,000.
Q. You looked at 11 debit memos.
A. Correct.
Q. Those 11 debit memos that you looked at, did those 11 debit memos add up to the $273,399.80 that I'm looking at on the screen right now?
A. I don't know.
Q. You only looked at 11 debit memos.
MR. ROSENTHAL: Object to the form.
BY MR. MAZZOLA:
Q. So my question is, what did you do for purposes of your analysis to confirm that the debit memos around about the time of March 2016 all added up to $273 -- $273,399.80?
What did you do?
MR. ROSENTHAL: Object to the form.
A. So this is a summary. This summary -- why don't you look on the screen for a second.
\\\

BY MR. MAZZOLA:
Q. I'm looking at it.
A. Oh. Sorry.
So you see it says "Sum" in left paren, March 2016 D32 to D38? So that cell specifically is reference -- what I'll call the supporting payment detail sheet. And so if you go look to those specific cells, 32 to 38 on the March 2016 tab, it will sum to that amount.
So what I did is, I compiled all the remaining --
Q. Where am I supposed to go to? To March what?
A. 2016.
Q. Okay.
A. So you can just pick any one.
Q. No. I know how this works.
(Pause in proceedings.)
MR. ROSENTHAL: So we're now looking at the March 2016 tab, for the record.
MR. MAZZOLA: Yes.
BY MR. MAZZOLA:
Q. So this debit memo was identified there. Right?

A. Correct.

If you total -- do you see where it's in red from rows 32 to 38? That sum would equate to the amount you saw on the balance -- where the summary is.

So you can see that there's two debit memos in excess of $10,000 here, so we would have reviewed what I'll call 99 percent of this debit amount that --

Q. So I see -- I see two of them that add up to -- they add to 273. Do you see that?

A. I do see your total.

Q. So you would have looked at this one, this delamination one? That's $154,000?

A. Correct.

Q. And you would have looked at this one for $117,000?

A. Correct.

Q. Would you have looked at the other ones?

A. No.

We looked at them in the sense we compiled the data on these payment details, but we didn't do any further analysis.

If you hold "control" and click that button, it will take you all the way to the left --

to the first tab, rather.

Q. There we go. Which we were looking at before. Right?

This summary?

A. You picked one of the years. I think you picked 2016, specifically.

Q. We'll pick it again.

If you look at --

A. So -- and I also -- go ahead.

Q. So if we look at this column, line 7, the $54,000, you would have done the same analysis there.

A. So that --

Q. If you click on that --

A. Yeah. It also equates to the detail.

Q. It doesn't seem to jump.

I'm looking at line 10, cell -- line 10 at D. Do you see that? If I click that and that that will jump?

A. I don't know technology. Doesn't always work, so I can't give you an answer.

Q. But it's your testimony, then, that unless the debit memo was greater than $10,000, you did not review it.

A. Correct.

Q. And when you reviewed the debit memo, what did you do, other than look at it?

A. We looked at the debit memo and made sure that the amount agreed -- or we traced the amount from the ledger to the details to make sure it equated. And then we also made sure that the debit memo was sent to the other side.

Q. Did you review any responses from Benlida regarding those debit memos --

A. Yes.

Q. -- disputing them?

You did?

A. Well, specifically, the first Benlida reconciliation and the second Benlida reconciliation do dispute the debit memos.

Q. But you said you looked at emails transmitting them.

A. We -- I saw the physical debit memos that reflected they were sent.

Q. You saw that.

A. Yes.

Q. And did you do anything to verify the veracity of the amount identified in the debit memo?

A. Yes.

Q. And what did you do?

A. So we compiled the three data sources. And so that three-way match, you know, tells the story of the approximation of the debit memo balance.

Q. Did you compare a -- the debit memos to responses that were written back from Benlida? Emails, other communications.

A. So I just want to be clear. As it relates to the analysis through July 2019, the primary sources are the CTX recon, the two Benlida responses, and the meeting minutes.

Q. And that's it.

A. For the data compilation. Correct.

Q. Let's look at --

A. And I'd just like to add a clarification point.

Q. Okay.

A. Do you see how there's payments in column H?

Q. Yep.

A. These payments may not always equate to the payments supported in the schedule, so we aggrated all of the payments to make sure we had the whole universe of transactions.

Q. But you didn't change any of the numbers in these spreadsheets.

A. Strictly compilation.

And then the adjustments that we do make to some of the payments are identified in our report, for example.

Q. For example, what?

A. What I just said.

Q. Oh. There is an adjustment you made.

A. Yeah. We do make adjustments to the payments in our report.

Q. You're talking about these transactions. I think you said that word.

And in Footnote Number 10, you refer to individual invoices, payments, and debit memos. Now, we know that you reviewed -- I think you said 11 debit memos?

A. Correct.

Q. So other than those 11 debit memos that you reviewed, you're just relying upon the numbers that were provided to you. Is that correct?

A. The numbers within the CTX spreadsheet and the two Benlida responses. Correct.

Q. Those are the numbers you're relying on.

Why do you keep saying "the Benlida responses"?

A. Because they're a component of the

equation.

Q. Does the Benlida response confirm that the debit memo is accurate?

A. So my view is, there -- it's a reconciliation between the parties. And it appears to be a good-faith reconciliation.

I've been involved in some transactions where there's an earn-out and the buyer only wants to get -- wants to recognize the adjustments that decrease the amount that they're going to have to pay out. But in this instance, Benlida is actually saying, you know, Circuitronix, LLC, here's a few payments that we forgot that reduce the balance.

So there's adjustments, you know, both ways to the parties to really try to come to what the balance is as of that point in time.

Q. So I think you just said it was a good-faith reconciliation between Benlida and CTX. Is that right?

A. And I just want to be clear. It's up to that point in time.

But after July 2019, then the transactions moved into a prepayment plan. So we only reconciled through July 2019.

Q. But at that point, it was a good-faith reconciliation. Is that what you're saying?

A. Correct. Subject to some adjustments. But, yes.

(Telephonic interruption.)

BY MR. MAZZOLA:

Q. So the reconciliation -- you said it was a good-faith reconciliation between Benlida and CTX. You did say that. Right?

A. (No audible response.)

Q. But that reconciliation between CTX and Benlida only related to transactions between CTX U.S. and Benlida. Isn't that correct?

A. There were other spreadsheets of the transact -- in the initial transmittal email.

That email contains two spreadsheets. The first spreadsheet is between Circuitronix, LLC, and Benlida, and it contains what we've seen. And then the second spreadsheet is between Circuitronix, LLC, and ROK, and contains similar structured data to we saw in Circuitronix, LLC, and Benlida.

Q. But you did not review any reconciliations between CTX Hong Kong and Benlida. Isn't that correct?

MR. ROSENTHAL: Object to the

form.

A. Other than identified in the footnote.

BY MR. MAZZOLA:

Q. Did you ever see a spreadsheet from Benlida to CTX advising that Benlida believed that CTX Hong Kong owed them $13 million?

Did you ever see that spreadsheet?

A. Yes.

Q. But you didn't address that in this report.

A. I did not address that spreadsheet in Circuitronix's counterclaim report.

Q. Not in this report.

A. Correct.

Q. Did anyone tell you not to do that?

A. Not that I recall.

Q. Did you ever reach out to Mr. Rosenthal or Mr. Cole and say, Hey, there's this $13 million claim by Benlida owed by CTX Hong Kong, perhaps we should address that in this report?

Did you ever do that?

MR. ROSENTHAL: I'm going to instruct him not to answer that question.

Communication with counsel and experts in federal court are privileged.

Unless you disagree, I don't

think it's a proper question.

MR. MAZZOLA: No. No, no.

BY MR. MAZZOLA:

Q. Did you ever think that -- did you ever think that you should do that?

A. I did not.

Q. What about Mr. Mukamal? Did you and him ever discuss whether you should address Benlida's claim that the Hong Kong entity owed it $13 million?

A. Yes. We discussed it.

Q. And what did you and he discuss?

A. That we would -- that we would potentially consider any of the issues raised in a rebuttal report.

But we did not receive an affirmative report from the plaintiffs that would explain the basis of including other parties not named in the lawsuit in the claims.

Q. And that's the related-party issue. Is that what you mean?

A. So the counterclaim is between Circuitronix, LLC, and Benlida. I don't believe there's other parties named.

Q. A beg your pardon. I was being interrupted.

MR. MAZZOLA: Would you read back the answer, Rebecca?

(The following record was read:

A. "So the counterclaim is between Circuitronix, LLC, and Benlida. I don't believe there's other parties named.")

BY MR. MAZZOLA:

Q. Why would you think that Benlida's claim of the $13 million owed by the Hong Kong entity would not be subject to your expert report?

A. Because I'm the expert for the defendants and not the plaintiffs.

Q. But why would you not address it?

If Benlida is claiming that the Hong Kong entity owes it $13 million, why did you not think that would be relevant to address?

A. I don't believe that's included in Circuitronix, LLC's, counterclaim. That's your case. Right?

Q. But then we talked earlier about the related parties. Did you -- do you see that the Hong Kong -- do you agree that the Hong Kong entity is a related party to the U.S. entity from an accounting perspective?

MR. ROSENTHAL: Object to the form.
A. I haven't done a related-party analysis to make that determination. There's common transactions between the two parties. Sure.
BY MR. MAZZOLA:
Q. Okay. So what are the factors you considered? Common control is one of them. We talked about that. Right?
A. We did.
Q. You considered common ownership. That's another factor you consider. Is that correct?
MR. ROSENTHAL: Object to form.
A. You could.
BY MR. MAZZOLA:
Q. And you consider -- what about common interest? Is that something you could consider?
MR. ROSENTHAL: Object to the form.
A. You could.
I haven't really thought out the nuances of related-party analysis in detail to sit here and comment about it thoroughly.
BY MR. MAZZOLA:
Q. But as it is, you never looked at it.

Isn't that correct?
A. What is "it"?
Q. This issue about related parties.
You never reported on it; you never did the analysis.
A. We did not do -- perform a related-party analysis.
Q. And that's because you thought it wasn't relevant.
A. I've looked at the counterclaim. The counterclaim is between Circuitronix, LLC, and Benlida. I did not include any other parties.
Q. Did you ever see this document? It's a document that we've identified as Exhibit 40.
A. We previously did this.
Q. Yeah. And --
A. And I told you -- I told you I hadn't seen it, because that was the blue document.
Q. Oh. You've never seen this document. Okay.
A. I can pull it up, though, if you want me to look at it.
Q. Yeah.
(Pause in proceedings.)
\\\

BY MR. MAZZOLA:

Q. Since you haven't seen it, it's not going to be fair for me to take your time, or anyone else's time, to go through the whole thing, and I won't do that.

But if you go to the -- I guess it's the last page of it. At the bottom, you'll see CTX 8004.

MR. LERNER: That's the Bates stamp number.

MR. MAZZOLA: He's on the last page. The signature page.

BY MR. MAZZOLA:

Q. Do you see that?

A. I do.

Q. And do you see that there's -- while there's no signature there, I don't think anyone has claimed or alleged that Rishi Kukreja did not draft this letter and that Rishi Kukreja -- that there may or may not be a signed version of it going around, but that's not really the issue for right now.

But do you see that Rishi Kukreja's signature block there says that he's signing for CTX USA and CTX Hong Kong?

MR. ROSENTHAL: Object to the

form.

A. I see those words.

BY MR. MAZZOLA:

Q. Do you see those words?

If were you aware that Rishi was entering into agreements on behalf -- hypothetically speaking -- on behalf of CTX U.S. and CTX Hong Kong, would that have any bearing, in your mind, regarding this question of related parties?

A. I don't know.

Q. Because you mentioned earlier when I was asking you -- I think before one of the breaks about related parties, you were quick to point to the manufacturing agreement. And you made reference in the manufacturing agreement that it was just signed on behalf of the LLC, the U.S. operation. I don't know if you recall that answer.

But I'm asking you now, if you knew -- hypothetically speaking, if Mr. Kukreja was signing contracts on behalf of both U.S. and Hong Kong, if that, in your professional judgment, has any bearing as to whether or not the U.S. entity and the Hong Kong entity are related parties.

A. I apologize. I don't remember saying -- pointing to the manufacturing agreement as support

that Circuitronix, LLC, was a separate company from Circuitronix Hong Kong.

I recall I said the names were different, which identified that they were separate entities.

Q. My question now is, you're seeing a contract -- hypothetically speaking, a contract that is signed by Mr. Kukreja on behalf of the U.S. entity and the Hong Kong entity. You're seeing it now.

As an accountant -- forensic accountant who understands issues regarding related parties, does this have any bearing in your mind, as you sit here today, as to whether or not the U.S. operation and the Hong Kong operation are related parties? Yes or no.

A. I don't believe so. I'd have to think about it more.

Q. Okay.

A. I haven't read this whole agreement, you know, sitting here.

Q. We'll come back to it.

What if you -- what if you saw the U.S. entity -- hypothetically speaking, if you saw the U.S. entity, CTX U.S., here in United States paying

the debts and obligations of CTX Hong Kong? Would that have any bearing, in your mind as an accountant, as to whether or not the U.S. entity and the Hong Kong entity are related parties?

A. I haven't performed a related-party analysis to consider all the facts and circumstances that could affect this issue. My report was focused on Circuitronix, LLC's, counterclaim.

Q. I know you didn't do that, so I'm just asking what's called a hypothetical question.

The question -- the questions that I asked you about this Exhibit 40, the agreements signed by Mr. Kukreja on behalf of the U.S. entity and the Hong Kong entity, that was a hypothetical question.

Now I'm asking you another one. And this question is, if you saw proof that showed that CTX U.S. was paying the debts and obligations of CTX HK, just hypothetically speaking, would that be something, in your professional mind, that would have any bearing as to whether or not the U.S. entity and the Hong Kong entity are related parties?

A. You keep saying "related parties." They -- there could be some, you know, common management, but they're separate companies.

All the transactions are tracked separately. CTX U.S. sent a reconciliation between itself and Benlida, itself and ROK. And Circuitronix Hong Kong similarly responded with its -- or Benlida responded on the third email with its transactions between Benlida and Circuitronix Hong Kong. So even if there's some, you know, common management, the transactions are tracked separately.

Q. So from an accounting perspective, professionally speaking, is it common and good practice to ignore related-party transactions?

A. I don't understand your question.

Q. It's just a question.

If you -- is it common and good practice to not address related-party transactions when they're -- when they're -- when the information's available to you?

A. It depends on the facts and circumstances.

Q. So in this case over here, where Benlida is claiming that the Hong Kong entity owes it $13 million, is that something that you think is worth reviewing?

A. So I was retained for the counterclaim.

The amount that Benlida would be due

from Circuitronix Hong Kong would have been something for the plaintiff to publish in an affirmative report.

Q. Okay. I don't -- I'm asking you about related parties, and I'm trying to understand if you think it's prudent accounting practice to review related-party transactions when you're looking at an entire picture.

A. It depends on the facts and circumstances.

Q. Okay. And it sounds to me, from what I'm hearing, is that you only looked at part of the picture. Is that correct?

A. So, again, I analyzed the picture as it relates to Circuitronix, LLC's, counterclaim against Benlida.

Q. So you only looked at part of the picture that relates to transactions between the U.S. entity and Benlida. Is that correct?

A. Correct. As identified in the counterclaim.

Q. Is the engagement letter that was -- that you signed on behalf of -- you know, your services. Was that limited solely to this CTX U.S. counterclaim?

A. The engagement letter, I don't believe, is

that nuanced. They're more general.

Q. So then at some point, some instruction was given to you to only address the counterclaim. Is that correct?

A. That's not correct.

Q. Did you make the decision to only address the counterclaim?

A. Well, again, I testified on this issue a few times. But we were retained for the counterclaim.

And then Footnote 4 states that we assembled some data for use in a rebuttal, but we didn't get an a affirmative report by the plaintiff to rebut.

Q. Okay. Why do you need a report?

You know what the allegations are in the complaint. Right?

A. In which complaint?

Q. You read the third amended complaint. Right?

A. The plaintiff's complaint.

Q. Yes.

A. Okay.

Q. You did read it. Right?

A. I did.

Q. And you do know, then, in the third amended complaint drafted by the plaintiffs, there are allegations that the Hong Kong entity owes it $13 million. You must know that.

A. I don't know if that's how the number shakes out precisely. There's invoices included. I don't know if all those invoices necessarily equate to the 13.5, but I do know that Benlida claims it's owed money from Circuitronix Hong Kong.

Q. And the fact of the matter is that when you did your analysis, you looked solely at transactions between the U.S. entity and Benlida. Only.

MR. ROSENTHAL: Object to the form.

BY MR. MAZZOLA:

Q. For purposes of this report. Is that correct?

MR. ROSENTHAL: Object to the form.

A. As identified in the counterclaim, we identified the transactions between Circuitronix, LLC, and Benlida.

BY MR. MAZZOLA:

Q. Are you aware that the plaintiffs in this case have alleged that the CTX invoices are owed by

the U.S. entity?

MR. ROSENTHAL: Object to the form.

A. Well, the complaint's against -- it's Benlida v. Circuitronix, LLC. So, yes.

BY MR. MAZZOLA:

Q. Okay. So that makes sense -- right? -- that that would be the case.

A. "That makes sense. Right?"

I don't understand your question.

Q. Well, my question was, are you aware that the plaintiffs are alleging that those CTX Hong Kong invoices are owed by the -- by CTX U.S. Do you know that to be the case?

A. From the complaint. Yes.

But they didn't put it in an affirmative report where I would understand the basis for which CTX, LLC, would be responsible for the debts of another company.

Q. But you as an accounting professional, because you reviewed the complaint. When you reviewed the complaint, you understood that Benlida was alleging that the -- the CTX Hong Kong invoices are owed by CTX U.S.S. That's correct. Right?

A. The CTX Hong Kong invoices appear in

Benlida's complaint.

Q. And that the allegation by Benlida is that those invoices are owed by the U.S. operation. Is that correct as you understood the complaint?

A. That's Benlida's allegation.

Q. And is it correct as you understood the complaint?

A. That's Benlida's allegation.

Q. Okay. The question is, is it correct?

A. Is "what" correct? You say saying "its," and --

Q. Is their allegation that you under -- not the ultimate question.

But is it your understanding, from reading the complaint, that Benlida is alleging that CTX Hong Kong's invoices are owed by CTX U.S.

A. I don't know if they artfully say it that well.

But the Circuitronix Hong Kong invoices are included in the complaint between Benlida and Circuitronix, LLC.

MR. MAZZOLA: Do you want to break now?

MR. ROSENTHAL: Sure.

(Off record: 12:52 p.m. to 1:36 p.m.)

BY MR. MAZZOLA:
Q. So still looking at your report. We'll look at page 16, Mr. Parisi.
A. Okay. Give me one second to --
Q. I beg your pardon. 6.
A. Page 6.
Q. Page 6.
A. Okay.
Q. At paragraph 15, you talk about you looked at CT recon and the Benlida recon and from that you compiled a database.
Where is that detailed database?
MR. MAZZOLA: Is that something that was shared with us that contained ...
MR. ROSENTHAL: That's not something that we produced.
MR. MAZZOLA: Okay.
A. The answer to your question, though, is the source files are contained within the first three. The Rishi transmittal email, the response from Benlida, the follow-up from Benlida, sprinkle in a little meeting minutes for the adjustment, and that's the cake.
BY MR. MAZZOLA:
Q. And this is -- and that results in page --

on page 7 of Table 1?

A. Correct.

Q. And there's a difference. You come up -- what is this difference?

Can you explain to me what this means, that the CT -- and I'm going to talk a little bit.

The CTX recon says 5.3 million. Then Benlida comes back and says, No, it's 4.07 million. And the difference is 1.242. That's just straight math. Right?

A. Precisely.

Q. And when you look at payments, you have a difference, again, that's just straight math. Correct?

A. Correct.

Q. On the invoices, again, it's -- there's a difference of $662,918. That's straight math. Right?

A. Correct.

Q. And on the debit memos, that's straight math as well?

A. Correct.

Q. The total amount of debit memos is somewhere on the order of 2.7 to 2.2 million. Right?

A. For Circuitronix, LLC, yes.

Q. The U.S. operation.

And did you -- again, you did judgmentally select 11 debit memos to review.

A. Correct. In excess of $10,000.

Q. But only the 11.

A. Correct.

As they contain, you know, the material amount of the debit memos.

Q. How did you determine whether the debit memos were properly created?

Did you go back to the contract? Did you go back to emails?

Did you go back to something to find out what the basis for the debit memos were?

A. So the basis for the debit memos is the monthly transmittal emails included in the CTX recon. And then Benlida comes back; they have their adjustments, and we reconciled those as identified in Table 1. And then we sampled the debit memos, as I previously discussed.

Q. Why -- do you accept Benlida's number of the 4.072?

A. Do I accept their number ...

Q. At some point, you go through all of this,

and you come up the with a final number.

A. Correct.

Q. Do you accept Benlida's number, or do you accept CTX's number for your final calculations?

A. Neither.

Q. Neither.

And what number do you choose? Say, for example, on this Table 1 summary.

Do you split the difference? Did you do something else?

A. My report speaks for itself.

Q. Okay. So tell me what you do.

So that's what we're looking at -- can you explain to me what you did here?

A. Sure. Which part would you like to discuss?

Q. Well, I can go to the back, on page 14. Page 14 is where you do a final summary of the payables reconciliation between CTX and Benlida. Correct?

A. Correct.

Q. And here, you come up with the reconciliation, per CTX's $4.76 million. Right?

A. Correct.

Q. And that's a different number from CTX's on

page 7.

A. Correct.

Q. And so we'll just have to go through and discuss with how you come up with that number. Right?

A. There's a table that identifies the changes. And this summary table references the previous table that explains why the numbers are different.

Q. The table that summarizes the changes, can you tell me where that is?

A. Sure.

So we have to be very clear when we talk about these components, because it's easy to talk general. But there's three real pieces of the pie: Payments, invoices, and debit memos.

The payments are largely -- you know, it's amazing how close they are. There's a $92,000 difference on $67 million.

The second component is the invoices. The difference between the two is $662,000.

And there's also the debit memos, which we've previously discussed.

Q. So let's talk about payments, because you do address the payments --

A. Sure.
Q. -- on page 7.
And that's where you reference that $92,338 difference. Do you see that?
A. I do. That's further elaborated in Table 2.
Q. And here, that -- it says, "Our analysis reveals that the payment difference is attributable to payments made by CTX, which were not listed in the CTX recon."
And my question there is, how or why would a payment be made by CTX, which was not listed on their recon -- on their CTX recon?
A. It wasn't listed on the recon.
Q. Well, what you're saying is, there was a payment made by CTX that they never noted on their reconciliation. How did that happen?
A. It wasn't noted on the reconciliation.
Q. But how would that happen?
A. I don't -- I don't know how it didn't happen.
Q. Is that a sign of sloppy accounting? Sloppy bookkeeping?
MR. ROSENTHAL: Object to the form.

A. It's a sign that their bookkeeping isn't perfect.

But the transactions are largely in synch. And you have to remember the volume of data, too. There's a significant amount of volume being transmitted. You know, there's $65 million of invoices, and even more than that in payments. So the quantity is extreme.

And you can understand that when the parties are shipping, you know, there was disputes sometimes about the price, and then also the quantity originally ordered versus invoiced, for example. And those two differences would create some of the invoice differences.

BY MR. MAZZOLA:

Q. So, in your mind, that $92,000 delta is not a big number.

A. It's all relative.

You know, $92,000 would be a lot of money for me to pay personally. But in the grand scheme of how close these numbers are, it's certainly within a reasonable degree of certainty.

Q. On Table 2, when you write "concurring payments," can you explain to me what that meant?

A. Sure. So the way the reconciliation works

is, let's say there was a $100 payment on the CTX recon. And then Benlida comes back and says, No, that payment was $80. Well, clearly, that payment is nonconcurring.

But to the extent the payment wasn't objected to by Benlida, as it relates to the Circuitronix original transmittal, then those payments, for purposes of this analysis, are reflected as concurring payments.

Q. So if they both have it, it goes in as a concurring payment. Concurring payment and -- is that what you're saying?

A. No. That's not what I'm saying.

Q. What are you saying, then?

A. So we have it on the Circuitronix recon --

Q. Yep.

A. -- and they don't object to it in the Benlida response, then that would be a concurring payment.

Q. A concurring payment. Okay.

A. So think about an invoice. If it was in the original Circuitronix email, but Benlida doesn't have a comment on it, we've treated that as a, you know, concurring invoice.

It's only where the difference is that

we really have to focus on for purposes of reconciling the balance between the two parties.

Q. On the second line, you have a -- CTX payments claimed in the CTX recon, but not in the Benlida records. That's the $2.229 million. Do you see that?

A. I do.

Q. What are those?

A. Exactly what the label says.

Q. So CTX is showing they paid them; Benlida is showing that it's not paid, or not received or doesn't exist.

A. Correct.

Q. And then the 2.47 is on the other side.

A. Correct. And that was in Benlida's second response email.

And I view this as -- it's really interesting. What Benlida is really saying, Circuitronix, you forgot about these payments, to really reconcile what the balance between the two parties is.

Q. So they were honest with each other.

A. They're trying to reconcile the balance.

Q. But it seems that they're being pretty honest with each other, and they're pretty close on

the numbers. Right?

A. Those numbers are very close, considering the volume of transactions. It's like you said, $92,000 is a lot of money. But in the grand scheme of $67 million in seven-years-plus of transactions is relatively close.

Q. So I'm looking through all these numbers. Is it fair to say, in your opinion, that the Benlida people are honest with their numbers?

A. The Benlida people are honest with their numbers ...

I mean, they're trying to reconcile the balance. Honestly is really outside the scope of my report.

Q. Okay. But they're coming pretty close to what your client's saying. Right?

A. Relatively.

Q. And if two people are kind of close to the numbers, does that give you an indication of reliability?

A. It depends on the facts and circumstances and who's preparing the analysis.

Q. When you looked at the Benlida reconciliation, did you see anything that looked untoward?

A. I mean, to me, it's just data. I don't ascribe, you know, emotions like that or judgments to data. It's just data.

Q. Well, in looking at that data from Benlida and comparing to the data of your client, can you provide any judgments to the honesty and credibility of the Benlida's data?

MR. ROSENTHAL: Object to the form.

A. I don't view data as honesty. It's just data, subject to further examination.

BY MR. MAZZOLA:

Q. Looking at the data that was produced by Benlida in comparison to the data that was produced by CTX, you did find that the two -- that both sets of data were reasonably close to each other.

A. In certain parts. Yes.

Q. And if -- your client's data is reliable. Right?

A. It was the basis of our analysis. But we made adjustments to our client's data, as indicated in the report.

Q. But I assume you operated under the assumption that your client's giving you reliable data.

A. Well, the -- first, we received the data. And then we need to understand the data and the context. But we -- we -- I don't want to say we assumed the client's data was correct.

It's definitely the basis, but we make adjustments from the there. So we don't view as 100 percent correct, but it is a starting point.

Q. Well, after looking at it, you spent a lot of time with it. Do you have any reason to believe that the data that was provided to you by CTX was unreliable?

A. I believe the data is reliable as I sit here, as identified in the report.

Q. And you spent a lot of time looking at the data that was provided by Benlida too. Is that correct?

A. We spent time looking at the Benlida data. Yes.

Q. And if the Benlida data and the CTX data are pretty close to each other, because you did say that earlier, can you also agree that the Benlida data is as reliable as CTX's data?

A. It's just data. So I don't view it as one data is better than the other, it's just --

\\\

BY MR. MAZZOLA:
Q. I'm not saying one's better.
A. Well, you -- okay.
What was your question, then, specifically?
Q. We talked earlier a few seconds ago, and I think you did ultimately agree that, at the end of the day, after looking at all the CTX data, that you found it to be reliable, for the most part.
A. Well, just to be clear, I said the CTX data was relatively close to what Benlida the data said. Now you're kind of having the Circuitronix data stand on itself.
Q. Well, they're both close to each other.
A. Well, one's a derivative of the other, which identifies changes.
Q. They're numbers. And the numbers are close to each other. One person says "X," another person says "Y," and those two numbers are pretty darn close to each other. Is that fair?
A. Which numbers specifically?
Q. Well, let's go back to this Table 1. Right? Regarding the payments.
At paragraph 16, you wrote that there is concurrence between the parties as to over

99 percent of these payments leaving only a difference of $9,203,867. Right?

A. I see those words.

Q. Okay. And you wrote that.

A. In conjunction with preparing the report. Yes.

Q. And so my question to you is, if Benlida and CTX, regarding their recon, are so close on the payment question, does that give you a sense that the numbers are reliable as and between each other?

A. The payments is only one portion, so you have to look at everything.

If the payments were close and the invoices -- or the debit memos were way different, then, you know, that would present an issue. So I can't look at one little piece to say everything's great. You have to take it in totality.

Q. Okay. So payments are really close. You said that. Right?

A. Correct.

Q. The invoices, are those close in your mind?

A. They're less close. They're more divergent than the payments.

Q. But not by much, though.

A. Approximately. That's fair to say. In the

grand scheme of the transactions.

Q. Yeah. And the debit memos. Even the debit memos, in the grand scheme of transactions, are those close?

A. Approximately.

Q. So what I'm trying to understand is that if your client's numbers are reliable -- can you say that?

Are you willing to say that?

A. We had to adjust the data, so I don't want to just sit here -- some of the data is reliable, but I don't want to say it's perfect, because we did have to make adjustments as identified in my report.

Q. I didn't say "perfect."

A. Okay.

Q. Just reliable for purposes of your testimony. Are they reliable numbers as an accountant?

In your professional discretion and your professional experience, are these numbers, over the course of many years of $67 million, are the numbers relatively reliable? Would you give me that much?

A. It's a starting point for an analysis.

Q. Is it a relatively reliable starting point

for an analysis?

There's nothing wrong with saying your client's numbers are reliable.

A. It's not that I'm trying -- it's just the starting point. You're trying to -- I'm not -- it's just data.

Q. What I'm trying to data get at is, if CTX's numbers are reliable, are Benlida's numbers reliable?

A. And that's why I -- that's why I keep telling you, it's a starting point. Right? You're trying to say if I don't know -- I don't want to assume what you're saying, but to me, you're saying Circuitronix's data is reliable; therefore Benlida's data is reliable. And I keep trying to explain the process that this is a starting point, and then we, you know, kick the tires, et cetera.

Q. So as a starting point, after everything you've done throughout the whole process. You've done all this. We're only on Table 1. We're going to get to Tables 6, 7, 8, whatever the tables are.

At a starting point, were these numbers within the relative realm, universe, of reliability?

A. They're just numbers. These are just the starting numbers provided on a spreadsheet.

Q. Let's go to the next one, then. Table 2. Now, there, you do all your adjustments, and you come down, and you have a $12,000 difference. Do you see that?

A. I do.

Q. Now, these adjustments and the numbers -- again, your sources are what? CTX's numbers and Benlida's numbers. Right?

A. Correct.

Q. Now, as you get to this "Totals As Per Recon As Adjusted," would you consider CTX's number that you have there reliable?

A. Well, I just wanted to be clear. This 67,728,456, that's really CTX's initial compilation. And then we make the adjustments based on some of the Benlida feedback as well.

Q. The payments before, you just said, were 99 percent concurrent.

A. Correct.

Q. Okay.

A. And we see that on line 1 -- or on the line here.

Q. All right. You also wrote that your invoices were almost 99 percent concurrent between Benlida and CTX. That's at paragraph 19. Do you

see that?
A. Um-hmm -- correct.
Q. So now you've just written in your report that the payments were 99 percent concurrent, and the invoices were 99 percent concurrent at jump. At starting point. Right?
A. Um-hmm.
Q. So my question now is -- same question.
If the -- does that give you any indication that the numbers between CTX and Benlida -- well, let's start off with CTX -- that CTX's numbers were reliable?
A. It's a reliable foundation to begin the analysis.
Q. Okay. So CTX's numbers are a reliable foundation to begin the analysis. It would also be that Benlida's numbers are a reliable foundation to begin the analysis. Isn't that correct?
A. It could be. It's definitely a beginning point. Absolutely.
Step 1: Obtain the data. Step 2: Analyze the data.
Q. But what I'm saying to you is -- what I'm suggesting is, that if you looked at this and your concurrences were not 99 percent or they were

62 percent, would that indicate to you that there was something major or something was -- a major disconnect here?

A. If one payment totaled 100 and the other totaled 62, there would be a disconnect. And then we'd have to research to understand why and who's correct.

Q. And if one set of invoices was 100 and another set of invoices were 62, that would also be evidence of a major disconnect between CTX and Benlida. Right?

A. Yes and no.

Q. Okay. What's the "no"?

A. So we're talking about $67 million of invoices. If one invoice said 100 and another one said 102, I would not use the words "major disconnect" as you just --

Q. I said 100 and 60 -- 100 and 62.

A. Okay. One invoice is 100, and the other one's 62. That's a $38 difference. I wouldn't describe that as major.

Q. I meant the totals.

A. Okay. If one totals 100 and the other totals 62, I wouldn't consider $38 big difference.

Q. When you talked over here about payments,

there's a 99 percent concurrence between both of them.

A. Okay.

Q. And you agree that when there's a 99 percent concurrence between two sets of numbers, then it becomes a reasonable basis to begin an analysis. Right?

A. Correct.

Q. That's on the payments. Having -- that's on the payments.

When we get to the invoices, you also write that have you have a 99 percent concurrence between CTX's invoice numbers and Benlida's invoice numbers. Is that correct?

A. Correct.

Q. When you have a 99 percent concurrence between one set of invoices and another set of invoices, does that lead you to believe, in your professional opinion, that that, too, is a reasonable basis -- reasonable foundation to begin the analysis at?

A. Well, now we're passed the foundation. Right? The foundation is the data, but now you're talking about the comparison. Right? So now we're into the results. Because you have to think

methodology.

Step 1: Get the data. Step 2: Compile the data. And step 3: Analyze the data to make that determination.

Q. We're not at step 2 yet. I'm --

A. You already -- you were, because you said "analyze."

Q. I'm looking at the data that you have. And you've told me, at least on two points on the data, payments and invoices, that there's a 99 percent concurrence between CTX and Benlida. Is that correct?

A. Yes.

But that's after I analyzed it, but you said we're at step 1 where I just got the data, so I'm confused by your question.

Q. Okay. So after you've analyzed it, you're at 99 percent concurrence.

A. Is that a question?

Q. Yes.

So if you're at 99 percent concurrence after your analysis, after you've looked at it carefully, does that then tell you that the numbers you're getting from CTX -- from Benlida and CTX are both reasonable and both reliable?

A. It makes me feel that the analysis is within a reasonable degree of certainty. Yes. The occurrence of the amounts.
Q. Okay. So occurrence tells you that they're both sort of coming up with the same number.
A. Generally, yes.
Q. And you're not seeing anything out of whack after doing your analysis. Right?
A. What do you mean by "anything"?
Q. Well, you're not seeing that CTX says $100 is owed or $100 million is owed, and Benlida is coming back and saying $200 million or $50 million. There's no major disparity between the two sets of numbers after analysis between Benlida and CTX. Isn't that correct?
A. Yes. We went through the disparities and discussed them ad nauseam.
Q. So does that lead you to believe, then, that the numbers that you got from Benlida are reasonable and reliable numbers after your analysis?
A. So the numbers from Benlida that adjusted Circuitronix, LLC's, counterclaim were reasonably close.
Q. Okay. So Benlida gave you numbers that were reasonably close to what CTX had.

A. On a net basis, the adjustments between Circuitronix and Benlida are reasonably close.

Q. So let's go to the analysis of invoice discrepancies, page 9. This talks about -- at paragraph 20.

At paragraph 20, you talk about CTX's adjustments to Benlida invoices. What did that -- what did you mean by that?

A. So, for example, Benlida's the supplier in this matter. Benlida would send an invoice. And let's just say that invoice is for 100 quantity with a dollar price. That is Benlida's invoice.

Well, what happens, for example, if, instead, of $1 per unit, the quantity per the purchase order was 99 cents. And in that case, we'd have to make an adjustment to the invoice.

And similarly, if 100 quantity was ordered but only 99 arrived, and when the invoice was received by Circuitronix, LLC, for 100, then you'd need to adjust that. And that adjustment would happen with a debit memo. Or if it wasn't resolved, then you would be left with some invoice differences identified in this analysis.

Q. How did you verify CTX's adjustments to Benlida's invoices?

A. So the basis of our analysis was the CTX numbers.

Q. So if CTX told you that Benlida short-shipped or had the unit price wrong, that would be the data -- that would be the basis for your analysis?

A. No.

Q. Then how would you know?

A. So I don't know if you've seen the transactions, but Circuitronix doesn't object to the numbers. Circuitronix launches its first shot in the reconciliation, which is the transmittal email. So that's the first -- the first response. And then Benlida comes back with the two adjustments. And so that's the foundation.

In your line of questioning, it made it seem like Benlida said, Here's the number first, and then Circuitronix came back with adjustments. So I just wanted us to have a clear record.

Q. No. But on an invoice of $1,000 and CTX says, No, it should only be $800. How did you verify that?

A. That's by -- I think your question's out of line with the fact pattern.

Because Circuitronix first says, even

though Benlida does send the invoice, our first step is compile the data in the Circuitronix recon. So we wouldn't know about any differences from the Benlida invoices as you're describing in your questioning.

Q. What did you do to check the -- maybe I'm not understanding. And that wouldn't be the first time.

Did you -- what did you do to check that the adjustments proposed by CTX were accurate and correct? Did you pull invoices? Did you pull shipping documents?

A. So we attempted to determine, as it relates to the $62,000 invoice difference, which side was correct. Meaning, you have to actually look at -- the quantity ordered and received and the price.

If you've ever looked at these invoices, while they may be -- you know, if you pick any payment detail, it may say "Invoice 1234," you know, "$100,000." But when you get to the actual -- that's just an invoice total. Right? Just like your professional fee invoices. The total may be X, but that's comprised of many, many pages.

And so when you look at the invoice, there can be hundreds of part numbers on the

invoice. Some more, some less. And so we attempted to reconcile those differences. So to do that, you'd have to obtain -- for each part, you'd have to first figure out where the differences are, receive the receiving logs, what -- the purchase order, compare the quantities, et cetera. And it is a massive undertaking.

And due to the compressed time frame from when we started, approximately mid-April to when the report was due, there was not enough time to pull the voluminous amount of support that would have been required to make the determination for the $662,000 either way.

Q. So you did not -- you did not pull any support to confirm the difference is what you're saying.

A. We were unable to determine which side was correct for the differences.

Q. So how did you pick a side? A team, if you will.

MR. ROSENTHAL: Object to the form.

A. We presented the numbers as identified in the reconciliation, but we didn't make any further adjustments to those differences.

BY MR. MAZZOLA:
Q. And you say that in line -- in paragraph 20. Because you write "CTX advises that on occasion." Do you see that?
MR. ROSENTHAL: I'm sorry. Where are you reading from?
MR. MAZZOLA: Line 21 -- I beg your pardon.
Paragraph 21, second line, second sentence.
BY MR. MAZZOLA:
Q. Are you reading it, Mr. Parisi?
A. I am. I see those words.
Q. And then on your last sentence in that paragraph, you write "CTX contends."
Do you see that?
A. Um-hmm.
Q. So based upon the testimony that you just gave, and based upon what you wrote in this report, it sounds to me that when you got to this discrepancy of $662,000, that that was based on what CTX advised and contended to you. Is that correct?
A. We used the invoice amount as adjusted and labeled in the report for the Circuitronix as it relates to the amounts due through July 2019.

Q. So you relied upon the CTX numbers for that. Right?
A. For this portion.
Q. And then you even write "No further procedures were performed with respect to the invoice differences between CTX and Benlida."
A. Correct.
Q. And you said before, the reason you didn't drill down any deeper was for that very reason. It would be unduly burdensome because the volumes of documents to look at would be so great. Is that correct?
A. Correct.
And the time frame to do it. It's not an impossible task, it's just the time frame's very compressed.
Q. And so it would have required looking at bills of lading, shipping documents, shipping receipts, and things of that nature.
A. Correct.
And that's the same with the lead-time penalty at as well.
Q. And I'm not saying this in a pejorative sense, I'm just saying insofar as the payment discrepancy goes, you relied on CTX's numbers and

you checked the math. Is that right?

MR. ROSENTHAL: Object to the form.

A. For CTX, LLC's, payments, we reconciled the payments. Yes.

BY MR. MAZZOLA:

Q. And you confirmed their math.

A. We confirmed the math.

And then we also checked the payments to bank statements to make sure there was a payment dispersed on that date for that amount.

Q. But as you said before, you didn't dig any deeper because it would be too much work and not enough time.

A. I just want to be clear. Your question's focused on the invoices.

Q. Yes.

A. Yes. We did not -- we were not able to reconcile the invoice differences totaling $662,000 as identified in Table 3 of the report.

Q. And you said that that was similar with respect to the lead-time penalties as well.

A. Correct. We were not able to get all the input data to confirm the inputs into the lead-time penalty calculation. Specifically the ship date and

the receive date by part number, because those are the main factors in addition to some other items.

Q. That was one of the main factors on lead-time penalties is the ship date, how many days it was late. And based upon that, that would form the foundation for the lead-time penalties. Right?

A. Yes and no.

Q. Okay. What's the "no" part?

A. There is also specific provisions about the amount of product Benlida was supposed to put into production and ship as well. But the criteria for the lead-time penalty is different, depending on the time period.

Q. But, again, looking at all that data, ship dates, volume, that would have been too burdensome in the time permitted to do it. Is that correct?

A. We were not able to obtain all the data to validate the inputs in the time provided.

Q. So, instead, you just relied upon the data as it was provided to you from CTX.

A. And Benlida.

Q. So whose side did you pick? If Benlida said "X" and CTX said "Y," who's number did you agree with?

A. I would say "Z," which is the numbers that

we determined in our report.

Q. Well, let's look at this over here. The invoices. What number did you pick?

You picked $662.98 -- $662,918. Right?

A. 65,176,316 is the total invoices in Table 7.

Q. Okay. But I'm talking about what we were just talking about on page 9 --

A. Oh. Sorry.

Q. -- the aggregate discrepancy of $662,918. That was the number that was advised to you by CTX.

A. Correct.

Q. And that was the number you're using for your calculations going forward. Is that correct?

A. Correct.

Q. And that number ...

(Pause in proceedings.)

BY MR. MAZZOLA:

Q. And the number that you relied on, the 662, that came from CTX -- I'm sorry. I'm recovering. I just got distracted.

That's correct. Right? The 662 came from CTX.

A. That's incorrect.

The 662 is a function of the

difference between CTX and Benlida. That number could not have come from CTX in isolation, as you asked.

Q. No. It says -- you wrote, "CTX contends that these variances in price and quantity have resulted in the aggregate discrepancy of 662."

So you come to that number based upon what CTX is contending. Is that correct?

A. It's what CTX contends, less what Benlida contends.

Q. So it's the discrepancy.

A. The delta. Yes.

Q. And, as you said before, there was no other digging in deeper because you didn't have the time to do so, and it was too burdensome.

A. Yeah. I just want to be very clear.

You know, we have to be careful when we talk about invoices, payments, and debit memos. So for the invoices, we didn't resolve the difference as identified in the report.

Q. And 662,918 is the number that you're using for your calculation going forward.

A. That's the amount of the invoice difference is the 662 between Benlida and Circuitronix, LLC.

Q. Now, on the debit memos, you write that

there are $486,939, which DMs were listed in the CTX recon but are not included in the Benlida recon? Can you explain what that means?

A. Just what the words say.

Q. So CTX had them, but Benlida did not?

A. Precisely.

Q. And that $486,939 number, did you use that for calculations going forward?

A. We used it as a basis, subject to further adjustment as identified later in the report for the meeting minute adjustments to the debit memos.

Q. And on the judgmentally selected -- we talked about that earlier -- you selected 11. Right?

A. I'm sorry?

Q. You selected 11 debit memos.

A. Correct.

Q. When you say "judgmentally," what does that mean? How does that work in the accounting world?

Do you go down the list and pick the first 11 that are greater than $10,000?

A. So there's -- you can sample many ways. But the primary ways are random. You know, think if we had 9,999 invoices. You would say, here is one, here's the maximum. You know, give us 25 random

numbers in between there. And that's random sampling.

Or you can judgmentally sample where you say, I want everything over a certain threshold.

Or, alternatively, you can do haphazard sampling, where you just say, I'm going to pick this one and that one, and it's random.

You get -- it depends on what you're trying to accomplish, how thorough a sampling you have to do. If you want high reliability, you need to pick more transactions, et cetera.

Q. So when you judgmentally decided to select those greater than $10,000, how did you do that? You just sorted by number?

A. A little bit of alchemy, and then we also had an Excel list where it was sorted --

Q. Excel spreadsheet and you sort.

A. Correct.

Q. Mr. Parisi, here's Exhibit 153 in front of you again. I want to go back to some of the things you talked about earlier about the debit memos.

Can you pick, say, summary 2015? Is that okay?

A. This is your deposition.

Q. No. But I -- we want summary 2016, but --

I want the record to be clear that -- I think as I was clicking on these things, I may have messed up some of the coding on the inside, so --

A. Yeah. Whatever you want --

Q. -- they look a little different than they did before.

So let's try 2015.

A. Sure. You can also exit and reopen it if you wanted a clean version.

Q. Yeah, I know. We'll stick with 2016.

So let's go to -- let's look at --

MR. ROSENTHAL: JC, I didn't hear, but did you identify the exhibit that we're looking at?

MR. MAZZOLA: Yeah. 153.

MR. ROSENTHAL: Thank you.

BY MR. MAZZOLA:

Q. So we're at summary 2016, and we're looking at line 3 where it says "October payment detail, date, invoice total, and debit memo total."

Do you see the debit memo total is $78,772.32?

A. I see those numbers on the screen.

Q. Now, if you go to -- if I click -- it jumped before. It's not jumping.

A. I'm not familiar with the clicking trick, and I use a lot of Excel.

Q. So now we have to go to October.

Okay. Mr. Parisi, I'm going to click on the tab that says "October 2015," and presumably, these numbers add up to $72,000 -- $78,000. I think that's what was on the last ...

And this is comprised of -- one, two, three, four, five -- six debit memos.

A. Five.

MR. ROSENTHAL: Five.

BY MR. MAZZOLA:

Q. Five debit memos.

This first debit memo says "total penalty for lead-time exceedances for POs in July 2015." Is that a debit memo that you would have pulled and looked at?

A. It depends. If this debit memo was on the CTX recon and not on the Benlida recon as identified in the report, sitting here, I do not know if that lead-time penalty met that criteria.

Q. Okay. So it would have to be on both reports before you would pull it?

A. The opposite.

Q. It would have to be on one and not the

other --

A. Correct.

Q. -- so you don't know if that meets this criteria.

A. Because there's no sense of looking at if they concur. We're only focused mainly about where they do not concur.

Q. Well, let's assume they didn't concur here. Would you have pulled this one?

A. Yes.

And we further would have reduced that lead-time penalty amount by 50 percent. Because on Table 4, there's a series of adjustments to the debit memos, and this one specifically says "cut down half amount on Jan through July 2015 orders penalty."

So that's what I'm trying to say. CTX's numbers are a basis for our analysis. Right? We're not accepting CTX's analysis on its face. We're also looking at what Benlida said, the meeting, in trying to come up with an accurate balance.

Q. Where are the debit memos? Are they contained in the materials that you provided to us?

A. Yes. Do you see the folder that says

RECD53 --

Q. Um-hmm.

A. Correct.

Q. But this is the -- two, four, six, eight, ten, eleven. Well, this is one of the 11 debit memos you looked at. Let's look at one of them.

We'll look at --

A. Pick that 2015 or 2016 one. That might have been one of the ones we were just viewing. But you can pick whatever you want to on that.

Q. I need all the help I can get. Okay?

MR. LERNER: Are we going to mark this as an exhibit?

MR. MAZZOLA: I guess we do, because it's a different document. It's not part of it. So let's call this 155.

(Deposition Exhibit 155 marked for identification.)

MR. MAZZOLA: 155 is a debit memo. So we can all find it later on, it's dated 3/10/2015, and the last four digits of the debit memo number are 0310.

MR. LERNER: Does this have a CTX Bates number?

MR. MAZZOLA: No.

There is no Bates number on it, I presume.

MR. ROSENTHAL: The data that they have, presumably, matches the Bates numbers, but they don't have the Bates set, so --

MR. LERNER: This is from 2015, so it wasn't within the period of time of the discovery. We went back to January 2016, so that's the reason.

MR. ROSENTHAL: They've got data.

MR. LERNER: Yeah. It's fine.

MR. ROSENTHAL: And it's not from our exact set, so --

MR. MAZZOLA: You've got it now.

MR. ROSENTHAL: Yeah.

BY MR. MAZZOLA:

Q. So doing your judgmental analysis of instances where the 11 memos don't match and adding the criteria that it had to be greater than $10,000, this was one you would have pulled up. Is that correct, Mr. Parisi?

A. Correct.

Q. Okay. Now, with regards to this debit memo, it talks about a total penalty for lead-time

exceedances for U.S. purchase orders. And I know earlier you talked about lead-time penalties, and how because of the onerous and burdensome nature, you were unable to dig down deeper beyond the number that was provided to you by CTX. Is that correct?

A. So for lead-time penalties specifically, we compiled the data of the lead-time penalties, which were contained in many spreadsheets. And then we aggregated that data and reconciled the lead-time penalties to the meeting minutes, but we were unable to test the inputs of the lead-time penalty workbooks.

So for a sample of the lead-time penalty workbooks, we tested the mathematical application inconsistency of the lead-time penalty calculations to ensure it was accurate as recorded.

Q. But you weren't able to test the input, you said.

A. Correct.

Q. And the input is how many days. Right?

That's one factor for the input. Right?

A. No.

Q. Well, you say you weren't able to check the input. What does that mean? What's included in the

input?

A. You said the number of days, just to be clear --

Q. Well, the lead-time penalty --

A. Hold on. Which was just a little vague.

So the days is a function of the receipt date and the ship date. The difference between the two. So that's what I'm trying to be clear about.

Q. Okay. Ship date and receipt date --

A. Correct.

Q. -- are the number of days.

So you looked at the ship date and the receipt date, but you weren't able to verify that input data.

A. We were not able to independently verify the ship date or the receipt date. Correct.

Q. So all you were able to verify, then, was the math that was provided to you.

A. Correct.

And we compiled the lead-time penalty data, and we reconciled that compilation to the meeting minutes as identified in the report.

Q. But the meeting minutes didn't address every lead-time penalty.

A. There were only adjustments for certain periods of time, based on the meeting minutes provided.

Q. Okay.

A. And identified in the report.

Q. The reason I started asking about lead-time penalties is because this is a debit memo for a lead-time penalty. So the question is, were you able to do anything to verify the accuracy of this number?

A. So we started from the reconciliations. We looked at the difference, and then we requested support from Circuitronix, LLC, to, one, confirm that the amount matched and to make sure they were presented on the invoice. And here it says "Total lead-time penalty exceedances as of December 14, U.S. purchase orders."

Q. So this $32,000, based upon that reason, this is the total lead-time penalty exceedances for the whole month. Is that what they mean here?

A. Correct.

Q. How do you know that?

A. So the lead-time penalty data that I've seen specifically is primarily aggregated on a month basis. The debit memos are just like this, where

it's presented on a monthly basis.

I haven't seen any lead-time penalties itemized in all of the individual parts that create the lead-time penalty. Usually, it's just a one-line item, as you've seen. And then the notes -- the descriptions on the payment details, sometimes they reference the delay for the lead-time exceedances, rather.

Q. What's the -- what's Benlida Circuit Board HK?

A. I do not know. I do not know why that labeling's on this invoice.

Q. While we're still on this, then, you made reference to looking at this in a folder that you've identified as "Lead-time Penalty Support." Let's just pull one of them up.

We're going to call this -- it's a spreadsheet. "BDL Penalty for Lead-Time Exceedance Report, 11 November 2020."

MR. ROSENTHAL: Can I ask you one favor? Since we did this, I just was thinking. During Mr. Paulikens' deposition when we pulled -- when the roles were reversed, when we pulled up documents like this, you guys would email them to each

other so we would have them.

MR. MAZZOLA: Oh, okay.

MR. ROSENTHAL: Can you maybe work that into this as you go or maybe --

MR. MAZZOLA: Oh, yeah.

MR. ROSENTHAL: -- Mr. Lerner can do it.

MR. LERNER: The next time we do a break, we'll just do it.

MR. ROSENTHAL: Because I just realized, how am I going to remember this.

BY MR. MAZZOLA:

Q. This spreadsheet was prepared by CTX. Right?

A. Correct.

Q. And this is a spreadsheet you would have looked at in calculating lead-time penalties.

A. Yes.

Q. Can you walk me through this?

A. Yes.

Q. We're looking at line 6. Do you see line 6?

A. I do.

Q. 11/3/2020. It's a Layer Account 2, Vendor ship date per agreement. It says "12/1/2020." It

says "Late." And its pretty self-explanatory. 22 days late. And the penalty is $8.52 for that. Is that correct?

A. Correct.

Q. Did you independently verify that this item was, in fact -- this purchase order was, in fact, shipped late?

A. I did not verify the ship date or the item receipt date.

Q. So we don't know if it was 22 days late, two days late, or 42 days late.

A. I did not test the inputs into the spreadsheet.

Q. Okay.

MR. ROSENTHAL: For the record just to be clear, he's on the November 2020 tab.

MR. MAZZOLA: Right.

BY MR. MAZZOLA:

Q. So on the lead-time penalties -- when you come up with the lead-time penalty number, did you check any of the -- confirm any of the input?

A. We are unable to confirm the inputs into the lead-time penalty calculation.

Q. So if we go back to -- what was this

one? -- Exhibit 155, the debit memo that we were looking at, this has a $32,320.20 number on it. Right?

A. That number appears on the screen.

Q. This would be the same thing. You were unable to confirm any of the input data that comprises this $32,000 debit memo. Is that correct?

A. Correct.

Q. There's a lot of other lead-time penalty exceedance reports that you're seeing me scroll through, and I am on Exhibit 151 at the "LTP Support" folder, and there's multiple Excel spreadsheet files here.

If I pulled up one of these spreadsheets, would your testimony be similar to the last spreadsheet we looked at insofar as you did not check any of the input data?

A. Correct.

Q. So we're going to pull up another one from April 2020.

MR. ROSENTHAL: This is 157?

MR. MAZZOLA: Yes.

MR. ROSENTHAL: I'm sorry. The lead-time exceedance report from April 2020?

MR. MAZZOLA: Yes.

(Deposition Exhibit 157 marked for identification.)

BY MR. MAZZOLA:

Q. And that O. What is that O? That is the sum -- right? -- that I'm clicking at? That $2,932.90?

MR. ROSENTHAL: I'm sorry. Column O you're referring to?

MR. MAZZOLA: Yeah.

A. I think the answer to your question is, no.

BY MR. MAZZOLA:

Q. Okay.

A. There appears to be too much. I would -- I'd imagine that if you identified the blue -- if you aggregated the blue that says "Late," that would equate to the total.

Q. How?

A. Because it appears to be missing some formula that's been hard-coded that would make it easier for you to see.

Because there you've got 15,000, as opposed to 2,932. So if you add up the blue lates, that would likely equate to the 2,932 that you asked about.

Q. Okay. So for this April 2020 period, what is the total penalty?

A. It's likely that 2,932.9.

Q. So it's not the grand total of column P, then?

A. Correct. Because that appears duplicative.

You can see how one line item is broken out into many quantity received, and so I think that's what's creating the duplication.

For example, in column E, you can see that there's a similar purchase order for rows 6 through 11, which total 2,000 parts. But you can see the quantity received is broken out into the individual receipts. And so that's likely why there's a duplication in the penalty, even though it should only be recorded once.

Q. The blue should only be -- the only one recorded.

A. Correct. So if you add up those cells identified in blue that -- and say "Late," that would likely equate to the 2,932.

Q. But same testimony on this, the input wasn't checked.

A. Correct.

Q. Of course, the discount matrix doesn't

change because the discount -- I'm at the tab that says "Discount Matrix." Because the discount matrix is what the discount is based upon numbers of days late. Right?

A. Correct.

MR. MAZZOLA: I've got to take a break.

(Off record: 2:33 p.m. to 2:43 p.m.)

BY MR. MAZZOLA:

Q. We are still talking about this document that was in front of you.

MR. ROSENTHAL: And just for the record, that's 157.

BY MR. MAZZOLA:

Q. And I think you were explaining that it was just the blue lines that add up to the penalty.

A. Correct.

If you even right-clicked and hit "filter by color," it would likely equate to that total. If you want to do it easily.

Q. Right click?

A. Filter by selected color.

You clicked on the column header. You have to pick, for example, P6.

Q. Okay. And there's the number right there.

MR. ROSENTHAL: I'm sorry. Just so I understand what you're looking at, Mr. Mazzola. You're saying the number --

MR. MAZZOLA: Yeah. We clicked on -- there was a question about there's a total -- there's a number in bold at that cell, cell 1-O, and I was trying to understand the source of that number.

And Mr. Parisi explained to me that's the penalty number, and it's the -- the penalty numbers -- the penalties that are added up that they combined that equal that are just the blue lines.

MR. ROSENTHAL: And the number is $2,932.90 that you're referring to?

MR. MAZZOLA: Yes. That's the number.

A. For this spreadsheet only. Sometimes there's not that, you know, quote/unquote, duplication issue there. But the math always comes out correctly.

(Pause in proceedings.)

MR. MAZZOLA: What exhibit are we up to now? 156?

MR. ROSENTHAL: 8.

MR. MAZZOLA: Here's another document that I put up. Benlida Shipment and Payment Details. Let's call this 159 [sic].

(Deposition Exhibit 158 marked for identification.)

BY MR. MAZZOLA:

Q. Have you ever seen this document before?

A. I have.

Q. Is this document contained within the materials that were provided to us?

A. Yes.

MR. ROSENTHAL: And these are the shipment details with CTX Hong Kong.

MR. MAZZOLA: Yes.

MR. ROSENTHAL: 158. Correct? I think you said 159, JC.

MR. MAZZOLA: Okay. 158.

BY MR. MAZZOLA:

Q. I'm going to try to find the path to it.

A. Sure. That would be in the follow-up from the date data. Source 3.

Q. Okay. So that document is found in the Expert Report Docs Utilized, Follow-up Benlida. And it's right there.

A. It's actually subsumed within the email. I just put the Excel files there for ease of access.
Q. This document you did review. Is that correct?
A. Correct.
Q. But you did not review it -- you did not incorporate this document in your report. Correct?
A. Correct.
Q. And why did you not incorporate it in your report?
A. Because this analysis of transactions between Circuitronix Hong Kong and Benlida was not relevant for CTX's counterclaim.
Q. This document was produced by Benlida. Is that correct?
A. Correct.
Q. Do you have a corresponding document of a similar nature addressing similar invoices that was prepared by CTX?
A. We did receive a reconciliation of Circuitronix Hong Kong transactions in Benlida prepared by Circuitronix.
Q. Does it contain the materials here?
A. I don't believe so.
Q. As you sit here today, do you see this

number, this $13.492 million from Benlida?

A. I do see that number.

Q. On the CTX reconciliation, do we recall what number they ended up with?

A. No.

I remember there was a significantly larger gap between this set of transactions.

And by "this," I mean Circuitronix and Benlida -- Circuitronix Hong Kong and Benlida.

The gap in the numbers was much larger than the gap that we witnessed in the report on -- I believe it was Table 2, when we talked about those 1 percent differences. And so the difference was larger so we did not do anything further as identified in the report.

Q. If you look at Exhibit 121.

MR. ROSENTHAL: It's the one in the notebook.

A. I think it's 3.

MR. ROSENTHAL: Yes. It's this one.

BY MR. MAZZOLA:

Q. We looked at this is document earlier. I asked you if you had this document, you said, no.

But this is an email with the attached

spreadsheets written by Mr. Kukreja. And in that email, he acknowledges that "We owe Benlida" -- this is for the Hong Kong operation -- "U.S. $8.843 million."

Do you see that?

A. I see those words.

Q. As you sit here today, do you recollect -- does this refresh your recollection as to what the CTX Hong Kong reconciliation number was?

A. It does not.

And I just want to be clear. We had to do a lot of work to reconcile the CTX, LLC, transactions and Benlida to really get a good idea of what we thought that balance was with the Circuitronix Hong Kong data. And we just primarily compiled the data, and we did not go to the same level as we did with Circuitronix, LLC, and Benlida, because there's a lot of work involved.

And, you know, we were going to for a rebuttal report, but we did not thoroughly determine where we thought the range lies between for those sets of parties.

Q. So you have no recollection, as you sit here, what the difference was between Benlida's 13.492 million and CTX's number.

A. Correct.

Q. And this document, 121, does not refresh your recollection that it was rounded out 8.9 million.

MR. ROSENTHAL: Object to the form.

A. I just want to identify that this document is dated July 29, 2019. And the series of emails we reviewed earlier, which form the foundation for the analysis, are dated November 2019. So there was six months of additional transactions -- or five months that happened subsequent to this email. So this balance is just a starting point.

I mean, we saw in the Benlida second response where a month later, they're still finding the different payments that Circuitronix forgot about.

(Pause in proceedings.)

MR. ROSENTHAL: We have some physical copies of a few of the exhibits, if you want --

MR. MAZZOLA: No. We don't need them right now.

MR. ROSENTHAL: You don't need them? We'll deal with this later.

MR. MAZZOLA: Yeah.

BY MR. MAZZOLA:

Q. Let's look at another debit memo. Okay?

A. Okay.

Q. This is a debit memo, and I'm going to call this Exhibit 159.

(Deposition Exhibit 159 marked for identification.)

BY MR. MAZZOLA:

Q. Dated March 21 -- we're calling it 159. And this is dated 21 March 2016, and it ends in 0321. And it's also addressed to this Benlida Hong Kong.

Do you see that? Do you know why that is?

A. I'm not familiar with that name. That variation of the Benlida name.

Q. And I don't think we've seen this one before. But, again, this one is for lead-time exceedances for POs in November 2015 of $116,512.11.

Do you see that?

A. I do.

Q. Same thing here. This would be a number that would have come off the spreadsheets. Right?

A. Correct. Subject to further refinement.

Q. Okay. But you did not drill down to the input data. Is that correct?
A. We did not verify the input data.
MR. MAZZOLA: I'm going to open up another one. 160. This one is dated October 2013.
(Deposition Exhibit 160 marked for identification.)
BY MR. MAZZOLA:
Q. This too is for lead-time penalties. Do you see that?
A. I see those words.
Q. $24,749.72. Right?
A. I see that number.
Q. So same thing: You didn't check the input. Right?
A. Correct.
Q. Who's Sunny K? Sunny Kapoor.
Do you know that name?
A. I do.
Q. Did you read any emails from him?
A. Not that I recall.
Q. Did you ever speak to Mr. Kapoor?
A. I don't recall meeting him.
Q. Do you know where he works?

A. I do not.

(Deposition Exhibit 161 marked for identification.)

BY MR. MAZZOLA:

Q. I'm going to pull one more up. 161 is this is exhibit number. It's dated September 12th, 2014. The debit memo number ends in 520. And this is a $39,911.17.

This is a lead time as well. Right?

A. Lead-time exceedances of March 2014 U.S. purchase orders.

Q. Did any of the debit memos that you judgmentally select relate to anything other than lead-time penalties?

A. Yes.

Q. They did. Because I have the 11 over here. I think I pulled up four or five now.

Is there a way for you to quickly tell me that?

A. If you look at where it discusses this in the report. Here we go.

Looking at paragraph 24, it says of these 11 debit memos, 9 were to due to lead-time exceedances, which explains the luck of your selection. One was due to late delivery, and one

was due to product quality. So if we --

Q. If we went through them all, we'd find the other ones.

A. Yeah.

Q. My sidekick suggested a question.

What is the difference between a late delivery and lead-time penalty?

A. A late delivery and a lead-time penalty ...

I don't know specifically.

Q. And one debit memo was due to product quality.

With respect to the debit memo that was due to product quality, did you review -- dig down on that and review what the quality issue was?

A. Not that I recall.

Q. Why do you make a distinction between lead-time penalties after January 2016? This is on page 12 of your report.

A. Did you complete your question?

Q. Yes.

MR. ROSENTHAL: I didn't understand it. Sorry.

A. I wasn't -- I thought you were flipping --

BY MR. MAZZOLA:

Q. Why do you make a distinction regarding

lead-time penalties after January 2016? You have a heading there.

A. So as identified in paragraph 30, until January 2016, the debit memos were included -- or the lead-time penalties were included in debit memos.

Q. And after that, they were included -- they were done separately. Is that right?

A. Correct.

Q. Did you review the lead-time penalties that were done after January 2016?

A. Yes.

You and I reviewed them as well earlier.

Q. Okay. So that discussion, we had included all the lead-time penalties.

A. No. That was just one month. The spreadsheets are individual. The spreadsheet doesn't include all of them, the combination of all of the spreadsheets. So I'm just trying to say, this is one month. Right? You'd have to add all the months.

So I just don't want it -- to make it seem like I testified there was one master spreadsheet provided.

(Deposition Exhibit 156 marked for identification.)

BY MR. MAZZOLA:

Q. So we're looking at a spreadsheet from November 2020. This is BLD Penalty for Lead-Time Exceedances, November 2020, which was Exhibit 156.

This is an example of a lead-time penalty report that would have been utilized after January 2016.

A. Correct.

Q. Same thing over here. If you look at line 6, column O, for 22 days late. And you never had the -- you never did examine if there was 20 days late, two days late, or 42 days late. Right?

A. We didn't test the inputs, to be clear --

Q. You never tested it; you just accepted the number.

Let's look at your Table 6 on page 13. This is your lead-time penalty analysis. Is that correct?

A. This is a compilation.

Q. And so the $3.107 million is the number you used for your calculations going forward. Is that correct?

A. Correct.
Q. And on page 14, this is, I suspect, what you call your final reconciliation.
A. I call this the summary of payable reconciliation between CTX and Benlida.
Q. And you put that together by having a payment number, an invoice number, and a debit memo number. Is that right?
A. When you say "that," what you just described is the components of the balance through July 2019.
Q. Can you walk me through the math here?
How do you come up with the $7.868 million?
A. Sure.
$4,760,000 plus $3,107,000 equates to 7,868,000.
Q. So the $4,760,000, is the number that's per CTX. Is that right?
A. I wouldn't necessarily say per CTX. That's a result of using the CTX calculation as the basis, and then subject to the adjustments we made as identified in the report.
Q. Well -- so let's look at payments from Table 2.

A. Sure.
Q. And your Table 2 was on ...
A. Page 8.
Q. Page 8.
You're using the 67,623.56 number, which comes out of there. Right?
A. Correct.
So with that number, for example, CTX's pure number would be the 67,728. But from there, we deducted this decoration fee and the 1 millimeter tin line fee, which results in the 67,623,000 number we just discussed.
Q. Okay. So you started with CTX's number per their recon table of 67.728 million. Right?
A. Well, we -- yes. Correct.
Q. And then you reduced it based upon the decoration fee and the immersion tin line item.
A. Correct.
Q. Your invoice number, you got that from Table 3. Right?
A. So Table 3 identifies the differences of the 662,000 and breaks that amount into the components.
And so the concurring invoices, the difference is in invoice amount and in just invoices

that are absent from the reconciliations.

Q. Okay. And in this instance, you used the CTX number, the 65.176 million. Right?

A. Correct.

Q. And then the debit memos, you used the 2.313 number. And that's from your Table 5.

A. Correct. Which is the debit memos per the CTX reconciliation adjusted for some those meeting minutes.

Q. And the CTX number is -- it's significantly higher. It's $430,000 greater. Right?

A. Correct. Approximately.

Q. On this Table 7, one of those numbers doesn't look right. What number is that? That's -- there's 97,824.

MR. ROSENTHAL: It's not 824.

Do you mean 284?

MR. MAZZOLA: 284. I beg your pardon. Yep.

A. Correct. There is a mathematical -- the formula is not correct, and the number -- the difference should be ...

BY MR. MAZZOLA:

Q. Is it 432? 470? Closer to that?

A. Yes. Correct.

But that -- that issue identified in Table 7, it just impacts this difference column. It doesn't impact any of the actual numbers presented elsewhere in the report or flow through to anything else.

Q. So the difference would have gone up to 1.13. Right?

A. It would have increased. I didn't crunch the math, but approximately --

Q. By about $400,000, so it's over $1 million, then.

A. Yeah. It would be over $1 million. Correct.

Q. So that 747 difference should be 1 million, 1,000,001?

A. Correct.

Q. Why do you say that difference doesn't affect anything?

A. So that number here, whatever, 747 or the million dollars, it just stops here. It doesn't flow into anywhere else. This is just a calculation of the difference of the components as identified in the report.

Q. And then so you come up with this amount owed by Benlida to Circuitronix U.S. of 7.868

million.

A. Correct.

Q. And this brings us back to full circle before. As an accountant -- forensic accountant -- and it sounds like you used to do audits. Right?

A. No.

Q. What did you do that said -- it was internal audits. Okay.

A. Not as fun as a regular audit.

Q. Not as fun as a regular audit.

As an internal auditor, if you were working for a company and you saw that they were -- seemingly were overpaying a vendor nearly $8 million, would that seem normal to you?

A. It depends on the facts and circumstances of the relationship.

Q. Okay. But is it normal, or it just depends?

MR. ROSENTHAL: Object to the form.

A. There could be reasons -- a lot of reasons for it happening, the overpayment specifically.

For example, I've seen emails where Benlida needed money so they were redirecting payments. And it could happen -- the overpayments

could happen for a host of reasons.

Q. Do you think maybe Benlida was hungry for money? Because we saw in this Exhibit 121 -- you can look at that. 121.

Rishi, by his own admission, states that the Hong Kong entity owed Benlida $8.84 million. Do you think that's maybe why Benlida was hungry for money.

A. The balance could have an impact on Benlida's cash flow.

Q. That balance. Right?

A. Yes. If it's accurate.

Q. Do you have any reason to believe Rishi's number here is not accurate on 121?

A. Which number are you referring to?

Q. The $8.8 million.

A. Yes.

Q. Why do you say that?

A. Well, you previously showed me in the Circuitronix Hong -- or Circuitronix Hong Kong and Benlida reconciliation, which had a different number, so -- with a large disparity. So I don't know, sitting here, who's correct.

And I also want to point out that this email is dated July. And then we saw

reconciliations, even by Benlida, occurring all the way through November. So even at this point in time, these numbers aren't firm yet.

Q. Do you know the date of this document?

MR. ROSENTHAL: Which one?

MR. MAZZOLA: Exhibit 158, the Benlida shipment and payment details.

MR. ROSENTHAL: CTX HK?

MR. MAZZOLA: Yep.

BY MR. MAZZOLA:

Q. It does go as far as 2019. Do you see that?

A. This goes through -- this analysis specifically goes through July 2019. And I want to say it was included in the transmittal email from Benlida to Circuitronix, LLC, on or about November 19, 2019.

Q. Did CTX respond to this and produce their own reconciliation, if you know?

A. I do not know. I don't believe so.

Q. Do you have Exhibit 27 in front of you?

A. I can.

Q. Yeah. Please.

A. All righty. Ready when you are.

Q. Have you ever seen this document? It's

called a business authorization.

A. I'm not familiar with this document.

Q. It's short enough for you to look at. Do you see where it says, "For purposes of our company's business"?

A. I see those words.

Q. If you had been provided with this document during your analysis, would you have thought to consider that the Hong Kong entity is a related party to the U.S. entity?

A. They could be related parties.

Q. Did you ever see ...

MR. ROSENTHAL: Can we go off the record for a second?

MR. MAZZOLA: Yeah.

(Discussion off the record.)

(Deposition Exhibit 162 marked for identification.)

BY MR. MAZZOLA:

Q. I'm going to hand you over a document, which we've marked as 162.

MR. MAZZOLA: And I don't know, Stephen, if you've seen this before.

MR. ROSENTHAL: I don't think so. Did you guys produce this thing?

MR. MAZZOLA: We just saw it the other day.

MR. ROSENTHAL: Okay.

BY MR. MAZZOLA:

Q. This is a document we've marked as 162 --

MR. ROSENTHAL: So let me just interpose an objection for the record, since I haven't even had a chance to look at it. But if it hasn't been produced in discovery, I object to your asking him questions about it.

But having preserved that, go ahead.

MR. MAZZOLA: Okay. We think it came from you guys, or it's your people on some level. To be determined.

BY MR. MAZZOLA:

Q. Mr. Parisi, you haven't seen this document, so I'm not expecting you to take it from the blindside. So take your time looking at it.

(Document review.)

BY MR. MAZZOLA:

Q. You haven't seen it before, so I just want to ask you. Attached to this email, dated August 18th, 2022, the email is from a person named

Charlene at Jules Jiu. And they're a -- they purport to be the auditor for Circuitronix Hong Kong. Do you see that?

A. It appears to be that. Yes.

Q. And then in the next two pages, they've attached a confirmation for audit purposes.

A. I see those words.

Q. And these are addressed to ROK in the first instance and Benlida in the second instance. Do you see that?

A. I see the words "ROK" on page 2 and "Benlida" on page 3.

Q. And, I guess, what I'm interested in is, what is the auditor trying to suggest when they say "Due to you, Hong Kong dollars, 52,287,000?

MR. ROSENTHAL: Object to the form.

A. I don't know. I'd have to --

BY MR. MAZZOLA:

Q. What do you understand that to mean?

MR. ROSENTHAL: Object to the form.

A. -- I'd have to look at the whole document in context.

\\\

BY MR. MAZZOLA:

Q. If you had seen this document as part of your preparations, and preparation of the report, would this have had any bearing on any of your discussions, thoughts, or opinions?

MR. ROSENTHAL: Objection. Foundation.

A. I don't believe so.

(Deposition Exhibit 163 marked for identification.)

MR. MAZZOLA: This is another document, Exhibit 163. Similar in nature to the last document. It's an email from the same person, Charlene. It's dated July 24th, 2013.

So this I can assure, Mr. Rosenthal, I have never seen before two days ago.

MR. ROSENTHAL: Same objection to the line of questioning.

BY MR. MAZZOLA:

Q. This is a similar document to the one you just looked at before. Again, it's prepared by a certified public accountant. And it says "Confirmation for Audit Purposes," and it's

addressed to Benlida.
Do you see where it says "due to you"?
A. I don't see those words.
Where are you looking?
Q. I beg your pardon. On the attachment.
A. Are you on page 2 or 3?
Q. Page 3.
A. Page 3.
Q. Do you see where it says that "Due to you," it's got Hong Kong dollar, 52,593,000?
A. I see "Due to you" on the page and HKD 52 million.
Q. In your professional experience, is this an indication by Circuitronix Hong Kong's auditors that Circuitronix Hong Kong, at least by their numbers, believes that they owe Benlida somewhere in the order of 52.5 million Hong Kong dollars?
A. I'm not sure. This is the first time I've seen this document.
(Document review.)
A. I'm not sure.
BY MR. MAZZOLA:
Q. That's your answer? "I'm not sure"?
A. This document's a little confusing, because it says "due to you" and it's regarding

Circuitronix Hong Kong. I don't know if there's a translation issue.

Q. Okay. You know who it's addressed to. Right?

A. To Benlida. It says "to Benlida."

Q. And then it has a column that says, "due from you." Right?

A. Yes. I see those words on the page.

Q. And then there's a column that says "due to you"?

A. Correct. I see those words.

Q. I'm just asking, in your professional experience, having dealt with certified public accountants, auditors, and the like, would the recipient of this believe -- Benlida, hypothetically -- that Circuitronix Hong Kong believes that they owe Benlida 52.59 million Hong Kong dollars?

MR. ROSENTHAL: Object to form.

A. So this is Benlida's records, not Circuitronix Hong Kong, I believe -- or no. I'm not sure.

BY MR. MAZZOLA:

Q. Well, if you read the cover email, it says, "We are the auditor of Circuitronix Hong Kong."

A. Okay.
Q. Do you see where it says that?
A. I do see that on the first page.
Q. Does that lead you to believe that the attachment is based upon the records that are being held by Circuitronix Hong Kong?
A. It appears that way.
Q. So with that, if you were the recipient of this at Benlida, would it be reasonable, from an accounting perspective, for them to conclude that Circuitronix Hong Kong -- at least their auditors and accountants -- believed that Benlida is owed $52.59 million from Circuitronix Hong Kong?
MR. LERNER: HK dollars.
MR. MAZZOLA: HK dollars.
Hong Kong dollars.
A. It appears to be trying to confirm a balance.
BY MR. MAZZOLA:
Q. And if you received this and you were Benlida, based upon all you know about accounting and auditing, would it be reasonable for Benlida to believe that Circuitronix Hong Kong believes that they owe Benlida $52.59 million Hong Kong dollars?
A. It appears that way.

Q. Who is Siddharth Gusain?
A. Where do you see that name?
Q. It's on the email page from Charlene.
A. I'm not familiar.
MR. MAZZOLA: Give me one second. And we can go off the record.
(Discussion off the record.)
BY MR. MAZZOLA:
Q. If you had seen these documents, 163 and 164 ...
A. I think you mean 162 and 163?
Q. Yes. 162 and 163.
... would that have any bearing on your thoughts about whether the Hong Kong entity and the U.S. entity are related parties?
A. So these documents don't change my opinion as relates to Circuitronix, LLC's, counterclaim.
Q. Okay. And the question was, does this have any bearing on your thinking or thoughts regarding -- professional thoughts, whether or not the Hong Kong entity and the U.S. entity are related parties for accounting purposes?
MR. ROSENTHAL: Objection. Form.
A. They could be related, but they're separate entities.

BY MR. MAZZOLA:

Q. But for accounting purposes.

A. I don't know -- when you keep saying "related parties for accounting purposes" -- right? -- I'm not aware of any formula that you put in these pieces and out pops an independent variable based on the dependent variables in the components you described. Right?

So they could be related parties, but separate companies. Similarly, I could have multiple companies, and they'd be separate companies.

Q. But when you -- from an accounting perspective, you need to consider the -- from an accounting perspective, you need to consider the numbers -- the dollars and cents of related parties to get the whole picture. Isn't that correct?

A. It depends on the context.

Q. Well, in the context where one entity has agreed to pay the debts of another. Is that something you where would consider them related parties?

A. Which -- what are you referring to specifically?

Q. Well, if the U.S. operation was paying the

debts of the Hong Kong entity, would that be something you would want to know?

A. It depends on the facts and circumstances.

Q. Well, what if it's just as simple as that?

There's proof and evidence in this case that the U.S. entity was paying the debts of the Hong Kong entity. Would that have any bearing as to whether or not the two entities are related parties, and from a professional accounting perspective, you need to look at both of them collectively to come up with a true number.

A. I'm not sure if I'm following you.

If I took Stephen out to lunch and he asked me to pay, you know, for food, I don't know if that would make me responsible for his debts.

Q. No. You guys aren't related in any respect.

A. Okay. If it was my mom, would the answer be different?

Q. No. But if it was two separate companies -- purportedly, two separate companies.

They have the same ownership, same control. One entity has agreed in writing to pay the debts of the other, would that have any bearing on your analysis?

A. I don't know that they have the same ownership and same control.
Q. Let's -- let me ask you another question.
You did have the Exhibit 21 in front of you. That was the manufacturing agreement.
A. One second, please.
MR. ROSENTHAL: Do you want him to pull it up?
MR. MAZZOLA: Yeah. Yeah.
A. Okay.
BY MR. MAZZOLA:
Q. This document, you did see. Right?
A. Yes.
Q. Let me ask you a question. Regarding 162 and 163, those audit reports -- you don't have to look at them.
In your opinion, can you think of any reason why the U.S. entity -- or why any entity would agree to overpay someone to the tune of $8 million and then agree to pay them another $8 million?
A. So they're separate entities. Right? We all agree that Benlida tracked the records of Circuitronix, LLC, and Hong Kong separately, as did Circuitronix.
I know the overpayment seems large,

you know, in terms of me and you dollars. But when you consider the relative size of the transactions between Circuitronix, LLC, and Benlida, that overpayment only equates to a few months' worth of invoices.

So while the amount in absolute terms may be large, you know, on a relative basis considering the volume, those transactions would get absorbed quite quickly.

Q. If they continued to do business.

A. If they continued to do business.

Q. Let's look at the manufacturing agreement. There's a --

A. And that's 21. Correct?

Q. Yeah.

On page 10 of the manufacturing agreement, there's a list of customers -- potential customers and Circuitronix customers.

A. What paragraph are you looking at?

Q. Just page 10.

A. Page 10.

Q. Page 10.

A. Okay. I'm on page 10.

Q. Do you understand that these customers that are identified here were identified as exclusive

customers of CTX, the U.S. operation?

A. I do not remember those words specifically. I see these customer names on here, but I have not specifically -- I don't remember this whole manufacturing agreement to comment on it.

Q. If I tell you to assume that they are exclusive customers and that the Hong Kong entity was issued purchase orders for these exclusive customers, would that have any bearing upon your thoughts about whether or not the Hong Kong entity and the U.S. entity are related parties from an accounting perspective?

A. You keep saying "from an accounting perspective." They're --

Q. It's an accounting term, isn't it?

A. When I think of related parties, what I think of is -- I come from a bankruptcy world. Right? Or primarily a bankruptcy world.

So when you say "related parties," I think of the context of bankruptcy. Right?

Joe is the CEO of this company. Are his related entities, you know, getting paid money that he also owns. Those companies could be separate. But that's really the context that I think of it in.

Q. Okay. So --
A. Whether it's common ownership, you know, between the two parties or it's his --
Q. So --
A. -- company that he's --
Go ahead.
Q. This common ownership is one of the things you looked at to identify related parties. Is that correct?
A. You keep saying "identify related parties." Right? I don't know -- there's no formula that you put these independent variables into and out pops a dependent that I -- so I'm a little confused --
Q. I understand --
A. -- on your line of questioning.
Q. -- I understand.
Accounting is as much an art as it is a science. I understand that.
When you -- to do a full picture, a full forensic accounting picture in an instance such as this, my question is, do you think it's important to look at the related parities if two companies are related with each other.
One has a debit, and one has a credit. To get the full picture, do you think it makes sense

to look at them both together?

A. For Circuitronix, LLC's, counterclaim?

Q. The whole claim.

A. For your claim. For the plaintiff's claim.

Q. Well, from Circuitronix's counterclaim. Do you think it's important to do that?

A. Do I think it's important to consider entities outside of the counterclaim for purposes of the counterclaim?

Q. My question is this:

If you're going to do a full picture of the debts and obligations between two parties, do you think it makes sense to look at debts and obligations between related parties? Debts and obligations of all the parties.

A. So just to be clear, your question is if I'm looking at the debts between two parties, should I consider more than those two parties.

Q. I guess I should rephrase it this way.

You never looked at, examined, or evaluated obligations that Benlida claims CTX owes -- isn't that correct? -- for purposes of your report.

MR. ROSENTHAL: Object to the form.

A. So our report looks at the CTX, LLC, and

Benlida transactions.

BY MR. MAZZOLA:

Q. Just the CTX U.S. and Benlida transactions. It does not look at the CTX Hong Kong and Benlida transactions. Isn't that correct?

A. Correct. As they were not identified in the counterclaim.

Q. Okay. And now what I'm asking you is if CTX Hong Kong is a related party to the U.S. operation, do you think it would have been prudent to look at those transactions, assuming that it is a related party. Let's do it that way.

A. As the plaintiff's expert or for the counterclaim?

Q. However you want to do it.

As for the counterclaim.

A. I do not believe -- you know, as we discussed earlier, you said there's two parties in the counterclaim. Are other parties' debts, or potential debts, besides these two parties, relevant for these two parties' balance.

Q. And you know that my clients, in their complaint, are suing CTX, LLC, the U.S. operation, for invoices that they issued to the Hong Kong entity. You know that because you read the

complaint.
A. Is that a question?
Q. Yes.
Do you know that to be true?
A. I thought you said "you know that" because I read the complaint.
Q. Yes.
A. Yes. I'm aware that Benlida is trying to recover Circuitronix Hong Kong invoices from Circuitronix, LLC, on the complaint.
Q. And if, at the end of the day, it turns out that the U.S. -- CTX U.S. owes the debts of CTX Hong Kong, does that make your report valueless?
A. No. Not at all.
Q. Why not?
A. Well, there is -- there would be two components. Right? There's still the Circuitronix, LLC, balance with Benlida, which would be one component. And then if liability was determined, as you described, then the balance of the debt due to Hong Kong would potentially be included in that amount.
Q. It would be included how? As an offset?
A. I don't know.
I would have loved to see, you know,

an affirmative report by the plaintiff that laid out all these legal theories to rebut. But unfortunately, for whatever reason, an affirmative report wasn't issued.

Q. And if that was the case, you would then have to consider the relationship between the U.S. operation and the Hong Kong operation.

A. Among other items, absolutely. There's many items you would have to consider in evaluating the facts and circumstances.

Q. So back to this document over here. I guess, the question was -- I'm asking you to assume that these were exclusive customers of the U.S. operation, and if the fact that the Hong Kong entity is selling to these exclusive customers, does that have any bearing in your mind as to whether the Hong Kong entity and the U.S. entity are related parties.

MR. ROSENTHAL: Object to the form.

A. I don't know the answer to that question.

BY MR. MAZZOLA:

Q. What about ...

(Pause in proceedings.)

MR. MAZZOLA: I'm frozen up a

little bit here.

BY MR. MAZZOLA:

Q. How about this: Do you consider the issue of whether the U.S. operation owes Benlida for the debts of the Hong Kong operation to be an issue of law or accounting?

A. Law.

Q. And if it's an issue of law, then why would you be looking for something like that from our accountant?

A. I don't understand your question.

Q. Well, I just asked you is the -- is the question about whether or not the U.S. operation owes the debts of the Hong Kong operation an issue of law or accounting. Right? And I think you said it was a question of law.

And before I got hung up on this computer, you were saying you would have loved to have seen something like that from our accountant talking about the obligations and the debts of the Hong Kong operation.

So why -- why would you have expected to see that from our accountants if it's a question of law?

MR. ROSENTHAL: Object to the

form.

A. I'm confused. We were retained by the defendant. What you're presenting seems to be the plaintiff's position. Right?

So if we did the work, then the defendant would be paying for the plaintiff's accounting work. Right?

BY MR. MAZZOLA:

Q. If it's -- the question was, do you consider the fact that the U.S. operation is paying the debts of the Hong Kong operation to be an accounting question or a legal question. And I think your response was you said it was a legal question.

MR. ROSENTHAL: Object to the form.

A. I haven't seen evidence of the -- of Circuitronix, LLC, paying the debts of the Hong Kong entity.

BY MR. MAZZOLA:

Q. Would that have any bearing on your opinions?

A. It could.

If a payment out of Circuitronix, LLC, was really a payment for the benefit of Circuitronix

Hong Kong, we'd want to make sure that payment was in the proper category.

Similarly, when we talked about payment differences, there was one payment that was due to Benlida for OSP that Benlida directed be paid to ROK, but we still put it in the Benlida ledger accordingly, based on that same fact pattern you just described.

MR. MAZZOLA: My computer is frozen.

A. You know the plights of being an accountant, now. This is what I deal with all the time.

(Pause in proceedings.)

MR. MAZZOLA: I'm going to take a break.

(Off record: 3:43 p.m. to 3:53 p.m.)

BY MR. MAZZOLA:

Q. I want to pull up a document. Now, this is called "Payment Schedule for ROK U.S. HK Payment Detail Reconciliation 2012 to 2018." This was previously marked at Rishi's deposition, so it was a recently disclosed document.

MR. ROSENTHAL: Let me see if I can tell you the number.

MR. MAZZOLA: And we put everything on OneDrive, and I didn't want to take this one out. I'm feeling it was a 40-something.

MR. ROSENTHAL: That far back?

MR. MAZZOLA: No. 140-something.

MR. ROSENTHAL: Oh. Okay.

(Pause in proceedings.)

BY MR. MAZZOLA:

Q. So this is a document we put in front of you. We previously marked this document as Exhibit 140.

Have you seen this document before?

A. Yes.

Q. Was it included in the documents that you reviewed?

A. We received this document, but it wasn't relevant for the CTX, LLC, counterclaim.

Q. So you didn't review it?

A. Not in conjunction with the counterclaim report.

Q. Did you -- not in conjunction with the report you prepared.

A. I've seen the spreadsheet.

Q. Okay. So you did -- you did have this

document.

A. Correct.

Q. So the documents that were produced to us that we looked at earlier -- and I'm bringing up this -- this is 151.

These are just the documents that you used and incorporated into your report, 147. Exhibit 147. Is that what you're saying?

A. Primarily.

Q. Primarily. So there's a set of other documents that you did review that you did not use in your report?

A. Correct.

Q. Because before we took the break, we were talking about this related-party issue, and you said to me if you saw evidence of the U.S. operation paying the debts of the Hong Kong operation, that would be something that would be important and that you would consider in evaluating whether the U.S. operation and the Hong Kong operation are related parties. Do you remember that?

MR. ROSENTHAL: Object to the form.

A. So you keep going back to this related parties. They could be related, but they're still

separate entities, and they track the transactions separately.

So if I had two businesses, you could argue that they were related parties. But if they were maintained separately, then that's a separate issue. So I'm not -- you keep going back to this --

BY MR. MAZZOLA:

Q. Okay. I --

A. -- related party.

Q. The great thing is, is this nice lady is writing everything down. Okay? That's what I thought your answer was.

I thought you had said earlier, If I saw proof that the U.S. entity was paying the debts of the Hong Kong entity, that would have been important for me to know, and it would have had bearing as to whether or not the U.S. entity and Hong Kong entity are related for accounting purposes.

A. I think you're mischaracterizing my testimony --

Q. I may be --

A. -- because I recall I specifically told you that it would matter which payment was in the ledger. And I specifically recall we talked about that OSP example in my report where Benlida wanted

one payment directed to ROK instead for the OSP payment. And I said it would matter which ledger that transaction was recorded in to make sure, one, there was no duplication and, two, to make sure it was in the appropriate balance.

Q. It's okay with me. This lady's writing it all down, and I trust that she's getting it all down.

So I want to look at -- so this document that I just put up in front you, which we had previously marked as Exhibit 140, this payment schedule for ROK U.S. HK, you did see this. This was in your -- the material you had, though it wasn't disclosed to us that the document had -- that you used for your report. That's correct?

A. We had been provided this document previously.

Q. If we look at -- do you know what this document tells you?

A. Yes.

Q. And this document is a list of payments that were made to ROK. Is that what you understand it to be?

A. Yes. By Circuitronix, LLC.

Q. Okay. How do you know they're paid by

Circuitronix, LLC?

A. Because I believe that Citibank account to be a Circuitronix, LLC, transaction that I believe the Circuit -- the ROK transactions were with Circuitronix, LLC.

Q. Okay. But you know that Citibank bank account is a U.S. account because of the SWIFT number. Right?

A. I believe so. I don't know if there's any other data on the far right side that you're not fully displaying that would -- no.

Yeah. I believe the Citibank account is the Circuitronix, LLC, account.

Q. And we know it's a U.S.-based account because of the SWIFT number that says "CITIUS33." We know that. Right?

A. It appears that way.

Q. There's also -- and I'm looking at line 57, column D. Right?

A. Um-hmm.

Q. Okay. And you can see throughout this document that there's a lot of SWIFT numbers that have this -- in that same column that bear the Citi U.S. SWIFT number. Right?

A. Correct.

Q. And down here at line 69, column D -- I beg your pardon. Line 70, column D, you see another SWIFT number. Do you see that?

A. I do.

Q. And that SWIFT number is related to an HSBC Bank. Do you see that?

A. I do.

Q. And the SWIFT number has "HK" in it. Would that indicate to you that that's a Hong Kong account?

A. It could.

Q. Okay.

A. I see "HK" in the SWIFT number.

Q. I'm going to pull up another document. I guess we're going to have to call this one -- I think this document probably was previously identified as 142.

MR. MAZZOLA: Right, Rich?

What do you think?

BY MR. MAZZOLA:

Q. This is the ROK Payment Detail CTX U.S. HK 2012 to 2018. Do you see that, Mr. Parisi?

MR. ROSENTHAL: Is that 139?

MR. MAZZOLA: That's 142?

Okay. This is not 142, then.

MR. ROSENTHAL: Try 139.
MR. MAZZOLA: 139?
MR. ROSENTHAL: I mean, maybe. I'm not looking at what you're looking at. But based upon what you said, I think it might be. Payment detail version 2 ROK 2012 to 2019 --
A. My 139 in this binder's blank, so I can't help.
MR. LERNER: 139.
MR. MAZZOLA: It's 139.
BY MR. MAZZOLA:
Q. Mr. Parisi, have you seen this document before? This spreadsheet.
A. Yes.
MR. ROSENTHAL: I'm sorry. Are you showing that now on the screen?
MR. MAZZOLA: Yes.
MR. ROSENTHAL: Okay.
BY MR. MAZZOLA:
Q. And, again, this is a document that you got from Mr. Rosenthal and/or Chauncey, but you did not use it in the preparation of the report that we've been discussing today. Right?
A. Correct. CTX, LLC's, counterclaim.

Q. But you reviewed it. Right?
A. Correct.
Q. Did you do an analysis of it?
A. I compiled the data.
Q. I'm going to draw your attention to -- let's go to the tab at November 2015. Do you see this document over here?
A. I do.
Q. This is a payment memo -- payment detail memo. Are you familiar with these documents?
A. Yes. I do call them the payment details. The monthly payment details.
Q. And this is a monthly payment detail from Circuitronix U.S. to ROK. Do you see that?
A. I see those words.
Q. And if you scroll down on this column E, you see entries for Hong Kong. Do you see that?
A. I do see "HK" on the screen.
Q. Okay. Do you have any understanding what that means?
MR. ROSENTHAL: Would you mind scrolling to the top, just for my benefit, too?
MR. MAZZOLA: Yeah. I can make it smaller, but then maybe Mark can't see

it.

A. Oh, no. These are real glasses.

BY MR. MAZZOLA:

Q. You can see?

A. I can see.

I mean, Hong Kong. It says "HK" in column E.

Q. And let's go to December 2015. Do you see that?

A. I see the tab on the screen.

Q. It says "Hong Kong" as well?

A. I see the letters "HK" next to select cells in column E.

Q. In 2016, they made it a little easier. And it says "HK total." Do you see that?

A. That's one of the components.

Q. And it's a U.S. total.

A. Correct.

Q. And on February 2016, they did the same thing. They broke it down.

And March of 2016, they did the same thing.

MR. ROSENTHAL: I'm sorry. Just to keep up with you, you're now on the March 2016 payment detail tab?

MR. MAZZOLA: Yes.

BY MR. MAZZOLA:

Q. There's a Hong Kong total. Do you see that, Mr. Parisi?

A. I do.

Q. And on March 2016, they're still showing -- at least CTX is still showing a balance. Right?

A. Between CTX -- presumably, CTX, LLC, and ROK.

Q. Yeah. Well, it's got "Hong Kong totals" in there. Do you see that?

A. Let's scroll up to the top.

It says from Circuitronix, LLC, to ...

MR. ROSENTHAL: Wait. You've got to -- he's trying to read while you're moving, JC.

A. ... "to ROK Printed Circuit Boards, Ltd."

The words HK appear in column E, but this says "from Circuitronix, LLC."

BY MR. MAZZOLA:

Q. Oh. I see where it's written. Oh. Absolutely.

But it also makes reference to -- there's a bill number. Do you see that?

And there's references to Hong Kong on

the bill number. Do you see that? The "HK"?
A. I see "HK" in column A and also column E.
Q. And the Circuitronix, LLC, people, the people here in Fort Lauderdale, they broke this down with the Hong Kong total and the U.S. total. Right?
A. I see those subtotals.
Q. And so it's showing a balance owed of $206,000. Do you see that?
A. Correct. For March 2016. I see those numbers on the screen.
Q. And then when you get to April 2016, another Hong Kong total of 167,000, and the U.S. total is 77 -- 771,000.
Does -- the fact that these payment details reflect amounts owed for Hong Kong and U.S., does that suggest related entities to you?
A. Between that HK, assuming that HK represents Circuitronix Hong Kong. So there's the Circuitronix -- it appears there could be the Circuitronix Hong Kong and LLC invoices on that same tab.
Q. So it doesn't indicate that those -- that the two are related entities, then.
A. They could very well be related. There's common management, and they have some shared

services. But they're still -- this one combines the net balance, but the invoices are clearly tracked separately.

Q. What if the U.S. operation was paying all of these obligations, the Hong Kong total and the U.S. total, from the U.S. bank account? Would that suggest to you that the two entities, the Hong Kong entity and the U.S. entity, are related?

A. Not necessarily.

Q. Would it be another factor you would consider?

A. I consider -- I consider all the facts and circumstances.

Bill.com could pay my bills, but that doesn't mean Bill.com is my related party, just a payment processor.

Q. That's all they are, just a payment processor.

A. Correct --

MR. ROSENTHAL: "They" in the hypothetical you --

MR. MAZZOLA: Bill.com.

BY MR. MAZZOLA:

Q. But in Bill.com -- you don't have any ownership interest in Bill.com?

A. Me?
Q. Yeah.
A. Not that I'm aware of.
Q. You don't get -- you don't get copied on emails that are sent to Bill.com?
A. I do get copied on some emails that are sent to Bill.com.
Q. You don't have any control over Bill.com?
A. I mean, I've used Bill.com before.
Q. But you -- so I think the example you're giving me is very different from the factual patterns in this case.
A. There's paymasters for companies. That happens regularly.
Q. Okay. So are you suggesting that the LLC in this instance is nothing more than a paymaster for the Hong Kong entity?
MR. ROSENTHAL: Object to the form.
A. I don't know.
BY MR. MAZZOLA:
Q. Let's look at -- if I -- let's look at some of these. Let's pick a date. This December 2000 -- the February 2016 tab. The payment detail. Do you see this?

A. I see the tab on the screen.
Q. It's a payment detail that's dated May 1, 2016. Do you see that?
A. I do.
Q. The total of $537,000. The subtotal is comprised of an HK total of 120 and a U.S. total of 417. Do you see that?
A. I see those words.
Q. Do you see these payments?
A. I see those words.
Q. It says "Less payment 4/21/2016 of 300,000."
And then it says another payment of 300,000 performed on April 28th, 2016. Do you see those?
A. I see those numbers and words.
Q. If you look at this document, 139, in conjunction with 140, and we went to the payments just referenced on the February 2016 tab, one of the payments was made on April 21, 2016, for $300,000. Do you see that?
MR. ROSENTHAL: Could you just tell me what you're referencing on the screen right now?
MR. MAZZOLA: 981.

MR. ROSENTHAL: No. I mean, this is exhibit what? 140?

MR. MAZZOLA: 140.

MR. ROSENTHAL: Thanks.

BY MR. MAZZOLA:

Q. Line 81, column A.

Do you see column B where it says $300,000?

A. I do.

Q. Column C is Citibank, and column D, there's the U.S. SWIFT number. Do you see that?

A. I see U.S. and the SWIFT number.

Q. Yes. And then there's another payment referenced on April 28th. Do you see that?

A. I do.

Q. $300,000?

A. I do.

Q. From Citibank.

And the SWIFT number, that has the "U.S." in it. Right?

A. I see U.S. and the SWIFT number.

Q. Does that indicate to you that, insofar as Exhibit 139 is concerned on this February 2016 tab, that someone's paying from the U.S., the debts incurred by the Hong Kong entity?

A. To ROK?

Q. Yes.

A. It appears that way.

Q. Is that -- would that be something that might indicate to you that the U.S. operation and the Hong Kong entity -- the Hong Kong operation are related entities from an accounting perspective?

MR. ROSENTHAL: Object to the form.

A. They could be related parties. But that's separate from who's responsible for the debts of which entity.

BY MR. MAZZOLA:

Q. Well, we know right here from this one example --this one example -- that the U.S. operation is or did pay the debts of the Hong Kong operation.

MR. ROSENTHAL: Object to the form.

BY MR. MAZZOLA:

Q. Is that what you're seeing here from an accounting perspective?

MR. ROSENTHAL: Same objection.

A. I'm seeing "HK" on certain invoices. And it appears that Circuitronix, LLC, made payments to

ROK for those invoices.

BY MR. MAZZOLA:

Q. On behalf of the HK operation.

MR. ROSENTHAL: Object to the form.

A. It appears that way.

BY MR. MAZZOLA:

Q. Okay. Let's -- is that some information that -- I guess, you did have that information before you prepared this report. Right?

A. When you say "that information," what are you referring --

Q. This. You had these spreadsheets. Right?

A. Yes.

Q. Okay. But you didn't include any of that discussion in your report.

A. ROK is not a party to the counterclaim, as far as I'm aware.

Q. So, I guess, the other question I want to ask is that if, in fact, CTX U.S. is responsible for paying the debts of CTX Hong Kong, then that makes your report have no value. Right?

MR. ROSENTHAL: Object to the form.

A. I disagree. And we -- and I previously

answered this question.

BY MR. MAZZOLA:

Q. You continue to disagree with that.

MR. ROSENTHAL: Object to the form.

I continue to object to the asked and answered.

BY MR. MAZZOLA:

Q. Are you familiar with -- do you know what the financial arrangement is between yourself and Mr. Mukamal for your expert services in this case?

A. I don't understand your question.

Q. Do you know the financial arrangements between -- for you and Mr. Mukamal and CTX for your time in preparing the report and testifying in this case?

A. We're hourly consultants, if that's your question.

Q. You are hourly consultants?

A. Correct.

Q. And what is the rate?

A. The rate for what?

Q. Your work. Hourly rate.

A. $460.

Q. Do you have any -- how much have you

billed?

A. For the whole project?

Q. Um-hmm.

A. I have no idea.

Q. Would Mr. Mukamal know that?

A. I have no idea what he knows. I do not know if he's reviewed the invoices.

Q. Okay.

MR. LERNER: Actually, we have the invoices here.

MR. MAZZOLA: Do we?

MR. LERNER: Yeah. We do.

MR. ROSENTHAL: Yeah.

BY MR. MAZZOLA:

Q. I'm going to just do a little housecleaning over here.

(Pause in proceedings.)

MR. MAZZOLA: We have copies of these. Right?

MR. LERNER: No.

MR. ROSENTHAL: That's my only one.

MR. MAZZOLA: We don't have copies of them?

MR. LERNER: Just mark it in

and --

MR. ROSENTHAL: -- and we'll deal with it.

MR. MAZZOLA: Yeah.

BY MR. MAZZOLA:

Q. I'm going to hand them to Mr. Parisi to look at and tell us how much the total is. Because I got confused.

MR. LERNER: He can do it now.

A. Oh.

BY MR. MAZZOLA:

Q. Do you want a calculator?

A. I'm going to need a computer. There's -- there's a lot of invoices here.

MR. ROSENTHAL: Maybe you can tell him how to calculate it.

MR. LERNER: Is this 164, the next one? Invoices?

MR. MAZZOLA: Yeah.

(Deposition Exhibit 164 marked for identification.)

BY MR. MAZZOLA:

Q. We've handed to you a stack of invoices, Mr. Parisi. We've marked them as Exhibit 164.

Were you being facetious when said you

couldn't tell us what the grand total was?

A. I can absolutely do it. I can get out a piece of paper and add all these up.

Q. Just give us a rough number. It looked like it was north of $100,000. I just wanted to get that.

A. I'll concede it's north of $100,000.

Q. Okay. And would those invoices reflect all the work that was done on this?

A. All of the work from inception to the last invoice date. Citrin takes a little while to publish their invoices, so all the invoices that Citrin's finalized have been produced.

Q. And I did ask the question -- it wasn't well asked, but you asked me. It looked like it -- it raised the issue in your mind.

And I was trying to understand. I'm kind of interested now. Is there any financial arrangement between yourself and Mr. Mukamal? Did he agree to share fees with you regarding this file?

A. No. I do some hourly consulting for Kapila Mukamal on, you know, lingering issues since I left, but I haven't done anything in two and a half months.

This was my last -- you know, you

leave a case, you can't leave your previous firm high and dry. So pretty much all my matters with Kapila Mukamala have concluded.

Q. Okay. So the retention for you via Citrin is unique to this case then. Right?

That was not a very good question.

I guess, what I'm trying to understand is, Mr. Mukamal is not paying you for your time today or for anything. You're being paid separately by CTX.

A. Yes. Citrin -- just to be clear, Citrin is paid by Circuitronix, LLC.

Q. Okay.

MR. LERNER: And I think we're paying for him today.

MR. ROSENTHAL: Yeah.

BY MR. MAZZOLA:

Q. And Mr. Mukamal is not -- he hasn't agreed to pay you for any additional work related to this file.

A. No.

Q. Okay. Whatever additional work you're doing for Mr. Mukamal on an hourly basis is for -- unrelated to this work.

A. Yes.

Q. Do you have any other depositions coming up any time soon?
A. I'm filing a report today, so I assume, yes. And I hope it is soon.
Q. Is that report for Mr. Rosenthal?
A. Unfortunately, not.
He's great to work with, though.
Q. Is it for Mr. Cole?
A. It is for Cole, Scott & Kissane.
MR. ROSENTHAL: That's a different law firm.
MR. MAZZOLA: Yes. It is a different law firm. Yes.
Cole, Scott, with a S-c-o-t-t.
BY MR. MAZZOLA:
Q. Have you ever been adverse to any client Mr. Cole represented?
A. Not that I'm aware.
Q. Have you ever been adverse to any clients Mr. Rosenthal or his firm has represented?
A. Not that I recall.
Q. Are you familiar with the term -- the accounting term "FIFO"?
A. Absolutely.
Q. Okay. What does that mean?

A. First in, first out.
Q. Did you consider FIFO in reviewing this claim? This matter?
A. So when you review everything -- right -- we're only talking about invoices, payments, and debit memos. And you may remember a long time ago called "the order of operations." Right? Parentheses, exponents, multiplication, addition --
Q. PEMDAS.
A. PEMDAS. Yes. I didn't want to be that nerdy and say it, but yes. PEMDAS.
And so when you're just adding -- right? -- there's no multiplication here. We're just in the addition/subtraction component of the PEMDAS. And so no matter what order -- as in FIFO or LIFO -- you add and subtract, you're going to get the same answer.
Q. It makes no difference, then.
A. When you analyze everything. Correct.
Because it's all -- it's all out at the end of the day.
Q. Is it unreasonable for a business to apply payments to the oldest invoices first?
A. As long as it's for the correct -- it depends.

The answer is, it depends.

Q. If the payment doesn't -- if the payment made by the payor does not define what invoices or identify what invoices they should be attributable to, is there anything unreasonable about the payee applying that money to their oldest invoices?

A. That's one option.

Q. Okay.

A. Another option would be to call the company and say, Hey, which invoices are you paying specifically?

Q. But it is reasonable to apply it to the oldest invoices.

A. It could be. As long as it's applied to the appropriate entity that issued those invoices.

You wouldn't want to have a matching issue. You know, the -- accounting's very big on matching. Right? You want to have the revenues and expenses in the proper period, in same way you'd want to have the invoices applied against the proper payments.

Q. So assuming it's the proper entity, there's nothing unreasonable about a bookkeeping department taking a payment that doesn't otherwise identify to what invoice it's attributable to and applying it to

its old invoices.

A. Hypothetically?

Q. Yes.

A. That could happen.

Q. And is it reasonable to do that?

A. It depends on the facts and circumstances. I'd reach out and ask for detail to apply issues.

In this example, you know, if it wasn't applied FIFO, some of these, you know, invoice differences would have been flushed out, hopefully. But it could -- but payments on accounts certainly can happen.

Q. But it is -- it remains reasonable -- now, while you may prefer someone to pick up the phone and call, it does remain reasonable for a bookkeeping department to apply monies to the oldest invoices. Is that correct?

MR. ROSENTHAL: Object to form.

A. If applied to the proper entity, it -- that could be an appropriate method of accounting for payments.

(Pause in proceedings.)

MR. LERNER: Just give us a minute.

(Discussion off the record.)

BY MR. MAZZOLA:
Q. Let's look at -- we're back to Exhibit 140.
MR. ROSENTHAL: If I may, this is the ROK Payment Detail --
MR. MAZZOLA: Yeah. This is 139.
MR. ROSENTHAL: -- U.S. Hong Kong tab.
BY MR. MAZZOLA:
Q. We're looking at the February 2016 tab.
And this is a payment detail. Right?
A. This is -- this spreadsheet tab on the screen is the payment details between Circuitronix LLC, and ROK Printed Circuit Board for invoices dated February 2016.
Q. And there were many of these payment details.
A. So I just -- there are payment details for -- between the three groups of parties.
Q. Okay. So --
A. Monthly payment details.
Q. So you would receive payment details from Circuitronix, LLC, to Benlida. Right?
A. For the counterclaim.
Q. Did you ever see any -- in the materials that were provided to you -- payment details from

Circuitronix Hong Kong to Benlida?
A. I don't recall.
Q. But regarding this payment detail, it's dated May 1, 2016. Do you see that?
A. Yeah.
The way it works is, there's the invoices, and then there's the payments, which are AMS60. Or there's some changes, depending on the point of time.
Q. So there's a bill date you can see over here on line 14, column B.
A. I see column B.
Q. It says February 1, 2016. Right?
A. Correct.
Q. And then down below over here, you'll see a payment date, line 39, making reference to a payment on April 21. Do you see that?
A. I do.
Q. And then this document is produced sometime later and sent to, in this instance, ROK on or about May 1, 2016. Right?
A. No.
Q. When is it sent?
A. November 1st, 2019, is part of the initial email from Circuitronix, LLC, to Benlida.

Q. November 2019 is when it's first sent?
A. November 1st, 2019.
Q. It's sent over two years later?
A. Yes.
If you go to the far right, the ROK transactions ceased in 2018, I want to say.
If you just -- yeah. Hold "control" and click that little pointer.
Q. So this payment detail that has a date of May 1, 2016, was not sent to ROK in May of 2016?
A. So I just want to be clear. There's two different potential versions of this payment details. What you're looking at right now, this is CTX's compilation of the monthly payment details between CTX, LLC, and ROK.
For CTX, LLC, and Benlida, the initial CTX recon, as we referred to it in the report, that is also a compilation. But the actual emails, the monthly transmittals, between CTX, LLC, and Benlida, those were, in fact, sent monthly. But now you're looking at an aggregation.
So in the same way we wouldn't say, Oh, you know, there's a January 2012 tab, this wasn't sent until November 2019. The 2012 tab was sent in 2012. This is just a consolidation. And

there was probably also some adjustments from the original monthly transmittals to these updated versions.

Q. So this payment detail dated May 1 for invoices from February 2016 reflecting payments made in April 2016 was not sent to ROK until 2019. Is that what you're saying?

MR. ROSENTHAL: Object to the form.

A. So imagine -- let me just say it differently. The parts --

BY MR. MAZZOLA:

Q. I've seen emails --

A. There's emails.

Q. -- with these payment details attached to them.

A. Correct.

Q. So my question is, based upon all the information you've looked at, do you know when this payment detail would have been sent to ROK?

MR. ROSENTHAL: By "this payment detail," are you referring to the one up on the screen right now?

MR. MAZZOLA: Not the one up on the screen.

BY MR. MAZZOLA:

Q. The data. The data contained in this one.

A. Approximately 90 days after the month of the invoice.

Q. So sometime in --

A. May.

Q. -- May. Okay.

A. Presumably. On or about.

Probably after May, because the payments would have -- you know, all the transactions would come after -- or the sending of the payment details would come after the payments were sent.

Q. Okay. So still talking about payment application and applying of payments.

I guess, hypothetically, if CTX U.S. is responsible for the debts of CTX Hong Kong, is it -- would it be appropriate and reasonable for Benlida to apply payments from the U.S. operation to the oldest invoices of either U.S. or Hong Kong?

A. If Circuitronix, LLC, is responsible for all the debts of Circuitronix Hong Kong.

Q. Hong Kong. Um-hmm.

A. Then you could presumably combine the balances.

Q. So it would be reasonable, then, for Benlida to apply payments from U.S. to the oldest of either of their invoices, Hong Kong or U.S.

A. If they're found liable and you disregard the separate corporations, then you could presumably combine all the balances.

Q. Okay. Have we finished up with that -- that spreadsheet. Right? The invoices.

A. Yeah. Do you want them?

Q. Yeah. So we're just going to assume that they're greater than $100,000 for purposes of today. They are what they are.

MR. MAZZOLA: I can keep these?

MR. ROSENTHAL: No. That's the marked --

MR. LERNER: Those are the ones that are going to be marked and --

MR. MAZZOLA: Are we getting -- but we have a set, though?

MR. LERNER: No. But it will go to the reporter, and the reporter will send it to us.

MR. ROSENTHAL: Why don't we just keep them for tomorrow here.

MR. MAZZOLA: Yeah.

MR. ROSENTHAL: That's Exhibit 164.

BY MR. MAZZOLA:

Q. Did you read Mr. Paulikens' report?

A. Yes.

Q. Do you know Mr. Paulikens independently of this case?

A. This is the first time I have heard of him or his firm.

(Pause in proceedings.)

BY MR. MAZZOLA:

Q. Where did you work doing internal audits?

A. Cross Country Healthcare.

Q. You did say that.

A. And Ryder Trucking. Or Ryder Systems is the name, actually.

Q. I'm looking at some initials on one of these invoices.

It says JZP.

A. JZP. Yes. That is Jasmine Padilla. She is a trusted assistant. So she would have done clerical work, adding together of spreadsheets. Work of that nature.

Q. What's Mr. Kukreja's initials? Do you know?

A. SVK.

(Pause in proceedings.)

BY MR. MAZZOLA:

Q. Did she put any time on this file, if you know?

A. Absolutely.

For a while, the cadence was myself -- worked on primarily by myself and Mr. Mukamal. And then much later on, I can't remember when we were -- when Kapila Mukamala was retained officially. But much later on, she became involved, but I can't remember if that was before or after pencils down.

Q. Oh. I see her. She's SVK.

A. I'm sure she has lots of time on there.

Q. There's reference to "meeting at Circuitronix." Would you have gone to those meetings?

A. Yes. We previously discussed, and I told you who I met with at Circuitronix.

Q. Um-hmm. Are you guys allowed to block bill at Citrin Cooperman?

It's a lawyer joke.

A. Not really.

Q. And your billing rate went up when you joined Citrin?

A. I think the technical answer is, no.

Q. Oh.

A. My rate technically went down from -- I think it was $500, or almost, to $460. And then there's an admin fee, which brings it slightly higher.

Q. What's the admin fee?

A. There's a 5 percent admin fee for all technology and everything.

We have access to a lot of systems and, you know, resources that we can use. It depends on the facts and circumstances.

MR. ROSENTHAL: Everyone's a hologram.

(Pause in proceedings.)

BY MR. MAZZOLA:

Q. So regarding Mr. Paulikens' report, do you have any comments, any points of agreement, any points of disagreement? I know that's a massive question, so I'll break it down.

How about this -- we'll start with this: Any points of disagreement.

A. Yes.

Q. Do you want to start with them?

A. Yes. I thought it was odd in the report

how we were criticized for excluding ROK from the report. And in multiple instances, he referred to ROK, but I think he was actually referring to CTX Hong Kong and Benlida.

And then we were criticized for excluding the ROK transactions, but he also didn't include those transactions. So I'm not sure. That was confusing.

And then, additionally, he never identified -- it was a rebuttal report, which was strange because he never identified the basis of why Circuitronix, LLC, would be responsible for Circuitronix Hong Kong, for the debts specifically. He just says, you know, kind of look at all of this.

And then it doesn't appear he went very deep into the details or reconciled any of the underlying data.

Sitting here, I don't really know what he contends the balance for -- due to Circuitronix Hong Kong is.

Q. One of the things you just said, he never explained why the Hong Kong entity would be responsible for the U.S. -- I beg your pardon -- why the U.S. entity would be responsible for the Hong Kong entity.

But didn't you testify earlier that that -- you believe that to be a legal question? So why would an accountant opine on that?

A. Well, if he's putting two different companies together, I'd like to know why. What's the basis? Does the basis make sense? Is it logical?

You know, I do not know they -- why it wasn't put in an affirmative report, but ...

Q. Do you think that maybe he was referring to the fact that the Hong Kong entity and the U.S. entity are related entities?

A. I don't want to speak for Mr. Paulikens.

Q. You also said that you were confused that he didn't dig deeper into the data.

A. Correct.

Q. We talked today that -- when you testified to this that, insofar as the lead-time penalties go, you didn't dig into the data because it was too burdensome and would take too much time. Do you remember saying that?

A. We didn't verify the inputs. Correct.

Q. Okay. I think you testified to the same thing with respect to the debit memos. That you didn't verify the inputs into the debit memos

either, because that would have taken too much time.

A. We didn't have enough time.

Q. And it would be overburdensome.

Do you think maybe that's why Mr. Paulikens didn't dig into the same data, because it was overburdensome and there wasn't enough time?

A. So we reconciled the data and determined how close the two were. We requested debit memos to make sure that some of the differences were accounted for. And we also verified the payments, the bank statements to make sure an amount was dispersed on that date, and identified the differences.

And so when I talk about reconciliations, I'm not talking about merely, you know, reprinting, you know, what one side represents, but, you know, a little more kicking the tires and -- you know, this is expert-level work. We're not just, you know, pasting data.

Q. Okay. But you -- but -- that's right. It is expert-level work. Okay? And it sounds to me like you did a lot of math checking. Is that correct?

A. We did a lot of math checking; we reconciled to the meeting minutes; we compiled the

data; we checked the bank statements. We did a lot of work.

Q. How many meeting minutes did you look at? There's only one set of meeting minutes.

A. I think there's several. I believe there is three to five, perhaps.

Q. Okay. Over a how-many-year relationship?

A. 2012 to the present.

Q. Okay.

A. There could be more meeting minutes, but they may not have been relevant to the issues identified.

Q. So you didn't look at them, then. Right?

A. I did not look at what I was not provided.

Q. So we know you checked the math. You said you looked at meeting minutes.

And the meeting minutes are where? Where would they be?

A. So those would likely be those Bates-stamped documents, BDL 073, BLD 582. And I'm not sure what that 364 is. That's definitely one. And there's --

MR. ROSENTHAL: When you say "that's definitely one," you're talking now about --

THE WITNESS: Meeting minutes --

MR. MAZZOLA: Yes. BLD ending in 73.

BY MR. MAZZOLA:

Q. Okay. You looked at that. You looked at BLD ending in 364?

A. I'm not sure what that one is, specifically.

Q. That has meeting minutes attached to it.

A. Oh. That's the transmittal email -- that's a transmittal email for meeting minutes, yes. This is one of the main meeting minute transmittal emails between the parties.

Q. That's a page-and-a-quarter document. Right?

A. That's one attachment on the email. There's several.

MR. ROSENTHAL: To be clear -- sorry, JC -- because you're talking about an email that has six attachments.

What you're referring to is the one entitled "Meeting Minutes 2016," 0725. Right?

MR. LERNER: And just so we're clear, I think it probably has more than

six attachments.

MR. ROSENTHAL: You're right.

MR. LERNER: But probably eight.

BY MR. MAZZOLA:

Q. And you looked at this BLD 582. Right? This set of meeting minutes. Right?

A. Yes.

MR. MAZZOLA: Great. Thank you.

MR. ROSENTHAL: You said you're done?

MR. MAZZOLA: Yes.

MR. ROSENTHAL: Okay. We'll read.

(Proceedings concluded at 4:45 p.m.)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

JIANGMEN BENLIDA PRINTED )
CIRCUIT CO., LTD., )
Plaintiff, )
vs. ) Civil Action No.
CIRCUITRONIX, LLC, ) 21-601-125-civ
Defendant. )

REPORTER'S CERTIFICATE

ORAL DEPOSITION OF MARK PARISI, CPA,CIRA, CFE, CTCE
Monday, July 31, 2023

I, Rebecca J. Callow, Registered Merit Reporter, Certified Realtime Reporter, Registered Professional Reporter and Notary Public in and for the State of Florida, hereby certify to the following.

That the witness, MARK PARISI, CPA, CIRA, CFE, CTCE, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to ____________________________.

That a copy of this certificate was served on all parties and/or the witness shown herein on _____________.

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

[ X ] was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

[ ] was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys to the action in which this proceeding was taken. Further, I am not a relative or employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this, the 14th day of AUGUST, 2023.

_________________________________

Rebecca J. Callow, RMR, CRR, RPR

Notary Public, Miami, Florida

My Commission No. HH 409626

Expires: 06/12/2027