Exhibit B

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF FLORIDA

3    JIANGMEN BENLIDA PRINTED    )

4    CIRCUIT CO., LTD.,          )

5        Plaintiff,              )

6    vs.                         ) Civil Action No.

7    CIRCUITRONIX, LLC,          ) 21-601-125-civ

8        Defendant.              )

9

10                ORAL DEPOSITION

11   BARRY MUKAMAL, CPA, PFS, ABV, CIRA, CFE, CFF, CGMA

12              Tuesday, August 1, 2023

13

14

15

16

17

18

19

20

21

22

23   Reported by:

24   Rebecca Callow, RMR, CRR, RPR

25   Job No. 131876

1

2      ORAL DEPOSITION OF BARRY MUKAMAL, CPA, PFS,

3   ABV, CIRA, CFE, CFF, CGMA, produced as a witness

4   at the instance of the Defendant and duly sworn,

5   was taken in the above-styled and numbered cause

6   on the 1st day of August 2023, from 10:30 a.m. to

7   4:02 p.m., before Rebecca J. Callow, Registered

8   Merit Reporter, Certified Realtime Reporter,

9   Registered Professional Reporter and Notary Public

10   for the State of Florida, reported by computerized

11   stenotype machine at the offices of

12   Podhurst Orseck, P.A., One S.E. 3rd Avenue,

13   Suite 2300, Miami, Florida, pursuant to the

14   Federal Rules of Civil Procedure.

15

16

17

18

19

20

21

22

23

24

25

```
 1                          APPEARANCES

 2    FOR PLAINTIFF:

 3         Podhurst Orseck, P.A.

 4         One S.E. 3rd Avenue

 5         Suite 2300

 6         Miami, Florida 33131

 7         (305) 358-2800

 8              By:  Christina Martinez, Esq.

 9                   cmartinez@podhurst.com

10                   Stephen Rosenthal, Esq.

11                   srosenthal@podhurst.com

12

13    FOR DEFENDANT:

14         Mazzola Lindstrom LLP

15         1350 Avenue of the Americas

16         2nd Floor

17         New York, New York 10019

18         (646) 216-8300

19              By:  Jean-Claude Mazzola, Esq.

20                   jeanclaude@mazzolalindstrom.com

21                   Richard Lerner, Esq.

22                   richard@mazzolalindstrom.com

23    ALSO PRESENT:

24         Jessica Miller

25         Rishi Kukreja (via Zoom)
```

```
 1                       INDEX

 2                                        PAGE

 3  BARRY MUKAMAL, CPA, PFS, ABV, CIRA, CFE, CFF, CGMA

 4  Examination by Mr. Mazzola ........................7

 5

 6

 7

 8

 9

10

11  Changes and corrections  .........................184

12  Signature Page  ..................................185

13  Court Reporter's Certificate .....................186

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        EXHIBITS

 2    NO.             DESCRIPTION                    PAGE

 3    Exhibit 164     Kapila Mukamal Invoices:        181

 4                    5/31/2021 through 6/30/2023

 5    Exhibit 165     Barry E. Mukamal - Recent        25

 6                    Testimony History

 7    Exhibit 166     4/12/2019 Invoice No.            54

 8                    CCT-BLD-190412001

 9    Exhibit 167     Benlida Invoice No.              54

10                    BLDCCT-HK19080602

11    Exhibit 168     Black binder containing         101

12                    supporting materials used by

13                    Kapila Mukamal

14

15                 PREVIOUSLY MARKED EXHIBITS

16    NO.                                            PAGE

17    Exhibit 21      ...............................139

18    Exhibit 27      ...............................135

19    Exhibit 40      ...............................127

20    Exhibit 62      .................................8

21    Exhibit 121     ................................76

22    Exhibit 139     ...............................142

23    Exhibit 140     ...............................147

24    Exhibit 144     ................................98

25
```

1                PREVIOUSLY MARKED EXHIBITS (Cont.)

2     NO.                                              PAGE

3     Exhibit 147         ................................11

4     Exhibit 151         ................................15

5     Exhibit 152         .................................9

6     Exhibit 155         ...............................107

7     Exhibit 156         ...............................108

8     Exhibit 158         ...............................156

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                       - - - - - -

 3    BARRY MUKAMAL, CPA, PFS, ABV, CIRA, CFE, CFF, CGMA,

 4           called as a witness herein, having

 5        been first duly sworn by a Notary Public,

 6         was examined and testified as follows:

 7                       EXAMINATION

 8    BY MR. MAZZOLA:

 9    Q.    Good morning, Mr. Mukamal.

10    A.    Good morning.

11    Q.    Actually, can you give me your name for the

12    record?

13    A.    Sure.  Barry Mukamal.  M-u-k-a-m-a-l.

14    Q.    And you are a forensic accountant.  Is that

15    correct?

16    A.    Well, if you want to put a label to it, I'm

17    a certified public accountant.

18    Q.    You understand that you're here to provide

19    testimony in a matter brought by our clients, which

20    we're referring to as "Benlida," against

21    Circuitronix, LLC.

22              Do you understand that?

23    A.    Yes.

24    Q.    And you also understand that we're going to

25    be asking you questions about a report that was
```



1   prepared by you, and I also understand by

2   Mr. Parisi. Is that correct?

3        A.    Correct.   Just to be clear, there's a --

4   your complaint and there's a countercomplaint.

5        Q.    Okay.   So I assume you've read both.

6   Right?

7        A.    I did.

8        Q.    We might as well start right now.   Let's

9   look at -- if you have the binders in front of you,

10  there's an Exhibit 162.

11               I beg your pardon.   It's 62.   I'm so

12  sorry.

13       A.    Yes.

14       Q.    Do you see that document?

15       A.    Yes.

16       Q.    Do you see that it says "Third Amended

17  Complaint" on it?

18       A.    Yes.

19       Q.    It's on the right side.   And that's got the

20  caption of the lawsuit.   It's Benlida versus

21  Circuitronix, LLC.

22               And you understand that you're here to

23  testify in connection with this litigation.   Okay?

24  Whether it's the third-party complaint, the

25  counterclaim, the answer, but in connection with this



1   litigation as regards to the report that you wrote.

2   Is that correct, Mr. Mukamal?

3       A.   Yes.

4       Q.   And we've got another document.  It's

5   Exhibit 152.

6            152 is a document that's got the

7   caption across the top, "Benlida versus Circuitronix,

8   LLC."  And if you'll note, that's the same caption

9   that's on the Third Amended Complaint at Exhibit 62.

10  Is that correct?

11           Same case number?

12      A.   Same case number.

13      Q.   It says "Exhibit 1" in the upper right-hand

14  corner.

15           Do you see that on Exhibit 152?

16      A.   Yes.

17      Q.   And in the lower right-hand corner, it says

18  "Kapila Mukamal."

19           Do you see that --

20      A.   Kapila.

21      Q.   -- "Kapila Mukamal."

22           Kapila Mukamal is your forensic and

23  insolvency advisory firm.  Is that correct?

24      A.   That's how it's described, but it's a CPA

25  firm.



1    Q.    Okay.  But the point is that this

2 Exhibit 152 was attached to the report that you

3 prepared in connection with this litigation.  Is

4 that correct?

5    A.    Yes.

6    Q.    And this Exhibit 152, this identifies

7 documents utilized in the preparation of the report.

8 Is that correct?

9    A.    And/or reviewed.

10    Q.    Okay.  It says "utilized."

11    A.    That's what it says.

12    Q.    And the review that you're looking at is my

13 handwriting.  So you would have done both.  You

14 would have utilized them, and you would have

15 reviewed those documents.  Is that correct?

16    A.    Yes.

17    Q.    And Mr. Parisi would have done the same.

18 Is that correct?

19    A.    Yes.

20    Q.    And Item Number 1 on that is the

21 Third Amended Complaint.

22          Do you see that?

23    A.    Yes.

24    Q.    So as we go forward with today's

25 deposition, is it safe for me to assume that you



1  did, in fact, review and utilize this Exhibit 62,

2  which is identified as the Third Amended Complaint?

3      A.   I did review it, yes.

4      Q.   Did you utilize it?

5      A.   I utilized it in forming my opinions.

6      Q.   Okay.  So you reviewed and utilized.  So as

7  we -- is that correct?

8      A.   Yes.

9      Q.   And so as we go forward again today, if I

10  refer to a document that's on this Exhibit 1, your

11  Exhibit 1, which is marked as our exhibit -- the

12  case Exhibit 152, I can assume as I go forward that

13  these are documents that you utilized and reviewed.

14      A.   Well, we're talking about this document

15  here.  We're not talking about all of the documents

16  that may or may not be referenced in the complaint.

17      Q.   I'm talking about this -- okay.

18          Let's look at Exhibit 147.

19      A.   Okay.

20      Q.   That is your report.  Right?

21      A.   Yes.

22      Q.   This is a report that was prepared by you

23  and Mr. Parisi.  Is that correct?

24      A.   Yes.

25      Q.   And I assume you read this report before it

1   was submitted to us and to your counsel -- or to

2   CTX's counsel.  Is that correct?

3       A.   Yes.

4       Q.   And I assume that everything that's in this

5   report, because you approved it, and I assume you

6   signed off on it.  Right?

7       A.   Yes.

8       Q.   You did.  And because of that, we can

9   assume that everything in this report you believe is

10  correct, and it's presented within a reasonable

11  degree of accounting certainty.  Is that correct?

12      A.   It's my opinions.  Yes.

13      Q.   Okay.  And your opinions are rendered

14  within a reasonable degree of accounting certainty?

15      A.   It's a vague term, but I believe that's

16  correct.

17      Q.   Okay.  So back to this Exhibit 152, which

18  is attached to this Exhibit 147.  What I want to

19  understand, Mr. Mukamal, is as we go through the

20  deposition today that if there's a document that is

21  identified on Exhibit 152, which is Exhibit 1 to

22  your report, can I assume those documents were

23  utilized and reviewed by you and Mr. Parisi?

24      A.   The documents contained in my report?

25  Or -- are you talking about --



1    Q.   This Exhibit 152.  Do you have that in

2    front of you?

3    A.   Oh.  This.

4    Q.   Yeah.

5    A.   Sorry.

6    Q.   And I will represent to you that that

7    Exhibit 152 is attached to your report.

8    A.   To the extent it's relevant for my

9    opinions, I believe that's correct.

10   Q.   Your report contains all your opinions.

11   Right?

12   A.   It contains the contents of my opinions.

13   Q.   Okay.  How is that different from -- how is

14   that -- my question was, your report contains all of

15   your opinions.

16        Can you give me a yes or no on that?

17   A.   It contains all the opinions that I intend

18   to testify about.  Yes.

19   Q.   Okay.  And then the question I'm trying to

20   get to so I can just get a baseline for starting

21   today is, there's an Exhibit 1 that is attached to

22   your report, which we collectively have marked as

23   Exhibit 152.

24        As we go forward today, can I assume

25   that if the document is identified on this



1    Exhibit 152, which is Exhibit 1 to your report, that

2    you utilized and reviewed them in the preparation of

3    your report?

4        A.    To the extent that it's relevant to my

5    opinions.

6        Q.    And the report contains all your opinions.

7        A.    Correct.

8        Q.    And I assume the same is with Mr. Parisi.

9    He would have reviewed and utilized them to the

10   extent that they are relevant to his opinions.

11       A.    I can't speak for Mr. Parisi.

12             But you -- I assume you asked him that

13   question yesterday, and that's my assumption.

14       Q.    So let's just start with the first thing we

15   were asking about, which is the Third Amended

16   Complaint which you have in front of you as

17   Exhibit Number 62.

18       A.    Yes.

19       Q.    You did review that in preparation for

20   rendering your opinion and preparing the report.  Is

21   that correct?

22       A.    I reviewed it.

23       Q.    Let's look at another document we have.

24   And we're going to -- we call it 151.  And I will

25   represent that that 151 is a printout of what's on



 1    the screen in front of you.

 2                    Do you see that, Mr. Mukamal?

 3        A.    Yes.

 4        Q.    If it's easier to look at the document or

 5    the screen.

 6                    This printout is a printout of what was

 7    contained on a USB drive that was provided to us by

 8    CTX's counsel.

 9                    MR. LERNER:  Via Dropbox.

10                    MR. MAZZOLA:  What's that?

11                    Oh.  Via Dropbox.

12    BY MR. MAZZOLA:

13        Q.    And we were advised that what was in that

14    Dropbox that you're looking at on the screen is

15    everything that was utilized by you and Mr. Parisi

16    in the preparation of the report.  Is that correct?

17        A.    If it was given to you by counsel with that

18    representation, I assume it's correct.

19        Q.    I don't know for certain, but it seems to

20    me like the number of documents, just the sheer

21    number, is much greater than what is identified on

22    Exhibit 152.

23                    Can you explain to me why that might be

24    the case?

25        A.    I would -- I believe that some of the items

1    on 152 are broadly defined, and this is detail of

2    documents that we did utilize in arriving at the

3    opinions that are extracted from those documents.

4        Q.   You said -- you said "we."  Who are the

5    "we's" that were involved in forming the opinion and

6    in the preparation of the report?

7              And if those -- if that's two different

8    sets of people, perhaps you could let me know that.

9        A.   Well, these are members of my firm.

10       Q.   Okay.

11       A.   And Mr. Parisi.

12       Q.   So I understand Mr. Parisi worked with you

13   in rendering the opinion.  Is that correct?

14       A.   In the process of rendering the opinion, we

15   worked together.

16       Q.   In the process of rendering the opinion,

17   did you also work with Ms. Khanorkar?

18   A.   Very good.

19              Yes.

20              MR. ROSENTHAL:  I spelled it out

21       for him phonetically.

22              MR. MAZZOLA:  And I remembered

23       how to write it.

24   BY MR. MAZZOLA:

25       Q.   In the process of rendering your opinion,



1   did you work with anyone else, other than Mr. Parisi

2   and Ms. Khanorkar?

3        A.    Yeah.   I'm sure there were people that -- I

4   don't have -- I'm sorry.   I don't have the invoices

5   in front of me, but I'm sure there were people that

6   were doing quality review.

7        Q.    And those would have been what you call --

8   you call them junior accountants now or assistants?

9        A.    We call them consultants in our firm.

10       Q.    But is it then fair to say that the heavy

11  brain lifting, if you will, was done by yourself,

12  Mr. Parisi and Ms. Khanorkar?

13       A.    "Khanorkar," actually, is the correct

14  pronunciation.

15              But you did very well, by the way.

16       Q.    Is that correct?

17       A.    I would agree with that.

18       Q.    Ms. Khanorkar -- I understand she works

19  remotely from India.   Is that correct?   Did I

20  understand that correctly?

21       A.    No.   She's visiting India.

22       Q.    Okay.   And visiting there for how long?

23       A.    She's been there for about a month and a

24  half now, two months.   Month and a half to two

25  months.



1    Q.    Was she there on business?

2    A.    No.  She's taking care of her husband's

3  mother.

4    Q.    Do you know if she has any relationship

5  with Mr. Kukreja in India?

6    A.    I'm almost certain she does not.

7    Q.    Or any of his family?

8    A.    I'm almost certain she does not.

9    Q.    How is it that your firm came to be

10  retained in this matter?  And that's a big question,

11  I understand.  But what I'm getting at was who

12  called you?  Was it Mr. Cole?

13    A.    That's my recollection.

14    Q.    Okay.  Before Mr. Cole reached out to you,

15  had you ever done any business with Mr. Kukreja?

16    A.    There was -- there was another case

17  involving Circuitronix, LLC.

18    Q.    What was that other case?

19    A.    I believe it was Kin Wong versus

20  Circuitronix or vice versa.

21    Q.    Okay.  And other than working on that

22  Kin Wong case with Mr. Cole and Mr. Kukreja, had you

23  ever worked with Mr. Kukreja or any of his companies

24  prior to that?

25    A.    Not that I know of.  Not that I recall.



1      Q.    How big is your -- well, how big is your

2  firm?

3               And I just asked that question to get

4  an idea as to whether it's possible that your firm

5  could have worked with Mr. Kukreja, and you didn't

6  know that.

7      A.    No.  I would have known that because we run

8  conflict checks.

9      Q.    And you're -- I assume you're not a

10  10,000-accountant firm.  Right?

11      A.    No.  I left that.

12      Q.    Mr. Parisi walked into that.  Right?

13      A.    I don't know what that means.

14      Q.    Mr. Parisi went to Citrin.  That's a much

15  larger firm.

16      A.    Oh.  Yeah.  He walked into that.

17      Q.    He walked into that.

18      A.    That's a good point.

19      Q.    Why did Mr. Parisi leave?

20               MS. MARTINEZ:  Objection.

21      A.    You'll have to ask him that question.

22  BY MR. MAZZOLA:

23      Q.    Had -- prior to Mr. Cole calling you to

24  retain you in connection with this case, had you

25  ever worked with Mr. Cole?



1     A.    Yes.

2     Q.    And how many times?

3     A.    One other time I remember -- I recall.

4     Q.    What about the Podhurst firm?  Had you ever

5  worked with the Podhurst firm before this case?

6     A.    Yes.

7     Q.    And what case was that?

8     A.    Far & Wide Travel.

9     Q.    Do you know -- do you recall what that

10  related to?

11     A.    That's one case.

12     Q.    Oh.  That's one case.  Okay.

13     A.    Yeah.  Maybe there's another.  Give me a

14  moment.  A case called PayCargo.

15     Q.    With respect to Mr. Cole, have you ever

16  been adverse to any client he's represented?

17     A.    Not that I recall.

18     Q.    With respect to the Podhurst firm, have you

19  ever been adverse to any clients the Podhurst firm

20  represented?

21     A.    It's possible, but not that I recall.  And

22  it would have been many years ago if it -- if it did

23  exist.

24     Q.    And I'll assume the answer is no, because

25  you probably wouldn't be sitting here.  But have you



1    ever been adverse to Mr. Kukreja or any of his

2    companies?

3              MS. MARTINEZ:  Objection.

4        A.   Not to my knowledge.

5    BY MR. MAZZOLA:

6        Q.   You're a well-experienced expert witness, I

7    understand.  Is that correct?

8        A.   I don't know really what that means.

9              I have experience.

10       Q.   Okay.  And I assume that you've provided

11   deposition testimony before?

12       A.   Yes.

13       Q.   A number of times.  Right?

14             I have the list, so it's a lot.

15       A.   Well, that's maybe the last five years or

16   so.

17       Q.   Okay.

18       A.   The answer is ...

19       Q.   "Yes"?

20       A.   Multiple times.

21       Q.   Have you provided testimony at trial?

22       A.   Yes.

23       Q.   In both state courts and federal courts?

24       A.   Yes.

25       Q.   Was that here in Florida or throughout the

1   country?

2        A.    Primarily in Florida.

3        Q.    Have you ever been disqualified as an

4   expert?

5                   Do you know what I mean by that?

6        A.    Yes.

7                   But not disqualified.  But I know what

8   you mean.

9        Q.    You know what I mean by that.  Yeah.  That

10   was a bad question.

11                   So you've never been disqualified by a

12   judge as an expert.

13        A.    One time I wasn't able to testify because

14   the judge determined that the remedy for the matter

15   was contained within a specific contract that she

16   interpreted, and that my testimony was not

17   necessary.

18        Q.    So the judge precluded you from testifying

19   on relevancy?

20                   MS. MARTINEZ:  Objection.

21   BY MR. MAZZOLA:

22        Q.    If you know?

23        A.    That's my understanding.  I mean, the

24   order -- and there was a comment, just to be clear,

25   in her ruling that said my methodology was fine.  It

1    was just not helpful.  It was not relevant.

2        Q.   So you knew I was going to ask that next

3    question.

4                 Has your methodology ever been rejected

5    by a judge?

6        A.   No.

7        Q.   What about your opinions?  Have they ever

8    been rejected?

9        A.   What's the difference?

10       Q.   I don't know.  It sounds like in this case,

11   a judge said that she wasn't going to accept your

12   opinion, and it sounds like she said it was because

13   it wasn't relevant.

14       A.   Well, I was precluded from testifying in

15   the case based on my interpretation relevancy.

16       Q.   Were you precluded after -- do you know

17   what it means to be voir dired as a witness?

18       A.   Yes.

19       Q.   Was it after you were voir dired as a

20   witness?

21       A.   At trial, are you talking about?

22       Q.   Yeah.

23       A.   No.

24       Q.   Okay.  So this is something that was

25   done --



1       A.    Pretrial.

2       Q.    -- on papers.  You understand that.  Right?

3       A.    Yes.

4       Q.    What case was that?

5             Do you remember?

6       A.    Bimini Bay, I believe.

7       Q.    Attached to your report at Exhibit 147,

8  Mr. Mukamal, is a list at the back.  I'm going to

9  hold this up for you.  It's this blue-and-white

10 shaded chart --

11      A.    Yeah.

12      Q.    -- so you can easily find it.

13            MS. MARTINEZ:  What exhibit is

14      that, JC?

15            MR. MAZZOLA:  147.  It's his

16      report.  Is it attached to yours?  Did I --

17            MS. MARTINEZ:  I don't think we

18      have the exhibits attached to the report.

19      But let's see.  It's possible.

20            (Discussion off the record.)

21 BY MR. MAZZOLA:

22      Q.    Mr. Mukamal, I had asked you a question to

23 try to have you identify the case where the judge

24 that, I believe is what you said, precluded you from

25 testifying.  And you said the case was Bimini Bay.



1    And.

2                  I'm going to hand you what we're going

3    to mark as Exhibit 165.  Okay?

4                  (Deposition Exhibit 165

5                  marked for identification.)

6        BY MR. MAZZOLA:

7        Q.    And, Mr. Mukamal, I will represent that

8    Exhibit 165 was an exhibit -- or is an exhibit

9    that's attached to your report.

10       A.    Right.

11       Q.    And it's pretty self-explanatory.  I'm just

12   putting it in front of you.  It's a list of cases.

13   Right?

14       A.    Correct.

15       Q.    And it's just in front of you to look at to

16   see if it refreshes your recollection on any more

17   details about the Bimini Bay case so we can find it.

18       A.    I'm sorry?

19       Q.    So we can identify it.

20       A.    Oh.  It wouldn't be on this list.

21       Q.    Okay.  And that's because why?

22       A.    Because this is recent testimony history.

23   Bimini Bay is many, many years ago.

24       Q.    Okay.

25       A.    I mean, normally, I'd like to keep this to

1    four years, five years, at the longest, to comport

2    with the federal rules.  But sometimes we just -- it

3    doesn't get dropped.  But Bimini Bay was a long time

4    ago.

5         Q.    What court was it in?

6         A.    District court -- district court in Miami.

7         Q.    You say "district."  Are you referring to

8    the southern district federal court?

9         A.    Correct.

10        Q.    Any judge ever say that your opinions were

11   unrealistic?

12             MS. MARTINEZ:  Objection.

13        A.    In court?  Not that I recall.

14   BY MR. MAZZOLA:

15        Q.    Okay.  Any judge ever write anything that

16   made reference to your opinion as being unrealistic?

17             MS. MARTINEZ:  Objection.

18        A.    I'm interpreting what you mean by

19   "unrealistic."  And not to my recollection or

20   knowledge.

21        BY MR. MAZZOLA:

22        Q.    Any judge ever -- have you ever been -- has

23   any of your methodologies that you've relied upon

24   ever been found to be unrealistic?

25             MS. MARTINEZ:  Objection.



1    A.    However you define the term "unrealistic,"

2  I don't think so.

3    BY MR. MAZZOLA:

4    Q.    Now, we looked at 151, which is what's up

5  on the screen.

6    A.    Oh.  Yes.

7    Q.    And then we looked at -- and I'm going to

8  hold it up for you, just so you can see it, just to

9  refresh your recollection, of Exhibit 152.

10   A.    Right.

11   Q.    And here I am trying to understand the --

12  you know, again, the universe of all the documents

13  that were utilized.  151 is what's up on the screen.

14  152 was what was attached to your report.

15          Were there any other documents that you

16  reviewed in the preparation of your report?  And

17  that's a different question from utilized.

18   A.    It's quite possible.

19   Q.    Okay.

20   A.    But it wasn't relevant to my evaluation.

21   Q.    Okay.  Who provided the documents to you?

22   A.    I believe it was a combination of counsel

23  and the client directly.

24   Q.    What were the circumstances of the client

25  CTX providing you documents directly?



```
 1                 MS. MARTINEZ:  Objection.

 2       A.    I'm not sure I understand the question.

 3       BY MR. MAZZOLA:

 4       Q.    Well, did you ask for additional documents

 5  from the client, and they sent them to you?

 6       A.    I'm sure, during the course of our

 7  engagement, we requested information that clarified

 8  or supported other documents.

 9       Q.    So --

10       A.    And I would have noted, to the extent that

11  they were relevant, they were listed and provided to

12  counsel to provide to you.

13       Q.    So in terms of the first step, the first

14  set of documents that was provided to you, that

15  would have been provided by counsel.  Is that

16  correct?

17       A.    To the best of my recollection.  But I

18  don't know the sequencing of documents.

19       Q.    Do you ever --

20       A.    Because remember, things like this is a

21  start-and-stop engagement.

22       Q.    Yes.  Do you have a recollection of

23  reviewing documents and saying to yourself,

24  presumably, first, that we need something else and

25  then going back and asking for it?
```



1      A.    I don't remember specifically any

2   circumstance of that, but I'm sure it happened.

3      Q.    If Mr. Parisi had come to the same sort of

4   thought conclusion or epiphany, would he have

5   discussed that with you, or would he have gone

6   directly back either to counsel or client and asked

7   for additional documents?

8                MS. MARTINEZ:  Objection.

9      A.    He would not have asked me permission to

10   ask for documents.

11   BY MR. MAZZOLA:

12      Q.    That isn't how it operated.  He was

13   sufficiently senior to be able to make decisions on

14   his own?

15                MS. MARTINEZ:  Objection.

16      A.    If it was an issue that he was concerned

17   about, that maybe he was overstepping what he

18   believes he should have asked -- should be asking

19   for, he would have conferred with me.  And we likely

20   would have conferred with counsel.

21   BY MR. MAZZOLA:

22      Q.    In conferring with counsel, would

23   Mr. Parisi have been present for those discussions?

24      A.    I don't know all of them, but most likely,

25   yes.



```
 1      Q.    Would Ms. Khanorkar have been present for

 2   those discussions?

 3      A.    On occasion.

 4      Q.    Other than communicating with counsel, did

 5   you have communications with anyone at CTX?

 6      A.    Yes.

 7      Q.    And who was that?

 8      A.    Mr. Kukreja.

 9      Q.    So you spoke with Rishi?

10      A.    Oh, yes.

11      Q.    Okay.  Anyone else?

12      A.    It depends on the time frame that you're

13   talking about.

14               I mean, it was -- if it was during --

15   during the whole case matter, yes.  I just don't

16   remember the names.  I mean, his internal staff, we

17   had a meeting or two.

18      Q.    Do you recall speaking to a lady named

19   Lina Ochoa?

20      A.    It's possible.

21      Q.    A lady named Nicole Donaldson?

22      A.    It's possible.

23      Q.    I don't want to put you on the spot, and I

24   really don't want to take the time to go through the

25   time sheets, and I don't know your billing
```



```
 1   practices.  But would you have made a note meeting

 2   with --

 3       A.   I would have said "client," most likely.

 4       Q.   Okay.  What about Celin Astudillo?

 5            Do you recall speaking to him?

 6       A.   I don't remember the names.

 7       Q.   Celin Astudillo is a -- I'm going to -- I'm

 8   going to suspect, because we're in Miami, he's of

 9   Cuban descent.

10            MR. LERNER:  No.  Ecuador,

11       Nicaragua.  Latin American.

12            MS. MARTINEZ:  Objection.

13   BY MR. MAZZOLA:

14       Q.   He's of Latin descent.  I think he's maybe

15   late 50s, early 60s.  No?

16            MS. MARTINEZ:  Objection.

17       A.   I think it's possible.  I just don't

18   recall.

19   BY MR. MAZZOLA:

20       Q.   Other than Rishi, any other names that you

21   can recall having spoken with?

22       A.   Sitting here, no.

23       Q.   Do you have any recollection of speaking

24   with anyone at CTX that was in India?

25            Not like Rishi on business in India,
```



```
1   but just someone working for Rishi at the India

2   operation.

3        A.    Not for this matter.

4        Q.    Any recollection of speaking to anyone that

5   was in Hong Kong in connection with this matter?

6        A.    I don't believe I did.

7        Q.    Did you bring a file with you today?

8        A.    I brought my report with me, and I think

9   Mr. Paulikens's report also.

10       Q.    Okay.

11       A.    Somewhere.

12       Q.    Did you bring any engagement -- your

13  engagement letter with you?

14       A.    No.

15       Q.    What was the scope of your engagement?

16       A.    The scope of my engagement was to -- and I

17  think I -- let me back up.  I think I put it in my

18  report.

19             (Document review.)

20       A.    So the scope of my engagement was to

21  evaluate, quantify, and support the counterclaim of

22  my client.

23       BY MR. MAZZOLA:

24       Q.    And that -- you're looking at your report.

25  Right?
```



1    A.    That's my report.

2    Q.    And you were looking in the report when you

3 said that.

4    A.    No.   That's -- I was looking to see if I

5 said it in the report.

6    Q.    Okay.   But -- and so that is the scope.

7              Was that scope --

8    A.    Well, it was also anticipated that if I

9 received -- if we received a -- an affirmative

10 report from your client's expert supporting your

11 client's claims that we would be in a position to

12 rebut those claims.

13    Q.    Regarding the scope that you just

14 articulated, did you define that scope?

15    A.    That was defined by my counsel -- by client

16 and counsel.

17    Q.    So when you say "client," that would have

18 been CTX.   Is that correct?

19    A.    CTX, LLC.   Correct.

20    Q.    And it would have been Mr. Cole.   Is that

21 correct?

22    A.    Initially, yes.

23    Q.    Did the scope of your assignment ever

24 change over the life of this litigation?

25    A.    It didn't change.   It just -- part of



1    the -- the anticipated scope of an affirmative

2    report from your client -- or from your expert was

3    received would have been a rebuttal report.

4        Q.   Did you receive a deposition notice to be

5    here today?

6        A.   I don't recall.

7        Q.   I will represent to you that our office did

8    serve a deposition notice on counsel for CTX.  And

9    that the deposition notice did instruct that you

10   bring your file with you.

11            Were you asked to bring your file?

12       A.   I was asked to bring my report.

13       Q.   And you were not asked to bring your file?

14       A.   Well, my understanding was everything that

15   I had was already provided to you, so -- but I don't

16   recall being asked that specifically.  But it's

17   possible.

18       Q.   When I use "Circuitronix" or I said "CTX,"

19   you were very careful to come back and say

20   "Circuitronix, LLC."  Why is that?

21       A.   That's who retained me.  Retained my firm.

22       Q.   Okay.  But if I just used the word

23   "Circuitronix," you don't think I'm talking about

24   the LLC?

25            Do you think I'm talking about someone



1  else or trying to trick you?

2      A.    I'm just being clear for the record.

3      Q.    Are you aware that there's another

4  Circuitronix operation -- and those are my words --

5  in Hong Kong?

6            MS. MARTINEZ:  Objection.

7      A.    I'm aware that there's an entity in

8  Hong Kong -- and I don't know the formal name; I

9  don't recall it -- that's entitled "Circuitronix."

10  Whatever the formal name is.

11  BY MR. MAZZOLA:

12      Q.    Do you know that the Hong Kong entity also

13  has "Circuitronix" in its name?

14      A.    I believe that's correct.

15      Q.    Let's look at Exhibit 162.  Perhaps this

16  might refresh your recollection.

17      A.    Sure.

18            MS. MARTINEZ:  162.  Right?

19            MR. MAZZOLA:  Yeah.

20      A.    I'm there.

21            MS. MARTINEZ:  I'm going to

22      continue counsel's prior objection

23      yesterday regarding this document.

24  BY MR. MAZZOLA:

25      Q.    Have you ever seen this document?



1      A.    I don't recall seeing this.

2      Q.    Let me ask you this question:

3            After Mr. Parisi's deposition

4   yesterday, did you speak with him?

5      A.    Yes.

6      Q.    What did you guys talk about?

7      A.    I had one question for him on just the

8   document that was in my possession.

9      Q.    What was the document that was in your

10  possession?

11     A.    If you give me a moment, I'll tell you.

12     Q.    Okay.

13            (Document review.)

14     A.    I just asked him, does he feel okay.

15  BY MR. MAZZOLA:

16     Q.    You asked him if he feels okay, and he

17  said, "I'm fine"?

18     A.    He said, "I'm fine," and "Thank you for

19  appearing in the deposition."  That's it on the

20  deposition.

21     Q.    Did he talk to you about any of the

22  questions that were asked?

23            MS. MARTINEZ:  Objection.

24     A.    No.

25  \\\



```
 1         BY MR. MAZZOLA:

 2         Q.    Any of the topics that were covered?

 3               MS. MARTINEZ:  Objection.

 4         A.    No.

 5         BY MR. MAZZOLA:

 6         Q.    But you did have a conversation with him

 7    about a document that you are going to show us?

 8               MS. MARTINEZ:  Objection.

 9         BY MR. MAZZOLA:

10         Q.    Is that correct?

11               MS. MARTINEZ:  Objection.

12         A.    Yes.

13               No, about the question.  And I'm

14    looking to see what it was.  It was an allocation.

15               (Document review.)

16         BY MR. MAZZOLA:

17         Q.    What is that binder you're looking through,

18    Mr. Mukamal?

19         A.    This is my report with all the attachments

20    that are referenced in the report.

21         Q.    That's your report with the attachments

22    that are referenced in Exhibit 151?

23         A.    No.

24         Q.    152?

25         A.    No, no, no.  With some attachments relating
```

1   to references in the report.  Just a spattering of

2   them.

3        Q.   So it's a selection of documents that come

4   from Exhibit 152.

5                Let me show you this, Mr. Mukamal.

6                Mr. Mukamal?

7        A.   Yes.

8        Q.   Is that correct?

9        A.   Yes.

10       Q.   So what you're looking at is a subset of

11  the documents that are represented on Exhibit 152.

12  Is that correct, Mr. Mukamal?

13       A.   Of -- those are -- I'm sorry.

14               Let me take a look again.  I'm sorry.

15               Or summaries.  Yeah.

16       Q.   Okay.  Or summaries?

17       A.   Yeah.

18       Q.   Okay.  So does that constitute your file?

19       A.   Just excerpts from those documents.

20       Q.   Are they excerpts or the whole document?

21       A.   Just excerpts.

22               MR. MAZZOLA:  So perhaps at the

23       break, counsel can make a photocopy of

24       that.

25               MR. LERNER:  The entire book?



1          MR. MAZZOLA:  Yeah.

2     A.   Give me a moment.  Okay?

3     BY MR. MAZZOLA:

4     Q.   Okay.

5     A.   Because I don't remember what I asked him.
6 It had to do with an allocation.  So just give me a
7 moment.

8          (Document review.)

9     A.   It had to do with a number on Table 5
10 relating to the waiver of a lead-time penalty.

11    BY MR. MAZZOLA:

12    Q.   Okay.  So two questions, maybe more.  I
13 can't promise.  But two questions.

14          Where -- that document you were just
15 looking at --

16    A.   Right.

17    Q.   -- that you said related to a question
18 regarding Table 5 --

19    A.   Right.

20    Q.   -- in that black binder that's to your
21 right.  Where in that black binder is it?  Was it
22 tabbed?  Is it --

23    A.   No.  It's just -- it was in the report.  I
24 circled it.  That's what I was looking for.

25    Q.   You circled.  What did you circle?



1      A.    I circled the number I was questioning.

2      Q.    So that was in Table 5?

3      A.    Yes.

4            I didn't see the circle before.

5      Q.    Sir, do you have 147 in front of you, which

6  is your expert report?

7      A.    Yes.

8      Q.    So the document you were looking at in your

9  black binder was your report that you were looking

10  at?

11      A.    Yes.

12      Q.    Okay.  And you were looking at Table 5 in

13  your -- in your report that's in your black binder?

14      A.    Yes.

15      Q.    And on Table 5, you had a number -- Table 5

16  relates to LTP waivers, which we understand to be

17  lead-time penalty waivers.  And you had circled a

18  number there.  What number was that?

19      A.    Number 2.  Under waiver at 14.2 percent.

20      Q.    And what did you and he talk about?

21      A.    I asked him, I can't recall how we arrived

22  at that number, and he reminded me.

23      Q.    How did you arrive at that number?

24      A.    It's an allocation of a fixed number that

25  was provided as a waiver, as opposed to a percentage



Page 41

1   like the other waivers were.  So it had to be

2   allocated.

3       Q.   So is it fair to say, then, you were

4   reviewing this report in preparation for your

5   testimony this morning.  As you were reviewing this

6   report, you posed a question to yourself about this

7   number 2 on Table 5, and you called up Mr. Parisi

8   and asked him if he could explain to you how you

9   arrived at it?

10      A.   It was a reminder --

11               MS. MARTINEZ:  Objection.

12               THE WITNESS:  I'm sorry.

13      A.   I knew it at one time; I just didn't

14   remember it sitting there because I looked --

15      BY MR. MAZZOLA:

16      Q.   Mr. Mukamal, it happens to me all the time.

17   I'm just trying to clarify what happened here.

18      A.   That's exactly what happened.  And I needed

19   clarification on how that number was arrived at, and

20   I neglected to see the footnote.

21      Q.   I'm not trying to trick you.  This is what

22   professionals do every day.  We talk to our peers,

23   and we try to understand things.

24      A.   Right.  But you asked me what I talked

25   about, and I was trying to be specific.



1   Q.   All I was hoping it was for something more

2   exciting than that.

3   A.   Nothing more exciting than that.

4   Q.   And that binder contains other excerpts and

5   documents.  Is that correct?

6   A.   Excerpts of exhibits that -- or items that

7   were already listed.  Correct.

8   Q.   So I want to get back to how -- before we

9   went down this rabbit hole, we were looking at

10  Exhibit 162.

11  A.   Yes.

12  Q.   And counsel had raised an objection as was

13  raised yesterday.  And I was asking you questions

14  about the Hong Kong entity.  But while you're at it,

15  you might as well take a look at this document.

16          (Document review.)

17  BY MR. MAZZOLA:

18  Q.   Have you ever seen this document prior to

19  this morning?

20  A.   No.

21  BY MR. MAZZOLA:

22  Q.   I put this front of you, one, because you

23  said you knew there was a Hong Kong entity, but you

24  did not know the name of the Hong Kong entity.

25  A.   I didn't recall the legal name of the



1　Hong Kong entity.

2　　　Q.　This is a document which I want you to

3　assume that -- I think it's a fair assumption that

4　this was produced by that Hong Kong entity's

5　certified public accountants working as an auditor.

6　Is that fair?　Is that a fair assumption?

7　　　　　　　MS. MARTINEZ:　Objection.

8　　　A.　I'll assume it for purposes of your

9　question.

10　　　BY MR. MAZZOLA:

11　　　Q.　Okay.　And with that said, is it a fair

12　assumption, then, that at least these certified

13　public accountants operating as an auditor

14　understand the Hong Kong entity to be referred to as

15　Circuitronix (Hong Kong) Limited?

16　　　A.　That's their reference.

17　　　Q.　While we're on this document, let's go to

18　the last page of it.

19　　　　　　　If you assume for the purposes of

20　　　this question that this company Jules Jiu,

21　　　J-i-u.　Jules, J-u-l-e-s, J-i-u.

22　　　　　　　MR. LERNER:　"Joe."

23　　　　　　　MS. MARTINEZ:　How do you say

24　　　that, Richard?

25　　　　　　　MR. LERNER:　"Joe."　Jules Jiu.



1       BY MR. MAZZOLA:

2       Q.    Jules Jiu & Company, Certified Public

3    Accountants, are operating as an auditor.

4              Is it fair to assume, then, that

5    insofar as they are concerned, this auditing company

6    that they believe that Circuitronix Hong Kong owes

7    Benlida 52.28 million Hong Kong dollars?

8              MS. MARTINEZ:   Objection.

9       A.    No.

10      BY MR. MAZZOLA:

11      Q.    That's not fair to assume that?

12      A.    No.

13      Q.    Can you explain to me why that's not a fair

14   assumption?

15      A.    Because they're sending confirmation.   If

16   they believed it, they would have formed an opinion

17   on it, not asked for a confirmation.

18      Q.    So are they asking for Benlida to confirm

19   if that, in fact, that was owed?

20              You're reading the email now.

21      A.    Yeah.   I'm reading the email.   I just want

22   to see that it was sent to Benlida.   Confirmation

23   was sent to Benlida.

24      Q.    And do you see where the email says, "We

25   would like to confirm the outstanding balance as of



1    31 December 2021 between Circuitronix and your

2    companies."

3              Do you see where it says that?

4    A.   Yes.

5    Q.   So you don't think it's a fair assumption

6    that if someone received this, that it's a statement

7    insofar as the auditors are concerned that

8    Circuitronix Hong Kong owes Benlida 52.28 million

9    Hong Kong dollars?

10             MS. MARTINEZ:   Objection.

11   A.   No.   That's what they're trying to

12   determine.

13   BY MR. MAZZOLA:

14   Q.   Do you see the column in the middle on the

15   last page?

16   A.   Yes.

17   Q.   Do you see where it says, "Due from you"?

18             What does that say?

19   A.   "Due from you."

20   Q.   And it says what?   What's it say below

21   that?

22   A.   Nil.

23   Q.   So insofar as this document is concerned,

24   just this document alone, it makes reference to

25   nothing owed by Benlida.   Is that a fair assumption?



1          MS. MARTINEZ:  Objection.

2     A.   I mean, that's what the document says.

3  You're asking me to assume the document is correct.

4     BY MR. MAZZOLA:

5     Q.   I'm asking you to assume it's a correct

6  document.

7     A.   Okay.  It's a request for confirmation.

8  They are trying to confirm whether the information

9  their client gave them is correct or not.

10    Q.   So they're asking Benlida to confirm that

11 the information that Circuitronix Hong Kong gave to

12 them is correct.  Is that correct?

13         MS. MARTINEZ:  Objection.

14    A.   It's a -- an assumption on my part because

15 that's what a confirmation normally takes care of.

16 Or is intended to accomplish.

17    BY MR. MAZZOLA:

18    Q.   So --

19    A.   I can't say.  I've never seen this document

20 before, and I don't know the circumstances behind

21 it, other than my assumption --

22    Q.   Okay.  So if this auditor is asking Benlida

23 to confirm that information provided by its client

24 Circuitronix Hong Kong is correct, then this

25 document is asking Benlida to confirm that, one,



1   Benlida owed Circuitronix Hong Kong nothing.  Is

2   that true?

3       A.   That's what the document suggests.

4       Q.   Okay.  And, two, it's asking Benlida to

5   confirm that Circuitronix Hong Kong owes it

6   52.287 million Hong Kong dollars.  Is that true?

7       A.   Well, I don't know if it's true, but that's

8   what the document indicates.

9       Q.   Okay.  But assuming that these auditors are

10  reasonably good and assuming that they got the

11  information from Circuitronix Hong Kong, is this

12  something that someone might rely on if they

13  received it?

14            MS. MARTINEZ:  Objection.

15      A.   I don't know what that means, "someone."

16  BY MR. MAZZOLA:

17      Q.   Would Benlida rely on it if they received

18  it?

19      A.   I don't really know what that means.

20            They're asking, I believe, Benlida to

21  confirm.  Am I misunderstanding this?  This is --

22  they're asking -- I'm sorry.  ROK.

23            I'm on the wrong page.

24      Q.   Okay.

25      A.   They're asking ROK to confirm the numbers



1   that Hong Kong -- I'm sorry -- that Circuitronix

2   Hong Kong records may show as a receivable or a

3   payable.

4       Q.   Okay.  Let me ask you this next question.

5   It's a hypothetical.

6       A.   Sure.

7       Q.   A kid shows up to mow your lawn.  He's been

8   doing it for a long time.  You don't know the kid

9   that well because maybe you have a grown son or

10  another family member or wife or spouse that has

11  been dealing with this kid every week that cuts your

12  lawn.  You show up.  No one else is home.  He's just

13  finishing the lawn, and you say to him, Let me

14  confirm it's a hundred bucks to cut my lawn.

15           Do you think it would be reasonable,

16  one, for that kid to assume that you're agreeing to

17  give him 100 bucks if he says yes?

18           MS. MARTINEZ:  Objection.

19      A.   I don't know.

20  BY MR. MAZZOLA:

21      Q.   Do you think it would be reasonable for

22  that kid to assume that you believed the cost of

23  cutting the lawn was 100 bucks?

24           MS. MARTINEZ:  Objection.

25      A.   It may or may not be.  I mean, it could



```
 1    be -- it could mean a lot of things.

 2        BY MR. MAZZOLA:

 3        Q.    Mr. Mukamal, that was the softest softball

 4    I could lob up.  So how come that can't be a yes

 5    answer?

 6        A.    Because you're asking it in a hypothetical

 7    situation.  You're saying someone that never --

 8    never dealt with this person before.  Maybe he's

 9    testing the person to see if he's overcharging or

10    not overcharging.  It's a facts-and-circumstances

11    based issue.

12        Q.    So your answer is you don't know?

13            MS. MARTINEZ:  Objection.

14        A.    Not without more facts.

15        BY MR. MAZZOLA:

16        Q.    Not without more facts.  Right?

17        A.    Right.

18        Q.    There's a lot of facts in this case,

19    though.  Right?

20        A.    There's a lot of facts in every case.

21        Q.    Let's look at Exhibit 62, please.  And that

22    was the Third Amended Complaint.

23        A.    Yes.

24        Q.    And you did review this complaint.  Right?

25        A.    Yes.
```



Barry Mukamal, CPA, PFS, ABV, CIRA, CFE, CFF, CGMA                    8/1/2023
Case 0:21-cv-60125-RNS   Document 201-2   Entered on FLSD Docket 08/22/2023   Page 51 of 187

Page 50

 1                   MS. MARTINEZ:  Objection.

 2                   THE WITNESS:  Sorry.

 3       A.   I read it.

 4       BY MR. MAZZOLA:

 5       Q.   And you would have read the whole thing as

 6  part of your preparations?

 7                   And it's okay if you don't say every

 8  line because I understand there's a lot.  Yeah.

 9       A.   Not every line, because you have invoices

10  listed.

11       Q.   Yes.  Okay.

12                   But at some point, you would have

13  reviewed invoice numbers.  Right?

14                   Judgmentally, you would have taken a

15  look at some invoices?

16       A.   Or I would have instructed someone to.

17       Q.   Okay.  Let's look at -- let's look at -- I

18  don't know; how do I do this now?

19                   I'm going to pull some stuff up on the

20  screen.  I don't think it's been introduced yet.

21                   So we're looking at -- 151 is the

22  exhibit.  That's the master list, Mr. Mukamal, that

23  we talked about.  And I'm going to scroll down to the

24  folder that says "Benlida Complaint Invoices."  And

25  there's another folder that says "Invoices."



1          Do you see those two folders?

2     A.    On the screen.

3     Q.    Okay.  Now, these items would have been

4  provided to you from counsel.  That's correct?

5     A.    I think they were provided to Mr. Parisi

6  through counsel, and it was filed in our system.

7     Q.    Let's look at these invoices.  I click into

8  the Invoice folder, and I'm going to pull up an

9  invoice here.

10          Do you see this invoice?

11     A.    Yes.

12     Q.    Let's mark this as Exhibit --

13          MR. MAZZOLA:  Are you making a

14     list, Richard?

15          MR. LERNER:  Yes.

16     BY MR. MAZZOLA:

17     Q.    This is a commercial invoice.  I'll

18  represent that it's a Benlida invoice, and it's for

19  the total amount of $44,246.73.

20          Do you see that, Mr. Mukamal?

21     A.    I do.

22     Q.    It's dated 12 April 2019.  And it's got an

23  invoice number ending in 2001.

24          Would this invoice have been reviewed

25  in preparation of the report?



Barry Mukamal, CPA, PFS, ABV, CIRA, CFE, CFF, CGMA                    8/1/2023
Case 0:21-cv-60125-RNS   Document 201-2   Entered on FLSD Docket 08/22/2023   Page 53 of
187

Page 52

1             MR. MAZZOLA:  I beg your pardon,

2       everyone.  It goes on for more pages.

3       BY MR. MAZZOLA:

4       Q.   It's five pages.

5             It would have been.  Right?

6       A.   It would have been reviewed as part of a --

7    usually, we spot-check invoices.

8       Q.   Okay.

9       A.   I don't know what Mr. Parisi did in total.

10   I don't know what his scope was, sitting here.

11      Q.   Well, let me ask you this question.  You're

12   looking at that complaint.  And that complaint's got

13   a lot of invoice numbers referenced.  Right?

14      A.   Correct.

15      Q.   This folder -- Mr. Mukamal, this folder

16   that's identified "Invoices" from Exhibit 151

17   contains only three invoices.  Is that fair to say,

18   or do you want me to open them all up?

19      A.   That folder contains three invoices.

20      Q.   Okay.  And you know that because of the way

21   the invoice numbering convention is the same.  You

22   can assume that.  Right?

23      A.   Yes.

24      Q.   So my question is, how did you just end up

25   with three invoices if there's hundreds of invoices



1    referenced in the complaint -- third amended

2    complaint?

3        A.    So this is work that Mr. Parisi did.    I

4    would assume you would have asked him about that

5    yesterday.    And I assume that these are the

6    documents -- these are the invoices we looked at to

7    test the existence of the invoices.

8        Q.    Let's look at Benlida Complaint Invoices.

9    That's another folder.    Now, this, of course, has

10   more invoices in it.

11       A.    Can I -- can you open one up?

12       Q.    Yeah.    Let's open up this folder 2.

13            Do you know why the folders are

14   separate like that, what the SS folder represented?

15       A.    It means superceded.    We may have had an

16   issue with it electronically or otherwise, and it

17   was replaced.

18       Q.    So let's open up this invoice that's

19   numbered BLDCCT-HK.

20       A.    Right.

21       Q.    And I open it up.    This is an invoice --

22            MR. MAZZOLA:    And, Rebecca, I'm

23       going to go back for a second to fix it

24       because I didn't read the whole number in.

25       Is that okay?



1            MS. MARTINEZ:  Yeah.  For the

2      previous.

3            MR. MAZZOLA:  For the previous.

4            MS. MARTINEZ:  For Exhibit 166.

5            (Deposition Exhibit 166

6            marked for identification.)

7      BY MR. MAZZOLA:

8      Q.   Mr. Mukamal, so the record's clear, I said

9      this invoice that we're going to open up says

10     BLDCCT-HK and the number is 19080602.

11            MS. MARTINEZ:  Are you going to

12     make that a new exhibit, JC?

13            MR. MAZZOLA:  Yeah.  Why not?

14            MS. MARTINEZ:  Okay.  That will

15     be Exhibit 167, then.

16            (Deposition Exhibit 167

17            marked for identification.)

18     BY MR. MAZZOLA:

19     Q.   So here is this exhibit -- invoice.

20            Do you see this invoice?

21     A.   Yes.

22     Q.   Now, this is an invoice from Benlida.

23            Do you see that?

24     A.   Yes.

25     Q.   This invoice is addressed to Circuitronix

1   (Hong Kong) Limited.

2              Do you see that?

3      A.   Yes.

4      Q.   Did you review this invoice?

5      A.   Did I?  Likely not.

6      Q.   When I say "you," oftentimes -- okay? --

7   and I should correct this.  "You" means the

8   Kapila --

9      A.   Kapila.

10     Q.   -- Kapila Mukamal team.

11     A.   It could have been reviewed but not

12  utilized.

13     Q.   Okay.  But if it's in these materials,

14  these are documents that would have been reviewed?

15     A.   Right.

16              So with respect to this group of

17  documents, I suspect what you are looking at are

18  those documents that we selected to review.  Whether

19  they were reviewed or not in anticipation -- I don't

20  know to what extent they were reviewed.  Mark Parisi

21  would have done that.

22              To the extent we received an

23  affirmative report from your expert that addressed

24  the complaint -- the third amended complaint.

25     Q.   Does anyone at your office understand



1    Chinese?

2        A.    No.

3        Q.    How about read it?

4        A.    Not to my knowledge.

5        Q.    Okay.  So what would your office have done

6    if there were documents in Chinese?  Who would have

7    helped translate that?

8        A.    We would have looked at amounts on the

9    invoice and shipping addresses -- you know,

10   receiving addresses and who issued the invoice.  It

11   also has part numbers and number of pieces there, so

12   it's an invoice.

13            MR. MAZZOLA:  And to clean up the

14       record, Christina, because I just noticed

15       there are multiple tabs down here.  Do you

16       see me playing through them over here?

17            MS. MARTINEZ:  Um-hmm.

18   BY MR. MAZZOLA:

19       Q.   Mr. Mukamal, the document that was in front

20   of you, we were asking questions about, is actually

21   a packing list.  Okay?

22       A.    Oh.

23       Q.   If you look at -- if you look at the

24   bottom, there's something -- there's a tab that says

25   "DC."  And we're still on Exhibit 167.



1          There's another tab that says "PL,"

2   which we can presume is packing lists.  There's

3   another tab, which says "Invoice," which we can

4   presume is invoice.  It says "INV" and then "PO,"

5   purchase order.

6          So let's go back to the invoice.  So

7   this is a document, which is a -- we're at the

8   invoice tab.  Right, Mr. Mukamal?

9       A.   Yes.

10      Q.   And this invoice has an invoice number.

11          Do you see that?

12      A.   Yes.

13      Q.   It says "BLDCCT-HK19080602."  Right?

14      A.   Yes.

15      Q.   Do you know what the "HK" is there for?

16      A.   It's an identification of the purchaser of

17   the product.

18      Q.   So by identifying the purchaser of the

19   product, does that mean they're identifying

20   Circuitronix (Hong Kong) Limited., as you see on the

21   left of this commercial invoice, as the purchaser of

22   the product?

23      A.   That's what it appears to be.

24      Q.   Okay.  Let's go back to the folder at 151

25   exhibit -- Exhibit 151, the folder that says



1   "Invoices."

2               You recall we just looked at that.

3   Right, Mr. Mukamal?

4       A.   Yes.

5       Q.   And we're going to open up the invoice we

6   opened up before, which is invoice 166 --

7   Exhibit 166.  And this is the invoice dated 12th

8   April 2019.  This invoice has an invoice number,

9   too.  Right, Mr. Mukamal?

10      A.   Yes.

11      Q.   And this invoice number has no reference to

12  "HK" on it.  Is that correct, Mr. Mukamal?

13      A.   Correct.

14      Q.   And this invoice from Benlida with no

15  reference to HK on it, Mr. Mukamal, is addressed to

16  Circuitronix here in the United States.  Is that

17  correct?

18      A.   That's what it says.

19      Q.   I assume because you guys have these

20  documents, and I also assume that because you have

21  the complaint, that in the complaint, where Benlida

22  is suing Circuitronix, LLC, and they make reference

23  to a Hong Kong invoice -- an invoice with "HK" on

24  it, that they're looking to Circuitronix, LLC, to

25  pay that invoice.  Is that a fair assumption,



1   Mr. Mukamal?

2       A.   It's a fair lay assumption.

3            I don't even know if it's an

4   assumption.  You're asking for these invoices

5   related to your client's claim.

6       Q.   But as you look through the complaint,

7   because I know you -- someone on your team looked at

8   these invoices.  Right?

9       A.   Yes --

10           MS. MARTINEZ:  Objection.

11           THE WITNESS:  I'm sorry.

12      A.   To what extent, I don't know.

13  BY MR. MAZZOLA:

14      Q.   Okay.  But someone would have looked at

15  them.  Right?

16           MS. MARTINEZ:  Objection.

17  BY MR. MAZZOLA:

18      Q.   Is that correct?

19      A.   To my -- that's to the best of my

20  knowledge.

21      Q.   And someone -- I think it's fair to assume

22  because you just did it in about 12 seconds -- would

23  have been able to conclude that if there's an "HK"

24  in the invoice number, that invoice is looking to

25  Circuitronix Hong Kong.  It's sent to Circuitronix



1    Hong Kong.  Right?  Is that correct?

2                    MS. MARTINEZ:  Objection.

3                    I can pull that one up for you.

4        Do you want me to do that?

5        A.    Sure.  I'm not sure I understand your

6    question, but I'll do the best I can.

7        BY MR. MAZZOLA:

8        Q.    Okay.  This is 167 we're looking at.  Last

9    time we looked at this, I asked you what the HK was

10   for.  And I think in all of about six seconds, you

11   were able to conclude that the "HK" meant that

12   Benlida -- Benlida -- was looking to Circuitronix

13   Hong Kong Limited to pay it.

14                   MS. MARTINEZ:  Objection.

15       BY MR. MAZZOLA:

16       Q.    Is that still your testimony now?

17       A.    That's what it appears to be.

18       Q.    Okay.  And now we're going to look at 166.

19   And here I think it took you maybe eight seconds to

20   conclude that where there's no "HK" on it, Benlida's

21   looking to Circuitronix, LLC, here in Florida to pay

22   it.  Is that still your testimony?

23                   MS. MARTINEZ:  Objection.

24       A.    They issued an invoice to that entity.

25   \\\



1        BY MR. MAZZOLA:

2        Q.    When you issue an invoice to someone,

3    you're expecting that person to pay it.  Right?

4        A.    I assume so.  But I'm not sure what you're

5    asking.

6        Q.    Well, the question I'm asking is, the

7    complaint by Benlida suing Circuitronix, LLC, here

8    in Florida, you know it because you looked at it,

9    also contains invoices that have the "HK" numbering

10   conventions.  Is that correct?

11       A.    I believe that's a fact.

12       Q.    Okay.  That is a fact.

13            So in reviewing this complaint, whether

14   or not Benlida wins, whether or not a judge says they

15   win, whether or not a jury says it wins, those are

16   all legal issues.  You don't do that; you do

17   accounting things.

18            Is it fair to assume, looking at this

19   as an accountant, that Benlida, whether they're right

20   or wrong, is looking to Circuitronix here in Florida

21   to pay those Hong Kong invoices.  Is that a fair

22   assumption?

23            MS. MARTINEZ:  Objection.

24       A.    I think that's the positions they're

25   taking.  But to me, it's a legal determination



1    whether this indicates what you said.  Whether

2    that's legally sufficient, what it means from a

3    legal standpoint.

4              But the fact of the matter -- all I'm

5    saying is, they included invoices that include

6    Benlida and Hong Kong in the complaint, that -- a

7    reference to Benlida and Hong Kong in the

8    complaint --

9         BY MR. MAZZOLA:

10        Q.    But --

11        A.    -- that's all I can say.

12              You're asking me to draw a conclusion

13   from that, but I'm not going to.

14        Q.    But you did review it.

15        A.    Yeah.  I saw the --

16        Q.    So in reviewing this complaint, you and

17   your team would have been aware that Benlida was

18   looking to Circuitronix here in the U.S. to pay

19   invoices issued to Circuitronix Hong Kong.  Yes or

20   no.

21              MS. MARTINEZ:  Objection.

22        A.    So you're asking whether Benlida was

23   asking --

24        BY MR. MAZZOLA:

25        Q.    No.  No.  I'm asking you --



1    A.    Yeah.

2    Q.    -- if you or your team, in reviewing this

3    complaint --

4    A.    Right.

5    Q.    -- knew that Benlida was looking to the

6    U.S. Circuitronix, LLC, to pay invoices owed by

7    Circuitronix Hong Kong?

8              MS. MARTINEZ:   Objection.

9    A.    I can only surmise.  They include it in a

10   list of invoices.  Whether that's legally sufficient

11   or not to draw that conclusion, I can't give an

12   opinion on that.

13   BY MR. MAZZOLA:

14   Q.    But from reading this, you know that

15   they're, at a minimum, looking to Circuitronix, LLC,

16   to pay those debts of Circuitronix Hong Kong.

17             MS. MARTINEZ:   Objection.

18   A.    I can only assume.

19   BY MR. MAZZOLA:

20   Q.    Are you assuming yes or assuming no?

21   A.    I can only assume that they're looking to

22   collect these invoices on their -- attached to the

23   complaint.

24   Q.    You can assume --

25   A.    Whether they're Hong Kong, otherwise,



1    whether they're third-party invoices or not, I'm

2    not -- this was not relevant to my opinions.

3         Q.    Because some days, I'm happy with a sloppy

4    transcript.  Other days, I want a really clean,

5    crisp one.

6         A.    Yes.

7         Q.    Today I'm in clean, crisp mode.  So --

8         A.    Aren't I lucky?

9               MR. ROSENTHAL:  It's the bow tie.

10              MR. MAZZOLA:  It's the bow tie.

11   BY MR. MAZZOLA:

12        Q.    So you can assume, yes, that Benlida is

13   looking to Circuitronix here in the U.S. to pay the

14   debts of Circuitronix Hong Kong?  Can you assume yes

15   to that?

16        A.    I'm not so sure I can.

17              I mean, the complaint has a list of

18   invoices.  The circumstances that surround those

19   invoices and why they're on the list is -- I could

20   only surmise at this point.

21   BY MR. MAZZOLA:

22        Q.    How about this:

23              At a minimum, can you assume -- well,

24   when you say "surmise," what does that mean?

25              You can surmise what?  Can you surmise



```
 1    yes or surmise no?

 2        A.   I can surmise that these are the invoices

 3    that are attendant to the complaint.  And I need to

 4    look at the operative paragraph.

 5        Q.   Are you looking at your report or the

 6    complaint?

 7        A.   The complaint.

 8             These are the invoices that support

 9    the claims of your client.  That's all I can say.

10        Q.   And these are the invoices that Benlida is

11    looking to get paid on.

12             Can you agree to that?

13             MS. MARTINEZ:  Objection.

14        A.   They are claiming they're owed.

15    BY MR. MAZZOLA:

16        Q.   Okay.  Okay.

17             MR. LERNER:  We need a break.

18             MR. MAZZOLA:  Who needs a break?

19             MR. LERNER:  Me.

20             MR. MAZZOLA:  For real?

21             Is that okay?

22             MS. MARTINEZ:  Yes.

23             (Off record:  11:54 a.m. to 12:05 p.m.)

24    BY MR. MAZZOLA:

25        Q.   Mr. Mukamal, let's look at Exhibit 147.
```



1    A.    Yes.

2    Q.    This is -- this is your report.  Is that

3  correct?

4    A.    Yes.

5    Q.    Now, it's got your name and Mr. Parisi's

6  name on it.

7    A.    Yes.

8    Q.    Just give me a sense -- and I spoke to

9  Mr. Parisi about this yesterday.  But give me a

10 sense of how the work was divided between you and

11 Mr. Parisi.

12   A.    Yes.  I decided for efficiency sake --

13            (Telephonic interruption.)

14            THE WITNESS:  I thought I put

15 this on Focus.  I'm sorry.

16   A.    So for not only efficiency, but to avoid

17 duplication, because I knew that, you know, the

18 data -- I surmised, at the time, the data would be

19 dense and would have to be mined and reformatted,

20 that he would handle that.  He's been -- he was with

21 the firm for a long time, and we -- I grew

22 accustomed to his competence in this area.

23            And it was a lot of data to have to

24 sort through.  And we divide -- I let him deal with

25 that aspect -- or I instructed him -- I'm sorry --



1    to deal with that aspect.

2                  I was involved in just the

3    architect -- initially, the architecture of the

4    whole engagement, and was involved in identifying

5    what I thought the issues were that needed to be

6    addressed and then reviewing the data afterwards,

7    after it was cleaned up, and arriving -- and

8    accepting the opinion --

9        Q.    In arriving --

10       A.    Arriving at opinions that we jointly agreed

11   upon and accepted.

12       Q.    I think you said you saw yourself as the

13   architect to identify the issues.

14       A.    Basically the work plan.  To identify the

15   work plan.

16                  But it really had to be done in

17   conjunction with what the data -- how the data was

18   presented and what data needed to be mined.  It

19   was -- it was a joint, overlapping effort but

20   required technical skills that he was better -- he

21   was more adept at.

22       Q.    What do you mean "technical skills"?

23                  What is he more adept at than you?

24       A.    He created a database that needed to be

25   created in order to do -- derive the information



1  that he did in the report.

2      Q.   And you described yourself as the architect

3  that identified issues.  Is that what -- is that

4  correct?

5      A.   If that's what I said, that's what I said.

6      Q.   As the architect identifying issues, what

7  were the -- well, what time in the process did you

8  first identify issues?

9      A.   When I say "issues," I'm talking more about

10  what the work plan is and what we were -- what our

11  opinions were going to encompass.

12      Q.   Did you start the process with any

13  assumptions?

14          Do you know what I mean by that?

15      A.   I know what you mean by it, but I really

16  didn't have any assumptions.

17          I mean, to me, this was a

18  reconciliation process that involved a lot of data

19  that needed to be understood.  And that's what we

20  focused on is the reconciliation.

21      Q.   Is it fair to say, though, that because

22  you're working for Circuitronix that you have these

23  initial meetings with clients and counsel.  After

24  those initial meetings with client and counsel, did

25  you form any preliminary assumptions -- or did you



1    form any preliminary assumptions, and if so, what

2    were they?

3        A.    I didn't have any preliminary assumptions.

4    I was trying to reconcile between your client and

5    Circuitronix, my client.

6        Q.    Was that --

7        A.    Well, reconcile the numbers.  I mean, we

8    had to understand the reconciliations that occurred,

9    and that's what our focus was.

10       Q.    Was that your instructions, marching order

11   brief, if you will, to reconcile a set of numbers?

12                MS. MARTINEZ:  Objection to the

13           extent it includes confidential

14           attorney-client communications.

15       A.    I don't think client -- counsel gave me

16   instructions up front, other than to understand what

17   the differences were between the parties.

18   BY MR. MAZZOLA:

19       Q.    But naturally, you know, we didn't go

20   through your record and your experience, and --

21   because I think that's a waste of time with you.

22   And I don't mean that in a pejorative sense because

23   I now it's there.

24                But what I'm getting at is you -- this

25   is not your first time.  You've done this many, many,



1    many, many times.  And initially, these things start

2    off with the client saying, Hey, this is what I think

3    I'm owed.  Or, Hey, this guy took this kind of money

4    from me.

5        A.    Yeah.  I don't recall a conclusion being

6    presented to me up front.  My role initially was to

7    understand what your client's position was and what

8    our client's position was vis-à-vis the

9    reconciliations that were provided.

10       Q.    Those were the recon -- the CTX recon and

11   the Benlida recon.  Right?

12       A.    The two Benlida responses to the

13   Circuitronix reconciliation.

14       Q.    Your report makes reference to just the two

15   recons.

16             So before we go forward, let's just --

17       A.    Well, the second reconciliation was just

18   them correcting what they believe were corrections

19   to the first one, if I recall.

20       Q.    Okay.  Well, let's --

21       A.    In other words, there was a supplemental

22   response by your client four or five days after the

23   one they first sent.

24       Q.    Okay.  So if there were two reconciliations

25   sent by Benlida, it sounds like what you just said



1    that you recall them being close in time and that

2    there was a -- somehow a merger of those two

3    reconciliations.

4        A.    Yeah.   That's how I remember it.

5        Q.    Okay.   Let's look at your report.   Let's

6    hit page 3.

7        A.    Okay.

8        Q.    And I probably should have looked at this

9    before with you, Mr. Mukamal, because it does say --

10   at the bullet points under paragraph 1, it gives

11   your instructions.   You were retained by legal

12   counsel.

13            Do you see that at paragraph 1?

14       A.    I do.

15       Q.    And it has the two bullet points.

16       A.    Correct.

17       Q.    And you guys wrote this:   I'm not putting

18   words in your mouth.

19            It says you were retained by legal

20   counsel to do two discrete items, as I understand.

21   And I guess that is correct.   Right?

22       A.    That's correct.

23       Q.    And those two discrete items are the ones

24   identified in the bullet points of paragraph 1 of

25   your report.   Right?



 1      A.    That's correct.

 2            That's different than what I just told

 3   you before, a few minutes ago.

 4      Q.    And one was to analyze the accounts payable

 5   reconciliation prepared by Benlida and CTX as of

 6   July 31, 2019?

 7      A.    Yes.

 8      Q.    And my question is, when this instruction

 9   came from counsel, did it come after discussions,

10   after strategizing?

11            I don't know -- I don't want to know

12   what was said or happened at those meetings, but was

13   it a process?  You met with them; you talked, went

14   back, looked at some documents.  And then at that

15   point, there was a final decision to say we're going

16   to look at the accounts payable reconciliations

17   prepared by Benlida and CTX.

18            MS. MARTINEZ:  Again, objection

19      to the extent it covers counsel and expert

20      witness privileged communications.

21            I'll instruct you to answer other

22      than those.

23            THE WITNESS:  Sure.

24      A.    I could just tell you the process. I mean,

25   in 2022, we originally met and just discussed what



1  the matter was about and what the issues -- not even

2  what the issues are.  Like, what we would have to

3  do, how to develop, as I said, a work plan.  And I

4  think the work plan was decided by me, in

5  paragraph 1 of my report, as being the necessary

6  information that we would have to embark to

7  validate.

8      BY MR. MAZZOLA:

9      Q.   So you made this decision that these would

10 be the two things that you would cover?

11     A.   Well, ultimately, I?

12          Did.  I mean -- and it could have been

13 in consultation with counsel and client at the time.

14 I mean, there were conversations.  I just don't

15 recall specifically the time frames.  And, like I

16 said, there's a start and stop to this litigation.

17 I don't recall how far we got originally before

18 there was a stay on the litigation, so ...

19     Q.   But, in any event, that -- at that first

20 bullet point, you talk about reconciliations

21 prepared by Benlida.  And then you have "and CTX."

22          But there is a footnote to that CTX.

23 Do you see that?

24     A.   Yes.

25     Q.   And that footnote only refers -- identifies



1    that you're only referring to Circuitronix, LLC.

2              Do you see that?

3        A.   Yes.

4        Q.   And you know Circuitronix, LLC, is what we

5    sometimes call "Circuitronix U.S."  Is that right?

6        A.   I've heard it referred to that.

7        Q.   So at some point, there was a conscious

8    decision to just look at the reconciliations as

9    they're related between Benlida and the U.S.

10   operation.  Is that correct?

11       A.   That was our understanding of what was in

12   the complaint.

13       Q.   But you did look at the complaint -- the

14   third amended complaint.  We talked about this

15   earlier.  You don't have to look at it now.  We

16   talked about that earlier.

17              Do you recall?

18       A.   Yes.  And you recall I was trying to get

19   you to make an assumption.  I'm not sure you made

20   it, but Rebecca, this nice lady, wrote it all down.

21              But in that complaint, at a minimum,

22   Benlida is making allegations about Hong Kong

23   invoices.  You've got to agree to that.  Right?

24              MS. MARTINEZ:  Objection.

25       A.   Hong Kong -- HK invoices were referenced.



1    In what context is beyond the scope of what I was

2    asked to opine on.

3         BY MR. MAZZOLA:

4         Q.    So you were only asked to opine on the --

5    the U.S. side.  Is that correct?

6         A.    I was asked to opine on the reconciliations

7    that were done between Circuitronix and your client.

8         Q.    But only those --

9         A.    And identify what those differences were.

10        Q.    But the reconciliations you were asked to

11   opine on only related to the U.S. side insofar as

12   Circuitronix was concerned.

13        A.    I don't recall that specific direction.

14        Q.    Okay.  But you wrote over here that you're

15   looking at reconciliations prepared by Benlida and

16   CTX U.S. only.  Is that right?

17             MS. MARTINEZ:  Objection.

18        A.    That's what I wrote.  Yes.

19   BY MR. MAZZOLA:

20        Q.    Do you think it would have made more sense

21   to get a fuller picture to look at -- do you think

22   it would have made more sense to enable you to get a

23   fuller picture to look at -- when looking at the CTX

24   side to look at the CTX and the Hong Kong side?

25             MS. MARTINEZ:  Objection.



1    A.    Fuller picture of what?  I'm not sure I

2    understand the question.

3    BY MR. MAZZOLA:

4    Q.    The total amounts outstanding.  The total

5    amounts owed between everyone.

6    A.    No.  My -- my charge was to determine the

7    balance between Circuitronix -- what was owed

8    between Circuitronix, LLC, and Benlida.

9    Q.    So no one ever gave you any instructions to

10   look at anything that might be owed between

11   Circuitronix Hong Kong and Benlida?

12             MS. MARTINEZ:  Objection.

13   A.    I don't recall what the instructions were

14   during the earlier litigation before it was stayed.

15   BY MR. MAZZOLA:

16   Q.    Did you ever -- did you ever go back and

17   think it might make sense based upon -- as you're

18   going through everything, to look at those Hong Kong

19   numbers?

20   A.    No.

21   Q.    Did you ever see this document?  This is an

22   exhibit that we previously marked as Exhibit 121.

23             The interesting stuff is at the

24   paragraphs A, B, and C.

25   A.    I don't recall seeing this.  I may have.  I



```
1    don't know.

2         Q.   Is this a document that would have been

3    provided to you?

4         A.   I don't know.

5         Q.   Do you see who's writing that email?

6         A.   Yes.

7         Q.   And that's Rishi.  Rishi Kukreja.  Right?

8         A.   Yes.

9         Q.   And in that email, he writes, "For Benlida

10   CTX HK, we owe Benlida" -- and he's referring to

11   U.S. dollars -- "$8.843 million."

12              Do you see that?

13        A.   Are you talking about -- oh.  You're

14   talking about C.

15        Q.   A.

16        A.   Oh, A.  Oh.  8.843.  Sorry.  I'm reading

17   three.

18              Give me a moment.

19              (Document review.).

20        A.   Yes.  I see that.

21        BY MR. MAZZOLA:

22        Q.   And you also see at B, where Rishi's then

23   saying that -- I think we can assume what he's

24   meaning there, for CTX USA Benlida owes us

25   $5.723 million.  Right?
```



```
 1                  MS. MARTINEZ:  Objection.

 2        A.   Yes.

 3        BY MR. MAZZOLA:

 4        Q.   Okay.  That's a fair assumption, that's

 5   what he's saying.  Right?

 6        A.   That's what it -- you read what's on the

 7   email.

 8        Q.   And the next one, he's talking about ROK

 9   owing $3.37 million.  Right?

10        A.   Yes.

11        Q.   So on the one hand, Rishi's talking about

12   he, his entities -- that's my words, you don't have

13   to agree with that -- but his entities saying that

14   they owe Benlida $8.843 million out of Hong Kong.

15   Right?

16        A.   For Hong Kong.  For CTX Hong Kong.

17        Q.   Yeah.  And then he talks about the credit

18   for U.S., and he talks about the credit that ROK

19   owes.  Right?

20        A.   Yes.

21        Q.   And then he writes in red -- I don't know

22   why he picked red -- but he talks about an all in

23   all.  All in all.  That means he's adding up all the

24   numbers together, and he concludes that Benlida

25   owes -- and ROK owes him $256,000.
```



1              Do you see that?

2      A.    That's what it says.

3      Q.    So insofar as Rishi was concerned on

4  July 29th, 2019 -- and I'm not commenting on -- and

5  I'm not asking you to comment on the accuracy of the

6  numbers -- but at least that amendment, insofar as

7  Rishi was concerned, is it fair to say that Rishi

8  was treating all these numbers together

9  collectively?

10             MS. MARTINEZ:  Objection.

11      BY MR. MAZZOLA:

12      Q.    Is that fair to say?

13      A.    No.

14      Q.    No.  Even though he wrote that down.

15      A.    Well, that's your interpretation of this

16  email.  I can interpret it another way.

17      Q.    Okay.  So you don't think that's a fair

18  interpretation?

19      A.    I think that's your interpretation.

20      Q.    Give me another interpretation.

21      A.    He clearly delineated between three

22  separate entities here.

23      Q.    But he groups all the numbers together.

24      A.    Well, he groups it up because he's sending

25  it to one entity.  He's sending it to the bookkeeper



```
1    for Benlida, who was dealing with all three

2    entities.

3        Q.   Do you think Rishi is treating them all,

4    the Hong Kong entity and the U.S. entity, as related

5    parties?

6              MS. MARTINEZ:  Objection.

7        A.   What's your definition of "related

8    parties"?

9        BY MR. MAZZOLA:

10       Q.   What is your definition of "related

11   parties" from an accounting perspective?

12       A.   From an accounting perspective, related

13   parties are parties that have a relationship amongst

14   each other to some extent.  And it depends what that

15   is -- what that is.

16       Q.   And it's one of the factors you look at as

17   common control.  Right?

18       A.   Common control could be indicative of

19   related party.

20       Q.   Common ownership could be indicative of

21   related parties.  Right?

22       A.   If there's a control element, yes.

23       Q.   Common, combined, commingling in

24   accounting -- I shouldn't say that.  Strike that.

25              Combined accounting could be an
```



1    indication of related parties?

2        A.    You need to define that.  I don't know what

3    that means, so be specific.

4        Q.    Well, you put the two related parties

5    together, as Mr. Kukreja did.  You add up the

6    numbers, and you come up with a total.  You don't

7    think so?

8        A.    No.

9              I think this is just the summary of

10   three entities saying you're -- this is the total of

11   the three.  I mean, it's obvious that netting these

12   three entities, which are clearly separate entities,

13   comes to that number.

14       Q.    Why do you say they're "clearly separate

15   entities"?

16       A.    Because he's delineated them as three

17   separate entities.  CTX Hong Kong is owed

18   8.8 million.  Benlida owes Circuitronix, LLC,

19   5 million.  Round numbers.

20       Q.    Um-hmm.

21       A.    And Circuitronix for ROK owes -- is owed

22   3.375 million.

23       Q.    What about this?  What about paying the

24   debts?

25       A.    What about it?



1      Q.    What about paying the debts of another

2   entity?

3      A.    Oh.   That's for a -- facts and

4   circumstances related.   That could happen.   That

5   could happen amongst related parties all the time.

6      Q.    So if -- so if one entity was paying the

7   debts of another entity and there was common

8   ownership and common control, would that also be an

9   indicia of related entity, related parties?

10      A.    Facts and circumstances related.   It's --

11   it happens all the time.   And there's nothing

12   untoward about it.

13            The -- for example, one company could

14   supply a good or service to the other company.   And

15   there could be an intercompany payment or a payment

16   going to a third party that supplied that good and

17   service on behalf of entity number 1 that actually

18   went to the benefit of entity number 2 between those

19   two parties.

20      Q.    So the payments of the debts of another

21   is -- I'm just asking -- is that a factor that is

22   considered in identifying two parties are related?

23      A.    The business relationship in an

24   accounting -- an auditing context is always

25   considered and evaluated.



1      Q.   Let's -- okay.

2           If you had seen this document, would

3   you have considered that, to create a more complete

4   picture, it would have been necessary to look at the

5   Hong Kong Benlida debts and obligations?

6      A.   No.

7      Q.   Okay.  In your report -- well, let me ask

8   you this question:

9           Of all the records that you looked at,

10  they were -- they were items that were extracted from

11  the CTX accounting system.  Right?

12     A.   As it relates to Circuitronix, LLC's,

13  reconciliations sent to Benlida, yes.

14     Q.   What does it mean -- in your report, you

15  say, "We were not engaged" -- this is in paragraph 2

16  in the middle -- "and did not perform any

17  attestation or audit ..."

18     A.   Are you done with your question?

19     Q.   Yeah.  Yeah.  What does that mean?  Yeah.

20     A.   Yeah.  This is a standard paragraph.  We're

21  not -- we do not perform attestation procedures at

22  my firm.

23     Q.   Or audit?

24     A.   Well, that's an attestation procedure.

25     Q.   What's the difference between an



1    attestation and an audit?

2        A.    Attestation falls under different standards

3    under the -- under generally accepted auditing

4    standards.

5        Q.    And then you do go on to explain, "We

6    relied on the records of CTX as produced, the CTX

7    recon and the Benlida recon."  And that you "did not

8    perform any additional procedures to provide

9    assurance as to their reliability."

10              So as I understand that, that means you

11   got the numbers; you checked the numbers to make sure

12   the math was correct.  Is that true?

13              MS. MARTINEZ:  Objection.

14       A.    We checked the integrity of the numbers as

15   it was provided to us -- as they were provided to us

16   against the database.

17   BY MR. MAZZOLA:

18       Q.    How is that different from checking the

19   numbers to see if they're correct?

20       A.    I don't know -- I don't know if it's

21   different.

22       Q.    Okay.

23       A.    I mean, the information provided to us was

24   placed into an analysis that enabled us to review

25   the information in a cohesive fashion.



1     Q.   And in not performing any additional

2  procedures to provide assurance as to their

3  reliability, that means that you never drilled down

4  to the supporting documentation that created that

5  number.

6              MS. MARTINEZ:  Objection.

7     A.   I believe we indicated, in some cases, we

8  did.

9              So, for example, I tested -- we tested

10  payments.  We wanted to determine that the payments

11  were being made.

12  BY MR. MAZZOLA:

13     Q.   But, in any event, I know this because it's

14  written in the report.  When you did the

15  reconciliation, you looked at the numbers from

16  Benlida regarding the U.S. side and Circuitronix

17  regarding the U.S. transactions, the numbers were

18  real close, weren't they?

19     A.   They were.  With the exceptions noted in

20  the report.

21     Q.   Let me ask you a question.  When the

22  reconciliations were done, I think the number was --

23  you said they were on the payments portion.  Let's

24  go to paragraph 7.

25     A.   I'm there.



1                         Paragraph 7?

2        Q.    Yep.

3        A.    Okay.

4        Q.    I beg your pardon.  Page 7, paragraph 161.

5    I'm sorry.

6        A.    Yes.

7        Q.    You said there was a -- there is

8    concurrence between the parties as to over

9    99 percent of the payments.

10        A.    Correct.

11        Q.    So what did that tell you from an

12    accounting perspective?

13        A.    It told me what Benlida and Circuitronix

14    were relying on for the payments were within like

15    $92,000 of 60 -- almost 70 -- $68 million of

16    payments.

17        Q.    So that's indicative that the CTX numbers

18    had a degree of reliability to them.  Right?

19                    MS. MARTINEZ:  Objection.

20        A.    It gave me comfort that there was alignment

21    between the two entities in terms of payments

22    relating to the two entities, CTX, LLC, and Benlida.

23                    MR. MAZZOLA:  Okay.  I'm sorry,

24        Rebecca.  Would you read that back, please?

25                    (The following record was read:



1          A.  "It gave me comfort that

2              there was alignment between the

3              two entities in terms of

4              payments relating to the two

5              entities, CTX, LLC, and

6              Benlida.")

7      BY MR. MAZZOLA:

8      Q.    And my question is, then, now, Mr. Mukamal,

9  is you had comfort that the two numbers in side by

10 side -- is it fair to say that your comfort with the

11 two numbers side by side were accurate?

12             MS. MARTINEZ:  Objection.

13     A.    I didn't audit these numbers.  What I did

14 was I determined what the differences were.

15     BY MR. MAZZOLA:

16     Q.    How about this:  At least both -- well, but

17 if two people are coming up with same number

18 virtually and they both have competent

19 bookkeeping -- bookkeeping departments, doesn't that

20 give you some level of comfort that the numbers

21 coming out of CTX were pretty darn accurate?

22             MS. MARTINEZ:  Objection.

23     A.    It didn't alert me to an inaccuracy.

24     BY MR. MAZZOLA:

25     Q.    What's the difference?

1        A.    I think there's a difference.

2        Q.    Okay.

3        A.    You're asking a global question.

4        Q.    Okay.

5        A.    And here, I'm looking at a very specific

6   set of transactions.

7        Q.    And then -- so the numbers, then, coming

8   out of Benlida, the answer has to be the same.

9   There was nothing alerting you to an inaccuracy of

10  the numbers coming from Benlida.  That's got to be

11  the answer because CTX, there's no alert of

12  inaccuracy by their numbers.  It's got to be the

13  same on the other side of the coin.

14              MS. MARTINEZ:  Objection.

15       A.    They agreed with each other.  Whether they

16  were accurate or inaccurate, I can't say for sure.

17       BY MR. MAZZOLA:

18       Q.    But is it true, then, because it was true

19  for Circuitronix, that insofar as the -- Benlida's

20  numbers were concerned, there was nothing in your

21  words alerting you to an inaccuracy.

22              MS. MARTINEZ:  Objection.

23       A.    Well, there wasn't --

24       BY MR. MAZZOLA:

25       Q.    If not yes, explain why.



1     A.    -- a 92,000 inaccuracy --

2     Q.    Okay.

3     A.    -- aligning the two numbers.  How's that?

4     Q.    Okay.

5     A.    That's the best I could answer.

6     Q.    But the question was, was there anything in

7  the Benlida numbers alerting you to an inaccuracy?

8     A.    As to that line?  No.

9     Q.    Okay.  And the same thing for CTX.

10    A.    I accepted the accuracy of the numbers on

11  both sides for that line.

12    Q.    Here's an interesting question I want to

13  ask you about.  Now that we've accepted the accuracy

14  of these numbers.  Right?  We've accepted that

15  they're not inaccurate.

16    A.    I accepted they agreed to each other within

17  $92,000.

18    Q.    So you've come up with the -- an

19  overpayment by CTX.  Right?

20    A.    No.  I don't think I came up with an

21  overpayment.

22    Q.    Well, you have -- you come up with a number

23  at the bottom that says CTX is owed money.

24    A.    No.  I called it a difference.

25    Q.    Well, look at Table 1.



```
1       A.   That's what I'm looking for.  Okay.  Okay.

2   I'm sorry.

3       Q.   Yeah.

4       A.   Okay.  I'm looking at Table 1.

5       Q.   You've got CTX being owed, on the one hand,

6   5.3 million, and on the other hand, 4.07 million.

7       A.   I'm sorry.  I mean --

8       Q.   We're on page 7.

9       A.   Yeah.  I mean -- yeah.

10           According to the reconciliations.  The

11  recon- -- according to the difference in the two

12  reconciliations between Benlida and

13  Circuitronix, LLC.

14      Q.   So --

15      A.   That's what those numbers --

16      Q.   There's an overpayment.

17      A.   That there's a credit.  That there's an

18  overpayment.  This is an unreconciled difference.

19           Maybe, perhaps, calling it an

20  unreconciled difference would be more accurate.

21      Q.   How does -- I'm going to call it an

22  overpayment.  You can call it whatever you want.

23  Okay?

24           How does an overpayment happen to that

25  level?
```



1      A.   Well, first of all, you're talking about

2  $67 million.

3      Q.   Okay.

4      A.   Okay -- of payments, invoices that are

5  different.  It happens -- invoices that are

6  different, debit memos that are different, all three

7  categories affect the balances between those two

8  entities.

9      Q.   How does a prudent business person -- I

10 mean, I guess, the question is, have you ever seen

11 overpayments of this level?

12     A.   As a percentage?

13     Q.   No.  Just as a -- yeah.  As a percentage.

14     A.   Sure.

15     Q.   Okay.  How about as a number?

16     A.   At least that.

17     Q.   And how does that happen?  How does a

18 prudent business person allow overpayments to the

19 tune of $5 million?

20          MS. MARTINEZ:  Objection.

21     A.   Well, actually, the overpayment of payments

22 that you're indicating as an overpayment, which I'm

23 not conceding is an overpayment, is $92,386.

24 BY MR. MAZZOLA:

25     Q.   At the end on Table 7 --



1    A.    Yes.

2    Q.    -- you reach a conclusion.  And that

3  conclusion has lead-time penalties, et cetera.  But

4  you come up with a conclusion -- well, you just said

5  something.  The overpayment is only $92,000.  Are

6  you sure about that?

7    A.    The cash overpayment --

8              MS. MARTINEZ:  Objection.

9    A.    -- $92,000 between the two reconciliations

10  that they performed.

11    BY MR. MAZZOLA:

12    Q.    Let's look at Table 1.  How do you get to

13  that?

14    A.    Well, you do that by creating a database

15  between Benlida's reconciliation and CTX, LLC's

16  reconciliation.

17    Q.    Okay.  Well walk me through Table 1.

18    A.    Okay.  So Table 1 is Benlida's -- I'm

19  sorry -- CTX, LLC's initial reconciliation.  They

20  said -- I think it was November 1st, if I recall

21  correctly.  They indicated payments were made that

22  are included in the reconciliation of 67,728,456.

23              (Interruption.)

24    Q.    Are you still looking at it, Mr. Mukamal?

25              (Document review.).



1      A.   Right.  So CTX's initial reconciliation

2   showed payments of 67,728,000.  Benlida's two

3   responses to that showed 67,636,070.  They were

4   close.

5      BY MR. MAZZOLA:

6      Q.   So when you come up with an amount owed,

7   that amount owed is based -- at least here so far,

8   it's on debit memos.  Right?

9      A.   Yes.

10     Q.   It's based on lead-time penalties?

11     A.   Yes.  Which are part of the debit memos.

12     Q.   Yep.

13          MS. MARTINEZ:  Sorry.  Are you

14     referring to Table 1 or Table 7?

15          MR. MAZZOLA:  I'm just asking

16     questions.

17          MS. MARTINEZ:  Oh, okay.

18     BY MR. MAZZOLA:

19     Q.   Right.  That's where you come up with those

20   numbers?

21     A.   Well, I didn't come up with the numbers.  I

22   extracted those numbers from both parties' set of

23   records.

24     Q.   So, then, it sounds to me, then, if we look

25   at Table 7 now, where you come up with those



1   numbers, 7.868 million owed by Benlida to CTX.

2             Do you see that?

3      A.    Yeah.  Yes.

4      Q.    That number is made up of $2.3 million in

5   debit memos.  Right?

6      A.    It's a component.  Yeah.

7      Q.    And it's also made up of 3.1 million in

8   lead-time penalties after January 2016.

9      A.    I'm sorry.  Table 7, you're looking at?

10     Q.    Yes.  Table 7 on page 14.

11     A.    Right.  I'm sorry.  I'm not understanding

12  your question.

13            The lead-time penalties net of waivers

14  is 3,107,000.

15     Q.    Okay.  But you have a total amount owed of

16  7.8 million.  7.86.

17     A.    When comparing the two reconciliations and

18  adjusting, yeah.

19     Q.    So it sounds to me, then, from what you

20  just said earlier, the lion's share of that

21  7.86 million is made up of debit memos and lead-time

22  penalties.

23     A.    Yeah.  The majority of it is.  I agree.

24     Q.    Okay.  The vast majority?

25     A.    Okay.



1       Q.   Right?  Is that correct?

2            Because you said 92,000 was what the --

3  someone paid too much, by $92,000.  But the rest of

4  this number, the 7.86 million, we get to that by

5  lead-time penalties and debit memos.

6       A.   Let me look.

7            (Document review.)

8       A.   Yeah.  But the adjustments in the

9  subsequent tables affect that initial number.

10  BY MR. MAZZOLA:

11      Q.   By how much?

12           (Document review.)

13      A.   I don't -- it's just a number for all of

14  the analysis.

15  BY MR. MAZZOLA:

16      Q.   Yeah.  It's not fair to ask you for a

17  specific number, Mr. Mukamal.

18      A.   Right.

19      Q.   I'm just trying to understand, when you

20  come up with $7.86 million, really where do we have

21  to look for that money?

22           Do you look to the debit memos and the

23  lead-time penalties, or do we look to the fact that

24  someone sitting here in Miami -- I beg your pardon --

25  Fort Lauderdale accidently overpaid?



1          MS. MARTINEZ:  Objection.

2     A.   No.  There are adjustments between the two

3  entities that had to take place after their

4  reconciliations that we identified.  Okay?  And

5  that's what's reflected in Table 7.

6     BY MR. MAZZOLA:

7     Q.   So money invoiced --

8     A.   Right.

9     Q.   -- money paid --

10    A.   Right.

11    Q.   -- is a $92,000 difference?

12    A.   Well -- it shows the $92,000 difference.

13 And if you look at Table 2, for example, in cash,

14 because that's what you're referring to, I made

15 adjustments to that that weren't made by the

16 parties.

17    Q.   Let me ask you this question, then.

18    A.   Yes.

19    Q.   If there was never a lead-time penalty and

20 there was never a debit memo issued, would Benlida

21 owe CTX any money?

22    A.   Well, then you'd just be looking at part of

23 the reconciliation that was required.  You'd be

24 looking at just payments versus invoices, and that's

25 not -- that's not what this case is about.



1    Q.    No.  I know that.  I know that.

2    A.    All right.

3    Q.    But if I could wave a magic wand, you'd

4  have -- there would be no lead-time penalties and no

5  debit memos.  Then what would the difference be?

6  $92,000.  Right?

7    A.    No.  Go to Table 7.

8              And you'll see 662,000 on invoices,

9  12,614 against that in payments.

10   Q.    I beg your pardon, Mr. Mukamal.  You're at

11  what table?

12   A.    Table 7.

13   Q.    Okay.  So what would that number be?

14             Oh.  It would be $668,000 on --

15   A.    662.

16   Q.    662.

17             And then the debit memos, there's a

18  mistake there in the math.  You see that.  Right?

19   A.    I'm sorry.  On Table 7?

20   Q.    Yeah.

21   A.    Oh.  I think on debit memos, there was an

22  error.  I think your expert picked that up, and he's

23  right.  It was just one number against another

24  number.  Formula error.

25   Q.    So my question is, if there were no debit



 1    memos --

 2         A.    Right.

 3         Q.    -- and there were no lead-time penalties,

 4    you would have how much of a difference?

 5         A.    Well, I'd have to correct for the math

 6    error.  So I don't remember what the figures were.

 7    Hold on a moment.  I'll do the math.

 8               Actually, give me a moment.  I want to

 9    go to Paulikens' report.

10         Q.    You want to look at Mr. Paulikens' report?

11         A.    Yeah.  Just -- he identified the addition

12    error.

13         Q.    You can look at it.  Let's note that

14    exhibit number.  That's Exhibit Number 144.

15               And, Mr. Mukamal, if there's anything

16    you want to look at, just ...

17               (Document review.)

18         A.    Yeah.  There's a total that looks like a

19    few hundred thousand dollars' difference.

20         BY MR. MAZZOLA:

21         Q.    Okay.

22         A.    So instead of, for example, Table 5 to be

23    exact.  Instead of a 97,284 difference, it would be

24    470,393.  And the invoices are fine.  The cash

25    difference is fine.  So, basically, the difference



1  is the 470 -- whoa, whoa.

2          Yeah.  It's the 470,393 against 97,264

3  [sic].

4      Q.   And so the question is, if there were no

5  debit memos, if that column was zero and the

6  lead-time penalties was zero, what would be your

7  conclusion?

8      A.   You're asking me to assume that -- monies

9  that were owed?

10     Q.   Yes.  I'm asking you to assume that debit

11  memos, Table 5, turns out to be zero.  Nothing is

12  owed on a debit memo.  Lead-time penalties, Table 6,

13  turns out to be zero.  What do I do?  I back out

14  $5.4 million?

15     A.   Well, you'd have to add 470,000 to debit

16  memos -- oh.  Back out debit memos.

17          So it would be just between payments

18  and invoices?

19     Q.   Um-hmm.

20     A.   It would be 662 minus 12,614 --

21     Q.   Okay.

22     A.   -- 660,000 -- excuse me.  663,000, less,

23  say, 12 -- say, 13,000.

24     Q.   So 650,000 -- 600 -- yeah.

25     A.   If you knock out all the other amounts that



```
1    are owed.

2                    MR. MAZZOLA:   Now is good to

3       stop, if everyone's okay.

4                    MR. ROSENTHAL:   Okay.

5                    (Off record:  12:58 p.m. to 1:43 p.m.)

6                    (Deposition Exhibit 168

7                    marked for identification.)

8       BY MR. MAZZOLA:

9       Q.   Okay.  Good afternoon, Mukamal.

10      A.   Oh, good afternoon.

11      Q.   Welcome back.

12      A.   Thank you.

13      Q.   I'm going to hand over to you what we've

14   marked now as Exhibit 166 [sic].  This is the black

15   binder, we're going to call it.  I think everyone in

16   the room knows that's what I'm referring to.  It's

17   the binder that you brought with you today.

18      A.   Okay.

19                    MS. MARTINEZ:   I think that's

20      168.

21                    MR. MAZZOLA:   168, then.  That's

22      correct.

23   \\\

24   \\\

25   \\\
```

1              (Deposition Exhibit 168

2              marked for identification.)

3      BY MR. MAZZOLA:

4      Q.   Okay.  You don't have to spend any time

5   looking through it.  Just take two seconds, look at

6   it, and just say, is that a fair and accurate

7   photocopy of what you gave to Ms. Martinez.

8              (Document review.)

9      BY MR. MAZZOLA:

10     Q.   And I'll assume you have no reason to

11  believe that if we asked you to photocopy it, it

12  wasn't -- it was done correctly.  Right?

13     A.   It looks correct to me.

14     Q.   Thank you.  Okay.  This is 168.

15     A.   Well, I haven't been over every page.

16     Q.   That's okay.

17              What is the --

18     A.   I'm sorry.

19     Q.   What is the binder?  These are the

20  documents that you relied on, or are these -- tell

21  me what this is.  What they're meant to be.

22     A.   This is just a report with some backup that

23  I put together.

24     Q.   Okay.

25     A.   Support for some of the writings in the



1    report.

2       Q.    And some of the documents within the binder

3    look like they were spreadsheets that were made by

4    you or your team.  Is that correct?

5       A.    It's possible, yes.

6       Q.    Mr. Mukamal, I should have -- I neglected

7    to ask you this before, and I didn't spend any time

8    really going through your credentials.  But I want

9    to run through all the alphabet behind your name.

10              CPA.  I know what that is.

11      A.    Good.  Good start.

12      Q.    PFS.  What's that?

13      A.    Personal financial specialist.

14      Q.    Okay.  What does that do?  What does a

15   personal financial specialist do?

16      A.    Estate planning, tax planning, planning for

17   financial -- it's basically a financial planning

18   designation conferred by the AICPA.

19      Q.    APV, what is that?

20      A.    "ABV."

21      Q.    ABV.  Yes.

22      A.    It's the Accredited in Business Valuation.

23      Q.    A CFE?

24      A.    Certified fraud examiner.

25      Q.    CFF?



1     A.    Certified in financial forensics.

2     Q.    CIR?

3     A.    "CIRA."

4     Q.    CIRA.  Yes.

5     A.    Certified insolvency and restructuring

6  advisor.

7     Q.    And CGMA?

8     A.    Certified global management accountant.

9     Q.    What does a certified global management

10 accountant do?

11    A.    It's just a designation for understanding

12 systems in companies.  You know, how they operate

13 internally, that sort of thing.

14    Q.    Systems in companies and how they operate?

15    A.    How they operate.  I mean, it's not

16 something -- it's not a designation I use.  It's

17 just something I received over -- you know, over

18 time.

19    Q.    What do you mean you don't use it?

20    A.    The discipline that it teaches, I don't

21 utilize.

22    Q.    What's a CIRA?  Mr. Parisi has that, and I

23 see you don't have it.

24    A.    Yes, I do.

25    Q.    Oh.  You do.  I beg your pardon.



1            It's the CTCE that he has.

2      A.    I don't have that.

3      Q.    What is that?

4      A.    I have no idea.

5            That's -- it's -- I think it relates

6  to CTC -- I don't remember it.  It's something I'm

7  not capable of doing.

8      Q.    Okay.  Let's go back to your report.  Let's

9  look at page 6.

10     A.    Okay.

11     Q.    There's a footnote where you talk about

12 reconciliation of transactions at paragraph 13; it's

13 Footnote 10.

14           What were those -- and below, it says,

15 Transactions refers to individual invoices, payments

16 and debit memos.

17           What does that mean?

18     A.    That was the initial reconciliation that

19 Circuitronix sent to Benlida.

20     Q.    Did you review any individual invoices?

21 You or Mr. Parisi.

22     A.    Just -- no.  We reviewed the electronic

23 data that was contained within the reconciliations.

24     Q.    So you reviewed the spreadsheets?

25     A.    Reviewed the spreadsheets and the



1    identification of those transactions.

2        Q.   Did you go in and drill down and look at

3    individual invoices?

4        A.   Mr. Parisi may have.  But that wasn't, I

5    don't think, part of our scope.

6        Q.   What about debit memos?

7        A.   What about them?

8        Q.   Did you look at individual debit memos?

9    You or Mr. Parisi.

10       A.   I don't know what Mr. Parisi testified to

11   yesterday, but --

12       Q.   He testified that he looked at 11 debit

13   memos.

14       A.   That was a test that was done.  Right.

15            But for the vast majority, we didn't.

16       Q.   You didn't look at them?

17       A.   We looked at them within the data provided

18   by Benlida -- I mean, I'm sorry -- by Circuitronix

19   in the reconciliation.

20       Q.   Well, let's look at a debit memo.  Let me

21   pull one up.

22            (Pause in proceedings.)

23            MR. MAZZOLA:  Are you looking at

24      one right now?

25            MS. MARTINEZ:  Right.  I put



1    Exhibit 159.  That was the first one.

2              MR. MAZZOLA:  I would love to

3    find Exhibit 159.

4              Christina, what was the ...

5              MS. MARTINEZ:  159 is the first

6    one I have.  It's, according to my index,

7    March 21st, 2016.

8              MR. MAZZOLA:  What's the debit

9    memo number?

10             MS. MARTINEZ:  I don't have that

11   written down.

12             MR. LERNER:  Here.  I'm just

13   going to send it to you.

14             (Pause in proceedings.)

15             MR. MAZZOLA:  I have it right

16   over here.

17             MR. LERNER:  What did you call

18   it, Christina?

19             MS. MARTINEZ:  159 is the first

20   one I have.

21             MR. MAZZOLA:  There's a 155, too.

22             MS. MARTINEZ:  Oh.  Sorry.

23   Didn't realize that, because there were

24   three in a row that were debit memos.

25   \\\

1      BY MR. MAZZOLA:

2      Q.    Let's look at 155, Mr. Mukamal.

3      A.    Yes, sir.

4      Q.    So what we've put in front of you is

5      Exhibit 155.  This is a debit memo.

6            Do you see that?

7      A.    Yes.

8      Q.    Do you have any recollection of ever seeing

9      this debit memo or one that looks similar to this?

10     A.    Similar ones, I do recall seeing.

11     Q.    And on it, this debit memo makes reference

12     to the penalty for lead time.

13           Do you see that?

14     A.    Yes.

15     Q.    And what was done to check or confirm the

16     data?  The background data, the information, that

17     supports this debit memo.

18     A.    Circuitronix maintains a lead-time penalty

19     input in their ERP system.  Inputs were accepted as

20     per what's in my report.

21     Q.    So let's look at Exhibit 156.

22     A.    All right.  Yes.

23     Q.    Exhibit 156 is a spreadsheet that we used

24     yesterday with Mr. Parisi.  It talks about penalty

25     for lead-time exceedances.



1           Do you see that up in the upper

2    left-hand corner?

3       A.    Yes.

4       Q.    And if you scroll all the way over to the

5    far right, you'll see in the blue, "Timeliness,"

6    "Late," "Days Late, 22," "Penalty $8.52."

7           I'm at the top row.

8           Do you see that?

9       A.    Yes.

10      Q.    What was done to confirm that, in fact,

11   this shipment was 22 days late?

12      A.    I believe in my report I indicated we

13   accepted the inputs that are on this sheet.

14      Q.    So you just accepted that CTX reported that

15   this was 22 days late?

16      A.    It's not that I don't -- really just

17   accepted it.  I mean, I inquired as to how -- what

18   the process was and how this was -- the information

19   or the data was accumulated.  But with the short

20   deadline, as a result of the case restarting, we

21   didn't have time to validate any further.

22      Q.    So is it generally true that for all the

23   lead-time penalties because of the short deadline

24   and the amount of work involved, you did not do

25   anything to validate beyond looking at what is on



1  this spreadsheet provided by CTX?

2      A.   We didn't have their ERP system available

3  to us.

4      Q.   So you couldn't do anything other than just

5  take that number?

6      A.   I didn't do anything.

7      Q.   You didn't do anything else.  Okay.

8           You did check the math, I presume?

9      A.   I believe Mr. Parisi did.  Yes.

10          I also believe I indicated exactly

11  that in my report.

12     Q.   Where did you indicate that in your report?

13          Is that paragraph 33?

14     A.   I'm looking.

15          Well, that's part of it.  But I

16  believe that there was a mention.  Just give me a

17  moment.

18          (Document review.)

19     A.   Paragraphs 39 and 40.

20     BY MR. MAZZOLA:

21     Q.   Okay.

22     A.   And then in the introduction to the report,

23  we indicated we didn't do anything further than what

24  was indicated.

25     Q.   Did you -- did you ever review any emails



1   from anyone at Benlida disputing the lead-time

2   penalty?

3       A.   I may have.  I don't recall.

4       Q.   Did you review any spreadsheets from

5   Benlida saying the lead-time penalty is not

6   accurate, and here's what the correct number is?

7       A.   I believe that Mr. Parisi would have done

8   that.

9       Q.   And if he did that, it would have been

10  contained in the documents that were 151.  Right?

11      A.   I don't know.

12      Q.   Well, it would have to be.  Right?

13      A.   Well, if he saw something.  I don't know if

14  he saw it on the screen.  I don't know if he printed

15  it.  I don't know.

16      Q.   Okay.  But he -- Mr. Parisi is not going to

17  come in and talk about a lead-time penalty in this

18  report without having looked at what the other side

19  had to say about these lead-time penalties.  Isn't

20  that correct?

21            So, for example --

22      A.   I don't know the answer to that.  I mean,

23  the fact is I would have expected to see it if -- in

24  your expert's report if he had specific disputes.

25      Q.   So, for example, if we look at this



 1    Exhibit 156 -- we had that in front of you before.

 2        A.    Right.

 3        Q.    At that top line, where -- at the far right

 4    where the columns get blue.  And you have

 5    "Timeliness," "Late," "Days Late, 22," "Penalty

 6    $8.52."

 7                  If Benlida -- and this is just by way

 8    of example -- had come back and said, You know what?

 9    That's not right.  That shipment was timely, and

10    there should be no $8.52 penalty.  Would you have

11    looked at that document?

12        A.    You gave me a hypothetical.  I don't know.

13        Q.    If that document were available, would you

14    have considered it?

15        A.    I would have looked at it.

16        Q.    Did you ever ask CTX if they had such a

17    document?

18                  (Document review.)

19        A.    This is what my client was indicating were

20    the correct lead-time penalties.

21        BY MR. MAZZOLA:

22        Q.    And --

23        A.    I would assume -- or I assumed that if

24    there was a dispute and it was agreed to by

25    Circuitronix, they would have eliminated it from



1   their database.

2       Q.   Do you know if Benlida raised any

3   objections to any of these lead-time penalties?

4       A.   I don't know.

5       Q.   Do you know if Benlida --

6       A.   Well, I'm sure they did.

7       Q.   Okay.

8       A.   And I'm sure it was in the normal course of

9   business.

10      Q.   Do you have any documentation that shows

11  Benlida agreed to these lead-time penalties?

12      A.   Well, I don't know which ones -- I'd have

13  to look at what -- which ones these --

14      Q.   Just any of them.

15      A.   I don't recall.

16      Q.   I really do want to talk about related

17  parties again.

18              You talked earlier about the -- from an

19  accounting perspective, related parties, Mr. Mukamal.

20      A.   Can I back up?  Because there's something I

21  didn't understand in your question.  I just want to

22  make sure it's clear.

23      Q.   Sure.

24      A.   Give me a time frame.

25              When you say "these lead-time



1    penalties," what are you referring to?

2         Q.    These ones in front of you.

3         A.    Okay.

4         Q.    Any of the lead-time penalties.

5         A.    These are in 2020.

6         Q.    Um-hmm.

7         A.    All right.  So --

8         Q.    The documents that came off the --

9         A.    Right.

10             So Benlida -- my recollection is

11    Benlida requested that lead-time penalty debit memos

12    not be sent to them.  That's my recollection.

13             So I wouldn't have a debit memo for

14    that.  I would just have the lead-time penalty

15    spreadsheet.

16         Q.    I wasn't asking about debit memos, I was

17    asking if you had ever seen any communication from

18    Benlida objecting to any lead-time penalty.  That

19    was one question.  I think your answer was either

20    no, or I don't recall.  Is that correct?

21             MS. MARTINEZ:  Objection.

22         A.    I'm sure I've seen emails about lead-time

23    penalties prior to 2016.  But I can't recall,

24    specifically.

25    \\\



1      BY MR. MAZZOLA:

2      Q.    But if there were emails prior to 2016

3  addressing lead-time penalties that are addressed in

4  your report, they would be in the set of documents

5  identified in Exhibit 151.

6      A.    I don't know.  I don't know what didn't

7  exist -- what existed that I didn't see.

8      Q.    But that's why we spent a little -- so much

9  time earlier.  I was trying to understand what is

10 the -- I needed -- I need to know what the universe

11 of documents are that you reviewed and that you

12 utilized to prepare the report.

13           And as I understand it, Mr. Mukamal,

14 it's what was contained in Exhibit 152 and what is

15 contained in Exhibit 151, which is this on the

16 screen.

17           Truth be told, I haven't looked at

18 every document.  But I just want to know that

19 these -- if these documents came from your lawyer,

20 these are the documents that you guys utilized and

21 relied on in preparing the report.

22     A.    As far as I know, yes.

23     Q.    Okay.  I will accept mistakes happen;

24 something doesn't get transcribed, doesn't get

25 loaded over; something's corrupted.  But if you gave



1     it to your lawyers and we got it on the OneDrive, or

2     the download, that that is what you utilized.  Is

3     that correct, Mr. Mukamal?

4          A.   To my knowledge, yes.

5          Q.   Okay.  And I was going to jump into the

6     related-party discussion.

7                    You did say earlier, Mr. Mukamal -- I

8     think you did -- that from an accounting perspective,

9     the factors and the criteria that you considered to

10    decide if two parties are related from an accounting

11    perspective is -- common control is one of them.

12    Right?

13                    MS. MARTINEZ:  Objection.

14         A.   Common control could be one of them.

15         BY MR. MAZZOLA:

16         Q.   Okay.  Common ownership could be one of

17    them, too.  Right?

18         A.   Yes.

19         Q.   Common interest could be another.  Right?

20         A.   Could be -- I'm sorry.  Common interest?

21         Q.   They have common interests.

22         A.   I don't know what that means.

23         Q.   Business, economic.  You know what a common

24    economic interest is, don't you?

25         A.   They're joint partners in something.  Joint



1    venturers.  I mean, I don't -- I'm not sure I --

2        Q.    Perhaps.

3        A.    It's possible.

4        Q.    Another one would be something I suggested,

5    the fact that one of these entities pays the debts

6    of another.  That also could be a factor.  Is that

7    correct?

8        A.    You'd need more.  It's very

9    facts-and-circumstances oriented, as I previously

10   testified to.

11       Q.    And that's why I just gave you four

12   examples to consider.

13       A.    If you're constantly paying debts for

14   another entity -- okay? -- that aren't your debts

15   and you're not getting something equivalent in

16   return, it could be.

17       Q.    If you're not getting something equivalent?

18       A.    Equivalent in return.

19       Q.    Meaning, they're not paying your debts.

20       A.    Or they're not giving you something in

21   return.  That's an equivalent economic value.

22       Q.    When you say "they," that's the person

23   that's the beneficiary of the debts being paid.

24       A.    Two-party -- I'm assuming a two-party

25   arrangement in your example.



Barry Mukamal, CPA, PFS, ABV, CIRA, CFE, CFF, CGMA     8/1/2023
Case 0:21-cv-60125-RNS   Document 201-2   Entered on FLSD Docket 08/22/2023   Page 118 of
Page 117
187

1    Q.   What about a three-party arrangement, where

2  someone's manufacturing something and -- like in our

3  case, Benlida's manufacturing something, perhaps

4  they're manufacturing something in the Hong Kong

5  entity, but the U.S. operation is paying the debt of

6  the Hong Kong entity.

7              MS. MARTINEZ:  Objection.

8    A.   Can you give me a hypothetical?

9  BY MR. MAZZOLA:

10   Q.   That's a hypothetical there.

11   A.   There could be a lot of reasons why one

12  entity's paying the debt for another entity that

13  relates to offsets, relates to other transactions,

14  relates to convenience, relates to, you know,

15  advance monies on my behalf and I'll pay it back

16  tomorrow, and because -- you know, a hold on our

17  bank accounts.  I mean, there's all sorts of things

18  that could occur.

19   Q.   Do you mean like in a loan situation?

20   A.   It could be a short-term loan.  It could be

21  you delivered something of value to us, and we'll --

22  instead of paying or reimbursing you for that --

23  that asset or that consideration, we will take care

24  of an obligation.

25              These are all hypotheticals.



1    Q.    Sure.

2    A.    I mean, I've seen -- I've seen entities

3  transact business with each other and with third

4  parties on their behalf in the past.

5    Q.    Let me ask you about the -- I think you --

6  you talked -- you used the word "short-term loan."

7  And the word that excited me was "loan."

8            How -- from an accounting

9  perspective --

10    A.    I'm sorry.  You mentioned "loan."

11    Q.    No.  I heard you say "short-term loan."

12    A.    But you mentioned, "as in a loan."

13    Q.    Okay.

14    A.    And I was following up with that.  Sorry.

15  Go ahead.

16    Q.    It doesn't matter, Mr. Mukamal.  You know,

17  this lady's writing everything down, so we have a

18  record.

19    A.    Sure.

20    Q.    So let's talk about a loan.

21            From an accounting perspective, an

22  accounting perspective, someone who's responsible for

23  keeping track of numbers and keeping track of data

24  from an accounting perspective, what are the indicia

25  of a loan?  What would you expect to see if something



1    were a loan?

2        A.   It could be a promise to pay for -- for

3    monies or something of value that was advanced.  It

4    could be a document.

5        Q.   You would look for a document, and that

6    would be one --

7        A.   It could be a document.

8        Q.   What about interest?

9        A.   It could contain interest.  It may not

10   contain interest.  I've seen it both ways.

11       Q.   What about remedies for default?  Would you

12   see that in a loan or remedies in the event of

13   default?

14       A.   I've seen those in loan documents before,

15   yes.

16       Q.   What about terms, how much is being lent.

17   Is that something you would see in a loan document?

18       A.   If it's applicable, yes.

19       Q.   What about repayment terms?  Is that

20   something you would see in a loan document?

21       A.   Sometimes, yes; sometimes, no.

22       Q.   From an accounting perspective, how does --

23   let me ask you this question -- well, from an

24   accounting perspective, how does -- hypothetically

25   speaking, how should a business report a loan that



1    they give to someone.  How is that recorded?

2         A.   It would be recorded as a due to, due from.

3    You defined it as a "loan."  Correct?

4         Q.   Um-hmm.

5         A.   It could be recorded as an actual separate

6    asset on a -- on the balance sheet, for example.  It

7    could be an off-balance-sheet item.  That's

8    possible.

9         Q.   What's an off-balance-sheet item?

10        A.   It's not recorded.

11        Q.   Are you allowed to do that in accounting?

12        A.   What do you mean if you're "allowed"?  I

13   don't know what that means.

14        Q.   When you say "off-balance sheet," that just

15   doesn't sound right to me.

16        A.   It means that it's not just recorded in the

17   books, because it's meant to be repaid, or it's

18   meant to be taken as a distribution to one party.

19   There's a lot of things that could happen.  It

20   really depends on facts and circumstances.

21        Q.   Is that a good practice to not record

22   things on your books?

23        A.   I didn't suggest it was a good practice.

24   You're asking what -- what could happen.

25        Q.   In this case, how would you expect a loan



```
 1    to Benlida to be reflected in CTX's U.S. books and

 2    records?

 3                    MS. MARTINEZ:  Objection.

 4    BY MR. MAZZOLA:

 5    Q.    Hypothetically speaking.

 6    A.    You're giving me a fact that it's a loan?

 7    Q.    I'm just giving you a hypothetical.

 8                    If a loan was given by CTX U.S. to

 9    Benlida, how would you expect that loan to be

10    recorded in CTX's books and records?

11                    MS. MARTINEZ:  Objection.

12    A.    I don't have an opinion on how they record.

13                    You're saying CTX's books and records.

14    BY MR. MAZZOLA:

15    Q.    Um-hmm.

16    A.    I don't have an opinion on how they make

17    recordations in their books and records for loans

18    made.

19    Q.    What would be a good, proper practice?

20    A.    I can give you the possible practices.

21    Q.    Okay.

22    A.    I'm not going to comment on what's proper

23    practice or not.

24    Q.    Okay.  What would the possible practices

25    be?
```



1     A.    You're defining it as a loan now.  Correct.

2     Q.    I didn't make that word up.  Someone else

3  used the word in this case.

4     A.    But you're defining it for purposes of my

5  question as a loan.

6     Q.    Yes.  As a loan.

7     A.    Okay.  A loan could be a due to, due from.

8  It could be an exchange -- I'm loaning you something

9  temporarily for an exchange of value that I'm

10 holding collateral for.  And I'm not going to record

11 the loan because I have adequate collateral or

12 offsetting credits to apply.  It could be a

13 long-term loan as part of a line of credit.  It

14 could be pursuant to an agreement -- an intercompany

15 agreement between or -- intercreditor agreement

16 between the parties.  It's possible.  It's all I can

17 remember -- think of offhand.

18    Q.    But the best practice is to record the loan

19 in your books and records.

20          MS. MARTINEZ:  Objection.

21    A.    I don't have an opinion as to what's best

22 practice.  I've seen a lot of different practices.

23 It's -- I think it's facts-and-circumstance based,

24 and what the circumstances are matter.

25 \\\



1          BY MR. MAZZOLA:

2          Q.    Do you know in this case that there has

3     been an allegation by Rishi Kukreja of CTX that he

4     lent money to the Benlida people?

5                    Have you ever heard that?

6          A.    Personally, or are you talking about

7     corporately?

8          Q.    Corporately.

9          A.    Okay.  Because you said "he lent money."

10         Q.    Yeah.

11         A.    Okay.  I think I recall hearing that.

12         Q.    As part of your due diligence and review of

13    documents in preparation for this report, did you

14    review that aspect?

15         A.    No.

16         Q.    Do you have any knowledge with respect to

17    how CTX reflects that loan on their books and

18    records?

19         A.    What loan?

20         Q.    The loan that Mr. Kukreja says that CTX

21    gave to Benlida.

22         A.    Are you referring to payments in excess of

23    invoices that are made?

24         Q.    I didn't use the word.  Mr. Kukreja used

25    the word "loan."



1     A.   Right.  So that's what's I think you may be

2     referring to.  I'm not -- I haven't audited

3     Circuitronix's books, so I don't know what

4     particular loans are sitting on the balance sheet.

5               But I do know that there's payments in

6     excess of invoices that were made in accordance with

7     the practice between the -- between Circuitronix and

8     Benlida with respect to three-month -- three-month

9     invoices being paid and payments on account that are

10    being made by Circuitronix against those that result

11    in a credit balance to Circuitronix resulting from

12    those payments.

13    Q.   So that credit balance, based upon the

14    payments that we talked about earlier that -- my

15    recollection was you said they were about $668,000.

16    Is that correct, Mr. Mukamal?

17    A.   No.  That's not correct.

18              These are concurring invoices that we

19    were talking about, and concurring payments.  That's

20    not an over --

21    Q.   What are --

22    A.   -- that's not what I'm talking about.

23    Q.   What are you talking about?

24    A.   I'm talking about more payments in dollar

25    amounts that are currently -- that are made in the



1    current period against invoices that have been

2    accumulated in the past 90 days.

3         Q.   And so you understand that might be what

4    Mr. --

5         A.   It's possible.

6         Q.   Okay.  And insofar as your report goes --

7    we talked earlier about this -- you concluded that

8    if you took lead-time penalties out, the debit memos

9    out, that the overpayment was $668,000 or

10   thereabouts.  Is that correct?

11        A.   Hold on a second.

12        Q.   So what I'm getting at is, you're talking

13   about this overpayment.  Are you suggesting that

14   this overpayment of $668,000 is the loan that

15   Mr. Kukreja is talking about?

16        A.   It could be.  I don't know.

17        Q.   So back to the related parties.

18             So let's -- you keep talking about

19   facts and circumstances being important in

20   determining whether two entities are related parties.

21        A.   Well, you talked about it in an accounting

22   perspective.

23        Q.   Yes.  From an accounting perspective.

24        A.   And I'm talking about -- I'm referencing as

25   an audit perspective.  Because related parties



1    become -- become in focus as an auditing component.

2         Q.   Okay.  But auditing is part of accounting.

3    Right?

4         A.   It's element of it.

5         Q.   You've got to be a -- I assume you've got

6    to be a CPA to do an audit.  Right?

7         A.   No.  You don't have to be a CPA to do an

8    audit.  You have to be a CPA to opine on the

9    financial statements.

10        Q.   After you've done the audit?

11        A.   Yeah.  It's tough to opine on something you

12   haven't done yet.

13        Q.   So talking about facts and circumstances,

14   we talk about -- and I gave you a lot of examples, a

15   lot of factors you could consider.

16        A.   Right.

17        Q.   Common control is one.

18        A.   Okay.

19        Q.   Is that correct?

20        A.   It's one fact --

21             MS. MARTINEZ:  Objection.

22             You can answer.  Sorry.

23        A.   It's one factor.

24   BY MR. MAZZOLA:

25        Q.   And another factor is -- that you might



1    consider is common ownership.  Is that correct?

2              MS. MARTINEZ:  Objection.

3        A.    Correct.

4        BY MR. MAZZOLA:

5        Q.    Another factor, which we -- I tried this

6    one, common interest.  And what I was talking about

7    there was shared business interest between the two

8    entities.  Is that another factor?

9              MS. MARTINEZ:  Objection.

10       A.    Only if the one affects the other in

11   commerce.

12       BY MR. MAZZOLA:

13       Q.    Okay.  And is another factor that you might

14   consider in identifying, if two parties are related

15   parties, is if one party is paying the debts of

16   another one?

17             MS. MARTINEZ:  Objection.

18       A.    That's not necessarily true.

19       BY MR. MAZZOLA:

20       Q.    Okay.  Let's look at -- let's look at what

21   we previously marked as Exhibit 40.

22             This is a letter on Circuitronix

23   letterhead.  Do you see that?

24       A.    I do.

25       Q.    Mr. Mukamal, have you ever seen this



1    document before?

2        A.   I do recall seeing it.

3        Q.   You do recall seeing it.

4             Did you review it?

5        A.   I don't recall whether I reviewed all of

6    it, a piece of it, the first page.  I just don't

7    remember.

8        Q.   What was the circumstances of you reviewing

9    it?

10       A.   I think it was referenced in one of the

11   court pleadings.

12       Q.   If you go to the penultimate page of the

13   letter -- that's a fancy word for second to last.

14             MR. MAZZOLA:  Right?

15             MR. ROSENTHAL:  It's the bow tie.

16   BY MR. MAZZOLA:

17       Q.   -- you'll see what lawyers call, you know,

18   the notice section.  Where you see, "if to Benlida,"

19   "if to ROK," "if to CTX U.S.," "if to CTX Hong

20   Kong."

21             Do you see that?

22       A.   Yes.

23       Q.   With respect to the CTX U.S.A, do you see

24   that notice is being given to -- although it's being

25   sent to Florida here, it's being sent to the



1    attention of Mr. Kukreja.

2              Do you see that?

3        A.    Yes, it is.

4        Q.    And do you see with respect to the

5    Hong Kong entity, it's being sent -- although to a

6    Hong Kong address -- to Mr. Kukreja as well.

7              Do you see that?

8        A.    Yes.

9        Q.    From an accounting perspective, is that

10   a -- just one minor -- maybe not a big piece -- but

11   just one minor indicia that they're related parties?

12   That U.S.A CTX and Hong Kong CTX are related parties

13   with this both addressed to Mr. Kukreja?

14       A.    They could be related parties.  But I don't

15   understand what related parties have to -- what

16   you're suggesting here.

17              I mean, related parties does not

18   create anything other than potential disclosure

19   issues, unless there is -- unless there's some --

20   the companies are being audited -- you know, subject

21   to audit and it requires a determination by the

22   auditors if there's any fraud or defalcation that's

23   taking place.  That's the consideration to me --

24       Q.    Let me ask this question --

25       A.    -- by an auditor.



1              Just being a related party may rise to

2    a level of disclosure if it's significant enough,

3    but it doesn't mean that the economic interests

4    aren't maintained separately.

5         Q.    If CTX U.S.A and CTX Hong Kong are related

6    parties from an accounting audit and business

7    perspective, let's assume that.

8         A.    If what?  I'm sorry.

9         Q.    Is they are.  So --

10        A.    Which two entities?

11        Q.    CTX Hong Kong and CTX U.S.A.

12        A.    Okay.

13        Q.    If you assume that they're related parties.

14   With that assumption, would it then make sense for

15   you to review the debts claimed to be owed by

16   CTX Hong Kong to Benlida?

17        A.    In what context?

18             MS. MARTINEZ:  Objection.

19   BY MR. MAZZOLA:

20        Q.    In any context.

21             You know Benlida's claiming that CTX

22   Hong Kong owes them money.  You know that.

23        A.    I'm sorry?

24        Q.    You know that Benlida is claiming that CTX

25   Hong Kong owes them money.



1     A.   Yes.

2     Q.   You know that --

3     A.   Yes.  Yes.

4     Q.   -- whether it's true or not, but you know

5  that's their allegation.

6     A.   Yes.

7     Q.   And you knew that was their allegation from

8  the beginning when you read the complaint.  Isn't

9  that correct?

10     A.   Yes.

11     Q.   And my question -- it's kind of a bigger

12  question here.

13           And you know that in the complaint,

14  Benlida is looking to the U.S. -- CTX U.S. to pay

15  those debts to the Hong Kong entity.  You know that

16  as well.  Right?

17           MS. MARTINEZ:  Objection.

18     A.   I assume that from the tenor of the

19  complaint.

20     Q.   So you know that?  So if you --

21     A.   But I don't -- I didn't see it in the

22  complaint.

23     Q.   But you assume it from the tenor of the

24  complaint.

25     A.   Well, after the fact.



1    When I'm looking at it now, and I'm

2  saying, oh, this is really what it means, but I

3  didn't see any claim in there in the complaint

4  against -- go ahead.

5    Q.   Well, you saw the invoices with the "HK."

6  We went through that whole discussion earlier --

7    A.   I know that.  But that --

8    Q.   -- so my question is this:

9    Assuming that that's true, why would

10  you not do any analysis of the invoices, the

11  payments, the debits, between the Hong Kong entity

12  and Benlida?

13    A.   Because the claim isn't in the third

14  amended complaint that your client filed.

15    Q.   The claim is not in the complaint?

16    A.   It's not in the complaint.  That was -- and

17  I think I said this before.  If that was the

18  contention, I would have expected an affirmative

19  report from your expert, which I would have

20  evaluated for rebuttal.  But I didn't get that

21  report.

22    Q.   So your answer is that the complaint does

23  not allege that Benlida is looking to CTX U.S. to

24  pay the debts of CTX Hong Kong?

25    MS. MARTINEZ:  Objection.



1      BY MR. MAZZOLA:

2      Q.   That's a legal question, but that's --

3      A.   I think it's a legal question.  I mean, you

4   know you could -- you could possibly infer.  But

5   that goes beyond the scope of what I was asked to

6   do.

7      Q.   What you were asked to do?

8      A.   What I was asked to do was to evaluate the

9   intercompany between Benlida and Circuitronix U.S.

10      Q.   And that was your instruction.  That's what

11   you were asked to look at between Benlida -- Benlida

12   and Circuitronix U.S.  Right?

13      A.   Reconcile those accounts.

14      Q.   And that was it.  No?

15           And at no point did you ever go back to

16   anyone and say, Hey, you know what?  Perhaps we

17   should look at the accounts between Hong Kong CTX and

18   Benlida.

19      A.   And why would that be?

20      Q.   You -- at no time did you ever go back and

21   do that, did you?

22      A.   I didn't go back to do it.

23           But why would I?  These are separate

24   entities.

25      Q.   You were following your instructions,



1  initially, which was just to look at CTX U.S. and

2  Benlida.  Is that correct?

3      A.   I was asked to pursue the counterclaim,

4  evaluate the counterclaim that my client filed.

5  Rebuttal against your claim is a different issue.

6  And until I saw the report of your expert, there was

7  nothing for me to do.

8      Q.   Hypothetically, if CTX U.S. is responsible

9  for the debts of CTX Hong Kong.

10     A.   Do you mind if I walk over there and get

11 some water?

12     Q.   Go ahead.

13     A.   Go ahead.  Ask your question.

14     Q.   Is it appropriate and reasonable -- scratch

15 that question.

16     A.   Okay.

17     Q.   Continue with Exhibit 40.

18     A.   Okay.

19     Q.   If you go to the next page of Exhibit 40,

20 you'll see that Mr. Kukreja is signing on behalf of

21 CTX U.S. and CTX Hong Kong.

22          Is -- the fact that he's signing on

23 behalf of both companies, is that indicia that the

24 two companies, CTX U.S. and CTX Hong Kong, are

25 related?



1      A.     Are what?

2      Q.     Are related entities.

3      A.     It may or may not be.  I'm not disputing

4   one way or the other.

5              What -- I don't see a signature,

6   though.  That's all I'm --

7      Q.     I don't think anyone is disagreeing that

8   Mr. Kukreja did not write that or that he did not

9   agree to that.  And I think -- I don't know if

10  there's a signed version of it.

11     A.     Okay.  So that wasn't a trick question.  I

12  know you better --

13     Q.     No.  That was not a trick question.

14     A.     Okay.

15     Q.     Let's look at Exhibit 27.

16     A.     Yes.

17     Q.     This is a document we've been referring to

18  as a business authorization.

19     A.     Yes.

20     Q.     Have you ever seen this document before?

21     A.     No.  But I heard about it.  I think I read

22  it in a pleading.

23     Q.     Do you see where it begins in the English

24  portion "For purposes of our company's business."

25              Do you see that?



1       A.    Yes.

2       Q.    And can you read that?  Circuitronix, LLC.

3  Do you see what it says?  Take a look at it.

4                (Document review.)

5       A.    Yes.

6  BY MR. MAZZOLA:

7       Q.    The language of that.  How do you

8  understand the language of that to read?

9                MS. MARTINEZ:  Objection.

10      A.    I can only interpret it in my -- in my

11  head.

12  BY MR. MAZZOLA:

13      Q.    Okay.

14      A.    I don't know legally what it means

15  precisely.

16      Q.    In your head as an accountant, though,

17  looking at this document and in your professional

18  accounting opinion, might this document be indicia

19  that Circuitronix, LLC, and Circuitronix Hong Kong

20  are related entities?

21                MS. MARTINEZ:  Objection.

22      A.    This in and of itself?

23  BY MR. MAZZOLA:

24      Q.    Um-hmm.

25      A.    It doesn't suggest they're related



 1    entities.

 2         Q.    It doesn't suggest that at some level

 3    Circuitronix, LLC, is agreeing to pay debts due?

 4         A.    Well, it says, "Due to place orders to your

 5    company," meaning Benlida, "on our behalf."

 6              So it could be that they're, you know,

 7    being appointed as a representative to place orders

 8    for the benefit of Circuitronix, LLC.

 9         Q.    And then do you see what it says below,

10    that they're assuming?

11         A.    Below.

12         Q.    No.   The next sentence.   You only read that

13    first sentence.   "Circuitronix, LLC, assumes" --

14         A.    -- all -- "Circuitronix assumes all

15    Circuitronix (Hong Kong) Limited's debts due to

16    these orders."

17              These orders are orders for

18    Circuitronix, LLC, for the benefit of Circuitronix,

19    LLC."

20         Q.    Okay.   So in your professional opinion,

21    this document doesn't indicate that the two

22    entities, the Hong Kong entity and the U.S. entity,

23    are related --

24              MS. MARTINEZ:   Objection.

25         A.    In and of itself, it could be an agency --



1  you know, an agency, you know, relationship -- not

2  an agency, a representative agreement for another

3  company to order on behalf because it may be more

4  convenient; it may be that -- that it falls within

5  the way that the two companies, meaning the

6  Hong Kong entity and -- I'm sorry -- Circuitronix

7  and Benlida using another entity to identify -- to

8  facilitate shipments --

9      BY MR. MAZZOLA:

10     Q.   But -- but --

11     A.   -- let's put it that way.

12              I don't know.  I mean --

13     Q.   -- but certainly not as an agent.  Right?

14              MS. MARTINEZ:  Objection.

15     A.   I don't know.

16     BY MR. MAZZOLA:

17     Q.   Okay.

18     A.   That's a legal determination.

19     Q.   Could this be considered, as an accountant

20  reviewing everything, just one small indicia of the

21  Hong Kong entity and the U.S. entity being related

22  parties?

23              MS. MARTINEZ:  Objection.

24     A.   It's possible.  In and of itself, it

25  doesn't.



1       BY MR. MAZZOLA:

2       Q.   But it could be one indicia.  One small

3   indicia.

4            MS. MARTINEZ:  Objection.

5       A.   What -- a related party doesn't create a

6   joint obligation.  I'm not sure I understand the

7   context of your question.

8       BY MR. MAZZOLA:

9       Q.   I'm just asking if -- the fact that one

10  entity is promising to pay the debts of another,

11  whether or not -- if that is reflected that the two

12  parties from an accounting perspective are related

13  parties.  And the answer is either yes or no.

14      A.   It's from an auditing perspective, not from

15  an accounting perspective.

16      Q.   Okay.

17      A.   But from an auditing perspective, it may be

18  something to ask a question about.

19      Q.   Okay.  Let's look at Exhibit 21.

20           Have you seen this document before?

21      A.   I believe so.

22      Q.   And I don't mean to trick you.  This is

23  actually --

24      A.   But I think this was an attachment to one

25  of the pleadings.



1    Q.   And I'll tell you that is the manufacturing

2    agreement that is subject to this dispute here.

3              And I want you to go to the last page

4    of it.  Maybe it's not the last page.

5              It's page 10.  I'm sorry.

6              I will represent to you that this is a

7    list of exclusive customers.

8              Do you see that?

9    A.   No.  I don't see --

10   Q.   Page 10.

11   A.   I see page 10.  It says "Identify potential

12   customers."

13   Q.   And "Circuitronix customers."

14   A.   Right.

15   Q.   And I'm going to represent to you that the

16   parties in operation viewed these as exclusive

17   customers of Circuitronix.

18   A.   Okay.

19   Q.   Circuitronix U.S.  And the question I have

20   is if, as an accountant, you understood that

21   Circuitronix Hong Kong was purchasing for this --

22   these exclusive customers from Benlida, would that

23   be an indicia -- a small indicia, it doesn't need to

24   be a big one, just a small indicia -- that CTX

25   Hong Kong and CTX U.S. operate as related parties.



1              MS. MARTINEZ:  Objection.

2      A.    What's the predicate that you started off

3  with?

4      BY MR. MAZZOLA:

5      Q.    CTX Hong Kong is selling to Benlida --

6  other way around.

7      A.    Other way around.  Yeah.

8      Q.    Is purchasing, from Benlida, product for

9  these exclusive customers.

10     A.    Right.

11     Q.    And CTX USA, of course, is not objecting,

12 from an accountant's perspective, or an auditor's

13 perspective.  Looking at the whole picture, is that

14 an indicia that CTX U.S. and CTX Hong Kong are

15 related parties?

16             MS. MARTINEZ:  Objection.

17     A.    I don't think it's dispositive of anything.

18 There could be a lot of reasons for that.

19     BY MR. MAZZOLA:

20     Q.    Let's look at a document which we

21 identified yesterday ...

22             (Pause in proceedings.)

23             MR. MAZZOLA:  Christina, can you

24     give me a lifeline on this one?

25             MS. MARTINEZ:  I believe it's



1       139, but I'm not 100 percent --

2                   MR. MAZZOLA:  Yeah.  I'm not sure

3       if is 139 or 140.  So we want to make the

4       record clear --

5                   MS. MARTINEZ:  What I have on my

6       list for 140 is the payment schedule, so

7       that's what makes me think this is 139.

8                   MR. MAZZOLA:  Thank you,

9       Christina.

10      BY MR. MAZZOLA:

11      Q.   We're putting up a document in front of

12      you, Mr. Mukamal, which we've identified, which

13      we've previously marked as Exhibit 139.

14      A.   Right.

15      Q.   And it's really not a fair question to ask

16      you if you've ever seen it because -- unless you

17      know.

18                   Have you ever seen this document?

19      A.   I haven't seen this document, to my

20      recollection.  But I've seen one that had a 4/22

21      update on it.  But it wasn't this because it went

22      through 2021.

23      Q.   What I want to point out to you, this is a

24      ROK payment detail.

25                   And you know who -- you know ROK.



1    You've heard of that company?

2        A.   Yes.

3        Q.   ROK was -- I guess, you call them a related

4    party with Benlida.  Right?

5                 MS. MARTINEZ:  Objection.

6        A.   I don't know what their legal connection

7    is.

8        BY MR. MAZZOLA:

9        Q.   What about from an accounting perspective?

10   Do you know?

11                MS. MARTINEZ:  Objection.

12       A.   I think there's some connection.  I don't

13   know what precisely it is.

14       BY MR. MAZZOLA:

15       Q.   Okay.  In any event, though, at the bottom

16   of this, you'll see various tabs, which are

17   year-by-year summaries, and I'm going through them.

18                 Do you see that?  I'm just showing you.

19   And then they get into monthly summaries.  And I'm

20   going to scroll off of one of these months.  Let me

21   take a look.  Maybe I'll go to -- I'll go to

22   February 2016.  Is that okay?  We did this yesterday.

23       A.   Why are we doing it again?

24                 It's a joke.

25       Q.   That's a good one.  Because you don't know



1    how Mr. Parisi answered it.

2        A.    I do not.

3        Q.    So I'm going to make it a little smaller so

4    we can -- that's too small.  To try to let you see

5    more of it at one time.

6                This is a payment detail.

7                Are you familiar with these payment

8    details?

9        A.    Yes.

10       Q.    And this is a payment detail -- it's dated

11   May 1, 2016.  And it's got bill numbers on the

12   left-hand column at A.  Then at B, it's got bill

13   dates.  It's got memos down at column C.  And it's

14   got amount dues down in column D.

15               And in this one, you can see that it's

16   got a subtotal of $537,000 owed.

17               Do you see that?

18       A.    Can you go up to the top again, please?

19       Q.    Um-hmm.

20       A.    And go down.

21       Q.    Do you see how it's from Circuitronix, LLC.

22   Right?

23       A.    Okay.  Go down.

24       Q.    Do you want me to stop?

25       A.    Yeah.  Just I want to see where the



```
 1    payments were coming.

 2                   Stop right there.

 3         Q.    Okay.  Are you still with me?

 4         A.    Okay.

 5                   (Document review.)

 6    BY MR. MAZZOLA:

 7         Q.    Okay.  In this one, you see a subtotal of

 8    $537,000.

 9                   Do you see that?  Approximately.

10         A.    Yes.

11         Q.    And do you see how that subtotal is

12    comprised of a U.S. total of $417,000, and then

13    there's also a Hong Kong total of $120,000.

14                   MS. MARTINEZ:  Just for the

15         record, we're looking at rows 26, 36, and

16         37.

17    BY MR. MAZZOLA:

18         Q.    Do you see that, Mr. Mukamal?

19         A.    Yes.

20         Q.    And if you look at column A, I guess that's

21    where the invoice column was -- right? -- or the

22    bill number column.  It seems that ROK is using

23    this -- a similar numbering convention that Benlida

24    does because they have an "HK" in there.

25                   Do you see that?
```



1    A.   Yes.

2    Q.   And is it fair for you to assume that where

3 there's an "HK" in this -- in bill number, that that

4 is because the purchase orders were issued from the

5 Hong Kong Circuitronix entity.

6          MS. MARTINEZ:  Objection.

7    A.   I don't know for a fact --

8 BY MR. MAZZOLA:

9    Q.   Okay.

10   A.   -- but it's an assumption.

11         MS. MARTINEZ:  Objection.

12 BY MR. MAZZOLA:

13   Q.   And then you see over here that there's

14 payments made to this subtotal.

15         Do you see that?

16   A.   Correct.

17   Q.   And we're looking at lines 39 and 40.  And

18 the payments are $300,000 apiece?

19   A.   Yes.

20   Q.   Now, if those -- let's look at what we also

21 call "Payment Schedule."  And the dates of those are

22 4/21 and April 28 -- 4/21 and 4/28/2016.  Is that

23 right?

24   A.   Yes.  According to that.

25         MR. LERNER:  The payment schedule



1        is Exhibit 140.

2        BY MR. MAZZOLA:

3        Q.    So if we look at the payment schedule --

4   and I'm scrolling down -- this is Exhibit 140.

5                     Have you ever seen this payment

6   schedule?

7        A.    I may have.  I don't recall this one

8   specifically.

9        Q.    Then we go to the April 21 date.

10                    Do you see that?

11       A.    Yes.

12       Q.    And there's a $300,000 payment that matches

13  up to the payment detail.  Is that correct?

14                    I could pull the other document up.

15       A.    Could you just highlight it where you're

16  talking about?

17                    MR. LERNER:  81.

18       A.    There we go.

19       BY MR. MAZZOLA:

20       Q.    And there's another payment -- another

21  payment on April 28th of $300,000.

22                    Do you see that?

23       A.    Yes.

24       Q.    And is it fair to say that those payments

25  match the payments noted on Exhibit 139, this



1    payment detail?

2        A.    The amounts are the same.

3        Q.    And the dates are the same.  Right?

4        A.    Yes.

5        Q.    So is it a fair assumption that the

6    payments referenced on payment schedule 140 are the

7    same payments?

8        A.    It's possible.

9        Q.    Now, these payments came from a Citibank

10   account.

11              Do you see that?

12       A.    Yes.

13       Q.    They both did.

14              And these payments were made to ROK.

15   Do you see that?

16       A.    Yes.

17       Q.    So that's further indicia that the payments

18   are the same between the payment detail and this

19   payment schedule.  Right?

20       A.    Right.  Because they came from the same

21   bank.

22       Q.    No.  Because they went to the same

23   recipient, which is ROK Printed Circuit Board.

24       A.    It's a piece of it.

25       Q.    Okay.  Now, do you see the SWIFT number?



1    The CT -- CITIUS33?

2       A.   You'll have to highlight it.

3            Yes.  I see the SWIFT number.

4       Q.   I assume you know -- you've been around

5    banking long enough to know that that's a SWIFT code

6    that indicates that the money is originating from a

7    U.S. bank account.  Right?

8       A.   I believe that's correct.

9       Q.   And do you know that this account number

10   is -- can you assume, or do you believe it is true,

11   that this account number is -- and I will tell you

12   it's true, that this account is CTX, LLC's, U.S.

13   account?

14            MS. MARTINEZ:  Objection.

15       A.   Is CTX U.S. --

16   BY MR. MAZZOLA:

17       Q.   -- U.S.'s account.  Bank account.

18       A.   I'll accept your representation for the

19   purposes of your question.

20       Q.   So is -- the fact that CTX U.S. is

21   seemingly paying the debt of CTX Hong Kong, is that

22   another condition that you would look at to conclude

23   that -- from an accounting perspective, that

24   CTX Hong Kong and CTX U.S. are related parties?

25            MS. MARTINEZ:  Objection.



```
 1              Go ahead.  Go ahead.

 2       A.   Can you go back to the first page?  I just

 3  want to make sure of something.

 4              MR. LERNER:  Go back to

 5       Exhibit 139.

 6              THE WITNESS:  No.  You're fine

 7       where you are.  Back to right.  There.

 8       Where you are.

 9              MR. LERNER:  Back to 139.

10  BY MR. MAZZOLA:

11       Q.   I can go back to November 2015, and we can

12  do the same exercise through April 2016.

13       A.   Is this a ROK invoice, or is this a

14  Hong Kong invoice?

15              Can you tell me?

16       Q.   I beg your pardon?

17       A.   Go down.  I'm sorry.  Right there.

18              Is that a ROK invoice, or is that a

19  Hong Kong invoice from Benlida?

20       Q.   It says ROK HK -- ROK.  These are ROK

21  invoices.  Yes.

22       A.   Okay.  Your question, please.

23       Q.   So my question is, in fact, this is

24  evidence that CTX U.S. is paying the debts of

25  CTX Hong Kong to ROK, as opposed to Benlida, is
```



1  that -- maybe not proof positive -- but from your

2  professional perspective, indicia that CTX Hong Kong

3  and CTX U.S. are, from accounting and financial

4  perspective, related parties?

5              MS. MARTINEZ:  Objection.

6      A.   It's a consideration.  But it's not indicia

7  of -- is not indicia that they're paying debts on

8  behalf of Hong Kong.

9              It could be that they're advancing

10  money at their request -- at Hong Kong's request, or

11  Hong Kong owes Circuitronix money for whatever

12  reason, and they've been directed to pay invoices on

13  behalf.

14      BY MR. MAZZOLA:

15      Q.   But you don't know, because you never did

16  that accounting review.

17      A.   Well, I never got to do that accounting

18  review because your own witness didn't provide a

19  report to that effect.

20      Q.   But -- so -- but you never did it?

21      A.   It was a rebuttal.  There was a rebuttal

22  element to that, not an affirmative report.

23      Q.   But the thing is, you're here to testify in

24  accordance with your report.  And your report only

25  addresses the reconciliations, the dollars, the



1    purchases, the invoices, the money flowing back and

2    forth between CTX U.S. and Benlida.  Isn't that

3    correct?

4        A.   I believe that's correct.

5        Q.   Your report does not in any place address

6    any of the money flowing back and forth -- the

7    invoices, debit memos, obligations -- between

8    CTX Hong Kong and Benlida.  Isn't that correct?

9        A.   I didn't audit the payments going back and

10   forth between the two.

11       Q.   And your report doesn't anywhere address

12   CTX U.S. owing any debts of CTX Hong Kong.

13       A.   That's beyond the scope of my report.

14       Q.   And your report doesn't address CTX U.S.

15   paying anything on behalf of CTX Hong Kong.

16       A.   Or receiving any goods from CTX Hong Kong

17   and paying CTX Hong Kong for goods that Hong Kong

18   provided to Circuitronix.

19       Q.   And that's because your instructions were

20   only to look at the CTX U.S. Benlida transactions.

21            MS. MARTINEZ:  Objection.

22       A.   My scope was to evaluate the

23   reconciliations that were between Benlida and

24   Circuitronix, LLC, and identify the differences.

25   \\\



1       BY MR. MAZZOLA:

2       Q.   And you did that.

3            But you testified earlier that from

4  looking at the complaint -- you don't need to be a

5  lawyer to do this because you were able to do it --

6  that it infers from the complaint that Benlida is

7  suing CTX U.S. for invoices issued to CTX Hong Kong.

8  You said that earlier.

9            Is that still true?

10      A.   I can't infer.  I'd have to really

11  speculate because it wasn't part of the complaint.

12      Q.   In your reading of the complaint, you

13  didn't see that.  This would be pure speculation.

14      A.   I think it's a legal determination as to

15  whether it was properly pled or not.  It's not in my

16  wheelhouse to do that.

17      Q.   You recall we talked earlier -- we looked

18  at invoices.  You recall we did that.  And those

19  invoices, they have the numbering convention

20  including an "HK" on it.  And the invoices -- these

21  are materials that you have.  I can show them to you

22  again.

23            I've pulled up from the Benlida

24  complaint file, and I recall looking at this invoice.

25            MR. MAZZOLA:  What was the number



1       on this one?

2                   MR. LERNER:   166.

3       BY MR. MAZZOLA:

4       Q.   This was Exhibit 166.  Right?

5                   MR. MAZZOLA:  I don't know.  Hold

6       on.

7                   MR. LERNER:  Yes.  It's 166.

8                   MS. MARTINEZ:  I think for 166, I

9       have --

10                  MR. MAZZOLA:  April date.  Right?

11                  MS. MARTINEZ:  Well, I have

12      something labeled CCT-BLD190412001.

13                  For 167, I have BLDCCT-HK1980602.

14      So I'm not sure they're the ones that have

15      been previously pulled up.

16                  So this is Exhibit 167 that we're

17      looking at.

18                  MR. MAZZOLA:  Yes.

19      BY MR. MAZZOLA:

20      Q.   So this is the Exhibit 167.  Do you see

21      this on the screen?  We looked at this earlier.

22      A.   Yes.  I see it.

23      Q.   And this is an invoice issued by Benlida.

24      And the numbering convention for the invoice has

25      "HK" in it.  And you acknowledged earlier that where



1   there's an "HK" in it, that it was an invoice issued

2   to Circuitronix Hong Kong.

3       A.   Well, I don't know that for a fact, but it

4   appears to be that.

5       Q.   Okay.

6       A.   But I don't know what --

7       Q.   You may not know that for a fact.

8       A.   Right.

9       Q.   But I bet you can surmise that Mr. Kukreja

10  would have known that for a fact.  Right?

11              MS. MARTINEZ:  Objection.

12  BY MR. MAZZOLA:

13      Q.   Right?

14      A.   You're asking me to surmise?  I can surmise

15  he knows more than I do about where that shipment

16  went.

17      Q.   Okay.  And so my point was, you can look at

18  this -- you're a pretty smart guy.  You can look at

19  this.  You have this document, and you know that

20  these invoice numbers are contained in the

21  complaint.

22              So the question is, when you got your

23  instructions and you read the complaint, did you ever

24  go back to anyone and say, Hey, hold on a second.

25  Maybe we should be looking at the Hong Kong Benlida



1    transactions as well?

2                   MS. MARTINEZ:  Objection.

3        A.    My charge was rebuttal.  I rebutted the

4    elements of the complaint.

5                   What you're saying is, I should -- I

6    should go back and do an investigation of each

7    invoice.  And the invoices that you're indicating

8    have nothing to do with identifying the difference

9    in the invoices and the payments and the debit

10   memos.  What you're asking me to do is reconstruct

11   and recharacterize what occurred between the

12   parties.

13       BY MR. MAZZOLA:

14       Q.    You had this document.  It was Exhibit 158.

15       A.    Okay.

16       Q.    One minute.  This is Exhibit 158.  It says

17   "Benlida shipment, payment and detail

18   CTX Hong Kong."

19                   Now, you saw I pulled this document off

20   of the ones that were provided to us and the ones

21   that you had for review.  Did you review this

22   document?

23       A.    Can you hit a tab, please?

24       Q.    You see the summary at the bottom.  Right?

25       A.    Yes.



1    Q.    And what does it show in column D?

2          Balance due.  Do you see that?

3    A.    Correct.

4    Q.    $13 million.

5          Do you see that?

6    A.    Yes.

7    Q.    What year do you want me to hit, because I

8    don't know any more about this document than you do.

9    So let's ...

10    A.    Any tab.  It doesn't matter.

11    Q.    I hit 2014.

12    A.    Okay.

13    Q.    I'm going to make it a little smaller,

14    Mr. Mukamal -- okay? -- so we can look at it a

15    little better.

16          Are you looking at the invoice numbers,

17    Mr. Mukamal?

18    A.    Yes.

19    Q.    There's a lot here, but you can see that

20    they have the "HK" in it.  Right?

21    A.    Correct.

22    Q.    And as we talked about earlier, the "HK" in

23    the invoice number is an indication that it was

24    related to a purchase order out of the Hong Kong

25    operation -- CTX's Hong Kong operation.  Right?



1      A.    I'm assuming.

2      Q.    Did you see this document before?

3      A.    I may have.  Because I think it equals the

4   number that's owed between the parties.  The bottom

5   line number, I think, is -- what? -- the summary?

6      Q.    This summary?

7      A.    Yeah.

8      Q.    Well, the bottom line number says what?  If

9   this was produced by Benlida, what does the bottom

10  line summary show you?

11     A.    It shows an accounts receivable.

12     Q.    To Benlida?

13     A.    Yeah.  But that's just self-serving.

14  That's the amount that's, I believe, related to

15  Hong Kong.

16     Q.    It's the amount that Benlida says the

17  Hong Kong entity owes them.  Whether it's true or

18  not -- fabricated or pulled out of thin air --

19  that's what it says.  Right?

20     A.    I believe.  Correct.

21     Q.    You guys had this.  Right?  You have, on

22  the one hand, someone at Benlida sending

23  communications to someone at CTX U.S.  And you had

24  this document.

25             Did you guys ever think, looking at



1   this document, Hey, maybe we should start looking at

2   the whole picture and not just half the picture.

3                   Did you ever think of that?

4                   MS. MARTINEZ:  Objection.

5       A.   What you're asking me -- what you're saying

6   is why didn't I go beyond the scope that was

7   required in order to defend the third amended

8   complaint on behalf of my client.

9       BY MR. MAZZOLA:

10      Q.   I'm not asking you to do something that

11  you're not supposed to do.  I was just asking,

12  perhaps, why didn't you just raise the issue with

13  everyone and say, Hey, maybe we should look at this?

14      A.   Well, I was anticipating your expert to do

15  that.  And that's why I started looking at invoices.

16  And he didn't raise it.  So why would I raise it in

17  my affirmative report and do a rebuttal against a

18  report that wasn't even issued in the first place?

19      Q.   So you made no comments, and you have no

20  opinion on this, do you?

21                  MS. MARTINEZ:  Objection.

22      A.   I have an opinion that your client

23  maintained a separate set of books for Circuitronix,

24  LLC.  And that's what I reconciled.

25  \\\



1          BY MR. MAZZOLA:

2          Q.   But you have no opinion as to whether or

3    not this number -- this 13.482 million is accurate.

4    You have no opinion on that.

5          A.   I didn't evaluate that.

6          Q.   So the answer is you have no opinion.  You

7    can't have any opinion because you never looked at

8    it.

9          A.   Well, I looked at what was owed, because it

10   was on documents that I saw.  But it was owed

11   between Benlida and Circuitronix Hong Kong, not

12   between Benlida and Circuitronix, LLC.

13         Q.   And so the --

14         A.   By your own books -- by your client's own

15   books.

16         Q.   So your answer is, then, you have no

17   opinion as to the accuracy or veracity of this

18   number because you never looked at it.

19              MS. MARTINEZ:  Objection.

20         A.   I said I did look at it.  And then it was

21   clear what it was.

22         BY MR. MAZZOLA:

23         Q.   You never reviewed it -- my question is

24   this:

25              Do you have an opinion as to whether



1    that's an accurate number?  Yes or no.

2         A.   I have an opinion that it's accurate in

3    your -- in your client's records.

4         Q.   Do you know what CTX Hong Kong is showing

5    in their records?

6         A.   No.

7         Q.   Do you -- let's assume ...

8              THE WITNESS:  Can we take a

9    break?

10             MR. MAZZOLA:  Sure.

11             THE WITNESS:  I need five

12   minutes.  It's been a while.

13             (Off record:  3:12 p.m. to 3:26 p.m.)

14   BY MR. MAZZOLA:

15        Q.   Mr. Mukamal, you did review Mr. Paulikens'

16   report.  Right?

17        A.   Yes.

18        Q.   And it's fair to say that it's really

19   rebuttal to yours.  Is that fair?

20        A.   That's my interpretation of it -- or my

21   reading of it.

22        Q.   And before we went on the break, you were

23   talking about, you know, how Mr. Paulikens didn't --

24   didn't put up a number, so to speak.  And my

25   question for you is really -- I mean, why would



1    Benlida need an expert -- and you know there's

2    hundreds and hundreds of invoices in this case.

3    Right?

4        A.   There's a lot of invoices.

5        Q.   A lot of invoices.

6             And you know Benlida's position is

7    there's hundreds of unpaid invoices.  You must

8    understand that much.  Right?

9        A.   I didn't count them.

10       Q.   So the question is what value would an

11   expert add to add up invoices and come up with a

12   subtotal?

13            MS. MARTINEZ:  Objection.

14   BY MR. MAZZOLA:

15       Q.   As a full total.

16            MS. MARTINEZ:  Objection.

17       A.   I don't know what his -- what his position

18   is with respect to your -- the third amended

19   complaint.

20   BY MR. MAZZOLA:

21       Q.   Why?

22       A.   And remember, my -- my charge was to

23   evaluate the counterclaim, and that's what I did.

24            I was anticipating that he would put

25   forth his arguments, his calculations, his



1   insertions of what that would be.  I wasn't going to

2   do his job for him.  And that's what you're

3   suggesting, that, well, you know there's things out

4   there that we're claiming.

5                 And I'm like, Okay, well, where are

6   you claiming it?  I didn't see it in the

7   complaint -- your complaint, and I'm waiting for

8   Mr. Paulikens to identify what -- and quantify what

9   that is.

10      Q.   And my question to you --

11      A.   And I would have evaluated it at that time.

12      Q.   So my question to you is, then, what does

13   an expert say, or why is an expert needed to add up

14   all these invoices and come up with a total?

15      A.   Well, for everything you've been asking me

16   for today.  That this is a payment that was made

17   from company X to company Y, and that was because

18   company X received the benefit of it and took on the

19   obligation, and this is the evidence that suggests

20   they took on the obligation.  I saw none of that,

21   because he didn't file a report.

22      Q.   Okay.  And that's not really an accounting

23   issue.  It's more of a legal issue that you just

24   raised.

25      A.   I think it's an accounting issue.



```
1                    I mean, you're telling me to do a
2    calculation of what your client claimed, and my job
3    was the counterclaim.
4        Q.   What I was saying to you before the break
5    was you had this document in front of you, which we
6    marked as 150 --
7                    MR. MAZZOLA:  What was the
8        number?
9                    MR. LERNER:  I'm not sure.
10                   MR. MAZZOLA:  I have it.
11   BY MR. MAZZOLA:
12       Q.   We marked as Exhibit 158.  And my question
13   was, you have this in front of you.  You have a
14   document.  You have Benlida saying they're owed
15   13-point -- approximately $13.5 million.  You had
16   that in front of you.  And my question to you is why
17   not just go back to CTX and the lawyers that you're
18   working with and say, Hey, should we address this,
19   or Maybe we should address this?
20                   MS. MARTINEZ:  Objection.
21       A.   I think I answered the question as best I
22   could.
23   BY MR. MAZZOLA:
24       Q.   The answer is you never did it.
25                   MS. MARTINEZ:  Objection.
```



1      A.   My answer is I was waiting for the

2 counterclaim -- for the rebuttal report.  And I

3 would have addressed whatever he raised in the

4 rebuttal report.  That was my intention.  He didn't

5 file a rebuttal report.

6      BY MR. MAZZOLA:

7      Q.   Let me ask you a hypothetical here.  Let's

8 just assume --

9      A.   I mean, I'm sorry.  He didn't file -- I'm

10 sorry.

11           He didn't file a rebuttal report.  He

12 didn't file an affirmative report relating to what

13 his opinions would be.  And he -- as far as I knew,

14 he was designated as the expert to do so.  But I

15 didn't receive anything.

16           What you're asking me to do is to go

17 ahead and do something that I was going to do on

18 rebuttal, and that was the plan.  And there was a

19 very short deadline to do so.

20      Q.   And my question to you is -- and maybe you

21 answered already -- is why do I need an affirmative

22 expert to go ahead and add up all these hundreds of

23 invoices and come up with a number that our clients

24 say are not paid?

25           MS. MARTINEZ:  Objection.



1    A.    Because analysis is necessary for that.

2   And that was your expert's supposed anticipated

3   position.  It's not my job to do his job or your

4   job.

5    BY MR. MAZZOLA:

6    Q.    Okay.  Let's assume -- let's assume that

7   CTX U.S. -- all right?  Let's assume that they're

8   responsible for the debts of CTX Hong Kong.  Okay?

9   So we're going to make that assumption.

10    A.    It's a hypothetical.  Okay.

11    Q.    And we're going to assume that the

12   lead-time penalties and all the offsets are valid,

13   and they're not disputed by anyone.  We're assuming

14   that one, too.  How much does CTX owe Benlida?

15            MS. MARTINEZ:  Objection.

16    A.    I don't think CTX owes Benlida under this

17   scenario you just laid out.

18    BY MR. MAZZOLA:

19    Q.    You're assuming the U.S. operation's

20   responsible for ...

21    A.    Oh.  Responsible for?

22    Q.    ... the debts of CTX Hong Kong.  Yeah.

23    A.    I'm not going to guess that.  You're asking

24   me to guess something.

25            I mean, you could do -- you could do



1   the math based on your own client's claims.

2        Q.   It's not a guess.  It's just a hypothetical

3   question.

4        A.   If all the numbers are right, you do the

5   math.  I mean, Hong Kong -- I'm sorry -- Benlida is

6   claiming that Hong Kong owes it $13,492,823,

7   according to the schedule you have up.

8        BY MR. MAZZOLA:

9        Q.   And we assume your number is spot on at

10  7.6-million.

11       A.   Okay.  So do the math.  7 million from

12  13 million is --

13       Q.   8 million.

14       A.   -- about --

15       Q.   No.

16            About 6 million?

17       A.   6 million and change.

18            It's just math.  It doesn't mean that

19  it's correct.

20       Q.   No.

21       A.   Nor would I suggest it's correct.

22       Q.   The math wasn't hard to do, though.  Right?

23       A.   No.

24       Q.   Even a lawyer can do the math.

25       A.   No.  Straight math is not hard to do,



1    but ...

2        Q.    Let me ask you this question.   This is

3    another hypothetical with assumptions.

4                Let's assume that Benlida issued 1,000

5    invoices to CTX Hong Kong and U.S., and that

6    CTX Hong Kong and CTX U.S. made payment for all but a

7    few hundred.

8        A.    Okay.

9        Q.    And you guys said this.   You said that

10   there's -- assume that there's a 99 percent

11   agreement as to the amounts invoiced across the

12   thousands of invoices, and on the amounts paid.   How

13   can you shed any light on how much is owed by

14   CTX U.S. and CTX Hong Kong?

15       A.    I'm not sure I understand the question.

16                MS. MARTINEZ:   Objection.

17   BY MR. MAZZOLA:

18       Q.    As an expert.

19       A.    I'm not sure I understand.

20       Q.    Well, you're making the assumption that

21   thousands of invoices were issued to both Hong Kong

22   and U.S.

23       A.    Right.

24       Q.    Most of those invoices were paid, except a

25   few hundred, and there's this 99 percent agreement



```
 1    on everything.

 2         A.    Did you say Hong Kong and the U.S.?

 3         Q.    Yes.

 4         A.    And you're asking me to assume -- I only

 5    made that observation before -- between Benlida and

 6    Circuitronix, LLC.  So you're asking me to make an

 7    assumption that also applies to Hong Kong?

 8         Q.    And Benlida.

 9         A.    Circuitronix Hong Kong and Benlida.  Okay.

10    The same -- the same alignment of percentages.

11         Q.    Numbers.  Yeah.

12         A.    I'm sorry?

13         Q.    The same alignment.  Yeah.

14         A.    Okay.

15         Q.    How would you, or could you, shed any light

16    as to what's owed?

17               MS. MARTINEZ:  Objection.

18         A.    I don't have your client's records -- I'm

19    sorry.  Let me strike that.

20               Quantification of amounts is a lot

21    different than who owes those amounts.

22         BY MR. MAZZOLA:

23         Q.    That's a legal question.

24         A.    It's a very legal question.

25         Q.    That's why we're assuming.
```



1    A.    Okay.  But your client kept separate books

2 and records for amounts -- for amounts owed.  So why

3 would I make a calculation that's hypothetical in an

4 expert report?

5    Q.    Your client kept separate books and records

6 as well.

7    A.    Right.  And that's what I relied on.

8    Q.    Yeah.  But you say it like it's a bad

9 thing.  That my client is keeping separate books and

10 records.  Everyone does.

11    A.    But you want me to just add a payable from

12 one separate company to a receivable on another and

13 net them out?  I mean, that's simple math, but it

14 doesn't make it so.

15    Q.    Let me ask you this question, because we

16 just -- we did -- I think you may have possibly

17 answered that other question earlier.

18          You saw a sets of books produced by --

19 or a set of numbers produced by CTX, and you saw a

20 set a numbers produced by Benlida --

21    A.    You called them books.  They're records.

22    Q.    I did.  I meant records.  Yeah.  I said a

23 number -- set of records.  Right --

24    A.    Yes.

25    Q.    -- produced by Benlida and a set of records



1    produced by CTX.  And those were the records that we

2    used in connection with recon -- the Benlida recon

3    and the CTX recon.

4        A.    In essence.

5        Q.    In essence.  And that you recall -- and I

6    know you recall because your report says it -- that

7    they were pretty darn close, 99 percent accuracy.

8        A.    Right.  Except for the lead-time penalties

9    and the lead-time exceedances.

10       Q.    So assume that there was a high degree of

11   accuracy there.  Do you have any reason to believe

12   that that same high degree of accuracy would not

13   have carried its way over to this Exhibit 158?

14       A.    I don't know.  Speculation.

15       Q.    Do you consider the issue of whether CTX

16   owes Benlida for the debts of CTX Hong Kong to be an

17   issue of law or an issue of accounting?

18       A.    It could have elements of both.  It

19   certainly -- it does have questions of law.  The

20   accounting between the two is a different issue.

21       Q.    Why do you say that?

22       A.    Because the quantification may be a

23   different issue.  You have to go through the same --

24   the same elements that I went through for the

25   reconciliation between Benlida and Circuitronix,



1   LLC.  Your expert would have had to have gone

2   through with his reconciliations, and then he would

3   have to indicate where the goods were shipped to and

4   things of that nature, because I would assume he'd

5   be claiming that these are Circuitronix LLC's

6   obligations.  But there were no -- there was

7   evidence to -- that he presented.

8        Q.    Are you familiar with the term "FIFO"?

9        A.    Yes.

10       Q.    That's a notion of first in, first out?

11       A.    Yes.

12       Q.    And you agree with the term "FIFO" in

13   connection with this matter?

14       A.    Yes.

15       Q.    Is there anything on the bookkeeping,

16   accounting perspective unreasonable for a bookkeeper

17   to apply monies received to their oldest invoices

18   if, when the monies are sent, there's no indication

19   at the time of sending to what invoice they should

20   be applied to?

21       A.    Okay.  So you're asking me to assume that

22   there's no evidence -- or no identification of what

23   invoices payments are intended to be applied

24   against?

25       Q.    Um-hmm.



1    A.    Okay.  The answer is it may or may not be.

2              So if you have commingling of

3    different entities that you're applying on a FIFO

4    basis and/or statute of limitations apply to some

5    of -- to some of those payment applications, there

6    would be a difference between specific

7    identification and FIFO.

8    Q.    I'm not sure I follow that.

9    A.    Sure.

10             So scenario one:  You have two

11   different companies that invoices are -- a list of

12   invoices are out there that are unpaid.  Right?  And

13   payment comes in from an -- from an obligor, and

14   that payment is intended to go against invoices for

15   company A, but not company B.  FIFO would give you a

16   wrong calculation.

17             If, on the other hand, or in

18   conjunction with that, you had a statute of

19   limitations problem where old invoices, whether in

20   conjunction with A -- scenario A or not, applying a

21   payment that came in under -- applied under FIFO to

22   an obligation that precedes the -- which exceeds the

23   statute of limitations, that would be incorrect

24   because that invoice couldn't be collected as a

25   matter of law.  Right?  It would be stale.



1      Q.    Why, from an accounting perspective, do you

2   -- if the statute of limitations has already blown,

3   do you walk away from the collection on an invoice?

4   You don't do that.  You know you don't do that.

5   That makes no sense.

6                  MS. MARTINEZ:  Objection.

7      A.    Why not?

8   BY MR. MAZZOLA:

9      Q.    What business people write off a bad debt

10  because the statute of limitations has expired?

11     A.    If the payor doesn't intend it to be

12  applied to that, yes.  Then you'd have a dispute,

13  wouldn't you?

14     Q.    Yeah.  But you know people don't do that.

15  They pay the debts.  They resolve their old

16  invoices -- I mean, their old accounts payable

17  receivables.

18                 MS. MARTINEZ:  Objection.

19     A.    I think I answered under the -- I'm sorry.

20                 I think I answered under the scenario

21  -- two scenarios I laid out.

22     Q.    So let me just recap, then.  Right?

23     A.    Sure.

24     Q.    So the question is, if you receive a

25  payment for a payor or obligor and the payment,



1   which is a wire transfer -- a whole number, all

2   ending in zeros, similar to the ones we were looking

3   at over here, the 300,000s, the 500,000s -- and

4   there's no indication at the time the payment is

5   sent or the time the payment is received as to what

6   invoices this money should be applied to, is it

7   reasonable for a bookkeeping department to just take

8   that money, plop it at the oldest invoices, and

9   apply it?

10       A.   Well, it's possible they could -- they can

11  do that.  It doesn't mean it's legally permissible.

12       Q.   I'm not asking you legally; from a

13  bookkeeping.

14            Is that reasonable to do that?

15       A.   I really don't know what the question

16  means.

17            Meaning, is it -- you know, would a

18  bookkeeper do that?  I've seen it happen before.  It

19  doesn't make it right.

20       Q.   When you're provided --

21       A.   It's similar -- it's similar to my

22  accounting firm.  If I have a client that didn't pay

23  me in 2012 for something -- for a bill on an invoice

24  in 2012.  And in 2023, that same client comes to me

25  and says, I have something I need you to do.  I



1    might say I will do it.  Okay?  But I want to be

2    paid for it within 10 days before I issue -- or

3    deliver a report.  I'm making up a scenario.

4                     And that person pays me $10,000 on

5    account -- I'm making up a number.  Okay?  And my

6    bookkeeper applies it to the -- to an invoice that's

7    well beyond the statute of limitations.  And then I

8    go back to the client and say, Well, you still owe

9    me for this report.  I think the client has a legal

10   claim against me for taking his money and applying

11   it to something that I couldn't legally collect.

12       Q.   But you're creating a set of facts that are

13   not necessarily applicable here.  And I would also

14   add that anyone that does that is probably not a

15   good businessman, and I think you're a lot smarter

16   than that.  And before you sign the new engagement

17   with that client, you would probably say you've got

18   to clear up that old debt.

19       A.   You're making a lot of assumptions in that

20   statement, sir.

21       Q.   So let's assume this, then.  Right?  Let's

22   assume that CTX U.S. was responsible for all of

23   CTX Hong Kong's invoices.  And let's assume that no

24   statute of limitations issues exist.  And, again,

25   money's just coming in, round numbers.  Would it be



1   reasonable for a bookkeeper to apply that money, if

2   there's no instruction, to the oldest invoices?

3       A.   If there's --

4               MS. MARTINEZ:  Objection.

5               THE WITNESS:  I'm sorry.

6       A.   It would be if there's identification of

7   what invoices the payments that are in the queue are

8   meant to be applied against.

9       BY MR. MAZZOLA:

10      Q.   It would be unreasonable if there was

11  indication as to what invoices the money is to be

12  applied to.

13      A.   Or what -- why the payment's coming in.  I

14  mean, the inquiry would be, what are you paying?

15              Now, if you have indication of what --

16  what you're paying, I think you answered your own

17  question.

18      Q.   But if you don't, do you think it's

19  incumbent upon the bookkeeping department to go back

20  and say, what are you paying?

21      A.   I think it's --

22              MS. MARTINEZ:  Objection.

23              THE WITNESS:  I'm sorry.

24      A.   I think it's important for the obligee to

25  indicate what they're doing.  In this case, I didn't



1    see any indication what they were providing to --

2    you know, my understanding is that your client just

3    didn't inform the company what it was doing, how it

4    was applying -- how it was applying payments.

5        BY MR. MAZZOLA:

6        Q.   Did you see any instruction from CTX as to

7    how to apply the payments?

8        A.   I believe I did.  It's -- they sent every

9    three months, a payment application.

10       Q.   So let's look at this document we had

11   before, which is --

12              MR. LERNER:  Which one?

13              MR. MAZZOLA:  -- the statement

14   detail from May 1, 2016.

15              (Pause in proceedings.)

16              MS. MARTINEZ:  This is the ROK

17   payment detail on Exhibit 158 still?

18              MR. MAZZOLA:  Yes.  158.  Thank

19   you, Christina.

20   BY MR. MAZZOLA:

21       Q.   Do you see this ROK payment detail that's

22   from Circuitronix?

23       A.   I see it.

24       Q.   Does this indicate --

25              It's dated May 1.  Do you see that?



1    A.    2016.  Yes.

2    Q.    Do you know on what date this payment

3  detail would have been transmitted to, in this case,

4  ROK?

5    A.    I don't know looking at it.

6    Q.    And if it was transmitted on May 1 for

7  invoices from February and some from April, and

8  there was whole numbers, as it is here, made in the

9  end of April, would this be reasonable and

10 sufficient to let a bookkeeper know to what invoices

11 to apply the money to?

12              MS. MARTINEZ:  Objection.

13 BY MR. MAZZOLA:

14   Q.    Round numbers, I meant.  Round numbers.

15   A.    Rounds numbers where?  I'm sorry.

16   Q.    Over here.

17   A.    Right.  So that was a course of conduct

18 between the parties that were paying round numbers.

19 I saw emails that Benlida was, you know, constantly

20 asking for money, so there were payments being made.

21 I mean, it's -- but the invoices that are being paid

22 are clearly -- that they want that applied against

23 are clearly indicated on the top part of that

24 document.

25   Q.    But you see even after this, he's carrying



1    a balance --

2        A.    Yes.

3        Q.    -- of 189,000.

4        A.    That doesn't give your client -- yes.

5              But that doesn't give your client

6    leave to decide where they're going to apply a

7    credit balance and not provide an accounting,

8    indicating what they were doing to give the party a

9    chance to object to that.  Because that's obviously

10   not what was intended by that -- by that type of

11   document.

12       Q.    But if it's sent a month later, is that

13   timely?

14             MS. MARTINEZ:  Objection.

15       A.    If that's the course of conduct between the

16   parties, it could be, yes.  I think so.

17   BY MR. MAZZOLA:

18       Q.    You said our clients were always begging

19   for money.

20       A.    I didn't say "begging."

21       Q.    "Harping" or "chasing" for money.

22             MS. MARTINEZ:  Objection.

23       A.    I saw emails to that effect.

24   BY MR. MAZZOLA:

25       Q.    Do you think maybe they were chasing for



```
 1    money because, pursuant to Exhibit 158, they were

 2    owed $13 million?

 3        A.   I'm sure that had a part of it.

 4             They should have then pursued

 5    Circuitronix Hong Kong for that.  That would be one

 6    way to deal with it.

 7        Q.   Mr. Mukamal, we have your invoices here.

 8        A.   Yes, sir.

 9        Q.   I can hand them to you.  But if you know

10    the grand total --

11        A.   I do not.

12        Q.   I guess I'm going to hand them to you.

13    It's Exhibit 164.

14             MS. MARTINEZ:  I think you have

15        them.

16             THE WITNESS:  Oh.  I do.  I do.

17        A.   I'm sorry.  I have it.  Okay.

18             (Deposition Exhibit 164

19             marked for identification.)

20    BY MR. MAZZOLA:

21        Q.   I'm just looking for a grand total.

22        A.   Oh, I'm sorry.  I'd have to add them up.

23        Q.   I asked Mr. Parisi yesterday.  He thought

24    it was north of 100,000.  I think it's north of

25    200,000.
```



1      A.    Oh.   Wait a minute.   I'm sorry.   Give me a

2 moment.

3           I'm including carryover balances from

4 paid amounts.

5      Q.    Yeah.   Okay.   Has it all been paid?

6      A.    Through June.

7           (Document review.)

8      A.    About 230 total.

9 BY MR. MAZZOLA:

10     Q.    Has it all been paid?

11     A.    Yes.

12     Q.    Has your firm been paid everything in

13 connection with the Kin Wong case?

14     A.    Yes.

15     Q.    And I assume that Mr. Kukreja doesn't have

16 any accounts payable to you.

17     A.    I haven't billed July yet.

18     Q.    MCP.   I see that on the invoices.   That's

19 Mr. Parisi.   Right?

20     A.    Correct.

21     Q.    Who is BEM?

22     A.    Me.

23     Q.    Oh.   Yeah.   Sorry.

24           SVK is?

25     A.    Sharmila Khanorkar.



1      Q.    And Mr. Parisi left on his own accord?

2      A.    Yes.

3      Q.    You have no problem with any of the work he

4   did?

5      A.    No.  He's -- he's sorely missed.

6      Q.    A good, fine, competent accountant?

7      A.    Yes.

8      Q.    And if he had an opinion yesterday, that

9   opinion would be good and solid in your mind?

10     A.    I don't know what he said, but --

11     Q.    Okay.

12     A.    -- I have faith in his judgment.

13     Q.    Okay.

14           MR. MAZZOLA:  Give us two

15   seconds.  I think we're done.  I just need

16   two seconds.

17           (Off record:  4:00 p.m. to 4:02 p.m.)

18           MR. MAZZOLA:  I'm done.

19           MS. MARTINEZ:  We will read and

20   sign, please.

21           (Proceedings concluded at 4:02 p.m.)

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF FLORIDA

 3    JIANGMEN BENLIDA PRINTED    )

 4    CIRCUIT CO., LTD.,          )

 5         Plaintiff,            )

 6    vs.                        ) Civil Action No.

 7    CIRCUITRONIX, LLC,         ) 21-601-125-civ

 8         Defendant.            )

 9

10                REPORTER'S CERTIFICATE

11                ORAL DEPOSITION OF

12    BARRY MUKAMAL, CPA, PFS, ABV, CIRA, CFE, CFF, CGMA

13              Tuesday, August 1, 2023

14         I, Rebecca J. Callow, Registered Merit

15    Reporter, Certified Realtime Reporter, Registered

16    Professional Reporter and Notary Public in and for

17    the State of Florida, hereby certify to the

18    following.

19         That the witness, BARRY MUKAMAL, CPA, PFS,

20    ABV, CIRA, CFE, CFF, CGMA, was duly sworn by the

21    officer and that the transcript of the oral

22    deposition is a true record of the testimony given

23    by the witness;

24         That the original deposition was delivered

25    to _____.
```

1

2          That a copy of this certificate was served

3    on all parties and/or the witness shown herein on

4    _____.

5

6          I further certify that pursuant to FRCP

7    Rule 30(f)(1) that the signature of the deponent:

8          [ X ] was requested by the deponent or a

9    party before the completion of the deposition and is

10   to be returned within 30 days from date of receipt

11   of the transcript.  If returned, the attached

12   Changes and Signature Page contains any changes and

13   the reasons therefor;

14          [    ] was not requested by the deponent or

15   a party before the completion of the deposition.

16          I further certify that I am neither

17   counsel for, related to, nor employed by any of the

18   parties or attorneys to the action in which this

19   proceeding was taken.  Further, I am not a relative

20   or employee of any attorney of record in this cause,

21   nor am I financially or otherwise interested in the

22   outcome of the action.

23

24

25



1

2          SUBSCRIBED AND SWORN TO under my hand and

3   seal of office on this the 15th day of

4   August, 2023.

5

6

7        _____

8        Rebecca J. Callow, RMR, CRR, RPR

9        Notary Public, Miami, Florida

10       My Commission No. HH 409626

11       Expires:  06/12/2027

12

13

14

15

16

17

18

19

20

21

22

23

24

25