Exhibit #

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
----------------------------------------x
JIANGMEN BENLIDA PRINTED CIRCUIT CO.,
LTD.,

                           Plaintiff,  :

         - against -

CIRCUITRONIX LLC,

                        Defendant.   :
----------------------------------------x

                1350 Avenue of the Americas
                New York, New York

                July 20, 2023
                9:40 a.m.

       EXAMINATION BEFORE TRIAL of RANDALL M.

PAULIKENS, CPA/AVB/CFF/CITP, and Expert

Witness on behalf of the Plaintiff herein,

taken by the Defendant, pursuant to Court

Order, held at the above-mentioned time and

place, before Michelle Lemberger, a Notary

Public of the State of New York.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1

 2   A P P E A R A N C E S:

 3

 4   MAZZOLA LINDSTROM, LLP
     Attorneys for Plaintiff
 5        1350 Avenue of the Americas, 2nd Floor
          New York, New York 10019
 6   BY:  RICHARD LERNER, ESQ.

 7
     A/P J.C. MAZZOLA, ESQ.
 8
          Adam Wiener
 9

10

11   PODHURST ORSECK, P.A.
     Attorneys for Defendant
12        One S.E. 3rd Avenue, Suite 2300
          Miami, Florida 33131
13   BY:  STEPHEN F. ROSENTHAL, ESQ.

14        Srosenthal@podhurst.com

15

16
                  *      *      *      *      *
17

18

19

20

21

22

23

24

25
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1

 2                S T I P U L A T I O N S

 3

 4           IT IS HEREBY STIPULATED AND AGREED

 5    by and between the attorneys for the

 6    respective parties herein, that filing,

 7    sealing and certification be and the same are

 8    hereby waived.

 9           IT IS FURTHER STIPULATED AND AGREED

10    that all objections, except as to the form of

11    the question shall be reserved to the time of

12    the trial.

13           IT IS FURTHER STIPULATED AND AGREED

14    that the within deposition may be signed and

15    sworn to before any officer authorized to

16    administer an oath, with the same force and

17    effect as if signed and sworn to before The

18    Court.

19

20

21

22

23

24

25
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1

 2   R A N D A L L   M.   P A U L I K E N S, having

 3          been first duly sworn by a Notary

 4          Public of the State of New York, was

 5          examined and testified as follows:

 6   BY THE REPORTER:

 7       Q.  Please state your name for the

 8   record.

 9       A.  Randall Martin Paulikens.

10       Q.  What is your current business

11   address?

12       A.  36 East Main Street, Somerville, New

13   Jersey 08876.

14   EXAMINATION BY

15   MR. ROSENTHAL:

16       Q.  Good morning, Mr. Paulikens.

17       A.  Good morning.

18       Q.  My name is Stephen Rosenthal.  I

19   represent Circuitronix LLC in this

20   litigation.

21       A.  Okay.

22       Q.  I know you've been deposed many

23   times before, so if at any point I ask a poor

24   question please ask me to rephrase it and

25   I'll do my best.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

                    R. Paulikens

1

2        A.   Okay.

3        Q.   Prior to beginning today, you handed

4    me a USB drive that was produced by you in

5    response to our subpoena for your deposition

6    today?

7        A.   Yes.

8        Q.   So I put this into my laptop

9    computer; we're in an office where it is

10   projected on a screen.  I want to ask you

11   some sort of housekeeping questions about

12   that before we get into your report and

13   opinions.

14       A.   Okay.

15       Q.   So on the drive there's a

16   document --

17       A.   Can I go up and stand there so I can

18   read the screen?

19       Q.   Of course.  Whatever is comfortable

20   for you.

21       A.   Thank you.

22       Q.   There's a folder that is called,

23   Documents sent to counsel for deposition,

24   right?

25       A.   Yes.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        Q.  What is that?
 3        A.  That was in response to a request
 4    you made last week.  There's two tranches of
 5    information sent in my report.  One is the
 6    documents from your expert report, and there
 7    was additional documents and you had asked
 8    for those additional documents.  That's what
 9    was sent to you last week --
10        Q.  Okay.
11        A.  -- I think via e-mail.  So that is a
12    duplicate of that.
13        Q.  Okay.  While we're talking about
14    this document sent to counsel for deposition
15    folder that you just described, I'm opening
16    it on the screen.  And I'll scroll down so
17    you can see it.  That's the documents within
18    that folder that you sent to my office last
19    week or so?
20        A.  Yes.
21        Q.  And I have printed that list out on
22    paper.
23            Let me hand it to you and you can
24    assure yourself that it is the same thing
25    that's on the screen that is on your USB.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2              (Witness peruses document.)
 3     A.  Yes, it looks pretty --
 4     Q.  Is there anything missing?
 5     A.  It looks pretty -- it looks like the
 6   same list.
 7              MR. ROSENTHAL:  Just for
 8        housekeeping purposes, we're up to
 9        Exhibit 141, I think, is the next one
10        that I wrote down.
11              So we're going to mark that, if
12        I can, as Exhibit 141.
13              (Whereupon, at this time, the
14        above-mentioned printout of documents
15        sent to counsel was marked as Exhibit
16        141 for identification.)
17              MR. ROSENTHAL:  That's
18        basically a printout of the documents
19        sent to counsel for deposition.
20              MR. LERNER:  I just want to
21        note, Stephen, that on the thumb
22        drive it has a different filing
23        folder name when I sent it to you.  I
24        renamed it for clarification because
25        there were further documents reviewed
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens

 2         by Mr. Paulikens but they weren't the

 3         ones that were necessarily referenced

 4         in the report.

 5              I renamed it so that it would

 6         be clear and distinct from those

 7         other documents.

 8              MR. ROSENTHAL:  Right.  And so

 9         what you were just talking about, Mr.

10         Lerner, at the top of 141 shows the

11         renamed file name that you just

12         mentioned?

13              MR. LERNER:  Yes.  And I am the

14         one who renamed it.

15              MR. ROSENTHAL:  Okay.  We will

16         hold you responsible for that.

17    BY MR. ROSENTHAL:

18         Q.  Okay.  So let's return back to the

19    USB that we were looking at on the computer

20    screen.  I will get out of that folder that

21    we just looked at.

22              So the first other folder says,

23    Agreements.  I will open that.

24              Are any of these PDF files in here

25    marked up or annotated by you?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                     R. Paulikens

2          A.   No.

3          Q.   And that contains the manufacturing

4     agreement, the letter agreement from 2016, a

5     second document called second agreement from

6     2016.

7               Do you know if that second agreement

8     from 2016 is different from the 2016 letter

9     agreement without me opening it?

10         A.   As I'm standing here, I don't

11    recall.

12         Q.   Okay.  Let me open that for a

13    moment.  I'm opening --

14               MR. ROSENTHAL:  It says the

15          file has been damaged, all right.  So

16          I won't open that.

17         Q.   And the Circuitronix contract, do

18    you know what that is?  Should I open it?

19         A.   You should open it.

20               MR. ROSENTHAL:  Same thing.

21          That's odd.  It says it's a PDF but

22          it's not a supported file type or

23          it's been damaged.  Okay.

24         Q.   Do you know if you've been able to

25    open these when you were doing it?

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2        A.  I had no problem opening them, so I

3    don't know what happened.

4        Q.  Okay.  Let me try another one out of

5    curiosity, the complaint.  Okay.  Same thing.

6            So there's a folder called analysis.

7    I'm going to open that.

8        A.  Yes.

9        Q.  It has two Excel spreadsheets?

10       A.  Yes.

11       Q.  Do you know what those are?

12       A.  Yes.  These are working copies of

13   documents that were produced from one of the

14   parties in the case, and you see the name

15   FLLP?

16       Q.  Yes.

17       A.  It was the firm I was with when I

18   started this engagement, Friedman, LLP.

19       Q.  Okay.

20       A.  And AJ Santye is the current firm

21   I'm with.  And I rename -- if I open up a

22   copy of a document, I rename it so that -- to

23   keep the metadata pure.

24       Q.  Okay.  Do you know whether these,

25   either of these is marked up in a way that

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

                    R. Paulikens

1
2    would show -- indicate your work?

3         A.  There may have been formatting

4    differences.  There's no notes and stuff,

5    but, you know, we open them, copy them,

6    format them for printing so we can read

7    what's there.

8         Q.  Okay.  Let me just out of, you know,

9    in the interest of completeness, open the

10   first one, which is called Benlida payment

11   details, CTX dash HK underscore 2015 to 2019,

12   underscore V2.1002 AJS.

13        Okay.  I'm opening this up.  Mr.

14   Paulikens, is there anything when I open it

15   up that I should potentially look at that may

16   or may not contain your notes, any tab?

17        A.  No.  There wouldn't -- I typically

18   wouldn't -- don't put notes in something like

19   that.  Any analysis that we did on this file

20   would have some sort of -- a tab that says,

21   like, working analysis or some sort of

22   delineation that is separate from the source

23   data.

24        Q.  Okay.  So like sheet number 1, that

25   tab is not --

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
  1                    R. Paulikens

  2        A.  That came from them.  That's not

  3    from us.

  4        Q.  Although it says in yellow, Per

  5    Benlida payment details, with some codes and

  6    then it says Worksheet.

  7        A.  Well, that's the name of the file.

  8    And OO2.  And this looks like -- I don't want

  9    you to hit enable content.

 10        Q.  Right.

 11        A.  But this looks like a formula where

 12    it references the name of the files to where

 13    they got it.  So that's why I think that says

 14    that there.

 15        Q.  Okay.  But you're saying that's not

 16    stuff that you added to this file?

 17        A.  No.

 18        Q.  Or your firm.  Okay.

 19            There's a lot of different tabs at

 20    the bottom over time.

 21        A.  It was years summary and then

 22    monthly summary for multiple years.

 23        Q.  Okay.  I'll get out of that.

 24            Let me go to -- let me get out of

 25    this then.  Now we're back to your USB drive
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2     and it says, Court documents folder.  I'll
 3     just open that.  Those are self-explanatory
 4     names?
 5          A.  Yes.
 6          Q.  And then there's one called
 7     Documents, which is a general name?
 8          A.  Correct.
 9          Q.  Am I correct to generalize that
10     these -- the stuff in this folder was related
11     to work you had done in this case connected
12     to a hearing that was held in January 2023 in
13     Miami?
14          A.  These actually predate that.  My
15     retention began in May of '22, a little more
16     than a year ago.  And this was some of the
17     initial documents we were provided back then,
18     hence the dates.
19          Q.  Okay.  So let me just open 053122,
20     is that May 31, '22 folder?
21          A.  Correct.
22          Q.  It contains a bunch of Excel
23     spreadsheets.  Just out of curiosity, is it
24     possible to address this folder called
25     documents that we're looking at in general;
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    did you rely upon or look at items in this

 3    folder for purposes of your report?

 4        A.  Not this specific folder, but some

 5    of the documents within these were, like the

 6    ones that say payments for HK, this and that,

 7    which were also used by your expert, they're

 8    duplicated here.

 9            So to be candid, I didn't look at

10    these specifically but there were duplicates

11    of the same file.

12        Q.  They ended up somewhere else?

13        A.  Yes.

14        Q.  There's a folder called -- not a

15    folder, sorry, an Excel spreadsheet file

16    called Benlida versus CTX accounting event.

17    Do you see that?

18        A.  Yes.

19        Q.  I'm going to open that.  Do you know

20    who generated that document?

21        A.  I believe this came from the client.

22        Q.  I think I have printed one of these

23    out.  So let me see if I can find that.  Yes.

24            MR. ROSENTHAL:  Let me hand you

25         what I will mark as the next exhibit,
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                     R. Paulikens
 2          which is 142.
 3                 (Whereupon, at this time, the
 4          above-mentioned Benlida v. CTX
 5          accounting event was marked as
 6          Exhibit 142 for identification.)
 7    BY MR. ROSENTHAL:
 8          Q.  The title of that is Benlida versus
 9    CTX accounting event.
10                 Mr. Paulikens, is that a document
11    that I've handed you marked as Exhibit 142,
12    the same as the one that's on the screen that
13    was from your USB drive?
14          A.  Certainly looks to be.
15          Q.  And your understanding is that was
16    prepared by Benlida?
17          A.  I believe so.
18          Q.  Okay.  I'm going to open a PDF
19    that's on -- I'm going to attempt to open a
20    PDF that's on the USB, but it's not letting
21    me open it.
22                 That was the e-mail correspondence I
23    was trying to open.  Let me try to open the
24    meeting minutes one.  Same thing.
25                 MR. ROSENTHAL:  Off the record.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1              R. Paulikens
2           (Discussion held off the
3       record.)
4       Q.  We're now looking at Mr. Lerner's
5   computer with another USB that's the same --
6   a copy of the same stuff that we were looking
7   at the USB that you gave to me.
8       A.  Yes.
9       Q.  So now we're back in the documents
10  folder and there's a PDF that's called e-mail
11  correspondence.  I'm just going to click on
12  that.
13          That brings up an e-mail dated at
14  the top July 14, 2016 from Rishi Kukreja to
15  Tracy at Benlida, correct?
16      A.  Yes.
17      Q.  And it is a long string e-mail.
18  There may actually be several e-mails,
19  correct?
20      A.  There's multiple e-mails back and
21  forth on it.
22      Q.  Okay.  We're not going to belabor
23  it, just identify it.
24          Mr. Paulikens, you see there's a
25  folder called Documents to be sent to counsel
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens
2    with Chinese character not able to compress?
3         A.  Yes.
4         Q.  Okay.  I recognize those as ones
5    that were sent to us in a separate folder.
6         A.  Yes.
7         Q.  Other than the folder that Mr.
8    Lerner subsequently called, Further documents
9    to rely upon?
10        A.  Correct.
11        Q.  Okay.  And it seems to me that those
12   are primarily compilations of data that
13   related to work that I assume you did in
14   connection with the hearing that was in
15   January of 2023; is that right?
16        A.  Yes.  The settlement hearing and
17   that, you know, experience.
18        Q.  Right.  Okay.  There's another
19   folder called Expert report.  That contains
20   in it a folder called Documents, CTX
21   documents relied upon by CTX's expert CPA.
22        A.  Yes.
23        Q.  Now there's another folder and if
24   you open that, Mr. Lerner, thank you, that
25   contains a list of items you received through
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    my office, correct?  Indirectly through

 3    counsel?

 4         A.  Yes.

 5         Q.  Okay.  And those are all things from

 6    the Kapila Mukamal, K-A-P-I-L-A,

 7    M-U-K-A-M-A-L, report?

 8         A.  The KM report.

 9         Q.  The KM report.

10              So there are some additional Excel

11    spreadsheets in this expert report.  Let me

12    show Mr. Lerner where we are.

13              In the expert report folder --

14         A.  Okay, wait, where are we?

15         Q.  We're in the expert report folder.

16         A.  No, we're on the drive, okay.  We're

17    on the flash drive.

18         Q.  Correct.  This is all about the

19    flash drive.  I'm just trying to understand

20    what's in here.

21              There's an Excel spreadsheet that's

22    called Benlida payment details CTX U.S. 2015

23    to 2019 version 2.1 AJS working copy.

24              Do you see that?

25         A.  Yes.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1               R. Paulikens

2       Q.  And is that another copy of

3    something we saw with a similar name already?

4       A.  As I said, every time I get a file

5    that I open up that's from somebody else, I

6    put an extension on it called Working copy

7    with a firm name so as to not to corrupt the

8    original document.

9            So I probably opened this up and

10   then so I didn't mess up what was sent from

11   your expert.

12      Q.  Okay.  And so the same thing with

13   the one below that says AJS working copy

14   2023?

15      A.  Yes.

16      Q.  And the one below that says AJS

17   working copy?

18      A.  Correct.

19      Q.  Okay.  There's a Word document

20   called Mukamal Parisi report?

21      A.  Yes.

22      Q.  Word convert for citation, what's

23   that?

24      A.  What I do is if I get a PDF report,

25   in order if I'm going to take quotes out of

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    it, I convert it to a Word document so I can

3    easily cut and paste it, which is why I

4    called it such as it is.

5         Q.   Okay.  I will go out of that folder.

6              The financials for settlement folder

7    has about seven documents in it.  Is that all

8    related to the earlier discussion about

9    settlement of the case?

10        A.   Yes, this was from the fall.  You

11   can tell from the dates that was original

12   information that came in to me, hence the

13   Chinese characters.

14        Q.   See the folder that's called New

15   documents, May 31, '22?

16        A.   Yes.

17        Q.   Again, based upon the dates, those

18   are related to the beginning of your

19   retention, I guess, in the case?

20        A.   Yes.  Those are duplicated from what

21   we talked about 15 minutes or so ago.

22        Q.   So we have a lot of copies of the

23   same stuff.

24        A.   This is the way things were produced

25   and when they were produced.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

| | |
|---|---|
| 1 | R. Paulikens |
| 2 | Q.  Okay.  There's a folder called |
| 3 | Response report next. |
| 4 | A.  Yes. |
| 5 | Q.  If you can open that, all right. |
| 6 | So that's all related to the report |
| 7 | that we're going to be talking about today |
| 8 | for your deposition, right? |
| 9 | A.  Yes. |
| 10 | Q.  Okay.  So the first subfolder in |
| 11 | that -- actually let me ask you generally. |
| 12 | Is everything -- what is the purpose of this |
| 13 | folder and the way you organized it? |
| 14 | A.  This is a copy of my file.  This is |
| 15 | the way I kept it.  So there's lead time |
| 16 | penalty support, which is all the documents |
| 17 | from the lead time penalties.  If you click |
| 18 | on that you can see these were copies of |
| 19 | documents that we got from your expert and we |
| 20 | opened them up and may have copied them, |
| 21 | reformatted them, so we could print, include |
| 22 | them as a PDF in the report, hence you see |
| 23 | the two duplicate names. |
| 24 | So you see a version that's the |
| 25 | Excel version and a PDF version. |

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2        Q.  Let me just ask you if we go to the

 3   bottom of this list in this file, which is

 4   called, Excel spreadsheet called Summary,

 5   dated July 6, 2023.

 6        A.  Okay.

 7        Q.  I'm going to open that a sec on the

 8   screen.

 9             And can you describe what this

10   document is?

11        A.  Scroll up to the top, please?  Yes.

12   This was the sum of our work where they

13   literally just took a -- summarized the

14   totals from each of the lead time penalty

15   worksheets that were prepared by your expert,

16   or I'm sorry, that were produced by your

17   expert, not prepared.

18             MR. ROSENTHAL:  Okay.  So I'll

19        tell you, this is not a document that

20        I saw as something that was provided

21        to me before today.  So it would be

22        good to somehow mark this.  And I

23        don't think we can do it physically

24        because of the setup we have here.

25             So let me just be real clear
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2          for the record.  I'd like to call

 3          this Exhibit 143, and this is the

 4          Excel spreadsheet called Summary, and

 5          it resides in a folder on Mr.

 6          Paulikens's USB, which is called LTP

 7          support, which is within a folder

 8          called response report, which is

 9          within a folder called Benlida

10          documents for deposition.

11               And after the deposition, we'll

12          figure out how to generate a piece of

13          paper.

14               MR. MAZZOLA:  Do you want to

15          just make A, B, C, D, Es to that

16          exhibit?

17               MR. ROSENTHAL:  No.

18               (Whereupon, at this time,

19          Summary was marked Exhibit 143 for

20          identification.)

21  BY MR. ROSENTHAL:

22      Q.  It's basically the summary of lead

23   time penalty data, right?

24      A.  Yes.

25      Q.  So let me ask you to, I mean, I
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2    could actually do this part, if you want.
 3          Right above that, Mr. Paulikens,
 4    you're seeing on the screen there's two Excel
 5    files that say BLD penalty summary with
 6    dates.
 7       A.  Yes.
 8       Q.  Like the one that Mr. Lerner has
 9    hovering over says, BLD penalty summary FEB
10    2016 to July 2021 KM.
11       A.  Um-hum.
12       Q.  Is that a document that your office
13    prepared or is that something you received
14    from someone else?
15       A.  I think that this is a -- it's
16    hidden, but this document was one that I
17    believe was sent to us, but you have to open
18    it, if you don't mind.
19       Q.  You're referring to the one that
20    doesn't have KM next to it?
21       A.  Correct.
22       Q.  So you want to open that one.
23          Can you tell whether that was --
24       A.  Yes.  This looks like it's one of
25    the files that your expert -- KM prepared and
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens
 2    when we opened it up, we named a copy KM so
 3    that we didn't corrupt it.
 4        Q.  So, basically, those two files are
 5    the same except for that designation?
 6        A.  Yes.
 7        Q.  Let's go back out to the folder, if
 8    we can.
 9            So there's a folder that says, PDF
10    for report.
11        A.  Yes.
12        Q.  Let's open that.  And it's got a
13    bunch of different files with names like E2
14    and E2A.
15            What are those?
16        A.  Those, as I printed the documents
17    that are in the exhibits in my report,
18    they're printed from Excel.  So in order to
19    include them in the PDF, I have to print them
20    to PDF, and my shorthand -- so when I put
21    them in populate the final expert report is
22    Exhibit 2, Exhibit 2A.
23        Q.  Okay.  So if we just click on E2 for
24    a second, let's see if that opens.  This is
25    what I can't do on the drive you gave me.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

                        R. Paulikens

1

2       A.   Right.

3       Q.   That opens up a document that became

4   Exhibit 2 in your report?

5       A.   Correct.

6       Q.   Okay.  There is -- let's go back out

7   to the folder.

8            So you see the file called, the

9   second one AJ Santye response report

10  7-8-23-F?

11      A.   Yes.

12      Q.   What is the F, final?

13      A.   Yes.

14      Q.   Okay.  Do you have any drafts of the

15  report saved?

16      A.   I deleted the drafts.  I had a

17  corruption problem myself so I put in

18  separation on it after I fixed it.

19      Q.   And I assume that's your practice

20  anyway, to delete drafts?

21      A.   Yes.  And they get overwritten

22  anyway in the ordinary course.

23      Q.   Okay.  Going back to the folder tree

24  of your USB drive, so now we're looking at

25  just documents, we've explored those first

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2      three folders.

3            The Excel spreadsheet that's 2012 to

4      2019 reconciliation analysis?

5         A.   Okay.

6         Q.   That, again, doesn't contain any

7      working notes or calculations by your office,

8      or does it?

9         A.   No.  I think we called it working

10     copy, again, to separate it from the original

11     copy.  Because that, I believe, we can

12     certainly open it, was the source for one of

13     the exhibits in my report.  And as I'm

14     standing here, that one -- one of the

15     exhibits we had to -- we noted on it that we

16     moved some of the data to make it reasonably

17     comparable to the other exhibits in terms of

18     dating.

19        Q.   Okay.  So let me -- there's two

20     Excel spreadsheets that we're looking at that

21     are titled the same title, Benlida payment

22     details CTX U.S. 2012 to 2021 version 5

23     working copy.

24        A.   Um-hum.

25        Q.   It actually looks like there's three

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    of them.  What happened?

 3         A.  What happened was, similar to what

 4    you had with the flash drive, I had an issue

 5    and you'll see by the dates, this was the one

 6    that was finally used for the report because

 7    things got corrupted, which is why I changed

 8    the name, but you asked for my file.

 9         Q.  The one that says working copy 2 is

10    the one that was used for the report?

11         A.  Yes.  And I think that they all

12    translated to what was in the report.  But at

13    one point that's all you see fixed.

14         Q.  Okay, got it.

15             Let me just scroll down.  There's

16    something called -- a PDF document called,

17    how do you pronounce it, Santye?

18         A.  Santye.

19         Q.  Santye expert report?

20         A.  Yes.

21         Q.  Is that your report?

22         A.  I think that's the whole report.

23    Yeah, it looks like the whole PDF of the

24    report.

25         Q.  Just another version -- I mean,
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2     another copy of this final report?

3         A.  It looks like it.

4              MR. LERNER:  It's 140 pages.

5         Q.  And then there's a final -- let's go

6     back out of that.  A final document, an Excel

7     spreadsheet called Working analysis.  What is

8     that?

9         A.  Open it?  Okay.  This is some of our

10    work product, and you'll see a start feed

11    into the exhibits or actually cut and pasted

12    into our working copy, which you'll see this

13    is, I think, on page 1 or page 2 of our

14    report.

15        Q.  And this is actually something taken

16    from -- this page we're looking at called

17    inserts tabs is taken from the KM report,

18    right?

19        A.  No.

20        Q.  What?

21        A.  No.  This is work that we did

22    recreating the tables as published in the KM

23    report so that we could insert them as

24    appropriate in our report.  And we inserted

25    this column here because it was a math error
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2   in the KM report.  Which is why it's
 3   highlighted in yellow.
 4        Q.  The column that's called difference
 5   per KM report?
 6        A.  Yes.  Yes, that was what was in the
 7   KM report without the shading.  But there was
 8   a math error in the report.  So we added this
 9   column here, column P.
10        Q.  And since we don't have this
11   document necessarily in the record with the
12   columns, it's called, Difference with math
13   correction?
14        A.  Yes.
15        Q.  Okay.  So just to be clear, the
16   column -- and I'm now, you've referenced your
17   report, which I'm holding, and I'm going to
18   give you a copy of that so that we can both
19   be on the same page literally.
20             MR. ROSENTHAL:  I'd like to
21        mark your report as Exhibit 144.
22             That's Mr. Paulikens's report.
23             (Whereupon, at this time, the
24        above-mentioned Paulikens expert
25        report was marked as Exhibit 144 for
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2          identification.)

3    BY MR. ROSENTHAL:

4        Q.  So if you turn to page 2 of your

5    report, does that chart that we have just

6    been talking about on the screen appear there

7    as well?

8        A.  Yes.  That's when we called it -- we

9    printed a copy of the penultimate conclusion.

10       Q.  Okay.  So now, returning to the

11   screen, there's a tab, Grand summary 2023.

12       A.  Yes.

13       Q.  Is this material that your office

14   prepared or in part prepared?

15       A.  This was drawn from other source

16   documents, and this was literally -- so we

17   didn't do it automatically by linking.  We

18   did it by just reinserting certain things so

19   they didn't get changed as we were putting

20   the report together.  So this is partly our

21   work product, partly a compilation of other

22   documents in the report.

23       Q.  Okay.  And this tab, grand summary

24   2023, has a bunch of blue colored tables,

25   right?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2       A.  There's blue highlights in the
 3   tables, yes.
 4       Q.  Blue highlights sort of.  I'm just
 5   trying to describe how they appear.
 6       A.  Okay.
 7       Q.  Do these, I'd say, seven different
 8   blue highlighted tables appear in your
 9   report?
10       A.  In different places they do.  And we
11   reference the source document, where it came
12   from.
13            MR. ROSENTHAL:  Okay.  Just in
14        the interest of completeness, I'm
15        going to make an attempt to mark this
16        folder, or sorry, this document,
17        called Working analysis, this Excel
18        spreadsheet as Exhibit 145.  Because
19        if we don't mark it this way we'll
20        never find it again.
21            (Whereupon, at this time, the
22        above-mentioned working analysis
23        spreadsheet was marked as Exhibit 145
24        for identification.)
25   BY MR. ROSENTHAL:
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                     R. Paulikens
 2       Q.  So while we're waiting for that
 3    to -- for the computer to catch up, there's
 4    another one that's -- another tab in this
 5    same Excel spreadsheet called, Grand summary
 6    2012 to 2021.  Is that --
 7       A.  Scroll up.
 8       Q.  -- also something --
 9       A.  That may have wound up as part of
10    our report, too.  These were, again, we were
11    summarizing information for easy inclusion in
12    the narrative section of our report.
13       Q.  Thank you.  Okay.
14            Well, that concludes the exciting
15    tour of your USB drive.
16            Actually, I'm just going to check
17    two other things before I finish it.
18            I spoke too soon.  There's two other
19    documents which will take a moment.
20            So we're looking now, Mr. Paulikens,
21    at your USB drive and there's two Word
22    documents at the very bottom of it.  One is
23    called 01-21 Benlida audited financial
24    statements draft.
25            Do you know what that is?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2      A.   Yes.   Benlida sent their audited
 3  financials and various quarterly financials
 4  in the fall of '22.  That -- and they were
 5  literally in Chinese.  And that was the
 6  translated version that I could use.
 7      Q.   Okay.  And that -- your involvement
 8  with that was related to the hearing held in
 9  Miami in January 2023?
10      A.   Yes.   That was about, yeah, the
11  settlement, whatever, move to maintain it,
12  whatever.
13      Q.   Not related to your current report?
14      A.   No.
15      Q.   Okay.  Let me just open the last
16  file which is dated February 23rd of this
17  year, Benlida report and recommendation.
18           That's a court filing, right?
19      A.   Correct.  That was received.
20              MR. ROSENTHAL:  All right.
21       That concludes the exciting traipse
22        through your USB.  I think we can now
23         get out of that.
24              Let's take a quick break.
25              (Whereupon, a brief recess was
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens

 2         taken.)

 3   BY MR. ROSENTHAL:

 4        Q.  Mr. Paulikens, how many lawsuits are

 5    you presently serving as a retained expert

 6    in?

 7        A.  Active and inactive, I've never

 8    counted, but I would have to estimate between

 9    15 and 25 cases that are in various stages of

10    litigation process.

11        Q.  And what percentage of your time is

12    presently spent serving as an expert witness

13    for lawsuits?

14        A.  In my profession, roughly 80 percent

15    of my time is spent in the litigation support

16    form.  20 percent is traditional accounting,

17    roughly.  I didn't track it to the hour.

18        Q.  So by that you mean roughly

19    80 percent of your time is spent working as

20    an expert witness?

21        A.  Right, or consulting as part of the

22    litigation process.

23        Q.  Okay.  Have you ever been retained

24    to work for Benlida before?

25        A.  No.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1              R. Paulikens

2      Q.  Have you ever been retained to work

3  for a company known as Sinosure before?

4      A.  Not that I recall, no.

5      Q.  The China credit insurance entity?

6      A.  No, not that it rings any bells.

7      Q.  Have you ever served as an expert in

8  a case with either of these gentlemen at

9  Mazzola Lindstrom?

10     A.  Yes.

11     Q.  What case was that?

12     A.  It was Fred --

13          MR. LERNER:  Faust.

14     A.  Faust.

15     Q.  What did that involve?

16     A.  It was --

17     Q.  You can't look to them to answer.

18     A.  It was a wrongful termination case,

19  and the client -- we represented plaintiff

20  who was seeking damages for various

21  allegations he had against his former

22  employer.

23     Q.  Okay.  And what court was that in,

24  do you recall?

25     A.  I believe that was New York Supreme.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    I forget the county as I'm sitting here.

 3         Q.  Do you recall who the other party

 4    was, the counterparty?

 5         A.  It was, as I'm sitting here, I'm

 6    embarrassed, I actually don't remember the

 7    other side's name and it was not that long

 8    ago.

 9         Q.  Is that the only case you can think

10    of that you worked with the Mazzola Lindstrom

11    firm in?

12         A.  As of right now, it's the only other

13    case I've been formally retained at.  There

14    may be -- there's another case that may or

15    may not go forward.  It's a small case in New

16    Jersey, still hasn't gotten very far.

17         Q.  Okay.  So other than those two

18    cases, this is the only other case that you

19    worked with the Mazzola Lindstrom firm in?

20         A.  To the best of my knowledge right

21    now, yes.

22         Q.  Is that Faust case, I know you list

23    your prior cases, do you have that listed on

24    the prior case list somewhere?

25         A.  No.  I only list my prior testimony
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                     R. Paulikens

2    deposition or trial or arbitration.  Faust

3    never got to deposition, trial or arbitration

4    so it is not listed.

5         Q.  Have you ever been disqualified or

6    stricken by a court as an expert?

7         A.  No.

8         Q.  Has a court ever limited the scope

9    of your expert testimony?

10        A.  No.

11        Q.  Has the court ever rejected your

12   expert opinions as unreliable?

13        A.  No.

14        Q.  Has your methodology that you've

15   used in your expert reports in other cases

16   ever been deemed unrealistic?

17        A.  There was a case that my client

18   lost, it was on Long Island.  The judge

19   didn't agree with my position.  The case is

20   under appeal.  I said the company was worth

21   29 million, the other expert said 6.  The

22   judge chose 6.

23            Shortly after the decision, the

24   company was sold for $103 million in cash

25   plus 50 million in earn-outs.  It's under

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

R. Paulikens

1

2    appeal.

3        Q.  So I think you answered this

4    question.  I think you gave that answer to a

5    question that I asked, whether a court had

6    called your methodology unrealistic.  Is that

7    what happened in that case?

8        A.  He was critical of the assumptions

9    and following the forecasts that I made,

10   which turned out to be pretty reliable.  But

11   there was criticism and it was written up, I

12   think, in a couple of trade journals and

13   nobody mentioned the sale of the company and

14   the appeal.

15       Q.  But I guess the question is, do you

16   know whether the Court in that case called

17   your opinion unrealistic or not?

18       A.  No.  I think he thought the

19   forecasts that I relied upon were

20   unrealistic, and I'm not trying to nuance it

21   too much, but I think that's what he said.

22       Q.  Okay.  Has any court ever found that

23   you have relied on considerations that are

24   not appropriate in your opinions?

25       A.  No, not that I remember.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                     R. Paulikens

 2        Q.  Okay.  When you were first retained

 3   in this case, in I think you told us

 4   May 2022?

 5        A.  Correct.

 6        Q.  Who were you retained by?

 7        A.  JC Mazzola and Rich -- the two of

 8   them.  And Mr. Richard Lerner.

 9        Q.  We previously marked your report as

10   Exhibit 144.  I'll just refer to it as your

11   report.

12            I'm going to go through this in

13   detail to understand what you've written and

14   your opinions.  Okay?

15        A.  Okay.

16        Q.  On page 1, the very beginning you

17   say, As part of our retention, we have

18   prepared this response report.

19        A.  Yes.

20        Q.  So I'm just going to focus on that

21   part.

22            What else were you retained to do by

23   the Mazzola Lindstrom firm for this case?

24        A.  Well, as I said, we were initially

25   retained in May of '22, so a little more than
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                   R. Paulikens

2     a year ago.  And we started working on and

3     understanding the issues at hand.  And

4     roughly, I think it was mid June we were told

5     the case was settled, pencils down.

6            So my first portion of my work was,

7     you know, whether it was a consultant or

8     expert, we were going to, you know, prepare

9     some level of analysis for them.  Then the

10    case settled, at least --

11        Q.  Nominally?

12        A.  -- nominally settled, thank you.

13    And it went quiet until the fall.  And then

14    worked on, you know, the enforcement of the

15    settlement action, for lack of a better term,

16    I became involved in the financial analysis.

17    So kind of three distinct portions of work.

18        Q.  And returning to page 1 of your

19    report, the sentence I read continues to say,

20    We've prepared this response report to the

21    expert report prepared by Barry Mukamal and

22    Mark Parisi, I'm leaving out their acronyms.

23        A.  Yes.

24        Q.  So what is a response report in your

25    practice, in general?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                       R. Paulikens

2          A.   It's basically, some people call it

3     a response report, some people call it a

4     rebuttal report.  But another expert will

5     produce a report that, and this sounds

6     cliche, but we'll respond to, and/or answer

7     or address what we either agree or disagree

8     with that response report.  So it's a

9     response to another expert's report.

10         Q.   Okay.  And would you consider this

11    response report to be a full response or a

12    full-throated response or something like that

13    or is it a partial response?

14         A.   I believe it's a full-throated

15    response to what was included in the four

16    corners of the KM report.  So, yes, it would

17    be a full response to that.  They had some

18    waivers that they might want to amend in

19    their report, and I also reserve the right to

20    amend as the need arises.

21         Q.   So you were not instructed, you

22    know, don't touch certain issues that are in

23    the KM report, respond to it in its entirety

24    as best you can?

25         A.   Yes.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2       Q.  Okay.  You were never asked to

 3  prepare an affirmative report on behalf of

 4  Benlida before the KM report was created?

 5       A.  That's correct.

 6       Q.  Okay.  And did you work on this

 7  report alone or did you have the assistance

 8  of other professionals?

 9       A.  I had assistance of certain

10  professionals, but the lion's share of all

11  the work was done by me.

12       Q.  And how many other folks helped you

13  with the report?

14       A.  Probably two people.  One of them

15  probably was mostly proofreading type of

16  work, because I always try to have a cold set

17  of eyes proofread.  I had a junior,

18  first-year student do some of the

19  accumulations for me.  But this particular

20  report I probably did 90 percent of the man

21  hours myself.

22       Q.  Okay.  And the junior person that

23  you mentioned, is that an employee of the

24  company?

25       A.  Right, yes.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2        Q.  But you said a first-year student?

 3        A.  I'm sorry, I said first-year staff

 4   member, I'm sorry.

 5        Q.  Does that person have a professional

 6   degree?

 7        A.  He's an accountant, he's a degreed

 8   accountant.  Bachelor's degree, I think he's

 9   sitting for the exam.  But we call them first

10   years nowadays as opposed to junior and

11   senior.

12        Q.  Okay.  Just so it is clear, what is

13   that person's name?

14        A.  I believe it was Michael Barry who

15   helped me on this matter.

16        Q.  B-A-R-R-Y?

17        A.  Yes.

18        Q.  Let me ask you a couple of questions

19   about finances.

20             Your hourly rate that you're

21   charging for your work, I think you listed in

22   your report?

23        A.  It's 550.

24        Q.  Okay.  And did you charge a flat

25   rate for this report or did you just do it
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    hourly?

3        A.   It's hourly.

4        Q.   Do you know how many hours you did

5    that went into creating this report?

6        A.   I haven't looked at my timesheets

7    so I couldn't -- I mean, it's a significant

8    amount of hours, but I couldn't tell you if

9    it's 30 or 50 as I'm sitting here.  I haven't

10   looked.

11       Q.   Do you have those records somewhere?

12       A.   We have the records, I just don't

13   know them.

14       Q.   Okay.  If we wanted to get those

15   records as part of your total work on this

16   case, can we get those through your counsel

17   potentially?

18       A.   Potentially.  I'll leave it to them

19   what they're willing to produce.

20       Q.   Do you know the total amount you've

21   been paid so far in this case representing

22   Benlida or working as an expert for Benlida?

23            MR. LERNER:  Objection.

24            You could answer.

25       A.   I have to bifurcate the answer.  The

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2      work I did at Friedman, which started in May

3      of '22, and I was with Friedman, technically

4      I still am, the work we did ended by the end

5      of June.  I believe there was $25,000 that

6      was ultimately paid to Friedman.

7          Q.  You said it went until June of 2023?

8          A.  No, June of 2022.

9          Q.  Okay.

10         A.  And then at Santye and Company, I

11     believe we billed and have been paid 60,000

12     from September through, I guess, through the

13     hearing.  That was the billing.  And then we

14     were paid within the last couple of months.

15         Q.  So from September of 2022 until the

16     last couple of months?

17         A.  The hearing, which would have been

18     January of '23.

19         Q.  Okay.  Just to be clear.  So from

20     that time period, September 22nd to

21     January 2023, you believe was about $60,000?

22         A.  Something like that.

23         Q.  And then since January 2023,

24     obviously, it was, as you described, pencils

25     down for a period of time.  When you picked
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                  R. Paulikens

2     the pencils back up, since that time have you

3     billed?

4          A.  Let me clarify.  It was pencils down

5     on the settlement back in June of '22.  So a

6     year ago.  The case was quiet until circa

7     October -- September, October of '22.  So

8     three months or so.  And then after the

9     hearing in January, there hasn't -- I don't

10    recall there being a lot of work that I've

11    done until we started responding to the KM

12    report.

13         Q.  Okay.  And I guess then that last

14    interval of time where you were engaged to

15    respond to the KM report, you don't have a

16    sense of whether it's 30 or 50 or however

17    manhours, right?

18         A.  Not as I'm sitting here right now.

19    I haven't billed it yet.

20         Q.  So prior to that time, about

21    $85,000?

22         A.  Yeah.

23         Q.  Your firms have been paid?

24         A.  Yeah, something like that.

25         Q.  In terms of preparation for today's

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    deposition, what did you review to refresh

3    your recollection?

4        A.  I reviewed the KM report.  I

5    reviewed my report.  Clearly putting the

6    documents together on the thumb drive, it was

7    also part of review.  I reviewed, you know,

8    some of the financials, some of the other

9    information just to fully try to, you know,

10   get my recollection up as much as I could.

11   But I focused principally on my report and

12   the KM report and the documents that were

13   involved in that.

14       Q.  Did you review anything that's not

15   been listed in the materials we looked at on

16   your USB drive or the two reports you just

17   described; anything sort of extraneous or

18   exogenous to that set of data?

19       A.  No.  Because I think our report was

20   issued on the 7th or so of July, so maybe

21   about two weeks ago.  So I don't think there

22   was a lot of opportunity to see anything not

23   listed on the report.

24           So as I'm sitting here, I can't

25   remember a particular document that I may

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    have looked at since.

 3         Q.  But I mean, there's nothing that

 4    stands out in your mind that you looked to as

 5    a resource that's, essentially, new, not from

 6    the documents you had reviewed for preparing

 7    your report, solely in preparation for

 8    today's deposition?

 9         A.  Yes.  No, there's nothing new in the

10    last two weeks that I recall.

11         Q.  Okay.  So in your report, you used

12    the term -- I'm going to direct you to page 2

13    at the top.  On the third line, you use the

14    term CTX.

15         A.  Yes.

16         Q.  Okay.  Just about defining terms,

17    what does that refer to when you say CTX in

18    your report?

19         A.  CTX, I think I defined earlier on.

20    There's CTX, which when I just use CTX it's a

21    broad description of Circuitronix.  I

22    understand there's Circuitronix entities,

23    Circuitronix Hong Kong and there's others

24    that I am tangentially aware of.  But when I

25    say CTX, it's meaning the defendant.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2        Q.  Well, who is the defendant in this

3    case, what entity?

4        A.  I believe it's CTX U.S.

5        Q.  It's also known as CTX LLC?

6        A.  Yes.  I believe the name is on

7    the -- yes, Circuitronix LLC.

8        Q.  And you're referring to the cover of

9    your report?

10       A.  Yes.

11       Q.  So let me be clear.

12            When you use CTX, do you mean CTX

13   LLC or do you mean CTX broadly?

14       A.  Different parts in the report I

15   tried to define CTX as broadly, because I

16   know there's multiple entities that are at

17   issue.

18       Q.  Okay.

19       A.  You know, when I was specifically

20   referring to one or the other, it was CTX's

21   particular paragraph is more of a setting the

22   table.

23       Q.  Okay.

24       A.  It was just, you know, what we were

25   talking about kind of thing.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                   R. Paulikens
 2        Q.   Okay.  So you weren't being precise
 3   in that --
 4        A.   No.  I was just trying to set the
 5   table as to what we were doing and looking
 6   at.
 7        Q.   Okay.  Have you calculated the
 8   amount of damages being sought by Benlida
 9   anywhere in this lawsuit?
10        A.   No, not as formal calculation.  It's
11   an accounts receivable issue more than
12   anything.
13        Q.   Can you explain to me what those two
14   terms mean in your mind so I understand what
15   you -- how you distinguish formal calculation
16   from an accounts receivable issue?
17        A.   Well, in order to do a formal
18   calculation, you would need -- literally it's
19   related.  But in order to come to a precise
20   number that Benlida is entitled to, you know,
21   6,632,000 yadda, yadda, dollars, you'd have
22   to do a fairly detailed calculation which
23   incorporates an analysis in reconciliation of
24   the accounts receivable from day one, in
25   order to come to the specific finite numbers
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2   at a point in time because it's a fluid

 3   number in general because they continue to do

 4   business together.  Plus, you know, if you --

 5   because of the way accounts receivable work,

 6   you need to start from day one, you can't

 7   just pick an arbitrary start date and say

 8   we're going to measure it from here without

 9   an agreement as to what the beginning balance

10   or opening balance was, if you're going to

11   try to truncate a long-term relationship.

12        Q.  Okay.

13        A.  I have not done that calculation.

14   So when you said do we calculate amounts due,

15   I put illustrations in depending upon the

16   data source of the magnitude that could be

17   found, because multiple data sources of

18   multiple different numbers because they cover

19   multiple different time periods.

20        Q.  Okay.  You mentioned that a formal

21   calculation like that would require a

22   reconciliation of accounts receivable from

23   day one, right?

24        A.  Because the way I understand it --

25        Q.  Let me just -- I correctly recited
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    what you had said, right?  That --

3         A.   Go back?

4         Q.   -- part of the formal calculation

5    requires a reconciliation of accounts

6    receivable from day one?

7         A.   Right.  Because my understanding of

8    the case is Benlida seeking payment on its

9    accounts receivable.

10        Q.   Okay.

11        A.   Broadly speaking.

12        Q.   Just on that point of the

13   reconciliation of accounts receivable, is it

14   correct to say that both Circuitronix LLC and

15   Benlida, prior to this litigation, engaged in

16   a back and forth attempting to do just that,

17   this reconciliation of their accounts

18   receivable?

19        A.   Yes.  And I absolutely reference

20   that in my report, that there was a lot of

21   information transmitted between both sides as

22   they were trying to develop a number or an

23   agreement or resolution.

24        Q.   Right.  So in other words, they

25   were -- we'll talk about this in detail, but

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2     the reconciliation effort that happened in

3     2019 between the parties was the type of work

4     that you would agree, if you were hired to do

5     an independent formal calculation, you would

6     be doing similar stuff, correct?

7          A.  Similar, yes.  Because you want to

8     see, you know, what literally what does one

9     owe the other.

10         Q.  Right.  And to do that you have to

11    look at invoices and payments among other

12    things, right?

13         A.  Among other things.

14         Q.  Okay.  In a granular fashion,

15    presumably?

16         A.  Potentially, yes.

17         Q.  Okay.  So we were just talking --

18              MR. LERNER:  Can you read that

19         back.

20      (Whereupon, at this time, the requested

21    portion was read by the reporter.)

22         Q.  So we were just -- I was asking you

23    a series of questions starting from the

24    premise that you had distinguished between a

25    formal calculation and an accounts -- I can't
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens
2    read my own handwriting.  I think maybe it's
3    accounts reconciliation.  Maybe you'll be
4    able to help me because I can't read my own
5    writing.
6            You had distinguished between, when
7    I asked you did you do a formal calculation
8    or -- strike that.
9            I had asked you whether you had
10   calculated the amount of damages that Benlida
11   is owed in this case, you said, no, that
12   would require a formal calculation, which you
13   didn't do, right?
14       A.  Not a formal -- correct, not a
15   formal calculation.
16       Q.  And you distinguished that from
17   something else, and I just can't recall the
18   words you used.
19       A.  I will distinguish it again so we
20   can be clear.
21       Q.  Thank you.
22       A.  From my chair, the dispute is an
23   accounts receivable dispute.
24       Q.  Receivable, that was the word I
25   couldn't read.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

R. Paulikens

1

2     A.  And, therefore, the damages, to use

3   your word, is what Benlida is seeking in the

4   lawsuit to be paid.

5     Q.  What are its accounts receivable

6   that's owed?

7     A.  Right.  So when you say damages,

8   there could be other elements of damages.

9   It's a very broad category from my side of

10  the table.

11    Q.  Right.

12    A.  In this case, it's a receivables

13  issue, which is why I try to clarify that you

14  need to look at accounts receivable.

15    Q.  Thank you.

16        So having clarified that term, have

17  you done that?  Have you looked at the

18  accounts receivable independently to

19  determine how much Benlida is owed in your

20  view?

21    A.  Not independently.  My role is to

22  respond to the four corners of the KM report.

23    Q.  Okay.  Could you have done it

24  independently, based upon the data that you

25  had?

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2        A.  Could it be done, the data, I know,

3    there is tens and tens of thousands of pages

4    that were available in May '22 before the

5    settlement, and I haven't looked at them,

6    maybe even at all since then, because the

7    case settled.

8            So the information ought to be in

9    there.  And certainly to diligently go

10   through the CTX reconciliation, the Benlida,

11   and then the HK and all of that, I believe

12   the information is in the universe to do

13   that; it would be an undertaking.

14       Q.  Is it fair to summarize what you

15   just said to say that you believe that the

16   data exists in the reconsolidation documents

17   sent forth between Benlida and CTX but it

18   would be a major undertaking to do it?

19       A.  Without knowing the full population

20   of documents that were sent back and forth

21   because the documents sent back and forth,

22   reconciliations and summaries that the

23   individual parties did, so to answer your

24   question, if an Excel sheet bounces between

25   both parties that references debit memos,

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                  R. Paulikens

2   invoices, and payments, that's not going to

3   be part of the Excel worksheet.  They may be

4   referenced, but the data might be elsewhere,

5   you know, the bank drafts and that other type

6   of stuff.

7       Q.  So when you refer to data, you mean

8   like the underlying documents that are

9   summarized in those Excel spreadsheets?

10      A.  Correct, yeah.  There could be a

11  great deal of underlying data.  There's a lot

12  of invoices, for example.  So that, I

13  believe, must exist.  But when you use the

14  term that was transmitted between the

15  parties, that normally doesn't -- that

16  underlying data is not included in an Excel

17  spreadsheet.

18      Q.  But you understand that in the

19  ordinary course of business between Benlida

20  and Circuitronix, that Benlida would send

21  invoices to Circuitronix, right?

22      A.  Yes.

23      Q.  So, therefore, both parties

24  presumably have those invoices, right?

25      A.  That's what I kind of thought I just

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    said.

3        Q.  Okay.  And also then if Circuitronix

4    would issue debit memos to Benlida that both

5    parties would have a copy of the debit memos

6    that Circuitronix issued to Benlida, correct?

7        A.  You would think both parties had the

8    same data.

9        Q.  And, likewise, that if Circuitronix

10   made payments to Benlida, that there would be

11   records of those payments on both sides of

12   the transaction as well, right?

13       A.  You would expect that.

14       Q.  So that underlying data that you

15   just described presumably is held by both

16   companies, right, one would expect?

17       A.  One would expect.  One would -- I'm

18   not trying to be -- they have access to the

19   data.  Whether it's held or how it is held

20   because part of the issue in the

21   reconciliations was neither party -- and I

22   say this in my report, seem to have a

23   complete document set.

24           And, again, this is by way of

25   illustration, but there was debit memos that

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2     Benlida didn't have in their file that CTX

3     issued, and I understand there were some

4     invoices that were missing.

5              So while you said they had that

6     information, my understanding from their

7     whole reconciliation process is they kept

8     finding things that one side didn't have.

9         Q.  And during that 2019 reconciliation

10    process, part of what it surfaced was which

11    documents each side seemed to be missing,

12    right, from each other?

13        A.  That's a fair summarization.

14        Q.  And then they worked collaboratively

15    to try to fill in those blanks, right?

16        A.  And I mentioned that in my report.

17        Q.  So at the end of that reconciliation

18    process, which I think is, like, if I'm

19    recalling correctly, November of 2019?

20        A.  Something like that.

21        Q.  They've gone back and forth several

22    times and sort of evolved their effort to

23    find the answer, right, on their accounts

24    reconciliation?

25        A.  Yeah, they had gone back and forth,
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2     and I believe they were narrowing in on at

 3     least that they each had the same amount of

 4     data.  I'm sorry, the same data.  And then my

 5     understanding is disputes began about cutoffs

 6     and other things, and that's more the legal

 7     side of the issue.  But my understanding,

 8     they were working towards at least to agree

 9     on a population.

10          Q.  So in summary, if you had access to

11     the underlying data, that makes up the

12     spreadsheets that are in the account

13     reconciliation documents that Benlida and

14     Circuitronix exchanged with one another in

15     2019, you would presumably have been able to

16     do an accounts receivable calculation

17     independently, correct?

18          A.  If you had all of the data and it

19     was all agreed to, presumably you could.

20          Q.  And if you had 95 percent of it, you

21     could do 95 percent of an accounts

22     receivable, independent calculation?

23          A.  Certainly the more data -- the more

24     complete your data, the more comprehensive

25     and accurate your result would be.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2        Q.  But assuming that the end of the

3    process of both companies working to try to

4    find the complete picture with all the data

5    resulted in, and I'm making up a number,

6    95 percent of it being located, if you had

7    that 95 percent of the data hypothetically,

8    you could produce an independent accounts

9    receivable analysis that would represent that

10   95 percent, right?

11       A.  If it was 95 percent of all of the

12   relevant data that the parties believe is

13   accurate, you could.  But I understand part

14   of the dispute is that different parties have

15   a different involvement in the data.  So if

16   you had 95 percent of half of the

17   information, your receivable -- your

18   reconciliation may not necessarily tell the

19   whole picture.

20       Q.  So let's go back to your report on

21   page 1, I think.  The bottom paragraph.  I

22   think you just alluded to this.

23           You say, as we will discuss in the

24   following pages, It is not what is in the KM

25   report that should be instructive to the

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    trier of fact, it is what is not in the KM

3    report that actually informs the reader of

4    the order of magnitude of the amount being

5    sought by the plaintiff, Benlida, and why.

6    Right?

7         A.  Yes, you read that correctly.

8         Q.  Is your response report attempting

9    to show the amount being sought by the

10   plaintiff, Benlida?

11        A.  No.  My response report is

12   responding to the KM report, which only

13   discussed the U.S. -- Circuitronix U.S. and

14   it ignored the Hong Kong issue.  And my

15   report specifically discusses, there's a

16   whole other portion of a -- of a dispute

17   here, and the results of the KM report taken

18   on its face don't make commercial sense.

19        Q.  So help me with this.  If your

20   report is not making an affirmative statement

21   or if you don't intend to testify as to how

22   much money Benlida should be owed -- let me

23   stop right there.

24             Do you intend to testify in this

25   case how much money Benlida is owed by

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens
 2    Circuitronix, if asked by counsel?
 3         A.  If asked by counsel and I prepare a
 4    report, then I would be asked to do that, but
 5    I wasn't asked to do that in preparing the
 6    response report.  I was pointing out the
 7    shortcomings, my opinion, in the KM report
 8    because of the missing pieces.
 9         Q.  Okay.  So do you have -- have you
10    formed an opinion of the amount being sought
11    by the plaintiff Benlida, as you write on
12    page 1 of your report?
13         A.  No, not a formal number.  As I put
14    out in my report on various pages, I said,
15    using the phrase, Depending on the data
16    source Benlida is owed, I think, anywhere
17    from the low 3 millions to as much as
18    $8 million, depending upon the data source.
19    And, again, all the data that was cited, some
20    of it started in 2012, went through '19, and
21    then some of it started in '15 and then went
22    through '21.
23              So when you compared the running
24    totals of each, you had a significant order
25    of magnitude difference.  Benlida is over --
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2   owes CTX on one set of data by -- and I'll

3   use 5 million for simple illustration, but

4   the Hong Kong entity is owed 13 million.  So

5   it's a net 8 million that Benlida owes.

6          And I was pointing out that the KM

7   report didn't cover that issue, didn't

8   address it, didn't even mention it.  So

9   that's why I put different examples and

10  caveated them, was dependent upon the data

11  source.

12     Q.  So on page 4 of your report, there's

13  a paragraph that begins, The significant

14  disparity.

15          Do you see that?

16     A.  Yes.

17     Q.  Three lines down at the right side

18  it begins a sentence that says, quote, As we

19  will show information from KM and others show

20  that CTX HK owes about $13 million, close

21  quote.

22     A.  Yes.

23     Q.  That's the high-end range -- well,

24  no, that's the highest number I think I've

25  seen in your report that you refer to,
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2     correct?

 3          A.   That might be.

 4          Q.   Okay.

 5          A.   That might be.  And could I make a

 6     correction?  The date of the e-mail that I

 7     referenced, I typed wrong.

 8          Q.   Let's -- we'll get to that later.

 9     Let's just stay on this issue.

10          A.   Okay.

11          Q.   So with respect to the statement you

12     say, As we will show, information from KM and

13     others show that CTX HK owes about

14     $13 million, have you done an independent

15     calculation to come up with that figure?

16          A.   No.  What I did was I took one of

17     the files that we went through on the thumb

18     drive that was produced to your expert, which

19     was from his files that showed the HK -- I'll

20     call it the HK portion.

21          Q.   You're referring to the Circuitronix

22     Hong Kong?

23          A.   Yes.

24          Q.   Okay.

25          A.   It showed the same blue highlighted
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                 R. Paulikens

 2    amounts, it showed invoices, debit memos,

 3    payments, and it showed that the running

 4    total at one point was $13 million.  It's

 5    reprinted as part of a report and that came

 6    directly from the KM files.

 7         Q.  Let me direct you to page 8 of your

 8    report, to the blue highlighted chart, and

 9    ask you whether that's the one you're

10    referring to.

11              (Witness peruses document.)

12         Q.  At the top of the page.

13         A.  Yes.  And there's the 13 million.

14         Q.  That's the one that says, Balance

15    due slash credit balance, and it's got 13.492

16    million?

17         A.  Correct.  And that was -- the source

18    document came from CTX Hong Kong was part of

19    the reconciliations that they were doing in

20    2019, and that particular file came from your

21    expert's files.

22         Q.  So let me do this, because I know

23    that you marked certain of these charts with

24    the blue highlighting as exhibits to your

25    report, right?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2       A.  Yes.  We printed some of them.

 3       Q.  If we look on the screen, I have

 4   your PDF right here.  It says, Paulikens'

 5   open report.

 6            MR. LERNER:  Also, note for the

 7         record Exhibit 144 does not include

 8         all of the attachments.

 9            MR. ROSENTHAL:  Correct.

10         Otherwise it would be ten times as

11         long.

12            THE WITNESS:  Can we take a

13         five-minute break?

14            MR. ROSENTHAL:  Sure.

15            (Whereupon, a brief recess was

16         taken.)

17   BY MR. ROSENTHAL:

18       Q.  Mr. Paulikens, I'm showing you a

19   copy of your report on the computer screen

20   because this copy of it, digital copy, has

21   the exhibits which are voluminous.

22       A.  Okay.

23       Q.  They are not printed out in

24   Exhibit 144.

25            So I want to ask you whether the
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                      R. Paulikens

2      blue highlighted chart that appears at the

3      top of page 8 of your report that you were

4      just talking about is the same one that

5      appears as Exhibit 3?

6           A.  I have to get up.

7           Q.  Please.  And then I'll scroll down

8      and rotate this.  The top says, Source,

9      Benlida shipment and payment details CTX-HK

10     2012 to 2019.

11          And you might want to take your

12     report with you, just to --

13          A.  That looks like the same chart.

14     Because it was brought forward from the

15     exhibit, certainly the numbers agree.

16          Q.  Okay.  So those are the same two

17     things, right?

18          A.  Yes.  And this is the exact -- this

19     is the exhibit?

20          Q.  You're asking me?

21          A.  Yes.

22          Q.  Yes, see, it says Exhibit 3?

23          A.  Exhibit 3, and is there pages behind

24     it?

25          Q.  Yes.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2       A.  Okay, there's detail, yes.

3       Q.  So I want to just ask you something

4    else about the source document for this chart

5    that is Exhibit 3 to your report, and also

6    appears on page 8 of it.

7           In your document that you provided

8    us, and I'm pulling it up on the screen, I'm

9    going into the folder called, Further

10   documents reviewed by Randall Paulikens.  I

11   want to show you the document that matches

12   that title, which is Benlida shipment and

13   payment details.  Bear with me a second.

14      A.  Right here?

15      Q.  You're pointing to the one that says

16   CTX HK 2012 to 2019?  Let me open that then,

17   it's an Excel spreadsheet.

18          This brings up a blue highlighted --

19   the summary tab brings up a blue highlighted

20   chart, right?

21      A.  Correct.

22      Q.  And it doesn't have additional

23   columns like you had done where it says

24   payment type?

25      A.  We had spread it out to show the

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                  R. Paulikens
2    payment type and show the debit memos, but it
3    still gets to the same $13,492,000, which I
4    referenced it as the source of the
5    information.  So I spread it out to make it
6    easier to compare the other tables.
7         Q.  Okay.  So, okay, so this is the
8    source file for --
9         A.  Right, there is a few versions of
10   it, and if we click on that -- and there was
11   also similar information.  Again, there was a
12   lot of Excel files going back and forth, but
13   that is the source for that $13 million we
14   just saw that it agreed.
15        Q.  Okay.  So I don't recall whether we
16   made this an exhibit previously, but so just
17   for the purpose of clarity, the Excel
18   spreadsheet file that we're looking at, which
19   I'm going to make this the next exhibit which
20   will be 146, is entitled Benlida shipment and
21   payment details, CTX HK 2012 to 2019, right?
22        A.  Correct.
23        Q.  And then I will close out of it, Mr.
24   Paulikens and you can look at where it
25   resides on the folder.  This is the one you
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    directed us to?

3        A.  Correct.  That was the source

4    document and then --

5        Q.  Let me just for the record be clear.

6    That's dated on the computer file 7/14/2023?

7        A.  Which would have been the date that

8    it was sent to you.

9        Q.  Okay.  And it is 256 kilobytes,

10   right, just to identify it?

11       A.  I think that's correct, yeah.

12       Q.  Okay.

13            MR. ROSENTHAL:  So at the end

14        of the deposition, we'll print this

15        one out as, at least that summary

16        page, and mark that as Exhibit 146.

17            (Whereupon, at this time, the

18        above-mentioned file entitled Benlida

19        shipment and payment details CTX HK

20        2012 to 2019 was marked as Exhibit

21        146 for identification.)

22            MR. LERNER:  So only the

23        summary page will be 146?

24            MR. ROSENTHAL:  We can make the

25        whole exhibit that, but we can print

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                     R. Paulikens

2          out just the summary page.

3                 MR. MAZZOLA:  What is the whole

4          exhibit?

5                 MR. ROSENTHAL:  It's 146, it's

6          called Benlida payment and shipment

7          details CTX HK.

8                 MR. MAZZOLA:  Off the record.

9                 (Discussion held off the

10         record.)

11   BY MR. ROSENTHAL:

12         Q.  The last one was Chinese?

13         A.  Yes.

14         Q.  All right.  So I'll go back.

15   Anyway, this Excel spreadsheet is in the

16   folder called -- that Mr. Lerner sent,

17   Further documents reviewed by Randall

18   Paulikens.

19         Do you see that?

20         A.  Yes.  And that came out of -- that's

21   it from your expert's production, which is

22   why it's that name and it looks a little

23   different.  So that's your expert's file --

24         Q.  Okay.

25         A.  -- not mine.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens
 2      Q.  Okay.  Just to be clear, that's
 3  the -- we've established that is the Excel
 4  spreadsheet that becomes the source for this
 5  chart that's on page 8 of your report and
 6  also Exhibit 3 of your report, correct?
 7      A.  Yes.  The file you just looked at
 8  was from your expert, but the source
 9  information --
10      Q.  Is what you used?
11      A.  -- is what we used, which is from
12  his file.
13      Q.  Okay.  All right.
14          Going back to page 4 of your report,
15  the line that I asked you about a few minutes
16  ago before the break, where you talked about
17  the $13 million number?
18      A.  Yes.
19      Q.  Are you with me?  You said we will
20  show information from KM and others show that
21  CTX HK owes about $13 million?
22      A.  Yes.
23      Q.  The information from KM, is that the
24  document that we just looked at on the
25  screen?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        A.  That's the document, because that
 3   came from KM.  That came from KM's file and
 4   the others is, that was one of the documents
 5   that was bounced back and forth during
 6   reconciliation process.
 7        Q.  Okay.  So let me -- you're ahead of
 8   me because what I wanted to ask you what does
 9   and "others" mean in your report, information
10   from KM and others?
11        A.  So that document was attached to one
12   of the e-mails as they were -- the parties
13   were trying to resolve their dispute.
14        Q.  Okay.  So in other words, when you
15   say, We will show information from KM and
16   others that CTX HK owes about $13 million,
17   this is KM and others is one unit that's
18   referring to the document that we just looked
19   at which is Exhibit 3 to your report?
20        A.  Right.
21        Q.  And that Excel spreadsheet that we
22   just marked as Exhibit 146?
23        A.  Right.  That was the information I
24   was citing that it came from other people.
25        Q.  Okay.  I wasn't sure if it was two
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2    different sources, that's why I was asking
 3    that question.
 4         A.  No, no.  It's that same basic file
 5    that's been shared multiple times.
 6         Q.  Okay.  Let me go back to page 3 of
 7    your report.
 8              There's a small one-sentence
 9    paragraph above the words, The dispute, that
10    subheading.
11         A.  Okay.
12         Q.  And you say that, quote, To fully
13    understand the economic relationship between
14    the parties and where the state of the
15    ultimate economic relationship lies, correct?
16         A.  You didn't read the whole sentence.
17         Q.  Okay.  This fact, as well as the
18    actions of all sides, needs to be considered
19    to fully understand the economic relationship
20    between the parties and where the state of
21    the ultimate economic relationship lies.
22              Did I read that correctly?
23         A.  Yes, you did.
24         Q.  Okay.  So who are the parties in
25    that sentence?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2        A.   The parties -- I was referring to

 3     the paragraph above, which talked about the

 4     hearing from January.  And I was simply

 5     saying that certainly the two litigants are

 6     doing -- have been doing business together

 7     for a long period of time.  And my

 8     understanding from the testimony is that

 9     there is a relationship, and I said it in the

10     paragraph, that is not -- they're friends.

11     Friendly.

12             So there's a long relationship,

13     there was testimony about business dealings,

14     and I said to look at the whole picture

15     between them you need to look at the whole

16     picture between them.  That's all I was

17     saying.

18        Q.   I'm asking a narrower question.

19        A.   Okay.

20        Q.   Who are the parties when you refer

21     to that it is necessary to look at the

22     economic relationship between the parties?

23     Who do you mean?

24        A.   Well, I was talking about the key

25     members of the litigants have a long
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    relationship outside of business as neither

 3    side denied a level of familiarity.  So

 4    that's what I was referring to.

 5        Q.  So you're referring to the people,

 6    not the companies?

 7        A.  I was referring to people, and the

 8    people who run the companies.

 9        Q.  Which people were you referring to?

10        A.  There's Tracy, there's Rishi, and

11    I'm not going to try the luck at the last

12    names.  There's Richard, that's -- there was

13    other -- there's other managers.  But

14    there's -- my understanding from the

15    testimony was there was a certain level of

16    familiarity.

17             MR. LERNER:  Hold on, you said

18         Richard.  You didn't mean -- the only

19         Richard I know of in this case is me.

20             THE WITNESS:  No.  The

21         accountant, I think the title is CFO.

22             MR. LERNER:  Are you thinking

23         of Roger?

24             THE WITNESS:  Roger, I'm sorry,

25         Roger.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    BY MR. ROSENTHAL:

 3        Q.  So you say you became aware of that

 4    from the testimony.  Did you read a

 5    transcript of the testimony of that hearing?

 6        A.  I was in the hearing towards the end

 7    of the day.  I was sequestered for six or so

 8    hours of it.  And the latter two hours, I was

 9    in the courtroom and I did hear part of

10    Tracy's -- I'm not going to get her last name

11    right, and Rishi's testimony as well as the

12    CFO for Circuitronix.

13        Q.  So you were in the courtroom during

14    that --

15        A.  I was in the courtroom for the

16    latter two hours or so.

17        Q.  In that sentence on page 3 of your

18    report that I had originally focused on, you

19    used the terms, The economic relationship and

20    then you say, The ultimate economic

21    relationship.

22        A.  Correct.

23        Q.  What do you mean by ultimate as

24    distinguished from just the economic

25    relationship?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2        A.   Okay.   Two issues.   One, the KM

3    report only focused on the CTX U.S. portion

4    and ignored the Hong Kong portion.   So from

5    my chair as an accountant, that's an

6    incomplete picture, and we discussed with

7    that chart why it is an incomplete picture.

8             Secondly, there was discussions in

9    the testimony that there were -- there's

10   claims that they were -- that one party was

11   fronting money to another, you know.   And so

12   it sounded like if we're going to understand

13   what the ultimate economic truth is we need

14   to look at all of this information, including

15   all of these, I'll call it, side details,

16   because they may feed into the behavior of

17   the parties, which drives the ultimate

18   economics, which wasn't covered in the KM

19   report.

20       Q.   And when you refer to a discussion

21   in the testimony that one party was fronting

22   money to another, can you be more specific to

23   what you're referring to?

24       A.   Yeah, there was discussions about

25   moneys that were sent from one entity to

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2     another, having to do with regulatory issues

 3     in China.  I couldn't -- I don't know the

 4     specific cites, but there was a certain

 5     amount of cooperation between the parties

 6     that was testified to.  And all I'm saying in

 7     that paragraph is, we need to look at

 8     everything to get to a definitive number and

 9     not a snapshot of a particular piece.

10          Q.  You had in your documents that you

11     reviewed excerpts of deposition testimony I

12     noticed.  Did you have entire depositions as

13     well or just excerpts that were provided?

14          A.  Just the excerpts, as they were made

15     as part of the record for the motion hearing

16     in January.

17          Q.  Okay.  So I assume that that's the

18     source that you're drawing upon for what you

19     were just testifying?

20          A.  It was that there was some of the

21     other moving papers from the court documents

22     and I think it was covered in the testimony

23     that I heard at least portions of the ones

24     that were actually in the hearing.

25          Q.  So there's another place where you
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    refer to the entire economic picture as

3    you've just testified to on page 4 of your

4    report at the top, the top paragraph, let me

5    direct you to that.

6            Do you see the paragraph that

7    starts, As a result?

8        A.   Okay.

9        Q.   You have a parentheses there that

10   says, Since the KM report did not produce any

11   information or analysis with regard to CTX HK

12   or ROK, the KM report is not a source as to

13   the entire economic picture either, right?

14       A.   Correct.

15       Q.   And that's what you were just

16   testifying about, a part of the picture,

17   versus the entirety, right?

18       A.   Correct.  There's a Hong Kong

19   picture, there's the U.S. picture, and I know

20   it's a legal dispute and I'm speaking as an

21   accountant, but those are some big disputes

22   and the KM report didn't cover the other

23   half, if you will.

24       Q.   What companies are involved in the

25   entire economic picture, in your view?

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2        A.  A definitive list, I can't generate

3   as I'm sitting here.  But there's certainly

4   Circuitronix, the parent, in Miami, there's

5   Circuitronix Hong Kong, there's Benlida and

6   then there's ROK.  And then there's a new

7   Benlida entity that's building a factory.

8            They all seemingly work together in

9   terms of communication.  Again, that's a

10  legal issue.  I'm not trying to prejudge it,

11  but there is a certain amount of cooperation

12  between the entities.

13       Q.  So your view is that all of those, I

14  think you named five entities, need to be

15  considered to get the, quote, entire economic

16  picture, close quote?

17       A.  Correct.  Because the individual

18  pieces don't necessarily make economic sense

19  in a vacuum.

20       Q.  Let me take you back to page 2 of

21  your report.  If you can turn there, I'm

22  going to ask you about something you wrote.

23            At the top, first line, you write,

24  The limitations of the KM report are properly

25  spelled out on page 3 of the KM report.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                   R. Paulikens

2          Do you agree that they properly

3      express limitations in their report?

4          A.  Well, they were fairly clear that

5      they did this and this and did not do that

6      and that.  And I'm not trying to be vague,

7      but I'm trying to answer the question

8      quickly.

9          Q.  Right.

10          A.  And I think when an expert doesn't

11      do something and communicate it basically

12      upfront, that's proper.  Because then you

13      don't hold them responsible for something

14      they didn't do or weren't asked to do.  So

15      that's what I was saying here.

16              They were fairly clear, we only

17      looked at this, we didn't look at the source

18      documents, we compared the two

19      reconciliations and some other information,

20      and that's all that we did.

21              And from my chair as another expert,

22      I believe that's an appropriate, call it a

23      limitation, but it's an appropriate

24      communication of what they did or did not do.

25          Q.  So the KM report was clear about

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens

 2   what they were considering and what they

 3   weren't considering, right?

 4        A.  From my chair, the short answer,

 5   yes.  And I think I basically said that.

 6        Q.  Okay.  And you also say on page 3 of

 7   your report, at the top line, We take issue

 8   not as much with what is included in the KM

 9   report, close quote, I'm going to stop right

10   there.

11        A.  Okay.

12        Q.  Does that mean that you don't take

13   issue with what they didn't choose to include

14   in their report, that analysis?

15        A.  Well, as I say later on in my

16   report, their report was a summary and they,

17   you know, summarized the information, they

18   didn't include the exhibits.  So I said words

19   to the effect, since they didn't produce

20   their file, a more comprehensive report, we

21   couldn't recreate their work.  But we weren't

22   in the position to fully agree or disagree,

23   but we noted some congruence with what we had

24   seen with what they had done, and we said we

25   are not taking issue with certain analyses
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                      R. Paulikens

2     they had actually been done for purposes of

3     our response report.  I'm paraphrasing but I

4     think it's almost a quote.

5          Q.  What does it mean to not take issue

6     when you are a rebuttal expert?

7          A.  For purposes -- when I say that, I'm

8     saying, okay, I can accept what they're

9     saying, at least insofar as this whatever

10    piece I'm discussing.  And if I don't have a

11    position to disagree with them, then I won't

12    necessarily take issue, because maybe they're

13    right on this piece of what they did.  And

14    I'm not going to argue it if there's nothing

15    to argue.  And I said that, I think, very

16    clearly in the report.

17         Q.  Okay.  I mean, in other words, just

18    to be more concrete, what you're referring to

19    now, the part of their report that you don't

20    take issue with, correct me if I'm misstating

21    this, is the 2019 reconciliation part; is

22    that right?

23         A.  Well, a little bit more granular.

24    The way they did their report, they compared

25    invoices and tried to locate the exceptions,
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                      R. Paulikens

2     which I don't have a problem with from a

3     methodology perspective.  And they came out

4     with the 600-odd-thousand dollar difference.

5     I wasn't offended by that result, for the

6     piece that they did do in their report.

7             So that's what I'm saying.  We're

8     not taking issue with that portion of their

9     report.  I took issues with the stuff that

10    wasn't in the report.

11        Q.  All right, and you make that clear?

12        A.  I tried to.

13        Q.  Okay.  I may come back to the part

14    that you don't take issue with, but I'm going

15    to try to proceed in a different way for a

16    moment.

17            Just looking at your language in

18    your report on page 2, forgive me for

19    bouncing around, I'll just try to direct you

20    clearly to what I'm speaking to specifically

21    in your report.

22            At the top again, you say the KM

23    report simply reconciled the claims of the

24    litigants, et cetera.  I want to ask you

25    about what you mean by "simply" there.  Was

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2    that meant as criticism or just description

3    of what they did?

4        A.  Just a description.  And I don't

5    think they used the word simply.  But in

6    their report they said, and I'm paraphrasing,

7    we compared the CTX reconciliation to the

8    Benlida reconciliation.  And they did not

9    look to the source documents, they didn't

10   seek to validate the underlying data.

11          They were pretty descriptive in the

12   report that they can -- they compared this to

13   this, and produced what they produced.  And

14   that's what they did.  Perhaps that's what

15   they were asked to do.  But what I'm saying

16   here is, that's what they did, they didn't go

17   through and do a forensic analysis of the

18   underlying documents.  They didn't go to

19   provide assurance that the CTX source

20   information was correct.  They relied upon

21   what was given to them by CTX and Benlida,

22   and didn't go any further to vet or validate

23   the underlying data, and they said that

24   clearly.

25       Q.  And part of the reason that you
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    don't take issue with that part of their

3    report is that the data that they relied on

4    from CTX was also passed through Benlida

5    during that reconciliation process, right?

6         A.  Well, part of it is that, well, I

7    don't take issue with it because they were

8    very clear that what they didn't do.  So I'm

9    not going to jump up and down when somebody

10   says I didn't do something to say that they

11   didn't do it, you know, to blame them, for

12   lack of a more eloquent term, that they

13   didn't do it because they were clear.  But

14   they still didn't do it.

15        Q.  Now, one of the things they did do,

16   though, right, is that they verified the

17   numbers at a transactional level, right?

18        A.  They verified, they compared the

19   two.  You know, when you use the word verify,

20   is that going back to the invoices?  I don't

21   believe they did that, the way I read the

22   report.

23        Q.  I'm saying in terms of looking at

24   each transaction that's logged somewhere in

25   the data that was exchanged between

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                   R. Paulikens
 2    Circuitronix and Benlida in the
 3    reconciliation process?
 4        A.  All right, perhaps I'm not following
 5    your question.  So maybe let's try it again
 6    so I can answer it.
 7        Q.  So I'm asking you whether they
 8    verified the numbers in the reconciliation
 9    documents at a transactional level?
10        A.  I don't believe they verified the
11    numbers at the transactional level.  The way
12    I understood what they did, they compared,
13    and I'm going to use this by way of example,
14    the list of information.
15            For example, the invoices was
16    67-million-odd dollars of invoices, that the
17    parties agreed on.  And so they compared that
18    and said, okay, Circuitronix agrees with
19    Benlida.  We're done with that.  And then
20    they show it in their report.  And they did
21    the same thing with the payments and then
22    they look for the discrepancies.
23            So you say verified.  They compared
24    the two data sources or the two party's data.
25    Verify to me maybe also goes a little
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2    further.  Did they go to the actual invoices,
 3    did they go to shipping documents, and they
 4    did not.
 5        Q.  So let's use a different verb.
 6            Are you aware that they looked at
 7    the numbers reported for individual
 8    transactions in Excel spreadsheets which
 9    summarized those numbers?
10            MR. LERNER:  Objection.
11            You can answer.
12        Q.  Do you follow me?
13        A.  Can you repeat?  No, I don't.
14        Q.  Okay, I think his objection was
15    vagueness, too, so let me try to be clear.
16            You received their supporting
17    documents, correct?
18        A.  Yes.
19        Q.  And you've incorporated those into
20    the USB, that's what we've gone over.
21            You're aware that a lot of these
22    Excel spreadsheets that were exchanged
23    between Circuitronix and Benlida during their
24    reconciliation process in 2019 had not just
25    summary pages but then also individual time
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2     period tabs which listed by transaction

 3     amounts, correct?

 4          A.  Reams of them, yes.

 5          Q.  Right.  That's what I'm referring

 6     to.

 7               Are you aware that what Kapila

 8     Mukamal and Parisi -- the names of our

 9     experts are Barry Mukamal and Mark Parisi --

10     for the benefit of our court reporter.  So

11     we'll call it the KM report for short.

12          A.  Um-hum.

13          Q.  You are aware that for purposes of

14     the KM report that they went to the

15     transactional level in those reconciliation

16     spreadsheets and worked from the ground up to

17     assess those numbers?

18               MR. LERNER:  Objection.

19          A.  They didn't disclose that's what

20     they did.  They provided summaries in the

21     four corners of the report and they did not

22     provide their work product to show the

23     analysis that they did.  And I said that I

24     didn't disagree with their analysis, I said

25     you didn't show your work product so I could
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2    agree with their analysis.

3          They -- I believe they did exactly

4    what you said.  They used Excel and dated

5    extraction tools, but they didn't put a

6    trail.  They put a table in their report and

7    said, here's the total, and that's what I

8    commented on.

9       Q.  So you haven't seen that, but you

10   don't dispute that that's what they did, if

11   that's what they say they did?

12      A.  I believe that's what they did.

13      Q.  Okay.

14      A.  That's why I say, I can't agree or

15   disagree.  Because I think that's exactly

16   what they did, but they didn't provide the

17   work product -- I'm sorry, yeah, work product

18   in order to trace it.  But I didn't -- that's

19   why I said, I don't take issue with it.

20   Because what they resulted in made sense, at

21   least as far as they took it.

22          MR. LERNER:  At least in terms

23       of --

24     (Whereupon, at this time, the requested

25   portion was read by the reporter.)
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        A.  At least as far as they, meaning KM,
 3    took their analysis.
 4        Q.  KM also independently identified
 5    some discrepancies between the two companies'
 6    reconciliations, right?
 7        A.  Yes.
 8        Q.  You don't take issue with that?
 9        A.  No, because again, they were
10    comparing two data sources that ought to
11    agree so their methodology should have kicked
12    out things that didn't.
13        Q.  And one of the things that you don't
14    fault them for doing was emphasizing that
15    they didn't perform any other analysis of the
16    underlying claims?
17        A.  Repeat that?
18        Q.  So let me look at page 2 of your
19    report, I'm quoting you.
20            Are you with me?  Page 2, the
21    paragraph that begins Further.
22        A.  Um-hum.
23        Q.  You wrote, The KM report emphasized
24    that it did not perform any other analysis of
25    the underlying claims, period, right?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2      A.  Yes.

 3      Q.  But they actually did perform some

 4   additional analysis, didn't they?

 5      A.  Well, on the italicized portions

 6   they relied upon the records of CTX as

 7   produced, the reconciliation, the Benlida

 8   recon, and this is a quote from them.  And

 9   they did not perform any additional

10   procedures to provide assurance as to the

11   reliability beyond the procedures enumerated

12   herein.

13          So what they're saying is, we did

14   what we did, we've communicated what we did,

15   and that's all that we did.

16      Q.  But they say, Beyond the procedures

17   enumerated herein, right?

18      A.  Yes.

19      Q.  And they did do some things to

20   ensure reliability, correct?

21              MR. LERNER:  Objection.

22      A.  Again, we're getting into what's

23   reliable.  They compared two lists together

24   to come up with a list that has the totality

25   of the information.  Did they dig behind the
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens
 2    numbers to determine that the list, the
 3    sources that populated both lists are, in
 4    fact, accurate and complete?  My
 5    understanding is they did not do that step.
 6        Q.  At all?
 7        A.  At all.  And I think they say that
 8    reasonably clearly.  That's all I'm saying
 9    here.  They didn't go -- they took the list,
10    they compared the list, that's a certain
11    amount of analysis and verification.  But
12    they didn't go behind those lists in their
13    work.
14            MR. ROSENTHAL:  Do you have a
15        copy of their report?  Did you print
16        one, Rich?  The Kapila Mukamal
17        report?
18            MR. LERNER:  No.
19            MR. ROSENTHAL:  Off the record.
20            (Discussion held off the
21        record.)
22        Q.  So referencing the KM report?
23        A.  Okay.
24        Q.  Take a look at paragraph 15 on page 6.
25            MR. ROSENTHAL:  And we will
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2         mark a clean copy of the KM report as
 3         Exhibit 147.
 4              (Whereupon, at this time, the
 5         above-mentioned KM report was marked
 6         as Exhibit 147 for identification.)
 7   BY MR. ROSENTHAL:
 8         Q.  Mr. Paulikens, do you see where they
 9   say, We compiled the detailed database and
10   identified transaction level of discrepancies
11   between the two reconciliations?
12         A.  Yes.
13         Q.  Did you ever see that detailed
14   database that they're referencing?
15         A.  To me, that's a database that they
16   created and I haven't seen their work
17   product.
18         Q.  So did you look through the
19   materials that we produced that was their
20   work product to see if that detailed database
21   was there?
22         A.  I didn't see that database when I
23   went through their documents and I was
24   responding to the report here.  Because I
25   didn't see exactly where these numbers
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

                    R. Paulikens

1

2   specifically came from.

3       Q.  Okay.

4       A.  But --

5       Q.  Let me ask you.

6           MR. LERNER:  He pointed in the

7       document to certain numbers.  Can we

8       just identify for the record what

9       those numbers were?

10          THE WITNESS:  That was Table 1.

11      Q.  Of page 7 of the KM report?

12      A.  Yes.

13      Q.  Okay.  Let me ask you to turn to

14  paragraph 24 of the KM report, which is on

15  page 10 at the top.

16          Do you see that they say, To

17  investigate further, we judgmentally selected

18  DMs with an amount in excess of $10,000?

19      A.  Yes.

20      Q.  Do you see that?

21      A.  Yes.

22      Q.  So they actually did do a judgmental

23  sample of debit memos to check the accuracy

24  of Circuitronix's numbers listed in its

25  reconciliation, correct?

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                      R. Paulikens

2         A.  They judgmentally selected them and

3    traced numbers, yes.

4         Q.  So that's beyond just accepting the

5    numbers face value from the reconciliation

6    report, correct?

7         A.  No.  From my chair, they simply

8    traced one set of numbers to the other set of

9    numbers.  When you talk about validate --

10        Q.  Sorry, I didn't say validate.  Just

11   to be clear to what you're testifying --

12        A.  Okay.

13        Q.  -- they traced one set of numbers to

14   another set of numbers.  What specific --

15   what sets of numbers do you understand they

16   did?

17        A.  I'll read what they said.  They

18   judgmentally, which is a specific auditing

19   term, selected debit memos, DMs, with an

20   amount in excess of 10,000.  Fine, that's a

21   scope, which were claimed on one

22   reconciliation which is largely an Excel

23   sheet, from Circuitronix's side.

24        Q.  Okay.

25        A.  Which is not listed there.  But
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens
 2    it's -- and they said they agreed.  So the
 3    debit memos that Circuitronix claimed also
 4    showed up on Circuitronix's reconciliation,
 5    that's the way I interpret that first
 6    sentence.
 7        Q.  Okay.  But is it -- do you
 8    understand it also to mean that they looked
 9    at individual debit memo documents and
10    compared what was said on those individual
11    debit memo documents to the spreadsheet that
12    listed those debit memos?
13        A.  It said judgement is like the debit
14    memos.  To me it's not clear if they actually
15    looked at the debit memo or the electronic
16    support for the debit memo.
17        Q.  Okay.
18        A.  And it doesn't say that they went
19    back beyond the debit memo itself to
20    determine if the information that is
21    summarized in the debit memo is correct.
22        Q.  And if you look at footnote 18 of
23    that report, right there they said they
24    yielded a sample of 11 debit memos with an
25    aggregate amount of a certain amount of
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2   money?
 3       A.  Right.
 4       Q.  So you don't know one way or another
 5   from reading this whether they looked at an
 6   individual 11 debit memos, the amounts that
 7   were listed on them or not, right?
 8       A.  Well, it says they selected a
 9   sample, fine.  But it doesn't say how far
10   they went to validate the information
11   contained within the debit memo.
12       Q.  The debit memo, as you're familiar
13   with in this case?
14       A.  I've seen copies of them.
15       Q.  And they are -- they list a, like a
16   reason and then an amount of money, right?
17       A.  Correct.
18       Q.  So do you question whether or not
19   the KM report, the experts actually look at
20   the 11 debit memos that they say they
21   sampled?
22       A.  No.  I don't dispute that they
23   looked.
24       Q.  Okay.
25       A.  What I -- what's unclear is did --
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2   what, if any, steps they did to validate that
 3   the reason for your example was appropriate.
 4   And I'll use the term agreed in quotes, that
 5   it was an appropriate reason.  They compared
 6   the numbers, they compared the debit memo,
 7   they compared it to the CTX reconciliation,
 8   they compared it, all good, all appropriate.
 9   But how far they went to determine if the
10   debit memo itself was valid, they didn't say.
11        Q.  Okay.
12              MR. LERNER:  Just for clarity,
13         I just want to make sure for the
14          record that we understand that this
15          is Table 4 of the KM report.
16        Q.  So if you would take a look at
17   Exhibit 147, the KM report, paragraph 33.
18   It's on page 12.
19          Do you see that they say that they
20   selected a judgmental sample of 8 lead time
21   penalty spreadsheets and confirmed the
22   accuracy of CTX's computations of lead time
23   penalty?
24        A.  Yes.
25        Q.  So you don't dispute that they did a
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    judgmental sample of that data either, right?

 3         A.   No.   I don't believe that they did,

 4    you know, they took eight of the -- I'm not

 5    sure what the population of spreadsheets are,

 6    there's a lot of them, and they checked to

 7    make sure they calculated correctly.

 8         Q.   They being Circuitronix?

 9         A.   Well, I'm sorry, let me be clear.

10         I don't dispute that KM did exactly

11    what they said.  They looked at 8

12    spreadsheets and reviewed that the math

13    calculated.  So if it was late by two weeks,

14    it was "X" percent penalty.  I don't doubt

15    that they did that for the eight

16    spreadsheets, and that they did check the

17    math, I don't doubt that at all.

18         Q.   And here they footnote paragraph --

19    footnote 22, that they didn't validate the

20    inputs used to compute the lead time

21    penalties?

22         A.   Correct.

23         Q.   And that's appropriate to disclose?

24         A.   It's absolutely appropriate to

25    disclose, which is why I said that very much
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    upfront in my report.  They were clear what

 3    they did or did not do.

 4         Q.  So let's come back to page 2 of your

 5    report.

 6              You reprinted this chart, this

 7    table, which is designated Table 7 from the

 8    KM report, right?

 9         A.  Correct.  We made a change, because

10    we noticed there was a math error, which is

11    why I highlighted it in yellow, which is what

12    their report was.  So their report cut off

13    immediately to the right of the yellow

14    portion.

15         Q.  Right.  So you added, and we talked

16    about this when we were looking through your

17    materials on the USB, the last column that

18    says, Difference with math correction?

19         A.  Correct.

20         Q.  And so what is the math error that

21    you identified?

22         A.  If you look across, and I'm looking

23    at the payments from Table 2, which is for

24    CTX, it was $67,623,456.  Compare that to

25    the one for Benlida next door, there's a
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens
 2    $12,000 -- $12,614 difference.
 3          Same math for the next column.  662,
 4    they cover that in the report.  And then
 5    debit memos are comparing the two totals
 6    here.  And they go from 2.3, 2.13 --
 7    $2.313 million, excuse me.  And for Benlida
 8    it was a million 843.  And they said it was,
 9    97,000 was the difference.  And that's not
10    the difference between those two numbers.
11    It's actually a much bigger difference than I
12    pointed out.
13        Q.  That's the 470,000?
14        A.  The 470,000.  And I just pointed
15    that out.  So if it's a simple math error,
16    okay, it happens.  But following their table,
17    I got, you know, a significantly different
18    number.  And that's all I'm pointing out.  I
19    don't know if there's anything else behind
20    the 97,000, as to why that's the number and
21    there's just a piece that's not clear.
22        Q.  What is the import of that
23    difference?
24        A.  It makes -- it means that the
25    amounts due to Circuitronix are higher than,
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                   R. Paulikens

 2    all things held equal, than KM had in their

 3    report.  So they had a difference of 747,000

 4    in their report, and the difference here is a

 5    million -- $1,120,000 and change.

 6         Q.  And that number represents the sort

 7    of delta between what Circuitronix says it is

 8    owed, Circuitronix U.S. says it's owed, and

 9    what Benlida says it owes to Circuitronix

10    U.S.?

11              MR. LERNER:  Objection.

12         A.  Between the two formulas, yes.  What

13    one party admits it owes or doesn't owe and

14    it's probably the reason why we're here.  But

15    for purposes of this table, that's what you

16    said is -- that's the difference between what

17    CTX says Benlida owes it versus what Benlida

18    says it owes Circuitronix.

19         Q.  And we're talking about Circuitronix

20    U.S. in that particular?

21         A.  Yes, yes.

22              THE WITNESS:  Can we take

23         another quick break?

24              (Whereupon, a brief recess was

25         taken.)
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    BY MR. ROSENTHAL:

 3         Q.  I want to ask you about some

 4    limitations on the scope of your opinion or

 5    work that you've done.

 6         A.  Okay.

 7         Q.  I believe on page 3 of your

 8    report -- well, I'll do this generally and

 9    you can tell me if there's a specific part of

10    your report that we should look at.

11              But my understanding is you've not

12    been engaged to opine on the validity or

13    appropriateness of debit memos between the

14    companies; is that correct?

15         A.  Yes, yes.  There is -- part of the

16    dispute is there's debit memos that would

17    reduce potentially amounts owed, and we nor

18    KM were engaged to opine whether those debit

19    memos were appropriate or agreed or

20    supported.  So I did not provide that

21    opinion.

22         Q.  Okay.  And what is the function, in

23    your understanding, of the function of debit

24    memos that Circuitronix U.S. issued to

25    Benlida?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2        A.  Well, the function would be a

3    reduction of the amounts that Circuitronix

4    owed.  Let me be a little bit more clear.

5            In a typical accounts receivable

6    where a customer owes the supplier money, a

7    debit memo is the reduction of the amounts

8    that are owed.  And I know there's -- we're

9    kind of in the opposite world here so I just

10   want to be clear.

11           So the debit memos that Circuitronix

12   U.S. claimed against Benlida would certainly

13   reduce, would go against whatever amounts are

14   owed or would add if there's an overpayment.

15       Q.  Right.

16       A.  They function almost as an -- almost

17   like a payment functionally.

18       Q.  So have you taken -- undertaken any

19   analysis of the debit memos in this case?

20       A.  No, we have not.

21       Q.  We touched on earlier some

22   information that you gleaned from your

23   attendance at the hearing in Miami back in

24   January of 2023?

25       A.  Yes.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        Q.  Do you recall that?  And at the top
 3    of page 3 of your report, you reference that
 4    at the very top paragraph.
 5            Do you see that?
 6        A.  Yes.
 7        Q.  So the second paragraph on page 3,
 8    you say, This fact as well as the actions
 9    both sides needs to be considered to fully
10    understand?
11        A.  Yes.
12        Q.  What are you referring to, what is
13    "this fact"?
14        A.  The fact that there was a long-term
15    business relationship, but as well as the key
16    members of a long relationship.  My
17    understanding is the principals know each
18    other, they're friendly, that they are --
19    that because they are friendly, you know,
20    it's not quite the same as the true
21    unrelated, you know, adverse parties in a
22    typical economic transaction.
23            There's a certain level of
24    familiarity, and all I'm saying is, based on
25    some of the testimony you need to incorporate
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

                        R. Paulikens

1

2      that before you say, you know, before you

3      opine that one piece of the information is

4      absolutely correct when there's other pieces

5      that affect it.  You know?

6           Q.  So what is your understanding -- you

7      write in your report, A long relationship

8      outside of business.  What are you referring

9      to there?

10          A.  They've known each other for a

11     number of years.

12          Q.  You say outside of business?

13          A.  Well, exactly.  Outside of business,

14     they talked about, there was familiarity,

15     they've had dinners and other things

16     together.  Tracy discussed that a little bit.

17     Rishi discussed he was helping out Mr. -- I

18     believe it's Huang is the right way to say

19     his name within his testimony.

20               It certainly sounded like there was

21     more familiarity than simple supplier and

22     customer.  And all I'm saying is, they talked

23     about it.  They didn't deny it.  That's just

24     a fact that one ought to consider when you're

25     looking at the overall relationship.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2        Q.  Do you recall hearing, perhaps,

 3   Rishi's testimony at that hearing that he

 4   considers Tracy Huang a friend?

 5        A.  I believe that's a recollection I

 6   absolutely have.  How he specifically said

 7   it, I couldn't -- but, yes.

 8        Q.  I'm paraphrasing as well.

 9        A.  Yes.  The intent, absolutely, that

10   they were friendly.

11        Q.  Do you believe that people engaged

12   in a traditional business relationship are

13   not usually friends with one another?

14        A.  You can be friends with the people

15   you transact business with.  My impression

16   was there -- it was more than just the

17   familiarity of somebody you do business with

18   on a daily basis.  That was my impression of

19   his testimony.

20        Q.  Are you suggesting anything beyond

21   the fact that they just seem to be friendly

22   with one another?

23        A.  No.  But as I recall his testimony,

24   he was indicating that, and I am

25   paraphrasing, you know, that he had helped
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2     out Benlida or Mr. Huang in earlier stages,

3     which suggested maybe a little bit more than

4     just a commercial relationship.

5         Q.  Helped out how?

6         A.  I believe there was money, Rishi

7     said, that was advanced.  And I'm not

8     specific on exactly the story, but a part of

9     his testimony he talked about that there was

10    a certain familiarity that he considered all

11    of them friends.  And maybe I think he used

12    the word mentor or something else.

13        Q.  And how does your understanding of

14    that relationship play into your evaluation

15    of the financial dispute between these

16    companies?

17        A.  It plays into the inverse

18    relationship towards the end of my report

19    that discusses that one entity claims it

20    overpaid its supplier by 5-million-odd

21    dollars and that another entity that's

22    clearly related was underpaid by 13 million

23    from the chart we talked about.  And

24    individually, you wouldn't have those kind of

25    transactions.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2            Ordinarily, a supplier doesn't
 3    over -- a customer doesn't overpay its
 4    supplier ever.  Or certainly not by months
 5    worth of revenue.  And you don't have another
 6    supplier that may have one year of sales --
 7    one year of transactions being owed.
 8            I mean, individually, those are odd
 9    transactions.  And I covered that in my
10    report, which is simply wanting to say why is
11    that.  It doesn't make sense that these two
12    pieces are so isolated and disparate.
13        Q.  So you're saying what might explain
14    it is the fact that there is some close
15    personal relationship between the principals
16    of the two sides?
17        A.  Right.  It could be a close personal
18    relationship, but you need to understand how
19    one half can have such an odd relationship in
20    terms of an overpayment of accounts
21    receivable, and then the other side has a
22    significant underpayment of accounts
23    receivable, when you take into consideration
24    the whole.  And it's just an odd situation.
25    And when you look at the whole, the
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    relationship makes sense how the individual

 3    parts got off.  There has to be a reason for

 4    it.

 5       Q.  Do you fault the KM report authors

 6    for not giving some credit to this

 7    relationship that you're describing between

 8    the principals?

 9       A.  No, I'm not -- I'm not faulting

10    them.  I'm not giving credit for their

11    relationship.  What I said is, KM didn't

12    discuss anything other than in a footnote of

13    the existence of another issue, which is the

14    KM issue -- I'm sorry, the HK issue.

15           I'm sorry, the KM report didn't

16    discuss, other than in a footnote, the HK

17    issue.  That's what I was faulting KM on.

18    Because they didn't mention it at all, other

19    than in a footnote that they might come up

20    with a report if so asked later on.

21       Q.  Looking again at page 3 of your

22    report, second to last paragraph, the last

23    line.  I'll give you a second to look at that

24    paragraph.

25           (Witness peruses document.)
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2       A.   Okay.

 3       Q.   You are referring to these detailed

 4  lists of invoices and payments that were

 5  exchanged by the parties during their

 6  reconciliation process.  And you say, Those

 7  records provide useful insight as to the

 8  payment status of the business transactions

 9  between the parties.

10       A.   Yes.

11       Q.   You agree that relying upon those

12  reconciliation spreadsheets does provide

13  useful insight as to where things stood in

14  2019 ultimately, correct?

15       A.   Yes.

16       Q.   Okay.  But then you say that -- I'm

17  looking for where you say this.  The next

18  page, page 4, I think, somewhere you say,

19  It's difficult for either side to know which

20  source is the final word.

21       A.   Top paragraph of page 4?

22       Q.   Right.  What do you mean by that?

23       A.   Sure.  In this particular case, the

24  case was at one point settled.  At least

25  nominally, I think, was the phrase you used.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                   R. Paulikens

 2      And as an accountant, I understand settlement

 3      talks are not discoverable.  Understood.

 4      Certainly the parties working to reconcile

 5      their differences.

 6              As an accountant, when somebody

 7      might say that's a settlement discussion,

 8      somebody else might say, that's just two

 9      businesses trying to get to the right answer.

10      And all I'm saying in that paragraph is, this

11      information is useful, it's discoverable, and

12      it provides useful information.  Perhaps not

13      definitive, because each of the -- you know,

14      I didn't say this, but it provides useful

15      insight, which I chose those words because

16      it's useful to get to the ultimate

17      conclusion.

18          Q.  I read this and understood you to be

19      saying, so maybe I'm incorrect, that with

20      respect to the sort of ping-ponging back and

21      forth in 2019 of different reconciliation

22      reports between Benlida and Circuitronix

23      U.S., that the last one exchanged can't be

24      regarded as sort of the final word in that

25      exchange; is that what you meant?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2        A.  That's partially what I meant.  And

3    because with each ping-pong, to use your

4    phrase, there was more information that came

5    to light, and I don't know that there has

6    been a definitive answer that at a point in

7    time there is a specific amount due, whatever

8    measure that the parties can agree to because

9    then the disputes as to who owed what to whom

10   took over and statute of limitations issues

11   take over.

12           So all I was saying is, with all the

13   information going back and forth, which was

14   somewhat disparate they were working to

15   clarify, I don't know that anyone knows at

16   this moment what the absolute final agreed

17   upon dataset between all of the related

18   parties is.

19       Q.  You'll agree that the last one of

20   those reconciliation spreadsheets exchanged

21   between the parties at least reflects the one

22   with the most input from both sides as of

23   that time period, didn't you?

24       A.  I would agree that that would make

25   the logical inference that was whatever was
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    contained was as complete as the parties had

 3    available to them.  But then there's, you

 4    know, there may be other claims that were

 5    added such as the lead time penalties that

 6    were, I think, after.  But, again, there's a

 7    bouncing back and forth, information maybe

 8    was coming together.

 9        Q.  But with respect -- I'm sorry.

10        A.  But with that last piece, it

11    probably was, at least at that moment, the

12    up-to-date of what they were exchanging.  But

13    it is also unclear if that up-to-date also

14    went back to day one.

15        Q.  Well, they originally did, if I'm

16    remembering correctly, a 2015 to 2019

17    reconciliation, right?

18        A.  That covered that time period, yes.

19        Q.  And then Benlida sought earlier

20    records from Circuitronix going back to 2012,

21    the inception of the relationship, right?

22        A.  Correct.

23        Q.  And then the reconciliation then

24    encompassed 2012 to, I think, 2021, right?

25        A.  There were spreadsheets that
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    obviously evolved after '19, yes.

3        Q.  But they went back to 2012 as well,

4    correct?

5        A.  They did.  But what's unclear from

6    the spreadsheets, and you saw when we had

7    that exhibit on the screen, was that they

8    showed the running balance for each year and

9    I put a cumulative column in.  It's unclear

10   if it went -- if the 2012 went all the way

11   back to invoice zero.

12       Q.  Do you know whether it did or not?

13       A.  As I'm sitting here, I don't know.

14   But as I was saying in that paragraph,

15   there's a lot of information back and forth

16   for disparate time periods.  And so it's, you

17   know, with what I've seen, it's impossible to

18   know that we have a definitive answer today

19   as to what both parties can agree on.

20       Q.  You make a comment on page 4 of your

21   report that at the end of the first full

22   paragraph, It is difficult to appreciate why

23   there was so much information missing from

24   each other's records; close quote?

25       A.  Yes.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                     R. Paulikens

2        Q.  Are you -- what's the point of

3    saying that?  Why do you flag that?

4        A.  Because you've got two fairly

5    substantial companies that have a significant

6    disagreement on accounts receivable and

7    accounts payable.  And it's just odd in

8    35 years of accounting that you would be that

9    far off, that they didn't have this going on

10   all the time.  It just seemed to me odd that

11   they would be -- one side would be missing so

12   much information from the other.

13       Q.  Do you intend to offer an opinion

14   about it being odd in this case, like tie in

15   to anything germane to the numbers that we're

16   talking about?

17            MR. LERNER:  Objection.

18       A.  I haven't been asked to give a

19   formal opinion on that, but as we're looking

20   at reconciliations, you know, when you have

21   your millions of dollars being, you know,

22   bounced back and forth between them for two

23   sophisticated companies, it's just not

24   typical.  You know, what I've seen, you would

25   normally have a little bit better control on
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens

 2    each side to know what the other was talking

 3    about.

 4        Q.  Do you intend to offer an opinion

 5    about the controls on Circuitronix's side of

 6    its records?

 7              MR. LERNER:  Objection.

 8              You could answer.

 9        A.  I have not been engaged to do a

10    study of Circuitronix's internal control

11    mechanisms.  That would be part of their

12    audit.  So I'm not going to give you an

13    opinion on something I haven't been engaged

14    to do.  So I'm not, at this point going to

15    give an opinion, because I haven't been

16    asked.

17        Q.  Same thing with respect to Benlida.

18    Have you been asked to evaluate its internal

19    control methods for its documentation of its

20    finances?

21              MR. LERNER:  Objection.

22        A.  I have not been asked.  That would

23    be part of their audit process.

24        Q.  Do you intend to offer any opinion

25    in this case about the state of
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2     Circuitronix's records compared to the state

 3     of Benlida's records?

 4              MR. LERNER:  Objection.

 5              MR. ROSENTHAL:  What's your

 6         objection?

 7              MR. LERNER:  Is it going to

 8         come up as a direct opinion?  It may

 9         come up as part of an explanation of

10         his opinion -- of other opinions he

11         may give.  But it's not going to be

12         an ultimate opinion that he provides.

13              MR. ROSENTHAL:  Okay.

14         Q.  In light of Mr. Lerner's response,

15     can you answer whether you intend to offer an

16     opinion about the state of Circuitronix's

17     records compared to Benlida's records in this

18     case?

19         A.  Other than the fact that they're

20     different, and that the actions of the

21     parties showed that there were significant

22     differences, and that to me is just an odd

23     oddity, given the, I think, sophistication of

24     the parties, at least my perceived -- my

25     perception of their sophistication.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2              It might be an explanation to a

3    question that comes up, but I'm not studying

4    the internal controls of Circuitronix or

5    Benlida.

6         Q.   What is your perceived -- what is

7    your perception of the comparative state of

8    the two company's records, Benlida and

9    Circuitronix U.S.?  Do you have one or not?

10        A.   No, no.  I think you misheard what I

11   was saying.

12        Q.   Okay.

13        A.   I said perception of their

14   sophistication.  Circuitronix is a

15   substantial company.  I believe they do

16   business in multiple continents.  Benlida is

17   a substantial company.  And the fact that

18   they were missing as much as they did between

19   the two, is just not something I normally see

20   at companies that significant and, I believe,

21   sophisticated when you are doing business in

22   multiple continents.

23        Q.   Okay.  Take a look at page 4.

24   There's a paragraph that starts -- you're

25   talking about this issue, I believe.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1              R. Paulikens

 2      A.  Yes.

 3      Q.  You say, The significant disparity

 4  in information in the implication that any

 5  one source is better is best illustrated by

 6  an e-mail.  And we'll leave that for a

 7  moment.

 8          I want to ask you, the implication

 9  that any one source is better, what are you

10  getting at there?  Are you saying that there

11  is an implication that one source is better

12  than the other or you shouldn't assume that?

13  I don't understand the language.  That's why

14  I want to ask you, what do you mean by the

15  implication that any one source is better?

16      A.  Sure.  It can be a bit of an

17  explanation.

18      Q.  Okay.

19      A.  Typically, if you have, you know, a

20  customer, you know what they owe you.  And

21  that customer knows what it owes you.  And

22  within some, you know, ordinary economic

23  timing differences, you have a pretty good

24  handle as to where you stand.  And usually

25  your customer owes you money not the other
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2    way around.

3            And because of the functions, even

4    as I said in the e-mail, that one entity has

5    a $13 million balance due and the other

6    entity has a $5 million amount due, on some

7    set of records, then his e-mail talks about

8    CTX U.S. overpaid Benlida by 5.3 million, and

9    then Hong Kong also was overpaid by 2

10   million, shows there's a huge swing there.

11           Because -- so one set of information

12   produced showed 13 million that Hong Kong

13   owed Benlida.  And -- but Rishi in his e-mail

14   says, no, at least in sequence, no, Hong Kong

15   actually is owed 2 million, that's a

16   $15 million swing.

17           All I'm saying is, there's a lot of

18   pieces moving here.  And taking one

19   particular chart or another particular chart

20   as gospel is not advised.

21       Q.  That's what you mean by, if I'm

22   understanding you correctly, you can't say

23   any one particular source is better?

24       A.  That's really what I tried to say,

25   is because it's -- and there are disparate
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens

 2    pieces of time which are disparate.  So to

 3    say one is better than the other right now, I

 4    don't think is appropriate for anybody.

 5         Q.  Okay.  And then when you say,

 6    Significant disparate information, you're

 7    alluding to what I think you just explained,

 8    which is that Mr. Kukreja thought in an

 9    e-mail, which we'll talk about in more

10    detail, that Circuitronix Hong Kong was

11    actually owed by Benlida 2.179 million, when

12    there's another view of the evidence in a

13    spreadsheet that shows a $15 million swing

14    from that.

15         A.  Correct.  And all I'm saying is,

16    this is some big movements.

17         Q.  I understand what you've written

18    now.

19              Let's talk about that e-mail.  I

20    know you volunteered earlier in the

21    deposition that there's an error in the date.

22    Correct?

23         A.  Yes.

24         Q.  What is the correct date?

25         A.  It's November 1, 2019.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1              R. Paulikens
2       Q.  Is there a November 11, 2012 e-mail
3   that you were talking about?
4       A.  No.  It was me making -- I wrote --
5   I marked this up.  I apologize.
6       Q.  That's okay.
7       A.  The document, I marked it.
8           MR. LERNER:  The actual
9        exhibit.
10          MR. ROSENTHAL:  We'll just note
11       for the record that the handwritten
12       mark is Mr. Paulikens indicating a
13       typographical error that was in the
14       report.
15      A.  Yes.  Now, I don't -- if there is an
16  e-mail from 2012, I'm not aware of it.  I
17  wrote that e-mail.  It was -- it had Chinese
18  characters around it.  When I typed it in, I
19  just typed it badly, and I didn't notice that
20  until yesterday.
21      Q.  Okay.  Let me just pull up on our
22  screen -- let me show you what I understand
23  you to be referring to.
24      A.  I'm going to stand up.
25      Q.  Sure.  Looking at the screen of the
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2      documents that you reviewed that were

3      produced to us, there's a document on here

4      that is marked with a Bates number CTX 1993

5      to 1994.

6            I'm just going to open that and ask

7      you whether the e-mail that is in that

8      document, which is dated November 14, 2019,

9      at the top but then scrolling down,

10     November 1, 2019 --

11        A.  Right.  This is the e-mail that I

12     was referring to here.  And that shows, if

13     you scroll down, some of the numbers that I

14     cite in the report and that's where I messed

15     up the date.

16        Q.  Okay.  So just for clarity sake

17     you're referring to the e-mail that is at the

18     bottom of page CTX 1993 from Rishi Kukreja

19     dated November 1, 2019, correct?

20        A.  Yes.

21        Q.  And that e-mail contains the two

22     dollar figures that are referenced in your

23     report?

24        A.  I believe so, if you scroll down.

25        Q.  Why don't you take your report, just

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    so you can follow along with me because you

 3    talk about this e-mail there on page 4.

 4           Just looking at your report, Mr.

 5    Paulikens, you say with reference to that

 6    e-mail, that the e-mail claims that CTX U.S.

 7    overpaid Benlida by $5,314,868.

 8       A.  Yes.  Can you scroll down on the

 9    next page?

10       Q.  Yes.

11       A.  Yes.  Right there.  (Indicating).

12       Q.  So that's on page CTX 1994, that

13    number?

14       A.  Yes.

15       Q.  Okay.  And then that CTX, you say in

16    your report CTX HK overpaid by $2,179,988.74.

17    And that's the number that is shown in yellow

18    on page CTX 1994.

19       A.  Correct.  These are disparate

20    numbers.  What I'm saying is, over the

21    whole -- there's just -- it's a moving target

22    as to what the right number is, and I'm just

23    saying I'm not sure what the final complete

24    picture is.  That's all that paragraph was

25    saying.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2        Q.   Okay.   Got it.

 3             Continuing on page 4 of your report,

 4   you referred to a response to Mr. Kukreja's

 5   e-mail.

 6        A.   Yes.

 7        Q.   And that it contains an Excel file

 8   with a name 2012 to 2019?

 9        A.   Right CCT.

10        Q.   Reconciliation analysis 2019,

11   November 15th, CCT?

12        A.   Yes.

13        Q.   Let me ask you again just looking at

14   your materials on the computer screen.   Hang

15   on a second, I'll pull it back up.

16             That's -- you're referring to the

17   e-mail that is right here at the top of the

18   page?

19        A.   I believe that file was included and

20   it was included in both your expert and the

21   various things, that CCT analysis.

22        Q.   And that's on page CTX 1993?

23        A.   That's the reference in the e-mail.

24        Q.   Okay.

25             MR. ROSENTHAL:   For the record,
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

R. Paulikens

1

2          that e-mail that we're looking at has

3          been previously marked as Exhibit 79.

4          Just so you know.

5     Q.   That attachment that ends with 2019

6    dot 11 dot 15 CCT, is actually in your report

7    as an exhibit, right?

8     A.   I believe excerpts of it are.

9     Q.   Let me flip to your report, the

10   exhibits to your report, which we don't have

11   printed out but we can look at here on the

12   computer screen.

13          Let me pull up your report and show

14   you Exhibit 1, and ask you whether that's --

15   let me turn it sideways.  --

16    A.   That was part of the -- yeah, part

17   of the file.  And I reprinted part of it in

18   my report, and it was at Exhibit 1.  And that

19   was part of the parties working toward

20   resolution.

21    Q.   Okay.  And I believe that's actually

22   reproduced in your report at page 5?

23    A.   Yeah.

24    Q.   So, basically, that same

25   reconciliation analysis report, 2012 to 2019

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    that's on page 5 of your report, is also at

 3    Exhibit 1 to your report?

 4         A.  Yeah, and I believe the file, as I

 5    recall, is quite comprehensive.  Because this

 6    is a summary and there's files drawing from

 7    various sub tabs.

 8         Q.  Why did you place that in your

 9    report at page 5, that table?

10         A.  Just showing that the parties were

11    working to try to resolve and figure out why

12    they were so disparate in their beliefs as to

13    what the status was.  And it was, you know, a

14    process they went through.

15         Q.  Calling your attention back to page

16    4 of your report, where you're talking about

17    the e-mail in which Benlida sent this file to

18    Circuitronix.

19              You write toward the bottom of that

20    page, quote, Many of the largest

21    discrepancies were from the earlier years of

22    the relationships, close quote.

23         A.  Yes.

24         Q.  What years are you referring to?

25         A.  If you look at the table on the next
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2      page, you'll see, if you go to the left it

 3      says year 12 -- 2012 to 2014.  You'll see

 4      there's, you know, significantly large

 5      numbers in those years and prior.

 6              Going to the middle of the table

 7      there's a million eight difference on the

 8      2014, and you see the numbers kind of drop

 9      off in the subsequent years.

10              So all I'm saying is while they

11      had -- and I'm looking at the payment

12      discrepancy, which is 2,569,000, right, I

13      guess, where your pen is, you know, the vast

14      majority of that was from 2014 and prior.

15              So all I was saying in that, you

16      know, part of the issue here, maybe was the

17      earlier part of the relationship, because

18      some of the bigger numbers here, you know,

19      were from a period of time before.

20          Q.  So if I understand what you're

21      saying correctly, at least according to this

22      effort between the two companies, between the

23      parties to reconcile their differences back

24      in 2019, this chart, as you observed, was

25      showing that at least between Benlida and
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1              R. Paulikens
 2   Circuitronix U.S., on the left side of that
 3   chart, the largest difference between their
 4   assessments of who owes whom what, occurred
 5   in 2014?
 6        A.  It's actually a little bit more.
 7   It's the differences -- there seemed to be
 8   more differences in the earlier years, '14
 9   and prior.  And I used the million eight as
10   in my answer a few minutes ago.
11        Q.  Eight million eight?
12        A.  A million eight.  I thought I said a
13   million eight.  Some of the numbers are
14   larger from the prior period, and then they
15   sort of get smaller as they, you know, as
16   they got more recent.  So maybe they got
17   better.
18        Q.  And that discrepancy represents
19   what, a difference between the two companies'
20   books about how much has been paid?
21        A.  Again, this was them trying to marry
22   their two -- I'll call it perceptions of the
23   data.  And from looking at the table and
24   looking at the backup to this table, it
25   looked like the differences were earlier in
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2    the relationship.  That's what I simply said.
 3         Q.  Have you logged those differences
 4    anywhere else independently or were they
 5    basically payment discrepancies that the
 6    parties had identified themselves in this
 7    chart?
 8         A.  Yeah, what I was referencing in the
 9    report, and this -- that was the state of the
10    data in response to those e-mails, circa
11    November 2019, that they were -- again, this
12    is one of the ping-pong balls that went back
13    and forth there.  And I just noticed, as I
14    said, that the discrepancies were earlier,
15    the bigger discrepancies were earlier.
16         Q.  And you didn't separately catalogue
17    those discrepancies independent of, like,
18    what the parties had identified themselves
19    in, for example, this chart?
20         A.  I don't follow what you're asking.
21    Maybe it's an easier question than I think it
22    is.
23         Q.  It's designed to be easy.  Did you
24    keep a separate list of the payment
25    discrepancies?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                   R. Paulikens

 2        A.  No, no.  We looked at -- I was

 3   looking at this as to partly upsetting the

 4   table going, well, how do we know which one

 5   is right when neither of the parties have a

 6   consistent set of data, and how can the trier

 7   of fact know what the ultimate resolution is

 8   if there's an inconsistent dataset between

 9   the parties.

10        Q.  Okay.  But this table at the top of

11   page 5 of your report is something that

12   Benlida sent to Circuitronix, correct?

13        A.  Yeah, I believe it was their -- a

14   response to Rishi's e-mail.

15        Q.  And they, in this chart, at the top

16   of page 5 of your report, reported two sets

17   of transactions, right?  On the left side

18   they reported transactions between Benlida

19   and Circuitronix U.S., correct?

20        A.  Yes.

21        Q.  And in the right side they reported

22   transactions between ROK and Circuitronix

23   U.S. slash HK?

24        A.  Yes.

25        Q.  Okay.  Do you know why they did
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    that?

3        A.  Why they did that?  I mean, as I

4    said, there's other entities related to both

5    parties.  And so, you know, I think

6    Benlida -- from the e-mail, I think the top

7    of the e-mail chain was asking, well, what

8    about HK?  And I saw e-mails that said, well,

9    Circuitronix U.S., what about HK?  And I

10   remember seeing e-mails that were asking,

11   hey, what about this other piece?

12       Q.  Okay.  Let me pull up that e-mail so

13   you can see it.

14           This is Circuitronix 1993, which has

15   that e-mail you're referring to.

16       A.  Yes.  So here it says, Please

17   provide DMs details for those we cannot find

18   in our records and also check the invoices

19   and payments again.  Besides the

20   reconciliation, CTX HK should also be checked

21   so that we can come to the whole picture.

22           And this was in response to Rishi's

23   e-mail of about two weeks prior.  So I said,

24   they're talking about the whole picture.  And

25   so from what I'm looking at is, one piece is

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2    not the whole picture, because they even
 3    reference, hey, what about this other piece.
 4         Q.  Okay.  So still on page 5 of your
 5    report, beneath that chart, you referenced
 6    this before, you say, We're unable to
 7    recreate KM report's results and are not in a
 8    position to fully agree or disagree with
 9    portions of their findings.
10              Are there portions of their findings
11    that you are in the position to fully agree
12    or disagree with?
13         A.  No.  Because they did what they did,
14    and that doesn't sound right, but they did
15    their work.  I think their analysis that they
16    said that they did, they did.  And it gave a
17    result.  And I didn't take issue with it.
18    I'm not, for now, disputing that the payments
19    were 67 million, and I'm not disputing that
20    the invoices, there were some slight
21    differences, I'm not disputing that.
22              And I'm not disputing, you know,
23    that the debit memos that have been
24    circulated, there is a difference, forget the
25    math error.  You know, I'm not disputing
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    that.  I think they probably did an accurate

 3    job.

 4            It's the underlying implication that

 5    that is the only piece, that is why I can't

 6    fully agree or disagree.  But as I said, I'm

 7    accepting, for purposes of this response

 8    report, that I'm not taking issue with what

 9    they did.

10        Q.  And you are gesturing to the chart

11    that's on the center of page 5 --

12        A.  Yes.

13        Q.  -- of your report, which is Table 7

14    from the KM report?

15        A.  Right.

16        Q.  In general, you're saying you don't

17    take issue with what's in that chart?

18        A.  Correct.

19        Q.  Okay.  Is that why you say fully

20    agree or disagree, you're not in a position

21    to fully disagree or agree, but you can

22    partly agree?

23        A.  As I think I used the word

24    congruence in the next paragraph.  I said,

25    look, they're kind of coming together and
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    it's not where the dispute is.

 3        Q.  Okay.  I'm trying to understand your

 4    language so I understand what your testimony

 5    is going to be.

 6            Below that chart on page 5, you say,

 7    We have not been able to recreate exactly the

 8    KM report's results.

 9            Do you see that?

10        A.  Yes.

11        Q.  Did you attempt to recreate their

12    results?

13        A.  No.  We didn't attempt to actually

14    redo their work.  But in other parts of

15    our -- when we initially started, we saw

16    similar type of trends that they came up

17    with, you know, that CTX, you know, payment

18    levels and other things.  And for purposes of

19    this, I said, actually, this kind of makes

20    some sense.  But there's more than one piece.

21            So without the detail I said -- but

22    the multitude of data source says, The

23    ongoing work with respect to litigants we

24    don't take issue with the reconciliation

25    period.  So I'm not taking issue with it.  I
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2      think it says fairly what they did and I

3      don't know that it's wrong.  I can't agree

4      with certainty that it's completely right

5      within that table.  I think I was clear, but

6      maybe not.

7           Q.  You used the term, There's a certain

8      amount of consistency.

9           A.  Yes.

10          Q.  Okay.  By which I understand you to

11     mean that the table above is sufficiently

12     reliable that you don't question it, correct?

13          A.  We're accepting it for purposes of

14     what I'm communicating here, yes.

15          Q.  And you're also accepting it for

16     purposes of the trial, I assume?

17          A.  Well, for purposes of the trial, I'm

18     saying the two data sources suggest the 5 --

19     I'm rounding for conversation -- the

20     $5 million here --

21          Q.  Wait, let me --

22          A.  -- which is the 4.7.

23          Q.  Sorry for interrupting you.  You're

24     talking about the 4.760 figure?

25          A.  Right.  And I said, for purposes of
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2      the invoices, the payments and the debit

 3      memos such as they are, there's a certain

 4      consistency that up until that subset or

 5      subtotal or stopping point, I'm not going to

 6      question that.

 7          Q.  Okay.

 8          A.  I later on say, the lead time

 9      penalties, you know, is, you know, they

10      calculate them, they recalculate them --

11      recalculated them, but I'm not necessarily

12      agreeing that they are appropriate or they're

13      valid, because that's a legal question beyond

14      either expert.

15              And, obviously, the total that KM is

16      showing is the sum of their two numbers.  And

17      I'm saying -- all I'm saying is the subtotal

18      here, for purposes of where we are, I'm not

19      going to quibble with but it's only part of

20      the big picture.

21          Q.  Got it.  So just to oil all that

22      down, we'll talk about lead time penalty

23      separately, but for purposes of the

24      reconciliation of accounts receivable through

25      2019 for Circuitronix U.S., you're not going
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2     to quibble with the 4.7 million figure that

3     KM came up with; is that correct?

4          A.  Not at this point, no.

5          Q.  Okay.  Well at what point are you

6     going to quibble with it?

7          A.  If, in fact, we have to -- there

8     comes a need that I have to supplement my

9     report or something else happens between now

10    and trial, I may -- whatever work I do then

11    may change what I'm prepared to say today.

12         Q.  Okay.

13         A.  With that caveat, at this moment,

14    the 4.7 million, based on what they did, I

15    can live with.

16         Q.  As you sit here today, based on all

17    the work you've done to date on July 20,

18    2023, you have no basis to question the

19    reliability of that figure, 4,760,847 that's

20    listed on the chart on page 5 of your report

21    for the accounts receivable for Circuitronix

22    U.S. through July 2019, correct?

23              MR. LERNER:  Objection.

24         A.  Right.  As I said, as the subtotal

25    or stopping point, yes.  Because that's only
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    one part of the whole picture.

3         Q.  As a subtotal or stopping point,

4    yes, you would quibble with it because

5    it's -- or no, you're not quibbling with it?

6    I want to understand your testimony.

7         A.  I'm sorry.  As a subtotal or

8    stopping point, I'm not quibbling with it as

9    of today.

10        Q.  Got it.  I understand your testimony

11   that it is only a part of the full picture.

12        A.  That is correct.

13        Q.  So that's the basis of your

14   criticism, correct?

15        A.  Correct.

16        Q.  Okay.  And as of today, you're not

17   aware of any other data that would call into

18   question that $4.76 million figure, right?

19        A.  I'm not aware as I sit here today of

20   other data that could, but it is possible

21   that more data may come up that may

22   materially change that number.

23        Q.  Okay, but as of now that's just a

24   hypothetical possibility?

25        A.  It's a possibility.  And given the

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2     multitude of data exchanges between the

3     parties, it might be a little bit more than

4     hypothetical that there would be data that

5     would change that number.  Materially, I

6     don't know.

7          Q.  Are you aware that discovery in this

8     case has ended?

9          A.  Understood.  But you said what I'm

10    aware of.  There could be data that could

11    change the number.

12         Q.  Okay.  So at the bottom of page 5 of

13    your report, the last paragraph, you

14    transition to a different subject.  You

15    say -- you write that the KM report does not

16    include any discussion of how common or

17    uncommon it is for a customer to overpay on

18    its account to the level concluded to in the

19    KM report, close quote, right?

20         A.  Yes.

21         Q.  I take it from your prior testimony

22    today that you are referring here to what you

23    described as an unusual situation based upon

24    your experience that Circuitronix U.S. had,

25    even according to Benlida's own books, an
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2     overpaid situation to the tune of something

 3     like $4.7 million; is that right?

 4               MR. LERNER:  Objection.

 5        A.  Repeat that?  I'm sorry.

 6               MR. ROSENTHAL:  I am going to

 7          have to ask Michelle to read that

 8          back.

 9        (Whereupon, at this time, the requested

10     portion was read by the reporter.)

11        A.  Yes.  It's -- that kind of, that

12     magnitude of overpayment is strange or

13     unusual.  Sorry, unusual.

14        Q.  So how is the unusual nature of that

15     situation relevant to how much they have or

16     have not paid?  In other words, the fact that

17     it is unusual, that you flagged it in your

18     report, how, if at all, does that relate to

19     the magnitude of that difference?

20        A.  I'm not following your question, and

21     I'm sorry.

22        Q.  Let me ask it in a simpler way.

23               The fact that it is unusual doesn't

24     bear on the sort of veracity of the numbers

25     themselves, right?  They are what they are?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

| | |
|---|---|
| 1 | R. Paulikens |
| 2 | A.   Okay.  It's unusual that you have an |
| 3 | overpayment to that magnitude, which would be |
| 4 | multiple months of sales.  When you have a |
| 5 | customer, the customer ordinarily either owes |
| 6 | you, meaning the supplier, money, or they |
| 7 | don't owe you anything.  And even in |
| 8 | accounting and auditing, you look for |
| 9 | significant overpayments for potential |
| 10 | reclassification within the books of the |
| 11 | financial statements. |
| 12 | So what I'm saying is, and I'll use |
| 13 | a simple example.  If your law firm invoiced |
| 14 | $9,500 to a client, you would know they owed |
| 15 | you 9,500.  That's the typical relationship. |
| 16 | If they happened to pay your firm 10,000, |
| 17 | they would have an overpayment of $500, you |
| 18 | know, not a big deal.  If they sent $50,000 |
| 19 | where you had an over -- your client overpaid |
| 20 | you by $40,000, that is unusual, forgetting |
| 21 | retainers, for attorneys, you know, for that |
| 22 | matter. |
| 23 | That's unusual in a commercial |
| 24 | setting where you have that magnitude of |
| 25 | overpayment from an unrelated third party to |

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                   R. Paulikens

 2     a supplier.  That's why I thought it was

 3     unusual and uncommon.

 4          Q.  And you, in your report, at the top

 5     of page 6, you refer to a table on the next

 6     page about a prepaid balance.

 7          A.  Yes.

 8          Q.  And there wasn't a table on the next

 9     page, so I'm assuming you mean the one below

10     it?

11          A.  The pagination changed at the very

12     end.

13          Q.  Okay.  And so when you're talking

14     about CTX U.S. maintaining a prepaid balance

15     approaching three to six months of invoices,

16     you're referring to the table immediately

17     below it?

18          A.  Yes.

19          Q.  Okay.  And that's on page 6 of your

20     report.  Correct?

21          A.  Yes.

22          Q.  Okay.  And you note that KM was

23     silent on this issue, right?

24          A.  Correct.

25          Q.  And what is the issue you're
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    referring to?

 3        A.  The issue is how common it is for a

 4    third -- unrelated customer to consistently

 5    have three to six months of prepayments.  And

 6    if you look right down the chart you can, you

 7    know, take the revenue, divide it by the

 8    receivable, and it was anywhere between three

 9    and six months.  That's very, very unusual in

10    my 30-something years of accounting.

11            And KM didn't mention it at all,

12    positive or negative.  It just -- and it's

13    odd.  It's not $500 as in my example with

14    your law firm.  It's six months of revenue,

15    consistently, or three to six months of

16    revenue.  It's just odd.

17        Q.  So let me ask you, just so I can

18    follow along, too.  We're looking at the

19    chart on page 6 of your report, and you write

20    at the top a source, right?

21        A.  Um-hum.

22        Q.  And that's Benlida payment details

23    CTX U.S. 2012 to 2021 V5, right?

24        A.  Yes.

25        Q.  I can show you your report, but this
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2     also attaches Exhibit 2 to your report?

 3         A.  I believe so.  And some of this

 4     information was also shown separately because

 5     this table we used to try to marry certain

 6     other exhibits.  Because the timing and

 7     dating was just different.

 8         Q.  Okay.  Let me just pull up your

 9     report to make sure I'm able to follow.

10              So I am showing you on the computer

11     screen your report, Exhibit 2.

12              Here is Exhibit 2, you may have to

13     look up to look at it, but you may want to

14     compare the chart that's in your report to

15     make sure I'm right.

16         A.  It looks good.  Yeah, it looks good

17     from here.  253, the 195, yeah, it looks like

18     the same chart.

19         Q.  Okay.  So basically the chart -- I

20     see in your report below it you reference

21     Exhibit 2?

22         A.  Yes.

23         Q.  I just wasn't sure if that is the

24     same thing.

25         A.  That is the same thing.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        Q.   Okay.   And you write in your report
 3   on page 6, This file that is the source came
 4   from the KM report's documents; is that
 5   correct?
 6        A.   Yes.
 7        Q.   And did you see where they got it
 8   from?   Like do you know if it came from
 9   Benlida or CTX?
10        A.   As I'm sitting here, I don't know
11   where they got it from.   But I think this
12   file was one of the ping-pong balls.
13        Q.   In the reconciliation process?
14        A.   In the reconciliations.
15        Q.   Okay.   And you write that this was
16   reprinted with -- here at the top, Reprinted
17   with formatting changes and additional
18   analysis from you, right?
19        A.   Yes.
20        Q.   I recognize that the last three
21   columns that start Cumulative, and then the
22   payment types are new on the chart?
23        A.   Yes.
24        Q.   That's what you all added?
25        A.   Yes.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        Q.  Okay.  Is there anything else that
 3   you guys changed from the source document on
 4   this?
 5        A.  No.  The only thing that on one
 6   group we did was some of the original
 7   documents netted debit memos against
 8   invoices.  In other words, instead of having
 9   two columns like we show here total invoices
10   and total debit memos by year, some of the
11   earlier versions netted them as one number.
12        Q.  And what was it called, total?
13        A.  I think it was called total.  And
14   what we did was, we simply expanded it in
15   order to show a little bit more consistency
16   as to what we were talking about.  And so
17   that's why we had some formatting changes.
18   And then, of course, additional analysis is
19   this three right-hand columns.
20        Q.  Okay.  So let me just go take the
21   time to try to trace the Exhibit 1 chart,
22   which is, I understand, the same one that's
23   on page 6 of your report to the source
24   document for a minute.
25             So I'm going to open up on the
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

|    | R. Paulikens |
|----|--------------|
| 1  | R. Paulikens |
| 2  | computer screen the KM Citrin reliance |
| 3  | documents.  You want me to start first on |
| 4  | yours, what you guys have provided us?  We're |
| 5  | looking for something called Benlida payment |
| 6  | details CTX U.S. 2012 to 2021 version 5.  I |
| 7  | didn't see it. |
| 8  | A.  All right.  This was documents |
| 9  | further reviewed.  My work product wouldn't |
| 10 | have been in here.  So go to -- |
| 11 | Q.  This is from the USB that you guys |
| 12 | provided? |
| 13 | A.  Yes.  Remember, there was two |
| 14 | tranches of production.  There was documents |
| 15 | that we had that you asked for last week and |
| 16 | then there was some other working file that |
| 17 | we gave you today.  So there's a working file |
| 18 | that would trace to what actually was |
| 19 | produced. |
| 20 | MR. ROSENTHAL:  So let's do it |
| 21 | this way.  Perhaps Mr. -- we'll go |
| 22 | off the record and Mr. Lerner could |
| 23 | perhaps find it, you can e-mail it to |
| 24 | me and then I can project it up here. |
| 25 | (Discussion held off the |

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

                    R. Paulikens

 1

 2          record.)

 3              (Whereupon, a brief recess was

 4          taken.)

 5   BY MR. ROSENTHAL:

 6      Q.  Mr. Paulikens, what we've done is

 7   during the break, your counsel, Mr. Lerner,

 8   went to your USB that you brought with you

 9   and I think you identified this file as the

10   one that we --

11      A.  Yes.  I think the one that's coming

12   up.

13      Q.  So I've now gotten the e-mail from

14   him.  I'm saving it over here to my computer

15   and I will open it up in a second.  Okay?

16          I think we're going to mark this as

17   Exhibit 148, but let's double check that it

18   is the correct one.

19          The file is called Benlida payment

20   details CTX U.S. 2012-2021 V5, and then it

21   says July 2023 report, correct?

22      A.  Yes.

23      Q.  And I understand that you are the

24   one that added or your firm added the

25   July 2023 report to the file name?

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2         A.   Right.
 3         Q.   Okay.  I'm going to open it up.  And
 4    I'll go to the summary report tab.  Is that
 5    where we should look?
 6         A.   Yes.
 7         Q.   Okay.  And can you just satisfy
 8    yourself that that is the source that you
 9    used for Exhibit 2 to your report?  It's on
10    page 6.
11         A.   Yes, that looks correct.
12         Q.   Are you satisfied that --
13         A.   Yes, this matches the table.
14              MR. ROSENTHAL:  Okay so we'll
15         mark that as Exhibit 148.
16              (Whereupon, at this time, the
17         above-mentioned Benlida payment
18         details CTX U.S. 2012-2021 V5 July
19         2023 report was marked as Exhibit 148
20         for identification.)
21              MR. ROSENTHAL:  And to make
22         that easier for us afterwards, I will
23         e-mail it back to Mr. Lerner with the
24         title Exhibit 148.
25              I may be at the end of this
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2           line of questioning and we can take a

3           break for lunch.  But let me just

4           check real quick.

5               Let me just ask a couple of

6           questions on this chart which appears

7           on page 6 on your report where you

8           designate the types of payments.

9    BY MR. ROSENTHAL:

10          Q.  What was your purpose in doing that?

11          A.  My purpose in doing that was

12   twofold.  I understand there's a dispute that

13   whether the payments were payments on account

14   or otherwise, and this ties into what is the

15   starting point.  And I understand, and I

16   mention it, there's statute of limitations

17   issues in question.

18               And what I wanted to see is how did

19   we arrive at these balances and how were the

20   payments made.  And because the spreadsheets

21   that was provided not only showed the details

22   of the invoices and debit memos, et cetera,

23   but there was a tab that listed the payments.

24               And what I have shown is almost all

25   of the payments, and I gave you a breakdown
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2    of which ones were in even ten thousands of

3    dollars.  And up through 2018 -- I'm sorry,

4    2019, almost all of the payments every year

5    were in very even amounts.  Seemingly

6    payments on account.  250,000, 300,000.

7    There's a detail in the exhibits.

8            And it wasn't until 2019 that the

9    payments started, you know, having much more

10   specific dollars and cents amounts.  And that

11   clearly changed in 2019.

12           And that may affect whatever

13   starting point you might use, if you pick an

14   arbitrary middle date.  And I'm picking a

15   date for, you know, '16 -- 2016 to start,

16   what's the outstanding balance at that point

17   in time?

18           Because if you truncate it when you

19   have payments on account, you know, you need

20   to determine an agreed upon starting point

21   when you're tracing ins and outs.

22      Q.  Okay.  You mentioned that sometime

23   in 2019 the payments for Circuitronix, and

24   this is Circuitronix LLC, changed from

25   rounded even amounts, rounded to a $10,000
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

|   |   |
|---|---|
| 1 | R. Paulikens |
| 2 | amount to specific dollars and cents? |
| 3 | A.  Right.  And it was circa August, and |
| 4 | it's in the exhibit.  And it was in the file |
| 5 | and it lists out all the payments. |
| 6 | Q.  Do you know why that change |
| 7 | occurred? |
| 8 | A.  Why that -- it was concurrent when |
| 9 | they were trying to reconcile, you know, |
| 10 | grand reconciliation was in the fall of 2019, |
| 11 | at least started.  And all I'm noting is they |
| 12 | started making those payments -- I'm sorry, |
| 13 | the payment structure changed at that point |
| 14 | in time. |
| 15 | Specific reason why they did it that |
| 16 | way, I don't know.  But there was a profound |
| 17 | change in the way that part of the |
| 18 | relationship worked. |
| 19 | Q.  So your understanding was it had |
| 20 | something to do with the fact that they were |
| 21 | engaged in this reconciliation process at |
| 22 | that time? |
| 23 | A.  The change happened concurrently |
| 24 | with the reconciliation.  If that was the |
| 25 | gravamen for, you know, change in the payment |

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2      structure or there was some other issue, I

3      simply noted there was a significant change

4      in that dynamic of the relationship as they

5      were trying to reconcile.

6           Q.  So other than your awareness that at

7      the same time there was this reconciliation

8      effort going on between the companies, you're

9      not aware of any other reason, as you sit

10     here today, why Circuitronix U.S. started

11     paying in specific amounts in August 2019,

12     correct?

13          A.  No, not as I'm sitting here today.

14     Other than the timing, which I discussed in

15     the report.  And the fact that it was a

16     significant change, circa August of 2019.

17          Q.  You are answering my question no,

18     but, yes, you're not aware of any other

19     reason, right?

20          A.  I'm not aware of any other reason,

21     I'm sorry.

22          Q.  That's fine.  And closely related to

23     this subject, at the very bottom of page 6 of

24     your report, you say -- three lines from the

25     bottom, We also note that much of the Excel

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    files were created at around this time when

 3    the parties were trying to reconcile the

 4    amounts owed to one another, which was in the

 5    later half of 2019.

 6              What was the point of bringing that

 7    up?

 8        A.  It was a profound change in how

 9    literally that dynamic of the relationship

10    worked.  I didn't speculate in the report

11    that they may have had an agreement that they

12    were going to do things differently.  But it

13    was, from my chair, it was just a noteworthy

14    profound change on what was an odd result,

15    which we talked about about a half hour ago

16    as to the relationship.

17              So something changed in August.  And

18    I know they were trying to reconcile.

19              MR. ROSENTHAL:  This is a good

20         point for a break if that makes sense

21         to everybody.

22              (Whereupon, a brief recess was

23         taken.)

24    BY MR. ROSENTHAL:

25        Q.  Mr. Paulikens, we left off before
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                 R. Paulikens

 2    lunch on page 6 of your report, we were

 3    talking about the analysis you did which

 4    showed the rounded payments that were being

 5    made?

 6         A.  Yes.

 7         Q.  And then the transition to

 8    non-rounded in August of 2019; do you recall

 9    that?

10         A.  Yes.

11         Q.  Okay.  At the bottom of page 6 of

12    your report you say, This is noteworthy.

13         A.  Yes.

14         Q.  What is noteworthy?  What are you

15    talking about?

16         A.  The change.  Because I talked -- I

17    mean, again, it was flowing from the

18    paragraph above it, when I said in fact it

19    was not until the payments -- not until

20    August 8, 2019 that the payments ceased being

21    rounded even amounts and the payments were

22    made in very specific dollar and cents, and I

23    said this is noteworthy.

24         Q.  And the noteworthy part is?

25         A.  The change.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        Q.  And then you go on to say that, in
 3   your view this is consistent with ongoing
 4   payments on account.  Right?
 5        A.  Yes.
 6        Q.  Can you define for us what payments
 7   on account is?
 8        A.  Sure.  Typically, when you have an
 9   ongoing relationship where you're constantly
10   buying from a vendor, you can wait until you
11   get the invoice that says, you know, $12,123
12   yadda, and pay it.  But frequently, people
13   will simply just send $10,000 or 13,000, even
14   amounts, because they know they're going to
15   owe it and they just send it.  That's payment
16   on account.  And so that's different as
17   opposed to specific invoice payment.
18             And when I see round payments like
19   that, when you have an ongoing relationship,
20   that is, I'll say, almost always a payment on
21   account type of relationship.
22        Q.  Do you know whether there was a
23   payment on account relationship between
24   Circuitronix U.S. and Benlida?
25        A.  I don't know if they -- I know
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2    there's discussion and dispute about that and

3    that there's discussion about when the

4    specific payments may or may not be

5    identified.  But the mere fact that for

6    multiple years substantially payments were

7    even 10,000s, that's the data and the actions

8    that are suggestive of payment on account.

9        Q.  You say in your report that

10   ordinarily it is customary to apply payments

11   on account to the oldest invoice first unless

12   in a timely manner specific invoices are

13   identified, right?

14       A.  Yes.

15       Q.  Where is that customary, in your

16   experience?

17       A.  It's customary in every business

18   that I've been involved in.  I mean,

19   sometimes somebody will say, I'm paying these

20   invoices and not this one because I'm

21   disputing it, fine.

22           But ordinarily, any firm and company

23   I've been in, we apply it to the oldest

24   first.  And every business -- I mean, I can't

25   think of a business as I'm sitting here that
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

R. Paulikens

1

2    didn't apply, you know, payments on account

3    to the oldest invoice.  Otherwise you get

4    your aging messed up.  Because if you don't,

5    your aging is going to have the oldest one

6    still out there which may wreck your debt

7    covenants so it's customary -- it may wreck

8    your covenants with your banks and all.

9         So you typically pay the oldest one

10   first, FIFO.  That's what I've always seen,

11   unless there's specific identification.

12        Q.  Of invoices?

13        A.  Of invoices.

14        Q.  The custom of applying payments on

15   account presumes the existence of an account

16   that the parties both know about, right?

17        A.  Say that again, please?  I'm sorry.

18        Q.  The custom that you were referring

19   to of paying -- of applying payments on

20   account presumes the existence of an account

21   that both parties know about, right?

22        A.  Well, an account, yeah, it would

23   presume an obligation.  I'm not sure how to

24   answer your question.  I mean, normally you

25   don't pay an invoice for no reason.  I'm just

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                R. Paulikens
 2    not following your question, I'm sorry.
 3        Q.  Well, have you had a case where one
 4    party applies payment to an account that's
 5    different from the one the party that's
 6    making the payment thinks that it is making
 7    payments towards?
 8             MR. LERNER:  Objection.
 9        A.  Repeat that again?  Please.
10        Q.  Have you ever had a case where one
11    party applies payments it receives to an
12    account that is different from the one that
13    the paying party thinks it is making the
14    payment towards?
15             MR. LERNER:  Objection.
16        A.  When you say have I ever had a case,
17    a litigation matter, not that I can think of
18    on that specific fact.  In terms of a broad
19    general question, at some point the totality
20    of the relationship, it would get corrected.
21             So if there was two affiliates, and
22    I paid a million dollars to one and I should
23    have paid it to another, sooner or later it
24    would get corrected and reconciled.  I
25    haven't had a case like that in litigation,
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2    and I don't, as I'm sitting here, can't think
 3    of just a commercial situation that I became
 4    involved in.
 5        Q.  Well, yeah, so let me broaden it.
 6    Because you were -- when I said case, you
 7    thought litigation?
 8        A.  Yes.
 9        Q.  Let me ask you as broadly as
10    possible.  In your experience as an
11    accountant, and as broader than just as an
12    expert advising companies and doing various
13    financial work for companies over your
14    career, have you had a situation, have you
15    ever been aware of a situation where one
16    party was applying payments to an account
17    that's different from the one that the paying
18    party thinks it's making its payments for?
19        A.  I won't say never, because I've
20    never thought of that.  But that situation
21    would wash out in the reconciliation process
22    because then you get the divergent outcomes
23    such as we have here.
24            We have one -- one is getting
25    favored by payments and another is being
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    starved of payments.  Sooner or later if

 3    they're related, they're going to try to

 4    figure it out.

 5        Q.  I didn't ask you whether in this

 6    hypothetical they would wash out or not.  I'm

 7    just asking you in your experience, have you

 8    ever had a situation that you're aware of

 9    where one party was applying payments to an

10    account that was different from the one that

11    the party making the payments thought it was

12    making payments toward?

13              MR. LERNER:  Objection.

14        A.  It's difficult to answer because

15    ordinarily that would be reconciled, fixed in

16    the ordinary course of business.  And, again,

17    when you say in your hypothetical, you are

18    suggesting that there's two accounts, I think

19    was your words or two entities, maybe I'm

20    reaching, sooner or later they're going to

21    talk to each other because the disparate

22    treatment is going to get abnormal.

23        Q.  Can you think of a single example in

24    your experience where this has happened?

25        A.  No.  Because in my experience sooner
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2      or later it would have been caught.

3          Q.  It would be very unusual for it to

4      happen?

5          A.  It would be unusual and I can't

6      think of one, and ordinarily it would be

7      caught at some point.

8          Q.  Let me come back to what you were

9      writing about on page 6 of your report that

10     we talked about a few minutes ago, which is

11     this custom of payment on account being

12     applied to the -- on a FIFO basis unless

13     there's a specification of specific invoices.

14         A.  Yes.

15         Q.  Is it your intention to offer an

16     opinion in this case that that custom is

17     applicable to the relationship between the

18     parties in this case?

19             MR. LERNER:  Objection.

20             You could answer.

21         A.  Because, I mean, a formal opinion,

22     it's customary, again -- let me start the

23     answer again.

24             To give a formal opinion, I'm

25     unsure.  Because it's such a strange -- the
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    payments on account to me is just basic

3    business, that that's norm and I've seen that

4    in every business I've seen in 35 years.  So

5    if that's an opinion you're asking, yes, I've

6    seen that.  You know, payments on account,

7    apply the oldest one first.  I've seen that

8    consistently for 35 years.

9            If that's the opinion you're asking,

10   yes, that's the opinion I would give on the

11   witness stand.

12       Q.  Okay.  Let me ask you a similar

13   question about the timely specification of

14   invoice exception to that custom.

15           Are you planning to give an opinion

16   in this case whether Circuitronix made timely

17   identification of invoices that it wanted its

18   payments applied to Benlida or not?

19           MR. LERNER:  Objection.

20       A.  At this point, I don't know that I'm

21   going to give an opinion specifically on what

22   is considered appropriate of a delay.  I

23   mean, ordinarily, if somebody is applying a

24   specific invoice -- I'm sorry, a payment to a

25   specific invoice, they would send the check

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                      R. Paulikens

2    old school and say, invoice 12345.  Or they

3    would send wiring instructions with the

4    follow up e-mail in short order so that the

5    recipient knows that that payment is going to

6    be specifically applied.

7            It's my understanding, as an

8    accountant, that it is up to the recipient to

9    determine how to apply the payment unless

10   specifically instructed by the payor as to

11   where to put the payment.  And whether three

12   days, ten days, you know, is a reasonable

13   amount of time that may be acceptable, two,

14   three, four months might become commercially

15   cumbersome.

16       Q.  I didn't see in your report anything

17   specific about this issue to the facts of

18   this case.  In other words, I didn't see you

19   take a position one way or the other on

20   whether or not Circuitronix did or didn't

21   make timely designations of the invoices it

22   wanted its money applied to; is that correct,

23   it's not in your report?

24       A.  Correct.  I didn't specifically take

25   a position on that.  I noted that that issue

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2    is actually a dispute.
 3         Q.  You're aware of that from reading
 4    summary judgment papers?
 5         A.  Right.  And there is a dispute,
 6    there is a question, it goes back to starting
 7    dates, it goes back to everything, because
 8    everything gets intertwined.  So I'm aware of
 9    it and it is a dispute, I didn't take a
10    position on it.
11         Q.  And you just referenced starting
12    dates so I want to ask you about that.
13    Because in your report on page 7, you say --
14    you have a sentence and I'm pointing up here,
15    that says, This impacts the starting point of
16    when to start the analysis.
17              What are you referring to when you
18    say this, this impacts?
19         A.  We were talking about the FIFO
20    arrangement, and I can answer it better
21    perhaps by an illustration.
22         Q.  Okay.
23         A.  If you start on day zero and it was
24    a $10,000 invoice, a $9,000 payment there's a
25    running balance of $1,000.  And then if
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2       there's a $9,000 payment and a $20,000

 3       payment maybe there's an overpayment of

 4       11,000.  And that's going to continue on when

 5       you're making round payments on account.

 6              And at some point you're going to

 7       have at some later date an actual amount due.

 8       And if you start with that actual amount due

 9       on a date certain, fine, but if you

10       arbitrarily pick July 1, 2018, to pick a date

11       out of the air, and you don't know which one,

12       if they have specific invoice charges or FIFO

13       charges, that starting date balance could be

14       very wrong because depending on where you

15       apply the FIFO payments it may be older

16       invoices due.

17              You may -- if you decide that you

18       don't want to have payments applied to 2013

19       invoices by way of illustration, you know,

20       they could still be outstanding, it doesn't

21       change what's due.  But I mean, so when you

22       have a dynamic relationship like the

23       receivable and payable relationship between

24       customer and supplier, and you have payments

25       on account or unspecified -- unspecific, you
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    have to be very careful as to where you start

3    your analysis to make sure your beginning

4    starting point is reasonable and even agreed

5    upon.  That's what I was talking about there.

6        Q.  Okay.  Given that this is a rebuttal

7    report that you've written, I'm struggling

8    with how that commentary applies to the KM

9    report.

10            Are you saying that they picked an

11   arbitrary start date?

12       A.  No.  What I said was the sentence

13   above it, I said they didn't discuss the

14   issue at all.  And so in some aspects of the

15   report they started at 2015, at other aspects

16   they start at 2012.

17            I know there is a -- there is a

18   debate as to what the starting point has got

19   to do with the statute of limitations.  And

20   what I'm saying is, even the charts that are

21   in the report that just showed running

22   balances, in other words, invoices less

23   payments gave you a running balance, we

24   talked about the chart before lunch.

25            And we just need to know where we're

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2     going to start and what the balance was,

3     because otherwise if you don't discuss the

4     starting balance and you simply look at ins

5     and outs of invoices and payments without

6     properly accounting for where you started,

7     you may get a misleading result if you do

8     anything that truncates part of the

9     relationship, because the accounts receivable

10    balance issue goes from day one of the

11    relationship through current.

12         Q.  Okay.  With respect to the KM

13    report's opinions relating to the

14    reconciliation period through 2019, they

15    started in 2012, didn't they?

16         A.  I believe that's when they started

17    their analysis, which may be day zero.

18         Q.  Right.  So at least for that portion

19    of their analysis, that starts essentially

20    like the right place, don't you agree?

21         A.  I believe so.  But I also understand

22    there is a statute of limitations and payment

23    applicability being debated in the case.  But

24    for purposes of your question, KM looked like

25    they went back to day zero.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2        Q.  But that statute of limitations

 3   issue has no bearing in your understanding on

 4   Circuitronix U.S.'s credit vis-a-vis Benlida,

 5   at least for that reconciliation period,

 6   right?

 7        A.  There's no bearing -- I hate to use

 8   the word no bearing.

 9        Q.  Okay.

10        A.  Because depending upon if you looked

11   at, and I'm going to use 2015 as an

12   illustration.  If there was a balance due to

13   Circuitronix as of the end of the 2015 of a

14   million dollars --

15        Q.  Hypothetically?

16        A.  Hypothetically, and you don't take

17   that into consideration, it may have a

18   bearing -- if the statute of limitations says

19   that is irrelevant, it may have a bearing on

20   the final outcome.  Because some of the

21   disputes we talked about about an hour ago

22   were early in the relationship.

23             So maybe I'm making the answer more

24   complicated than it needs to be.  I don't

25   want to say never, because whenever you
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens

 2      truncate a relationship that has to go back

 3      to day zero, you run the risk of a result

 4      that doesn't make sense coming towards the

 5      end.

 6          Q.  Okay.  Let me ask it this way and I

 7      think it may wrap up the point.  But are you

 8      aware, as you sit here today, of any argument

 9      that Benlida has asserted that any amounts

10      that Circuitronix U.S. is owed for the

11      reconciliation period from Benlida, is --

12      should be offset because of a statute of

13      limitations, because it's older than a

14      statute of limitations date?

15          A.  As I'm sitting here, I'm not aware

16      that Benlida has made that claim.  I

17      understand that they were asking, because we

18      talked about it in the e-mail we saw, what

19      about HK, in the e-mails as they were trying

20      to reconcile the entire relationship, they

21      kept saying, what about HK.  And I know

22      that's a dispute in the case.

23          Q.  Okay.  And you are aware that

24      Circuitronix HK is not a party to the

25      lawsuit, right?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        A.   That's my understanding, you know,
 3   as the current state of the case.
 4        Q.   Okay.  On page 7 of your report
 5   again, I'm just keying off of what you've
 6   written, you say that, An arbitrary start
 7   date that does not consider the running
 8   balance is misleading.  I'm taking a fragment
 9   of your sentence.
10        A.   Yes.  Where?
11        Q.   I'm here.
12        A.   I found it, okay.
13        Q.   Third paragraph or second full
14   paragraph on page 7.
15             Are you contending that anything in
16   the KM report involved an arbitrary start
17   date and if so which parts?
18        A.   No.  All I'm saying is that, you
19   know, again, all of the issues here overlap
20   and perhaps are influenced by the other.  The
21   KM relationship, based on the data that they
22   presented seems to go back to day zero.  And
23   it was a congruency or consistency between
24   the 4-odd-million dollars that CTX showed and
25   the -- a different number, but Benlida had a
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    substantially consistent number.  And that

3    went back to day zero, that's a number.

4            But I understand that one of the

5    disputes is where do we start comparing

6    payments.  And all I'm saying here is, unless

7    we're careful as to what the beginning

8    balance we agree to start with, there could

9    be a misleading end result if we start in the

10   middle and just have ins and outs after.

11       Q.  Okay.  So the word arbitrary that's

12   used in your report is not designed to, like,

13   label something that KM did, you're just

14   making a general point?

15       A.  I'm making a general point.  If you

16   start on August or September, it may change.

17   You have to get a consistent agreed-upon

18   amount.

19       Q.  Understood.

20           Same question with respect to the

21   word misleading, which is a powerful word on

22   page 7 of your report.

23           You're not making an allegation that

24   anything in the KM report is misleading,

25   you're just saying, as I understand you, in

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2      general, if you were to try to make certain

3      calculations based upon an improper arbitrary

4      start date it would lead to a misleading

5      result?

6           A.  If you change the beginning number,

7      it could change the ending number.  And that

8      may not be what the parties believe, it may

9      not even be the correct number, but the

10     results, however you did the analysis may, in

11     fact, change.

12          Q.  Are you saying there was anything

13     misleading in the KM report?

14          A.  No.  As I said, I didn't take issue

15     with what they did and I said five minutes

16     ago that they didn't, you know, the four or

17     five million was congruent with a lot of the

18     data.  But it was only part of the issue,

19     which is what my biggest criticism was.

20          Q.  So your report, just wrapping this

21     part up, says -- acknowledges that KM did not

22     discuss the issue of the payment pattern and

23     what you view as something consistent with

24     payment on account, right?

25          A.  Correct.  They didn't discuss it.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                   R. Paulikens

2        Q.   Nor did they issue an opinion on how

3    Circuitronix intended its payments to be

4    applied, did they?

5        A.   Correct.  I don't think they covered

6    that in the report either.

7        Q.   And they didn't cover how Benlida

8    should have applied them or -- number one,

9    right?

10       A.   Yeah, they didn't -- they did a

11   reconciliation between the two parties, they

12   didn't opine whose was right.

13       Q.   Are you critical of their not having

14   opined about that issue?

15       A.   No, not in the vacuum in that what

16   they did, they said what they did.  They

17   communicated what they did.  And, you know,

18   from what I can tell, what they did was

19   correct.  And I used the term, I'm not going

20   to disagree with it.

21       Q.   Okay.

22       A.   It was the pieces that were not in

23   the report that I think are important.

24       Q.   Okay.  So that's the next subheading

25   in your report.  What is not in the KM report

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2     on page 7.
 3             I'm looking now at your next --
 4     withdrawn.
 5             You say, We reprint a portion of a
 6     spreadsheet that was included in the KM
 7     report documents relied upon.  Right?
 8         A.  Yes.
 9         Q.  On page 7.  And you reference
10     Exhibit 3, we already talked about -- I think
11     we have, and you already previously told us
12     that that Exhibit 3 is what appears on the
13     top of page 8.
14         A.  Yes.
15         Q.  That blue highlighted chart?
16         A.  Right.
17         Q.  We already talked about that, didn't
18     we?
19         A.  Yes, we did.
20         Q.  And on page 7 you write in reference
21     to that spreadsheet, quote, This shows the
22     information that was not included in the KM
23     report as it related to the invoicing and
24     payments made to ROK, close quote, right?
25         A.  Yes.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        Q.   Okay.
 3             MR. ROSENTHAL:   Off the record
 4        for one moment.
 5             (Discussion held off the
 6        record.)
 7        Q.   Look at page 8 of your report there.
 8   Underneath that chart you say, As shown
 9   previously, CTX U.S.'s and Benlida's data
10   indicate that CTX overpaid Benlida by
11   approximately $5.4 million, depending upon
12   the data source.   Right?
13        A.   Yes.
14        Q.   Is that a recapitulation of the
15   testimony you've already given?
16        A.   Yes.   In fact, since I'm referring
17   back to a table earlier in my report, and I
18   think we discussed that kind of at length.
19        Q.   We did.   And can you just show me
20   which report that table is that you're
21   referring to?
22        A.   I think it's the table on page 6
23   which is 5.6 million and then the e-mail from
24   Rishi was 5.4 million, which is why I say,
25   depending upon the data source.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens

 2       Q.  Okay.

 3       A.  You know, there's an overpayment

 4   floating out there.

 5       Q.  Okay.  So just, the chart that you

 6   just referred to on page 6 of your report is

 7   the one that's got the blue highlighting

 8   right in the middle of the page?

 9       A.  Yes.  And it's like 5.6 million in

10   the pretty much center.

11       Q.  The specific number is 5,633,674.51,

12   correct?

13       A.  Correct.

14       Q.  Below, this is on page 8 of your

15   report of where we just were, you state, CTX

16   has underpaid the Benlida Group by

17   $13.5 million, right?

18       A.  Correct.

19       Q.  What is the Benlida Group, you

20   capitalize that?

21       A.  I call -- well, I'm talking about

22   the 13.5 million, which is the HK.  So I

23   guess I could have said Benlida, CTX HK

24   underpaid by 13.5 million.  So that whole

25   paragraph is on the one hand there's a
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2     $5.4 million overpayment and on the other

 3     hand there's a $13.5 million underpayment.

 4     There's a net balance due with those numbers

 5     of 8 million.  That's what that paragraph

 6     says.  It's all dependent upon the data

 7     source.

 8          Q.  Okay.  And just to be real precise,

 9     in the sentence before when you said that CTX

10     overpaid Benlida by approximately

11     $5.4 million, the CTX entity that you're

12     specifically referring to is U.S., right?

13          A.  Wait, say that again, I'm sorry?

14          Q.  (Indicating)?

15          A.  Oh, that paragraph, I'm sorry.

16          Q.  In your report on page 8, it's okay,

17     where you say that, The data indicates that

18     CTX overpaid Benlida by approximately

19     $5.4 million, what I'm asking you is

20     specifically the CTX entity you're referring

21     to there is the U.S. entity?

22          A.  Yes.

23          Q.  Dropping back down to the next

24     paragraph after the $13.5 million reference,

25     you say, This has been studiously not covered
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                      R. Paulikens

2    by KM, referring to $13.5 million?

3         A.  Yes.

4         Q.  When you say "studiously not

5    covered," I interpret that to mean that they

6    were deliberately avoiding it.  Is that what

7    you mean to convey?

8         A.  Yes.  Because not only did they not

9    cover it in the body of their report, they

10   specifically mention in footnotes that they

11   have the analysis or they have the data to do

12   the analysis and they are not, I'm

13   paraphrasing what they said in their report,

14   but they're not going to provide that

15   analysis until after a response report to

16   their report, and I cover that actually in

17   two paragraphs.

18            So they actually, they had the

19   information, they know they have the

20   information, and they are -- did not cover it

21   at all, except to say in a footnote, we're

22   not covering it.

23        Q.  Right.  And they say why, correct?

24        A.  Yeah, they said -- they said it's

25   just -- they're not covering it.  And I
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2    understand as you said earlier, the debate is
 3    to who is in the case, who meaning the
 4    entity.
 5        Q.  But they say why, they say they're
 6    saving it for rebuttal?
 7        A.  Well, why, yes, saving it for
 8    rebuttal, yes.
 9        Q.  So they weren't deceptive or tricky
10    as to why they're not revealing that
11    information in their report, right?  They
12    said they're reserving it in their rebuttal?
13        A.  Yes.  They said -- they're saying
14    they're reserving it for rebuttal, but they
15    didn't cover that issue.  And it's a
16    substantial issue.
17        Q.  You say in page 8 that, you know,
18    why it is intentionally left out of the KM
19    report is interesting, to use your phrase?
20        A.  Yes.
21        Q.  Why did you find it interesting, if
22    you read that they're holding it for
23    rebuttal?
24        A.  Because the penultimate conclusion
25    of their report that says that a customer has
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                   R. Paulikens

 2      overpaid their supplier by three to six

 3      months' sales is an economically very strange

 4      occurrence as an accountant, where you don't

 5      have overpayments of months of sales.

 6            If you are audited and if you have

 7      financial statements, you have to reclass it

 8      differently as a negative accounts payable,

 9      it would be receivable.  It's just an oddity

10      that to look and stop there was such an

11      abnormal inverse relationship to what's the

12      norm, strikes me as odd.

13            And interesting is why did you stop

14      there?  Have you ever seen that in your

15      career that somebody overpays by six months

16      and again, forgetting legal retainers aside.

17         Q.  You go on to say in that same part

18      of your report, that, To ignore the CTX HK

19      slash Benlida slash ROK issue as KM does

20      makes the entire conclusion of the KM report

21      difficult to accept, close quote.  I want to

22      ask you about that.

23            What exactly is the conclusion of

24      the report, as you understand it?

25         A.  The conclusion of their report is
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2     that dependent upon where you stop,

 3     Benlida -- I'm sorry, Benlida owes CTX U.S.

 4     $4 million or $7.9 million; depending on the

 5     final disposition with time penalties, that's

 6     a debate and they measured it.

 7              But the issue, as far as our case is

 8     the parties are intertwined, and as I said a

 9     couple of minutes ago.  The commercial

10     relationship where a customer overpays to

11     that magnitude is odd to me when they know

12     there's a claim that a related party is

13     underpaid to an even greater amount.  And if

14     we stop there, you're going to -- the

15     economic conclusion doesn't make sense to me.

16         Q.  When you use the term "it's an

17     untenable theory," right in your report --

18         A.  Correct.  Because you have two

19     entities that seemingly work somewhat in

20     tandem.  And you've got a combined commercial

21     relationship that hits the norms and makes

22     perfect sense and are covered on the next

23     page, you know, that said if you net the two,

24     for purposes of this question, they have

25     between three and four months -- about three
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                   R. Paulikens
 2      months of revenue in accounts receivable or
 3      payable depending which side, and given
 4      that's kind of an ordinary commercial
 5      relationship because it takes time to process
 6      payments.
 7              So on the combined basis, the
 8      commercial relationship makes sense.  But the
 9      two pieces were so disparate from the norm,
10      it strikes me as odd that they didn't cover
11      it.
12          Q.  You understand that the authors of
13      the KM report, Circuitronix's experts in this
14      case, may have made a legal assumption that
15      this case doesn't implicate the CTX Hong Kong
16      account, right?
17          A.  Correct.
18          Q.   In fact, that's what they did,
19      right, to your understanding?
20          A.  They may have made a legal
21      assumption or they may have been told to
22      assume that legal assumption.  But
23      regardless, the conclusion in their report,
24      knowing they had the data strikes me as
25      curious.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2        Q.  Well, does making such an

3   assumption, assuming they did, that the CTX

4   HK account is not legally relevant to CTX

5   U.S.'s claim against Benlida, its

6   counterclaim in this case, does that

7   assumption, if they made it, automatically

8   make their theory untenable?

9        A.   No.  It's -- they're allowed to make

10  an assumption based on perhaps a direction

11  from counsel, a finding, that's a common

12  thing.  But what strikes me as odd is the

13  ultimate conclusion that they come to just

14  doesn't make sense, that two parties who were

15  largely unrelated, or unrelated, maybe

16  friendly, we discussed that a long time ago,

17  you know, would have such an abnormal

18  relationship when the other half of the

19  transaction suggests the total would be net.

20           It just doesn't make economic sense

21  that you ought to stop there.  Maybe they

22  were told to, but it certainly, as I said in

23  my thesis of my report, it's what is not in

24  the report that I took issue with.  And that

25  wasn't in their report.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1              R. Paulikens

2         If it's proper for them to not

3    include it, that's on -- that's okay, the

4    judge will make that decision.

5         Q.  If they were to testify that the

6    reason they didn't include the Circuitronix

7    Hong Kong accounts in their report and

8    instead reserved them for rebuttal waiting to

9    hear what Benlida asserted for its claim for

10   the Circuitronix Hong Kong account and that

11   counsel instructed them to make that choice,

12   you wouldn't say that that was an

13   unreasonable thing for them to have done as

14   experts in the case, would you?

15        A.  No, not in a vacuum, you know,

16   following their marching orders for that, not

17   at all.  It's just odd because of the

18   magnitude in the inverseness, if that's a

19   word, of the relationship.

20        Q.  The magnitude that you're talking

21   about, though, is from an accounting

22   perspective, right?

23        A.  Yes.

24        Q.  The assumption would be driven by a

25   legal perspective that is just looking at

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1              R. Paulikens

 2    different considerations, correct?

 3        A.   Understanding there's a difference

 4    of a way of looking at things that an

 5    accountant would and they're accountants,

 6    too, and lawyers would, and understanding

 7    there's a dispute.  It's -- their conclusion

 8    that there's such a big -- is just odd from

 9    an accounting perspective when you know what

10    the other side of --

11        Q.   You freely acknowledge that their

12    report expressly focused on really one

13    dynamic --

14        A.   Facet of the report.

15        Q.   One facet.  It was Circuitronix U.S.

16    vis-a-vis Benlida, right?

17        A.   Yes.

18        Q.   And they said, we know that there's

19    Circuitronix Hong Kong.  We didn't address

20    that, correct?

21        A.   That's all I'm pointing out.

22        Q.   So you're pointing out something

23    that's not in your report?

24        A.   Exactly.  That's what I said I was

25    going to do at the outset.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        Q.  I want to ask you about a term you
 3   use.  On page 8 in the paragraph in the
 4   middle you have a sentence that says, Thus,
 5   even if the offsets claimed by CTX are
 6   ultimately proved at trial and accounted for,
 7   the CTX Group would still owe the Benlida
 8   Group as much as $8 million depending upon
 9   the data source, right?
10        A.  Um-hum.
11        Q.  What are you referring to by the
12   offsets?
13        A.  Again, it's an issue.  There are
14   certain lead time penalties.  There's, you
15   know, they calculated lead time -- they,
16   meaning KM, calculated lead time penalties,
17   you know.  So some of the offsets and, again,
18   depending on the data source because it's
19   going to change, you know, there's still an
20   amount due.
21             If there's a million dollars or $4
22   million that's going to change it.  But it's
23   a dynamic relationship, what gets included
24   into the final result, what's in and out of
25   the case.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        Q.   Okay.  Do you -- have you formulated
 3   an opinion about the value of those offsets
 4   for purposes of your report?
 5        A.   No.  Because the offsets, you know,
 6   rights now, I think that are in play, in
 7   part, are the lead time penalties, which
 8   accumulated to the 4-million-odd dollars.
 9        Q.   And the $8 million figure, I know
10   you've talked about it, but I'm being
11   thorough so forgive me for repeating things.
12   But the $8 million figure you write on page 8
13   of your report, you calculate simply by
14   looking at the $13.5 million number that you
15   have said certain reconciliation documents
16   say that Circuitronix Hong Kong owes to
17   Benlida, right?  And subtracting the roughly
18   $5 million that you concede, you're not
19   taking issue with, that reconciliation
20   numbers show that Circuitronix U.S. has a
21   credit with Benlida for, right?
22        A.   Yes.  You know, I've said it that
23   way, and if you look at the data chart above
24   it in that report, when you simply look at
25   the current year change, the balance due, if
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                 R. Paulikens

 2    you look in the column there, you'll see in

 3    the last, you know, '17, '18, and '19, there

 4    was big increases in the balance due on that

 5    one chart.  So all I'm saying is --

 6         Q.  And that chart is the one that's on

 7    page 8?

 8         A.  On page 8.

 9         Q.  Okay.

10         A.  So it's a dynamic relationship

11    depending on where you start, what you

12    include, and that's all I'm saying.  There's

13    a lot of math, a lot of numbers that have to

14    be decided, what we're starting with and

15    what's in the mix and what's out of the mix.

16    Because we can go in circles.

17         Q.  I'm not asking you --

18         A.  I'm not saying you are.

19         Q.  That's how you got the $8 million

20    number?

21         A.  Yes.

22         Q.  Just turning to page 9 of your

23    report, talking about the statute of

24    limitations issue.

25              I note that the end of the first
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens

 2   paragraph there you write what you have said

 3   today, correct, that the KM report appears to

 4   begin its analysis with a lookback to 2012?

 5        A.  Yes.

 6        Q.  And you put in the section here

 7   about statute of limitations for what reason?

 8        A.  My understanding is, again, it's a

 9   legal dispute, and I'm not trying to handicap

10   it as an accountant.  But I'm emphasizing

11   that the start amount, which we've covered in

12   multiple ways today, may be influenced by

13   what the judge may rule and what the statute

14   of limitations, we still need to get the

15   right beginning balance, we covered that, I

16   think a couple of hours ago.

17           And I'm just saying that, you know,

18   there's issues that all influence what the

19   final number is.  You know, if we start at a

20   hard date that nothing before 2015 matters,

21   just to pick an example, you know, that may

22   change the ending number.

23        Q.  So on the next paragraph of your

24   report, you reference worksheets within the

25   files KM produced to illustrate the amounts
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                   R. Paulikens

 2    due from the period of 2015 through

 3    July 2019.

 4            You see that?

 5        A.  Yes.

 6        Q.  Okay.  And then you say, Included in

 7    Exhibit 3 and Exhibit 4, excerpts from two

 8    files.  Let me make sure that I've got the

 9    right ones because I had a little difficulty

10    with this.

11            So I'm going to pull up your report

12    on the computer and go to Exhibit 3.  I don't

13    know why it always rotates.

14            So Exhibit 3 has a document that has

15    a source name, right?

16        A.  Yes.

17        Q.  Can you just read that source name

18    up there?  What's the one on the screen?

19        A.  Okay.  Except this is --

20        Q.  Just if you can follow my question.

21        A.  This is 2012 to 2019.

22        Q.  Mr. Paulikens, I just need you to

23    answer my question.

24            The one that I pulled up on the

25    screen that's Exhibit 3, the source says
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                        R. Paulikens

2       what?

3            A.   Benlida shipment and payment

4       details, CTX-HK 2012 to 2019.

5            Q.   Okay.   I know you were going to

6       this, but in your report on page 9 you say

7       that Exhibit 3 says CTX-HK -- sorry, Benlida

8       payment details, CTX HK 2015 to 2019 version

9       2.1, right, in your report?

10           A.   Yes.

11           Q.   So which is it?   Because these don't

12      match.   Exhibit 3 says 2012 to 2019?

13           A.   Right.

14           Q.   And your report says 2015 to 2019?

15           A.   What does Exhibit 4 have?   What does

16      Exhibit 4 say?   Because I don't have that.

17           Q.   Yes.   Exhibit 4 says CTX-HK 2015 to

18      2019 version 2.1.

19           A.   Right.   So my exhibit numbers

20      changed from the narrative in your hands to

21      the actual exhibits.   So that's why I

22      reference the file name which is that source

23      file.   And so the next one, which I said is

24      Exhibit 4, probably is Exhibit 5.

25           Q.   Okay, wait, so then staying with one

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                      R. Paulikens

2    thing at a time.  On page 9 of your report

3    where it says parentheses Exhibit 3.

4         A.  Right.

5         Q.  That --

6         A.  Should be 4.

7         Q.  That should say Exhibit 4?

8         A.  Yes.

9         Q.  So that's a mistake.  And then it

10   says in your report, And Benlida payment

11   details CTS, which is probably just a typo,

12   it should be CTX, right?

13        A.  Yes.

14        Q.  U.S. 2015 to 2019 version 2.1, and

15   it says Exhibit 4.

16        A.  If you could click on Exhibit 5.

17        Q.  Okay, so right now we're looking at

18   Exhibit 4 on the screen, and that says it's

19   called -- its source is CTX HK not CTX U.S.,

20   right?

21        A.  No.  This says CTX HK, which is

22   exhibit -- should say Exhibit 4 in a

23   narrative in my report.  That gives you the

24   million -- the $8 million balance shown on

25   the next paragraph.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        Q.   Okay.  Hold on, because this is
 3   still not clear to me.
 4             We've established that where your
 5   report said Exhibit 3, that was incorrect and
 6   it should have said Exhibit 4?
 7        A.   4.
 8        Q.   Because we're now looking at
 9   Exhibit 4 on the screen, and Exhibit 4 is CTX
10   HK figures, right, from 2015 to 2019?
11        A.   Yes.
12        Q.   Okay.  Now I'm just trying to follow
13   you.  Looking at your report, the next one
14   you list says, Benlida payment details CTS
15   U.S., 2015 to 2019, Exhibit 4.  But since
16   we're looking at Exhibit 4 on the screen,
17   that's also not --
18        A.   No, it should be Exhibit 5.
19        Q.   Your report should have said
20   Exhibit 5?
21        A.   Yes.
22        Q.   All right.  So let me click to
23   Exhibit 5.
24             Exhibit 5 says the source is Benlida
25   payment details CTX U.S. 2012 to 2021 version
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2    5.  That's not it either, is it?
 3         A.  That's version 5 -- click on
 4    Exhibit 6.  It should be -- I must have moved
 5    them.  Where it says Exhibit 4 in my
 6    narrative, it should say Exhibit 6.  I moved
 7    it.
 8         Q.  Okay.  So that's why I had trouble
 9    following.
10         A.  I'm sorry.
11         Q.  All right.  So where it says
12    Exhibit 3, it should say Exhibit 4.  And
13    where it says Exhibit 4, it should say
14    Exhibit 6?
15         A.  Correct.
16         Q.  Okay.  So let me ask you this.
17              Your point in flagging what you've
18    now shown are the two exhibits you were
19    trying to reference on page 9 of your report
20    was that the KM files produced to you
21    illustrates the -- illustrate the amounts due
22    for the period from 2015?
23         A.  Correct -- I'm sorry.
24         Q.  Right.  And so that's the point in
25    time you were sort of trying to focus us on?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1              R. Paulikens

 2        A.   Right.  So the statute of

 3   limitations and the static start point

 4   changes based upon whatever file source

 5   you're using.  The two numbers I have here

 6   and included in my report as exhibits, even

 7   though they're mislabeled, show different

 8   outcome than the 8 million we talked about

 9   ten minutes ago.  This is 3 million when you

10   are truncating the early years off.

11        Q.   Okay.

12        A.   So all I'm saying is that is a big

13   issue.

14        Q.   Okay.  And I know you were trying to

15   fast forward ahead of my trying to figure out

16   which exhibit was which when you referenced a

17   dollar figure earlier?

18        A.   Yes.

19        Q.   And in your report it says for the

20   periods shown, which I now understand to be

21   2015 through 2019 --

22        A.   Yes.

23        Q.   -- CTX owes Benlida slash ROK

24   approximately $8.8 million, and Benlida owes

25   CTX approximately $5.7 million?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        A.   Right.   Which are the totals.
 3        Q.   So using Exhibits 4 and 6 to your
 4   report, the corrected numbers, that's the
 5   data?
 6        A.   Yes.
 7        Q.   Got it.   And when you say CTX in
 8   that sentence, the first CTX is CTX Hong
 9   Kong, correct?
10        A.   Owes.   Yes.
11        Q.   And the second CTX, Benlida owes
12   CTX?
13        A.   U.S.
14        Q.   CTX U.S.?
15        A.   Yes.
16        Q.   Okay.   And you say in your next
17   sentence, As shown in the files relied upon
18   by KM, Benlida is owed approximately a net
19   amount of $3.119 million?
20        A.   Correct.
21        Q.   When you say, The files relied upon
22   by KM, where did they rely upon them?
23        A.   Well, they include -- it was
24   information relied upon in the report, that
25   was the -- it was produced to me, these were
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2        files.  So it was information available to

3        them.  All I'm saying is this information in

4        their file for these dates give you this

5        result.

6            Q.  And you supplied a bunch of

7        materials equally when we asked for your

8        files, correct?

9            A.  Yes.

10           Q.  Including bringing a USB here today?

11           A.  Yes.

12           Q.  Did you rely upon everything that's

13       in those computer files to produce your

14       report?

15               MR. LERNER:  Objection.

16           A.  Well, rely is a very broad subject,

17       you know.  It's information that was

18       available to me in my work, some of which was

19       more relevant than others, like the financial

20       statements which I sent you from the

21       settlement work that I did.  I gave that to

22       you because it obviously influences my

23       understanding of the case.

24           Q.  Well, I'm just asking you this

25       question because you used the words "relied

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2     upon" in your report.  And I want to

 3     understand what you mean by that.

 4         A.  Oh, okay.

 5         Q.  So these materials that you are

 6     saying were relied upon by KM related to the

 7     2015 to 2019 time period were things that

 8     were in their materials that they had, right,

 9     in their possession?

10         A.  Yes.

11         Q.  Were they relied upon in their

12     report, per se?

13         A.  The specific exhibit, no.  But

14     remember, as we discussed earlier, they went

15     from day zero 2012 through 2019 or '21.  So

16     by default this information is at least

17     subsumed in some of those numbers.  It's

18     different excerpting of information,

19     depending on the dates.  So how much they

20     relied upon it, but it was in their

21     information.

22         Q.  But you, yourself, have testified

23     that you can't just have something subsume

24     within a time period, that the start time

25     matters?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2        A.  And that was the purpose of this

3    section of the report, to say the start time

4    does matter, because you get a different

5    result if you start at 2015 and go to '21

6    than if you do, if you start at 2012 and go

7    to 2019.

8        Q.  And in the KM report, we've already

9    established they start at 2012?

10       A.  Yes.  I said that in my report about

11   two pages ago.

12       Q.  When you said they relied upon this

13   2015 to 2019 database, they didn't really

14   rely upon it, like use it as some evidence

15   that they formed an opinion in their report

16   based upon.  They just had it in the

17   materials that they considered among many,

18   correct?

19       A.  Well, among many, and because they

20   didn't discuss the HK issue, other than to

21   say they're not discussing the HK issue, this

22   was available and I know it's circular.

23       Q.  My point is, you have materials that

24   are within your materials for this file, for

25   this case, that you didn't specifically rely

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

                    R. Paulikens

1

2    upon to draw opinions from for your report,

3    correct?

4         A.  That's correct.

5         Q.  Okay.  You come up with this 3.119

6    number?

7         A.  Yes.

8         Q.  And you say, As shown on the next

9    page.  So let's go there to page 10 of your

10   report.

11          I see that figure in the third blue

12   highlighted chart at the bottom right.

13        A.  Um-hum.

14        Q.  Is that where it is?

15        A.  Yes.

16        Q.  Okay.  And you created that chart?

17        A.  Yes.  This is -- we created this

18   chart using those source information in order

19   to try to get to a consistent end point in

20   2019 where the balances could be.  And the

21   purpose was, and I use this phrase

22   throughout, depending upon the data source.

23          So the top chart was the CTX HK

24   cutoff at 2019.  Then the second piece was

25   the CTX U.S. cutoff at '19.  You know, so I'm

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    trying to get some level of comparability.

 3    And then the third piece of the chart is

 4    simply the mathematical totals of each of

 5    those.

 6            So the running total in the top of

 7    the chart is HK in this chart owes Benlida

 8    8.8 million.  In this chart, Benlida owes CTX

 9    U.S. 5.7 million.  Simply, the balance due is

10    the 3 million.  It's just an illustration

11    that there's data and start dates matter.

12        Q.  Okay.  So I recognize the top

13    chart --

14        A.  Yes.

15        Q.  -- I believe, as Exhibit 4 you were

16    showing us to your report.  I'll pull it up

17    on the screen.

18            That's the right thing, right, CTX

19    HK 2015 to 2019?

20        A.  Yes.

21        Q.  8,843,225.58.

22        A.  Yes.

23        Q.  And then I believe that the second

24    chart on page 10 of your report is Exhibit 6,

25    as you've identified.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2              Can you confirm that?

3        A.   Yes.  5.7.  Yes.

4        Q.   Okay.  Got it.

5              So, basically, page 10 has

6    Exhibit 4, Exhibit 6 and then a total?

7        A.   Correct.

8        Q.   Underneath those charts on page 10

9    of your report you say, KM acknowledges that

10   CTX owes Benlida slash ROK approximately

11   $13,492,823.  I'm going to stop there.

12             Where does KM acknowledge that debt?

13       A.   It -- I don't think they

14   specifically acknowledge that debt within

15   their report.  The data that I pulled from

16   their files show the 13 million, we've

17   covered that before.  So the purpose of this

18   is, there's a whole lot of this relationship

19   that's not just the two parties at KM

20   covered.

21       Q.   I'm just focusing on your words, KM

22   acknowledges.  Can you see that they don't

23   acknowledge that?

24       A.   No.  They didn't form any opinion,

25   other than discussing they weren't
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens

 2    discussing.

 3        Q.  And then you continue in that

 4    sentence, you say, And maintains -- and

 5    you're talking about KM.  KM acknowledges a

 6    certain amount and maintains for the purposes

 7    of analysis that Benlida owes CTX

 8    approximately $9.4 million, right?

 9        A.  Correct.

10        Q.  But they don't actually -- KM

11    doesn't actually maintain that in its report,

12    does it?

13        A.  No.  They think it shows that,

14    again, one of the other charts from the other

15    thing shows another larger amount, because,

16    again, depending on which version of the

17    these years, the numbers are all over.

18        Q.  So this narrative that you have in

19    your report is your characterization of

20    documents that happened to be in the

21    materials that KM had access to?

22        A.  Yes.

23        Q.  Okay.  And just to conclude, you

24    then say at the bottom of page 10, As shown

25    in these files, according to KM, Benlida is
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    owed approximately a net amount of 4 million

3    and change, right?

4         A.  Depending upon which data source,

5    yes.

6         Q.  But you didn't write, depending upon

7    which data source, did you?

8         A.  I've said that throughout the

9    report.  So I've said that.  Didn't say it

10   here.

11        Q.  My focus is what you did say here.

12   You said, According to KM, right?

13        A.  Yes.

14        Q.  But it is not according to KM, is

15   it?

16        A.  It's according to files in their

17   file.

18        Q.  Data in their file would support

19   that number, you're saying?

20        A.  Yes.

21        Q.  Okay.

22             THE WITNESS:  Can we take a

23      quick break?

24             MR. ROSENTHAL:  We'll take a

25      break, sure.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2               (Whereupon, a brief recess was

 3          taken.)

 4    BY MR. ROSENTHAL:

 5        Q.  So we're on page 11 of your report,

 6    Mr. Paulikens, and I recognize Exhibit 3,

 7    because you've labeled it at the top.  That

 8    is Exhibit 3, right, just to be clear?

 9        A.  I think so.  The '19 version.

10        Q.  Let me just click on Exhibit 3 so we

11    can confirm since some of these things got

12    misnumbered in your report.  Go ahead and

13    take a look.

14        A.  Yes.

15        Q.  Okay.  So 3 is 3 on that page.

16    Let's look at Exhibit 5, because I will note

17    for you that the only time I saw Exhibit 5

18    referenced in your report is the little top

19    middle chart on page 11.  I'll click on

20    Exhibit 5, and I may have to rotate this

21    three times.

22               Showing you Exhibit 5 to your

23    report --

24        A.  That looks like the source of the

25    middle portion of the chart.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        Q.  Okay.  Let me just ask you this one
 3   question about it.
 4             You see how the source says that
 5   it's Benlida payment details, CTX U.S. 2012
 6   to 2021 at the top?
 7        A.  Yes.
 8        Q.  In your report, and here also on
 9   Exhibit 5, it cuts off at 2019.
10             Do you know if the original source
11   had 2020 and '21 in it?
12        A.  I think it did, and I was trying to
13   get some level of matching --
14        Q.  Okay.
15        A.  -- between each of the different
16   data sources so that there was some level of
17   consistency.
18        Q.  Okay.
19        A.  That's why there also was a note
20   that some were done on accrual -- I'm sorry,
21   on a calendar and some were done on a fiscal.
22        Q.  Okay.  And looking back at your
23   report on page 11, the third chart, the blue
24   highlighting, it says total on the top of it.
25        A.  Yes.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                  R. Paulikens

2        Q.   How did you calculate those totals?

3        A.   That's just added up.  So if you

4   look at the first two numbers, so taking 2012

5   is just an illustration, is $50,844 on the

6   top chart.

7        Q.   Yes.

8        A.   And then add that to the 1,168,214

9   in the middle chart?

10        Q.   You mean $1,168,214 middle chart

11   number?

12        A.   Yes.  Gives you $1,219,000 and some

13   change.

14        Q.   And so, basically, for purposes of

15   this part of your report, you added the top

16   chart, which is Circuitronix Hong Kong, the

17   middle chart, which is Circuitronix U.S. and

18   got a total?

19        A.   Yes.

20        Q.   Both total invoices, total debit

21   memos, total payments and then the balance?

22        A.   Running balance.

23        Q.   And I want to look at what you said

24   about that beneath these charts.

25            I'm paraphrasing, you say that it's

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2     untenable to separate ROK and Benlida,

3     correct?  I'll read the specific sentence.

4     You say, quote, To show the untenable

5     position that CTX seeks to do by separating

6     Benlida and ROK, parentheses, where Benlida

7     has been overpaid and ROK has been underpaid,

8     we will combine the two balances to show

9     they're combined, Benlida and ROK have a

10    commercially normal relationship with CTX.

11          Did I read that correctly?

12      A.  Yes.

13      Q.  So my first question is, is it

14    untenable to separate ROK out?

15      A.  It's untenable to separate -- I

16    think it's untenable to try to separate

17    either of the parties from each other because

18    they seem to work together.  So all I'm

19    showing here is, on the one hand you got the

20    CTX U.S. that's got a significant

21    overpayment, $9.4 million at the end of 2019.

22    And yet you've got, basically, roughly the

23    same time, CTX Hong Kong underpaid by 13.4.

24          And I'm just saying, and I talked

25    about this earlier, that's just a very odd

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    relationship.  And then you combine them,

3    which is what the bottom did, and it's an

4    illustration that combined is actually a

5    fairly normal typical commercial

6    relationship.

7             That's why trying to separate one

8    from the other I don't think makes economic

9    sense.

10        Q.  Let me ask you about the second line

11   where you say, Where Benlida has been

12   overpaid and ROK has been underpaid.

13            Do you see that?

14        A.  Um-hum.

15        Q.  Where does it show that ROK has been

16   underpaid?

17        A.  It doesn't.  It would be -- it

18   should be -- it should have said HK was

19   under -- what's the word I'm looking for?

20            What did you say?

21        Q.  Go ahead.  Mr. Lerner was

22   volunteering something, but thought better of

23   it.

24        A.  What I'm trying to show in this

25   chart is that when you look at the Hong Kong

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2     portion and the CTX U.S. portion, you need to

 3     combine them.  And perhaps my draftsmanship

 4     was imprecise.

 5         Q.  Well, it was wrong, wasn't it?

 6         A.  Imprecise or wrong.

 7         Q.  You made a mistake by saying ROK,

 8     didn't you?

 9         A.  It should have said Hong Kong or HK.

10     Because I was trying to show that the two

11     parties -- you can't separate the

12     relationship.

13         Q.  Okay.  But it's also a mistake to

14     say, even if you change it to say, CTX Hong

15     Kong has been underpaid, right?

16         A.  CTX Hong Kong --

17         Q.  Because actually you're saying --

18         A.  Yes.

19         Q.  -- that CTX Hong Kong is the party

20     that underpaid by $13 million?

21         A.  Underpaid, yes.

22         Q.  Right?

23         A.  Correct.

24         Q.  So that's another mistake, isn't it?

25         A.  Yes.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens

 2        Q.  So --

 3        A.  So what I should --

 4        Q.  How should this paragraph be

 5   understood properly?

 6        A.  It should say, when you look at the

 7   HK and CTX HK relationship with Benlida, you

 8   need to take them as a whole because of the

 9   disparate results.

10        Q.  I understand that.  Okay.

11             Earlier in your report, you, if you

12   look at page 7, right beneath the heading, it

13   says what is not in the KM report?

14        A.  Yes.

15        Q.  You say, quote, There are two

16   Benlida entities, Benlida and ROK.  And there

17   are two Circuitronix entities, CTX U.S. and

18   CTX HK.

19        A.  Yes.

20        Q.  So you are aware that there are two

21   different Benlida entities, one is Benlida

22   and one is ROK?

23        A.  ROK, yes.

24        Q.  When you were referring to ROK on

25   page 11, you conceded that that was an error?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2        A.  Yes.  Because I was talking -- the

3    charts talk about HK.

4        Q.  Where does ROK fit into this

5    analysis at all?

6        A.  In this particular chart it doesn't

7    fit in the analysis, because I was only

8    talking about the CTX HK.

9        Q.  I understand, on page 11?

10       A.  On page 11.

11       Q.  I'm asking you more broadly.  Where

12   does ROK fit into the entire relationship

13   with the parties, since that's the focus that

14   you said that KM should have focused on?

15       A.  Well my understanding is, and again

16   part of it is a function of the dispute

17   itself, is that the parties are intertwined.

18   The litigants are intertwined in their

19   activities, CTX HK and CTX U.S. are

20   intertwined amongst themselves and Benlida

21   and ROK are intertwined amongst themselves.

22   And it's separating two of them from the

23   others might give an economically

24   unreasonable result which was the whole

25   purpose of this chart, to show there's more

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens
2    to this story.
3        Q.  Have you taken moneys owed to ROK as
4    opposed to moneys owed to Benlida into
5    consideration at all for purposes of any of
6    your report?
7        A.  No.  The information was from the
8    charts here which was HK.
9        Q.  I'm just trying to get away from
10   this particular page of whatever you were
11   trying to show there.  I'm asking you just
12   more broadly.
13           Did you consider ROK's accounts in
14   anything you did in your report, separate
15   from Benlida's accounts?
16       A.  No.  What I -- no, the numbers I
17   used in my reports were cited for the
18   documents we've already discussed.  They were
19   CTX HK, and if there was an ROK number which
20   I'm not remembering as I'm sitting here, I
21   don't think I did.  I was focusing on this.
22       Q.  In fact, I think that the charts you
23   used with the blue highlighting on them, that
24   look all kind of the same format-wise, were
25   for Benlida not ROK; does that comport with
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

R. Paulikens

1

2       your understanding?

3           A.  Yes, it does.

4           Q.  The only one that I saw that had ROK

5       on it was going back to page 5 of your report

6       at the top, which was a reconciliation

7       analysis.

8           A.  It was a CCT reconciliation for the

9       one that was called CCT?

10          Q.  I don't remember what it was called.

11      But we have talked about it.

12          A.  We did.  It's referenced the prior

13      page, it was the 11/15 CCT --

14          Q.  Yes.

15          A.  -- spreadsheet.  That was just one

16      of their work product, one of the litigants'

17      ping-pong balls.

18          Q.  Right.  In fact, that was one I

19      believe that was sent from Benlida -- this is

20      the one where you said in the e-mail Benlida

21      created this, their accounting department,

22      and they sent it in that file.  Because CCT

23      is their abbreviation for Circuitronix, I

24      don't know if you're aware of that?

25          A.  No, actually, no.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        Q.  And in that chart, at the top of
 3   page 5 of your report they actually have
 4   transactions between ROK in the right-hand
 5   side?
 6        A.  Yes.
 7        Q.  Do you see that?  Not Benlida but
 8   ROK.
 9        A.  Right, okay.
10        Q.  And the only -- well, I'll leave it
11   at that.  Okay.
12             Having pointed out that distinction
13   between ROK and Benlida for purposes of
14   discussion, coming back to this chart here at
15   the top of page 5 of your report, you didn't
16   use this right-hand side of that chart --
17        A.  No.
18        Q.  -- for anything?
19        A.  No, I did not.  It was an
20   illustration that the parties were working to
21   reconcile or resolve whatever dispute they
22   had.
23        Q.  Got it.  Globally?
24        A.  Yes.
25        Q.  Okay.  On page 11 of your report --
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2      let me pause and just read it.

3             Okay.  So in the bottom paragraph,

4      page 11, you say, In the table above at the

5      end of 2018, there's a combined -- a typo

6      there, there is a combined, I think the word

7      there should be -- there's a combined

8      $5.879 million balance, right?  Owed by CTX

9      entities to Benlida slash ROK.

10            Do you see that?

11     A.   Yes.

12     Q.   That should just say to Benlida,

13     right?

14     A.   Correct.

15     Q.   So the ROK is an error, correct?

16     A.   Correct.

17     Q.   You're just literally referring

18     there to these prior charts on the same page?

19     A.   Yes.

20     Q.   Okay.  And when you did the

21     calculation of the rough monthly amount

22     volume of purchases of 2.1 or $2.2 million a

23     month, which entities were you deriving that

24     from?

25     A.   The combined invoices highlighted in

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                      R. Paulikens

2    yellow on the left.  It's an illustration,

3    it's 26 million divided by 12.

4         Q.  I understand.  But the 26 million

5    number as you've now explained is the

6    product, is the sum of business between

7    Circuitronix U.S. and Benlida and

8    Circuitronix Hong Kong and Benlida, right?

9         A.  Yes.

10        Q.  Did you do a calculation of what the

11   volume of business of Circuitronix U.S. and

12   Benlida was monthly?

13        A.  Monthly, no.

14        Q.  Okay.  Would it surprise you if it

15   was roughly the same in the $2 million range

16   or would it be substantially less?

17        A.  Repeat your question again?  I'm

18   sorry.

19        Q.  No problem.  Essentially, what I'm

20   asking you is, was the monthly volume of

21   business between Circuitronix U.S. and

22   Benlida in the range of $2 million?

23        A.  Circuitronix U.S. and Benlida, for

24   which period, no, because when you look at

25   the invoices in the middle of that chart, it

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1              R. Paulikens
 2    says there was $9 million of invoices.  I'm
 3    looking at 2015 because that's where my
 4    finger is.
 5         Q.  Okay.
 6         A.  You know, that would be one million
 7    or less than one million.  So my illustration
 8    here was just taking the total, divided by
 9    the net receivable, gives you a commercially
10    typical relationship.
11         Q.  I thought that you had previously in
12    your report indicated a monthly, like how
13    many months ahead CTX U.S. was?
14         A.  At one point one of the other charts
15    showed a balance due of $5 million -- of
16    overpayment of $5 million.  And I think there
17    was 8 or $9 million of revenue.  I said there
18    was six months, perhaps, three to six months,
19    I think.  And it was, again, an illustration.
20         Q.  And that was a similar kind of
21    calculation?
22         A.  Yes.
23         Q.  So at the end of page 11 you say,
24    Based on the information in the above table
25    at the end of 2018, there is approximately
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2    2.7 months of purchases that CTX owes Benlida
 3    slash ROK for using 2018 purchases as a
 4    guide.
 5          We should cross out the ROK again,
 6    right?
 7       A.  Yes.
 8       Q.  Lead time penalties is the next
 9    subject.
10          You acknowledge that KM, in its
11    report, did at least mathematically validate
12    the inputs based upon a judgmental sample for
13    lead time penalties, right?
14       A.  No.  I said they recalculated,
15    approximately, eight spreadsheets.  They did
16    not validate the inputs used to calculate it.
17       Q.  You say the following, Since KM by
18    its own report did not seek to validate the
19    inputs, this claim is unsupported, and you
20    say, Other than mathematically in the KM
21    report?
22       A.  Right.  Because I said in the
23    italics version, they did not validate the
24    inputs used to compute the LTPs.
25       Q.  So what do you mean when you say,
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2     Other than mathematically?

 3        A.  Okay.  What KM did was they checked

 4     the math, and I don't want to be pejorative

 5     when I say that, but they went into the

 6     spreadsheets and we looked at certain of them

 7     and said that, okay, shipment one was ten

 8     days late.  And there's a lead time penalty

 9     of some percentages of sales and they

10     calculated that.  And then the chart itself

11     showed ship date, receive date, and it was

12     all formula driven.  And it calculated if it

13     was on time or if there was a penalty.

14        Q.  Right.

15        A.  And I know that KM did check the

16     math and they said they did it without

17     exception.  But they didn't go back to the

18     documents to say, okay, did it really ship on

19     April 1st, was it really received on a date,

20     was there any other reason why the lead time

21     penalty may have been waived, like a specific

22     lead time penalty, not like a group of them,

23     which there was a discussion about.

24             So they said they checked the math

25     and it was, you know, $4 million for CTX U.S.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2    But they didn't go back to see if Benlida

3    agreed with that or disagreed.  Because my

4    understanding is they haven't been asserted,

5    I don't know if that's the right word.

6         Q.   Okay.  So I understand your

7    testimony, what you're saying is, the lead

8    time penalty amounts in the KM report are at

9    least mathematically supported, just not

10   validated based upon the underlying data; is

11   that correct?

12        A.   Correct, yes.  Because they didn't

13   say, no, this lead time penalty is correct,

14   based on receiving docs, shipping docs,

15   whatever.  They checked -- they didn't

16   check -- they checked the math, they didn't

17   validate the correctness of the inputs.

18   That's what I understand they say they said.

19        Q.   And have you looked at their math as

20   well?

21        A.   We checked some of the worksheets

22   that came there, judgmentally in the math

23   work.  So the spreadsheets certainly seemed

24   to be functioning correctly.

25        Q.   Okay.  And the next sentence in your
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    report in the middle of page 12 says, We are

 3    not aware of any acceptance, rejection or

 4    waivers that both parties agreed to other

 5    than what is spelled out in the KM report at

 6    paragraphs 34 to 36, right?

 7         A.   Correct.

 8         Q.   And that means, as I understand what

 9    you're saying, if I understand what you're

10    saying, that where they lay out paragraphs 34

11    and 36, certain evidence of agreements by

12    Circuitronix to waive lead time penalties?

13         A.   Right.

14         Q.   You're not contesting that that

15    happened, correct?  In other words, you don't

16    dispute their summary of those waivers of

17    lead time penalties, do you?

18         A.   I'm not disputing their recitation

19    of that.  What I said was, we're not aware

20    that Benlida -- I know there's a section

21    there that Benlida said there is none.  And

22    under your finger -- I'm trying to read this

23    upside down.

24         Q.   You have a copy of it.

25         A.   I do?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2        Q.   The KM report?

 3        A.   No, I don't.

 4        Q.   Sorry, I'm looking at page 13.

 5        A.   So in paragraph 34 of the report --

 6   34 to 36 of their report, they summarize

 7   CTX's claim for lead time penalties based

 8   upon certain date ranges.  And they recite

 9   the second tranche which says they were

10   waived.

11            And my understanding is that there

12   is disputes as to the penalties and whether

13   they are waived or not, it's a legal issue.

14   So, again, I'm not trying to handicap it.

15        Q.   Okay.  I'm just trying to understand

16   your testimony.

17            So, one, you're considering the

18   question of whether or not lead time

19   penalties were waived were not a legal issue?

20        A.   Yes.

21        Q.   And that's something that you didn't

22   venture into, correct?

23        A.   Correct.  That's going to be a

24   determination when -- if they're valid and

25   when you can assert them.  But to me that's
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    more of a legal question than an accounting

3    question.

4         Q.  Okay.  And you're not aware of any,

5    just looking at your words in your report, we

6    are not aware of any acceptance, rejection,

7    or waivers that both parties agree to other

8    than the ones that are discussed in

9    paragraphs 34 and 36 of the KM report?

10        A.  Correct.

11        Q.  Okay.  Did you make an independent

12   inquiry into that or you just left it at

13   that?

14        A.  I left it at that because I

15   understand it's an issue.  They -- the debit

16   memos were never issued.  I mean, the issue

17   was discussed, but debit memos, as part of

18   the grand reconciliation, were included.  So

19   my understanding is there's a dispute there.

20        Q.  And you comment that you were also

21   provided with the same information that

22   supports KM report's calculations in

23   paragraph 36 and Table 6 of their report?

24        A.  Correct.  We checked, we got the

25   Benlida -- sorry, the lead time penalty

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                   R. Paulikens

 2      spreadsheets and we were able to, you know,

 3      test check ourselves, the spreadsheets to

 4      make sure they worked.

 5           Q.  And did they work?

 6           A.  The ones we checked certainly did

 7      work.

 8           Q.  Okay.  So you're not going to

 9      contest the mathematics from those lead time

10      penalty spreadsheets?

11           A.  Not the ones I -- not the ones we

12      saw.  And like I said, we took a judgmental

13      sample ourselves and it worked, so I know the

14      math works.

15           Q.  That technique of taking a

16      judgmental sample, it's kind of like drilling

17      a bore hole in an area and seeing if it's

18      right in enough places that you feel

19      comfortable that you got a sample to say that

20      this data seems to be reliable; is that

21      right?

22           A.  A judgmental sample is actually an

23      older audit term where instead of using

24      statistical sampling or some other more

25      numerical-based choice, like every 10th every
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

| 1 | R. Paulikens |

2    15th, you use your judgment to figure out

3    which ones might be the best things to look

4    at to cover the sample.

5          So you may use the ten largest, by

6    way of illustration, that's not random,

7    that's not -- that's judgmental, and you may

8    take a few others.  But that's actually an

9    old auditor's term.  Because it's not meant

10   to imply statistical vigor.

11       Q.  But because it's something that you

12   used yourself to sort of test this

13   information that KM was relying upon, I take

14   it you don't take issue with their use of

15   judgmental sampling --

16       A.  No.

17       Q.  -- for certain numbers either?

18       A.  No.  Judgmental, again, it's an old

19   auditor's term.  And it means we looked at

20   certain things but we didn't do a statistical

21   robust sampling.  And I don't -- I'm not

22   offended by that, they said what they did,

23   and I don't -- eight spreadsheets kind of

24   made sense.  They all seemed to work.  The

25   ones we checked worked, too.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1              R. Paulikens
 2      Q.  So you have an illustration here,
 3  you say, By way of illustration, the lead
 4  time penalties from April 2016 through March
 5  of 2018 were calculated in such and such.
 6          Do you have a specific source for
 7  that that you are referring to?
 8      A.  No.  Because I was just talking
 9  about -- they didn't provide the analysis.
10  And when we looked at that particular
11  spreadsheet -- spreadsheets, certain lead
12  time penalties for Benlida and ROK were
13  combined and we couldn't tell if there was a
14  separation.  And since they didn't provide
15  how they did it, I couldn't recreate it.
16          And I'm simply saying, if they were,
17  you know, exactly how the parties worked,
18  again, it's more of the interrelationship
19  between the parties, they were combined on
20  the same spreadsheets for a period of time.
21      Q.  Okay.
22          MR. LERNER:  Can we take a
23      break?
24          MR. ROSENTHAL:  Please, go
25      ahead.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1              R. Paulikens
 2              (Whereupon, a brief recess was
 3         taken.)
 4  BY MR. ROSENTHAL:
 5      Q.  So Mr. Paulikens, we're looking at
 6  the USB that you brought with you inside a
 7  folder called Benlida documents for
 8  deposition, sub folder called Response report
 9  and then a sub folder called LTP support,
10  right?
11      A.  Right.
12      Q.  And then in that, you recall this is
13  actually a bunch of documents that also the
14  KM --
15      A.  Yes.  I was about to say, what was
16  different, I believe, was that we created
17  PDFs.  We printed them to PDF, which is why
18  you see PDF in Excel versions.
19      Q.  Of both?  Of each, rather?
20      A.  Of each.
21      Q.  Okay.  So let me just open one of
22  the Excel versions, which is the original
23  format, okay?  I'll open one that says --
24  they all have the same title, like BLD space
25  ROK penalty for lead time exceedences report
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    and then a date?

 3         A.  And a month, correct.

 4         Q.  So I'm just going to open the first

 5    one.  You said in your report on page 12,

 6    April 2016 through March of 2018.  Right?

 7         A.  Correct.

 8         Q.  So I'll just pull up the first one,

 9    which is April 2016.

10         A.  Wait, that's not right.

11              MR. LERNER:  You just have to

12         scroll down.

13         A.  Okay, so here's the file that we

14    got.  And it said lead time penalties BLD and

15    ROK.

16         Q.  I guess what I'm wondering is, do

17    these lead time penalties that are listed

18    here distinguish between Benlida and ROK?

19         A.  I couldn't find a distinguishment,

20    and when we did this summary of the lead time

21    penalties, which was in your first half hour

22    of the deposition, those amounts we couldn't

23    see exactly how KM got to it.

24              So my point was, I couldn't

25    delineate how they did it.  I couldn't find
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
  1                   R. Paulikens

  2    like an invoice type of series or some PO

  3    type of series that I could separate.  But

  4    simply the totals, and we did check the math

  5    because this is all formula driven, you know,

  6    the penalties and it accumulates up here

  7    (indicating).

  8         Q.  Okay.

  9         A.  And I think, that's as far up as it

 10    goes.  Oh, the summary, this is the data dump

 11    where they got it from, you clicked off the

 12    tab here.  My mistake.

 13             So the math here was the math that

 14    was checked.  So this tab pulls in from these

 15    tabs.

 16         Q.  You're referring, just for the

 17    record, to the April 2016 tab at the bottom?

 18         A.  Right.  Which is, I'll call it the

 19    working tab, for lack of a better term, that

 20    the lead time penalty was actually calculated

 21    for that month.

 22         Q.  So there's a total penalty in pink

 23    of 92,429.56, right?

 24         A.  Yes.

 25         Q.  And that was on the document itself
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                   R. Paulikens
 2    already, correct?  That total?  Or did you
 3    guys total it up?
 4        A.  This was the formula.  This was the
 5    document that was the live file that
 6    calculated it.  I'm sorry, go ahead.
 7             MR. ROSENTHAL:  Okay.  Thank
 8          you, Mr. Lerner for your computer.
 9             MR. LERNER:  You're very
10          welcome.  We New York lawyers are
11           very courteous.
12             MR. ROSENTHAL:  You are.
13        Q.  So I see at the bottom of page 12 of
14    your report, the last paragraph, it could
15    raise the question of whether or not the
16    statute of limitation applies to lead time
17    penalties that are dating back more than a
18    certain number of years?
19        A.  Yes.  It's a legal question from my
20    chair.
21        Q.  Not something that you factor in one
22    way or another to your analysis, correct?
23        A.  Correct.  They're calculated,
24    whether there was any information that would
25    say that the calculation should be changed
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

| | |
|---|---|
| 1 | R. Paulikens |
| 2 | such as an agreement that a particular |
| 3 | shipment could be late for whatever reason, |
| 4 | it was not covered. |
| 5 | Q.  And you say, As of the date of both |
| 6 | expert reports, it is seven years since the |
| 7 | lead time penalties measured by KM in their |
| 8 | report, correct? |
| 9 | A.  Correct. |
| 10 | Q.  So the comment you're making there |
| 11 | looks at July 2023 and goes back seven years? |
| 12 | A.  To 2016. |
| 13 | Q.  You're not offering an opinion as to |
| 14 | when the statute of limitations date should |
| 15 | be started through the lookback period, are |
| 16 | you? |
| 17 | A.  No.  I'm simply saying it's a |
| 18 | question that may have an effect on the |
| 19 | ultimate resolution. |
| 20 | Q.  So on page 13 of your report, you |
| 21 | start by saying, This provides an interesting |
| 22 | insight into the relationship of the CTX |
| 23 | entities. |
| 24 | What is the "this" in your sentence, |
| 25 | I couldn't tell? |

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1              R. Paulikens
 2      A.  The this is the fact that they have
 3   these penalties, which total roughly
 4   $4 million.  I'm rounding from the KM report
 5   that haven't been assessed, if you will, by
 6   CTX against Benlida, even though,
 7   theoretically, they've been calculated for a
 8   number of years.  And we're not talking a
 9   small amount of money.  $4 million is a
10   significant magnitude.
11      Q.  Right.
12      A.  And that, again, suggests that
13   there's something else as a pure adversarial
14   commercial relationship.
15      Q.  Are you aware that Circuitronix --
16   strike that.
17          Are you aware that there is evidence
18   in the case that Benlida asked Circuitronix
19   not to continue to send debit memos for the
20   time penalties after a certain date in 2016?
21      A.  I believe they stopped sending the
22   debit memos.  And the reason why that was, I
23   know it's an issue that is in dispute as to
24   whether it's covered a little bit in the KM
25   report, that there's a dispute as to whether
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                     R. Paulikens

 2    they qualify for lead time penalty.  I mean,

 3    it's a legal issue, but the debit memos

 4    haven't been sent because they had been

 5    prior.

 6         Q.  My question is a little bit

 7    different.

 8              Are you aware that there's evidence

 9    that Benlida asked Circuitronix not to send

10    those debit memos for the time penalties?

11         A.  As I'm sitting here, I don't know of

12    evidence that said please stop.

13         Q.  If, hypothetically, that were the

14    case, would that change your view that the

15    fact of these lead time penalties accruing

16    but not being sent by Circuitronix to Benlida

17    provides an interesting insight into the

18    relationship of the CTX entities, as you say?

19         A.  Well, the fact that they asked not

20    to have the penalties sent, and if the

21    penalty -- lead time penalties are, I hate to

22    use the word legitimate or bonified, I'm not

23    sure of the right word, I don't know that it

24    would change, because the fact that they're

25    not assessing the penalties, even if they're
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1              R. Paulikens

2   entitled to and it's not an insignificant

3   amount of money, suggests there's more to the

4   relationship than meets the eye because

5   $4 million of penalties that could be

6   assessed would be material to the amounts in

7   play here.  So it suggests to me, and that's

8   all I'm saying is, there's something here,

9   there's more "here" here.

10      Q.  The interesting insight into the

11  relationship that you're talking about is the

12  relationship then between Circuitronix on one

13  side and Benlida on the other?

14      A.  Yes.  Because there's that --

15  there's a significant magnitude of lead time

16  penalties that -- it's a big number.

17      Q.  I understand.

18      A.  That's all I'm saying.  There's more

19  here.

20      Q.  But take a look at your report on

21  page 13.  You say, quote, This provides an

22  interesting insight into the relationship of

23  the CTX entities close quote.  You don't say

24  between Circuitronix on one side and Benlida

25  on the other side?

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        A.  Oh.
 3        Q.  Is that a mistake or were you trying
 4   to make a different point than what you just
 5   testified about?
 6        A.  No, I don't think it was a different
 7   point.  Maybe it wasn't as clear as it could
 8   be.  It's just there is more here here.
 9        Q.  Then you say, If the CTX entities
10   are truly separate, and CTX considers Benlida
11   and ROK separate, why does CTX calculate the
12   substantial lead time penalties on the same
13   Excel worksheet file and tabs?  There's two
14   things there that I want to ask you about.
15   Two or three.
16             What are you talking about, if the
17   CTX entities are truly separate first?
18        A.  Well, if the CTX and their
19   relationship with the parties, because
20   there's this big number and we've just
21   covered that.  But then if the entity, the
22   individual entities themselves are all
23   separate, meaning ROK is completely separate
24   from Benlida which is completely separate
25   from HK which is completely separate from CTX
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    U.S., this calculation, these worksheets from

 3    CTX perspective considers Benlida and ROK the

 4    same, because they combined the data, at

 5    least from what I can tell they combined the

 6    data.

 7           And it's just suggestive that the

 8    parties don't keep each other, the individual

 9    entities completely separate, there is

10    overlap.  And it's just suggestive there's

11    more to the relationship than meets the eye.

12       Q.  You keep on saying that intriguingly

13    more to the relationship than meets the eye,

14    more than just a business relationship, and

15    it just makes me wonder, like, what are you

16    getting at?  I don't know what you're getting

17    at.

18       A.  Okay.  It makes no economic sense to

19    have one related entity have an overpayment

20    of 5 and a half million dollars dependent on

21    the data source, and then another entity

22    that's clearly related that has the complete

23    opposite, that can -- the disparate

24    relationship is odd on an individual basis.

25           However, as I said the prior page,
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    when you combine them, you actually have a

 3    commercially reasonable relationship.  And I

 4    know it's a legal question.

 5         Q.  Right.  I just want to illustrate

 6    something to you because it might help keep

 7    it clear.

 8             Four quadrants, this side is CTX,

 9    left side, right side is Benlida.  Okay?

10         A.  I'm with you.

11         Q.  You got CTX U.S., that's one

12    company, right?

13         A.  Yes.

14         Q.  And you've got CTX Hong Kong, that's

15    another company, to your knowledge, right?

16         A.  Yes.

17         Q.  On the other side, the Benlida side,

18    you have Benlida is a company, correct?

19         A.  Um-hum.

20         Q.  And you've got ROK, correct?

21         A.  Yes.

22         Q.  What you just testified about was, I

23    understand it to be at least, the

24    relationship between Circuitronix U.S. and

25    Circuitronix Hong Kong, correct, when you
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    were saying one party has a big amount owing

3    and the other party has a big amount

4    overpaid.

5         A.  Correct.

6         Q.  And you're talking about the

7    relationship between these two parties,

8    correct, CTX HK and CTX U.S.?

9         A.  With Benlida.  Because when I was

10   talking about the receivables, we were

11   talking about one had an overpayment of, I'll

12   use 13 million because we covered it, and one

13   had an underpayment --

14        Q.  I think you got it backwards, one

15   had under payment of 13 million?

16        A.  I'm sorry, yes, and one had an

17   overpayment of 5 million.

18        Q.  Right.

19        A.  And when CTX is showing was

20   combining Benlida and ROK on the same

21   worksheet it shows a certain familiarity

22   between the two and that's all I was saying

23   on the lead time penalties.

24        Q.  Okay.

25        A.  There's four players here, and they

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2    interact differently, they interact in an

3    overlapping way, and to understand the total

4    economics, you need to take the total

5    relationships together.  And that's all I was

6    trying to inartfully say.

7         Q.  I got you, okay.

8              And then on the same vein, you say,

9    you make this additional point at the top of

10   page 13, you say that, quote, Further,

11   arbitrarily not assessing the LTPs, lead time

12   penalties, and then seeking to assess them at

13   the very same time, also is suggestive that

14   CTX considers Benlida and ROK as one economic

15   entity.

16             Can you explain that?

17        A.  It's the same thing; the four

18   quadrants of your chart, you know, they act

19   as a group to some degree, you know,

20   shipments.  I know some of this is legal

21   questions about who is who and who controls

22   what, but I'm saying, these parties don't

23   seem to act completely as four independent

24   business entities.  Their interactions tend

25   to overlap, whether it be management or other
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2    things, I'm just saying there's more to the

3    relationship than just what was covered under

4    the KM report.

5         Q.  Okay.  So let me ask you about this

6    factorial piece of what your sentence says.

7    The part that says, Arbitrarily not assessing

8    the lead time penalties and then seeking to

9    assess them at the very same time.

10            What are you referring to there

11   about not assessing them and seeking to

12   assess them at the very same time?

13        A.  Well, they calculated them for each

14   of the months.  And as you said, CTX --

15   Benlida asked them not to.  And it just

16   suggests there's something, you know, why

17   wouldn't you assess a penalty that you're

18   entitled to for that kind of money.

19        Q.  Okay.  And you're not privy to what

20   potential explanation there might be for

21   that?

22        A.  No.  It just -- it's -- the

23   individual relationships are a little

24   different than what is normal.  And I'm

25   saying here, just we need to look at the
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                 R. Paulikens

 2   bigger picture.

 3       Q.  If there is testimony in the case

 4   that you're not privy to at this time that

 5   the reason that Benlida asked Circuitronix

 6   not to assess those lead time penalties was

 7   because Benlida had problems with the Chinese

 8   government about its trade balances, that

 9   might explain why Circuitronix did them the

10   favor of not sending them those lead time

11   penalties, might it not?

12              MR. LERNER:  Objection.

13       A.  I'm not aware of the testimony.  It

14   is an explanation.  How far that explanation

15   would go, I can't speculate as I'm sitting

16   here.  How far it would go.

17       Q.  I'm not asking you to engage in

18   speculation.  I'm just saying, that's a

19   potential example posed to you as a

20   hypothetical, because you don't have the

21   data, the information, that if it were found

22   to be true, might explain this otherwise

23   strange looking thing, right?

24       A.  Which, see, also, your hypothetical

25   supports there's more to the relationship
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2    than necessarily meets the eye.

3        Q.  Well, that Circuitronix is willing

4    to extend a favor to Benlida, for example?

5        A.  I'm just saying there's more to the

6    relationship and it's a big number.

7        Q.  But that's the type of thing you

8    mean by it's more to the relationship.  For

9    example, they might be willing to do them a

10   favor financially to help them out in a

11   situation?

12       A.  On the one hand, yes.  I mean, and

13   that's what I'm saying, you have to look at

14   the totality of everything.

15       Q.  In fact, what you as an accountant

16   might view as economically irrational

17   behavior, by Circuitronix might actually

18   reflect personal friendship and beneficence

19   by its CEO toward Benlida.  Possible, right?

20           MR. LERNER:  Objection.

21       A.  It's a hypothetical, but you'd have

22   to look at the entire relationship to see if

23   there's a positive on the one side and a

24   negative on the other.  And the answer to

25   your question, that that illustrates that
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2     there may be more to the relationship than a

3     particular portion of the dollars and cents.

4          Q.  You can have a situation where

5     someone says, I'm going to loan you $20, and

6     the people are friendly, and the person who

7     owes the $20 doesn't pay it back right away.

8     And the person who lent the $20 says, You

9     know what, it's all right, you can pay me

10    back later, don't worry about it now.  I know

11    you'll take care of it later.  That happens

12    in daily life among people who are friends?

13         A.  Yes.

14         Q.  If that extended for a long period

15    of time and it was two companies, you might

16    say that's economically an irrational thing

17    for the company that is owed the money to do,

18    right?  I mean, it's a small amount of money?

19              MR. LERNER:  Objection.

20              Go ahead and answer.

21         A.  Understanding we're just talking

22    illustration, at some point the magnitude of

23    that becomes irrational.

24         Q.  Let's put a real number on it that

25    would be rational for a company's books.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens
 2    Let's say its $25,000.  That's a real number,
 3    yes?
 4         A.  Well, it depends on the size of the
 5    company, but it's certainly not $20.
 6         Q.  All right.  Make it $20,000.  And
 7    that sits unpaid for an extended period of
 8    time.  At some point for the company that is
 9    owed that $20,000, as you said earlier today,
10    it could mess up their aging of debt records,
11    right?
12         A.  It could, yes.  I mean, depending on
13    where it's accounted for.
14         Q.  And if that company, for whatever
15    reason, because it enjoys a good relationship
16    with the owners of the other company says,
17    Don't worry about it, I know you'll make it
18    up to me, we've noted it, you owe it, but I'm
19    letting it go for right now.  Like, that
20    could happen, right?
21         A.  That could happen, but it would
22    probably be some other benefit for the
23    company who extended the credit, air quotes.
24         Q.  And they're continuing to do
25    business this whole time?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2      A.   Right.  So there would be some

3    benefit somewhere that they perceived they

4    were getting from that.  And you would have

5    to look at that and as an accountant you look

6    at the whole relationship, because you have

7    customer supplier and then debtor and

8    creditor, and, again, they even overlap.

9      Q.  And the point I'm making is that

10   even corporate entities will sometimes extend

11   each other certain leeway as an act of good

12   faith in an ongoing relationship, right?

13     A.  They would -- they would extend each

14   other some leeway probably within reason.

15   And if they extended it, there had to be a

16   reason somewhere else that they expected to

17   get it, quote, back, unquote.

18     Q.  At some point?

19     A.  At some point.  Or they were already

20   getting it back vis-a-vis something else.

21     Q.  And you don't know exactly what that

22   was between Circuitronix on the one side and

23   Benlida on the other side, do you?

24     A.  No.  I mean, we've been talking

25   about the U.S. piece and we've been not

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                 R. Paulikens

 2     talking a lot about the Hong Kong.  So I

 3     don't know exactly where the meeting of their

 4     minds came to on that issue.

 5         Q.  So you bring up in your report on

 6     page 13 that -- a separate point, that it

 7     seems like CTX has control over CTX HK.

 8     Right?  What do you base that on?

 9         A.  My understanding is that from some

10     of the, you know, papers that some of the

11     decision makers, you know, defer to Rishi,

12     I'm not going to get his name right.  And my

13     understanding is there is aspects of that

14     that, you know, Rishi covers everything.  But

15     he's the president, I think, of the

16     conglomerate.

17         Q.  So you're saying he's the president

18     of --

19         A.  Well, he's the head, I believe of

20     Circuitronix.

21         Q.  What is the Circuitronix?

22         A.  Circuitronix LLC.

23         Q.  And what position does he have at

24     Circuitronix Hong Kong?

25         A.  I don't know.  I've seen, and I
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2     can't remember what his specific position is,

 3     but I think, and I'm foggy as I'm sitting

 4     here on the, you know, specific ownership and

 5     roles.  But I understand there's an issue as

 6     to who is calling the shots where.  And

 7     that's a legal issue, kind of beyond my --

 8     it's a legal issue.

 9         Q.  Even though it's beyond the sort of

10     scope of your report or your opinion, you say

11     it would seem that he has control over CTX

12     HK.  So you've sort of taken a position on

13     that, no?

14         A.  Well, I'm saying there's clearly --

15     they're clearly related parties by any

16     definition of accounting.  My understanding

17     is either HK is owned by CTX or they're

18     controlled by the same management company

19     overall.  And I'm talking as broadly as an

20     accountant, related parties in accounting are

21     considered a fairly broad net with which to

22     capture relationships.

23         Q.  And do related parties in accounting

24     usually have a control relationship by one

25     vis-a-vis the other?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2       A.  They can.  But sometimes you have a
 3  related party that they need each other.
 4       Q.  But they're not always in a
 5  controlling relationship?
 6       A.  Yeah, and control is a less precise
 7  term nowadays, you know, 20 percent could be
 8  control of a company.
 9       Q.  So the fact that parties might be
10  related does not necessarily mean that one
11  controls the other?
12       A.  No.  But when they're related in
13  terms of centralized management or combined
14  ownership -- I'm sorry, not combined
15  ownership.  Overlapping ownership, you know,
16  they're considered related parties and you
17  just have a higher level scrutiny in
18  accounting.
19       Q.  But you don't know one way or the
20  other whether the ownership of Circuitronix
21  U.S. overlaps the ownership of Circuitronix
22  Hong Kong, do you?
23       A.  From its pure ownership, no, I don't
24  have that now.  But, again, from an
25  accountant's perspective, related party is
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2     not a black and white test.  It's a facts and

 3     circumstances situation as to what, where you

 4     start being considered a related party.

 5          Q.  So what are the facts and

 6     circumstances that make you conclude that CTX

 7     U.S. seemingly has control over CTX HK?

 8          A.  Because my understanding is that

 9     what the claim being made, and my

10     understanding is Mr. Rishi -- Rishi is in

11     charge.  And my understanding, I have seen

12     documents where the -- a manager of HK said

13     they had to go back to Rishi for some

14     approval.  And I forget if it's an e-mail, as

15     I'm sitting here, or motion or moving paper

16     that showed that there is some layer of

17     control over HK.

18          Q.  Okay.  You say in the next line of

19     your report, quote, Put another way, CTX HK

20     and CTX U.S. would appear to be controlled

21     and dominated by CTX.

22              When you say "by CTX," what are you

23     referring to?

24          A.  The parent, CTX LLC.

25          Q.  When you say "the parent," are you
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                       R. Paulikens

2     saying that CTX LLC is a corporate parent of

3     CTX HK?

4          A.   No.   I'm not trying to say in a

5     strict corporate parent.   I'm saying in the

6     way I see the relationship -- the way I

7     understand decisions are being made, there's

8     a control aspect over Hong Kong.   Whether

9     it's by direct ownership interest or whether

10    it's by direct shared management.   Whether

11    it's by direct other issues, there is some

12    layer of influence and control over CTX.

13    And --

14         Q.   Over CTX Hong Kong, to be precise?

15    You said over CTX.   I'm sorry to interrupt

16    you, but I think you meant over CTX Hong

17    Kong, right?

18         A.   Yes.   So, again, from an accounting

19    perspective, when you see disparate

20    relationships like we're seeing in terms of

21    the receivables, it suggests there's more

22    here than the individual pieces might imply.

23         Q.   Does that perception that you have

24    as an accountant influence in any way your

25    opinions set forth in the report, and if so

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2    how?
 3         A.  No.  Because as I said in my thesis,
 4    it wasn't what was in the KM report and what
 5    was not.  And these other aspects, such as
 6    the HK issue, which we've covered extensively
 7    today, you know, suggests there's more to the
 8    relationship.  And I understand there's legal
 9    disputes around it, but in order to get to
10    the full economic appropriate outcome, you
11    might need to consider all of that.
12         Q.  Okay.  And then there's this other
13    dynamic of the relationship between Benlida
14    and ROK.  What is your understanding of that
15    relationship?
16         A.  They're affiliated companies on the
17    Benlida side.  One is one factory and there's
18    another factory and I forget the towns that
19    they're located in.
20         Q.  You are aware that they're across
21    the street from each other?
22         A.  Yeah, but I mean, there's -- but
23    there's two separate entities.
24         Q.  And do you consider them separate
25    entities for purposes of your analysis?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2        A.  I think they're separate entities,

 3   for my analysis I kind of considered them

 4   closely similar.  I think their financials

 5   were consolidated, but as I'm sitting here, I

 6   don't have a perfect recollection of that.

 7        Q.  Well, that last point I need to

 8   explore with you.  You think that their

 9   financials were consolidated.  Your whole

10   report is about Benlida's financials.  So

11   which financials are consolidated that you're

12   talking about?

13        A.  I believe the audited financials

14   that we talked about as part of the

15   settlement litigation.

16        Q.  Earlier in the year?

17        A.  Earlier in the year, the financials,

18   the audited financials as I'm sitting here, I

19   believe were consolidated financials which

20   include the two, I think, but now I'm not

21   sure.

22        Q.  Okay.  Other than that issue, in

23   terms of the financial intercourse between

24   Benlida and Circuitronix, are you aware of

25   there having been consolidated Benlida ROK
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    records, other than the lead time penalty

 3    spreadsheets that we looked at a few minutes

 4    ago?

 5        A.  No.  The consolidated ROK and

 6    Benlida documents, not that I am aware of,

 7    not that I've seen, that I can recall as I'm

 8    sitting here.

 9        Q.  In fact, most of the spreadsheets

10    that we've been looking at today that are in

11    the -- that form the basis for charts in your

12    report are Benlida specific, right?

13        A.  Yes.

14        Q.  Okay.  On page 13 of your report, in

15    that center paragraph, one of the things you

16    say is that the patterns of payment behavior

17    with rounded even payments starting and

18    stopping at nearly the same time suggests

19    strong operational control and influence that

20    reduces the separation from CTX's

21    perspective.

22            What do you mean by that?

23        A.  Well, simply, you had two entities,

24    CTX Hong Kong and CTX U.S. that from circa

25    2012 paid in the same pattern, even $10,000
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                        R. Paulikens

2      rounded payments.  Payments on account we

3      discussed.  And suddenly at the same time, or

4      contemporaneous, they have a complete 180 --

5      well, not 180 but a significant change in

6      their payment pattern, suggests that there's,

7      from both of them, suggests that there is

8      some level of influence, control, because

9      they both changed substantially the same

10     time.  It's -- so it's, again, it's just that

11     change at the same time with everything else,

12     it's indicative that there's more here than

13     meets the eye.

14         Q.  So you're drawing the inference from

15     the fact that both Circuitronix U.S. and

16     Circuitronix Hong Kong changed their payment

17     behavior to start paying specific dollars and

18     cents numbers for Benlida's invoices that the

19     inference is that there must be something

20     more to the relationship between Circuitronix

21     U.S. and Circuitronix Hong Kong?

22         A.  Yes.  And as well as the

23     relationship and I understand the legal side

24     that one is not in the case and the other is,

25     understanding that, but, again, all of that

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1              R. Paulikens

2    is interrelated.

3          So you have a payment series that

4    after multiple years suddenly changes, I

5    think, at a contemporaneous time as they're

6    trying to reconcile receivables and amounts

7    due.  And you have one with a big overpayment

8    and another with a big underpayment.  You

9    know, it suggests that they are all kind of

10   in the same boat.  And I'm not trying to be

11   judgmental to get a legal conclusion in, but

12   there is certainly a relatedness to the

13   group.

14       Q.  You say at the end of that paragraph

15   on page 13 of your report, that you

16   understand it's a legal issue whether orders

17   placed by CTX Hong Kong were actually placed

18   for CTX U.S., right?

19       A.  Yes.

20       Q.  But then you say, However, from an

21   accountant's standpoint, the data clearly

22   supports such a conclusion.

23          How does the data clearly support

24   that conclusion?

25       A.  Because, again, you've got the end

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens
2    result, which is one entity is underpaid by
3    significant amount, the other entity is
4    overpaid, and it's the same type of circuit
5    boards -- same type of circuit boards.  And
6    my understanding is, it disputes as to the
7    customers and who can make a decision.
8            So there's a relationship,
9    obviously, between HK and CTX U.S. that
10   suggests that they are together.  And all I'm
11   saying is, we need to take into consideration
12   the totality of everything, you know, the
13   similar payment terms, the similar payment
14   style, you know, the disparate receivable and
15   payable information.  All suggests there's
16   more to the relationship than necessarily
17   meets the eye on an individual basis.
18       Q.  The KM report does not address the
19   issue of whether orders placed by
20   Circuitronix Hong Kong were placed for
21   Circuitronix United States, right?
22       A.  No, it doesn't.  No.  The KM report
23   does not discuss that issue.
24       Q.  I think we've covered everything you
25   say on page 13.  We can move on to page 14.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2            So on page 14 at the top end of the
 3      first paragraph you note, We reserve the
 4      right to recalculate lead time penalties once
 5      the necessary data is provided to us, right?
 6          A.   Correct.
 7          Q.   What data do you consider necessary
 8      to do that?
 9          A.   As I said earlier, when we
10      accumulated the lead time penalties from the
11      spreadsheets that we received from KM, it
12      didn't tie in, that we could tell, into the
13      report paragraph 35 or 36.  I couldn't trace
14      A to B.  And they didn't give me a trail to
15      follow, to go from the spreadsheet, you know,
16      stack of spreadsheets, and you know how they
17      got to that because when we accumulated the
18      penalties that you saw on the top right-hand
19      corner, it came out to a different number.
20          Q.   Let me just ask you something
21      because I'm not sure I understood.
22            We looked on your USB that you
23      brought today that contained -- remember you
24      showed me the 2016 to 2018 lead time penalty
25      spreadsheets which you had copied from Excel
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                 R. Paulikens
 2    spreadsheets to PDFs?
 3         A.  Yes.
 4         Q.  They had the same name as the file,
 5    right?
 6         A.  Yes.
 7         Q.  Those were all received from KM?
 8         A.  Yes.
 9         Q.  So you received KM's data on lead
10    time penalties that they looked at, right?
11         A.  I received those files and when we
12    accumulated the -- when we accumulated the
13    amounts on the -- each individual Excel sheet
14    and we saw the $92,000 total at the top
15    right-hand corner.
16         Q.  At the top, right?
17         A.  When we accumulated them for all of
18    the months, we got a different number than
19    was reflected in the KM report.
20         Q.  Okay.
21         A.  And all I'm saying is, I don't know,
22    because they didn't say how they got from A
23    to B, and they calculated something like
24    $4 million, and we had a different number,
25    and I couldn't, from what I saw in the report
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    see exactly how they got there.  I'm not

 3    saying they did it wrong necessarily, but I

 4    couldn't see how they did it.

 5        Q.  I don't see a number that you got in

 6    your report.  Did you put it in?

 7        A.  No.  I didn't put a number, I didn't

 8    put a number.  I said I can't trace it.

 9        Q.  So when you got a different number,

10    where did you write that down?

11        A.  I believe it was one of the exhibits

12    we looked at today.  I think there was a lead

13    time accumulation sheet.  I think it was one

14    of the exhibits, maybe not.

15        Q.  I don't know that we've seen that.

16    So let's take a moment to understand where

17    that is in your records.

18          Could you -- maybe it would be

19    fastest if you could just take a look at your

20    USB and tell us what you're referring to.

21        A.  Do we have my report handy, the full

22    report?

23        Q.  Yes.  You want me to pull that up on

24    the computer?

25        A.  Yes.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1           R. Paulikens

2       Q.  You're talking about your report,

3   which is this, okay.  Is it an exhibit?

4       A.  I think it was an exhibit, and I

5   think it was Exhibit 1.  No, no.  Scroll

6   down.  No, try Exhibit 2.  No, then I am

7   mistaken in my record.  It was one of the

8   documents you opened up from the USB drive

9   this morning.  I think it said summary.

10      Q.  Okay.  So did we mark that?  I don't

11  know if we did.

12      A.  Yes, it was one of the early

13  exhibits we marked.

14      Q.  You're right.  We marked it as 143.

15          MR. LERNER:  I probably

16      e-mailed it to you.

17          MR. ROSENTHAL:  Yes.  Let me

18      save it to my computer real quick and

19      we can pull it open.

20      Q.  So this summary, I'm going to pull

21  on the file name Exhibit 143, okay, so it is

22  clear.

23          Taking a look at Exhibit 143, Mr.

24  Paulikens, let's see if this is what you're

25  talking about.  Do you want me to scroll to

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    the top?

 3        A.  Please.

 4        Q.  It says summary of lead time penalty

 5    spreadsheets from KM files.

 6                MR. LERNER:  Can you pause for

 7         a minute.  Are you sure that's 143?

 8                MR. ROSENTHAL:  I'm pretty

 9         sure.  That's how I wrote it down.

10                MR. LERNER:  Okay.

11        A.  So if you scroll to the bottom of

12    that, the totals of these you would need to

13    add up and they add up to a different number

14    than what's shown on their reports.

15        Q.  So let me pause for one second.

16    Since you're gesturing to a screen, the total

17    of these, you mean line 92 --

18        A.  86 to 92, okay.

19        Q.  Well, hold on one second.  Let me

20    ask you something.  Isn't 86 -- so 87 to 90

21    adds up to 92, doesn't it?

22        A.  Say that again?

23        Q.  You are taking --

24        A.  Oh, yes, 87 to 90 adds up to 92,

25    yes.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                 R. Paulikens
 2        Q.  So you have bold face totals there
 3   for line 92?
 4        A.  Right.
 5        Q.  Four of them for different, I guess,
 6   those are different time periods?
 7        A.  You have to go to the top.  You have
 8   to go to the top.
 9        Q.  Let's -- okay, one of them is
10   Benlida.  Sorry, the first column is Benlida?
11        A.  Benlida slash -- Benlida and ROK.
12        Q.  Second column is just Benlida?
13        A.  Correct.
14        Q.  Third column is Hong Kong?
15        A.  Right.
16        Q.  And the fourth is Shen Zhen?
17        A.  Yes.
18        Q.  So just going down to the bottom
19   with the totals.
20        A.  Right.
21        Q.  Go ahead.
22        A.  So what I'm saying and only saying
23   is, I'm going to gesture to the report, the
24   KM report on page, paragraph 36.  These lead
25   time penalty totals, so the first one is 832.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1              R. Paulikens

 2      Q.  Yes.

 3      A.  The one on the spreadsheet says 14

 4  million four, so all I'm saying is, I can't

 5  see where these names came from the documents

 6  we got from the expert.  That's all I'm

 7  saying.  Because I can't -- I couldn't find a

 8  way that they separated and got to those

 9  numbers -- any of them.  That's all I'm

10  saying.

11              MR. LERNER:  Could we indicate

12        for the record what you are pointing

13        to?

14              MR. ROSENTHAL:  He told us it

15        was paragraph 36 of the KM report,

16        which has been marked as Exhibit 147.

17      Q.  So when you looked at lead time

18  penalty data on what we've now marked as

19  Exhibit 143 -- had previously marked the

20  summary, let me ask you this question.  You

21  had the first column with Benlida and ROK?

22      A.  Because they were combined within

23  the spreadsheets by me.

24      Q.  And then at some point --

25      A.  They were separated.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens

 2       Q.  And that's why you have a column,

 3   just Benlida?

 4       A.  Right.

 5       Q.  And that separation began sometime

 6   in 2018, correct?

 7       A.  Looks like it.

 8       Q.  About August 2018?

 9       A.  Yes.

10       Q.  Okay.  And then --

11       A.  Hong Kong.

12       Q.  The Hong Kong column is lead time

13   penalty is Circuitronix Hong Kong had

14   delineated?

15       A.  It's in the document.

16       Q.  So when you go to the totals --

17       A.  Yes.  So all we're saying is when

18   you took the spreadsheets that were produced

19   to us, keyed them into this summary that we

20   created, those numbers are simply different

21   than what's reflected here.  And I couldn't

22   tell from their report how they exactly got

23   to those numbers.

24       Q.  Got it.

25       A.  That's actually all I was saying.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2        Q.  Understand, okay.

 3             So are you aware that KM in its

 4    report, as it says in paragraph 30, you can

 5    take a look on page 12, it's one page back,

 6    they talked about issuing, the top line

 7    issuing debit memos to Benlida, right?

 8        A.  Up until January '16.

 9        Q.  Right.  So if you were to remove the

10    lead time penalties, if you had a way of

11    doing it to ROK, from the combined ones,

12    perhaps you could isolate the Benlida ones,

13    right?

14        A.  Perhaps.  And all my point was, I

15    saw what they did, I accumulated it, I

16    couldn't tie to the numbers that they

17    presented, and they didn't give me the

18    roadmap.

19        Q.  Okay.  Got it.  You didn't attempt

20    to individually do it yourself other than

21    this summary chart?

22        A.  We look at it in total, see how did

23    they get it, I can't see how he did it and

24    they didn't give me a roadmap to recreate it.

25        Q.  Okay.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1              R. Paulikens

2              MR. LERNER:  Let's take five.

3              (Whereupon, a brief recess was

4        taken.)

5     BY MR. ROSENTHAL:

6         Q.  On page 14 of your report, Mr.

7     Paulikens, referring to the second paragraph

8     in the conclusions?

9         A.  Okay.

10        Q.  You make several points I want to

11    ask you about.  You said that, The KM report

12    only seeks to show one side of the economic

13    relationship between the litigants.  Do you

14    see that?

15        A.  Yes.

16        Q.  Namely the side that best suits

17    their client's needs, right?

18        A.  Yes.

19        Q.  Who are the litigants in this case;

20    you use that term?

21        A.  Benlida and Circuitronix.

22        Q.  Benlida and Circuitronix what?

23        A.  LLC.

24        Q.  Right.  And the KM report shows the

25    economic relationship between those two

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    companies, right?

 3        A.  Correct.

 4        Q.  And that's the entire side of the

 5    economic relationship between those two

 6    companies, isn't it?

 7        A.  Those two, yes.  That is the entire

 8    side within the case, but I understand

 9    there's disputes amongst the attorneys as to

10    whether the other entities get pulled in for

11    various legal theories.

12        Q.  Okay.

13        A.  Which is what I was talking about

14    there, that there is more here here.

15        Q.  And they're explicit, as you have

16    said, "they" being KM, about which portions

17    of the economic relationship in general that

18    they're discussing and which ones they're not

19    discussing?

20        A.  Yes.  They were very clear about

21    that.

22        Q.  Okay.  And then you say, however,

23    taking into consideration the CTX HK slash

24    Benlida slash ROK aspects, parentheses -- I'm

25    sorry, comma, which is a substantial portion
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2   of the overall Benlida slash CTX

 3   relationship, pause right there, does ROK fit

 4   into that picture or is that a mistake?

 5       A.  It doesn't necessarily add anything

 6   to the sentence.  I'm just trying to say,

 7   looking at the total pool.  That's all I'm

 8   saying.  There's more here than maybe meets

 9   the eye.

10       Q.  Okay.

11       A.  And that's all it's trying to say.

12   There's more here than just those two.  And

13   the results of that relationship, even if

14   accurate, don't tell the entire economic

15   story.

16       Q.  And I assume the numbers here, 3 and

17   8 million, that range is a reference to what

18   we've already talked about earlier in your

19   report?

20       A.  Yes.  Dependent on the data source.

21   There's a totality amount due, but, again,

22   even that depends upon lead time penalties,

23   statute of limitations.  I think they all say

24   that in the rest of that paragraph that

25   there's multiple issues that have to be
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    decided before a finite number is arrived at.

3         Q.   Okay.  And then you go on to say,

4    another variable is the Court's final

5    decision on whether the payments by CTX to

6    both Benlida and ROK were payments on account

7    of specific invoices?

8         A.   Correct.

9         Q.   Why do you include payments to ROK

10   there?

11        A.   Well, there was payments made and

12   then probably could have eliminated ROK, but

13   the whole specific payment, payment on

14   account issue is an issue that attorneys are

15   disputing.

16        Q.   ROK is actually a mistake there

17   isn't it, it should not be included?

18        A.   I believe so.

19        Q.   In the next paragraph, the biggest

20   word, however, second line at the end says,

21   One affiliate has a large overpayment,

22   parentheses, CTX U.S., close quote.  That's

23   undisputed, correct?

24        A.   Yeah, I mean, maybe the exact

25   amount, but certainly the magnitude at this

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens
 2    moment is not.
 3        Q.  That's something we've already
 4    talked about at length?
 5        A.  Yes.
 6        Q.  So the final paragraph on page 14
 7    you say, Our role in this litigation among
 8    others is to analyze the KM report and
 9    consequently quantify the amounts owed to
10    Benlida, close quote.
11             You're not really quantifying the
12    amounts owed to Benlida as part of your
13    retention, are you?  You're really just
14    critiquing the KM report?
15        A.  I was responding to the KM report.
16    And as I showed in the illustrations which
17    we've covered, depending upon what the
18    rulings are of the Court in terms of what's
19    in or what's out, there's a measurement, a
20    continuum of an amount due between 3 and
21    $8 million, depending upon a lot of sources.
22        Q.  But you are not offering an opinion
23    in this case as to how much money Benlida is
24    owed, correct?
25        A.  No, not yet.  I'm responding -- at
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens
 2    this report I'm responding solely to KM.
 3         Q.  Okay.  But you say, At this point,
 4    so it begs the question, and here's the
 5    question, if you are asked, I assume you're
 6    saying to offer an opinion as to how much
 7    Benlida is owed, then you would do so?
 8         A.  If asked.
 9         Q.  And you would do so based solely
10    upon the work that you have done for purposes
11    of this report or would you have to do
12    additional work?
13         A.  I'd have to do additional work.
14         Q.  Okay.  Let me ask you a question
15    about behind tab B of your report.  I don't
16    know if you have that there.
17         A.  No.
18         Q.  I'll pull it up on the computer.
19            Tab B, okay, if you look at -- can
20    you see it or should I make it bigger?
21         A.  It's fine.
22         Q.  At the end of the second full
23    paragraph, under your assumptions and
24    limiting conditions, you say, We will be
25    measuring -- I'm highlighting it -- the
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2      amount of damage based upon the

 3      determinations of existence and magnitude of

 4      liability.

 5              Is that what you did in this case?

 6          A.  Well, we will -- I critique the

 7      Benlida -- the KM report.  And if we are

 8      asked, and we discussed the magnitude of what

 9      Benlida might be owed by the range of the

10      amounts dependent on the data source and

11      dependent upon what's in and out, that's what

12      I'm referring to.

13              Because if it's determined that HK

14      and CTX should be taken as one in this case,

15      legal decision, you know, then that changes

16      the dynamic.  And I gave you a range because

17      there's other questions that would

18      necessarily affect the numbers and it would

19      be a little bit of a Chinese menu where to

20      start.

21          Q.  And that's just not something you've

22      done at this time?

23          A.  Not yet, no.

24          Q.  Two paragraphs down, you say, I've

25      highlighted it for you, it says, Unless
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                R. Paulikens

 2    otherwise stated in the report, the economic

 3    analysis of the amount due to the plaintiffs

 4    has not considered various factors.

 5          Again, I ask you, are you -- you

 6    have not yet calculated in this report, I

 7    understand the economic analysis of the

 8    amounts due to the plaintiffs, which is

 9    Benlida in this case; is that correct?

10        A.  Right.  And it's just the whole

11    sentence is, you know, subsequent events,

12    contingent assets, any other contingencies,

13    either today or after, we did what we did,

14    and that's it.

15          So this is a, you know, it's not

16    whether they sold the company or burned down

17    the company.

18        Q.  Is this just stock language?

19        A.  It's stock language, you know, to,

20    you know, basically we're saying what did we

21    do, what didn't we do.

22        Q.  Okay.  That's not something you've

23    done yet in this report, correct?

24        A.  That's correct.  Because there's, at

25    this point, there's no contingent assets that
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    we've been asked to analyze, contingent

 3    liabilities or events, as of the date of the

 4    report.

 5        Q.  And there's one line again, I think

 6    it's stock language, but I will ask you about

 7    it.  You say, We have relied upon

 8    representations of counsel as necessary in

 9    preparing this report.

10            Is there anything in particular to

11    this case, this report you've done, where

12    you've relied upon the representations of

13    counsel?  I don't think we've talked about

14    it?

15        A.  No.  I don't think there's anything

16    because it's a core accounts receivable case.

17    Obviously, we relied on that counsel informed

18    us there's disputes, you know, and I've

19    discussed that there's a dispute and it's not

20    an account -- it's legal, not accounting.

21        Q.  Let me just ask you about some

22    documents that are in these printouts of what

23    I was given.

24        A.  Okay.

25        Q.  And then I think we'll be able to
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2    wrap this up.
 3            So in your -- at the end of your
 4    report, there's a thing called additional
 5    documents utilized?
 6        A.  Yes.
 7        Q.  Here you've numbered them.  Number
 8    55, if you just take a look at your list.
 9        A.  It didn't come out on the report.
10        Q.  Here, you can -- I'll show you.  It
11    says, Benlida source for complaint.  Do you
12    see that?
13        A.  Yes.
14        Q.  Okay.  Do you recall what that was?
15        A.  That was an Excel document that
16    listed out all of the documents -- I'm sorry,
17    all of the invoices that were included in the
18    complaint.
19        Q.  Okay.
20        A.  It was a lengthy document.  We
21    actually, I think we had it opened up today.
22    There was an Excel file.
23        Q.  Okay.  Yes, you are correct in your
24    memory.  Let me just show you on the computer
25    what I think you're talking about.  In the
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    further documents reviewed by Randall

 3    Paulikens there's an Excel file which is --

 4         A.  I think it's there.

 5         Q.  -- Benlida source for complaint.  Is

 6    that what you're looking at, right here?

 7         A.  Yes.

 8         Q.  Let me open that up.  It has a date

 9    of December 1, 2020; is that right?

10         A.  I think that's what the date was.

11         Q.  Okay.  So I have actually printed

12    out copies of some of these tabs so that I

13    can make them exhibits so that I can

14    understand them.

15             So did that document -- that Excel

16    file come to you with that title on it?

17         A.  I believe it did.

18         Q.  Okay.  Do you know from whence that

19    came, from whom?

20         A.  It came through counsel.  I believe

21    it came through counsel early in the case,

22    you know, May of '22.

23         Q.  So I'm going to -- we are looking on

24    the screen at a tab at the bottom that says

25    EN, which I think means English.  Because
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens

 2    there's one that is CN, which when you click

 3    on it is in Chinese.

 4         A.  Chinese.  That sounds about right.

 5              MR. ROSENTHAL:  So I only have

 6          two of these, maybe you can share

 7          this with Mr. Paulikens.  I'm going

 8          to mark Exhibit 149, a printout of

 9          that tab, EN tab.

10              (Whereupon, at this time, the

11          above-mentioned EN tab was marked as

12          Exhibit 149 for identification.)

13    BY MR. ROSENTHAL:

14         Q.  And my first question to you is, did

15    you all, your firm, do any of the work that

16    is depicted on this document?

17         A.  No.

18         Q.  Okay.  This is just what was

19    received by you?

20         A.  This was received.

21         Q.  Did this factor -- I mean, did you

22    review this for purposes of your report in

23    this case?

24         A.  Not for the review of the KM.  This

25    was very early in my relationship to this
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens
 2    case.
 3         Q.  Okay.
 4         A.  And once it was settled or nominally
 5    settled, we put the pencils down.
 6         Q.  This is in that tranche of
 7    documents?
 8         A.  That was in that very initial
 9    tranche of documents.
10         Q.  If you look at column D, it says,
11    Cutoff on May 31, 2020 for a number of
12    different variables.
13              Do you see that?
14         A.  Yes.
15         Q.  Do you have any idea what that is?
16         A.  No.  It might be that that's the
17    date they were trying -- they created this
18    schedule, you know, because the other -- the
19    first tab is literally a detailed list of
20    invoices outstanding.
21         Q.  The first tab in the Excel
22    spreadsheets?
23         A.  The Excel file.  If you look at
24    invoice details, if I remember correctly,
25    that's a fairly substantial tab.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2       Q.  You remember correctly.  I
 3   apparently have a printout of it here.  This
 4   is invoice details tab.
 5            MR. ROSENTHAL:  Since you
 6         mentioned that, let me mark this as
 7         149-A.
 8              (Whereupon, at this time, the
 9         above-mentioned invoice details tab
10         was marked as Exhibit 149-A for
11         identification.)
12   BY MR. ROSENTHAL:
13       Q.  Since this comes from the same Excel
14   spreadsheets, this is 149-A, do you recognize
15   that as a printout of what we're showing on
16   the computer screen as the invoice details
17   tab?
18       A.  It looks to be.
19       Q.  Let me know if you need me to move
20   it around.
21       A.  Just scroll up.
22       Q.  That's as far as it goes.  I can
23   make it smaller maybe.
24       A.  Grab this and pull it down.
25       Q.  Oh, go down?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens

2         A.   Go down.

3         Q.   Tell me when to stop.

4         A.   Just go.  Stop.  I mean, based on a

5    quick review, it certainly looks to be the

6    same, a printout of that tab.

7         Q.   I'll go all the way to the bottom a

8    second, too.  Just the last entry is 252, we

9    have a printout all the way through that.

10        A.   Yes.  40,000, yes.

11        Q.   Okay.  Do you know if -- well, at

12   the top of what has now been marked as

13   Exhibit 149-A, has a note that says unpaid

14   invoice breakdown until 5/31/2020.

15        A.   Yes.

16        Q.   Do you know what that says, what

17   that means?

18        A.   I think it's translated from

19   China -- Chinese, that means open accounts

20   receivable.  That's how it translated to,

21   unpaid invoices.

22        Q.   Up to that date?

23        A.   That's what it sounds -- that's what

24   I take that to mean, based on what's here.

25        Q.   And do you recall looking at this
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                   R. Paulikens

 2    listed invoices for any work that you've done

 3    in this case?

 4        A.  No.  Again, I think we got this very

 5    early in our retention.  And before we got

 6    very far into it, it was pencils down.

 7        Q.  Okay.  And do you see that the green

 8    highlighted cell at the top has something

 9    called CTX U.S. total?

10        A.  Yes.

11        Q.  And it's got 7.2 million and change?

12        A.  Yes.

13        Q.  And then there's the separate one in

14    column H, CTX Hong Kong total?

15        A.  Yes.

16        Q.  And it lists -- well, it doesn't

17    list a number.

18        A.  It doesn't list a number.  And then

19    there's a reference error all the way in the

20    right.  So I don't know what happened in the

21    file.

22        Q.  Okay.  That's an Excel issue?

23        A.  That's Excel saying something's

24    missing.

25        Q.  And another tab within Exhibit 149
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens

 2   which is a digital exhibit, the Excel

 3   spreadsheet called sheet 1, let me scroll to

 4   the top.

 5          Do you recognize what that is?

 6      A.  These amounts -- these amounts look

 7   like a printout of these three columns on the

 8   left.

 9      Q.  The three columns as what we've

10   marked as Exhibit 149-A?

11      A.  Yes.  And it looks like they're the

12   same amounts from what I can tell with a note

13   in column D, as in David.  That, I think,

14   mimics what was in the complaint.

15      Q.  Okay.  Right, that language that no,

16   to date Circuitronix has paid no portion of

17   the amount owed?

18      A.  It mimics the way the complaint was

19   structured.

20             MR. ROSENTHAL:  Okay.  I have a

21        printout of that, too.  So let me

22        mark that.  Let's call that 149-B.

23        149-B is the tab in the Excel

24        spreadsheet which has been marked as,

25        I guess, 149, and that tab is called
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                   R. Paulikens

 2          sheet 1.

 3               (Whereupon, at this time, the

 4          above-mentioned sheet 1 of Exhibit

 5          149 was marked as Exhibit 149-B for

 6          identification.)

 7               MR. LERNER:  I looked at the

 8          metadata on this and it looks like it

 9          says Steve Prifti, our paralegal may

10          have, I think he prepared this

11          spreadsheet and provided it.

12               MR. ROSENTHAL:  Okay.  I know

13          that Mr. Paulikens said he didn't

14          prepare it so that makes sense.

15               MR. LERNER:  You'll have the

16          electronic version and it has the

17          metadata.

18     BY MR. ROSENTHAL:

19          Q.  Can you tell, Exhibit 149-B is a

20     printout of what we're looking at on the

21     screen, sheet 1?

22          A.  Yes.

23          Q.  Okay.  Did that document, 149-B,

24     provide you any assistance whatsoever in your

25     work on the case?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                   R. Paulikens

 2         A.   No.  It was background, it was to

 3    show how the complaint was derived or

 4    crafted.

 5         Q.   Okay.  Let me traipse through a

 6    couple of printouts.

 7              There is a file, electronic file,

 8    among the records that you collected that

 9    concerns 2017 monthly statements.  Do you

10    recall that?

11         A.   Not as I'm sitting here.

12         Q.   Okay.

13              MR. LERNER:  Do you want him to

14         look at it?

15              MR. ROSENTHAL:  I want to try

16         to find it.

17         Q.   I will show you the document, that's

18    fine.  And I just don't know if it's

19    something that you're going to recognize by

20    itself.

21              MR. ROSENTHAL:  And Rich,

22         forgive me, I only have -- I have two

23         copies of this.

24              MR. LERNER:  It's all right.

25         You're marking it in?
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens

 2              MR. ROSENTHAL:  I'll wait and

 3       see if he recognizes it.

 4       Q.  I'm handing you a document that

 5   says, Benlida in short on top to customer

 6   Circuitronix LLC from June 2017.

 7           Do you recognize this document?

 8       A.  As I'm sitting here, I do not

 9   recognize this document.  It looks like an

10   invoice but I don't -- I don't have a

11   specific recollection of this at all as I'm

12   sitting here.

13       Q.  Okay.  So I want to represent to you

14   where I found it in the materials that were

15   provided to me that came from you.  But I

16   need to -- oh, yes, here.  Okay.  Here we go.

17           So let me just show you on the

18   computer.  Actually, here we have a printout

19   of the file.

20       A.  Okay.

21       Q.  If you look at these Excel

22   spreadsheets at the top that say 2017

23   statement reconciliation --

24       A.  Okay.

25       Q.  -- I'll show you on the computer
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2    what it looks like.
 3              Do you see where I am on the
 4    computer?
 5         A.   Yes.
 6         Q.   I'm going to open the document first
 7    that says 2017 statement reconciliation.
 8    That's not what you're holding, right?
 9         A.   No.  I'm holding the list of
10    documents.
11         Q.   Let me look at the other one, 2017
12    statement reconciliation is the other name,
13    it's similar.
14         A.   It looks like the same document.
15         Q.   That is actually -- let me show you
16    a paper printout of what you're looking at on
17    the screen.
18              Can you see that is the same thing
19    that's on the screen?
20         A.   It looks the same.
21              MR. ROSENTHAL:  Let's mark it
22         so it is clear.  Let's call this 150.
23         And this I will show Mr. Lerner, too,
24         it's the date on line 3 is
25         January 10, 2018.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2                    (Whereupon, at this time, the

 3            above-mentioned shipment amount

 4            comparison was marked as Exhibit 150

 5            for identification.)

 6         Q.  Do you see that at the top of the

 7    first page?

 8         A.  Yes.

 9         Q.  And it is to Circuitronix LLC slash

10    Circuitronix Hong Kong Limited from Benlida

11    slash ROK?

12         A.  Yes.

13         Q.  Do you know what this document is?

14         A.  I don't, as I'm sitting here, I

15    don't know.  It's certainly -- it looks like

16    a comparison between the Benlida ROK versus

17    CTX shipment amounts, but I didn't prepare it

18    and it was from 2018.

19         Q.  I mean, this was in the folder of

20    materials that was provided to us that were

21    within your further documents reviewed list.

22         A.  Right.

23         Q.  In your report, it's not ringing a

24    bell, though?

25         A.  No.  It was part of the initial
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                    R. Paulikens
2    documents we got in May, a year ago, and then
3    we were pencils down, so it wasn't used in
4    this last cycle.
5         Q.  Okay.  Got it.
6              So the other document you looked at
7    a moment ago over there by your right elbow,
8    that one is something that fell into the
9    category of stuff you were given --
10        A.  Very early on.
11        Q.  And it is not something you dealt
12   with?
13        A.  No.  For purposes of KM --
14        Q.  Report?
15        A.  Yes.
16        Q.  Okay.  Let me just show you
17   something that goes with that document and
18   just for what it is worth, what I'm talking
19   about is this June 2017 Benlida, I believe
20   it's a monthly statement.  With it there is a
21   more specific breakdown, a printout of
22   another database, another spreadsheet.  You
23   see it bears the same -- well, it actually,
24   it doesn't, it says shipment?
25        A.  This says April.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2        Q.  The top says shipment in June 2017.

 3   Do you see that at the top?

 4        A.  I see that.

 5        Q.  It's dated July 10, 2017 in the

 6   center?

 7        A.  Yes.

 8        Q.  And it is from Circuitronix --

 9   sorry, to Circuitronix LLC from Benlida?

10        A.  Yes.

11        Q.  And the subject is monthly statement

12   for delivery?

13        A.  Yes.

14        Q.  Have you reviewed documents like

15   this for purposes of the case?

16        A.  No.  Because this was, again, it was

17   back from '17.  And then the case was

18   settled --

19        Q.  I think you mean not '17, but 2022?

20        A.  No, no.  It says these were

21   shipments from 2017.

22        Q.  I apologize, yes.

23        A.  And when we were started in May of

24   '22, and then the case was settled in June of

25   '22, we put pencils down on reviewing these
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                    R. Paulikens

2    documents.

3         Q.   Okay.  I will not belabor this issue

4    then.

5              Are you aware of whether or not

6    Benlida sent separate monthly statements to

7    Circuitronix LLC and Circuitronix Hong Kong?

8         A.   As I'm sitting here, I'm not one way

9    or the other.

10        Q.   Let me show you, we have printed

11   out, you recall the reconciliation analysis

12   report 2012 to 2019 that was copied into your

13   report?

14        A.   One page was, yes, it was an Excel

15   file, yes.

16        Q.   Right.  What I'm showing you now is

17   a paper version of that Excel file that had

18   various other tabs in it.

19        A.   Yes.

20        Q.   We printed them out here.

21        A.   This is the whole --

22        Q.   I believe so, yes.  This stack.

23   What I want to ask you is whether or not, if

24   you recall without looking at the electronic

25   file, your office did any work in those

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
1                     R. Paulikens
2     spreadsheets or whether those spreadsheets
3     were ones simply received by your office?
4          A.  Those ones were ones that were
5     simply received.  I checked to make sure that
6     the map -- the formulas to the summary were
7     flowing.  And then I went back to the
8     individual tabs to see what they did.  But we
9     didn't do it.  So I reviewed that document, I
10    didn't create it.
11         Q.  Okay.
12              MR. LERNER:  I'm sorry, can you
13          identify that?  Is that one of the
14          exhibits we marked in earlier?
15              MR. ROSENTHAL:  I think it is.
16          Let me see.  It's probably 146 but
17          let me double check.
18         Q.  Mr. Paulikens, you're welcome to
19    take a look at it but these are printouts of
20    that Excel spreadsheet and the question
21    really is just, do these represent work that
22    was presented to you from its source, not
23    work that you did on it?
24         A.  Yes, we did not do the work.  It was
25    given to us.  I reviewed that spreadsheet.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens
 2        Q.  Okay, that's what I thought.
 3             Let me ask you, for example, in
 4   the -- in your documents that were provided
 5   to us, there is an Excel spreadsheet right
 6   here called Benlida statement reconciliation.
 7             I'm hovering over it, do you see
 8   that?
 9        A.  Yes.
10        Q.  I'm going to open it up.  And it's
11   got a lot of tabs over time.  And do you
12   recall utilizing this for any of your work?
13        A.  No, not for the KM portion of it.
14   Again, I believe that was sent to us as part
15   of the ping-pong balls early in May of '22.
16        Q.  And you see that the column A says
17   company and it says U.S.?
18        A.  Um-hum.
19        Q.  I'm going to scroll down.  And then
20   at line 402 it ends for U.S. and then line
21   405 it picks up and it says company HK?
22        A.  Yes.
23        Q.  Are you aware of the fact that when
24   the companies -- the parties to this case
25   were doing their reconciliation effort in
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                    R. Paulikens

 2    2019 that they were segregating the CTX U.S.

 3    from CTX HK for calculations?

 4         A.  They segregated it.  Can you scroll

 5    all the way down?

 6         Q.  Yes.

 7         A.  Okay.  Yes.

 8         Q.  You are aware of that?

 9         A.  Yes.  At least in terms of the Excel

10    sheet it was.

11         Q.  And I guess in the interest of

12    completeness, let me see, I just showed

13    you -- I'm not sure which one we're looking

14    at, can you tell?  It's not this one.

15         A.  Well, it is now.

16         Q.  But the default one that it went

17    to -- so we're looking at the January 2017

18    one?

19         A.  Wasn't there more tabs a moment ago?

20         Q.  Let me close it and open it back up.

21              Benlida statement reconciliation.

22    Can you tell what tab we're looking at that

23    it defaults open to?

24         A.  Carefully click on that right arrow.

25         Q.  Okay.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                      R. Paulikens
 2        A.   Keep going.  We're looking at the
 3   November tab.
 4        Q.   November 2017?
 5        A.   Yes.
 6        Q.   Okay.  So if we tab back to the
 7   first one on it, which is January 2017, and
 8   we scroll down, we see the company is U.S.,
 9   there's a note in there, that's not something
10   you did, right?
11        A.   No.
12        Q.   And then it ends at line 133 for
13   U.S. and then shifts to Hong Kong in line
14   136?
15        A.   Yes.
16        Q.   Okay.
17             MR. LERNER:  So we didn't mark
18        anything now?
19             MR. ROSENTHAL:  I don't think
20        we need to mark it.
21        Q.   One more I will ask you about and
22   then we're done.
23             There's one that's called an Excel
24   spreadsheet in your file called BLD ROK
25   shipments plus payments 7-20-2019.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1                  R. Paulikens

 2          Are you familiar with that file?

 3      A.  That was one that was provided to us

 4  probably as the initial document tranche.

 5      Q.  And I guess the question I have for

 6  you is, did you do any work in this Excel

 7  spreadsheet file?

 8      A.  In this one, no.  This was, I

 9  believe it's Benlida's work that was sent to

10  us, although it may have been one of the

11  ping-pong balls that was going back and forth

12  when they were trying to reconcile.  The date

13  source suggests it, July of 2019.

14      Q.  Other than what we've discussed

15  today in great detail, are there any opinions

16  that as you sit here today you are planning

17  to offer in this case that we haven't talked

18  about today?

19      A.  As I'm sitting here right now, I

20  don't think so.

21      Q.  Okay.  Do you want to confer with

22  counsel to double check on that?

23              MR. LERNER:  No.

24              MR. ROSENTHAL:  I have no more

25        questions.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1              R. Paulikens

2              Thanks for your patience.

3              MR. LERNER:  I have a question.

4              MR. ROSENTHAL:  Okay.

5   EXAMINATION BY

6   MR. LERNER:

7        Q.  Mr. Paulikens, you testified

8   earlier, and it may have been within the

9   first hour or so, that the moneys owed by CTX

10  to Benlida is in the range, I believe you

11  said 3 million to 8 million.

12       A.  Depending on the data source, yes, I

13  believe I did.

14       Q.  And for purposes of making that

15  statement, did you factor in or assume, for

16  sake of analysis, the validity of CTX's late

17  time penalties and debit notes?

18              MR. ROSENTHAL:  Objection to

19        the form.

20       A.  Debit memos up through January '16

21  are subsumed in the numbers because that

22  range I gave you was in the charts that we

23  discussed at length today.  But I don't

24  believe the lead time penalties were included

25  in those charts after January of '16.

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

```
 1              R. Paulikens

 2              MR. LERNER:  Okay.  Thank you.

 3              MR. ROSENTHAL:  So under at

 4       least Florida procedure, which may

 5       not apply in this deposition, you

 6       have a right to read this transcript.

 7       I don't know if under New York

 8       stipulations you do or don't.

 9              MR. LERNER:  It's ordinarily,

10       you're taking the deposition, you

11       would send him -- us a copy and we

12       convey it to him, the transcript, for

13       review.

14              THE REPORTER:  Because it's

15       federal, you have to order your own

16       copy.

17              MR. LERNER:  That's right.

18       Yes.

19              MR. ROSENTHAL:  So just to

20       instruct the witness, he's probably

21       quite familiar with this, he's an

22       expert in many cases, if he wishes to

23       read the transcript he will have to

24       work with counsel to order a copy.

25              We will order the transcript.
```

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1                   R. Paulikens

2              MR. LERNER:  We will as well.

3

4

5       (Whereupon, at 4:35 p.m., the examination

6    of this witness was concluded.)

7

8    _____

9    RANDALL M. PAULIKENS, CPA/AVB/CFF/CITP

10

11   Subscribed and sworn to before me

12   this _____ day of _____, 2023.

13

14   _____

15       NOTARY PUBLIC

16

17

18

19

20

21

22

23

24

25

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1

2                     I N D E X

3

    WITNESS           EXAMINATION BY          PAGE
4
    Randall M.        Mr. Rosenthal             4
5   Paulikens         Mr. Lerner              304

6
                      EXHIBITS
7
    EXHIBIT           DESCRIPTION             PAGE
8
      141             Printout of documents
9                     sent to counsel           7

10    142             Benlida v. CTX accounting
                      event                    15
11
      143             Summary spread sheet     23
12
      144             Paulikens expert report  30
13
      145             Working analysis
14                    spreadsheet              32

15    146             File entitled Benlida
                      shipment and payment details
16                    CTX HX 2012 to 2019      72

17    147             KM report                97

18    148             Benlida payment details
                      CTX U.S. 2012-2021 V5 July
19                    2023 report             155

20    149             EN tab                  285

21    149-A           Invoice details tab     287

22    149-B           Sheet 1 of Exhibit 149  291

23    150             Shipment amount
                      comparison              295
24

25   (Exhibits retained with Mr. Rosenthal)

Randall M. Paulikens, CPA/AVB/CFF/CITP
July 20, 2023

1

2              C E R T I F I C A T E

3         I, MICHELLE LEMBERGER, a shorthand

4    reporter and Notary Public within and for

5    the State of New York, do hereby certify:

6         That the witness(es) whose testimony

7    is hereinbefore set forth was duly sworn by

8    me, and the foregoing transcript is a true

9    record of the testimony given by such

10   witness(es).

11        I further certify that I am not

12   related to any of the parties to this

13   action by blood or marriage, and that I am

14   in no way interested in the outcome

15   of this matter.

16

17

18

19

20

21

22

23

24             MICHELLE LEMBERGER

25