**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-60125-CIV-SCOLA/GOODMAN**

JIANGMEN BENLIDA PRINTED
CIRCUIT CO., LTD.,

Plaintiff,

v.

CIRCUITRONIX LLC,

Defendant.

_____/

**CIRCUITRONIX, LLC'S RESPONSE IN OPPOSITION TO**
**BENLIDA'S MOTION *IN LIMINE***

**PODHURST ORSECK, P.A.**
One S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
Tel.: 305-358-2800/Fax: 305-358-2382
Stephen F. Rosenthal
srosenthal@podhurst.com
Matthew Weinshall
mweinshall@podhurst.com
Christina H. Martinez
cmartinez@podhurst.com

*Counsel for Circuitronix, LLC*

Circuitronix, LLC ("CTX") opposes Benlida's motion to exclude (1) testimony from Professor Wei Cui, CTX's expert on Chinese tax, customs, and trade-credit regulations, as well questioning to elicit testimony from lay witnesses regarding Benlida's compliance with these regulations, and (2) evidence regarding Benlida's trade-credit insurer, China Export & Credit Insurance Corporation ("Sinosure").  DE 196 ("Motion").  Because the evidence and testimony Benlida seeks to preclude is materially relevant to Circuitronix's counterclaim and defenses, the Court should deny Benlida's Motion.

## I.   Testimony Regarding Benlida's Regulatory Obligations in China Should Be Admitted

Benlida argues that Professor Cui's opinions and related witness testimony regarding Benlida's regulatory obligations in China have "no bearing on the matters at issue in this case." Mot. at 2.  Despite that assurance, this testimony provides a valuable backdrop for a jury to understand Benlida's conduct towards CTX through the course of the parties' business relationship.  Specifically, it helps make sense of *why* Benlida might have occasionally requested that CTX direct payments that it owed to Benlida to Benlida's affiliate, ROK Printed Circuit Co., Ltd. ("ROK"), instead.

Testimony that helps to explain Benlida's behavior, including those payments to ROK, is undeniably relevant to CTX's counterclaim and affirmative defenses.  Indeed, one component of CTX's claimed damages is based on Benlida's failure to credit CTX for payments that Benlida requested CTX pay to ROK.  *See* DE 198-2 (CTX's Rule 26(a)(1) Supp'l Disclosure of June 26, 2023) at 2.  The issue of CTX's regulatory obligations and compliance in China thus is not "collateral" to but enmeshed with the issues in the lawsuit.  Neither Rule 608 nor Rule 403 bar introduction of Professor Cui's testimony or CTX's questioning of lay witnesses about Benlida's regulatory obligations and compliance.  Finally, even if reference to Benlida's compliance status

1

in China causes some prejudice to Benlida in the eyes of jurors, any prejudice is outweighed by the importance of such testimony to CTX's counterclaim and can be properly managed with a limiting instruction from the Court.

### A. The testimony of a Chinese regulatory law expert regarding the Chinese legal environment in which Benlida operated is relevant to CTX's counterclaim and affirmative defenses

CTX intends to use Professor Cui as a foreign law expert whose testimony is important to set the scene in which the parties' business dispute arose.  As a Chinese company exporting goods to a foreign (U.S.) company, Benlida is subject to Chinese regulatory oversight.  *See* DE 196-1 (Cui Report).  During the course of the parties' business relationship, Benlida periodically invoked concerns about compliance with Chinese law to justify certain conduct, as discussed more specifically below.  To even the playing field at trial, CTX retained a Chinese law expert, Professor Cui, who can set the background for the jury and explain a few principles of Chinese foreign exchange regulations that underlie the parties' business dealings.[1]  For all Benlida's protestation about potential testimony from Professor Cui regarding whether Benlida was sanctionable for violating Chinese law, Professor Cui's report makes clear that he "merely identifies some features of the Chinese regulatory framework in light of which [Benlida's] conduct may be assessed" and that he does not "reach any conclusions regarding BLD's compliance (or lack thereof) with such framework."[2]  DE 196-1 at 2.

Professor Cui will discuss two general requirements of Chinese law that help to contextualize Benlida's conduct toward CTX, and specifically, its instruction that CTX pay ROK

---

[1] The fact that the parties' contract is governed by Florida law has no bearing on these issues. Benlida's assertion to the contrary (Mot. at 4-5) is simply off-point.  Regardless of the law governing the parties' contract, Chinese law has also influenced Benlida's conduct, as Professor Cui explains.

[2] Benlida is forced to speculate about Professor Cui's *potential* testimony because it elected not to take his deposition and confirm the contours of his expert opinions.

money that was in fact owed to Benlida: (1) that a legal exporter of goods should be the recipient of foreign currency payments for that export, and (2) that exporters which receive such foreign currency payments must make timely reports of the receipt or extension of trade credit (*e.g.*, through deferred payments, advance payments, or other transactions).  *See* DE 196-1 at 2-3. Using an expert to testify about international law or practice is acceptable where the testimony provides important background to certain issues.  *See, e.g.*, *United States v. Ali*, 799 F.3d 1008, 1014-15 (8th Cir. 2015) (affirming defendant's conviction in connection with sending funds to Somalian organization designated as a foreign terrorist organization; describing foreign law expert testimony about history of Somalia, organization's role and goal to impose Islamic law in Somalia, and organization's connections with al Qaeda); *United States v. Young*, 916 F.3d 368, 381 (4th Cir. 2019) (finding testimony of expert witness regarding convergence between Islamist and Nazi ideologies was relevant because it assisted the jury by providing context for the historical backgrounds of and connection between Nazism and militant Islamism and would assist the jury in understanding evidence of predisposition).

Professor Cui's testimony is relevant under Rule 401 because "it has … [a] tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."  Fed. R. Evid. 401.  As Professor Cui explains, Chinese regulations require that foreign currency payments be received by whichever of Benlida or ROK actually exported the goods paid for.  Benlida's desire to comply or reflect compliance with this requirement likely informed its request to CTX that it divert certain payments owed to Benlida to ROK instead.  Moreover, these unorthodox requests could have affected Benlida's recording of those payments, helping to explain why Benlida's accounting books don't agree with CTX's.

Relatedly, regarding the second regulatory principle Professor Cui addresses, Benlida's desire to comply with reporting requirements regarding receipt or extension of trade credit—and to avoid adverse administrative action like the monetary penalties or compliance-status downgrade discussed in Professor Cui's report, DE 196-1 at 3—would necessarily affect Benlida's bookkeeping, which could in turn illuminate how and why Benlida "failed to properly credit" payments or "made demands for prepayments, advance payments, and payment premiums" (*see* DE 34 (Counterclaim) at ¶ 39.c-d).  By helping a jury understand party communications and Benlida's bookkeeping concerning CTX—particularly with respect to the payment-to-ROK instruction—Professor Cui's testimony will help a jury determine whether CTX overpaid Benlida and whether Benlida properly requested, and credited, those payments.

Without Professor Cui's explanation of the regulatory framework to fill the gap many jurors may miss the connection between Benlida's references to a particular regulatory body and its related requests for wires to ROK.  For instance, in one email cited by Professor Cui, Benlida's Sales Director, Huang Sulan ("Tracy"), informed CTX that Benlida had received a "formal notice from [the] tax department" advising that "ROK is now [o]n [the] blacklist" due to a foreign exchange gap issue.  *See* Exhibit 1 (CTX_2070).  She suggested that "CTX must only wire to [the] ROK account" for money owed to "both Benlida and ROK" to resolve the issue and provided options for how to resolve the gap given the "CTX wire amount is bigger than [the] payable amount."  *Id.*  She also said that Benlida "will write a report to [the] tax department to explain" the situation and admitted that "[s]ince we cannot explain … we have to make up some other reasons."  *Id.*  In another email, Ms. Huang referenced a "formal notice from [the] tax department" and stated that "to resolve ROK foreign exchange gap in tax department, we need to do some wire transfers."  *See* Exhibit 2 (CTX_3495-96) at 1 (email from tracy@benlida.com on

2017-04-13 at 15:07).  She then outlined similar proposals about how to structure payments in order to help Benlida avoid unnecessary fees or penalties.  *Id.*

Professor Cui's testimony regarding Chinese regulations about reporting requirements and the proper export/receipt of foreign currency payments will help the jury understand *why* Benlida might reference issues with the tax authority and payments to ROK in the same breath. That understanding supports the aspect of CTX's claim for damages based on uncredited payments Benlida asked it to send to ROK.  Professor Cui's testimony thus will help the jury contextualize and decipher the significance of Benlida's instructions, thereby making their delivery more probable in the eyes of a jury.  The fact that Benlida made those instructions—and that CTX paid ROK as instructed but never received credit for those payments with Benlida—is of consequence for determining that aspect of CTX's claimed damages.  *See* DE 198-2 (CTX's Rule 26(a)(1) Supplemental Disclosure of June 26, 2023) at 2.

More broadly, CTX's counterclaim, and indeed some of its affirmative defenses, assert that Benlida "has not properly credited payments made by [CTX]" and that "CTX maintains a significant credit balance due to overpayments that have accumulated over the course of the companies' relationship."  DE 34 (Affirmative Defenses) at ¶ 1; *see also, e.g.*, *id.* at ¶ 2, (Counterclaim) at ¶¶ 5, 37-40.  Because understanding how and why those instructions were made and payments were recorded will directly affect a jury's ability to assess affirmative defenses and CTX's claim for damages, Professor Cui's testimony is relevant and admissible.

**B.  Lay testimony about Benlida's compliance with Chinese regulatory law is appropriate because Benlida invoked that justification to CTX for certain actions and it is relevant to CTX's counterclaim and affirmative defenses**

Benlida's motion also seeks to bar any testimony by lay witnesses about Benlida's compliance with Chinese regulatory law.  Mot. at 6-7.  As with Professor Cui's testimony, this evidence is relevant to CTX's counterclaim seeking recovery of money paid to ROK at Benlida's

5

direction as well as its affirmative defense that CTX has made payments to ROK which Benlida "has not properly credited."  DE 34 (Affirmative Defenses) at ¶ 1; *see also id.* ¶ 5 (waiver).

Benlida's witnesses have implicitly acknowledged the relevant connection between Chinese regulatory law and Benlida's accounting practices—the latter of which goes directly to Benlida's basis for claiming that CTX owes Benlida money on supposedly unpaid invoices. Benlida's Sales Director, Tracy Huang, testified at her deposition, for instance, that the Chinese tax department requires Benlida to keep separate the accounts receivable for every company customer because of foreign exchange regulations and value-added tax calculations.  Exhibit 3 (Tracy Huang Depo. Excerpts) at 34:2-11.  Her acknowledgement of this Chinese-law requirement, as well as Benlida's retention of an outside auditor to review separately kept company books, undermines Benlida's explanation that it applied CTX payments to some combined version of the CTX and Circuitronix (Hong Kong) Ltd. ("CTX-HK") account books.

Additionally, communications sent by Benlida and its witnesses' deposition testimony and potential trial testimony regarding the company's regulatory compliance are relevant to CTX's counterclaim for damages based on uncredited CTX payments to ROK.  Ms. Huang acknowledged at her deposition, for instance (consistent with Professor Cui's report), that Chinese regulations required Benlida "to show a match" in its books between the shipment value of exported goods and foreign currency received.  Tracy Huang Depo. at 116:4-12; 191:19-192:15.  And she testified that Benlida requested CTX make certain payments to help balance books and that Benlida sometimes had to pay a tax due to gaps in the books.  *See id.* at 117:4-12 (referencing request to help balance ROK's books); *see also id.* at 114:24-120:6 (fuller context); 118:4-12; 221:10-20.  Benlida's Chief Financial Officer, Wu Yukun ("Roger"), provided similar testimony regarding how Benlida's regulatory obligations in China and its business dealings with

CTX sometimes affected each other and Benlida's compliance status.  *See, e.g.*, Exhibit 4 (Roger Wu Depo. Excerpts) at 215:20-217:17 (testifying about Benlida's obligation to report foreign currency transactions, the required "match" between product sales to foreign buyers and amount of foreign currency received, and how the mismatch in the CTX account caused "trouble" for Benlida before the Chinese tax authority).

This testimony sheds light on background pressures that may have motivated Benlida to request that CTX make certain payments to ROK and to reflect those payments in its books to show the requisite "match."  These facts make also it more probable that Benlida resorted to unorthodox accounting practices throughout its relationship with CTX, which in turn is material to a jury's evaluation of CTX's counterclaim and defenses against Benlida's theory of the case, which depends upon the reliability of its accounting practices.  Benlida's regulatory obligations in China are plainly distinct from its contractual obligations with CTX, but Ms. Huang's and Mr. Wu's deposition testimony confirm that the two are deeply intertwined.  CTX should not be precluded from eliciting testimony that exposes how Benlida's regulatory concerns about compliance translated to its treatment of CTX.

## C. Rule 608 does not bar admission of testimony regarding Benlida's regulatory obligations in China

Based on the line of cases Benlida cites in support of its argument, its weapon of choice against the introduction of evidence regarding its Chinese regulatory obligations and compliance status appears to be Rule 608.  *See* Mot. 3-4 (describing courts' analysis involving Rule 608 and regarding evidence to attack witness credibility, citing *U.S. v. Hertzberg*, 558 F.2d 1219 (5th Cir. 1977); *Torres v. Rock & River Food, Inc.*, No. 15-22882-civ, 2016 WL 8716674 (S.D. Fla. May 11, 2016); *Puerto v. Moreno*, No. 19-25282, 2021 WL 2716201 (S.D. Fla. July 1, 2021)).  But Rule 608 is a poor choice for this battle.

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800  Fax  305.358.2382 • Ft. Lauderdale 954.463.4346                    www.podhurst.com

First, the Rule focuses on the admissibility of evidence of credibility and/or truthful character, whereas here CTX seeks to introduce testimony regarding Benlida's regulatory obligations primarily to show the regulatory framework's effect on Benlida's treatment of CTX, not Benlida's noncompliance or character.  Second, Rule 608 speaks to evidence used to impeach or challenge *a testifying witness'* truthfulness or credibility.  It does not address a situation where, as here, Benlida seeks to preclude testimony that may speak to *Benlida's* (*i.e.*, *a corporate party's*) general credibility or truthful character, *see* Mot. 3 (surmising CTX desires to use the testimony to "collaterally attack *Benlida's* credibility") (emphasis added).  Beyond these weaknesses, Rule 608 does not bar evidence of a witness' credibility (contrary to Benlida's apparent belief (Mot. 3-4)), or of cross-examination regarding a witness' character for truthfulness. [3]

Rule 608(b) prohibits the use of extrinsic evidence to prove the witness' character for truthfulness, but "'the absolute prohibition on extrinsic evidence applies *only* when the sole reason for proffering th[e] evidence is to attack or support the witness'[s] character for truthfulness.'"  *United States v. Burnette*, 65 F.4th 591, 607 (11th Cir. 2023) (citation omitted; alteration in original; court's emphasis).  In other words, to the extent CTX might offer the regulation and compliance testimony to address issues of a witness'[s] bias or credibility, Rule 608(b) would permit it.  *See id.* at 606-07 (noting distinction recognized in *United States v. Abel*, 469 U.S. 45, 56 (1984) "between extrinsic evidence presented to demonstrate a witness's 'bias,'

---

[3] Although Benlida does not specify, it appears to rely on Rule 608*(b)* (not Rule 608(a)) as the basis for excluding regulatory and compliance testimony.  Rule 608(a) governs attacks on a witness' credibility through "testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character." Fed. R. Evid. 608(a).

8

which Rule 608(b) permits, and evidence presented to show his lack of 'veracity,' which the Rule prohibits").

Notably, the Rule generally "does not preclude the use of extrinsic evidence that contradicts material testimony." *Bratt v. Genovese*, 782 F. App'x 959, 967 (11th Cir. 2019) (citing *United States v. Calle*, 822 F.2d 1016, 1021 (11th Cir. 1987)); *see also United States v. Wheeler*, 16 F.4th 805, 828 (11th Cir. 2021) (explaining that "extrinsic evidence can be 'offered for other grounds of impeachment (such as contradiction, prior inconsistent statement, bias and mental capacity)'") (citing Fed. R. Evid. 608(b), advisory committee's notes to 2003 amendments).

Rule 608 does not present an obstacle to CTX offering Professor Cui as a witness or to asking Benlida witnesses about Benlida's regulatory obligations and compliance in China—so long as that evidence does not attack a testifying witness's character for truthfulness on direct examination and so long as the evidence emerges for impeachment or to contradict material facts during cross-examination.  Regardless, as discussed, CTX intends to use Professor Cui's testimony to contextualize party communications regarding how Benlida's regulatory obligations redounded on CTX, including how and why Benlida was prompted to request that CTX make payments.  It intends to elicit testimony from Benlida's witnesses on much the same subject and to cross-examine them, as necessary, on these topics based on their direct testimony.  There is no Rule 608 problem.

Benlida's notion that this testimony veers into "collateral issues" that risk jury confusion ignores how evidence of Benlida's regulatory responsibility here is far more tightly bound to CTX's claims and defenses than the wholly unconnected matters that parties have sought to introduce in other cases.  In *Torres v. Rock & River Food, Inc.*, No. 15-22882-civ, 2016 WL

8716674, at *2-3 (S.D. Fla. May 11, 2016), like in *Puerto v. Moreno*, No. 19-25282, 2021 WL 2716201, at *1 (S.D. Fla. July 1, 2021), plaintiffs sought to exclude evidence of their own nonpayment of income taxes in Fair Labor Standards Act cases.  This Court, rightly, rejected the one defendant's *in pari delicto* defense in *Torres*, determining that extrinsic evidence of the plaintiffs' taxpaying record was "in no way connected with the *Defendants'* alleged failure to properly compensate Plaintiff."  2016 WL 8716674, at *2.  In contrast, as Benlida's own witnesses have implicitly acknowledged, Benlida's regulatory obligations *do* bear on its bookkeeping practices and payment requests to CTX.

### D.  The probative value of Professor Cui's and Benlida's witnesses' potential testimony is not outweighed by any unfair prejudice

Because the probative value of testimony and evidence regarding Benlida's Chinese regulatory obligations outstrips any resulting prejudice to Benlida, Rule 403 does not block admission.

"[E]xclusion of relevant evidence under Rule 403 is 'an extraordinary remedy that should be used sparingly' and only after looking at the evidence 'in the light most favorable to its admission.'"  *Bluestarexpo, Inc. v. Enis*, No. 21-20875-CIV, 2022 WL 16835934-SCOLA/GOODMAN, at *14 (S.D. Fla. Nov. 9, 2022) (quoting *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1303 (11th Cir. 2018)).  "'[T]he balance should be struck in favor of admissibility.'"  *United States v. Archible*, No. 21-14172, 2022 WL 16833770, at *2 (11th Cir. Nov. 9, 2022) (quoting *United States v. Alfaro-Moncada*, 607 F.3d 720, 734 (11th Cir. 2010)).

Exclusion is not appropriate here, contrary to Benlida's claim that such testimony will have a "potentially prejudicial effect and risk of confusing the issues to be tried."  Mot. at 6. Presumably, Benlida means to repeat the same criticisms it did under Rule 608, suggesting that

10

such testimony may cast Benlida in a negative light or that it will create a "sideshow about the regulatory law of China." Mot. at 5.  As before, neither criticism is well-founded.

First, as discussed, this testimony and related evidence is directly relevant to CTX's claimed damages for monies owed to Benlida but paid to ROK at Benlida's direction.  It is also relevant to provide jurors with a fuller picture of CTX's affirmative defenses based on the same ROK payments and claims that Benlida did not properly credit CTX payments made to it.  The mere fact that there might be some prejudice to Benlida by the introduction of such evidence is not a basis to exclude it under Rule 403—particularly where CTX's focus in introducing it is primarily intended to explain Benlida's motivations based on its regulatory concerns and less to expose any noncompliance in and of itself.  The fact that references to such noncompliance will likely be raised in the testimony is not sufficient reason to ignore the relevance and probative value of the overall testimony by excluding it.  Subjects with far greater potential to unfairly prejudice have been permitted.  *See, e.g.*, *United States v. Springer*, 753 F. App'x 821, 828–29 (11th Cir. 2018) (concluding that "potential prejudicial value of references to [defendant's] pro-ISIS sympathies" did not outweigh "sufficiently countervailing probative value"); *United States v. Lehder-Rivas*, 955 F.2d 1510, 1518 (11th Cir. 1992) (admitting evidence of defendant's views on Hitler and comparisons of his drug trafficking organization with the Third Reich, even though it was prejudicial, given probative value in proving motives and demonstrating nature and scope of criminal conspiracy).  Any prejudice that may flow from evidence about Benlida's non-compliance with Chinese regulatory law is not unfair.

Second, and relatedly, far creating a "side show," focused testimony explaining pertinent Chinese regulations and Benlida's compliance "will help fill in the gaps and paint a more-complete picture for the jury" about why Benlida might have credited payments in a particular

way or directed that payments from CTX be paid to the ROK account. *United States v. Escalona*, No. 22-20423-CR, 2023 WL 3093630, at \*4 (S.D. Fla. Apr. 25, 2023). The testimony is calculated to help jurors understand how the background factors and regulatory pressures in China *outside of* Benlida's relationship with CTX may have affected its day-to-day dealings and transactions *with* CTX, and most specifically, that may have prompted it to ask for payments to ROK.

Finally, any danger of unfair prejudice posed by this testimony can be ameliorated by a limiting instruction advising jurors to consider it only for purposes of understanding Benlida's reasons for directing payments to ROK or explaining pressures to record payments and exports in a particular way. *Archible*, 2022 WL 16833770, at \*2 (citing *United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005)); *Springer*, 753 F. App'x 821, 829 (11th Cir. 2018) (citing Circuit authority for the proposition that the "district court's limiting instruction mitigated any unfair prejudice possibly caused by admission of prior bad act evidence") (citing *United States v. Edouard*, 485 F.3d 1324, 1346 (11th Cir. 2007)). Likewise, the Court can caution jurors that Benlida's regulatory obligations in China and compliance therewith are distinct from its contractual obligations toward CTX. Courts have frequently determined that "[a]ny residual prejudicial concern [of prejudice] [can be] ameliorated by the district court's several admonitions to the jury" about its legitimate uses under the Rules of Evidence. *United States v. Green*, No. 22-10785, 2023 WL 2883003, at \*2 (11th Cir. Apr. 11, 2023) (discussing limiting instruction in the context of mitigating potential prejudicial effect of evidence of other acts).

Because testimony regarding Benlida's compliance with regulatory obligations is relevant and because neither Rule 608 or Rule 403 prevent its introduction, the Court should deny Benlida's motion.

**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800  Fax  305.358.2382 • Ft. Lauderdale 954.463.4346                    www.podhurst.com

II.     **Testimony and Documents Regarding Sinosure and Benlida's Trade-Credit Insurance Should Be Admitted**

Evidence concerning Sinosure, Benlida's trade-credit insurer, is relevant to CTX's counterclaim and defenses.  Contrary to Benlida's arguments, neither Federal Rule of Evidence 411 nor the collateral source rule provides a valid basis for excluding this evidence.

A.  **Evidence Concerning Sinosure Is Relevant**

Benlida has maintained trade-credit insurance with Sinosure—also known as Zhong Xin Bao—for several years.  Exhibit 5 (Huang Xiangjiang Depo. Excerpts) at 91:18-92:6; Tracy Huang Depo. at 195:11-16.  The insurance covers the risk that Benlida cannot collect money owed from its customers.  Huang Xiangjiang Depo. at 89:20-90:4.  Sinosure establishes insurance or credit limits specific to each of Benlida's customers.  Tracy Huang Depo. at 197:1-198:14.  It therefore established separate limits applicable to CTX and CTX-HK.  *Id.*

Benlida submitted two claims to Sinosure for amounts owed by CTX and CTX-HK, respectively, in August or September of 2019.  Roger Wu Depo. at 198:12-22; Depo. Exs. 80, 81. This was the first time that Benlida submitted claims to Sinosure with respect to either Circuitronix business.  Tracy Huang Depo. at 195:17-196:18.  Benlida, however, was required to report delinquent accounts to Sinosure within 60 days of the delinquency.  Roger Wu Depo. at 195:23-197:16.

Benlida began charging CTX for insurance premiums in April or May of 2019, at Sinosure's direction.  Tracy Huang Depo. at 37:18-38:21; Roger Wu Depo. at 90:16-91:8.  This added an extra three-to-ten percent to Benlida's invoices.  *Id.*

This evidence concerning Benlida's relationship with Sinosure is relevant, and thus admissible under Federal Rule of Evidence 402, for at least three reasons.  ***First***, CTX's counterclaim alleges that the Sinosure-directed insurance premiums tacked on to Benlida's

invoices breached the Manufacturing Agreement and Letter Agreement, neither of which permitted Benlida to charge CTX the premiums.  DE 34, ¶ 39(d).  The amount of the improperly charged premiums, totaling approximately $317,539, constitutes a component of the damages that CTX seeks to recover under its counterclaim.  CTX Supp'l Disclosure at 3.

**Second**, the evidence of Sinosure's treatment of CTX and CTX-HK as separate and distinct entities, together with Benlida's submission of separate claims for each entity in 2019, supports CTX's defense against Benlida's effort to hold it responsible for CTX-HK's alleged debts.  As Benlida's witness even concedes, Sinosure established different insurance or credit limits for each entity "[b]ecause they are different entities."  Tracy Huang Depo. at 198:21-199:4.

**Third**, the timing and contents of the claims that Benlida submitted to Sinosure in 2019 call into question the credibility of Benlida's representations in this case regarding its accounting and CTX's alleged debts.  Benlida's claims that certain invoices to CTX (and CTX-HK) remain unpaid rely upon a first-in-first-out accounting method that commingles the debts and payments from both CTX and CTX-HK and which is based on millions of dollars of claimed overdue payments from CTX-HK that are many years old.  Only $1.3 million of the $13.5 million Benlida contends CTX-HK owed, and which went into its calculation of its claims, is from 2019; some $7 million of the total dates back before 2018, with over $4 million of it dating from between 2012-2016.  *See* DE 198 at 10.  But Benlida's failure to submit a claim to Sinosure for any alleged CTX debts from 2012 through 2018 contradicts Benlida's current theory.

### B.  Rule 411 Is Inapplicable

Contrary to Benlida's claims, Federal Rule of Evidence 411 does not apply here.  The rule provides:

> Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise

14

> wrongfully. But the court may admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control.

Fed. R. Evid. 411. As the second sentence of the rule makes clear, "all evidence of insurance should not be categorically excluded under Rule 411." *Vargas v. Michaels Stores, Inc.*, No. 8:16-CV-1949-T-33JSS, 2017 WL 3723655, at *2 (M.D. Fla. Aug. 29, 2017). Rather, the prohibition set forth in the first sentence of the rule is limited "to insurance that would indemnify a person from liability for the injury at issue." Charles A. Wright & Kenneth W. Graham, Federal Practice & Procedure: Evidence § 5363.

The Sinosure insurance does not meet the criteria for exclusion under the first sentence of Rule 411. It does not insure Benlida "against liability" for anything. Rather, it compensates Benlida for the sale of goods when customers fail to pay—it protects Benlida from the risk of customer non-payment. Thus, evidence concerning the Sinosure insurance cannot fall within the ambit of Rule 411. *See Green Const. Co. v. Kansas Power & Light Co.*, 759 F. Supp. 740, 744 (D. Kan. 1991), *aff'd*, 1 F.3d 1005 (10th Cir. 1993) (admitting evidence concerning insurance in a breach of contract action because "the present case does not involve liability insurance").

And regardless of how the Sinosure insurance is characterized, CTX is not pointing to the mere fact that Benlida was or was not insured to prove that Benlida "acted negligently or otherwise wrongfully," as the rule requires. Fed. R. Evid. 411. Rather, as discussed in the prior section, evidence concerning Benlida's interaction with Sinosure—not the mere existence of the insurance—is probative of: CTX's damages under its counterclaim; Benlida's violation of the parties' contracts; the separate and distinct nature of CTX and CTX-HK and Benlida's awareness thereof; and the lack of credibility of Benlida's claims concerning its accounting method and CTX's alleged debts. These permissible uses of evidence concerning Benlida's relationship with Sinosure steer clear of Rule 411. *See Herrera v. 7R Charter Ltd.*, No. 1:16-CV-24031, 2020 WL

15

**Podhurst Orseck, P.A.**

One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800  Fax  305.358.2382 • Ft. Lauderdale 954.463.4346                    www.podhurst.com

8768451, at *12 (S.D. Fla. Oct. 23, 2020), *aff'd*, No. 21-11766, 2022 WL 42751 (11th Cir. Jan. 5, 2022) (permitting the introduction of evidence regarding insurance, over a Rule 411 objection, because the plaintiff did "not seek to introduce the insurance policy for the purpose of proving Defendant's Captain acted negligently").

Indeed, courts have specifically approved the use of evidence concerning insurance to prove damages, as CTX intends to do here. *See DSC Commc'ns Corp. v. Next Level Commc'ns*, 929 F. Supp. 239, 247 (E.D. Tex. 1996) (holding that Rule 411 "*does not* prohibit the use of evidence of insurance where it is relevant to the issue of damages or punitive damages") (quotation marks omitted); *accord Ferren v. Nat'l R.R. Passenger Corp.*, No. 00 C 2262, 2001 WL 1607586, at *9 (N.D. Ill. Dec. 12, 2001) (admitting evidence concerning insurance because it was relevant for "establishing [plaintiff's] alleged damages").  Likewise, courts have overruled objections like Benlida's when details of a party's relationship with an insurer were relevant to a breach of contract claim, as is the case here.  *Smith v. Summers*, 334 F. Supp. 3d 339, 345 (D.D.C. 2018) (holding that "evidence of the parties' contractual relationship is relevant and admissible under Federal Rule of Evidence 402, and its admission does not violate Rule 411"); *Eagle Suspensions, Inc. v. Hellmann Worldwide Logistics, Inc.*, 571 F. App'x 281, 286 (5th Cir. 2014) (affirming admission of evidence regarding insurance where it was relevant to breach of contract claim).

The inapplicability of Rule 411 is evident from the glaring absence of relevant authority from Benlida's motion.  The only case it cites that even mentions Rule 411 is *Jetport, Inc. v. Landmark Aviation Miami, LLC*, No. 1:16-CV-23303-UU, 2017 WL 7734085, at *1 (S.D. Fla. July 26, 2017).  But *Jetport* cannot help Benlida for two reasons.  ***First***, both parties agreed in *Jetport* that evidence regarding their insurers should be excluded.  *Id.* at *1.  There is no such

concession here.  **Second**, the insurance *was* liability insurance, the case involved competing claims of negligence for a collision between aircraft, and the only contemplated purpose of mentioning the insurance was to establish a party's negligence—the precise fact pattern that fits within the narrow ambit of Federal Rule of Evidence 411.  *Id.*  This case involves none of those circumstances, so *Jetport* and Rule 411 are irrelevant here.

### C.  The Collateral Source Rule Is Inapplicable

Benlida's alternative argument for excluding evidence regarding Sinosure—the collateral source rule—fares no better.  Because CTX is not seeking to use amounts that Benlida received from Sinosure to reduce or offset Benlida's claimed damages, the collateral source rule does not apply here.

The collateral source rule generally provides that a plaintiff's receipt of benefits from a source independent of the defendant will not diminish the plaintiff's recovery of damages from the defendant.  *See ML Healthcare Servs.*, 881 F.3d at 1298 ("When a tort plaintiff has been compensated by her health insurer, or other non-defendants, for injuries that have been caused by the defendant, the question arises whether the plaintiff can recover those expenses for which she has already been reimbursed. The collateral source rule provides that the plaintiff is entitled to recover those already-reimbursed expenses.").  This common law doctrine is considered a substantive issue, and thus is governed by state law in a diversity action.  *See id.* at 1299 ("The substantive component of the rule, which prohibits the reliance on collateral source payments to reduce a plaintiff's damages award, is binding on a federal court sitting in diversity.").  Florida law, which applies in this diversity case, recognizes a modified version of the collateral source rule.  *See* § 768.76, Fla. Stat. (requiring a court to reduce a damages award by the amount a plaintiff receives from certain collateral sources); *Joerg v. State Farm Mut. Auto. Ins. Co.*, 176

So. 3d 1247, 1249 (Fla. 2015) ("[T]he Legislature has abrogated the common law damages rule.").

The evidentiary consequence of Florida's collateral source rule, however, is a matter of federal law. *See ML Healthcare*, 881 F.3d at 1299-1301. Under the familiar division set forth in *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), federal law governs procedural issues, which "encompass rules of evidence, and therefore, the Federal Rules of Evidence, not state evidentiary rules, apply to evidentiary disputes in a federal diversity action." *ML Healthcare*, 881 F.3d at 1299 (quotation marks omitted). In *ML Healthcare*, the Eleventh Circuit held that "federal law controls" evidentiary decisions related to Georgia's collateral source rule, because Georgia law provides that "[e]vidence concerning the receipt of collateral benefits will likely be inadmissible most of the time, but sometimes admission will be proper," and distinguishing between legitimate and improper uses of evidence "is a procedural" decision. *Id.* at 1301. Florida law is no different than Georgia law on this issue, as Florida law also permits the admission of evidence concerning the receipt of collateral benefits for certain purposes. *Joerg*, 176 So. 3d at 1250 n.1. Thus, under *ML Healthcare*, 881 F.3d at 1301-03, the admissibility of evidence concerning Benlida's relationship with Sinosure is controlled by the standard rules of evidence, including Rule 403, under which the exclusion of relevant evidence "is an extraordinary remedy that should be used sparingly and only after looking at the evidence in the light most favorable to its admission." *Id.* at 1303 (quotation marks omitted).

Benlida makes no effort to satisfy this heavy burden. It fails to even reference Rule 403. Mot. at 8-9. Instead, it cites several cases that simply decline to reduce or offset damages awards by the amounts plaintiffs received from independent sources. *See Camps v. Bravo*, No. 1:20-CV-24294, 2023 WL 4996937, at *7 (S.D. Fla. July 11, 2023) (declining to reduce damages award

based on plaintiffs' receipt of "compensation from the Argentine government"); *F.D.I.C. v. Prop. Transfer Servs., Inc.*, No. 12-80533-CV, 2013 WL 5535561, at *17 n.31 (S.D. Fla. Oct. 7, 2013) ("The FDIC's damages shall not be offset by the insurance benefits."). These cases are inapplicable because CTX is not seeking to introduce evidence regarding Benlida's relationship with Sinosure to reduce or offset any claimed damages.

Likewise, Benlida finds no support in *Southern v. Plumb Tools, A Division. of O'Ames Corporation*, 696 F.2d 1321, 1323 (11th Cir. 1983), because the Eleventh Circuit distinguished *Southern* in *ML Healthcare* on grounds applicable here. In *ML Healthcare*, the court held that *Southern*, which construed Alabama law, did not apply because Alabama's collateral source rule was "an all-or-nothing proposition," unlike Georgia's rule. *ML Healthcare*, 881 F.3d at 1301. Because Florida and Georgia law, as discussed above, both permit the admission of evidence concerning benefits received from collateral sources under some circumstances, *Southern* does not apply here either.

For similar reasons, Benlida's reliance on *Cowley v. Sunset Yacht Charters, Inc.*, No. 10-61928-CIV, 2011 WL 13394805, at *1 (S.D. Fla. July 22, 2011), is unavailing. *Cowley* relied primarily on *Southern* to exclude evidence concerning payments the plaintiff received from a "health and disability insurer." *Id.* Given *ML Healthcare*'s subsequent limitation of *Southern*, *Cowley*, which has not been cited by any other court, is inapplicable here as well. Additionally, *Cowley* narrowly concerned evidence of insurance payments received from an insurer, whereas the relevant evidence here involves the broader relationship and communications between Benlida and Sinosure, which are probative of CTX's damages, the distinction between CTX and CTX-HK, and the lack of credibility of Benlida's accounting practices, regardless of any payments that Benlida has received from Sinosure.

Moreover, as *ML Healthcare* recognized, "the potential for prejudice" arising from the admission of evidence concerning Sinosure can "easily be[] mitigated" and does not warrant its exclusion. *Id.* at 1303. While Benlida does not identify any specific form of potential prejudice, it presumably is concerned that the jury will conclude from evidence of its receipt of insurance payments that it has been compensated and thus reduce its damages award. But a limiting instruction on that issue, in accordance with Florida's statutory abrogation of the collateral source rule, would be more than sufficient to eliminate any risk of undue prejudice. *Id.* The collateral source rule, therefore, provides no basis for excluding evidence concerning Sinosure in this action.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Benlida's motion and allow the objected-to evidence to be introduced at trial.

Dated: August 22, 2023                     Respectfully submitted,


                                                    PODHURST ORSECK, P.A.
                                                    One S.E. 3rd Avenue, Suite 2300
                                                    Miami, Florida 33131
                                                    Tel.: 305-358-2800

                                                    */s/ Stephen F. Rosenthal*
                                                    Stephen F. Rosenthal
                                                    Florida Bar No. 0131458
                                                    srosenthal@podhurst.com
                                                    Matthew P. Weinshall
                                                    Florida Bar No. 84783
                                                    mweinshall@podhurst.com
                                                    Christina H. Martinez
                                                    Florida Bar No. 1029432
                                                    cmartinez@podhurst.com

                                                    *Counsel for Circuitronix, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a true copy of the foregoing has been served via transmission of Notices of Electronic Filing generated by CM/ECF on August 22, 2023 as filed with the Clerk of the Court using CM/ECF.

By: /s/ Stephen F. Rosenthal

Stephen F. Rosenthal
Florida Bar No. 131458

21