UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-60125-CIV-Scola/Goodman

JIANGMEN BENLIDA PRINTED
CIRCUIT CO., LTD.,

        Plaintiff,

v.

CIRCUITRONIX, LLC,

        Defendant.

**Plaintiff Jiangmen Benlida Printed Circuit Co., Ltd.'s
Memorandum of Law in Opposition to Circuitronix LLC's Second
"Omnibus" Motion *in Limine***

**MAZZOLA LINDSTROM LLP**
Richard E. Lerner
Jean-Claude Mazzola
*Counsel for Jiangmen Benlida Printed
Circuit Co., Ltd.*
1350 Avenue of the Americas, Second Floor
New York, New York 10019
646.216.8300
richard@mazzolalindstrom.com
jeanclaude@mazzolalindstrom.com

August 22, 2023

Plaintiff Benlida hereby opposes defendant Circuitronix LLC's second of two motions *in limine*, which seeks an order precluding nine potential items of proof. As in prior papers submitted in this action, for consistency Circuitronix LLC is referred to herein as CTX-US, and Circuitronix (Hong Kong) Ltd. is referred to as CTX-HK. The third amended complaint is referred to as the TAC. To avoid repetition, we incorporate herein by reference the arguments made in opposition to CTX-US's first motion *in limine*, which sought to preclude Benlida's rebuttal expert from testifying, and apologize for unavoidably repeating some of the prior arguments herein.

## Argument

**Point I:    The Court Should Reject, or Reserve for Trial, the Issue Whether Benlida may Present a Damages "Computation" Beyond that Pled in the Complaint.**

As noted in opposition to CTX-US's first motion *in limine*, during its case in chief Benlida expects to testify that goods were ordered by CTX-US and CTX-HK, that Benlida delivered the goods that were ordered, that Benlida issued invoices, and that CTX-US and CTX-HK failed to pay in full. Benlida expects to show, further, that CTX-HK's orders were placed for customers on CTX-US's "exclusive customer list," and thus that CTX-HK purchased them as an agent for CTX-US and thus that CTX-US is liable therefor, and additionally that they are each jointly and severally liable for the other's purchases by virtue of having become co-signers to the 2012 Manufacturing Agreement. There should be very little dispute about how much was invoiced and was paid, as CTX-US's expert Barry Mukamal acknowledges that there is 99% agreement between the parties as to the amounts at issue: (See Mukamal Dep., Ex. A, pp. 86, 88-89)

> Q. You said there was a – there is concurrence between the parties as to over 99 percent of the payments.
> A. Correct.

Q. So what did that tell you from an accounting perspective?

A. It told me what Benlida and Circuitronix were relying on for the payments were within like $92,000 of 60 – almost 70 – $68 million of payments.

Q. So that's indicative that the CTX numbers had a degree of reliability to them. Right?

MS. MARTINEZ: Objection.

A. It gave me comfort that there was alignment between the two entities in terms of payments relating to the two entities, CTX, LLC, and Benlida.

\*\*\*

Q. And then -- so the numbers, then, coming out of Benlida, the answer has to be the same. There was nothing alerting you to an inaccuracy of the numbers coming from Benlida. That's got to be the answer because CTX, there's no alert of inaccuracy by their numbers. It's got to be the same on the other side of the coin.

MS. MARTINEZ: Objection.

A. They agreed with each other. Whether they were accurate or inaccurate, I can't say for sure.

BY MR. MAZZOLA:

Q. But is it true, then, because it was true for Circuitronix, that insofar as the -- Benlida's numbers were concerned, there was nothing in your words alerting you to an inaccuracy.

MS. MARTINEZ: Objection.

A. Well, there wasn't --

BY MR. MAZZOLA:

Q. If not yes, explain why.

A. -- a 92,000 inaccuracy --

Q. Okay.

A. -- aligning the two numbers. How's that?

Q. Okay.

A. That's the best I could answer.

Q. But the question was, was there anything in the Benlida numbers alerting you to an inaccuracy?

A. As to that line? No.

Q. Okay. And the same thing for CTX.

A. I accepted the accuracy of the numbers on both sides for that line.

Q. Here's an interesting question I want to ask you about. Now that we've accepted the accuracy of these numbers. Right? We've accepted that they're not inaccurate.

A. I accepted they agreed to each other within $92,000.

3

This is to say, a simple computation beyond that pled in the complaint may well be unnecessary, and surely Benlida would not make a federal case of such a trivial difference, especially since Benlida and CTX-US and CTX-HK continue to do business with each other. However, it would appear that CTX-US is trying to place Benlida in a straitjacket, barring it from offering any explanation of the numbers in response to CTX-US's cross-examination of Benlida's witnesses, or to rebut CTX-US's case in chief.

As CTX-US argues (as it did in its first motion *in limine*) that Benlida should be precluded from offering such testimony because of some violation of Rule 26, we reiterate that Your Honor rejected such arguments in *Ore v. Tricam Indus.*, 2017 U.S. Dist. LEXIS 171639, *18-19; *FTC v. On Point Global LLC*, 2021 U.S. Dist. LEXIS 201532, *20, and *Ramones v. Experian Info. Sols.*, LLC, 2021 U.S. Dist. LEXIS 168243, *13. For the reasons previously stated, we respectfully submit that CTX-US's motion *in limine* to preclude any damages computation beyond that presented in the TAC should be denied, or at least the issue should be reserved for trial, where the Court will be in the best position to determine the relevance and probative value of such testimony.

**Point II:   The Court Should Flatly Deny CTX-US's Motion *in Limine* to Preclude Testimony Regarding the Debts of CTX-HK.**

CTX-US's defense in this action is that moneys it paid to Benlida for goods ordered by both itself and by CTX-HK (even though the CTX-HK orders were placed for CTX-US's "exclusive customers" and even if CTX-US and CTX-HK became co-signers of the 2012 Manufacturing Agreement by virtue of the 2016 Letter Agreement) should have only been

4

attributed by Benlida to CTX-US's accounts receivable. The preposterousness of CTX-US's position is illustrated by the following *If/Then* example demonstrating CTX-US's logic:

***If:***   (a) CTX-US orders $10,000,000 in goods from Benlida, and

(b) CTX-HK also orders $10,000,000 in goods from Benlida, and

(c) CTX-US sends a wire payment of $15,000,000 to Benlida,

***Then:***  (d) CTX-US now has a credit balance with Benlida of $5,000,000, and CTX-HK still owes Benlida $10,000,000, and

(e) Benlida should look to CTX-HK for $10,000,000, and Benlida should give back to CTX-US the $5,000,000 on its counterclaim.[1]

It is Benlida's position that CTX-US is responsible for the orders placed by CTX-HK, because (a) orders placed by CTX-HK were for CTX-US's "exclusive customers," and thus CTX-HK was the agent of CTX-US with respect to such purchases; (b) even if there were no principal-agent relationship, they functioned as one and the same company; and (c) they are jointly and severally liable in any event as co-signers. In sum, Benlida respectfully submits that, inasmuch as CTX-US's obligation to pay for the orders placed by CTX-HK remains a live issue, there is no basis to preclude testimony regarding the debts of CTX-HK. Additionally, the "overpayment" is only explicable by the fact that CTX-US and CTX-HK are related entities, and is not an overpayment at all, but a payment that reduces the overall A/R of the two combined entities.[2]

---

[1] See CTX-US's Answer/Counterclaim (DE 34, Counterclaim ¶ 23, at p. 12) ("CTX currently maintains a significant credit balance due to overpayments that have accumulated over the course of the companies' relationship.")

[2] This will be the subject of the rebuttal testimony of Benlida's expert Randall Paulikens, which is addressed in the memorandum submitted by Benlida in opposition to CTX-US's motion to preclude Mr. Paulikens.

**Point III:   As Under Florida Law there is No Statute of Limitations Problem in This Case, and as CTX-US's Own Expert Acknowledged that FIFO Accounting is Proper, Preclusion of Testimony Regarding "Stale" Claims is Inapt.**

In opposition to CTX-US's motion for summary judgment, Benlida showed that – according to Florida's highest court – when a debtor makes a payment to a creditor without designating "at the time of payment" on the check itself or including within the wire-transfer instruction itself the invoice to which the payment should be applied, the creditor may apply the payment to the earliest invoices. See *Randall v. Pettes*, 12 Fla. 517, 534, 1868 Fla. LEXIS 20, at **26 (Fl. Sup. Ct. 1868). This is not just black-letter Florida law: CTX-US's own expert acknowledged the propriety of such accounting method during his deposition: (Parisi Dep., Ex. B, pp. 241-242, 248) ("*Q.* If the payment doesn't -- if the payment made by the payor does not define what invoices or identify what invoices they should be attributable to, is there anything unreasonable about the payee applying that money to their oldest invoices? *A.* That's one option. … *Q.* Okay. So still talking about payment application and applying of payments. [¶] I guess, hypothetically, if CTX U.S. is responsible for the debts of CTX Hong Kong, is it -- would it be appropriate and reasonable for Benlida to apply payments from the U.S. operation to the oldest invoices of either U.S. or Hong Kong? *A.* If Circuitronix, LLC, is responsible for all the debts of Circuitronix Hong Kong. *Q.* Hong Kong. Um-hmm. *A.* Then you could presumably combine the balances.")

Moreover, there is nothing at all improper about applying payments by a debtor to unpaid debts that might be time-barred by statute of limitations, where the payment by the creditor does not specify that, for example, the moneys are to be applied to only more recently incurred debts. See *Henry v. Halifax Hospital Dist.*, 368 So. 2d 432, 433 (Fla. Dist. Ct. App., 1st Dist. 1979) ("The law is clear that the expiration of the period of time prescribed by a statute of limitations

does not extinguish the debt itself but only precludes the bringing of legal action to collect that debt. *Hoagland v. Railway Express Agency,* 75 So.2d 822 (Fla. 1954); 21 Fla.Jur., Limitations of Action, section 4 at 168; *Danielson v. Line,* 135 Fla. 585, 185 So. 332 (1938)." See also *Somohano v. PRA Receivables Mgmt. LLC*, 819 Fed. Appx. 873, 876 (11th Cir. 2020) (interpreting Florida law: "Even after the statute of limitations extinguishes the remedy, however, the right to payment of a debt continues to exist. *Danielson v. Line*, 135 Fla. 585, 185 So. 332, 333 (Fla. 1938).")

An illustrative case, albeit a New York case, is *Hahn Automotive Warehouse, Inc. v. American Zurich Ins. Co.*, 81 A.D.3d 1331, 916 N.Y.S.2d 678, 679-680, 2011 N.Y. App. Div. LEXIS 960 (NY Appellate Division 4th Dep't 2011) (internal citations and punctuation omitted; emphasis added), wherein the court stated:

> We reject the contention of plaintiff on its appeal that the court erred in determining that defendants were entitled to apply the letter of credit to all debts, including those that were time-barred. A letter of credit is interpreted in accordance with the same rules that apply to any other contract, and a familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing. Contrary to plaintiff's contention, the letter of credit unequivocally permitted defendants to apply the letter of credit to any debts that plaintiff owed to defendants. The letter of credit did not permit plaintiff to direct the particular debt to which the letter of credit should be applied, ***nor did it prohibit defendants from using the letter of credit to satisfy otherwise time-barred debts.*** Furthermore, plaintiff provided the letter of credit well before the current controversy arose. Thus, because the payment in question was already in the creditor's possession as security for a debt, the money already belonged to the creditor and they were entitled to apply it to the obligation in any manner that they chose. Contrary to plaintiff's further contention, plaintiff could not set conditions upon the use of the letter of credit after it had been provided to defendants. As previously noted, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms, and the letter of credit at issue specifically stated that it "cannot be modified or revoked without [defendants'] consent."
> 
> With respect to plaintiff's contention that defendants could not apply the letter of credit to the debts that arose prior to the expiration of the statute of limitations, ***we note the well-settled proposition that the expiration of the time period prescribed in a statute of***

> *limitations does not extinguish the underlying right, but merely bars the remedy.* … *The theory of the statute of limitations generally followed in New York is that the passing of the applicable period does not wipe out the substantive right; it merely suspends the remedy.* Notably, plaintiff does not contend that the debts at issue are not due and owing. Thus, despite the expiration of the statute of limitations with respect to those debts, defendants were entitled to apply the letter of credit to them.
>
> Contrary to the contention of defendants on their cross appeal, however, the court properly concluded that the counterclaims for any debt that arose more than six years prior to the commencement of this action were time-barred. The contention of defendants that the claims for those debts did not accrue until they made a demand for payment is without merit. Where, as here, the claim is for payment of a sum of money allegedly owed pursuant to a contract, the cause of action accrues when the [party making the claim possesses a legal right to demand payment. Thus, in such a case, the statute of limitations begins to run when the right to make the demand for payment is complete, and the party making the claim will not be permitted to prolong the statute of limitations simply by refusing to make a demand. Here, the court properly determined that the counterclaims for payment of the debts at issue were time-barred because defendants had the right to demand payment for those debts more than six years prior to the commencement of this action. *That conclusion does not, however, prevent defendants from applying the letter of credit, which plaintiff had previously provided to them, to any debt, including those debts that are time-barred, inasmuch as the expiration of the statute of limitations merely bars the remedy but does not extinguish defendants' rights.*

Moreover, CTX-US's reliance on out-of-context shipment and payment detail charts (see p. 10 of the second motion *in limine*) is utterly misplaced and obfuscatory, particularly since CTX-US's expert Mark Parisi himself acknowledged that FIFO application of moneys received to the oldest debts is appropriate. As Benlida expert Paulikens testified, the vast majority of the payments recorded were in round thousands-of-dollar increments until the middle of 2019 when the parties started trying to negotiate and reconcile their books. (Paulikens Dep., pp. 157-159; see also Paulikens report, p. 6). Mr. Paulikens explained that round-number payments are very indicative of payments on account (see Paulikens Dep., pp. 160-162), which would almost universally be applied using FIFO. (See Paulikens Dep., pp. 163-164).

While the chart excerpted from the Paulikens report was reproduced properly, CTX-US either misapprehends or pretends to misapprehend what it means. The table (which was also

8

produced by CTX-US and used by its experts) was not intended to be a true representation of the aging accounts receivable, to show the amounts that were outstanding, nor from what period the amounts were unpaid. That table is simply a summary of the total invoices and the total payments reflected in each period by the records shared by both parties. Counsel's interpretation that there are balances due from prior to the statute-of-limitations cutoff period is simply incorrect.

Applying payments to the oldest outstanding invoices is a long-time customary practice in business. We present the same chart with the additional analysis to make it an appropriate representation of accounts receivable. (Obviously Benlida's accounts receivable are CTX-HK's – and thus CTX-US's – accounts payable). As shown below, as of the date that this table was created (circa November 1, 2019), the most recent invoices were outstanding and everything prior to 2017 was paid in full. There are no invoices outstanding that are subject to the mischievous statute-of-limitations argument that is being made. The following table puts the numbers in context, on a FIFO basis. (Note: an enlarged version of the chart is included as an addendum to this memorandum)

| Source Benlida Shipment and Payment Details CTX-HK_2012-2019 | | | | | | | FIFO Payments | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Payment Detail Year | Total Invoices | Total Debit Memos | Total Payments | Balance Due/(Credit Balance) | Cummulative | Net Invoices and Debit Memos | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019.01-07 | FIFO Balance |
| 2012 | $ 50,844.68 | | $ - | $ 50,844.68 | $ 50,844.68 | $ 50,844.68 | $ (50,844.68) | | | | | | | | $ - |
| 2013 | 663,041.04 | (39,550.39) | 242,827.24 | 380,663.41 | 431,508.09 | 623,490.65 | | (191,982.56) | (431,508.09) | | | | | | - |
| 2014 | 2,127,957.19 | (15,911.64) | 776,987.44 | 1,335,058.11 | 1,766,566.20 | 2,112,045.55 | | | (345,479.35) | (1,766,566.20) | | | | | - |
| 2015 | 4,866,595.96 | | 3,959,983.86 | 906,612.10 | 2,673,178.30 | 4,866,595.96 | | | | (2,193,417.66) | (2,673,178.30) | | | | - |
| 2016 | 7,449,167.92 | | 5,572,718.50 | 1,876,449.42 | 4,549,627.72 | 7,449,167.92 | | | | | (2,899,540.20) | (4,405,490.00) | (144,137.72) | | - |
| 2017 | 7,095,140.71 | | 4,405,490.00 | 2,689,650.71 | 7,239,278.43 | 7,095,140.71 | | | | | | | (4,410,862.28) | (2,245,367.06) | 438,911.37 |
| 2018 | 9,451,795.08 | | 4,555,000.00 | 4,896,795.08 | 12,136,073.51 | 9,451,795.08 | | | | | | | | | 9,451,795.08 |
| 2019.01-07 | 3,602,117.12 | | 2,245,367.06 | 1,356,750.06 | 13,492,823.57 | 3,602,117.12 | | | | | | | | | 3,602,117.12 |
| | $ 35,306,659.70 | $ (55,462.03) | $ 21,758,374.10 | $ 13,492,823.57 | | | $ - | $ (242,827.24) | (776,987.44) | (3,959,983.86) | (5,572,718.50) | (4,405,490.00) | (4,555,000.00) | (2,245,367.06) | $13,492,823.57 |
| | | | | Agrees | | | | | | | | | | | Agrees |
| Source | | | | | | | | | | | | | | | |
| Benlida Shipment and Payment Details CTX-HK_2012-2019 | | | | | | | | | | | | | | | |
| Original creation date 11-1-2019 | | | | | | | | | | | | | | | |

This is to say:

- In 2012, there were $50,844.58 in invoices and no payments were made.
- In 2013 there were a total of $242,827.84 in payments made. Using FIFO, the first $50,844.58 was applied to the 2012 invoices. The balance of 2013 payments or $191,982.56 was applied to the 2013 net invoices of $623,490.65. Therefore, the balance

9

due at the end of 2013 is in fact $431,508. But this represents 2013 invoices only, as the 2012 invoices were paid with the first $50,844.58. This is proven by the fact that there were $623,490.65 in net invoices in 2013 against $191,982.56 in remaining payments, leaving a balance due of $431,508.09. This is what was shown in the cumulative column.

- In 2014 there was a total of $776,987.44 in payments. The first $431,508.09 was applied against the 2013 invoices. As a result, the 2013 invoices using FIFO, are paid in full. The balance of the 2014 payments or $345,479.35 is applied against the 2014 invoices of $2,112,045.55. This leaves $1,766,566.20 on 2014 invoices at the end of 2014. All of the 2012 and 2013 were fully paid using FIFO. The cumulative balance due at the end of 2014 remains $1,766,566.20 as shown in the original table, but this represents only 2014 invoices – the most recent – again consistent with normal and customary business practices testified to by CTX-US's own expert using FIFO.

- The same pattern follows 2015 to 2019. In fact, using FIFO, CTX-HK (and thus CTX-US, jointly and severally) still owed Benlida a portion of the 2017 invoices ($438,911.37); all of the 2018 invoices ($9,451,795.08); and the 2019 invoices of $3,602,117.12 as shown in the table. The total is $13,492,823.57.

This shows that as of the date of the source file, Benlida was owed $13,492,823.57 on invoices from the 2017, 2018, and 2019 invoices, and only those invoices, as the older invoices were cleared by properly using FIFO bookkeeping, applying recent payments to the oldest debts, where there was no express designation "at the time of payment" by CTX-US or CTX-HK that only certain invoices were to be treated as having been paid. Thus, there simply is no statute-of-limitations issue in this case, despite CTX-US's attempt to manufacture one.

In any event, as it remains a live issue whether CTX-US is or is not responsible for the debts of CTX-HK, it would be premature to hold that FIFO treatment of payments made to Benlida was improper.

**Point IV:   There Should be No Pre-Trial Preclusion of Accounting Records Not Produced During Discovery.**

Benlida does not expect to introduce at trial records of account that have not previously been produced. Nonetheless, in the unlikely event that a document may have slipped through the cracks, so to speak, the Court could make the determination at trial whether (a) the failure to produce it was a mere inadvertence, and (b) introduction of the document would be prejudicial to

10

CTX-US. At this time, there is no "live" issue, as we are unaware of any data that had been extracted from the Jindie accounting system that have not been produced.

**Point V: There Should be No Preclusion of Testimony Regarding "Related Party" Status.**

There should be no preclusion of testimony regarding the relationship between CTX-US and CTX-HK, as such testimony will help the jury to understand CTX-US's approach to the case, as explained using the *If/Then* example above. The fact that CTX-US and CTX-HK are related must be allowed into evidence to show that CTX-US is trying to claim back moneys from Benlida that were actually payments for goods ordered for it by CTX-HK. Benlida's accounting expert, in rebuttal, will assist the jury, by showing why the relatedness of CTX-US and CTX-HK negates the idea that Benlida owes money back to CTX-US. The jury cannot be left to sit in the dark and wonder what CTX-HK has to do with this case, when it is clear that CTX-HK was placing orders for CTX-US's "exclusive customers," and thereby acting as CTX-US's agent if not as a mere division of CTX-US, and when CTX-US and CTX-HK became co-signers to the 2012 Manufacturing Agreement by virtue of the 2016 Letter Agreement, as CTX-US alleges in its counterclaim. (DE 34, Counterclaim ¶3, at p. 7). Benlida has no quarrel with the case law cited by CTX-US for the proposition that testimony regarding foreign labeling of pharmaceutical products might be irrelevant.[3] Nor does Benlida have any quarrel with the idea that expert testimony should be precluded where it would serve to confuse the jury. Here, however, testimony regarding the relationship between CTX-US and CTX-HK could only serve to educate the jury, to help the jurors understand why alleged "overpayments" made by CTX-US were actually payments to reduce the CTX-HK accounts receivable. Such testimony is not intended to

---

[3] *In re Seroquel Prod. Liab. Litig.*, No. 6:06MD1769-ORL-22DAB, 2009 WL 223140, at *5-6 (M.D. Fla. Jan. 30, 2009).

"bolster" Benlida's case in chief; rather, it is intended to counter CTX-US's claims for recoupment of "overpayments."

**Point VI: Benlida Does Not Intend to Contradict Its Admission That Under the 2016 Letter Agreement, CTX-HK Became a Party to the 2012 Manufacturing Agreement. Therefore, No Preclusion Order in This Regard is Warranted.**

The issue in this case is not whether CTX-HK became a party to the 2012 Manufacturing Agreement when its principal Rishi Kukreja signed the 2016 Letter Agreement in behalf of both CTX-US and CTX-HK. Though Benlida did argue in opposition to the motion for summary judgment that CTX-HK did not become a party to the 2012 Manufacturing Agreement through the execution of the 2016 Letter Agreement, a more refined argument would have stated that CTX-US's "exclusive customers" did not thereby become CTX-HK's exclusive customers, as "exclusive" means "exclusive to CTX-US."

In opposition to the motion for summary judgment, Benlida focused on the principal-agent relationship between CTX-US and CTX-HK, and that point stands, whether or not CTX-US and CTX-HK became co-signers through the execution of the 2016 Letter Agreement. In other words, Benlida's imprecise argument in opposition to the motion for summary judgment is of no moment, because (a) CTX-US is liable as principal for the purchases made by CTX-HK for CTX-US's "exclusive customers," whether or not CTX-HK became a signatory to the 2012 Manufacturing Agreement, and (b) CTX-HK's having become a party to the 2012 Manufacturing Agreement actually establishes an additional basis for CTX-US's liability for orders placed by CTX-HK, as CTX-US and CTX-HK thereby became co-signers.

That is, when CTX-HK and CTX-US became co-signers, they thereby became jointly and severally liable for each other's debts to Benlida. And this position is supported by CTX-US's payments in behalf of CTX-HK, as companies do not regularly "overpay" one another. CTX-US

12

has not presented any authority that might show otherwise. Whether it is decided as a matter of law that CTX-US is liable for CTX-HK's purchases, or the determination is left to the jury, remains to be seen. Benlida does not intend to argue at trial that the 2016 Letter Agreement did not make CTX-US and CTX-HK co-signers to the 2012 Manufacturing Agreement; rather, Benlida maintains that CTX-US's "exclusive customers" nonetheless remained CTX-US's exclusive customers and thus that CTX-HK acted as the agent for CTX-US when it made purchases for CTX-US's exclusive customers, and in any event as co-signers they remain jointly and severally liable. In sum CTX-US is liable both on principal-agent grounds, and because CTX-US and CTX-HK are co-signers. At least a jury may so find, if the Court does not so hold as a matter of law.

**Point VII: The Entire Print Run of Invoices Should Not be Precluded, as It Is Proof of the Total Amount that CTX-US and CTX-UK Were Invoiced, and When Measured Against the Payments Received, the Total Comes out to the Same Amount Sought.**

While Benlida is suing on several hundred specific invoices, as pled in the TAC, and maintains that CTX-US and CTX-HK wire transfers, which were bereft of notations as to specific invoices to which payments should be attributed, were properly (*i.e.*, in accordance with, e.g., *Randall v. Pettes*, supra) applied to the earliest invoices, a presentation to the jury of all of the invoices will be demonstrative of the sheer volume of business that the parties were doing, but – more importantly – provide the jury with the full and complete amount that was billed to CTX-US and CTX-HK for the goods delivered. With that print run, it is a matter of simple math to show (a) how much was invoiced, and (b) how much was paid by CTX-US and CTX-HK, resulting in (c) the number that is owed by CTX-US, both for itself and for orders placed for it by CTX-HK or as to which CTX-US is a co-signer and thus co-obligor. CTX-US's expert Mr. Parisi testified that the math should work out the same: (Parisi Dep., Ex. B, pp. 241-242)

> Q. Are you familiar with the term – the accounting term "FIFO"?
> A. Absolutely.
> Q. Okay. What does that mean?
> A. First in, first out.
> Q. Did you consider FIFO in reviewing this claim? This matter?
> A. So when you review everything -- right -- we're only talking about invoices, payments, and debit memos. And you may remember a long time ago called "the order of operations." Right? Parentheses, exponents, multiplication, addition --
> Q. PEMDAS.
> A. PEMDAS. Yes. I didn't want to be that nerdy and say it, but yes. PEMDAS. [¶] And so when you're just adding -- right? -- there's no multiplication here. We're just in the addition/subtraction component of the PEMDAS. And so no matter what order -- as in FIFO or LIFO -- you add and subtract, you're going to get the same answer.
> Q. It makes no difference, then.
> A. When you analyze everything. Correct. [¶] Because it's all -- it's all out [sic] at the end of the day.

In other words, should the Court find (as a matter of law) or the jury find (as a matter of fact) that Benlida properly applied payments on a FIFO basis, the math should work out the same, no matter how the math is done. By bringing in the entire print run of invoices, which Benlida's witnesses will testify were routinely sent to CTX-US and CTX-HK, and Benlida will testify as to how much was received from CTX-Us and CTX-HK, it's simple math to determine what is owed, prior to any entitlement to an offset proved by CTX-US for lead-time penalties or air-freight bills. CTX-US should not be heard to argue that Benlida has failed to provide a computation of its damages, when the invoices *are* that computation, but then simultaneously ask that the invoices be precluded. Again, Benlida cannot argue this case in a straitjacket, particularly with respect to information, *viz* the invoices, that CTX-US has been in possession of since before this case was even filed.

None of this could plausibly cause any confusion to the jury, and CTX-US cannot claim prejudice because, as its principal Rishi Kukreja acknowledged at deposition, all of Benlida's invoices were in fact received by CTX. (See, e.g., Kukreja Dep., Ex. C, pp. 74-75, 100-101).

Accordingly, the full print run of invoices will aid the jury in seeing how much in total was invoiced. Then, based upon the total amounts paid by CTX-US and CTX-HK (which will be testified to by Benlida, and presumably CTX-US's principal Rishi Kukreja), the jurors could do the simple math and determine how much is owed. The next step will be to determine whether CTX-US is entitled to any offsets, or money back based upon the *If/Then* illustration above, and report its verdict to the Court. As CTX-US said in its first motion *in limine*, this is indeed a straightforward case.

## Conclusion

Wherefore, except as to those points of agreement noted in CTX-US's moving papers, it is respectfully submitted that its second motion *in limine* should be denied in all other respects.

Dated: New York, New York
August 22, 2023

**Mazzola Lindstrom LLP**

By: _____
Richard E. Lerner
Jean-Claude Mazzola
*Counsel for Jiangmen Benlida Printed Circuit Co., Ltd.*
1350 Avenue of the Americas, Second Floor
New York, New York 10019
Tel.: 646.216.8300

Service via ECF

**Addendum**

Source Benlida Shipment and Payment Details CTX-HK_2012-2019

| Payment Detail Year | Total Invoices | Total Debit Memos | Total Payments | Balance Due/(Credit Balance) | Cummulative | Net Invoices and Debit Memos | FIFO Payments 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019.01-07 | FIFO Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2012 | $ 50,844.68 | | $ - | $ 50,844.68 | $ 50,844.68 | $ 50,844.68 | $ (50,844.68) | | | | | | | | $ - |
| 2013 | 663,041.04 | (39,550.39) | 242,827.24 | 380,663.41 | 431,508.09 | 623,490.65 | | (242,827.24) | | | | | | | - |
| 2014 | 2,127,357.19 | (15,911.64) | 776,987.44 | 1,335,058.11 | 1,766,566.20 | 2,112,045.55 | | (191,982.56) | (345,479.35) | | | | | | - |
| 2015 | 4,866,595.96 | | 3,959,983.86 | 906,612.10 | 2,673,178.30 | 4,866,595.96 | | | (431,508.09) | (1,766,566.20) | | | | | - |
| 2016 | 7,449,167.92 | | 5,572,718.50 | 1,876,449.42 | 4,549,627.72 | 7,449,167.92 | | | | (2,193,417.66) | (2,899,540.20) | | | | - |
| 2017 | 7,095,140.71 | | 4,405,490.00 | 2,689,650.71 | 7,239,278.43 | 7,095,140.71 | | | | | (2,673,178.30) | (4,405,490.00) | | | - |
| 2018 | 9,451,795.08 | | 4,555,000.00 | 4,896,795.08 | 12,136,073.51 | 9,451,795.08 | | | | | | | (4,410,862.28) | | 438,911.37 |
| 2019.01-07 | 3,602,117.12 | | 2,245,367.06 | 1,356,750.06 | 13,492,823.57 | 3,602,117.12 | | | | | | | (144,137.72) | (2,245,367.06) | 9,451,795.08 |
| | $ 35,306,659.70 | $ (55,462.03) | $ 21,758,374.10 | $ 13,492,823.57 | | $ - | $ (242,827.24) | (776,987.44) | (3,959,983.86) | (5,572,718.50) | (4,405,490.00) | (4,555,000.00) | (2,245,367.06) | $13,492,823.57 | 3,602,117.12 |
| | | | | Agrees | | | | | | | | | | Agrees | |

Source

Benlida Shipment and Payment Details CTX-HK_2012-2019

Original creation date 11-1-2019

16