Exhibit B

1            THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF FLORIDA

3    JIANGMEN BENLIDA PRINTED    )

4    CIRCUIT CO., LTD.,          )

5         Plaintiff,            )

6    vs.                        ) Civil Action No.

7    CIRCUITRONIX, LLC,          ) 21-601-125-civ

8         Defendant.            )

9

10

11                   ORAL DEPOSITION

12          MARK PARISI, CPA, CIRA, CFE, CTCE

13               Monday, July 31, 2023

14

15

16

17

18

19

20

21

22

23   Reported by:

24   Rebecca Callow, RMR, CRR, RPR

25   Job No. 131875

1

2       ORAL DEPOSITION OF MARK PARISI, CPA, CIRA,

3   CFE, CTCE, produced as a witness at the instance

4   of the Defendant and duly sworn, was taken in the

5   above-styled and numbered cause on the 31st day of

6   July 2023, from 10:26 a.m. to 4:45 p.m., before

7   Rebecca J. Callow, Registered Merit Reporter,

8   Certified Realtime Reporter, Registered

9   Professional Reporter and Notary Public for the

10  State of Florida, reported by computerized

11  stenotype machine at the offices of Orseck, P.A.,

12  One S.E. 3rd Avenue, Suite 2300, Miami, Florida,

13  pursuant to the Federal Rules of Civil Procedure.

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        APPEARANCES

2    FOR PLAINTIFF:

3         Podhurst Orseck, P.A.

4         One S.E. 3rd Street

5         Suite 2300

6         Miami, Florida 33131

7         (305) 358-2800

8              By:  Stephen Rosenthal, Esq.

9                   srosenthal@podhurst.com

10                  Christina Martinez, Esq.

11                  cmartinez@podhurst.com

12

13   FOR DEFENDANT:

14        Mazzola Lindstrom LLP

15        1350 Avenue of the Americas

16        2nd Floor

17        New York, New York 10019

18        (646) 216-8300

19             By:  Jean-Claude Mazzola, Esq.

20                  jeanclaude@mazzolalindstrom.com

21                  Richard Lerner, Esq.

22                  richard@mazzolalindstrom.com

23   ALSO PRESENT:

24        Jessica Miller

25        Rishi Kukreja (via Zoom)
```

Mark Parisi, CPA, CIRA, CFE, CTCE                                      7/31/2023
Case 0:21-cv-60125-RNS   Document 203-2   Entered on FLSD Docket 08/22/2023   Page 5 of 262

Page 4

```
 1                        INDEX

 2                                                    PAGE

 3   MARK PARISI, CPA, CIRA, CFE, CTCE

 4   Examination by Mr. Mazzola .......................7

 5

 6

 7

 8

 9

10

11

12   Changes and corrections  ......................259

13   Signature Page  ...............................260

14   Court Reporter's Certificate ..................261

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 151 | Printout:  List of digital materials reviewed | 39 |
| Exhibit 152 | Exhibit 1 to Expert Report – Documents Utilized by Kapila Mukamal | 74 |
| Exhibit 153 | Payment detail:  2012 through 2019 | 87 |
| Exhibit 154 | Reconciliation analysis report: 2012-2019 | 87 |
| Exhibit 155 | 3/10/2015 Debit Memo BEN-DM20150310 | 166 |
| Exhibit 156 | Jiangmen Benlida Penalty for Lead-Time Exceedances for November 2020 Purchase Orders | 189 |
| Exhibit 157 | Jiangmen Benlida Penalty for Lead-Time Exceedances for April 2020 Purchase Orders | 175 |
| Exhibit 158 | Payment Detail:  2012 through 2019 | 179 |
| Exhibit 159 | 3/16/2021 Debit Memo BEN-DM20160321 | 184 |

```
 1                    EXHIBITS (cont.)

 2   NO.              DESCRIPTION                     PAGE

 3   Exhibit 160      10/20/2013 Debit Memo            185

 4                    BEN-DM20131020

 5   Exhibit 161      9/14/2014 Debit Memo             186

 6                    BEN-DM20140520

 7   Exhibit 162      8/18/2022 email: Charlene Yip    197

 8                    to Accounting@Benlida.com, Re:

 9                    Circuitronix(Hong Kong)Limited

10                    - Audit Confirmation Request to

11                    Jiangmen Benlida Printed

12                    Circuit Co Ltd & ROK Printed

13                    Circuit Board Co Ltd

14   Exhibit 163      7/24/2023 email chain:           200

15                    Accounting@Benlida.com, Re:

16                    Circuitronix(Hong Kong) Limited

17                    - Audit Confirmation Request to

18                    Jiangmen Benlida Printed

19                    Circuit Co Ltd

20   Exhibit 164      05/31/2021 Kapila Mukamal        237

21                    Invoice 7843

22

23               PREVIOUSLY MARKED EXHIBITS

24   NO.                                              PAGE

25   Exhibit 140      ................................218
```

```
 1                 P R O C E E D I N G S

 2                      - - - - - -

 3              MARK PARISI, CPA, CIRA, CFE, CTCE,

 4              called as a witness herein, having

 5          been first duly sworn by a Notary Public,

 6            was examined and testified as follows:

 7                          EXAMINATION

 8      BY MR. MAZZOLA:

 9      Q.    Good morning, Mr. Parisi.

10      A.    Good morning.  How are you?

11      Q.    Doing good.

12              My name is JC Mazzola.  I'm an

13      attorney.  I'm going to be asking you some questions

14      in connection with a lawsuit that was filed by our

15      clients.  It's -- we've been calling it collectively

16      "Benlida against Circuitronix, LLC."

17              Do you understand that you're here to

18      answer questions in connection with an expert --

19      expert opinion report that you prepared in connection

20      with that lawsuit?

21      A.    Yes.

22      Q.    You are presently employed with Citrin, I

23      understand.  Is that correct?

24      A.    Correct.

25      Q.    Citrin is an accounting firm?
```

1      A.    Among other things.

2      Q.    Okay.  How long have you worked with

3  Citrin?

4      A.    February of this year.

5      Q.    And prior to working with Citrin, were you

6  working with Kapila Mukamal?

7      A.    Yes.

8      Q.    And what were you doing at Kapila Mukamal?

9      A.    My work primarily encompassed forensic

10  accounting investigations, commercial litigation,

11  bankruptcy-related matters, including insolvency,

12  fraudulent transfers, fraudulent conveyance, Ponzi

13  schemes, receiverships, work of that nature.

14      Q.    And you left Kapila -- Kapila Mukamal, you

15  said, in February?

16      A.    Correct.

17      Q.    Why did you leave them?

18      A.    For a bigger runway.

19      Q.    Okay.  While at Kapila -- I'm going to call

20  it "the Mukamal firm."  Is that okay, Mr. Parisi?

21      A.    Yes.

22      Q.    And if I call it "the Mukamal firm," you'll

23  know that I'm referring to Kapila Mukamal, and

24  Barry Mukamal as well.  Okay?

25      A.    Okay.



1                    MR. ROSENTHAL:  Can I ask one

2       question?  Is it pronounced Mukamal or

3       Mukamal?

4                    THE WITNESS:  Mukamal.

5       A.   If you need to distinguish between Mukamal

6   and KM, just let me know.

7   BY MR. MAZZOLA:

8       Q.   I may go back and forth, but I'm just

9   trying to get my groove here.

10                   So speaking of that, you left them for

11  a better opportunity.

12                   While you were at the Mukamal firm,

13  while you were there, did you work on preparing a

14  report in connection with this case?

15      A.   So after I left and before I was formally

16  retained in Citrin, I did answer a few calls and

17  helped out a little bit.  But much of the report

18  writing, from what I recall, didn't begin until I

19  was retained -- or on or about there.

20      Q.   I didn't understand that.  Much of the

21  report writing did not begin until you were

22  retained?

23      A.   Much of the -- I'm sorry.

24      Q.   Do you mean until you left?

25      A.   Until after that.  The report wasn't



1    finished, you know, until the very, very end.

2         Q.   The very end of what?  Were you still at

3    Mukamal's firm when the report was written?

4         A.   No.

5         Q.   Were you at Mukamal's firm when the

6    report -- when the writing of the report was

7    started?

8         A.   No.

9         Q.   What did you do -- broad picture.  We're

10   going to get into some details.

11              What did you do basically, just a broad

12   picture, in connection with the preparation of the

13   report?

14        A.   So the first component of the report is the

15   damages -- or the balance due through July 2019.

16   That amount is calculated based on three primary

17   sources.  Which is, one, the initial email --

18        Q.   What was that?  Through June -- what date

19   was it?

20              You said you prepared a calculation on

21   damages through a date.  Was that June, you said?

22        A.   July 2019.

23        Q.   July 29th?

24              MR. ROSENTHAL:  "2019."

25        A.   July 2019.



1          So that analysis is comprised of three

2    sources.  The first is the initial email from

3    Circuitronix to Benlida, which contained the

4    invoices, payments, and debit memos, as identified

5    by Circuitronix.  That was on November 1st, 2019.

6          On November 14th, 2019, Benlida

7    responds and identifies invoices, payments, and

8    debit memos that had disparities with Benlida's

9    records.  Those disparities increased and decreased

10   payments in same with invoices and debit memos.

11          And then, I want to say, on

12   November 19th, there is a second email where Benlida

13   identifies additional payments that CTX did not have

14   in its records that Benlida thought should be in the

15   reconciliation.

16   BY MR. MAZZOLA:

17   Q.   So --

18   A.   And so the aggregation of those three data

19   points, plus the reconciliation of the meeting

20   minutes, is the primary compilation of the balance

21   through July 2019.  And then that is the first

22   component of the report.

23          The second component of the report --

24   Q.   Well, let's look at your report, so --

25   A.   -- is an aggregation of the --



1      Q.    Let's look at your report --

2      A.    -- lead-time penalties --

3             MR. ROSENTHAL:  Hold on.  Hold

4      on.

5             THE WITNESS:  Sorry.

6             MR. ROSENTHAL:  He wants to

7      interrupt you and stop your answer --

8      BY MR. MAZZOLA:

9      Q.    Let's just put down Exhibit 147.  This has

10     been previously marked.  Okay?

11     A.    Yes.

12     Q.    Because I think you're talking about

13     different sections of your report.

14             MR. ROSENTHAL:  And 147 is the

15     report.  Correct?

16     BY MR. MAZZOLA:

17     Q.    You see that.  That's your report.  Right?

18     A.    Yes.

19     Q.    Okay.  And before you go into the next

20     section, I think what you're talking about is one of

21     the things you looked at is what I'm seeing in your

22     report referred to as the CTX reconciliation and the

23     Benlida reconciliation.

24     A.    I'm not sure if that was a question.

25     Q.    That's what you're referring to when you're



1   talking about the Rishi email and then the response

2   from Benlida.

3       A.   Correct.

4               So the starting point is -- the CTX

5   recon is Rishi's initial email.  And then -- so, for

6   example, if Rishi -- or Circuitronix, through

7   Rishi's email said an invoice should be a dollar.

8   And then Benlida comes back and says, No, it should

9   be $1.20.

10              The dollar would be on the CTX recon,

11  the 20 cents would be on the Benlida recon, and --

12  or a component of it.  And when you add A plus B,

13  you get the Benlida recon amount.

14      Q.   And what I'm trying to understand is, in

15  connection with this report that's in front of you,

16  147, you testified a few moments ago that this

17  report was drafted -- started, drafted, and

18  completed after you had left the Mukamal firm.  Is

19  that correct?

20      A.   So I want to be clear.  When you say

21  "drafted," there is the compilation of the numbers,

22  which I don't consider drafting the report.  I

23  consider drafting the physical word-writing of the

24  report.

25      Q.   Okay.  And the compilation of the numbers,



1    is that -- let's talk about what you did.  It sounds

2    like to me -- let's look at your report -- or the

3    report.

4              Take a look at page 6.  Do you see

5    that?  It says "Work Performed and Analysis."

6        A.    Correct.

7        Q.    And then if you see just above

8    paragraph 13, it refers to the reconciliation

9    period.

10             Do you see that?

11       A.    Correct.

12       Q.    And you were just talking before, I

13   believe, about the review of numbers in connection

14   with this reconciliation period.  Is that correct?

15       A.    Correct.  When I talk about the

16   reconciliation on November 1st, 2019, that's the

17   same reconciliation as identified on paragraph 13.

18       Q.    Okay.  And while we're in this report,

19   let's go to page 9.  The bottom of page 9 at

20   paragraph 23.  Do you see "Debit Memos"?

21       A.    Yes.

22       Q.    Did you have any involvement in reviewing

23   debit memos?  Just, generally speaking.

24       A.    Yes.

25       Q.    Okay.  What about lead-time penalties?  Did

1    you look at those?

2        A.   Yes.

3        Q.   How was the work divided up between you and

4    Mr. Mukamal?

5        A.   So Mr. Mukamal is the primary partner at

6    Kapila Mukamal.  He developed the initial work plan,

7    you know, did the initial case intake.  I assisted

8    with the compilation of the data.

9              As you're aware, there is a lot of

10   data here, and it's very voluminous.  And he was the

11   one who architected the report, and I assisted with

12   the data compilation as necessary.

13       Q.   Okay.  So he architected the report.

14             What does that mean?

15       A.   He meets with counsel, reads the complaint,

16   identifies a preliminary work plan of how to draft

17   the report.

18       Q.   Did you meet with counsel?

19       A.   I've met with counsel.

20       Q.   In preparation for this report, did you

21   meet with counsel?

22       A.   Yes.

23       Q.   Did you meet with counsel in preparation

24   and review of the numbers?

25       A.   I don't understand your question.



1          Q.   Well, I'm trying to understand when you met

2     with counsel.  I know you met with counsel today.  I

3     know you probably met with counsel prior to today.

4               But while this report was -- while

5     the -- while you were doing the analysis of these

6     numbers, because it sounds like that's how the work

7     was split up.  Is that right?

8               You did the analysis of the numbers.

9     The crunching.  Is that correct?

10              MR. ROSENTHAL:  Object to the

11         form.

12         BY MR. MAZZOLA:

13         Q.   Do you know what I mean?

14         A.    I compiled the data and assisted with the

15    report as well.

16         Q.   And as you were compiling the data, did you

17    meet with counsel?

18         A.   Yes.  We previously met with counsel

19    before.

20         Q.   As you were compiling the data, did you

21    have any communications with counsel?

22         A.   Yes.  We communicated with counsel.

23         Q.   As you were compiling the data, did you

24    ever call up counsel and say, The data says this?

25              Don't tell me what it says, but



1   communications like that?

2       A.   We discussed preliminary numbers, yes.

3       Q.   Did you discuss preliminary numbers with

4   anyone at CTX?

5       A.   Not that I recall.

6       Q.   Did do you ever -- what do you mean, not

7   that you recall?

8       A.   We met with the Circuitronix staff, you

9   know, to understand the numbers and the business

10  processes.  I don't recall saying, Here's our final

11  numbers, to the CTX staff.

12      Q.   When you say you met with staff, who's

13  "we"?

14      A.   Myself and my partner, Barry Mukamal.

15      Q.   And so as we go forward with today's

16  deposition, so that I'm clear, was there anyone else

17  in that "we"?

18             Was there a junior accountant that was

19  helping out?  Was there a -- I don't know if you

20  have -- call them para-accountant, anything like

21  that, helping out, or was all the work done by you

22  and Mr. Mukamal?

23      A.   So there is a third person who is integral

24  to the process.  Her name is Sharmila Khanorkar, and

25  she is a partner at Kapila Mukamala.



```
1       Q.    Sharmila?

2       A.    Yes.

3       Q.    As it sounds.

4             And how do you spell her last name?

5       A.    K-h-a-n-o-r-k-a-r.

6       Q.    Yeah.  I lost that.

7             MR. ROSENTHAL:  Khan-or-kar.

8             MR. MAZZOLA:  Khan-or-kar.

9       A.    Yes.  Some junior staff may have helped

10   out, you know, for, you know, clerical-type work.

11   But the three of us were 98 percent of the work, I

12   would say.

13   BY MR. MAZZOLA:

14      Q.    What did Ms. Khanorkar do?

15      A.    She assisted with the case and also

16   assisted in drafting the report.

17      Q.    What does "assisting with the case" mean?

18      A.    So we -- there's many issues that come up.

19   And her, Barry and I discuss the issues and navigate

20   the path forward.

21      Q.    Okay.  What kind of issues would come up?

22      A.    So there's -- the issues in this case

23   aren't complicated.  It's very simple.  There's

24   invoices, payments, and debit memos.

25      Q.    And so what kind of issues --
```



1       A.    I'm.

2       Q.    -- came up for Ms. Khanorkar --

3       A.    If you would let me finish my answer, I

4   will --

5       Q.    Okay.

6       A.    -- I am happy to.

7             So there's a lot of data in this case.

8   The key issue is how to present this data simply so

9   everyone can understand it.  And that is the main

10  issue that we grappled with.

11      Q.    So that was the issue.

12            So Ms. Khanorkar, her involvement was

13  to discuss with you and Mr. Mukamal ways to present

14  the data in a fashion that would make sense in your

15  mind.  Is that correct?

16            MR. ROSENTHAL:  Object to the

17      form.

18      A.    Correct.  And she assisted with the report

19  drafting.

20      BY MR. MAZZOLA:

21      Q.    So you met with staff.  You said you met

22  with staff from CTX.  Is that right?

23      A.    Correct.

24      Q.    And when you would meet with staff at CTX,

25  was Carmila [sic] present?



 1                MR. ROSENTHAL:  "Sharmila."

 2        BY MR. MAZZOLA:

 3        Q.    Sharmila.

 4        A.    No.  She is primarily in Orlando or India.

 5   I don't believe she's been to Circuitronix.

 6        Q.    Does the Mukamal firm have an office in

 7   India?

 8        A.    I mean, she could be an office by herself,

 9   she's so good.  But they don't have a physical

10   office out there.

11        Q.    But she just worked in India?

12        A.    Correct.

13        Q.    So regarding meeting with staff at CTX, was

14   Ms. Khanorkar ever present on the phone by Zoom or

15   anything like that?

16        A.    She may have been on Zoom once.

17        Q.    When you had these meetings with staff at

18   CTX, was counsel present at those meetings, either

19   remotely or physically?

20        A.    Yes.

21        Q.    When you had the meetings with staff at

22   CTX, who at CTX was present?

23        A.    Rishi Kukreja.  Lina Ochoa.  We had a

24   previous accountant person there whose name escapes

25   me.  Nicole Donaldson, I met with her.  And I can't



1  remember the names of -- there was one other person.

2  I can't recall his name.

3      Q.    And it was an accountant person you met

4  with there?

5      A.    Correct.

6      Q.    Does the name Celin Astudillo ring a bell?

7      A.    Yes.

8            You have a good memory.  That is it.

9      Q.    That's who it was?

10           When did these conversations happen?

11           And it sounds like there was more than

12  one.  Is that right, Mr. Parisi?

13     A.    Correct.  I'd say well over a year ago.

14           I mean, when the -- there was a period

15  of time, which I can't recall when the pencils-down

16  order was given.  But before that period of time --

17  I mean, all the work was primarily done for this

18  case before settling, and then we made a few

19  refinements.

20           But, you know, a lot of the work was

21  done before the case settled.  It was just a matter

22  of dusting it off, recalling what we did,

23  simplifying and drafting the report.

24     Q.    So pencils down, I think, was sometime in

25  the spring of -- it's 2023 -- 2022?  Is that what



Case 0:21-cv-60125-RNS   Document 203-2   Entered on FLSD Docket 08/22/2023   Page 23 of
262

1  you recall?

2       A.    I don't recall, unfortunately.

3       Q.    Okay.  And you left Mukamal's firm in

4  February of this year?

5       A.    Correct.

6       Q.    So you were present when there was that

7  pencils-down time.  Is that correct?

8       A.    Yes.

9       Q.    And I assume -- I don't know when -- when

10  your lawyers told you to start writing again.  Was

11  that after you left or, was it before you left?

12       A.    I want to say it was mid-April.  Early,

13  mid-April, with a June 8th report date.  So the time

14  frame was very compressed, but we were able to

15  accomplish the task.

16       Q.    But you had left by then?

17       A.    Yes.

18       Q.    Was a draft report written by the time you

19  left in February?

20       A.    No.  We -- before we did the pencils down,

21  we had not started drafting the report.

22       Q.    At the time you put the pencils down, was

23  there any communication between -- like, written

24  communications between you and either counsel or CTX

25  with proposals or drafts or anything of that nature?



1      A.    We emailed counsel.

2      Q.    Did you email them theories that you may

3   have had?

4                 MR. ROSENTHAL:  I'm going to

5        object, because I don't think you're

6        permitted to probe into that issue.

7                 I don't think you should answer

8        that question.

9   BY MR. MAZZOLA:

10     Q.    But there were email communications before

11   pencils down?

12     A.    Yes.

13     Q.    So let's talk a little bit about your

14   background.  We just got off on a little bit of a

15   tangent here.

16                 How long have you -- well, tell me

17   what -- what you do.  You're an accountant.  Right?

18     A.    Correct.

19     Q.    You gave a little example about the type of

20   accounting work you do.  Is that correct?

21     A.    Correct.

22     Q.    You did give an example.

23                 You are -- were retained in this case

24   was -- by whom?

25     A.    Circuitronix, LLC.



1     Q.    And who was it that reached out to you?

2     A.    Well, the case had been ongoing for some

3  time.   The case was originally retained by

4  Kapila Mukamal.   And because of the compressed time

5  frame, I was retained directly to assist and help

6  bring the matter to a close due to the compressed

7  time frame.

8     Q.    What do you mean you were -- you worked at

9  the Mukamal firm.   Is that correct?

10    A.    That's --

11    Q.    What do you mean -- what do you mean you

12 were retained separately?

13            Wasn't the Mukamal firm retained?

14    A.    So Kapila Mukamal was retained, and I left

15 Kapila Mukamala.

16    Q.    In February of this year?

17    A.    In -- at the end of January, I left.

18    Q.    Okay.

19    A.    At the end of this year.

20            And then they retained -- due to the

21 compressed time frame, instead of Kapila Mukamal

22 finishing the report, they retained me as well to

23 help meet the deadline.

24    Q.    That's now.   But I'm going way back to the

25 beginning.



1      A.    Okay.

2      Q.    When all of this first started, who

3   retained you back then?  Is it no one, and they

4   actually retained Mr. Mukamal, and you worked for

5   him?

6      A.    I worked at Kapila Mukamal previously.

7   Circuitronix, LLC, had previously engaged

8   Mr. Mukamal and Kapila Mukamal for this matter.

9      Q.    Okay.  So you were not present -- you were

10   not involved in the initial retention of the Mukamal

11   firm.  Is that correct?

12      A.    I was there with the initial retention of

13   the Mukamal firm, yes.

14      Q.    And when the Mukamal firm was initially

15   retained, who was it that reached out to the Mukamal

16   firm?

17      A.    I'd be speculating.

18      Q.    Okay.  Was it Mr. Rosenthal?

19      A.    I believe it's more likely to be Chauncey,

20   based on the timeline.

21      Q.    Do you know if the Mukamal firm has ever

22   worked with Chauncey before?

23      A.    Yes.  They have worked together.

24      Q.    In what kind of capacity?

25      A.    In at least one other case for Circuitronix

Mark Parisi, CPA, CIRA, CFE, CTCE                                7/31/2023
Case 0:21-cv-60125-RNS   Document 203-2   Entered on FLSD Docket 08/22/2023   Page 27 of
262

Page 26

1    as an expert.

2              And then I do not know any cases

3    between Barry and Chauncey previously, but I assume

4    there's probably at least one.

5       Q.   Do you know the circumstances of that one

6    case?

7       A.   No.  They just knew each other, so I

8    assumed they worked with each other previously.

9       Q.   Do you know how Chauncey was introduced to

10   Mr. Mukamal?

11      A.   No.

12      Q.   Does Mr. Mukamal have a relationship with

13   CTX independent of Chauncey?

14      A.   Not that I'm aware of.

15      Q.   Does the Mukamal law firm provide any

16   accounting services for -- for CTX other than the

17   preparation of this report?

18      A.   So Kapila Mukamal is a forensic accounting

19   firm as opposed to a law firm.

20      Q.   As opposed to a regular accounting firm.

21              MR. LERNER:  No.  You misspoke.

22   You said "law firm."

23              MR. MAZZOLA:  Did I say that?

24              MR. ROSENTHAL:  Yeah.

25              MR. MAZZOLA:  Okay.



1          BY MR. MAZZOLA:

2          Q.   Has Mr. Mukamal provided any accounting

3     services, other than the preparation of this report

4     and presumably the other report through Mr. Cole,

5     for CTX?

6          A.   Those are the only two engagements I'm

7     aware of with Circuitronix and Kapila Mukamal.

8          Q.   So you're not aware of any connection

9     between the Mukamal firm and CTX other than for

10    forensic accounting services?

11         A.   Correct.

12         Q.   What about Ms. Khanorkar?  Do you know if

13    she's ever performed --

14              MR. ROSENTHAL:  I'm sorry.  I'm

15         laughing at the pronunciation.  It's

16         Khanorkar it ends with an "R."  Not like

17         Roca.

18              MR. MAZZOLA:  Khanorkar.

19              MR. ROSENTHAL:  Okay.  Khanorkar.

20    BY MR. MAZZOLA:

21         Q.   With respect to Ms. Khanorkar, do you know

22    if she's provided any accounting services to CTX?

23         A.   I do not believe so.

24              Yeah.  We're forensic accountants, not

25    regular accountants.



1       Q.   Oh.  I understand that.

2       A.   Okay.  Just making sure.

3       Q.   Okay.  So in terms of that, let's talk

4   about your day-to-day at the Mukamal firm.  Is it --

5   is it all forensic accounting work?

6       A.   Well, I'm not at the Mukamal firm.  I'm

7   at --

8       Q.   When you were.  When you were.

9            When you were at the Mukamal firm, all

10  your day-to-day accounting was for forensic

11  accounting.  Is that correct?

12      A.   Correct.  We do not do traditional

13  accounting work at all.  Or audit work.

14      Q.   So just forensics.

15           And as you understand forensics, that

16  means providing things like litigation support.  Is

17  that correct?

18      A.   Correct.

19      Q.   It might be valuation services.  Is that

20  correct?

21      A.   Occasionally.

22      Q.   It might be providing trial testimony.  Is

23  that correct?

24      A.   Yes.

25      Q.   At the Mukamal firm, did the Mukamal firm

1    have any relationship with Podhurst, the law firm

2    you're at today?

3        A.    We've worked with Podhurst previously.

4        Q.    And how many cases, in your recollection,

5    did the Mukamal firm do with the Podhurst firm?

6        A.    Two, perhaps, that I am aware of.

7              There could be more, but I'm only

8    involved with -- when I was at Kapila Mukamal in a

9    subset of the cases.

10       Q.    Do you have any recollection of what those

11   case names were?

12       A.    Yes.  One of them was PayCargo versus

13   CargoSprint.

14       Q.    So PayCargo versus CargoSprint.  And this

15   was work that was done for the Podhurst firm.

16   Right?

17       A.    The Podhurst firm was counsel.

18       Q.    That was one case.

19              Did you provide deposition testimony on

20   the PayCargo case?

21       A.    I did not.

22       Q.    Did Mr. Mukamal?

23       A.    He did.

24       Q.    Did that PayCargo case go to trial?

25       A.    It did.



1      Q.    Do you know what the result was?

2      A.    PayCargo was successful on its claim and

3   received a judgment against CargoSprint.

4      Q.    Did you work on that case?

5      A.    I did.

6      Q.    What did you do on that case?

7      A.    Data compilation.

8      Q.    Similar to the type of work you did on this

9   case, the CTX case, data compilation?

10      A.    Correct.

11      Q.    There was another case you mentioned that

12   the Mukamal firm worked on in conjunction with the

13   Podhurst firm.  What was that case?

14      A.    The name escapes me, but it was a

15   class-action matter that dealt with a tax matter

16   that dealt with foreign tax credits.  I believe the

17   defendant was John Hancock, perhaps.  But I'm not

18   100 percent certain.

19      Q.    Did you -- what did you do in that case?

20      A.    Similar to these other issues, which is

21   primarily data compilation.

22      Q.    Did Mr. Mukamal -- did you provide -- were

23   you deposed in that case?

24      A.    No.

25      Q.    Was Mr. Mukamal deposed?



1      A.   I don't recall.

2           I believe it was a class action, and I

3  can't remember if he was deposed or not.

4      Q.   Has that case been resolved?

5      A.   I believe so.

6      Q.   Did that case go to trial?

7      A.   I don't believe so.

8      Q.   Any other cases that the Mukamal firm

9  worked on with Podhurst?

10     A.   Not that I'm aware of.

11          Barry's 40 years old, though, and I've

12 only been with him for ten, so there could certainly

13 -- or he's been working for 40 years, so he could

14 certainly -- you know, there could be a lot more in

15 the 30-year gap.

16     Q.   What about you, individually?  Do you have

17 a list of cases that you provided testimony on?

18          Have you ever -- you, personally, ever

19 provided testimony on behalf of any Podhurst clients?

20     A.   No.

21     Q.   Have you ever provided any testimony on

22 behalf of Chauncey Cole's clients?

23     A.   No.

24     Q.   You have given depositions before.  Right?

25     A.   Correct.



1     Q.   And if we look at -- towards the back of

2   that Exhibit 147.

3              MR. ROSENTHAL:  I'm not sure if

4        the copy you have given him has that.

5              MR. LERNER:  The marked exhibit

6        didn't have of it.

7     A.   It's okay.

8   BY MR. MAZZOLA:

9     Q.   It was a list provided to us of cases that

10  you provided deposition testimony for.

11             MR. ROSENTHAL:  I can give him

12       this list, if you want.

13             MR. MAZZOLA:  Sure.

14    A.   I'm familiar with all my cases.

15  BY MR. MAZZOLA:

16    Q.   I just want to know if that's the complete

17  list.  Has anything been added to that since this

18  reports been prepared?

19    A.   That is the current list.

20    Q.   And has anything changed on that list?

21             Have you provided any trial testimony?

22    A.   Not yet.

23    Q.   When you say "not yet," is that because

24  you've never been proffered as an expert witness in

25  trial?



1      A.    I've not testified at trial yet as an

2  expert witness.

3      Q.    Have you ever been proffered as an expert

4  witness at trial?

5            Do you know what I mean by that?

6      A.    The cases that I've had expert reports have

7  not made it to the trial phase yet.  They have all

8  settled primarily after a deposition or been delayed

9  for many years.

10           But several of those matters will go

11  to trial soon.

12     Q.    Prior to working at the Mukamal firm, where

13  did you work before that?

14     A.    Cross Country Healthcare.

15     Q.    And what did you do for Cross Country

16  Healthcare?

17     A.    Internal audit.

18     Q.    How did you end up getting into the

19  forensic side of things?

20     A.    Internal audit is like watching paint dry,

21  and so accounting is also a low bar in terms of

22  exciting work.  And so this is by far the most

23  interesting accounting work that helps me get

24  through the day-to-day.

25     Q.    Okay.  That's a very good answer.  That's a



1    really good answer.

2              Have you ever been disqualified as an

3    expert witness in any court?

4         A.    No.

5         Q.    Have you ever had any of your professional

6    opinions rejected by a court?

7         A.    No.

8         Q.    What about your -- the methodology that

9    you've used?  Have you ever had a court reject your

10   methodology?

11        A.    No.

12        Q.    You've had it disputed, I'm sure.  Right?

13        A.    I mean, other experts always dispute.

14        Q.    Yes.  But a court has never rejected your

15   methodology?

16        A.    Correct.

17        Q.    What about a court ever concluding that

18   your methodology is unreasonable?  Has that ever

19   happened to you?

20        A.    No.

21        Q.    Or a court concluding that you overreached?

22   Has that ever happened?

23        A.    No.

24        Q.    Has a court ever concluded that your

25   opinions were unrealistic?



1     A.    No.

2     Q.    Has a court ever concluded that the

3     assumptions that you've relied on were unrealistic?

4     A.    No.

5     Q.    Do you have any recollection of any judge

6     anywhere saying, Hey, Mr. Parisi, you didn't get

7     this right?

8     A.    No.

9     Q.    Do you have any recollection of any judge

10    anywhere saying, You know, Mr. Parisi was

11    unrealistic?

12    A.    No.

13    Q.    Or that Mr. Parisi overreached?

14    A.    No.

15    Q.    How many -- the list that we have -- it's

16    not very long.  I think it's maybe a third of a

17    page.  Is that correct?

18    A.    Approximately.

19    Q.    So in terms of how many depositions.  How

20    many depositions have you done?

21    A.    As an expert witness?

22    Q.    Yeah.

23    A.    Probably five expert witness depositions.

24    Q.    How many expert witness reports have you

25    prepared in your own name?



Mark Parisi, CPA, CIRA, CFE, CTCE                                    7/31/2023
Case 0:21-cv-60125-RNS   Document 203-2   Entered on FLSD Docket 08/22/2023   Page 37 of
262

Page 36

1      A.    Eight to ten.

2      Q.    In terms of the -- when I say "expert,"

3   we're talking about expert witnesses.  So this would

4   be a litigated matter.  You understand that.  Right,

5   Mr. Parisi?

6      A.    Yes.  A filed expert report with

7   conclusions was the answer that I gave.

8      Q.    Okay.  So in those eight to ten instances,

9   what courts were those matters filed in where the

10  lawsuits were pending?

11     A.    State court.

12     Q.    Here in Florida?

13     A.    Correct.  And one was in bankruptcy court.

14     Q.    Did you ever do any federal courts here in

15  Florida?

16     A.    Yes.

17     Q.    I asked you about those eight reports that

18  you prepared.  I think you said eight was the

19  number.  Right?

20     A.    Approximately, yes.

21     Q.    Okay.  And I asked you in what courts were

22  they in, and you said they were all in Florida, and

23  one was in bankruptcy.  Is that what you said?

24     A.    Correct.

25     Q.    And then the next question was, have you



1    ever filed -- have you ever been involved in any

2    litigations with filed expert reports in federal

3    court.  And the answer to that is, yes, too?

4         A.   Yes.

5         Q.   Okay.  And is that number subsumed within

6    that eight that you had mentioned before?

7         A.   When you say "that number," what are you

8    referring to?

9         Q.   Well, I asked you how many cases had you

10   been involved in where expert reports were prepared

11   and filed.  You said eight.

12        A.   Where I was the expert?

13        Q.   Yes.

14        A.   Okay.

15        Q.   So eight of them.  Right?

16        A.   Approximately, yes.

17        Q.   And I asked you what courts they were in,

18   and you said that they were all Florida state, and

19   then you said one bankruptcy.

20        A.   I thought you were saying -- you were

21   referring to the additional cases that we hadn't

22   previously discussed, which -- for which I filed

23   reports but were on my testimony history.

24        Q.   I want to know what your whole list.

25        A.   Okay.  Then federal, state, and bankruptcy.



1      Q.    Okay.  But you've never testified in open

2   court before.  Right?

3      A.    I've testified on hearings, but not at

4   trial.

5      Q.    Okay.  So you have testified before a

6   judge?

7      A.    Correct.

8      Q.    And those times you've testified before a

9   judge, I assume the judge qualified you as an

10  expert.  Is that correct?

11     A.    I believe I've been qualified as an expert.

12  I don't fully remember.  But yes.

13     Q.    Did you ever testify before Judge Scola

14  here in the Southern District?

15     A.    No.  Not that I recall.

16     Q.    How many times have you testified in court?

17     A.    I've only testified in court on probably

18  two, maybe three, hearings.

19     Q.    Those were hearings?

20     A.    Correct.

21     Q.    What were the hearings involving?

22     A.    Bankruptcy production disputes.

23     Q.    What's a bankruptcy production dispute?

24     A.    When you're suing someone in bankruptcy and

25  they don't want to produce any documents and say



1    regularly available accounting records don't exist.

2        Q.   Okay.

3                  MR. MAZZOLA:  Let's mark ...

4                  Let's mark this document -- we're

5        going to mark a document.  And what --

6        we're also going to look at the screen.

7        And I'm going to mark it.  Is that okay?

8                  MR. ROSENTHAL:  Yeah.  Is that

9        the next one?

10                 MR. MAZZOLA:  Yeah.  Did you mark

11       your connection -- your -- yours from the

12       last time?

13                 MR. ROSENTHAL:  Yes.  So this is

14       going to be 151?

15                 MR. MAZZOLA:  Yeah.  151.

16                 (Deposition Exhibit 151

17                 marked for identification.)

18       BY MR. MAZZOLA:

19       Q.   All right, Mr. Parisi.  I'm going to hand

20   you a document.  That's a document that we've marked

21   as 151.  And this is a printout that I made.  And on

22   the screen over here -- can you see the screen,

23   Mr. Parisi?

24       A.   I do.

25       Q.   It's a printout that I made of,



1    essentially, the folders which purport to contain

2    all the documents that you reviewed.  It purports to

3    show all the documents that were provided on -- by

4    your attorney to us.  Okay?

5        A.    Okay.

6        Q.    And I wanted to understand -- basically,

7    what I want to understand right now is everything

8    that you reviewed in connection with the preparation

9    of this report.  And it may very well be that you

10   didn't review everything here, that only certain

11   items were reviewed by you.  Is that fair?

12       A.    That's fair.

13       Q.    Okay.  So let's look at -- I guess we can

14   look at these Rishi transmittal emails.

15       A.    Sure.

16       Q.    I don't want to pull them all up because it

17   will take us all day to do that.  But by looking at

18   what I'm opening up, can you give me a sense as to

19   whether or not these were things that you would have

20   reviewed.

21             And I will tell you this:  They were

22   provided to us by Mr. Rosenthal as documents that

23   were reviewed and relied upon by the experts in this

24   case.

25             MR. ROSENTHAL:  So before he



1           answers, if you could just make it clear

2           which ones you're asking about by reading

3           the name and --

4                      MR. MAZZOLA:   I will do that.

5           BY MR. MAZZOLA:

6           Q.   So let's just go back over here.

7                      So there's a Rishi Transmittal Email

8     folder.  Is that something you would have reviewed?

9           A.   Yes.

10          Q.   There's a Response From Benlida folder.  Do

11    you see that?

12          A.   Yes.

13          Q.   Is that something you would have reviewed?

14          A.   Yes.

15          Q.   There's a Follow-Up Benlida folder.  Is

16    that something you reviewed?

17          A.   Yes.

18          Q.   The August 2019 Forward folder.  Would you

19    have reviewed that?

20          A.   Yes.

21          Q.   Benlida Complaint Invoices.

22          A.   Yes.

23          Q.   How about Citibank Statements?

24          A.   Yes.

25          Q.   Invoices?



```
1        A.    Yes.

2        Q.    LTP Support?

3        A.    Yes.

4        Q.    This Received 5/3/23 CTX?

5        A.    I'm not sure what that is, off the top of

6   my head, like I am the others.

7        Q.    How about I open it up a little more?

8        A.    Oh.  I know what this is.

9              Yes.

10       Q.    These say "DM" on them.  Do you see that?

11       A.    I do.  I know exactly what they are.

12       Q.    These are debit memos.  Right?

13             You have to give a verbal.

14       A.    Yes.

15             I'm sorry.  I apologize.

16       Q.    This reconciliation analysis.  Would you

17   have reviewed that?

18             MR. ROSENTHAL:  Wait.  Let's be

19        clear.  That's a 2012 to 2019

20        reconciliation analysis.  2019.11.15 CCT.

21             I say that because there's a lot

22        of different things with those words

23        "reconciliation analysis" in them.  That's

24        why.

25       A.    Yeah.  I don't remember what that file is,
```

**TP** One

Mark Parisi, CPA, CIRA, CFE, CTCE                    7/31/2023
Case 0:21-cv-60125-RNS   Document 203-2   Entered on FLSD Docket 08/22/2023   Page 44 of
262

Page 43

1   specifically.

2       BY MR. MAZZOLA:

3       Q.   If I open it, will this help refresh your

4   recollection?

5       A.   Yes.  I think that's the --

6       Q.   I'm just tabbing through the bottom.

7       A.   Yeah.  I know what -- yeah.  This is -- I

8   think this is the -- Benlida's first response.  This

9   looks like the Benlida's first response email -- or

10  no.

11           Yeah.  It looks like their first

12  response email, would be my guess.

13      Q.   So this is what we call 2012 to 2019

14  reconciliation analysis, 2019.11.15.  Is that

15  correct?

16      A.   Correct.

17           MR. MAZZOLA:  Did I get that

18      right, Stephen?

19           MR. ROSENTHAL:  I'm sure you did.

20      BY MR. MAZZOLA:

21      Q.   Moving down this list, Benlida Payment

22  Details CTX U.S. 2012 to 2021 Version 5.  Did you

23  review that?

24      A.   Yes, I reviewed it.

25      Q.   And then there's a Benlida -- it's a



1    Microsoft Word document.  It's got a whole bunch of

2    zeros, but ends in 73.

3         A.    I believe that's meeting minutes.

4         Q.    And you reviewed them?

5         A.    Yes.

6         Q.    They're mentioned in the report?

7         A.    Yes.

8         Q.    This looks like an email, Benlida, ending

9    in 364.  Is that something you would have reviewed,

10   too?

11        A.    Yes.  I don't remember the specific context

12   of that email, but we reviewed all the items in our

13   documents utilized.

14        Q.    So everything that we're looking at here --

15   you just said "we" reviewed everything.

16        A.    Yes.

17        Q.    I'm asking about you right now.  You

18   reviewed everything.  Right?

19        A.    Yes.

20        Q.    Now, the "we" -- does the we include

21   Mr. Mukamal?  Did he review everything?

22        A.    Yes.

23        Q.    What about Ms. Khanorkar?

24        A.    Yes.

25        Q.    She reviewed everything as well?



1    Anyone else that would have reviewed

2 everything at the Mukamal firm?

3    A.   Us three are the primary -- primary people

4 working on the matter.  There may be some junior

5 staff doing some clerical-type work, but nothing

6 substantive.

7    Q.   When you moved over to Citrin, did you

8 bring a file over --

9         When you moved over to Citrin, did you

10 bring the file over with you?

11    A.   No.

12    Q.   All the file materials in connection with

13 this remained with the Mukamal firm?

14    A.   Correct.  Nor did I want that treasure.

15    Q.   So if I ask you any question about any of

16 the documents that are contained on this 151, you

17 would have seen that document.  Is that correct?

18    A.   Correct.

19    Q.   Did you review any other documents that are

20 not listed on this Exhibit 151?

21    A.   Not for the counterclaim.

22    Q.   What does that mean?

23    A.   Well, we were retained for

24 Circuitronix, LLC's, counterclaim against Benlida.

25 There's also additional transactions between



1   Circuitronix, LLC, in Hong Kong, and similarly

2   Circuitronix, LLC, and ROK.  But those additional

3   parties were not relevant for purposes of the

4   counterclaim or included in the counterclaim.

5       Q.   So you're talking about documents that

6   related to transactions between -- I'm going to call

7   it Hong Kong.  Right?  CTX Hong Kong.

8            So between the Hong Kong operation and

9   Benlida, those documents, you did not review for

10  purposes of this report and your testimony today.  Is

11  that correct?

12      A.   Correct.

13      Q.   You also referred to ROK.  Is that correct?

14      A.   Correct.

15      Q.   Okay.  You also referred to documents

16  between -- that relate to the transactions between

17  the Hong Kong entity and ROK and that you did not

18  review those documents for purposes of this report

19  and your testimony today.  Is that correct?

20      A.   So I just want to give clear testimony.

21  You said Circuitronix Hong Kong and ROK.  The

22  transactions would be between Circuitronix Hong Kong

23  and Benlida and also Circuitronix, LLC, and ROK.

24      Q.   Okay.  So we're talking Circuitronix, LLC,

25  and ROK.  You didn't review those documents.



1          MR. ROSENTHAL:  Object to form.

2     A.   So I want to be clear.  For the

3  counterclaim.  I did not review those documents for

4  purposes of the counterclaim.

5     BY MR. MAZZOLA:

6     Q.   Okay.  In connection with the -- but for

7  purposes -- so the report that you created today and

8  for your testimony that you're going to provide

9  today, you did not review those documents.

10     A.   We had the data assembled so we could

11  respond to it -- to a claim and affirm the report if

12  we were going to produce a rebuttal.  But we didn't

13  really analyze those transactions as they were not

14  relevant for the counterclaim.

15     Q.   And those transactions are the Hong Kong

16  entity and Benlida.  Right?

17               Correct?

18     A.   Correct.

19     Q.   You're saying the U.S. entity and ROK.  Is

20  that the other set you looked at?

21     A.   Correct.

22     Q.   Or that you looked at but they're not

23  referenced in your testimony today or your report

24  today?

25     A.   Well, I would like to be clear.  We do have

**TP** One

Case 0:21-cv-60125-RNS   Document 203-2   Entered on FLSD Docket 08/22/2023   Page 49 of
262

1  a footnote --

2      Q.   I know the footnote.  Yeah.  We're going to

3  get to the footnote.  We're just ramping up here --

4  getting ramped up.

5      A.   I'm excited, too.

6      Q.   Any documents -- any other documents that

7  are out there that you have that are not on this

8  list?

9      A.   For the counterclaim?

10     Q.   For anything connected to the relationship

11 between Benlida CTX, LLC, CTX Hong Kong,

12 CTX Shenzhen.  Anything.

13             MR. ROSENTHAL:  I'm sorry.

14     What's the question?

15             MR. MAZZOLA:  Any other documents

16     that he has or has reviewed that are not

17     contained on this list, this 151?

18             MR. ROSENTHAL:  What are you

19     asking?  Does he have anything else?

20     A.   Yes.  We have additional documents that we

21 received.  But we did not utilize them for the

22 report, and they are not included in our documents

23 utilized accordingly.

24     BY MR. MAZZOLA:

25     Q.   Okay.  So we know there's a set of



1    documents that you received that you did not utilize

2    for your report accordingly.  We know that.  And

3    that set that you just talked about relates to these

4    things between Hong Kong and Benlida and U.S. and

5    ROK.

6                    Is there any other set of documents?

7        A.    No.   These are the primary issues in the

8    case.

9        Q.    So there's no other documents that you were

10   provided that you -- that are not on the list and

11   you did not utilize.

12       A.    We were provided documents that we did not

13   utilize.

14       Q.    And the ones -- I'm trying to understand

15   what you mean "utilize."  So what you didn't

16   utilize, it seems to me, is these documents related

17   to the Hong Kong Benlida and the ROK transactions.

18       A.    Correct.

19       Q.    Okay.  Is there anything else?

20       A.    Not that I recall.

21       Q.    Okay.  The documents.  Who gave them to

22   you?

23                    And by that, I mean literally.  Did

24   they come from Chauncey?

25                    That's a question.



1    A.    I'm sorry.  I was waiting for you to

2    finish.

3    Q.    That's the question.  Were -- the

4    documents.  Were they provided to you by -- were

5    they provided to you from Chauncey via email or some

6    other way?

7    A.    Primarily through Chauncey.

8    Circuitronix, LLC, may also have sent us some

9    documents.

10    Q.    Did Mr. Rosenthal or anyone that works with

11    Mr. Rosenthal send you any documents?

12    A.    Yes.  I believe they sent us documents.

13    Which documents, I can't recall who sent what

14    specifically.  Most of the documents were received a

15    long time ago.

16    Q.    So Mr. Rosenthal and his team sent

17    documents.  Is that correct?

18    A.    I believe so.

19    Q.    But you don't have a recollection of what

20    they sent, just that they sent you something.

21    A.    Correct.

22    Q.    Mr. Cole, Chauncey Cole, he sent you some

23    documents.  Is that correct?

24    A.    Correct.

25    Q.    And CTX, they sent documents, too.  Is that



1    correct?

2        A.    Correct.

3        Q.    Did CTX ever send you documents independent

4    of Mr. Rosenthal or Mr. Cole?

5        A.    Not that I recall.

6        Q.    Who selected the documents that you

7    reviewed?

8        A.    We selected -- I mean, I don't fully

9    understand your question.

10              There are documents in the litigation.

11   The documents were produced to us as relevant to the

12   litigation.  There are many documents.

13       Q.    So the documents that were produced to you

14   were sent to you by CTX, Mr. Rosenthal, or Mr. Cole.

15   Is that correct?

16       A.    Correct.

17       Q.    Did -- is it fair to say, then, that it was

18   either CTX, Mr. Rosenthal, or Mr. Cole that selected

19   the documents for you to review in the first

20   instance?

21              MR. ROSENTHAL:  Object to the

22       form.

23       A.    No.

24   BY MR. MAZZOLA:

25       Q.    That's not fair to say that?



 1      A.    No.

 2      Q.    Did you participate in selecting any

 3   documents?

 4      A.    Yes.

 5      Q.    You did?

 6            Did you go back to CTX and say, I want

 7   to see this, or I want to see that?

 8      A.    Absolutely.

 9      Q.    Did you go back to Mr. Cole and say, I want

10   to see this and I want to see that?

11      A.    We requested documents.  I don't remember

12   who we specifically requested documents from but

13   counsel.

14      Q.    Did you ever request any documents after

15   reviewing a first set or a second set of documents?

16      A.    Yes.

17      Q.    What I'm getting at is, did you ever go

18   back to CTX, Mr. Cole, or Mr. Rosenthal and say,

19   Hey, we want to see this or that?  Anything like

20   that ever happen?

21      A.    Yes.

22      Q.    Can you give me an example of that?

23      A.    So in the report, we selected debit memos

24   for sampling.  That would be a primary example.

25      Q.    You selected debit memos for sampling.



1     A.    Correct.

2     Q.    Those debit memos that you selected for

3  sampling would be contained on this 151.  Right?

4     A.    Yes.

5     Q.    So if I pulled up a debit -- so you

6  selected them.

7              What do you mean you selected them?

8              Did you go back to Mr. Cole and say,

9  Send us a particular debit memo?

10    A.    It might not have been Mr. Cole, but yes.

11    Q.    Well, you may have gone back to

12 Mr. Rosenthal.  Right?

13    A.    Correct.  I just don't remember if it was

14 Mr. Cole or Mr. Rosenthal or who it was

15 specifically.

16    Q.    Did you ever have direct communications

17 with anyone at CTX requesting any documents?

18    A.    Our communications -- I mean, we primarily

19 communicated through email.  But no.  I didn't call

20 anyone directly at CTX and request documents, if

21 that's your question.

22    Q.    So direct -- did you have any direct

23 communications with CTX via email?

24    A.    We communicated with CTX and counsel via

25 email.



1       Q.    Did you ever have any direct, independent

2    communications with CTX without counsel?

3       A.    Not that I recall.

4       Q.    Did Mr. Mukamal ever have any direct

5    communications with CTX without counsel that you

6    know?

7       A.    Not that I'm aware.

8       Q.    Did you have any -- ever have any -- "you"

9    ever have any direct telephone calls with anyone at

10   CTX without counsel?

11      A.    Not that I recall.

12      Q.    What about Mr. Mukamal?

13            MR. ROSENTHAL:  Did he have

14   conversations with Mr. Mukamal?

15            MR. MAZZOLA:  Yeah.  Mr. -- no,

16   no, no.  Conversations with -- he knows.

17   BY MR. MAZZOLA:

18      Q.    Did Mr. Mukamal have any conversations with

19   anyone at CTX?

20      A.    I don't want to speak for Barry.  I have no

21   idea.

22      Q.    Okay.  What about Ms. Khanorkar?

23      A.    Not that I'm aware of.

24      Q.    Did you ever have an opportunity to review

25   any -- any documents, spreadsheets, or anything on,



1    say, Mr. Rosenthal's computer that's not reflected

2    on this list 151?

3          A.    I've not been through Mr. Rosenthal's

4    computer.

5          Q.    Okay.  Did he ever show you anything that's

6    not on this list?

7          A.    I mean, did he show us anything ...

8                      Not that I recall.

9          Q.    I'm trying to understand the universe of

10   everything that you have in your file that you've

11   reviewed.

12         A.    Um-hmm.

13         Q.    And what I want to know is, were you ever

14   meeting with Mr. Rosenthal at any time, or anyone

15   that works for him, and they showed you a

16   spreadsheet that you looked at and reviewed, but

17   it's not contained on this list 151?

18         A.    Yes.

19         Q.    There were spreadsheets they showed you.

20         A.    Yes.

21         Q.    That are not on this list.

22         A.    Yeah.

23         Q.    What did those spreadsheets reflect?

24         A.    So recently -- because our report was filed

25   on June 8th, and some of the key depositions had not



1    yet occurred, or we hadn't had transcripts, and we

2    received a spreadsheet from Benlida.  Benlida

3    testified that there were --

4        Q.    What are you reading?

5        A.    I'm not reading anything.  This is my

6    report.

7        Q.    It's in your report, then.  Right?

8        A.    No.

9                MR. ROSENTHAL:  No.  You just

10       interrupted his answer, though.

11   BY MR. MAZZOLA:

12       Q.    Go ahead and finish.

13       A.    So Benlida said that -- or the testimony

14   says that there was two spreadsheets that -- or two

15   sets of books Benlida kept.  Or I may be

16   paraphrasing.  But one had the transactions,

17   quote/unquote, commingled, even though you could

18   clearly see the delineation between

19   Circuitronix, LLC, and Hong Kong in the records.

20   And then a second spreadsheet -- or that everywhere

21   was commingled.

22                And then I was also aware of that

23   there was a second spreadsheet where the books were

24   kept separate, but I haven't seen that separate --

25   the separate set of books yet.  Only the one where



1    the records of Circuitronix, LLC, and Hong Kong are

2    commingled.

3         Q.   So CTX, LLC, and CTX Hong Kong are

4    commingled?

5         A.   By Benlida.

6         Q.   By Benlida.

7              Why do you use the word "commingled"?

8         A.   Because all the transactions for

9    Circuitronix, LLC, and Circuitronix Hong Kong are

10   contained on the same spreadsheet.  But within the

11   payments, for example, there's a column.  And

12   sometimes for each payment, it identifies is this a

13   Circuitronix, LLC, payment; is there a Circuitronix

14   Hong Kong payment.

15        Q.   That's Benlida's records.

16        A.   Correct.

17        Q.   And what does that mean to you?

18        A.   I don't understand your question.

19        Q.   Why did you raise it?

20             Why is it relevant?

21             Do you have an opinion based upon that?

22             MR. ROSENTHAL:  Object to the

23   form.

24             Go ahead.

25        A.   Your question was, did I review any other



1    spreadsheets?

2        BY MR. MAZZOLA:

3        Q.    Yes.  And now you're raising it, and I'm

4    asking if you have any comments, opinions about

5    that.

6        A.    My only comment was the -- even though the

7    analysis is commingled, you can clearly tell if the

8    payments are attributable to Circuitronix Hong Kong

9    or LLC.

10              And similarly, the invoices --

11   Benlida's the one who creates the invoices.  The

12   invoice numbers, specifically.  And within that

13   invoice number, there's a designation to identify if

14   Benlida created that spreadsheet for -- or that

15   invoice, rather, for Circuitronix Hong Kong or LLC.

16              And so I did take that spreadsheet,

17   and I separated it to see if the results would be

18   similar to what's in our report, to see if, you

19   know, Benlida's internal records reflected something

20   similar to what our analysis concluded.

21       Q.    What do you mean "concluded"?

22       A.    About the balance due as of July 2019 and

23   the compilation of the lead-time penalties.

24       Q.    And that's in your report?

25       A.    Correct.



1        Q.   So this additional thing that you reviewed,

2   that worked its way into your report.   Is that what

3   you're saying?

4              MR. ROSENTHAL:   Object to form.

5        A.   So that is not what I'm saying.

6   BY MR. MAZZOLA:

7        Q.   Okay.   What are you saying, then, about

8   this additional thing that you reviewed on

9   Mr. Rosenthal's computer after the depositions --

10              MR. ROSENTHAL:   Object to the

11        form.

12   BY MR. MAZZOLA:

13        Q.   -- does that impact your report in any way?

14              MR. ROSENTHAL:   Object to the

15        form.

16        A.   So I just want to be very clear.

17   Mr. Rosenthal sent us a spreadsheet of Benlida's

18   accounting records as represented by Benlida.   I

19   analyzed that spreadsheet well after my report had

20   passed.   And so that report -- or that spreadsheet,

21   rather, did not change the opinions in my report.

22        BY MR. MAZZOLA:

23        Q.   It does not change the opinions in your

24   report.

25        A.   Correct.



1     Q.   Does it support the opinions in your

2  report, in your opinion?

3     A.   In a way.

4     Q.   If -- do you have the binders in front of

5  you?

6     A.   Yes.

7     Q.   Can you go to -- there's an Exhibit 21.

8          MR. ROSENTHAL:  JC, just so you

9     know, there's some that may not be in

10    there.

11         MR. MAZZOLA:  No.  These are

12    all -- these are nothing.  This is the

13    manufacturing agreement, one is the --

14         MR. ROSENTHAL:  I'm just saying

15    there may be some that are not in there,

16    but that should be there.

17         MR. MAZZOLA:  No.  These are

18    there.

19         MR. ROSENTHAL:  I'm telling you.

20    You don't know what's in these.  Some of

21    these are not, because I haven't put my

22    copies in there.

23         MR. MAZZOLA:  Okay.

24         MR. ROSENTHAL:  I noticed it

25    yesterday.



1              MR. MAZZOLA:  Okay.

2        BY MR. MAZZOLA:

3        Q.    I saw you stopped at a number of charts.

4        A.    Well, I'm flipping through all three.

5        Q.    Have you ever seen that document that's

6   Exhibit 21?

7        A.    I believe I've seen it before.  Yes.

8        Q.    We're going to talk about this later.  I'm

9   just trying to clear a few things out here.  I'll

10  ask you some questions about that later.

11              While you're in the binders, can you go

12  to Exhibit 40.

13              Have you ever seen that document?

14       A.    I don't believe so.

15       Q.    Okay.  Let's go to Exhibit 121.

16       A.    121.  That's in the other one.

17       Q.    Mr. Parisi, if you need to take a break at

18  any time, just let us know.

19       A.    I'm good to keep going.

20       Q.    You're a lot younger than me.

21              This is a document -- this is

22  Exhibit 121.  It's an email.

23              Do you see that?

24              You're not there yet, are you?

25       A.    Yes.



1      Q.    Have you ever seen that document?

2      A.    Not that I recall.

3      Q.    Okay.  From an accounting perspective, this

4  is a little bit more interesting than the other

5  ones.  Right?

6      A.    Yes.

7      Q.    Spreadsheets and stuff.  But you haven't

8  seen it.

9      A.    Correct.

10      Q.    Okay.  Let's look at your report.  I'm

11  going to draw your attention to that.

12            Do you have it in front of you?

13            You can close the other binders now.

14      A.    Yes.

15      Q.    So I think we -- in talking to you a bit

16  earlier, you're prepared to talk about anything

17  that's contained within this report today.  Is that

18  correct?

19      A.    Yes.

20      Q.    Do you anticipate, in answering any of your

21  questions, being -- and I don't know yet if it's not

22  a fair question, but I'm just trying to understand

23  that I can ask you questions about this report, and

24  you're prepared to talk about this report.  Is that

25  correct?



1     A.    Absolutely.

2     Q.    Okay.  Of course, there may come a moment

3  within the report -- a time in response to the

4  question where you may have to say, Well, no,

5  Mr. Mukamal knows this, or something else.  And

6  we'll address that when we get to it.  But I just

7  want to roll through this report with you.  Okay?

8     A.    Absolutely.

9     Q.    You know, if you look at your first

10  paragraph, your first bullet point, you talk about

11  analyzing accounts payable reconciliations prepared

12  by Benlida and CTX.  You have a footnote there, and

13  you distinguish -- you identify it as CTX, LLC.

14              Do you see that?

15     A.    I do see the footnote.

16     Q.    Why such a distinction?

17     A.    I don't understand your question.

18     Q.    Were you intending to distinguish CTX, LLC,

19  as separate from CTX Hong Kong?

20     A.    They are separate companies.

21     Q.    Who told you they were separate companies?

22     A.    The names.

23     Q.    Anyone else tell you that?

24     A.    I mean, it's obvious they're separate

25  companies.



1     Q.   Do you know how they're organized legally?

2     A.   One is a Hong Kong company, and one is a

3  domestic company.

4     Q.   You're a fine accountant, but are you an

5  attorney?

6     A.   I am not an attorney.

7     Q.   Did you review the corporate documents of

8  CTX, LLC, and the corporate documents of

9  CTX Hong Kong?

10     A.   Not that I recall.

11     Q.   Okay.  Did you review any contracts between

12  CTX, LLC, and CTX Hong Kong?

13     A.   I previously saw the manufacturing

14  agreement that we referred to, and I saw meeting

15  minutes as well.  But I don't remember additional

16  contracts.

17     Q.   Are you familiar with the organizational

18  structure of CTX Hong Kong?

19     A.   I'm not.

20     Q.   Are you familiar with the organizational

21  structure of CTX, LLC?

22     A.   I'm not.

23     Q.   Are you familiar with the ownership

24  structure of CTX Hong Kong?

25     A.   I'm not.



1     Q.   Are you familiar with the ownership

2   structure of CTX, LLC?

3     A.   I believe Rishi Kukreja owns Circuitronix,

4   LLC.

5     Q.   Are you aware of -- do you know if there's

6   any common control between CTX Hong Kong and

7   CTX, LLC?

8     A.   Common control ...

9          I'm not sure what you mean by "common

10  control."

11    Q.   It's just a question.

12         Are you aware if there's any common

13  control between CTX, LLC, and CTX Hong Kong?

14         MR. ROSENTHAL:  Object to the

15  form.

16    A.   I'm aware that Rishi Kukreja is involved in

17  the operations of Circuitronix Hong Kong, but I

18  don't know if that rises to the level of what you

19  mean by "control."

20    Q.   What about -- are there any common

21  interests between CTX Hong Kong and CTX, LLC, if you

22  know?

23         MR. ROSENTHAL:  Object to form.

24    A.   What do you mean "common interests"?

25  \\\



1         BY MR. MAZZOLA:

2         Q.    Do you know of related parties?

3         A.    Yes.

4         Q.    From an accounting perspective?

5         A.    Yes.

6         Q.    And do you -- what is a related party from

7    an accounting perspective?

8         A.    So they could physically be related and

9    they're related parties.  One person, for example,

10   could own two entirely separate companies, and those

11   companies may or may not do business with each

12   other.

13        Q.    If one person owns two or two separate

14   companies, and you're doing an accounting, would you

15   consider those two companies to be related parties?

16        A.    It depends.

17        Q.    It would depend on a lot of factors.

18   Right?

19        A.    Correct.

20        Q.    And the factors that you would look at in

21   looking at related parties are, from an accounting

22   perspective, would be things like common control.

23   Is that a factor you would look at?

24        A.    It could be.

25        Q.    You would also look at -- a factor might be



1    common ownership.  Isn't that correct?

2         A.    It could be.

3         Q.    Another factor you might look at, when you

4    are looking at related parties from an accounting

5    perspective, are things like do these parties have a

6    common interest.  Those are factors you would look

7    at.  Is that correct?

8         A.    It could be.  Yes.

9         Q.    So when you wrote down Circuitronix, LLC,

10   was that an effort by you to distinguish the

11   Circuitronix U.S. operation from the Circuitronix

12   Hong Kong operation?

13        A.    Yes.

14        Q.    Did you ever do a related-party analysis

15   between CTX U.S. and CTX Hong Kong?

16        A.    Not that I recall.

17        Q.    But if you did, it would be in the report.

18   Right?

19        A.    Correct.

20        Q.    Okay.  So if you don't recall it, and it's

21   not in the report, that means you didn't do it.

22   Right?

23        A.    Correct.

24        Q.    Okay.  Now, it says you were retained by

25   legal counsel "to."  Do you see that?



Case 0:21-cv-60125-RNS   Document 203-2   Entered on FLSD Docket 08/22/2023   Page 69 of
262

1      A.      Correct.

2      Q.      And there's two bullet points there.

3              This was the brief, if you will, or the

4  instruction that you received from legal counsel, and

5  that was to analyze the accounts payable

6  reconciliations prepared by Benlida and CTX U.S. only

7  as of July 31, 2019.  Is that correct?

8      A.      Correct.

9      Q.      And then you were also asked to examine and

10 summarize calculations prepared by CTX with respect

11 to lead-time penalties owed from Benlida.  Is that

12 correct?

13     A.      Correct.

14     Q.      Now, it looks like when you were asked to

15 examine and summarize calculations, they were only

16 the calculations prepared by CTX with respect to

17 lead-time penalties.  Is that correct?

18     A.      No.

19     Q.      But that's what it says.

20     A.      Well, they were prepared, but there's also

21 some meeting minutes where Benlida and CTX agreed to

22 waive some of the lead-time penalty, rather.  And

23 so, to me, that involvement means Benlida is

24 somewhat involved in the lead-time penalty

25 calculations.



1              I mean, there is testimony about it.

2    It appears in the meeting minutes.  So it was

3    somewhat a joint effort.

4         Q.   But the calculations that you looked at,

5    you know, the spreadsheets, the numbers that you

6    looked at, those were pursuant to this bullet point

7    prepared by CTX.  Is that correct?

8         A.   Correct.

9         Q.   And that's what you wrote.  Right?

10        A.   Correct.

11             MR. MAZZOLA:  Can we take a break

12        now?  Is that okay with you, Stephen?

13             MR. ROSENTHAL:  It's your depo.

14        I'm happy to take a break.

15             (Off record:  11:33 a.m. to 11:41 a.m.)

16        BY MR. MAZZOLA:

17        Q.   So you know, I had asked a question about

18   related parties, and it dawned on me when I'm

19   looking at what you were instructed to do.  You were

20   not instructed to do a related-party analysis.  Is

21   that correct?

22        A.   Not that I recall.

23        Q.   But if you were instructed to do it, it

24   would have been in the report.  Right?

25        A.   I don't remember any discussion of



1   related-party analysis, nor was it defined in our

2   initial scope.

3        Q.   Okay.  Did you or Mr. Mukamal ever suggest

4   to the CTX side that a related-party analysis might

5   be useful?

6        A.   Not that I recall.

7        Q.   You don't recall that?

8        A.   I do not.

9        Q.   You didn't have the conversation.  Right?

10        A.   I did not.

11        Q.   Do you know if Mr. Mukamal did?

12        A.   Not that I'm aware.

13        Q.   And what about Ms. Khanorkar?

14        A.   Not that I recall.

15        Q.   Anyone have a conversation with anyone on

16   the CTX side that a related-party analysis would be

17   necessary to do a full picture of this?

18        A.   What do you mean by "this"?

19        Q.   This analysis to provide a full picture.

20             MR. ROSENTHAL:  For the record,

21        you're referring to the report marked as

22        Exhibit 147?

23        A.   Yeah.  For CTX's counterclaim.

24   BY MR. MAZZOLA:

25        Q.   Yes.



1       A.    Not that I recall.

2       Q.    As you sit here today, do you think a

3    related-party analysis would be useful?

4       A.    As I sit here right now, I do not believe

5    so.

6       Q.    Why is that?

7       A.    Because I don't understand how that

8    information would impact the counterclaim.

9       Q.    We'll ask you later, maybe.  Okay?

10      A.    Okay.

11      Q.    At paragraph 2, you talk about we have not

12   been requested to perform, nor have we performed, an

13   analysis, which is required beyond -- an analysis

14   beyond what was required for the analysis presented

15   in this report.  That's still true, as you sit here

16   today.  Right?

17      A.    Correct.

18      Q.    So in terms of the related-party analysis

19   that we were just talking about, you have not been

20   asked to do such, and you have not done such.  Is

21   that correct?

22      A.    Correct.

23      Q.    You say that your analysis was performed

24   using records of CTX.

25            Do you see that?



1    A.    Correct.

2    Q.    And, again, I'm trying to understand

3  that -- you know, when you talk about records you

4  received, these are -- all the records you have here

5  are records that you received from CTX.  Is that

6  correct?

7    A.    We also received some meeting minutes.  And

8  I think those meeting minutes had Benlida Bates

9  stamp numbers on them.

10   Q.    Okay.  Other than those meeting minutes

11 that had a Benlida Bates stamp number on it, as you

12 sit here today, the records that you reviewed,

13 spreadsheets, everything that's in this one --

14 that's up on the screen over here, and that's

15 Exhibit 151, those were documents that you received

16 from CTX.  Is that correct?

17   A.    We received documents from CTX and counsel.

18   Q.    Okay.  That side, not from Benlida.

19   A.    We received Benlida documents through

20 counsel.

21   Q.    Is there anything you received -- anything

22 you received or reviewed was filtered through

23 counsel and/or CTX.  Is that correct?

24           MR. ROSENTHAL:  Object to form.

25   A.    I'm trying to recall if we did any



1    independent internet searches.

2        BY MR. MAZZOLA:

3        Q.    Did you?

4        A.    I don't recall.  I'd have to look at the

5    documents utilized.

6                    I don't have it in this report

7    version.

8                    MR. ROSENTHAL:  Oh.  You want to

9        see the documents?

10                   THE WITNESS:  Correct.

11                   MR. ROSENTHAL:  Let me do this.

12       Let me tear off the copy I have.  I don't

13       think it's marked in any way.

14       BY MR. MAZZOLA:

15       Q.    What do want to look at?

16       A.    Just the "Documents Utilized" section of

17   the report.

18       Q.    Oh, okay.

19       A.    I just don't recall if there's any sources

20   of data that --

21       Q.    That is -- that's not on my version,

22   either?

23       A.    No.  It truncates -- it truncates on page

24   15 for me.

25                   MR. ROSENTHAL:  I don't have an



1          unmarked page of that, so -- but you could

2          probably bring it up on the screen.  I

3          don't know if the report's in there.

4                    MR. MAZZOLA:  Mine has it.  You

5          can look at mine.  I don't care.

6                    I'm going to rip it off.  Is that

7          okay?  Should we exhibit it?  Mark it?

8                    MR. LERNER:  Yeah.  Mark it as

9          152.

10                   (Deposition Exhibit 152

11                   marked for identification.)

12                   MR. MAZZOLA:  Stephen, that has

13         some of my handwriting on it.

14                   MR. ROSENTHAL:  Okay.

15                   (Document review.)

16         A.    Okay.  Yes.  Everything here appears like

17    it would have come from Circuitronix or through

18    counsel.

19         BY MR. MAZZOLA:

20         Q.    Okay.  And you see at that top -- I

21    actually wrote on it.  It says "Documents Utilized."

22    So these would have been documents utilized in the

23    preparation of the report.  Is that correct?

24         A.    Correct.

25         Q.    And you'll see my own handwriting there.  I

1    kind of -- a question:  Reviewed.

2              I assume you would have reviewed these

3    as well.  Right?

4        A.   Yes.

5        Q.   Okay.

6        A.   Absolutely.

7        Q.   And then this nice lady over here is going

8    to make a photocopy of this for us.

9        A.   Oops.  Sorry.  I put that in the middle of

10   the table.  I apologize.

11       Q.   Moving through your report, you advised

12   that you did not perform any attestation or audit

13   procedures.

14              What does "attestation" mean?

15       A.   It's a form of review in accounting.  It's

16   an accounting term of art.

17       Q.   What does it mean?

18       A.   It's similar to review -- it's similar to

19   an audit.

20       Q.   Okay.

21       A.   Just procedures to verify the financials.

22       Q.   So that -- so you're saying you didn't --

23   you did not perform an attestation or audit with any

24   of the summary analysis presented herein.  Does that

25   mean you didn't check them?



1       A.    No.  In accounting, "audit" is a very

2  specific term of art.  "Audit" means, in the

3  traditional sense, an audit of the records.

4       Q.    Okay.  So you did not audit the records,

5  then.

6       A.    Correct.  We did not issue what you would

7  think of as a financial statement report that you're

8  accustomed to.

9       Q.    But what you did do is you did review the

10  numbers.  Right?

11       A.    Correct.

12       Q.    You checked the numbers to make sure they

13  added up correctly.  Is that correct?

14       A.    That was one of the tasks we performed.

15       Q.    You checked the math is what you did.

16       A.    We checked the math; we compiled the math;

17  we reconciled the sources; we compared it to, you

18  know, the different data sources; and we prepared a

19  big reconciliation and kicked the tires.

20       Q.    But you reviewed the math.

21       A.    Yes.  That was one of the things we did is

22  review the math.

23       Q.    Is that the main thing you did?

24       A.    No.  The main thing I did is everything I

25  said in my prior answer.



1      Q.    You reconciled.  Right?

2      A.    We reconciled.

3      Q.    But you did not audit the numbers.

4      A.    We did not prepare a formal audit report of

5   Circuitronix, LLC.

6      Q.    I know you didn't perform -- prepare a

7   report, but did you audit the numbers?

8      A.    I don't know what you mean when you say

9   "audit."

10      Q.    How do you know the numbers that you were

11   looking at were correct?

12      A.    So which numbers are you referring to

13   specifically?

14      Q.    Any number.

15            You were looking at spreadsheets that

16   were provided to you by CTX.  Did you audit those and

17   dig down behind those numbers to confirm that the

18   numbers were accurate?

19      A.    So you -- I just want to be clear.  You

20   said Circuitronix.  There's also the Benlida

21   adjustments to the Circuitronix records.

22      Q.    I know that.

23            So the Circuitronix numbers.  Did you

24   check those numbers, other than looking at them and

25   checking the math?



1      A.   Yes.

2      Q.   Okay.  Did you go back and look at the

3  source documents for them?

4      A.   For some, yes.

5      Q.   For all of them?

6      A.   For all of them, no.

7      Q.   I know you made judgmental choices to pull

8  certain documents like debit memos.  Is that right?

9      A.   Correct.

10      Q.   Did you make judgmental analysis and pull

11  invoices?

12      A.   We did have some invoices.  Yes.

13      Q.   Some?

14      A.   Some.

15      Q.   But not all.

16      A.   I know we had all of the complaint

17  invoices, and I believe we had other invoices as

18  well.

19      Q.   Did you pull lead-time penalty data?

20      A.   I didn't pull lead-time penalty data.  I

21  compiled the lead-time penalty data provided.

22      Q.   You compiled the lead-time penalty data

23  provided to you.

24      A.   Correct.

25      Q.   Did you ask for any additional lead-time

1   penalty data from anyone or just reviewed the stuff

2   that was provided to you.

3       A.   We reviewed the lead-time penalty data

4   provided to us by Circuitronix, and then there was

5   also a Benlida production of documents.  And

6   contained within that document production were

7   meeting minutes, and we used those meeting minutes

8   to adjust the lead-time penalty calculation.

9       Q.   Because you wrote three lines down that --

10  and you said, "And did not perform any additional

11  procedures to provide assurance as to their

12  reliability beyond the procedures enumerated

13  herein." Do you see that.

14      A.   I do.

15      Q.   Okay.  So you didn't perform an audit.  You

16  said that.  Right?

17      A.   Correct.

18      Q.   You didn't perform an attestation.  You

19  said that.  Right?

20      A.   Correct.

21      Q.   And you also wrote that you did not perform

22  any additional procedures to provide assurance as to

23  the reliability of what was contained in the CTX

24  recon and the Benlida recon beyond what's enumerated

25  here in your report.  Right?



1    A.    Correct --

2              MR. ROSENTHAL:  Objection.  Asked

3    and answered.

4              You can answer.

5    A.    Correct.

6    BY MR. MAZZOLA:

7    Q.    So we're going to go through your report,

8    and we're going to examine the procedures that you

9    did to confirm that these number are accurate.  Is

10   that correct?  We'll do that.

11   A.    I don't know.  But I hope we'll do that.

12   Q.    Okay.  But it's in your report.

13   A.    Correct.

14   Q.    You make a reference to a footnote,

15   Footnote 4.  Do you see that?

16              You talk about, "We have also conducted

17   a preliminary analysis."  And this is what I think

18   you might have been alluding to earlier.  Do you see

19   that?

20   A.    I do see Footnote 4.

21   Q.    Where is that preliminary analysis?  Is it

22   written down anywhere?

23   A.    It's the -- it's an Excel spreadsheet.

24   Q.    Where's the Excel spreadsheet?

25   A.    It's in our records.



1      Q.    Was it provided counsel?

2      A.    I don't believe so.

3      Q.    And why is it not referenced here in this

4   report or provided in this report?

5      A.    Because it's not relevant for

6   Circuitronix's counterclaim.

7            We preliminarily compiled the

8   Hong Kong data and ROK data, and we didn't know if

9   we would have to use that data in a rebuttal report.

10  But there was no affirmative report provided, so we

11  did not use such data in the rebuttal report.

12     Q.    And it's not provided -- it sounds to me,

13  because you were not instructed to provide it.

14  Right?

15     A.    I don't understand your question.

16     Q.    Were you instructed to not provide it?

17     A.    I don't understand your question.

18     Q.    Were you instructed to not provide the

19  preliminary analysis?

20            MR. ROSENTHAL:  Do you mean in

21      the report --

22            MR. MAZZOLA:  In the report.

23            MR. ROSENTHAL:  -- in some other

24      place?

25     A.    I'm sorry.  I don't understand your --



1        BY MR. MAZZOLA:

2        Q.   I'm asking where's the preliminary

3    analysis.  You it said was a spreadsheet that you

4    have.  Is that correct?

5        A.   Correct.

6        Q.   I asked why has that -- why has that

7    preliminary analysis not been provided to me?

8    Why -- first of all, start there.

9             Why has it not been provided to me?

10             MR. ROSENTHAL:  Objection.  Asked

11        and answered.

12             You can answer.

13        A.   I don't know why it hasn't been provided to

14    you, but it's not relevant for Circuitronix's

15    counterclaim.

16        BY MR. MAZZOLA:

17        Q.   Has it been provided to the -- your

18    lawyers?

19             MR. ROSENTHAL:  Same objection.

20        A.   We didn't finalize an analysis of

21    Circuitronix Hong Kong or ROK.  All we did is

22    preliminarily just compile the basic spreadsheets

23    that we've gone over and the sources.

24             But that data is not relevant for

25    Circuitronix's counterclaims, so it doesn't -- you



1    know, we didn't rack up a bunch of fees, you know,

2    going out of scope.

3         BY MR. MAZZOLA:

4         Q.   Why do you say it's not relevant to their

5    counterclaim?

6         A.   Well, because Circuitronix's counterclaim

7    is between Circuitronix, LLC, and Benlida.

8         Q.   Okay.  And that's because you believe that

9    Circuitronix Hong Kong is not a related party.

10        A.   That's a legal issue.

11        Q.   Well, I asked you did you do a

12   related-party analysis; you said, no.  Right?

13        A.   Correct.

14        Q.   And that you have no recollection of anyone

15   ever having a communication with anyone at -- on the

16   CTX side about doing a related-party analysis.  Is

17   that correct?

18             MR. ROSENTHAL:  Object to form.

19        A.   Correct.

20        BY MR. MAZZOLA:

21        Q.   So your testimony is that you believe this

22   preliminary analysis is not relevant to CTX's

23   counterclaim.

24        A.   The preliminary analysis of the

25   transactions between Circuitronix Hong Kong and



```
 1   Benlida and Circuitronix LLC, and ROK.  Correct.

 2       Q.   Is not relevant in your mind.

 3       A.   It's not that it's not relevant.  The

 4   parties are not in the counterclaim.

 5       Q.   Let's look at --

 6            I've just gone into --

 7            MR. MAZZOLA:  Did we have this

 8       already previously marked?

 9            MR. LERNER:  What is this?

10            MR. MAZZOLA:  This is the CTX ...

11            (Pause in proceedings.)

12       BY MR. MAZZOLA:

13       Q.   You make reference to a "CTX recon."

14            MR. ROSENTHAL:  Just for the

15       record -- okay.  You're doing it now.

16            MR. MAZZOLA:  I'm going to try to

17       pull it up.  I just want to make sure that

18       I get to the right one, though.

19       BY MR. MAZZOLA:

20       Q.   When you refer to the CTX recon, is it the

21   document that says "Benlida Payment Detail CTX

22   U.S."?

23            Is that what you're referring to,

24   Mr. Parisi?

25       A.   Yes.
```



1    Q.   So it's the -- and that is up on the

2    screen.  Right?

3              Do you see it?

4              MR. ROSENTHAL:  Would you mind,

5         Mr. Mazzolo, just clicking on the ellipses

6         on the top of the document so we know the

7         title at very top?

8              It's the -- in the gray bar.  I

9         think that shows it.  Right?  In the gray

10        bar.

11   A.   Yeah.  That's it.

12             MR. MAZZOLA:  That's it.

13   BY MR. MAZZOLA:

14   Q.   So this document that says "Benlida Payment

15   Detail CTX U.S. 2012 to 2019," is what you're

16   referring to as the "CTX recon."  Right?

17   A.   Correct.

18   Q.   And that's contained within the folder that

19   says "Rishi Transmittal."

20   A.   Correct.

21   Q.   And is it also fair to say that this CTX

22   recon relates only to -- and I'm going to call it

23   "CTX U.S. transactions."  Is that fair to say and

24   correct?

25   A.   Correct.



1     Q.   And you refer to something called the

2   "Benlida recon."  And that's contained within a

3   folder that says "Response From Benlida."

4              And that's a document that's called --

5   an Excel document that's called "2012 to 2019

6   Reconciliation Analysis, 2019.11.15."

7              Do you see that?  I'm going to open it

8   up.

9     A.   I do.  That's the spreadsheet we reviewed

10   previously that was outside the folder.

11    Q.   Okay.  And this reconciliation analysis,

12   where it says, "Reconciliation Analysis Report,"

13   this is what you're referring to as the "Benlida

14   recon."  Right?

15    A.   Correct.

16              MR. MAZZOLA:  Have these been

17        marked as exhibits?

18              MR. ROSENTHAL:  I'm trying to

19        see.  Just one of them was dated 11/15, I

20        saw.

21              What was the other one dated?  Do

22        you recall?

23              THE WITNESS:  November 1st.

24              MR. ROSENTHAL:  So it might be

25        120.  I'm not sure.



1                    MR. MAZZOLA:  We can mark them

2        again.

3                    MR. ROSENTHAL:  My notes of the

4        120 are Benlida and ROK, so it's probably a

5        different one.

6                    MR. MAZZOLA:  I feel like I've

7        seen them, but let's -- can we can mark

8        them again?

9                    MR. ROSENTHAL:  Sure.  No

10       problem.

11                   MR. MAZZOLA:  So just to fix the

12       record here.  "Benlida Payment Detail, CTX

13       U.S. 2012 to 2019," contained within the

14       "Documents Utilized by Expert" folder, the

15       Rishi transmittal, we're going to call 153.

16                   And "2012 to 2019 Reconciliation

17       Analysis, 2019-.11.15" contained within

18       "Documents Utilized" by Mr. Parisi in the

19       "Response from Benlida" file, we're going

20       to call 154.

21                   (Deposition Exhibit 153, 154

22                   marked for identification.)

23       BY MR. MAZZOLA:

24       Q.   Mr. Parisi, we're looking at page 3.  You

25  had another footnote here, Footnote 7, just to state

1    one example.  We have not yet been provided with any

2    transcripts of depositions taken recently.

3              Did you review the transcripts of any

4    depositions?

5        A.   Not that I recall.  The main depositions

6    were Rishi Kukreja and Tracy, and those occurred

7    after our report was issued primarily.  We did

8    not -- or we didn't have the transcripts available

9    in time, if they were issued, if the depositions

10   occurred previously, so we had not have the

11   privilege.

12       Q.   But you used the words "just to state" --

13   "just to state one example."  Any other examples?

14       A.   Not that I recall right now.

15       Q.   Okay.

16       A.   But there were deposition transcripts that

17   was also that spreadsheet of the commingled

18   accounting.

19       Q.   What about the transcript of Akshay Koul?

20   Did you review that?

21       A.   I did not.

22       Q.   What about the transcript of Lena Ochoa,

23   did you review that?

24       A.   I did not.

25       Q.   Do you know when they were taken?



1       A.    I do not.

2       Q.    They were taken sometime ago.  But you

3   didn't review those?

4              MR. ROSENTHAL:  Object to the

5       form.

6       A.    I did not.

7   BY MR. MAZZOLA:

8       Q.    And you used the word -- I'm just -- your

9   language, "to state just one example."

10             MR. ROSENTHAL:  What's your

11      question?

12  BY MR. MAZZOLA:

13      Q.    When people use, "to state just one

14  example," that type of language, it sounds like

15  there were some other examples.

16             So were there any other examples that

17  fall into relevant information that you have not yet

18  reviewed?

19             MR. ROSENTHAL:  Object to form.

20      A.    The primary data that we were waiting on,

21  as I recall, was the deposition transcripts.

22  BY MR. MAZZOLA:

23      Q.    Okay.  So to state "the example," not just

24  one example, you should have written.  Right?

25      A.    That's the one I recall sitting here.



1    There could also be additional discovery produced in

2    conjunction with those depositions.

3         Q.   Before we move off of these, let's look at

4    what we previously marked as Exhibit 154.

5                   This is the CTX recon.

6                   MR. LERNER:  You put up 153; you

7         called it 154.

8                   MR. MAZZOLA:  Oh.  I beg your

9         pardon.  153.  The CTX recon.  This is the

10        CTX recon that's on the screen.  153.

11                  MR. ROSENTHAL:  And just so you

12        guys know, I think it's the same as 120.

13                  MR. MAZZOLA:  Okay.

14                  MR. ROSENTHAL:  Jessica has

15        confirmed.

16   BY MR. MAZZOLA:

17        Q.   Looking at this summary page, do you see

18   these over here?

19        A.   I do.

20        Q.   There's a parenthetical that says

21   5,314,868.81.  And what does that number reflect?

22        A.   That number reflects the net balance after

23   consideration of the invoices, less the debit memos

24   and the payments as relates to the transactions

25   between Circuitronix, LLC, and Benlida.



1        Q.    And that got parentheses around it, so

2   that's a negative number.  Right?

3        A.    It's a credit balance.

4        Q.    Credit balance.

5              And so that is a document -- this

6   spreadsheet is prepared by CTX.  Right?

7        A.    Correct.

8        Q.    It wasn't prepared by you.  Right?

9        A.    Correct.

10       Q.    It wasn't prepared by Benlida?

11       A.    Correct.

12       Q.    And when an accountant says "a credit

13   balance," what does that mean?

14             That means that Benlida, pursuant to

15   this spreadsheet, owes CTX the 5.3 million.  Right?

16       A.    Correct.  Before verification and comments

17   by Benlida.

18             This is Circuitronix's initial attempt

19   at reconciling the balance between the two parties.

20       Q.    But this is just for the U.S. operation.

21   Is that correct?

22       A.    Correct.

23             There are separate spreadsheets

24   tracked by Benlida and Circuitronix.  And the

25   transactions between Circuitronix and U.S. and



```
 1    Circuitronix Hong Kong are separate, just like the

 2    transactions with Benlida and ROK.

 3        Q.   Let's look at what we've marked as

 4    Exhibit 121.  Do you see that?

 5                 (Document review.)

 6        A.   I do.

 7                 MR. MAZZOLA:  What time is lunch

 8        going to happen?

 9                 MS. MILLER:  It's not getting

10        here till 12:30.

11                 MR. ROSENTHAL:  Sometime after

12        12:30, JC.

13                 (Pause in proceedings.)

14    BY MR. MAZZOLA:

15        Q.   So we're looking at this Exhibit 121.

16                 Have you ever seen this document

17    before?

18        A.   Not that I recall.

19        Q.   And this document, it looks like it's an

20    email that was sent from Rishi.  Do you see that?

21        A.   I do see Rishi's name.

22        Q.   And it's dated July 29th, 2019.

23        A.   That is the date.

24        Q.   In the subject, he talks about a final

25    payment reconciliation. Do you see that?
```



1      A.    I see those words.

2      Q.    And he makes reference to "CTX," and he

3  makes reference to "Hong Kong," "CTX U.S.," and

4  "ROK."  Do you see that?

5      A.    I see the words on the page.

6      Q.    And then in the body, he's writing to a

7  person named Douglas at Benlida.  Do you know who

8  Douglas is?

9      A.    I know he's involved with -- he's one of

10  the major players at Benlida, or in the upper

11  echelon.

12      Q.    Do you see where Rishi writes, at line A,

13  Benlida for CTX Hong Kong.  We owe Benlida U.S. $8.8

14  million, 843 thousand, 225 dollars and 69 cents.  Do

15  you see that?

16      A.    I see those words.

17      Q.    Do you see that's written by Rishi?

18      A.    I see that he sent the email.

19      Q.    Did you ever consider in your analysis,

20  monies owed by CTX Hong Kong to Benlida?

21      A.    We did not.

22      Q.    Is it true that in your analysis you only

23  looked at the transaction -- the transactions

24  between CTX U.S. and Benlida?

25      A.    Those were the transactions we analyzed for



1    purposes of Circuitronix, LLC's, counterclaim.

2        Q.   Is that the same as answering, "yes," that

3    for purposes of your report -- this report, 147 --

4    you only looked at transactions between CTX U.S. and

5    Benlida?

6        A.   Our report primarily analyzed transactions

7    between CTX U.S. and Benlida.

8        Q.   Now, you said primarily analyses.

9        A.   Um-hmm.

10       Q.   What other things does it analyze?

11       A.   Well, we also compiled the data that we

12   identified in Footnote 4.  But we -- as we

13   anticipated in preparing a rebuttal, but there was

14   no affirmative report filed by the plaintiff where

15   the Circuitronix Hong Kong data and ROK data could

16   have been helpful.

17       Q.   So what you're saying is that you did not

18   provide any data -- any information in this report

19   regarding transactions between CTX U.S. -- beg your

20   pardon.  CTX Hong Kong and Benlida.  Is that

21   correct?

22       A.   The transactions between CTX Hong Kong and

23   Benlida do not enter into the figures recorded in

24   the report.

25       Q.   It's just the transactions between U.S. and



1   Benlida that create the figures that are in your

2   report.  Is that correct?

3       A.   Correct.

4       Q.   And we had talked a little bit earlier

5   about the related parties, and we asked if you or

6   anyone on the Mukamal side had -- did a

7   related-party analysis.  And I think your answer

8   was, no, you did not.  Is that correct?

9       A.   We did not prepare a related-party

10  analysis.

11      Q.   And that neither you, as far as you know,

12  or Mr. Mukamal, nor Ms. Khanorkar suggested to

13  Mr. Rosenthal, to Mr. Cole, or anyone at CTX, that

14  you do a related-party analysis.  Isn't that

15  correct?

16                  MR. ROSENTHAL:  Object to the

17      form.

18      A.   Not that I'm aware.

19              (Pause in proceedings.)

20  BY MR. MAZZOLA:

21      Q.   Let me ask this question.  How does -- from

22  an accounting perspective, how does an overpayment

23  happen?

24      A.   It's when you send more money than the

25  invoice amount.



1    Q.   I know that.   That's the obvious answer.

2              But have you ever seen that happen

3    before?

4    A.   Yes.   I've seen credits before.

5    Q.   To the tune of $5 million?

6    A.   I've seen credit balances before, yes.   I

7    don't recall specifically a balance of $5 million.

8    Q.   Have you ever seen one larger than

9    $5 million?

10   A.   I don't recall.   I've seen credit balances,

11   if that's your question.

12   Q.   Okay.   What's the last credit balance you

13   remember?

14   A.   I have no idea.   I see so many numbers,

15   they all kind of blend together.

16   Q.   Okay.   But have you ever seen one of

17   $5 million?

18   A.   I don't recall.

19   Q.   But is it normal for businesses to overpay?

20   A.   It happens.   Certainly.

21   Q.   But is it normal for businesses to overpay?

22   A.   It depends on the facts and circumstances.

23   Q.   Is it normal for a well-run business, in

24   your professional, experience to overpay?

25   A.   It's not normal for businesses to overpay,



1    but there can be other reasons for those payments.

2        Q.    For overpayments?

3        A.    Correct.

4        Q.    But it's not normal?

5                    MR. ROSENTHAL:   Object to the

6        form.

7        A.    It depends on the facts and circumstances.

8        BY MR. MAZZOLA:

9        Q.    How is it ever normal for a business to

10   overpay?   Why don't you give me some example?

11       A.    Well, it's a -- Circuitronix is a key

12   supplier of Benlida.   For example, I've seen emails

13   where Benlida has been directing Circuitronix to

14   send money to other entities.

15                   And Benlida also -- I've seen emails

16   where also Benlida says that they need money into

17   Benlida for one reason or another.   So I don't know

18   if the facts and circumstances of this transaction

19   are normal.

20       Q.    How do you reconcile the overpayment of

21   $5 million -- let me ask you this question.

22                   If, in fact, looking at Exhibit 121,

23   and Mr. Kukreja is correct, that -- he writes "we."

24   "We owe Benlida $8.8 million."

25                   Do you see where he writes that?



1        A.    I see those words on the page.

2        Q.    How do you reconcile the fact that he owes

3    them $8.8 million, but in the same breath he's

4    saying that someone owes them $5.7 million?

5        A.    So I just want to be very clear on who

6    we're talking about.  There's multiple transactions

7    represented on this page, and we can address each

8    one individually.

9              But Circuitronix Hong Kong -- the

10   first line is between Circuitronix Hong Kong and

11   Benlida, which is separate from Circuitronix, LLC,

12   and Benlida.

13       Q.    But why would Mr. Kukreja, who is writing

14   on behalf of all three companies, talk about a debit

15   to him of over $8 million -- credit owed to him -- a

16   credit that he has over $8 million, but at the same

17   time, talking about a debit of $8.8 million?

18             Who does that?

19             MR. ROSENTHAL:  Object to the

20        form.

21       A.    I'm sorry.  I don't understand your

22   question.

23   BY MR. MAZZOLA:

24       Q.    Who would agree to overpay to that extent?

25             MR. ROSENTHAL:  Object to the



1        form.

2        A.    I don't understand your question.

3        BY MR. MAZZOLA:

4        Q.    Why would a businessman agree to overpay to

5   another business over $8 million?

6                    MR. ROSENTHAL:  Same objections.

7        A.    I'm not focused on the why, I'm strictly

8   focused on what actually happened.

9        BY MR. MAZZOLA:

10       Q.    And is it fair to say that that kind of

11  overpayment is not normal?

12       A.    It depends on the --

13                   MR. ROSENTHAL:  Object to the

14       form.

15                   Sorry.

16                   It's been asked and answered

17       three times.

18       A.    It depends on the facts and circumstances

19  of the case.

20                   I previously told you that I saw

21  emails where Benlida was definitely hungry for money

22  and directing payments.  So it's -- you know,

23  there's a lot of transaction history in this case.

24       BY MR. MAZZOLA:

25       Q.    Just because someone is hungry for money,



1   why would a prudent business person overpay them

2   just because they're asking for it?

3                   MR. ROSENTHAL:  Object --

4        A.   Because Benlida is a key supplier to

5   Circuitronix.  If Benlida goes under, presumably,

6   some Circuitronix clients would be harmed as well.

7                   So they have -- Circuitronix has

8        an incentive to make sure Benlida can

9        continue to operate.

10   BY MR. MAZZOLA:

11        Q.   So you're suggesting that Benlida somehow

12   strong-armed Circuitronix into overpaying?

13        A.   I didn't say that.

14                   But what I said is there's an

15   incentive to make sure Benlida is in business.

16        Q.   And so just based upon that, Mr. Kukreja

17   would permit an overpayment of over $8 million,

18   almost $9 million?

19                   MR. ROSENTHAL:  Object to the

20        form.

21        A.   I think you may have mischaracterized what

22   the document reflects.

23   BY MR. MAZZOLA:

24        Q.   In this case, do you know how the

25   overpayments happened?



1       A.      Yes.

2       Q.      How did they happen?

3       A.      The payments exceeded the invoices.

4       Q.      On your -- page 5 of your report,

5  background and information from counsel.  Did you

6  read any of the complaints in this case?

7       A.      I did.

8       Q.      Are they identified on your document

9  description?

10              It's the first one.  The third amended

11  complaint.  So that's the one you read?

12      A.      I believe I also read the second amended

13  complaint.

14      Q.      Regarding the reconciliation.  Regarding

15  the CTX recon, what did you do to review the CTX

16  recon?  Can you talk me through the process?  Let me

17  put that up.

18      A.      Let me know when you're ready.

19              MR. ROSENTHAL:  This is 154?

20              MR. MAZZOLA:  154.

21  BY MR. MAZZOLA:

22      Q.      There's a number of summaries.  Do you see

23  that?

24      A.      You lost the screen, unfortunately.

25              (Pause in proceedings.)



1              MR. ROSENTHAL:  Do you want to go

2      off the record for a second so we can

3      figure that out?

4              (Pause in proceedings.)

5              MR. MAZZOLA:  Want to take a

6      break now?

7              MR. ROSENTHAL:  Jessica said we

8      don't have food yet.  She's texted Juan to

9      help with this.

10             MR. MAZZOLA:  Let's keep moving.

11             MR. ROSENTHAL:  He's here now.

12     Why don't you wait -- can we go off the

13     record?

14             (Pause in proceedings.)

15     BY MR. MAZZOLA:

16     Q.   Mr. Parisi, this is the document we were

17  asking you to look at.  This is the CTX recon?

18     A.   Correct.

19             MR. MAZZOLA:  153.

20             MR. LERNER:  154.

21     BY MR. MAZZOLA:

22     Q.   154.  So let's look at this.  There's a

23  column C.  Do you see that?

24     A.   I do see column C.

25     Q.   There is a column B that says "Total

```
 1    Invoices."

 2                   So what did you do to confirm -- let's

 3    look at column B, Total Invoices.

 4                   I don't want to click on them.  They

 5    seem to be clickable.  What happens if I click?

 6        A.   I don't know.

 7        Q.   Okay.  It pulls to the invoice summary.  Do

 8    you see that?

 9        A.   The -- it's a year summary.

10        Q.   Okay.

11        A.   For the year.

12        Q.   Let's -- so, I guess, it just did.  It went

13    to summary for 2016.  And there are invoice totals,

14    debit memo totals.

15                   What did you do to confirm that for

16    October, column A, payment detail date, January 2016,

17    that the invoice total was $581,764.68?  Did you pull

18    those invoices and review them?

19        A.   We did review some of the invoices.  Yes.

20        Q.   Did you pull all of them?

21        A.   No.

22        Q.   You made a judgmental determination to pull

23    some invoices?

24        A.   We reviewed some invoices.  Yes.

25        Q.   And the invoices that you pulled would have
```



1    been provided in the documents utilized by you.

2    Right?

3        A.    Correct.

4        Q.    Same thing for the debit memo total.  And

5    I'm looking at the summary for 2016 on that same

6    exhibit.

7        A.    Um-hmm.

8        Q.    Let's look at this one that's row 6,

9    January.  And it has a debit memo total of $155,924.

10   Do you see that?

11       A.    I see that number.

12       Q.    Did you pull the debit memos to review

13   them -- all of them that add up to $154,500?

14       A.    We only sampled the debit memos in excess

15   of $10,000, which were 11 in number, I believe.

16       Q.    There were 11 debit memos that you

17   reviewed.

18             How many debit memos were there in

19   total?

20       A.    I don't know off the top of my head.  Not a

21   number in millions, though.

22       Q.    So what did you do with respect to -- I

23   moved the cursor down to line 8, and I have it

24   floating over a debit memo total of $273,399.80.  Do

25   you see that?



1     A.   I see that number.

2     Q.   What did you do to confirm that that number

3  was accurate?

4     A.   So we compiled the debit memos, and then we

5  sampled the debit memos in excess of $10,000.

6     Q.   You looked at 11 debit memos.

7     A.   Correct.

8     Q.   Those 11 debit memos that you looked at,

9  did those 11 debit memos add up to the $273,399.80

10  that I'm looking at on the screen right now?

11     A.   I don't know.

12     Q.   You only looked at 11 debit memos.

13          MR. ROSENTHAL:  Object to the

14     form.

15  BY MR. MAZZOLA:

16     Q.   So my question is, what did you do for

17  purposes of your analysis to confirm that the debit

18  memos around about the time of March 2016 all added

19  up to $273 -- $273,399.80?

20          What did you do?

21          MR. ROSENTHAL:  Object to the

22     form.

23     A.   So this is a summary.  This summary -- why

24  don't you look on the screen for a second.

25  \\\



```
 1         BY MR. MAZZOLA:

 2         Q.   I'm looking at it.

 3         A.   Oh.  Sorry.

 4              So you see it says "Sum" in left

 5    paren, March 2016 D32 to D38?  So that cell

 6    specifically is reference -- what I'll call the

 7    supporting payment detail sheet.  And so if you go

 8    look to those specific cells, 32 to 38 on the

 9    March 2016 tab, it will sum to that amount.

10              So what I did is, I compiled all the

11    remaining --

12         Q.   Where am I supposed to go to?  To March

13    what?

14         A.   2016.

15         Q.   Okay.

16         A.   So you can just pick any one.

17         Q.   No.  I know how this works.

18              (Pause in proceedings.)

19              MR. ROSENTHAL:  So we're now

20         looking at the March 2016 tab, for the

21         record.

22              MR. MAZZOLA:  Yes.

23         BY MR. MAZZOLA:

24         Q.   So this debit memo was identified there.

25    Right?
```



Case 0:21-cv-60125-RNS   Document 203-2   Entered on FLSD Docket 08/22/2023   Page 108 of
262

1          A.    Correct.

2                    If you total -- do you see where it's

3     in red from rows 32 to 38?  That sum would equate to

4     the amount you saw on the balance -- where the

5     summary is.

6                    So you can see that there's two debit

7     memos in excess of $10,000 here, so we would have

8     reviewed what I'll call 99 percent of this debit

9     amount that --

10         Q.    So I see -- I see two of them that add up

11    to -- they add to 273.  Do you see that?

12         A.    I do see your total.

13         Q.    So you would have looked at this one, this

14    delamination one?  That's $154,000?

15         A.    Correct.

16         Q.    And you would have looked at this one for

17    $117,000?

18         A.    Correct.

19         Q.    Would you have looked at the other ones?

20         A.    No.

21                    We looked at them in the sense we

22    compiled the data on these payment details, but we

23    didn't do any further analysis.

24                    If you hold "control" and click that

25    button, it will take you all the way to the left --



1    to the first tab, rather.

2        Q.    There we go.  Which we were looking at

3    before.  Right?

4              This summary?

5        A.    You picked one of the years.  I think you

6    picked 2016, specifically.

7        Q.    We'll pick it again.

8              If you look at --

9        A.    So -- and I also -- go ahead.

10       Q.    So if we look at this column, line 7, the

11   $54,000, you would have done the same analysis

12   there.

13       A.    So that --

14       Q.    If you click on that --

15       A.    Yeah.  It also equates to the detail.

16       Q.    It doesn't seem to jump.

17             I'm looking at line 10, cell -- line 10

18   at D.  Do you see that?  If I click that and that

19   that will jump?

20       A.    I don't know technology.  Doesn't always

21   work, so I can't give you an answer.

22       Q.    But it's your testimony, then, that unless

23   the debit memo was greater than $10,000, you did not

24   review it.

25       A.    Correct.



1        Q.    And when you reviewed the debit memo, what

2    did you do, other than look at it?

3        A.    We looked at the debit memo and made sure

4    that the amount agreed -- or we traced the amount

5    from the ledger to the details to make sure it

6    equated.  And then we also made sure that the debit

7    memo was sent to the other side.

8        Q.    Did you review any responses from Benlida

9    regarding those debit memos --

10       A.    Yes.

11       Q.    -- disputing them?

12             You did?

13       A.    Well, specifically, the first Benlida

14   reconciliation and the second Benlida reconciliation

15   do dispute the debit memos.

16       Q.    But you said you looked at emails

17   transmitting them.

18       A.    We -- I saw the physical debit memos that

19   reflected they were sent.

20       Q.    You saw that.

21       A.    Yes.

22       Q.    And did you do anything to verify the

23   veracity of the amount identified in the debit memo?

24       A.    Yes.

25       Q.    And what did you do?



1        A.    So we compiled the three data sources.  And

2   so that three-way match, you know, tells the story

3   of the approximation of the debit memo balance.

4        Q.    Did you compare a -- the debit memos to

5   responses that were written back from Benlida?

6   Emails, other communications.

7        A.    So I just want to be clear.  As it relates

8   to the analysis through July 2019, the primary

9   sources are the CTX recon, the two Benlida

10  responses, and the meeting minutes.

11       Q.    And that's it.

12       A.    For the data compilation.  Correct.

13       Q.    Let's look at --

14       A.    And I'd just like to add a clarification

15  point.

16       Q.    Okay.

17       A.    Do you see how there's payments in

18  column H?

19       Q.    Yep.

20       A.    These payments may not always equate to the

21  payments supported in the schedule, so we aggrated

22  all of the payments to make sure we had the whole

23  universe of transactions.

24       Q.    But you didn't change any of the numbers in

25  these spreadsheets.



1     A.    Strictly compilation.

2           And then the adjustments that we do

3     make to some of the payments are identified in our

4     report, for example.

5     Q.    For example, what?

6     A.    What I just said.

7     Q.    Oh.  There is an adjustment you made.

8     A.    Yeah.  We do make adjustments to the

9     payments in our report.

10    Q.    You're talking about these transactions.  I

11    think you said that word.

12          And in Footnote Number 10, you refer to

13    individual invoices, payments, and debit memos.  Now,

14    we know that you reviewed -- I think you said 11

15    debit memos?

16    A.    Correct.

17    Q.    So other than those 11 debit memos that you

18    reviewed, you're just relying upon the numbers that

19    were provided to you.  Is that correct?

20    A.    The numbers within the CTX spreadsheet and

21    the two Benlida responses.  Correct.

22    Q.    Those are the numbers you're relying on.

23          Why do you keep saying "the Benlida

24    responses"?

25    A.    Because they're a component of the

1   equation.

2       Q.    Does the Benlida response confirm that the

3   debit memo is accurate?

4       A.    So my view is, there -- it's a

5   reconciliation between the parties.  And it appears

6   to be a good-faith reconciliation.

7             I've been involved in some

8   transactions where there's an earn-out and the buyer

9   only wants to get -- wants to recognize the

10  adjustments that decrease the amount that they're

11  going to have to pay out.  But in this instance,

12  Benlida is actually saying, you know, Circuitronix,

13  LLC, here's a few payments that we forgot that

14  reduce the balance.

15            So there's adjustments, you know, both

16  ways to the parties to really try to come to what

17  the balance is as of that point in time.

18      Q.    So I think you just said it was a

19  good-faith reconciliation between Benlida and CTX.

20  Is that right?

21      A.    And I just want to be clear.  It's up to

22  that point in time.

23            But after July 2019, then the

24  transactions moved into a prepayment plan.  So we

25  only reconciled through July 2019.



1      Q.   But at that point, it was a good-faith

2  reconciliation.  Is that what you're saying?

3      A.   Correct.  Subject to some adjustments.

4  But, yes.

5                 (Telephonic interruption.)

6      BY MR. MAZZOLA:

7      Q.   So the reconciliation -- you said it was a

8  good-faith reconciliation between Benlida and CTX.

9  You did say that.  Right?

10     A.   (No audible response.)

11     Q.   But that reconciliation between CTX and

12 Benlida only related to transactions between CTX

13 U.S. and Benlida.  Isn't that correct?

14     A.   There were other spreadsheets of the

15 transact -- in the initial transmittal email.

16              That email contains two spreadsheets.

17 The first spreadsheet is between Circuitronix, LLC,

18 and Benlida, and it contains what we've seen.  And

19 then the second spreadsheet is between Circuitronix,

20 LLC, and ROK, and contains similar structured data

21 to we saw in Circuitronix, LLC, and Benlida.

22     Q.   But you did not review any reconciliations

23 between CTX Hong Kong and Benlida.  Isn't that

24 correct?

25              MR. ROSENTHAL:  Object to the



1      form.

2      A.    Other than identified in the footnote.

3      BY MR. MAZZOLA:

4      Q.    Did you ever see a spreadsheet from Benlida

5   to CTX advising that Benlida believed that CTX

6   Hong Kong owed them $13 million?

7              Did you ever see that spreadsheet?

8      A.    Yes.

9      Q.    But you didn't address that in this report.

10     A.    I did not address that spreadsheet in

11   Circuitronix's counterclaim report.

12     Q.    Not in this report.

13     A.    Correct.

14     Q.    Did anyone tell you not to do that?

15     A.    Not that I recall.

16     Q.    Did you ever reach out to Mr. Rosenthal or

17   Mr. Cole and say, Hey, there's this $13 million

18   claim by Benlida owed by CTX Hong Kong, perhaps we

19   should address that in this report?

20              Did you ever do that?

21              MR. ROSENTHAL:  I'm going to

22       instruct him not to answer that question.

23              Communication with counsel and

24       experts in federal court are privileged.

25              Unless you disagree, I don't



1         think it's a proper question.

2                    MR. MAZZOLA:  No.  No, no.

3         BY MR. MAZZOLA:

4         Q.   Did you ever think that -- did you ever

5    think that you should do that?

6         A.   I did not.

7         Q.   What about Mr. Mukamal?  Did you and him

8    ever discuss whether you should address Benlida's

9    claim that the Hong Kong entity owed it $13 million?

10        A.   Yes.  We discussed it.

11        Q.   And what did you and he discuss?

12        A.   That we would -- that we would potentially

13   consider any of the issues raised in a rebuttal

14   report.

15                   But we did not receive an affirmative

16   report from the plaintiffs that would explain the

17   basis of including other parties not named in the

18   lawsuit in the claims.

19        Q.   And that's the related-party issue.  Is

20   that what you mean?

21        A.   So the counterclaim is between

22   Circuitronix, LLC, and Benlida.  I don't believe

23   there's other parties named.

24        Q.   A beg your pardon.  I was being

25   interrupted.



1              MR. MAZZOLA:  Would you read back

2        the answer, Rebecca?

3                  (The following record was read:

4                  A. "So the counterclaim is

5                  between Circuitronix, LLC, and

6                  Benlida.  I don't believe

7                  there's other parties named.")

8        BY MR. MAZZOLA:

9        Q.   Why would you think that Benlida's claim of

10       the $13 million owed by the Hong Kong entity would

11       not be subject to your expert report?

12       A.   Because I'm the expert for the defendants

13       and not the plaintiffs.

14       Q.   But why would you not address it?

15                  If Benlida is claiming that the

16       Hong Kong entity owes it $13 million, why did you not

17       think that would be relevant to address?

18       A.   I don't believe that's included in

19       Circuitronix, LLC's, counterclaim.  That's your

20       case.  Right?

21       Q.   But then we talked earlier about the

22       related parties.  Did you -- do you see that the

23       Hong Kong -- do you agree that the Hong Kong entity

24       is a related party to the U.S. entity from an

25       accounting perspective?

1                    MR. ROSENTHAL:  Object to the

2       form.

3       A.    I haven't done a related-party analysis to

4    make that determination.  There's common

5    transactions between the two parties.  Sure.

6       BY MR. MAZZOLA:

7       Q.    Okay.  So what are the factors you

8    considered?  Common control is one of them.  We

9    talked about that.  Right?

10      A.    We did.

11      Q.    You considered common ownership.  That's

12   another factor you consider.  Is that correct?

13                   MR. ROSENTHAL:  Object to form.

14      A.    You could.

15      BY MR. MAZZOLA:

16      Q.    And you consider -- what about common

17   interest?  Is that something you could consider?

18                   MR. ROSENTHAL:  Object to the

19      form.

20      A.    You could.

21                   I haven't really thought out the

22   nuances of related-party analysis in detail to sit

23   here and comment about it thoroughly.

24      BY MR. MAZZOLA:

25      Q.    But as it is, you never looked at it.



1    Isn't that correct?

2         A.    What is "it"?

3         Q.    This issue about related parties.

4                You never reported on it; you never did

5    the analysis.

6         A.    We did not do -- perform a related-party

7    analysis.

8         Q.    And that's because you thought it wasn't

9    relevant.

10        A.    I've looked at the counterclaim.   The

11   counterclaim is between Circuitronix, LLC, and

12   Benlida.  I did not include any other parties.

13        Q.    Did you ever see this document?  It's a

14   document that we've identified as Exhibit 40.

15        A.    We previously did this.

16        Q.    Yeah.  And --

17        A.    And I told you -- I told you I hadn't seen

18   it, because that was the blue document.

19        Q.    Oh.  You've never seen this document.

20   Okay.

21        A.    I can pull it up, though, if you want me to

22   look at it.

23        Q.    Yeah.

24                (Pause in proceedings.)

25   \\\



 1          BY MR. MAZZOLA:

 2          Q.    Since you haven't seen it, it's not going

 3     to be fair for me to take your time, or anyone

 4     else's time, to go through the whole thing, and I

 5     won't do that.

 6                But if you go to the -- I guess it's

 7     the last page of it.  At the bottom, you'll see

 8     CTX 8004.

 9                MR. LERNER:  That's the Bates

10          stamp number.

11                MR. MAZZOLA:  He's on the last

12          page.  The signature page.

13          BY MR. MAZZOLA:

14          Q.    Do you see that?

15          A.    I do.

16          Q.    And do you see that there's -- while

17     there's no signature there, I don't think anyone has

18     claimed or alleged that Rishi Kukreja did not draft

19     this letter and that Rishi Kukreja -- that there may

20     or may not be a signed version of it going around,

21     but that's not really the issue for right now.

22                But do you see that Rishi Kukreja's

23     signature block there says that he's signing for

24     CTX USA and CTX Hong Kong?

25                MR. ROSENTHAL:  Object to the



1      form.

2      A.    I see those words.

3      BY MR. MAZZOLA:

4      Q.    Do you see those words?

5            If were you aware that Rishi was

6      entering into agreements on behalf -- hypothetically

7      speaking -- on behalf of CTX U.S. and CTX Hong Kong,

8      would that have any bearing, in your mind, regarding

9      this question of related parties?

10     A.    I don't know.

11     Q.    Because you mentioned earlier when I was

12     asking you -- I think before one of the breaks about

13     related parties, you were quick to point to the

14     manufacturing agreement.  And you made reference in

15     the manufacturing agreement that it was just signed

16     on behalf of the LLC, the U.S. operation.  I don't

17     know if you recall that answer.

18           But I'm asking you now, if you knew --

19     hypothetically speaking, if Mr. Kukreja was signing

20     contracts on behalf of both U.S. and Hong Kong, if

21     that, in your professional judgment, has any bearing

22     as to whether or not the U.S. entity and the

23     Hong Kong entity are related parties.

24     A.    I apologize.  I don't remember saying --

25     pointing to the manufacturing agreement as support



1   that Circuitronix, LLC, was a separate company from

2   Circuitronix Hong Kong.

3                I recall I said the names were

4   different, which identified that they were separate

5   entities.

6       Q.   My question now is, you're seeing a

7   contract -- hypothetically speaking, a contract that

8   is signed by Mr. Kukreja on behalf of the U.S.

9   entity and the Hong Kong entity.  You're seeing it

10  now.

11               As an accountant -- forensic accountant

12  who understands issues regarding related parties,

13  does this have any bearing in your mind, as you sit

14  here today, as to whether or not the U.S. operation

15  and the Hong Kong operation are related parties?  Yes

16  or no.

17      A.   I don't believe so.  I'd have to think

18  about it more.

19      Q.   Okay.

20      A.   I haven't read this whole agreement, you

21  know, sitting here.

22      Q.   We'll come back to it.

23               What if you -- what if you saw the U.S.

24  entity -- hypothetically speaking, if you saw the

25  U.S. entity, CTX U.S., here in United States paying



1  the debts and obligations of CTX Hong Kong?  Would

2  that have any bearing, in your mind as an accountant,

3  as to whether or not the U.S. entity and the

4  Hong Kong entity are related parties?

5       A.   I haven't performed a related-party

6  analysis to consider all the facts and circumstances

7  that could affect this issue.  My report was focused

8  on Circuitronix, LLC's, counterclaim.

9       Q.   I know you didn't do that, so I'm just

10 asking what's called a hypothetical question.

11            The question -- the questions that I

12 asked you about this Exhibit 40, the agreements

13 signed by Mr. Kukreja on behalf of the U.S. entity

14 and the Hong Kong entity, that was a hypothetical

15 question.

16            Now I'm asking you another one.  And

17 this question is, if you saw proof that showed that

18 CTX U.S. was paying the debts and obligations of

19 CTX HK, just hypothetically speaking, would that be

20 something, in your professional mind, that would have

21 any bearing as to whether or not the U.S. entity and

22 the Hong Kong entity are related parties?

23      A.   You keep saying "related parties."  They --

24 there could be some, you know, common management,

25 but they're separate companies.



1          All the transactions are tracked

2   separately.  CTX U.S. sent a reconciliation between

3   itself and Benlida, itself and ROK.  And

4   Circuitronix Hong Kong similarly responded with

5   its -- or Benlida responded on the third email with

6   its transactions between Benlida and

7   Circuitronix Hong Kong.  So even if there's some,

8   you know, common management, the transactions are

9   tracked separately.

10      Q.   So from an accounting perspective,

11  professionally speaking, is it common and good

12  practice to ignore related-party transactions?

13      A.   I don't understand your question.

14      Q.   It's just a question.

15          If you -- is it common and good

16  practice to not address related-party transactions

17  when they're -- when they're -- when the

18  information's available to you?

19      A.   It depends on the facts and circumstances.

20      Q.   So in this case over here, where Benlida is

21  claiming that the Hong Kong entity owes it

22  $13 million, is that something that you think is

23  worth reviewing?

24      A.   So I was retained for the counterclaim.

25          The amount that Benlida would be due



1   from Circuitronix Hong Kong would have been

2   something for the plaintiff to publish in an

3   affirmative report.

4       Q.   Okay.  I don't -- I'm asking you about

5   related parties, and I'm trying to understand if you

6   think it's prudent accounting practice to review

7   related-party transactions when you're looking at an

8   entire picture.

9       A.   It depends on the facts and circumstances.

10      Q.   Okay.  And it sounds to me, from what I'm

11  hearing, is that you only looked at part of the

12  picture.  Is that correct?

13      A.   So, again, I analyzed the picture as it

14  relates to Circuitronix, LLC's, counterclaim against

15  Benlida.

16      Q.   So you only looked at part of the picture

17  that relates to transactions between the U.S. entity

18  and Benlida.  Is that correct?

19      A.   Correct.  As identified in the

20  counterclaim.

21      Q.   Is the engagement letter that was -- that

22  you signed on behalf of -- you know, your services.

23  Was that limited solely to this CTX U.S.

24  counterclaim?

25      A.   The engagement letter, I don't believe, is



1    that nuanced.  They're more general.

2         Q.   So then at some point, some instruction was

3    given to you to only address the counterclaim.  Is

4    that correct?

5         A.   That's not correct.

6         Q.   Did you make the decision to only address

7    the counterclaim?

8         A.   Well, again, I testified on this issue a

9    few times.  But we were retained for the

10   counterclaim.

11             And then Footnote 4 states that we

12   assembled some data for use in a rebuttal, but we

13   didn't get an a affirmative report by the plaintiff

14   to rebut.

15        Q.   Okay.  Why do you need a report?

16             You know what the allegations are in

17   the complaint.  Right?

18        A.   In which complaint?

19        Q.   You read the third amended complaint.

20   Right?

21        A.   The plaintiff's complaint.

22        Q.   Yes.

23        A.   Okay.

24        Q.   You did read it.  Right?

25        A.   I did.



1      Q.   And you do know, then, in the third amended

2  complaint drafted by the plaintiffs, there are

3  allegations that the Hong Kong entity owes it

4  $13 million.  You must know that.

5      A.   I don't know if that's how the number

6  shakes out precisely.  There's invoices included.  I

7  don't know if all those invoices necessarily equate

8  to the 13.5, but I do know that Benlida claims it's

9  owed money from Circuitronix Hong Kong.

10      Q.   And the fact of the matter is that when you

11  did your analysis, you looked solely at transactions

12  between the U.S. entity and Benlida.  Only.

13                  MR. ROSENTHAL:  Object to the

14      form.

15      BY MR. MAZZOLA:

16      Q.   For purposes of this report.  Is that

17  correct?

18                  MR. ROSENTHAL:  Object to the

19      form.

20      A.   As identified in the counterclaim, we

21  identified the transactions between

22  Circuitronix, LLC, and Benlida.

23      BY MR. MAZZOLA:

24      Q.   Are you aware that the plaintiffs in this

25  case have alleged that the CTX invoices are owed by



```
 1    the U.S. entity?

 2              MR. ROSENTHAL:  Object to the

 3       form.

 4       A.   Well, the complaint's against -- it's

 5    Benlida v. Circuitronix, LLC.  So, yes.

 6    BY MR. MAZZOLA:

 7       Q.   Okay.  So that makes sense -- right? --

 8    that that would be the case.

 9       A.   "That makes sense.  Right?"

10              I don't understand your question.

11       Q.   Well, my question was, are you aware that

12    the plaintiffs are alleging that those CTX Hong Kong

13    invoices are owed by the -- by CTX U.S.  Do you know

14    that to be the case?

15       A.   From the complaint.  Yes.

16              But they didn't put it in an

17    affirmative report where I would understand the

18    basis for which CTX, LLC, would be responsible for

19    the debts of another company.

20       Q.   But you as an accounting professional,

21    because you reviewed the complaint.  When you

22    reviewed the complaint, you understood that Benlida

23    was alleging that the -- the CTX Hong Kong invoices

24    are owed by CTX U.S.S.  That's correct.  Right?

25       A.   The CTX Hong Kong invoices appear in
```



1    Benlida's complaint.

2        Q.   And that the allegation by Benlida is that

3    those invoices are owed by the U.S. operation.   Is

4    that correct as you understood the complaint?

5        A.   That's Benlida's allegation.

6        Q.   And is it correct as you understood the

7    complaint?

8        A.   That's Benlida's allegation.

9        Q.   Okay.   The question is, is it correct?

10       A.   Is "what" correct?   You say saying "its,"

11   and --

12       Q.   Is their allegation that you under -- not

13   the ultimate question.

14                But is it your understanding, from

15   reading the complaint, that Benlida is alleging that

16   CTX Hong Kong's invoices are owed by CTX U.S.

17       A.   I don't know if they artfully say it that

18   well.

19                But the Circuitronix Hong Kong

20   invoices are included in the complaint between

21   Benlida and Circuitronix, LLC.

22                MR. MAZZOLA:   Do you want to

23       break now?

24                MR. ROSENTHAL:   Sure.

25                (Off record:   12:52 p.m. to 1:36 p.m.)



1        BY MR. MAZZOLA:

2        Q.   So still looking at your report.  We'll

3   look at page 16, Mr. Parisi.

4        A.   Okay.  Give me one second to --

5        Q.   I beg your pardon.  6.

6        A.   Page 6.

7        Q.   Page 6.

8        A.   Okay.

9        Q.   At paragraph 15, you talk about you looked

10  at CT recon and the Benlida recon and from that you

11  compiled a database.

12              Where is that detailed database?

13              MR. MAZZOLA:  Is that something

14       that was shared with us that contained ...

15              MR. ROSENTHAL:  That's not

16       something that we produced.

17              MR. MAZZOLA:  Okay.

18       A.   The answer to your question, though, is the

19  source files are contained within the first three.

20  The Rishi transmittal email, the response from

21  Benlida, the follow-up from Benlida, sprinkle in a

22  little meeting minutes for the adjustment, and

23  that's the cake.

24       BY MR. MAZZOLA:

25       Q.   And this is -- and that results in page --



1    on page 7 of Table 1?

2         A.    Correct.

3         Q.    And there's a difference.  You come up --

4    what is this difference?

5               Can you explain to me what this means,

6    that the CT -- and I'm going to talk a little bit.

7               The CTX recon says 5.3 million.  Then

8    Benlida comes back and says, No, it's 4.07 million.

9    And the difference is 1.242.  That's just straight

10   math.  Right?

11        A.    Precisely.

12        Q.    And when you look at payments, you have a

13   difference, again, that's just straight math.

14   Correct?

15        A.    Correct.

16        Q.    On the invoices, again, it's -- there's a

17   difference of $662,918.  That's straight math.

18   Right?

19        A.    Correct.

20        Q.    And on the debit memos, that's straight

21   math as well?

22        A.    Correct.

23        Q.    The total amount of debit memos is

24   somewhere on the order of 2.7 to 2.2 million.

25   Right?



1      A.     For Circuitronix, LLC, yes.

2      Q.     The U.S. operation.

3             And did you -- again, you did
4      judgmentally select 11 debit memos to review.

5      A.     Correct.  In excess of $10,000.

6      Q.     But only the 11.

7      A.     Correct.

8             As they contain, you know, the
9      material amount of the debit memos.

10     Q.     How did you determine whether the debit
11     memos were properly created?

12            Did you go back to the contract?  Did
13     you go back to emails?

14            Did you go back to something to find
15     out what the basis for the debit memos were?

16     A.     So the basis for the debit memos is the
17     monthly transmittal emails included in the CTX
18     recon.  And then Benlida comes back; they have their
19     adjustments, and we reconciled those as identified
20     in Table 1.  And then we sampled the debit memos, as
21     I previously discussed.

22     Q.     Why -- do you accept Benlida's number of
23     the 4.072?

24     A.     Do I accept their number ...

25     Q.     At some point, you go through all of this,



1    and you come up the with a final number.

2        A.    Correct.

3        Q.    Do you accept Benlida's number, or do you

4    accept CTX's number for your final calculations?

5        A.    Neither.

6        Q.    Neither.

7              And what number do you choose?  Say,

8    for example, on this Table 1 summary.

9              Do you split the difference?  Did you

10   do something else?

11       A.    My report speaks for itself.

12       Q.    Okay.  So tell me what you do.

13             So that's what we're looking at -- can

14   you explain to me what you did here?

15       A.    Sure.  Which part would you like to

16   discuss?

17       Q.    Well, I can go to the back, on page 14.

18   Page 14 is where you do a final summary of the

19   payables reconciliation between CTX and Benlida.

20   Correct?

21       A.    Correct.

22       Q.    And here, you come up with the

23   reconciliation, per CTX's $4.76 million.  Right?

24       A.    Correct.

25       Q.    And that's a different number from CTX's on

TP One

1    page 7.

2        A.    Correct.

3        Q.    And so we'll just have to go through and

4    discuss with how you come up with that number.

5    Right?

6        A.    There's a table that identifies the

7    changes.  And this summary table references the

8    previous table that explains why the numbers are

9    different.

10       Q.    The table that summarizes the changes, can

11   you tell me where that is?

12       A.    Sure.

13             So we have to be very clear when we

14   talk about these components, because it's easy to

15   talk general.  But there's three real pieces of the

16   pie:  Payments, invoices, and debit memos.

17             The payments are largely -- you know,

18   it's amazing how close they are.  There's a $92,000

19   difference on $67 million.

20             The second component is the invoices.

21   The difference between the two is $662,000.

22             And there's also the debit memos,

23   which we've previously discussed.

24       Q.    So let's talk about payments, because you

25   do address the payments --



1     A.    Sure.

2     Q.    -- on page 7.

3           And that's where you reference that

4  $92,338 difference.  Do you see that?

5     A.    I do.  That's further elaborated in

6  Table 2.

7     Q.    And here, that -- it says, "Our analysis

8  reveals that the payment difference is attributable

9  to payments made by CTX, which were not listed in

10  the CTX recon."

11          And my question there is, how or why

12  would a payment be made by CTX, which was not listed

13  on their recon -- on their CTX recon?

14    A.    It wasn't listed on the recon.

15    Q.    Well, what you're saying is, there was a

16  payment made by CTX that they never noted on their

17  reconciliation.  How did that happen?

18    A.    It wasn't noted on the reconciliation.

19    Q.    But how would that happen?

20    A.    I don't -- I don't know how it didn't

21  happen.

22    Q.    Is that a sign of sloppy accounting?

23  Sloppy bookkeeping?

24          MR. ROSENTHAL:  Object to the

25    form.



1      A.    It's a sign that their bookkeeping isn't

2   perfect.

3            But the transactions are largely in

4   synch.  And you have to remember the volume of data,

5   too.  There's a significant amount of volume being

6   transmitted.  You know, there's $65 million of

7   invoices, and even more than that in payments.  So

8   the quantity is extreme.

9            And you can understand that when the

10   parties are shipping, you know, there was disputes

11   sometimes about the price, and then also the

12   quantity originally ordered versus invoiced, for

13   example.  And those two differences would create

14   some of the invoice differences.

15      BY MR. MAZZOLA:

16      Q.    So, in your mind, that $92,000 delta is not

17   a big number.

18      A.    It's all relative.

19            You know, $92,000 would be a lot of

20   money for me to pay personally.  But in the grand

21   scheme of how close these numbers are, it's

22   certainly within a reasonable degree of certainty.

23      Q.    On Table 2, when you write "concurring

24   payments," can you explain to me what that meant?

25      A.    Sure.  So the way the reconciliation works



1    is, let's say there was a $100 payment on the CTX

2    recon.  And then Benlida comes back and says, No,

3    that payment was $80.  Well, clearly, that payment

4    is nonconcurring.

5                    But to the extent the payment wasn't

6    objected to by Benlida, as it relates to the

7    Circuitronix original transmittal, then those

8    payments, for purposes of this analysis, are

9    reflected as concurring payments.

10   Q.   So if they both have it, it goes in as a

11   concurring payment.  Concurring payment and -- is

12   that what you're saying?

13   A.   No.  That's not what I'm saying.

14   Q.   What are you saying, then?

15   A.   So we have it on the Circuitronix recon --

16   Q.   Yep.

17   A.   -- and they don't object to it in the

18   Benlida response, then that would be a concurring

19   payment.

20   Q.   A concurring payment.  Okay.

21   A.   So think about an invoice.  If it was in

22   the original Circuitronix email, but Benlida doesn't

23   have a comment on it, we've treated that as a, you

24   know, concurring invoice.

25                    It's only where the difference is that



1    we really have to focus on for purposes of

2    reconciling the balance between the two parties.

3         Q.   On the second line, you have a -- CTX

4    payments claimed in the CTX recon, but not in the

5    Benlida records.  That's the $2.229 million.  Do you

6    see that?

7         A.   I do.

8         Q.   What are those?

9         A.   Exactly what the label says.

10        Q.   So CTX is showing they paid them; Benlida

11   is showing that it's not paid, or not received or

12   doesn't exist.

13        A.   Correct.

14        Q.   And then the 2.47 is on the other side.

15        A.   Correct.  And that was in Benlida's second

16   response email.

17             And I view this as -- it's really

18   interesting.  What Benlida is really saying,

19   Circuitronix, you forgot about these payments, to

20   really reconcile what the balance between the two

21   parties is.

22        Q.   So they were honest with each other.

23        A.   They're trying to reconcile the balance.

24        Q.   But it seems that they're being pretty

25   honest with each other, and they're pretty close on



1    the numbers.  Right?

2        A.    Those numbers are very close, considering

3    the volume of transactions.  It's like you said,

4    $92,000 is a lot of money.  But in the grand scheme

5    of $67 million in seven-years-plus of transactions

6    is relatively close.

7        Q.    So I'm looking through all these numbers.

8    Is it fair to say, in your opinion, that the Benlida

9    people are honest with their numbers?

10       A.    The Benlida people are honest with their

11   numbers ...

12              I mean, they're trying to reconcile

13   the balance.  Honestly is really outside the scope

14   of my report.

15       Q.    Okay.  But they're coming pretty close to

16   what your client's saying.  Right?

17       A.    Relatively.

18       Q.    And if two people are kind of close to the

19   numbers, does that give you an indication of

20   reliability?

21       A.    It depends on the facts and circumstances

22   and who's preparing the analysis.

23       Q.    When you looked at the Benlida

24   reconciliation, did you see anything that looked

25   untoward?



1      A.    I mean, to me, it's just data.  I don't

2   ascribe, you know, emotions like that or judgments

3   to data.  It's just data.

4      Q.    Well, in looking at that data from Benlida

5   and comparing to the data of your client, can you

6   provide any judgments to the honesty and credibility

7   of the Benlida's data?

8            MR. ROSENTHAL:  Object to the

9      form.

10     A.    I don't view data as honesty.  It's just

11  data, subject to further examination.

12  BY MR. MAZZOLA:

13     Q.    Looking at the data that was produced by

14  Benlida in comparison to the data that was produced

15  by CTX, you did find that the two -- that both sets

16  of data were reasonably close to each other.

17     A.    In certain parts.  Yes.

18     Q.    And if -- your client's data is reliable.

19  Right?

20     A.    It was the basis of our analysis.  But we

21  made adjustments to our client's data, as indicated

22  in the report.

23     Q.    But I assume you operated under the

24  assumption that your client's giving you reliable

25  data.



1      A.   Well, the -- first, we received the data.

2  And then we need to understand the data and the

3  context.  But we -- we -- I don't want to say we

4  assumed the client's data was correct.

5           It's definitely the basis, but we make

6  adjustments from the there.  So we don't view as

7  100 percent correct, but it is a starting point.

8      Q.   Well, after looking at it, you spent a lot

9  of time with it.  Do you have any reason to believe

10  that the data that was provided to you by CTX was

11  unreliable?

12      A.   I believe the data is reliable as I sit

13  here, as identified in the report.

14      Q.   And you spent a lot of time looking at the

15  data that was provided by Benlida too.  Is that

16  correct?

17      A.   We spent time looking at the Benlida data.

18  Yes.

19      Q.   And if the Benlida data and the CTX data

20  are pretty close to each other, because you did say

21  that earlier, can you also agree that the Benlida

22  data is as reliable as CTX's data?

23      A.   It's just data.  So I don't view it as one

24  data is better than the other, it's just --

25  \\\



1       BY MR. MAZZOLA:

2       Q.   I'm not saying one's better.

3       A.   Well, you -- okay.

4            What was your question, then,

5  specifically?

6       Q.   We talked earlier a few seconds ago, and I

7  think you did ultimately agree that, at the end of

8  the day, after looking at all the CTX data, that you

9  found it to be reliable, for the most part.

10      A.   Well, just to be clear, I said the CTX data

11 was relatively close to what Benlida the data said.

12 Now you're kind of having the Circuitronix data

13 stand on itself.

14      Q.   Well, they're both close to each other.

15      A.   Well, one's a derivative of the other,

16 which identifies changes.

17      Q.   They're numbers.  And the numbers are close

18 to each other.  One person says "X," another person

19 says "Y," and those two numbers are pretty darn

20 close to each other.  Is that fair?

21      A.   Which numbers specifically?

22      Q.   Well, let's go back to this Table 1.

23 Right?  Regarding the payments.

24            At paragraph 16, you wrote that there

25 is concurrence between the parties as to over



1   99 percent of these payments leaving only a

2   difference of $9,203,867.  Right?

3        A.   I see those words.

4        Q.   Okay.  And you wrote that.

5        A.   In conjunction with preparing the report.

6   Yes.

7        Q.   And so my question to you is, if Benlida

8   and CTX, regarding their recon, are so close on the

9   payment question, does that give you a sense that

10  the numbers are reliable as and between each other?

11       A.   The payments is only one portion, so you

12  have to look at everything.

13            If the payments were close and the

14  invoices -- or the debit memos were way different,

15  then, you know, that would present an issue.  So I

16  can't look at one little piece to say everything's

17  great.  You have to take it in totality.

18       Q.   Okay.  So payments are really close.  You

19  said that.  Right?

20       A.   Correct.

21       Q.   The invoices, are those close in your mind?

22       A.   They're less close.  They're more divergent

23  than the payments.

24       Q.   But not by much, though.

25       A.   Approximately.  That's fair to say.  In the



1   grand scheme of the transactions.

2        Q.   Yeah.  And the debit memos.  Even the debit

3   memos, in the grand scheme of transactions, are

4   those close?

5        A.   Approximately.

6        Q.   So what I'm trying to understand is that if

7   your client's numbers are reliable -- can you say

8   that?

9             Are you willing to say that?

10       A.   We had to adjust the data, so I don't want

11  to just sit here -- some of the data is reliable,

12  but I don't want to say it's perfect, because we did

13  have to make adjustments as identified in my report.

14       Q.   I didn't say "perfect."

15       A.   Okay.

16       Q.   Just reliable for purposes of your

17  testimony.  Are they reliable numbers as an

18  accountant?

19             In your professional discretion and

20  your professional experience, are these numbers, over

21  the course of many years of $67 million, are the

22  numbers relatively reliable?  Would you give me that

23  much?

24       A.   It's a starting point for an analysis.

25       Q.   Is it a relatively reliable starting point



1   for an analysis?

2                 There's nothing wrong with saying your

3   client's numbers are reliable.

4       A.   It's not that I'm trying -- it's just the

5   starting point.  You're trying to -- I'm not -- it's

6   just data.

7       Q.   What I'm trying to data get at is, if CTX's

8   numbers are reliable, are Benlida's numbers

9   reliable?

10      A.   And that's why I -- that's why I keep

11  telling you, it's a starting point.  Right?  You're

12  trying to say if I don't know -- I don't want to

13  assume what you're saying, but to me, you're saying

14  Circuitronix's data is reliable; therefore Benlida's

15  data is reliable.  And I keep trying to explain the

16  process that this is a starting point, and then we,

17  you know, kick the tires, et cetera.

18      Q.   So as a starting point, after everything

19  you've done throughout the whole process.  You've

20  done all this.  We're only on Table 1.  We're going

21  to get to Tables 6, 7, 8, whatever the tables are.

22                At a starting point, were these numbers

23  within the relative realm, universe, of reliability?

24      A.   They're just numbers.  These are just the

25  starting numbers provided on a spreadsheet.



1    Q.   Let's go to the next one, then.  Table 2.

2  Now, there, you do all your adjustments, and you

3  come down, and you have a $12,000 difference.  Do

4  you see that?

5    A.   I do.

6    Q.   Now, these adjustments and the numbers --

7  again, your sources are what?  CTX's numbers and

8  Benlida's numbers.  Right?

9    A.   Correct.

10    Q.   Now, as you get to this "Totals As Per

11  Recon As Adjusted," would you consider CTX's number

12  that you have there reliable?

13    A.   Well, I just wanted to be clear.  This

14  67,728,456, that's really CTX's initial compilation.

15  And then we make the adjustments based on some of

16  the Benlida feedback as well.

17    Q.   The payments before, you just said, were

18  99 percent concurrent.

19    A.   Correct.

20    Q.   Okay.

21    A.   And we see that on line 1 -- or on the line

22  here.

23    Q.   All right.  You also wrote that your

24  invoices were almost 99 percent concurrent between

25  Benlida and CTX.  That's at paragraph 19.  Do you



1    see that?

2        A.    Um-hmm -- correct.

3        Q.    So now you've just written in your report

4    that the payments were 99 percent concurrent, and

5    the invoices were 99 percent concurrent at jump.  At

6    starting point.  Right?

7        A.    Um-hmm.

8        Q.    So my question now is -- same question.

9              If the -- does that give you any

10   indication that the numbers between CTX and

11   Benlida -- well, let's start off with CTX -- that

12   CTX's numbers were reliable?

13       A.    It's a reliable foundation to begin the

14   analysis.

15       Q.    Okay.  So CTX's numbers are a reliable

16   foundation to begin the analysis.  It would also be

17   that Benlida's numbers are a reliable foundation to

18   begin the analysis.  Isn't that correct?

19       A.    It could be.  It's definitely a beginning

20   point.  Absolutely.

21              Step 1:  Obtain the data.  Step 2:

22   Analyze the data.

23       Q.    But what I'm saying to you is -- what I'm

24   suggesting is, that if you looked at this and your

25   concurrences were not 99 percent or they were



1   62 percent, would that indicate to you that there

2   was something major or something was -- a major

3   disconnect here?

4       A.   If one payment totaled 100 and the other

5   totaled 62, there would be a disconnect.  And then

6   we'd have to research to understand why and who's

7   correct.

8       Q.   And if one set of invoices was 100 and

9   another set of invoices were 62, that would also be

10  evidence of a major disconnect between CTX and

11  Benlida.  Right?

12      A.   Yes and no.

13      Q.   Okay.  What's the "no"?

14      A.   So we're talking about $67 million of

15  invoices.  If one invoice said 100 and another one

16  said 102, I would not use the words "major

17  disconnect" as you just --

18      Q.   I said 100 and 60 -- 100 and 62.

19      A.   Okay.  One invoice is 100, and the other

20  one's 62.  That's a $38 difference.  I wouldn't

21  describe that as major.

22      Q.   I meant the totals.

23      A.   Okay.  If one totals 100 and the other

24  totals 62, I wouldn't consider $38 big difference.

25      Q.   When you talked over here about payments,



1    there's a 99 percent concurrence between both of

2    them.

3         A.    Okay.

4         Q.    And you agree that when there's a

5    99 percent concurrence between two sets of numbers,

6    then it becomes a reasonable basis to begin an

7    analysis.  Right?

8         A.    Correct.

9         Q.    That's on the payments.  Having -- that's

10   on the payments.

11              When we get to the invoices, you also

12   write that have you have a 99 percent concurrence

13   between CTX's invoice numbers and Benlida's invoice

14   numbers.  Is that correct?

15        A.    Correct.

16        Q.    When you have a 99 percent concurrence

17   between one set of invoices and another set of

18   invoices, does that lead you to believe, in your

19   professional opinion, that that, too, is a

20   reasonable basis -- reasonable foundation to begin

21   the analysis at?

22        A.    Well, now we're passed the foundation.

23   Right?  The foundation is the data, but now you're

24   talking about the comparison.  Right?  So now we're

25   into the results.  Because you have to think



1   methodology.

2                   Step 1:  Get the data.  Step 2:

3   Compile the data.  And step 3:  Analyze the data to

4   make that determination.

5       Q.   We're not at step 2 yet.  I'm --

6       A.   You already -- you were, because you said

7   "analyze."

8       Q.   I'm looking at the data that you have.  And

9   you've told me, at least on two points on the data,

10   payments and invoices, that there's a 99 percent

11   concurrence between CTX and Benlida.  Is that

12   correct?

13       A.   Yes.

14                   But that's after I analyzed it, but

15   you said we're at step 1 where I just got the data,

16   so I'm confused by your question.

17       Q.   Okay.  So after you've analyzed it, you're

18   at 99 percent concurrence.

19       A.   Is that a question?

20       Q.   Yes.

21                   So if you're at 99 percent concurrence

22   after your analysis, after you've looked at it

23   carefully, does that then tell you that the numbers

24   you're getting from CTX -- from Benlida and CTX are

25   both reasonable and both reliable?



1        A.    It makes me feel that the analysis is

2   within a reasonable degree of certainty.  Yes.  The

3   occurrence of the amounts.

4        Q.    Okay.  So occurrence tells you that they're

5   both sort of coming up with the same number.

6        A.    Generally, yes.

7        Q.    And you're not seeing anything out of whack

8   after doing your analysis.  Right?

9        A.    What do you mean by "anything"?

10       Q.    Well, you're not seeing that CTX says $100

11  is owed or $100 million is owed, and Benlida is

12  coming back and saying $200 million or $50 million.

13  There's no major disparity between the two sets of

14  numbers after analysis between Benlida and CTX.

15  Isn't that correct?

16       A.    Yes.  We went through the disparities and

17  discussed them ad nauseam.

18       Q.    So does that lead you to believe, then,

19  that the numbers that you got from Benlida are

20  reasonable and reliable numbers after your analysis?

21       A.    So the numbers from Benlida that adjusted

22  Circuitronix, LLC's, counterclaim were reasonably

23  close.

24       Q.    Okay.  So Benlida gave you numbers that

25  were reasonably close to what CTX had.



1      A.    On a net basis, the adjustments between

2   Circuitronix and Benlida are reasonably close.

3      Q.    So let's go to the analysis of invoice

4   discrepancies, page 9.  This talks about -- at

5   paragraph 20.

6            At paragraph 20, you talk about CTX's

7   adjustments to Benlida invoices.  What did that --

8   what did you mean by that?

9      A.    So, for example, Benlida's the supplier in

10  this matter.  Benlida would send an invoice.  And

11  let's just say that invoice is for 100 quantity with

12  a dollar price.  That is Benlida's invoice.

13           Well, what happens, for example, if,

14  instead, of $1 per unit, the quantity per the

15  purchase order was 99 cents.  And in that case, we'd

16  have to make an adjustment to the invoice.

17           And similarly, if 100 quantity was

18  ordered but only 99 arrived, and when the invoice

19  was received by Circuitronix, LLC, for 100, then

20  you'd need to adjust that.  And that adjustment

21  would happen with a debit memo.  Or if it wasn't

22  resolved, then you would be left with some invoice

23  differences identified in this analysis.

24      Q.    How did you verify CTX's adjustments to

25  Benlida's invoices?



1     A.    So the basis of our analysis was the CTX

2   numbers.

3     Q.    So if CTX told you that Benlida

4   short-shipped or had the unit price wrong, that

5   would be the data -- that would be the basis for

6   your analysis?

7     A.    No.

8     Q.    Then how would you know?

9     A.    So I don't know if you've seen the

10  transactions, but Circuitronix doesn't object to the

11  numbers.  Circuitronix launches its first shot in

12  the reconciliation, which is the transmittal email.

13  So that's the first -- the first response.  And then

14  Benlida comes back with the two adjustments.  And so

15  that's the foundation.

16               In your line of questioning, it made

17  it seem like Benlida said, Here's the number first,

18  and then Circuitronix came back with adjustments.

19  So I just wanted us to have a clear record.

20    Q.    No.  But on an invoice of $1,000 and CTX

21  says, No, it should only be $800.  How did you

22  verify that?

23    A.    That's by -- I think your question's out of

24  line with the fact pattern.

25               Because Circuitronix first says, even



1    though Benlida does send the invoice, our first step

2    is compile the data in the Circuitronix recon.  So

3    we wouldn't know about any differences from the

4    Benlida invoices as you're describing in your

5    questioning.

6        Q.    What did you do to check the -- maybe I'm

7    not understanding.  And that wouldn't be the first

8    time.

9              Did you -- what did you do to check

10   that the adjustments proposed by CTX were accurate

11   and correct?  Did you pull invoices?  Did you pull

12   shipping documents?

13       A.    So we attempted to determine, as it relates

14   to the $62,000 invoice difference, which side was

15   correct.  Meaning, you have to actually look at --

16   the quantity ordered and received and the price.

17              If you've ever looked at these

18   invoices, while they may be -- you know, if you pick

19   any payment detail, it may say "Invoice 1234," you

20   know, "$100,000."  But when you get to the actual --

21   that's just an invoice total.  Right?  Just like

22   your professional fee invoices.  The total may be X,

23   but that's comprised of many, many pages.

24              And so when you look at the invoice,

25   there can be hundreds of part numbers on the



1    invoice.  Some more, some less.  And so we attempted

2    to reconcile those differences.  So to do that,

3    you'd have to obtain -- for each part, you'd have to

4    first figure out where the differences are, receive

5    the receiving logs, what -- the purchase order,

6    compare the quantities, et cetera.  And it is a

7    massive undertaking.

8               And due to the compressed time frame

9    from when we started, approximately mid-April to

10   when the report was due, there was not enough time

11   to pull the voluminous amount of support that would

12   have been required to make the determination for the

13   $662,000 either way.

14      Q.   So you did not -- you did not pull any

15   support to confirm the difference is what you're

16   saying.

17      A.   We were unable to determine which side was

18   correct for the differences.

19      Q.   So how did you pick a side?  A team, if you

20   will.

21               MR. ROSENTHAL:  Object to the

22      form.

23      A.   We presented the numbers as identified in

24   the reconciliation, but we didn't make any further

25   adjustments to those differences.



1          BY MR. MAZZOLA:

2          Q.   And you say that in line -- in paragraph

3    20.  Because you write "CTX advises that on

4    occasion."  Do you see that?

5                    MR. ROSENTHAL:  I'm sorry.  Where

6       are you reading from?

7                    MR. MAZZOLA:  Line 21 -- I beg

8       your pardon.

9                    Paragraph 21, second line, second

10      sentence.

11   BY MR. MAZZOLA:

12        Q.   Are you reading it, Mr. Parisi?

13        A.   I am.  I see those words.

14        Q.   And then on your last sentence in that

15   paragraph, you write "CTX contends."

16                    Do you see that?

17        A.   Um-hmm.

18        Q.   So based upon the testimony that you just

19   gave, and based upon what you wrote in this report,

20   it sounds to me that when you got to this

21   discrepancy of $662,000, that that was based on what

22   CTX advised and contended to you.  Is that correct?

23        A.   We used the invoice amount as adjusted and

24   labeled in the report for the Circuitronix as it

25   relates to the amounts due through July 2019.



1     Q.     So you relied upon the CTX numbers for

2  that.  Right?

3     A.     For this portion.

4     Q.     And then you even write "No further

5  procedures were performed with respect to the

6  invoice differences between CTX and Benlida."

7     A.     Correct.

8     Q.     And you said before, the reason you didn't

9  drill down any deeper was for that very reason.  It

10 would be unduly burdensome because the volumes of

11 documents to look at would be so great.  Is that

12 correct?

13    A.     Correct.

14            And the time frame to do it.  It's not

15 an impossible task, it's just the time frame's very

16 compressed.

17    Q.     And so it would have required looking at

18 bills of lading, shipping documents, shipping

19 receipts, and things of that nature.

20    A.     Correct.

21            And that's the same with the lead-time

22 penalty at as well.

23    Q.     And I'm not saying this in a pejorative

24 sense, I'm just saying insofar as the payment

25 discrepancy goes, you relied on CTX's numbers and



1    you checked the math.  Is that right?

2                   MR. ROSENTHAL:  Object to the

3         form.

4         A.    For CTX, LLC's, payments, we reconciled the

5    payments.  Yes.

6         BY MR. MAZZOLA:

7         Q.    And you confirmed their math.

8         A.    We confirmed the math.

9                   And then we also checked the payments

10   to bank statements to make sure there was a payment

11   dispersed on that date for that amount.

12        Q.    But as you said before, you didn't dig any

13   deeper because it would be too much work and not

14   enough time.

15        A.    I just want to be clear.  Your question's

16   focused on the invoices.

17        Q.    Yes.

18        A.    Yes.  We did not -- we were not able to

19   reconcile the invoice differences totaling $662,000

20   as identified in Table 3 of the report.

21        Q.    And you said that that was similar with

22   respect to the lead-time penalties as well.

23        A.    Correct.  We were not able to get all the

24   input data to confirm the inputs into the lead-time

25   penalty calculation.  Specifically the ship date and



1    the receive date by part number, because those are

2    the main factors in addition to some other items.

3         Q.    That was one of the main factors on

4    lead-time penalties is the ship date, how many days

5    it was late.  And based upon that, that would form

6    the foundation for the lead-time penalties.  Right?

7         A.    Yes and no.

8         Q.    Okay.  What's the "no" part?

9         A.    There is also specific provisions about the

10   amount of product Benlida was supposed to put into

11   production and ship as well.  But the criteria for

12   the lead-time penalty is different, depending on the

13   time period.

14        Q.    But, again, looking at all that data, ship

15   dates, volume, that would have been too burdensome

16   in the time permitted to do it.  Is that correct?

17        A.    We were not able to obtain all the data to

18   validate the inputs in the time provided.

19        Q.    So, instead, you just relied upon the data

20   as it was provided to you from CTX.

21        A.    And Benlida.

22        Q.    So whose side did you pick?  If Benlida

23   said "X" and CTX said "Y," who's number did you

24   agree with?

25        A.    I would say "Z," which is the numbers that

1    we determined in our report.

2        Q.   Well, let's look at this over here.  The

3    invoices.  What number did you pick?

4             You picked $662.98 -- $662,918.  Right?

5        A.   65,176,316 is the total invoices in

6    Table 7.

7        Q.   Okay.  But I'm talking about what we were

8    just talking about on page 9 --

9        A.   Oh.  Sorry.

10       Q.   -- the aggregate discrepancy of $662,918.

11   That was the number that was advised to you by CTX.

12       A.   Correct.

13       Q.   And that was the number you're using for

14   your calculations going forward.  Is that correct?

15       A.   Correct.

16       Q.   And that number ...

17             (Pause in proceedings.)

18   BY MR. MAZZOLA:

19       Q.   And the number that you relied on, the 662,

20   that came from CTX -- I'm sorry.  I'm recovering.  I

21   just got distracted.

22             That's correct.  Right?  The 662 came

23   from CTX.

24       A.   That's incorrect.

25             The 662 is a function of the



1    difference between CTX and Benlida.  That number

2    could not have come from CTX in isolation, as you

3    asked.

4        Q.   No.  It says -- you wrote, "CTX contends

5    that these variances in price and quantity have

6    resulted in the aggregate discrepancy of 662."

7                 So you come to that number based upon

8    what CTX is contending.  Is that correct?

9        A.   It's what CTX contends, less what Benlida

10   contends.

11       Q.   So it's the discrepancy.

12       A.   The delta.  Yes.

13       Q.   And, as you said before, there was no other

14   digging in deeper because you didn't have the time

15   to do so, and it was too burdensome.

16       A.   Yeah.  I just want to be very clear.

17                 You know, we have to be careful when

18   we talk about invoices, payments, and debit memos.

19   So for the invoices, we didn't resolve the

20   difference as identified in the report.

21       Q.   And 662,918 is the number that you're using

22   for your calculation going forward.

23       A.   That's the amount of the invoice difference

24   is the 662 between Benlida and Circuitronix, LLC.

25       Q.   Now, on the debit memos, you write that



1    there are $486,939, which DMs were listed in the CTX

2    recon but are not included in the Benlida recon?

3    Can you explain what that means?

4        A.    Just what the words say.

5        Q.    So CTX had them, but Benlida did not?

6        A.    Precisely.

7        Q.    And that $486,939 number, did you use that

8    for calculations going forward?

9        A.    We used it as a basis, subject to further

10   adjustment as identified later in the report for the

11   meeting minute adjustments to the debit memos.

12       Q.    And on the judgmentally selected -- we

13   talked about that earlier -- you selected 11.

14   Right?

15       A.    I'm sorry?

16       Q.    You selected 11 debit memos.

17       A.    Correct.

18       Q.    When you say "judgmentally," what does that

19   mean?  How does that work in the accounting world?

20            Do you go down the list and pick the

21   first 11 that are greater than $10,000?

22       A.    So there's -- you can sample many ways.

23   But the primary ways are random.  You know, think if

24   we had 9,999 invoices.  You would say, here is one,

25   here's the maximum.  You know, give us 25 random



1    numbers in between there.  And that's random

2    sampling.

3              Or you can judgmentally sample where

4    you say, I want everything over a certain threshold.

5              Or, alternatively, you can do

6    haphazard sampling, where you just say, I'm going to

7    pick this one and that one, and it's random.

8              You get -- it depends on what you're

9    trying to accomplish, how thorough a sampling you

10   have to do.  If you want high reliability, you need

11   to pick more transactions, et cetera.

12   Q.   So when you judgmentally decided to select

13   those greater than $10,000, how did you do that?

14   You just sorted by number?

15   A.   A little bit of alchemy, and then we also

16   had an Excel list where it was sorted --

17   Q.   Excel spreadsheet and you sort.

18   A.   Correct.

19   Q.   Mr. Parisi, here's Exhibit 153 in front of

20   you again.  I want to go back to some of the things

21   you talked about earlier about the debit memos.

22             Can you pick, say, summary 2015?  Is

23   that okay?

24   A.   This is your deposition.

25   Q.   No.  But I -- we want summary 2016, but --



1   I want the record to be clear that -- I think as I

2   was clicking on these things, I may have messed up

3   some of the coding on the inside, so --

4       A.   Yeah.  Whatever you want --

5       Q.   -- they look a little different than they

6   did before.

7                So let's try 2015.

8       A.   Sure.  You can also exit and reopen it if

9   you wanted a clean version.

10      Q.   Yeah, I know.  We'll stick with 2016.

11               So let's go to -- let's look at --

12               MR. ROSENTHAL:  JC, I didn't

13      hear, but did you identify the exhibit that

14      we're looking at?

15               MR. MAZZOLA:  Yeah.  153.

16               MR. ROSENTHAL:  Thank you.

17      BY MR. MAZZOLA:

18      Q.   So we're at summary 2016, and we're looking

19   at line 3 where it says "October payment detail,

20   date, invoice total, and debit memo total."

21               Do you see the debit memo total is

22   $78,772.32?

23      A.   I see those numbers on the screen.

24      Q.   Now, if you go to -- if I click -- it

25   jumped before.  It's not jumping.



1     A.   I'm not familiar with the clicking trick,

2  and I use a lot of Excel.

3     Q.   So now we have to go to October.

4          Okay.  Mr. Parisi, I'm going to click

5  on the tab that says "October 2015," and presumably,

6  these numbers add up to $72,000 -- $78,000.  I think

7  that's what was on the last ...

8          And this is comprised of -- one,

9  two, three, four, five -- six debit memos.

10    A.   Five.

11         MR. ROSENTHAL:  Five.

12 BY MR. MAZZOLA:

13    Q.   Five debit memos.

14         This first debit memo says "total

15 penalty for lead-time exceedances for POs in

16 July 2015."  Is that a debit memo that you would have

17 pulled and looked at?

18    A.   It depends.  If this debit memo was on the

19 CTX recon and not on the Benlida recon as identified

20 in the report, sitting here, I do not know if that

21 lead-time penalty met that criteria.

22    Q.   Okay.  So it would have to be on both

23 reports before you would pull it?

24    A.   The opposite.

25    Q.   It would have to be on one and not the



1    other --

2        A.    Correct.

3        Q.    -- so you don't know if that meets this

4    criteria.

5        A.    Because there's no sense of looking at if

6    they concur.  We're only focused mainly about where

7    they do not concur.

8        Q.    Well, let's assume they didn't concur here.

9    Would you have pulled this one?

10       A.    Yes.

11             And we further would have reduced that

12   lead-time penalty amount by 50 percent.  Because on

13   Table 4, there's a series of adjustments to the

14   debit memos, and this one specifically says "cut

15   down half amount on Jan through July 2015 orders

16   penalty."

17             So that's what I'm trying to say.

18   CTX's numbers are a basis for our analysis.  Right?

19   We're not accepting CTX's analysis on its face.

20   We're also looking at what Benlida said, the

21   meeting, in trying to come up with an accurate

22   balance.

23       Q.    Where are the debit memos?  Are they

24   contained in the materials that you provided to us?

25       A.    Yes.  Do you see the folder that says



1    RECD53 --

2         Q.    Um-hmm.

3         A.    Correct.

4         Q.    But this is the -- two, four, six, eight,

5    ten, eleven.  Well, this is one of the 11 debit

6    memos you looked at.  Let's look at one of them.

7                   We'll look at --

8         A.    Pick that 2015 or 2016 one.  That might

9    have been one of the ones we were just viewing.  But

10   you can pick whatever you want to on that.

11        Q.    I need all the help I can get.  Okay?

12                   MR. LERNER:  Are we going to mark

13        this as an exhibit?

14                   MR. MAZZOLA:  I guess we do,

15        because it's a different document.  It's

16        not part of it.  So let's call this 155.

17                   (Deposition Exhibit 155

18                   marked for identification.)

19                   MR. MAZZOLA:  155 is a debit

20        memo.  So we can all find it later on, it's

21        dated 3/10/2015, and the last four digits

22        of the debit memo number are 0310.

23                   MR. LERNER:  Does this have a CTX

24        Bates number?

25                   MR. MAZZOLA:  No.

1              There is no Bates number on it, I

2       presume.

3              MR. ROSENTHAL:  The data that

4       they have, presumably, matches the

5       Bates numbers, but they don't have the

6       Bates set, so --

7              MR. LERNER:  This is from 2015,

8       so it wasn't within the period of time of

9       the discovery.  We went back to

10      January 2016, so that's the reason.

11             MR. ROSENTHAL:  They've got data.

12             MR. LERNER:  Yeah.  It's fine.

13             MR. ROSENTHAL:  And it's not from

14      our exact set, so --

15             MR. MAZZOLA:  You've got it now.

16             MR. ROSENTHAL:  Yeah.

17      BY MR. MAZZOLA:

18      Q.   So doing your judgmental analysis of

19      instances where the 11 memos don't match and adding

20      the criteria that it had to be greater than $10,000,

21      this was one you would have pulled up.  Is that

22      correct, Mr. Parisi?

23      A.   Correct.

24      Q.   Okay.  Now, with regards to this debit

25      memo, it talks about a total penalty for lead-time

1    exceedances for U.S. purchase orders.  And I know

2    earlier you talked about lead-time penalties, and

3    how because of the onerous and burdensome nature,

4    you were unable to dig down deeper beyond the number

5    that was provided to you by CTX.  Is that correct?

6         A.   So for lead-time penalties specifically, we

7    compiled the data of the lead-time penalties, which

8    were contained in many spreadsheets.  And then we

9    aggregated that data and reconciled the lead-time

10   penalties to the meeting minutes, but we were unable

11   to test the inputs of the lead-time penalty

12   workbooks.

13             So for a sample of the lead-time

14   penalty workbooks, we tested the mathematical

15   application inconsistency of the lead-time penalty

16   calculations to ensure it was accurate as recorded.

17        Q.   But you weren't able to test the input, you

18   said.

19        A.   Correct.

20        Q.   And the input is how many days.  Right?

21             That's one factor for the input.

22   Right?

23        A.   No.

24        Q.   Well, you say you weren't able to check the

25   input.  What does that mean?  What's included in the



1  input?

2      A.   You said the number of days, just to be

3  clear --

4      Q.   Well, the lead-time penalty --

5      A.   Hold on.  Which was just a little vague.

6           So the days is a function of the

7  receipt date and the ship date.  The difference

8  between the two.  So that's what I'm trying to be

9  clear about.

10     Q.   Okay.  Ship date and receipt date --

11     A.   Correct.

12     Q.   -- are the number of days.

13          So you looked at the ship date and the

14  receipt date, but you weren't able to verify that

15  input data.

16     A.   We were not able to independently verify

17  the ship date or the receipt date.  Correct.

18     Q.   So all you were able to verify, then, was

19  the math that was provided to you.

20     A.   Correct.

21          And we compiled the lead-time penalty

22  data, and we reconciled that compilation to the

23  meeting minutes as identified in the report.

24     Q.   But the meeting minutes didn't address

25  every lead-time penalty.



1        A.    There were only adjustments for certain

2   periods of time, based on the meeting minutes

3   provided.

4        Q.    Okay.

5        A.    And identified in the report.

6        Q.    The reason I started asking about lead-time

7   penalties is because this is a debit memo for a

8   lead-time penalty.  So the question is, were you

9   able to do anything to verify the accuracy of this

10  number?

11       A.    So we started from the reconciliations.  We

12  looked at the difference, and then we requested

13  support from Circuitronix, LLC, to, one, confirm

14  that the amount matched and to make sure they were

15  presented on the invoice.  And here it says "Total

16  lead-time penalty exceedances as of December 14,

17  U.S. purchase orders."

18       Q.    So this $32,000, based upon that reason,

19  this is the total lead-time penalty exceedances for

20  the whole month.  Is that what they mean here?

21       A.    Correct.

22       Q.    How do you know that?

23       A.    So the lead-time penalty data that I've

24  seen specifically is primarily aggregated on a month

25  basis.  The debit memos are just like this, where



1    it's presented on a monthly basis.

2              I haven't seen any lead-time penalties

3    itemized in all of the individual parts that create

4    the lead-time penalty.  Usually, it's just a

5    one-line item, as you've seen.  And then the

6    notes -- the descriptions on the payment details,

7    sometimes they reference the delay for the lead-time

8    exceedances, rather.

9      Q.   What's the -- what's Benlida Circuit Board

10   HK?

11     A.   I do not know.  I do not know why that

12   labeling's on this invoice.

13     Q.   While we're still on this, then, you made

14   reference to looking at this in a folder that you've

15   identified as "Lead-time Penalty Support."  Let's

16   just pull one of them up.

17              We're going to call this -- it's a

18   spreadsheet.  "BDL Penalty for Lead-Time Exceedance

19   Report, 11 November 2020."

20              MR. ROSENTHAL:  Can I ask you one

21        favor?  Since we did this, I just was

22        thinking.  During Mr. Paulikens' deposition

23        when we pulled -- when the roles were

24        reversed, when we pulled up documents like

25        this, you guys would email them to each



1        other so we would have them.

2                 MR. MAZZOLA:  Oh, okay.

3                 MR. ROSENTHAL:  Can you maybe

4        work that into this as you go or maybe --

5                 MR. MAZZOLA:  Oh, yeah.

6                 MR. ROSENTHAL:  -- Mr. Lerner can

7        do it.

8                 MR. LERNER:  The next time we do

9        a break, we'll just do it.

10                 MR. ROSENTHAL:  Because I just

11        realized, how am I going to remember this.

12        BY MR. MAZZOLA:

13        Q.    This spreadsheet was prepared by CTX.

14    Right?

15        A.    Correct.

16        Q.    And this is a spreadsheet you would have

17    looked at in calculating lead-time penalties.

18        A.    Yes.

19        Q.    Can you walk me through this?

20        A.    Yes.

21        Q.    We're looking at line 6.  Do you see

22    line 6?

23        A.    I do.

24        Q.    11/3/2020.  It's a Layer Account 2, Vendor

25    ship date per agreement.  It says "12/1/2020."  It



1    says "Late."  And its pretty self-explanatory.

2    22 days late.  And the penalty is $8.52 for that.

3    Is that correct?

4        A.    Correct.

5        Q.    Did you independently verify that this item

6    was, in fact -- this purchase order was, in fact,

7    shipped late?

8        A.    I did not verify the ship date or the item

9    receipt date.

10       Q.    So we don't know if it was 22 days late,

11   two days late, or 42 days late.

12       A.    I did not test the inputs into the

13   spreadsheet.

14       Q.    Okay.

15               MR. ROSENTHAL:  For the record

16       just to be clear, he's on the November 2020

17       tab.

18               MR. MAZZOLA:  Right.

19   BY MR. MAZZOLA:

20       Q.    So on the lead-time penalties -- when you

21   come up with the lead-time penalty number, did you

22   check any of the -- confirm any of the input?

23       A.    We are unable to confirm the inputs into

24   the lead-time penalty calculation.

25       Q.    So if we go back to -- what was this



1    one? -- Exhibit 155, the debit memo that we were

2    looking at, this has a $32,320.20 number on it.

3    Right?

4         A.    That number appears on the screen.

5         Q.    This would be the same thing.  You were

6    unable to confirm any of the input data that

7    comprises this $32,000 debit memo.  Is that correct?

8         A.    Correct.

9         Q.    There's a lot of other lead-time penalty

10   exceedance reports that you're seeing me scroll

11   through, and I am on Exhibit 151 at the "LTP

12   Support" folder, and there's multiple Excel

13   spreadsheet files here.

14              If I pulled up one of these

15   spreadsheets, would your testimony be similar to the

16   last spreadsheet we looked at insofar as you did not

17   check any of the input data?

18        A.    Correct.

19        Q.    So we're going to pull up another one from

20   April 2020.

21              MR. ROSENTHAL:  This is 157?

22              MR. MAZZOLA:  Yes.

23              MR. ROSENTHAL:  I'm sorry.  The

24        lead-time exceedance report from

25        April 2020?



1                    MR. MAZZOLA:  Yes.

2                    (Deposition Exhibit 157

3                    marked for identification.)

4        BY MR. MAZZOLA:

5        Q.   And that O.  What is that O?  That is the

6    sum -- right? -- that I'm clicking at?  That

7    $2,932.90?

8                    MR. ROSENTHAL:  I'm sorry.

9        Column O you're referring to?

10                   MR. MAZZOLA:  Yeah.

11       A.   I think the answer to your question is, no.

12       BY MR. MAZZOLA:

13       Q.   Okay.

14       A.   There appears to be too much.  I would --

15   I'd imagine that if you identified the blue -- if

16   you aggregated the blue that says "Late," that would

17   equate to the total.

18       Q.   How?

19       A.   Because it appears to be missing some

20   formula that's been hard-coded that would make it

21   easier for you to see.

22                   Because there you've got 15,000, as

23   opposed to 2,932.  So if you add up the blue lates,

24   that would likely equate to the 2,932 that you asked

25   about.

1     Q.    Okay.  So for this April 2020 period, what

2   is the total penalty?

3     A.    It's likely that 2,932.9.

4     Q.    So it's not the grand total of column P,

5   then?

6     A.    Correct.  Because that appears duplicative.

7             You can see how one line item is

8   broken out into many quantity received, and so I

9   think that's what's creating the duplication.

10            For example, in column E, you can see

11  that there's a similar purchase order for rows 6

12  through 11, which total 2,000 parts.  But you can

13  see the quantity received is broken out into the

14  individual receipts.  And so that's likely why

15  there's a duplication in the penalty, even though it

16  should only be recorded once.

17    Q.    The blue should only be -- the only one

18  recorded.

19    A.    Correct.  So if you add up those cells

20  identified in blue that -- and say "Late," that

21  would likely equate to the 2,932.

22    Q.    But same testimony on this, the input

23  wasn't checked.

24    A.    Correct.

25    Q.    Of course, the discount matrix doesn't



1    change because the discount -- I'm at the tab that

2    says "Discount Matrix."  Because the discount matrix

3    is what the discount is based upon numbers of days

4    late.  Right?

5         A.   Correct.

6                   MR. MAZZOLA:  I've got to take a

7         break.

8                   (Off record:  2:33 p.m. to 2:43 p.m.)

9    BY MR. MAZZOLA:

10        Q.   We are still talking about this document

11   that was in front of you.

12                  MR. ROSENTHAL:  And just for the

13        record, that's 157.

14   BY MR. MAZZOLA:

15        Q.   And I think you were explaining that it was

16   just the blue lines that add up to the penalty.

17        A.   Correct.

18                  If you even right-clicked and hit

19   "filter by color," it would likely equate to that

20   total.  If you want to do it easily.

21        Q.   Right click?

22        A.   Filter by selected color.

23                  You clicked on the column header.  You

24   have to pick, for example, P6.

25        Q.   Okay.  And there's the number right there.



1                      MR. ROSENTHAL:  I'm sorry.  Just

2          so I understand what you're looking at,

3          Mr. Mazzola.  You're saying the number --

4                      MR. MAZZOLA:  Yeah.  We clicked

5          on -- there was a question about there's a

6          total -- there's a number in bold at that

7          cell, cell 1-O, and I was trying to

8          understand the source of that number.

9                      And Mr. Parisi explained to me

10         that's the penalty number, and it's the --

11         the penalty numbers -- the penalties that

12         are added up that they combined that equal

13         that are just the blue lines.

14                      MR. ROSENTHAL:  And the number is

15         $2,932.90 that you're referring to?

16                      MR. MAZZOLA:  Yes.  That's the

17         number.

18         A.    For this spreadsheet only.  Sometimes

19     there's not that, you know, quote/unquote,

20     duplication issue there.  But the math always comes

21     out correctly.

22                      (Pause in proceedings.)

23                      MR. MAZZOLA:  What exhibit are we

24         up to now?  156?

25                      MR. ROSENTHAL:  8.

1              MR. MAZZOLA:  Here's another

2      document that I put up.  Benlida Shipment

3      and Payment Details.  Let's call this 159

4      [sic].

5              (Deposition Exhibit 158

6              marked for identification.)

7      BY MR. MAZZOLA:

8      Q.   Have you ever seen this document before?

9      A.   I have.

10     Q.   Is this document contained within the

11   materials that were provided to us?

12     A.   Yes.

13              MR. ROSENTHAL:  And these are the

14      shipment details with CTX Hong Kong.

15              MR. MAZZOLA:  Yes.

16              MR. ROSENTHAL:  158.  Correct?  I

17      think you said 159, JC.

18              MR. MAZZOLA:  Okay.  158.

19     BY MR. MAZZOLA:

20     Q.   I'm going to try to find the path to it.

21     A.   Sure.  That would be in the follow-up from

22   the date data.  Source 3.

23     Q.   Okay.  So that document is found in the

24   Expert Report Docs Utilized, Follow-up Benlida.  And

25   it's right there.

1      A.    It's actually subsumed within the email.   I

2   just put the Excel files there for ease of access.

3      Q.    This document you did review.   Is that

4   correct?

5      A.    Correct.

6      Q.    But you did not review it -- you did not

7   incorporate this document in your report.   Correct?

8      A.    Correct.

9      Q.    And why did you not incorporate it in your

10   report?

11      A.    Because this analysis of transactions

12   between Circuitronix Hong Kong and Benlida was not

13   relevant for CTX's counterclaim.

14      Q.    This document was produced by Benlida.   Is

15   that correct?

16      A.    Correct.

17      Q.    Do you have a corresponding document of a

18   similar nature addressing similar invoices that was

19   prepared by CTX?

20      A.    We did receive a reconciliation of

21   Circuitronix Hong Kong transactions in Benlida

22   prepared by Circuitronix.

23      Q.    Does it contain the materials here?

24      A.    I don't believe so.

25      Q.    As you sit here today, do you see this



1    number, this $13.492 million from Benlida?

2         A.    I do see that number.

3         Q.    On the CTX reconciliation, do we recall

4    what number they ended up with?

5         A.    No.

6                    I remember there was a significantly

7    larger gap between this set of transactions.

8                    And by "this," I mean Circuitronix and

9    Benlida -- Circuitronix Hong Kong and Benlida.

10                   The gap in the numbers was much larger

11   than the gap that we witnessed in the report on -- I

12   believe it was Table 2, when we talked about those

13   1 percent differences.  And so the difference was

14   larger so we did not do anything further as

15   identified in the report.

16        Q.    If you look at Exhibit 121.

17                   MR. ROSENTHAL:  It's the one in

18        the notebook.

19        A.    I think it's 3.

20                   MR. ROSENTHAL:  Yes.  It's this

21        one.

22        BY MR. MAZZOLA:

23        Q.    We looked at this is document earlier.  I

24   asked you if you had this document, you said, no.

25                   But this is an email with the attached



1    spreadsheets written by Mr. Kukreja.  And in that

2    email, he acknowledges that "We owe Benlida" -- this

3    is for the Hong Kong operation -- "U.S.

4    $8.843 million."

5                    Do you see that?

6        A.    I see those words.

7        Q.    As you sit here today, do you recollect --

8    does this refresh your recollection as to what the

9    CTX Hong Kong reconciliation number was?

10       A.    It does not.

11             And I just want to be clear.  We had

12   to do a lot of work to reconcile the CTX, LLC,

13   transactions and Benlida to really get a good idea

14   of what we thought that balance was with the

15   Circuitronix Hong Kong data.  And we just primarily

16   compiled the data, and we did not go to the same

17   level as we did with Circuitronix, LLC, and Benlida,

18   because there's a lot of work involved.

19             And, you know, we were going to for a

20   rebuttal report, but we did not thoroughly determine

21   where we thought the range lies between for those

22   sets of parties.

23       Q.    So you have no recollection, as you sit

24   here, what the difference was between Benlida's

25   13.492 million and CTX's number.



1    A.    Correct.

2    Q.    And this document, 121, does not refresh

3    your recollection that it was rounded out

4    8.9 million.

5                MR. ROSENTHAL:  Object to the

6         form.

7    A.    I just want to identify that this document

8    is dated July 29, 2019.  And the series of emails we

9    reviewed earlier, which form the foundation for the

10   analysis, are dated November 2019.  So there was six

11   months of additional transactions -- or five months

12   that happened subsequent to this email.  So this

13   balance is just a starting point.

14                I mean, we saw in the Benlida second

15   response where a month later, they're still finding

16   the different payments that Circuitronix forgot

17   about.

18                (Pause in proceedings.)

19                MR. ROSENTHAL:  We have some

20        physical copies of a few of the exhibits,

21        if you want --

22                MR. MAZZOLA:  No.  We don't need

23        them right now.

24                MR. ROSENTHAL:  You don't need

25        them?  We'll deal with this later.



1          MR. MAZZOLA:  Yeah.

2      BY MR. MAZZOLA:

3      Q.    Let's look at another debit memo.  Okay?

4      A.    Okay.

5      Q.    This is a debit memo, and I'm going to call

6  this Exhibit 159.

7              (Deposition Exhibit 159

8              marked for identification.)

9      BY MR. MAZZOLA:

10     Q.    Dated March 21 -- we're calling it 159.

11  And this is dated 21 March 2016, and it ends in

12  0321.  And it's also addressed to this

13  Benlida Hong Kong.

14              Do you see that?  Do you know why that

15  is?

16     A.    I'm not familiar with that name.  That

17  variation of the Benlida name.

18     Q.    And I don't think we've seen this one

19  before.  But, again, this one is for lead-time

20  exceedances for POs in November 2015 of $116,512.11.

21              Do you see that?

22     A.    I do.

23     Q.    Same thing here.  This would be a number

24  that would have come off the spreadsheets.  Right?

25     A.    Correct.  Subject to further refinement.



1      Q.    Okay.  But you did not drill down to the

2    input data.  Is that correct?

3      A.    We did not verify the input data.

4                MR. MAZZOLA:  I'm going to open

5    up another one.  160.  This one is dated

6    October 2013.

7                (Deposition Exhibit 160

8                marked for identification.)

9    BY MR. MAZZOLA:

10     Q.    This too is for lead-time penalties.  Do

11   you see that?

12     A.    I see those words.

13     Q.    $24,749.72.  Right?

14     A.    I see that number.

15     Q.    So same thing:  You didn't check the input.

16   Right?

17     A.    Correct.

18     Q.    Who's Sunny K?  Sunny Kapoor.

19                Do you know that name?

20     A.    I do.

21     Q.    Did you read any emails from him?

22     A.    Not that I recall.

23     Q.    Did you ever speak to Mr. Kapoor?

24     A.    I don't recall meeting him.

25     Q.    Do you know where he works?



1    A.   I do not.

2              (Deposition Exhibit 161

3              marked for identification.)

4    BY MR. MAZZOLA:

5    Q.   I'm going to pull one more up.  161 is this

6    is exhibit number.  It's dated September 12th, 2014.

7    The debit memo number ends in 520.  And this is a

8    $39,911.17.

9              This is a lead time as well.  Right?

10   A.   Lead-time exceedances of March 2014 U.S.

11   purchase orders.

12   Q.   Did any of the debit memos that you

13   judgmentally select relate to anything other than

14   lead-time penalties?

15   A.   Yes.

16   Q.   They did.  Because I have the 11 over here.

17   I think I pulled up four or five now.

18              Is there a way for you to quickly tell

19   me that?

20   A.   If you look at where it discusses this in

21   the report.  Here we go.

22              Looking at paragraph 24, it says of

23   these 11 debit memos, 9 were to due to lead-time

24   exceedances, which explains the luck of your

25   selection.  One was due to late delivery, and one



1    was due to product quality.  So if we --

2        Q.   If we went through them all, we'd find the

3    other ones.

4        A.   Yeah.

5        Q.   My sidekick suggested a question.

6             What is the difference between a late

7    delivery and lead-time penalty?

8        A.   A late delivery and a lead-time penalty ...

9             I don't know specifically.

10       Q.   And one debit memo was due to product

11   quality.

12            With respect to the debit memo that was

13   due to product quality, did you review -- dig down on

14   that and review what the quality issue was?

15       A.   Not that I recall.

16       Q.   Why do you make a distinction between

17   lead-time penalties after January 2016?  This is on

18   page 12 of your report.

19       A.   Did you complete your question?

20       Q.   Yes.

21            MR. ROSENTHAL:  I didn't

22   understand it.  Sorry.

23       A.   I wasn't -- I thought you were flipping --

24   BY MR. MAZZOLA:

25       Q.   Why do you make a distinction regarding



1  lead-time penalties after January 2016?  You have a

2  heading there.

3      A.    So as identified in paragraph 30, until

4  January 2016, the debit memos were included -- or

5  the lead-time penalties were included in debit

6  memos.

7      Q.    And after that, they were included -- they

8  were done separately.  Is that right?

9      A.    Correct.

10     Q.    Did you review the lead-time penalties that

11 were done after January 2016?

12     A.    Yes.

13             You and I reviewed them as well

14 earlier.

15     Q.    Okay.  So that discussion, we had included

16 all the lead-time penalties.

17     A.    No.  That was just one month.  The

18 spreadsheets are individual.  The spreadsheet

19 doesn't include all of them, the combination of all

20 of the spreadsheets.  So I'm just trying to say,

21 this is one month.  Right?  You'd have to add all

22 the months.

23             So I just don't want it -- to make it

24 seem like I testified there was one master

25 spreadsheet provided.



1          (Deposition Exhibit 156

2          marked for identification.)

3     BY MR. MAZZOLA:

4     Q.   So we're looking at a spreadsheet from

5   November 2020.  This is BLD Penalty for Lead-Time

6   Exceedances, November 2020, which was Exhibit 156.

7          This is an example of a lead-time

8   penalty report that would have been utilized after

9   January 2016.

10    A.   Correct.

11    Q.   Same thing over here.  If you look at

12  line 6, column O, for 22 days late.  And you never

13  had the -- you never did examine if there was

14  20 days late, two days late, or 42 days late.

15  Right?

16    A.   We didn't test the inputs, to be clear --

17    Q.   You never tested it; you just accepted the

18  number.

19          Let's look at your Table 6 on page 13.

20  This is your lead-time penalty analysis.  Is that

21  correct?

22    A.   This is a compilation.

23    Q.   And so the $3.107 million is the number you

24  used for your calculations going forward.  Is that

25  correct?



1       A.      Correct.

2       Q.      And on page 14, this is, I suspect, what

3   you call your final reconciliation.

4       A.      I call this the summary of payable

5   reconciliation between CTX and Benlida.

6       Q.      And you put that together by having a

7   payment number, an invoice number, and a debit memo

8   number.  Is that right?

9       A.      When you say "that," what you just

10  described is the components of the balance through

11  July 2019.

12      Q.      Can you walk me through the math here?

13              How do you come up with the

14  $7.868 million?

15      A.      Sure.

16              $4,760,000 plus $3,107,000 equates to

17  7,868,000.

18      Q.      So the $4,760,000, is the number that's per

19  CTX.  Is that right?

20      A.      I wouldn't necessarily say per CTX.  That's

21  a result of using the CTX calculation as the basis,

22  and then subject to the adjustments we made as

23  identified in the report.

24      Q.      Well -- so let's look at payments from

25  Table 2.



1    A.    Sure.

2    Q.    And your Table 2 was on ...

3    A.    Page 8.

4    Q.    Page 8.

5          You're using the 67,623.56 number,

6    which comes out of there.  Right?

7    A.    Correct.

8          So with that number, for example,

9    CTX's pure number would be the 67,728.  But from

10   there, we deducted this decoration fee and the

11   1 millimeter tin line fee, which results in the

12   67,623,000 number we just discussed.

13   Q.    Okay.  So you started with CTX's number per

14   their recon table of 67.728 million.  Right?

15   A.    Well, we -- yes.  Correct.

16   Q.    And then you reduced it based upon the

17   decoration fee and the immersion tin line item.

18   A.    Correct.

19   Q.    Your invoice number, you got that from

20   Table 3.  Right?

21   A.    So Table 3 identifies the differences of

22   the 662,000 and breaks that amount into the

23   components.

24          And so the concurring invoices, the

25   difference is in invoice amount and in just invoices



1    that are absent from the reconciliations.

2       Q.    Okay.   And in this instance, you used the

3    CTX number, the 65.176 million.   Right?

4       A.    Correct.

5       Q.    And then the debit memos, you used the

6    2.313 number.   And that's from your Table 5.

7       A.    Correct.   Which is the debit memos per the

8    CTX reconciliation adjusted for some those meeting

9    minutes.

10      Q.    And the CTX number is -- it's significantly

11   higher.   It's $430,000 greater.   Right?

12      A.    Correct.   Approximately.

13      Q.    On this Table 7, one of those numbers

14   doesn't look right.   What number is that?   That's --

15   there's 97,824.

16               MR. ROSENTHAL:   It's not 824.

17               Do you mean 284?

18               MR. MAZZOLA:   284.   I beg your

19        pardon.   Yep.

20      A.    Correct.   There is a mathematical -- the

21   formula is not correct, and the number -- the

22   difference should be ...

23      BY MR. MAZZOLA:

24      Q.    Is it 432?   470?   Closer to that?

25      A.    Yes.   Correct.



 1                    But that -- that issue identified in

 2   Table 7, it just impacts this difference column.  It

 3   doesn't impact any of the actual numbers presented

 4   elsewhere in the report or flow through to anything

 5   else.

 6        Q.    So the difference would have gone up to

 7   1.13.  Right?

 8        A.    It would have increased.  I didn't crunch

 9   the math, but approximately --

10        Q.    By about $400,000, so it's over $1 million,

11   then.

12        A.    Yeah.  It would be over $1 million.

13   Correct.

14        Q.    So that 747 difference should be 1 million,

15   1,000,001?

16        A.    Correct.

17        Q.    Why do you say that difference doesn't

18   affect anything?

19        A.    So that number here, whatever, 747 or the

20   million dollars, it just stops here.  It doesn't

21   flow into anywhere else.  This is just a calculation

22   of the difference of the components as identified in

23   the report.

24        Q.    And then so you come up with this amount

25   owed by Benlida to Circuitronix U.S. of 7.868



1    million.

2        A.    Correct.

3        Q.    And this brings us back to full circle

4    before.  As an accountant -- forensic accountant --

5    and it sounds like you used to do audits.  Right?

6        A.    No.

7        Q.    What did you do that said -- it was

8    internal audits.  Okay.

9        A.    Not as fun as a regular audit.

10       Q.    Not as fun as a regular audit.

11             As an internal auditor, if you were

12   working for a company and you saw that they were --

13   seemingly were overpaying a vendor nearly $8 million,

14   would that seem normal to you?

15       A.    It depends on the facts and circumstances

16   of the relationship.

17       Q.    Okay.  But is it normal, or it just

18   depends?

19             MR. ROSENTHAL:  Object to the

20       form.

21       A.    There could be reasons -- a lot of reasons

22   for it happening, the overpayment specifically.

23             For example, I've seen emails where

24   Benlida needed money so they were redirecting

25   payments.  And it could happen -- the overpayments



 1  could happen for a host of reasons.

 2      Q.   Do you think maybe Benlida was hungry for

 3  money?  Because we saw in this Exhibit 121 -- you

 4  can look at that.  121.

 5              Rishi, by his own admission, states

 6  that the Hong Kong entity owed Benlida $8.84 million.

 7  Do you think that's maybe why Benlida was hungry for

 8  money.

 9      A.   The balance could have an impact on

10  Benlida's cash flow.

11      Q.   That balance.  Right?

12      A.   Yes.  If it's accurate.

13      Q.   Do you have any reason to believe Rishi's

14  number here is not accurate on 121?

15      A.   Which number are you referring to?

16      Q.   The $8.8 million.

17      A.   Yes.

18      Q.   Why do you say that?

19      A.   Well, you previously showed me in the

20  Circuitronix Hong -- or Circuitronix Hong Kong and

21  Benlida reconciliation, which had a different

22  number, so -- with a large disparity.  So I don't

23  know, sitting here, who's correct.

24              And I also want to point out that this

25  email is dated July.  And then we saw



1    reconciliations, even by Benlida, occurring all the

2    way through November.  So even at this point in

3    time, these numbers aren't firm yet.

4         Q.   Do you know the date of this document?

5              MR. ROSENTHAL:  Which one?

6              MR. MAZZOLA:  Exhibit 158, the

7         Benlida shipment and payment details.

8              MR. ROSENTHAL:  CTX HK?

9              MR. MAZZOLA:  Yep.

10   BY MR. MAZZOLA:

11        Q.   It does go as far as 2019.  Do you see

12   that?

13        A.   This goes through -- this analysis

14   specifically goes through July 2019.  And I want to

15   say it was included in the transmittal email from

16   Benlida to Circuitronix, LLC, on or about

17   November 19, 2019.

18        Q.   Did CTX respond to this and produce their

19   own reconciliation, if you know?

20        A.   I do not know.  I don't believe so.

21        Q.   Do you have Exhibit 27 in front of you?

22        A.   I can.

23        Q.   Yeah.  Please.

24        A.   All righty.  Ready when you are.

25        Q.   Have you ever seen this document?  It's



1    called a business authorization.

2        A.   I'm not familiar with this document.

3        Q.   It's short enough for you to look at.  Do

4    you see where it says, "For purposes of our

5    company's business"?

6        A.   I see those words.

7        Q.   If you had been provided with this document

8    during your analysis, would you have thought to

9    consider that the Hong Kong entity is a related

10   party to the U.S. entity?

11       A.   They could be related parties.

12       Q.   Did you ever see ...

13            MR. ROSENTHAL:  Can we go off the

14       record for a second?

15            MR. MAZZOLA:  Yeah.

16            (Discussion off the record.)

17            (Deposition Exhibit 162

18            marked for identification.)

19   BY MR. MAZZOLA:

20       Q.   I'm going to hand you over a document,

21   which we've marked as 162.

22            MR. MAZZOLA:  And I don't know,

23       Stephen, if you've seen this before.

24            MR. ROSENTHAL:  I don't think so.

25       Did you guys produce this thing?



1              MR. MAZZOLA:  We just saw it the

2      other day.

3              MR. ROSENTHAL:  Okay.

4      BY MR. MAZZOLA:

5      Q.   This is a document we've marked as 162 --

6              MR. ROSENTHAL:  So let me just

7      interpose an objection for the record,

8      since I haven't even had a chance to look

9      at it.  But if it hasn't been produced in

10     discovery, I object to your asking him

11     questions about it.

12             But having preserved that, go

13     ahead.

14             MR. MAZZOLA:  Okay.  We think it

15     came from you guys, or it's your people on

16     some level.  To be determined.

17     BY MR. MAZZOLA:

18     Q.   Mr. Parisi, you haven't seen this document,

19  so I'm not expecting you to take it from the

20  blindside.  So take your time looking at it.

21             (Document review.)

22     BY MR. MAZZOLA:

23     Q.   You haven't seen it before, so I just want

24  to ask you.  Attached to this email, dated

25  August 18th, 2022, the email is from a person named

1    Charlene at Jules Jiu.  And they're a -- they

2    purport to be the auditor for

3    Circuitronix Hong Kong.  Do you see that?

4         A.   It appears to be that.  Yes.

5         Q.   And then in the next two pages, they've

6    attached a confirmation for audit purposes.

7         A.   I see those words.

8         Q.   And these are addressed to ROK in the first

9    instance and Benlida in the second instance.  Do you

10   see that?

11        A.   I see the words "ROK" on page 2 and

12   "Benlida" on page 3.

13        Q.   And, I guess, what I'm interested in is,

14   what is the auditor trying to suggest when they say

15   "Due to you, Hong Kong dollars, 52,287,000?

16             MR. ROSENTHAL:  Object to the

17        form.

18        A.   I don't know.  I'd have to --

19   BY MR. MAZZOLA:

20        Q.   What do you understand that to mean?

21             MR. ROSENTHAL:  Object to the

22        form.

23        A.   -- I'd have to look at the whole document

24   in context.

25   \\\



1          BY MR. MAZZOLA:

2          Q.   If you had seen this document as part of

3     your preparations, and preparation of the report,

4     would this have had any bearing on any of your

5     discussions, thoughts, or opinions?

6                    MR. ROSENTHAL:  Objection.

7          Foundation.

8          A.   I don't believe so.

9                    (Deposition Exhibit 163

10                   marked for identification.)

11                   MR. MAZZOLA:  This is another

12         document, Exhibit 163.  Similar in nature

13         to the last document.  It's an email from

14         the same person, Charlene.  It's dated

15         July 24th, 2013.

16                   So this I can assure,

17         Mr. Rosenthal, I have never seen before two

18         days ago.

19                   MR. ROSENTHAL:  Same objection to

20         the line of questioning.

21         BY MR. MAZZOLA:

22         Q.   This is a similar document to the one you

23    just looked at before.  Again, it's prepared by a

24    certified public accountant.  And it says

25    "Confirmation for Audit Purposes," and it's

1  addressed to Benlida.

2           Do you see where it says "due to you"?

3  A.   I don't see those words.

4           Where are you looking?

5  Q.   I beg your pardon.  On the attachment.

6  A.   Are you on page 2 or 3?

7  Q.   Page 3.

8  A.   Page 3.

9  Q.   Do you see where it says that "Due to you,"

10 it's got Hong Kong dollar, 52,593,000?

11 A.   I see "Due to you" on the page and

12 HKD 52 million.

13 Q.   In your professional experience, is this an

14 indication by Circuitronix Hong Kong's auditors that

15 Circuitronix Hong Kong, at least by their numbers,

16 believes that they owe Benlida somewhere in the

17 order of 52.5 million Hong Kong dollars?

18 A.   I'm not sure.  This is the first time I've

19 seen this document.

20           (Document review.)

21 A.   I'm not sure.

22 BY MR. MAZZOLA:

23 Q.   That's your answer?  "I'm not sure"?

24 A.   This document's a little confusing, because

25 it says "due to you" and it's regarding



Mark Parisi, CPA, CIRA, CFE, CTCE                                    7/31/2023
Case 0:21-cv-60125-RNS   Document 203-2   Entered on FLSD Docket 08/22/2023   Page 303 of 262

Page 202

1   Circuitronix Hong Kong.  I don't know if there's a

2   translation issue.

3        Q.   Okay.  You know who it's addressed to.

4   Right?

5        A.   To Benlida.  It says "to Benlida."

6        Q.   And then it has a column that says, "due

7   from you."  Right?

8        A.   Yes.  I see those words on the page.

9        Q.   And then there's a column that says "due to

10   you"?

11        A.   Correct.  I see those words.

12        Q.   I'm just asking, in your professional

13   experience, having dealt with certified public

14   accountants, auditors, and the like, would the

15   recipient of this believe -- Benlida,

16   hypothetically -- that Circuitronix Hong Kong

17   believes that they owe Benlida 52.59 million Hong

18   Kong dollars?

19             MR. ROSENTHAL:  Object to form.

20        A.   So this is Benlida's records, not

21   Circuitronix Hong Kong, I believe -- or no.

22             I'm not sure.

23        BY MR. MAZZOLA:

24        Q.   Well, if you read the cover email, it says,

25   "We are the auditor of Circuitronix Hong Kong."



1    A.    Okay.

2    Q.    Do you see where it says that?

3    A.    I do see that on the first page.

4    Q.    Does that lead you to believe that the

5    attachment is based upon the records that are being

6    held by Circuitronix Hong Kong?

7    A.    It appears that way.

8    Q.    So with that, if you were the recipient of

9    this at Benlida, would it be reasonable, from an

10   accounting perspective, for them to conclude that

11   Circuitronix Hong Kong -- at least their auditors

12   and accountants -- believed that Benlida is owed

13   $52.59 million from Circuitronix Hong Kong?

14                MR. LERNER:  HK dollars.

15                MR. MAZZOLA:  HK dollars.

16   Hong Kong dollars.

17   A.    It appears to be trying to confirm a

18   balance.

19   BY MR. MAZZOLA:

20   Q.    And if you received this and you were

21   Benlida, based upon all you know about accounting

22   and auditing, would it be reasonable for Benlida to

23   believe that Circuitronix Hong Kong believes that

24   they owe Benlida $52.59 million Hong Kong dollars?

25   A.    It appears that way.



1    Q.    Who is Siddharth Gusain?

2    A.    Where do you see that name?

3    Q.    It's on the email page from Charlene.

4    A.    I'm not familiar.

5             MR. MAZZOLA:  Give me one second.

6    And we can go off the record.

7             (Discussion off the record.)

8    BY MR. MAZZOLA:

9    Q.    If you had seen these documents, 163 and

10   164 ...

11   A.    I think you mean 162 and 163?

12   Q.    Yes.  162 and 163.

13             ... would that have any bearing on your

14   thoughts about whether the Hong Kong entity and the

15   U.S. entity are related parties?

16   A.    So these documents don't change my opinion

17   as relates to Circuitronix, LLC's, counterclaim.

18   Q.    Okay.  And the question was, does this have

19   any bearing on your thinking or thoughts

20   regarding -- professional thoughts, whether or not

21   the Hong Kong entity and the U.S. entity are related

22   parties for accounting purposes?

23             MR. ROSENTHAL:  Objection.  Form.

24   A.    They could be related, but they're separate

25   entities.



1      BY MR. MAZZOLA:

2          Q.    But for accounting purposes.

3          A.    I don't know -- when you keep saying

4      "related parties for accounting purposes" --

5      right? -- I'm not aware of any formula that you put

6      in these pieces and out pops an independent variable

7      based on the dependent variables in the components

8      you described.  Right?

9                So they could be related parties, but

10     separate companies.  Similarly, I could have

11     multiple companies, and they'd be separate

12     companies.

13         Q.    But when you -- from an accounting

14     perspective, you need to consider the -- from an

15     accounting perspective, you need to consider the

16     numbers -- the dollars and cents of related parties

17     to get the whole picture.  Isn't that correct?

18         A.    It depends on the context.

19         Q.    Well, in the context where one entity has

20     agreed to pay the debts of another.  Is that

21     something you where would consider them related

22     parties?

23         A.    Which -- what are you referring to

24     specifically?

25         Q.    Well, if the U.S. operation was paying the



1   debts of the Hong Kong entity, would that be

2   something you would want to know?

3        A.    It depends on the facts and circumstances.

4        Q.    Well, what if it's just as simple as that?

5              There's proof and evidence in this case

6   that the U.S. entity was paying the debts of the

7   Hong Kong entity.  Would that have any bearing as to

8   whether or not the two entities are related parties,

9   and from a professional accounting perspective, you

10  need to look at both of them collectively to come up

11  with a true number.

12       A.    I'm not sure if I'm following you.

13             If I took Stephen out to lunch and he

14  asked me to pay, you know, for food, I don't know if

15  that would make me responsible for his debts.

16       Q.    No.  You guys aren't related in any

17  respect.

18       A.    Okay.  If it was my mom, would the answer

19  be different?

20       Q.    No.  But if it was two separate

21  companies -- purportedly, two separate companies.

22             They have the same ownership, same

23  control.  One entity has agreed in writing to pay the

24  debts of the other, would that have any bearing on

25  your analysis?



1      A.    I don't know that they have the same

2   ownership and same control.

3      Q.    Let's -- let me ask you another question.

4            You did have the Exhibit 21 in front of

5   you.  That was the manufacturing agreement.

6      A.    One second, please.

7            MR. ROSENTHAL:  Do you want him

8      to pull it up?

9            MR. MAZZOLA:  Yeah.  Yeah.

10     A.    Okay.

11   BY MR. MAZZOLA:

12     Q.    This document, you did see.  Right?

13     A.    Yes.

14     Q.    Let me ask you a question.  Regarding 162

15   and 163, those audit reports -- you don't have to

16   look at them.

17            In your opinion, can you think of any

18   reason why the U.S. entity -- or why any entity would

19   agree to overpay someone to the tune of $8 million

20   and then agree to pay them another $8 million?

21     A.    So they're separate entities.  Right?  We

22   all agree that Benlida tracked the records of

23   Circuitronix, LLC, and Hong Kong separately, as did

24   Circuitronix.

25            I know the overpayment seems large,



1   you know, in terms of me and you dollars.  But when

2   you consider the relative size of the transactions

3   between Circuitronix, LLC, and Benlida, that

4   overpayment only equates to a few months' worth of

5   invoices.

6                   So while the amount in absolute terms

7   may be large, you know, on a relative basis

8   considering the volume, those transactions would get

9   absorbed quite quickly.

10      Q.   If they continued to do business.

11      A.   If they continued to do business.

12      Q.   Let's look at the manufacturing agreement.

13  There's a --

14      A.   And that's 21.  Correct?

15      Q.   Yeah.

16                  On page 10 of the manufacturing

17  agreement, there's a list of customers -- potential

18  customers and Circuitronix customers.

19      A.   What paragraph are you looking at?

20      Q.   Just page 10.

21      A.   Page 10.

22      Q.   Page 10.

23      A.   Okay.  I'm on page 10.

24      Q.   Do you understand that these customers that

25  are identified here were identified as exclusive



1    customers of CTX, the U.S. operation?

2         A.    I do not remember those words specifically.

3    I see these customer names on here, but I have not

4    specifically -- I don't remember this whole

5    manufacturing agreement to comment on it.

6         Q.    If I tell you to assume that they are

7    exclusive customers and that the Hong Kong entity

8    was issued purchase orders for these exclusive

9    customers, would that have any bearing upon your

10   thoughts about whether or not the Hong Kong entity

11   and the U.S. entity are related parties from an

12   accounting perspective?

13        A.    You keep saying "from an accounting

14   perspective."  They're --

15        Q.    It's an accounting term, isn't it?

16        A.    When I think of related parties, what I

17   think of is -- I come from a bankruptcy world.

18   Right?  Or primarily a bankruptcy world.

19             So when you say "related parties," I

20   think of the context of bankruptcy.  Right?

21             Joe is the CEO of this company.  Are

22   his related entities, you know, getting paid money

23   that he also owns.  Those companies could be

24   separate.  But that's really the context that I

25   think of it in.



1     Q.    Okay.  So --

2     A.    Whether it's common ownership, you know,

3     between the two parties or it's his --

4     Q.    So --

5     A.    -- company that he's --

6           Go ahead.

7     Q.    This common ownership is one of the things

8     you looked at to identify related parties.  Is that

9     correct?

10    A.    You keep saying "identify related parties."

11    Right?  I don't know -- there's no formula that you

12    put these independent variables into and out pops a

13    dependent that I -- so I'm a little confused --

14    Q.    I understand --

15    A.    -- on your line of questioning.

16    Q.    -- I understand.

17          Accounting is as much an art as it is a

18    science.  I understand that.

19          When you -- to do a full picture, a

20    full forensic accounting picture in an instance such

21    as this, my question is, do you think it's important

22    to look at the related parities if two companies are

23    related with each other.

24          One has a debit, and one has a credit.

25    To get the full picture, do you think it makes sense



1    to look at them both together?

2        A.    For Circuitronix, LLC's, counterclaim?

3        Q.    The whole claim.

4        A.    For your claim.  For the plaintiff's claim.

5        Q.    Well, from Circuitronix's counterclaim.  Do

6    you think it's important to do that?

7        A.    Do I think it's important to consider

8    entities outside of the counterclaim for purposes of

9    the counterclaim?

10       Q.    My question is this:

11             If you're going to do a full picture of

12   the debts and obligations between two parties, do you

13   think it makes sense to look at debts and obligations

14   between related parties?  Debts and obligations of

15   all the parties.

16       A.    So just to be clear, your question is if

17   I'm looking at the debts between two parties, should

18   I consider more than those two parties.

19       Q.    I guess I should rephrase it this way.

20             You never looked at, examined, or

21   evaluated obligations that Benlida claims CTX owes --

22   isn't that correct? -- for purposes of your report.

23             MR. ROSENTHAL:  Object to the

24       form.

25       A.    So our report looks at the CTX, LLC, and

1   Benlida transactions.

2       BY MR. MAZZOLA:

3       Q.    Just the CTX U.S. and Benlida transactions.

4   It does not look at the CTX Hong Kong and Benlida

5   transactions.  Isn't that correct?

6       A.    Correct.  As they were not identified in

7   the counterclaim.

8       Q.    Okay.  And now what I'm asking you is if

9   CTX Hong Kong is a related party to the U.S.

10  operation, do you think it would have been prudent

11  to look at those transactions, assuming that it is a

12  related party.  Let's do it that way.

13      A.    As the plaintiff's expert or for the

14  counterclaim?

15      Q.    However you want to do it.

16              As for the counterclaim.

17      A.    I do not believe -- you know, as we

18  discussed earlier, you said there's two parties in

19  the counterclaim.  Are other parties' debts, or

20  potential debts, besides these two parties, relevant

21  for these two parties' balance.

22      Q.    And you know that my clients, in their

23  complaint, are suing CTX, LLC, the U.S. operation,

24  for invoices that they issued to the Hong Kong

25  entity.  You know that because you read the



1  complaint.

2      A.    Is that a question?

3      Q.    Yes.

4            Do you know that to be true?

5      A.    I thought you said "you know that" because

6  I read the complaint.

7      Q.    Yes.

8      A.    Yes.  I'm aware that Benlida is trying to

9  recover Circuitronix Hong Kong invoices from

10 Circuitronix, LLC, on the complaint.

11     Q.    And if, at the end of the day, it turns out

12 that the U.S. -- CTX U.S. owes the debts of

13 CTX Hong Kong, does that make your report valueless?

14     A.    No.  Not at all.

15     Q.    Why not?

16     A.    Well, there is -- there would be two

17 components.  Right?  There's still the Circuitronix,

18 LLC, balance with Benlida, which would be one

19 component.  And then if liability was determined, as

20 you described, then the balance of the debt due to

21 Hong Kong would potentially be included in that

22 amount.

23     Q.    It would be included how?  As an offset?

24     A.    I don't know.

25            I would have loved to see, you know,



1    an affirmative report by the plaintiff that laid out

2    all these legal theories to rebut.  But

3    unfortunately, for whatever reason, an affirmative

4    report wasn't issued.

5        Q.   And if that was the case, you would then

6    have to consider the relationship between the U.S.

7    operation and the Hong Kong operation.

8        A.   Among other items, absolutely.  There's

9    many items you would have to consider in evaluating

10   the facts and circumstances.

11       Q.   So back to this document over here.  I

12   guess, the question was -- I'm asking you to assume

13   that these were exclusive customers of the U.S.

14   operation, and if the fact that the Hong Kong entity

15   is selling to these exclusive customers, does that

16   have any bearing in your mind as to whether the

17   Hong Kong entity and the U.S. entity are related

18   parties.

19            MR. ROSENTHAL:  Object to the

20       form.

21       A.   I don't know the answer to that question.

22   BY MR. MAZZOLA:

23       Q.   What about ...

24            (Pause in proceedings.)

25            MR. MAZZOLA:  I'm frozen up a



1          little bit here.

2          BY MR. MAZZOLA:

3          Q.    How about this:  Do you consider the issue

4    of whether the U.S. operation owes Benlida for the

5    debts of the Hong Kong operation to be an issue of

6    law or accounting?

7          A.    Law.

8          Q.    And if it's an issue of law, then why would

9    you be looking for something like that from our

10   accountant?

11         A.    I don't understand your question.

12         Q.    Well, I just asked you is the -- is the

13   question about whether or not the U.S. operation

14   owes the debts of the Hong Kong operation an issue

15   of law or accounting.  Right?  And I think you said

16   it was a question of law.

17              And before I got hung up on this

18   computer, you were saying you would have loved to

19   have seen something like that from our accountant

20   talking about the obligations and the debts of the

21   Hong Kong operation.

22              So why -- why would you have expected

23   to see that from our accountants if it's a question

24   of law?

25              MR. ROSENTHAL:  Object to the



1        form.

2        A.   I'm confused.  We were retained by the

3    defendant.  What you're presenting seems to be the

4    plaintiff's position.  Right?

5                    So if we did the work, then the

6    defendant would be paying for the plaintiff's

7    accounting work.  Right?

8        BY MR. MAZZOLA:

9        Q.   If it's -- the question was, do you

10   consider the fact that the U.S. operation is paying

11   the debts of the Hong Kong operation to be an

12   accounting question or a legal question.  And I

13   think your response was you said it was a legal

14   question.

15                    MR. ROSENTHAL:  Object to the

16       form.

17       A.   I haven't seen evidence of the -- of

18   Circuitronix, LLC, paying the debts of the Hong Kong

19   entity.

20       BY MR. MAZZOLA:

21       Q.   Would that have any bearing on your

22   opinions?

23       A.   It could.

24                    If a payment out of Circuitronix, LLC,

25   was really a payment for the benefit of Circuitronix



1    Hong Kong, we'd want to make sure that payment was

2    in the proper category.

3                    Similarly, when we talked about

4    payment differences, there was one payment that was

5    due to Benlida for OSP that Benlida directed be paid

6    to ROK, but we still put it in the Benlida ledger

7    accordingly, based on that same fact pattern you

8    just described.

9                    MR. MAZZOLA:  My computer is

10       frozen.

11       A.   You know the plights of being an

12   accountant, now.  This is what I deal with all the

13   time.

14                   (Pause in proceedings.)

15                   MR. MAZZOLA:  I'm going to take a

16       break.

17                   (Off record:  3:43 p.m. to 3:53 p.m.)

18       BY MR. MAZZOLA:

19       Q.   I want to pull up a document.  Now, this is

20   called "Payment Schedule for ROK U.S. HK Payment

21   Detail Reconciliation 2012 to 2018."  This was

22   previously marked at Rishi's deposition, so it was a

23   recently disclosed document.

24                   MR. ROSENTHAL:  Let me see if I

25       can tell you the number.



 1                    MR. MAZZOLA:  And we put

 2       everything on OneDrive, and I didn't want

 3       to take this one out.  I'm feeling it was a

 4       40-something.

 5                    MR. ROSENTHAL:  That far back?

 6                    MR. MAZZOLA:  No.  140-something.

 7                    MR. ROSENTHAL:  Oh.  Okay.

 8                 (Pause in proceedings.)

 9       BY MR. MAZZOLA:

10       Q.    So this is a document we put in front of

11    you.  We previously marked this document as

12    Exhibit 140.

13                    Have you seen this document before?

14       A.    Yes.

15       Q.    Was it included in the documents that you

16    reviewed?

17       A.    We received this document, but it wasn't

18    relevant for the CTX, LLC, counterclaim.

19       Q.    So you didn't review it?

20       A.    Not in conjunction with the counterclaim

21    report.

22       Q.    Did you -- not in conjunction with the

23    report you prepared.

24       A.    I've seen the spreadsheet.

25       Q.    Okay.  So you did -- you did have this



1    document.

2        A.    Correct.

3        Q.    So the documents that were produced to us

4    that we looked at earlier -- and I'm bringing up

5    this -- this is 151.

6              These are just the documents that you

7    used and incorporated into your report, 147.

8    Exhibit 147.  Is that what you're saying?

9        A.    Primarily.

10       Q.    Primarily.  So there's a set of other

11   documents that you did review that you did not use

12   in your report?

13       A.    Correct.

14       Q.    Because before we took the break, we were

15   talking about this related-party issue, and you said

16   to me if you saw evidence of the U.S. operation

17   paying the debts of the Hong Kong operation, that

18   would be something that would be important and that

19   you would consider in evaluating whether the U.S.

20   operation and the Hong Kong operation are related

21   parties.  Do you remember that?

22              MR. ROSENTHAL:  Object to the

23       form.

24       A.    So you keep going back to this related

25   parties.  They could be related, but they're still



1    separate entities, and they track the transactions

2    separately.

3              So if I had two businesses, you could

4    argue that they were related parties.  But if they

5    were maintained separately, then that's a separate

6    issue.  So I'm not -- you keep going back to this --

7    BY MR. MAZZOLA:

8    Q.   Okay.  I --

9    A.   -- related party.

10   Q.   The great thing is, is this nice lady is

11   writing everything down.  Okay?  That's what I

12   thought your answer was.

13             I thought you had said earlier, If I

14   saw proof that the U.S. entity was paying the debts

15   of the Hong Kong entity, that would have been

16   important for me to know, and it would have had

17   bearing as to whether or not the U.S. entity and

18   Hong Kong entity are related for accounting purposes.

19   A.   I think you're mischaracterizing my

20   testimony --

21   Q.   I may be --

22   A.   -- because I recall I specifically told you

23   that it would matter which payment was in the

24   ledger.  And I specifically recall we talked about

25   that OSP example in my report where Benlida wanted



1    one payment directed to ROK instead for the OSP

2    payment.  And I said it would matter which ledger

3    that transaction was recorded in to make sure, one,

4    there was no duplication and, two, to make sure it

5    was in the appropriate balance.

6        Q.   It's okay with me.  This lady's writing it

7    all down, and I trust that she's getting it all

8    down.

9             So I want to look at -- so this

10   document that I just put up in front you, which we

11   had previously marked as Exhibit 140, this payment

12   schedule for ROK U.S. HK, you did see this.  This was

13   in your -- the material you had, though it wasn't

14   disclosed to us that the document had -- that you

15   used for your report.  That's correct?

16       A.   We had been provided this document

17   previously.

18       Q.   If we look at -- do you know what this

19   document tells you?

20       A.   Yes.

21       Q.   And this document is a list of payments

22   that were made to ROK.  Is that what you understand

23   it to be?

24       A.   Yes.  By Circuitronix, LLC.

25       Q.   Okay.  How do you know they're paid by



1   Circuitronix, LLC?

2        A.    Because I believe that Citibank account to

3   be a Circuitronix, LLC, transaction that I believe

4   the Circuit -- the ROK transactions were with

5   Circuitronix, LLC.

6        Q.    Okay.  But you know that Citibank bank

7   account is a U.S. account because of the SWIFT

8   number.  Right?

9        A.    I believe so.  I don't know if there's any

10  other data on the far right side that you're not

11  fully displaying that would -- no.

12            Yeah.  I believe the Citibank account

13  is the Circuitronix, LLC, account.

14       Q.    And we know it's a U.S.-based account

15  because of the SWIFT number that says "CITIUS33."

16  We know that.  Right?

17       A.    It appears that way.

18       Q.    There's also -- and I'm looking at line 57,

19  column D.  Right?

20       A.    Um-hmm.

21       Q.    Okay.  And you can see throughout this

22  document that there's a lot of SWIFT numbers that

23  have this -- in that same column that bear the Citi

24  U.S. SWIFT number.  Right?

25       A.    Correct.



Mark Parisi, CPA, CIRA, CFE, CTCE
7/31/2023
Case 0:21-cv-60125-RNS   Document 203-2   Entered on FLSD Docket 08/22/2023   Page 224 of 262

Page 223

1     Q.    And down here at line 69, column D -- I beg

2   your pardon.  Line 70, column D, you see another

3   SWIFT number.  Do you see that?

4     A.    I do.

5     Q.    And that SWIFT number is related to an

6   HSBC Bank.  Do you see that?

7     A.    I do.

8     Q.    And the SWIFT number has "HK" in it.  Would

9   that indicate to you that that's a Hong Kong

10  account?

11    A.    It could.

12    Q.    Okay.

13    A.    I see "HK" in the SWIFT number.

14    Q.    I'm going to pull up another document.  I

15  guess we're going to have to call this one -- I

16  think this document probably was previously

17  identified as 142.

18          MR. MAZZOLA:  Right, Rich?

19          What do you think?

20  BY MR. MAZZOLA:

21    Q.    This is the ROK Payment Detail CTX U.S. HK

22  2012 to 2018.  Do you see that, Mr. Parisi?

23          MR. ROSENTHAL:  Is that 139?

24          MR. MAZZOLA:  That's 142?

25          Okay.  This is not 142, then.



 1                    MR. ROSENTHAL:  Try 139.

 2                    MR. MAZZOLA:  139?

 3                    MR. ROSENTHAL:  I mean, maybe.

 4       I'm not looking at what you're looking at.

 5       But based upon what you said, I think it

 6       might be.  Payment detail version 2 ROK

 7       2012 to 2019 --

 8       A.   My 139 in this binder's blank, so I can't

 9    help.

10                    MR. LERNER:  139.

11                    MR. MAZZOLA:  It's 139.

12       BY MR. MAZZOLA:

13       Q.   Mr. Parisi, have you seen this document

14    before?  This spreadsheet.

15       A.   Yes.

16                    MR. ROSENTHAL:  I'm sorry.  Are

17       you showing that now on the screen?

18                    MR. MAZZOLA:  Yes.

19                    MR. ROSENTHAL:  Okay.

20       BY MR. MAZZOLA:

21       Q.   And, again, this is a document that you got

22    from Mr. Rosenthal and/or Chauncey, but you did not

23    use it in the preparation of the report that we've

24    been discussing today.  Right?

25       A.   Correct.  CTX, LLC's, counterclaim.



1      Q.    But you reviewed it.  Right?

2      A.    Correct.

3      Q.    Did you do an analysis of it?

4      A.    I compiled the data.

5      Q.    I'm going to draw your attention to --

6   let's go to the tab at November 2015.  Do you see

7   this document over here?

8      A.    I do.

9      Q.    This is a payment memo -- payment detail

10   memo.  Are you familiar with these documents?

11     A.    Yes.  I do call them the payment details.

12   The monthly payment details.

13     Q.    And this is a monthly payment detail from

14   Circuitronix U.S. to ROK.  Do you see that?

15     A.    I see those words.

16     Q.    And if you scroll down on this column E,

17   you see entries for Hong Kong.  Do you see that?

18     A.    I do see "HK" on the screen.

19     Q.    Okay.  Do you have any understanding what

20   that means?

21             MR. ROSENTHAL:  Would you mind

22        scrolling to the top, just for my benefit,

23        too?

24             MR. MAZZOLA:  Yeah.  I can make

25        it smaller, but then maybe Mark can't see



1        it.

2        A.    Oh, no.  These are real glasses.

3        BY MR. MAZZOLA:

4        Q.    You can see?

5        A.    I can see.

6              I mean, Hong Kong.  It says "HK" in

7   column E.

8        Q.    And let's go to December 2015.  Do you see

9   that?

10       A.    I see the tab on the screen.

11       Q.    It says "Hong Kong" as well?

12       A.    I see the letters "HK" next to select cells

13  in column E.

14       Q.    In 2016, they made it a little easier.  And

15  it says "HK total."  Do you see that?

16       A.    That's one of the components.

17       Q.    And it's a U.S. total.

18       A.    Correct.

19       Q.    And on February 2016, they did the same

20  thing.  They broke it down.

21              And March of 2016, they did the same

22  thing.

23              MR. ROSENTHAL:  I'm sorry.  Just

24        to keep up with you, you're now on the

25        March 2016 payment detail tab?



 1                    MR. MAZZOLA:  Yes.

 2          BY MR. MAZZOLA:

 3          Q.    There's a Hong Kong total.  Do you see

 4     that, Mr. Parisi?

 5          A.    I do.

 6          Q.    And on March 2016, they're still showing --

 7     at least CTX is still showing a balance.  Right?

 8          A.    Between CTX -- presumably, CTX, LLC, and

 9     ROK.

10          Q.    Yeah.  Well, it's got "Hong Kong totals" in

11     there.  Do you see that?

12          A.    Let's scroll up to the top.

13                    It says from Circuitronix, LLC, to ...

14                    MR. ROSENTHAL:  Wait.  You've got

15          to -- he's trying to read while you're

16          moving, JC.

17          A.    ... "to ROK Printed Circuit Boards, Ltd."

18                    The words HK appear in column E, but

19     this says "from Circuitronix, LLC."

20          BY MR. MAZZOLA:

21          Q.    Oh.  I see where it's written.  Oh.

22     Absolutely.

23                    But it also makes reference to --

24     there's a bill number.  Do you see that?

25                    And there's references to Hong Kong on



1    the bill number.  Do you see that?  The "HK"?

2         A.   I see "HK" in column A and also column E.

3         Q.   And the Circuitronix, LLC, people, the

4    people here in Fort Lauderdale, they broke this down

5    with the Hong Kong total and the U.S. total.  Right?

6         A.   I see those subtotals.

7         Q.   And so it's showing a balance owed of

8    $206,000.  Do you see that?

9         A.   Correct.  For March 2016.  I see those

10   numbers on the screen.

11        Q.   And then when you get to April 2016,

12   another Hong Kong total of 167,000, and the U.S.

13   total is 77 -- 771,000.

14              Does -- the fact that these payment

15   details reflect amounts owed for Hong Kong and U.S.,

16   does that suggest related entities to you?

17        A.   Between that HK, assuming that HK

18   represents Circuitronix Hong Kong.  So there's the

19   Circuitronix -- it appears there could be the

20   Circuitronix Hong Kong and LLC invoices on that same

21   tab.

22        Q.   So it doesn't indicate that those -- that

23   the two are related entities, then.

24        A.   They could very well be related.  There's

25   common management, and they have some shared



1    services.  But they're still -- this one combines

2    the net balance, but the invoices are clearly

3    tracked separately.

4        Q.    What if the U.S. operation was paying all

5    of these obligations, the Hong Kong total and the

6    U.S. total, from the U.S. bank account?  Would that

7    suggest to you that the two entities, the Hong Kong

8    entity and the U.S. entity, are related?

9        A.    Not necessarily.

10        Q.    Would it be another factor you would

11   consider?

12        A.    I consider -- I consider all the facts and

13   circumstances.

14                Bill.com could pay my bills, but that

15   doesn't mean Bill.com is my related party, just a

16   payment processor.

17        Q.    That's all they are, just a payment

18   processor.

19        A.    Correct --

20                MR. ROSENTHAL:  "They" in the

21        hypothetical you --

22                MR. MAZZOLA:  Bill.com.

23   BY MR. MAZZOLA:

24        Q.    But in Bill.com -- you don't have any

25   ownership interest in Bill.com?



1     A.    Me?

2     Q.    Yeah.

3     A.    Not that I'm aware of.

4     Q.    You don't get -- you don't get copied on

5  emails that are sent to Bill.com?

6     A.    I do get copied on some emails that are

7  sent to Bill.com.

8     Q.    You don't have any control over Bill.com?

9     A.    I mean, I've used Bill.com before.

10    Q.    But you -- so I think the example you're

11 giving me is very different from the factual

12 patterns in this case.

13    A.    There's paymasters for companies.  That

14 happens regularly.

15    Q.    Okay.  So are you suggesting that the LLC

16 in this instance is nothing more than a paymaster

17 for the Hong Kong entity?

18              MR. ROSENTHAL:  Object to the

19    form.

20    A.    I don't know.

21 BY MR. MAZZOLA:

22    Q.    Let's look at -- if I -- let's look at some

23 of these.  Let's pick a date.  This December 2000 --

24 the February 2016 tab.  The payment detail.  Do you

25 see this?



1     A.    I see the tab on the screen.

2     Q.    It's a payment detail that's dated May 1,

3  2016.  Do you see that?

4     A.    I do.

5     Q.    The total of $537,000.  The subtotal is

6  comprised of an HK total of 120 and a U.S. total of

7  417.  Do you see that?

8     A.    I see those words.

9     Q.    Do you see these payments?

10    A.    I see those words.

11    Q.    It says "Less payment 4/21/2016 of

12  300,000."

13            And then it says another payment of

14  300,000 performed on April 28th, 2016.  Do you see

15  those?

16    A.    I see those numbers and words.

17    Q.    If you look at this document, 139, in

18  conjunction with 140, and we went to the payments

19  just referenced on the February 2016 tab, one of the

20  payments was made on April 21, 2016, for $300,000.

21  Do you see that?

22            MR. ROSENTHAL:  Could you just

23       tell me what you're referencing on the

24       screen right now?

25            MR. MAZZOLA:  981.



1          MR. ROSENTHAL:  No.  I mean, this

2     is exhibit what?  140?

3          MR. MAZZOLA:  140.

4          MR. ROSENTHAL:  Thanks.

5     BY MR. MAZZOLA:

6     Q.   Line 81, column A.

7          Do you see column B where it says

8     $300,000?

9     A.   I do.

10    Q.   Column C is Citibank, and column D, there's

11    the U.S. SWIFT number.  Do you see that?

12    A.   I see U.S. and the SWIFT number.

13    Q.   Yes.  And then there's another payment

14    referenced on April 28th.  Do you see that?

15    A.   I do.

16    Q.   $300,000?

17    A.   I do.

18    Q.   From Citibank.

19         And the SWIFT number, that has the

20    "U.S." in it.  Right?

21    A.   I see U.S. and the SWIFT number.

22    Q.   Does that indicate to you that, insofar as

23    Exhibit 139 is concerned on this February 2016 tab,

24    that someone's paying from the U.S., the debts

25    incurred by the Hong Kong entity?



1        A.     To ROK?

2        Q.     Yes.

3        A.     It appears that way.

4        Q.     Is that -- would that be something that

5   might indicate to you that the U.S. operation and

6   the Hong Kong entity -- the Hong Kong operation are

7   related entities from an accounting perspective?

8                    MR. ROSENTHAL:   Object to the

9        form.

10       A.     They could be related parties.  But that's

11  separate from who's responsible for the debts of

12  which entity.

13       BY MR. MAZZOLA:

14       Q.     Well, we know right here from this one

15  example --this one example -- that the U.S.

16  operation is or did pay the debts of the Hong Kong

17  operation.

18                   MR. ROSENTHAL:   Object to the

19       form.

20       BY MR. MAZZOLA:

21       Q.     Is that what you're seeing here from an

22  accounting perspective?

23                   MR. ROSENTHAL:   Same objection.

24       A.     I'm seeing "HK" on certain invoices.  And

25  it appears that Circuitronix, LLC, made payments to



1   ROK for those invoices.

2       BY MR. MAZZOLA:

3       Q.    On behalf of the HK operation.

4             MR. ROSENTHAL:   Object to the

5       form.

6       A.    It appears that way.

7       BY MR. MAZZOLA:

8       Q.    Okay.   Let's -- is that some information

9   that -- I guess, you did have that information

10  before you prepared this report.   Right?

11      A.    When you say "that information," what are

12  you referring --

13      Q.    This.   You had these spreadsheets.   Right?

14      A.    Yes.

15      Q.    Okay.   But you didn't include any of that

16  discussion in your report.

17      A.    ROK is not a party to the counterclaim, as

18  far as I'm aware.

19      Q.    So, I guess, the other question I want to

20  ask is that if, in fact, CTX U.S. is responsible for

21  paying the debts of CTX Hong Kong, then that makes

22  your report have no value.   Right?

23             MR. ROSENTHAL:   Object to the

24      form.

25      A.    I disagree.   And we -- and I previously



1    answered this question.

2         BY MR. MAZZOLA:

3         Q.    You continue to disagree with that.

4              MR. ROSENTHAL:   Object to the

5    form.

6              I continue to object to the asked

7    and answered.

8         BY MR. MAZZOLA:

9         Q.    Are you familiar with -- do you know what

10   the financial arrangement is between yourself and

11   Mr. Mukamal for your expert services in this case?

12        A.    I don't understand your question.

13        Q.    Do you know the financial arrangements

14   between -- for you and Mr. Mukamal and CTX for your

15   time in preparing the report and testifying in this

16   case?

17        A.    We're hourly consultants, if that's your

18   question.

19        Q.    You are hourly consultants?

20        A.    Correct.

21        Q.    And what is the rate?

22        A.    The rate for what?

23        Q.    Your work.   Hourly rate.

24        A.    $460.

25        Q.    Do you have any -- how much have you

1  billed?

2      A.    For the whole project?

3      Q.    Um-hmm.

4      A.    I have no idea.

5      Q.    Would Mr. Mukamal know that?

6      A.    I have no idea what he knows.  I do not

7  know if he's reviewed the invoices.

8      Q.    Okay.

9              MR. LERNER:  Actually, we have

10      the invoices here.

11              MR. MAZZOLA:  Do we?

12              MR. LERNER:  Yeah.  We do.

13              MR. ROSENTHAL:  Yeah.

14      BY MR. MAZZOLA:

15      Q.    I'm going to just do a little housecleaning

16  over here.

17              (Pause in proceedings.)

18              MR. MAZZOLA:  We have copies of

19      these.  Right?

20              MR. LERNER:  No.

21              MR. ROSENTHAL:  That's my only

22      one.

23              MR. MAZZOLA:  We don't have

24      copies of them?

25              MR. LERNER:  Just mark it in

```
 1    and --

 2                 MR. ROSENTHAL:  -- and we'll deal

 3    with it.

 4                 MR. MAZZOLA:  Yeah.

 5    BY MR. MAZZOLA:

 6    Q.   I'm going to hand them to Mr. Parisi to

 7    look at and tell us how much the total is.  Because

 8    I got confused.

 9                 MR. LERNER:  He can do it now.

10    A.   Oh.

11    BY MR. MAZZOLA:

12    Q.   Do you want a calculator?

13    A.   I'm going to need a computer.  There's --

14    there's a lot of invoices here.

15                 MR. ROSENTHAL:  Maybe you can

16    tell him how to calculate it.

17                 MR. LERNER:  Is this 164, the

18    next one?  Invoices?

19                 MR. MAZZOLA:  Yeah.

20                 (Deposition Exhibit 164

21                 marked for identification.)

22    BY MR. MAZZOLA:

23    Q.   We've handed to you a stack of invoices,

24    Mr. Parisi.  We've marked them as Exhibit 164.

25                 Were you being facetious when said you
```

1  couldn't tell us what the grand total was?

2      A.   I can absolutely do it.  I can get out a

3  piece of paper and add all these up.

4      Q.   Just give us a rough number.  It looked

5  like it was north of $100,000.  I just wanted to get

6  that.

7      A.   I'll concede it's north of $100,000.

8      Q.   Okay.  And would those invoices reflect all

9  the work that was done on this?

10      A.   All of the work from inception to the last

11  invoice date.  Citrin takes a little while to

12  publish their invoices, so all the invoices that

13  Citrin's finalized have been produced.

14      Q.   And I did ask the question -- it wasn't

15  well asked, but you asked me.  It looked like it --

16  it raised the issue in your mind.

17              And I was trying to understand.  I'm

18  kind of interested now.  Is there any financial

19  arrangement between yourself and Mr. Mukamal?  Did he

20  agree to share fees with you regarding this file?

21      A.   No.  I do some hourly consulting for

22  Kapila Mukamal on, you know, lingering issues since

23  I left, but I haven't done anything in two and a

24  half months.

25              This was my last -- you know, you



1  leave a case, you can't leave your previous firm

2  high and dry.  So pretty much all my matters with

3  Kapila Mukamala have concluded.

4      Q.   Okay.  So the retention for you via Citrin

5  is unique to this case then.  Right?

6               That was not a very good question.

7               I guess, what I'm trying to understand

8  is, Mr. Mukamal is not paying you for your time today

9  or for anything.  You're being paid separately by

10 CTX.

11     A.   Yes.  Citrin -- just to be clear, Citrin is

12 paid by Circuitronix, LLC.

13     Q.   Okay.

14          MR. LERNER:  And I think we're

15     paying for him today.

16          MR. ROSENTHAL:  Yeah.

17 BY MR. MAZZOLA:

18     Q.   And Mr. Mukamal is not -- he hasn't agreed

19 to pay you for any additional work related to this

20 file.

21     A.   No.

22     Q.   Okay.  Whatever additional work you're

23 doing for Mr. Mukamal on an hourly basis is for --

24 unrelated to this work.

25     A.   Yes.



1    Q.    Do you have any other depositions coming up

2  any time soon?

3    A.    I'm filing a report today, so I assume,

4  yes.  And I hope it is soon.

5    Q.    Is that report for Mr. Rosenthal?

6    A.    Unfortunately, not.

7          He's great to work with, though.

8    Q.    Is it for Mr. Cole?

9    A.    It is for Cole, Scott & Kissane.

10          MR. ROSENTHAL:  That's a

11  different law firm.

12          MR. MAZZOLA:  Yes.  It is a

13  different law firm.  Yes.

14          Cole, Scott, with a S-c-o-t-t.

15  BY MR. MAZZOLA:

16    Q.    Have you ever been adverse to any client

17  Mr. Cole represented?

18    A.    Not that I'm aware.

19    Q.    Have you ever been adverse to any clients

20  Mr. Rosenthal or his firm has represented?

21    A.    Not that I recall.

22    Q.    Are you familiar with the term -- the

23  accounting term "FIFO"?

24    A.    Absolutely.

25    Q.    Okay.  What does that mean?



1        A.    First in, first out.

2        Q.    Did you consider FIFO in reviewing this

3    claim?  This matter?

4        A.    So when you review everything -- right --

5    we're only talking about invoices, payments, and

6    debit memos.  And you may remember a long time ago

7    called "the order of operations."  Right?

8    Parentheses, exponents, multiplication, addition --

9        Q.    PEMDAS.

10       A.    PEMDAS.  Yes.  I didn't want to be that

11   nerdy and say it, but yes.  PEMDAS.

12             And so when you're just adding --

13   right? -- there's no multiplication here.  We're

14   just in the addition/subtraction component of the

15   PEMDAS.  And so no matter what order -- as in FIFO

16   or LIFO -- you add and subtract, you're going to get

17   the same answer.

18       Q.    It makes no difference, then.

19       A.    When you analyze everything.  Correct.

20             Because it's all -- it's all out at

21   the end of the day.

22       Q.    Is it unreasonable for a business to apply

23   payments to the oldest invoices first?

24       A.    As long as it's for the correct -- it

25   depends.



1          The answer is, it depends.

2      Q.   If the payment doesn't -- if the payment

3  made by the payor does not define what invoices or

4  identify what invoices they should be attributable

5  to, is there anything unreasonable about the payee

6  applying that money to their oldest invoices?

7      A.   That's one option.

8      Q.   Okay.

9      A.   Another option would be to call the company

10  and say, Hey, which invoices are you paying

11  specifically?

12      Q.   But it is reasonable to apply it to the

13  oldest invoices.

14      A.    It could be.  As long as it's applied to

15  the appropriate entity that issued those invoices.

16          You wouldn't want to have a matching

17  issue.  You know, the -- accounting's very big on

18  matching.  Right?  You want to have the revenues and

19  expenses in the proper period, in same way you'd

20  want to have the invoices applied against the proper

21  payments.

22      Q.   So assuming it's the proper entity, there's

23  nothing unreasonable about a bookkeeping department

24  taking a payment that doesn't otherwise identify to

25  what invoice it's attributable to and applying it to



1    its old invoices.

2         A.    Hypothetically?

3         Q.    Yes.

4         A.    That could happen.

5         Q.    And is it reasonable to do that?

6         A.    It depends on the facts and circumstances.

7    I'd reach out and ask for detail to apply issues.

8              In this example, you know, if it

9    wasn't applied FIFO, some of these, you know,

10   invoice differences would have been flushed out,

11   hopefully.  But it could -- but payments on accounts

12   certainly can happen.

13        Q.    But it is -- it remains reasonable -- now,

14   while you may prefer someone to pick up the phone

15   and call, it does remain reasonable for a

16   bookkeeping department to apply monies to the oldest

17   invoices.  Is that correct?

18             MR. ROSENTHAL:  Object to form.

19        A.    If applied to the proper entity, it -- that

20   could be an appropriate method of accounting for

21   payments.

22             (Pause in proceedings.)

23             MR. LERNER:  Just give us a

24   minute.

25             (Discussion off the record.)



```
1          BY MR. MAZZOLA:

2          Q.   Let's look at -- we're back to Exhibit 140.

3                    MR. ROSENTHAL:   If I may, this is

4          the ROK Payment Detail --

5                    MR. MAZZOLA:   Yeah.   This is 139.

6                    MR. ROSENTHAL:   -- U.S. Hong Kong

7          tab.

8          BY MR. MAZZOLA:

9          Q.   We're looking at the February 2016 tab.

10                   And this is a payment detail.   Right?

11         A.   This is -- this spreadsheet tab on the

12    screen is the payment details between

13    Circuitronix LLC, and ROK Printed Circuit Board for

14    invoices dated February 2016.

15         Q.   And there were many of these payment

16    details.

17         A.   So I just -- there are payment details

18    for -- between the three groups of parties.

19         Q.   Okay.  So --

20         A.   Monthly payment details.

21         Q.   So you would receive payment details from

22    Circuitronix, LLC, to Benlida.  Right?

23         A.   For the counterclaim.

24         Q.   Did you ever see any -- in the materials

25    that were provided to you -- payment details from
```



1    Circuitronix Hong Kong to Benlida?

2        A.    I don't recall.

3        Q.    But regarding this payment detail, it's

4    dated May 1, 2016.  Do you see that?

5        A.    Yeah.

6              The way it works is, there's the

7    invoices, and then there's the payments, which are

8    AMS60.  Or there's some changes, depending on the

9    point of time.

10       Q.    So there's a bill date you can see over

11   here on line 14, column B.

12       A.    I see column B.

13       Q.    It says February 1, 2016.  Right?

14       A.    Correct.

15       Q.    And then down below over here, you'll see a

16   payment date, line 39, making reference to a payment

17   on April 21.  Do you see that?

18       A.    I do.

19       Q.    And then this document is produced sometime

20   later and sent to, in this instance, ROK on or about

21   May 1, 2016.  Right?

22       A.    No.

23       Q.    When is it sent?

24       A.    November 1st, 2019, is part of the initial

25   email from Circuitronix, LLC, to Benlida.



1    Q.    November 2019 is when it's first sent?

2    A.    November 1st, 2019.

3    Q.    It's sent over two years later?

4    A.    Yes.

5          If you go to the far right, the ROK

6    transactions ceased in 2018, I want to say.

7          If you just -- yeah.  Hold "control"

8    and click that little pointer.

9    Q.    So this payment detail that has a date of

10   May 1, 2016, was not sent to ROK in May of 2016?

11   A.    So I just want to be clear.  There's two

12   different potential versions of this payment

13   details.  What you're looking at right now, this is

14   CTX's compilation of the monthly payment details

15   between CTX, LLC, and ROK.

16          For CTX, LLC, and Benlida, the initial

17   CTX recon, as we referred to it in the report, that

18   is also a compilation.  But the actual emails, the

19   monthly transmittals, between CTX, LLC, and Benlida,

20   those were, in fact, sent monthly.  But now you're

21   looking at an aggregation.

22          So in the same way we wouldn't say,

23   Oh, you know, there's a January 2012 tab, this

24   wasn't sent until November 2019.  The 2012 tab was

25   sent in 2012.  This is just a consolidation.  And



1    there was probably also some adjustments from the

2    original monthly transmittals to these updated

3    versions.

4        Q.    So this payment detail dated May 1 for

5    invoices from February 2016 reflecting payments made

6    in April 2016 was not sent to ROK until 2019.  Is

7    that what you're saying?

8                    MR. ROSENTHAL:   Object to the

9        form.

10       A.    So imagine -- let me just say it

11   differently.  The parts --

12   BY MR. MAZZOLA:

13       Q.    I've seen emails --

14       A.    There's emails.

15       Q.    -- with these payment details attached to

16   them.

17       A.    Correct.

18       Q.    So my question is, based upon all the

19   information you've looked at, do you know when this

20   payment detail would have been sent to ROK?

21                   MR. ROSENTHAL:   By "this payment

22       detail," are you referring to the one up on

23       the screen right now?

24                   MR. MAZZOLA:   Not the one up on

25       the screen.



1       BY MR. MAZZOLA:

2       Q.    The data.   The data contained in this one.

3       A.    Approximately 90 days after the month of

4    the invoice.

5       Q.    So sometime in --

6       A.    May.

7       Q.    -- May.   Okay.

8       A.    Presumably.   On or about.

9              Probably after May, because the

10   payments would have -- you know, all the

11   transactions would come after -- or the sending of

12   the payment details would come after the payments

13   were sent.

14      Q.    Okay.   So still talking about payment

15   application and applying of payments.

16             I guess, hypothetically, if CTX U.S. is

17   responsible for the debts of CTX Hong Kong, is it --

18   would it be appropriate and reasonable for Benlida to

19   apply payments from the U.S. operation to the oldest

20   invoices of either U.S. or Hong Kong?

21      A.    If Circuitronix, LLC, is responsible for

22   all the debts of Circuitronix Hong Kong.

23      Q.    Hong Kong.   Um-hmm.

24      A.    Then you could presumably combine the

25   balances.



1    Q.   So it would be reasonable, then, for

2  Benlida to apply payments from U.S. to the oldest of

3  either of their invoices, Hong Kong or U.S.

4    A.   If they're found liable and you disregard

5  the separate corporations, then you could presumably

6  combine all the balances.

7    Q.   Okay.  Have we finished up with that --

8  that spreadsheet.  Right?  The invoices.

9    A.   Yeah.  Do you want them?

10   Q.   Yeah.  So we're just going to assume that

11  they're greater than $100,000 for purposes of today.

12  They are what they are.

13            MR. MAZZOLA:  I can keep these?

14            MR. ROSENTHAL:  No.  That's the

15      marked --

16            MR. LERNER:  Those are the ones

17      that are going to be marked and --

18            MR. MAZZOLA:  Are we getting --

19      but we have a set, though?

20            MR. LERNER:  No.  But it will go

21      to the reporter, and the reporter will send

22      it to us.

23            MR. ROSENTHAL:  Why don't we just

24      keep them for tomorrow here.

25            MR. MAZZOLA:  Yeah.



1              MR. ROSENTHAL:  That's

2      Exhibit 164.

3      BY MR. MAZZOLA:

4      Q.    Did you read Mr. Paulikens' report?

5      A.    Yes.

6      Q.    Do you know Mr. Paulikens independently of

7      this case?

8      A.    This is the first time I have heard of him

9      or his firm.

10              (Pause in proceedings.)

11      BY MR. MAZZOLA:

12      Q.    Where did you work doing internal audits?

13      A.    Cross Country Healthcare.

14      Q.    You did say that.

15      A.    And Ryder Trucking.  Or Ryder Systems is

16      the name, actually.

17      Q.    I'm looking at some initials on one of

18      these invoices.

19              It says JZP.

20      A.    JZP.  Yes.  That is Jasmine Padilla.  She

21      is a trusted assistant.  So she would have done

22      clerical work, adding together of spreadsheets.

23      Work of that nature.

24      Q.    What's Mr. Kukreja's initials?  Do you

25      know?



1        A.      SVK.

2                (Pause in proceedings.)

3        BY MR. MAZZOLA:

4        Q.      Did she put any time on this file, if you

5        know?

6        A.      Absolutely.

7                For a while, the cadence was myself --

8        worked on primarily by myself and Mr. Mukamal.  And

9        then much later on, I can't remember when we were --

10       when Kapila Mukamala was retained officially.  But

11       much later on, she became involved, but I can't

12       remember if that was before or after pencils down.

13       Q.      Oh.  I see her.  She's SVK.

14       A.      I'm sure she has lots of time on there.

15       Q.      There's reference to "meeting at

16       Circuitronix."  Would you have gone to those

17       meetings?

18       A.      Yes.  We previously discussed, and I told

19       you who I met with at Circuitronix.

20       Q.      Um-hmm.  Are you guys allowed to block bill

21       at Citrin Cooperman?

22               It's a lawyer joke.

23       A.      Not really.

24       Q.      And your billing rate went up when you

25       joined Citrin?



1     A.    I think the technical answer is, no.

2     Q.    Oh.

3     A.    My rate technically went down from -- I

4  think it was $500, or almost, to $460.  And then

5  there's an admin fee, which brings it slightly

6  higher.

7     Q.    What's the admin fee?

8     A.    There's a 5 percent admin fee for all

9  technology and everything.

10          We have access to a lot of systems

11 and, you know, resources that we can use.  It

12 depends on the facts and circumstances.

13          MR. ROSENTHAL:  Everyone's a

14    hologram.

15          (Pause in proceedings.)

16    BY MR. MAZZOLA:

17    Q.    So regarding Mr. Paulikens' report, do you

18 have any comments, any points of agreement, any

19 points of disagreement?  I know that's a massive

20 question, so I'll break it down.

21          How about this -- we'll start with

22 this:  Any points of disagreement.

23    A.    Yes.

24    Q.    Do you want to start with them?

25    A.    Yes.  I thought it was odd in the report

1  how we were criticized for excluding ROK from the

2  report.  And in multiple instances, he referred to

3  ROK, but I think he was actually referring to

4  CTX Hong Kong and Benlida.

5              And then we were criticized for

6  excluding the ROK transactions, but he also didn't

7  include those transactions.  So I'm not sure.  That

8  was confusing.

9              And then, additionally, he never

10  identified -- it was a rebuttal report, which was

11  strange because he never identified the basis of why

12  Circuitronix, LLC, would be responsible for

13  Circuitronix Hong Kong, for the debts specifically.

14  He just says, you know, kind of look at all of this.

15              And then it doesn't appear he went

16  very deep into the details or reconciled any of the

17  underlying data.

18              Sitting here, I don't really know what

19  he contends the balance for -- due to Circuitronix

20  Hong Kong is.

21      Q.   One of the things you just said, he never

22  explained why the Hong Kong entity would be

23  responsible for the U.S. -- I beg your pardon -- why

24  the U.S. entity would be responsible for the

25  Hong Kong entity.



1                   But didn't you testify earlier that

2       that -- you believe that to be a legal question?  So

3       why would an accountant opine on that?

4            A.   Well, if he's putting two different

5       companies together, I'd like to know why.  What's

6       the basis?  Does the basis make sense?  Is it

7       logical?

8                   You know, I do not know they -- why it

9       wasn't put in an affirmative report, but ...

10           Q.   Do you think that maybe he was referring to

11      the fact that the Hong Kong entity and the U.S.

12      entity are related entities?

13           A.   I don't want to speak for Mr. Paulikens.

14           Q.   You also said that you were confused that

15      he didn't dig deeper into the data.

16           A.   Correct.

17           Q.   We talked today that -- when you testified

18      to this that, insofar as the lead-time penalties go,

19      you didn't dig into the data because it was too

20      burdensome and would take too much time.  Do you

21      remember saying that?

22           A.   We didn't verify the inputs.  Correct.

23           Q.   Okay.  I think you testified to the same

24      thing with respect to the debit memos.  That you

25      didn't verify the inputs into the debit memos



1   either, because that would have taken too much time.

2       A.   We didn't have enough time.

3       Q.   And it would be overburdensome.

4            Do you think maybe that's why

5   Mr. Paulikens didn't dig into the same data, because

6   it was overburdensome and there wasn't enough time?

7       A.   So we reconciled the data and determined

8   how close the two were.  We requested debit memos to

9   make sure that some of the differences were

10  accounted for.  And we also verified the payments,

11  the bank statements to make sure an amount was

12  dispersed on that date, and identified the

13  differences.

14           And so when I talk about

15  reconciliations, I'm not talking about merely, you

16  know, reprinting, you know, what one side

17  represents, but, you know, a little more kicking the

18  tires and -- you know, this is expert-level work.

19  We're not just, you know, pasting data.

20      Q.   Okay.  But you -- but -- that's right.  It

21  is expert-level work.  Okay?  And it sounds to me

22  like you did a lot of math checking.  Is that

23  correct?

24      A.   We did a lot of math checking; we

25  reconciled to the meeting minutes; we compiled the



1   data; we checked the bank statements.  We did a lot

2   of work.

3        Q.   How many meeting minutes did you look at?

4   There's only one set of meeting minutes.

5        A.   I think there's several.  I believe there

6   is three to five, perhaps.

7        Q.   Okay.  Over a how-many-year relationship?

8        A.   2012 to the present.

9        Q.   Okay.

10       A.   There could be more meeting minutes, but

11   they may not have been relevant to the issues

12   identified.

13       Q.   So you didn't look at them, then.  Right?

14       A.   I did not look at what I was not provided.

15       Q.   So we know you checked the math.  You said

16   you looked at meeting minutes.

17                And the meeting minutes are where?

18   Where would they be?

19       A.   So those would likely be those

20   Bates-stamped documents, BDL 073, BLD 582.  And I'm

21   not sure what that 364 is.  That's definitely one.

22   And there's --

23                MR. ROSENTHAL:  When you say

24        "that's definitely one," you're talking now

25        about --



 1                    THE WITNESS:  Meeting minutes --

 2                    MR. MAZZOLA:  Yes.  BLD ending in

 3      73.

 4      BY MR. MAZZOLA:

 5      Q.   Okay.  You looked at that.  You looked at

 6  BLD ending in 364?

 7      A.   I'm not sure what that one is,

 8  specifically.

 9      Q.   That has meeting minutes attached to it.

10      A.   Oh.  That's the transmittal email -- that's

11  a transmittal email for meeting minutes, yes.  This

12  is one of the main meeting minute transmittal emails

13  between the parties.

14      Q.   That's a page-and-a-quarter document.

15  Right?

16      A.   That's one attachment on the email.

17  There's several.

18                    MR. ROSENTHAL:  To be clear --

19      sorry, JC -- because you're talking about

20      an email that has six attachments.

21                    What you're referring to is the

22      one entitled "Meeting Minutes 2016," 0725.

23      Right?

24                    MR. LERNER:  And just so we're

25      clear, I think it probably has more than



```
 1         six attachments.

 2                  MR. ROSENTHAL:  You're right.

 3                  MR. LERNER:  But probably eight.

 4         BY MR. MAZZOLA:

 5         Q.   And you looked at this BLD 582.  Right?

 6                  This set of meeting minutes.  Right?

 7         A.   Yes.

 8                  MR. MAZZOLA:  Great.  Thank you.

 9                  MR. ROSENTHAL:  You said you're

10         done?

11                  MR. MAZZOLA:  Yes.

12                  MR. ROSENTHAL:  Okay.  We'll

13         read.

14                  (Proceedings concluded at 4:45 p.m.)

15

16

17

18

19

20

21

22

23

24

25
```

```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF FLORIDA

3    JIANGMEN BENLIDA PRINTED    )

4    CIRCUIT CO., LTD.,          )

5         Plaintiff,             )

6    vs.                         ) Civil Action No.

7    CIRCUITRONIX, LLC,          ) 21-601-125-civ

8         Defendant.             )

9                    REPORTER'S CERTIFICATE

10   ORAL DEPOSITION OF MARK PARISI, CPA,CIRA, CFE, CTCE

11                    Monday, July 31, 2023

12            I, Rebecca J. Callow, Registered Merit

13   Reporter, Certified Realtime Reporter, Registered

14   Professional Reporter and Notary Public in and for

15   the State of Florida, hereby certify to the

16   following.

17            That the witness, MARK PARISI, CPA, CIRA,

18   CFE, CTCE, was duly sworn by the officer and that

19   the transcript of the oral deposition is a true

20   record of the testimony given by the witness;

21            That the original deposition was delivered

22   to _____.

23            That a copy of this certificate was served

24   on all parties and/or the witness shown herein on

25   _____.
```

1

2                    I further certify that pursuant to FRCP

3       Rule 30(f)(1) that the signature of the deponent:

4                    [ X ] was requested by the deponent or a

5       party before the completion of the deposition and is

6       to be returned within 30 days from date of receipt

7       of the transcript.  If returned, the attached

8       Changes and Signature Page contains any changes and

9       the reasons therefor;

10                   [    ] was not requested by the deponent or

11      a party before the completion of the deposition.

12                   I further certify that I am neither

13      counsel for, related to, nor employed by any of the

14      parties or attorneys to the action in which this

15      proceeding was taken.  Further, I am not a relative

16      or employee of any attorney of record in this cause,

17      nor am I financially or otherwise interested in the

18      outcome of the action.

19

20

21

22

23

24

25

1

2          SUBSCRIBED AND SWORN TO under my hand and

3   seal of office on this, the 14th day of AUGUST,

4   2023.

5

6

7

8   _____

9   Rebecca J. Callow, RMR, CRR, RPR

10   Notary Public, Miami, Florida

11   My Commission No. HH 409626

12   Expires:  06/12/2027

13

14

15

16

17

18

19

20

21

22

23

24

25