UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-60125-CIV-Scola/Goodman

---

JIANGMEN BENLIDA PRINTED
CIRCUIT CO., LTD.,

        Plaintiff,

v.

CIRCUITRONIX, LLC,

        Defendant.

---

**Plaintiff Jiangmen Benlida Printed Circuit Co., Ltd.'s Reply to CTX-US's Opposition to its Motion *in Limine* (a) to Preclude Expert on Chinese Law and Testimony Related Thereto; and (b) to Preclude Testimony Regarding Trade-Credit Insurance**

 

**MAZZOLA LINDSTROM LLP**
Jean-Claude Mazzola
Richard E. Lerner
*Counsel for Jiangmen Benlida Printed Circuit Co., Ltd.*
1350 Avenue of the Americas, Second Floor
New York, New York 10019
646.216.8300
jeanclaude@mazzolalindstrom.com
richard@mazzolalindstrom.com

August 29, 2023

Plaintiff Benlida, by and through its undersigned counsel and pursuant to the applicable Federal Rules of Evidence, submits this memorandum in reply to its motion *in limine*, which seeks, *inter alia*, to preclude testimony of Professor Wei Cui and related testimony regarding regulations about taxes, import-expert and trade credit, and testimony regarding insurance. For consistency with the papers submitted in opposition to Circuitronix's motions *in limine*, we will refer herein to the defendant as CTX-US, and its Hong Kong affiliate Circuitronix (Hong Kong) Ltd. as CTX-HK. The third amended complaint will be referred to as the TAC. We again apologize in advance for unavoidably repeating some of the prior arguments herein.

### Argument

**Point I: The Answers to the Questions (a) Whether Benlida is Owed Money, (b) How Much, and (c) Whether CTX-US is Entitled to an Offset Do Not Require any Analysis of Motive or the Business Milieu.**

We begin again with the *If/Then* example set forth in our prior papers. CTX-US's position in this litigation is illustrated by the following:

*If:* (a) CTX-US orders $10,000,000 in goods from Benlida, and
(b) CTX-HK also orders $10,000,000 in goods from Benlida, and
(c) CTX-US sends a wire payment of $15,000,000 to Benlida,

*Then:* (d) CTX-US now has a credit balance with Benlida of $5,000,000, and CTX-HK still owes Benlida $10,000,000, and
(e) Benlida should look to CTX-HK for $10,000,000, and Benlida should give back to CTX-US the $5,000,000 on its counterclaim.

In opposition to the motion to preclude the testimony of Professor Wei Cui, CTX-US argues that his opinions and lay testimony germane thereto would "provide[] a valuable backdrop for a jury to understand Benlida's conduct towards CTX through the course of the parties' business relationship." (See DE 202, pdf. p.2). However, behavior and milieu have no bearing whatsoever on the questions of who owes whom what. On one side of the equation is Benlida and its now defunct affiliate ROK. On the other side is CTX-US and CTX-HK. Assume that Benlida and its affiliate ROK invoiced, collectively, $20 million to CTX-US and CTX-HK, as per the above hypothetical, but that each issued invoices to CTX-US and CTX-HK, as follows:

| Invoiced By: | Amount: | Invoiced To: |
|---|---|---|
| Benlida | $5 million | CTX-US |
| Benlida | $5 million | CTX-HK |
| ROK | $5 million | CTX-US |
| ROK | $5 million | CTX-HK |
| Total | $20 million | |

Assume further that CTX-US wires $15 million to ROK. Now then, who owes what to whom?

1

Benlida's position is that CTX-US and CTX-HK remain jointly and severally liable to pay the remaining $5 million (for the reasons stated in its prior memoranda, both in opposition to the motion for summary judgment and in opposition to CTX-US's motions in limine). CTX-US's position is that it has made an overpayment to ROK for $10 million because ROK had only invoiced it $5 million, while CTX-US actually paid $15 million.

Regardless who is correct, however, motive and the business background can shed no light whatsoever on this issue. Benlida acknowledges that moneys paid by either CTX-US or CTX-HK reduce the overall A/R of Benlida and ROK. Even if CTX-US were to dispute this, however, questions of motive and the business background would aid no one – neither the Court nor the jury – in determining whether such payments reduce the overall debt, or just reduce the amounts owed to ROK. Nor would such testimony aid the Court or jury in determining whether CTX-US and CTX-HK are jointly and severally liable for the entire remaining A/R, nor even whether CTX-US is entitled to get back $10 million from ROK, or, for that matter, Benlida. Any allegedly improper motive could not possibly alter the amount that is actually owed, nor could the "background" shed light on how much is owed.

The owner of a plumbing company might, for example, ask a customer to pay off a $10,000 bill by sending the money as a tuition payment to his daughter's school. When the payment is made, it immediately discharges the debt, regardless of the plumber's motive in asking that the money be paid to the school. Both customer and owner may well be guilty of tax fraud, but that is a collateral matter that has no bearing whatsoever on whether the customer still owed money to the company.

CTX-US argues that Professor Cui's testimony would "help[] make sense of why Benlida might have occasionally requested that CTX direct payments that it owed to Benlida to Benlida's affiliate [ROK]" and would "help[] to explain Benlida's behavior." (DE 202, pdf. p.1). CTX-US argues that this would explain Benlida's failure to credit CTX for payments that CTX-US made to ROK. Benlida will prove, however, that any such moneys paid to ROK did in fact reduce the total outstanding A/R, as to which CTX-US was jointly and severally liable, both because CTX-HK acted as CTX-US's agent with respect to such purchases and because CTX-HK and CTX-US became co-signers to the 2012 Manufacturing Agreement, by execution of the 2016 Letter Agreement.

The terrorism cases cited by CTX-US have no bearing whatsoever on what is, here, nothing more than a bookkeeping dispute. In *United States v. Ali*, 799 F.3d 1008 (8th Cir. 2015), the

defendant was convicted of sending money to the al Shabaab terrorist group. To prove *mens rea*, an expert was permitted to testify about the connections between al Shabaab and al Qaeda: (*Id*. at 1028)

> [Expert witness] Bryden's testimony also had substantial probative value. As we explained in *Omar*, a description of the connections between al Shabaab and al Qaeda 'helped to establish the open and notorious nature of al Shabaab's activities,' a fact that is relevant for establishing the mens rea necessary for a material-support conviction under 18 U.S.C. § 2339B. 786 F.3d at 1112-13. Moreover, much of Bryden's testimony about al Qaeda related to an exchange of statements between Osama bin Laden and al Shabaab. This testimony was probative because the Government admitted a telephone call between Ali and Afgoye in which the two discussed al Shabaab's response to Osama bin Laden's message. Bryden's testimony therefore added helpful context for the trier of fact. For these reasons, we find no abuse of discretion in permitting Bryden's limited testimony about the ties between al Shabaab and al Qaeda.

Likewise, CTX-US cites *United States v. Young*, 916 F.3d 368, 379-381 (4th Cir. 2019), for the proposition that expert testimony is admissible to give historical context to Islamism's and Nazism's historical connections, and to establish the defendant's predisposition, and thus would aid the jury in assessing the defendant's entrapment defense:

> At trial, the Government called Dr. Daveed Gartenstein-Ross as an expert witness regarding (1) violent extremist movements claiming inspiration from Islam; (2) white separatists and the neo-Nazi movement; (3) the radicalization processes for such groups; and (4) the Libyan Civil War. Dr. Gartenstein-Ross also explained points of overlap between Nazism and radical Islamism with examples of individuals who had subscribed to both philosophies. Expert testimony is admissible under Federal Rule of Evidence 702 if it involves specialized knowledge that will assist the trier of fact in understanding the evidence or determining a fact in issue, and is both reliable and relevant. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-92, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)….
>
> ***
>
> As to relevance, we conclude the testimony was relevant and met Rule 702's requirement that the expert's specialized knowledge "help the trier of fact . . . understand the evidence or to determine a fact in issue." Dr. Gartenstein-Ross' testimony assisted the jury by providing context for the historical backgrounds of and connection between Nazism and militant Islamism. As the "evidence in this case was complicated, touching by necessity on a wide variety of ideas, terms, people, and organizations connected to radical Islam," as well as white supremacism, the district court fairly concluded that the testimony would assist the jury in understanding [**20] evidence regarding predisposition. *United States v. Benkahla*, 530 F.3d 300, 309 (4th Cir. 2008). For these reasons, we conclude the district court did not abuse its discretion in admitting Dr. Gartenstein-Ross' testimony.

In the case at bar, there is no *mens rea* issue: Whether Benlida could properly apply moneys received from CTX-US or CTX-HK to reduce each other's A/R does not depend on anyone's state of mind, but instead upon (a) whether FIFO attribution of the payments is proper, where there is no

3

designation "at the time of payment" of a particular invoice to which payment should be attributed,[1] and (b) whether CTX-US is liable for orders placed by CTX-HK, whether by virtue of principal-agent law or as co-signers.[2] While CTX-US suggests that such testimony is relevant for the jury to understand Benlida's motives (DE 202, at pdf. pp. 8-12), it is noteworthy that in the *U.S. v. Young* case relied upon by CTX-US, the Fourth Circuit deemed the motives of the FBI agents to be irrelevant, and thus testimony regarding their motives was properly barred: (*id.* at 382)

> [T]he district court barred the introduction of June 2016 messages between FBI agents reflecting their frustration with the slow pace of the investigation, which Young argued went to their motives and consequently the issue of entrapment. The district court properly concluded that the agents' motives were "irrelevant" to entrapment because whether or not Young was induced had to be assessed by "what specifically was presented to [Young]" by the agents rather than what the agents discussed amongst themselves.

CTX-US has failed to articulate what element of any cause of action, defense or counterclaim that has been pled could be established or rebutted through expert or lay testimony regarding the tax, customs and trade-credit laws, regulations or requirements in China. The question whether "Benlida 'failed to properly credit' payments or 'made demands for prepayments, advance payments, and payment premiums'" (DE 202 at pdf. p. 5) cannot be illuminated (contrary to CTX-US's argument) by testimony about Chinese regulations, because this case is governed by Florida law, which holds that FIFO attribution is proper when instructions as to how the debtor wishes the payments to be attributed are not provided at the time of payment (per *Randall v. Pettes*, 12 Fla. 517 1868 Fla. LEXIS 20 (Fl. Sup. Ct. 1868)). Chinese tax, customs and trade-credit laws, regulations and

---

[1] See *Randall v. Pettes*, 12 Fla. 517, 534, 1868 Fla. LEXIS 20, at **26 (Fl. Sup. Ct. 1868), previously cited in opposition to CTX-US's motion for summary judgment.

[2] See, *e.g.*, the case law previously cited in opposition to CTX-US's motion *in limine* to preclude Benlida's expert Randall Paulikens – *viz.*, *Trinity Universal Ins. Co. v. Drake*, 587 S.W.2d 458, 465 (Tex. Civ. App., Dallas 1979), aff'd in part, rev'd in part on other grounds ("Generally, joint and several liability arises when two or more persons jointly engage in the commission of a tort or co-sign a note or contract." (Emphasis added)); *Thomas v. Capital Medical Management Associates, LLC*, 189 Md. App. 439, 985 A.2d 51 (Md.App. 2009) see also *In re Hall*, 2019 Bankr. LEXIS 4062, at *7 (Bankr. M.D. Fla. 2019) ("[W]hen Ms. Daley agreed to co-sign the loan, she assumed the full legal obligation to pay it. It is a common risk that co-signors must pay co-signed loans when the other party files bankruptcy."); and *Southeastern Bank v. Brown*, 266 B.R. 900, 907 (S.D. Ga. 2001) ("Before giving the loan to the debtor, the creditor secured the promise of the cosigner that if for some reason the debtor could not pay, the cosigner would be liable on the debt. As a result, the creditor protected itself through contract from the very problem that has arisen here, the debtor's inability to pay his or her debts."); *WBDH-BC Holdings Ltd. v. Varsatel Corp.*, 2022 U.S. Dist. LEXIS 154726, at *29 (S.D. Fla. 2022) (citing *Brackin Tie, Lumber & Chip Co. v. McLarty Farms, Inc.*, 704 F.2d 585, 586 (11th Cir. 1983)).

requirements do not bear on whether Benlida did or did not properly credit payments. As for whether it was proper for Benlida to demand pre-payment from a customer that was millions of dollars in arrears, there is again no showing how Chinese tax, customs, or trade-credit laws, regulations or requirements would illuminate this issue.

Whether or not ROK was put on a blacklist with the Chinese tax department, and CTX-US was asked to, and did, make payment to ROK to help clear up the problem has no bearing on whether the money paid by CTX-US was actually owed and whether, upon payment, the CTX-US / CTX-HK arrearage was thereby reduced. If, as CTX-US claims, the payments were not properly credited, well, math doesn't care about motives. It's a matter of simple arithmetic to correct the math. Just move the payment from one column to the other. But then, since CTX-US is responsible for the debts of CTX-HK, under principal-agent law or as co-signer, CTX-US will have to pay the money, regardless which column the debt falls into.

CTX-US maintains that testimony and expert opinion regarding Benlida's regulatory obligations is proper because it would have bearing upon the "general credibility" of Benlida as a "corporate party," which is not barred. (DE 202, pdf p. 9). CTX-US distinguishes between the credibility of a testifying witness and a corporate entity, and argues that it is only when the *sole* reason for introducing such evidence is to attack or support a testifying witness's character for truthfulness, while such evidence could be introduced to address issues of bias or credibility. (*Id.*) This argument, however, puts the cart before the horse. CTX-US argues that while evidence presented to demonstrate bias is permitted by Rule 608(b), evidence offered to show lack of veracity is prohibited. The question that CTX-US does not attempt to explain is, How would the regulatory framework show Benlida's bias? Nor does CTX-US show how such testimony would contradict any material fact to which Benlida's witnesses might testify.

As previously explained, Benlida's case in chief will be quite simple, along the lines of: *Q*. How much did CTX-US and CTX-HK order from Benlida? *Q*. How much was paid? *Q*. How much is owed? As for the affirmative defenses and counterclaims, CTX-US will argue that it overpaid and does not owe money for orders placed by CTX-HK. Not one single material fact could be contradicted, nor a single sentence of testimony be shown, to have been biased because of Chinese regulations and laws regarding taxes, customs or trade-credit reporting obligations. Before such testimony would be permissible, the laws and regulations of China would have to be germane to some issue in the case, as even the case relied upon by CTX-US makes clear – *U.S. v. Young*, supra

5

(the agents' motives were "irrelevant"). Here, it is irrelevant what motivated Benlida to ask that CTX-US make payments of moneys owed to ROK. All that matters is whether it was paid, and whether it was properly accounted for. And given that CTX-US's own expert acknowledged the 99% congruence between CTX-US's and Benlida's books,[3] it is unfathomable that bias could be shown, as math simply doesn't have a bias.

Of course, regulatory obligations "do bear on [Benlida's] bookkeeping practices and payment requests" (DE 202, pdf p. 11), but that does not make regulatory obligations probative of whether CTX-US does or does not owe Benlida money. CTX-US argues that such testimony will be "relevant to [its] claimed damages for monies owed to Benlida but paid to ROK at Benlida's direction … and [will] provide jurors with a fuller picture of [its] affirmative defenses based on the same ROK payments and claims that Benlida did not properly credit CTX payments made to it." (DE 202, pdf p. 12). Yet CTX-US fails to explain how such testimony could enlighten the jury.

Whether or not the money paid by CTX-US reduced the overall A/R, and whether or not FIFO bookkeeping is proper under *Randall v. Pettes*, supra, the Chinese tax, customs and trade-credit reporting rules will change nothing. Here, motive is irrelevant. See *SEB S.A. v. Sunbeam Corp.*, 148 F. App'x 774, 790 (11th Cir. 2005) ("A party's motive is irrelevant to a breach of contract claim under Florida law."), in contrast to the criminal cases cited by CTX-US. Having pro-Isis sympathies, per the *U.S. v. Springer*[4] case cited by CTX-US or pro-Hitler views, per the *U.S. v. Lehder-Rivas*[5] case that it also cited, were relevant to the defendants' criminal *mens rea* and to proving the nature and scope of a criminal enterprise. But as motive is irrelevant to breach-of-contract claims in this lawsuit, the Chinese regulations, and how they may have influenced the bookkeeping practices are inadmissible.

**Point II: CTX-US has Failed to Show that Testimony and Other Evidence Regarding Benlida's Trade-Credit Insurance Will Enlighten the Jury.**

CTX-US argues that it is not seeking to reduce the amounts it owes Benlida by the amounts paid by Sinosure to Benlida, and that the collateral-source rule is therefore inapplicable. (DE 202, pdf p. 18). But this acknowledgement demonstrates why the introduction of testimony regarding trade-credit insurance will only confuse the jury. Presumably because it wishes to argue that non-

---

[3] CTX-US's expert Barry Mukamal acknowledges that there is 99% agreement between the parties as to the amounts at issue. (See DE 203-1; Mukamal Dep., pp. 86, 88-89).
[4] *United States v. Springer*, 753 F. App'x 821 (11th Cir. 2018).
[5] *United States v. Lehder-Rivas*, 955 F.2d 1510 (11th Cir. 1992).

reporting of past-due accounts means that the money claimed by Benlida in this lawsuit was not actually due, CTX-US argues that Benlida had an obligation to report delinquent accounts to Sinosure. (DE 202, pdf p. 14). However, this is a non-sequitur, just as not reporting a collision to one's auto-insurer does not mean that an accident did not occur. Again, if money is owed to Benlida, it is owed regardless whether Benlida reported the debt to Sinosure. Benlida's contractual reporting obligations to Sinosure will not provide a whit of guidance to the jury in this case; rather, it could only confuse them, leaving them to speculate whether Benlida could be recovering twice.

CTX-US misconstrues the testimony regarding the "premiums" that it was required to pay after its credit was cut off, and was required to pre-pay for goods purchased from Benlida. CTX-US calls them "insurance premiums." To the contrary, however, CTX-US was simply required to initially pay an additional 10%, later reduced to 3%, which was added on to current orders, in order to pay down the past due debts. These pay-downs of past debts are what the parties referred to as "premiums." They are not "insurance premiums." These "premiums" were remitted to Sinosure when paid, to reimburse Sinosure for the money paid by Sinosure to Benlida under the trade-credit insurance policy. Ms. Huang explained in her deposition, excerpts of which were attached to CTX-US's opposition papers. (DE 202-3)

> Q. Okay. So now since prepayment commenced, the premiums added on to the purchases, what are the premiums added on to the purchase, for the prepayment purchases?
> A. Premiums means that after we apply a complaint in Sinosure. And then after Sinosure, how to say -- after Sinosure, finish the process of our complaint and then they -- Sinosure requests Benlida to add the premium in the future transaction because they need premium to cover some debt. So that's why at that time we request Circuitronix to do the prepayment and also premium.
> Q. And did Circuitronix agree to make a prepayment with a premium at that point in time?
> A. Yes.
> Q. Okay. And the premium is -- it is ten percent more?
> A. Sometime -- it means during some periods of time, I cannot remember the exact month, it was ten percent. And then we cut down to 3 percent because we talked to Sinosure and apply to their approval to agree to 3 percent.
> Q. Okay. So that's the premium you are talking about?
> A. Yes.
> Q. And so since that prepayment time started, that was when, sometime in 2019?
> A. I think September -- June -- no, April or May 2019 I think. I cannot remember exact month. (Huang Dep. pp. 37-38).

CTX-US's excerpts from the Huang deposition omitted the next questions and answers. Accordingly, we attach hereto the complete transcript. The testimony continues as follows:

7

> Q. … Whenever that was -- … [¶] -- you are saying in this answer that the premiums have been applied to pay down past debt on a FIFO basis?
> A. Yes. (Ex. A, pp. 38-39).

CTX-US appears to not understand how trade-credit insurance works. Assume, for sake of analysis, that Sinosure paid Benlida $1 million on the trade-credit insurance claim because CTX-US and CTX-HK defaulted on their payment obligations. If Benlida sues to recover moneys owed, and does recover, it must reimburse Sinosure for the moneys it paid to Benlida. The "premiums" paid by CTX-US, which it says now total $317,539 (DE 202, pdf. p. 15), would be returned to Sinosure, thereby reducing the $1 million paid by Sinosure to $682,461. If Benlida recovers damages of $13 million from CTX-US in this case, then the balance of $682,461 will be paid to Sinosure, and Benlida will keep the rest. This was explained on the record during Ms. Huang's deposition:

> Q. Take a look at that and just let me know is there anything in there that reflects that during that meeting you mentioned the possibility of looking to Sinosure to make the -- part of the problem go away, the financial problem?
> MR. LERNER: Objection.
> BY MR. ROSENTHAL:
> Q. And by that I mean the financial dispute between the parties.
> MR. LERNER: Objection.
> MR. ROSENTHAL: What is the basis of the objection?
> MR. LERNER: It doesn't make the problem go away by reporting it to Sinosure. The money continues to be owed and collectible by Sinosure. If Benlida pursues the claim here, they're obligated to indemnify Sinosure. The problem doesn't go away. It just gets delayed.
> MR. ROSENTHAL: You said if Sinosure elects to pursue the claim.
> MR. LERNER: … -- if Benlida pursues the claim here as they are, they're … obligated to pay back Sinosure. So it doesn't resolve any problem.
> MR. ROSENTHAL: Right. (Ex. A, pp. 274-275)

Moreover, as Wu "Roger" Yukun testified, CTX-HK's and CTX-US's debts were only insured up to the credit limit allowed by Sinosure. Thus, if the credit limit is, for example, only $1 million, then Benlida could only put in a claim for a default of up to that amount. Any debt above that amount was not covered by insurance. (See 202-4, pp. 197-198). It is 100% certain that such testimony would confuse the jury and require an inordinate amount of wasted time to explain the Sinosure insurance policy and how trade-credit insurance works. Benlida would also have to explain that making a claim with Sinosure for less than the full amount owed by CTX-US or CTX-HK does not constitute an admission that CTX-US actually owes less than has been claimed in this lawsuit.

Citing *Green Const.*,[6] CTX-US argues that evidence of insurance is admissible here because the insurance is not liability insurance (see DE 202, pdf p. 16). But CTX-US left out the analysis:

> While evidence of the existence of liability insurance is not admissible as tending to prove negligence or other wrongdoing, it may be admissible for other purposes, where the fact of insurance has arguably an independent, substantive evidentiary relevance. …
>
> [¶] [T]he contract at issue here involves an allocation of risk between the parties. Thus, the specific risks which each party contracted to undertake are relevant to a breach of contract action arising out of the parties' agreement. Thus, this court's denial of KPL's motion *in limine* to exclude all reference to a material provision of the parties' contract, *i.e.*, the contractual clause which provided that KPL was to maintain an "all-risk" insurance policy, was not erroneous as the contractual provision had potentially independent relevance as a material provision of the contract in dispute. This independent relevance is highlighted by the fact that prior to the trial, the mechanism for failure of the dam had not been determined. Thus, there was more than a slight possibility that such loss would be covered by an "all-risk" insurance policy. (See 759 F. Supp. at 743-744).

CTX-US also cites *Herrera v. 7R Charter Ltd.*[7] for the proposition that information regarding insurance is admissible to show Benlida's relationship with Sinosure. (DE 202, pdf pp. 16-17). CTX-US's reliance on the *Herrera* case, however, is misplaced, as the following excerpt demonstrates:

> While Defendant claims it had no control over the tender because it was owned by Calot, the insurance policy for the OLGA lists the Protector as an 'Additional Watercraft' from January 2015 until the OLGA was eventually sold. *Id.* Therefore, Plaintiff does not seek to introduce the insurance policy for the purpose of proving Defendant's Captain acted negligently, but rather to rebut Defendant's denial of control. *Id.* at 8. Plaintiff states that although Defendant argues control is not an issue because Calot selected the insurance company and insured the vessel, the control at issue concerns the instrumentality, in this case the Protector, not the actual insurance policy. *Id.* at 7.
>
> Given that this is a bench trial, the Court does not find it necessary to exclude all mention of insurance *per se*. To the extent that information regarding insurance bears on whether the Protector was a tender of the Olga, Plaintiff may seek to introduce that evidence at that time. Of course, whether the Court ultimately allows it at trial will depend on the Rules of Evidence, but the Court here, in a Motion *in Limine*, declines to strike all references to insurance given that there may be some relevance to the facts at issue. The Court, at this juncture, cannot determine whether the testimony of the broker would be necessary to exclude if the information regarding insurance is limited to those that might bear on the facts at issue, and therefore, his testimony is not stricken at this time. As such, the Motion as to this issue is DENIED WITHOUT PREJUDICE, such that the admissibility of insurance can be determined in light of the evidence at trial.

---

[6] *Green Const. v. Kansas Power and Light*, 759 F. Supp. 740 (D. Kan. 1991), *aff'd* 1 F.3d 1005 (10th Cir. 1993)

[7] See S.D. Fla. Docket No. 1:16-cv-24031-KMW (DE 186, Oct. 23, 2020), at p.26.

In the case at bar, the maintenance of trade-credit insurance is of no relevance to the contractual relationship between CTX-US and Benlida. There is no shifting of risk of non-payment from CTX-US to Sinosure; by purchasing trade-credit insurance, Benlida did not relieve CTX-US of the obligation to pay its bills. CTX-US argues testimony regarding the Sinosure coverage could be introduced to rebut Benlida's claim of damages. It seems that CTX-US is arguing that Benlida may not double-dip, so to speak. Benlida, of course, acknowledges that it cannot. But because Benlida has an obligation to reimburse Sinosure for any money recovered from CTX-US, to the extent of such payments by Sinosure – and because Benlida has included the "premiums" that Benlida has charged CTX-US for current orders, and reduced the amounts claimed in this lawsuit accordingly – there is no possibility of double dipping and the issue is moot.

CTX-US has failed to articulate any element of any cause of action, affirmative defense or counterclaim that could be proved through the introduction of testimony regarding Benlida's trade-credit insurance policy with Sinosure, or testimony related thereto. Benlida, however, has demonstrated that such testimony could not possibly be relevant to any issue, and that it will both confuse the jury and prejudice Benlida by introducing irrelevant questions as to why Benlida did or did not submit claims to Sinosure based upon CTX-US's and CTX-HK's debts, and leave the jury with the mistaken impression that Benlida was only damaged to the extent of the claims made to Sinosure, and that it was not damaged to the extent it received reimbursement from Sinosure. We would then have to introduce testimony to the jury to explain how trade-credit insurance works and explain that some of the moneys recovered in this action will have to be reimbursed to Sinsoure. Moreover, the jurors may be predisposed to dislike insurance companies, and may erroneously infer that Sinosure is driving this bus, so to speak, seeking to recover moneys that it paid out on a claim, and they could give the U.S.-based company the benefit of the doubt over a Chinese insurer. The prejudice is palpable and for that reason, in addition to the further reasons set forth above, such testimony should be excluded.

## Conclusion

Wherefore, it is respectfully submitted that the Court should issue an order, in sum and substance in the form submitted herewith as exhibit "B," precluding defendant Circuitronix from questioning Benlida witnesses about compliance *vel non* with Chinese regulatory law, and from introducing Professor Wei Cui to testify at trial regarding such matters, and from introducing testimony or documentation regarding trade-credit insurance.

10

Dated: New York, New York
       August 29, 2023

**Mazzola Lindstrom LLP**

*By:*
Jean-Claude Mazzola
Richard E. Lerner
*Counsel for Jiangmen Benlida Printed Circuit Co., Ltd.*
1350 Avenue of the Americas, Second Floor
New York, New York 10019
Tel.: (646) 216-8300
jeanclaude@mazzolalindstrom.com
richard@mazzolalindstrom.com

11