UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-60125-CIV-SCOLA/GOODMAN

JIANGMEN BENLIDA PRINTED
CIRCUIT CO., LTD.,

Plaintiff,

v.

CIRCUITRONIX, LLC,

Defendant.
_____/

*Benlida's Statement of Issues of Law Which Remain to Be Decided by the Court*

Counter-Defendant Jiangmen Benlida Printed Circuit Co., Ltd. hereby submits its statement of issues of law that remain with respect to its defense against Circuitronix's counterclaim.

VIII. **CONCISE STATEMENT OF ISSUES OF LAW WHICH REMAIN FOR DETERMINATION BY THE COURT**

Benlida contends that the legal issue remains as to whether FIFO attribution of payments made by CTX-US and by CTX-HK were properly applied to the earliest invoices with respect to the PCBs that were the subject of the invoices that were ordered by CTX-US or by CTX-HK, because all orders were for CTX-US's exclusive customers. Benlida contends that there is no statute of limitations bar on applying payments to the oldest invoices, because: (a) When a debtor makes a payment to a creditor without designating "at the time of payment" on the check itself or including within the wire-transfer instruction itself the invoice to which the payment should be applied, the creditor may apply the payment to the earliest invoices. See, e.g., *Randall v. Pettes*, 12 Fla. 517, 534, 1868 Fla. LEXIS 20, at **26 (Fl. Sup. Ct. 1868). And (b) The law is clear that the expiration of the period of time prescribed by a statute of limitations does not extinguish the debt itself but only precludes the bringing of legal action to collect that debt. See, e.g., *Henry v. Halifax Hospital Dist.*, 368 So. 2d 432, 433 (Fla. Dist. Ct. App., 1st Dist. 1979).

Because the contract is governed by Florida law, and CTX – a sophisticated party – is presumed to know Florida law, and Benlida thus contends that CTX was aware that Benlida had the

1

right to apply payments made to it to whichever invoice it wished, if CTX did not designate at the time of payment (or even within a reasonable time thereafter) which particular invoices were to be marked off, so to speak.

Benlida further contends that under Florida's Uniform Commercial Code, because the 2012 Manufacturing Agreement provides that Florida law shall apply to this action, the agreement thereby brought within the contract §671.103, which provides that the principal-agency law and the law merchant is "supplementary" to any contract governed by Florida law, and thereby put CTX on notice that principal-agency law applies, specifically the law that under the contract itself, CTX-US was responsible for orders placed by CTX-HK for CTX-US's exclusive customers, as such law was incorporated into the contract itself by operation of the statute:

> **671.103  Supplementary general principles of law applicable.**—Unless displaced by the particular provisions of this code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

The law merchant, which is incorporated into the 2012 Manufacturing Agreement, needs some explication. Needless to say, no one enters into multi-million dollar sales contracts for the purchase and sale of sophisticated electronics without themselves being sophisticated businessmen. Only merchants do, and there would (should) be no dispute that both parties are and throughout have been merchants, at least under Florida law, which Belinda will argue controls, largely because the parties agreed that it did but also because of the principles, under international law, of *lex loci*.

Inportantly, while aspects of Florida law can be traced back to 4th Millennium BC Iraq, for the most part this case will concern 20th and 21st Century aspects. And while this is a contracts case, of course, the law of contracts that will apply overall, as Belinda will establish, is the Uniform Commercial Code, which, fortunately, does not vary much as Florida enacted it from the standard version that the people who provide documents for uniform state laws would have. That means the standard texts will probably provide secondary authority, as well as foreign state case law, because the legal doctrines are (by definition) meant to be the same, and again Belinda will argue that the importation of such concepts where Florida law is silent will be in this diversity case controlled by Florida's law of conflicts (which is also true by venue considerations).

If we may be permitted, UCC expresses the modern (it dates from the 1960s, and replaced the earlier, 1920s version, called variously the Unfiorm Sales Act). And all one needs to know to grasp all that follows is the story told in law schools back in the day when it was new:

Grocery chain in New York sells fish it buys from suppliers including one in Seattle. The Seattle fellow sends telegram, in sum, "Advising we have 5,000 cases wall-eyed pike FOB Seattle $7." The NYC fellow replied, "Great, send 7000 cases of the clear-eyed pike CIF NYC $6." Back comes, "Thanks for the order, have shipped 2000 cases of Haddock CAS $8." Subsequently, 2500 cases of salmon arrive.

Back in the day, this would trigger a "battle of the forms," each side arguing that their standard contract language each agreed to 20 years ago but never really understood, as was also likely true of their lawyers, controls any dispute, and what the contract terms really are.

Today it's all electronic and instaneous, but the concepts have not changed.

The purpose of UCC is no different than the purpose of the law merchant as it was first used in 3300 BC when some caravan got to Egypt from Lebanon carrying the wrong cedar. No one could wait seven years for messages to be explained, so merchants developed the confidence that the disputes would be enforced in local courts, where they would be represented by local agents they had never met, and that they would know that whatever the destination, the laws would be reasonable, often known, and fair.

More recently, this was essential to the spread of Western society by seafaring merchant trade, so that the ports in England would not be clogged with ships waiting years for resolution of disputes about delivery.

In all these cases, through and including this one, the primary function of the law merchant, of which we may fairly say that UCC is just its current flavor, is that of a "gap-filler" and "dispute resolver."

What this means is that just as sophisticated parties are presumed to know the difference in PCB manufacturing processes, they are presumed to know the law merchant and importantly the contract terms that UCC will supply even to the extent, as Belinda will show is present in this case, that the parties' course of conduct, even if entirely *sub silentio*, has created them or supplied them, even if it overrides their written contracts (after all, someone has to decide what to do when they start – and they all do – ignoring the written terms).

Furthermore, under §671.209, CTX had notice that FIFO rules apply, and that Benlida was within its rights in applying the payments as it deemed fit, with respect to any invoices issued with respect to orders placed for CTX-US's exclusive customers, whether the orders were placed by CTX-US itself, or were placed by CTX-HK. See Florida UCC § 671.209.

Furthermore, Benlida contends that the course of dealing between the parties will demonstrate that Benlida had the right to apply payments to the oldest invoices, whether they were the invoices attributable to orders placed by CTX-US or orders placed by CTX-HK, as all orders were placed for CTX-US's exclusive customers, thus implicating §671.203 of Florida's UCC.

Benlida will further contend that the course of performance will be necessary for the jury to consider, thus implicating § 672.208 (Course of performance or practical construction) of Florida's UCC.

With regard to CTX's claim for lead-time penalties, § 672.306 is implicated, as Benlida contends that CTX placed orders far in excess of Benlida's agreed-upon capacity.

***

Benlida reserves its rights to raise any and all other legal issues that may become apparent during the trial of this case.

Dated:   New York, New York
         September 29, 2023                    **Mazzola Lindstrom LLP**

                                               _____
                                               Richard E. Lerner

                                               */s/ Jean-Claude Mazzola*
                                               Jean-Claude Mazzola
                                               Counsel for Jiangmen Benlida Printed
                                               Circuit Co., Ltd.
                                               1350 Avenue of the Americas, Second Floor
                                               New York, New York 10019
                                               Tel.: (646) 216-8300
                                               richard@mazzolalindstrom.com
                                               jeanclaude@mazzolalindstrom.com

                                               *Counsel for Jiangmen Benlida*
                                               *Printed Circuit Co., Ltd.*

**Service via ECF**