1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2
                CASE NO. 21-60125-CIV-SCOLA/GOODMAN
3

4

5    JIANGMEN BENLIDA PRINTED
     CIRCUIT CO., LTD.,
6
             Plaintiff,
7
        vs.
8
     CIRCUITRONIX, LLC,
9
             Defendant.
10   _____/

11

12

13

14                  TRANSCRIPT OF PROCEEDINGS
                    DEPOSITION OF RISHI KUKREJA
15

16

17                 Thursday, June 1, 2023
             One Southeast Third Avenue, Suite 2300
18                 Miami, Florida  33131
                   9:22 a.m. - 7:03 p.m.
19

20

21

22             Stenographically Reported By:
                    LAUREL A. MAZUR
23             Florida Professional Reporter

24

25

```
 1    APPEARANCES:

 2

           On behalf of the Plaintiff:
 3
                MAZZOLA LINDSTROM, LLP
 4              1350 Avenue of the Americas, 2nd Floor
                New York, New York  10019
 5              BY: RICHARD LERNER, ESQ.
                richard@mazzolalindstrom.com
 6              BY: JEAN-CLAUDE MAZZOLA, ESQ.
                jeanclaude@mazzolalindstrom.com
 7

 8              GABLES ESTATES TAX & ADVISORY SERVICES
                396 Alhambra Circle, Suite 200
 9              Miami, Florida 33134
                BY: XIAOMING "ANGELA" GUAN, ESQ.
10              aguan@gecpas.com

11

12         On behalf of the Defendant:

13              PODHURST ORSECK, P.A.
                SunTrust International Center
14              One Southeast Third Avenue, Suite 2300
                Miami, Florida  33131
15              BY: STEPHEN F. ROSENTHAL, ESQ.
                srosenthal@podhurst.com
16              BY: CHRISTINA H. MARTINEZ
                cmartinez@podhurst.com
17

18

           Also Present:
19
                HUANG SULAN
20

21

22

23

24

25
```

```
 1                    I N D E X

 2            DIRECT  CROSS  REDIRECT  RECROSS

 3  By Mr. Mazzola        5

 4

 5                 DEPOSITION EXHIBITS

 6  NUMBER    DESCRIPTION                          PAGE

 7  No. 114   Answers to Interrogatories            79

 8  No. 115   E-mails 5/21/19 - 5/22/19             96
              CTX 12181-12182
 9
    No. 116   CTX Payment Detail 10/1/1            112
10            CTX 259556

11  No. 117   E-mail 7/29/16                       116
              Attachments: Various
12            CTX 1015-1016

13  No. 118   E-mail 7/10/16                       118
              CTX 1017
14
    No. 119   E-mail 6/8/16                        125
15            Attachments: Various
              CTX 1533-1534
16
    No. 120   E-mail 11/1/19                       129
17            Attachments: Various

18  No. 121   E-mail 7/29/19                       131
              Attachments: Various
19
    No. 122   E-mail 12/4/14                       144
20            Attachment: BLD Payment Detail 12/2/14

21  No. 123   E-mails 1/29/15 - 2/2/15             147
              Attachments: Various
22
    No. 124   E-mail 2/26/16                       152
23            Attachment: BLD Payment Detail 3/1/15

24  No. 125   E-mail 4/27/15                       153
              Attachment: ROK Payment Detail/Bank Slips
25
```

```
 1                  DEPOSITION EXHIBITS

 2    NUMBER    DESCRIPTION                        PAGE

 3    No. 126   E-mails 8/11/16 - 8/31/16          190

 4    No. 127   E-mail 3/27/17                     217

 5    No. 128   CTX Payment Detail 9/1/16          240

 6

 7    Certificate of Oath................................257

 8    Reporter's Certificate.............................258

 9    Certificate and Jurat..............................259

10    Errata Sheet.......................................260

11    Witness Notification Letter........................261

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                (The witness is duly sworn.)

 3   Thereupon,

 4                    RISHI KUKREJA,

 5   being by the undersigned notary public first duly

 6   sworn, was examined and testified as follows:

 7                    DIRECT EXAMINATION

 8   BY MR. MAZZOLA:

 9        Q    Good morning, Mr. Kukreja.

10        A    Good morning.

11        Q    We are here to take your deposition.  I think

12   you are aware of that.

13        A    Yes, sir.

14        Q    This is a deposition in a lawsuit that our

15   clients -- and I am going to refer to them as Benlida,

16   is that fair?

17        A    Yes.

18        Q    -- has brought against Circuitronix LLC.  You

19   are aware of that lawsuit; is that correct?

20        A    I am.

21        Q    And you are also aware that you are here this

22   morning to give testimony in a deposition connected

23   with that case; is that correct?

24        A    That is correct.

25             MR. ROSENTHAL:  Can we make appearances?
```

 1              MR. MAZZOLA:  Let's do that.  Mr. Rosenthal

 2        reminded me we should make appearances.  I assume

 3        the court reporter has done that, but I will start

 4        myself.

 5              So we have the record already begun.  My name

 6        is JC Mazzola.  I am an attorney.  I represent the

 7        plaintiff Benlida in this case.

 8              To my right is my law partner Richard Lerner,

 9        and to his right is our client and corporate

10        representative Tracy Huang, and to her right is

11        Angela Guan, and she is an attorney also

12        representing Benlida.

13              MR. ROSENTHAL:  And Stephen Rosenthal and

14        Christina Martinez on behalf of Circuitronix LLC,

15        and we have two summer law clerks who are law

16        students observing the deposition.

17              MR. MAZZOLA:  I think we are set.

18   BY MR. MAZZOLA:

19        Q    So you do understand the purpose of a

20   deposition; is that correct?

21        A    I do.

22        Q    I am sure you have been prepared for this

23   deposition, right?

24        A    I am.

25        Q    I am sure you spoke to your lawyers and got

```
 1    an understanding of the types of questions I would ask.

 2    I don't want to know what you talked about.  Perhaps

 3    they showed you some documents.

 4            After that preparation with your lawyers, do

 5    you feel comfortable today to provide testimony in this

 6    case?

 7        A    I do.

 8        Q    And you feel you have been adequately

 9    prepared?

10        A    I do.

11        Q    What I don't want to happen is we get to

12    trial and I ask you a question at trial or I refer to

13    this transcript and you say, Mr. Mazzola, I would have

14    wanted more time with my lawyers to prepare.  So I want

15    to be very clear right now, you are set and ready to

16    go?

17        A    I am set and ready to go.

18        Q    We understood you weren't feeling well.  I

19    think maybe we got a text -- might have been Tuesday as

20    you were coming down -- and I see Mr. Rosenthal has

21    just put on a mask.  He likes to be safe it seems.  How

22    are you feeling physically?

23        A    I feel good.

24        Q    Do you feel physically prepared to go forward

25    with this deposition?
```

```
 1        A    I do.
 2        Q    You know it's going to be a number of hours.
 3   It will likely be shorter than the other ones, because
 4   we don't have a translator, but you are prepared to sit
 5   here for the better part of today?
 6        A    I am.
 7        Q    I also presume you know the ground rules
 8   here.  All we are asking for is for you to tell the
 9   truth; is that correct?
10        A    That is correct.
11        Q    You know that you have been sworn to tell the
12   truth?
13        A    That is correct.
14        Q    You know that you are under oath to tell the
15   truth?
16        A    That is correct.
17        Q    I assume you know that if you don't tell the
18   truth while you are under oath you could subject
19   yourself to some serious repercussions; is that
20   correct?
21        A    Yes.
22        Q    Mentally speaking -- we just talked about
23   physically speaking.  Mentally speaking do you feel
24   your head is clear today and you are ready to proceed?
25        A    I do.
```

```
 1        Q    Have you taken any medications that would

 2   impact your ability to remember things clearly?

 3        A    No.

 4        Q    Anything that would impact your ability to

 5   stay sharp?

 6        A    No.

 7        Q    You answered that very quickly.  You have

 8   been deposed before; is that correct?

 9        A    Yes.

10        Q    I assume this is not your first deposition,

11   right?

12        A    It is not.

13        Q    And can you talk to me about other times you

14   have been deposed?

15        A    What would you like to know?

16        Q    Well, let's talk about the last case that you

17   were deposed in.

18        A    Sure.

19        Q    Which one was that one?

20        A    The last case I was deposed in was a case

21   against -- which we were the plaintiffs against a law

22   firm which we brought for malpractice.

23        Q    When did that deposition happen?

24        A    So that deposition happened sometime in 2022,

25   but I am just trying to recollect the month.  I am not
```

1    being able to recollect the month.

2        Q    That is okay.  Who was the law firm you were

3    suing?

4        A    Carlton Fields.

5        Q    Did you tell Mr. Rosenthal you brought a

6    malpractice suit against a prior attorney?

7        A    Yes.

8             MR. ROSENTHAL:  And I still stay here.

9             MR. MAZZOLA:  Still sitting here.

10   BY MR. MAZZOLA:

11       Q    There was a case that went to trial I

12   understand a couple weeks ago or couple months ago?

13       A    Yes.

14       Q    Chauncey Cole, your attorney -- Chauncey Cole

15   is still your attorney; is that correct?

16       A    He is.

17       Q    What you are doing is great, because you are

18   nodding your head, but try to speak audibly, because

19   sometimes the court reporter may not be catching it.

20   She is very good, I am sure she might be, but --

21       A    Sure.

22       Q    Chauncey Cole, is he still your attorney?

23       A    Yes.

24       Q    And there was a bench trial I was just asking

25   about.  I think it was a few weeks ago or few months

```
 1    ago.  I know about that because Mr. Cole told us about

 2    it.

 3         A    Yes.

 4         Q    What was that case about?

 5         A    We were the defendant in that case --

 6    defendants and counter-plaintiffs -- and it was about

 7    trademark rights.

 8         Q    Who was the counter-party in that lawsuit?

 9         A    Shenzhen Kinwong.

10         Q    Is that what people collectively understand

11    as the Kinwong lawsuits?

12         A    There were three Kinwong lawsuits.  The first

13    two we were the plaintiffs; and we won the first one,

14    they settled the second one, and the third one is

15    ongoing.

16         Q    The third one is ongoing.  That is the one

17    you just tried a couple weeks ago?

18         A    Yes, because after closing statement the

19    judge told us that he would need to see us again and

20    over the next couple of weeks he will be calling us

21    for -- and giving each side 30 minutes each.

22         Q    Post-trial briefings?

23         A    No.  We were not able to close properly

24    because he had given us 90 minutes each to close and

25    each side had taken two hours and he had some other --
```

1        Q    So the trial is still ongoing?

2        A    That is what -- yes.

3        Q    What was the Kinwong lawsuit all about?  Can

4   you give me some background on that?

5             MR. ROSENTHAL:  Objection to the form.

6   BY MR. MAZZOLA:

7        Q    Do you understand my question?

8        A    Sort of.

9        Q    Here is another ground rule.  If I ask you a

10  question and you don't say to me I don't understand the

11  question or can you rephrase that question,

12  Mr. Mazzola, I am going to assume you understood the

13  question; is that fair?

14       A    That is I fair.

15       Q    And when you give an answer to that question,

16  I am going to assume, and ultimately a jury and finder

17  of fact is going to assume, that you understood the

18  question as that question is most properly understood

19  by people, okay?

20       A    Understood.

21       Q    I asked you can you give me some idea or

22  describe in your words about what the Kinwong dispute

23  was about.

24             MR. ROSENTHAL:  Object to the form.

25             THE WITNESS:  We -- Circuitronix --

1        Circuitronix registered the Kinwong trademark in

2        United States, since we believe that we had first

3        use from 2005, and they brought a lawsuit against

4        us because they believe that they had the rights

5        to Kinwong.

6    BY MR. MAZZOLA:

7        Q    And was Benlida involved in that in any way?

8        A    Benlida was involved to the extent that they

9    believed that we were manufacturing parts at Benlida

10   using the Kinwong UL logo.

11       Q    When you say they, Kinwong thought that you

12   were manufacturing parts at Benlida using Kinwong UL

13   logo?

14       A    That is correct.

15       Q    Were you doing that?

16       A    No.

17       Q    What was this about Benlida's name being on

18   some of the products being scratched off or removed?

19       A    I do not know.

20       Q    Did you ever hear that?

21       A    No.  Benlida's name being on some products

22   and being scratched off?

23       Q    Or removed, changed.

24       A    Never.

25       Q    Where were you getting -- who was the

```
 1   manufacturer of the Kinwong products?

 2        A    Who was the manufacturer of -- Kinwong was

 3   the manufacturer.

 4        Q    Kinwong was the manufacturer of the products?

 5        A    Of the products which Kinwong -- yes.

 6        Q    Did --

 7             MR. ROSENTHAL:  Sorry, Robert.  Is that your

 8        computer?

 9             MR. LERNER:  I'm trying to shut it off.

10   BY MR. MAZZOLA:

11        Q    Did -- with respect to this Benlida -- so it

12   was Kinwong believed you were manufacturing parts at

13   Benlida?

14        A    No, we were manufacturing parts at Benlida.

15        Q    But Kinwong was alleging that you were

16   manufacturing Kinwong parts at Benlida and using

17   Kinwong's UL?

18        A    Yes.

19        Q    And that wasn't happening?

20        A    No.

21        Q    I heard something about CTX registering a

22   Benlida trademark.  Did that ever happen?

23        A    Never.

24        Q    Not here in the United States?

25        A    No.
```

1      Q     Not here or anywhere else?

2      A     We have not registered the Benlida trademark.

3  We own Benlida LLC.  We have incorporated Benlida LLC.

4      Q     What is that, Benlida LLC?

5      A     It's an LLC which I am the -- how do you call

6  it -- I am the founder of or I am the registered -- I

7  am not the registered agent.  But I am the -- it's been

8  incorporated by me.

9      Q     So let's go through that.  I didn't know

10  about this.

11            So Benlida LLC, right, that is an LLC that

12  you formed, is that correct?

13      A     Benlida LLC is an LLC which we formed.

14      Q     When you say we --

15      A     My team.

16      Q     That is Rishi's side?

17      A     Yes.

18      Q     So when you say we and me, that is Rishi?

19      A     Yes.

20      Q     So Benlida LLC is a corporate entity that you

21  guys formed, right?

22      A     Yes.

23      Q     And you mentioned someone else's name in

24  connection with that.

25      A     So all my company's, the registered agent is

```
 1    a law firm called Torres PA.  So initially I said that

 2    I was the registered agent, but then I corrected that.

 3        Q    And you just do that for corporate structural

 4    purposes, et cetera, right?

 5        A    So that we do not miss any notices.

 6        Q    Do you also do that so that it's a little

 7    more difficult to find out who the party that formed

 8    the business is?

 9        A    No, because my name is there.

10        Q    Your name is on it as well?  And where is

11    this LLC formed, what state?

12        A    In Florida.

13        Q    So if I went to the Florida Department of

14    Corporations and looked up Benlida LLC, I would see

15    Torres PA as registered agent, and I would see your

16    name on it as well; is that, Rishi?

17        A    Absolutely.

18        Q    When did you form Benlida LLC?

19        A    In January of 2012 -- January of 2013.

20        Q    What does Benlida LLC do?

21        A    Nothing.

22        Q    Why did you form it?

23        A    Because at that point in time we were

24    thinking -- basically what we were planning to do is

25    that all the business we would do with Benlida, we
```

```
 1    would have Circuitronix LLC as the holding company, all

 2    the business which was being routed from Benlida would

 3    go under the Benlida LLC company, and the Kinwong would

 4    be the Kinwong LLC company, and we had formed several

 5    manufacturer names.

 6         Q    Did you form a Kinwong LLC?

 7         A    Yes.

 8         Q    Same reason?

 9         A    Same -- no.  Kinwong had a slightly -- had a

10    different reason.  So we were planning to do the

11    business, but when we formed Kinwong LLC, the main

12    objective the Kinwong LLC was to hold trademark rights

13    through Circuitronix.  Because Circuitronix had been

14    using the Kinwong trademark since 2005, and we assigned

15    the rights to -- we assigned the rights of that

16    trademark to Kinwong LLC.

17         Q    Did Kinwong know that you were using the

18    trademark?

19              MR. ROSENTHAL:  Object to form.

20              THE WITNESS:  Kinwong says that they knew

21         that we were using the trademark to the extent

22         which they had permitted us to use it for their

23         product.

24    BY MR. MAZZOLA:

25         Q    So they did know there was some limited
```

 1   permissive use is what you are saying?

 2        A    Yes.

 3        Q    Did Benlida know you formed this LLC back in

 4   2013?

 5        A    Absolutely.

 6        Q    Who did you discuss that with?

 7        A    With Tracy, with Douglas.  They were there.

 8        Q    You wouldn't have formed it without

 9   discussing it with them, right?

10        A    So I have a very close relationship with

11   Tracy and Douglas, and I think we were discussing --

12   there was nothing which we did not discuss.  They would

13   tell me anything and everything which was going on in

14   China, if they heard anything bad about us, and we

15   would tell them about all the problems we were having.

16   We were the ones who informed them about any problems

17   we were having with Kinwong and everything else.  So we

18   always had a good relationship.

19             Now, obviously I understand that that -- as

20   this case proceeds everybody has to posture for their

21   benefit.  It's part and parcel of the -- but that

22   doesn't take anything away from what -- that does not

23   take anything away from the way I believe our

24   relationship was and I hope will be at some point in

25   the future.

1      Q      So your recollection is that you did discuss

2    this with Benlida, the formation of the LLC here in

3    Florida; is that correct?

4      A      Yes.

5      Q      Do you know who you discussed it with

6    specifically?

7      A      With Tracy and with Douglas.

8      Q      Do you have an independent recollection of

9    that conversation, or is it, just as you said, we

10   talked about so much?

11     A      No.  So -- there are multiple occasions in

12   which we have discussed this.  So I do not know whether

13   you know this, but at one point in time there were also

14   discussions where we would merge the companies,

15   Circuitronix and Benlida, which would help Benlida get

16   a better valuation when they go public.  So there is

17   documentation about that.

18            There is documentation about when we created

19   organization charts where Douglas or Mr. Huang was the

20   CEO of the entire organization, and we, Circuitronix

21   was actually reporting to Mr. Huang in some manner.

22   So -- and there was Benlida -- there was Benlida LLC in

23   that organizational chart.  So it was discussed --

24   there is -- there were discussions and there is

25   documentation to back up the discussion also.

1          Q    How far along did you get in this wedding

2    planning of sorts?

3               MR. ROSENTHAL:  I am sorry.  Wedding

4          planning?

5               MR. MAZZOLA:  Wedding planning.

6               THE WITNESS:  So I believe that if it was

7          only Douglas, Tracy, and I working, the

8          discussions would move far along, but I believe

9          that it was something which Mr. Huang, he did not

10         want, or Mr. Huang -- it was -- I don't want to

11         say too big for him to conceptualize, but it was

12         something that was not in his way of thinking.

13              At times I felt it was going along really

14         well, and at times -- so the discussion would go

15         in -- the discussion would go in and then they

16         would ask me for a loan or money, and I would pay

17         it, the discussion would continue.  If by chance

18         that the loan or money was -- what they asked for

19         was not given to them, then it would take a back

20         seat.  So it was hot and cold at different points

21         between 2016 and 2018.

22   BY MR. MAZZOLA:

23         Q    So that was the next question I was going to

24   ask you.  When did these conversations begin?  Sounds

25   like 2016.

```
1      A    I think they started in 2015.  If I have to

2   definitely say, 2016 to 2018, yes.

3      Q    No one wants you to guess.

4      A    That is why I said if I have to say

5   definitely.

6      Q    We have thousands of documents that will show

7   it.  If we ever get to that point, we will have a

8   document.

9      A    Sure.

10     Q    But what I do want is to get your best

11  recollection.

12     A    Absolutely.

13     Q    An estimate would be fine for me, okay?  I

14  will even take a guesstimate.  I am not sure

15  Mr. Rosenthal will, but I will even take a guesstimate.

16          So sometime around 2015-2016 is your

17  recollection?

18          MR. ROSENTHAL:  Object to the form.  Asked

19      and answered.

20          THE WITNESS:  Yes.

21  BY MR. MAZZOLA:

22     Q    Then you said this courtship would run hot

23  and cold; is that correct?

24     A    Yes.

25     Q    And that is me recharacterizing it.  And then
```

```
 1    it would run cold when they were looking for you said

 2    loans or money; is that correct?

 3         A    It would run -- so as the records show that

 4    between 2016 and -- as the records will show between

 5    2016 and 2019 we bent backwards and gave concession

 6    after concession to Benlida/ROK, including fronting

 7    money which was not owed to them, and if there was a

 8    discussion taking place where they asked for help and

 9    they needed the help, it would be really hard, those

10    discussions.  And let's assume that I would push back

11    and say no, at this point I cannot do it, then it would

12    become cold.

13         Q    You said -- you used the word money that was

14    not owed to them, them being Benlida.  Did you just say

15    that?

16         A    Benlida and ROK.

17         Q    Benlida and ROK.  You know Benlida and ROK

18    very much believe that that money was owed to them?

19    You understand that, right?

20              MR. ROSENTHAL:  Object to form.

21              THE WITNESS:  I really do not believe that

22         they believe that.  I believe that this entire

23         case is about them trying to justify lies which

24         they have told to Sinosure and the Tax Department.

25         I really, really believe that with true
```

 1      conviction.

 2   BY MR. MAZZOLA:

 3      Q    So you believe in your heart that they know

 4   that they are not entitled to any money?  That is what

 5   you believe?

 6      A    I genuinely believe that.  I genuinely

 7   believe and with discussions with Tracy and with

 8   Douglas I have said forget about -- let's forget for

 9   the time being about who owes who money.  Where did

10   this 12 million-dollar number come from?  Where did

11   this big number come from?  And both of them have said

12   that -- both of them have told me that it is Mr. Huang

13   who is working with Ms. Chen and it's out of their

14   hands.  So I was pretty shocked by what Mr. Huang said

15   yesterday --

16           MR. ROSENTHAL:  You have answered the

17      question.

18   BY MR. MAZZOLA:

19      Q    There is a few things here.  So I want to get

20   back to some stuff, and now your counsel said you have

21   answered the question.  And that is fine for him to say

22   that.  But what I would say to you is when I ask you a

23   question, you can give me as complete an answer as you

24   like.  I expect that, okay?

25      A    Understood.

```
 1        Q     You understand that?  What I don't expect at

 2   a deposition is for your attorney to say that you have

 3   answered the question and stop talking, okay?

 4        A     Understood.

 5        Q     Your attorney is permitted to object, and you

 6   should always wait for him to do that, okay?

 7        A     Understood.

 8        Q     Your attorney may from time to time say,

 9   Rishi, don't answer that question.  That happens.  You

10   understand that as well?

11        A     Sure.

12        Q     Was there something more you wanted to say,

13   Rishi, before your attorney said you have said enough?

14        A     I think I completed it by saying I was

15   surprised by the position Mr. Huang took about his

16   noninvolvement with the company during the relevant

17   period.

18        Q     There is a lot of things I want to touch on

19   over here.

20              Back to the authorization for the BLD LLC --

21        A     I didn't get that, BLD LLC.

22        Q     Beg pardon.  Benlida is an LLC.  I was

23   reading my shorthand.

24        A     There is no authorization.

25        Q     You said there were conversations, correct?
```

1       A    There is no authorization.  I said I had done

2    that.  I didn't seek approval from anybody.

3       Q    You just did it?

4       A    I don't need to seek approval.  There is a

5    way of managing things.  You go and check whether the

6    name is available in a particular market, in a

7    particular -- go to the Division of Corporations, it's

8    available, you take.  As a courtesy I informed them.  I

9    told them what I was thinking.

10      Q    Just like I can go to a various state here in

11   the United States, I can check that state -- I don't

12   know, find a state, Idaho, Utah -- you are probably

13   ahead of me on this one -- but then I can open my own

14   LLC called Circuitronix LLC if it was available?

15      A    Yes, but you wouldn't be able to do that.  As

16   you said, I am ahead of you.

17      Q    You probably are ahead of me.

18           You were talking just a little bit earlier

19   about Tracy --

20      A    Yes.

21      Q    -- who is in the room, and how you thought

22   that she knows in her heart of heart that this money is

23   not owed to her, right?  Did you say that?  Something

24   along those lines, right, Rishi?

25      A    Yes.

1          Q    We had a hearing in January.  Do you remember

2    that hearing?

3          A    That was about the -- yes.

4          Q    We were in court.  Do you remember that?

5          A    Yes.

6          Q    Judge Goodman was there.

7          A    I do.

8          Q    Remember he gave us a short period of time to

9    talk?

10         A    Yes.

11         Q    To much of mine and Mr. Rosenthal's chagrin.

12   Do you remember testifying at that hearing that you

13   thought Tracy was an honest person?

14         A    I still believe Tracy is an honest person.

15   When I asked Tracy -- I have not spoken with Tracy on a

16   one-to-one basis in the last 12 to 18 months.  We used

17   to talk pretty much every day at one point in time.

18   But when I used to talk with her and say -- on a

19   particular issue -- and say, Tracy, what's up with this

20   e-mail, and she would say that, Rishi, I work for

21   Benlida, I have to do what I have been instructed to

22   do.

23         Q    Can you give me an example of that type of

24   e-mail?

25         A    Lots and lots.  Actually Douglas also used to

1    say the same thing to me.  It's not one like it's on a

2    constant basis, and I do not necessarily want to --

3    this entire exchange is not about picking up on petty

4    issues to get father and son in trouble or Tracy in

5    trouble, but there are lots of instances where they

6    express complete disagreement with what Mr. Huang was

7    doing.  But this is not what this lawsuit is about.

8    The numbers are going to show what the numbers are

9    going to show.

10        Q    That is right.  The numbers will show what

11   the numbers will show.  You are confident in your

12   numbers, right?

13        A    Absolutely confident.

14        Q    The team that puts together your numbers, top

15   team, right?

16        A    Yes.  They are human.  They make mistakes

17   once in a while, and through reconciliation those

18   mistakes are reconciled.  But yes, top team.

19        Q    And so mistakes that are made are discovered

20   in reconciliation?

21        A    They are discovered in different ways.  One

22   of them is reconciliation.

23        Q    What are the otherwise they get discovered?

24        A    They can be internal reconciliations, there

25   could be external reconciliations, they can be

1    third-party audits, internal audits.  There are

2    different ways of doing it.

3            As an example, if we buy 1 million of a part

4    number from somebody, we have sold 900,000 pieces to

5    the customer and we have got 200,000 pieces lying in

6    the warehouse; we have to investigate where the extra

7    hundred thousand pieces come from.  Then it comes out

8    that either we didn't buy 1 million, we bought

9    1.1 million; or we didn't sell 900,000, we sold only

10   800,000; or the inventory is not 200,000, it's only

11   100,000.  So there are internal audits which take

12   place.

13       Q    You also mentioned external audits, right?

14       A    Yes.

15       Q    External audits have occurred, right, between

16   you and Benlida?

17       A    What is your definition of external audit?

18       Q    You know, times where Benlida would come in

19   and audit with you.  Did that ever happen?

20       A    They would not audit with us.  One side, they

21   would give their records, they would provide their

22   records, and we would provide our records side-by-side,

23   and they would come back and say -- like let's assume

24   that our records showed we received 10,000 pieces and

25   they showed that they shipped 11,000 pieces.  They

```
 1   would demonstrate that they shipped 11,000 pieces,

 2   and as long as we would go and check with the

 3   warehouse, we received $11,000, correct the records.

 4   Or let's assume -- the same could happen with pricing.

 5   The price on our purchase order is $1, their bill shows

 6   $1.10.  I understand the reason why the bill shows

 7   $1.10.

 8        Q    And then pay the ten cents?

 9        A    No, tell them that they are not allowed --

10   they are not allowed to bill anything different than

11   what is on the purchase order.  Simple and straight.  A

12   purchase order is a contract.

13        Q    What if a price increase had been agreed?

14        A    So there was a methodology for the price

15   increase.

16        Q    But if a price increase had been agreed, then

17   they can bill more; is that right?

18        A    No.  If a price increase had been -- are you

19   talking about price increase on a part number or

20   general price increase which was agreed -- which was

21   discussed in the December 2016 meeting?

22        Q    Well, you brought it up.  Let's talk about

23   both, okay.  There was the December 2016 meeting,

24   right?

25        A    Yes.
```

 1      Q    And there you just said -- because this lady

 2   is writing it down -- that in the December 2016 meeting

 3   you used the word agreed.  Do you remember saying that?

 4   Do you remember saying that?

 5      A    I said there was a discussion, and it did

 6   not -- from our side it's black and white as to what

 7   the agreement is, but the e-mail minutes of the meeting

 8   show exactly what the agreement is, but the position

 9   which Benlida is taking today in terms of how they are

10   calculating shows that they are diverting from those

11   minutes of the meeting.

12      Q    That may be true.  So what I am hearing is

13   that there is a dispute between you and Benlida as to

14   whether or not the price increase was agreed; is that

15   correct?

16      A    It cannot be a dispute.  There is a minutes

17   of the meeting which has been exchanged.  Anybody can

18   go back and change a contract and say no, no, I didn't

19   agree to this, but if it's documented, it's documented.

20      Q    My question is this.  Do you agree that they

21   believe -- Benlida -- that a price increase was agreed?

22   Do you believe that, yes or no?  Whether they are right

23   or wrong, do you believe that?

24      A    I believe that there was a -- forget about

25   them.  I believe there was a price increase agreed

 1    upon.

 2         Q    You believe that there was a price increase

 3    agreed upon?

 4         A    Based upon the terms and conditions in the

 5    December 2016 meeting.

 6         Q    So you believe there was a price increase

 7    agreed upon?

 8         A    Yes.

 9         Q    Is that your testimony?

10         A    That is my testimony.

11         Q    And the price increase was agreed upon per

12    the 2016 meeting?

13         A    Yes.

14         Q    What do you think Benlida agrees -- this is

15    just -- this is not a guesstimate, just what do you

16    think.  What do you think Benlida agrees with respect

17    to the price increase from the December 2016 meeting?

18         A    So the first guideline is -- let's break this

19    down, right?  I did not need to agree.  I was the one

20    who proposed any sort of increment beyond the base

21    price -- the base square footage of whatever, 5600

22    square meters, whatever that number was.

23              The first problem is that the price increase

24    could only happen if by chance Benlida on a weekly

25    basis shipped 7600 square meters, excluding the PQ 26,

```
 1    and launched 7600 square meters into production

 2    excluding the PQ 26, which did not happen a single week

 3    after December 2016.

 4         Q    So that was your understanding of the price

 5    increase?

 6         A    That is not my understanding.  This is the

 7    minutes of the meeting.  You got the minutes of

 8    meeting, right?

 9         Q    It's not for me to decide.

10         A    Yes, anybody who can speak English will

11    decide -- or understanding English will decide.  That

12    is beside the point.

13         Q    Do you think the people at Benlida properly

14    understand English?

15         A    So --

16         Q    Do you think that?

17         A    I believe based upon what I saw of Douglas, I

18    believe that they choose to understand when they want

19    to understand, and they choose not to understand when

20    they do not understand -- when they do not want to

21    understand.

22         Q    So you think that they feigned ignorance

23    sometimes?

24         A    You cannot feign ignorance when stuff is in

25    black and white.  You can come back and keep denying in
```

 1    the face of stuff and it's -- the minutes are black and

 2    white.

 3        Q    Hold on a second.  You can keep talking if

 4    you want, but --

 5            MR. ROSENTHAL:  Do you want the exhibit?  Is

 6        that what you are looking for?  We had marked

 7        that.  All the minute meetings have been marked in

 8        the notebook, which is over here if you want me to

 9        tell you what it is.

10            At any point if you want me to try to help --

11            MR. MAZZOLA:  I am going to use my whomped-up

12        ones.

13            MR. ROSENTHAL:  That is fine.  I am saying if

14        you want to show him one --

15            MR. MAZZOLA:  Do you put the colloquies on

16        the record?

17            THE REPORTER:  I'm on until everybody agrees

18        we are off.

19            MR. MAZZOLA:  My own marked-up one, not

20        whomped-up exhibits.

21            MR. LERNER:  The number on the top corner

22        matches.

23            MR. ROSENTHAL:  We have that in the notebook

24        before the witness if you want.  If you tell me

25        what you are looking for, I will help him get it.

 1   BY MR. MAZZOLA:

 2        Q    Would you agree, Rishi, that CTX and Benlida

 3   have a different understanding about the price

 4   increase?  Would you agree to that statement?

 5             MR. ROSENTHAL:  Object to the form.

 6             THE WITNESS:  The only -- only when I am

 7        forced to agree is because what the numbers they

 8        are proposing -- I have seen the numbers they

 9        propose, right?  I heard the -- I participate in

10        the depositions.  So I am seeing the numbers on

11        spreadsheets, I have seen the Answers to the

12        Interrogatories.  I have seen everything.  So

13        obviously I disagree with all of that.

14   BY MR. MAZZOLA:

15        Q    I am just trying to understand if you just

16   agree that CTX -- you -- and Benlida -- Tracy -- have a

17   different understanding of what the price increase was.

18   Can you agree to that?

19             MR. ROSENTHAL:  Objection.

20             THE WITNESS:  Yes, because it shows in the

21        work product.  It shows in the calculations.

22   BY MR. MAZZOLA:

23        Q    So when you say yes -- I think you said

24   but -- because it shows in the calculations, what do

25   you mean by that?

```
 1      A    As I explained to you, they do not follow the

 2   guidelines in the December 2016 meeting.

 3      Q    As you understood those guidelines, right?

 4      A    As any English-speaking person should

 5   understand.

 6      Q    And that is how we went down that whole line

 7   about English speaking.  They would provide pricing to

 8   you, is that correct, and invoices, and they would send

 9   you things, right?

10      A    Yes.

11      Q    And those invoices would reflect what they

12   believe the price increase was?

13      A    Absolutely not.  The price increase was not

14   on any invoices.

15      Q    You are saying the price increase was never

16   agreed?

17           MR. ROSENTHAL:  Objection to form.

18           THE WITNESS:  The price -- until today they

19      have not provided us with a single invoice on a

20      price increase, and the -- they provided us with

21      spreadsheets showing the calculation, and there is

22      enough documentation on the record which shows

23      that both parties agreed that they will hold off

24      on giving price increase invoices to us and we

25      will hold off giving lead time penalty invoices to
```

```
1          them.  So we gave our calculations of the lead

2          time penalty, they gave their calculations of

3          price increase, neither side gave -- after

4          February of 2016 we did not give any lead time

5          penalty -- lead time penalty invoices, and I do

6          not believe that they have given us a single

7          invoice for price increase.

8    BY MR. MAZZOLA:

9          Q    Okay.  I just want to lock this statement

10   down, okay.  We are going to get back to this later.

11   Lead time is -- it's one of my topics.  I am going to

12   do that later.

13              So after 2016, you have not applied any lead

14   time penalty; is that what you are saying?

15              MR. ROSENTHAL:  Objection.

16              THE WITNESS:  Our last invoice on lead time

17         penalty, our last debit note on lead time penalty,

18         was in the month of February of 2016.  Starting

19         March of 2016 until now everything is done on

20         spreadsheets.

21   BY MR. MAZZOLA:

22         Q    On spreadsheets?

23         A    Yes.

24         Q    So the spreadsheets do reflect the lead time

25   penalty; is that correct?
```

1     A    The spread sleets do, but we didn't give them

2  a physical credit note, because both parties accepted

3  that they would hold back giving their invoice for

4  price increase as we would hold back -- this entire

5  thing boils down to that -- because of whatever

6  problems -- misreporting they did to China Customs.

7  They were not in a position to make their numbers look

8  any worse, so they requested us to hold back.

9     Q    Why do you keep talking about this China

10  Customs thing?

11     A    Because they really messed up.  There

12  is acknowledgment all over the place from their side.

13  There is so many documents out there which show that

14  they messed up reporting to China Customs.

15     Q    So you think the whole thing is made up to

16  cover up something with China Customs?

17     A    It absolutely is.  It's a very serious

18  problem for them.  And whatever lies they said to

19  Sinosure and whatever lies they said to the banks to

20  get the lines of credit, this is all what this case is

21  about.

22     Q    You keep talking about lies.  I have heard

23  that a few times now.  I wrote down lies and I put a

24  circle around it, meaning to get at it, and I am going

25  to get back at that.

1          How many years have you been doing business

2   with Benlida and Tracy and Mr. Huang and ROK?  How many

3   years?

4          MR. ROSENTHAL:  Object to form.

5          THE WITNESS:  From 2005.

6   BY MR. MAZZOLA:

7      Q    So we are going on 23 years -- no.  A lot of

8   time.  Eighteen years.

9      A    Yes.

10     Q    During that period of time, did you ever lie

11  to anyone at Benlida or ROK?

12     A    Did I lie?

13     Q    Yes.

14     A    I didn't -- all these lies from their side

15  started in 2018 -- in 2018-2019.  Until that time

16  nobody was lying to each other.  One day though just to

17  justify the numbers backwards and they were in such

18  financial trouble and they were being audited by China

19  Customs and the Tax Department, and that is where this

20  entire thing -- that is the -- they fabricated

21  everything.

22     Q    The question was during the time that you

23  have done business with these people, did you ever lie

24  to them?  That is a yes or no.

25     A    No.

1        Q    Have you ever misled them?

2        A    I have never deliberately misled them.

3        Q    Have you ever told them a half truth?

4        A    I do not believe that I have deliberately

5    told them a half truth.

6        Q    Did you ever lie to any of your upstream

7    customers?

8        A    Every sales organization has to lie to

9    sugarcoat.  When are these parts going to get

10   delivered?  They are in route to Hong Kong.  They are

11   stuck in China Customs.  They are in the last stages of

12   production.  So there may have been white lies like

13   that, yes.

14       Q    Misleading?

15       A    Yes.

16       Q    To customers?

17       A    It's part of the sales -- there is no

18   organization which can say they did not sugarcoat stuff

19   when presenting information to a customer.

20       Q    Or lie to a customer, right?

21       A    You can use that as -- you can characterize

22   it as lie.  I do not characterize it as lie.

23       Q    I don't know.  This lady is writing it all

24   down.  She wrote it down.

25       A    I did not characterize it, you characterized

```
 1    it as a lie.

 2         Q    I don't know what she wrote down.

 3              MR. ROSENTHAL:  I think we all know what she

 4         wrote down; what is being said in the room.

 5    BY MR. MAZZOLA:

 6         Q    Is this way of sugarcoating things, is that a

 7    way of life at Circuitronix?

 8         A    Not really.

 9         Q    I think you said it's what you have to do,

10    you have to sugarcoat things for your customers.  You

11    said those words, right?

12         A    You have to manage customers' expectations.

13    A customer comes back and says that I need the delivery

14    of these boards in two weeks, and you know you are not

15    going to make it in two weeks.  But sales 101 says you

16    never go back and tell the customer you are not going

17    to do it, you go back and say it's very difficult and

18    impossible, but we try our best to do it.

19         Q    What sales 101 course was that?

20         A    In Wharton, and maybe in Howard too.

21         Q    Why not just tell them the truth?

22         A    Because you want your customers to believe

23    that you are trying everything for them, which at the

24    back end we are trying everything for them.  Ask Tracy

25    whether she has seen anybody who works as diligently as
```

```
 1    we do for our customers.  We work hard for the

 2    customers.  We try -- our goal is to try and achieve

 3    success for our sales, for our manufacturers, and we

 4    manage that in that process.

 5        Q    Isn't it just easier to tell the truth,

 6    because then you don't have to remember anything?

 7        A    The majority of the time that information is

 8    given -- majority of the time the information is

 9    exactly what it is.  What I have just described to you

10    maybe an exception.

11        Q    Now it's an exception that that happens?

12             MR. ROSENTHAL:  Objection.

13    BY MR. MAZZOLA:

14        Q    You can answer.

15        A    You are talking about a full -- you are

16    talking about millions and millions of transactions.

17        Q    Yes.

18        A    Out of the millions and millions of

19    transactions, 99 percent of the transactions are just

20    black and white as what's required.  Any sort of

21    sugarcoating is required on 1 percent of the

22    transaction.

23        Q    Those are your numbers now, right; 1 percent

24    versus 99 percent?

25             MR. ROSENTHAL:  Objection to form.
```

```
 1            THE WITNESS:  Yes, those are my numbers.

 2   BY MR. MAZZOLA:

 3       Q    Now?

 4            MR. ROSENTHAL:  Objection to form.

 5            THE WITNESS:  Always.  Always.

 6   BY MR. MAZZOLA:

 7       Q    Did you ever tell any white lies to Benlida

 8   or ROK?

 9            MR. ROSENTHAL:  Objection.

10   BY MR. MAZZOLA:

11       Q    You used the word white lies.

12       A    I do not believe so.

13       Q    Did you ever sugarcoat anything to Benlida or

14   ROK?

15       A    I do not believe so.

16       Q    So white lies and sugarcoating are only

17   things that you use upstream to your customers, right?

18       A    Because upstream we have to manage

19   expectations.  On the flip side, Benlida has lied to me

20   on several occasions.  Something is going to ship next,

21   and it does not ship next week.  DWI pre status of

22   product is here and it's not here.

23            Now, when I get that information, if I went

24   to Tracy, she would get down to the bottom of it and

25   tell me the exact situation.
```

 1        Q    You don't know if it was a white lie from

 2   Tracy, you just know she said it would ship next week?

 3        A    We would get that information, but if I went

 4   to Tracy, she was a reliable source for me to get

 5   accurate information.  I am not saying Tracy said white

 6   lies to me.

 7        Q    You said that we should ask Benlida if they

 8   believe that they -- that you diligently worked for

 9   your customers.  Do you remember just saying that?

10        A    Yes, I do.

11        Q    How about I ask you this question.  Do you

12   think that Benlida diligently worked for you?

13        A    Benlida diligently worked for us until the

14   2018-2019 time frame when we no longer could support

15   all these loans and advances which we were paying them,

16   and within that -- within that characterization they

17   did overestimate their capabilities from a capacity and

18   quality perspective.

19             Now, whether they did it maliciously, I

20   cannot necessarily say that, but during that time frame

21   they did -- they made statements -- until 2018-'19.

22   After 2019 they blatantly -- they did not follow the

23   Manufacturing Agreement, the second agreement.

24   Nothing.  Everything went to the wayside.

25        Q    That is what you think, right?

 1      A    That is what I think, and that is what a

 2   Court will think too.

 3      Q    That is what you think?

 4           MR. ROSENTHAL:  Objection to form.

 5   BY MR. MAZZOLA:

 6      Q    Is that right?  Correct?

 7           MR. ROSENTHAL:  Asked and answered.

 8           THE WITNESS:  So, Mr. Mazzola, I would like

 9        to ask you a question.  How would I ask a question

10        based upon what you think?  I can only answer

11        questions based on what I think.  That is the only

12        way I can answer the question.  I cannot answer

13        the question on anybody else's behalf.

14   BY MR. MAZZOLA:

15      Q    So you don't know what Benlida believes,

16   right?

17      A    Specific to?

18      Q    To anything.

19      A    I cannot get into the mind of Benlida, but

20   obviously I can tell you what I believe based upon my

21   conversations with them, and what is recapped in the

22   minutes of the meetings also.

23      Q    The minutes of the meeting.  This would be

24   the December 2016 meeting?

25      A    You know how many minutes of meetings we

1   have?  Twenty, 30, 40.

2       Q    I think you did say December 2016 meeting.

3       A    That addressed price increase issue.

4   Specific topic, specific minutes of meeting.  Other

5   lead time penalty is addressed in another meeting,

6   October 2017 meeting.  I can keep going on.

7            Anyway, yeah, different meetings have

8   different --

9       Q    Different what?

10      A    Different contents in it.

11      Q    What other meetings do you remember?  You

12  remember the December 2016 meeting was pricing, you

13  remember the October 2017 meeting was lead time, right?

14      A    Yes.

15      Q    Are there any other meetings as you sit here

16  today you have a specific recollection of and what was

17  the -- and the subject of those meetings?

18      A    If you tell me the subject, I will tell you

19  the -- which meeting was discussed.

20      Q    Air freight.

21      A    Air freight was discussed in the March 2018

22  meeting in Miami, but prior to that in 2018 they asked

23  us to give the backup of the air freight.

24      Q    There was a trial, I think, at the end of

25  last year, November-December, 2022.  Chauncey was the

1    trial attorney, and the trial related to -- it started

2    off as an unpaid obligation, maybe 75 or $80,000.  You

3    made a counterclaim and you prevailed.

4              Do you remember that trial?

5       A    It was a Top Search trial.  And we didn't

6    only prevail, yesterday the judge certified a

7    7 million-dollar judgment in our favor.

8       Q    So you did prevail?

9       A    Not only did we prevail, they objected and

10   asked for reconsideration, and yesterday the judge

11   denied all their -- denied their request for

12   reconsideration and awarded us $7 million.  And we

13   expect to get that in -- during the hearing he said

14   within two weeks -- what do they do?  They issue the --

15   the written judgment.

16      Q    Top Search was suing you for unpaid

17   obligations?

18      A    Yes.

19      Q    And why, as you recall, were those invoices

20   not paid by you?

21      A    There were multiple reasons.  Firstly,

22   majority of the $75,000 worth of invoices belonged to

23   Circuitronix Hong Kong, not Circuitronix USA, and

24   Circuitronix Hong Kong was not a plaintiff in the case.

25   So that is number one.

1            Number two is that on several of the

2    Circuitronix LLC invoices they were quality claims tied

3    to them.

4            The third one was that our Manufacturing

5    Agreement with Top Search allowed us to offset for any

6    potential claims we may have against breach of

7    contract.

8        Q    And that was the Top Search case?

9        A    Yes.

10       Q    Have you ever been convicted of a crime?

11       A    No.

12       Q    Never?

13       A    Never.

14       Q    What about misdemeanor?  Ever convicted of a

15   misdemeanor?

16       A    No.

17       Q    When I say crime, I mean felonies or

18   misdemeanors.  You understand that, right?

19       A    Never convicted.

20       Q    Who is Melanie Rhodan?

21       A    She used to work in -- she used to work at

22   Circuitronix LLC.

23       Q    Used to work there.  When did she leave?

24       A    I cannot recollect, but it's been a number of

25   years.

```
 1          Q     Any recollection as to why she left?

 2          A     I do not, but I guess just normal attrition.

 3          Q     Lina might know, Lina Ochoa?

 4          A     She may, yes.

 5          Q     Does she still work there?

 6          A     She does.

 7          Q     What about Marcia Delgado, who is that

 8   person?

 9          A     She used to be an accounting manager at

10   Circuitronix.

11          Q     Does she still work for Circuitronix?

12          A     No.

13          Q     She used to be?

14          A     Used to be.

15          Q     Nicole Donaldson, who is that person?

16          A     She also used to work in Circuitronix.

17          Q     She left as well?

18          A     Yes.

19          Q     What does Lina Ochoa do?

20          A     She is the global operations manager.

21          Q     And as global operations manager, one of her

22   roles is HR, right?

23          A     HR reports to global ops.  That is correct.

24          Q     What about accounting, do they report up to

25   her?
```

1        A      Yes.  Actually, I take that back.  Accounting

2   reports to the CFO who reports to me, but she has

3   dotted line reporting of the accounting team to her.

4        Q      Who else reports up to her?

5        A      Administration, logistics -- administration

6   and logistics are the same -- HR -- that is it.  Yes.

7        Q      And when you say global operations, you are

8   referring to CTX.  When I say CTX, you know what I

9   mean?

10       A      CTX LLC.

11       Q      CTX LLC, right?

12       A      Yes.

13       Q      And then there is also a Mexican operation;

14  is that correct?

15       A      Yes, but she doesn't have -- she doesn't do

16  anything for the Mexican -- it's the -- the Mexican

17  operation is not under Circuitronix.

18       Q      It's not part of the CTX umbrella?

19       A      Yes.

20       Q      But there's the Hong Kong that is under the

21  CTX, LLC umbrella?

22              MR. ROSENTHAL:  Object to the form.

23  BY MR. MAZZOLA:

24       Q      It's not?

25       A      Circuitronix Hong Kong is a separate company.

```
 1        Q    So it's not under the same umbrella?

 2        A    No.

 3        Q    No?  What about Circuitronix India?

 4        A    Circuitronix India is --

 5             MR. ROSENTHAL:  Object to form.

 6             Sorry.  Go ahead.

 7   BY MR. MAZZOLA:

 8        Q    Also a separate company?

 9        A    Yes.

10        Q    What about Circuitronix Shenzhen?

11             MR. ROSENTHAL:  Objection to form.

12             THE WITNESS:  Circuitronix Shenzhen is owned

13        by Circuitronix Hong Kong.

14   BY MR. MAZZOLA:

15        Q    If she is global operations manager, what is

16   her globe, just US CTX LLC?

17        A    And any aspect of Circuitronix LLC operations

18   which -- so we have a team in India which does work for

19   Circuitronix LLC.  So she will have dotted line

20   reporting of that team to her.

21        Q    What do you mean you have a team in India

22   that works for Circuitronix LLC?  Can you clarify that?

23        A    So we have got -- you may know about back

24   office operations.  So we have several back office

25   operations in India; for accounting, for inside sales,
```

1    engineering.

2         Q    What about Akshay, where does he work?

3         A    Whenever you have a chance, can I take a

4    break?

5         Q    We will take a break right now.  Where does

6    Akshay work?

7         A    Akshay is based in Circuitronix Hong Kong.

8         Q    Akshay is in -- so A-K-S-H-A-Y  K-O-U-L -- is

9    in Circuitronix Hong Kong?

10        A    Yes.

11        Q    Was he working at Circuitronix Hong Kong in

12   2018?

13        A    Yes.  I think he has been there since 2014.

14        Q    Why would he keep an e-mail address that says

15   Circuitronix.co.India?

16        A    Because he started in India and he was moved

17   from India.

18        Q    So he just kept the e-mail address?

19        A    Yes.

20             MR. MAZZOLA:  Let's take a break.

21             (Thereupon, there is a short break.)

22   BY MR. MAZZOLA:

23        Q    So we were asking about Akshay.

24        A    Yes.

25        Q    And Akshay works, as you said, for CTX Hong

```
 1   Kong?

 2       A    That is correct.

 3       Q    He just kept his India --

 4       A    Yes.

 5       Q    You are the overall boss of all the global

 6   operations, right?

 7       A    So my mother is the owner of Circuitronix

 8   Hong Kong.  Circuitronix -- and through that

 9   Circuitronix Shenzhen and Circuitronix Europe, and my

10   mom and my dad were the owners of Circuitronix India.

11   My dad passed away a couple of years ago, and since

12   then the second owner is just for -- yeah, there is a

13   second minority owner just for --

14       Q    Who is that?

15       A    Sounendra Mahapatra.

16            THE REPORTER:  You're going to have to spell

17       that for me.

18            THE WITNESS:  Yes.  S-O-U-M-E-N-D-R-A, last

19       name M-A-H-A-P-A-T-R-A.

20            And I am the owner of Circuitronix Hong Kong,

21       and I manage -- I am the owner of Circuitronix

22       LLC.

23   BY MR. MAZZOLA:

24       Q    But you manage Hong Kong?

25       A    I manage Hong Kong.
```

1          Q     Because I hear a lot about Ms. Promila.

2          A     That is my mom, yes.

3          Q     Funny enough though, I have never seen an

4    e-mail in the tens of thousands of e-mails -- we did a

5    search -- for Promila, P-R-O-M-I-L-A.  Why is that?

6          A     Same reason why you didn't see a single

7    e-mail from Mr. Huang.

8          Q     She is not on e-mails?

9          A     Yes.

10         Q     But you do do the day-to-day management of

11   Circuitronix Hong Kong?

12         A     I do the day-to-day -- so, as one would

13   appreciate, we obviously rely on managers.  Akshay runs

14   the day-to-day operations and he reports to me.

15         Q     You have overall management authority?

16         A     I have overall management authority.

17         Q     And naturally you are authorized to sign

18   documents on behalf of Circuitronix Hong Kong, right?

19         A     I am.  But I do want to clarify in the event

20   my mother says I cannot sign a document, I cannot sign

21   a document.  I do have the authority, but she has the

22   final authority.

23         Q     Are there any documents in this case that

24   have been signed on behalf of Circuitronix Hong Kong

25   that your mother later said, hey, Rishi, you didn't

 1   have authority to sign that?

 2        A    No.

 3        Q    So if I look at something -- let's look, for

 4   example, at this.  This was previously marked as

 5   Exhibit 40.

 6        A    May I have a copy?

 7        Q    It's in those binders.

 8             MR. ROSENTHAL:  By the way, JC, when -- if

 9        you are going to ask about any documents -- JC?

10        Just housekeeping.  This doesn't have numbers 1

11        through 20 in it because they were the ones you

12        marked during the depositions you took last year.

13        I have a set I think somewhere that I have to get.

14             MR. MAZZOLA:  I don't know if we will use any

15        of them.  If we do, it will be nothing of any

16        excitement.

17             MR. ROSENTHAL:  Well, if you do need one send

18        us a copy of it and we will work as we go.

19   BY MR. MAZZOLA:

20        Q    This starts off with an e-mail.  Do you see

21   that?

22        A    Yes.

23        Q    It refers to the secondary agreement, do you

24   see that?

25        A    Yes.

```
 1        Q    You talked earlier about a secondary

 2   agreement.  Do you remember that, Rishi?

 3        A    I do.

 4        Q    When you were talking about the secondary

 5   agreement, were you referring to the document in front

 6   of you?  It's an e-mail followed by a four-page letter.

 7        A    Yes.

 8        Q    Five-page letter.  Are you familiar with this

 9   letter?

10        A    I am.

11        Q    It looks like it has been signed by the

12   people at Benlida and ROK; is that correct?  At the

13   back page.

14        A    Yes.

15        Q    Now, it says Rishi Kukreja for CTX USA and

16   CTX Hong Kong.  The document I am looking at is not

17   signed.  Why is that?

18        A    Because you got an unsigned copy of the

19   document.  We have a signed copy too.

20        Q    So there is a signed copy out there?

21        A    Yes.

22             MR. ROSENTHAL:  You guys filed it.

23             MR. MAZZOLA:  Okay.

24   BY MR. MAZZOLA:

25        Q    So when you guys signed that document,
```

 1   presumably you were authorized to sign for CTX Hong

 2   Kong?

 3        A    Yes.

 4        Q    Is this something you would have cleared past

 5   your mother?

 6        A    I would have discussed it with her.

 7        Q    So this would be an example of -- the signed

 8   version, the one that is filed with the court -- that

 9   you are signing on behalf of CTX Hong Kong, right?

10        A    Yes.

11        Q    Is it your view that this second signed

12   agreement remains in force?

13        A    Yes.

14        Q    If you look to the second to last page, if

15   there is notices that need to be provided -- do you see

16   that?

17        A    Yes.

18        Q    It says Hanchao Huang.  You know that to be

19   Douglas?

20        A    Yes.

21        Q    And if it's CTX USA or CTX Hong Kong, the

22   notices are to you, correct?

23        A    Yes, but different addresses.

24        Q    What was the purpose of entering into that

25   second agreement?

```
 1      A    There were number of reasons.  The first

 2   reason was that the Manufacturing Agreement did not

 3   have Hong Kong as Circuitronix Hong Kong.  So we wanted

 4   that Manufacturing Agreement to -- for Circuitronix

 5   Hong Kong to be an independent party to the

 6   Manufacturing Agreement.

 7           The second reason is that at this point in

 8   time, Benlida was asking us to do things which --

 9      Q    Okay.  So the first one was to effectively

10   make Circuitronix Hong Kong a party to the agreement?

11           MR. ROSENTHAL:  Forgive me.  I didn't know if

12        he wanted to list anything else before you

13        interrupted him.

14           MR. MAZZOLA:  I just need to remember.

15   BY MR. MAZZOLA:

16      Q    The first one was Circuitronix.  You went

17   into the second one -- the first one was Circuitronix

18   Hong Kong.  You went into the second one?

19      A    The second one was at this point in time

20   Benlida was asking us to do things which were -- which

21   were -- which did not align with what was agreed on

22   the -- which did not align with the Manufacturing

23   Agreement.

24           As an example, the payment terms.  So we did

25   not want anybody to go back and say, well, since you
```

```
 1   started, that is the way you were doing business,

 2   somehow we had waived terms and conditions, the payment

 3   terms, in the original agreement.  So that is why we

 4   wrote the second paragraph.

 5        Q    What are you looking at?

 6        A    "Due to discrepancies between Circuitronix

 7   USA and manufacturing with respect to balances of

 8   certain accounts."  That paragraph.

 9        Q    Okay.

10        A    So that was number two.  Number three, we

11   clarified the way notices should be given to either

12   party.

13        Q    That was it, the two reasons, right?

14        A    Three reasons.

15        Q    The third reason was the notices.

16             Do you have Exhibit 21 in front of you?

17        A    No.

18             MR. ROSENTHAL:  I think you might.  It's the

19        first one in the binder.

20             THE WITNESS:  Yes.

21   BY MR. MAZZOLA:

22        Q    Let me ask you -- you might have to flip back

23   and forth, but you may not have to.

24             You earlier were looking at Exhibit 40.  That

25   was the letter on Circuitronix letterhead dated
```

```
 1   July 21, 2016.  That is the document that you are

 2   referring to as the secondary -- that is what you mean

 3   by the second agreement?

 4        A    Secondary.

 5        Q    Second agreement?

 6        A    Secondary.

 7        Q    So I am holding it up.  This is the secondary

 8   agreement, Exhibit 41, right?

 9        A    Yes.

10        Q    Exhibit 21, that is the Manufacturing

11   Agreement; is that correct?  The existing agreement; is

12   that correct?

13        A    What do you mean by existing?  Both of them

14   are existing agreement.  It's the existing agreement

15   referred to in 41, yes.

16             THE WITNESS:  By the way, it's not 41, it's

17        40.

18   BY MR. MAZZOLA:

19        Q    I beg your pardon.  There is a reference in

20   the second paragraph of Page 2 of Exhibit 41.

21        A    41 or 40?

22        Q    I beg your pardon, 40.

23             MR. ROSENTHAL:  Off the record.

24             (Thereupon, there is a short break.)

25
```

1    BY MR. MAZZOLA:

2         Q    So you are referring -- in Exhibit 40 you are

3    referring to a secondary Manufacturing Agreement; is

4    that correct?

5         A    Yes.

6         Q    Was that secondary Manufacturing Agreement

7    ever prepared, agreed to, or signed, entered into?

8         A    It was prepared, but it was never signed --

9    never agreed to and never signed.

10        Q    So insofar as you are concerned, the

11   relationship between CTX and Benlida is governed by

12   this Exhibit 21, the Manufacturing Agreement; is that

13   correct?

14        A    Yes.

15        Q    And this letter agreement, Exhibit 40?

16        A    And subsequent minutes of meeting post

17   July 21, 2016.

18        Q    You stated three purposes for this -- what I

19   am going to call the letter agreement, because that is

20   what it says, Exhibit 40.  One was to bring CTX Hong

21   Kong into the agreement; is that correct?

22        A    Yes.

23        Q    The second one is the second paragraph, and

24   it relates to discrepancies between CTX USA and the

25   manufacturer.  Do you see that?

```
 1      A     Yes.  But it was more about the change in
 2  payment terms.
 3      Q     Well, it says what it says, right?
 4      A     Yes, the last -- yeah, it says what it says.
 5      Q     And you talk about the discrepancy, and next
 6  to discrepancy in the second line you talk about CTX
 7  USA, CTX Hong Kong, and the manufacturer.  The idea was
 8  that a new second Manufacturing Agreement would be
 9  negotiated, right?
10      A     Yes.
11      Q     But until such Manufacturing Agreement was
12  negotiated, you agree to continue to make payments to
13  Benlida, right?
14      A     Make payments to Benlida based upon what
15  ships this week will be paid next week.
16      Q     I am not sure I understand that.  Why would
17  you volunteer that?
18      A     Why would I volunteer that statement?
19      Q     Why would you volunteer that statement just
20  now, yeah.
21      A     Nothing.  That was something what they
22  requested for.  So --
23      Q     You are saying they requested that?
24      A     Okay.
25      Q     It says what it says, right?
```

```
1      A    No, no, no.  Let me try to explain the
2   rationale to you behind it also.
3           So we were doing close to 20 to $25 million
4   per year of business at this point in time with
5   Benlida.  Or that is what we were projecting to do.  So
6   if you take that as per month, that would be around
7   $2 million worth of business.  Let's just put
8   $24 million.  So at any point in time we would be owing
9   Benlida between 4 to $6 million, because three months
10  payment terms with AMS of 60.  So the accounts
11  receivable would be four to six months -- 4 to
12  $6 million.
13          So what we -- by this time, or around this
14  time, we had had our first meeting in Miami, and Tracy
15  had outlined the discrepancies, and the discrepancies
16  between the two parties was less than $2 million.  So
17  what we told them is -- and they were saying that the
18  $2 million was impacting their --
19      Q    In their favor?
20      A    In their favor, correct.
21      Q    That was in --
22      A    -- July of 2016.  So we said -- they were
23  saying the $2 million was affecting their cash flow and
24  operations.  So we said that if we pay you for what you
25  ship this week, next week that puts you ahead as far as
```

```
 1   cash flow is concerned.  So that is what we started

 2   doing in December of 2016.  And it remains to be seen

 3   how they are going to prove that the $2 million

 4   ballooned to $12 million.

 5       Q    So that is what this Paragraph 2 was as you

 6   understand?

 7       A    Yes.  But we did not want to tell them that

 8   that is something which -- it was no sort of waiver to

 9   the original Manufacturing Agreement.  It was temporary

10   solution.

11           MR. ROSENTHAL:  Mr. Mazzola, what paragraph

12       were you talking about?

13           MR. MAZZOLA:  Paragraph 2 to attachment

14       Exhibit 40.

15           MR. ROSENTHAL:  Thank you.

16   BY MR. MAZZOLA:

17       Q    Who is Donovan Waite?

18       A    He is -- he is the accounting manager for

19   Circuitronix LLC.

20       Q    How long has he been accounting manager?

21       A    I think for three years now.

22       Q    Do you remember meeting -- the March 2018

23   meeting addressed air freight; is that your

24   recollection?

25       A    It spoke about air freight, yes.
```

```
 1      Q    So there is a document that is Exhibit 58 in

 2   the binder.  It starts off with an e-mail.  It's from

 3   Tracy.  It says, "Rishi, here is the meeting recap."

 4           MR. ROSENTHAL:  Give him a minute until he

 5      finds it.

 6           THE WITNESS:  Got it.

 7   BY MR. MAZZOLA:

 8      Q    When you testified earlier that the

 9   March 2018 meeting addressed air freight, is this the

10   meeting you were referring to?

11      A    Yes.

12      Q    It says Meeting Recap on the attachment.  Do

13   you see that?

14      A    Yes.

15      Q    Would you consider this meeting minutes?

16      A    Yes.

17      Q    Did you respond to this e-mail that Tracy

18   sent you on March 21, 2018?

19      A    Respond in terms of whether I agreed or

20   disagreement with this?

21      Q    Yes.

22      A    I did not because -- I did not, no.

23      Q    But you did get it, right?

24      A    I did get it.

25      Q    And there was no response to it?
```

```
 1              MR. ROSENTHAL:  Object to form.

 2    BY MR. MAZZOLA:

 3        Q    Is that correct?

 4              MR. ROSENTHAL:  Objection.

 5              THE WITNESS:  There was no response.

 6              MR. MAZZOLA:  Steve, we want to use

 7        Circuitronix Answers to Plaintiff's

 8        Interrogatories.  There was a new version printed

 9        off yesterday.  Do you have a copy we can use?

10              MS. MARTINEZ:  I can print one.

11              MR. MAZZOLA:  And excuse me.  I just need

12        to --

13              (Thereupon, there is a short break.)

14    BY MR. MAZZOLA:

15        Q    Who is Sourabh Sharma?

16        A    He manages inside sales team.  He is the

17    general manager for Circuitronix India.

18        Q    But he manages the inside sales team for all

19    the CTX operations?

20        A    No, for India.  For Circuitronix India.

21        Q    When you say inside sales -- I want to

22    refresh my recollection -- that means these are the

23    salesmen that sell to your upstream customers, right?

24        A    No.

25        Q    What do these guys do?
```

```
 1      A    They support the outside salespeople who sell

 2 to the upstream customers.

 3      Q    Okay.  So they are on that side then?

 4      A    So basically they do all paperwork, they

 5 order entry.

 6      Q    But they are your salesmen to sell to your

 7 customers?

 8      A    Yes, provide reports to outside salespeople.

 9      Q    Who is the head of your bookkeeping

10 department, accounting department?

11      A    Circuitronix LLC?

12      Q    Yes.

13      A    It's Donovan.

14      Q    Donovan.  Who is Todor?

15      A    Todor used to be -- Donovan took -- Todor

16 used to do the same thing as Donovan.

17      Q    And Todor is T-O-D-O-R, right?

18      A    Yes.

19      Q    What happened to Todor?

20      A    He left the company.

21      Q    Was he fired?

22      A    No.

23      Q    So Donovan is the person who took Todor's

24 position?

25      A    I am trying to recollect whether somebody
```

1    joined between Todor and Donovan, but today Donovan

2    does what Todor was doing.

3         Q    That is what?

4         A    He manages the entire accounting team.

5         Q    And that includes accounts payable, right?

6         A    Accounts payable and -- it includes accounts

7    payable, yes.

8         Q    And so Donovan does that now and Todor did it

9    then?

10        A    Yes.

11        Q    Between Donovan and Todor, the team that they

12   manage, that team would be responsible for accounts

13   payable, right?

14        A    And accounts receivable.

15        Q    And accounts receivable.  That team would

16   also be responsible for preparing the reconciliations

17   we talked so much about during this case, right?

18        A    Yes.

19        Q    And when I say reconciliations, you know what

20   I mean, right?

21        A    Absolutely.

22        Q    And that would be the team that -- I should

23   put something in front of you.  There is an

24   Exhibit 106.  It should be in the binders.

25        A    Yes.

```
 1        Q    Exhibit 106 is an e-mail from Melanie Rhodan.

 2   She is an accounts payable specialist, right?

 3        A    Yes.

 4        Q    And attached to that is a spreadsheet on

 5   Circuitronix letterhead.  Do you see that?

 6        A    Yes.

 7        Q    And then behind that looks like -- these look

 8   like something internal.

 9        A    That is screen shots from the payment forms.

10        Q    From the banks?

11        A    From the bank.

12        Q    Marcia doesn't work there anymore, Nicole

13   doesn't work there anymore, Melanie doesn't work there

14   anymore; is that correct?

15        A    Marcia, Nicole, Evan -- who's Chu Kwok Wai --

16   and Nicole.  None of them work there no more.

17        Q    So we have seen a lot of these documents, the

18   attachments.  Do you see this?

19        A    Yes, I do.

20        Q    The Circuitronix one, the green across the

21   top?

22        A    Yes.

23        Q    I think they are all the same color; is that

24   correct?

25        A    They are all what?
```

```
 1        Q    They are all the same color.  They all have

 2   the green across and the three columns?

 3        A    Yes, I think so.

 4        Q    So the green doesn't mean anything, right?

 5        A    The green --

 6        Q    The colors that you are using don't mean

 7   anything?

 8        A    Circuitronix company colors.  That is what a

 9   circuit board looks like.

10        Q    And then on these bank reference printouts --

11   do you see that?

12        A    Yes.

13        Q    I see it's got a source account, 2698, right?

14        A    Yes.

15        Q    They are both from 2698, and if you go to the

16   next page you will see that, right?

17        A    Yes.

18        Q    There is different amounts.  Do you see

19   that --

20        A    Yes.

21        Q    -- on the first and second one?

22        A    Uh-huh.

23        Q    The beneficiary is the same of course.  The

24   beneficiary account of course is the same, right?

25        A    Yes.
```

```
 1        Q    The bank that the money is going to is the

 2   same, as is the swift, right?

 3        A    Yes.

 4        Q    And they made the special instructions.  Then

 5   there is a Citibank reference number.

 6        A    Yes, which is different.

 7        Q    And those are difference numbers because

 8   those are just numbers that the bank applies to this

 9   particular wire; is that correct?

10        A    That is right.

11        Q    So that is not a number you create; is that

12   correct?

13        A    Yes, it's a Citibank reference number.

14        Q    And it says -- so when I say -- when I see

15   Citibank, I can presume that that means that these

16   payments were paid from the Citibank account; is that

17   correct?

18        A    That is correct.

19        Q    Does Circuitronix LLC have any other bank

20   accounts other than Citibank accounts?

21        A    Yes.

22        Q    What other bank accounts do they have?

23        A    HSBC.

24        Q    CTX LLC has an HSBC account?

25        A    Yes.
```

```
 1        Q    If you look back to the spreadsheet now on

 2   the page before --

 3        A    Yes.

 4        Q    -- there are bill numbers.  You see that,

 5   right?

 6        A    Yes.

 7        Q    Those bill numbers are unique numbers that

 8   were created by Benlida; is that correct?

 9        A    Yes.

10        Q    And then there is a bill date.  Do you see

11   that?

12        A    Yes.

13        Q    And this is a ledger of what is being paid

14   prepared by Circuitronix; is that correct?

15        A    Yes.

16        Q    So I can understand the dates, payment

17   detail, October 1, 2019 -- do you see that?

18        A    Yes.

19        Q    But if I look below, all the bill dates are

20   all from July, August, and it looks like there is a

21   debit memo at the bottom from September.  Do you see

22   that?

23        A    Yes.

24        Q    And this e-mail was sent in October; is that

25   correct?
```

 1      A    Yes.

 2      Q    When were the payments made?  The payments

 3  would have been made in September; is that correct?

 4      A    September 6 and September 18.

 5      Q    So why such a long lag time between the bill

 6  date and the payment detail that is prepared?

 7      A    So the contractual payment terms are AMS 60

 8  days.  So payments for bills in July are payable in

 9  October based upon AMS 60 days.

10      Q    How do you understand AMS 60 days to operate?

11      A    I understand it exactly the way everybody

12  should understand it.  It stands for after monthly

13  statement 60 days.

14      Q    So 60 days after you get the bill?

15      A    Sixty days after we get the monthly

16  statements.  So all of July shipments Benlida gives --

17  contractually supposed to give us a statement say the

18  first few working dates of August, and 60 days starts

19  from the monthly statement.

20      Q    So a bill date that says July 5, 2019, may

21  not have been received until some other time; is that

22  what you are saying?

23      A    No.

24      Q    It was received on July 5?

25      A    In that time frame.  But the actual statement

```
 1    for whatever happened in a month came in August.  And

 2    the reason why you see the invoices for 8/2 and 8/3

 3    included, because we didn't want to include those

 4    invoices in there, but Benlida requested us to include

 5    those invoices because they said the shipment was made

 6    in July.  So they wanted -- they wanted us to go by

 7    when they shipped from their factory, not when we

 8    received it.  So that is why -- and another reason why

 9    they told us they wanted us to do that was because they

10    wanted to keep their books with China Customs in sync.

11    So we accepted it.

12         Q    No big deal, right?

13         A    No big deal, because as long as we received

14    it in the first couple of working days and as long as

15    we had evidence that it was actually shipped in the

16    month of July, we included in there.

17         Q    You don't dispute that Benlida has sent you

18    these invoices; is that correct?

19         A    I don't dispute it at all.

20         Q    So if we pulled up all of these, there would

21    be no dispute that Benlida had sent the invoices,

22    right?

23         A    Absolutely.

24         Q    And when you say when we get invoices, this

25    detail that I am looking at is just for Circuitronix
```

```
 1   LLC, right?

 2        A    It says from Circuitronix LLC, and the

 3   invoice nomenclature also shows Circuitronix LLC.

 4        Q    But there are similar documents that say

 5   Circuitronix Hong Kong on it, right?

 6        A    There are, yes.

 7        Q    And those similar documents will have a

 8   different nomenclature or numbering convention, if you

 9   will, for the bill number, right?

10        A    That is right.

11        Q    And those that relate to Hong Kong would have

12   a HK on it someplace?

13        A    If I recollect correctly.  I would have to

14   look at it, but yes, sounds correct.  That sounds

15   correct.

16        Q    So when you say we get invoices, you are

17   referring to Circuitronix LLC and Circuitronix Hong

18   Kong, right?

19        A    Circuitronix LLC gets the Circuitronix LLC

20   invoices, Circuitronix Hong Kong gets Circuitronix Hong

21   Kong invoices.

22        Q    You use them collectively as we?  You did say

23   we.

24        A    Every time I am using we, I am talking about

25   Circuitronix LLC.
```

 1       Q    On this document over here?

 2       A    Unless you ask me differently, everything

 3   which I am going to testify to is about Circuitronix

 4   LLC.

 5       Q    Okay.  And when they would send invoices or

 6   bills for Hong Kong accounts payable, did they use the

 7   same e-mail addresses?

 8       A    No.  So, like, if you look at the e-mail, you

 9   would be able to see that ChuW@CircuitronixHK is a Hong

10   Kong e-mail address.  So if they send it to everybody,

11   the ones which are Hong Kong will be dealt by the Hong

12   Kong personnel, the one for US would be dealt by the US

13   personnel.

14       Q    But they would be copied on the same e-mail?

15       A    In some cases.

16       Q    So it would not be uncommon for me to see

17   another payment detail coming from the LLC that copies

18   people from Hong Kong on it; is that correct?

19       A    That is correct.

20       Q    And likewise, it would not be uncommon for me

21   to see a Benlida payment detail for US -- for Hong Kong

22   invoices that copy people in the US, right?

23       A    Yes, it would not be uncommon.

24       Q    This Exhibit 106, this spreadsheet, has a CTX

25   US credit balance.  Do you see that?

```
 1        A      That is correct.

 2        Q      Why the reference to US credit balance?  Was

 3   there a CTX Hong Kong credit balance?

 4        A      There should be.

 5        Q      As of October 1, 2019, do you know what the

 6   CTX Hong Kong credit balance was?

 7        A      I do not.

 8        Q      But there should have been one, right?

 9        A      Yes.

10        Q      One more question.  Why -- are you

11   familiar -- there might have been some talk, and I am

12   sure you heard about it -- this idea of first in, first

13   out accounting.  Did you hear anything about that?  Are

14   you familiar with that?

15        A      I am.

16        Q      And when Circuitronix would send these

17   payment detail accounts, there would be bill dates and

18   there would be amounts, right?

19        A      Yes.

20        Q      And was it your intention that what was paid

21   was to pay these particular bills?

22        A      So if you look at this point in time, we

23   should not have paid the 86,166 or the 101,356, because

24   we were already overpaid by 6,220,188.02.  We made

25   those payments as loans which were being requested by
```

```
 1   Benlida.

 2           And so in our case -- in this case -- there

 3   was no reason to do first in, first out basis, because

 4   the 5,506,949.73 would be covered for invoices of --

 5   let's assume at a million dollars per month -- for the

 6   next five to six months.

 7       Q    Your view is you didn't have to pay anything?

 8       A    We just had to apply it to past -- past

 9   balances which they owed us.

10       Q    How did you come up with this number; the

11   86,166 and the 101,356?  How did you come up with those

12   numbers?

13       A    The previous week's ships was paid in the

14   next week.  It was numbers which Benlida was asking us

15   for help on.

16       Q    You keep calling these loans.

17       A    Yes.

18       Q    Were there any loan documents in place?

19       A    So there are lots of e-mails which outline

20   discussions with loan documents, and there is an e-mail

21   where -- where Tracy or Douglas, I have forgotten

22   whom -- said not to provide the loan document, because

23   if it's a loan it would basically mess up their

24   financials even more.  But there are discussions where

25   they have acknowledged that any prepayment is a loan.
```

1          Q     But there is no loan document?  That is the

2     question.

3          A     There is no loan document.

4          Q     Was there any interest owed on this loan?

5          A     Technically there should be interest owed on

6     the loan, but as a good partner we -- we could see that

7     they were already in deep amount of trouble through

8     this and throughout the e-mails and everything else,

9     and the objective was not to do anything which would

10    make this situation any worse.

11         Q     So it was just an act of grace by you to not

12    have applied interest then, right?

13         A     Yes.

14         Q     And then what about were there any default

15    terms in this loan?  What happens if they defaulted?

16    Were there any terms agreed to?

17         A     Yes, lawsuit.

18         Q     They sued you.

19         A     If they not sued us, we would sue them very

20    shortly.  We understand the concept of statute of

21    limitations.

22         Q     Were any default terms -- beg pardon --

23    collateral.  Was there any collateral placed on this

24    loan?

25         A     There was no collateral.  There was no

```
 1    specific collateral as such.  At this point in time we

 2    were thinking they would continue shipping new parts to

 3    us, which would allow us to keep reducing the

 4    outstanding balance, but just around this time frame

 5    they went ahead and asked for -- started asking for

 6    prepayment.

 7        Q    You talked about a statute of limitations.

 8    You said we know what a statute of limitations is,

 9    right?

10        A    Yes.

11            MR. MAZZOLA:  What number are we up to?  This

12        is a new exhibit.

13            MR. ROSENTHAL:  I think 114.  Yeah, 114.

14            (Thereupon, Deposition Exhibit No. 114

15             is marked for identification.)

16            MR. MAZZOLA:  Plaintiffs Answers to

17        Plaintiffs Interrogatories.  Hold on.  It's the

18        Defendant's Answers to Plaintiff's

19        Interrogatories.

20            MR. LERNER:  The one you gave us yesterday.

21            MS. MARTINEZ:  I gave you two.

22            MR. MAZZOLA:  Do you have a copy of it?

23            MS. MARTINEZ:  I have a copy of it.

24    BY MR. MAZZOLA:

25        Q    Do you see this document, Rishi?
```

1        A    Yes, I do.

2        Q    This is Defendant's Answers to Plaintiff's

3   Interrogatories.  If we go towards the back, I think

4   there is a Page 13 -- there is two Page 13s -- but you

5   are signing and you are saying that this is true and

6   correct?

7        A    That is correct.

8        Q    So I will presume that you saw the questions,

9   you are aware of the questions, and you saw the answers

10  and you are aware of the answers that were being given

11  in this document; is that correct?

12       A    Yes.

13       Q    And you had talked earlier about the statute

14  of limitations, were aware of the statute of

15  limitations.  What did you mean by that?

16       A    You asked why did we not bring a claim, and I

17  was trying to explain in due course of time if we were

18  not able to resolve everything in an amicable fashion

19  we would have brought a claim.

20       Q    Ultimately you think you would have sued as

21  well first?

22       A    Yes.

23       Q    And the suit would have been on the loan; is

24  that what you're saying?

25       A    The suit would be on the damages which we

```
 1   have outlined in our supplemental interrogatories

 2   tomorrow -- yesterday.  We provided it to you

 3   yesterday.  We provided you additional supplement.

 4        Q    Additional one, right?

 5             MR. ROSENTHAL:  I think he is referring to

 6        the supplemental initial disclosure.

 7             THE WITNESS:  I am sorry.  Supplemental

 8        initial disclosure.

 9   BY MR. MAZZOLA:

10        Q    We are talking about this set of

11   Interrogatories over here and the statute of

12   limitations.

13             If you look at Interrogatory No. 8, do you

14   see that?

15        A    Yes.

16        Q    And you talk about the plaintiff, that being

17   Benlida, waiting an unreasonably long time to file the

18   late suit, and that defendant's ability to defend the

19   lawsuit have been unduly prejudiced by this

20   unreasonable delay.  Do you see that?

21        A    I do.

22        Q    And then you provide an answer.  Do you see

23   your answer over there?

24        A    Yes.

25        Q    And it says, "It appears that plaintiff is
```

```
 1    seeking to justify these false claims by asserting that

 2    the money defendant paid for these invoices was used by

 3    plaintiff to pay alleged debts from many years ago

 4    prior to January 19, 2017."

 5             Why did you say that?

 6       A    Because that is what they did.

 7       Q    What did they do?

 8       A    They just -- it's all documentation -- so

 9    on -- on -- starting December 2016, December 1, 2016,

10    anything shipped in a particular week, we made payments

11    next week and on a regular basis, never exceeding two

12    weeks.  There was master log which was kept where all

13    the invoices, all the shipments they made, was on the

14    left side, all the payments they made on the right

15    side, and -- or payment number on the top.  It was

16    shared between the companies.  So there is no way

17    anybody would be able to convince any finder of fact

18    that these invoices in 2018-2019 were not paid for.

19             And once all the documentation is -- once

20    everything is reviewed, you will see that what Benlida

21    did was that they flagged a certain discrepancy in

22    2016, and between 2016, '17, '18, '19 we worked

23    together and addressed those discrepancies.  Some we

24    agreed with them, some they agreed with us, we came up

25    to the numbers and the reconciliation.
```

```
1              As soon as we showed them that they were in

2     all paid position, all of a sudden they started

3     bringing up issues from 2011 to 2014, because we

4     clearly showed them that we had addressed all the

5     issues satisfactory.

6         Q    So you take objection to them applying

7     payments on later invoices to earlier invoices; is that

8     what you take objection to?

9         A    I take objection to three different things.

10    The first thing I take objection to is for the

11    statements for the record being shared starting with

12    December 2016, where week after week we are exchanging

13    the spreadsheets showing the invoices and the payments.

14        Q    Are these the reconciliation spreadsheets?

15        A    That is a different spreadsheet, different

16    set of spreadsheets.  It's not a different spreadsheet.

17    It's week after week.

18        Q    But the reconciliation spreadsheets are

19    accurate, right?

20             MR. ROSENTHAL:  Let him answer the question

21         you asked.

22             THE WITNESS:  Then the second thing which we

23         objected to is when month after month we are

24         sending these payment details, there is not a

25         single e-mail from Benlida saying, hey, guys, no,
```

```
 1        no, this money -- whether it's the 86,000 or

 2        101,000 or the 6 million -- do not apply that way.

 3        We have applied it this entire -- the entire game

 4        they started playing started in 2019 or 2020.

 5   BY MR. MAZZOLA:

 6        Q    What game was that?

 7        A    Of saying that -- the first time we heard

 8   that they were applying any of these payments to

 9   something in 2011, '12, '13, '14 was far, far --

10   actually it may even have been after the lawsuit.  I

11   cannot recollect.  And --

12        Q    What is wrong with them applying payments to

13   old unpaid invoices?  Why is that a problem?

14        A    So the first thing is that we are clearly on

15   a month-by-month basis showing what we are doing, and

16   they are not objecting to it.  That is number one.

17             Number two, you don't wake up one day in 2019

18   and say something is open in 2012 where all the minutes

19   of meetings from 2015, '16, '17, '18, '19 show -- do

20   not show my past due balances.

21        Q    So you don't believe there were any past due

22   balances?

23        A    There were no past due balances.  They are

24   all fabricated.  And we have given enough opportunity

25   for -- through our statements to show -- through these
```

1    statements to show what we were doing.

2            And the final one is the reconciliation, that

3    we gave -- we gave two reconciliations.  First we gave

4    one from 2015 to 2019.  They sat on it for a few

5    months, and then they came back and said now we need

6    stuff from 2011 onwards.

7        Q    Did you give them a reconciliation going back

8    to 2011?

9        A    To 2012.  And I had -- and then they provided

10   the feedback on that two thousand -- they provided

11   feedback on the reconciliation.  We addressed any

12   errors which we had made on the reconciliation, and we

13   resubmitted it to them addressing all the -- every

14   observation they gave.  And we still demonstrated we

15   were up by $7 million.

16       Q    So my question is this.  What is wrong from a

17   business accounting perspective with a business person

18   applying payments to old unpaid invoices?

19       A    Two things which are wrong.  The first thing

20   which is wrong -- actually three things which are

21   wrong.  The first one is -- the first thing that is

22   wrong, if it's fabricated, it's wrong.

23           The second thing, in 2019 or 2018 you

24   cannot -- 2019 you cannot bring up, hey, you guys have

25   adequately shown us the reconciliation from 2015 to

```
 1    2019, so now we need to go back to 2012.  In 2019, if

 2    you apply the statute of limitations, you passed 2012,

 3    2013, and all of 2014 actually.

 4            But leave that aside.  The most important

 5    thing is that once we gave the reconciliations, they

 6    have accepted our reconciliations.  They have accepted

 7    our -- they flagged certain errors in our

 8    reconciliations, we corrected those errors, and

 9    actually what they flagged increased the number, did

10    not decrease what was owed by them to us.

11        Q    So you simply just don't believe that those

12    invoices remained unpaid from 2011, '12, '13, '14?

13            MR. ROSENTHAL:  Object to the form.

14            THE WITNESS:  I don't -- it's not that I

15        don't believe.  I don't think they believe the

16        same.

17    BY MR. MAZZOLA:

18        Q    But you don't believe it either?

19        A    I certainly do not believe it.

20        Q    Let me ask you this question.  What does your

21    accounts receivable department do if a customer has got

22    some AR and they pay in to you?  Does your accounts

23    receivable department apply to the oldest invoice or

24    apply to the newest invoice?

25            A    GAAP doesn't allow that.
```

1       Q    What does your accountant do?

2       A    GAAP does not allow that.  You put it into a

3   suspense account and you continue to follow up with the

4   customer to provide you with a statement of what they

5   have paid.  And until the time they provide you with a

6   statement, you leave it in the suspension account.

7   International accounting rules do not allow you to

8   randomly apply invoices wherever you want to apply

9   invoices.

10      Q    So your people don't do that?

11      A    It's not -- it's not allowed by GAAP.

12      Q    So your people don't do that; is that what

13  you are telling me?

14      A    Yes, yes, they do not do that.

15      Q    Yes, they do not do that?

16      A    Yes.

17      Q    They don't do that?

18      A    They do not do that.

19      Q    And you don't believe the Benlida people were

20  doing that?

21      A    They didn't tell us they were doing, they

22  just fabricated everything for Sinosure, for Sinosure

23  and for China Customs.

24      Q    Do you have -- have you ever lied to the Tax

25  Authority or Customs officials?

```
 1        A     Never.

 2        Q     Ever lie to your insurer?

 3        A     Never.

 4        Q     Did you ever sugarcoat anything for the

 5   Customs officials?

 6        A     Never.

 7        Q     What about for your insurance companies --

 8        A     Never.

 9        Q     Who is Ralph Bischoff, B-I-S-C-H-O-F-F?

10        A     Ralph Bischoff was a -- Ralph Bischoff used

11   to own 50 percent of a company called EIEMS in India.

12        Q     EIEMS, what do they do?

13        A     They are in to PCBA, printed circuit board

14   assemblies.

15        Q     And his company was called -- what was it?

16        A     EIEMS.

17        Q     Is he -- are you part owner of that business,

18   or were you ever part owner?

19        A     Not me.  My mother bought 50 percent -- 60

20   percent of his ownership stake.

21        Q     When did she buy that?

22        A     2017 or 2018.  I have forgotten.

23        Q     Did he ever own any of your business?

24        A     No.

25        Q     She bought 60 percent of it?
```

```
 1      A    She bought -- yes.

 2      Q    How big was his business?

 3      A    Not big.  Small company.

 4      Q    It's a small -- what is a small company?

 5      A    I think today their sales are close to

 6  $3 million per year.

 7      Q    There was a lot of talk about round trip

 8  money, that Tracy asked you to send her money and you

 9  sent her money and then she was to send it back.

10           Do you remember those conversations?

11      A    I do.

12      Q    Do you recall asking Tracy to wire $150,000

13  to Ralph Bischoff?

14      A    I was trying to think -- yes, that is what I

15  did.  She still owe me $50,000.  I want my money right

16  now.

17      Q    What was the --

18           MR. ROSENTHAL:  Let the record reflect he is

19      smiling.

20  BY MR. MAZZOLA:

21      Q    What was the money going to Ralph Bischoff

22  for?

23      A    My mother -- my mother must have been using

24  it as a part of transaction.

25      Q    Why do it that way?
```

```
 1        A    Why do it in --

 2        Q    Why have Tracy send the money to Ralph

 3   Bischoff?

 4        A    Tracy asked me to help them where she would

 5   send money to us, $200,000, and we from Circuitronix

 6   Hong Kong would send money to ROK so they can clean up

 7   whatever mess they were in.

 8             So from my side and from my mother's side,

 9   you can do it in two ways.  The $150,000, which we send

10   to Tracy to ROK, she would have pulled that out as

11   owner's drawing into a personal name and sent it to

12   Ralph Bischoff.

13             Or we could help ROK -- Mr. Huang, Douglas

14   and Tracy -- with what they were trying to do, send it

15   to ROK and have Tracy send the money.

16             So as long as the transaction is booked

17   properly in terms of the money being withdrawn from

18   Circuitronix Hong Kong as owners drawing, and that is

19   what was done, and that is how it was reflected on our

20   financials.

21        Q    That is how you booked it out, owner's draw?

22        A    Owner's draw.  It had the same effect.  So it

23   was not -- we did not misrepresent or lie to any tax

24   authority or anything of that sort.  And they did

25   whatever they had to do to clean their mess up.
```

```
 1              MR. MAZZOLA:  Can we take two minutes?

 2              (Thereupon, there is a short break.)

 3   BY MR. MAZZOLA:

 4       Q    Rishi, we are done with that exhibit.  I

 5   think Stephen is going to be the -- keep track of them.

 6              MR. ROSENTHAL:  I will.

 7   BY MR. MAZZOLA:

 8       Q    I think in the binders there is two exhibits

 9   that were previously marked, Exhibits 68 and 69.

10       A    Yes, sir.

11       Q    Exhibit 68 is an e-mail stream dated from

12   May 2017.  Do you see that?

13       A    Yes.

14       Q    And it starts -- the bottom of the thread

15   says, "Please send me a photograph outlining the recap

16   of our discussion on 17 May 2017 on the white board to

17   me"?

18       A    Yes.

19       Q    Did that meeting happen in China or here in

20   the US?

21       A    Based upon my recollection in China.

22       Q    And the e-mail thread starts off with you

23   asking for an outline; is that correct?

24       A    Meaning we discussed something that was on

25   the white board.  So the handwriting where it says
```

```
 1    AMS 60 days and everything on the right side is my

 2    handwriting, and the main handwriting is Tracy's

 3    handwriting.

 4         Q    The -- you talked earlier about these

 5    meetings you would have a lot.  Is this white board

 6    a -- how would I call this -- a recap or memo of the

 7    meeting that you guys had somewhere around 17 May 2017?

 8         A    That should be correct.

 9         Q    And this was sent to you.  Did you ever

10    respond to this e-mail when you received it, Rishi?

11         A    No, I did not.

12         Q    I presume you read it, right?

13         A    Absolutely I read it.

14         Q    I presume you would have reviewed the

15    photograph?

16         A    Absolutely I did.

17         Q    And I presume if you had taken any exception,

18    you would have responded to Tracy, right?

19         A    Absolutely I would.

20         Q    Let's look at Exhibit 69.  This one is a

21    similar setup.  It's an e-mail addressed to you.

22         A    Yes.

23         Q    And then on the back of it is a photograph.

24    Do you see the photograph?

25         A    Yes.
```

```
 1      Q    Another white board.  And it starts off with,

 2  "For the number we found out in our last meeting in

 3  CTX, did CTX revise the books?  What is the payable

 4  number to Benlida/ROK now in CTX's books?  Please share

 5  more details to us."

 6           Did you respond to that e-mail?

 7      A    I cannot recollect.

 8      Q    Is this -- when she refers to our last

 9  meeting in CTX March 2018, were you present at that

10  meeting?

11      A    I was.

12      Q    That was a meeting at your offices here in

13  Florida, right?

14      A    Yes.

15      Q    When you look at the photograph in the next

16  page, white board, whose handwriting is that?

17      A    Tracy's.

18      Q    There is a black column and a blue column of

19  writing; do you see that?

20      A    Yes.

21      Q    The black column looks like it's -- it

22  represents -- talks about money.  Looks like moneys

23  owed.  Is that what it is?

24      A    Yes.

25      Q    And then the other side, the right side, the
```

 1    blue side, has BLD/ROK books; do you see that?

 2         A    Yes.

 3         Q    The left side is your books, CTX books; is

 4    that right?

 5         A    Yes.

 6         Q    And the right side is BLD/ROK books?

 7         A    Yes.

 8         Q    And below it has sub.  What does that mean at

 9    the bottom?

10         A    What does sub mean?  I cannot recollect, but

11    it's some sort of total or something.  I don't know.

12         Q    It says 4.124 million.  Do you know what that

13    total is?

14         A    I do not.  I do not, but --

15         Q    Do you see on the blue column it says

16    4.625 million?

17         A    Yes.

18         Q    Do you recall those totals being moneys that

19    were owed to Benlida?

20         A    I cannot recollect.  I am not able to

21    recollect, but all I can say with certainty is that

22    both these documents go against your case completely.

23         Q    That is fine.  It's not for me to decide.

24         A    But I cannot recollect.  That is fine.

25         Q    So you don't recollect?

```
1              MR. ROSENTHAL:  Object to the form.

2              THE WITNESS:  So --

3              MR. ROSENTHAL:  Just objection, asked and

4         answered.  I am saying as to the form, because we

5         typically do that in Florida practice, which means

6         anything having to do --

7              MR. MAZZOLA:  I will live and die by my

8         question.

9              MR. ROSENTHAL:  I just don't want to do

10        speaking objections, I would rather just say asked

11        and answered if that is okay.

12             MR. MAZZOLA:  That is fine.

13   BY MR. MAZZOLA:

14        Q    You can answer again.

15        A    There is some part of this which I am

16   completely aware of, but there is some parts which I am

17   not.  But, again, all in all -- these numbers do not

18   sound unreasonable to me.  Let's put it this way.

19        Q    And Tracy does ask you what is the payable

20   number to Benlida ROK now in CTX's books?  Did you

21   respond to this e-mail?

22        A    I gave her a complete reconciliation.

23        Q    And that would have been the response?

24        A    Yes.

25        Q    Did you understand Tracy to be trying to
```

```
 1   understand what she believed was owed to her?

 2        A    Yes.

 3        Q    And you gave her a reconciliation.  Would

 4   that have been a reconciliation done about July 2019?

 5        A    I cannot recollect the date, but some -- we

 6   worked on a reconciliation and gave a complete

 7   reconciliation.

 8        Q    Let's look at a reconciliation.

 9             (Thereupon, Deposition Exhibit No. 115

10              is marked for identification.)

11   BY MR. MAZZOLA:

12        Q    Rishi, that is a document we just marked

13   as --

14             MR. ROSENTHAL:  Are you going to give us a

15        copy?

16             MR. MAZZOLA:  Yes.

17   BY MR. MAZZOLA:

18        Q    Do you see this e-mail thread, Rishi?

19        A    Yes.

20        Q    It's dated May 22, 2019.

21        A    May I have the attachment?

22        Q    I don't have the attachments.  But you have

23   the document in front of you, right?

24        A    Sure.

25        Q    That is what I am using.  This is an e-mail,
```

```
 1   and when you refer to reconciliations --

 2        A    That is not what I am referring to.

 3        Q    What are you referring to?  Can you describe

 4   it to me.

 5        A    So this reconciliation, which is what you are

 6   seeing, Benlida and us, we put a system in place where

 7   starting I think 2016 -- definitely 2017 -- like,

 8   whatever was shipped in March, by the following month

 9   we would reconcile to any pricing discrepancy, any

10   quantity discrepancy.  So this is just one month.

11        Q    That is right.

12        A    So you would have -- you should have 12, 24,

13   36 -- between 36 to 48 months of reconciliation like

14   this, which the reconciliation I gave was a complete

15   master reconciliation from 2015 to 2019 which basically

16   listed the moneys we believed Benlida owed Circuitronix

17   LLC.

18        Q    That was sometime in July of 2019, right?

19             MR. ROSENTHAL:  Objection, asked and

20        answered.

21             THE WITNESS:  I cannot recollect.  You will

22        have to show me something.

23   BY MR. MAZZOLA:

24        Q    But it would have a final payment

25   reconciliation?
```

```
 1        A     If you show me the document, I will confirm

 2   if that is the one.

 3        Q     In any event, what you are saying is that

 4   this document, No. 115, down at the bottom it says,

 5   "Please find attached statement reconciliation for

 6   April 2019 invoices," this would just be one of many

 7   reconciliations done on a monthly basis, right?

 8        A     Yes.

 9        Q     Now, these reconciliations, they would have

10   been done by who?

11        A     So by this time the process had been really

12   streamlined.  We had one of our employees who was

13   actually sitting in the -- in Benlida, and any time a

14   shipment left she would first verify the quantities and

15   prices and everything else, and then for the entire

16   month we would do the reconciliation -- Chu Kwok Wai

17   would do it for Hong Kong and Melanie and Nicole would

18   do it for -- or Paul -- would do for the US, for the

19   LLC.

20        Q     How many employees did you have at Benlida?

21        A     We had one person in accounting.

22        Q     Was that Chu Kwok --

23        A     No, Chu Kwok Wai was based in Hong Kong.

24        Q     At CTX Hong Kong?

25        A     Yes.
```

```
1        Q     Paul Silodor was here in the US?

2        A     Yes.

3        Q     And this was a good team, right?

4        A     I believe that we have a good team.

5        Q     And the work they did was correct and

6   accurate?

7        A     Within what could be expected of a human

8   being, yes.

9        Q     Do you see, if you move up the e-mail thread,

10  Tracy is writing back?

11       A     What am I looking at?

12       Q     Middle of the page.

13       A     I don't think it's Tracy, it's Ms. Chen.

14       Q     Ms. Chen is writing back, correct?

15       A     Yes.

16       Q     She is writing something is defective?  Do

17  you know what she was referring to?

18       A     Yes.

19       Q     What is she referring to?

20       A     I don't know the nitty-gritty of things.

21  There must be some discrepancy.  There was -- it looks

22  like there was a discrepancy in the March invoice.

23  So -- and then she flagged something in an April

24  invoice.

25       Q     So Ms. Chen is clearly reviewing the
```

```
 1   reconciliations, right?

 2        A    Yes.

 3        Q    And Ms. Chen is pointing out, as you can see

 4   in this e-mail, things that she views to be a

 5   discrepancy, right?

 6        A    Yes.  Part of the reconciliation process.

 7        Q    This Benlida statement reconciliation, the

 8   one from April 2019, you see down below at the bottom

 9   it's the subject.  When the reconciliations were done

10   in 2019 and prior, did they include CTX Hong Kong?

11        A    You would have to show me the attachments --

12   if you show me the attachment, I will be able to -- to

13   comment on it.  Without the attachment, I cannot.

14        Q    Why did -- I am looking at these e-mails.  I

15   am seeing a lot of people from Hong Kong and people

16   from the US side all on the same e-mail.  Why was that?

17        A    For the benefit of Benlida, because they were

18   sending invoices and statements to the wrong parties.

19   So what we actually did was at some point in time we

20   actually made it simpler, we just put accountreceivable

21   and accountspayable@Circuitronix.com, and there were

22   lots of people who were in that -- and then our Hong

23   Kong people would pull up what is relevant for them and

24   the US people would pull up what is relevant for them.

25   Because a lot of confusion was coming because they
```

```
 1    would send information to the wrong e-mail or something

 2    of that sort.

 3         Q    And you are also saying -- I think, I want to

 4    clarify -- are you saying that Benlida was sending

 5    invoices that should have been going to Hong Kong to

 6    the US?

 7         A    So they were sending invoices in error in a

 8    group of, like, 20 invoices which were being sent to

 9    the US, there would be one invoice included for Hong

10    Kong.  When you would follow up what is the reason,

11    they would immediately flag an error.  And it happened

12    a few times.  So we resolved it and came up with these

13    global e-mail IDs.

14         Q    At some point CTX US had agreed to guarantee

15    all of Circuitronix Hong Kong's debts and liabilities.

16    Do you remember that?

17              MR. ROSENTHAL:  Objection.

18              THE WITNESS:  Absolutely wrong.

19    BY MR. MAZZOLA:

20         Q    That is not right?

21         A    Not right.

22         Q    Do you remember the -- do you remember the

23    Business Authorization?

24         A    Absolutely I do.

25         Q    What do you remember about that?
```

```
 1      A     If you can show me the Business Authorization

 2   I will be able to --

 3      Q     It's exhibit 27.

 4      A     "For the purposes of our company's business,

 5   Circuitronix LLC hereby authorizes Circuitronix Hong

 6   Kong Limited to place orders to your company on our

 7   behalf.  Circuitronix LLC assumes all of Circuitronix

 8   Limited's debts due to these orders."

 9            There were three types of orders which we

10   were placing with Benlida.  Circuitronix LLC was

11   placing orders for Circuitronix LLC's requirements.

12      Q     Hold on.  Okay, so Circuitronix LLC was

13   placing orders on its own behalf?

14      A     Yes.  Circuitronix Hong Kong was placing

15   orders --

16      Q     Let me guess, on behalf of CTX LLC?

17      A     Circuitronix Hong Kong.

18            MR. ROSENTHAL:  Why don't you just let him

19      answer.

20            MR. MAZZOLA:  I think I know where he is

21      going.

22            MR. ROSENTHAL:  But you didn't.

23   BY MR. MAZZOLA:

24      Q     On its own behalf?

25      A     Yes.  And then there was these orders,
```

1    Circuitronix LLC orders, which required some sort of

2    secondary operation in China.  As an example, their

3    boards which required PTF, so Circuitronix Benlida was

4    expected to build the boards and ship it to a PTF

5    subcontractor.

6         Q    Who was expected to build the boards and ship

7    it to the subcontractor?

8         A    Benlida was expected.

9         Q    To build and ship to subcontractor for

10   additional work?

11        A    Yes.  But the subcontractor was not their

12   subcontractor, it was a Circuitronix subcontractor.

13             So initially what was decided was for those

14   specific orders, Circuitronix LLC would place the

15   purchase order in Benlida, Benlida -- Circuitronix Hong

16   Kong -- Benlida would ship those boards to Circuitronix

17   Hong Kong.

18             So the order for that -- for that specific

19   was supposed to come from two places, because --

20   because the boards, when they were released to a

21   subcontractor -- let's assume a hundred thousand

22   dollars worth of boards were released to our

23   subcontractor -- if something got lost, those boards

24   got lost, Benlida wanted a way to get -- be made whole

25   for those boards.

```
 1              And so -- because it was our subcontractor.

 2    They were not working with that subcontractor.  So

 3    there was -- this was put in place that Circuitronix --

 4    since those boards were being consigned to Circuitronix

 5    Hong Kong, if those boards got lost before being

 6    returned to Benlida, we would be responsible for

 7    Circuitronix Hong Kong's debt on those boards.

 8         Q    I am sorry, Rishi.  You are an awesome

 9    witness.  I have deposed thousands of witnesses, but

10    that is barely passing the straight face test for me.

11              MR. ROSENTHAL:  Objection.

12    BY MR. MAZZOLA:

13         Q    Can you explain where it says that on this

14    document, Exhibit 27?

15         A    That is what it says, that for specific

16    orders -- so Circuitronix Hong Kong never placed orders

17    for Circuitronix LLC.  Circuitronix Hong Kong placed

18    orders for Circuitronix Hong Kong; Circuitronix LLC

19    placed orders for Circuitronix LLC; and in those

20    specific cases Circuitronix Hong Kong placed orders for

21    Circuitronix LLC for those specific cases.

22         Q    Were the invoices different?  Were the

23    purchase orders different?

24              Let's start the first time.  Were the

25    purchase orders different?
```

1        A      Were the --

2        Q      Could I find a purchase order that fit into

3   this square peg that you are creating?

4               MR. ROSENTHAL:  Objection.

5               THE WITNESS:  So if there were purchase

6          orders which were being placed, there would not be

7          those purchase orders, then we do not need to have

8          this Business Authorization.

9               At some point -- so Circuitronix LLC shipped

10         a hundred thousand pieces to -- Circuitronix LLC

11         built -- placed a PO for a hundred thousand pieces

12         to Benlida.

13   BY MR. MAZZOLA:

14        Q      LLC -- CTX LLC places a hundred thousand

15   order to Benlida?

16        A      Benlida build the hundred thousand pieces and

17   gave it to Circuitronix Hong Kong.  Circuitronix Hong

18   Kong coordinated the PTF process with the third-party

19   contractor.  They released the hundred thousand pieces,

20   shipped the hundred thousand pieces back to Benlida.

21   Benlida finished the last step of wash and packaging

22   and shipped the boards to us.

23               This Business Authorization letter is

24   specifically for if something happened to those boards

25   when it went to Circuitronix Hong Kong and the PTF

 1   process, because if the boards got lost in that entire

 2   process, Circuitronix Benlida would not be paid for

 3   them.

 4        Q    That is what it says?

 5        A    That is what this is for.  Because until

 6   today -- if by chance Circuitronix Hong Kong was

 7   placing orders from Circuitronix LLC, that means

 8   Circuitronix Hong Kong would need to be selling stuff

 9   to Circuitronix LLC.  They never sold stuff to

10   Circuitronix LLC.

11            The transaction is Circuitronix Hong Kong to

12   Benlida, Benlida ships the board to Circuitronix Hong

13   Kong, and Circuitronix Hong Kong to their customers.

14   Similar to Circuitronix LLC to Benlida, Benlida ships

15   the boards to Circuitronix LLC, and the board ships to

16   the customers.

17        Q    So this Business Authorization you are saying

18   is for that narrow scenario?

19        A    Because Circuitronix Hong Kong never placed

20   orders for Circuitronix LLC.  Never, ever placed orders

21   for Circuitronix LLC.

22        Q    So -- I want to understand though.  Could I

23   find a purchase order that fits this narrow scenario

24   whereby this Business Authorization would apply?

25        A    I believe that if you speak with your client,

1   she will be able to tell you about what I have just

2   said, about boards shipping to the PTF -- to the PTF

3   subcontractor.  They never paid the PTF subcontractor.

4   Circuitronix managed the PTF subcontractor.

5          The boards would reach -- you will see

6   several e-mails on record where they complained that

7   the PTF subcontractor is not returning the boards back

8   to them on time.  You will see several e-mails where

9   they are concerned -- when Benlida gives hundred

10  thousand pieces to the PTF subcontractor, the PTF

11  subcontractor, when they finish whatever they do, they

12  may return 99,500 pieces and 500 may get scrapped at

13  their end.  Who is going to be responsible for the 500?

14  So there is discussion about that.

15         So, yes, there is a complete line of

16  questioning associated with that.  There is a complete

17  line of transactions for which there is documentation.

18     Q    Associated with that aspect of it?

19     A    Yes.

20     Q    Why was that never reduced to this agreement?

21         MR. ROSENTHAL:  Why was what?

22  BY MR. MAZZOLA:

23     Q    Why was that language never introduced into

24  this agreement?

25     A    Because at the end of the day it was that

```
 1   situation.  There were other situations which were

 2   being contemplated where, say, Kinwong would build

 3   boards -- and it actually happened sometime in the

 4   future after 2014 -- Kinwong would build boards and

 5   ship it to Benlida for OSP or immersion tin.

 6           And so that -- in that situation also

 7   Circuitronix Hong Kong was doing certain transactions

 8   for Circuitronix LLC, but it's a very limited scope

 9   of -- Circuitronix Hong Kong never placed orders for

10   Circuitronix LLC.  Simple and straight.  Never.

11       Q    The orders are only placed for Circuitronix

12   Hong Kong?

13       A    Circuitronix Hong Kong.  Every board

14   Circuitronix Hong Kong got from Benlida went to

15   Circuitronix Hong Kong customers, besides this narrow

16   set of three, four, five transaction part numbers

17   where --

18       Q    Didn't every board that was produced by

19   Benlida go to clear it's way through Circuitronix Hong

20   Kong?

21       A    So every board either went to a warehouse

22   which was owned by Circuitronix Hong Kong or a

23   third-party warehouse which was not owned by us but we

24   subcontracted.

25       Q    But it all went to Hong Kong?
```

1      A    Because according to China Customs law it has

2  to transit out of the country.  That is right.  And our

3  terms with Benlida were FOB or FCE Hong Kong.  So we

4  were the ones responsible for moving the product from

5  Hong Kong to our customers either -- in the US.

6      Q    So you are telling me that there would be an

7  e-mail thread, or various e-mails treads, that discuss

8  your understanding of this agreement?

9      A    Not really.  There would be e-mail thread --

10  there should be some e-mail treads for sure, but mostly

11  e-mail threads would show the orders which apply to a

12  transaction like this.

13      Q    Did you ever hear or understand that Benlida

14  interpreted this as being a Business Authorization

15  whereby Circuitronix LLC would guarantee and pay the

16  debts of Circuitronix Hong Kong?

17      A    I heard about it not -- I heard about it at

18  some point in time in 2017 or 2018 when they asked me

19  to sign another authorization agreement, and I refused

20  to sign it.

21      Q    Did you disavow them of that statement in

22  2017?

23           MR. ROSENTHAL:  What statement?

24           MR. MAZZOLA:  Disabuse?  Disabuse.

25

```
 1   BY MR. MAZZOLA:

 2        Q    Did you disabuse them of that belief in 2017?

 3        A    Yes, by not signing it, by saying that

 4   Circuitronix Hong Kong would not responsible --

 5   Circuitronix LLC is not responsible for Circuitronix

 6   Hong Kong's debts.

 7        Q    And that is the position you maintain today,

 8   right?

 9        A    That is the position I maintain today.

10        Q    Has CTX USA ever paid a debt on behalf of CTX

11   Hong Kong?

12        A    Specific to?

13        Q    Benlida or anyone.

14        A    Has CTX USA paid a debt to -- I do not think

15   so.  I believe that Circuitronix -- I do not think so.

16             There were one or two wires with Circuitronix

17   which Benlida applied -- there were one or two wires

18   which Circuitronix -- which Benlida received from

19   Circuitronix LLC and applied to Hong Kong, and then at

20   some point in time when corrected it.

21        Q    What about the other way; any instance where

22   Circuitronix Hong Kong was paying the debt of CTX LLC,

23   the US operation?

24        A    So let's, again, start off by saying that

25   there were certain transactions -- like let's talk
```

 1   about the investment in the immersion tin line or the

 2   OSP payment.

 3          Benlida requested for all the money to come

 4   from -- to ROK.  Some of those moneys were moneys owed

 5   by Circuitronix LLC.  So if Circuitronix -- were owed

 6   by Circuitronix LLC and some of those moneys were owed

 7   by Circuitronix Hong Kong.  So let's assume that entire

 8   wire went from Circuitronix LLC --

 9      Q    So that would be an example of Circuitronix

10   LLC paying the debt of Circuitronix Hong Kong?

11      A    But shortly after that, Circuitronix Hong

12   Kong would pay their share by paying something -- let's

13   assume the OSP payment was hundred thousand dollars;

14   $75,000 was for Circuitronix Hong Kong, $25,000 for

15   Circuitronix LLC.  The money went from Circuitronix

16   LLC, because they wanted a hundred thousand dollars.

17   Then there is a possibility that $75,000 was applied --

18   Circuitronix Hong Kong made a payment for $75,000 on

19   behalf of Circuitronix LLC to balance the books out.

20   But it was very seldom.  It hardly happened.

21      Q    It sounds to me, though, like what you are

22   saying is there are examples where Circuitronix LLC

23   would pay a debt owed -- an amount owed, whether you

24   call it a debt or not -- an amount owed to Benlida or

25   ROK for US invoices and Hong Kong invoices; is that

```
 1   correct?

 2        A    Not for any invoices.  Not for any invoices.

 3   For any --

 4        Q    Let's do this --

 5             MR. ROSENTHAL:  Let him finish his answer.

 6             MR. MAZZOLA:  He can finish it, but let me

 7        put him out of his misery though.  My misery.

 8   BY MR. MAZZOLA:

 9        Q    Go ahead.  Continue.

10        A    Not for any invoices.  At the end of the day,

11   they could be -- it was never for parts, it was for

12   something like investment in the immersion tin line or

13   OSP or something of that sort.

14        Q    Okay.  Well, this is why I do use documents

15   sometimes.

16             MR. ROSENTHAL:  Is this going to be 116?

17             MR. MAZZOLA:  Yeah, 116.  I don't have the

18        e-mail chain.  I probably did, but I decided it

19        wasn't interesting enough.

20             (Thereupon, Deposition Exhibit No. 116

21             is marked for identification.)

22   BY MR. MAZZOLA:

23        Q    This is a payment detail.  Do you see this?

24        A    Yes.

25        Q    It's an exhibit marked 116.
```

1        A    Yes.

2        Q    Now, I learned earlier on today that when it

3   says from Circuitronix LLC, that means Circuitronix US

4   operation, right?

5        A    That is correct.

6        Q    And ROK, that is a Benlida business, right?

7   It's a Mr. Huang business?

8        A    It's not a Benlida business, it's a separate

9   business.

10       Q    But it's a Mr. Huang business, right?

11       A    Yes.  ROK is a signatory to the Manufacturing

12   Agreement.

13       Q    They are a signatory to the Manufacturing

14   Agreement, right?

15       A    So different entity but --

16       Q    I am holding up Exhibit 21.  They are a

17   signatory to this agreement, right?

18       A    Sure.  If we thought they were one, we would

19   not split them up.  Similarly, if we thought

20   Circuitronix LLC and Circuitronix Hong Kong were one,

21   we would not add the secondary agreement.

22       Q    I am just saying, here is an example, right?

23       A    Sure.

24       Q    It's in 2016, right?  And it looks to me like

25   it's an example of Circuitronix LLC paying a Hong Kong

```
 1    invoice; am I correct?

 2        A    ROK's Hong Kong invoice, not Benlida's Hong

 3    Kong invoice.  There's a difference.

 4        Q    Are they paying a Hong Kong invoice?

 5        A    ROK's invoice, not Benlida's.  There is a

 6    difference.

 7        Q    What is the difference?

 8        A    The -- right at the beginning when

 9    Mr. Huang -- when Douglas started -- or Mr. Huang

10    started ROK, they requested specifically for ROK -- so

11    they can get concessions from the Chinese government

12    because it was a start-up -- that all the payments

13    should come from the US specifically for ROK.

14             You will not see this in the case of Benlida.

15    You cannot turn around and combine Business

16    Authorization letter to Jiangmen Benlida and put that

17    for ROK.

18        Q    But this is an example of a payment on behalf

19    of CTX Hong Kong coming through the US; is that

20    correct?

21        A    For ROK.

22        Q    I don't care who it's being made on behalf

23    of.  Is that correct?

24        A    It's correct for ROK.

25        Q    If I went through all of the payment details
```

```
 1    like this, would I find other examples of Circuitronix

 2    LLC paying something -- I don't care who it's going

 3    to -- paying something on behalf of CTX Hong Kong?

 4    Would I see other examples?

 5         A    You may for ROK, yes.

 6         Q    For ROK, right?  How would I know it's for

 7    ROK?  Because it would say it, right?

 8         A    Yes, sir.

 9              MR. ROSENTHAL:  Objection to form.

10    BY MR. MAZZOLA:

11         Q    We were talking about instances of CTX USA

12    paying on behalf of CTX Hong Kong.  What I am trying to

13    understand is if that ever happened -- and we went over

14    the one example which you say was limited to the ROK

15    scenario --

16         A    I think you stated that incorrect.

17         Q    Correct me please?

18         A    I told you that for payments like where --

19    for payments like OSP and investment into immersion tin

20    lines -- if by chance one company paid those amounts

21    which were not part related, a certain portion was owed

22    by the other company, and to -- if -- I gave the

23    example that if by chance there is $200,000 was paid

24    for the immersion tin line, and it was decided that a

25    hundred thousand is going to be taken by Circuitronix
```

1   Hong Kong and a hundred thousand by Circuitronix LLC,

2   and the payment went from Circuitronix LLC, then

3   Circuitronix Hong Kong would pay hundred thousand of

4   Circuitronix LLC's invoices.

5       Q    I understand.  But we also just went over the

6   other example --

7       A    That is ROK.  That is different.

8       Q    Okay.  I am trying to understand this

9   document.  This is why I have been scratching my head

10  over here.

11              (Thereupon, Deposition Exhibit No. 117

12                is marked for identification.)

13  BY MR. MAZZOLA:

14      Q    This is an e-mail we marked as Exhibit 117.

15  Do you see this e-mail from 2016?  It's from Jim Cho.

16  Do you see that?

17      A    I do.

18      Q    Jim is in Circuitronix Hong Kong, right?

19      A    Yes.

20      Q    And it talks about payment details.  See how

21  it says payment details for Benlida, and it has the CTX

22  Hong Kong on it?  Do you see that?

23      A    Yes.

24      Q    "Dear Tracy:  Attached are the CTX Hong Kong

25  payment details for your info and our payment records

1    as below.  Thank you."

2            And there is two payments; do you see that?

3    It says approved?

4        A    Yes.

5        Q    There is two payments.  There is a Citibank

6    payment, which I understand to be the CTX US account?

7        A    Yes.

8        Q    And there is an HSBC payment, which I

9    understand to be the Hong Kong account?

10       A    Hong Kong also has a Citibank account.

11           MR. ROSENTHAL:  Where are you pointing about

12       the HSB --

13           MR. LERNER:  Middle.

14   BY MR. MAZZOLA:

15       Q    Hong Kong may have a Citibank?

16       A    Not may have, has.

17       Q    Okay, they have.  And if they have, that

18   would make my next question a lot more difficult, but

19   it's not so difficult because it does say in a

20   parenthetical that CTX pay on behalf of CTX Hong Kong.

21   What does that mean?

22           MR. ROSENTHAL:  Object to form.

23           THE WITNESS:  So I need to go back and look

24       at the records, but it could fall in the category

25       of payments which I have just spoken to you about.

```
 1        That is number one.  Or number two is whether

 2        subsequently this was an error and it was

 3        corrected in subsequent statements.  So those two

 4        possibilities.

 5   BY MR. MAZZOLA:

 6        Q    And the third possibility is that perhaps CTX

 7   just paid something on behalf of CTX Hong Kong?

 8        A    Not possible.

 9        Q    Not possible.  Any other possibilities?

10        A    I have given you the information which I have

11   here.

12        Q    Well --

13        A    I don't even see the payment details for

14   Circuitronix, the 90,000 attached.  So I will have to

15   go back and look into what that was.

16             MR. MAZZOLA:  Maybe this will help.

17             (Thereupon, Deposition Exhibit No. 118

18              is marked for identification.)

19             MR. ROSENTHAL:  Would you mind putting

20        exhibits at the bottom, so when it's scanned --

21             MR. MAZZOLA:  Sorry about that.

22             MR. ROSENTHAL:  It's easier for document

23        management.

24   BY MR. MAZZOLA:

25        Q    This is another e-mail.  It's from Jim Cho to
```

 1   Tracy.  Looks like it's in July 2016.  Do you see that?

 2        A    Yes, I see the e-mail.

 3        Q    And it's payment details of CTX Hong Kong

 4   payments.  Do you see that?

 5        A    Yes.

 6        Q    Now, here it's talking about payments from

 7   the HSBC account.  Do you see that?

 8        A    I do.

 9        Q    Can you talk to me about -- if you'd put 117

10   in front of you.

11        A    I have got it.

12        Q    And you have 118 in front of you, right?

13        A    Yes.

14        Q    Let me ask you this question.  Looking at

15   118, does this help jog your recollection, refresh your

16   recollection, or help you better understand why on 117

17   CTX is paying on behalf of CTX Hong Kong?

18        A    On 117?

19        Q    Yes.

20        A    Where is 117?

21        Q    117.

22        A    Oh, 117, okay.  No, as I said, I have to go

23   back and look at the records.  I cannot -- I have to go

24   back and see what the 90,000 was specifically paid for.

25        Q    Here is the next question then.  Maybe you

1   can help me with this.  Both of these have a credit

2   balance, do you see that?  117 has a credit balance and

3   118 has a credit balance?

4        A    Yes, I see that.

5        Q    How does -- how are they the same, the

6   19,047.65.  Can you talk me through the logic of this?

7             On 117, Exhibit 117, it says current payable

8   balance paid in total 331,303.78.  Do you see that?

9        A    Can I just use my calculator?

10       Q    Sure.

11            It may be very simple, Rishi.

12       A    Give me one second.

13            Go ahead.  I am okay.  Tell me.  It's the

14   same -- this is 10th of July, the 19,047.  He pays the

15   next month -- it's 581.  We paid 160 plus 90.  He is

16   showing the balance as 331.  Out of the 331, the

17   19,047.65 still has to be subtracted.

18       Q    Then in the following -- I guess my question

19   is how do you -- how is the current payable balance

20   carrying over every month?  Is that always carried over

21   every month?

22       A    Why don't we see the next month.

23       Q    I don't have it at hand.

24       A    Because let's see what it takes, because the

25   next month there should be a positive balance of

 1   331,303.78 minus 19,047.65 --

 2           MR. ROSENTHAL:  You should probably say those

 3       numbers more slowly for our court reporter.

 4           THE WITNESS:  In the following month for

 5       September, there should be a positive balance in

 6       Benlida's favor of 331,303.78 minus 19,047.65.

 7   BY MR. MAZZOLA:

 8       Q    Let's look at 118, Exhibit 118.  I took my

 9   calculator out.

10       A    The math out there is correct.

11       Q    So that reflects -- in 118 it reflects an

12   overpayment is what you are saying, right?

13       A    Yes.

14       Q    And then in 117 it reflects that for the next

15   period 331,303.78 less 19,047.65 would be due

16   presumably?

17       A    Next what?  Sorry.

18       Q    On the next one following.

19       A    Yeah.

20           MR. ROSENTHAL:  By the next one, you are

21       referring to the next one --

22           MR. MAZZOLA:  The next one in sequence.

23           THE WITNESS:  117.

24   BY MR. MAZZOLA:

25       Q    Not 117.  The next one that would follow --

```
 1      A     Oh, yes, the September invoice.  The

 2   September payment.

 3      Q     In terms of things like penalty, lead time

 4   penalty, air freight, were those items broken down

 5   between US CTX and Hong Kong CTX?

 6      A     So until when we were sending them, they were

 7   broken, and the spreadsheets which we have are also

 8   separated.

 9      Q     At some point you stopped sending them; is

10   that correct?

11      A     No.  When the prepayment started, there was

12   no need to send them.

13      Q     Okay.  That is it?

14      A     Yes.

15            MR. MAZZOLA:  We have ten more minutes?

16            MR. ROSENTHAL:  I was just informed at this

17       moment that for our sake our food won't be here

18       until 1:30.  So if you want to wait -- if

19       Mr. Kukrega can keep going --

20            MR. MAZZOLA:  I figured we'd break at --

21       yeah, let's do that.

22            (Thereupon, there is a short break.)

23   BY MR. MAZZOLA:

24      Q     So I think I was asking about some lead time

25   penalty before we took that little quick break.
```

```
 1        A    Yes.

 2        Q    And you had indicated that there was a time

 3   period where the lead time penalty ended or they were

 4   stopped being calculated?

 5             MR. ROSENTHAL:  Objection.

 6   BY MR. MAZZOLA:

 7        Q    Clarify for me please.

 8        A    So at some point in time when there was

 9   prepayment which was being requested and we were

10   prepaying the moneys, two things happened.  One is

11   quantum purchase orders which we were using on Benlida

12   became very small, and the second thing was that

13   Benlida more or less was meeting the established lead

14   time on the parts, because they had a lot of open

15   capacity.  There are stragglers letters here and there

16   where there is -- they do default on the lead time

17   penalty, but the amount is so insignificant that we

18   stopped -- it stopped not being calculated, it's been

19   calculated, but I am not sending it to them.

20        Q    When did that start?

21        A    We did it --

22        Q    Yeah.

23        A    Not sending it?

24        Q    Yes.

25        A    I cannot recollect.
```

```
 1      Q    How were lead time penalties calculated?  Was

 2   there a formula?

 3      A    Yes.  It was as per our agreement in the

 4   minutes of the meeting.

 5      Q    But originally?  Is it in the contract, the

 6   manufacturing contract?

 7      A    Yes.

 8      Q    It is, okay.  You have that in front of you,

 9   right.  It's Exhibit 21?

10      A    The exhibits are not --

11           MR. ROSENTHAL:  Yes, here.

12           THE WITNESS:  The thing which I have seen is

13       the exhibits are not included in the -- let me

14       just see.  I take it back.  They are there.  Yes.

15   BY MR. MAZZOLA:

16      Q    It's not a trick question, Rishi.

17      A    Actually it's not.  The lead time penalty

18   formula, there is another document.

19      Q    And that was a formula that had been agreed

20   on by you and Benlida?

21      A    There was a formula between -- agreed between

22   us and Benlida, and they -- we sent them lead time

23   penalty debit notes for close to two years, two to

24   three years, before they objected to any of it.  Yes,

25   there was an agreement.
```

```
 1        Q    And you don't recall in what time -- what

 2   year it was or what date it was -- that you stopped

 3   charging the lead times?

 4             MR. ROSENTHAL:  Object to form.  Objection,

 5        misstates testimony.

 6             THE WITNESS:  I do not remember the time, but

 7        it's not that we stopped charging.  We calculated,

 8        but I don't send it to them.

 9             (Thereupon, Deposition Exhibit No. 119

10              is marked for identification.)

11   BY MR. MAZZOLA:

12        Q    This is a document we have marked as 119,

13   Exhibit 119.  This is an e-mail thread dated June 8,

14   2016.

15        A    Yes.

16        Q    So the e-mail thread starts off with Jim

17   sending to Tracy a penalty for lead times.  Do you see

18   that?

19        A    Yes.

20        Q    And obviously you are copied on it?

21        A    Yes.

22        Q    And so is Lina copied on it?

23        A    Yes.

24        Q    And Tracy pushes back and she objects.  Do

25   you see that?
```

1        A     Yes.

2        Q     When Jim sent this out to Tracy, he talked

3    about a lead time penalty of $36,581.86.  If you go to

4    the last page you will see that.

5        A     Yes.

6        Q     As Tracy calculates it, she comes up closer

7    to somewhere around $63.  Do you see that?

8        A     After adding days only four PO are late and

9    penalty amount is 33.60.

10       Q     She comes up with $33?

11       A     That is what she wrote in that part of the

12   e-mail.

13       Q     I guess that is a pretty large discrepancy,

14   isn't it?

15       A     That is a pretty large discrepancy.  The two

16   issues are this is related to Circuitronix Hong Kong.

17   So I have not reviewed it closely.

18             The second problem is that she just used an

19   arbitrary methodology on what she was -- so, yeah.

20   I -- every time we got e-mails like this, all we said

21   is that we will have to sit down and discuss, because

22   we do not agree with that calculation methodology.

23       Q     So the reconciliations wouldn't be adjusted

24   on a receipt of such an e-mail, right?

25       A     So by this time -- actually I have to -- I

```
 1    stand corrected on one thing which I wanted to tell

 2    you.  Initially I told you that we stopped sending lead

 3    time penalty on March 1, 2016.  It was March 1, 2017.

 4           But more importantly, during minutes of

 5    meeting, we had waived the penalty for March of 2016 to

 6    October of 2016.  So that was taken out of the

 7    equation.

 8       Q    But not in June of 2016 it wasn't?

 9       A    So in June of 2016 it was not.

10       Q    And I guess my question is this is an e-mail

11    thread where Tracy is writing back and she is objecting

12    to some -- to your calculations.  Do you see that?

13       A    Yes.

14       Q    When Tracy would object to your calculations,

15    did your team do anything?  Did they review?  Did they

16    correct?  What did they do?

17       A    So I know that at some point in time I got

18    involved, and when Tracy objected I objected back to

19    what Tracy was saying and we would say that we would

20    sit down and meet and see to it where we could come up

21    with -- but the specific one is related to Circuitronix

22    Hong Kong.  So I am not -- I have not really reviewed

23    it.

24       Q    Do you know if this discrepancy was ever

25    corrected?
```

```
 1            MR. ROSENTHAL:  Objection.

 2            THE WITNESS:  On the Circuitronix Hong Kong

 3       books?  I am not sure, because I have not done any

 4       sort of reconciliation.  I have not reviewed any

 5       reconciliation for Hong Kong.

 6  BY MR. MAZZOLA:

 7       Q    But the reconciliations were done?

 8       A    Reconciliations were done at some point, yes.

 9       Q    Are you aware of other examples similar to

10  this Exhibit 119 where Tracy writes back objecting to

11  lead time penalty?

12       A    I am aware of that.

13       Q    Are you aware of other examples where Tracy

14  writes back objecting to a reconciliation number?

15       A    Reconciliation?  Which one, monthly

16  reconciliation?

17       Q    Yes.

18       A    The monthly reconciliations, they objected,

19  but at the end of the day, by the time we finished it

20  in 2019, or whenever it stopped, there was no

21  disagreement because -- in 2017, '18, '19, finally

22  there was sort of complete agreement in the monthly

23  reconciliation.

24       Q    So by November 2019 your position is that

25  Benlida/ROK and Tracy were in full agreement with your
```

1   reconciliation?

2       A    For 2017, '18, '19.

3       Q    Yes.

4       A    Monthly reconciliations.  As far as master

5   reconciliations, they were in full agreement with our

6   Circuitronix LLC reconciliation from June to -- from

7   2012 to 2019 and --

8       Q    The master reconciliation?

9       A    Master.  Because what they did was we

10  provided them with feedback, they made certain

11  observations, we corrected those observations, and that

12  really did not decrease the numbers.

13      Q    And the master reconciliation, that was in

14  two thousand when?

15      A    From 2015 to 2019 was in March-April of 2019,

16  and from 2012 to 2019 was in November of 2019.

17          MR. MAZZOLA:  I think this e-mail is

18      somewhere out there guys.

19          (Thereupon, Deposition Exhibit No. 120

20           is marked for identification.)

21  BY MR. MAZZOLA:

22      Q    Rishi, this is a document we marked as 120.

23  I think it's a similar version as what has already been

24  put out there.  There is attachments, and we will get

25  to that.  I am just trying to keep track of the time

```
 1    before the break.

 2              You referred to the master reconciliation.

 3    Is this what you are referring to, what is attached?

 4        A    Yes.

 5        Q    See how it goes from April 2012 to -- for

 6    Benlida and ROK.  It's everything?

 7        A    Yes.

 8        Q    I am not going to ask you any more questions

 9    about that.  I wanted that put aside before the break

10    so I don't have to go crazy trying to find it.

11              Before we break, you talked about a person

12    that works for C -- CTX employee working at BLD.

13        A    Used to work.

14        Q    Were they your person, or was it like a

15    Benlida person?  Was it a secundant?  What was the

16    arrangement?

17        A    It was a Circuitronix employee.

18        Q    They were there every day, they had a desk

19    and --

20        A    Yes.

21        Q    Who did that person report to?  I assume you.

22        A    No, to Honkit Cho.

23        Q    And I presume -- and that was Jim, Honkit

24    Cho?

25              THE REPORTER:  Can I get a spelling on that?
```

```
 1              THE WITNESS:  H-O-N-K-I-T  C-H-O.

 2   BY MR. MAZZOLA:

 3       Q    We are going to get into the spreadsheets,

 4   but we can look at this document 120, right?  Why are

 5   you sending spreadsheets for the Hong Kong operation?

 6       A    I only sent it for Circuitronix US and ROK.

 7       Q    But it does say ROK payment details for

 8   US-HK.

 9       A    Reason is because specific to ROK, we

10   received instructions to -- from Benlida to make

11   payments to ROK for monies which were not owed at that

12   point in time to ROK.

13       Q    So it was intentional for you to leave Hong

14   Kong office this spreadsheet then, right?

15       A    That is correct, because we were not doing

16   Hong Kong.  But at some point in time we did send Hong

17   Kong too.

18       Q    Because you sent the spreadsheet -- let's

19   look at this one over here.

20              (Thereupon, Deposition Exhibit No. 121

21               is marked for identification.)

22   BY MR. MAZZOLA:

23       Q    This is 121, and you can look at it together

24   with 120.  This is from July.  This document I put in

25   front of you is 121, and this is from July 2019.  So
```

 1    just a couple months earlier, right?

 2         A    Yes.

 3         Q    And this one seemingly includes Hong Kong

 4    payments.  I don't think the spreadsheets are useful,

 5    but you can look at it if you want.

 6              MR. ROSENTHAL:  What is the question?

 7    BY MR. MAZZOLA:

 8         Q    Well, Rishi, you just said that in

 9    November 2019 on Exhibit 120 it was your intent --

10    intent -- to not give any information regarding CTX

11    Hong Kong because they were separate companies.

12              And then I am just asking -- maybe you can

13    clarify -- why four months earlier or five months

14    earlier when you were sending over reconciliations you

15    included Hong Kong payments?

16         A    Firstly, you should be aware that the

17    reconciliation from November 1, 2019, is completely

18    different from the reconciliation in July of 2019.

19         Q    July starts in 2015 --

20         A    No, July starts in 2016.  July is the

21    reconciliation showing what was shipped one week, paid

22    next week.  Douglas was claiming that we were not

23    adhering to the agreement what we accepted on the

24    July -- in the December 20 -- December 14, 2016

25    meeting.  And so I gave this and I said you are wrong,

1  because if you look at this we have paid you -- even

2  without taking lead time penalty and -- lead time

3  penalty and price increase into account, we have

4  overpaid you by 256,344.13.  This is specific to what

5  shipped one week, was paid next week.

6          And if you recollect, I told you that we were

7  changing sheets everyone to two weeks.  Zero objection.

8  Zero objection to this one that those invoices are

9  paid.  The invoices on the -- so this one is --

10     Q    What are you holding up?  What number?

11     A    121.  That is a different reconciliation.

12     Q    So 121 is a different reconciliation than 120

13  is what you are telling me?

14     A    121 is trying to show Douglas and Tracy that

15  their statement that we are not following the agreement

16  established in December of 2016 is incorrect vis-a-vis

17  payments, because what was shipped one week was paid

18  next week, and we were in an overpaid situation of

19  256,344.13 without taking into account lead time

20  penalty and price increase which would only increase

21  that number.

22     Q    So I guess my question was -- it initially

23  started because you said in November it was intentional

24  to leave off reference to Hong Kong, and then I am

25  trying to understand why in July, if it was the intent

1   to not mention Hong Kong in November, you included Hong

2   Kong in these spreadsheets.  Regardless of what the

3   area covers, why would you include Hong Kong in July

4   but not in November?

5        A    Because they had different objectives.  The

6   objectives were separate.  Even after the November 1,

7   2019, USA payment reconciliation, we also sent the Hong

8   Kong payment reconciliation two, three months later.

9        Q    After July?

10       A    After 3120, after November 1.

11            MR. ROSENTHAL:  Do you mean Exhibit 120?

12            THE WITNESS:  Yes, Exhibit 120.  We sent the

13       Hong Kong reconciliation I would say in the

14       March-April time frame of 2020.  So why was I

15       sending it?  At the end of the day, they were

16       accusing a company under my management that we

17       were not paying or doing whatever they were

18       fabricating, and I was demonstrating that none of

19       my companies were doing what they were

20       fabricating -- what they were -- what they were

21       claiming that we were doing.

22   BY MR. MAZZOLA:

23       Q    Is it possible your company was maybe

24   mistaken?  Maybe the bookkeeping was not good, not

25   accurate; is that possible?

1       A    So let's go back to the July 29, Exhibit 121.

2   After the July 29, 2019 e-mail was sent, Tracy sent

3   feedback to the e-mail where she flagged discrepancies

4   of $450,000 or something.  She agreed to everything

5   besides a number of $450,000.  There is an internal

6   e-mail between them where it breaks down about the

7   disagreement with the $450,000.  So if it was a mistake

8   by my team, as per Tracy they agreed to everything

9   which we sent July 29 beside that 400 to $500,000

10  quantum.

11      Q    And are you assuming Tracy found every

12  mistake?

13      A    I gave that feedback for the July 2019.  When

14  we sent the master agreement on November 1, 2019,

15  master reconciliation, there were between five to ten

16  e-mails which Ms. Chen sent us.  We went back and forth

17  about there is a mistake here, correct this mistake and

18  everything else.  And based upon the feedback which was

19  provided to us, we corrected the November 1, 2019 --

20  whatever feedback was given to us over five to ten

21  e-mails.

22           And the numbers sort of remained in the same

23  ballpark, maybe decreased or increased a little bit.  I

24  would assume with such detailed feedback, if they had

25  found any discrepancies, they would have flagged it

1    beyond that -- beyond those five to ten e-mails.

2              And so that is why I believe that there may

3    have been mistakes made by the team.  Those mistakes

4    were flagged by them, and we corrected the mistakes and

5    we gave -- after correcting the mistakes, we gave

6    another version of the reconciliation in January of

7    2020 which shows a similar or slightly higher number.

8         Q    We won't have time to go into that right now.

9    I do want to look at one more point.  I heard what you

10   said, Rishi, but I want to look at the July

11   reconciliation.  This is marked as 121.  If you go to

12   the very next page there is some spreadsheets there.

13        A    Yes.

14        Q    You are combining in July of 2019 the USA

15   operation and Hong Kong operation.

16        A    I am not combining.  They are separate.

17        Q    But you do see that?  You see it's on the

18   same spreadsheet?

19        A    In separate columns.

20        Q    But it does have a third column that totals

21   up, that combines it, right?

22        A    That is right, because they are saying two

23   companies under my control do not have -- are shorting

24   them.

25        Q    Are what?

1       A     Shorting them.  And I was trying to explain

2    to them that -- yeah, I was trying to explain to them

3    that we were doing nothing of that sort, and this is

4    the only way I could do it to give a global picture to

5    everything.

6       Q     But both these companies are under your

7    control.  I am not going to get into a debate with you

8    over corporate structure.  You acknowledge they are

9    under your control?

10      A     Absolutely.  I haven't challenged that.

11      Q     And there are some examples, this is being

12   one, where you do combine on spreadsheets US operation

13   and Hong Kong operation?

14            MR. ROSENTHAL:  Object to the form.

15            THE WITNESS:  We do combine with the purpose

16        of demonstrating what we needed to demonstrate.

17        We do not combine in any manner to try to show

18        they are one and the same organization.

19   BY MR. MAZZOLA:

20      Q     You said that, I didn't say that.  I am just

21   asking if it's true that there are documents that

22   reflect CTX Hong Kong and CTX USA that are the same

23   document that has been provided to our clients.  That

24   is all I am asking.

25      A     Yes.

 1        Q    And if you go through this a little bit

 2   more -- the pages aren't numbered, but you will see the

 3   invoice numbering convention and you will see HK next

 4   to it.  If I see that, that means it's a Hong Kong

 5   invoice, right?

 6        A    Yes.

 7        Q    And if I don't see a HK, it means it's a US

 8   invoice, right?

 9        A    Yes.

10        Q    Did your mother ever meet with anyone at

11   Benlida?

12        A    I think my mother met Tracy when she went to

13   India.

14        Q    Did she ever meet Mr. Huang?

15        A    She would have, but Mr. Huang never came to

16   the office.

17        Q    What does that mean?

18        A    My mother came to the China once in a while,

19   but Mr. Huang would say he was not working during that

20   time.

21        Q    Where did that come from?

22        A    Because Mr. Huang said that in his

23   deposition.

24        Q    Oh, yesterday?

25        A    Yesterday, yes.

```
 1              MR. MAZZOLA:  Let's do a break now.

 2              (Thereupon, there is a short break.)

 3   BY MR. MAZZOLA:

 4        Q    All right, Rishi, you are still under oath.

 5        A    Yes.

 6        Q    I assume everyone followed the rules during

 7   the break?

 8        A    Yes.

 9        Q    Other than small talk; the proverbial how am

10   I doing, the keep up the good work.  Other than that, I

11   presume there is no other discussion about the case?

12              MR. ROSENTHAL:  You can't discuss what you

13         discussed with your lawyers, so I object.

14   BY MR. MAZZOLA:

15        Q    I would be disappointed if Stephen didn't

16   give you the proverbial pat on the back, good job.

17              I want to go back to Exhibit 27, the Business

18   Authorization.  I just want to clarify a point.  You

19   may have already done it.

20              Insofar as purchase orders that would be

21   applicable to this Exhibit 27, were those purchase

22   orders, when they were issued to Benlida, did they have

23   any designation on them, anything that would advise

24   them, hey, the Business Authorization is applicable to

25   this PO?
```

```
 1              MR. ROSENTHAL:  Objection, vague.

 2              THE WITNESS:  I cannot recollect, but I don't

 3         think so.  But there may have been instructions

 4         that the boards have to go to a third-party

 5         subcontractor controlled by us.

 6   BY MR. MAZZOLA:

 7         Q    But there is no reference to third-party

 8   subcontractors controlled by CTX on this document; is

 9   that correct?

10         A    As I mentioned, that document only applies to

11   purchase orders Circuitronix LLC -- Circuitronix Hong

12   Kong is placing on behalf of Circuitronix LLC.  And the

13   only purchase orders -- those are the only part

14   numbers.

15         Q    What I am trying to understand is when a

16   purchase order is issued, does it say, hey, Tracy, hey,

17   Roger, hey, Douglas, hey Benlida team, this purchase

18   order is going to fall under the Business

19   Authorization, Exhibit 27?

20         A    I don't believe that it said that, but I

21   cannot recollect.

22         Q    Was there anything on the purchase order that

23   would alert the folks at Benlida that, hey, this

24   purchase order falls under the Business Authorization?

25              MR. ROSENTHAL:  Objection, asked and
```

 1       answered.

 2            THE WITNESS:  I cannot recollect.  I do not

 3       know.

 4  BY MR. MAZZOLA:

 5       Q    Who is the person that works -- who is the

 6  CTX person that is embedded at Benlida?

 7       A    Was embedded.

 8       Q    Yes, was.

 9       A    I forgot the name of the lady.

10       Q    And there is no one there now?

11       A    I don't think so.

12       Q    We were just talking at lunch -- which we are

13  allowed to do -- and I did ask, and they said it was a

14  lady and they don't remember the name.

15       A    I do not -- Jade.

16       Q    Jade?  Is she still there?

17       A    No.  Jade Lee.

18       Q    L-I?

19       A    Jade.  The precious stone Jade.

20       Q    L-E-E, L-I?

21       A    L-I or L-E-E.  I have forgotten.

22       Q    And CTX no longer has anyone at Benlida?

23       A    We don't because there are hardly any

24  transactions.  There are few transactions.

25       Q    And when Jade was there, who was she

```
 1   reporting to?

 2        A    Honkit Cho.

 3        Q    Rishi, do you have a business card on you?

 4        A    No, I don't.

 5        Q    Does the CTX Hong Kong entity, does that --

 6   do they have a separate website?

 7        A    No, they do not.  I don't believe they have a

 8   website.

 9        Q    During the hearing before Judge Goodman in

10   January, you testified under oath to the effect that

11   your business is a 20 million -- 200 million dollar a

12   year business.  Do you anything along those lines?

13        A    I said that all the businesses which fall

14   under my purview, including whatever -- Chrom, Sun

15   Air -- everything is $20 million.

16        Q    And these are all businesses you control?

17        A    Yes.

18        Q    Did there ever come a time -- scratch that.

19             When did you first learn that Benlida was

20   attributing the payments that it received from you to

21   its oldest invoices?

22        A    I cannot recollect, but if I -- I know you

23   have told me not to guess, and I have been told not to

24   guess, but I believe it was with the lawsuit.

25        Q    Rishi, can you pull up Exhibit 79 that was
```

1    previously marked?

2        A    Yes.

3        Q    And if you look at that in conjunction with

4    Exhibit 120 -- it looks like this.

5        A    It's right below on this one.

6        Q    Yes, I want to confirm to make sure it was

7    the same thread.

8            So the first question, Rishi, are Exhibit 79

9    and Exhibit 120 part of the same e-mail thread?

10       A    Yes.

11       Q    And Exhibit 79, although it's a later dated

12   exhibit, later dated e-mail, it's coming from someone

13   called accounting@benlida.com.  Do you know that to be

14   Ms. Chen?

15       A    Yes.

16       Q    And it looks like she is writing to the whole

17   group.

18            MR. ROSENTHAL:  What is your question?

19   BY MR. MAZZOLA:

20       Q    I guess is she?

21       A    She is.

22       Q    You are addressed on that; is that right?

23       A    Yes.

24       Q    And it looks like she is asking for

25   additional information?

1        A    Yes.

2        Q    Was that information provided?

3        A    Yes.  By the way, by any chance do you know

4    what this writing in Chinese is here?

5        Q    What writing in Chinese?

6        A    The first e-mail is to Tracy in

7    accounting@benlida.

8             MR. ROSENTHAL:  I know the answer, but I am

9        not able to say unless Mr. Mazzola asks me to.

10            MS. GUAN:  This one?  Just that -- just those

11       four?  "Came from my Huawei cell phone."

12            MR. ROSENTHAL:  I asked him that, and I

13       thought it was interesting too.

14            MR. MAZZOLA:  Here is an exhibit I want to

15       mark as Exhibit 122.

16            (Thereupon, Deposition Exhibit No. 122

17             is marked for identification.)

18   BY MR. MAZZOLA:

19       Q    So Exhibit 122 is an e-mail from Todor

20   Chelibashki.

21       A    Okay.

22       Q    And it looks like it is a -- well, you tell

23   me what this is.  There is an attachment to it as well.

24       A    Payment details December 2, 2014, for

25   September invoices.

```
1       Q    So I want to have you help me understand
2   these payment details.  The payment detail is dated
3   sometime in December, beginning of December --
4   December 2 -- and it's attached to a December 4 e-mail.
5   Do you see that?
6       A    Because September invoices are due in
7   December.
8       Q    AMS 60?
9       A    Yes.
10      Q    So the invoice numbers or the bill numbers
11  and the bill dates are all in September?
12      A    Yes.
13      Q    So the idea would be sometime within that
14  60-day period after everything was paid, your team
15  would send everything off to Benlida and say here is
16  the payment?
17      A    Yes.
18      Q    Does Todor still work there?
19      A    No.
20      Q    Why was Sunny copied on this?  I thought
21  Sunny was in India.
22      A    Sunny is in -- Sunny in December 4, 2014, was
23  in Hong Kong.
24      Q    Why would he have been copied on this if
25  there were no Hong Kong invoices being paid?
```

1    A    So in the beginning of 2013 I had decided

2  that Sunny Kapoor would become the CEO of Circuitronix

3  globally.

4    Q    Globally?

5    A    Yes.  And the agreement which we had was that

6  he would have the co-CEO role for two years, under

7  which I would mentor and train him.  And part of the

8  agreement was those two years he was going to be

9  spending in Hong Kong, and his employment was with

10 Circuitronix Hong Kong at that time.  And so as a part

11 of the co-CEO role, I was -- he was being copied on a

12 lot of correspondence globally.

13   Q    Sunny doesn't work for you anymore, does he?

14   A    He does not.

15   Q    There was a falling out between you two?

16   A    Yes.

17   Q    What happened?  Did he sue you or did you sue

18 him?

19   A    I think everybody sued each other.  I started

20 a lawsuit with him -- he sued me, went into settlement

21 agreement; I sued him, went into settlement agreement.

22   Q    Was it resolved?

23   A    Yes.

24   Q    When is the last time you spoke to Sunny?

25   A    I speak with him often.

1        Q     What kind of business is he in?

2        A     Sunny runs EIEMS for me.

3        Q     He works for you again?

4        A     He is -- he -- so Sunny owns 14 percent of

5   the EIEMS.

6        Q     IEMS?

7        A     EIEMS.

8        Q     EMES?

9              MR. ROSENTHAL:  EIEMS.

10             MR. MAZZOLA:  EIEIO, okay.

11   BY MR. MAZZOLA:

12       Q     And that is the outfit that you purchased --

13       A     My mom purchased 60 percent.

14       Q     And he owns the other 40 percent?

15       A     Yes.

16       Q     And your mom paid $150,000 for that

17   60 percent?

18       A     I think she paid a little bit more.

19       Q     What is that company worth now?

20       A     Not too much.  It does $3 million in revenue.

21             (Thereupon, Deposition Exhibit No. 123

22              is marked for identification.)

23   BY MR. MAZZOLA:

24       Q     This is an exhibit we marked as 123.  I guess

25   this is along the lines of the last one, Rishi.  This

```
 1   is a Benlida payment detail.  Do you see that?

 2        A    Yes.

 3        Q    Again, it's produced by Todor, right?

 4        A    Yes.

 5        Q    It has a similar cast of characters copied in

 6   on it?

 7        A    Yes.

 8        Q    Now, we know at the time that Sunny was in

 9   Hong Kong, right?

10        A    Yes.

11        Q    Was he still in Hong Kong in 2015?

12        A    This was 45 -- this was 45 days prior to both

13   of us going our own ways.

14        Q    Honkit Cho is copied on this?

15        A    Yes.

16        Q    But the invoices only relate to -- they are

17   only CTX payments.  Do you see that on the next page?

18        A    I do.

19        Q    Why is Honkit Cho copied on it?

20        A    If you look, I think what is happening is

21   that if you -- as I mentioned to you, there was a group

22   which we had come up with accounts payable, and that

23   basically had all the people in the two teams.  So as a

24   practice we would just -- this was just a group which

25   was made, and people -- we were just responding back to
```

```
 1    all the e-mails.  All the e-mails we were being copied

 2    on.  And Honkit would do what was required for Hong

 3    Kong, and the US team would do what was required for

 4    US.

 5         Q    I guess my question is if a payment detailing

 6    bank slip is coming from Todor on a brand new e-mail

 7    out of the US --

 8         A    It was not brand new.  As you see, he replies

 9    back to all.

10         Q    We are looking at 123.

11              MR. ROSENTHAL:  The bottom one?  Which one

12         are you talking about, Mr. Mazzola?

13              MR. MAZZOLA:  Exhibit 123.

14              MR. ROSENTHAL:  There is multiple e-mails

15         from Todor.  That is the confusion.

16    BY MR. MAZZOLA:

17         Q    Are you looking at 123 Rishi?

18         A    Yes.

19         Q    This looks like a new e-mail that Todor is

20    starting.

21              MR. ROSENTHAL:  Objection, vague.

22              THE WITNESS:  There is three e-mails; one,

23         two, three.  Maybe the bottom part of this e-mail?

24              MR. MAZZOLA:  Hold on.  Stephen, your e-mail

25         that you are looking at --
```

```
 1                MR. ROSENTHAL:  I will show you.

 2                MR. MAZZOLA:  I got them all screwed up.  I

 3        am sorry, Rishi.  Okay.  So this is -- I beg your

 4        pardon.

 5                MR. ROSENTHAL:  JC, can we take a minute?

 6                MR. MAZZOLA:  You are going to have to take a

 7        minute, because I screwed this all up.

 8                (Thereupon, there is a short break.)

 9    BY MR. MAZZOLA:

10        Q    So we are looking at 123, Rishi.  I beg your

11    pardon.  I got them confused.

12                This is an e-mail thread that does, again,

13    begin with Todor on January 29, 2015, and this is again

14    another payment detail at the back.  It seems there are

15    two payment details.  Do you see that?

16        A    Yes, January and February.

17        Q    And then there is two wires?

18        A    Yes.

19        Q    Actually one wire.  Again, this is coming out

20    of the Citibank account, the New York account, right,

21    because it ends -- the US account -- because it ends in

22    2689; is that right?

23        A    Yes.

24                MR. ROSENTHAL:  Sorry.  What ends in 2689?

25                MR. MAZZOLA:  The source account.  That is
```

1         the Citibank account.  We are on the last page.

2              MR. ROSENTHAL:  Are you looking -- JC, are

3         you looking at this page?

4              MR. MAZZOLA:  The completed wire detail.

5              MR. ROSENTHAL:  I don't see the number you

6         just said.

7              MR. MAZZOLA:  At the top, source account.

8              MR. ROSENTHAL:  2689 you said?

9              MR. MAZZOLA:  It ends in --

10             MR. ROSENTHAL:  2698?

11             THE WITNESS:  2698, yes.

12    BY MR. MAZZOLA:

13        Q    The same line of questioning I was getting

14    at; Honkit Cho was copied on this as well, and the

15    question I had with respect to the other document was

16    why is he being copied on something if all these were

17    coming out of the US office?

18        A    Well, it's the same.  Benlida was being --

19    Benlida was sending the e-mail to everybody in the

20    group and everybody was replying.

21        Q    But if you look at the beginning of the

22    thread, at the very bottom it starts with Todor and he

23    is starting the thread.

24        A    Sure.

25        Q    This is not as if Benlida is adding everyone.

```
 1    Do you see that?

 2        A    I do, but the protocol was already in place

 3    where everybody would copy everybody.

 4        Q    That was the protocol?

 5        A    That was the protocol, because the protocol

 6    started because we were missing invoices which Benlida

 7    was sending to the incorrect party responsible.

 8        Q    And the protocol is, according to you,

 9    something that was started by Benlida, right?

10            MR. ROSENTHAL:  Objection.

11            THE WITNESS:  The protocol of copying

12        everybody was -- the protocol to address whatever

13        issues, communication issues, Benlida was having

14        was started by us collectively.

15    BY MR. MAZZOLA:

16        Q    Us collectively?

17        A    By Benlida and us.

18        Q    So the idea was everyone would be included?

19        A    And then the Hong Kong people would pick up

20    their stuff.

21            (Thereupon, Deposition Exhibit No. 124

22             is marked for identification.)

23    BY MR. MAZZOLA:

24        Q    I thought you had said earlier -- looking at

25    Exhibit 124, but we can look at this one -- I thought
```

```
 1   you said earlier that the accounts payable e-mail

 2   address was the one that was created to address this.

 3        A    Yes, accounts payable has all the accounting

 4   clerks underneath either Honkit or -- so it was, but

 5   Honkit Was also in the e-mail -- in the e-mail

 6   distribution.

 7        Q    And you are in the distribution as well,

 8   right?

 9        A    I am in the distribution too.

10        Q    So, again, this is another e-mail.  This is

11   dated February 26, 2015.  It's Exhibit 124.  It's a

12   payment detail and bank slip.  Do you see that?

13        A    Yes.

14        Q    It's an e-mail thread started by Todor,

15   right?

16        A    Yes.

17        Q    Out of your office here in Florida.  And he

18   did copy -- open copy the Hong Kong office by Honkit,

19   right?

20        A    Yes.

21             (Thereupon, Deposition Exhibit No. 125

22              is marked for identification.)

23   BY MR. MAZZOLA:

24        Q    This is Exhibit 125.  It's an e-mail

25   address -- it's an e-mail addressed to Tracy, it's
```

```
 1    started again by Todor, and it relates to ROK bank

 2    slips.  Do you see that?

 3        A    It relates to ROK payment details and ROK

 4    bank slips.  You guys didn't print the ROK payment

 5    details, just the bank slips.

 6        Q    It's a big document.  If we look at the -- I

 7    guess you have to look at it in native format.

 8        A    Sure.

 9        Q    But you would have gotten this e-mail, right?

10        A    Absolutely.

11        Q    And presumably you would have read it, right?

12        A    I -- it means I cannot recollect, but I

13    should have.

14        Q    It looks like all the wire details, Rishi --

15    not all of them -- but if you scan through the attached

16    completed wire details, they are either set up or

17    approved by you?

18        A    They always have to be approved by me.

19        Q    But some of them just say set up by Rishi.

20    Let's look at the first one.

21        A    Yes.

22        Q    Does that mean you went onto the computer and

23    went to the bank account and sent the wire?

24        A    No, I think it was somebody set it up and I

25    release it.
```

```
1         Q    There is an Exhibit 89, which is already

2   before you.

3         A    Yes.

4         Q    This is a -- really a continuation of the

5   e-mail thread that we introduced as Exhibit 120.

6         A    Yes.  This is where both sides were

7   correcting each other's records.

8         Q    Is that because there were errors found in

9   the records?

10        A    Yes.  In some cases there were errors on our

11  part, and in some cases there were errors on Benlida's

12  part.  But there were four or five more e-mails in this

13  chain, and then finally all errors were addressed.

14        Q    It's believed all errors got addressed?

15        A    Well, they flagged all errors and we

16  addressed all the errors.

17        Q    So all flagged errors were addressed?

18        A    If that is the way you want to characterize

19  it.

20        Q    You are pretty confident in your team, right,

21  the quality of the work they do?

22        A    I am confident.

23        Q    What did Ms. Chen mean at the top of this

24  e-mail thread where she says, "These are payments in

25  our system which are missing on your spreadsheet"?
```

```
 1            MR. ROSENTHAL:  Objection.

 2            THE WITNESS:  There were payments which we

 3      made --

 4   BY MR. MAZZOLA:

 5      Q    If you know what she means.

 6      A    There were payments which we made which were

 7   not showing as payments on our spreadsheet.

 8      Q    So she is letting you know, hey, guys, you

 9   made a payment, but you are not showing on the

10   spreadsheet?

11      A    But when she wrote that to us, then in a lot

12   of cases we got back to them and showed them that they

13   were on our spreadsheets.  And a couple of cases, yes,

14   they were not on the spreadsheet.

15      Q    How regular, if you recall, was the

16   back-and-forth about discrepancies?

17      A    So as we discussed, starting 2017 it started

18   on a month-by-month basis.  Actually starting 2017 we

19   started on a month-by-month basis, but we went back to

20   2016 and 2015 and did it too.  So by the time 2019

21   came, we had done all the way from 2015 to 2019.

22      Q    But the back-and-forth regarding

23   discrepancies started in 2017, because that is when you

24   started doing the regular reconciliations?

25      A    No.
```

```
 1      Q     Why did it start in 2017?

 2      A     We just -- Benlida -- we decided that it's

 3   better to catch the problem right when it happens.  So

 4   rather than do it months and months after, just do it

 5   the next month.

 6      Q     So the intent of the parties back then was to

 7   try to catch these issues as soon as possible?

 8      A     Yes.

 9      Q     Are you confident that all the issues were

10   caught?

11      A     As confident as Benlida is, because we got

12   confirmation from them that all the issues were caught.

13      Q     There is another exhibit which I think is in

14   front of you.  It's in the binder.  It's Exhibit 60.

15   Do you see this e-mail dated January 2019?

16      A     Yes.

17      Q     And this is a meeting minute follow-up.  I

18   presume you were on this telephone call?

19      A     I have no reason to believe that I was not.

20   I cannot recollect though.

21      Q     Well, is it fair to say looking at the

22   minutes that there is a -- some dispute as regarding

23   the accuracy of the spreadsheet reconciliation that is

24   in the first paragraph.

25      A     I don't know which reconciliation it's in
```

 1   reference to.

 2        Q    But at a minimum someone is disagreeing with

 3   the accuracy of the reconciliation, right?

 4        A    Should be, but their was always

 5   back-and-forth rumor.  But, yes, should be.

 6        Q    You agree with that statement, right?

 7        A    I cannot agree with it with any sort of --

 8   without knowing which spreadsheet I will be talking

 9   about.

10        Q    Is it fair to say in January of 2019 at a

11   minimum, BLD is suggesting that accountants on both

12   sides should set up a call conference to check on

13   shipment records line-by-line?

14             MR. ROSENTHAL:  Paragraph 1 of the document?

15             MR. MAZZOLA:  Paragraph 1 of the meeting

16        minutes.

17             THE WITNESS:  So Benlida was making these

18        requests all the time, and I do not believe that

19        those requests were unreasonable requests between

20        two partners.  Even we do with customers and even

21        not customers.  But I don't know what

22        reconciliations.  The fact that somebody is asking

23        to do this is not out of the norm or is not --

24        yes.  But I do not know what this is about, but

25        yes, there is some sort of reconciliation which is

```
 1        being requested.

 2   BY MR. MAZZOLA:

 3        Q    Do you see that a request for additional

 4   payment of $1 million was made?  It's at Paragraph 3.

 5        A    Yes, they are asking us to -- they were

 6   telling us to loan the money.

 7        Q    It doesn't say that.  It says payment.

 8        A    If you see additional e-mails in this time

 9   frame, you will see that they ask for -- this is the

10   time frame in which they were talking about.  It

11   started with 1 million, then it would go to 2 million,

12   and there is a whole bunch of stuff going on.  And

13   around this time frame is when they were also

14   requesting for -- set up a loan agreement and

15   everything else as in the past.

16        Q    But it doesn't say that in this document?

17        A    It doesn't say that in the document.

18        Q    What was this that you promised to check your

19   cash flow and tell them you could afford to pay in four

20   days?

21        A    We were paying ahead as seen in the payment

22   details.  So we were -- this is where we sort of

23   started putting our foot down and saying we cannot

24   continue to -- the next two or three months we were

25   supporting them and paying them more and more.
```

1        Q     Why would you promise to check the cash flow

2   and then promise to pay to them?

3        A     They needed help.  I was always helping them.

4        Q     A million dollars is a lot of money, right?

5        A     A million dollars is a lot of money.

6   $12 million is more than $1 million.  They owe us

7   $12 million.

8        Q     They lost 12 million?

9        A     They owe us 12 million.

10       Q     You believe they owe you 12 million?  What --

11  it looks like Tracy's chasing at the top of this e-mail

12  thread, on the first page of it.  She says, "Hi Rishi.

13  We are still waiting on the confirmation of 1 million

14  US wired."

15       A     Yes, because they were in a lot of financial

16  trouble and they were in a lot of trouble with the tax

17  authorities.  If you look at all the e-mails around

18  this point in time, it seems as though the tax

19  authorities were closing in on them, and this is where

20  all their -- this is the time frame in which all the

21  game plans and fabrications started.

22       Q     Why would you be willing to pay her -- give

23  her a million dollars in January of 2019?

24       A     To -- to further our relationship.  In 2018

25  we did 20 million, $25 million worth of business.  Both

1    sides having a successful business relationship.  In

2    this time frame also we were talking about merging the

3    companies together.  So this is what you do for

4    business -- this is what business partners do for each

5    other.

6        Q    In January 2019 -- well, they are asking for

7    a million dollars, and it looks like you are

8    considering it, right?

9        A    I think I paid the million dollars.  I think

10   I paid the million dollars then, and I think I paid

11   another million dollars in March or April.

12       Q    But you are describing them as being a bad

13   company, a company who needs money, a company who needs

14   to borrow money from you, they had tax problems.  Why

15   are you giving them a million dollars, $2 million, over

16   the course of four months?

17       A    Respectfully, I have to say the only feedback

18   I have to give you is that you do not desert your

19   partners in time of need, and they were until that

20   point in time a good partner.  They were helping us --

21   if I called Douglas or Tracy, they would do whatever

22   they could and they would try to help us.  We were

23   trying to help them.  We were trying to get them out of

24   the bind they were in.  They acknowledged in several

25   e-mails that caused a big hole with the Tax Department.

1    So we were trying to help them out in whichever way we

2    could.

3         Q    So why did it end?

4         A    They stopped accepting purchase orders from

5    us.

6         Q    When did they stop accepting purchase orders

7    from you?

8         A    Sorry.  They stopped accepting purchase

9    orders without prepayment from us.

10        Q    When did that happen?

11        A    Sometime I think July or August -- August of

12   2019.

13        Q    Do you know why they did that?

14        A    I think that they were trying to --

15             MR. ROSENTHAL:  Let the record reflect that

16        the witness's response got interrupted by the

17        screen going on.

18             THE WITNESS:  Sorry.  Repeat your question.

19             (The pending question is read

20              back by the court reporter.)

21             THE WITNESS:  I believe that Mr. Huang wanted

22        to put our backs against the wall and try to

23        extract as much money as he could, which we did

24        not allow -- which we prevented -- which we did

25        not allow to happen.

```
 1    BY MR. MAZZOLA:

 2         Q    Did you ever think that -- well, did you ever

 3    think that in your words Benlida needed the money --

 4    that Benlida needed the money because you guys weren't

 5    paying your bills?  Did you ever think that maybe the

 6    failure for you to pay bills created the problem?

 7         A    How does one do reconciliation, show them

 8    that we are not by this time -- this is August 2019.

 9    We had done that reconciliation, shown them that we

10    were 250-some-thousand dollars ahead.  We had received

11    acknowledgment from Tracy that she agreed with all our

12    numbers, besides some $450,000 or whatever the case is.

13              So there was an acknowledgment from their

14    side that we were not past due in any manner.  That was

15    followed up with the November 2019 reconciliation --

16    all these e-mails which we see with Ms. Chen -- that

17    showed we were $7 million ahead.

18         Q    But all this presumes that the

19    reconciliations are accurate and the numbers are

20    correct, right?

21         A    So the way reconciliation is done is one

22    party presents the numbers, the other party critiques

23    it, the first party goes back and corrects or addresses

24    the criticism, and then you have got your final

25    numbers.  And that is the right process, and that is
```

```
 1    the process which was followed.  In January of 2020 it

 2    was established they owed us more than seven-plus

 3    million dollars, without taking lead time penalty and

 4    pricing increase into account.

 5         Q    In November?  In November?  You said November

 6    of 2019?

 7         A    In November we gave that data.  In

 8    November-December they gave us their feedback and

 9    criticisms.  We addressed that and gave them a final

10    reconciliation in January of 2020 after we addressed

11    all the feedback.

12         Q    Let's look at the November 1.  That was

13    Exhibit 120.  There were a number of attachments to it.

14              MR. MAZZOLA:  Stephen, what we will do is for

15         the attachments -- I assume you have all the

16         native documents as well -- we will just plop them

17         up on the screen.

18              MR. ROSENTHAL:  I guess you are not using the

19         Bates stamped ones.  It probably won't speed

20         things up in any way for us to try to pull them up

21         at the same time.  Jessica may have some of these,

22         like, certainly from this set of stuff.

23              MR. MAZZOLA:  She may.  Obviously she is your

24         Jessica, not ours.  Let's see how it goes.

25              MR. ROSENTHAL:  When you refer to a document,
```

1       describe it well enough so we will be able to

2       figure out --

3            MR. LERNER:  I will e-mail to you

4       simultaneously.

5            MR. ROSENTHAL:  If an e-mail has, like, three

6       or four attachments, if you can say the name of

7       the attachment.

8            MR. MAZZOLA:  Benlida Payment Details CTX-US

9       underscore -- we will do it that way.

10           THE WITNESS:  You do realize it is a big

11      spreadsheet.  It's got like 50 tabs.

12           MR. ROSENTHAL:  Just describe what you are

13      looking at.  We will make sure that the record is

14      clear.

15  BY MR. MAZZOLA:

16      Q    Let's look at this Exhibit 120.  This is

17  the --

18      A    Yes.

19      Q    I think you were just referring to this,

20  Rishi.  This is an e-mail from you dated November 1,

21  2019, and you were referring to Benlida owing you

22  $7.494 million, right?

23      A    Which does not include lead time penalty,

24  which would increase the numbers owed by even more.

25      Q    Which you had said earlier you dropped out

```
 1    the lead time penalties?  You weren't including those,

 2    right?

 3         A    I did not say that.

 4         Q    I thought you did.

 5         A    I said I thought we would address the lead

 6    time penalties at the same time we addressed the price

 7    increase.  Remember, the lead time penalties from --

 8    the lead time penalties from December -- November of

 9    2017 until this point in time were not included.

10         Q    From 2017 to now.  So that -- I beg your

11    pardon -- that period of time there were no lead time

12    penalties?

13         A    There were.

14         Q    You weren't including them?

15         A    They were not included in these numbers.

16    Details were sent to them.

17         Q    So your point was that you were going to

18    include these --

19         A    In addition to this there would be lead time

20    penalties.

21         Q    This Exhibit 120, there is no reference to

22    anything owed by CTX Hong Kong.  Why is that?

23         A    Because this is Circuitronix US

24    reconciliation.

25         Q    There was another document that we introduced
```

```
 1    as Exhibit 121 --
 2         A    Yes.
 3         Q    -- and this is -- the subject line is Final
 4    Payment Reconciliation for CTX, Hong Kong, CTX USA, and
 5    ROK.  Do you see that subject line?
 6         A    I see the subject line.
 7         Q    This July document, it's from you as well.
 8    It's to the same group of people at Benlida.  This one
 9    includes what CTX Hong Kong owes Benlida.  Do you see
10    that?
11         A    As I told you, there are different
12    reconciliations.  The July document is specific to all
13    the payments made from December 1, 2016, until July 1,
14    2019, because what Douglas and Tracy had told me is
15    that we were not following the December 2014 -- 2016
16    agreement, and I was trying to demonstrate to them that
17    we were following it and we were 256,344.13.
18         Q    That may be the case, but I am looking at
19    this document in front of us, 121, and I am looking at
20    the e-mail that you wrote that says, "Douglas --" here
21    you are acknowledging that for Benlida, CTX Hong
22    Kong -- that Benlida is owed $8.8 million.  Did you
23    write that?
24         A    I did.
25         Q    My question is why would you produce the
```

 1   November reconciliation that you drop it off?

 2            MR. ROSENTHAL:  Asked and answered.

 3            THE WITNESS:  I can only give you the

 4       information to the extent you will be willing to

 5       understand what I am saying.

 6            There are two separate goals with these

 7       documents.  The first -- the July document has --

 8       was addressing a concern which Douglas and Tracy

 9       had, that when we started this December -- when we

10       came to this agreement in December of 2016, that

11       you guys would pay us next week for what we

12       shipped this week, they said that you guys are

13       breaching that December agreement, and I was

14       demonstrating to them no we were not.

15            So once I -- once I gave that to them,

16       then -- even prior to this we had given a

17       reconciliation like the one in November, we had

18       given one in March of 2019.  That also showed that

19       we were way ahead as far as payments were

20       concerned.  That is from 2015 to 2019.

21   BY MR. MAZZOLA:

22       Q    How about this then -- I appreciate your

23   answers.  I appreciate your candor.  If you had

24   included the Hong Kong numbers in this one, what would

25   it have been?

```
 1      A    I don't have the numbers in front of me, but

 2  we sent the Hong Kong numbers two to three months after

 3  this date.  We did send.  I don't have the numbers,

 4  because according to us this lawsuit is not about Hong

 5  Kong invoices.

 6      Q    Well, according to you it's not.

 7      A    As I said, I have to do -- I have to speak in

 8  accordance to what I believe, and those are my

 9  opinions.  And yes, I cannot speak for a third party.

10      Q    Hong Kong is a third party now, right?

11      A    No.  I cannot -- I cannot include Hong Kong

12  because you believe Hong Kong should be included.  You

13  are a third party.

14      Q    It's is not my decision.

15      A    Yes.

16      Q    Perhaps you left Hong Kong numbers off 120,

17  Exhibit 120, because if you had done that, it would

18  have looked more favorable to Benlida?

19      A    So perhaps if one understands that it's

20  impossible to do two projects or three major projects

21  at the same time.  So you complete one project and move

22  to the next project.

23           Right after I sent the -- right -- emergently

24  after I sent the earlier full reconciliation from 2015

25  to 2019, Douglas asked me why -- Douglas and Tracy
```

1   asked me to include Hong Kong, and we worked on it and

2   we presented Hong Kong to them.  We presented Hong Kong

3   to them.

4        Q    You presented Hong Kong to Douglas and Tracy

5   sometime after November 2019?

6        A    No.

7        Q    When did you present it to them?

8        A    In March of 2019.

9        Q    In March of 2019 you gave it to them?

10       A    Yes.

11       Q    You gave it to them before you gave them this

12   one, 120?

13       A    No.  In January of 2019 we presented US 2015

14   to 2019, because that is the project which we had come

15   up with together.  They asked for Hong Kong.  We gave

16   them Hong Kong in March-April of 2019.

17            Then they came back, and since they realized

18   that we were way ahead in our payments with whatever

19   they asked for, then they started saying that when

20   defaulted on what is shipped this week next week

21   payment.  We gave them this July 2019 reconciliation.

22            Then they came back and said now we have to

23   look between 2011 and 2015.  We objected and said that

24   is not -- this is not something that was ever discussed

25   between 2015 and now.  We worked on it and gave that to

```
 1   them.

 2        Q    This one over here, November 2019, this is

 3   the most up-to-date, most complete reconciliation?

 4             MR. ROSENTHAL:  That is Exhibit 120?

 5             THE WITNESS:  Yes, that is from 2019.  Up to

 6        2019.

 7   BY MR. MAZZOLA:

 8        Q    Up to 2019.  My question is why doesn't

 9   Exhibit 120 from November 1, 2019, include the Hong

10   Kong numbers?

11        A    The reason is because we never ever said we

12   are going to go back from 2012 to 2015.  By this time

13   we realized what they were doing.  We realized that

14   they were just trying to find excuses.  They were

15   asking for one thing, we were addressing the

16   requirements, showing them we were in a no-pay

17   situation.  We never agreed to go back to 2011, '12,

18   '13, '14.  Never.  We did that -- we wrote that to

19   them.  We never agreed to it, we were doing that as a

20   favor, and that is what we did, and that is the final

21   reconciliation.

22        Q    That is where the favors ended?  You were not

23   going to give them the Hong Kong numbers after

24   November 2019, right?

25        A    We gave them -- in April of 2019 we gave them
```

```
 1   the Hong Kong numbers.

 2        Q    But you were not going to give it to them

 3   after this one in November of 2019?

 4             MR. ROSENTHAL:  Objection, asked and

 5        answered.

 6   BY MR. MAZZOLA:

 7        Q    Is that correct?

 8        A    Because we realized at this point in time

 9   what they were doing.  They were just doing games.

10        Q    Let's look at -- when you say they, who is

11   they?  Name names.  Is it Tracy?

12        A    So Tracy obviously just does what Mr. Huang

13   was asking her to do, and Douglas was doing what

14   Mr. Huang was asking him to do.  When I was in the room

15   it was Ms. Chen, Mr. Huang, Tracy, Douglas and

16   Ms. Liao.  I don't know how to pronounce the name.

17   Tracy can help you.  The general manager, Mr. Liao.

18             MS. HUANG:  Liao?

19             THE WITNESS:  Mr. Liao.  Sorry.

20             MR. MAZZOLA:  Can you put this one up on the

21        screen?

22   BY MR. MAZZOLA:

23        Q    Rishi, we are going to try to put Exhibit 120

24   up on the screen.

25             We are looking at Benlida Payment Details
```

 1    CTX-US_2012 to 2019.

 2              MR. ROSENTHAL:  Attachment to Exhibit 120?

 3              MR. MAZZOLA:  Yes, that is the attachment.

 4              MR. ROSENTHAL:  The native format.

 5    BY MR. MAZZOLA:

 6         Q    You will see at the bottom there is a number

 7    of tabs.  What we are interested in is 2014.  That is

 8    the September tab.  Do you see that, Rishi?

 9         A    That is the -- yeah.  That is the

10    September -- that is the September tab.

11         Q    It's a payment detail?

12         A    Sure, but what you have to understand is the

13    September tab is different from what you are going to

14    show me, because this September tab shows September

15    payments being made in December.

16         Q    I was going to go through that.  It's a

17    September tab, payment detail dated December 2, 2014;

18    is that right?

19         A    Yes.

20         Q    And off to the left you will see bill dates,

21    and those are bill dates from earlier pursuant to the

22    AMS 60, right?

23         A    No, those are September bill dates.

24         Q    That is right.

25         A    So previously what you were seeing when we

1    gave you a September payment detail, they were taking

2    invoices from June.  They were taking invoices from

3    June.

4        Q    But in any event, this is a payment detail

5    that reflects the payments that were made in September;

6    is that correct?

7        A    Yes.

8        Q    And if you scroll down towards the bottom you

9    will see those payments, right?

10       A    Yes.

11            MR. ROSENTHAL:  Object to the form.

12   BY MR. MAZZOLA:

13       Q    Do you see those payments?

14       A    I do.

15            MR. ROSENTHAL:  Clarifying question.  I don't

16       want to confuse this.  The top of this document

17       says December, okay.  The payments that you were

18       just talking about in your question are referring

19       to things that say November.  I want to be clear.

20       And the tab says September.  So there is a lot of

21       information we are looking at.

22            MR. MAZZOLA:  I peg your pardon.  It does say

23       that.

24   BY MR. MAZZOLA:

25       Q    At the bottom of this payment document you

```
 1   will see there are payments made.  Do you see the

 2   payments made?

 3       A    Yes.

 4       Q    Now, those payments were made in -- they are

 5   made in November and December.  Why are they made at

 6   that time?

 7       A    They are made in that time because September

 8   invoices are paid in December.

 9       Q    So those -- that reflects timely payment then

10   in your mind?

11       A    Yes.

12       Q    There is two payments that I want to draw

13   your attention to.  One is a payment made on

14   December 9, 2014.  Do you see that?

15       A    Yes.

16       Q    And that is for $935,575.54?

17       A    Yes.

18       Q    And then there is another payment below that

19   that was made on December 11, 2014, for $918,223.93.

20   Do you see that?

21       A    Yes.

22       Q    And those are payments that would have been

23   made back in 2014 according to your people's records,

24   right?

25       A    Yes.
```

1      Q    This spreadsheet was prepared by your people,

2   right?

3      A    Yes.

4      Q    Now, let's look at the spreadsheet that is up

5   there.  This is the payment details.  Do you see that?

6      A    Yes.

7      Q    It's payment detail December 2, and the first

8   bill number is ends in 3001.  Do you see that?

9      A    Yes.

10     Q    If you scroll down to the bottom, the last

11   debit memo ends in 0924.  Do you see that?

12     A    Yes.

13     Q    Now, I am just doing that to make sure we are

14   looking at the same one.

15          If you draw your attention to an exhibit we

16   marked earlier today as 122 -- do you see that?

17          MR. ROSENTHAL:  Let me pull it out.

18   BY MR. MAZZOLA:

19     Q    This is an e-mail from Todor.

20     A    Yes.

21     Q    It's dated December 4, 2014, right?

22     A    Yes.

23     Q    And so it could have been -- we are now

24   looking in this document, 122, at the contemporaneous

25   e-mail as was sent by Todor around about the time,

```
 1   right?
 2            MR. ROSENTHAL:  Would you mind scrolling to
 3        the top?
 4            MR. MAZZOLA:  We will scroll to the top and
 5        make sure we have the right thing.
 6   BY MR. MAZZOLA:
 7        Q    If you look, is it fair to say then that the
 8   payment detail that is attached to Todor's e-mail of
 9   December 4, 2014, is the same payment detail that is on
10   the screen?  I tried to highlight the bill numbers.
11        A    Again -- let me just answer this question.  I
12   can't believe that you guys are -- after this document
13   was sent, Ms. Chen gave us feedback.  She clearly
14   flagged those two payments, errors associated with
15   those two payments.
16            After they flagged the errors associated with
17   the payment, payment details were revised.  A revised
18   e-mail was given in January of 2019.  So it was
19   corrected.
20            So, yes, there was an error there.  Ms. Chen
21   flagged the errors, if you look at the feedback which
22   is provided, the payment details were corrected, and a
23   revised document was circulated.
24        Q    That is fine.  I am not asking for -- I am
25   trying to understand what happened.
```

```
 1      A    I believe that you guys also should know what

 2  has happened, and it's not -- I have sat here for the

 3  last -- I have repeated at least on three or four

 4  occasions about the process which happened after we

 5  sent the November 1 e-mail.

 6      Q    Rishi, this is called discovery.  I am

 7  discovering.  So it's a journey we are going to take

 8  together, okay?

 9      A    Sure, sure.

10      Q    So let's continue this journey.

11           I want to scroll back down on this.  There

12  are payments of 935, 918, that you were telling -- your

13  team was telling Benlida were made in December of 2014.

14  That is what this document says, right?

15      A    That is correct.

16      Q    Todor's document, Exhibit 122, which is made

17  contemporaneously --

18      A    Not contemporaneously.

19      Q    It was produced December 14?

20      A    After the feedback given by Ms. Chen.

21      Q    No, 122 is dated 2014?

22      A    It's one month after 2014.

23      Q    This document, 122, was created in 2014?

24      A    Sure, sure, yes.

25      Q    The document on the screen was created in
```

```
 1    2019?

 2         A    Sure.

 3         Q    In 2014, on this document that was created by

 4    Todor, there is no reference to those payments, the 918

 5    and the 935.  Do you see that?

 6         A    I do.

 7         Q    My question is what is the accurate document;

 8    is it the one that Todor created in 2014, or is it the

 9    one you created in 2019?

10         A    There is another version of this document

11    created after the feedback which we got from Ms. Chen,

12    and there was a revised reconciliation sent between

13    2012 and 2019 in January of 2020.

14         Q    Another interesting thing about these

15    documents together, in 2014 when Todor sent the payment

16    detail and bank slips for the payments made in

17    September, he says that the total at the bottom is

18    actually a credit.  Do you see that?

19         A    Credit of 5,821.

20         Q    Not a big credit.  But then five years later,

21    if we look at this screen here, it's no longer a

22    credit, it's a debit.

23         A    It's a credit too.

24         Q    It's something you are saying Benlida owes

25    you?
```

1        A     Yes.

2        Q     How does that happen, that you go from you

3    owing Benlida $5,000 in 2014, then you guys work up the

4    numbers in November 2019, and now for this month

5    Benlida owes you $1.1 million.  How does that happen?

6        A     As I said, there was a mistake which was

7    made.  Ms. Chen flagged the mistake and it was

8    corrected.

9        Q     Are there any other mistakes that may not

10   have been flagged?

11       A     Ms. Chen flagged the mistakes which she

12   believed were the mistakes made, and we corrected the

13   mistakes.

14       Q     I don't mean to be difficult, but it looks to

15   me like you are trying to get one over on Benlida,

16   telling them that they you $1.1 million?

17            MR. ROSENTHAL:  Objection.

18            THE WITNESS:  So obviously you are entitled

19       to believe what you would like to believe, but we

20       have a revised -- we have a revised spreadsheet

21       reconciliation which clearly shows that this was

22       corrected.

23   BY MR. MAZZOLA:

24       Q     Were those payments of 935 and 918, were they

25   ever made?

```
 1        A    They were made, but they were made in

 2   different amounts.  If you look at Ms. Chen's e-mail,

 3   she shows what you call -- remember the e-mail where

 4   she said we missed payments?

 5             You had this e-mail out here, this document

 6   No. 89.  Document No. 89 shows we missed $898,000 in

 7   payments.

 8        Q    Let's look at Exhibit 123 in the paper

 9   version.  These are, again, payment details.  Do you

10   see that?

11        A    Yes.

12        Q    It's a payment detail from -- dated

13   January 1, 2015, and another one dated February 1,

14   2015.

15        A    Yes.

16        Q    And these reflect payments on bills from the

17   end of September through the end of October on the

18   first one, and then -- really the end of October it

19   looks like -- with debit memos through December 31 on

20   the second one.  Do you see that?

21        A    Yes.

22        Q    And I double checked these to see if the

23   918,000 and the 935,000-dollar payments are there, and

24   they are not there, are they?

25        A    They are not.
```

1       Q    So they never happened?

2       A    Yes, but if you look at Ms. Chen's e-mail

3   from Exhibit 89, you will see what happened.

4       Q    Not everything was -- let's look back to the

5   spreadsheet, same one.  Let's look at April.

6            MR. ROSENTHAL:  You are going to the

7       April 2014 tab?

8            MR. MAZZOLA:  Nineteen.

9            MR. ROSENTHAL:  Can we take five?

10           (Thereupon, there is a short break.)

11  BY MR. MAZZOLA:

12      Q    We are looking at Exhibit 120, and we drilled

13  down to Benlida payment details CTX US 2012 to 2019?

14           MR. ROSENTHAL:  He has 123 in front of him.

15      Are you going back to 120?

16           MR. MAZZOLA:  Yes, back to 120.

17           MR. ROSENTHAL:  Okay, we are with you.

18           MR. MAZZOLA:  We are going to drill down to

19      April 2019.

20           MR. ROSENTHAL:  We are on the Excel

21      spreadsheet that is the Benlida Payment Details

22      CTX US 2012 to 2019, the Excel spreadsheet

23      attached to Exhibit 120.

24  BY MR. MAZZOLA:

25      Q    And, Rishi, do you see this is a payment

1    detail from July 1, 2019?

2        A    I do.

3        Q    And it's relating to the payment of bills in

4    April of 2019.  If you can scroll down all the way to

5    the bottom.

6             MR. ROSENTHAL:  Can you go up a little bit?

7        Thank you.

8             MR. LERNER:  Do you need to see more of it?

9             MR. MAZZOLA:  I want to see the bottom of it.

10            THE WITNESS:  I am good.

11   BY MR. MAZZOLA:

12       Q    This payment detail -- this payment detail at

13   the bottom has a credit?

14       A    Yes.

15       Q    This is -- it says July 1, 2019, CTX US

16   credit balance, 4.823 million?

17       A    Yes.

18       Q    So what you are saying there is that on

19   July 1, 2019, as of this spreadsheet which is from

20   November 1, the master one from November 1, 2019,

21   Benlida owes -- I guess you are saying they owe CTX US

22   $4.8 million.  Is that what you are saying?

23       A    I am.

24       Q    Now, we went back and we looked -- I don't

25   know if you can split screen --

```
 1              MR. ROSENTHAL:  You can minimize.

 2              MR. MAZZOLA:  Leave it up.

 3   BY MR. MAZZOLA:

 4        Q    If we look at Exhibit 121 -- do you have it

 5   in front of you?

 6        A    I do.

 7        Q    Again, this is an e-mail from you to Douglas,

 8   and presumably the information that you wrote in the

 9   e-mail you got from a reliable source at CTX?

10        A    Yes, I did.

11        Q    And you say, "As per our conversation, please

12   find attached payment details for July 1, 2009 (sic),

13   for the April invoices."  What you are looking at is

14   the payment details for July 1, 2019, for the April

15   invoices that were sent in November 2019, right?

16              MR. ROSENTHAL:  Are you gesturing to the

17        computer screen?

18              MR. MAZZOLA:  Yes.

19              THE WITNESS:  But seriously, please.  I told

20        you -- this is my fifth time I am telling this to

21        you.  I will explain it again.  This sheet is not

22        a master reconciliation.  This sheet is --

23              MR. ROSENTHAL:  You are saying this sheet --

24              THE WITNESS:  Exhibit 121 is for shipments

25        made on -- starting December 1 to what was paid
```

```
 1        next week.  This is just that.  This is a subset

 2        of 12 months in 2017, 12 months in 2018 -- 24

 3        months -- six months in 2019, and one month in

 4        2016.  That is the subset.

 5   BY MR. MAZZOLA:

 6        Q    That is fine.  I am just asking you to look

 7   at some numbers with me.  That is all.

 8        A    Sure.

 9        Q    You will get your chance to explain.  I just

10   want to look at some numbers with you.

11        A    Sure.

12        Q    I am just inquiring why when this spreadsheet

13   was provided, the reconciliation -- I am pointing up at

14   the screen -- Exhibit 120 and at the screen -- was

15   provided to Benlida, you showed that on the April

16   invoices with the July 1, 2019 payment details, Benlida

17   owed you guys $4.8 million.  Then back in July,

18   earlier -- sometimes it's in your favor -- you have

19   $5.7 million is owed.

20             Why the discrepancy?  It's in my client's

21   favor, I admit that, but why the discrepancy?

22        A    It's not in your client's favor.  Firstly,

23   you come back to Exhibit 120 -- sorry, you are still on

24   121.

25             So firstly, the issue is that this is a --
```

 1   you are comparing apples to oranges, okay.  What this

 2   is, as I told you, in 2016 we were told starting

 3   December 1 what ships one week we will pay next week.

 4   So this was a reconciliation.

 5           So Douglas came and Tracy came to me and

 6   said, Rishi, what you told us in December 2016 that you

 7   are going to pay one week, pay this week for what

 8   shipped last week, you are not keeping up with it.  And

 9   I said no, no, let me show you I am keeping up with it.

10           So I created -- if -- if you look at the

11   first entry on the spreadsheet, it starts on 12/1/2016,

12   okay.  So it starts on 12/1/2016.  If you look at the

13   last entry on that sheet, it ends on 7/20/2019.  Not

14   the payments.

15       Q   I believe you.  Okay.

16       A   Okay.  So this is just a subset.  So it's an

17   apples-to-oranges comparison.  You want to do

18   orange-to-orange, apple-to-apple comparison.  I will

19   help you.

20           Go to Exhibit 120.  Now, look at the number

21   which says 5.314 million down there.

22       Q   I see that, yes.

23       A   Obviously it's cut off, but --

24       Q   Close enough.

25       A   It says invoices through the month of July.

```
 1    So go to your right, May --

 2         Q    We will do this with you.

 3              MR. ROSENTHAL:  You are now talking about the

 4         Excel spreadsheet on the screen which is an

 5         attachment to Exhibit 120.  July 20, '19 tab on

 6         the bottom.

 7              THE WITNESS:  You see that number, five three

 8         one four --

 9    BY MR. MAZZOLA:

10         Q    I see that.  It matches the front page of the

11    same exhibit.

12         A    But what I am here to tell you, there is a

13    slight error in that number.  The error was that there

14    were payments where you saw in the September -- in the

15    September 2014 -- those two big payments of 935,000 and

16    918,000.

17              So Ms. Chen provided us with a list of

18    payments on our spreadsheet which were not received.

19    The total of those statements was close to

20    $2.5 million.  And then on the same spreadsheet, she

21    provided us payments which she had received, which were

22    not on our spreadsheet, which were not on this sheet,

23    and those payments totaled $2.47 million.

24              So there was a 33,000-dollar benefit once we

25    took out the payments which Ms. Chen said you have not
```

```
 1   received and we agreed with her, and we put in the

 2   payments which we had sent.

 3       Q    So Ms. Chen said you missed 2.5 million in

 4   payments?

 5       A    She said that you put 2.5 million in which we

 6   did not get, which Benlida did not get.  And she said

 7   you made 2.47 million in payments which Benlida got but

 8   you did not include in your sheet.

 9       Q    So in your records you made reference to

10   2.5 million in payments that you never made to Benlida,

11   right?  That is the first one, right?

12       A    Yes.

13       Q    And your records also reflected or failed to

14   reflect $2.4 million that you paid to Benlida?

15       A    2.47, yes.

16       Q    Those are your records, Rishi.  I don't know

17   how that is good.

18            MR. ROSENTHAL:  Is there a question?

19       Objection.  Don't answer until there is a

20       question.

21   BY MR. MAZZOLA:

22       Q    Do you think that is good, Rishi?

23       A    The issue is if you -- the fact that the

24   numbers are so close, yes, we should -- what somebody

25   in our company did was they took three payments in the
```

1   $2.47 million and clumped them together into 900-some

2   thousand.  There was payments from 2014.  They should

3   have been more accurate in terms of putting it in the

4   right place.  Acknowledge.  But net, it did not have an

5   impact on the numbers.  It had an impact on the numbers

6   by $30,000 or something of that sort.  And the e-mail

7   from Ms. Chen on 11/22 has a spreadsheet which shows

8   the information I just told you about.

9       Q    Okay, let's look at another example.

10           Todor didn't get fired?

11      A    He did not.  He did the right thing.  Why

12   would Todor get involved?

13      Q    I don't know.  I thought he was messing up

14   numbers.  Did he mess up numbers?

15      A    No.

16      Q    But mistakes were made with the numbers,

17   right?

18      A    Mistakes were made on both side, yes.  There

19   were mistakes made, and when reconciled and everything

20   was fixed.

21      Q    Now that we are talking about mistakes --

22           MR. ROSENTHAL:  Are we done with these

23       documents?

24           MR. MAZZOLA:  No, we are just bouncing.

25

```
 1                 (Thereupon, Deposition Exhibit No. 126

 2                  is marked for identification.)

 3   BY MR. MAZZOLA:

 4       Q    Rishi, I am going to put 126 in front of you.

 5   This is a long-ish e-mail thread, but if you look at it

 6   you can probably see what I am getting at.  This is an

 7   e-mail from August 31, 2016.  Do you see that Rishi?

 8       A    Yes.

 9       Q    And there is a longer thread to it, but what

10   I am interested really in is the top of it.

11                You advise him that you wired $450,000 to

12   Benlida.  Do you see that, Rishi, at the top of the

13   e-mail thread?

14       A    I do.

15       Q    And it turns out you made a mistake and only

16   wired 400?

17       A    Yes.

18       Q    Did that happen a lot?

19       A    I don't think so, but whenever it happened it

20   was corrected through the reconciliation process.

21       Q    But mistakes were happening, right?

22       A    Mistakes were happening on both sides.  This

23   may look like big mistakes, but these are not big

24   mistakes.  There were so many times there were

25   shipments which were made by Benlida where she said she
```

 1  shipped a part number, and the part number didn't show

 2  up at the warehouse.  And you went back to them and

 3  they said, oh, yeah, we found it lying on the dock.

 4  The person forgot.

 5          So mistakes like these, you can make a

 6  mountain out of a molehill, but it's not, like, they

 7  are caught -- like on August 31, 2016, 10:53 a.m. I

 8  said I wired 450K, and right after that I wired 400K.

 9  It's the same day.  It's not like --

10      Q    But it happens, right?  Mistakes would

11  happen?

12      A    Mistakes happen.  Mistakes happen, yes.

13      Q    Let's look at a couple more things on this.

14  I know I am bouncing around.

15          If you look at the bottom of this thread on

16  the first page, bottom of the page, you see how -- you

17  say I sent 400K from USA to ROK and 130,000 from HKG to

18  Benlida.  That was you making that payment from the

19  Hong Kong operation?

20          MR. ROSENTHAL:  Object to form.

21          THE WITNESS:  So the wires are set up by the

22      accountant, and I release it.

23  BY MR. MAZZOLA:

24      Q    Were you responsible for releasing wires from

25  the Hong Kong operation?

1       A    Sometimes I was.

2       Q    Why -- let's look at Exhibit 121.

3       A    Sure.

4       Q    How is it that -- regardless of, you know,

5  this was the you shipped this week you get paid next

6  week, apples-to-oranges -- regardless if this is an

7  apple or orange or banana -- I don't really care -- but

8  how is it that by July of 2019 according to your own

9  records -- your own records -- you guys owed Benlida

10  $8.8 million for Circuitronix Hong Kong POs?

11           MR. ROSENTHAL:  Object to form.  Foundation.

12           THE WITNESS:  How did it happen?

13  BY MR. MAZZOLA:

14       Q    Yes.

15       A    They were -- they wanted -- they wanted money

16  from the US.  We were paying from the US.  And they

17  wanted a loan from the US, so we would give them loan

18  from the US.  We wanted to give them loans from the US

19  so we can enforce the laws, which we did not believe

20  that we could do it in Hong Kong.

21       Q    We talked about loans before.  There is no

22  loan documents, right?  Is that correct?  You know what

23  a loan document looks like, right?

24       A    I do.

25       Q    There were no loan documents per se, right?

1      A    There were no loan documents, but there were

2  several exchanges -- there were several exchanges where

3  they were saying that these payments should be treated

4  as a loan.

5      Q    Putting that aside, what I want to

6  understand -- that explains the negative numbers on

7  this e-mail at Exhibit 121.  What I want to understand

8  is the 8.8 million that you write -- it's your e-mail,

9  right?  You see that?

10     A    Absolutely.

11     Q    Where it says we owe 8.8 million?

12     A    Yes.

13     Q    What was that for?

14     A    Circuitronix Hong Kong owed 8.8 million.

15     Q    And you write we.  Why do you write we?

16     A    Circuitronix Hong Kong.

17     Q    But why do you write we?

18     A    As I said, Circuitronix Hong Kong is under my

19  control.

20     Q    You wouldn't have written we owe 8.8 million

21  to Benlida if Benlida did not deliver product worth

22  $8.8 million; is that correct?

23     A    I am not challenging that we owed Benlida

24  $8.8 million minus lead time penalty, minus what was

25  owed for the lead time people, and what was owed for

1    the lead time penalty was close to $6.5 million.

2         Q    For the Hong Kong items?

3         A    For -- I don't have the exact split, the

4    exact break in my mind, but yes.

5         Q    So when you said less the 6.5 million in lead

6    time penalty, you are referring to Hong Kong purchase

7    orders, right?

8         A    No, 6.5 was between Hong Kong and the US.

9         Q    So why are you -- why are you mixing it all

10   up?  I thought they were separate?

11        A    They are all separate.

12        Q    But if they are all separate, why are you

13   mixing it all up then?

14        A    So at the end of the day you are questioning

15   me about Hong Kong invoices, and I do not believe that

16   this lawsuit is about Hong Kong invoices.  I do not

17   have exact numbers for Hong Kong with myself.

18        Q    But your lawyers would have asked you -- did

19   your lawyers ask you to provide discovery?

20             MR. ROSENTHAL:  I am going to instruct you

21        not to answer the question.  You are asking what

22        his lawyers told him.  That is not appropriate.

23   BY MR. MAZZOLA:

24        Q    You read the Complaint, right?

25        A    I read the Complaint.

1        Q    It's Exhibit 62.  Let's look at it.  Let's go

2   to Page 37.

3        A    I have gone through it.

4        Q    It's long, but let's go to Page 37.

5        A    Yes.

6        Q    There are invoice numbers referenced there,

7   right?

8        A    Yes.

9        Q    They say HK on them, right?

10       A    Yes.

11       Q    That means these are invoices from purchase

12  orders out of the Hong Kong office, right?

13       A    Yes.

14       Q    So why do you say you don't know anything

15  about a claim for Hong Kong unpaid invoices?

16            MR. ROSENTHAL:  Objection.  Misstates

17       testimony.

18            THE WITNESS:  So as I said, following this --

19       following this Complaint we filed a motion to

20       dismiss -- we filed our response, and in our

21       response we basically objected to this being the

22       proper venue for any claims against Hong Kong

23       invoices.

24            And we in our response to your -- in your

25       request we did advise that we would provide all

1          information related to Circuitronix US

2          transactions.  So we did communicate what we

3          believed our position generally is.

4    BY MR. MAZZOLA:

5          Q    But you do know based upon this document that

6    Benlida is suing you here in the US --

7          A    Yes.

8          Q    -- CTX LLC for payment of these Hong Kong

9    invoices?  You know that, right?

10              MR. ROSENTHAL:  Objection to suing you.

11              MR. MAZZOLA:  CTX.

12              THE WITNESS:  I do.

13   BY MR. MAZZOLA:

14         Q    I want to go back to Exhibit 121.  I

15   understand what you are saying.  I am trying to

16   understand in July of 2019 what's this $8.8 million

17   that you say we owe Benlida for.

18         A    So as I said, the lead time penalties had not

19   been -- we have not debited Benlida for the lead time

20   penalty.

21         Q    You had not yet debited for the lead time

22   penalties as of July 29 --

23         A    Between November 2017 and -- November 2017

24   and July 2019.

25         Q    Okay.

1      A    And at the end of the day, we believed that

2  we -- we believed that any moneys owed to Circuitronix

3  Hong Kong would have been offset with those lead time

4  penalties.

5      Q    But you don't write that here?

6      A    "All in all Benlida owes us 256,334.14.  This

7  does not take lead time penalty and price increase into

8  account, which only increase the amount of money owed

9  to Circuitronix."

10     Q    And you are saying the lead time penalty

11  would have been $6 million?

12          MR. ROSENTHAL:  Objection.

13          THE WITNESS:  Around this time it should have

14     been around $6.5 million, yes.

15  BY MR. MAZZOLA:

16     Q    Let me ask you about the lead time penalties

17  again.  They are in the contract, the Manufacturing

18  Agreement, right?

19     A    The methodology is not in the Manufacturing

20  Agreement.

21     Q    But there is reference to it, right?

22     A    Yes.

23     Q    So no one is saying lead time penalty is

24  something you made up.  I guess what I would like to

25  understand though is how do you quantify the damages to

```
 1   your company for lead time penalty?

 2        A    Benlida delays in making shipments to us made

 3   us lose very significant customers and revenue.

 4        Q    Can you give me an example of a customer you

 5   lost because of a late shipment?

 6        A    Sure.  We lost Novita Technologies.  We were

 7   doing close to three to three and a half million

 8   dollars with them.  We lost EVW.  We were doing two and

 9   a half to three million dollars with them per year.

10   These are per year numbers.  We lost JCI as a customer.

11   We were doing between eight to ten million dollars

12   worth of business with them.  We lost our business

13   with -- Kimball Electronics got impacted.  We were

14   doing close to 10 to 14 million dollars --

15        Q    These sound like $40 million already?

16        A    That is right, because it caused us a lot of

17   harm.  They absolutely did.  And the lead time

18   penalties actually do not account for majority of those

19   losses, because those were multi-year customers.  They

20   caused us tremendous amount of -- they caused

21   tremendous amount of damage to the company.

22        Q    So you are saying lead time penalties are not

23   even sufficient to compensate you for the loss?

24        A    No, they are not.

25        Q    There did come a time when you were trying to
```

```
 1   renegotiate a second Manufacturing Agreement; is that

 2   right?

 3        A    I think there was a draft given by Tracy.  I

 4   cannot -- I am not able to recollect how far it went,

 5   because Mr. Huang took a very destructive approach to

 6   the relationship.

 7        Q    Mr. Huang took a destructive approach?

 8        A    Took a destructive approach.  So we got to

 9   know very early on that Mr. Huang had reached out to

10   companies such as Kingshine and Shenzhen Kinwong.  And

11   Mr. Huang was not honest during his testimony.  I have

12   got it in writing from the -- from at least a couple of

13   these manufacturers that the discussion was him

14   discouraging them to do business with us.  So once

15   you --

16        Q    Do you have e-mails to that effect?

17        A    I have got backup e-mails, yes.  And if by

18   chance --

19        Q    If I asked you to provide us with copies of

20   those e-mails, would you be able to do that?

21        A    I will be able to do whatever my --

22             MR. ROSENTHAL:  He will do what his attorneys

23        advise him to do.  We will consider that in due

24        course.  We will check and see if it's requested.

25             MR. MAZZOLA:  It's requested now.
```

1           MR. ROSENTHAL:  Well, right now it's not

2      requested within the discovery period, because you

3      would be asking us to produce it in nine days.  So

4      let us check.  He is not going to go looking for

5      it now in the middle of the deposition.

6           MR. MAZZOLA:  Are you saying if he can't find

7      it by the 8th you are not going to give it to us?

8           MR. ROSENTHAL:  I am not telling you anything

9      right now.  I telling you we have to at least go

10      back to look to see whether or not it was

11      something responsive to what you requested that

12      would be due within the discovery period.

13           MR. MAZZOLA:  I think it's discoverable.

14           MR. ROSENTHAL:  I am not contesting that.

15           MR. MAZZOLA:  I think it probably falls under

16      the basis of a 26 disclosure.  It's all

17      discoverable.

18           MR. ROSENTHAL:  I disagree with you about 26,

19      but we can agree to discussion it.  But this is

20      your depo time so --

21  BY MR. MAZZOLA:

22      Q    Did you communicate with Benlida the extent

23  of the lead time losses to you or losses as a result of

24  the lead time?

25      A    We did give our calculations to Tracy.

 1        Q    Of the 40 million number, or something along

 2   those lines, or was it the lead time calculations per

 3   the agreement and the methodology?

 4        A    Lead time calculations.

 5        Q    During the course of this litigation there

 6   was some negotiation about a new Manufacturing

 7   Agreement.

 8        A    Yes.

 9        Q    Are you aware of that?

10        A    Yes.

11        Q    And that new Manufacturing Agreement, you

12   were willing to have some sort of similar lead time

13   language in that; is that correct?

14        A    I cannot recollect exactly, but that sounds

15   correct.

16        Q    Why would you do this to yourself twice?  Why

17   would you agree to a lead time language that ended up

18   costing you many millions more than the penalty itself?

19   Why would you agree to that twice?  Why would you be

20   willing to agree to it twice?

21        A    So at the end of the day, let's assume that

22   we were able to get the pricing which we accepted -- of

23   which we had requested for, and let us assume that that

24   combined with the lead time penalty, that combined with

25   the price increase methodology -- because we would have

1   gotten a further 10 percent discount because of the

2   price increase methodology, laminate prices were

3   falling at that time -- we believed that we would have

4   been able to adequately cover -- adequately -- at the

5   end of the day nobody makes -- everybody loses when any

6   sort of penalty is invoked.  So the entire objective is

7   to communicate how serious the matter is and for -- and

8   for the other side to take it very seriously so that we

9   don't -- because it hurts them too.

10       Q    So what I was asking you earlier about

11  e-mails, I think that related to comments that you

12  allege Mr. Huang had made to other businesses in China.

13  You said you had e-mails to that effect, and me and

14  Stephen had a discussion.  Do you remember that?

15       A    I do.

16       Q    Just a few moments ago.

17       A    I do.

18       Q    I want to ask you a question about the lead

19  time penalties, because I want to make sure my record

20  is clear and I understand this.

21            You said earlier that you lost customers and

22  business because of late deliveries by Benlida; is that

23  correct?

24       A    That is correct.

25       Q    You then ran off a number of customers names;

```
 1   is that correct?

 2       A    That is correct.

 3       Q    You then also talked about dollar amounts,

 4   and I threw the number 40 million out there, and you

 5   said that might be correct; is that right?

 6       A    $40 million per year.

 7       Q    Per year, okay.  Do you have any e-mails from

 8   these customers saying, hey, Rishi --

 9       A    Absolutely.

10       Q    -- it happened again.  Benlida is late.  We

11   are pulling the plug on you?

12       A    Rishi, Circuitronix is late.  We are pulling

13   the plug on you.  Absolutely.

14       Q    Would there ever be an occasion where a late

15   delivery could be Circuitronix's fault?

16       A    Not really.

17       Q    When a purchase order is made to Benlida, do

18   you disclose to Benlida what kind of time constraints

19   you are on with your upstream customers?

20       A    Yes, we do.

21       Q    And is that in the purchase order, or is it

22   via memos or other communication?

23       A    It's on the purchase order as well as when we

24   send them the e-mail we go back and say X number -- X

25   quantity required by such date, Y quantity required by
```

 1    such date.

 2         Q    Do you ever tell your customers, hey, this is

 3    going to be difficult for us to meet?

 4         A    When Benlida was doing what they were

 5    supposed to do, they would -- we would not be late

 6    because we would plan properly.

 7         Q    You would plan properly?

 8         A    We would plan properly.

 9         Q    And you have e-mails from customers saying,

10    hey, Circuitronix you are late.  We are pulling the

11    business?

12         A    Absolutely.

13         Q    Would you share those with me?

14              MR. ROSENTHAL:  Objection.  Again, we have

15         discussed this.

16              MR. MAZZOLA:  Well, I am asking -- making a

17         request for them.

18              MR. ROSENTHAL:  We will consider it after the

19         deposition.

20              JC, incidentally, if you'd point out to us

21         that there is a request that you served some time

22         ago that we should have produced such e-mails in

23         response to by now, then we will start running

24         around and getting them now, but I don't believe

25         that is the case.  I believe this is the first

1        time they were requested.

2              MR. MAZZOLA:  I am sure we made a request for

3        details and documents in support of the

4        counterclaim.

5              MR. ROSENTHAL:  I don't believe this is part

6        of the counterclaim.  You now have exactly what

7        the calculation damage is in the counterclaim.

8              MR. MAZZOLA:  I don't know what was

9        requested.

10             MR. ROSENTHAL:  This is not part of it.  That

11       is what I am saying.  That is why I can't --

12             MR. MAZZOLA:  I don't know.

13             MR. ROSENTHAL:  -- do it in general.

14   BY MR. MAZZOLA:

15       Q    Let's look at -- back up on the board.

16             MR. ROSENTHAL:  What is on the wall is

17       Exhibit 120, Benlida Payment Details CTX US

18       2012-2019 attachment in native form.

19   BY MR. MAZZOLA:

20       Q    What I want to look at -- maybe I will make

21   it easier for everyone.  I want to look at the ROK

22   payment details.

23             MR. ROSENTHAL:  That is the other attachment.

24             MR. MAZZOLA:  That is the other attachment.

25

```
 1    BY MR. MAZZOLA:

 2        Q    I put up before you, Rishi, the payment

 3    details for ROK --

 4             MR. ROSENTHAL:  May 2018 tab.

 5    BY MR. MAZZOLA:

 6        Q    -- May 2018 tab at the bottom.  The May 2018

 7    tab at the bottom, the payment detail for August 1,

 8    2018, for May payments.

 9             MR. ROSENTHAL:  Did you say May payments?

10             MR. MAZZOLA:  I beg your pardon.  It starts

11       in May.  It's the May tab.  The payments start --

12    BY MR. MAZZOLA:

13        Q    Do you see that?

14        A    There is only one payment, only one invoice.

15        Q    That is right.  There is only one invoice.

16    So it's the May one, May 23.  And here you have an

17    August 1, 2018 credit balance of 2.179 million?

18        A    Yes.

19        Q    So what you are saying here when you sent

20    this to everyone in November of 2019 is as of that

21    day -- or as of this payment, August 1, 2018 -- Benlida

22    owed you guys 2.179 million?  Or ROK did.

23        A    Yes.

24        Q    Now, if we compare that to --

25             MR. ROSENTHAL:  Can you scroll to the top so
```

1        I can see the title of that?  Thanks.

2   BY MR. MAZZOLA:

3        Q    Again putting aside apples-to-apples,

4   oranges-to-oranges, if we look at Exhibit 121, in the

5   middle of your e-mail you talk about for ROK CTX the

6   number is 3.375 million that you say they owe you.

7        A    Yes.

8        Q    So that was a mistake arguably that was

9   discovered in benefit for Benlida at ROK?

10       A    I don't understand what you are saying.

11       Q    The number went down.

12       A    The number didn't go down.  They asked us to

13  make more payments after that date.

14       Q    Well, as of that date --

15       A    They asked us to divert more payments from

16  one company to ROK, because ROK was facing very serious

17  problems with the tax bureau.  They asked us to make

18  more payments which brought the number up higher.

19       Q    Here you are showing --

20       A    Three-point --

21       Q    -- 3.3 million in July?

22       A    Yes.

23       Q    And then this spreadsheet is attached to the

24  November reconciliation and it's a smaller number.  How

25  do you explain the difference?

```
 1      A    This is the -- again, this spreadsheet is

 2   specific to what was -- what happened in terms of

 3   payments between December 1, 2016, and July 1, 2019.

 4           MR. ROSENTHAL:  For the record, the witness

 5       is talking about Exhibit 121 when he said this

 6       spreadsheet.

 7   BY MR. MAZZOLA:

 8      Q    Where is this --

 9      A    120 is a complete reconciliation.  But

10   similar to what happened with Circuitronix US, there is

11   some feedback which Ms. Chen gave to the ROK part of it

12   also which impacted this number, but very slightly.

13   Means -- it was a very slight impact.

14      Q    Why, looking at 121, if you see above for

15   Benlida you have CTX Hong Kong separated out and you

16   have CTX USA.  Do you see that on 121?

17      A    Yes.

18      Q    When you get to ROK, why do you sort of

19   combine the two; CTX US and CTX Hong Kong?

20      A    So specific to ROK was -- Benlida was asking

21   us -- there is a very clear acknowledgment from

22   Benlida's side where no moneys were owed to ROK, but

23   they were requesting us again and again to send money

24   to ROK.

25           So at the end of the day we believed -- and
```

```
 1   we sent the money from the US.  So we believed that

 2   that money -- whatever money has been sent to ROK after

 3   a certain point in time -- which is to the tune of

 4   around two-point-some million dollars -- all that money

 5   is owed to Circuitronix USA, because we did not want to

 6   send the money there, but Benlida begged us to send the

 7   money there and they needed us to send the money there.

 8        Q    And you sent it from the USA branch office?

 9             MR. ROSENTHAL:  Objection to the form.

10             THE WITNESS:  Yes.

11   BY MR. MAZZOLA:

12        Q    Did you understand my question?  You sent it

13   from US office, not the Hong Kong office?

14        A    We sent it from Circuitronix LLC, not

15   Circuitronix Hong Kong.

16             MR. MAZZOLA:  I have a few more things on

17        this line.  Can I take a break?

18             MR. ROSENTHAL:  Sure.

19             (Thereupon, there is a short break.)

20   BY MR. MAZZOLA:

21        Q    Let's look at -- let's look at -- Rishi,

22   there is an exhibit there that we marked as 123.  This

23   is an e-mail from Todor dated February 2.

24        A    Yes.

25        Q    The subject is Benlida Payment Detail and
```

```
 1   Bank Slip as Proof of Payment ROK Bank Slip, and there

 2   is some attachments.

 3           We are going to look at -- we are going to

 4   pull it up on the screen -- the Benlida Payment Details

 5   February 1, 2015.  And that would of course be for the

 6   November invoices; is that right?

 7       A    Correct.

 8       Q    In fact it may be attached.

 9       A    It's attached.

10           MR. ROSENTHAL:  It's attached to the paper

11       you say?

12   BY MR. MAZZOLA:

13       Q    I beg your pardon.  I want to look at the

14   January ones.

15           Okay.  So in the January one there is a

16   reference to a 500,000-dollar payment, and that payment

17   was made on December 18, 2014.  Do you see that?

18       A    Yes.

19       Q    Why does that payment appear there?  Is that

20   because it was made at the end of the prior year?

21       A    Why did that payment appear there?

22       Q    Yes.  Because it was made in the prior year,

23   right?

24       A    It was last payment which was made prior to

25   this payment detail.
```

1       Q    Then if we look at the next page, this is the

2   payment detail for February 1, 2015, right?

3       A    Yes.

4       Q    You see less a payment made on January 21,

5   2015, for $500,000.  Do you see that?

6       A    Yes.

7       Q    And of course that appears on the February

8   payment detail, because that payment would have been

9   made sometime January, at the end of January, right?

10      A    Yes.

11      Q    If you look at -- you can leave 123 in front

12  of you.  We will reference that again.

13           If you look at Exhibit 121, there is a number

14  of attachments to that exhibit.  This is the one from

15  July 29, 2019.

16      A    Yes.

17      Q    There is a number of attachments to this one.

18  What I want to look at is I want to look at the Benlida

19  Payment Details CTX US 2015 to 2019.

20           MR. ROSENTHAL:  The second attachment?

21           MR. MAZZOLA:  Yes, put that up on the screen.

22  BY MR. MAZZOLA:

23      Q    We made this a little I think more

24  straightforward now.  What I put up on the screen is

25  the payment detail.

1              MR. ROSENTHAL:  You are referring to the

2         January 2015 tab?

3              MR. MAZZOLA:  Under the January 2015 tab,

4         that is right.

5              THE WITNESS:  January 2015 tab.  We are

6         looking at January 2015 tab, okay.

7    BY MR. MAZZOLA:

8         Q    And it's the payment details from April 1,

9    2015.  Do you see that?

10        A    Yes.

11        Q    So it might have been a little slow, right?

12   April -- January to April?

13        A    No.

14        Q    That's right.  That is on the AMS 60?

15        A    Yes.

16        Q    If you look at this, you will see a payment

17   of $500,000.  Do you see that?

18        A    Yes.

19        Q    And that was made on January 21, 2015?

20        A    Yes.

21        Q    And that payment is being applied to these

22   January 2015 invoices; do you see that?  Is that

23   correct?

24        A    January 2015 invoices.  That is correct.

25        Q    But if you look back at Exhibit 123 --

 1        A     Yes.

 2        Q     -- and if you look at the payment detail for

 3    February 1, 2015, you see what appears to be the same

 4    500,000-dollar payment on January 21, 2015, being made

 5    towards the invoices from November and December of

 6    2014.

 7              MR. ROSENTHAL:  Objection.  Assumes facts.

 8    BY MR. MAZZOLA:

 9        Q     Why is that?

10        A     So as I said, in November of 2019 we did a

11    complete reconciliation, and once we did a complete

12    reconciliation we provided this information to Benlida,

13    Benlida provided us with feedback with a few errors, we

14    adjusted the errors, and then we came up with the final

15    agreement of how the payments applied.

16        Q     So this is just another error then?

17        A     It's not an error.  This is not an error.

18    This could be an error.

19        Q     Something is an error.  There is a $500,000

20    being applied twice.

21              MR. ROSENTHAL:  Can I just say when the

22         witness was pointing to this, I think he was

23         pointing to 123.  Just to be clear, because the

24         record will be unclear.

25              THE WITNESS:  I think that what -- this is

```
 1          2014 here.  So in this case we did not go -- we
 2          had not gone 2014 before and before.  So this was
 3          an incomplete statement.  This was not the
 4          November 2019 -- when was this -- this was -- this
 5          sheet was created in --
 6   BY MR. MAZZOLA:
 7          Q    In July of 2019?
 8          A    No, it was not.
 9               MR. ROSENTHAL:  We are talking about the
10          screen in front of us, which is the Excel
11          spreadsheet attached to Exhibit 121, just so
12          everyone is clear when we are reading this.
13   BY MR. MAZZOLA:
14          Q    This says Payment Detail April 1, 2015.  As
15   Stephen pointed out it's attached to Exhibit 121.
16          A    Yes.
17          Q    So my question to you was it seems that this
18   500,000-dollar payment made on January 21, 2015,
19   appears in two separate payment details for two
20   different time periods; is that correct?
21          A    In two different time periods where the
22   reconciliation was not finalized.  When the final
23   reconciliation was done, it was applied to the right
24   place.
25          Q    So there was a mistake somewhere, either the
```

1   reconciliation or back on -- in 123, Exhibit 123; is

2   that right?

3       A    Or there is -- you would have to look at the

4   final reconciliation, which is attached to 120.

5       Q    Let me ask you this question.  You are saying

6   if we looked at the final reconciliation, 120, we might

7   find it had been corrected there?

8       A    So this was the starting point of the final

9   reconciliation.  After Ms. Chen provided feedback,

10  there was another version of that provided.  But a good

11  starting point would be to start with what is attached

12  to 120, and then the best would be to go to the final

13  one which was provided after the feedback which was

14  provided by Ms. Chen.

15      Q    That would have been provided sometime in

16  early 2020 is what you are saying?

17      A    Yes, yes.

18      Q    So let me ask you this question.  Is it fair

19  then to say just on these two documents in front of

20  you, the exhibit up on the screen, which is the

21  attachment to 123 --

22              MR. ROSENTHAL:  121.

23  BY MR. MAZZOLA:

24      Q    -- 121, and the payment details from 123, is

25  it fair to say that at some point -- or at this point

1    at least, this point in time, the $500,000 was applied

2    twice?

3              MR. ROSENTHAL:  Object to the form.

4              THE WITNESS:  Not necessarily, because the --

5         what was attached to January of 2015 -- to

6         Exhibit 121, that was not created in July of 2019.

7         That was created -- that was given to -- that was

8         provided to Douglas and Tracy sometime in April --

9         March-April.

10   BY MR. MAZZOLA:

11        Q    Of 2015?

12        A    Of 2019.  Of 2019.

13        Q    So you don't agree then that it appears that

14   this payment of $500,000 was applied twice?

15        A    No, because that is not the final

16   reconciliation.

17        Q    But we are just looking at what is in front

18   of us.  Between these two documents, 123 -- Exhibit 123

19   and Exhibit 121 and the attachment that is on the

20   screen -- I am just asking you just looking at those

21   two documents, do you agree that $500,000 has been paid

22   twice?

23              MR. ROSENTHAL:  Object to form.

24   BY MR. MAZZOLA:

25        Q    It may have been fixed later on, but on those

```
1    two documents was it applied twice?

2            MR. ROSENTHAL:  Objection to form.

3            THE WITNESS:  I don't know what was going on,

4        because I got involved -- I started paying

5        attention during -- if you look at the November --

6        when we gave the earlier reconciliation, we did

7        not get feedback from Benlida; and then once we

8        gave the 2012 to 2015, we got the feedback from

9        Benlida.  Once we got the feedback from Benlida,

10       then we updated it and I micromanaged that

11       process.  So I don't know what this actually -- I

12       am not able to comment on it.

13   BY MR. MAZZOLA:

14       Q    Could it have been something Todor messed up?

15       A    It could have been something which Todor

16   messed up, or could have also been some incorrect

17   information which Benlida gave us.  I am not sure about

18   it.

19       Q    I don't like to beat on Todor, but he doesn't

20   work there any more.  Was he fired?

21           MR. ROSENTHAL:  Asked and answered.

22           THE WITNESS:  No.

23           (Thereupon, Deposition Exhibit No. 127

24            is marked for identification.)

25
```

```
 1    BY MR. MAZZOLA:

 2         Q    We were talking about Todor, and I guess I

 3    was asking whether or not -- what I wanted to ask is

 4    did you find that Todor's work was good, lacking?  Did

 5    you find he was making a lot of mistakes?

 6         A    I cannot -- I believe Todor was a competent

 7    employee.

 8         Q    So this is an e-mail -- looking at 127, it's

 9    an e-mail thread, and it starts with Tracy writing on

10    March 27, 2017.  She is referring to an invoice

11    discrepancy analysis update.

12              "As per last talking, if CTX accounting

13    already finished the analysis of 2016 discrepancy,

14    please forward to us immediately.  If not, please give

15    us a timeline of finishing the work."

16              I guess you are saying you found an error in

17    the analysis?

18         A    Yes.

19         Q    What was the error?  Do you remember?

20         A    I cannot remember.

21         Q    I guess you asked Todor to fix it?

22         A    Yes.

23         Q    It seems like you guys had been -- both

24    Benlida and CTX had been investing a lot of time and

25    energy in trying to find out these discrepancies; is
```

```
 1    that fair to say?

 2         A    So this entire problem was created by

 3    Benlida, and I am going to explain what I mean by that.

 4    We had this working contract in place --

 5         Q    Everything was created by Benlida?

 6         A    If you give me --

 7         Q    You sound like my ex-wife.  Everything was

 8    caused by me.

 9         A    I actually have started believing your

10    ex-wife too.  That is the other thing.  But let me --

11    actually Tracy may be able to agree with what I am

12    saying.

13              So what happened was that we had our

14    original -- our original agreement had something which

15    was called a price discount, and what the price

16    discount was doing was that based upon these invoicing

17    of business per month we were given an additional

18    discount, and it carried all the way to February of

19    2015.

20              Then Benlida came and told us they would like

21    to change that.  Rather than give us -- calculate the

22    price discount based upon the business or the shipments

23    in a month, they would just like to give us -- I cannot

24    remember the number -- 7 percent or 6 percent discount

25    on the existing price.
```

```
 1              So what we did was we accepted, and what we

 2      did was that -- let's assume something was $1.  The

 3      next bill we gave starting March was 94 cents.

 4              Some point in time shortly after that,

 5      Benlida came back and said no, no, it's not on the

 6      total price, it's only on something which is called the

 7      base price.

 8              So that is where the pricing discrepancy

 9      started.

10      Q    So you are saying the -- when did this start?

11      A    In the March 2015 time frame when Benlida

12      made a request for a change in the way we were dealing

13      with the -- the volume rebate.  Volume rebate.  And

14      then --

15      Q    Can you walk me through that again?  You

16      would issue a PO for a dollar?

17      A    First let me tell you what was happening in

18      2013 and 2014 until January and February 2015.  So

19      let's assume Benlida shipped $1 million to us in

20      January of 2015.  Then for all the purchase orders we

21      released in January 2015 -- what they shipped in 2015

22      were for purchase orders prior to --

23      Q    Sure.

24      A    So all the purchase orders we released in

25      January 2015, there would be a volume discount based
```

 1  upon the million dollars.  It's in the -- it's in the

 2  Manufacturing Agreement.

 3          So at some point they came back and told us

 4  it's creating problems with China Customs for them

 5  again.  So rather than doing it that way, they would

 6  just, like, scrap the volume rebate and they will give

 7  us a rebate just built into the part number.

 8          So I cannot recollect what the discount was;

 9  6 percent, 7 percent.  Let's say for this discussion

10  it's 6 percent.  So if there was a part number which

11  was a dollar, starting March 1 we would -- we started

12  releasing the bill 94 cents.  They came back and said

13  no, it cannot be 94 cents.  It has to be released --

14  the 6 percent discount is only on the base price, not

15  on finishing and everything else.  All the adders, what

16  they call the adders.  So the 94 cents -- could have

17  been 95 cents or 96 cents -- so that created a pricing

18  discrepancy.

19      Q    How did that create a pricing discrepancy?

20      A    Because according to us, it should have

21  been --

22      Q    Should have been 94 cents?

23      A    And according to them it should be 95, 96

24  cents.  But in retrospect, if I would have to go back

25  and do it again, I would not have accepted to change

1    the Manufacturing Agreement.  I would have just kept it

2    at the volume as per the -- the volume rebate.

3        Q    Did they not tell you how they understood the

4    rebate -- the discount to work?

5        A    So subsequently they did, but we did not

6    agree with that.

7        Q    So you kept issuing invoices for the 94 cents

8    and -- kept issuing POs at 94 and they kept issuing

9    invoices at 96?

10       A    But the last binding contract between the two

11   parties was our purchase order.  We gave them the

12   purchase order 94 cents, they built the parts at 94

13   cents, they did not -- you cannot unilaterally issue an

14   invoice which does not correspond to the purchase order

15   which you have in hand, and that is what they started

16   doing.

17       Q    It sounds like they told you, hey, Rishi, you

18   are issuing a PO at 94 cents, but we are going to be

19   invoicing you at 96 cents?

20       A    They didn't.

21       Q    You figured it out at some point?

22       A    We figured out at some point, but we did not

23   change our purchase order.  We gave our -- next PO we

24   gave at 94 cents.

25       Q    It took six years to figure it out?

1       A    No, by 2016 we came to an agreement regarding

2  the price discrepancy and the price discrepancy issue.

3  But, again, the point that I am making is the trigger

4  point of the problem was Benlida wanting to change the

5  contractual term.

6       Q    But you agreed to that?

7       A    It's not about agreement.  We always try

8  to -- they were always trying to help us, we were

9  always trying to understand what they needed and we

10  were trying to help them.  We were partners.  It was

11  not -- like, there is no reason for us to come back and

12  say no, this is --

13       Q    You are the one that is casting aspersions

14  now.  There is no --

15       A    I am not casting --

16            MR. ROSENTHAL:  Wait.  Sorry.  Objection.

17            THE WITNESS:  I am saying, that the way this

18       whole thing started was in that manner.  Good,

19       bad, ugly; I am not saying anything else.  I am

20       trying to explain to you why things got difficult

21       for our accounting.

22            It got difficult for accounting, because

23       according to basic accounting principles, if they

24       get an invoice for 96 cents and I issue purchase

25       order at 94 cents, they can only accept the

1          invoice at 94 cents.  Accounting is not allowed --

2          accounts payable is not allowed to accept an

3          invoice at a price different than what is in the

4          purchase order.  So that is where the problem

5          started.

6               But then that led to the payment discrepancy,

7          the price increase discrepancy, which is

8          documented -- the quantum of which is documented

9          in the July 2016 e-mail -- meeting -- July 2016

10         minutes of meeting, and in December we change the

11         payment terms.

12    BY MR. MAZZOLA:

13         Q    December what year?

14         A    Same year, 2016.

15         Q    2016.

16         A    So once again, that was a curve ball that was

17    thrown at our accounting.

18         Q    But you agreed?

19         A    But you are not understanding.  We agreed to

20    help them out, but they -- that is what created all

21    this confusion.

22         Q    Rishi, you wouldn't have agreed to it if it

23    wasn't good for your business.  You are not running a

24    clarity here.  You agreed to these things, right?  Did

25    you agree?

1        A     It was not good for our business.  It was so

2   that we could keep continuing doing business.  It

3   was -- in some cases -- status quo would have been the

4   best for us, but at the end of the day we are trying to

5   help them out, they are trying to help us out in other

6   areas.  I am trying to explain to you why things became

7   complicated.

8               But irrespective whether they were

9   complicated or not complicated, finally after going

10  back and forth, back and forth, back and forth, there

11  was no disagreement between the parties in January of

12  2020.  Zero difference.  Because in November we gave

13  our sheets, they observed certain differences, said

14  this is missing, that is missing, this is missing, we

15  provided them with the missing information, they

16  provided us with missing information, we updated the

17  sheet, and we closed it out.

18              So, yes, there was confusion.  There was --

19  it led to month-to-month reconciliation in 2017, 2018,

20  2019.  In 2017 we went back to 2016, 2015.  But by the

21  time 2019 November-December came, everything was sorted

22  out.  There is no confusion on their side, no confusion

23  on our side.  And that is what the evidence shows.

24       Q     In January of 2020?

25       A     In January of 2020.  And it took a couple of

1    iterations to get to that point and --

2        Q    And did you send -- did you send a

3    January 2020 reconciliation?

4        A    I do believe I did.

5            MR. MAZZOLA:  I assume we have it, Stephen,

6        but if we don't have it -- I assume we have it,

7        but if we don't, I would like to see it.

8            MR. ROSENTHAL:  I think we marked it.  Let me

9        tell you.

10           MR. MAZZOLA:  Is it 77?

11           MR. ROSENTHAL:  No, that is 2019.  Look at

12       91.  I don't know if that is it.  That is from you

13       guys to us.  That is in January 2020.  I don't

14       think that is what you are referring to.  Maybe it

15       is.

16           THE WITNESS:  So the January 2020 -- at this

17       point in time --

18           MR. MAZZOLA:  I may have it on my list of

19       things to get to.

20           MR. ROSENTHAL:  Wait for his question,

21       because we will get you confused.

22   BY MR. MAZZOLA:

23       Q    What you are saying, Rishi, is that you

24   provided that to everyone; is that what you are saying?

25       A    Yes, we provided to them.

```
1        Q    So were you saying, then, that it should be

2   no surprise to me that if -- as we continue to look

3   through these reconciliations prior to January 2020 --

4   that we finder errors; is that correct?

5        A    So we provide Benlida with the reconciliation

6   from 2012 to 2015 -- 2019.  In November of 2019 they

7   take the effort to flag errors over four or five

8   e-mails with spreadsheets, missing debits notes,

9   missing information.  We provided all that information

10  to them; missing invoice, missing this, missing that.

11  We provide all that to them.  We update our sheet.  We

12  provide that to them.

13            And then we do not -- at that point in time

14  we believe that both parties have finally seen

15  eye-to-eye, because they give us all the feedback, we

16  addressed all the feedback and corrected everything

17  which they observed, and everybody was on the same

18  page.

19       Q    And then what happened?

20       A    And then what happened was --

21       Q    The lawyers got involved?

22       A    Sort of at that point in time I guess they

23  believed that -- we had successfully demonstrated that

24  we didn't owe the money.  At that point in time things

25  got a little -- yeah, things started going downhill
```

1    pretty fast.

2        Q    There was a time when you were trying to

3    negotiate an arbitration agreement; do you remember

4    that?

5        A    I do.

6        Q    When did you guys start to try to negotiate

7    the arbitration agreement?

8        A    After our meeting in August 2019.

9        Q    And that went on for what, a year or so?

10       A    Yes.

11       Q    Why could you never come do an understanding

12   on that?

13       A    Because we could not agree to -- we wanted

14   the numbers to be broken -- they wanted the numbers to

15   be combined, and we wanted Circuitronix -- we wanted

16   numbers to be for Benlida Circuitronix USA, Benlida

17   Circuitronix Hong Kong.  We wanted all the companies to

18   be broken up, and they wanted combined numbers.

19       Q    Let's look at -- let's look at what we

20   previously marked as Exhibit 124.  124 is a hard copy.

21   You should have it in front of you.

22            So this is an e-mail from Todor.  It's again

23   a payment detail and a bank slip and proof of payment.

24   Do you see that?

25       A    Yes, I do.

```
 1        Q    There is a payment detail from March 1, 2015

 2   that is attached to it?

 3        A    Yes.

 4        Q    If you look at that payment detail, although

 5   it's for March 1, 2015, it's actually for invoices that

 6   were sent to you in December of 2014.  Do you see that?

 7        A    Yes.

 8        Q    And there the total owed is 649, and you are

 9   taking a 20,000-dollar payment made on January 26 --

10        A    $200,000.

11        Q    Beg pardon.  $200,000 on January 29, 2015.

12   Do you see that?

13        A    Yes.

14        Q    Now, if you look -- if you keep that in front

15   of you and you look up to -- this is on Exhibit 121,

16   it's up on the screen, and we are looking at Benlida

17   Payment Details CTX US 2015 to 2019, and we are looking

18   at the April payment detail.  Do you see that?

19        A    Yes.

20        Q    Now, of course it's a different payment

21   detail than what you have on Exhibit 124, but if you

22   scroll down -- and we will do that for you -- you will

23   see there is a 200,000-dollar payment made on

24   January 29, 2015, that is being applied to these

25   invoices from January 2015.  Do you see that?
```

 1      A    I do.

 2      Q    I guess my question is why when Todor

 3  produced the payment detail in February of 2015 does he

 4  apply what seems to be, again, the same 200,000-dollar

 5  payment?

 6      A    I guess my question to you is that why are

 7  you not looking at the latest reconciliation?

 8      Q    But I am asking questions.  That is the great

 9  thing about depositions, I get to ask and you get to

10  answer.

11          MR. ROSENTHAL:  The question is why did Todor

12      put the 200,000 --

13  BY MR. MAZZOLA:

14      Q    Why am I seeing the same 200,000-dollar

15  payment?

16      A    Because you are not looking at the latest

17  reconciliation.

18      Q    So is it fair to say a mistake was made

19  somewhere before the latest reconciliation?  It may

20  have been fixed, but based upon this document are we

21  seeing a mistake, error in bookkeeping?

22      A    It's not an error, it's an intermediate

23  reconciliation and leads to final reconciliation.  The

24  final reconciliation is what needs to be considered.

25  You should not be looking at intermediate

1    reconciliation.

2         Q    That is your answer?  You are not

3    acknowledging what we are looking at over here is a

4    bookkeeping error?

5         A    You are looking at an intermediate

6    reconciliation which was going back and forth between

7    the companies.  You are not looking at the final

8    reconciliation.

9         Q    And the final reconciliation is the one from

10   January 2020?

11        A    So the final reconciliation is -- the final

12   reconciliation is the one from April of 2022, because

13   there was some slight changes which were also being

14   made between January and -- January of 2020 and April

15   of 2022.

16        Q    There was one done in April 2022?

17        A    So -- yes.  It means yes, it was fine tuned

18   in April 2022.  That is correct.

19        Q    You were still fine tuning the

20   reconciliations in April 2022?

21        A    In preparation for trial.

22        Q    Did you share those with Benlida?

23        A    I shared those with my lawyers and I shared

24   those with our expert.

25             MR. ROSENTHAL:  He is referring to work

1      product.

2    BY MR. MAZZOLA:

3        Q    So you did some work product, and you shared

4    it with your lawyers.  So that isn't the final

5    reconciliation, that is your work product.  That is

6    okay.  You can do that.

7        A    Yeah, that is work product, but also final

8    reconciliation.

9        Q    I want to get back to my question.  And maybe

10   you have already answered it, but I will try again.

11           My question was this $200,000 that seems to

12   be applied twice, in your mind -- in your mind -- is

13   not a bookkeeping error; is that what you are saying?

14       A    That is right.  It's an intermediate

15   reconciliation.

16       Q    Intermediate reconciliation.  Is that like my

17   kid getting a C on the midterm and then getting an A on

18   the final?

19       A    It means -- I do not know about what your kid

20   is up to unfortunately, but if he is doing stuff like

21   that he better teach my kid too.

22           I really -- like, there is this constant back

23   and forth between the companies, how the calculation is

24   done here, calculation done there.  So there is no --

25       Q    Let's look at -- back at -- again we are

1    going to look at again 121.

2          MR. ROSENTHAL:  Which one is 121?

3          MR. MAZZOLA:  July.

4          THE WITNESS:  The other thing which should be

5      noted is that 121 has several spreadsheets

6      attached to it.

7    BY MR. MAZZOLA:

8      Q    It does, yes.

9      A    I think you should specify which spreadsheet

10   you are talking to, because the spreadsheet which

11   outlines these numbers in the body of the e-mail is not

12   what this spreadsheet is.

13         MR. ROSENTHAL:  When you say this, gesturing

14     to the screen.

15   BY MR. MAZZOLA:

16     Q    What screen are you looking at right now?

17     A    In 121 there is a body of an e-mail and it

18   gives certain numbers.  Those numbers have got nothing

19   to do with -- those numbers have nothing to do with

20   this --

21     Q    I appreciate that.  That is why we are

22   looking at the spreadsheets that are identified as

23   attachments.  That is what I am saying.

24     A    Yes.

25         MR. ROSENTHAL:  Just proceed with your

```
 1      question.

 2  BY MR. MAZZOLA:

 3      Q    Looking at this again, I want to look at the

 4  ROK payment details.

 5           MR. ROSENTHAL:  These are the attachments to

 6      Exhibit 121?

 7           MR. MAZZOLA:  Yes.  It's the January --

 8  BY MR. MAZZOLA:

 9      Q    So we are looking at the screen, ROK, these

10  are payment details for April 1, 2015.  Do you see

11  that, Rishi?

12      A    I do.

13      Q    And this is a payment detail that is attached

14  to Exhibit 121.  And what you will see is you will see

15  that there is a payment of $250,000 being made on

16  January 30, 2015, is applied.  Do you see that?

17      A    250K -- this is for January -- yeah.  Yes,

18  1/30.

19      Q    I am also going to draw your attention to

20  what we have previously marked as Exhibit 125.  It's a

21  hard copy e-mail.  Do you see that document in front of

22  you, Rishi?

23      A    I do.

24      Q    As you see, there are two attachments.  There

25  is two attachments referenced on the e-mail; an ROK
```

 1    payment detail and ROK bank slips.

 2         A    Yes.

 3         Q    Now we are going to look at -- in addition to

 4    the ROK bank slips, there is another document called

 5    ROK payment detail.  We will put it up on the screen.

 6              MR. MAZZOLA:  Maybe I can get at it another

 7         way.

 8              MR. ROSENTHAL:  Can we go off the record?

 9              MR. MAZZOLA:  Yeah.

10              (Discussion off the record.)

11              MR. MAZZOLA:  We will table that and keep

12         moving along.

13    BY MR. MAZZOLA:

14         Q    You were talking about Mr. Huang earlier.

15    And that I think you were suggesting that Mr. Huang had

16    been badmouthing CTX to its other CTX customers in

17    China.

18         A    Suppliers.

19         Q    Suppliers.  Did you view that to be a breach

20    of any of the contractual relationships between CTX and

21    Benlida?

22         A    The fiduciary duty clause.

23         Q    Did you raise a counterclaim to that effect?

24         A    I think we did.

25         Q    Did you confront Mr. Huang when you first

```
 1   learned of that?

 2        A    Akshay spoke to Tracy, and Tracy said that --

 3   after we heard about it, Akshay spoke with Tracy, and

 4   Tracy said she was not aware of it.

 5        Q    I think you had said earlier some other

 6   testimony that you had the utmost respect for

 7   Mr. Huang?

 8        A    I absolutely do.  Actually I still have

 9   utmost respect for him.  I didn't expect him to be -- I

10   was a little surprised with his testimony yesterday.

11        Q    Why?

12        A    Because he was not honest.  That is neither

13   here nor neither there.

14        Q    Why did you think he was not honest?

15        A    Mr. Huang, once he came back after his health

16   problem from -- back to Benlida, he was at the factory

17   each and every single day.  And Mr. Huang has an office

18   in Benlida, not the conference room.  He shares an

19   office with his son.  It's a room double the size of

20   this room, and father has a desk -- and you've seen

21   those Chinese dividers like with the -- and the son has

22   a desk on the other side, and then there is a

23   conference table.  Father and son have a desk, each

24   have a desk.  So sometimes when you are called to the

25   room to meet with Douglas -- actually not even a
```

 1   conference.  There is a conference table and then a tea

 2   table where they sit down and you can have tea.  Like

 3   if I am talking to Douglas, I can see through the

 4   divider, and Mr. Huang was on his -- on his --

 5       Q    So what are you saying was dishonest?

 6       A    Mr. Huang said he did not come to the office

 7   often.  He was not running the show, Douglas was

 8   running the show.  Mr. Huang was running the show.

 9   Mr. Huang has management meeting every morning, every

10   evening.  Mr. Huang -- just on and on.

11       Q    How many times have you been in Benlida's

12   office in the last year?

13       A    Not last year.  He said from 2012.  I was

14   there every couple months from 2012 to 2019.  And

15   Akshay --

16       Q    You weren't there every day?

17       A    I was not there every day, but we have got 20

18   employees who sit in Benlida.

19       Q    I thought you had one?

20       A    One accounting employee.

21       Q    Do you still have employees at Benlida?

22       A    Not that many.  We have five, six, seven.  A

23   smaller number.

24       Q    And those are quality control people?

25       A    Yes, and engineering.

```
 1        Q    Who pays them?

 2        A    We pay them.

 3        Q    Who is we?

 4        A    Circuitronix China.

 5        Q    Shenzhen China?

 6        A    Actually half the salary Circuitronix Hong

 7   Kong and half the salary Circuitronix Shenzhen.

 8        Q    Do you still have respect for Mr. Huang?

 9        A    I do.  I guess he is trying to get out of the

10   hole they dug for themselves.

11        Q    Excuse me?

12        A    I said I guess they are trying to get out of

13   the hole they dug for themselves.  So they are taking

14   the --

15        Q    Maybe it's the hole you created for them?

16        A    We will see.  I think trial is set for

17   August.

18        Q    October.

19        A    We will see who created a hole for whom.

20             MR. ROSENTHAL:  I suspect our IT folks left

21        for the day by now.  Do you want me to check?  I

22        mean, he told me in passing there were some things

23        sometimes with an interface with a particular

24        operating system, but you have a Dell.  So I don't

25        know that you have anything funky on there.
```

```
 1              MR. MAZZOLA:  Let's just move on.  Forget it.
 2              MR. ROSENTHAL:  Do you want to look over his
 3       shoulder?
 4              MR. LERNER:  No, it's an unable zip file.
 5       Maybe it could be unzipped by somebody else, but
 6       not me.
 7              MR. ROSENTHAL:  I don't know why the screens
 8       are not showing --
 9              MR. MAZZOLA:  You don't have it up anymore.
10       It's gone.
11              MR. LERNER:  Well, I have no access to it.
12              MR. ROSENTHAL:  This would be about the time
13       of the day -- you missed the pleasant experience
14       of being -- when I was questioning your clients --
15       where Rich and others would groan and --
16              MR. LERNER:  No, that happened at 7:00.
17              MR. ROSENTHAL:  They would say when are you
18       going to finish, and I would say I don't know.
19              Let me step out for a second.
20              (Thereupon, there is a short break.)
21  BY MR. MAZZOLA:
22       Q    Rishi, I just handed you a payment detail.
23              MR. ROSENTHAL:  What number now?
24              MR. MAZZOLA:  130.
25
```

```
 1    BY MR. MAZZOLA:

 2         Q    I don't have the attached e-mail to it, but

 3    it's a payment detail for September 1, 2016, for

 4    invoices --

 5              MR. ROSENTHAL:  Sorry to interrupt.  Did you

 6         skip 128 and 129?

 7              MR. MAZZOLA:  I did.  I totally did.

 8              (Thereupon, Deposition Exhibit No. 128

 9               is marked for identification.)

10              MR. ROSENTHAL:  This is now Exhibit 128.

11         Okay.

12    BY MR. MAZZOLA:

13         Q    It's a payment detail.  Do you see that,

14    Rishi, the document we are looking at?

15         A    Yes.

16         Q    It's a payment detail for September 1, 2016,

17    for Benlida?

18         A    Yes.

19         Q    You will see on the paper document in front

20    of you that it has a balance due of $117,943.19.  Do

21    you see that?

22         A    Yes.

23         Q    In front of you on the screen is a payment

24    detail for the same period and covering the same

25    invoice dates that was attached to Exhibit 120 and
```

```
 1    found under the attachment Benlida Payment Detail CTX

 2    US 2012 to 2019.  Do you see that?

 3         A    Yes.

 4         Q    I guess my question for you, Rishi, is why

 5    does the document on the screen, which comes off --

 6    which is attached to that Exhibit 120, have a balance

 7    due of I think it's $498,103?

 8         A    Again, as I said, what is up on the screen is

 9    intermediate reconciliation.

10         Q    You don't acknowledge there was a mistake in

11    bookkeeping at some point?

12         A    No.

13              MR. ROSENTHAL:  Can I indicate what that

14         document says for the record as well, which month

15         payment?  It's September 1, 2016.

16              MR. MAZZOLA:  Let's take a break.

17              (Thereupon, there is a short break.)

18    BY MR. MAZZOLA:

19         Q    There is an e-mail -- I beg your pardon.

20    Yes, it's an e-mail, Exhibit 53.

21         A    I think we should not consider this e-mail,

22    because Mr. Huang doesn't believe a meeting took place.

23    That is what Mr. Huang said yesterday, the meeting

24    didn't take place.

25              Q    Were you at the meeting?
```

1      A    I was not.

2      Q    Were these minutes forwarded to you?

3      A    They were.

4      Q    And they are sent to you by Tracy, right?

5      A    Yes.

6      Q    I assume Akshay was authorized to attend this

7    meeting; is that correct?

8      A    So Mr. Huang used to call for meetings all

9    the time, sometimes ask request for conference calls

10   and sometimes request as to show up in person, and

11   whenever I could not be there I would send Akshay.  He

12   was -- as I stated before, he was very involved with

13   the business.

14     Q    Akshay?

15     A    Mr. Huang.

16     Q    Mr. Huang?

17     A    And Akshay too.  Akshay was very involved

18   with the business on behalf of Circuitronix.

19     Q    And Akshay, when you say he was very much

20   involved in the business on behalf of Circuitronix, are

21   you referring to Circuitronix LLC, Circuitronix Hong

22   Kong?  What are you referring to?

23     A    Circuitronix Hong Kong.

24     Q    The business that was discussed at this

25   meeting, you -- you read this memo at some point,

1    right?

2          A     Pardon me?

3          Q     You read this memo at some point?

4          A     I read this memo as soon as the meeting took

5    place and I received it.

6          Q     So you have some familiarity about it, right?

7          A     I don't have some, I have all familiarity

8    with it.

9          Q     My question relates to Akshay -- Akshay --

10   Akshay's ability to represent CTX LLC and CTX Hong

11   Kong; is that correct?

12         A     Akshay has continuously mentioned that he is

13   only the messenger.  "I have fully understand the worry

14   from Benlida.  Will pass all the information to Rishi."

15         Q     He was the messenger?

16         A     He was the messenger.  Mr. Huang was -- for

17   lack of a better term -- expected us to show up when he

18   requested for the meeting, and we always tried to give

19   him that respect.  If he asked for it, we said yeah,

20   let's go ahead and have the meeting.  And most of the

21   time it could have been accommodated by phone calls,

22   which we did, or a lot of times actually I flew to

23   China to meet up with them.  Sometimes when I could

24   not, then I requested Akshay to represent me.

25         Q     If you go to the second page, it looks like

```
 1   there is some comments attributable to Akshay.  Do you

 2   see that?

 3        A    Yes.

 4        Q    Towards the bottom?

 5        A    Yes.

 6        Q    It says, "Akshay:  You are worrying that the

 7   risk of insufficient funds in CTX doesn't exist.  If

 8   BLD requires CTX provide financial certification which

 9   is issued by a bank, CTX will provide it immediately."

10             What was the genesis of that?

11        A    I guess the genesis was what Mr. Huang had

12   said in the text on top Benlida and ROK have -- like

13   all the stuff on the top.  So he was just reacting to

14   what was told to him.

15        Q    But he is advising that if Benlida was

16   concerned about the financial well-being of CTX, CTX

17   can provide financial certification issued by a bank.

18   Why would he have said that?

19        A    Because I told him he can say that, he can

20   represent that.

21        Q    You told him that if they had concerns about

22   your financial well-being, you would provide financial

23   records or financial audited reports or what?

24        A    To show that we had cash balances.  On

25   several occasions Akshay was at an in-person meeting
```

```
 1    where I met with Mr. Huang, Tracy, Douglas, Ms. Chen,

 2    Mr. Liao and everybody sitting right next to me, and I

 3    said the same thing.  So I think he just parroted what

 4    he heard me tell them.  On some occasions I would log

 5    onto my laptop and show Tracy the balances in our

 6    account.

 7        Q    What account?

 8        A    Circuitronix LLC.

 9        Q    What about Circuitronix Hong Kong?

10        A    I cannot recollect whether I showed that to

11    them.  I am not able to recollect.

12        Q    Why would you show Tracy your balances from

13    CTX LLC?

14        A    So that she could communicate to Mr. Huang

15    that -- she could communicate to Mr. Huang that our

16    financial stability should not be -- our financial

17    strength should not be challenged.

18        Q    If you are going to show her the one from CTX

19    LLC, why not the one from CTX Hong Kong?

20        A    Why not I show her my personal bank account

21    too?  That was sufficient to get the job done to get

22    the comfort.

23        Q    Just to show that CTX LLC, that was

24    sufficient?

25        A    It was just a way of saying that we had the
```

```
1    resources, don't worry, we can address any

2    requirements.

3        Q    Does the we have the resources means if CTX

4    Hong Kong couldn't pay it, CTX LLC would pay it?

5        A    Absolutely not.

6        Q    What good does showing her CTX LLC's bank

7    account?  What does that show?

8            MR. ROSENTHAL:  Objection.

9    BY MR. MAZZOLA:

10       Q    Insofar as CTX Hong Kong's obligations are.

11       A    It was just a general -- it was a very

12   general way of saying don't get nervous, what you

13   call -- Circuitronix LLC is financially strong company.

14       Q    Would that be, like, showing your personal

15   finances?  You are not going to pay the bills for your

16   businesses, are you?

17           MR. ROSENTHAL:  Objection.  Assumes facts.

18           THE WITNESS:  It asked for a $1.5 million

19       prepayment from Circuitronix LLC.  So we were

20       trying to -- and previously, as you see, they have

21       asked for $1 million, $1 million -- on several

22       occasions they asked for different sums --

23       $3 million.  The requests were all over the place.

24       So we would show them that we have the capability

25       of making that payment should we decide to make
```

```
 1        that payment.

 2   BY MR. MAZZOLA:

 3        Q    So we would show them that we have the

 4   ability to make that payment?

 5        A    The loans would always come from Circuitronix

 6   LLC.  It was always known to them it did not come from

 7   Circuitronix Hong Kong, because these were loans --

 8        Q    Now you are talking about loans.  Let's slow

 9   it down.  How often would you show Tracy the LLC's bank

10   accounts?

11        A    I showed it to her maybe once or twice.

12        Q    And when you would show her the LLC's bank

13   accounts, it was to assuage her concerns that Benlida's

14   bills would get paid; is that correct?

15        A    That is not correct.

16        Q    What was it to do then?

17        A    They were asking for money from us, loans

18   from us; are you able to give us -- front us some

19   money?

20        Q    Front us money for what?

21        A    A loan, a banking loans.

22        Q    So now it's loans?

23             MR. ROSENTHAL:  Object to the form.

24             THE WITNESS:  A banking loan.

25
```

```
 1   BY MR. MAZZOLA:

 2       Q    It had nothing to do with the unpaid

 3   obligations she was claiming they were owed?

 4       A    No.

 5       Q    It was always about a loan?

 6       A    You have seen the e-mails.

 7       Q    So someone was asking to borrow money, and to

 8   make them feel better you showed them your bank

 9   account?

10       A    Tracy and I had a close relationship.  Tracy

11   would ask me and I would help her out, and if I asked

12   her for stuff she helped me out.

13            At one point in time Douglas she and me were

14   scared of Mr. Huang.  We were collectively trying to

15   calm Mr. Huang down.  So it was a normal -- it was a

16   nice way of working together.  She would ask for help,

17   I would give them whatever help I could.  They would

18   ask for help, vice versa.

19       Q    So giving them help would include showing

20   them the LLC's bank accounts?

21       A    So it would -- she would come to us or we

22   would be sitting in a meeting and Mr. Huang would be

23   going nuts in Chinese banging the table with his hands

24   and stuff like that, and then Mr. Huang would leave the

25   conference room, Douglas sitting out there, and Tracy
```

 1   would come sit next to me, what do we do, what do we

 2   do.  I would say let's think about it.  We don't need

 3   to worry.  There is money out there if I have to loan

 4   money if push comes to shove.

 5          Sometimes the conversation was we don't have

 6   the money to pay the raw materials suppliers.  We can't

 7   make payroll next weekend.  And I would say no need to

 8   worry.  I can loan money to you guys, look.  Show them

 9   the bank account.

10   Q    Do you think your representations that the

11   LLC was so flush with cash that it could loan the money

12   assuaged their concerns about the large receivable they

13   had with CTX Hong Kong?

14   A    So at the end of the day there were two

15   things.  They knew that they didn't have a large

16   receivable Circuitronix Hong Kong.  It would have been

17   eaten into by the lead time penalty.  That is number

18   one.

19          Number two, if that was the case, if I wanted

20   Circuitronix LLC to guarantee Circuitronix Hong Kong

21   payment, I would have signed the authorization of the

22   business, which I refused to sign.

23   Q    You did sign this one, Exhibit 27?

24   A    For a different purpose as you see.

25   Q    Well, as you say.

```
 1      A    Yeah, and as the words read.

 2      Q    It's okay.  I don't decide these things.

 3      A    Yeah.

 4           MR. ROSENTHAL:  Then don't ask him about it.

 5           MR. MAZZOLA:  But it's important for me to

 6      understand what he thinks it says.  It's not for

 7      me to decide.

 8           MR. ROSENTHAL:  Asked and answered.

 9  BY MR. MAZZOLA:

10      Q    Did CTX ever order at any time more than

11  agreed upon capacity?

12           MR. ROSENTHAL:  Can you repeat -- did what?

13  BY MR. MAZZOLA:

14      Q    Did CTX order at any time more than the

15  agreed upon capacity?

16      A    At the end of the day Benlida was -- to begin

17  with, Benlida did not expect to have the problems which

18  we ran into ROK.  So they were banking on that

19  capacity.

20           The reason why they have given you as to why

21  they shut down ROK is not truthful.  They ran into a

22  lawsuit with the landlord of the building in ROK, and

23  it's a public record that they have a lawsuit out

24  there -- had a lawsuit.  I don't know how it settled.

25  So they lost that capacity.
```

1            Losing that capacity, they were not able to

2    keep up with their commitment to us and their other

3    customers and backlog kept accumulating and

4    accumulating and it created a big mess.  But at the end

5    of the day, they were completely aware of all the

6    projects which were being brought to them.  They were

7    extremely happy to receive the projects.  Obviously you

8    have seen the minutes of the meeting where they have

9    expressed happiness and the growth in business.  So --

10   you cannot have your cake and eat it too.  Is that the

11   saying?

12        Q    That is the saying.  The question was at any

13   time did CTX ever order more than the agreed upon

14   capacity?  You explained why there might have been

15   capacity problems, but the question is did you ever

16   order more than the agreed to capacity?

17        A    No.  If Benlida shipped the parts to us -- if

18   Benlida accepted the orders and put the orders into

19   production on a first in, first out basis, we would not

20   have any problems.

21            Benlida was accepting -- taking orders,

22   putting whatever they felt like into production, and

23   orders which were released today were getting produced

24   before orders which were released a month ago, creating

25   a problem on the orders released a month ago.

```
1              So they were doing all sorts of things

2    because of their limitations on procuring a certain

3    sort of laminate or their limitation in terms of

4    bottleneck in the process, the pressing process.

5              So as for that concern, they created this

6    entire mess.  Which, once again, you are not there to

7    decide.  It will be decided in October.

8         Q    I want to get back on this CTX Hong Kong.

9    Your position at CTX Hong Kong is what, general

10   manager?

11        A    Director.

12        Q    Is there anyone higher than you at CTX Hong

13   Kong?

14        A    The director is -- the director is -- I want

15   to say ceremonial role, but it's more of a strategic

16   role rather than a tactical role.  Between 2012 and

17   March of 2015 complete tactical execution at

18   Circuitronix Hong Kong was being done by Sunny Kapoor.

19   Between April of 2015 until today the complete tactical

20   day-to-day operations is run by Akshay Koul.  If they

21   run into any sort of issues, they come to me for sure,

22   but they are running the day-to-day of that operation.

23        Q    But ultimately they all report to you?

24        A    So Akshay has dotted line reporting.  For the

25   fulfillment of orders, they report to me; on financial
```

```
 1    issues, they report to my mom -- he reports to my mom.

 2         Q    On financial issues?

 3         A    Yes.

 4         Q    Who -- at CTX LLC here in the US, what is

 5    your position here?

 6         A    I am the CEO.

 7         Q    What is CTX LLC's ownership position of CTX

 8    Hong Kong?  Do they own the whole thing?

 9         A    Zero percent.  We are completely independent

10    companies.

11         Q    Why do you refer to it then as one of your

12    companies then?

13         A    I say that it's a company under my control.

14         Q    So it does not sit under the CTX LLC

15    umbrella?

16         A    It does not.

17         Q    In terms of reporting, does it report up to

18    you?

19         A    I explained the reporting structure.

20         Q    It reports to you --

21         A    And my mom.

22         Q    -- and your mother.  Are you able to access

23    the bank accounts for CTX Hong Kong?

24         A    I am able to access the bank accounts, but

25    for all transactions I need authorization from my
```

```
 1   mother.

 2       Q    Is there a particular reason why -- I guess

 3   the question is, you know, we are still -- our client

 4   is looking at a large receivable owed by CTX Hong Kong.

 5   Is there a reason that that hasn't been paid?  Perhaps

 6   your mother doesn't want to pay it?

 7       A    Because we do not believe it's a receivable.

 8   That receivable is fully negated by other -- by the

 9   lead time penalty.

10       Q    Has CTX ever made -- CTX LLC out of here in

11   the United States -- have they ever paid any debts or

12   obligations of CTX Hong Kong?

13       A    Has Circuitronix --

14       Q    -- LLC paid any debts or obligations of CTX

15   Hong Kong?

16            MR. ROSENTHAL:  Asked and answered.

17            THE WITNESS:  To the extent what I told you.

18       If there were investment projects where --

19       actually that was the reverse.  You are asking

20       Circuitronix -- I do not think so.

21            MR. ROSENTHAL:  I have a question.  Was the

22       question did US pay for Hong Kong or vice versa?

23            MR. MAZZOLA:  US pay for Hong Kong.

24   BY MR. MAZZOLA:

25       Q    Did you understand it that way, Rishi?
```

 1      A    I understood it that way.  But, again, I am

 2  going to just explain the -- I am going to explain it

 3  to you.  The nonproduct investment expenses --

 4  nonproduct expenses is immersion tin line -- it's

 5  300,000 US dollars.  That immersion tin line is going

 6  to be used on both Circuitronix Hong Kong product and

 7  Circuitronix US product.  The 300,000 goes from

 8  Circuitronix USA.  There is $150,000 which Circuitronix

 9  Hong Kong owes us, Circuitronix LLC.  Rather than

10  sending the money back, they may pay certain invoices

11  for us that $150,000.  But that is far and few.

12      Q    So Hong Kong would pay invoices for the LLC

13  to pay it back the debt that is owed?

14      A    But as I said, if I have to count the number

15  of transactions, it would be less than five.  Maybe

16  less than three.

17          MR. MAZZOLA:  Okay.  Give us five minutes and

18      we will wrap up, because we are really out of

19      time, but we need to reserve some time ironically.

20          (Thereupon, there is a short break.)

21          MR. MAZZOLA:  We are going to wrap up for the

22      night.

23          Rich is telling me that he sent an e-mail to

24      Steve, Christina, and Chauncey that we are going

25      to hold open the deposition pending receipt of the

1    documents.

2          MR. ROSENTHAL:  We just received the e-mail,

3    and we will review it and we will get back to you

4    on our position, but we haven't had a chance to

5    fully determine what we have to do with it.

6          MR. LERNER:  Okay.

7          MR. ROSENTHAL:  We will read.

8          (Thereupon, at 7:03 p.m. the deposition

9           adjourned sine die.)

10                    *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OATH

 2

 3    State of Florida    )

 4    County of Dade      )

 5

 6

 7            I the undersigned authority, certify that the

 8    witness, RISHI KUKREJA, personally appeared before me

 9    and was duly sworn.

10

11            Witness my hand and official seal this

12    15th day of June, 2023.

13

14

15            Laurel A. Mazur
              Notary Public, State of Florida
16            Commission No. GG 352516
              Expires:  7/28/23

17

18

19

20

21

22

23

24

25
```

```
 1                    REPORTER'S CERTIFICATE

 2   State of Florida      )
     County of Dade        )

 3

 4          I, Laurel A. Mazur, Court Reporter and Notary
     Public, State of Florida, do hereby certify that I was

 5   authorized to and did stenographically report the
     foregoing deposition in stenotype, that the foregoing

 6   pages, numbered from 1 to 256, inclusive, are a true
     and correct transcription of my shorthand notes of said

 7   deposition, and that the witness did request review of
     the transcript.

 8

 9          I further certify that I am not a relative,
     employee, attorney, or counsel of any of the parties,
     nor am I a relative or employee of any of the parties'

10   attorneys or counsels connected with the action, nor am
     I financially interested in the action.

11

12          The foregoing certification of this transcript
     does not apply to any reproduction of the same by any
     means unless under the direct control and/or direction

13   of the certifying reporter.

14          Dated this 15th day of June, 2023.

15

16          _____
            Laurel A. Mazur
17          Notary Public, State of Florida
            Commission No. GG 352516
18          Expires:  7/28/23

19

20

21

22

23

24

25
```