**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO. 21-cv-60125-RNS**

| | |
|---|---|
| JIANGMEN BENLIDA PRINTED CIRCUIT CO., LTD., | Miami, Florida |
| Plaintiff, | October 17, 2023 |
| vs. | 9:32 a.m. - 6:05 p.m. |
| CIRCUITRONIX, LLC, | Volume II |
| Defendant. | Pages 301 to 623 |

**TRIAL**
**BEFORE THE HONORABLE ROBERT N. SCOLA, JR.**
**UNITED STATES DISTRICT JUDGE**

APPEARANCES:

FOR THE PLAINTIFF:             RICHARD E. LERNER, ESQ.
                              JEAN-CLAUDE MAZZOLA, ESQ.
                              MAZZOLA LINDSTROM LLP
                              1350 Avenue of the Americas
                              Second Floor
                              New York, New York 10019

FOR THE DEFENDANT:            STEPHEN F. ROSENTHAL, ESQ.
                              MATTHEW P. WEINSHALL, ESQ.
                              CHRISTINA H. MARTINEZ, ESQ.
                              PODHURST ORSECK, P.A.
                              One SE 3rd Avenue
                              Suite 2300
                              Miami, Florida 33131

*STENOGRAPHICALLY REPORTED BY:*
*MARY ANN CASALE, RDR, FPR-C, CLR, CSR-IL*
*Official Court Reporter*
*United States District Court*
*Southern District of Florida*
*400 North Miami Avenue*
*Miami, Florida 33128*
*MaryAnn_Casale@flsd.uscourts.gov*

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

302

1
2

_I N D E X_

3  <u>WITNESS</u>                                          <u>PAGE</u>
   RISHI KUKREJA
4   Direct Examination (Continued) by Mr. Rosenthal   331
    Direct Examination (Resumed) by Mr. Rosenthal     433
5   Cross-Examination by Mr. Mazzola                  550

6

7                    PLAINTIFF'S EXHIBITS

8
   <u>EXHIBIT</u>                                      <u>RECEIVED</u>
9   P302                                             555
    P303                                             590
10

11
                   DEFENDANT'S EXHIBITS
12

13 <u>EXHIBIT</u>                                      <u>RECEIVED</u>
    D-B                                              321
14  D-Y13                                            542
    D-K7                                             326
15  D-U7                                             312
    D-Y7                                             323
16  D-D10                                            325
    D-W11                                            316
17  D-Q13                                            316
    D-R13                                            320
18  D-S13                                            320
    D-T13                                            320
19  D-U13                                            318
    D-V13                                            320
20  D-X13                                            546

21

22

23

24

25

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

303

1

2

<u>*I N D E X*</u>

3

<u>JOINT EXHIBITS</u>

4 <u>EXHIBIT</u>                                              <u>RECEIVED</u>

| EXHIBIT | RECEIVED |
|---|---|
| 13 | 310 |
| 30 | 309 |
| 42 | 315 |
| 46 | 311 |
| 48 | 324 |
| 49 | 324 |
| 51 | 324 |
| 52 | 324 |
| 70 | 316 |
| 77 | 316 |
| 78 | 327 |
| 79 | 329 |
| 88 | 535 |
| 89 | 528 |
| 120 | 319 |
| 121 | 326 |
| 133 | 311 |
| 148 | 538 |
| 159 | 311 |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

| | |
|---|---|
| 1 | THE COURT:  All right.  Let's go back on the |
| 2 | record for the trial.  The lawyers and the parties are |
| 3 | here.  It's 9:31. |
| 4 | About three minutes ago, eight of the jurors |
| 5 | are here and Mr. Fonseca was missing.  So we called him, |
| 6 | and he was at U.S. 1 and Granada, which right where I |
| 7 | live.  That's like 40 minutes away this time of day. |
| 8 | This is after we've wasted our time with him trying to |
| 9 | move his car yesterday morning, too. |
| 10 | MR. ROSENTHAL:  So, Judge, I have something |
| 11 | that we could use the time efficiently for, if you'd |
| 12 | like, about -- it might speed up the trial in terms of |
| 13 | just talking about some of the exhibits today. |
| 14 | THE COURT:  Yeah. |
| 15 | Well, what about -- I'm not waiting again for |
| 16 | Mr. Fonseca or any -- that's why we have nine jurors. |
| 17 | So, I mean, part of me wants to get rid of him right now, |
| 18 | but since it's the first day substantively in the trial, |
| 19 | I'll give him a little bit of time to get here.  But I'm |
| 20 | not doing this again. |
| 21 | What do you want to talk about? |
| 22 | MR. ROSENTHAL:  So, okay.  Thank you. |
| 23 | There's a lot of exhibits that we're going to |
| 24 | introduce through Mr. Kukreja today. |
| 25 | THE COURT:  Okay. |

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

| | |
|---|---|
| 1 | MR. ROSENTHAL:  And I think his testimony could |
| 2 | take the entire day.  I'm hoping it will be shorter, but |
| 3 | it depends on the length of cross. |
| 4 | MR. MAZZOLA:  Your direct is going to take all |
| 5 | day? |
| 6 | MR. ROSENTHAL:  Our direct will definitely take |
| 7 | into the afternoon. |
| 8 | And just, you know, in terms of the mechanics |
| 9 | of exhibits, I have, first, a question.  And for the |
| 10 | benefit of Mr. Vega and the folks who are putting up |
| 11 | exhibits.  When we -- when you admit an exhibit -- |
| 12 | And, Jessica, I want you to listen to this -- |
| 13 | (Continuing) -- do you automatically then flip |
| 14 | a switch so that the jurors are going to see it? |
| 15 | THE COURT:  Yes. |
| 16 | MR. ROSENTHAL:  So it's automatically published |
| 17 | when you make that announcement? |
| 18 | THE COURT:  Yes. |
| 19 | MR. ROSENTHAL:  Okay.  So they understand that, |
| 20 | okay. |
| 21 | The second thing was that we have done, as your |
| 22 | Honor is aware from yesterday, in an effort to redact |
| 23 | documents which contain references to Circuitronix Hong |
| 24 | Kong, so we've done that.  To the best of our ability, we |
| 25 | have been evolving it over the night to make sure that we |

1    don't miss things.

2          We want to make sure that if we inadvertently

3    miss something, you know, in accordance with your ruling,

4    that we haven't automatically opened the door to the

5    defense all of the sudden bringing this whole back issue

6    into the case.  So we have endeavored to redact, but I

7    just want an understanding from counsel here that that's

8    agreed.

9          MR. MAZZOLA:  I can't agree to that, Judge.  I

10   don't know -- I mean, as I've already said, it's a

11   dynamic situation, you know.  You know, they're putting

12   up a document.  They're offering the document.  It's

13   incumbent upon them if they want to make a redaction.  I,

14   obviously, will have an opportunity to object to the

15   redaction.  I may not think the redaction is appropriate,

16   I may not think the redaction is in accordance with your

17   Honor's order.

18         So I just don't know.  I don't want to give any

19   blankets -- you know, you can have two bites at this

20   apple.

21         THE COURT:  Okay.  What's the next thing?

22         MR. MAZZOLA:  I mean, we have hundreds of pages

23   of spreadsheets over here.

24         THE COURT:  Okay.  What's the next issue?

25         MR. ROSENTHAL:  So I can bring up the exhibits

1   that we intend to introduce through Mr. Kukreja and

2   perhaps obtain objections or rulings on them.  There are

3   no surprises, but that would definitely speed things up.

4           THE COURT:  All right.

5           MR. ROSENTHAL:  Would that be useful?

6           THE COURT:  Okay.  Isn't that what a pretrial

7   stipulation is?  I'm trying to see -- I don't see any

8   exhibits that are stipulated into evidence.  Out of

9   hundreds of exhibits, you couldn't stipulate to one

10  exhibit?

11          MR. MAZZOLA:  Judge, we were dropped, I would

12  say, close to, it would have been Saturday night --

13          THE COURT:  My only question is:  Is there one

14  exhibit that you stipulated to the admission to?

15          MR. MAZZOLA:  There's going to be a lot of

16  exhibits that we're going to stipulate to.

17          THE COURT:  Not "going to be."  My God.

18          Did you clean your room?  Yes.  Okay.  Have you

19  got a teenager?  Yes.  That means, I'm fixing to clean my

20  room, okay?

21          Have you stipulated to even one exhibit yet?

22  That's what's supposed to happen before the trial, not

23  during the trial.  So have you, yes or no?  That's all I

24  want to know.

25          MR. MAZZOLA:  Are you asking me or are you

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    asking the parties, Judge?

2           THE COURT:  I'll ask both of you.  I'm looking

3    at you.  You can answer first.

4           MR. MAZZOLA:  I mean, the answer is, Judge, we

5    have stipulated to -- I think, myself and Mr. Rosenthal

6    understand that we've stipulated to a lot of exhibits.  I

7    don't want to say all of the exhibits, but there was the

8    whole joint exhibit list and I think there's very few

9    objections on that.

10           What happened, your Honor, was there was a

11   ruling related to --

12           THE COURT:  I'm looking at the joint exhibit

13   list.  There's scores of objections still, so...

14           Does that mean that anything that's on the

15   joint exhibit list that doesn't have an objection listed

16   here, that those are all coming into evidence?

17           MR. MAZZOLA:  Yes.  If there's no objection,

18   they're coming into evidence.

19           THE COURT:  And do you intend to introduce all

20   the exhibits that are on the joint exhibit list to which

21   there's no objection?

22           MR. ROSENTHAL:  No.

23           THE COURT:  Okay.

24           MR. MAZZOLA:  And on my side, probably not.

25           THE COURT:  Okay.  So why don't we start with

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1  the ones that are -- to which there is no objection and

2  to which you intend to introduce them so we can just get

3  them in right now?

4          MR. ROSENTHAL:  So would you like me to do that

5  by identifying the ones I'm planning to go through with

6  Mr. Kukreja today or --

7          THE COURT:  Okay.

8          MR. ROSENTHAL:  I think that would be more

9  tailored, if you don't mind.

10          THE COURT:  Okay.

11          MR. ROSENTHAL:  Okay.  So based upon where we

12  left off, the first one is the second there, Exhibit 30.

13          And, Mr. Mazzola, that's the secondary --

14          THE COURT:  There is no objection listed to

15  that, so that's in.

16          (Exhibit 30 received in evidence.)

17          MR. MAZZOLA:  So that -- Steve, I'm looking at

18  this docket, 32461, right?

19          MS. MARTINEZ:  Yes.  That's our latest exhibit

20  list, yes.

21          THE COURT:  Okay.

22          MR. ROSENTHAL:  So the next one would be

23  Exhibit 13, which is a purchase order.

24          THE COURT:  All right.  And there's no

25  objection to that, so that's in.

310

1          (Exhibit 13 received in evidence.)

2          MR. ROSENTHAL:  Okay.

3          MR. MAZZOLA:  Where are we at?

4          MR. ROSENTHAL:  Exhibit 13.

5          THE COURT:  Okay.  I'm going by your exhibit

6   list, the joint exhibit list.  If there's no objection,

7   then it's waived.  So let's go.  The next one?

8          MR. ROSENTHAL:  The next is 133.

9          THE COURT:  133.  There is an objection.

10          MR. ROSENTHAL:  And they have not stated the

11   nature of some of these --

12          THE COURT:  Relevance and U-P, so unduly

13   prejudicial.  Okay.

14          MR. ROSENTHAL:  That's actually -- was our

15   objection when we were the defendant, which is

16   Circuitronix Hong Kong.  So we've redacted it in light of

17   your ruling.

18          THE COURT:  So you want to introduce 133

19   without any reference to CTX-HK?

20          MR. ROSENTHAL:  That's right.

21          THE COURT:  All right.  Do you have any

22   objection to that?

23          MR. MAZZOLA:  I'd have to look at the redacted

24   version. Let me see if I've got it.  I mean the k--

25          THE COURT:  Okay.  So I'm going to allow it in

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1     subject to making sure it's properly redacted.

2               (Exhibit 133 received in evidence.)

3               THE COURT:  Next.

4               MR. ROSENTHAL:  Next, 159.

5               THE COURT:  159, there's no objection to that.

6     That's in.

7               (Exhibit 159 received in evidence.)

8               MR. ROSENTHAL:  Okay.  The next one, your

9     Honor, is 46, the second attachment to it.  A lot of

10    these were Excel spreadsheets, but for your purposes,

11    your Honor, 46.

12              THE COURT:  All right.  46, there is no

13    objection to that, so that's in.

14              (Exhibit 46 received in evidence.)

15              MR. ROSENTHAL:  A lot of these contain

16    redactions --

17              THE COURT:  Okay.

18              MR. ROSENTHAL:  -- where we're protecting

19    CTX-HK.

20              The next one, your Honor, is D-U7.  So you have

21    to turn to Page 10, I'm told.

22              THE COURT:  Okay.  There's no objection to

23    that.  That's an email from Rishi to Tracy.  Okay.  So

24    that's in.

25              (Exhibit D-U7 received in evidence.)

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1        MR. MAZZOLA:  Obviously, your Honor, it's got

2   to be subject to what they're using it for.  If it's an

3   email from Rishi to Tracy, and they're going to offer --

4   you know, I don't know how they're going to use it.  Is

5   it going to be used against Tracy or is it going to be --

6   I'm not sure how they're going to use it.

7        MR. ROSENTHAL:  All right.  This is for

8   Mr. Kukreja's direct.

9        MR. MAZZOLA:  So you're going to introduce his

10  own email?

11       THE COURT:  What does it mean when there's two

12  asterisks where the objections go?

13       MR. ROSENTHAL:  So they never gave us their

14  objections weeks ago.  That was what they did about three

15  or four weeks ago, so --

16       THE COURT:  What happened -- was there -- the

17  only objections listed here are your objections?

18       MR. ROSENTHAL:  They objected to everything our

19  additional exhibits after we both submitted the joint

20  exhibit list.  So everything with D numbers, they just

21  put a blanket objection without stating a ground.

22       MR. MAZZOLA:  Let me just say this, your Honor,

23  so it's clear.

24       THE COURT:  Yes.

25       MR. MAZZOLA:  Hundreds of exhibits were dropped

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1   on us.

2   THE COURT:  Yes.

3   MR. MAZZOLA:  And these hundreds of exhibits

4   were being dropped on us as late as Sunday morning.

5   THE COURT:  Okay.

6   MR. MAZZOLA:  Saturday afternoon.

7   MR. ROSENTHAL:  That's not actually correct,

8   Mr. Mazzola.

9   MR. MAZZOLA:  That is correct.  We received

10  another Dropbox this morning, Judge.

11  THE COURT:  Okay.  Of things you've never seen

12  before or things they're saying, here, we gave you this a

13  year and a half ago, but we're identifying it as an

14  exhibit today?

15  MR. MAZZOLA:  I'm not saying they didn't give

16  it to us a year and a half ago, but what I'm saying, your

17  Honor, is all these exhibits are being dropped on us --

18  THE COURT:  Yes.

19  MR. MAZZOLA:  -- and then asking us to respond

20  to them --

21  THE COURT:  Okay.

22  MR. MAZZOLA:  -- whether they're going to use

23  them or not.  I think myself and Mr. Rosenthal are very

24  competent to address these things at the time of trial.

25  THE COURT:  We are at the time of trial.  He

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

314

1      just asked you what your position is then.

2            MR. MAZZOLA:  I don't even know what these

3      documents look like.

4            THE COURT:  All right.  So we're at the time of

5      trial.  What am I supposed to do?  I'll back and take a

6      nap and then come back?

7            MR. MAZZOLA:  He'll introduce the document, and

8      he'll establish his foundation, and I'll raise --

9            THE COURT:  No, he's not.  That's the whole

10     point.  We're not -- why do we have to spend time wasting

11     the jurors' time if there's going to be no objections?

12            You should be -- where are these documents?

13     Don't you have them organized so when he says D-U7, you

14     can pull it out and you can look at it and say yes or no?

15     Because you're going to do that one in front of the jury.

16            MR. MAZZOLA:  We have the documents, Judge.

17            THE COURT:  Pull it out.

18            MR. ROSENTHAL:  Judge, for the record, we

19     produced these documents to them on September 13th to

20     15th.  We have only reduced the documents that we

21     provided to them in accordance with the Court's rulings

22     on summary judgment and motion in limine.  And what

23     Mr. Mazzola is referring to that he got this morning or

24     last night was our attempts to redact in further

25     execution of the order you entered yesterday to enforce

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    the motion in -- in limine ruling.  So we're really

2    trying to narrow the difference here.

3              MR. MAZZOLA:  I don't have an objection other

4    than if he's purporting to introduce his own written

5    statement, he's going to have to establish the foundation

6    as to why he has to do that.

7              MR. ROSENTHAL:  It's a business record, your

8    Honor.

9              MR. MAZZOLA:  Then there you go.  Then it's

10   admissible.

11             THE COURT:  Okay.  Next.

12             D-U7 is in.

13             MR. ROSENTHAL:  Next one is 42.

14             THE COURT:  All right.  There's no objection to

15   that so that's in.

16             (Exhibit 42 received in evidence.)

17             MR. ROSENTHAL:  The next one is 77.

18             THE COURT:  77, there's both sides' objection

19   to that.

20             MR. ROSENTHAL:  Right.  So our objection is

21   mooted by the CTX-HK ruling, so we're reacting it.  And

22   they have an objection.

23             THE COURT:  So is it a statement -- it's an

24   email from Tracy, so it was a statement of a party

25   opponent.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

316

1           What is your objection?

2           MR. MAZZOLA:  Other than the redaction, your

3     Honor, which is the same objection we've had for

4     sometime.

5           THE COURT:  Okay.  All right.  So I'll overrule

6     that.  77 is in.

7           (Exhibit 77 received in evidence.)

8           MR. ROSENTHAL:  Next one is 70.

9           THE COURT:  All right.  There's no objection to

10    that, so that's in.

11          (Exhibit 70 received in evidence.)

12          MR. ROSENTHAL:  The next one is D-Q13.  This is

13    going to be towards the end of the list.  Page, looks

14    like, 12 -- no, sorry 13.  It's a summary of payments

15    made to ROK.

16          THE COURT:  Okay.

17          MR. MAZZOLA:  D-Q13?  Sure.

18          THE COURT:  No objection?

19          MR. MAZZOLA:  Nope.

20          THE COURT:  Okay.  So D-Q13 is in.

21          (Exhibit D-Q13 received in evidence.)

22          MR. ROSENTHAL:  And D --

23          MR. MAZZOLA:  With the understanding, Judge,

24    that there's still a foundational issue that has to be

25    laid.  I mean, it's based upon certain documents.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1          MR. ROSENTHAL:  We served --

2          (Simultaneous crosstalk.)

3          MR. MAZZOLA:  -- so it's a summary exhibit.

4          MR. ROSENTHAL:  We served it -- under Rule

5    1006, we served it -- it actually says what the

6    underlying documents are.  We served it a month ago or

7    so.

8          MR. MAZZOLA:  And I do see that, Judge, and so

9    those underlying documents, as far as I'm concerned, will

10   be fair game.

11         MR. ROSENTHAL:  Well, I mean, I guess -- are

12   you objecting to the summary?

13         MR. MAZZOLA:  No, I'm not objecting to the

14   exhibit.  I just want the record to be clear that when a

15   summary exhibit is being put into evidence, those summary

16   exhibits are based upon other documents --

17         THE COURT:  That should be in evidence.

18         MR. MAZZOLA:  And those documents are -- either

19   they're in evidence or they're not, but they're subject

20   to cross-examination and they're subject to challenge.

21         MR. ROSENTHAL:  Yeah, and we actually don't

22   think that that's a correct statement of the law in terms

23   of summaries.  If it fairly summarizes voluminous

24   information, the underlying documents don't have to be

25   separately admitted.

318

 1          MR. WEINSHALL:  They have to be admissible.

 2          MR. ROSENTHAL:  They have to be admissible,

 3  Mr. Weinshall is pointing out to me.

 4          MR. MAZZOLA:  Okay.  But then I have the right

 5  to challenge a witness --

 6          THE COURT:  So you can introduce the documents

 7  to show the summary is wrong, yes.  Okay.

 8          MR. ROSENTHAL:  Agreed.

 9          MR. MAZZOLA:  What was the number?

10          MR. ROSENTHAL:  D-Q13 we were talking about.

11          THE COURT:  Yep.

12          MR. ROSENTHAL:  And the next one would be

13  D-U13.

14          THE COURT:  Okay.

15          MR. ROSENTHAL:  A bank statement, which is, I

16  believe, one of the underlying documents in that.

17          MR. MAZZOLA:  So what bank statement is it,

18  Stephen, R13?

19          MR. ROSENTHAL:  D-U13.

20          MR. MAZZOLA:  Oh, D-U13.

21          MR. ROSENTHAL:  Otherwise known as "duh" 13.

22  That's just the way I think of it.

23          THE COURT:  Do you have any objection to D-U13?

24          MR. MAZZOLA:  There's no objection, Judge.

25          THE COURT:  All right.  So that's in evidence.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1          (Exhibit D-U13 received in evidence.)

2          THE COURT:  What's the next one?

3          MR. ROSENTHAL:  The next one is 120.  I don't

4     know if we said that already.

5          THE COURT:  You did not.  So there is a defense

6     objection.

7          MR. ROSENTHAL:  That was us.

8          THE COURT:  Yeah.  Are you withdrawing that?

9     Is this a redacted document, also?

10          MR. ROSENTHAL:  Yes.

11          MR. MAZZOLA:  And again, Judge, it's the same

12     objections about the redactions.

13          THE COURT:  All right.  I'll overrule that and

14     that will come into evidence.

15          (Exhibit 120 received in evidence.)

16          MR. ROSENTHAL:  Okay.  The next one is D-R13,

17     which is also on Page 13 of the list.  Another bank

18     statement -- and, actually, let me make this easier.

19          I'm going to be moving D-R13, D-S13, D-T13, and

20     D-V13.  These are all -- well, except for V, those are

21     bank statements.

22          MR. MAZZOLA:  I do have a query, I beg your

23     pardon, on the last one.

24          THE COURT:  Let's start with the bank

25     statements.  Do you have objection to R, S, and T, which

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    are other bank statements?

2              MR. MAZZOLA:  No.  We're back at R, now, right?

3              MR. ROSENTHAL:  R, S, T.  If you look at the

4    exhibit list, those bank statements are all grouped

5    together.

6              THE COURT:  Okay.  So D-R13, D-S13, D-T13 are

7    in evidence.

8              (Exhibits D-R13, D-S13, D-T13 received in

9              evidence.)

10             THE COURT:  All right.  What about D-V13?  What

11   is that?  It just says CTX with some numbers.

12             MR. ROSENTHAL:  You're asking me, Judge, about

13   V13?

14             THE COURT:  Yes.

15             MR. ROSENTHAL:  Let's see if I can tell you

16   real quickly.  I actually need to pull that up to see.

17             Can we pull up D-V13 on the monitors?

18             THE COURT:  There, it's on the screen,

19   Mr. Mazzola.  It's another bank statement.

20             MR. MAZZOLA:  Yeah, we have no objection to

21   bank statements.

22             THE COURT:  Okay.  D-V13 is in.

23             (Exhibit D-V13 received in evidence.)

24             MR. MAZZOLA:  Do you want to just do a blanket

25   agreement, Mr. Rosenthal, bank statements are okay?

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1        MR. ROSENTHAL:  We're done with them, but,

2   yeah.  Thank you.

3        MR. MAZZOLA:  Okay.

4        MR. ROSENTHAL:  So the next one is D-B, just B,

5   as in boy.

6        THE COURT:  What page is that?

7        MR. ROSENTHAL:  5, your Honor.  It's an email

8   from Sunny Kapoor to Tracy, re, penalty for leadtime

9   violation.

10        THE COURT:  Can Mr. Vega put these up on the

11   screen as we name them?

12        MR. ROSENTHAL:  Sure.  D-B, as in boy.

13        May Mr. Kukreja step out for the restroom, your

14   Honor?

15        THE COURT:  Yes.

16        MR. MAZZOLA:  That's not what we have.  What do

17   we have with that?

18        THE COURT:  Oh, B as in boy.  It's right there

19   on the screen.

20        MR. MAZZOLA:  I'd rather us scroll through than

21   Mr. Vega, so...

22        MR. ROSENTHAL:  It's a business record --

23        MR. MAZZOLA:  No, no, no, no.  We're okay with

24   it.

25        THE COURT:  All right.  D-B as in bravo is in.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1          (Exhibit D-B received in evidence.)

2          THE COURT:  What's the next one?

3          MR. MAZZOLA:  Before we get too far down the

4    line, Stephen, did we -- are all the bank statements --

5    is everyone in agreement they can all be all admissible?

6          MR. WEINSHALL:  I don't know which bank

7    statements he's talking about.

8          MR. ROSENTHAL:  Well, that's a fair point.  I

9    mean, the ones that we've just mentioned?  Yes.  I don't

10   know which ones you're talking about, so...

11         MR. MAZZOLA:  Well, I mean, they're bank

12   statements, so --

13         MR. ROSENTHAL:  They're bank statements on your

14   exhibit list, so I don't know what you're talking about.

15   If you're talking about the ones that we listed that we

16   just --

17         MR. MAZZOLA:  If I have a bank statement, I got

18   it from you and it's either on your list or I got it from

19   you.  And if I'm going to use a bank statement -- and I

20   don't planning to use it in my case in chief -- I will

21   use it as impeachment.

22         MR. ROSENTHAL:  Well, then it's for

23   impeachment, not admissible -- admissibility.

24         MR. MAZZOLA:  We'll just use it.

25         THE COURT:  Let's stick with this issue.  Let's

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1  go.  Let's go with the exhibits that this witness is

2  going to be referring to, so it's done.

3  　　　　　MR. ROSENTHAL:  Yeah, I mean, this -- if we --

4  by doing this, we're speeding up the day a lot.  I

5  promise.  Well, I don't want to make it sound that good.

6  But it's helping.

7  　　　　　THE COURT:  I don't know who it's helping.

8  It's not helping me.

9  　　　　　Go ahead.  What's the next one?

10  　　　　　MR. ROSENTHAL:  The next one is 159.

11  　　　　　THE COURT:  159, I have that in already.

12  　　　　　MR. ROSENTHAL:  Sorry.  Okay.  The next one is

13  D-Y7, Page 10.

14  　　　　　THE COURT:  D-Y7, an email from Rishi to Tracy.

15  　　　　　MR. MAZZOLA:  D-Y7.

16  　　　　　MR. ROSENTHAL:  Matt, what page is that?

17  　　　　　MR. WEINSHALL:  It's on Page 47 of this draft.

18  　　　　　MR. ROSENTHAL:  Okay.

19  　　　　　MR. MAZZOLA:  Okay.  We have an objection on

20  the redaction, Judge, but --

21  　　　　　THE COURT:  All right.  D-Y7 is in.

22  　　　　　(Exhibit D-Y7 received in evidence.)

23  　　　　　ROSENTHAL:  Okay.  I believe the next one is --

24  and I hope I haven't done this already.  48 and then 49

25  are the next two.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

324

1          MR. MAZZOLA:  Hold on, Steve.  I'm not as fast

2     as you.

3          THE COURT:  All right.  48 and 49, there's no

4     objection, so those are admitted.

5          (Exhibits 48 and 49 received in evidence.)

6          MR. MAZZOLA:  Can you hold on one second?

7          48 and 49, Stephen?

8          MR. ROSENTHAL:  Yeah, he said there's no

9     objections there.

10         THE COURT:  Next?

11         MR. ROSENTHAL:  51.

12         THE COURT:  51, there's no objection.  That's in.

13         (Exhibit 51 received in evidence.)

14         THE COURT:  Next?

15         MR. ROSENTHAL:  52.

16         THE COURT:  There's no objection to that, so

17     that's admitted.

18         (Exhibit 52 received in evidence.)

19         MR. ROSENTHAL:  The next one is D-10 -- D-D10.

20         THE COURT:  Wait, double -- D-D10?

21         MR. ROSENTHAL:  Yes; D-10.

22         MR. MAZZOLA:  D-10 -- D-D10.

23         THE COURT:  Wait.  D-10 or D-D10?

24         MR. ROSENTHAL:  I'm sorry.  Yes, D --

25     everything has got the D prefix, then D-10.

1           THE COURT:  All right.

2           MR. MAZZOLA:  I don't see that, I see --

3           THE COURT:  ROK penalty for leadtime exceedance

4   report, January 2018.

5           MR. MAZZOLA:  One second, Judge.  D-D10.  I

6   found it.

7           MR. ROSENTHAL:  Page 11.

8           MR. MAZZOLA:  I mean, subject to any

9   redactions.

10          THE COURT:  Okay.  So that's in subject to

11  redaction.

12          (Exhibit D-D10 received in evidence.)

13          THE COURT:  What's the next one?

14          MR. ROSENTHAL:  D-W11.  It's another leadtime

15  exceedance report.

16          MR. MAZZOLA:  What page is this, Stephen?

17          THE COURT:  13.  Right at the top.

18          Any objection?

19          MR. MAZZOLA:  There's no objection, your Honor.

20          THE COURT:  All right.  That's in.

21          (Exhibit D-W11 received in evidence.)

22          THE COURT:  Next?

23          MR. ROSENTHAL:  D-K7.  Page 9.

24          THE COURT:  All right.  It's an email from

25  Rishi to Tracy.

```
 1              Any objection?
 2              MR. MAZZOLA:  Subject to the redactions, Judge.
 3              THE COURT:  Okay.
 4              MR. ROSENTHAL:  And we have been redacting
 5   these.
 6              THE COURT:  All right.  So it's admitted
 7   subject to reaction.
 8              (Exhibit D-K7 received in evidence.)
 9              MR. ROSENTHAL:  Next one is Exhibit 121.  That
10   was our objection.
11              THE COURT:  Only your objection.  So it's been
12   redacted to resolve your objection?
13              MR. ROSENTHAL:  Yes.
14              THE COURT:  All right.  So that will be
15   admitted.
16              (Exhibit 121 received in evidence.)
17              MR. MAZZOLA:  Over objection with respect to
18   the reaction, Judge.
19              THE COURT:  Right.  Okay.
20              MR. ROSENTHAL:  And the next one is 78, also
21   being redacted.
22              MR. MAZZOLA:  Same objection, Judge.
23              THE COURT:  What does "I" mean?  You have an
24   objection here from the plaintiff, I.  What's that short
25   for?
```

1               MR. MAZZOLA:  I don't recall what I is.

2     There's a --

3               THE COURT:  Irritating?

4               MR. MAZZOLA:  Yeah, probably.

5               THE COURT:  Probably irrelevant?  I don't know.

6               MR. MAZZOLA:  No, I -- there's a schedule in

7     the local rules, and I don't recall what the I was.

8               THE COURT:  I see.  All right.  So that will be

9     admitted.

10              (Exhibit 78 received in evidence.)

11              THE COURT:  Next.

12              MR. ROSENTHAL:  78, redacted -- oh, that was

13    it, sorry.

14              Did I say 120?

15              THE COURT:  Yes.

16              MR. ROSENTHAL:  I said 121.  I think 120 is --

17              THE COURT:  You already did that.

18              MR. ROSENTHAL:  Oh, it's an attachment?  Is

19    that what we're talking about?

20              MR. MAZZOLA:  Stephen, what are we on, 120?

21              MR. ROSENTHAL:  Yes, 120.

22              I think we've already done that one.

23              MR. MAZZOLA:  We've addressed this, but again,

24    Judge, subject to our objections over the reactions.  I

25    mean, it's --

1          THE COURT:  Okay.

2          MR. MAZZOLA:  And I'm not quite sure what -- I

3   mean, what they're redacting is they're redacting

4   references to ROK, and so that gives me a little pause

5   for concern here because ROK is being introduced all over

6   the place.  They've got a summary exhibit with ROK

7   written in 18 font at the top and yet they're reacting

8   ROK right here.

9          MR. WEINSHALL:  So I actually had printed out

10  comparison documents.  We had the redaction and the

11  unredacted.

12          MR. MAZZOLA:  Yeah, we had the clean copy.

13          MR. WEINSHALL:  Oh, okay.  I can give them to

14  you now so you can look at the reactions and we can

15  resolve the redaction issue before the jury comes in

16  because it will require a side-by-side --

17          THE COURT:  Have you redacted anything relating

18  to ROK?

19          MR. WEINSHALL:  No.  We've redacted information

20  relating to CTX-HK.  So if it's a number or the reference

21  to CTX-HK or it's maybe a joint, like, CTX-HK and CTX-US,

22  that's what we're redacting.

23          MR. ROSENTHAL:  And I believe that the ROK

24  point may be that in some of these where ROK numbers were

25  reported, that had to do with combined to U.S. and Hong

```
 1    Kong, whereas the Benlida side is clean for U.S.
 2              So that may explain why --
 3              THE COURT:  Okay.  Is everybody in?
 4              COURT SECURITY OFFICER:  Yes.  He's in the
 5    restroom.
 6              THE COURT:  Okay.  So as soon as he's ready,
 7    we'll get started.
 8              MR. ROSENTHAL:  Shall I do a couple more?
 9              THE COURT:  Okay.
10              MR. ROSENTHAL:  Okay.  87 -- oh, did I say 79?
11    I'm sorry.
12              MR. MAZZOLA:  My objection is noted for that
13    last one, 120.
14              MR. ROSENTHAL:  I skipped one, I skipped 79.
15              THE COURT:  All right.  79, there's no
16    objection, so that's in.
17              (Exhibit 79 received in evidence.)
18              MR. MAZZOLA:  Okay.  The next one is 87?
19              THE COURT:  87 is only your objection.
20              MR. ROSENTHAL:  Right, so that's just the
21    redaction for CTX-HK issue.
22              MR. MAZZOLA:  Same objection, Judge.
23              THE COURT:  All right.
24              MR. MAZZOLA:  And before you bring the jury,
25    can I run out to the gent's real quickly?
```

330

1           THE COURT:  Yes.  Go.

2           MR. ROSENTHAL:  I can stop right here if you'd

3   like, your Honor.  So I'll make a note, Judge, we left

4   off at 87.

5           (Court recessed from 10:00 a.m. to 10:03 a.m.)

6           THE COURT:  Let's bring in the jury.

7           (Jury enters at 10:04 a.m.)

8           THE COURT:  Welcome back, everyone, and please

9   be seated.

10          What happened, Mr. Fonseca?

11          JUROR FONSECA:  Construction, new construction

12  on Old Country Road.

13          THE COURT:  Yeah.  I left my house at 6:30 so

14  I'd have time to stop and get bagels for you and still be

15  here on time for my 8:30 hearing, so...

16          Okay.  Look, I have a lifetime appointment.  It

17  doesn't matter whether this takes five or six days or

18  five or six weeks, but there's only a certain number of

19  hours in a day that we can reasonably be in trial to keep

20  this case on schedule.  We're already starting later than

21  we should have started because of my other hearing.  So

22  we're just -- it's all going to be more -- and every half

23  hour here and 20 minutes here adds up to extra days for

24  you all.  So I'm trying to keep this case moving to save

25  you time and get back to your lives.

1        So, okay, let's go back to where we were

2   yesterday.  And I want to remind you, you're still under

3   oath.  Come up and retake the stand.

4                        RISHI KUKREJA,

5   called as a witness herein, having been previously duly

6   sworn, was examined and testified further as follows:

7                   DIRECT EXAMINATION (Continued)

8   BY MR. ROSENTHAL:

9        Q.    Good morning, Mr. Kukreja.

10       A.    Good morning.

11       Q.    Do you recall during Mr. Mazzola's opening

12   statement yesterday he referenced an issue that

13   Circuitronix has about employee retention?

14       A.    Yes.

15       Q.    Has that been a problem?

16       A.    No bigger problem than any other company.  All

17   I can say is that mentoring employees is the number one

18   thing for me, as it's important where the organization is

19   concerned.  I believe it's the most important thing a

20   business owner or any manager can do for the

21   organization.

22       Q.    Have there been people that you have not been

23   able to retain who leave the company for one reason or

24   the other?

25       A.    Sure.  It's capitalism.  It's -- there is

1  attrition, but no more than any other company

2  experiences.  Actually, we measure our retention with our

3  peers, and it's -- we are much better than our peers.

4        Q.    Let me take us back to where we left off

5  yesterday, which was at a point where we were just going

6  to go from the manufacturing agreement from 2012 to the

7  next part of the contract story.

8              Can you just tell us by way of introduction,

9  what was the next major amendment to the contract, the

10  manufacturing agreement?

11       A.    So the next major amendment was the letter

12  agreement.

13             MR. ROSENTHAL:  Okay.  Can we bring up,

14  Mr. Vega, Exhibit 40, please, already in evidence.

15  BY MR. ROSENTHAL:

16       Q.    While this is coming up, do you remember the

17  approximate date that that was signed?

18       A.    It should have been July 2016.

19             MR. ROSENTHAL:  Okay.  Let's bring up the

20  attachment, please.

21  BY MR. ROSENTHAL:

22       Q.    July 21, 2016?

23       A.    Sounds correct, but I cannot remember exactly.

24       Q.    So what was the purpose of this agreement, this

25  letter agreement regarding the manufacturing agreement?

1    A.    So the -- the main reason -- there were a

2    number of reasons behind this, but I think that the most

3    important reason is, if you scroll down in the second

4    paragraph --

5    Q.    Tell us about that.

6    A.    -- we were under the opinion that we were -- at

7    this point in time we had paid more money to Benlida than

8    they were owed.  And they claimed that they were not.  So

9    we -- they needed money for their operations.  So through

10   this paragraph, I was, sort of, committing that I will

11   continue to pay the money, although, I believed that we

12   were in an overpaid situation, but -- until we can do our

13   reconciliations and resolve the discrepancies.

14   Q.    So were you just referring to the last sentence

15   that starts on the bottom, say, four lines up where it

16   says -- after Section 7, it says:  CTX-USA has agreed to

17   continue to make payments to manufacturer, irrespective

18   of the discrepancy in accordance with the payment

19   schedule set forth in the existing agreement even if such

20   payments would result in CTX-USA in having overpaid under

21   the existing agreement?

22   A.    That's correct.

23   Q.    Okay.  And why -- if you were already overpaid,

24   if you believed Circuitronix had already overpaid --

25   A.    Yes.

1     Q.   -- and they were telling you, no, we don't

2  think so, would you still, nonetheless, continue that?

3     A.   For two reasons; one -- the first one being

4  that if we -- if they did not have moneys to run the

5  operation and they delayed shipping the product to us --

6  if you recollect, yesterday I had spoken about some of

7  the liabilities and costs which we incur -- which we

8  would have incurred, so we wanted to prevent that.

9        But the second thing is that once we got into

10  the mode of delaying product to the customers and there

11  was reputational harm, that it would be very difficult to

12  recover from that damage.

13        THE COURT:  Mr. Fonseca, do you due need your

14  book?

15        JUROR FONSECA:  Yes.

16        THE COURT:  Is it back in the jury room?

17        JUROR FONSECA:  Yes.

18        THE COURT:  All right.  Why don't -- do you

19  want to run and get it and we'll wait for you?

20        (Brief pause.)

21        THE COURT:  All right.  Go ahead,

22  Mr. Rosenthal.

23        MR. ROSENTHAL:  Okay.  Thank you, your Honor.

24  BY MR. ROSENTHAL:

25     Q.   Mr. Kukreja, let me just skip down to the

1   bottom of this document for a moment to the signature

2   page and ask you a question about that.  See if Mr. Vega

3   can pull it up.

4           It goes on for several pages, right?

5           Okay.  So you see that it says a signature with

6   your name there?

7   A.   Yes.

8   Q.   Did you ultimately sign this document?

9   A.   Yes.

10  Q.   Okay.  This copy doesn't have your signature.

11          Do you know why?

12  A.   I do not.  I do not know why.

13  Q.   Okay.  Is there any dispute that you're aware

14  of between Benlida and Circuitronix as to whether or not

15  you signed this document?

16  A.   No.

17  Q.   And do you know who signed for Benlida and ROK

18  at the bottom?

19  A.   That's Douglas Huang.

20  Q.   Okay.  We can go back to an earlier page.

21          So in exchange for Circuitronix agreeing to

22  continue paying, even though Circuitronix believed and

23  told Benlida at that time that it was in an overpaid

24  situation as of July 2016, what did Circuitronix get in

25  exchange for this letter agreement, this amendment to the

1  manufacturing agreement?

2      A.    I think that one of the things -- so what we

3  got was continued shipments from production and shipments

4  from Benlida.  We got access to the factories so that we

5  could take our customers there.

6          But I think that one of the more important

7  things to understand is that although I believe that

8  $11 million is a lot of money, in the scheme of the

9  entire relationship, when you take it from 2012 to 2023,

10 and you take the $11 million and divide it by the total

11 amount of business, again, it's not insignificant, it's a

12 good amount of money, but one could see where one put

13 that on the back burner with the hope of prolonging the

14 relationship until we could do our reconciliation, which

15 we eventually did.  Both entities worked together and did

16 a full-blown reconciliation.

17     Q.    And what year was that in?

18     A.    So the reconciliation was broken into two

19 separate processes.  So first in 2017, we decided, Let's

20 stop -- so we had certain disagreements from the back.

21 So let's stop disagreeing going forward, so let's do

22 month-to-month reconciliation.

23          So the month-to-month reconciliation would be

24 whatever they shipped one month, we would reconcile it

25 within the next month.  There would be complete agreement

1    in terms of quantity shipped, prices, everything, no

2    disagreement.

3              And then we did in November -- in parallel, we

4    started doing a reconciliation from 2015 forward, which

5    we completed sometime in -- it was finalized in November

6    of 2019.

7       Q.   Okay.  So we're going to talk about that 2019

8    reconciliation in detail later.

9       A.   Yes.

10      Q.   Let me focus -- you're still back in 2016 now.

11   Your testimony was about putting something on the back

12   burner, discrepancies.

13             This manufacturing agreement, in the second

14   paragraph that you directed us to that's showing on the

15   screen, actually defines a term discrepancy.

16             If Mr. Vega can blow that up, we can see it.

17             What was your understanding of what the

18   discrepancy was as of July 2016, in general?

19      A.   So there were two -- broadly speaking, there

20   were two types of discrepancies in Benlida's books, and

21   we were in agreement with that.

22      Q.   You were, what, in agreement with that?

23      A.   Yes.

24             The first type of discrepancy was things which

25   were owed contractually to us.  They were trying to get

1    certain discounts on it.  Like, as an example, a leadtime

2    penalty.  They would say that it's $1.5 million.  Can you

3    cut it down a little bit, which -- so a discrepancy was

4    coming up because of that.

5          The second type of discrepancy, which -- the

6    second type of discrepancy, which happened at that point

7    in time, was them not reporting the debit notes which

8    they had taken in the prior years to the Chinese

9    authorities.  So there was a gap between their books and

10   the authorities, and they needed a way to bridge that

11   gap.

12         And so those were the two types of

13   discrepancies.  There was -- very seldom was there a

14   discrepancy in terms of -- there were certain cases of

15   discrepancies in which, let's assume, that they shipped

16   10,000 pieces and we said we received 9,900 pieces.  So

17   there were -- but those were the far and few.

18         The two biggest sets of discrepancies were the

19   ones which I just described.

20   Q.   Okay.  Let me direct your attention to Page 2

21   of the letter agreement, this supplemental agreement, and

22   to the place where it says at the top, right -- oh, wait.

23   Let's see.

24         Yes, do you see where it says:  In light of the

25   foregoing?

```
 1            MR. ROSENTHAL:  If you can make that bigger,
 2    Mr. Vega, so we can see it.
 3    BY MR. ROSENTHAL:
 4        Q.    Okay.  In light of the foregoing and in
 5    consideration of CTX-USA, agreed to continue to make the
 6    regularly scheduled payments, irrespective of the
 7    discrepancy.  Manufacturer and CTX-USA agree as follows.
 8            Who is the manufacturer?
 9        A.    Jiangmen Benlida.
10        Q.    Okay.  And let me direct your attention to,
11    there's a list of things there that is agreed to correct?
12        A.    Yes.
13        Q.    In the middle of Paragraph 3, I want to direct
14    your attention to a line where on the left side it starts
15    with CTX-USA --
16            MR. ROSENTHAL:  Yes, that's it.  If you could
17    below that up, Mr. Vega.
18    BY MR. ROSENTHAL:
19        Q.    What -- where it starts accordingly, what did
20    manufacturer Benlida acknowledge that it owes CTX-USA?
21    What does it say?
22        A.    A contractual common law statutory duty of good
23    faith, fair dealing, and loyalty and care.
24        Q.    Okay.  What did that mean to you as the person
25    representing Circuitronix USA in this letter agreement?
```

1      A.    It meant a lot of different things, but

2  definitely, if there were certain overpayments made, that

3  money was owed back to us.  That was number one.  But we

4  had some of our assets, as we told you, we still have a

5  $350,000 immersion tin line at the factory.

6      Q.    Okay.  What is that?

7      A.    It's a production -- it's a piece of production

8  equipment.

9      Q.    Okay.  And who purchased that?

10      A.    Circuitronix purchased that.

11      Q.    Okay.  For use in the Benlida factory?

12      A.    That's right.

13      Q.    Okay.  Sorry to interrupt you.

14      A.    And so there was a commitment from them to

15  protect that equipment.  There were other pieces of

16  equipment, too.

17      Q.    Okay.

18      A.    And so it involved a whole bunch of things.  It

19  involved -- we had 30 employees sitting at Benlida at

20  that point in time.  So not to approach them or not, I

21  would call, seeing to that both the organizations worked

22  together, that was another thing which they -- then

23  obviously anything related to customers was also

24  important.

25      Q.    Okay.

1      A.     So lots -- it's basically just the entire

2   business relationship.

3      Q.     So at this point in time when Benlida promised

4   a duty of good faith, fair dealing, loyalty and care to

5   Circuitronix, the two companies had now been working

6   together under the manufacturing agreement for how long,

7   like four years?

8      A.     Four -- yes, for four years.

9      Q.     Okay.  And during that four years, how would

10   you characterize the relationship between the companies?

11      A.     We had a great relationship.  Like both of --

12   both companies had one common goal, and it was that both

13   of us were successful.  And we were going -- we were

14   doing everything possible to be successful.  And they

15   were also doing everything possible to be successful.

16      Q.     Okay.  I'm going to switch gears now.  And I

17   haven't told Mr. Vega this, but let me ask you this

18   question.

19          Is it -- I want to talk about the issues of the

20   business flow, things that I talked about in my opening,

21   which I want you to help illustrate to the jury through

22   your testimony in evidence.

23          In talking about the different stages of the

24   process, would it assist you, perhaps, in describing it

25   to the jury to have a -- the demonstrative exhibit

1 showing some of the different steps?

2     A.   Sure.

3     MR. ROSENTHAL:  Okay.  Unless there's an

4 objection, your Honor, I'd like to put up as a

5 demonstrative exhibit -- and I'm telling Mr. Vega this --

6 the first step in the process of sending the purchase

7 order from Circuitronix to Benlida.

8     MR. MAZZOLA:  Stephen, this is from the

9 PowerPoint yesterday?

10     MR. ROSENTHAL:  Yes.

11     MR. MAZZOLA:  Okay.  Can you give me a hard

12 copy of that?

13     THE COURT:  All right.  Go ahead.

14     MR. MAZZOLA:  There's no objection.

15     MR. ROSENTHAL:  Okay.  Thank you.

16     So Mr. Vega, if you're able to find that.

17 Okay.  Great.

18 BY MR. ROSENTHAL:

19     Q.   So we're seeing -- can you see this,

20 Mr. Kukreja?

21     A.   I can.

22     Q.   Okay.  So tell us what a purchase order is.  I

23 know this is basic, but let's start from the beginning.

24     A.   Sure.

25     May I just say one more thing prior to what the

1  purchase order is?

2      Q.    Sure.

3      A.    By the time Step 1 was -- we reached Step 1, at

4  an average, Circuitronix had incurred between $100,000 to

5  $200,000 developing that customer for selling that

6  purchase order.

7      Q.    Doing what to the customer?

8      A.    Developing that customer.

9      Q.    Developing the customer?

10     A.    Yes.

11     Q.    Okay.

12     A.    And the second thing is that from the point one

13  of our employees had made first contact with the customer

14  to when we got the first purchase order from the

15  customer, we know in six months, as much as 18 months

16  could have lapsed --

17              (Simultaneous crosstalk.)

18  BY MR. ROSENTHAL:

19     Q.    So your point is there's a lot of work that

20  goes in that's not shown here?

21     A.    There's a lot of work because this illustration

22  was only meant to capture what happened when we secured

23  the customer and the process started forward.  There was

24  a lot of work and cost and everything, which by this

25  point in time, we had made, minimum, two or three trips

1    to China with the customer, one week-audits, submit

2    samples to the customer.

3            THE COURT:  When you went to China with a

4    customer, a potential customer, to show them Benlida's

5    operations, you would -- your company would pay for the

6    expenses of the other people?

7            THE WITNESS:  Yes.

8            THE COURT:  Okay.

9    BY MR. ROSENTHAL:

10       Q.   And following up to Judge Scola's question, who

11   bore the expense of that process of getting the customer

12   to that point of interest?

13       A.   Circuitronix.

14       Q.   Okay.  So the purchase order itself, the

15   document that's illustrated on this slide, what does it

16   look like?

17       A.   So a purchase order is a document, which on the

18   top it says the name of the -- right at the top it has

19   our name because Circuitronix LLC is sending the purchase

20   order.  Right below it has where the purchase -- who is

21   receiving the purchase order.  That would be, in this

22   case, Jiangmen Benlida.

23            On the right-hand side, it had the ship-to

24   address.

25       Q.   Like the warehouse it's going to?

1      A.      Warehouse or wherever it's going.

2              And then on top of that, you would have the

3      purchase order number.  And below in the body of the

4      purchase order, you would have the part number, the

5      quantity, the full description of the part number, the

6      unit price which we were going to pay the factory, in

7      this case what we were going to pay Benlida, and the

8      total.

9              So just supposing we were ordering 10,000

10     pieces of part A for $1, the total would be $10,000.  And

11     the payment terms of AMS 60 days would be also somewhere

12     on the top.  So all that was -- the purchase order

13     included all of that.

14             Right at the bottom in the footnote, there's a

15     note which says the purchase order is governed by

16     Circuitronix's standard terms and conditions, which all

17     the factories had to.

18     Q.      Okay.  So you've just described this from

19     memory.  Let me put up -- and maybe I should have done

20     this for you -- Exhibit 13.

21             MR. ROSENTHAL:  And maybe you could superimpose

22     that on the -- over the image.

23     BY MR. ROSENTHAL:

24     Q.      Mr. Kukreja, what is this that we're showing,

25     Exhibit 13?

1        A.    So right at the top --

2        Q.    Yeah, I mean, just what is this document?  Is

3   it --

4        A.    Well, this is a purchase order.

5        Q.    Okay.  So go ahead and describe it then.

6        A.    So on the left-hand top corner is the

7   Circuitronix logo.  Right below that, 3131 Southwest 42nd

8   Street is where we were on 8/19/2014 and where we are

9   even today.

10       Q.    That's your office?

11       A.    That's our offices in Fort Lauderdale.

12       Q.    Okay.

13       A.    And this is the vendor.  This is their address

14  out there.  The ship-to location is Circuitronix Hong

15  Kong.

16       Q.    So HKG is an abbreviation for Hong Kong?

17       A.    That is right.

18       Q.    And that's the location where they have to ship

19  the product when they finish?

20       A.    So we have a third-party warehouse.  And we've

21  got two third-party warehouses, and then another company,

22  Circuitronix Hong Kong, has a warehouse too.

23       Q.    Did Circuitronix U.S. pay Circuitronix Hong

24  Kong for use of that warehouse?

25       A.    That's right.  We have a contract between the

1    two organizations.

2         Q.   Okay.  So what else is worth noting on this

3    purchase order?

4         A.   We've got the part number, unit type.  This

5    piece -- if I think that we had demonstrative PCBs, I

6    would be able to show you the piece.

7              MR. ROSENTHAL:  May I hand, your Honor, the

8    witness a demonstrative --

9              THE COURT:  Yes.

10             MR. ROSENTHAL:  -- which we can show

11   Mr. Mazzola.

12             I know that you're familiar with these,

13   Mr. Kukreja.

14             Your Honor, may I hand one to -- or hand three

15   to the jury to allow them to see what they are?

16             THE COURT:  Yes.

17   BY MR. ROSENTHAL:

18        Q.   They have some notes on them, Mr. Kukreja.

19             What does that refer to?

20        A.   I have no --

21             (Simultaneous crosstalk.)

22             MR. MAZZOLA:  Stephen, I didn't look at the

23   notes.  I thought they were your notes.

24             MR. ROSENTHAL:  I guess they just identify what

25   the boards are.  Okay.

1        There's no objection, I understand, so can I

2   hand them to the jury?

3        THE COURT:  Yes.

4        MR. MAZZOLA:  One more second, Stephen.  Can I

5   have Tracy look at them?

6        MR. ROSENTHAL:  Sure.

7        MR. MAZZOLA:  Because I presume the presumption

8   is they came from her factory, so sorry.

9        Thanks.

10        THE WITNESS:  The notes can be taken out

11   because they don't --

12        MR. ROSENTHAL:  Yeah, the notes, I looked at

13   them.  They describe like a part number and they're about

14   the board, I think.

15        THE WITNESS:  Okay.  So they really don't make

16   any -- but anyways, yeah.

17   BY MR. ROSENTHAL:

18   Q.    Okay.  So let's -- I don't want to distract

19   them from your testimony, but if you could just, as

20   they're looking at what these things are --

21   A.    So the reason, if you look at the board, which

22   is on the right-hand side, on the right hand, it's got 8

23   pieces on them.  So one of those pieces goes into one

24   product.  But the company which is going to put the

25   components on them, it doesn't make any sense for them to

1    produce them as a one single PCB.  So they put it on a

2    panel of 8, 10, 12.  And then their panelized like

3    that -- their panelized like that, and they're assembled

4    in that manner.  And at the end of the assembly process,

5    they're de-panelized and made into single pieces.

6        Q.    They sort of cut them or break them?

7        A.    Yes, with a -- something like a router or pizza

8    cutter.  It's also called a pizza cutter in the

9    electronics industry.

10        Q.    When I said earlier that like leadtime is like

11    a late pizza delivery, it's not that far off, right?

12        A.    So then they're put into some sort of a plastic

13    or metal enclosure.

14        Q.    Okay.  And so the reason you brought this up

15    now is we're looking at a purchase order that has this

16    description field?

17        A.    No, sir.  The reason I brought it up was some

18    customers pay us for that entire panel, eight of them,

19    and some customers pay us for each piece.  So we have to

20    communicate to the supplier whether 83 cents is for that

21    entire panel or it's for the -- only a single piece.

22        Q.    And on this purchase order that we're looking

23    at, Exhibit 13, it says unit price, 83 cents?

24        A.    Yes.

25        Q.    Is that for the -- do you know if that's for

1    the entire panel or for the individual piece?

2        A.    If it was -- it's for the piece -- it's for the

3    single piece --

4        Q.    Okay.

5        A.    -- because if it was for the panel, that unit

6    type would be panel.

7        Q.    Okay.  And is that typical, that the prices of

8    these things are so cheap?  I say "so cheap" because

9    they're less than a dollar each.

10       A.    So this is less than a dollar, this -- it's a

11   base mount printed circuit board.  If you look at this,

12   it's 5 inches by 9 inches.  That's a panel.  And you have

13   to divide it by four -- the four of them are panel, so

14   it's a very small PCB.

15            So you've got no -- I just -- while coming out

16   here, I quoted a print circuit board which was $175

17   apiece.  It was a motherboard which went in a car.

18            So they're all over the place.  You get print

19   circuit boards which are in pennies also.

20       Q.    So some of them can be made very cheaply,

21   you're saying?

22       A.    It's not cheap.  They're small.  They're so

23   small, like --

24       Q.    Ah, I see.

25       A.    Like there's a print circuit board which is

1    used -- it's put under the cattle skin to track cattle.

2        Q.    Under the what, cow?  The cattle?

3        A.    Yeah, cattle.  Yeah, to track cattle, to track

4    cattle with --

5        Q.    Cattle.

6        A.    Yeah, cows.  With the satellites.  That's how

7    they herd them.  That could be one tenth of a penny.

8    They're just such tiny...

9        Q.    Interesting.  Okay.  And perhaps the Court --

10   we can hand them up to the Judge afterwards when the jury

11   is finished just so he has an opportunity to see.

12       So let me ask you this about the exhibit, the

13   purchase order.  This description is super-detailed.  I

14   don't want you to go into detail telling us what it is.

15       But can you just tell us what that tells

16   Benlida when Circuitronix sends a purchase order with all

17   that information on it?

18       A.    So the first thing is that we don't need to

19   tell Benlida any of this information because we provide

20   them with manufacturing files.  So all this information

21   is included in the manufacturing files.  What we do is

22   that we write all that information out there so that

23   there is no misinterpretation as to what is being

24   required.  We say that in the file what's written is

25   FR4TG170.  So this is our interpretation and this is how

1    we want you to build it.

2            Now, there are times when Benlida looks at this

3    and comes back and says, the file says something

4    different, and then we go back and forth and resolve the

5    discrepancy.

6            THE COURT:  When you say "the file," are you

7    sending them also something digitally?

8            THE WITNESS:  Yes.  It's a electronic file.

9            THE COURT:  Okay.

10           THE WITNESS:  It's called a Gerber file so we

11   send it electronically.

12           MR. ROSENTHAL:  Your Honor, when the last

13   jurors are finished with it, may I approach just to hand

14   it up?

15           THE COURT:  Sure.

16           MR. MAZZOLA:  That was Gerber, like baby food?

17           THE WITNESS:  Yes.

18           MR. MAZZOLA:  Gerber.

19   BY MR. ROSENTHAL:

20       Q.   So you had mentioned there's a footnote at the

21   bottom of this purchase order somewhere typically?

22       A.   Next page.

23       Q.   You're referring to this that Mr. Vega is

24   highlighting?

25       A.   Yes.

1      Q.    Is that just your standard language?

2      A.    So I think what's really important is that this

3   order, subject to attach Circuitronix terms and

4   conditions, which they have, the terms and conditions

5   state that:

6           This order is governed by the manufacturing

7   agreement.  The supplier will be responsible for all the

8   costs because of the quality issues, including any

9   additional efforts at incoming inspection and sorting and

10   et cetera.  If the total quantity of any order is not

11   completed by the delivery date committed by the factory

12   while accepting the orders, any additional freight costs

13   incurred by Circuitronix will be charged back to the

14   customer -- to the supplier.

15      Q.    And the supplier is who?

16      A.    Jiangmen Benlida.

17      Q.    Okay.  So when you talk about additional

18   freight costs incurred because of a late delivery, what

19   is that again?  I know you've covered it, but just to be

20   clear.

21      A.    So if the customer requires the parts to be --

22   so if the customer is -- we have customers who ask us to

23   deliver parts to their Hong Kong office, if they tell us

24   that they want the parts the 1st of November, they're

25   making some plans behind the scenes to get it to their

1   factory somehow.

2          If it's by ocean and they plan to get it by the

3   15th of December to the factory in United States and we

4   delay the November 1st, now they cannot make -- ship it

5   by ocean.  They need to ship it by air.  So they charge

6   us back the air freight cost, which we charge back to

7   Benlida.

8          Q.    Okay.

9          A.    There are other customers who request us to do

10  that.  They request us to deliver the parts in United

11  States or wherever they want us to deliver the parts.

12  And the same dynamics could work there, too, that we will

13  plan to ship it by ocean, we cannot, and now they have to

14  ship it by air.  And then we charge back the differential

15  back to Jiangmen Benlida.

16         Q.    Okay.  So we can leave this exhibit.

17         After Benlida receives the purchase order --

18  let's go to Step 2 of the process.

19             MR. ROSENTHAL:  If we can illustrate that,

20  Mr. Vega, on the chart.

21  BY MR. ROSENTHAL:

22         Q.    Step 2 is what?

23         A.    So Step 2, as per the contract, is Benlida

24  should place the purchase order into production the day

25  they receive the purchase order, unless we exceed the

1   agreed-upon allocated capacity.

2       Q.   Okay.  Can you think of the allocated capacity

3   in terms of, just for ease of reference, like a cup with

4   water in it?  I mean, I'm going to use that example.  I

5   know you don't.

6           Can you illustrate what the capacity is with

7   the water?

8       A.   Sure.

9           So there's a cup with water in it.  And until

10  the time the water is just sufficient to fill the cup,

11  it's good enough.  But as soon as you put more water, it

12  starts spilling.  So the same way, let's assume, the

13  agreed-upon capacity is 3,000 in a week.  If we get

14  3,100, it goes into the following day -- the following

15  week, sorry, because they're only allowed 3,000 for that

16  week.

17      Q.   3,000 what?

18      A.   Square meters.

19      Q.   Square meters, okay.

20      A.   3,000 square meters is what was negotiated in

21  2012.

22      Q.   What happened afterwards?

23      A.   In 2013, it became 4,200 square meters.  In

24  2015, it became 5,600 square meters.  On October 31st,

25  2017, it became 7,000 square meters.

1        Q.    Why did --

2              THE COURT:  So when you say a square meter --

3    so this one right here is like, I'd say, a -- it's not

4    really, but let's say it's a foot by a foot.  So that's

5    one square foot.

6              So you're talking about square meters is a

7    meter by a meter?

8              THE WITNESS:  Sure.

9              THE COURT:  So like this one has 3, 6, 8 -- 16.

10   This one has just 8.  And this one has 8 with a lot more

11   little things in it.

12             So it doesn't matter how many little pieces

13   within the square meters are there?

14             THE WITNESS:  It doesn't make a difference.

15             So because they just take the delivery size of

16   the printed circuit board and multiply it by -- if you

17   are ordering 100,000 at one time, you multiply that area

18   by 100,000, you get it for that part number, and then you

19   go all the part numbers which are released in that week

20   and you get the total area of which you've released.  So

21   it's extremely simple math.

22   BY MR. ROSENTHAL:

23        Q.    Basically, how big are these panels that are

24   going to be put -- put onto the production floor, or no?

25        A.    We do not go into that because we just measure

1   it by what they're shipping to us.  They're shipping --

2   they're shipping 5 inches by 5 inches.  That's 25 square

3   inches.  They ship 100,000 pieces.  We multiply the

4   100,000 by 25.  And then we convert into square meters

5   and that's how we -- and they add up for all the part

6   numbers in that particular month, and that gives us a

7   total square foot capacity.

8        Q.   And that's measured in meters by the agreement,

9   right, square meters?

10       A.   Yeah.  It's the way we -- according to the

11  contractual terms, it's square meters, yes.

12       Q.   Okay.  So just at this stage of the production,

13  I think we've already covered what it takes in terms of

14  what happens at the factory, in your earlier testimony.

15  And in the interest of time, I'm going to skip that.

16       Is there anything about the production process

17  itself that we haven't talked about that you think is

18  important to emphasize?

19       A.   So double-side PCB, which has just got two

20  layers, if it was the only printed circuit board which

21  was being manufactured at the factory, it could very

22  easily be completed within four to five days.  And in

23  China days, there's no difference in working days and

24  calendar days because they run 7 days a week, 24 hours a

25  day until -- they have two major breaks:  That's the

1     Chinese New Year and Mid-Autumn Festival.  The rest,

2     throughout the year they're running 24/7.  So there is no

3     difference between calendar day and working day in China.

4            So the reason why we give 28 days as our

5     leadtime, because that 28 days includes from the day they

6     put the order in the system, they may need to buy

7     laminate, which may take 3 to 5 days.  Laminate comes.

8     Then they start the production process.  They finish it,

9     say, not in 5 days, in 10 or 12 days, because they've got

10    other products.

11           They have to stage the manufacturing to get it

12    ready.  And then in those 28 days they also have to move

13    it from the factory in China to our warehouse in Hong

14    Kong.  And that could take between one to three days.

15    Q.    You're saying that the last part of the

16    shipping can take one to three days?

17    A.    The movement of product from their factory in

18    southern China to the warehouse in Hong Kong.

19    Q.    Okay.  So let's go to that Step 3 in the

20    process.

21           And if Mr. Vega can bring that up to remind us.

22    There's a little arrow there trying to indicate what you

23    just described, Mr. Kukreja.

24           How do they typically transport the product to

25    the warehouse that's in Hong Kong?  How does Benlida

1   typically transport it?

2       A.   So typically, it's by truck.  And the --

3   usually it takes less than 24 hours for the truck.

4       If the -- as I mentioned, they drive from the

5   Hong Kong-Shenzhen border to the factory is less than two

6   hours, two, two-and-a-half hours.  So same way the truck

7   goes in the reverse direction.

8       But the reason why we put 24 hours as the outer

9   time frame is it could be stopped by Chinese customs,

10  Hong Kong customs, and finally they make their way to

11  Hong Kong and they deliver the product.

12      Q.   So let me ask you about that because -- what is

13  at the border between Hong Kong and Mainland China?  If

14  you're driving a car or truck and you get to this

15  invisible line that's a border --

16      A.   It's not invisible.  It's a proper border.

17  Like it's the world's biggest border.

18      Q.   My apologies.  I haven't been there.

19      What happens?  Is there customs, you said?

20      A.   There's immigration and customs.

21      THE COURT:  Is there a wall?

22      THE WITNESS:  So there is no wall, but there is

23  barbed wire as well as they've made it in a certain way.

24  They've got water bodies, like rivers and stuff like

25  that.  And they have, sort of, faced some of those

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1  similar experiences which our southern border faces.  So

2  the same thing, same dynamics.

3          THE COURT:  I see.

4  BY MR. ROSENTHAL:

5      Q.    So it's a real border?

6      A.    It's a real border.

7      Q.    Okay.  And that is relevant to our discussion

8  here because it affects the time of the trucks and stuff

9  like that, or could it affect them?

10     A.    Yeah.  If China customs decides to do a full

11 inspection, then that -- what should have taken 12 to 24

12 hours can become whatever China customs wants.  We have

13 been in situations where stuff has been at China customs

14 for three days, four days, five days, something like

15 that.

16          But -- and then in the last -- in the last

17 three, four years, Benlida has started shipping more by

18 ferry.  There's a ferry which goes from the Jiangmen port

19 to the Hong Kong port.  And that takes three days or four

20 days, yeah.

21     Q.    Okay.  So let's talk about Step 4.

22          What happens when the product finally gets to

23 the warehouse that you guys contract to use in Hong Kong?

24     A.    The warehouse personnel, they receive what's

25 called a packing slip and a bill from Benlida.  So they

DIRECT EXAMINATION OF RISHI KUKREJA

1  go back and they check.  So the packing slip could have

2  20 part numbers on it, each part number could have

3  multiple number of boxes on it.  And so they make sure

4  that for Part No. A, the packing slip says 20 boxes, they

5  got 20 boxes.  And for each line item.  And they confirm.

6  If there are no discrepancies, they confirm receipt of

7  the cargo as advised by the shipper, and they take that

8  package and they go -- we go to Step 4.

9      Q.    So what do they do with the information from

10  the packing slip in Step 4?

11      A.    They send it to our -- to the back office which

12  we use in India.

13          MR. ROSENTHAL:  Okay.  So that's Step 5 on the

14  slide, Mr. Vega.

15  BY MR. ROSENTHAL:

16      Q.    Okay.  So this first illustrates an Arrow No. 5

17  over to the India.

18          And where is the back office located in India?

19      A.    It's in Gurgaon, India.

20      Q.    Where is that near?

21      A.    That's just outside Delhi.

22      Q.    New Delhi?

23      A.    Yeah.

24          THE COURT:  And how do you spell that?

25          THE WITNESS:  Gurgaon, G-U-R-G-O-A-N [sic].

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1          THE COURT:  Thank you.

2

3    BY MR. ROSENTHAL:

4      Q.    I would not have gotten that right.

5            And what's the -- can you describe the

6    operation that Circuitronix uses in that back office in

7    India for the receipt of this information?

8      A.    So there are two separate teams which are

9    interested in this information who require the

10   information for different purposes.  So we've got the

11   inside sales team.  They need to keep the customer

12   updated, how the product is moving, and when the customer

13   can expect the product.  And then we've got the

14   accounting team, which basically has to enter the

15   information so that the supplier gets paid as per the

16   contractual terms.

17     Q.    Okay.  Let me just interrupt you.

18           The accounting team, that's located where?

19     A.    So we've got a primary accounting team based in

20   Ft. Lauderdale, but we've got a back office accounting

21   team which supports the primary accounting team at the

22   back office.

23     Q.    In India?

24     A.    In India.

25     Q.    Okay.  Let me just focus on the receipt of the

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    information about the shipments for a second.

2         A.    Yes.

3         Q.    I want to get real detailed.

4              Where does it go?  What kind of system does it

5    get put into?

6         A.    So the warehouse in Hong Kong, they enter the

7    receipt date in the -- in what's called an ERP system.

8    And ERP stands for enterprise, resource, and planning.

9    It basically connects every aspect of the operation.

10             The -- we receive the customer's purchase order

11   in it.  We place the supply purchase order.  The product

12   is received as -- so when the warehouse goes to receive

13   the product, right, and it shows they received 10,000

14   pieces of Part No. A, if there's no purchase order, open

15   purchase order to the factory for Part No. A, they cannot

16   receive it.

17        Q.    It has to match in the system?

18        A.    Yeah, it has to match in the system because

19   they can only receive what we've ordered.  So warehouse

20   is going to go back and tell inside sales, we got 10,000

21   pieces but there's no purchase order.  And it will get

22   resolved one way or the other.  Sometimes it's a mistake

23   which our team could have made.  Sometimes it's a mistake

24   which Benlida could have made where they shipped product

25   to us which were not required.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    But it gets resolved real quick like it's -- we

2  are talking about -- like we were talking at one point in

3  time in 2017, '18, you're talking about hundred, 200

4  transactions per day.  And it was very efficient, and it

5  was getting resolved.  And there were discrepancies, but

6  when you look at the entire picture, the number of

7  discrepancies was not that significant.

8    Q.    Okay.  What is the contractual arrangement with

9  the company that's the back office that you describe in

10 India?  Circuitronix U.S. has an agreement with them of

11 some sort?

12    A.    We do.

13    Q.    And what does that agreement require them to

14 provide to Circuitronix?

15    A.    So we've got different skill sets which we

16 request for them -- from them.  They recruit those skill

17 sets.  And then we pay them a certain amount per hour for

18 those skill sets.

19    Q.    And is there somebody who's sort of in charge

20 of the process of receiving this information over in the

21 inside sales in India?

22    A.    So we've got an inside sales team, and the

23 inside sales team is led by a gentlemen by the name of

24 Sourabh Sharma.

25    Q.    Sourabh Sharma?

1    A.    Yes.

2    Q.    Okay.  And what's his title or position there

3  at the -- that company?

4    A.    So he's got -- he's got -- he's the general

5  manager of that operation with the main responsibility of

6  managing the inside sales team.  He does not manage the

7  accounting side of operations.

8    Q.    Okay.  Now, I don't know if you recall,

9  Mr. Mazzola in his opening referred to this gentleman,

10  Sourabh Sharma, as a yes man.

11          Do you know what that term means, "a yes man"?

12    A.    Yes.

13    Q.    Somebody who just agrees and says yes no matter

14  what?

15    A.    Yes.  I know what it means.

16    Q.    Okay.  How would you describe Mr. Sharma?

17    A.    I think the jury is going to see him tomorrow.

18    Q.    But how would you describe him since he's been

19  described by counsel for the other side?

20    A.    He's an extremely intelligent employee, and I

21  do not think that -- I believe that he would push back on

22  anything which he disagrees with.

23    Q.    Has he pushed back on you if he thinks you've

24  told him something incorrect?

25    A.    Several times.

1    Q.   Okay.  And this graphic that we have as an

2    illustration here has a second dotted line over to

3    Florida.  And you had testified about the accounting team

4    is the second team that gets information.

5         Can you tell us about that aspect of what

6    happens when this information gets put into -- and by the

7    way, what's the name of Circuitronix's ERP system?

8    A.   It's -- the current ERP system which we use is

9    called Sage.

10   Q.   Sage, okay.

11        So when the information gets put into Sage

12   about the receipt of the shipment, what does the

13   accounting side do with it, the accounting team?

14   A.   So the team which this goes to is called the

15   account payables team because they are responsible for

16   the bills of the company.  They are supply facing.

17        So a supplier bill can only be paid when

18   there's a purchase order in the system, which -- for

19   which quantity can be received.  The bill from the --

20   from the supplier which matches the quantity and the

21   bill -- the quantity as well as the price on the purchase

22   order and an actual receipt.

23        So it's called a three-point -- three-point

24   certification.  They cannot enter -- receive a bill until

25   the time all these three criterias are met.

1    Q.    Now, when you say they cannot do that, is that

2    just an instruction to the employees or is that the

3    system itself?

4    A.    So every company's accounts payable team works

5    in that manner.  They need to have a contract against

6    which the product comes.  The bill -- the quantity and

7    the unit price has to match that contract.  And more

8    important, the warehouse has to say that they received

9    the product.  Because if the warehouse does not receive

10   the product, you cannot pay for that product.

11   Q.    Okay.

12         MR. ROSENTHAL:  And I think our demonstrative,

13   Mr. Vega, has the next step which showed the invoice that

14   Mr. Kukreja was talking about.

15   BY MR. ROSENTHAL:

16   Q.    When do they typically send their invoice to

17   Circuitronix?

18   A.    Benlida sends their invoice -- they send a hard

19   copy of the invoice with the shipment at No. 3, and they

20   send a soft copy of the invoice within -- either on the

21   same day they make the shipment or within 24 hours.

22   Q.    And the soft copy is like an email?

23   A.    Yes.  It's a digital copy.

24   Q.    And who does that email go to in Circuitronix?

25   A.    It goes to the -- it goes to warehouse

 1    personnel.

 2         Q.    Okay.

 3         A.    And -- it goes to warehouse personnel.  It goes

 4    to inside sales.  And it goes to the accounts payable

 5    team.

 6         Q.    Okay.  So when we showed this dotted line over

 7    to Florida, how do the people in Florida at Circuitronix

 8    in the accounting department learn of this information if

 9    Benlida sent it to Hong Kong with the product?

10         A.    So for certain suppliers, the accounts payable

11    team is based in Florida.  For Benlida, the accounts

12    payable team is based in Florida.  For other suppliers,

13    the accounts payable team is based in India.  So Florida

14    would get that information just as a part of that email

15    which Benlida sends out.

16         Q.    So the email would actually go to the Florida

17    team as well?

18         A.    Yes.

19         Q.    Okay.  And then it's -- does the Florida team

20    in accounting have access to the Sage ERP system like on

21    their desktops?

22         A.    Yes.  Every employee does.

23         Q.    Okay.  So you can access it from a computer?

24         A.    Yeah.  You can access from wherever you are,

25    yes.

1    Q.   Okay.  So I think the next -- Mr. Kukreja, you

2   already described the next step, if I'm remembering this

3   right -- Well, I didn't remember it right.  Let me talk

4   about this, since it's come up and prompted my memory.

5            Once the Hong Kong warehouse receives the

6   product, do you guys delay or do you just ship it right

7   away to the customer?

8    A.   It depends.  With different customers, we have

9   different requirements.  For some customers, we would

10   just ship it.  They would have an instruction to ship it

11   to their -- to their Hong Kong office.  So it would come

12   to us and then we would just forward and ship it to their

13   Hong Kong office.  For some of our customers, they would

14   expect us to ship it to them directly in United States.

15   That also can be shipped by air or by ocean.  And then

16   there are other customers who want us to take this

17   product into our warehouses in the United States.  And we

18   take them in our warehouses in the United States and then

19   we have agreements how we ship it forward to the

20   customers.  Yeah, they give us a release and we make the

21   releases to the customers.

22    Q.   Okay.

23            MR. ROSENTHAL:  And let's bring up the next

24   one, Mr. Vega.  I think that's CTX accounting department

25   in Florida.

1   BY MR. ROSENTHAL:

2       Q.   I think you described this, Mr. Kukreja, but

3   let me ask you.

4            Do you know what the accounting department

5   does, the accounts payable, in the Florida office, like

6   how they handle this work when they receive a shipment?

7       A.   So, once again, as I mentioned, it's a

8   three-point verification.  They get a bill from Benlida

9   saying that they shipped a hundred pieces of Part No. A

10  at $1.  The accounting team has to find a corresponding

11  purchase order in the system which states the same.  And

12  then they have to find the receipt for that product.

13      Q.   You mean that it's actually been received by

14  the company?

15      A.   Physically been received by us.

16      Q.   Okay.

17      A.   And that receivable would be created by -- and

18  once all that information is there, then it's only at

19  that point in time the system will allow them to accept

20  the bill in the system.

21      Q.   So "the system" being Sage?

22      A.   Yes.

23      Q.   Once they, sort of, put the different keys into

24  Sage -- there's three points -- then the system is

25  programed to allow them to do it?

1  A. Yes. So by chances, they try to accept the

2 bill and there's no receivable, the system will not allow

3 them to create a bill. They'll say there's nothing to --

4 there's nothing to create the bill against. You have not

5 received the product for which you're trying to create

6 the bill.

7  Q. Okay. So when you refer to a bill, whose bill

8 is that? From what company to what company?

9  A. It's from Benlida to Circuitronix.

10  Q. And then what's the accounting department at

11 Circuitronix creating with this information?

12  A. They -- so they are just -- create -- they are

13 creating an accounts payable event and saying, Our

14 payment terms at Benlida is AMS 60 days, this is the day

15 it was received, so this is the day the payment is going

16 to be -- has to be made.

17  Q. So you mentioned AMS 60.

18  Let me ask Mr. Vega to bring up the next point

19 in this discussion, this illustration No. 9. Benlida

20 sends a monthly statement.

21  I believe you testified earlier that AMS means

22 after monthly statement, right?

23  A. Yes.

24  Q. So at the time that the accounting people in

25 Florida are calculating when the payment is going to be

1   due, has Benlida already sent the monthly statement or

2   does that happen afterwards or does it vary?

3         A.    So the monthly -- as I said, that there were

4   two types of monthly statements which we were working

5   with.

6               One was a monthly statement so that there's no

7   discrepancy between the parties as to what they shipped

8   versus what we receive.  So they would write the 1,000

9   entries -- line entries.  1st of March, we ship 1,000

10  pieces, Part No. A, $1 dollar, and keep going down.  So

11  we would immediately look at that monthly statement to

12  see -- and there would be an agreement in most of the

13  cases that everything matches.

14        Q.    So can I just interrupt you.  It could be a

15  little confusing.

16              Did you describe that as a monthly

17  reconciliation earlier?

18        A.    It's a monthly reconciliation.

19        Q.    And by "reconciliation," you mean both sides

20  looking at the information and making sure that both

21  agree on the information?

22        A.    Yes.  But this is specific to line item by line

23  item.  Because an invoice -- there could be five items on

24  an invoice.  So when that invoice comes in and says that

25  this invoice is due on 1st of May 2023.  The breakdown is

1    not given on the monthly statement which we receive at

2    the beginning of the month, whereas in the

3    reconciliation, we know line item by line item what that

4    invoice is made out of.

5           So by the time we get the monthly statement --

6    by the time we get the monthly statement, both the

7    parties are already in agreement with what should be on

8    that monthly statement.

9        Q.   What products have been shipped --

10       A.   Yes.

11       Q.   -- and what part numbers they are?

12       A.   Yes.  There is no confusion about it at that

13   point in time.

14       Q.   So when you say after we get the monthly

15   statement, you're talking about the one that Benlida

16   sends that lists a whole bunch of invoices because

17   they're now expecting payment, right?

18       A.   Yes.

19       Q.   Okay.  I want to show you -- why don't you

20   describe for me, if you can remember, what a monthly

21   statement looks like that Benlida would send that you're

22   describing that lists all of the shipments that they've

23   made and they're expecting payment on it, AMS 60-day

24   schedule.

25           Do you recall or should I show you?

1    A.    I think it would be better if you showed me.

2         MR. ROSENTHAL:  Okay.  Can you bring up Exhibit

3    133, please.

4         So, your Honor, this, I think, is our first

5    redacted exhibit, and I would ask the Court to explain to

6    the jury why we've done that, what the issue is.

7         THE COURT:  Okay.  So Members of the Jury, this

8    exhibit, and there may be others as well, are documents

9    that have been partially redacted, meaning some of the

10   information has been removed from them.  That's why

11   you'll see here it's whited-out or blacked-out.  And it

12   should -- usually it will say something like redacted on

13   its own so you know that a redaction has been made.

14        Redactions are necessary for a wide variety of

15   reasons, including that the redacted information is

16   unrelated to the evidence in the case, that the Court has

17   determined previously that the information is not

18   admissible, or to protect the personal information of

19   individuals or other companies that are not parties to

20   the lawsuit.  Those are just some examples of why

21   documents may be redacted.

22        So you should give the unredacted information

23   in any document whatever weight you choose, but you are

24   not to consider any characterization of the fact or

25   existence of any redaction in any document.

1          All right.  Go ahead.

2          MR. ROSENTHAL:  Thank you, your Honor.

3  BY MR. ROSENTHAL:

4      Q.    Mr. Kukreja, do you recognize what this

5  document is?

6      A.    Yes.

7      Q.    What is it?

8      A.    It's a monthly statement.

9      Q.    Okay.  What time period did it relate to?

10     A.    So this monthly statement was issued on 31st of

11  Jan, 2015.

12     Q.    Okay.  We can go down further if you need to,

13  but what is the information that it lists that Benlida is

14  sending over to Circuitronix?

15     A.    So there is an error in this monthly statement

16  because the due date should be under issue date, the

17  description of the columns should be changed.  Due date

18  should be where issue date is and the issue date is where

19  due date is.

20     Q.    Oh.  Because it has to be due later than it was

21  issued?

22     A.    Yes.

23     Q.    Okay.  But notwithstanding that typographical

24  error, can you just tell us the types of information that

25  Benlida sends to Circuitronix through these monthly

1    statements?

2        A.   So, basically, what they're showing is on 15th

3    of January -- on 31st of Jan. 2015 they shipped product.

4    They shipped that out.  Several different part numbers

5    where the amount was 256,939 -- 256,939.15.  And the

6    invoice number was BLD2015010901.

7             THE COURT:  You need to speak more slowly for

8    the jury.

9             THE WITNESS:  Okay.

10             THE COURT:  And also, more importantly, for the

11   court reporter.

12             THE WITNESS:  Sure.  Sorry.

13   BY MR. ROSENTHAL:

14       Q.   So it says an invoice number on the left?

15       A.   Yes.

16       Q.   And then an amount of -- and that's in what

17   currency?

18       A.   U.S. dollars.

19       Q.   Okay.  And then you told us about the date that

20   they issued it and then the date it's due?

21       A.   Yes.

22       Q.   Is there -- assuming that this one was not

23   incorrectly stated, the date that they issued it is what?

24   What does that mean?  Date issued what?

25       A.   So the date which they issued it.  So the -- if

1   you look at the invoice number, it says BLD2015010901.

2   From this invoice number, I can make out that they

3   shipped this product on the 9th of January 2015.

4       Q.    So you're saying the invoice coding that they

5   use says the year 2015?

6       A.    Yes.

7       Q.    Then the month and then the day?

8       A.    Yes.

9       Q.    And what's the 01 at the end?

10      A.    So sometimes on a particular day there could be

11  multiple invoices.  So this is the first invoice for that

12  day.  There could be another shipment which could be --

13  if it goes on that date, it would say 0902.

14      Q.    Okay.

15      A.    And similarly on the next one, it was shipped

16  on the 14th.  Now -- so what they did was that they put

17  that -- they put all of them as what should have been the

18  issue date of 31st of Jan. 2015, and that issue date of

19  31st of Jan. 2015 based upon AMS 60-day payment terms

20  should have been April 1st, 2015.

21      Q.    Okay.  Let me make just sure we understand

22  that.

23            So you're saying, basically -- correct me if

24  this is a fair characterization of what you just

25  testified.  So these different invoices that are listed

1    on this monthly statement were issued on different days

2    in January of 2015?

3         A.    Yes.

4         Q.    And it just so happens that they listed them as

5    all January 31st, the end of the month, on this

6    particular document, correct?

7         A.    They've done it for a reason because the clock

8    starts when they give the monthly statement.

9         Q.    Okay.  So they gave you this monthly statement.

10              At the top, the date is the 31st of January?

11        A.    Yes.

12        Q.    Okay.  And now, explain to us if they give you

13   the monthly statement on the 31st of January of 2015,

14   under the contract, the manufacturing agreement, how many

15   days does Circuitronix have to pay this -- the invoices

16   that are listed in the monthly statement?

17        A.    60 days from 31st of Jan. 2015.

18        Q.    Okay.

19        A.    They have written 15th of April, which I guess

20   is a grace period of two weeks.

21        Q.    Do you know why they did that?

22        A.    Not really, because in a lot of -- a lot of

23   cases, the monthly statement usually would not come on

24   the last day of the month.  Monthly statement would

25   usually follow a week or two weeks into the following

DIRECT EXAMINATION OF RISHI KUKREJA

1    month.

2            And so I guess just based upon internal

3    protocol, they must have said, we're going to give you

4    the monthly statement by the 15th of the following month,

5    and you have 60 days from there.

6        Q.    Okay.  So, in other words, they didn't always

7    issue the monthly statement on the 31st of a month.  It

8    sometimes took a little time for them to get it out the

9    door to Circuitronix --

10       A.    Sure, because actually they're not allowed to

11   issue the monthly statement of the last day of the month

12   because if they made a shipment on the last day of the

13   month, that would only be received in February.

14           Now, I know why they did it on the last day of

15   the month.

16       Q.    Why?

17       A.    They did it on the last day of the month

18   because in January they have Chinese New Year at the end

19   of January, so they must have done that prior to leaving

20   for Chinese New Year.

21       Q.    Okay.  And Chinese New Year you described as a

22   holiday where the workers take time off for a substantial

23   period?

24       A.    Between two to three weeks.

25       Q.    Okay.  Does that somehow make up for no

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

 1   weekends during the year?

 2       A.    It does, actually, because most of the

 3   personnel working at the factory, they live at the

 4   factory in dormitories in the factory.  They come from

 5   other places in China --

 6           MR. MAZZOLA:  Objection, Judge.  I'm not sure

 7   what the relevance of any of that is.

 8           THE COURT:  Overruled.

 9   BY MR. ROSENTHAL:

10       Q.    Okay.  Well, we've covered this invoice.  And

11   now let's go back to describing the process of -- the

12   business process.

13           MR. ROSENTHAL:  So I think we can take this

14   down.  And Mr. Vega, let's bring up the next one, which,

15   I think, if I recall correctly, was payment.

16   BY MR. ROSENTHAL:

17       Q.    Okay.  So now Circuitronix has received this

18   monthly statement.  The accounting department has

19   processed it.  Everything checked out with the

20   three-point system and so forth.

21           How does this payment happen?

22       A.    So if on 1st of April 2015 there was

23   $273,550.91 owed, each and every time Tracy would reach

24   out to me and say, we need a little bit more money for

25   our cash flow.  It could be anywhere from $50,000 to a

1    million dollars.  And when I've made the payment, I did

2    not make it as that exact amount.  I just -- if they

3    needed $200,000, I rounded it out to $500,000 and paid

4    it.

5            And the reason why we did not pay too much

6    attention to that, both sides knew we were in a no-pay

7    situation because when we sent other payment details, our

8    payment details clearly mentioned the overpayments at the

9    bottom month after month.

10       Q.   So before we get to the payment detail, which

11   actually is, like, the next step on this, let me just

12   stay on the actual payment.

13            How did Circuitronix make its payment?  Did it

14   write a check?  Did it send a bank wire?  Did it send a

15   person holding a bag of money?  What did it do?

16       A.   So accounting -- our accounting would tell me

17   that we owe 200 and whatever that number was.

18       Q.   Yeah.

19       A.   Invariably, around this time I would have

20   received a call from Tracy and accounting would tell me

21   what should they set up the wire for.  And then I would

22   say we're not going to send 270-some thousands dollars,

23   set it up for $500,000 or whatever Tracy requested,

24   whatever we'd agreed upon.  And they would set it up, and

25   I would release it.

DIRECT EXAMINATION OF RISHI KUKREJA

1    Q.    So your internal procedure at Circuitronix was

2    before you would send a bank wire or authorize a bank to

3    send a wire transfer to Benlida in China, who did it go

4    through at the company?

5    A.    The first -- the accounts payable team would

6    advise what was owed to them on first -- on a particular

7    day.  And then I would overrule that and tell them

8    that -- and then I would tell them any additional moneys

9    they had to...

10   Q.    Maybe you didn't understand my question.

11         I'm getting at:  Did it have to go through you?

12   Did you have to approve that?

13   A.    Yeah.  I approve all the payments.

14   Q.    You approve all the payments, okay.

15         Where is the bank that Circuitronix uses to

16   make payments to Benlida, what bank?

17   A.    May I just add one reason why I approve the

18   payments?

19   Q.    Yeah, sure, go ahead.  I'm sorry.

20   A.    Because if, by chance, we had to follow exact

21   procedures, then the only payment which could have gone

22   out would be the 200 and -- that number which

23   reflected -- any overpayment I had to approve --

24   Q.    I see.

25   A.    -- because we were incurring -- like, anything

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1   where the company incurs liability, that needs my

2   approval.  And our bank -- we bank with the main bankers

3   in the United States, Citibank, and we have an

4   alternative arrangement with HSBC.

5        Q.    Okay.  So after you authorized the wire, you

6   mentioned a couple minutes ago, a payment detail.

7             Let me ask Mr. Vega to bring up that last step,

8   we're finally through the last step of this process,

9   No. 11.

10            We actually looked at a payment detail at the

11  very beginning of your testimony yesterday.

12            MR. ROSENTHAL:  And I don't know if, Mr. Vega,

13  you can bring up Exhibit 100, which is already in

14  evidence.

15  BY MR. ROSENTHAL:

16       Q.    And while he's doing this, Mr. Kukreja, my

17  question to you is:  What is the payment detail?  And

18  then once it comes up on the screen, can you explain to

19  the jury what the information in it says?

20       A.    Sure.

21       Q.    This is Exhibit 100.

22            And before you tell us everything, do you

23  recognize this as a payment detail as I just said?  Is

24  that correct?

25       A.    I do recognize this as a payment detail.

1    Q.    Okay.  So let's -- go ahead and educate us on

2  what the different information is in this, this document?

3    A.    So on the right-hand side is the -- is

4  Benlida's bill.  It's the date they issued the bill to

5  us, and the invoice total, which is -- and there was a

6  shipment -- there were three shipments on 1/9.

7          Just give me just one second.

8          So there were two shipments on 1/9 -- Sorry.

9  There were two shipments on the 4th of January, the

10  second and the third one.

11    Q.    You're looking at the bill number column?

12    A.    Yes.

13    Q.    Okay.

14    A.    Now, we have included in this one a shipment

15  from the -- from 31st of December, 2018.

16    Q.    You're talking about the --

17    A.    Number one, yes.

18    Q.    Why is that?

19    A.    They include it because Benlida should not

20  have -- they gave us the bill on 12/31.  It's date when

21  they made the shipment.  It was not the date when we

22  received the shipment.  The clock starts when we receive

23  the shipment.  And so 1/9 is the date it was received.

24    Q.    Okay.

25    A.    The billing -- but all of that became, sort of,

1    irrelevant.  And you'll understand why when we go down --

2    when we scroll down.

3         Q.    Okay.  So let's look at the whole document.

4               You want us to focus on the bottom?

5         A.    If you could -- yeah.  So let's go to the debit

6    notes.

7         Q.    Okay.  So those are the ones just above there

8    on the left that start DEN-DM, the last six lines of the

9    main table.

10              Is that what you want us to look at?

11        A.    Yes.

12        Q.    Okay.  Tell us about what that's there for.

13        A.    So just without having the physical debit notes

14   on hand with myself out here, just by the virtue of that

15   they're small, these are quality rejections from the

16   customer to us.  The customer would come back and say 10

17   pieces -- you shipped 1,000 pieces.  Out of 1,000 pieces,

18   10 parts were bad.  They would give us the details.

19              We would send all that information to Benlida.

20   Benlida would analyze it.  They would issue a corrective

21   action to us.  And then if the customer charged us X, we

22   charged -- we had a corresponding debit note to Benlida.

23        Q.    Okay.  Let me just show an example of a debit

24   note.  It may not match this.

25              MR. ROSENTHAL:  But let me ask Mr. Vega if he

DIRECT EXAMINATION OF RISHI KUKREJA

1    can bring up Exhibit 159, please.  You can maybe

2    superimpose it on this or however you want to do it.  So

3    let's make this a little larger so we can read it.

4    BY MR. ROSENTHAL:

5        Q.    Mr. Kukreja, what is this document?

6        A.    So this is a leadtime penalty.

7        Q.    Is it a debit memo?

8        A.    So leadtime penalties, they're also issued as

9    debit memos.

10        Q.    Always or at one point in time?

11        A.    They were issued as debit memos until March of

12    2016.

13        Q.    Okay.  We'll put that aside for now.

14              But does this document illustrate what you were

15    trying to say before, that on the payment detail, which

16    is the document on the left, there's these line items

17    that are debit memos?  Is -- does the debit memo look

18    kind of like the one on the right?

19        A.    Yeah.  It's a negative invoice.  It's money

20    which is going to be deducted from what we owe Benlida.

21        Q.    Okay.

22              MR. ROSENTHAL:  So we can take the debit memo

23    down.  Let's focus back on the payment detail, the one on

24    the left please, Mr. Vega.

25              MR. MAZZOLA:  Mr. Rosenthal, what was the

1    exhibit number on the debit memo?

2         MR. ROSENTHAL:  159.

3         MR. MAZZOLA:  159?

4         MR. ROSENTHAL:  Yes.

5    BY MR. ROSENTHAL:

6    Q.    So looking back at the payment detail, which

7    was Step 11 in the process, the last piece of the back

8    and forth on paperwork, you talked about the top part,

9    which was the invoice list for that month.

10   A.    Yes.

11   Q.    And then you talked about the debit memos.

12        Why are those debit memos listed on this

13   invoice at this time -- or not this invoice, this payment

14   detail?

15   A.    So you have -- if you go up, like you've got

16   all these bills from them, the CCT numbers.

17        MR. ROSENTHAL:  And let's make that a little

18   bigger, Mr. Vega, so we can see it.

19        THE WITNESS:  Just the CCT.

20   BY MR. ROSENTHAL:

21   Q.    Okay.  The CCT is their abbreviation for

22   Circuitronix?

23   A.    Yeah.

24        But those are bills to us, right.  So we're

25   supposed to pay all these bills.  And then we go down to

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    the debit notes, minus all these debits --

2         Q.    Okay.

3         A.    -- which gives us a payment for that month.

4         Q.    Is that the subtotal line?

5         A.    Yeah, that 1,161,258.

6         Q.    $1,161,258.46?

7         A.    Yes.

8         Q.    Okay.  So that's what was -- that was like the

9    total bill, the AMS 60 bill that you have to pay?

10        A.    That's right.

11        Q.    Okay.  So then how did Circuitronix handle that

12   payment of that?

13        A.    So, once again, so at this point in time, we

14   were all paid by 7,487,963.59, which was coming from the

15   previous payment detail.

16             And in addition to that, Tracy would call me,

17   and she would say that they need this money or that money

18   or whatever they need, and I would send the money.  And

19   that -- so you'd take the top number, 1,161,528.46 [sic],

20   you subtract it from 7,487,963.50 [sic] because we would

21   apply the overpayment to that number.  And then we would

22   further add -- the more payments we made and what one

23   would come out was that on Feb 1st, 2019 we have a credit

24   balance of 7,576.435.13.and then in the next month's

25   payment detail, where you see credit balance from March

1   1st, we would have a credit balance for --

2       Q.   April 1st or something?

3       A.   Basically, this would be the February 2 -- when

4   we create the Feb. 2019 payment details, that's -- we

5   would start with an overpayment of 7 million.

6       Q.   I see, okay.

7       So what was the purpose of sending this payment

8   detail to Benlida?

9       A.   It was our way of telling them, number one,

10   these are the invoices we are paying, and this is how we

11   are paying, and this is what the balance is.

12       Q.   Okay.  And with the payment detail document

13   itself, which I assume it was sent by email?

14       A.   Could you just -- it was attached to the email,

15   right?

16       Q.   We may have.  I'm not sure.  Let's see.

17       MR. ROSENTHAL:  And, Mr. Vega, and this is

18   Exhibit 100.  Do we have any -- yes.

19       THE WITNESS:  So it was sent on the 12th of

20   April 2019.

21   BY MR. ROSENTHAL:

22       Q.   Okay.  And it lists a bunch of attachments

23   there.  The first attachment says, Benlida payment

24   details April 1st, 2019 with the January 2019 invoices

25   PDF.

 1          Was that what we were just looking at a moment

 2   ago?

 3      A.    Yes.

 4      Q.    So what are these other things that are

 5   attached to the email?

 6      A.    These were the bank confirmation slips.  You

 7   saw right at the bottom we said that we made a payment of

 8   300,000, 258,000, 400 -- 300,000.

 9          So like you can see the 300,000 was shipped on

10   4th of April, 2019.  And if you go to the payment detail,

11   you'd be able to see.

12      Q.    Okay.

13          MR. ROSENTHAL:  So, Mr. Vega, can you go back

14   to the payment detail itself, which is the --

15          MR. MAZZOLA:  Mr. Rosenthal, what's the exhibit

16   number?  Is this still 159 or is it a different number?

17          MR. ROSENTHAL:  This is 100.

18          MR. MAZZOLA:  100.  Thank you.

19          MR. ROSENTHAL:  No problem.

20          So, Mr. Vega, let's try to do this.  If we can

21   blow up the bottom part that Mr. Kukreja is talking

22   about, those red numbers, and then I'm going to ask you

23   to show another document next to it, if we can do that.

24          THE WITNESS:  So that's the April -- the last -

25   the less payment 4th of April 2019, $300,000.

DIRECT EXAMINATION OF RISHI KUKREJA

1  BY MR. ROSENTHAL:

2      Q.   Okay.  Let me actually look at that.  See the

3  one that says $400,000 on March the 8th --

4          THE COURT:  Before we get to that, let's take

5  our break.  Let's take a ten-minute break.  We'll see

6  everybody in ten minutes.

7          (Jury exits at 11:27 a.m.)

8          (Court recessed from 11:27 a.m. to 11: 38 p.m.)

9          THE COURT:  Welcome back, everyone.  Please be

10  seated.

11          All right.  Go ahead.

12          MR. ROSENTHAL:  Thank you, your Honor.  And

13  thank you for opening the blinds to let some sunlight in.

14  BY MR. ROSENTHAL:

15      Q.   So I think right before the break we had up on

16  the screen -- well, we have now added a document on the

17  right.

18          So on the left side, Mr. Kukreja, we were

19  looking at the payment detail.  And just before the break

20  I said I wanted to ask you about the $400,000 payment

21  made on March 8th, 2019.

22          Do you recall?

23      A.   Yes.

24      Q.   Okay.  So you said, if I'm characterizing what

25  you said correctly, that Circuitronix would send Benlida

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    in the email an attachment with a bank slip, correct?

2         A.    Yes.

3         Q.    What are we looking at on the right, which has

4    been -- one of the attachments of the email?

5         A.    It's a bank confirmation slip.

6         Q.    Where do you get that?  Where does Circuitronix

7    get that document from?

8         A.    From the Citibank portal.

9         Q.    The portal on the computer?

10        A.    Yes.

11        Q.    Okay.  And can you just walk us through that?

12             Whose source account is that?

13        A.    269- -- the account ending in 2698?

14        Q.    Yes.

15        A.    Is a Circuitronix checking account.

16        Q.    Okay.  And with what bank is that?  Do you

17   know?

18        A.    With Citibank.

19        Q.    Okay.  The bottom thing says Citibank's bank

20   reference number.

21             Is that that bank?

22        A.    Yes.

23        Q.    Okay.  And we can see the amount.

24             And who is -- what does the beneficiary mean?

25        A.    The amount is 400,000.  The beneficiary is

1    Jiangmen Benlida.

2          Q.    And what bank did Benlida ask Circuitronix to

3    send this money to?

4          A.    Bank of -- the bank which is written there, the

5    Bank of China.

6          Q.    Bank of China?

7                Can you bring the mic a little closer to you?

8    It's a little hard to hear you.

9          A.    Sure.

10         Q.    And I'm going to just show you this one right

11   now, but what was Circuitronix's practice in terms of

12   attaching these banks slips to the monthly payment

13   detail?  Did you just show them one example, or did you

14   show them one for each of the payments that are listed on

15   the payment detail?

16         A.    For each of the payments which are listed.

17         Q.    So then on this one, which is on the left side

18   of our screen, there are four separate payments listed

19   400,000, 250,000, 300,000, and 300,000.

20               You're saying that there would be four separate

21   payment slips attached to the payment detail?

22         A.    Yes.

23         Q.    Okay.  I'm not going to go through all those

24   now in the interest of time.

25               MR. ROSENTHAL:  We can pull this down.  Thank

DIRECT EXAMINATION OF RISHI KUKREJA

1   you, Mr. Vega.

2

3   BY MR. ROSENTHAL:

4       Q.   So you've testified about the fact that the

5   payment term in the contract was AMS 60 days and

6   explained to us what that means.

7            You've also mentioned in your testimony that

8   you would often get communications from Tracy Huang at

9   Benlida asking you to add additional funds, correct?

10      A.   That's correct.

11      Q.   How quickly did Circuitronix actually pay in

12  practice on average, typically?  Did they wait 60 to 90

13  days to pay or pay more quickly?

14      A.   So at the end of November of 2016, there was a

15  meeting between Mr. Huang, Douglas Huang, Tracy, and

16  myself, where they had communicated that they were --

17  their cash flow problems were continuing.  And they asked

18  me whether I could expedite payment terms to them.

19           So during that meeting, what was decided was

20  that whatever shipped this week, we would pay them by

21  next week.  So we contracted the payment terms from 60 to

22  90 days to, basically, less than 7 days.

23      Q.   When you say you

24  "contracted," you mean you shrunk or shortened?

25      A.   Yes.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1     Q.    What effect did that agreement that you reached

2  with them have on the actual contract term about AMS 60

3  days?

4     A.    None.

5     Q.    Okay.

6     A.    It was agreed upon -- it was agreed between the

7  parties that the contractual terms of AMS 60 still

8  existed.  And this was supposed to be a short-term

9  measure to help them with their cash flow.

10     Q.    Was this documented in -- you said there was a

11  meeting.

12          Was that in person?

13     A.    This November meeting, was it in person?  I

14  believe it was in person.

15     Q.    Okay.  When you guys -- and I don't mean to be

16  flip.

17          When you would have executives from the two

18  companies would meet in person, was there a practice

19  afterwards of trying to document what was discussed, at

20  least the important points?

21     A.    Absolutely.

22     Q.    Okay.

23     A.    Not only with Benlida, but with any meeting

24  which we take -- which we have.

25     Q.    Okay.  And what's the term used to describe

1    that document?

2        A.    Well, minutes of meeting.

3        Q.    Okay.  Let me ask Mr. Vega to pull up

4    Exhibit 46, the second attachment, please.

5            MR. ROSENTHAL:  So -- I can't really see.  We

6    may have a redaction issue.  Excuse me for one second,

7    your Honor, if I can confer with my colleagues.

8            My mistake.  I'm on the wrong page.

9    BY MR. ROSENTHAL:

10       Q.    If we can -- well, let me just ask you while

11   we're on the first page.  At the top, it says meeting

12   minutes.

13           MR. MAZZOLA:  We're using this document?

14           MR. ROSENTHAL:  Yeah, I just was --

15           MR. MAZZOLA:  Okay.

16           MR. ROSENTHAL:  I'm going to direct us to a

17   different page.

18   BY MR. ROSENTHAL:

19       Q.    So does this refresh your recollection as to

20   whether or not -- what the date of the meeting was,

21   Mr. Kukreja?

22       A.    Yes.

23       Q.    When was it?

24       A.    It was on the 13th and the 14th of December.

25   This was -- we had started -- Benlida had made this

1    request starting October of 2016.  We had several phone

2    calls between Mr. Huang, Douglas, Tracy, and myself,

3    which also minutes of the meeting -- where they were

4    meeting, where they made this request.

5           And starting the 1st of December, we actually

6    started following that guideline of what shipped this

7    week would be paid next week.  It was just formalized and

8    written in great amount of detail in this -- in these

9    minutes.

10   Q.    Okay.  And let me direct you to Page 3 of this

11   document.

12          MR. MAZZOLA:  Mr. Rosenthal, would you please

13   share the exhibit number again, please?

14          MR. ROSENTHAL:  Yep.  46, second attachment.

15          I'll wait.  Are you ready?

16          MR. MAZZOLA:  (No response.)

17          MR. ROSENTHAL:  Okay.

18   BY MR. ROSENTHAL:

19   Q.    So in Paragraph 1 there, Mr. Kukreja, it says:

20   After discussion, both parties agree as following:  CTX

21   make payment in weekly -- let me stop for a second.

22          Do you know who drafted this particular

23   language from the way it's written?  In other words, was

24   it Circuitronix or Benlida?

25   A.    Can you just go back -- this is a Benlida --

1    no.  Can you just go back to the first page?

2         So Benlida -- Tracy drafted this.  Tracy sent

3    the first one, but there is a lot of text which I had

4    written.  Like, I can tell you what text I've written if

5    you go to the next page.

6         Q.  Okay.  Well, we don't have to go into that,

7    Mr. Kukreja.  Let me ask you this.

8         Sometimes these have different colors.  How did

9    you use the color of font to designate who was writing

10   something?

11        A.  So it was just -- in some cases, we would just

12   use track changes in the document to track the change.

13   In some cases, we used a different color just to --

14        Q.  Okay.

15        A.  But if you go to the page we were looking at,

16   the third page, so H:  All orders will be released into

17   production ASAP, is what I have written.  Benlida will

18   accept, I have written.  The above does not impact any

19   other aspect of the current agreements, including, but

20   not limited to manufacturing agreement and secondary

21   agreement.  I have written that.

22        Q.  Okay.  So let me go -- let's just go a little

23   slowly so our court reporter can also get it.

24        So you're referring to the black font right

25   now, right?

1    A.   Yes.

2    Q.   Okay.  And let me focus on two things.  You

3  just read this line that says:  The above does not impact

4  any other aspect of our current agreements, including,

5  but not limited to, the manufacturing agreement and

6  secondary agreement.

7         What are you referring to by this secondary

8  agreement?

9    A.   The secondary agreement is the letter

10  agreement, which we looked at where we would continue to

11  pay.

12    Q.   That was the one in 2016?

13    A.   That was the one in July -- in July 2016.

14    Q.   Okay.  Now let's take that away.

15         Let me go back to where I started, which was

16  Paragraph 1 that has some of the black lines in it and

17  ask you who wrote this.

18         So this one, Tracy Huang speaks English.

19         And she also writes English as well?

20    A.   Yeah.  She -- yeah, she is fluent in both

21  written as well as --

22    Q.   Okay.  So she wrote:  CTX make payment in

23  weekly basic on every Monday.  Payment number follow

24  shipment amount.  Happen in last week.  Then pay clear by

25  end of every month.

1       Can you interpret what that means for us?  Can

2  you --

3       MR. MAZZOLA:  I --

4       MR. ROSENTHAL:  It was a poorly asked question.

5  Let me ask it this way.

6  BY MR. ROSENTHAL:

7       Q.   What did you understand Tracy Huang was saying

8  here?

9       A.   So, basically, Monday through Sunday they would

10  make shipments, either by truck or by ferry.  And the

11  following week, they said by Monday or Tuesday -- the way

12  it was supposed to work is that by Sunday, they were

13  supposed to get us all the details about what they did

14  Monday through Sunday, and we would release the payment.

15       They would say, we shipped $550,000, and then

16  the following week we would release the payment of

17  $550,000.

18       Now, the issue which happened out here was

19  because of the speed in which payments were being

20  requested, there was no way for accounts payable to do

21  the three-point verification.  Because, A, some of the

22  stuff which they shipped to us have not also been

23  received by us.  We were shipped something on Friday and

24  Saturday, Sunday, or they maybe even shipped something on

25  Tuesday by ferry which has not gotten to us.  But we were

1    just taking what she said -- what she told us, and we

2    were making the payments the following week.

3        Q.   So you relied upon when she told you, trusted

4    her, and made the payment?

5        A.   Yes.  And, again, the discrepancies were not

6    that big.  They were minor discrepancies here and there.

7    So there was nothing -- her numbers were pretty accurate

8    to not -- there were small mistakes which happen in

9    transactions between every company.  So they were not

10   wrong.

11       But what was agreed upon that at the end of the

12   month, we would do that shipment re- -- that monthly

13   statement reconciliation where the team would come back

14   and say, this is all the 1,000 items we shipped.  And if

15   there were any discrepancies either in their favor or our

16   favor, we would make up that adjustment.

17       Q.   Okay.  So you mentioned that this accommodation

18   was reached in, I think it was, December 1st, 2016, you

19   said it started --

20       A.   Yes.

21       Q.   -- what shipped last week we'll pay next week?

22       A.   Yes.

23       MR. ROSENTHAL:  Okay.  We can take that down.

24   Thank you, Mr. Vega.

25   BY MR. ROSENTHAL:

1     Q.    So how much more quickly was Circuitronix

2   paying Benlida than what it was obligated to do under the

3   AMS 60 terms of the contract?

4     A.    Under the AMS 60-day payment terms of the

5   contract, we would get between 60 days to 90 days to make

6   a payment.  Under this -- under this accommodation which

7   we were making for them, it was anywhere between zero to

8   five days because -- let's assume that they made a

9   shipment -- yeah, it was anywhere between zero and five

10  days because, as I mentioned, there were a lot of times

11  we were making the payment even before we got the

12  shipment.  They represented to us that they shipped

13  something --

14    Q.    You took their word for it?

15    A.    Yeah.  And it was accurate.  It was Tracy.

16    Q.    Okay.  You trust Tracy?

17    A.    I trust Tracy.

18    Q.    Okay.  Why did you make that accommodation?

19    A.    To help them with whatever they were going

20  through in terms of their financial troubles.  But at the

21  end of the day, to help myself also.

22    Q.    What was your interest in it, the company's

23  interest?

24    A.    We are a US-based company, and if I brought --

25  if I was -- Circuitronix was responsible for bringing

```
 1   GM's line down, I would get that debit note.  I would

 2   get --

 3        Q.    From GM?

 4        A.    GM would give it to their Tier 1.  Their Tier 1

 5   would give it to us.

 6        Q.    You were trying to avoid a situation like that?

 7        A.    Yeah, (inaudible) means.  And we were -- for

 8   three to four years between 2015 and 2019, we were on

 9   back-to-back calls with one of the major automotive

10   companies or some company or the other, every day, three,

11   four hours because of just the amount of delay.

12             MR. MAZZOLA:  Objection, Judge.  That's clearly

13   hearsay --

14             THE COURT:  Overruled.

15             MR. MAZZOLA:  -- if he's going to talk about

16   what someone at General Motor's is telling him.

17             MR. ROSENTHAL:  Hasn't said what the substance

18   was.

19             THE COURT:  All right.  Overruled.

20   BY MR. ROSENTHAL:

21        Q.    So you had conversations.  We're now talking

22   about what was in those conversations for many hours a

23   day with Tier 1 suppliers for automotive companies?

24        A.    Automotive companies predominantly, but all our

25   customers.
```

DIRECT EXAMINATION OF RISHI KUKREJA

1    Q.    Involving delays, you said?

2    A.    Involving delays.

3    Q.    Involving delays from Benlida shipments?

4    A.    Involving delays from Benlida shipments.

5    Q.    So you just talked about the agreement to

6    switch the accommodation from paying every 60 to 90 days

7    on those contractual schedule to what ships this week, we

8    pay next week.

9         At any point did Benlida require, as a

10   condition of doing business, prepayments?

11   A.    So there came a certain point in time where

12   under this revised agreement, not under the global AMS

13   60-day payment terms.  Under the revised agreement, we

14   were around $1.5 million all paid.  And I wrote an email

15   to Tracy that the hole is becoming bigger and bigger and

16   at some point in time we cannot continue to pay.  And we

17   did a reconciliation only from December 1st, 2016 until

18   sometime in May 2019 or that time frame.  And we showed

19   to them that we were in a no-pay situation.  They did

20   not -- and I told them that we need to scale back on

21   making these payments to them because the number's really

22   big.

23        And at that point in time, they refused to

24   accept any purchase orders until we prepaid for the

25   purchase orders, by starting August 1st, 2019.

DIRECT EXAMINATION OF RISHI KUKREJA

405

1    Q.    So you're saying that after you told them there

2    was a big hole and that this is becoming a problem, they

3    then said, We're not going to ship you products and put

4    your products into the factory unless you prepay us?

5    A.    Yes.

6    Q.    Was the contract changed at that time?

7    A.    No.  We were forced to accept it because, once

8    again, if we did not, the liability which Circuitronix as

9    a company would experience -- and I can also tell you

10   that the way automotive companies write their clauses,

11   they make directors of companies personal liable also, it

12   would have been much, much bigger than the $11 million

13   number which we're talking about, much bigger.

14   Q.    So let me show you what we've marked as

15   Exhibit D-U7, which is, I believe, an email.  And I'm

16   going to direct you to -- once we see it up.

17        This is an email between you and Tracy, a

18   conversation in August of 2019, correct?

19   A.    Yes.

20   Q.    You told us that they told you you have to

21   start prepaying on August 1st, 2019?

22   A.    I was in -- at their factory sometime in July.

23   And then we were trying to convince them that we should

24   not need to prepay, but they're not accepting orders and

25   finally we had to -- we had to accept the prepayment.

DIRECT EXAMINATION OF RISHI KUKREJA

1      Q.    Let me direct your attention -- if we can

2  scroll down to the email at the bottom of Page 1.  See

3  that top line.  I guess it scrolls under Page 2.

4           MR. ROSENTHAL:  Mr. Vega, can you blow up the

5  "please effect the."

6  BY MR. ROSENTHAL:

7      Q.    Do you see that's Tracy writing you on Monday,

8  August 5th, 2019?

9           MR. ROSENTHAL:  And let's -- you've got to

10  bring that -- catch the top of the next page, please.

11  BY MR. ROSENTHAL:

12     Q.    Do you see where she says:  Please effect the

13  prepayment of the total amount.  We will release the

14  orders once we receive the payment.

15           Is that what you were just testifying about?

16     A.    Yes.  They would not release orders unless they

17  received the payment.

18     Q.    When you say they won't release orders, you're

19  saying they would not put the product into their factory

20  and start building it until they received the money for

21  it?

22     A.    That's right.

23     Q.    And you told us you said, Okay, I'll deal with

24  it, I'll do it, essentially?

25     A.    Under a protest, yeah, because...

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1      Q.    Did you ever test to see whether they were

2    bluffing?

3      A.    So this spreadsheet has -- or this email has a

4    spreadsheet attached which says urgent part numbers.  And

5    if that spreadsheet is opened, you will see that they

6    have not released purchase orders which they had received

7    in March, April, May of that year, June, July.

8          So purchase orders were accumulating.  Our

9    customers were -- so we finally had to prepay.

10     Q.    So by this time you weren't interested in

11   testing whether they were bluffing; you knew that they

12   weren't releasing orders into production?

13     A.    We already knew because there were so many

14   orders which were held up.  So there was nothing to test.

15         MR. ROSENTHAL:  Okay.  Let's -- we can leave

16   this document.

17   BY MR. ROSENTHAL:

18     Q.    Let me pivot to a different subject.

19         What does the concept of cash flow mean in a

20   business?

21     A.    So cash flow means that you've got money which

22   is coming from the sales you made and you've got payments

23   which you need to make at a certain point in time.

24         So if you take this week -- if we take this

25   week into consideration, on Monday, you've got some money

1    which is coming from the customers and -- Monday through

2    Friday.  And the same week you've got payments which you

3    have to make, suppliers, rent, and everything else.

4            The money coming in should always be more than

5    the money going out because otherwise your business is

6    not profitable, and you're basically lending money to the

7    business.  You're acting like a bank rather than the

8    business paying for itself.

9         Q.    So around the time -- we talked about the

10   July 21st, 2016, supplemental agreement or letter

11   agreement.

12           Around that time, what was Benlida telling you

13   about its cash flow?

14        A.    Benlida had a cash flow issue since the time I

15   met them in 2005.  And when we reengaged with them, we

16   paid a lot of money upfront even to get ROK running.

17   They were asking for money upfront, and we paid them

18   money upfront.

19        Q.    Did you ever receive any emails from Tracy that

20   document what you've testified to here today, that they

21   were asking for money?

22        A.    Absolutely.

23        Q.    Let me show you what's been marked as

24   Exhibit 64, please.

25           And when this comes up, I want to ask you if

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

409

```
 1    you recognize that this is an email from Tracy to you on
 2    June 28th, 2016, about a month before the supplemental
 3    agreement is signed.
 4              MR. ROSENTHAL:  I think we have to scroll
 5    down a few pages --
 6    BY MR. ROSENTHAL:
 7        Q.   You see that that's the date and that's between
 8    you and Tracy?
 9        A.   Yes.
10        Q.   And actually, also from --
11              MR. ROSENTHAL:  Sorry.  Can we stay at the top
12    page?  My apologies.
13    BY MR. ROSENTHAL:
14        Q.   The first person is from whom?
15        A.   From Douglas.
16        Q.   From Douglas, okay.  That one's from Douglas.
17              So Douglas and you and Tracy are in an email
18    conversation?
19        A.   Yes.
20        Q.   And that's Douglas Huang, the CEO or general
21    manager of Benlida?
22        A.   Yeah.  But I would say he was a co-CEO, yeah.
23        Q.   Co-CEO with his father?
24        A.   Yes.
25        Q.   Okay.
```

DIRECT EXAMINATION OF RISHI KUKREJA

410

 1              MR. ROSENTHAL:  So let's scroll down to June

 2    24th, which is a few days later -- or earlier, I

 3    apologize, at -- 18:27 is the time stamp.  It might be

 4    above that.  Oh, there it is.

 5    BY MR. ROSENTHAL:

 6         Q.   So look at this No. 2.

 7              This is from Tracy to you, copying Douglas,

 8    right?

 9              MR. MAZZOLA:  One second, Mr. Rosenthal.

10              MR. ROSENTHAL:  Do you see it on the screen?

11              MR. MAZZOLA:  Yeah.  I'm just trying to --

12    yeah, thank you.

13              MR. ROSENTHAL:  Okay.

14    BY MR. ROSENTHAL:

15         Q.   Number 2, Mr. Kukreja, on June 21, 2016, a

16    month before the supplemental agreement was signed, what

17    did Tracy write to you in Line 2?  Just the first

18    sentence you can read, as we requested.

19         A.   As we requested the beginning of June we

20    need --

21         Q.   Some amount.

22         A.   -- payment from Circuitronix to keep us

23    running.

24         Q.   So they needed money from Circuitronix to keep

25    them running?

DIRECT EXAMINATION OF RISHI KUKREJA

411

1      A.    Right.

2      Q.    What did you understand that to mean?

3      A.    To keep their operations running.

4      Q.    Okay.

5            MR. ROSENTHAL:  Let's scroll up a couple more

6      emails in this conversation to June 24th at 11:28, if you

7      can find that, Mr. Vega.  I think it's going to be up in

8      the email conversation, June 24th at 11:00.  It's the one

9      at the bottom there, yeah.

10     BY MR. ROSENTHAL:

11     Q.    So this is an email from -- it's in Chinese.

12           Do you know who that is, those characters?

13     A.    It's Douglas.

14     Q.    He signed it, regards, Doug, right?

15     A.    Yeah.

16     Q.    Okay.  And that's to you, copy to Tracy?

17     A.    Yeah.

18     Q.    And so look at the second sentence in the

19     second line:  We have not -- It says:  We have not fully

20     pay last month's due laminate payment by today and soon

21     we need to pay salary.  Therefore, both factories need,

22     blank, to keep the line running.  This is the minimum

23     amount we need to collect before we settle the

24     discrepancy.

25           What is he talking about there?

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

DIRECT EXAMINATION OF RISHI KUKREJA

1      A.    So this email shows the factory's having a cash

2  flow problem.  But they are -- in my opinion, these are

3  not the best emails where they're actually asking us for

4  money above and beyond what we owe them.

5           This email still refers to a discrepancy which

6  exists there and sort of blaming the cash flow problem on

7  us.  The emails I'm talking to you about, they're emails

8  of record where they actually ask for sums of money,

9  acknowledging they're above and beyond what's owed to

10  them by any measure.

11      Q.    Okay.  Well, let me just show you a few

12  additional emails during this time period.  I'll show you

13  one more from 2016.

14           MR. ROSENTHAL:  Let's take a look at Exhibit

15  42, if we could please.

16  BY MR. ROSENTHAL:

17      Q.    And I'm going to ask you if we can first try to

18  identify the date just so we get a sense of the time

19  frame.

20           Okay.  Mr. Kukreja, what is the day of this

21  email that Tracy sent you?

22      A.    It was July 28th.  Tracy and Douglas --

23  actually, I'm not sure whether Douglas came on this one.

24  But Tracy -- I believe Tracy and Douglas had come to

25  Miami, and we had a meeting at our Fort Lauderdale

1    offices.

2                    MR. MAZZOLA:  I'm sorry.  I didn't hear that.

3                    THE WITNESS:  We had a meeting in our

4    Fort Lauderdale office.

5    BY MR. ROSENTHAL:

6         Q.    And do you see there at the bottom, the last

7    thing in the email, she says:  It is also needed for cash

8    float.  She says:  Please firstly address to Benlida.

9                    What was she asking you for in this email?

10        A.    So during this meeting, they had told us about

11   some of the issues, the financial distress they were in.

12   And during this meeting, I gave them -- I canceled around

13   $600,000, $590,000 worth of debit notes to them between

14   Jan. 1st, 2015 and July 31st, 2015, for leadtime penalty.

15        Q.    Why did you do that?

16        A.    Just to help them out.

17                And, in addition -- so there were -- there were

18   a whole bunch of -- I waived leadtime penalty for them.

19   They had asked for a certain amount of money, and I

20   was -- we were just trying to work together so I could

21   get them to where they needed to be to run the operation.

22        Q.    So we just looked at a couple of emails as

23   examples.

24                I mean, how many emails are there between the

25   companies over the decade?

DIRECT EXAMINATION OF RISHI KUKREJA

1    A.    Actually, I have the number from -- it's

2  around -- it should be around a million emails.

3    Q.    Okay.  And we don't have time to look at a

4  million emails, so we've selected some for purposes of

5  illustration.  These two that we just looked at were from

6  the summer of 2016.

7         Did Benlida's cash flow situation improve from

8  that time period to mid-2019, three years later?

9    A.    So I think we should focus on what happened

10  between July 28th, 2016, to 1st December 2016, when we

11  changed the payment term for what ships this week we pay

12  next week.

13    Q.    That accommodation?

14    A.    That accommodation.

15         So we were doing close to $30 million worth of

16  business per year with Benlida at this point in time.

17  That translates into $2.5 million per month of business.

18  By shrinking the payment detail from AMS 60 to what ships

19  this week we'll pay next week, it had an effect of

20  pumping in between 5 million to 7.5 million into the cash

21  flow  because what we paid on December 1st, 2016, we

22  would actually have to pay them on March 1st, 2017.

23    Q.    Under the contract terms?

24    A.    Under the AMS 60-day payment terms.  But we

25  were paying what shipped on December 1st on 8th of

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

 1   December.  So just by that action of ours, we had

 2   injected close to 5 to $7.5 million of money into their

 3   cash flow.

 4          So there was no reason -- like, if you look at

 5   the July 2016 minutes of the meeting, which I'm sure we

 6   will, they were talking about a discrepancy of 1,

 7   $1-1/2 million between the two organizations.  And just

 8   through this accommodation, we put $7 million, 5 to 7 and

 9   a half million dollars into the cash flow.  And the fact

10   that they still could not sustain the operation shows

11   that there was something which was -- there was something

12   which was wrong.

13       Q.   Let me show you an email from the end of the

14   time period you're talking about, from 2019.

15          MR. ROSENTHAL:  Let's bring up Exhibit 77,

16   please.

17   BY MR. ROSENTHAL:

18       Q.   So what was the date of this email from Tracy

19   to you?

20       A.   It was June 19, 2019.

21       Q.   So you just testified that starting in

22   December 1st, 2016, you started paying this week what

23   shipped last week?

24       A.   Yes.

25       Q.   And so now we're -- you've been doing that for

1   2017, 2018, and half of 2019, as you testified, injecting

2   more cash into their operation.

3           What does the second-to-last sentence say

4   about -- it says:  We need CTX to release.

5           Can you read that, in June of 2019?

6       A.   We need CTX release one wire today to cover

7   last big shipment value.  We are facing cash flow

8   problems, and we have 3 million RMB loan due tomorrow.

9       Q.   So they say we are still facing cash flow

10  problem two-and-a-half years later?

11      A.   Yes.

12      Q.   And what does it mean, we have 3 million RMB

13  loan due tomorrow -- what's an RMB again?

14      A.   So RMB is the Chinese currency, Chinese one.

15      Q.   Is there a conversion rate that's sort of

16  relatively stable you could tell us to think about that

17  in terms of --

18      A.   Today it's 1 is to 7.15.

19      Q.   Okay.  And what -- back in 2019, what was it,

20  roughly?

21      A.   I cannot recollect, but it should be 1 is to

22  6.2 at that time.

23      Q.   So if you divided 3 million by 6 --

24      A.   $500,000.

25      Q.   Okay.  So what are they saying, we have a --

```
 1     let's call it dollars -- $500,000 loan due tomorrow.
 2             Loan from who, do you know?
 3     A.    Loan to a bank.
 4     Q.    So they were borrowing from a bank.
 5             For what?
 6     A.    Well, I guess to -- a lot of companies do that,
 7     they have lines of credit with the bank to run their
 8     operations.  So that's not -- there's nothing wrong with
 9     the fact that they have a loan and they have to pay back
10     a loan.  But it clearly shows that the fact that they
11     were in distress after so much cash was still injected
12     into their operations that there was -- there was just
13     something wrong.
14     Q.    So they were looking to you, Circuitronix, to
15     give them money so they could pay off a bank loan that
16     they had taken out?
17     A.    Yes.  But, again, this -- this was not the --
18     we got this email every two months or three months, and
19     they were like this.
20     Q.    Wait.  Can you just clarify something.
21             Is Circuitronix a bank?
22     A.    When they send me emails like this, I didn't --
23     they're just asking a partner for help, and I was ready
24     to help.
25             But the issue which happened out here is that
```

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    at some point in time they stopped acknowledging that

2    there was overpayment, like in 2019.  They would ask us

3    to do a reconciliation of what was shipped this week,

4    paid next week, and we would show them the

5    reconciliation.  They would not like the number if it

6    showed overpayment.

7            Then they would go back and ask us to do a

8    global reconciliation from 2015 to 2019.  They would not

9    like that.  And so that's where I started getting

10   concerned because if they were not going to acknowledge

11   that they owed me money, there's no way for me to get

12   that money back.

13       Q.   Okay.  Let me just stay on this time period and

14   show you another email from this 2019 period.

15            MR. ROSENTHAL:  Exhibit 70, please.

16   BY MR. ROSENTHAL:

17       Q.   So this is an email dated what?  Let's see.

18            Mr. Kukreja, July 29, 2019?

19       A.   Yes.

20       Q.   Tracy to you and copying Douglas?

21       A.   Yes.

22       Q.   Let me direct your attention to a different

23   part of it, the paragraph that begins with -- oh, no,

24   it's right there, I'm sorry -- to begin with.

25            What's the first thing that she says?

1    A.    That Benlida is experiencing its most severe

2  cash flow problem.

3    Q.    Not being able to procure raw material or

4  making regular payroll?

5    A.    Yes.

6    Q.    And who do they blame for that in the next

7  sentence?

8    A.    So in April, May of 2019 is when I started

9  communicating with Douglas and Tracy that we were

10  significantly paid in an all-paid situation, and the

11  revised payment -- in the revised payment of terms of

12  what ships this week we'll pay next week.

13         And so I told them that I need to find a way of

14  getting out of it because it's becoming a bigger and

15  bigger problem for me.

16    Q.    Was this time period when sort of the roots of

17  this lawsuit that we're in today began roughly?

18    A.    Yes.

19    Q.    Okay.  Let me ask you to look at the part of

20  the email where she says --

21         MR. ROSENTHAL:  If we can zoom out, Mr. Vega,

22  to see it.  Yeah, okay, you've already pulled it up, but

23  I was going to direct you to this:  In summary.

24  BY MR. ROSENTHAL:

25    Q.    Mr. Kukreja, what does Tracy say in summary?

1    A.   We still want to solve problem by arbitration,

2  but we need to solve cash flow problems since our several

3  banking accounts were frozen by suppliers.

4    Q.   And so --

5    A.   You had asked the question whether this was

6  where the lawsuit -- this -- one of the reasons why they

7  got into this trouble is that in 2017, the banks and the

8  Government got on to --

9         MR. MAZZOLA:  Objection, Judge, to the --

10        THE WITNESS:  There's --

11        THE COURT:  Hold on.

12        MR. ROSENTHAL:  Hold on, Mr. Kukreja.

13        MR. MAZZOLA:  Objection to the relevance about

14  the banks and the Government.

15        THE COURT:  Sustained.

16        MR. ROSENTHAL:  Okay.

17  BY MR. ROSENTHAL:

18    Q.   So let's not talk about that, okay.  Let's just

19  focus on this.

20         As of July 20 -- whatever the date of this

21  email was, July 29th, 2019, Tracy Huang was saying to

22  you:  We need, blank, we need money to solve the cash

23  flow problem since our several banking accounts were

24  frozen by our suppliers.

25         Forgetting about why they were frozen, when

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    they say "suppliers," what companies are they referring

2    to, providers or what?

3         A.    The raw material which they use to build the

4    product they ship to us, those -- the printed circuit

5    boards.

6         Q.    So people who supply them with like the

7    substrate, the laminate --

8         A.    Yeah.

9         Q.    -- the copper-clad laminate?

10        A.    The copper-clad laminate.  There's copper

11   required.  There's silver required.  There's...

12        Q.    And those companies had frozen Benlida's bank

13   accounts in China?

14        A.    According to this email.

15        Q.    According to them?

16        A.    Yes.

17        Q.    All right.  Let's leave this subject.

18             MR. ROSENTHAL:  Okay.  We're going to pivot to

19   a new subject.

20             THE COURT:  Go ahead.

21             MR. ROSENTHAL:  Okay.  Just checking with the

22   Court.

23   BY MR. ROSENTHAL:

24        Q.    So, Mr. Kukreja, remember just -- and I'm

25   saying this for the jury's ability to follow where we're

DIRECT EXAMINATION OF RISHI KUKREJA

 1   going.

 2          In opening, we talked about the subject of -- I

 3   talked about the subject of money sent to ROK.

 4      A.   Yes.

 5      Q.   Okay.  I'm going to ask you a bunch of

 6   questions about that subject, ROK.

 7          Remind us, ROK is what?

 8      A.   ROK is another company which Mr. Huang started

 9   in 2011.  And Tracy and Douglas started working with that

10   company.  And at some point in 2012 when Mr. Huang

11   rebought the shares in Benlida, then they were working

12   for both the companies.

13      Q.   Okay.

14          MR. ROSENTHAL:  And just to orient ourselves,

15   if we can bring up the manufacturing agreement,

16   Exhibit 21 again.

17   BY MR. ROSENTHAL:

18      Q.   Do you remember we looked at this first

19   paragraph where you told us that one of the companies in

20   the manufacturing agreement is ROK Printed Circuit Co.,

21   right?

22      A.   Yes.

23      Q.   And that's the one you said had its factory

24   across the street or something from Benlida's factory?

25      A.   Yes.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

 1       Q.    Did Circuitronix send -- did it -- it did

 2   business with ROK?

 3       A.    Yes.

 4       Q.    It used that production facility?

 5       A.    Yes.

 6       Q.    Okay.  Did Circuitronix also send purchase

 7   orders to ROK --

 8       A.    Yes.

 9       Q.    -- different than it sent to Benlida?

10       A.    Yes.

11       Q.    Okay.  They were kept separate?

12       A.    They were kept separate.

13       Q.    Okay.

14             MR. ROSENTHAL:  We can leave the document.

15   Thanks.

16   BY MR. ROSENTHAL:

17       Q.    Did Circuitronix separately keep track of the

18   purchase orders that it sent to Benlida and the purchase

19   orders that it sent to ROK?

20       A.    So ROK was a completely separate supplier in

21   our ERP system.  And if one did not know -- nobody just

22   looking at the system could say that they were connected

23   because all the transactions were separate.

24       Q.    That means that the invoices were -- did they

25   come in separately, invoices from Benlida and ROK?

DIRECT EXAMINATION OF RISHI KUKREJA

424

1      A.     Yes.

2      Q.     So they sent them to you separately, too?

3      A.     Yes.

4      Q.     Okay.  And based upon what you said, I assume

5  that Circuitronix separately kept track of the payments

6  it made to Benlida from the payments it made to ROK?

7      A.     That is correct.

8      Q.     And did you send separate payment details to

9  Benlida and to ROK?

10      A.     Everything was done separately.

11      Q.     Okay.  And in general, in 2017, 2018, what, in

12  general, was going on with ROK as a business?  We talked

13  about this a little bit, but just to refresh people's

14  memory.

15      A.     So ROK was in a complete mess from the day it

16  was started.  And most of those problems originated

17  because they did not control the wastewater treatment

18  license.  The landlord did.

19          MR. MAZZOLA:  Objection.  I think we might have

20  made a similar one yesterday about the water issues.

21          MR. ROSENTHAL:  It was overruled.

22          THE COURT:  All right.  Overruled.

23  BY MR. ROSENTHAL:

24      Q.     Go ahead.

25      A.     And so they were always in financial distress.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

DIRECT EXAMINATION OF RISHI KUKREJA

425

1   And at some point in time Tracy brought to my attention

2   that the Chinese tax authorities and the banks --

3           MR. MAZZOLA:  Objection, Judge, to the

4   relevance and the --

5           THE COURT:  All right.  Overruled.

6   BY MR. ROSENTHAL:

7       Q.   Go ahead.

8       A.   -- were coming -- were coming down upon them.

9   And they told us that in certain time frames all payments

10  which were owed to Benlida should be sent to ROK so that

11  they could address whatever issues they were

12  experiencing -- whatever they were trying to do to

13  resolve their issues with the authorities.

14      Q.   Okay.

15          MR. ROSENTHAL:  Mr. Vega, could you bring up

16  Exhibit DU3, which is in evidence.

17  BY MR. ROSENTHAL:

18      Q.   You'll recall, Mr. Kukreja, that we actually

19  talked about this very -- at the very beginning of your

20  testimony yesterday afternoon.

21          Do you remember seeing this email from

22  March 21, 2017, from Tracy to you?

23      A.   Yes.

24      Q.   The subject is:  Urgent issue on ROK foreign

25  exchange?

```
 1         A.    Yes.

 2         Q.    When you were referring to them bringing it to

 3    your attention, that they had this problem with the

 4    Chinese authorities, are you referring to -- and I have

 5    to find it in the email.  It says:  Tomorrow -- Let's

 6    look at that sentence -- Actually, let's start at the

 7    beginning to make it clear.

 8               We received formal notice from tax department

 9    this afternoon --

10               The first sentence?

11         A.    Yes.

12         Q.    (Continuing) -- that ROK is now in blacklist

13    due to foreign exchange.  Get back from customer is much

14    less --

15               MR. MAZZOLA:  I have an objection on this

16    document.

17               MR. ROSENTHAL:  It's in evidence.

18               THE COURT:  What's the objection?

19               MR. MAZZOLA:  (Inaudible) --

20               THE STENOGRAPHER:  I can't hear you, Counsel.

21               THE COURT:  Mr. Rosenthal, go talk to him.

22               MR. ROSENTHAL:  I think he wants to approach.

23               MR. MAZZOLA:  Can we talk to you a second,

24    Judge?

25               THE COURT:  Sidebar.
```

1                (The following proceedings were had in sidebar.)

2                MR. MAZZOLA:  I'm sorry, Judge.  It looked like

3    it was -- we had the unredacted one yesterday, and that's

4    what just, sort of, got me --

5                MR. WEINSHALL:  We did.

6                MR. MAZZOLA:  -- my anxiety about the redacted

7    documents.

8                MR. WEINSHALL:  You're right.  We did not

9    realize that we had put up the unredacted version, and

10   the unredacted version has a few amounts that are -- that

11   we tried to redact out.  But we can --

12               MR. MAZZOLA:  My issue is I kind of think I

13   liked the unredacted one for my case.  So I don't know

14   what to do with this right now.  I've got to do a

15   side-by-side comparison.

16               MR. ROSENTHAL:  I think what you're probably

17   getting at -- now, I'm not familiar with exactly what the

18   text is that's redacted, but I suspect that it's numbers.

19   And numbers by themselves don't say Circuitronix Hong

20   Kong, but that one can reverse-engineer by looking into

21   spreadsheets and say, oh, there's a hundred thousand

22   dollar number.  At this particular time, that hundred

23   thousand dollar number must have involved Circuitronix

24   Hong Kong, and through reverse-engineering, we will be

25   accused of having opened the door to Circuitronix Hong

1   Kong in the case which we do not want to happen.

2            MR. MAZZOLA:  But you know, Stephen, I'm

3   allowed to reverse-engineer any document you put up

4   there.  I mean, that's --

5            MR. ROSENTHAL:  Yeah, but there's also judicial

6   rulings that are governing this proceeding.

7            THE COURT:  Okay.  So if they inadvertently put

8   something up there that should have been redacted and

9   they want to redact it now, I'm going to allow them to do

10  that.  And that does open the door.

11           MR. MAZZOLA:  Okay.  I mean, I wasn't

12  suggesting it did.  I just -- I didn't know how to react

13  to it, Judge, when you see a document like that, so --

14           MR. ROSENTHAL:  Understood.

15           THE COURT:  Okay.  Take a look around here.

16  Look around, just -- not going to be here very often.

17           (The following proceedings were had in open

18            court at 12:27 p.m.)

19           THE COURT:  Let's go.  We're going to go for

20  five more minutes, and then we'll break for lunch.

21           Go ahead.

22           MR. ROSENTHAL:  Okay.  We'll finish this

23  document.

24           Mr. Vega, can you put that Exhibit DU3 back on

25  the screen, please?

1    BY MR. ROSENTHAL:

2        Q.    So at the time of the objection, I think I was

3    asking Mr. Kukreja about the first sentence, that they

4    received formal notice from the tax department that ROK

5    is now in blacklist due to foreign exchange kickback from

6    customer is less than the amount exported.

7            What is the foreign exchange rule that you

8    understood that they were referencing?

9        A.    So if ROK declares to China customs or to the

10   Chinese tax authorities that they shipped $100 worth of

11   product to Circuitronix, they were obligated to show that

12   they received $100 of payment.  If they did not receive

13   $100 of payment, they were obligated to report the

14   discrepancy between the two.  If they got -- instead of

15   $100, they got $90, they were obligated to report the $10

16   differential -- the reasoning behind the $10

17   differential.

18       Q.    Okay.

19       A.    And although Tracy told us on March 21st that

20   they got this formal notice, Tracy had been talking with

21   me -- Tracy and Douglas had been talking with me about

22   this issue for pretty much all of -- beginning of 2017

23   Jan., Feb, And they were also -- yet -- so they didn't

24   inform me about it prior to this, too.

25       Q.    Okay.  And when they said -- and the sentence

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    says:  Big boss, Mr. Huang -- we talked about this

2    before, but now it's in context.

3              Big boss, Mr. Huang, had an urgent meeting --

4    I'm paraphrasing -- and he suggested that CTX must only

5    wire to ROK the amount in March when we collect both

6    Benlida and ROK's payment.

7              Is that one of the references you made a few

8    minutes ago to say that -- when you're saying that they

9    said to you, pay only money to ROK right now?

10        A.    Yes.

11        Q.    Okay.  And then they said -- and the sentence

12   says tomorrow.  It says:  Tomorrow we'll also write a

13   report to the tax department to explain.  Since we cannot

14   explain as the fact, we have to make up some other

15   reasons.

16             Right?

17        A.    Yes.

18        Q.    And then they say:  We know that this problem

19   mainly caused by ourselves, but now we really need CTX

20   support.

21             So who were they blaming for this problem that

22   ROK was in at that time?

23        A.    Actually, in this email, they're blaming

24   themselves.

25        Q.    Exactly.

1          So what did you do in response to this, what
2     they called urgent issue on ROK foreign exchange in March
3     of 2017?
4          A.    As I had mentioned to you, that even prior to
5     this email, they communicated to me verbally that they
6     needed payments from Benlida to go to ROK, and so we
7     diverted a few payments from -- which were owed to
8     Benlida to ROK.
9          Q.    Okay.  Even before the date of this email?
10         A.    Even before the date of this email.
11         Q.    Okay.
12         A.    And, actually, even -- and there were a few
13    payments in April of 2017 which were diverted, too.
14         Q.    Okay.  Well -- and you made a list of those
15    payments that you diverted to ROK at their instruction?
16         A.    Yes.
17              MR. ROSENTHAL:  Can we bring up Exhibit D-Q13.
18    And, Judge, maybe we'll just put this document up and
19    finish with that before lunch?
20              THE COURT:  Okay.
21    BY MR. ROSENTHAL:
22         Q.    Is this that document that we put together?
23         A.    Yes.
24         Q.    So the first -- well, what does it show us, in
25    general?

1    A.    It shows us -- there was this -- there was this

2 conversation which we had with them in Q1 of 2017.

3    Q.    And "Q1" meaning first quarter?

4    A.    First quarter, like Jan., Feb., March time

5 frame.

6         And then there was another set of meetings

7 which took place in February of 2018 where they gave us

8 similar instructions to divert payment which was being

9 sent to Benlida to ROK.  And based upon that, we paid ROK

10 $2,825,000 of Benlida money to ROK.

11    Q.    Okay.  Let's just focus on the 2017 part for

12 right now, and we'll come to these.  And because of the

13 lunch break coming up, let me see if I can just focus us

14 on one part of this.

15         Where would the three payments that are listed

16 on this exhibit, this green exhibit, 1, 2, and 3, which

17 are from 2017, where would those be reflected in

18 Circuitronix's records?

19    A.    These payments were made on -- they were on

20 ROK's books.

21    Q.    So where would Circuitronix have communicated

22 that to ROK, what document?

23    A.    In ROK's payment details.

24    Q.    Circuitronix's payment detail to ROK?

25    A.    That's right.

DIRECT EXAMINATION OF RISHI KUKREJA

433

1       Q.      Okay.

2               MR. ROSENTHAL:  So maybe we should stop there

3       because we're going to go to another document, unless the

4       Court wants me to --

5               THE COURT:  Okay.  So let's take our lunch

6       recess and come back at 1:45.  All right.  See everybody

7       at 1:45.

8               (Court recessed at 12:34 p.m. to 1:47 p.m.)

9               (Jury enters at 12:47 p.m.)

10              THE COURT:  Welcome back, everyone.  Please be

11      seated.  Thank you for being here on time.

12              And we're going to continue and hopefully

13      finish up the direct examination.

14              All right.  Go ahead.

15              MR. ROSENTHAL:  Thank you, your Honor.

16              Mr. Vega, just before we took a break, we had a

17      document that was on the screen.  I just want to refresh

18      people's memory.  That was Exhibit D-Q13, that green

19      chart.  Thank you.

20                      DIRECT EXAMINATION (Resumed)

21      BY MR. ROSENTHAL:

22      Q.      Mr. Kukreja, remember before the lunch break we

23      had referenced -- you were talking about those -- the

24      transactions that are on this list, in general, correct?

25      A.      Yes.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

434

1      Q.   Okay.  I want to direct your attention to the

2   2017 ones, which are the first three listed.

3      A.   Yes.

4      Q.   If I recall correctly, I think we -- before the

5   break, you had testified that those would appear on a

6   payment detail, right?

7      A.   Yes.

8      Q.   Okay.  And remind us what company's payment

9   detail it would appear on?

10      A.   On ROK's.

11      Q.   So Circuitronix's payment detail that was sent

12   to ROK?

13      A.   Right.

14      Q.   Okay.

15           MR. ROSENTHAL:  Let's bring up Exhibit 120,

16   please.  And if we can do it side by side with this, that

17   would be great.  I'm not sure if we can.  Yeah?  Okay.

18           Okay.  Let's look at -- I'm sorry, I gave you

19   the wrong -- we're looking for the second attachment, my

20   apology, the redacted attachment.  It's at Page 1.  So

21   the attachment to this email.

22           Okay.  So can you enlarge that a little bit so

23   Mr. Kukreja can read that at the top and the jury can

24   read the top of Exhibit 120.  Thank you.

25   BY MR. ROSENTHAL:

435

1    Q.    All right.  Mr. Kukreja, what are we looking at

2    right now, what document?

3    A.    It's the ROK payment detail from February 1st,

4    2017.

5    Q.    Okay.

6          MR. ROSENTHAL:  Okay.  And, Mr. Vega, if you

7    could zoom back out so we can see the whole thing.  Thank

8    you.  I want to actually direct Mr. Kukreja's attention

9    to the bottom part, the red numbers on the right.

10         So if you can let us see the left side of the

11   screen too actually.  Right, thank you.

12   BY MR. ROSENTHAL:

13   Q.    Mr. Kukreja, you've directed us to the payment

14   detail for ROK.  Can you explain to us whether or not the

15   payments from 2017 to ROK that appear in the green chart

16   1, 2, and 3 appear on the payment detail that

17   Circuitronix sent to ROK?

18   A.    They do.

19         MR. ROSENTHAL:  And perhaps Mr. Vega can

20   highlight the three that match.  Okay.

21         MR. MAZZOLA:  Okay.  And, Judge, would the

22   Court just note my objection to these redacted documents?

23         THE COURT:  Yes.

24   BY MR. ROSENTHAL:

25   Q.    So remind us again because we took a break,

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1   why -- why are we looking at these three payments right

2   now?

3       A.   So these three payments were made on Benlida's

4   behalf to ROK.

5       Q.   At their instruction?

6       A.   At their instruction.

7       Q.   Okay.  So you had mentioned that there were --

8   well, let's do this, actually.  I want to prove that you

9   paid these.

10          Where would we look to prove that you made

11  these payments of $300,000 on March 14th, $500,000 on

12  March 23rd, and another $500,000 on March 27th?

13      A.   There should be payment confirmation slips from

14  the bank.

15      Q.   Okay.  So a bank record of some sort?

16      A.   Yes.

17          MR. ROSENTHAL:  Well, do we have the payment

18  confirmation slips attached to this particular exhibit?

19  We may not because of redactions.  Okay.

20          So let's go right to the bank records

21  themselves.  Let's pull up Exhibit D-U13, please.  And if

22  it's possible to move -- we can get rid of this payment

23  detail page on the right just to give us screen space.

24  And maybe we can pull up the bank record next to the

25  green chart.

DIRECT EXAMINATION OF RISHI KUKREJA

```
 1    BY MR. ROSENTHAL:

 2         Q.    Okay.  Mr. Kukreja, what -- what is this a

 3    document of?

 4         A.    This is a -- this is a statement from our

 5    Citibank bank account.

 6         Q.    And what does it say the date of the account is

 7    on this statement?

 8         A.    It is -- the period is March 1st to March 31st,

 9    2017.

10         Q.    You're looking in the upper right-hand corner

11    there?

12         A.    Yes.

13               MR. ROSENTHAL:  Okay.  So if, Mr. Vega, you

14    would scroll down to see if we can see anything that's

15    not been redacted as far as an amount and stop there when

16    you see it.

17               Let me stop you right there.  Can you enlarge

18    the highlighted line there.

19    BY MR. ROSENTHAL:

20         Q.    So on March 14th, 2017, what did Circuitronix

21    pay?

22         A.    300,000.

23         Q.    And does that match the information in the

24    summary chart of payments?

25         A.    Yes.
```

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

438

```
 1        Q.    What does C-B-U-S-O-L international wire out

 2   mean?

 3        A.    It means it's a -- it's an international wire.

 4        Q.    Okay.  That's the bank's coding?

 5        A.    Yeah.

 6        Q.    Okay.

 7              MR. ROSENTHAL:  Let's zoom out of that and

 8   continue scrolling down.  Okay.  There's two more.  Can

 9   we just enlarge both of those together?  Okay.  Or we'll

10   do one at a time.

11   BY MR. ROSENTHAL:

12        Q.    Does that match the summary of payments you

13   said you've made?

14        A.    Yes, 3/23 and 3/27.

15              MR. ROSENTHAL:  Okay.  You've pulled them both

16   up, Mr. Vega, 3/23 and 3/27.

17   BY MR. ROSENTHAL:

18        Q.    Each of them for $500,000?

19        A.    Right.

20        Q.    So within -- between March 14th of 2017 and

21   March 27th of 2017, you wired $1.3 million to ROK?

22        A.    Yes.

23              MR. ROSENTHAL:  Okay.  Let's -- we can get rid

24   of the document to the right, please.

25   BY MR. ROSENTHAL:
```

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

DIRECT EXAMINATION OF RISHI KUKREJA

439

1    Q.    So you had told us already that in this green

2    chart of diverted payments -- or sorry, payments to ROK,

3    there's -- Numbers 4 through 9 relate to a different

4    period of time, right?

5    A.    Yes.

6    Q.    Was there another time that is documented in

7    evidence that ROK -- I'm sorry, that Benlida asked you to

8    send more money that was supposed to be sent to Benlida

9    to a different company, ROK?

10   A.    Yes.

11   Q.    Do you recall when that was?

12   A.    February of 2018.

13   MR. ROSENTHAL:  Okay.  Let's pull up

14   Exhibit 53, please.  If we can do it alongside, that's

15   great.  If not, no big deal.

16   BY MR. ROSENTHAL:

17   Q.    What happened in February of 2018, as we're

18   pulling this up?  What do you recall?

19   A.    Mr. Huang had been -- had asked me to come to

20   meet him in China.  And I was unable to do so, so he

21   asked for my colleagues to -- who is in the Hong Kong

22   office to come and visit him.  And these were the minutes

23   of the meeting between Mr. Huang and Akshay Koul.

24   Q.    And Akshay Koul, he went in your stead?

25   A.    He did, he did.  But Mr. Huang got a little

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    impatient.  We just did what he asked us to do.

2         Q.    Okay.  So this is an email to you from Tracy on

3    February 23rd, 2018?

4         A.    Yes.  It's the minutes of the meeting between

5    Tracy, Mr. Huang, and Akshay.

6         Q.    I know we just had lunch so, sorry, if you need

7    a break.

8               So let's look at the attachment to this email.

9               Do you recall seeing this document before?

10        A.    Yes.

11              MR. ROSENTHAL:  Okay.  Let's see if we can

12   enlarge Point No. 1.  Thank you.

13   BY MR. ROSENTHAL:

14        Q.    And do they sometimes do this in both Chinese

15   and English?

16        A.    Yes.  And they started doing it more so in

17   starting 2017.

18        Q.    Okay.  So what do the meeting minutes say that

19   Tracy explained to Circuitronix on that -- in that

20   meeting?

21        A.    (No response.)

22        Q.    If you see at the top where it says Tracy in

23   English, it says explain --

24        A.    Yes.  ROK's receivable payment and tax issue --

25              This -- it basically is similar to the March

```
 1   2017 email.
 2        Q.    In the sense that they're saying, we've got
 3   this tax issue?
 4        A.    Yes.
 5        Q.    Okay.  And let me just dwell on it for a
 6   moment.
 7              I'm going to look at the English part,
 8   obviously.  They say:  According to tax refunded rules
 9   for the exporting products which do not get foreign
10   exchange offset within limited time, the transactions
11   will be treated as domestic sales.
12              Do you know what that means?
13        A.    Yes.
14        Q.    Can you explain that?
15        A.    So as I had advised that when a Chinese factory
16   ships $100 worth of product, they're supposed to show
17   $100 worth of receipt.  Now, one of the main reasons
18   behind that is because they pay a VAT, which they get
19   back.
20        Q.    What is VAT?
21        A.    It's value added tax.
22              So let's assume that they shipped $100.  They
23   claimed back from the Government VAT for $13.
24        Q.    Whatever the percentage is?
25        A.    It's -- at different times it was different.
```

442

 1    Like it was 13 percent or 16 percent, but, yeah, I think

 2    more recently it's 13 percent.

 3         Q.    Okay.

 4         A.    Now, let's assume that they only get $90 back

 5    from --

 6         Q.    Circuitronix.

 7         A.    -- Circuitronix and the reason they did not get

 8    the $10 was because of some sort of debit notes or for

 9    some reason.  They're supposed to report that back to the

10    authorities and pay back the VAT, which they got back on

11    that $10, which they did not do all those years.

12         Q.    They did not do that?

13               MR. MAZZOLA:  I didn't --

14    BY MR. ROSENTHAL:

15         Q.    Did you say what -- they did not do that?

16         A.    Yes.

17               MR. MAZZOLA:  Although?

18               MR. ROSENTHAL:  All those years, he said.

19    BY MR. ROSENTHAL:

20         Q.    They did not do it all those years.

21         A.    Yes.

22         Q.    They are not doing what all those years?

23         A.    They did not report it back to the tax

24    authorities why there was a gap between the shipments

25    which they made and the payments they received.  And they

1    did not reimburse the VAT on the portion for which they

2    did not collect the money.

3        Q.    And, in fact, if you look at the next sentence,

4    it's been highlighted to view, at the end, I won't

5    belabor it, but she says:  The company would have to pay

6    the related VAT?

7        A.    Yes.

8        Q.    So let me just ask you one thing.

9             MR. ROSENTHAL:  If we can zoom back out to the

10   first part of this memo.

11   BY MR. ROSENTHAL:

12       Q.    If this was an ROK issue that they're talking

13   about, do you know why they put it on Benlida letterhead?

14       A.    I do not.  It came like this.  I know that

15   they're separate companies, and I know that they're

16   managed by Mr. Huang, Tracy, and everybody -- both sets

17   of companies are managed by them.

18       Q.    Okay.  So there was an amount that was stated

19   in Point No. 4 on Page 2.  I want to ask you to look at

20   that.

21             So does that refresh your recollection what the

22   percentage of the VAT was at that time?

23       A.    Yeah, 17 percent.

24       Q.    Okay.  So let's go down to Page 3, and let me

25   ask you what -- what did Benlida ask Circuitronix to do

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

```
 1   at this time in this meeting through this meeting?

 2             MR. ROSENTHAL:  If we can enlarge Paragraph 3.

 3   BY MR. ROSENTHAL:

 4        Q.   Do you recall?

 5        A.   So they asked us to pay the amount of any

 6   moneys which were owed to Benlida to ROK for that period.

 7        Q.   Let me direct your attention to the bottom

 8   right, about four lines up from the bottom of this

 9   highlighted, it says Benlida now request.

10             MR. ROSENTHAL:  Can you highlight that,

11   Mr. Vega?

12   BY MR. ROSENTHAL:

13        Q.   Benlida now requests CTX should pay U.S.

14   dollars 1500K.

15             How much money is that?

16        A.   $1.5 million.

17        Q.   As an advanced payment?

18        A.   Yes.

19        Q.   And who made that request according to these

20   meeting minutes?

21        A.   Mr. Huang.

22             MR. ROSENTHAL:  Can you highlight who said

23   that, Mr. Vega.

24   BY MR. ROSENTHAL:

25        Q.   So, Mr. Huang, the big boss, so to speak,
```

1    communicated this request?

2        A.    Yes.

3        Q.    And was this reported back to you right after

4    the meeting?

5        A.    Tracy sent the minutes of the meeting.

6        Q.    To you?

7        A.    Yes.

8        Q.    Okay.  So you received the information through

9    her -- from her directly?

10       A.    Yeah.  And also after she told me about it,

11   yeah.

12       Q.    Okay.  So after you learned of this request in

13   March of 2018, to help them out for VAT-related issues

14   and the tax reporting, what did you do?

15       A.    I paid them any money -- they asked me for

16   money, Benlida moneys, to be paid to ROK, and I paid -- I

17   sent moneys which were owed to Benlida to ROK.

18       Q.    Okay.  So let's go back away from this

19   document, and we'll look at the one on the left side.

20            Do you recall how much you authorized to be

21   sort of diverted from one company to the other at that

22   time?

23       A.    I cannot, but around $2 million, I think.

24       Q.    Okay.  See if looking at this green chart

25   refreshes your recollection of No. 4 through 9.

DIRECT EXAMINATION OF RISHI KUKREJA

446

1    A.    $1.525 million.

2    Q.    You're saying that adds up to 1.525?

3    A.    Yes.

4    Q.    Okay.  And with respect to these payments in --

5    from March to June of 2018, where would those be

6    reflected in -- in Circuitronix's records?

7    A.    In ROK's payment details.

8    Q.    Again, the same payment details to ROK?

9    A.    Yes.

10         MR. ROSENTHAL:  Okay.  So let's keep this green

11   chart up, Mr. Vega, and see if we can go back to

12   Exhibit 120, the second attachment, redacted at Page 2.

13         MR. MAZZOLA:  I beg your pardon?  You looked at

14   me when you said that, redacted.

15         MR. ROSENTHAL:  No, I'm just letting you know.

16   BY MR. ROSENTHAL:

17   Q.    Okay.  So are we looking at a payment detail

18   from Circuitronix to ROK printed circuit board?

19   A.    Yeah, but that's not the correct one.

20   Q.    You're right.  We need the one from, let's

21   see -- it may be my mistake.

22   A.    This is one of them.

23   Q.    Okay.

24         MR. ROSENTHAL:  What exhibit is this?  The next

25   page?  Oh, okay.  It's one PDF.  Okay, I understand.

1    Okay.

2

3    BY MR. ROSENTHAL:

4        Q.    So let's compare the chart to the payment

5    detail.  So let me ask you this.

6            The payment detail says payment from March 15,

7    2018, of $500,000, right?

8        A.    That's No. 4.

9        Q.    Number 4 on the green chart, okay.

10           Let's see.  Then it has one from April 4th,

11   2018, for $75,000?

12       A.    Yes.

13       Q.    What does that match up to?

14       A.    35,000 -- it just says April 5th on this side.

15       Q.    So the date's different by a day?

16       A.    Yeah.

17       Q.    Okay.  We're going to explore that.

18           And then -- well, do you believe that to be the

19   same payment?

20       A.    It is the same payment.

21       Q.    Okay.  And then it says, April 10th, $350,000.

22           What number is that?

23       A.    That's No. 6.

24       Q.    Okay.  Let's scroll down to the next -- I guess

25   it's the next page, which should be the next payment

1    detail.

2              Can you see the top?  This is a payment detail

3    from -- it's kind of small -- June 1st, 2018?

4        A.   Yes.

5        Q.   Perfect, thank you.

6              And it lists one for $200,000 on May 1st, 2018?

7        A.   Yes.

8        Q.   What number is that on the green chart?

9        A.   No. 7.

10       Q.   $200,000 on May 1st, okay.

11             Let's go down to the -- pardon me, the next

12   page of Exhibit 120, payment details.

13             This one is a payment detail at the top from

14   what date, July 1st, 2018?

15       A.   June -- yeah, that's for July 1st, yeah.

16       Q.   Okay.  And then it lists the payment having

17   been made on what date?

18       A.   Yes.

19       Q.   Which date, June 1st?

20       A.   1st, 2018.

21       Q.   Okay.  For $200,000.

22             Where does that match up on the chart?

23       A.   Number 8.

24       Q.   Okay.  You see what we're doing.  Let's do one

25   more.

DIRECT EXAMINATION OF RISHI KUKREJA

449

1              The next payment detail shows a payment.  Okay.

2              What was the date of that payment detail?

3         A.   June 29th, 2018.

4         Q.   Well, no, the date of the payment detail.

5         A.   August 1st, 2018.

6         Q.   Okay.  And it reflects a payment of June

7    29th --

8         A.   Yes.

9         Q.   -- 2018 for how much?

10        A.   For $200,000.

11        Q.   And that's already matched up --

12        A.   Yes.

13        Q.   -- the last one?

14             Okay.  So, are there bank records showing each

15   of these payments just like the ones from 2017?

16        A.   Yes.

17        Q.   Okay.  Let's look at one of them, and we'll

18   admit the rest in evidence.

19             MR. ROSENTHAL:  Let's look at Exhibit D-R13.

20   And keep up the green one, if we can.

21   BY MR. ROSENTHAL:

22        Q.   Is this a bank statement of Circuitronix?

23        A.   Yes.

24             MR. ROSENTHAL:  Okay.  Let's scroll down if we

25   can until we see one that's been either highlighted or

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    not redacted.  Can we make that larger?

2

3    BY MR. ROSENTHAL:

4        Q.    So this shows -- what?

5        A.    That there was a payment of $75,000 made on the

6    5th of -- on the 5th of April, 2018.

7        Q.    Okay.  And so before when we saw on the payment

8    detail it said April 4th --

9        A.    Yeah.

10       Q.    -- do you know why it would have said April 4th

11   when the payment was actually April 5th?

12       A.    I do not.

13       Q.    Okay.  Do you have any doubt that your bank

14   record is showing the right date that the money was

15   wired?

16       A.    I'm sure it was wired on the 5th.

17             MR. ROSENTHAL:  Okay.  So I won't belabor all

18   the bank records, but we've already asked the Court to

19   admit Exhibits D-S13, D-T13 and D-V13.

20             MR. MAZZOLA:  That's the remaining four of

21   them?

22             MR. ROSENTHAL:  Yes.  Yeah, so D-R13, D-S13,

23   D-T13, D-V13.  So I'm going to try to save us time.

24             So we can get rid of the bank record.  Thank

25   you, Mr. Vega.

```
 1   BY MR. ROSENTHAL:

 2       Q.    And just, in conclusion, on this issue of that

 3   ROK payments -- let's leave the green chart up -- having

 4   gone through all that and showing where it was in

 5   Circuitronix's records and the payment details and then

 6   showing that the bank records match the payment details,

 7   except for that one day on April 4th, April 5th, what was

 8   the total amount again that Circuitronix paid to

 9   Benlida -- sorry, paid to ROK instead of Benlida at their

10   direction?

11       A.    $2,825,000.

12       Q.    Okay.  Is that something Circuitronix is

13   claiming in this case?

14       A.    Yes, we are.

15       Q.    Okay.  Let's move on.  We're going to switch

16   gears entirely, we can get rid of this exhibit, and talk

17   about the subject of leadtime and leadtime penalties,

18   okay?

19       A.    Yes.

20       Q.    This is a different color than green.

21             By way of complete overview, can you just give

22   the jury an understanding of what Circuitronix, in

23   general, is claiming with respect to leadtime penalties

24   in this case?

25       A.    Leadtime -- the contractual leadtime is the
```

1   time from the day we place the purchase order to the

2   supplier to the day they provide the product to our Hong

3   Kong office.  And should they fail to do so, there are

4   two types of costs that Circuitronix incurs.

5        The first type of costs are costs of --

6   objective costs, or costs which can be calculated, such

7   as expedited air freight costs, such as line down costs,

8   and so on and so forth.

9        And then there's a second category of costs,

10  which is the subjective costs, which we are unable to

11  capture -- calculate; and that is, to be late on one

12  project, the customer does not give us a new project or

13  we are blacklisted from providing parts to customers in

14  the future.

15       So to be able to recuperate those costs, we

16  basically tell -- have a contractual term which says that

17  for each day that supplier is late, they have to give us

18  a certain percentage of the value of the product.

19       Q.   So can I stop you there for a moment?

20       A.   Yes.

21       Q.   In the initial manufacturing agreement, which

22  we looked at -- and I'd like to put it back on the screen

23  so the jury's reminded of it.

24            MR. ROSENTHAL:  Can we bring up Exhibit 21,

25  Schedule C, leadtime schedule.  Thank you.

 1    BY MR. ROSENTHAL:

 2        Q.    Does this provision in the original 2012

 3    manufacturing agreement contain the provision that you're

 4    talking about now, about a penalty percentage?

 5        A.    This does not.

 6        Q.    Okay.  So how did that get into the agreement?

 7        A.    So we had a follow-up round of meetings

 8    starting April of 2013.

 9        Q.    2013?

10        A.    Yes.

11        Q.    Okay.

12        A.    And there are -- I recall that email provides

13    further clarification, so how that calculation would be

14    done.

15        Q.    Let me ask you this.

16              Was there had an agreement made between

17    Circuitronix and Benlida regarding this penalty

18    provision?

19        A.    Yes.

20        Q.    And where was it documented in writing?

21        A.    It was in the series of emails that starts

22    April 2013.

23        Q.    Okay.

24              MR. ROSENTHAL:  Let me bring up Exhibit D-B, as

25    in bravo, starting at Page 5 of this email string.  It's

1    April 23rd, 2013.  Yes.

2

3    BY MR. ROSENTHAL:

4        Q.   Let me ask you to look at that, Mr. Kukreja.

5             You wrote an email to Tracy copying

6    Douglas and -- and remind us who to Sunny Kapoor was

7    again?

8        A.   Sunny Kapoor was -- in April 23rd, 2013, he was

9    a colleague of mine who I was grooming to be the next CEO

10   of Circuitronix.

11       Q.   Okay.  And you wrote this email?

12       A.   Yes.

13       Q.   I want to direct your attention, let's see, to

14   the -- yes, the first part, as per our conversation at

15   the top.

16       A.   Yes.

17       Q.   I'm going to read this for speed rather than

18   ask you through it:

19            As per our conversation, I would like to

20   implement the following guidelines for leadtime and

21   penalty clauses for leadtime violations.

22       A.   Yes.

23       Q.   What conversation had you had as of the date

24   that you wrote this email that you're referring to here?

25       A.   I told Tracy that they were delaying shipments

1   and it was causing a lot of reputational harm to us and

2   since the manufacturer's agreement allowed us to -- had

3   contemplated us to recuperate the consequential costs, I

4   would like to formalize the way we would go about doing

5   so.

6        Q.    And this was early in the life of the

7   manufacturing agreement?

8        A.    Yeah.

9        Q.    So did you specify in this email what the

10  penalty clause would be?

11       A.    Yeah, Clause C -- Point C mentions --

12             MR. ROSENTHAL:  Can we blow up Point C so we

13  can see that, please.

14  BY MR. ROSENTHAL:

15       Q.    Can you explain this to us?

16       A.    So there would be a .5 percent penalty per day

17  for the first two days.

18       Q.    For the first two days, what, late?

19       A.    Yes.

20       Q.    Okay.

21       A.    And then there would be a 1 -- so basically,

22  Day 1 would be 0.5 percent, Day 2 would be 0.5 percent,

23  Day 3 will be 2 percent, 0.5, 0.5, 1.

24       Q.    In other words, you're adding them each day?

25       A.    Yes.

DIRECT EXAMINATION OF RISHI KUKREJA

456

1      Q.    Okay.

2      A.    Day 4 will be again .5, .5, 1, 1.

3            And the main reason behind that was that --

4    let's assume that there was a purchase order for 1,000

5    pieces and they were late for all 1,000 pieces.  On

6    Day 1, they may have shipped 300 pieces but they were

7    still late on 700 pieces.  So it was a way of calculating

8    the leadtime penalty.  Like we were just tracking until

9    the time they completed the entire purchase order.

10     Q.    Okay.  Did Benlida object to this penalty

11   provision?

12     A.    No, actually, if you -- if we scroll up, go up,

13   through the email -- I just want to point out another

14   thing in the email below, in my email.

15           We did modify the leadtime.

16           MR. ROSENTHAL:  Yeah, let's put that up in

17   Point A so we can see that.

18   BY MR. ROSENTHAL:

19     Q.    The promised leadtime there?

20     A.    Yes.

21     Q.    Go ahead.  What --

22     A.    It was 10 days in the original contract.  We

23   made it three weeks, 21 days, what was double-side,

24   four-layer, which was 21 days.  We made it 28 days.

25   And so we increased the leadtime for them.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

457

1      Q.    Okay.  Why did you do that?

2      A.    So that they did not incur the leadtime penalty

3   or we could minimize the leadtime penalty which they

4   incurred.

5           Additionally, we started this conversation on

6   the 23rd of April 2013, and the first month we gave

7   them -- the leadtime penalty was on August 1st, 2013.  So

8   we gave them enough time to actually --

9      Q.    So you gave them leadtime on leadtime?

10     A.    Something like that.

11     Q.    Right.  Okay.

12     A.    So we -- it's not that we side blinded them.

13  We gave them a little bit of time to catch up and correct

14  whatever was incorrect.

15     Q.    Okay.  Let me ask you a different question.

16          When you -- you had said -- you went on a

17  tangent, but you said that if we go up higher in this

18  email, their response to this is somewhere in there?

19     A.    Yes.

20     Q.    Okay.  Do you want to show us what you were

21  directing us to?

22          MR. ROSENTHAL:  Mr. Vega, you have to scroll up

23  for Mr. Kukreja to see it.

24          THE WITNESS:  So, again, we can go through all

25  the details, right, but I think that the most important

DIRECT EXAMINATION OF RISHI KUKREJA

458

1    thing is that there was a back and forth, and the final

2    email on this chain you'd be able to see she did

3    request -- further up -- that she -- on July 1st, 2013,

4    she asked for the last two changes to be made.  They were

5    the last concerns.  She wanted six layers to go from 28

6    days to 35 days, we which agreed, and that the penalty

7    clause should start on 1st of August.

8    BY MR. ROSENTHAL:

9        Q.   So other than those adjustments, there was an

10   agreement, to your understanding, about this penalty

11   clause?

12       A.   Yes.

13       Q.   Okay.  So when we refer to leadtime penalty in

14   this case, that's because of this amendment to the

15   manufacturing agreement?

16       A.   Yes.  And that's the foundation of it.

17       Q.   Okay.  Let's move on.

18            Did -- Well, let me just ask you some questions

19   about how Circuitronix kept track of leadtimes and any

20   penalties that might have been owing because of this

21   provision.

22            Tell us in general just how the company tracked

23   these details?

24       A.   So we had the -- our ERP system clearly shows

25   what the purchase order date is, the date which we issue

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

DIRECT EXAMINATION OF RISHI KUKREJA

 1   the purchase order to the factory, our ERP system shows

 2   exactly -- the exact date when we received the product

 3   from the supplier in our Hong Kong office.

 4          So simple math can tell us the amount of time

 5   it took for the product to arrive.  And then just using

 6   certain formulas on an Excel table referring back to the

 7   penalties, you can program Excel to automatically

 8   calculate the penalty.

 9      Q.    Okay.  And just in case anybody here is not

10   familiar with Excel, can you just explain what Excel is?

11      A.    It's -- it's a computer program.  I mean, it's

12   like where you can actually do a lot of -- you can

13   manipulate data and do a lot of mathematical

14   calculations.

15      Q.    And when you say manipulate data, what do you

16   mean by that?

17      A.    So you can have one Excel sheet and then you

18   can have another Excel sheet or you can have one Excel

19   sheet with separate worksheets, and then you can have --

20   combine the data from one Excel sheet to the other Excel

21   sheet, combine the data.  You can run formulas on the

22   data.  You can program it in such a way that you can make

23   the sheets calculate the data by itself.

24      Q.    Okay.  So Excel has that capability itself?

25      A.    Yes.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

DIRECT EXAMINATION OF RISHI KUKREJA

1      Q.     As a computer program?

2      A.     Yes.

3      Q.     Okay.  Who makes Excel?

4      A.     Microsoft.

5      Q.     Okay.  And was there anybody at Circuitronix

6   that you tasked or someone else tasked with sort of

7   designing the Excel spreadsheet that the company would

8   use to track leadtime penalties and leadtime -- or

9   leadtimes and leadtime penalties?

10      A.     So, I went to Lina Ochoa who is our operations

11   manager.

12      Q.     Okay.  In what office?

13      A.     In the Fort Lauderdale office.

14      Q.     Okay.

15      A.     And since the accounting team reported

16   indirectly to her -- since she had oversight of the

17   accounting team and the logistics team, she was the one

18   who worked with them to create the Excel sheet and

19   basically what the process would be.

20      Q.     Okay.  Let me shift a little bit from this

21   specific computer database that you're talking about.

22             If, at the end of a period of time -- what was

23   the unit of time that you guys tracked this; every day,

24   every month, or created report of some sort?

25      A.     So initially what we were trying to do was we

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1   were trying to -- we were trying to do this month's

2   leadtime penalty next month.

3       Q.    Okay.

4       A.    And it could actually be done because the

5   maximum leadtime is 35 days.  So even if the supplier is

6   late by 10 days, that would be 45 days.  So by the 15th

7   of the following month --

8       Q.    You'd have all the information?

9       A.    -- you have -- even if they have not shipped

10  the product to you, because the maximum you could -- the

11  maximum leadtime penalty one could get was 10 percent.

12          So you could do it -- you could calculate it by

13  the 45th day, between the 45th and 60th day.  But at some

14  point in time we started doing it three months out.  The

15  month of October we would do it in January because we

16  would give the supplier, and in this case Benlida, the

17  ability to complete the order which they have on hand.

18      Q.    Related to a particular part number or

19  something like that?

20      A.    Related to a particular order.  Because they

21  were taking lots of time.  Like, they were taking

22  sometimes -- actually, sometimes they were taking beyond

23  three months to complete an order.

24      Q.    Okay.  And did Circuitronix ever put leadtime

25  penalty in the form of a debit memo and actually send

1    that debit memo over to Benlida?

2         A.    Yes.

3         Q.    Let's take a look at Exhibit 159, which we've

4    seen before, and ask you to explain what this is.

5         A.    So this is the leadtime penalty for November

6    2015 purchase orders.

7         Q.    And what was the date you sent it to Benlida?

8    Or you, Circuitronix, sent it to Benlida?

9         A.    The debit notice, 21st March, 2016, I do not

10   know when was it sent.

11        Q.    Okay.  And was there any requirement in the

12   contract, even as amended through the emails, of a

13   deadline for Circuitronix to send the leadtime penalty to

14   Benlida?

15        A.    So there was no requirement by the contract to

16   do so, but more importantly, at some point in time

17   Benlida came to us and asked us to stop sending them --

18   to hold off on sending them debit -- these debit notes.

19        Q.    When did that happen, do you recall?

20        A.    In -- it happened in March of 2016.

21        Q.    Why did they ask you to stop sending them?

22        A.    They asked us to stop sending them because it

23   was increasing the trade gap between their books and

24   China Customs' books.

25        Q.    So this one that we're looking at was $116,000

 1 and change, you're saying that that kind of number would

 2 show up as a debit, a negative.

 3          And did Circuitronix pay that?

 4     A.   So if you look under the terms and

 5 conditions --

 6     Q.   In the bottom left?

 7     A.   Yes.

 8          MR. ROSENTHAL:  Yeah.  Can you blow that up,

 9 please.  Thank you.

10          THE WITNESS:  It says:  Please use the debit

11 memo to decrease what we owe you.

12          So it would show up at the bottom of it,

13 payment detail as debit note.

14 BY MR. ROSENTHAL:

15     Q.   Okay.  After they asked you to stop sending

16 these debit notes containing leadtime penalties, did you

17 stop?

18     A.   Yes.

19     Q.   What did you do in the meantime with the data?

20 Did you stop tracking the data?

21     A.   Nope.  We didn't stop tracking the data.  And

22 in certain cases, like when we met, we also shared the

23 data with Tracy and Douglas.

24     Q.   Okay.  I want to direct your attention to a --

25 meeting minutes, Exhibit 42, which -- of a meeting that

1    took place in, I think you referenced it, July of 2016.

2         A.    Yes.

3         Q.    Without the document, do you recall whether

4    there was anything spoken about leadtime penalty during

5    that July 2016 meeting?

6         A.    Yes.

7         Q.    What happened?

8         A.    They found that the debit notes between Jan.

9    1st, 2015 and July of 2015 were extremely high, and they

10   asked me to give some sort of discount to them.

11        Q.    Can we pull up paragraph -- is this a document

12   you recognize as meeting minutes from them?

13        A.    Yes.

14        Q.    Okay.

15             MR. ROSENTHAL:   Let's pull up Paragraph 2 which

16   has leadtime penalty at the top.

17   BY MR. ROSENTHAL:

18        Q.    This may not have been what you were testifying

19   about, so let me ask first.   And forgive me, I think this

20   is a little different than you were testifying about.

21             Was it talking about capacity?   Was there any

22   change made?

23        A.    So the way the original contract was written

24   was that the agreed-upon capacity was 3,000 square meters

25   per week.   And let's assume that we placed orders beyond

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

465

1  3,000 square meters per week.  It would spill into the

2  next week.  At some point in time between the original

3  contract date of 2012 and 2014, that 3,000 square meters

4  was increased to 4,200 square meters.  And in July of

5  2016, it was increased to 5,600 square meters.

6      Q.   So is that the reference here to 5,600 square

7  meters --

8      A.   Yes.

9      Q.   -- in the second line?

10     A.   Yes.

11     Q.   So you talked about a cup and water

12  overspilling it in terms of capacity.

13          So is this just a bigger cup at this point by

14  agreement?

15     A.   So this is a bigger cup, yes.

16     Q.   Okay.  Now, you were also talking about

17  something about waiving?

18     A.   Yeah, so Clause No. 7.

19          MR. ROSENTHAL:  Paragraph No. 7 of this meeting

20  minute, can we make that larger.

21          THE WITNESS:  Actually, just the first --

22  BY MR. ROSENTHAL:

23     Q.   So the first sentence there?

24     A.   Yes.

25     Q.   So Circuitronix agreed to cut down 50 percent

1   of the penalty related to that time frame of orders?

2       A.    Yes.

3       Q.    And how did that come about at the meeting?

4       A.    I just asked them what could make them happy.

5   They said, give me a 50 percent discount.  And I gave it

6   to them.

7             MR. MAZZOLA:  I couldn't hear that.  Could you

8   repeat?

9             THE WITNESS:  They asked me -- I asked them

10  what could make them happy, and they said a 50 percent

11  discount, and I gave them a 50 percent discount.

12            MR. ROSENTHAL:  Okay.  We can leave this slide.

13  BY MR. ROSENTHAL:

14      Q.    You mentioned that periodically you would share

15  the data that you were tracking, that Circuitronix was

16  tracking, with Douglas and Tracy at Benlida during

17  meetings.

18            Were there also occasions when it was emailed

19  to them?  Did you ever actually share the Excel

20  spreadsheets themselves with them?

21      A.    So until Feb. of 2016, we did it on a

22  month-by-month basis.  We gave them the debit note and

23  the calculation.  And the way it actually worked was we

24  would send it to Tracy or someone in the team and they

25  would say, it's approved, and then we would give them the

 1    debit note.

 2             When that number started becoming unmanageable

 3    for them because of however they were managing the books

 4    and we held it -- they asked us to hold back the debit

 5    notes.  So we held back the debit notes, but off and on,

 6    we actually emailed them our calculations of what was

 7    being accumulated.  So we did actually -- we didn't give

 8    them the debit notes, but we did share with them the

 9    calculation of what was being calculated on a

10    month-by-month basis.

11        Q.   Did you give them the exact Excel spreadsheets

12    that the company was generating internally?

13        A.   Yes.

14        Q.   Okay.  Let me ask you to look at --

15             MR. ROSENTHAL:  Mr. Vega, Exhibit D-Y7.

16    BY MR. ROSENTHAL:

17        Q.   And, Mr. Kukreja, when this comes up, if you

18    can tell us what it is.

19             MR. MAZZOLA:  Was that on the list?

20             MR. ROSENTHAL:  It should be.

21             THE COURT:  All right.  D-Y7 is in evidence.

22             MR. ROSENTHAL:  Thank you, your Honor.

23    BY MR. ROSENTHAL:

24        Q.   So, Mr. Kukreja, what are we looking at here?

25        A.   So this is an email which I sent to them on

1  September 26th, 2019.  And I sent them the leadtime

2  penalty for April 2019.

3       Q.    And you --

4       A.    So that means --

5       Q.    Yeah.

6       A.    -- that I've already sent them until March of

7  2019 before this.

8       Q.    Okay.  So we're just picking an example.

9             Did you send multiple emails like this?

10      A.    Yes, but -- yes, I did.

11      Q.    Okay.  See how it says attachments, and the

12  first one has a -- I'm going to read what it says.  It

13  says BLD.  What's BLD?

14      A.    Benlida.

15      Q.    That's like an abbreviation you guys used?

16      A.    Yes.

17      Q.    Okay.  Benlida penalty for leadtime

18  exceedances.

19            What does "exceedances" mean?

20      A.    It means exceeding the leadtime.

21      Q.    Okay.  Is that what you called this

22  spreadsheet, leadtime exceedances report?

23      A.    It seems so, yes.

24      Q.    And I'm going to direct you to the bottom one,

25  I think.

1          MR. ROSENTHAL:  So do we have the ability to
2    show the leadtime exceedances report?
3          We may or may not because of redaction issue.
4    I just want to check.
5          Forgive me, your Honor.  We're just trying to
6    make sure we comply with the redaction protocol.
7          THE COURT:  Okay.
8          MR. ROSENTHAL:  And sometimes it's a difference
9    if it's a PDF or it's a live Excel spreadsheet and it's
10   harder to use.
11         If we can't do it now, we can move on.
12         Okay.  We're good to go.  It's the fourth
13   attachment to Exhibit D-Y7 -- sorry, third attachment.
14   We do the best we can.
15   BY MR. ROSENTHAL:
16       Q.   Okay.  Mr. Kukreja, we're now seeing a document
17   with a lot of --
18         MR. MAZZOLA:  Mr. Rosenthal.
19         (Discussion off the record.)
20   BY MR. ROSENTHAL:
21       Q.   Okay.  So we're all literally on the same page
22   here.
23         Mr. Kukreja, what are we looking at?  It's the
24   top-left corner.  Tell us what the title of this document
25   is.

1      A.    It's the leadtime penalty for April 2019

2   purchase orders.

3      Q.    Okay.  And we don't have to go into great

4   detail on this.

5            In general, what is this document?  Is this --

6   I'm just going to ask you.  Is this the Excel spreadsheet

7   you were talking about?

8      A.    Yes.

9      Q.    And all the data that's in this document, where

10  does it come from?

11     A.    So the PO date comes from the purchase order

12  date from ERP system.  The purchase order comes from ERP

13  system.  The item comes from ERP.  The layer count comes

14  from the ERP system.  Actually, everything in the gray

15  comes from the ERP system.

16     Q.    Okay.  What about the green?

17     A.    So the green also comes from the ERP system but

18  from a different part of the ERP system because this

19  comes from the sales module, A to J --

20     Q.    When you refer A to J, you're talking about the

21  black --

22     A.    Columns.

23     Q.    -- columns at the top of this spreadsheet?

24     A.    Yes.

25     Q.    Okay.

DIRECT EXAMINATION OF RISHI KUKREJA

471

1        A.    And then L2B comes from -- L, M, N comes

2    from -- actually, so L, M, N, O, P is automatically

3    calculated by the sheet.

4        Q.    Based on the mathematical codes that are

5    programmed into the Excel spreadsheet?

6        A.    Yes, based upon the mathematical codes which

7    are programmed, which is picked up from the discount

8    matrix on the next tab.

9        Q.    Okay.  Before we go to that, you're referring,

10   by the way, to the blue thing at the bottom that says

11   discount matrix?

12       A.    Yes.

13       Q.    Those things are call tabs?

14       A.    Or worksheets.

15       Q.    Tabs or worksheets, okay.

16            MR. ROSENTHAL:  Let me just pause for one

17   moment, Judge.

18            All right.  I just wanted to make sure that

19   we're complying with the Court's rulings on this.

20   BY MR. ROSENTHAL:

21       Q.    So since you referenced, Mr. Kukreja, the

22   discount matrix tab, let me ask -- I think this is a live

23   document, Mr. Vega to click on that discount matrix tab.

24   Okay.

25            What are we seeing here?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

472

1     A.    So this is the 5 percent -- it's what was

2   discussed in the March email.

3     Q.    The March 2013 penalty email?

4     A.    Yes.

5     Q.    So this is what you already testified to?

6     A.    Yes.

7     Q.    Okay.  And then it says in Line 11:  Discount

8   to be calculated as follows.

9           What does that mean?

10    A.    Item, price, multiplied by the quantity.

11          So if you go back to the April 2019 sheet, PO

12  quantity multiplied by the item price.

13    Q.    So that's Column B, the biggest column on the

14  left there?

15    A.    Column E, as in elephant.

16    Q.    E, as in elephant.

17          PO quantity, purchase order quantity?

18    A.    Yes.

19    Q.    Okay.

20    A.    Multiplied by Column G.

21    Q.    Unit price.

22    A.    Multiplied by number of days -- so basically,

23  what the math is that this first order is 32 days late.

24    Q.    You're looking now at Column O, the second blue

25  column?

DIRECT EXAMINATION OF RISHI KUKREJA

473

1    A.    Yes.

2    Q.    32 days late, the first column.

3    A.    Yeah.

4    Q.    First row, I mean.

5          Line 6 across?

6    A.    Yes, yes.

7    Q.    Okay.

8    A.    And so they would calculate -- after eight

9  days, you reach the maximum penalty which you can get

10 which is 10 percent.

11   Q.    Yep.

12   A.    So it takes the 27,300 multiplied by .21, which

13 is 5,596.  10 percent of that is 559.65.  That's the

14 penalty.

15   Q.    Okay.  So what you just did is you went -- you

16 used the formula that was on that data -- that data

17 sheet, and you did -- or was it the discount matrix

18 sheet?

19   A.    So, like, the discount matrix sheet, like, if

20 you look --

21   Q.    Well, let me interrupt you for one second just

22 because I want to make sure that I followed you

23 correctly.  And if I followed you correctly, then others

24 might have followed you.  If I didn't follow you

25 correctly, it's more likely others didn't.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    So you just said you take the purchase order

2 quantity in this particular shipment, which was 27,300,

3 right?

4    A.    Yes.

5    Q.    And then you multiplied that times the unit

6 price of 21 cents each, right?

7    A.    Yes.

8    Q.    And that gave you a total in the amount

9 category of, in the white one, that says $5,596.50?

10   A.    Yes.

11   Q.    And it's programmed to say that if it was ten

12 days late -- or ten days over the allotted leadtime, that

13 was the maximum of ten percent penalty.  And so you

14 applied a ten percent penalty to the amount.  And ten

15 percent of $5,596.50 is $559.65.

16       Did I say that correctly?

17   A.    So, yes and no.

18       Like, if you go to just what's above the Column

19 Numbers A, B, C, D, you see FM6.

20   Q.    Oh, yeah.  That formula there in the black?

21   A.    Yeah.  So that's the program -- that's the

22 way -- that's how it's programmed.

23   Q.    Okay.

24   A.    If it goes to M6 if it is -- if given a term up

25 there and then how that entire thing works, like how it's

1    been programmed to do it.

2            So it automatically -- it calculates it by

3    itself.

4        Q.   Okay.  Let's take a look at the data tab for a

5    moment, if that's okay, one to look at.

6            What is the data tab or the data sheet on this

7    leadtime penalty exceedance spreadsheet telling us?

8        A.   This gives you the part number and the layer

9    count.

10       Q.   On the left side?

11       A.   And out here is the leadtime penalty which was

12   agreed upon by the -- by the July -- by April 2013 email

13   chain.

14       Q.   Okay.  And this -- the LT days is like the

15   amount of leadtime that's allowed?

16       A.   Yes.

17       Q.   Okay.  Depending upon 1, 2, 4, 6, 8, 10 is the

18   layers?

19       A.   Yes.

20       Q.   Okay.  So we started into this Excel

21   spreadsheet as an attachment to an email which was sent

22   to Benlida, correct?

23       A.   Yes.

24       Q.   So was this an example of one month of leadtime

25   penalty calculations that Circuitronix did that you

1    shared with Benlida?

2        A.    Yes.

3        Q.    Okay.  We can leave this document.

4              And before we leave the subject of these

5    documents, how many times -- or how many leadtime penalty

6    exceedance spreadsheets were sent to Benlida over the

7    life of the business after you stopped sending them in

8    debit memo form, approximately?

9        A.    So we sent them -- 24 plus 428 -- 30 months

10   before we stop sending the debit notes.  And -- yeah.

11       Q.    What about after you stopped sending the debit

12   notes?

13       A.    And then we send them every month until very

14   recently.

15       Q.    Did you send them every month or you sent them

16   in batches but they were every month in a spreadsheet?

17       A.    So we -- Yeah.  We send them -- we send them

18   periodically.  Like, I cannot confidently state it was

19   every month, but it was every two to three months we

20   would combine and send it to them.

21       Q.    Okay.  So they had all your calculations on

22   leadtime penalty?

23       A.    They did.

24       Q.    Okay.  Was there a disagreement that arose

25   about leadtime penalty that led to another discussion in

1    2017?

2        A.    Yes.

3        Q.    Tell us about that.

4        A.    So there was a disagreement about how many

5    extra days should be added to the leadtime penalty.

6        Q.    To the leadtime or leadtime penalty?

7        A.    To the leadtime.

8        Q.    Time, okay.

9        A.    Because of us going over the orders which were

10   relating to them.

11       Q.    Over the capacity amount?

12       A.    Yes.

13       Q.    And what was the capacity amount as of 2017?

14       A.    It was -- as of October 31st, 2017, it was

15   5,600 square meters.

16       Q.    Okay.  And so you're saying that Circuitronix

17   was exceeding that, they were going -- they were giving

18   them -- the cup was running over, so to speak?

19       A.    That was Benlida's position.

20       Q.    Okay.  What was Circuitronix's understanding?

21       A.    So Circuitronix's understanding was that there

22   were weeks in which we were exceeding what they were

23   shipping to us, but majority of that problem had been

24   created by themselves.

25       Q.    How?

1     A.     Because if by chance you ship a lesser quantity

2     for 10 weeks or 12 weeks in a row, and by the time you

3     reach the 13th or the 14th week, you've got such a big

4     backlog; so the next few weeks when you're shipping above

5     the agreed-upon quantity, you cannot say -- you cannot

6     just take those weeks under consideration.

7            So there was a disagreement as to how the

8     leadtime was being -- means.  They basically were saying,

9     you've put 21 days or 28 days out here, it should be a

10    different number of days to calculate the leadtime.

11    Q.     Did you end up having a meeting as a result of

12    this disagreement?

13    A.     Yes.

14    Q.     In person?

15    A.     Yes.

16    Q.     Do you recall where that one was held?

17    A.     In -- at the factory in China.

18    Q.     Okay.  And what was the date of that meeting?

19 Do you remember?

20    A.     October 20th, 2017.

21    Q.     Were there minutes of that meeting made?

22    A.     Yes.

23    Q.     Okay.

24           MR. ROSENTHAL:  Let's pull up Exhibit 48,

25    please.

1    BY MR. ROSENTHAL:

2        Q.    Mr. Kukreja, this is an email from Tracy to

3    you, correct, with -- attaching draft of the meeting

4    minutes --

5        A.    Yes.

6        Q.    -- from -- what's the date of the meeting?  Can

7    you tell if this is --

8        A.    It was meeting minutes 2017, 10/20.  It was the

9    20th of October.

10       Q.    Okay.  Now you've been going from the 19th to

11   the 20th, right, according to Tracy wrote?

12       A.    Yeah.  We may have had a --

13       Q.    Okay.

14       A.    -- couple of meetings.

15             MR. ROSENTHAL:  Let's look at the -- it says

16   there's an attachment, meeting list.  Let's look at

17   that -- I think that's Exhibit 49.  Oh, the attachment is

18   on 48 itself.  I'm sorry.  Okay.  It's on 48 itself.

19   BY MR. ROSENTHAL:

20       Q.    Do you recognize these meeting minutes?

21       A.    Yes.

22       Q.    And who wrote this draft of the minutes?

23       A.    Tracy wrote this draft.  And as you've seen,

24   there were four for five iterations back and forth.

25       Q.    Okay.  I've seen that but we haven't in the

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

 1    courtroom seen it.

 2            So let me ask you:  Did you send comments back

 3    to this?

 4        A.    Yes.

 5            MR. ROSENTHAL:  Okay.  Now let's look at

 6    Exhibit 49.

 7    BY MR. ROSENTHAL:

 8        Q.    So you have an email at the top that says

 9    nothing.

10            But it's on October 31st in response to her

11    email to you sending the first draft of the meeting

12    minutes, correct?

13        A.    Yes.

14        Q.    And what's the attachment called?

15        A.    Circuitronix feedback.

16        Q.    Okay.  So let's open the attachment to that

17    email and look at the feedback.  So we see there's some

18    blue colored text.

19            What is that -- who wrote that?

20        A.    Tracy.

21        Q.    So Tracy wrote the changes to the draft that

22    Tracy made?

23        A.    Actually, if we can just go down, let me just

24    see something.

25            MR. ROSENTHAL:  Can you scroll down?

1          THE WITNESS:  Yes, yes.  Can you just go up.

2          So the blue is from me.

3    BY MR. ROSENTHAL:

4      Q.    Okay.  So when you did it, you used the track

5    changes feature on the Microsoft Word or some Word

6    processing program to show those differences?

7      A.    I think so, yes.

8      Q.    So it would stand out and they could see what

9    you were changing?

10     A.    Yes.

11     Q.    Okay.  Let me ask you to look at Paragraph 2 or

12   Numbered Item 2 --

13          MR. ROSENTHAL:  If we could scroll down.  Yep,

14   right there.

15   BY MR. ROSENTHAL:

16     Q.    (Continuing) -- and ask you:  What did you

17   write in the bottom blue where you wrote:  Prepayment of

18   any sum of money is based upon Benlida committing to

19   releasing a minimum order quantity of 7,000 square meters

20   per week and shipping 7,000 square meters of orders per

21   week.

22          What were you communicating there?

23     A.    So Clause No. 2 addressed three different

24   things.  It addressed the capacity which Benlida

25   committed to us.  That is, in the second paragraph,

1   Benlida confirms that from November 2017, order release

2   will be 7,000 square meters per week on average and 7,000

3   square meters shipment per week.  So that's the -- what

4   was 3,000 in the first contracts which became 5,600 at

5   some point -- which became 4,200 at some point, became

6   5,600 at -- became 7,000 going forward.

7        Q.   From this date forward?

8        A.   From November 1st.

9        Q.   2017?

10       A.   Yes.

11       Q.   Okay.

12       A.   So that was number one.

13            Now, if you recollect, at this point in time we

14   were not following the AMS 60-day payment terms.  We were

15   following what ships this week we pay next week.

16            So Benlida was again in a cash flow problem,

17   and they were asking for more money.  So what they did

18   was they said, can -- there, actually during the meeting,

19   I paid them a million dollars because they were -- they

20   were just asking for money, they needed money.

21       Q.   How did you pay them a million dollars in the

22   meeting?

23       A.   I had somebody set it up, and I released it.

24       Q.   A wire transfer?

25       A.   Yes.

1      Q.    Okay.

2      A.    And so what they said was, you pay us a million

3    dollars, and what we ship next week, if we ship $500,000

4    next week, we'll apply the 500,000 to that million,

5    leaving a balance of 500 in my favor.  And the next

6    week -- the week after, if they'd ship another 500, then

7    it would bring down the balance to zero.  And said that I

8    could help them and pay them another 1 to $2 million in

9    that mechanism.

10           So rather than paying what ships next week --

11   what ships this week, pay next week, they were asking for

12   some sort of prepayment.  And at this point in time, they

13   did not threaten to put orders on hold because -- I'm

14   going to explain that to you because we need to look at

15   the first part of the --

16     Q.    The meeting minutes?

17     A.    Yes.

18           But at this point in time they were requesting

19   for help.  And so that's what I started doing.  I

20   started, sort of, helping them out rather than paying

21   what ships this week, next week, paying them a big chunk

22   of money.  And then it would get adjusted in a couple of

23   weeks.  And when that would get depleted, pay them a

24   little bit more money, and so on and so forth.

25     Q.    Okay.  Let's -- let me just -- while we're on

 1  this email, let's go down to -- not this email, these

 2  meeting minutes, let me just go down, if I can, to the

 3  No. 3?

 4      A.    Maybe touch No. 1 first?

 5      Q.    Okay.  That's fine.  You know these better than

 6  I do.

 7            Let's look at number -- this is what you were

 8  just referencing?

 9      A.    Yes.

10      Q.    Okay.  How does this fit into what you were

11  just talking about?

12      A.    So, in this email, they are stating out here

13  when both reviewed --

14      Q.    Hold on.

15            Where are you pointing?

16      A.    Fourth line.

17      Q.    Fourth line.  When both -- okay.  The fourth

18  line:  When both reviewed, order releasing.

19            Go ahead.

20      A.    And shipment area from March 2017 orders that

21  Benlida believes in July, August is less than 5,600

22  square meters average, and Benlida only shipped 5,149

23  square meters an average per week in September of 2017.

24      Q.    Make sure you go slow for our court reporter,

25  too.

1    A.    Yes.

2    Q.    What did that signify?

3    A.    It is also a fact that Benlida delivered some

4    records up eight to ten weeks, order released into

5    production.

6    Q.    You're referring to the last sentence?

7    A.    Yes.

8    Q.    So this is something that Tracy wrote?

9    A.    This is what Tracy wrote, right.

10   Q.    Okay.

11   A.    Now -- so there was an acknowledgment from

12   their side that they were not complying with the 5,600

13   square meters per week.  At the same time, they were not

14   accepting my calculations for the leadtime penalty.

15         And, once again, to work with them as a good

16   partner, I waived leadtime penalty from March of 2017 to

17   October 2017, eight months.  I just waived it completely,

18   more than -- more than a million dollars.

19   Q.    So let me now take you to Paragraph 3, which

20   is --

21         THE COURT:  Does that mean in this trial you're

22   not asking for that?

23         THE WITNESS:  I am not asking for it.

24   BY MR. ROSENTHAL:

25   Q.    Any leadtime penalties that you have testified

DIRECT EXAMINATION OF RISHI KUKREJA

1    about, that's a good question, that you've waived --

2        A.    Yes.

3        Q.    -- that you have waived to them in business, is

4    not part of the damages that Circuitronix is seeking from

5    them in this case?

6        A.    It's not.

7        Q.    Because you waived it?

8        A.    Yes.

9        Q.    You stand by your word on that?

10        A.    Yes.  It's a gift I gave them.

11        Q.    Okay.

12        A.    But I was hoping that when I did that on

13    October 20th, 2017, starting November 1st, 2017, they

14    would not complain on anything in the -- going backwards.

15    They would only look at it November 1st going forward.

16        Q.    Okay.  So let me ask you about that.

17              Using that time that you're talking about, that

18    meeting as a point of reference --

19        A.    Yes.

20        Q.    -- when you had discussions about disagreements

21    that you were having, one of which was this leadtime

22    penalty thing, because it was a big ticket item and you

23    made that waiver, in your view, what did that meeting and

24    that waiver represent?

25        A.    So every time I -- there was a meeting like

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    this and I -- whether I gave a million dollars or I

2    waived any amount of money, there was gratitude from

3    their side.  Like, they were happy.  So a month, two

4    months later when we would go into any sort of a debate

5    or -- I don't want to use the word fight, but

6    disagreement, I was a little surprised because, what do

7    you call, I'd say that just a month ago when I was

8    sitting there, there was -- you guys seemed content with

9    what I did, but now you're not content again.

10        Q.    Was is it your understanding that when you made

11   a gesture like that it resolved the differences that were

12   being discussed at that point?

13        A.    I waived an entire eight months of a year of

14   leadtime penalty.  I mean, there's only a limit I can go

15   to in terms of trying to contribute to the partnership.

16        Q.    Okay.  So let's go, on this document, the

17   meeting minutes from October 20th, 2017, down to Item

18   No. 3.

19            MR. ROSENTHAL:  And just at the very top there.

20   Thank you, Mr. Vega.

21   BY MR. ROSENTHAL:

22        Q.    You were testifying about agreeing to waive

23   leadtime penalty from that March to October '17 period.

24            Is that documented here?

25        A.    Yeah.  It's -- Circuitronix agreed to waive

488

1    leadtime penalty for shipment made from March to October,

2    but not -- so I wrote they were due, but not air freight

3    and line-down costs.

4        Q.    Those are things that are different from

5    leadtime?

6        A.    Yes.

7        Q.    Okay.

8        A.    Those were the things which we got debited from

9    our customer directly.

10       Q.    Okay.  Now, there's a bunch of stuff in all

11   kinds of colors here, which I'm not going to delay us on

12   right now, okay?

13             So is there anything that you would want to

14   discuss for the jury about the detail that's discussed

15   here, or can we move on?

16       A.    No, I'd like to discuss it.

17             So what's highlighted at the text in red is

18   what Tracy had written.  But while giving my response,

19   since I was referring to text in red in my blue response,

20   I highlighted her text in red.

21       Q.    So it was originally black and you made it red?

22       A.    Red so that -- because I referred to the

23   sentence fourth from the bottom:  Circuitronix has agreed

24   to text in red.

25             MR. ROSENTHAL:  Okay.  So let's highlight that

1    if we can, Mr. Vega.  Fourth on the left side:

2           Circuitronix has agreed to the text in red.

3           Fourth from the bottom on the left.  Yeah,

4    right there.

5    BY MR. ROSENTHAL:

6        Q.    Okay.  So you were pointing out --

7        A.    I was pointing to that text.

8        Q.    And then you had also written in the blue

9    parentheses there:  This is not correct?

10       A.    Yes.

11       Q.    And what did "this" refer to?

12       A.    So basically, in the October 1st -- in this

13   meeting there was nothing changed as far as the way we

14   calculated the leadtime penalty in terms of percentages

15   as contemplated in 2013.

16          There was a change in terms of the capacity,

17   which was 7,000 square meters.  And I made the waiver

18   from March to October and they said, How about going

19   forward.

20          I said, I will waive even going forward if by

21   chances you ship 100 percent of the orders between seven,

22   weeks for double-sided -- seven weeks for double-side

23   layer; four-layer, eight weeks.  If you ship 100 percent

24   of the orders which we give you within that time frame,

25   I'll waive leadtime penalty for that month also going

1   forward.  Never happened.

2          And there was another guideline as to for --

3   but this entire text in red has two way criteria for

4   waiving leadtime penalty going forward.  It does not

5   modify any time or it does not do anything like that.

6      Q.   Okay.  Let me ask you something.

7          You said that this didn't modify the prior

8   agreement as amended, correct, if I heard you correctly?

9      A.   No, it only modified it to the extent of square

10  meters.

11     Q.   7,000 now?

12     A.   It did not modify the leadtime.

13     Q.   Okay.

14     A.   Because it says, this is not correct.  The

15  standard leadtime for double-sided four-layer is four

16  weeks, six-layer is five weeks.  Benlida must maintain

17  that leadtime.  So we did not modify that.

18     Q.   Okay.

19     A.   But we agreed to continue waiving leadtime

20  should they meet this criteria.

21     Q.   I understand.

22     A.   They could not.

23     Q.   Okay.  Let's go away from this document.

24          Let me show you Exhibit 51, which is an email,

25  whose date I don't have written down.

1          In the middle of the page, there's an email

2    from you dated November 2, 2017, just above where

3    Mr. Vega is highlighting.

4          Did you send that to Tracy relating to these

5    same meeting minutes we were just looking at?

6    A.    So I had provided the feedback to Tracy and

7    then -- yeah, and then I wrote -- asked to confirm it,

8    and then I also wrote that under no circumstances should

9    she believe that there was any sort of waiver to the

10   manufacturing agreement and the secondary agreement.

11   Q.    So just to be clear, you wrote:

12         There's one thing that should be added.  The

13   manufacturing agreement and the secondary agreement are

14   impacted only as for the points in these minutes.  All

15   other terms and conditions are in full effect.

16         And then you wrote:

17         Anything relating to payment terms and leadtime

18   penalty in the attached discussions are short-term

19   amendments until we're able to resolve all open issues

20   relating to past pricing discrepancy?

21   A.    Yes.

22   Q.    So is that what you were just testifying to a

23   moment ago?

24   A.    Yes.

25   Q.    And how did Tracy respond to that?  Do you

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1   recall?

2       A.    I think she confirmed the same.

3           MR. ROSENTHAL:  Let's see if we can scroll to

4   the top, Mr. Vega.

5   BY MR. ROSENTHAL:

6       Q.    In this email chain, did she respond on

7   November 3rd?

8       A.    (No response.)

9       Q.    She wrote:  Dear Rishi, the comments in your

10  following email is agreed.

11      A.    Yes.

12      Q.    Is it your understanding she agreed to what you

13  had just said?

14      A.    Yes.

15      Q.    Okay.  So the parties are on the same page

16  about how to handle this as of this date?

17      A.    No.  She further amended the meeting of the

18  minutes, which she sent on Monday.  And I further also --

19  it was for the clarification given one -- a couple more

20  times.  But it did not change anything substantially.

21      Q.    Okay.

22      A.    It was -- she just added a few comments which

23  did not really change anything.

24      Q.    Okay.

25          MR. MAZZOLA:  We're going to pivot away from

1   this, and let me just ask my colleagues a quick

2   housekeeping question.

3              (Brief pause.)

4   BY MR. ROSENTHAL:

5       Q.    Mr. Kukreja, we've talked about this in detail,

6   so we can do this, I think, pretty quickly.  You told us

7   about these Excel spreadsheets and the leadtime penalty

8   exceedance reports.

9              MR. ROSENTHAL:  Your Honor, what I'd like to do

10  on the next exhibit is we have made PDF redactions of

11  three pages.  And I'm talking, Mr. Mazzola, about D-D10.

12  Previously we had referred to the entire exhibit which is

13  in evidence.

14             MR. MAZZOLA:  D-D10?

15             MR. ROSENTHAL:  DD, as in Delta, 10.  But we're

16  only --

17             MR. MAZZOLA:  Is it a summary or is it a

18  leadtime spreadsheet?

19             MR. ROSENTHAL:  It's a leadtime spreadsheet.

20  Except what we're not doing is we're not -- we're asking

21  the Court to substitute three PDFs that we've made to

22  comply with the redaction requirements.  So I just want

23  to flag that for the record.

24             THE COURT:  Okay.

25             MR. MAZZOLA:  You'll just note my objection.

```
 1            Did we address this one this morning.

 2            MR. WEINSHALL:  This hasn't been shown yet.

 3            MR. ROSENTHAL:  It's been admitted, but we're

 4   redacting to be more careful.

 5            MR. MAZZOLA:  Oh.  So we're putting the whole

 6   thing in or?

 7            MR. ROSENTHAL:  Just these three PDF pages.

 8   I'll show them to you right now.

 9            MR. MAZZOLA:  You'll show them to me before?

10            MR. ROSENTHAL:  Let's do that.

11            And, your Honor, in light of the uncertainty

12   about what this exactly looks like, can we just do this

13   for identification right now?

14            THE COURT:  Okay.

15            MR. ROSENTHAL:  Just before the jury is shown.

16            THE COURT:  Okay.

17            MR. ROSENTHAL:  To make sure there is no

18   objection.

19            So let's show for identification the redacted

20   version of D-D10.  Boy, that's small.  Can you make it a

21   little bigger?

22            MR. MAZZOLA:  Okay.  Give me one second.

23            MR. ROSENTHAL:  And for the record, it's

24   showing a tab from the leadtime exceedances for January

25   2018 purchase orders.
```

DIRECT EXAMINATION OF RISHI KUKREJA

495

1          Which tab is that?

2          MR. MAZZOLA:  This is January 2018.

3          MR. ROSENTHAL:  The first tab.

4          MR. MAZZOLA:  And what pages are you putting

5     in?

6          MR. ROSENTHAL:  We're just putting in --

7          MR. MAZZOLA:  The first page.

8          THE COURT:  All right.  You know what, we're

9     close to our time for our afternoon break.  Let's take a

10    12-minute break.  All right.  So be back at 3:20.

11          (Jury exits at 3:09 p.m.)

12          (Court recessed at fro 3:09 to 3:23 p.m.)

13          MR. MAZZOLA:  I want a standing objection on

14    redactions.

15          THE COURT:  You want a standing objection on

16    the redactions?

17          MR. MAZZOLA:  Yes.

18          THE COURT:  Yes, you can have that, without

19    getting up every time.

20          (Jury enters at 3:24 p.m.)

21          THE COURT:  Welcome back.  Please be seated.

22          MR. ROSENTHAL:  Thank you, your Honor.

23          Having discussed with counsel during the break,

24    we can now, I believe, without -- well, preserving their

25    objections and redactions, we can now publish this to the

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1   jury.  Is that correct, Mr. Mazzola?

2              MR. MAZZOLA:  Yes.  Yes.

3              THE COURT:  Okay.

4   BY MR. ROSENTHAL:

5       Q.    Okay.  Mr. Kukreja, we're now all looking at

6   the same screen.  You were telling us that this is -- the

7   top left-hand corner, Mr. Vega, can you blow that up so

8   we can see, again, the title of it.

9              Leadtime exceedances reported for January 2018

10  now?

11      A.    Yes.

12      Q.    Different time period.

13             Is this similar to the spreadsheet we saw

14  before, the Excel spreadsheet?

15      A.    Yes.

16      Q.    Okay.  And in the interest of time, I'm going

17  to just point out some things and tell me if I've said

18  anything wrong.

19             You've got a column called POD, which is --

20  stands for purchase order date, right?

21      A.    But that's not the date on the purchase order.

22      Q.    Okay.  So is there something different about

23  this first column in this exhibit that is different from

24  the leadtime exceedances spreadsheet we saw from a

25  different time period?

1    A.    No.

2    Q.    Oh, okay.  So it's not the purchase order date.

3          What do you mean?

4    A.    So there was a lot of back and forth regarding

5    how much time the excess orders above the capacity to

6    contribute to the leadtime, so when we negotiated the

7    November 1st leadtime penalty going forward --

8    Q.    What year was that, November 1st, what?

9    A.    2017.

10   Q.    '17, okay.

11   A.    (Continuing) -- we accepted that as long as the

12   order we're releasing is above the agreed-upon amount of

13   7,000 square meters, we will blindly use the date Benlida

14   released the order into the -- into their system.

15         So these dates were actually provided by

16   Benlida.  This was a date when they released the orders.

17   Not when we released the orders to them, but the date in

18   the future when they put the orders into their system.

19   Q.    Okay.  So let me use the word release again in

20   two different contexts, just to be clear.

21         At this point in time after the November --

22   after November 1st, 2017, because of your October 20th,

23   2017, meeting, you just testified you agreed to use their

24   date that they put the order into production in the

25   factory, sort of Step 2, as the date to start the

1  leadtime clock running?

2     A.   Yes.  To be -- so that there was no controversy

3  and to be fair to them.

4     Q.   Okay.  And the difference between using that

5  date, as what I'll call day one for the clock, from when

6  you were doing before, was what?  What did you use as

7  Day 1 on the clock before that agreement?

8     A.   So from March of 2016, we used the dates they

9  put the parts into production.

10    Q.   Oh, all the way back to March 16?

11    A.   Yes.

12    Q.   Okay.

13    A.   But we never knew why they disputed it.  And we

14 didn't want to spend too much time on that, and that's

15 why we waived the eight months.  But in the October

16 meeting, it was actually stipulated as long -- it doesn't

17 say it in those many words, but that we will use the

18 release date as the -- the date they released it in

19 production rather than our purchase order date.

20    Q.   So which comes later, the date of your purchase

21 order that says it on the document or the date that they

22 release it into production?

23    A.   The date they release it into production.  It

24 comes a lot further.

25    Q.   A lot -- later in time?

DIRECT EXAMINATION OF RISHI KUKREJA

1    A.    Yes.

2    Q.    So who does it benefit as between Circuitronix

3  and Benlida if Circuitronix agreed to use the date that

4  Benlida actually put the PCBs into production on its

5  factory line as Day 1 for leadtime counting?

6    A.    It benefits Benlida.

7    Q.    Benefited Benlida, okay.

8          Just returning to this document briefly, we've

9  gone over a lot of these fields before.  This on, I see,

10  in the upper right-hand corner has a pink and green area.

11    A.    Yes.

12    Q.    What's that?  That's not something that was on

13  the other document.

14    A.    So Benlida wanted us to continue to waive

15  leadtime penalty.  And according to the October 2017

16  minutes of the meeting, we agreed that if they shipped

17  100 percent of the orders between -- for double-sided

18  four layer boards in seven weeks and six-layer and above

19  in eight weeks, we would waive the leadtime penalty.

20          They -- but at the same time, we told them that

21  starting March 1st of 2018, if they do not ship

22  80 percent of the orders as per the contractual leadtime,

23  we will reduce -- we will reduce the number of weeks

24  which we will consider for waiving leadtime penalty.  So

25  rather than starting March 1st, 2018, if they were not

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    meeting the 80 percent shipping -- 80 percent of the

2    orders within the April 2013 contractual leadtime, the

3    criteria would become tighter for them, they would -- the

4    criteria for waiving would be they need to ship 100

5    percent of the orders between six weeks for double-side

6    four-layer and seven weeks for anything above four

7    layers.

8            But once again, they never achieved any of

9    that.  So after that, it was never waived.  After

10   November 1st, 2017, it was never waived.

11       Q.    Okay.

12           MR. ROSENTHAL:  Let me just ask my colleagues.

13   Do you think we need to look at other two tabs?  I don't

14   think we need to waste time on that.

15           Okay.  We're going to -- although there are two

16   additional pages to this exhibit, this redacted PDF,

17   we're not going to take the time to go through them now.

18           MR. MAZZOLA:  And, Judge, I have another

19   objection to these documents.

20           THE COURT:  Which is?

21           MR. MAZZOLA:  Well, it's -- with respect to the

22   redactions, they're not redacted.  They just don't

23   appear.

24           MR. ROSENTHAL:  Can we have this discussion --

25           THE COURT:  No.  Just tell me in a couple of

```
 1    words what the objection is.

 2              MR. MAZZOLA:  The redactions -- there is not a

 3    black line through it.

 4              MR. ROSENTHAL:  That's right, because it's an

 5    Excel spreadsheet, so -- -

 6              THE COURT:  Okay.  All right.  I'll overrule

 7    that objection.

 8              MR. MAZZOLA:  The other one is the redactions,

 9    what redactions there are, had no bearing on the ultimate

10    total.  So I have an unredacted version here.

11              THE COURT:  All right.  Overruled.

12    BY MR. ROSENTHAL:

13        Q.   Let me wrap up the subject of leadtime penalty,

14    which is always challenging to understand.

15              At the end of the day, as the Judge asked you,

16    there are certain quantities that you waived, amounts of

17    money, for leadtime penalty.

18              Are those part of your claim in this case?

19        A.   They are not.

20        Q.   Okay.  What's part of the claim in this case

21    for leadtime penalty?

22        A.   For leadtime penalty, what's -- is any leadtime

23    penalty starting March of 2016 to October 2017, which was

24    not waived --

25        Q.   Okay.
```

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

DIRECT EXAMINATION OF RISHI KUKREJA

1      A.      -- anything besides those eight months.  And

2   starting November 1st, 2017, as per the minutes of the

3   meeting of October 20th, 2017.

4      Q.      And then that went until whenever the cutoff

5   was used to calculate the leadtime penalties being

6   claimed in this case?

7      A.      Yes.

8      Q.      Okay.  Do you recall, roughly, how much that is

9   that is being claimed for leadtime penalties as part of

10   the damages for Circuitronix?

11      A.      2,990,000 and change, a small amount.

12      Q.      Approximately, okay.

13           So just under $3 million?

14      A.      Just under $3 million.

15      Q.      Okay.

16           MR. ROSENTHAL:  Before we leave this subject,

17   let me check with my colleagues if I've forgotten

18   anything.

19           (Brief pause.)

20           MR. ROSENTHAL:  Okay.  We are able to move on,

21   which is good.

22           Let's turn to our almost-last topic with

23   Mr. Kukreja, the 2019 reconciliation, okay.

24   BY MR. ROSENTHAL:

25      Q.      You testified to this before, but can you tell

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    us very briefly what the 2019 reconciliation involved?

2    You mentioned two different parts of it earlier on, and

3    if you can refresh people's memory.

4         A.    So in March, April, May time frame of 2019, I

5    went back to Benlida and I told them that this revised

6    payment terms of what we shipped this -- what you shipped

7    this week, we pay next week, we are overpaid by around

8    $1.5 million, and at some point in time I have to -- I

9    cannot continue doing it.

10             So they asked to do a reconciliation of only

11   that portion, from December 1st, 2016, until there was

12   one done in April, there was one done in May, there was

13   one also done in July.  Only for what shipped this week,

14   paid next week.

15        Q.    This is all being done in 2019, you're taking

16   about?

17        A.    Yes.

18        Q.    Okay.

19        A.    And we showed them that we do not owe them any

20   moneys.  There was disagreement as to how much we were

21   overpaid, but we don't show we were in an overpaid

22   situation.  So at that point in time, they asked us to

23   do -- start our reconciliation from 2015 to 2019.

24        Q.    Can I pause you there?

25        A.    Yes.

1    Q.   Because that's, sort of, the second

2    reconciliation?

3    A.   Yes.

4    Q.   So let's just stay on the first one for a

5    moment, okay, if I may.

6         So you said, if I heard you correctly, that you

7    gave them the data on what ships last week, we pay this

8    week --

9    A.   Yes.

10   Q.   -- as a reconciliation?

11        Did you provide that to Benlida?

12   A.   Yes.

13   Q.   Okay.  Let me show you an exhibit.

14        MR. ROSENTHAL:  D-K7.  This is admitted already

15   in evidence, I believe.  Yes.

16   BY MR. ROSENTHAL:

17   Q.   Mr. Kukreja, do you recognize this email that

18   you sent on May 24th, 2019, to Tracy?

19   A.   Yes.

20   Q.   And what was this?  What are we showing?

21   A.   We had basically -- This is a table of what

22   shipped this week, we paid next week, that shipped 31 --

23   $40,022,497.85, and we have paid them 47,908,702.

24        And right on the top --

25   Q.   Up higher?

 1      A.    Up higher.

 2            MR. ROSENTHAL:  You have to get -- zoom out of

 3    that, please.

 4            THE WITNESS:  They needed some money, and so I

 5    wired it too, but we need to come up with a game plan to

 6    close the overpayment gap.

 7    BY MR. ROSENTHAL:

 8      Q.    That's your email in blue at the top there --

 9      A.    Yes.

10      Q.    -- blue writing?

11      A.    Yes.

12      Q.    So even though there was an overpayment by your

13    calculation of -- my math will be bad, but 47,900,000

14    minus 40 million, so like $7,900,000 at that point in

15    time, you still wired them $250,000?

16      A.    Yeah.  And, again, $7 million seems like a lot

17    of money --

18      Q.    Yes.

19      A.    -- but it technically represented what was at

20    that point in time 60 to 90 days of business.  We were

21    doing around $2.5 million per month of business with

22    them, slightly north of $2.5 million.

23            So I'm not saying that it's not a lot of money.

24    It's a lot of money, but like if you -- while you're

25    trying to do a risk/benefit analysis, there is -- one

1    could find reasons to exercise more patience.

2        Q.    Okay.  Now, there's an attachment, which we're

3    not going to get into, but I just want to identify it.

4              See the name of the attachment, it says -- I'm

5    going to look at the second one, BLD-ROK shipments plus

6    payments, and it has some dates.

7              MR. ROSENTHAL:  Now the next one, Mr. Vega.

8    Yep.

9    BY MR. ROSENTHAL:

10       Q.    What was that document -- what is that

11   document?

12       A.    We had on one -- one side of the sheet each and

13   every shipment which was received by them.  And on the

14   right side of the sheet, each and every payment which was

15   made to them.  And on the top, it showed the total of the

16   shipments.  And on the other side, it showed total of the

17   payments.

18       Q.    So is the chart with the orange and green that

19   we're looking at in the exhibit taken from that

20   attachment data?

21       A.    Yes.  Because that had each and every shipment

22   in there.

23       Q.    So, I mean, is it -- these are basically the

24   totals that came from the underlying data which you

25   attached to this email?

1    A.    Yes.

2    Q.    So did you give Benlida all your data?

3    A.    Yes.

4    Q.    Was it an open book, essentially?

5    A.    It was.

6    Q.    Okay.  And you mentioned before when I think I

7    interrupted you, but you said there were two different

8    kinds of reconciliations being done.  This was the first

9    one, what shipped last week, we pay this week.

10         What was the second one, more global?

11   A.    So they said that we should start every

12   shipment that was made from Jan. 1st, 2015, until around

13   this time frame, and every payment which was made from

14   Jan. 1st, 2015, until around this time in 2019.

15   Q.    Who picked the start date for that

16   reconciliation process of January 1st, 2015?

17   A.    Benlida did.

18   Q.    Why did they pick that date?  Do you know?

19   A.    Because prior to Jan. 1st, 2015, nobody ever

20   complained that there was any problem.

21   Q.    Okay.  So they went to the beginning?

22   A.    Of where they perceived the problem to be.

23   Q.    Okay.  So they went to -- your understanding is

24   they went to the beginning of where they perceived the

25   problem to be and said, give me all your numbers so we

1    can do this reconciliation in 2019?

2        A.    Yes.

3        Q.    Did you do that?

4        A.    We did that.

5        Q.    Okay.  Did you provide them a document which

6    showed that you did that?

7        A.    Yes, in July we did.

8        Q.    July of 2019?

9        A.    Yes.

10            MR. ROSENTHAL:  Can we see Exhibit 121, please,

11    the latest redaction.

12   BY MR. ROSENTHAL:

13       Q.    And you see this is an email you sent on

14   July 29th, 2019, to Douglas, copying Tracy?

15       A.    Yes.

16       Q.    By the way, do you know who the other name is

17   that's in Chinese characters who you copied?

18       A.    I do not.  I think it should be Ms. Chen.

19       Q.    She was somebody in accounting at Benlida?

20       A.    Actually, it could be Roger, but, yeah, I

21   cannot recollect, sorry.

22       Q.    Do you recall Roger's Chinese name?

23       A.    No, I cannot.

24       Q.    Does it refresh your recollection if I tell you

25   it was Wu Yukun Wu?

DIRECT EXAMINATION OF RISHI KUKREJA

509

1      A.    It sounds right.

2      Q.    Okay.  Roger Wu?

3      A.    Yes.

4      Q.    Okay.  So removing what we're looking at now

5    and just focusing on line --

6            MR. ROSENTHAL:  You can just pull up the whole

7    text of it, Mr. Vega, so we can see it better.

8    BY MR. ROSENTHAL:

9      Q.    So you say:  As per our conversation, please

10   find the attached payment details.

11           Is that the most recent one, July 1?

12     A.    There were April invoices.

13     Q.    Okay.  But the date of the payment details was

14   called July 1?

15     A.    Because based on AMS 60 days.

16     Q.    Right, okay.

17           And then you say:  B, Benlida for CTX-USA,

18   Benlida owes us how much?

19     A.    $5,723,591.60.

20     Q.    $5,723,591.60?

21     A.    Yes.  That number does not include the

22   $2.8 million which we -- $2.825 which we paid to ROK on

23   their behalf.  That is not included.

24     Q.    Because that's in the ROK side?

25     A.    Because that's on the ROK side.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

 1       Q.    Okay.

 2       A.    And that number does not include the leadtime

 3   penalty which we just discussed about the $2.9 million.

 4       Q.    And that's written in red below here?

 5       A.    Yes.

 6             MR. ROSENTHAL:  And, Mr. Vega, if you can zoom

 7   back out.

 8   BY MR. ROSENTHAL:

 9       Q.    The attachments contain a document called

10   Benlida payment details CTX-US 2015 to 2019, xlsx.

11             What's xlsx?

12       A.    It's the formal -- it's one of the versions of

13   Excel.

14       Q.    So it's an Excel spreadsheet?

15       A.    Yes.

16       Q.    So you attached to this email -- when you said,

17   here's the grand total, what did you attach so that they

18   could see?

19       A.    We attached the reconciliation between 2015 and

20   2019.  And we actually also attached another spreadsheet,

21   BLD-ROK shipments plus payments.  This one was another --

22   an updated version of what shipped last week, paid this

23   week, as of 20th of July 2019.

24       Q.    Okay.  Let me just ask you to take a look --

25             MR. ROSENTHAL:  Unless there's a redaction

1    issue, Mr. Weinshall, that I'm -- don't need to bump

2    into?

3            MR. WEINSHALL:  No.

4    BY MR. ROSENTHAL:

5        Q.    Okay.  Attachment No. 2 to Exhibit 121, which

6    is that CTX-US payment details 2015 to 2019.  And let's

7    take a look at the summary tab.

8            So, Mr. Kukreja, this is -- do you see there's

9    a summary tab in the bottom left?  We're looking at an

10   Excel spreadsheet now, right?

11       A.    Yes.

12       Q.    Mr. Vega is making it bigger.

13           So what did you show to Benlida at this time in

14   mid-2019 in response to their request?

15       A.    So not only did we give them a summary of what

16   they owed us, at the bottom we included the summary for

17   each and every month.  And then after that, we

18   included --

19       Q.    You mean each and every year?

20       A.    Each and every year.  And then payment details

21   for each and every month from January 2015 all the way

22   until July 2020 -- no, 2019.

23       Q.    Which was the date, approximately, that you

24   were doing this work?

25       A.    Yes.

DIRECT EXAMINATION OF RISHI KUKREJA

512

 1          MR. ROSENTHAL:  So let me ask Mr. Vega to do

 2    this.  Without going into those other tabs at the bottom

 3    and sidetracking us, can you just show the jury by

 4    clicking on the arrow that allows you to go tabs -- I

 5    don't know if you're familiar with that, at the bottom,

 6    right where your cursor is, the right caret to the left

 7    of summary.  If you just click on that down below.  Yep.

 8    And it moves to the right.

 9    BY MR. ROSENTHAL:

10         Q.   And you can see -- Mr. Kukreja, is that what

11    you're referring to?

12          MR. ROSENTHAL:  Can you stop for a sec.

13          THE WITNESS:  Yes.

14    BY MR. ROSENTHAL:

15         Q.   Is each one of those --

16         A.   It's a payment detail.

17         Q.   This is the payment detail for the month in

18    question?

19         A.   Yeah, this is for November 2016.

20         Q.   Okay.  And so we can go to the right and just

21    show that it goes on and on and on, right?

22         A.   Right to the end.

23         Q.   All right.

24          MR. ROSENTHAL:  So going back to the summary

25    tab, which you have to go all the way back to the left

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    on.  If you push control and click left, it will go all

2    the way over there.  Or we can look at it.

3    BY MR. ROSENTHAL:

4       Q.    So coming back to the summary tab, Mr. Kukreja,

5    after doing the reconciliation work at Circuitronix in

6    response to Benlida's request to go all the way back to

7    2015, what was the total amount that was concluded was

8    owed?

9       A.    $5,723,591.60.

10      Q.    And who owed that money to whom?

11      A.    Benlida owed that money to Circuitronix.

12      Q.    Okay.  After you sent Benlida this backup data

13   in response to their request, how did they respond?

14      A.    They said they would like us to go back to

15   2012.

16      Q.    Why?

17      A.    I guess they didn't like the number.

18      Q.    Okay.  Well, let me show you Exhibit 78,

19   please.

20           MR. ROSENTHAL:  We can take this one down.

21   Let's blow up the top part.

22   BY MR. ROSENTHAL:

23      Q.    Do you see that's an email from Tracy to you on

24   August 1st regarding the final payment reconciliation,

25   correct?

1      A.    Yes.

2            MR. ROSENTHAL:  And, Mr. Vega, if you can blow

3      up the -- first, let's get rid of that so we can see.

4      Actually, if you scroll down to Page 3, I think, is the

5      email that I want to look at first.  I apologize.  This

6      one in the middle.  Can you blow that one up?  Thank you.

7      BY MR. ROSENTHAL:

8      Q.    This is July 30th, 2019.

9            And this is from Tracy to you?

10     A.    Yeah.

11     Q.    And she says:

12           Rishi, we greatly appreciate your efforts in

13     the account reconciliation between our companies and we

14     will go through all the records you send us as soon as

15     possible.  In order to obtain a complete picture of the

16     reconciliation, please kindly provide the shipment and

17     payment records before 2015 starting from our

18     cooperation.  That is the account reconciliation data for

19     that period 2011 to 2014.  We believe that way we can

20     achieve time efficiency when we enter arbitration.

21           Prior to this email on July 30th, 2019, had

22     Benlida ever asked Circuitronix to go back further in

23     time than 2015?

24     A.    No.  They had never actually flagged anything.

25     Q.    So how did you respond when you received this

1    email?

2         A.    I told -- Again, they were shifting the

3    goalpost.  And I told them that's the first time I heard

4    them -- heard that they had any claims going all the way

5    back to 2011, '12.

6              MR. ROSENTHAL:  Okay.  Let's take a look --

7    Mr. Vega, if you can zoom out and scroll up to the next

8    email.

9    BY MR. ROSENTHAL:

10        Q.    What did Mr. Kukreja say -- Rishi, what did you

11   say?  Sorry.  At the top.

12        A.    The scope of this project has always been from

13   1st Jan. forward.  We have not done anything before 1st

14   Jan. 2015 since until today.  It has never ever been

15   questioned or disputed.

16        Q.    And you wrote that on what date?

17        A.    On 31st of July 2019.

18        Q.    Over four years ago you wrote that?

19        A.    Yes.

20        Q.    So after they asked you to go back even

21   further, as you used the term, to move the goal post,

22   from 2015 all the way back to 2012, what did you do?

23        A.    We did that.

24        Q.    Was there any labor involved in that process?

25        A.    It was definitely a lot of work because we had

1    to -- all the backup documents from 2012 to even -- after

2    two years to three years, we put all the documents in an

3    off-site storage unit and then tried to retrieve it and

4    then tried to make sense out of it.  And so that's --

5    yeah.  It was a lot of work.

6        Q.    Okay.  So after you did -- or your team did all

7    that work, did you then provide the results to Benlida?

8        A.    Yes, on 1st November 2019.

9              MR. ROSENTHAL:  Okay.  Let's take a look at

10   Exhibit 120, please, the redacted -- most recent redacted

11   version.

12   BY MR. ROSENTHAL:

13       Q.    This is an email on November 1st, as you said,

14   2019, from you to Douglas, copying Tracy and others.  I

15   said copying Tracy.  That may not be right.

16       A.    Tracy is copied on this email.

17       Q.    Okay.  Is that -- I don't know if that's

18   Tracy's name in Chinese.

19       A.    Actually, I don't even know that.  But it's --

20   every transaction which Tracy and I -- we did with

21   Benlida, Tracy was copied on it.  So either that's Tracy

22   or she accidentally got mixed up.  But when they

23   responded back, they put Tracy into that email for sure.

24       Q.    Okay.  But who did Tracy answer to at Benlida?

25       A.    I think both to Douglas as well as Ms. Huang.

1    Q.    Okay.  So either way, you sent it to one of the

2    senior people, right?

3    A.    Yeah.

4    Q.    So at the end of doing this additional work

5    going all the way up to 2012, what was the grand total

6    that was shown between Benlida and Circuitronix U.S.?

7    A.    $5,314,868.81.

8    Q.    And who owed that money to whom?

9    A.    Benlida owed that money to Circuitronix.

10   Q.    Okay.  So after you gave them this data -- and

11   by the way, this had attachments as well, right?

12   A.    Yes.

13   Q.    You gave them the backup?

14   A.    Yes.

15   Q.    You gave them the worksheets?

16   A.    Yes.

17   Q.    It was an open book?

18   A.    We gave them everything.

19   Q.    Okay.  At that point how did they respond to

20   Circuitronix?

21   A.    So there was a lot of cooperation from their

22   side, and they provided us with detailed feedback on some

23   of the errors on our -- in our sheets.  It was very

24   detailed feedback.

25   Q.    It was what?

518

1    A.    Extremely detailed feedback they provided us.

2    Q.    Okay.  Did they ever send you any feedback that

3   said this number is completely wrong, here is our number?

4    A.    No, no.  They just -- they pointed to us some

5   of the mistakes which we made.  And net, net those

6   mistakes contributed to 100, $150,000 in their favor.  So

7   the 5.314 reduced by 100, $150,000.

8    Q.    Over an eight-year, approximately, period?

9    A.    Yes.

10    Q.    Okay.  Let me just show you Exhibit 79.

11         MR. ROSENTHAL:  We can take this one down.

12   BY MR. ROSENTHAL:

13    Q.    So you see that this is in an email to you --

14   well, to you and a lot of people here in the middle --

15   from accounting at Benlida.com, that email address, on

16   November 14th, 2019?

17    A.    Yes.  And Tracy has been copied back into that

18   email.

19    Q.    Right.

20         And they say what to you?

21    A.    So they gave us the analysis --

22    Q.    That you just mentioned?

23    A.    Yeah.

24    Q.    Okay.  And then they said:

25         Please provide the DM's details for those we

519

1  can't find in our records --

2       A.    Yes.

3       Q.    -- and check the invoices and payments again?

4       A.    Yes.

5       Q.    So was this -- what you were describing, they

6  said, look, here's some details we need to check on --

7       A.    Yes.

8       Q.    -- and they're pointing out things that are

9  errors?  Okay.

10            Let's look at the attached PDF that they sent

11  you, this thing that's called 2012 that's -- 2019

12  reconciliation analysis redacted.

13            MR. ROSENTHAL:  Can we blow that up so we can

14  see it, please.

15  BY MR. ROSENTHAL:

16       Q.    So can you explain to us what these different

17  columns are that they were pointing out, what this is?

18       A.    So they were saying that there were four

19  buckets of discrepancies.  The first bucket was that we

20  missed 244 -- 245.25 in missing invoices.  Those were in

21  2012, '13, '14.  There was $418,932.86 in invoice

22  discrepancy, which was a little surprising for us because

23  we had been doing month to month reconciliation starting

24  2017.

25            So they said that there was a payment

1  discrepancy of 2,569,925.52, and there were debit memo

2  records discrepancy of 486,938.73.

3      Q.   When Circuitronix received this information

4  from Benlida, what did Circuitronix then do in response?

5      A.   We started investigating this.

6      Q.   Okay.

7           MR. ROSENTHAL:  So, Mr. Vega, if we can, kind

8  of, keep this to the side or keep it handy because we may

9  have to reference back to it.

10          Let me ask you to pull up Exhibit 87 redacted,

11 Exhibit 87.

12          And, I'm sorry, I don't know if this has been

13 admitted yet, your Honor.  This may be where we left off

14 in the morning.  So let me not publish this yet and ask

15 Mr. Mazzola.

16          THE COURT:  87 is in.

17          MR. ROSENTHAL:  Oh, yeah.

18          THE COURT:  It's in.

19          MR. ROSENTHAL:  It's in, okay.  It's the next

20 one with the attachments we haven't admitted.  Sorry, I

21 just want to flag it.

22          Do the jurors have this up?  Okay.  Thank you.

23 BY MR. ROSENTHAL:

24      Q.   So, Mr. Kukreja, this is an email you sent to,

25 I guess, everybody involved in the effort?

DIRECT EXAMINATION OF RISHI KUKREJA

1    A.    Yes.

2    Q.    And what was this telling Benlida?

3    A.    So when they provided us with the feedback, we

4    started looking back into the records because they said

5    that -- what they basically said was there were

6    $2.5 million worth of payments which we said was on our

7    list, which they did not receive.

8    Q.    And that's a big number.

9    A.    That's a big number.  So we started

10   investigating that.  So then we found $898,000 worth of

11   payments which we made, which was not on our sheet.  So

12   we went back and asked them whether these payments --

13   whether they found these payments.

14   Q.    Okay.

15         MR. ROSENTHAL:  And then if we can minimize

16   that and scroll down a little bit beneath that box.

17   BY MR. ROSENTHAL:

18   Q.    You wrote in B --

19         MR. ROSENTHAL:  If we can zoom there --

20   BY MR. ROSENTHAL:

21   Q.    -- please advise whether there are any

22   additional payments which are in your system which are,

23   for some reason, not in our own system, right?

24   A.    Yes.

25   Q.    Okay.  And did they do that?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1      A.    Yes.

2      Q.    Okay.  Let's, on this same email, scroll up to

3  the next one.  And on November 22nd, 2019, they said:

4  Dear --

5            But it's addressed to you, right?

6      A.    Yeah.

7      Q.    At that point you were very friendly so they

8  called you dear?  I don't know.

9            (Continuing) -- please see attachments, quote,

10 CTX missing INV details.

11           What does that mean?

12     A.    Missing invoice details and payment

13 discrepancy.

14     Q.    Okay.  As you requested?

15     A.    Yes.

16     Q.    Okay.

17           MR. ROSENTHAL:  So this next one which I want

18 to show has not yet been admitted, your Honor.  We left

19 off there.  This is the third attachment to Exhibit 87 --

20           MR. MAZZOLA:  One second, please.

21           We're looking at Exhibit -- I beg your pardon,

22 it's 70?

23           MR. ROSENTHAL:  87.

24           MR. MAZZOLA:  No objection.

25           MR. ROSENTHAL:  Okay.

1      MR. MAZZOLA:  Subject to the other ones.

2      THE COURT:  Okay.

3      MR. ROSENTHAL:  Okay.  So let's look at 87, the

4  third attachment.  This is the attachment to the email we

5  just looked at.  So can we make that a little larger.

6  Let's see.

7      So I'm pausing because what I'm looking at is

8  different from what's here, so I just want to double

9  check real quick.

10     So, yeah, what we're going to do is, it's the

11  other tab that says:  No records for CTX at the bottom.

12  This is the same attachment --

13     MR. MAZZOLA:  This is the one that was just up

14  before, right?

15     MR. ROSENTHAL:  Right.  It's an Excel

16  spreadsheet, but it has two tabs at the bottom, so I

17  wanted to show the right tab.

18     MR. MAZZOLA:  What's the other one that --

19     MR. ROSENTHAL:  That's the other one we were

20  just showing.  But we're --

21     MR. MAZZOLA:  This is the one you're working

22  off of Stephen?  This is the one you're using?

23     MR. ROSENTHAL:  Correct.  We're using both, but

24  right now we're going to talk about no records for CTX.

25     MR. MAZZOLA:  Okay.

1           MR. ROSENTHAL:  Okay.  Now we're showing the

2    right thing.

3    BY MR. ROSENTHAL:

4        Q.    Mr. Kukreja, what did Benlida say to you here

5    in this spreadsheet:  No records for CTX?

6        A.    So they had received payments of $2,477,529.10,

7    which was not on our reconciliation.

8        Q.    So this was money that they actually had

9    received from you?

10       A.    Yeah, this -- in 2013, in the month of June on

11   Day 4, they received $250,000.  2014, in the month of --

12   April 30th, they received 182,344.61.

13       Q.    Okay.

14       A.    And when you go down that list, they had not

15   received -- they had received 2,477,539.10.

16       Q.    And how did that compare to the amount of money

17   that they told you, if you can remember, in the previous

18   email that CTX was short, Circuitronix had not paid in

19   terms of invoices?

20       A.    That was 2,565,000.  I think it should be

21   adjusted in the next tab.  Do you see that two -- yeah,

22   that one there.

23       Q.    So they were saying there was 2,569,000 and

24   change, I'm going to call it, where you were short, but

25   then the next tab, no records CTX, said, oh, here is

 1   where those payments were?

 2        A.    But there were 2 million -- 2,477,000.  So if

 3   you look at, Should be adjusted, it has got no record, no

 4   record, no record for three.  The other ones, they're not

 5   saying that they didn't get the money.  They got $25,000.

 6   But they said it should not be applied to invoices

 7   because we paid to get Benlida painted.

 8        Q.    That was the decoration fee?

 9        A.    The decoration fee.

10        Q.    Okay.

11        A.    This was one of the -- $80,000 was one of the

12   installments for the immersion tin line.

13        Q.    Like a machine?

14        A.    Yes.

15              So they said that they received the money, but

16   we should not apply to invoices because it was for a

17   different purpose.

18              The same thing for OSP, that they got the

19   $135,000 and $100,000.  And so, technically speaking, the

20   235, 240, 260 -- $340,000 of this they had received, but

21   they were saying it should not be applied to product they

22   shipped to us.

23        Q.    It was more of an investment?

24        A.    It was more of an investment.

25        Q.    Okay.  Did you disagree with that?

1    A.    I disagreed with that, but in the bigger scheme

2    of things, they owed us 5 million -- north of 5 million

3    plus the 2.8 million, 7.8 million.  So in the bigger

4    scheme of things, I didn't want to argue about the

5    $340,000.  So we adjusted our system, we took them out.

6    The November 1st, 2019, we took all these payments out.

7    We added all the payments back in from our records for

8    Circuitronix.  So the ones they said they did not receive

9    or should be applied to something different, we took it

10   out of our reconciliation.  The ones they said that we

11   had sent to them and they were not on our sheet, we put

12   back.  So that there was difference of $89,000 between

13   our version reconciliation and advice reconciliation,

14   which we got off the adjustments.

15   Q.    Okay.  So your testimony is that they said to

16   you at some point, We don't have records of your

17   payments, and then they later showed you, after back and

18   forth, that there were records that were found.

19        Is that correct, in general, with respect to

20   the ones we're talking about here?

21   A.    I -- No, no.  I wouldn't say that.  They

22   were -- the way it worked is that the ones which said no

23   records for Circuitronix, we had made wire transfers to

24   them and we had not -- these ones out here.

25        Now, what -- after we recognize this, that in

```
 1    March of 2017 we changed ERP systems.  We were using
 2    NetSuite in the past and we transitioned to Sage on March
 3    1, 2017.  So we didn't have our previous system, and we
 4    were working mostly through email records and paper
 5    copies.
 6              So if you look at all these payments which got
 7    missed from our side were prior to 2016 and before.
 8         Q.   Those were all on your old system?
 9         A.   In the old system.
10              And Benlida is a good partner, which they did,
11    they came back and said, these also should be included.
12    And the other side of the coin was they came back and
13    said these should be taken out.
14         Q.   Okay.
15         A.   And they sort of balanced.  There was an
16    $80,000 difference between the two.
17         Q.   Okay.
18              MR. ROSENTHAL:  Let me show you -- well, let me
19    mark for identification, because it has not yet been
20    admitted.
21              (Plaintiff Exhibit 89 marked for identification.)
22              Your Honor, Exhibit No. 89.
23              THE COURT:  What number?
24              MR. ROSENTHAL:  89, your Honor.
25              MR. MAZZOLA:  Can I see it?
```

```
 1              MR. ROSENTHAL:  Can you bring it up for us,
 2    Mr. Vega.
 3              MR. MAZZOLA:  Mr. Vega, is that the entire
 4    document?
 5              MR. ROSENTHAL:  It's an email string.
 6              MR. MAZZOLA:  Oh, it's the emails -- it's an
 7    email thread.  It's okay, subject to all the other
 8    objections.
 9              MR. ROSENTHAL:  All right.  So 89 is in
10    evidence.
11              (Exhibit 89 received in evidence.)
12    BY MR. ROSENTHAL:
13         Q.   Okay.  So showing everyone Exhibit 89,
14    Mr. Kukreja, I just want to --
15              MR. ROSENTHAL:  Keep going.  Yeah, let's blow
16    that whole -- up.  Thank you.
17    BY MR. ROSENTHAL:
18         Q.   At the bottom, you wrote an email on
19    December 4th, 2019, to Benlida and said:  Please advise,
20    what does the no records for CTX represent?
21         A.   Yes.
22         Q.   And what did they respond?
23         A.   These statements are in our system, which are
24    missing in your spreadsheet.
25         Q.   Is that what you were just talking about?
```

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

DIRECT EXAMINATION OF RISHI KUKREJA

1      A.    Yes.

2      Q.    Okay.  So you clarified and they clarified?

3      A.    So they clarified, but we -- just because of

4   the good news we just didn't rely upon it.  We went back

5   on the wire transfer details and just -- the wire

6   transfer details for these missing -- the payments which

7   were in the system are -- have been produced in this

8   case.

9      Q.    Okay.  So let me just go back to the email that

10  we looked at, which was their list of things that were --

11  that you characterize as the issues that they raise with

12  the reconciliation, a date going all the way back to

13  2012, which was Exhibit 79.  The attachment, it says

14  reconciliation analysis report.

15          MR. ROSENTHAL:  Do you still have that,

16  Mr. Vega?  It's a PDF.  Or it's a redacted -- that's it.

17  BY MR. ROSENTHAL:

18     Q.    So, Mr. Kukreja, just going back to what we

19  were talking about, have we covered the first column of

20  the missing invoices that they listed?

21     A.    No, just what we spoke about with the payment

22  discrepancies.  That's the third column.

23     Q.    Okay.  The big column of the 2.5 --

24     A.    569.  That 2.569,925, which was in our

25  system -- which was in our spreadsheet, not in their

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

**DIRECT EXAMINATION OF RISHI KUKREJA**

1   system, got replaced by 2.477, which was 2.47 million,

2   which was in their system and which was not in ours.

3       Q.   So that's what you said, reduced the difference

4   to about whatever that difference is?

5       A.   Yep.  Around $90,000.

6       Q.   Okay.  So it went from a big number to a

7   smaller number, relatively?

8       A.   Yes.

9       Q.   Okay.  Now, I want to talk about that missing

10  invoice column and what Circuitronix investigated in

11  response to this.

12          MR. ROSENTHAL:  In order to do that, I'd like

13  to bring up a document that I believe has been admitted,

14  but let me just double check.  So let's do it for

15  identification purposes.  Exhibit 87, the third

16  attachment, redacted -- it's in evidence?

17          Apparently it's in evidence already.

18          THE COURT:  Okay.

19          MR. MAZZOLA:  Yep.

20          MR. ROSENTHAL:  Can we look at -- let's see.

21  Oh, this is the same one?

22          THE WITNESS:  That's not the one.

23          MR. ROSENTHAL:  This is not the one we're

24  trying to pull up.

25          All right.  We've done our best to try to do

 1    this in advance, but sometimes it's hard to find these.

 2              So it is Exhibit 87, but it's the second

 3    attachment to Exhibit 87.  So let's just do it for

 4    identification purposes and see if you have an objection.

 5              MR. MAZZOLA:  The exhibit, the second --

 6              MR. ROSENTHAL:  The second attachment to

 7    Exhibit 87.  I had said third, but I was wrong.

 8              MR. MAZZOLA:  You know, Stephen, let me just

 9    pop this in.

10              MR. ROSENTHAL:  That's it, yeah.  Do you see

11    what it is?

12              MR. MAZZOLA:  Hold on.

13              MR. ROSENTHAL:  Do you see it on the screen.

14              MR. MAZZOLA:  I'm sorry, Stephen.  Yes, but I

15    don't think I have seen it yet, so I beg your pardon.

16              87, second attachment, which is CTX missing

17    invoice detail.

18              MR. ROSENTHAL:  Yeah.  Okay?

19              MR. MAZZOLA:  Yes.

20              THE COURT:  Okay.

21              MR. ROSENTHAL:  So 87, the second attachment is

22    admitted as well?

23              THE COURT:  Yes.

24              MR. ROSENTHAL:  Thank you, your Honor.

25    BY MR. ROSENTHAL:

DIRECT EXAMINATION OF RISHI KUKREJA

532

1    Q.    All right.  Mr. Kukreja, what we're looking at

2    is another spreadsheet, right?

3    A.    Yes.

4    Q.    And the bottom-left corner, the right tab says:

5    CTX-US missing invoice with BLD?

6    A.    Yes.

7    Q.    Okay.  When we -- we were trying to get to this

8    document, we were talking about what did Circuitronix do

9    to check when Benlida said, Hey, there's invoices missing

10   from your big 2012 to 2019 reconciliation?

11   A.    Yes.

12   Q.    How does this answer that question?

13   A.    So the first thing is that majority of these

14   part numbers are not Circuitronix U.S. part numbers.

15   Q.    Okay.  What are the dates that were involved,

16   if you look at the left-hand column?

17   A.    From 2012 -- 5-31-2012 until --

18   Q.    If we scroll down to the bottom, let's see what

19   it runs until.  2013, 2014.

20   A.    2014, yeah.

21   Q.    Were there any parts -- I'm sorry, not parts --

22   invoices that were after December 29th of 2014 on this

23   list?

24   A.    No.

25   Q.    So now we're in November of 2019.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1           Had Benlida ever complained, to your

2   recollection, about invoices dating back from 2014 and

3   2013 and 2012 in the five to seven years that intervened

4   between then and 2019?

5       A.   No.

6       Q.   What did you do when you saw this?

7       A.   First, we reported back to them these part

8   numbers do not belong to Circuitronix LLC.  That's number

9   one.

10          Number two is that we -- the couple of part

11  numbers like the last two part numbers on the sheet, they

12  belong to Circuitronix LLC.  The last four part numbers

13  actually they belong to us.  And we asked them for

14  packing slips -- for shipping records so that we could

15  find out what they were and why they were missing.

16          And after having a few rounds of back and

17  forth, they sent us an email saying, please ignore this

18  because they made a mistake and these invoices are not

19  missing.

20      Q.   Okay.  So in the scheme of things, these

21  invoices -- we can take that down -- was it a big number?

22      A.   200 and some thousand dollars, according to the

23  sheet.

24      Q.   Okay.  So let's go back to the last thing that

25  we looked at, again, which was the -- and forgive me.

DIRECT EXAMINATION OF RISHI KUKREJA

534

1    The number, I believe, is 79, which had those different

2    columns and the things that Benlida was saying -- there

3    it is.

4          So we've covered invoices and payment

5    discrepancy.  And let's just talk about the right one --

6    sorry, the --

7          A.    Debit notes.

8          Q.    Actually, I don't know if we're going to cover

9    debit notes right now because I don't know if I have it

10   handy.  But let's cover the invoices that Benlida said

11   was missing, the left-hand column, which was $244,000.

12         A.    We just covered it.

13         Q.    That's it?  Okay.

14         A.    But we've got the email from them where they

15   retract.

16         Q.    Well, that's what I'm going to tell you about.

17         MR. ROSENTHAL:  So let's show Exhibit 88

18   please, for identification, Exhibit 88.  We can take that

19   down.  And just for identification purposes.

20         MR. MAZZOLA:  This is 88, okay.  One second,

21   please.

22         This is Joint Exhibit 88, right.

23         MR. ROSENTHAL:  Yes.

24         MR. MAZZOLA:  Yeah, there's no objection.

25         THE COURT:  All right.  88 is in evidence.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

DIRECT EXAMINATION OF RISHI KUKREJA

535

1          MR. ROSENTHAL:  Thank you, your Honor

2          (Exhibit 88 received in evidence.)

3          MR. ROSENTHAL:  Okay.  Thank you, your Honor.

4   BY MR. ROSENTHAL:

5     Q.   So, Mr. Kukreja, looking at 88, which is an

6   email, let's just look at the top one, December 4th,

7   2019.

8          This is the tail end of the reconciliation

9   process, right --

10    A.   Yes.

11    Q.   -- between the two companies?

12         What did accounting at Benlida tell you and

13  others at Circuitronix?

14    A.   They updated it and they said -- actually

15  Circuitronix recorded these invoices, these invoices are

16  not missing.

17    Q.   So they said we had some mistake in previous

18  records, actually, CTX recorded these, and they're not

19  missing?

20    A.   Yes.

21    Q.   Okay.  So that problem was resolved?

22    A.   Yep.  That means they did not -- they did not

23  bring -- after this, they did not bring anything up

24  further.

25    Q.   Okay.  So I'm not going to go back to this in

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

536

1    painstaking detail because we've been very detailed about

2    this, but with respect to the issue of the debit memos,

3    which was another column in that list of the four columns

4    that Benlida said these are the things missing, can you

5    tell us just based upon your testimony and your

6    recollection whether Circuitronix investigated that and

7    what the result of that investigation was?

8         A.    Firstly, we had provided them with all the

9    debit notes even prior to them flagging it.  They had

10   missed it in their system.  The way we know that is that

11   we got the emails in which we transmitted the debit notes

12   to them.

13         At the end of the day, there was a discrepancy

14   between them and us for $201.09.

15        Q.    $201?

16        A.    Yes.

17        Q.    Okay.  On the debit memos?

18        A.    Yes.

19        Q.    So that issue was small in comparison to the

20   numbers we're talking about?

21        A.    Yes.

22        Q.    Okay.  So --

23              MR. ROSENTHAL:  We can take that down.

24   BY MR. ROSENTHAL:

25        Q.    -- after you responded to them with this

1    information, what happened at the end of 2019?

2        A.    To be -- we went back and we made -- we took

3    out the $2.56 million, which they didn't want us to have

4    in the payment details.  We put the $2.47 million back.

5    They were, what do you call -- we took out the debit note

6    of 201 -- there was not one debit note.  There were about

7    four or five small debit notes which totaled up to

8    $201.09.  We took them out.  And we came up with our

9    final reconciliation sheet, and the date of that sheet

10   was February of 2021.

11       Q.    So as of -- at February of 2021, had this

12   lawsuit already begun?

13       A.    Yes.

14       Q.    So did you provide that final reconciliation

15   sheet or spreadsheet that Circuitronix had created to

16   Benlida in the ordinary course of business at that time?

17       A.    We did not.  We did not.  And the main reason

18   is it was work product which we needed to use in

19   litigation.

20       Q.    Okay.  So now that we're in this litigation in

21   this trial, at some point in this litigation Circuitronix

22   provided it to Benlida?

23       A.    Yes.

24       Q.    Okay.  Is there -- that document, is it another

25   Excel spreadsheet?

DIRECT EXAMINATION OF RISHI KUKREJA

538

1      A.    Yes.

2      Q.    Okay.

3            MR. ROSENTHAL:  Let's mark -- or show for

4      identification purposes Exhibit 148.

5            I don't mean to turn my back to the jury.

6            MR. MAZZOLA:  This was the joint exhibit,

7      right?

8            MR. ROSENTHAL:  Yes.

9            MR. MAZZOLA:  I thought you were going to

10     surprise me.

11           No objection, your Honor.

12           THE COURT:  All right.  148 is in evidence.

13           (Exhibit 148 received in evidence.)

14     BY MR. ROSENTHAL:

15     Q.    So, Mr. Kukreja, as context reviewing this

16     summary sheet, do you remember what the, sort of, total

17     was that before you did the internal final reconciliation

18     taking all of Benlida's different details into

19     consideration, what the total was that Benlida owed

20     Circuitronix for this 2019 reconciliation period?

21     A.    So by this time, we actually -- this

22     reconciliation did not end at 2019.  It went into 2021.

23     Q.    Fair enough.  Okay.

24     A.    And as of 2021, the amount increased to

25     5,633,757.51.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

DIRECT EXAMINATION OF RISHI KUKREJA

1     Q.     You're referring to the total that's on

2   Line 11, Column E, balance due --

3     A.     Yes.

4     Q.     -- for credit balance?

5     A.     Yes.

6     Q.     And the reason for that increment is that in

7   December of 2019, Benlida started making us pay a

8   10 percent or 3 percent premium over the purchase -- we

9   had to prepay.  That's number one.  But let's assume our

10  purchase order was for $100, we had to pay $110 to them

11  for them to accept the purchase order.

12         What did they call that additional amount?

13     A.     Premium payment.

14     Q.     A premium payment.  All right.  I want to talk

15  about that, but before we leave this subject of 2019

16  reconciliation, we're very close to being done,

17  Mr. Kukreja.

18         The number that's on there 5 -- I'm going to

19  call it 5.6 million to keep it easy, is that how much

20  Circuitronix is claiming against Benlida for that portion

21  of damages in this case?

22     A.     No.

23     Q.     Okay.  How much is Circuitronix claiming

24  against Benlida for the 2019 reconciliation part of the

25  case?

1      A.    4.7 million.

2      Q.    Only 4.7 million?

3      A.    Yes.

4      Q.    Okay.  Let's turn to the premium issue.

5            MR. ROSENTHAL:  We can take this down.

6  BY MR. ROSENTHAL:

7      Q.    When was it, approximately, that Benlida began

8  charging premiums to Circuitronix?

9      A.    On December 1st, 2019, Benlida did not like our

10  November 1st, 2019, reconciliation numbers.

11      Q.    Okay.  Where in the manufacturing agreement,

12  the 2016 letter agreement, or any amendment through

13  emails or meeting minutes was Benlida allowed to charge

14  Circuitronix a premium on top of the pricing for the

15  products?

16      A.    They're not allowed.  And, actually, not only

17  are they not allowed, they have acknowledged that this is

18  an overpayment.

19      Q.    So they had no contractual basis to do this?

20      A.    No.

21      Q.    But they did it anyway?

22      A.    Yes.

23      Q.    And did you pay it?

24      A.    Yes, we paid $317,000.

25      Q.    Why?

1    A.    Because they would not -- they would not

2   release purchase orders into the system unless we paid

3   them that.

4    Q.    Did Circuitronix keep track of these so-called

5   premium payments that -- or premium charges that Benlida

6   was charging?

7    A.    Yes.

8         MR. ROSENTHAL:  Your Honor, we'd like to show

9   for identification purposes initially Exhibit D-Y13.

10  It's called pro forma cost and inventory management

11  spreadsheet.

12        MR. MAZZOLA:  D-Y13.

13        MR. ROSENTHAL:  Any objection?  Are you still

14  studying?

15        MR. MAZZOLA:  I don't know what you -- I have

16  your D-Y13, and I'm assuming it's the same one, so...

17        THE COURT:  Is there any objection?

18        MR. MAZZOLA:  Did you send over a redacted one?

19        MR. WEINSHALL:  It's filtered.

20        MR. MAZZOLA:  Oh, it's filtered.

21        MR. ROSENTHAL:  We are close to done, your

22  Honor, with Mr. Kukreja's direct.  And the sun's not yet

23  hitting my eyes.

24        THE COURT:  It's coming.

25        MR. ROSENTHAL:  It's coming.

 1          THE COURT:  I'm not going to put the shade down

 2    today if you're still there.

 3          MR. ROSENTHAL:  I kind of liked the sunlight

 4    yesterday and then it got dark.

 5          THE COURT:  It's good when I see your eyes.

 6          MR. ROSENTHAL:  I appreciate it.

 7          So why don't you state your objection, and

 8    we'll pivot to it -- Well, I think I can short-circuit

 9    this because we'll try to accommodate what we understand

10    to be the objection.

11          MR. MAZZOLA:  It's the same objection, Judge,

12    with respect to the redactions.

13          THE COURT:  All right.  Overruled.

14          (Exhibit D-Y13 received in evidence.)

15          MR. ROSENTHAL:  All right.

16    BY MR. ROSENTHAL:

17      Q.   So, Mr. Kukreja, we're not going to show

18    details about this exhibit right now, even though --

19          MR. ROSENTHAL:  This is in evidence, your

20    Honor?

21          THE COURT:  Yes.

22          MR. ROSENTHAL:  Okay.

23    BY MR. ROSENTHAL:

24      Q.   (Continuing) -- we'll save time.

25          But can you tell us from your own understanding

1  of a document that Circuitronix created called Benlida

2  pro forma cost and inventory management spreadsheet?  Are

3  you familiar with what that was?

4         A.    Yes.

5         Q.    Okay.  So without seeing it -- your monitor is

6  blank, I assume?

7         A.    It's not.

8         Q.    You can see it?

9         A.    Yep.

10        Q.    Okay.  Let's take it down.  I don't know what

11 you were seeing.

12              Without seeing it, just tell us what that

13 spreadsheet tracked?

14        A.    So sometime after we were close to completing

15 the November 2019 reconciliation, Benlida came back to us

16 and told us they're going to start charging us a

17 20 percent premium on every purchase order we released to

18 them and it has to be prepaid.  So we tried negotiating

19 it.  We could not get out of it.  So the first purchase

20 order of close to -- the first purchase order close to

21 $300,000 we paid them a $60,000 premium.  That's

22 20 percent.  And we continued negotiating with them.

23              And eventually, in March of 2020, they accepted

24 to drop that -- the 20 percent to 10 percent and

25 3 percent, depending on different orders.  And another

1    thing which they did was they went back and said that the

2    $60,000 which you paid for the first purchase order, you

3    can cut that down to 10 percent, that's $30,000, and use

4    the balance $30,000 for subsequent premiums, like the

5    10 percent or the 3 percent.

6            So I instructed our accounting team to keep a

7    detailed log of every shipment which took place, what the

8    purchase order value was, what the premium amount was,

9    what the payment amount was.  And from December 1st,

10   2019, until today, we maintain that sheet based upon

11   instructions from counsel.

12       Q.   Well, let's not talk about lawyer-client

13   privilege discussions.

14       A.   But we were asked to just limit it to

15   October 15, 2021, and we put the cutoff date as -- we can

16   just filter it, and so we just took it up to October 15,

17   2021, and that resulted in a number of premium payments

18   of $317,000.  And that was between the 3 percent and the

19   10 percent because some line items were charged at

20   3 percent and some were at 10 percent.

21       Q.   Mr. Kukreja, has anybody called you a living

22   spreadsheet before?

23       A.   No.

24       Q.   Okay.  You didn't need a document.

25            Was there a final summary document that we

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1   prepared that shows that 317,000 and how it was broken

2   down for purposes of this case?

3        A.   Yes.

4        Q.   Okay.

5             MR. ROSENTHAL:  We'd like to show for

6   identification, your Honor, Exhibit D-X13, which is the

7   last exhibit that we have to show Mr. Kukreja, I think.

8             THE COURT:  Any objection?

9             MR. MAZZOLA:  One second.  This is...

10            Stephen, the...

11            MR. ROSENTHAL:  All right.  Any objection?

12            MR. MAZZOLA:  This -- your Bates number over

13  there is what was the last exhibit, right?

14            MR. ROSENTHAL:  Correct.

15            MR. MAZZOLA:  Okay.  Which was -- what number

16  was that now?

17            MR. ROSENTHAL:  You asked me what the last

18  exhibit was?

19            MS. MARTINEZ:  That was D-Y13.

20            MR. ROSENTHAL:  D-Y13.

21            MR. MAZZOLA:  That was already raised.

22            MR. ROSENTHAL:  Your Honor, I don't know if you

23  heard Mr. Mazzola.

24            MR. MAZZOLA:  There's no objection.

25            THE COURT:  Okay.  So D-X13 is in evidence.

```
 1                    (Exhibit D-X13 received in evidence.)
 2                    MR. ROSENTHAL:  Okay.  So we can now show
 3        D-X13.
 4                    Can you zoom in on that chart for us, Mr. Vega,
 5        please.
 6        BY MR. ROSENTHAL:
 7             Q.    So, Mr. Kukreja, can you see this red summary?
 8             A.    Yes.
 9             Q.    Does this accurately reflect, to the best of
10        your knowledge, the premiums that Benlida charged
11        Circuitronix that Circuitronix is bringing as part of its
12        claim in this lawsuit?
13             A.    It does.
14             Q.    So the total premium that's being sought is how
15        much exactly?
16             A.    $317,539.48.
17             Q.    Okay.  And even though those premiums have
18        continued to accrue in 2022 and 2023, that's not part of
19        our claim, correct?
20             A.    It is not.
21             Q.    Okay.  So we can take this down.
22                    Mr. Kukreja, you've been on the stand for a
23        full day, if we count yesterday and today.  So let me
24        just conclude with this.
25                    I want to ask you how much Circuitronix, the
```

1  company that you're the CEO of, is claiming in this

2  lawsuit against Benlida.  If you need us to bring up a

3  chart to refresh your recollection, just let me know,

4  because we have a pie chart that we created with the

5  numbers.

6          How much, if you can recall, is Circuitronix

7  requesting the jury to award for breach of contract for

8  the 2019 reconciliation period?

9      A.   If you can bring the pie chart because I --

10  yes.

11          MR. ROSENTHAL:  Okay.  Unless there's an

12  objection, we'd like to show the pie chart --

13          MR. MAZZOLA:  What's the pie chart?

14          MR. ROSENTHAL:  From the opening statement.

15          MR. MAZZOLA:  No objection.

16          MR. ROSENTHAL:  Okay.  Thank you, Mr. Mazzola.

17          Mr. Vega, do you have that handy?  Terrific.

18  BY MR. ROSENTHAL:

19      Q.   Okay.  Mr. Kukreja, I asked you about the 2019

20  reconciliation, this orange part of this pie.

21          Is that number that's reflected there an

22  accurate statement of how much Circuitronix is seeking

23  from Benlida for that period of time?

24      A.   Yes.

25      Q.   As part of the 2019 reconciliation process you

**DIRECT EXAMINATION OF RISHI KUKREJA**

 1    described?

 2        A.    We are seeking $4,760,847.

 3        Q.    For that.

 4              And you just covered the red chart which was

 5    premiums.

 6              How much is Circuitronix, just to repeat it,

 7    seeking for the premiums?

 8        A.    We are seeking $317,539.48.

 9        Q.    Okay.  How about the ROK diverted premiums,

10    which is the green chart that we had shown before?

11        A.    $2,825,000.

12        Q.    And then the leadtime penalties is colored in

13    yellow.  How much for leadtime penalties?

14        A.    $2,994,050.

15        Q.    Okay.  And I don't have a calculator up here.

16              How much do these add up to, roughly?

17        A.    Close to $11 million.

18        Q.    Under 11 million, but close to $11 million?

19        A.    Yes.

20        Q.    Okay.  So why did you let Benlida get so far in

21    debt to Circuitronix?

22        A.    At the -- so we were not given an option on

23    $317,539.48.  We were just -- it was something which we

24    were made to do just so that we could get our parts.

25              The leadtime penalties were much, much bigger

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1  than that.  We waived hundreds of thousands of dollars.

2  And, as I mentioned, the 4.7 million and the 2.825, which

3  approximate around 7.5 million, it represented three

4  months of business with Benlida.  And we believe that the

5  liabilities which we would experience should we not do

6  whatever it would take to keep the production lines

7  running would far exceed that number.

8       Q.   Did you trust that Benlida would make good on

9  these debts?

10      A.   Absolutely.

11      Q.   What choice did Circuitronix have in the

12  matter?

13      A.   None.

14      Q.   So after this case is over, regardless of

15  whatever decision the jury makes, are you still willing

16  to continue doing business with Benlida?

17      A.   Well, I -- I have stated on the record that I

18  will continue to make an effort to reconcile and get

19  things straight with Benlida.

20           MR. ROSENTHAL:  No further questions, your

21  Honor.

22           THE COURT:  All right.  Let's take a 15-minute

23  break.  We'll see everybody in 15 minutes.

24           (Court recessed from 4:40 p.m. to 4:57 p.m.)

25           (Jury enters at 4:58 p.m.)

CROSS-EXAMINATION OF RISHI KUKREJA

 1              THE COURT:  All right.  Mr. Mazzola.

 2              MR. MAZZOLA:  Thank you, Judge.

 3              Mr. Rosenthal, thank you.

 4              And, Ladies and Gentlemen of the Jury.

 5                        CROSS-EXAMINATION

 6    BY MR. MAZZOLA:

 7         Q.    Mr. Kukreja, it's good to see you.

 8         A.    Good to see you, too.

 9         Q.    You know, one of the last things you were

10    finished up with during your direct examination, and I

11    think it related to the discussion about the $317,000,

12    the premium.

13              Do you remember that?

14         A.    Yes.

15         Q.    There was a 10 percent component and there was

16    a 3 percent component.  And I think your testimony was

17    when Mr. Rosenthal asked you, you know, why did you pay

18    it.

19              Do you remember him asking you that?

20         A.    I do.

21         Q.    And I think your answer was:  We had no option.

22              Is that correct?

23         A.    That is correct.

24         Q.    Now, Benlida's not the only PCB vendor in

25    China; is that correct?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    A.    Benlida is not the only PCB vendor, but certain

2  projects have been approved at Benlida and we are

3  compelled to continue production of those --

4    Q.    Okay.  We're going to take about that.  But I

5  was just expecting a yes or no answer.  When I ask you a

6  question that says correct, I was expecting a yes or no

7  answer.  But we'll talk about that.  There are certain

8  projects that are approved at Benlida.  We'll talk about

9  that later.

10         But Benlida is not the only PCB manufacturer in

11  China; is that correct?

12    A.    They're not.

13    Q.    And, in fact, they're not the only PCB

14  manufacturer, I think, in that city; isn't that correct?

15    A.    That is correct.

16    Q.    So there are potentially other options; isn't

17  that correct?

18    A.    That is correct.

19    Q.    And some of the options you have are -- I think

20  Supertech is one, right?

21    A.    Supertech is not in that city.

22    Q.    But that's an option that you could use, right?

23    A.    That is right.

24    Q.    I think you guys do use Supertech; is that

25  correct?

1    A.    We used to use Supertech.

2    Q.    You have used Supertech then, right?

3    A.    Pardon me?

4    Q.    You have used Supertech?

5    A.    That is correct.

6    Q.    And then, of course, there's KingBoard.

7          Isn't that another PCB vendor?

8    A.    So KingBoard has --

9    Q.    Is that another PCB vendor, correct or not?

10   A.    Not correct.

11   Q.    What are they then?

12   A.    They're a laminate supplier.

13   Q.    A laminate supplier.

14         So you talked earlier about how the laminate is

15   a major component to the PCB; is that correct?

16   A.    That is correct.

17   Q.    What about Glory Faith?

18   A.    So Glory Faith is a Kingboard company.

19   Q.    And they make PCBs, right?

20   A.    They make PCBs.

21   Q.    What about Kinwong?

22   A.    They make PCBs, too.

23   Q.    Have you ever worked with any of those other

24   PCB suppliers?

25   A.    We have.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

553

1      Q.     Yeah.  You'll recall, and I think you'll recall

2  during some of the depositions and the sworn testimony in

3  this case, we were talking about a company called Benlida

4  LLC.

5             Do you remember talking about that?

6      A.     I do.

7      Q.     And Benlida LLC -- the Benlida is -- correct me

8  if I'm wrong, it's spelled the same way as this Benlida,

9  right?

10     A.     That is correct.

11     Q.     The B and the E and the N, L-I-D-A?

12     A.     That is right.

13     Q.     And we talked about Benlida LLC.

14            Do you remember that?

15     A.     That is correct.

16     Q.     And Benlida LLC, that's an LLC that you formed;

17 isn't that correct?

18     A.     That is correct.

19     Q.     And you formed that LLC -- I'm going to try to

20 get the date here, and this is off of Sunbiz.  There was

21 a file -- the effective date for this limited liability

22 company shall be January 18th, 2013; is that correct?

23     A.     That is correct.

24     Q.     I'm going to put this down in front of you for

25 identification purposes.

 1          Is that okay?

 2     A.   Sure.

 3     Q.   I'm going to use the ELMO.  Let's see how this

 4   works.

 5          MR. ROSENTHAL:  Except that camera needs to

 6   be -- yeah.

 7          MR. MAZZOLA:  In the right place.

 8          MR. ROSENTHAL:  Right.

 9          THE COURT:  Do you have an objection to this

10   exhibit?

11          MR. ROSENTHAL:  No, your Honor.

12          THE COURT:  What number is it?

13          MR. ROSENTHAL:  Well, it's not numbered.

14          MR. MAZZOLA:  Not numbered --

15          (Simultaneous crosstalk.)

16          MR. ROSENTHAL:  (Inaudible) impeachment or

17   something.

18          THE COURT:  Do you want to introduce it?  How

19   is it impeachment?  Do you want introduce it?

20          MR. MAZZOLA:  I do want to introduce it, yes.

21          THE COURT:  Okay.  What number is it?

22          MR. LERNER:  P302.

23          MR. ROSENTHAL:  Mr. Mazzola, do you have a copy

24   just because we don't have that.

25          MR. MAZZOLA:  Yes.

CROSS-EXAMINATION OF RISHI KUKREJA

555

1       THE COURT:  All right.  So that's in evidence.

2       (Exhibit P302 received in evidence.)

3       THE COURT:  We can show it to the jurors.

4  BY MR. MAZZOLA:

5       Q.   So this is the articles of incorporation that

6  you had prepared; is that correct?

7       A.   My attorneys did that.

8       Q.   That's Ozzie Torres, right?

9       A.   I -- that sounds correct.

10      Q.   Yeah.  Well, his name is right there.

11           Do you see that, Torres Law, P.A., right?

12      A.   But somebody else could have prepared that.

13  He's the registered agent.

14      Q.   But Ozzie Torres is your regular corporate

15  attorney, right?

16      A.   One of them.

17      Q.   And he's been your regular corporate attorney

18  for some time; hasn't he?

19      A.   He has.

20      Q.   So in addition to forming an LLC called Benlida

21  LLC, you've formed other LLC's; isn't that correct --

22      A.   That is correct.

23      Q.   -- Mr. Kukreja?

24           We were talking earlier about Glory Faith,

25  right?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    A.    That is right.

2    Q.    And Glory Faith is in the PCB business, right?

3    A.    Right.

4    Q.    And Glory Faith is also a vendor you guys have

5    used, right?

6    A.    That is correct.

7    Q.    Because I found something else when I started

8    investigating Benlida LLC.

9         I found that you formed another LLC in Florida

10   called Glory Faith LLC; is that correct?

11   A.    That is correct.

12   Q.    So let's put this document in front of you for

13   identification.

14        MR. ROSENTHAL:  Your Honor, I do have an

15   objection to this exhibit.

16        THE COURT:  All right.  What's the objection?

17        MR. ROSENTHAL:  It's not been listed, and it's

18   not being used for impeachment purposes.

19        THE COURT:  All right.  What is the relevance

20   of this?

21        MR. MAZZOLA:  What's the relevance of it is

22   it's to show that Mr. Kukreja is out forming LLCs and it

23   goes to credibility.  It goes to motive.

24        THE COURT:  All right.  Sustained.

25   BY MR. MAZZOLA:

CROSS-EXAMINATION OF RISHI KUKREJA

```
 1        Q.    With respect to the formation of the Glory
 2   Faith LLC, that was also done by Ozzie Torres as well; is
 3   that correct?
 4        A.    That is correct.
 5        Q.    Let me ask you this question with respect to
 6   the Benlida LLC.
 7             MR. MAZZOLA:  I think this is dying.
 8             THE COURT:  Okay.
 9   BY MR. MAZZOLA:
10        Q.    With respect to the Benlida LLC, it is true
11   that when you formed the Benlida LLC, you never asked for
12   any permission from Benlida; isn't that correct?
13        A.    We discussed it on several occasions, Benlida
14   and us.
15        Q.    But you never asked them for permission; isn't
16   that correct?
17        A.    No permission is required.  We've discussed it,
18   and they're aware of it.
19        Q.    But they never knew you were doing it.
20             You didn't get their authorization to do that;
21   isn't that correct?
22        A.    I cannot understand when you -- when we have a
23   discussion between parties and we say we're doing it, and
24   there's no objection --
25        Q.    So you had a conversation and they gave you
```

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    authority to do it.

2              Is that your testimony?

3    A.    I have -- firstly, I do not believe that

4    authorization is required.  But, secondly, I did tell

5    them about it, and they were aware of it.

6    Q.    Just as we talked during your deposition,

7    you're right, authorization is not required.  Anyone can

8    do it.

9              But did you ask them before you did it?  That's

10   the question.  Yes or no?

11   A.    I did not ask them, but I did inform them.

12   Q.    But you did not ask them before you did it?

13   A.    I cannot -- this is going back to 2013.  I

14   cannot recollect whether I told them before I did it or

15   after I did it.  But they were aware of it.

16   Q.    My issue is, because you have an uncanny

17   ability -- uncanny ability --

18             THE COURT:  Don't make opinions.

19             What's your question?

20             MR. MAZZOLA:

21   BY MR. MAZZOLA:

22   Q.    We have a number of spreadsheets and numbers,

23   and I'm asking you if you're able to recollect whether

24   you sought authority from Benlida before you opened up an

25   LL- -- organized an LLC in their name?

```
 1        A.    I cannot recollect.

 2        Q.    And you did the same thing with KingBoard.

 3              You opened up an LLC called KingBoard; isn't

 4   that correct?

 5              THE COURT:  What's the name?

 6              MR. MAZZOLA:  KingBoard.

 7              THE COURT:  Okay.

 8   BY MR. MAZZOLA:

 9        Q.    That's correct?

10        A.    That is correct.

11        Q.    Did you get their authority to do that?

12        A.    I do not understand why any authority is

13   required.  There is a mechanism in place.  You go to

14   Sunbiz.com -- .gov or .com, I've forgotten, and if there

15   is no -- if a name is available, you're allowed to

16   incorporate that name.

17        Q.    Did you ever do business with KingBoard?

18        A.    We did not.  We do business -- we did business

19   with the subsidiary, Glory Faith, but we did not do

20   business with KingBoard.

21        Q.    So you did business with their subsidiary.

22              Is that what you're telling us?

23        A.    That's right.

24        Q.    And you never thought to ask the parent company

25   if it would be okay to open up an LLC using their name?
```

1        A.    It's not their name.  They were using it in

2    Hong Kong and China.  It's not their name.

3        Q.    What about Kinwong?

4        A.    Yes.

5        Q.    Now, I know you did business with Kinwong,

6    right?

7        A.    We did.

8        Q.    And I know Kinwong was somewhat of a

9    substantial business partner; isn't that correct?

10        A.    That is correct.

11        Q.    And you went ahead, you came into Florida, you

12    went on Sunbiz, you opened up an LLC in their name; isn't

13    that correct?

14        A.    That is correct.

15        Q.    Did you ask Kinwong if you could do that?

16        A.    Let me add some perspective to --

17              THE COURT:  Well, first, answer the question

18    directly, and then you can explain.

19              THE WITNESS:  Sure.

20              No, I did not.  Let me add some perspective to

21    it.

22    BY MR. MAZZOLA:

23        Q.    You did not ask them?

24              THE COURT:  Hang on.  He can explain.

25              THE WITNESS:  If you go to any of these

561

1   factories, including Benlida, we had the Circuitronix

2   name next to Benlida's name -- actually, our name used to

3   be bigger than the Benlida name out there.

4          So any customer who walked through those gates

5   saw Circuitronix and Benlida as one organization.  And

6   the same thing about Kinwong.  On the main entrance, it

7   was Circuitronix name on one side of the gate, Kinwong

8   name on the other side of the gate.  So when they walked

9   in, they -- all customers associated both the names to

10  be -- the companies to be one in the other.

11         And Tracy at some point had a business card

12  from Circuitronix, she had a email ID from Circuitronix.

13  She had an email ID from Benlida.  There were

14  organization charts which were shared with customers

15  where I was reporting to Mr. Huang, I was the vice

16  president of sales and marketing reporting to the CEO.

17         So, yes, we projected that we were one company

18  together, Benlida and us together.  We projected we were

19  one company, and for the longest time we believed that we

20  were one company.

21  BY MR. MAZZOLA:

22      Q.   So you branded yourself to your customers as

23  one company?  Is that what you did?

24      A.   Both, Benlida and us, we branded ourselves as

25  one company to the customer.

562

1    Q.    But the customers are your customers, right?

2    A.    The customers are our customers, Circuitronix's

3    customers.

4    Q.    Because your contract had an exclusive customer

5    list in it, right?

6    A.    That's right.

7    Q.    And if Benlida had gone off and sold anything

8    to one of those exclusive customers, they would have been

9    in breach of contract, right?

10   A.    They would have been in breach of contract.

11   That is correct.

12   Q.    So they really weren't your customers; isn't

13   that correct?

14   A.    That's correct.

15   Q.    And so you were branding to your customers that

16   you were one in the same; isn't that correct?

17   A.    That is correct.

18   Q.    And you were branding yourself to your

19   customers that this factory was your factory?

20   A.    That is correct.

21         There was a photograph in the conference room

22   with Mr. Douglas Huang and I standing in front of a

23   Circuitronix sign, both of us pointing to the

24   Circuitronix sign.  It's in the conference room -- it

25   used to be in the conference room.  I haven't been there

1    for quite some time.

2         Q.    You have a website, right?

3         A.    Yes.

4         Q.    And your website has images of Circuitronix and

5    Benlida when you walk into the building, right?

6         A.    Our website has that.  That's number one.  Our

7    website has a 5 to 10 minute video of the Benlida factory

8    inside.

9              We got professional photographers to go into

10   that factory with Benlida's permission.  We made a sales

11   and marketing video.  Benlida asked us whether they could

12   use it.  We gave them a copy of that video.  I think they

13   also use it.  We also use it.  But everything is done

14   with their permission.

15        Q.    So the video you're referring to is the video

16   that's on your website, right?

17        A.    That video is on --

18        Q.    Is -- it's on your website, right?

19        A.    That is correct.

20        Q.    And it's on your website today, right?

21        A.    It's on our website today.

22        Q.    You talked a little bit earlier about how it

23   wasn't that easy to just transfer from one factory to

24   another.

25              Do you remember saying that?

1        A.    Yes, I do.

2        Q.    And why is that?

3        A.    Firstly, one glove does not fit all.  Each

4    customer is different.  And customers are not only

5    different by the virtue of being different customers,

6    it's also by the industry.  The automotive industry is

7    more stringent than the consumer electronics industry.

8    Something which could impact somebody's life, medical

9    industry, is more stringent than the automotive industry.

10   And I know you may think that this is a joke, but the

11   most --

12       Q.    I don't think it's a joke.

13             Why would you say that?

14       A.    No, I'm going to say something.

15       Q.    Okay.

16       A.    Let me say it.  You may find it funny.

17             But the white goods industry, which is

18   dishwashers, laundry machines, they're actually the most

19   stringent, because it's been determined that people

20   have -- that causes the maximum amount of -- that causes

21   the maximum amount of inconvenience should somebody's

22   machine break down.  So they actually -- that's why if

23   you look at your washing machine, they give a one -- or a

24   ten-year guarantee on it.  No other industry gives that

25   sort of warranty.

1        So customers -- there are two types of

2   customers.  One customers, they specify -- they order the

3   factory, they'll order two or three factories, and then

4   they give us a choice whichever factory we want to put

5   the project in, with the stipulation that once we put the

6   project into that factory, we -- and submit samples to

7   them, we cannot change it unless we get their approval.

8        The other customers who are not that stringent.

9   In the automotive industry they are slightly more

10  stringent.  And so once you launch a project in a

11  factory, they expect you to manufacture the board in that

12  factory for the life of the project because trying to

13  validate it with another factory is extremely expensive.

14       Q.   There was something you talked about earlier.

15  I think it's a Gerber.

16            Do you remember?

17       A.   I do.

18       Q.   G-E-R-B-E-R --

19       A.   Yes.

20       Q.   -- right, like the baby formula?

21       A.   Yes.

22       Q.   And, as I understand, this Gerber, it's kind of

23  like the code, right?

24       A.   No, not really.

25       Q.   But if you have a Gerber, you could give the

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1  Gerber to another factory, and couldn't they make the

2  same PCB for you?

3      A.    Yeah.   Once you've got the manufacturing

4  inputs, any factory can build the same printed circuit

5  board.

6      Q.    So if you have the Gerber for a PCB -- I don't

7  know if we still have those --

8      A.    Yes.

9          MR. MAZZOLA:  May I approach, Judge.

10          THE COURT:  Yes.

11  BY MR. MAZZOLA:

12      Q.    So if you had the Gerber for this PCB, you

13  could go across the street to another factory and make

14  it, right?

15      A.    Yes.

16      Q.    So my point is, there may be some difficulty,

17  but there are options in manufacturing your PCBs?

18      A.    That part number goes into a car.  If we needed

19  to get it built at another factory, we would have to go

20  back to the Tier 1 and tell them that we'd like to build

21  it in another factory.

22          They would have to go back to OEM, we'd have to

23  give permission to them.  And the Tier 1 would charge us

24  anywhere between $50,000 to $250,000 to validate that new

25  factory.  And it would take minimum 3 months, as much as

1    12 months to get that printed circuit board shifted from

2    one factory to the next factory.

3         Q.    And that was a cost of business that you didn't

4    want to do?

5         A.    That's a cost of business we'd like to avoid if

6    we could avoid because it's not only money.  It's

7    inconveniencing the customer, and we do not want to do

8    that.

9         Q.    Now, you're still doing business with Benlida.

10               You testified to that, right?

11        A.    Yes.

12        Q.    And we'll look at some things later.  We'll

13   discuss some things later.

14               But it is fair to say the amount of business

15   you're doing with Benlida is not as much as it was in

16   2019, 2020, 2017, 2018; isn't that correct?

17        A.    Yeah, we're doing very little business with

18   Benlida.

19        Q.    Has your business gone down?

20        A.    It's a combination of going -- so after COVID,

21   everybody's business has gone down.  And 2023 has been a

22   challenging year for the electronics industry.

23        Q.    But naturally you must have found other

24   vendors, right?

25        A.    We did.

1       Q.    So there's other vendors out there?

2       A.    Absolutely.   There are 3,000 printed circuit

3   board manufactures in China.

4       Q.    3,000?

5       A.    Actually it could be 5,000.

6       Q.    5,000.

7             So Benlida really didn't have you behind the

8   back, right?  You had other options; isn't that correct?

9       A.    Within limits, within restrictions.

10      Q.    But you had other options; isn't that correct?

11      A.    We were not free to -- we were not -- the

12  projects Benlida -- we are able to procure the boards

13  which we buy from Benlida today at least 20 to 30 percent

14  cheaper that what we get from Benlida today, but we do

15  not have -- we are not free to make that decision.  The

16  customer does not allow that.  The customer expects us to

17  run those boards until the end of the life of the

18  project.

19      Q.    But the number of boards you're ordering, the

20  square meters, has gone down significantly.

21            So my point is:  You have found another vendor;

22  isn't that correct?

23      A.    That's correct.  So any new project which we

24  get we do not send to Benlida.

25      Q.    You do send some new projects to them; don't

1    you?

2         A.   We -- actually, I saw an email yesterday where

3    there was a project which we are sending to them.

4         Q.   It was three days ago, right?

5         A.   I cannot -- I saw the email yesterday so it may

6    have been three days ago.

7         Q.   Tracy is an honest person.

8              You agree to that, right?

9         A.   Absolutely.

10        Q.   You agree Douglas is an honest person, right?

11        A.   Tracy and Douglas will do what Mr. Huang tells

12   them to do.

13        Q.   And what about Roger?  Is he an honest person?

14        A.   Roger, in addition to doing what -- Firstly,

15   Roger has given me no reason to not believe that he is a

16   an honest person.  I believe he is an honest person.

17   And -- but at the end of the day, they will tow the line

18   which Mr. Huang asks them to tow.

19        Q.   And you believe Benlida is a good company?

20        A.   I consider Douglas and Tracy to be -- to have a

21   personal relationship with them.  And out of all the

22   Chinese printed circuit board manufacturers we have dealt

23   with, Benlida is the only company where I can say

24   confidently as of 2019 has not done two things.  They

25   have not tried to circumvent our relationship with our

1   customers --

2        Q.   So they're honest, right?

3        A.   Yes.

4             And they have not -- until 2019.  I need to

5   clarify that.  I need to state that again.

6             And they never spoke badly about us to anybody

7   in the industry.  So, yeah, they were good people to work

8   with.

9        Q.   And they were honest, at least insofar as the

10  final reconciliation went, right?

11       A.   They were honest as far as the -- what they

12  were trying to do was they were trying to justify a

13  certain number.  And they were honest in providing the

14  feedback, but they were not able to get to that number.

15  And, eventually, that's what caused the relationship to

16  break.  But they tried everything, including adding the

17  premium payments.

18       Q.   I think you said, when Mr. Rosenthal was asking

19  you questions, towards the end of your testimony at the

20  end of the afternoon before we started this

21  cross-examination, that when all the reconciliations were

22  done, the numbers were very close.

23            I think you said they matched closely, and it

24  was about an $89,000 difference; isn't that correct?

25       A.   The -- that is correct.

571

1      Q.      Okay.  So their numbers versus your numbers,

2   about $89,000 difference, right?  Is that correct?

3      A.      That's correct, but that particular statement I

4   made specific to the payments transacted between the

5   company.  They objected to the 2.565 million on one hand,

6   and they received 2.477 million on the other hand which

7   was not accounted for.  The difference between the two is

8   approximately 80, $85,000.

9      Q.      But they helped you discover that information,

10  right?  Right?

11     A.      Right.

12     Q.      So they didn't hide that from you; is that

13  correct?

14     A.      That is correct.

15     Q.      So in terms of the reconciliation, the back and

16  forth that was going on towards the summer and fall of

17  2019, they were being open and sharing the numbers with

18  you; is that correct?

19     A.      That is correct.

20     Q.      I want to put up a document Mr. Kukreja, that

21  your lawyers used with you.  I think it might have been

22  the -- the very first document they used yesterday

23  morning.  And it's been previously marked, and it's in

24  evidence as D-U13.

25              This is an email --

1          MR. MAZZOLA:  Can you scroll down.  No, scroll

2     the other way.

3     BY MR. MAZZOLA:

4          Q.    So I just want to ask you a couple of questions

5     about this email just to get things started.

6               Mr. Kukreja, here's DU3.  And it's

7     been introduced into evidence.  It's an email from Tracy.

8     We talked about earlier.  And we may or may not get much

9     further into the weeds here.

10              But it's sent to you; is that correct?

11         A.    That is correct.

12         Q.    It's copied to Douglas.  And we know who

13    Douglas is, right?

14         A.    Yes.

15         Q.    It's also copied to Akshay Koul, right?

16         A.    Yes.

17         Q.    And I think we've talked about Akshay Koul,

18    but -- during your testimony; is that correct?

19         A.    Yes.

20         Q.    Who is Akshay Koul?

21         A.    He runs the sales and marketing for the

22    Asia-Pac region.

23         Q.    For the what factory?

24         A.    Asia-Pac.

25         Q.    Asia-Pac.

573

1        What does that mean, Asia-Pac?

2    A.    All the Asian countries, including India.

3    Q.    But not -- when you say -- so the Asia-Pacific?

4    That's what you mean, kinda?

5    A.    Yeah.

6    Q.    Okay.  Does it include Australia and those

7    other countries?

8    A.    Yes.

9    Q.    So when you say Asia-Pac, we're thinking along

10   the lines of Asia-Pacific, Japan, Korea, China, southeast

11   Asia --

12   A.    Yes.

13   Q.    -- and India?

14         Okay.  Where does he work?

15   A.    He's based in the Hong Kong office.

16   Q.    The Hong Kong office.

17         The Hong Kong office of what company?

18   A.    Circuitronix Hong Kong.

19   Q.    He's related to you; isn't it?

20   A.    He is my sister-in-law's cousin.

21   Q.    At one time I think he referred to himself as

22   your brother-in-law?

23   A.    When he was speaking with you?

24   Q.    Yeah.

25   A.    Maybe he did.

1    Q.    Okay.  So he's your sister's --

2    A.    No.  He's my brother's wife's cousin.

3    Q.    Okay.  When did you hire him?

4    A.    2014 or 2015 -- 2014.

5    Q.    Was that before or after he married -- I guess

6    married into the family?

7    A.    No.  My brother's been married since '97.

8    Q.    So he was already connected to the family in

9    other words; is that correct.

10   A.    That's right.

11   Q.    If we scroll down a bit on this, there's a

12   reference to -- and I don't know what this is.  It says

13   CTX-SZ.

14         What is that, CTX-SZ?

15   A.    Where is that?

16   Q.    It's just been highlighted.

17   A.    Circuitronix Shenzhen.

18   Q.    What is Circuitronix Shenzhen?

19   A.    Circuitronix Shenzhen is an affiliated company,

20   and they transact business in China.

21   Q.    In China?

22   A.    Within China.

23   Q.    And they do that because there's a benefit.

24   You don't have to export.

25         You can just transfer intra-country, right?

 1    A.   Something like that, yes.

 2    Q.   Does CTX Shenzhen order product from Benlida?

 3    A.   They do.

 4    Q.   And when they order product from Benlida, do

 5 they issue a purchase order?

 6    A.   Yes, Circuitronix Shenzhen issues a purchase

 7 order.

 8    Q.   They do issue a purchase order?

 9    A.   Yes.

10    Q.   Where does that purchase order come from?

11         MR. ROSENTHAL:  Objection; relevance.

12         THE COURT:  Overruled.

13 BY MR. MAZZOLA:

14    Q.   Where does that purchase order come from?

15    A.   Who generates that purchase order?

16    Q.   Who generates it?  Who sends it?  Let's do both

17 question.  Who generates it?  Who sends it?

18    A.   Somebody in Akshay's team.

19         THE COURT:  Somebody in what?

20         THE WITNESS:  In Akshay -- Akshay Koul, in his

21 team.

22         THE COURT:  Team?

23         THE WITNESS:  Yes.

24         THE COURT:  Okay.

25 BY MR. MAZZOLA:

576

1        Q.    So when that purchase order is generated for

2    CTX Shenzhen, it's produced by someone in Akshay Koul's

3    team, right?

4        A.    Yes.

5        Q.    And Akshay Koul is the person who runs, I think

6    you said it, CTX Hong Kong?

7        A.    He manages sales for CTX Hong Kong.

8        Q.    He manages sales for CTX Hong Kong.

9              So if I had an email with a purchase order

10   raised -- you know what that means when they say the

11   purchase order is raised, right?

12       A.    Yes.

13       Q.    What does that mean when the purchase order is

14   raised out?  Can you explain that?

15       A.    It's created and sent.

16       Q.    So if I had a purchase order that was raised

17   from CTX Shenzhen, and I looked at the email transmitting

18   it, who would be sending it?

19       A.    Lots of different people could be sending it.

20   I cannot name -- and it changes over the last 10 years.

21   Lots of different people may have sent it.

22       Q.    CTX India?

23       A.    CTX India could be one of the -- CTX India

24   could be one of the offices sending that purchase order.

25       Q.    Do you have any idea how many purchase orders

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

```
 1   were issued by CTX Shenzhen to Benlida?

 2       A.    I do not.

 3       Q.    No idea?

 4       A.    No idea.

 5       Q.    Do you have any sense -- let's talk now about

 6   employees.

 7             Now, you heard in opening statements that this

 8   is probably going to go longer than the allotted time

 9   that we have for the afternoon, but there was something

10   I'm trying to understand, and I'm having a hard time

11   understanding it because I could have sworn you testified

12   here in this courtroom that you had a thousand employees.

13             Is that what your testimony was, or did I

14   misunderstand that?

15       A.    You did not misunderstand that.

16             THE COURT:  Did not misunderstand it?

17             THE WITNESS:  Did not.

18   BY MR. MAZZOLA:

19       Q.    And I've got to assume -- because you know why

20   you're in this courtroom, right, we're talking about CTX,

21   so we're talking about their relationship with Benlida.

22             So I have to assume when you said you had a

23   thousand employees, you were referring to CTX; is that

24   correct?

25       A.    CTX, Circuitronix LLC.
```

CROSS-EXAMINATION OF RISHI KUKREJA

578

1      Q.    Circuitronix LLC?

2      A.    Yes.

3      Q.    Now, I also could have sworn you said that

4   you've got 55 employees here in Florida; is that correct?

5      A.    Sounds correct.

6      Q.    So what I can't understand -- and maybe you can

7   help me and at the same time help the jury understand --

8   where the other 945 employees of CTX work.

9      A.    Right.

10      Q.    Can give me a sense -- all right.  Let's go

11   through that and try to understand where they work.

12      A.    They work in Mexico.

13      Q.    In Mexico.

14            There's a CTX Mexico?

15      A.    There's an entity which Circuitronix has a

16   partnership in Mexico.

17      Q.    They have a partnership?

18      A.    So we have -- in Mexico there's something which

19   is known as a Maquila program.

20            THE COURT:  And how do you spell that?

21            THE WITNESS:  M-A-Q-U-I-L-A.

22            THE COURT:  Maquila?

23            THE WITNESS:  Maquila.

24            THE COURT:  Okay.

25            THE WITNESS:  And so they have to be two U.S.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

 1   entities which own that maquila.  And Circuitronix is a

 2   partner in -- has a partnership with another company

 3   which I own.

 4   BY MR. MAZZOLA:

 5       Q.   So the question I want to know then is if we

 6   looked at their paychecks, would it say CTX on it?

 7       A.   No, they'd say Wattera, but Circuitronix

 8   owns that --

 9       Q.   That's Wattera LLC, right?

10       A.   That's correct, but Circuitronix owns the

11   Maquila.

12       Q.   So the thousand employees that you were talking

13   about earlier working for CTX, they don't really work for

14   CTX, they work in Mexico through some sort of

15   partnership; is that correct?

16       A.   That is correct.

17       Q.   What about the people in CTX India?  Do they

18   work for you?

19       A.   They work for an affiliated company.

20       Q.   So when you said you had a thousand employees

21   that work for CTX and you told everyone how you grew CTX

22   from one person in 2002 to a thousand people, you're

23   really just referring to the 45 people that work in

24   Florida and the other 955 that work in Mexico, right?  Is

25   that correct?

CROSS-EXAMINATION OF RISHI KUKREJA

580

1    A.    Yes.  I was asked a question, and that's how I

2  answered it.

3    Q.    Okay.

4    A.    That's correct.

5    Q.    And so the ones in CTX India, they don't really

6  work for you, right?

7    A.    They do not work for me.

8    Q.    Who do they work for?

9    A.    For Richi Circuitronix.

10    Q.    Oh, that's Richi, R-I-C-H-I, that company,

11  right?

12    A.    That's right.

13    Q.    They have an email address that says

14  Circuitronix, I think, .co,.i, right?

15    A.    That's right.

16    Q.    That's Sourabh's email address?

17    A.    That's right.

18    Q.    That's the email address used by the inside

19  sales team, right?

20    A.    That's right.

21    Q.    And, as I understand it --

22    A.    Some people on the inside sales team.

23    Q.    As I understand it, Sourabh runs this inside

24  sales team, right?

25    A.    The India inside sales team.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    Q.    So when you talked about those thousand

2    employees, did those thousand employees include anyone

3    that worked at CTX Shenzhen?

4    A.    No, they did not.

5    Q.    They did not.

6          Because, of course, CTX Shenzhen is a different

7    company; is that right?

8    A.    Circuitronix Shenzhen is a different company,

9    that's right.

10   Q.    And when you talked about those thousand

11   employees, did those thousand employees include anyone

12   that worked at CTX Hong Kong?

13   A.    They did not, no.

14   Q.    So those thousand employees, Akshay Koul is not

15   included in that list, right?

16   A.    He is not.

17   Q.    He's on an awful lot of emails; isn't that

18   correct?

19   A.    That's right.

20   Q.    I kind of think he's been on almost every email

21   we've seen throughout this case so far; isn't that

22   correct?

23   A.    So I'm grooming Akshay Koul to become the group

24   CEO.  If at some point in time if he's able to do it,

25   he's going to move to the United States and take over

 1   Circuitronix LLC.

 2        Q.   There was a person name Sunny Kapoor?

 3        A.   Yes.

 4        Q.   His name was on emails as well, right?

 5        A.   Prior to 2015.

 6        Q.   Sunny Kapoor was Akshay Koul's predecessor,

 7   right?

 8        A.   That is correct.

 9        Q.   And Sunny Kapoor, I think, you were grooming to

10   be CEO as well, right?

11        A.   At that point in time, that's correct.

12        Q.   But you guys had a falling out, right?

13        A.   We did.

14        Q.   And he left, right?

15        A.   Yes.

16        Q.   Or you fired him.

17             But he left, right?

18        A.   Right.

19        Q.   He's now back, right?  Or am I misunderstanding

20   this?

21        A.   Back where?

22        Q.   Does he not -- does he work for you again?

23        A.   He does not.

24        Q.   I thought he worked for another company.

25        A.   EIEMS.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    Q.    EIEMS, right, yeah.

2          And that's the company that your mother,

3    Promila, is a majority owner in it, right?

4    A.    Yes.

5    Q.    Mr. Rosenthal asked you a couple questions

6    about employee retention.

7          Do you remember that?

8    A.    I do.

9    Q.    And you discussed it, right?

10   A.    Yes.

11   Q.    And you talked about how employees, you know,

12   sometimes they have to go.  And, you know, we all run

13   businesses here, sometimes people have to go, they just

14   don't do a good job, right?

15   A.    Sometimes they do a great job and they still

16   go.

17   Q.    They still go.  And I think you said it's

18   capitalism.

19          What did you mean by that?

20   A.    That a headhunter calls an employee, and they

21   get a good offer.  They make a decision to go.  Like I

22   cannot -- I cannot keep them against their will.  I can

23   try to convince them.

24   Q.    Who is Nicole Donaldson?

25   A.    Nicole Donaldson used to work in the accounts

584

1   payable team out of -- in the Fort Lauderdale office.

2       Q.    Doesn't work there anymore, right?

3       A.    Does not work there anymore.

4       Q.    What about David Fonseca, who is he?

5       A.    He used to be a controller at Circuitronix

6   Fort Lauderdale.

7       Q.    And he doesn't work there anymore, right?

8       A.    Does not work there any --

9       Q.    What happened to him?

10      A.    Lina terminated him.

11      Q.    There was a lady named Melonnie Rhoden.

12            What happened to her?

13      A.    Melonnie left the company.

14      Q.    What about Donovan Waite?

15      A.    He works for the company today.

16      Q.    What about Ivonne Suarez?

17      A.    I don't know who she is.

18      Q.    What about Paul Silverthorn?

19      A.    Paul left the company, and then he came back

20  and joined the company.  He was with us until a month

21  ago, and he left the company again.

22      Q.    There's an A.O. Shen.

23            She left too, right?

24      A.    She left.  She moved to Dallas.

25      Q.    There's a Todor Chelibashki.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

585

1      A.    Yes.

2      Q.    He left too, right?

3            THE COURT:  How do you spell that?

4            MR. MAZZOLA:  C-H-E-L-I-B-A-S-H-K-I.

5            THE COURT:  All right.

6            THE WITNESS:  I think Todor left in 2015 or

7    2016.

8    BY MR. MAZZOLA:

9      Q.    And there's a Howard Kosoy.

10           He left too, right?

11     A.    Around the same time frame.  About 2017, 2018.

12     Q.    And there was a Marcia Delgado.

13           She left too, right?

14     A.    That's right.

15     Q.    And isn't it fair to say -- I don't know if I'm

16   correct, but we'll talk about it later, that the majority

17   of those people worked in the finance section, right?

18     A.    That is correct.

19           MR. MAZZOLA:  One second.  I just need to

20   double check something.

21   BY MR. MAZZOLA:

22     Q.    So as I understand it, Melonnie Rhoden, she was

23   fired because I think you guys thought she was lazy,

24   right?

25     A.    She didn't report to me.  I had very little

```
 1    day-to-day interaction with her so I didn't make any
 2    decisions, but --
 3         Q.    Have you heard that?
 4         A.    That's what I've heard, yep, she was...
 5         Q.    So CTX has no employees in Hong Kong, right?
 6         A.    CTX has no employees in Hong Kong.
 7         Q.    And the global headquarters of CTX is here,
 8    right?
 9         A.    That's right.
10         Q.    So the global headquarters of CTX is here in
11    Florida; is that right?
12         A.    That's right.
13         Q.    This is the global headquarters right here in
14    Florida, right?
15         A.    Right.
16         Q.    You testified earlier that you have a website,
17    right?
18         A.    Yes.
19         Q.    That CTX has a website.  That was your
20    testimony, right?
21         A.    It is.
22         Q.    And, in fact, we've talked about this website
23    in another circumstance related to this case when you
24    were under oath; isn't that correct?
25         A.    That's right.
```

1      Q.    So it is your website, right?  Right?

2      A.    Circuitronix.com is our website.

3      Q.    Yeah, it's your website.

4            And there's a video that's embedded in that

5      website, right?

6      A.    Right.

7      Q.    And that video is your video, right?

8      A.    That's right.

9      Q.    I want to show you something -- that video.

10     A.    Sure.

11     Q.    Is that okay?  We will put it up.

12           MR. ROSENTHAL:  Objection; improper

13     impeachment, if that's the purpose.

14           MR. MAZZOLA:  It's an out-of-court statement.

15     It's his statement, your Honor.  And the impeachment will

16     be crystal clear once I play the video.

17           THE COURT:  All right.  Overruled.

18           (Video played in open court.)

19     BY MR. MAZZOLA:

20     Q.    I thought I heard him say, the person talking,

21     that Circuitronix headquartered in Hong Kong.

22           Is that what I heard?

23     A.    You may be right.  I didn't hear it.

24     Q.    You didn't hear that.

25           Do you want to play it again?

1    A.    No.  I take your word for it.

2    Q.    It's not there for me to hear.  It's for these

3 ladies and gentlemen of the jury to hear and the judge to

4 hear.

5    A.    Sure.

6    Q.    But you didn't hear that, right?

7    A.    No, I'm not disputing what's on -- I do not

8 make these videos.  Sales and marketing makes the videos.

9 And I may have seen it once in the passing over the last

10 three or four years.  And it's possible it says

11 Circuitronix Hong Kong.

12   Q.    Is the global headquarters.  That's possible,

13 right?  Is that what you're saying?

14   A.    It's -- it depends what the main purpose of the

15 video was.

16   Q.    Not my video.

17   A.    That's right.  So I do not know what the main

18 purpose is.  If the main purpose of the video was for a

19 European customer, then Circuitronix Hong Kong would be

20 the headquarters.

21   Q.    Okay.  So it depends who's listening to the

22 video, right?  Is that your testimony?

23   A.    Presentations are always tailor-made to --

24 presentations are always tailor-made to the person

25 who's -- it's being given to.

1      Q.    Mr. Kukreja, that's not a presentation.

2            That's a video on your website; is that

3    correct?

4      A.    That's a video on the Circuitronix website,

5    that is correct.

6      Q.    And it's your website; is that correct?

7      A.    It is my website that is correct.

8      Q.    Yes?

9      A.    Yes.

10     Q.    And whoever made that worked for you; is that

11   correct?

12     A.    Indirectly or directly, yes, they worked for

13   me.

14     Q.    Because there's a lot of emails and lot of

15   things going on in this case that are written by other

16   people, that are sent by other people, but they're

17   imputed to you or they're imputed to Benlida; isn't that

18   correct?

19     A.    That's correct.

20     Q.    What did you mean in that video where you

21   mentioned -- where the video mentions 3,000 skilled

22   engineers?  Is that included in your 1,000 employees?

23     A.    I think it says 3,000 skilled employees.

24     Q.    Okay.  Are those 3,000 skilled employees, are

25   they included in the 1,000 employees that you told us you

1    had here?

2         A.    No, I did not -- they're not included.  And it

3    does not say employs 3,000 skilled technicians.  It says

4    Circuitronix works with 3,000 skilled technicians.  If

5    you'd like to hear that again.

6              MR. MAZZOLA:  Judge, I'd like to move that

7    video into evidence.

8              THE COURT:  All right.  What's the number, 303?

9              MR. MAZZOLA:  Yes.

10             MR. ROSENTHAL:  No objection.

11             (Exhibit 303 received in evidence.)

12   BY MR. MAZZOLA:

13        Q.    And in that video on your website, you talk

14   about our state-of-the-art facilities.

15             What state-of-the-art facilities are you

16   referring to?

17        A.    If you saw one of the -- if you saw the

18   entrance of the facility, there was a Circuitronix name

19   and the Benlida name on top of it.  The Circuitronix in

20   green and Benlida in blue.  We have -- we had our company

21   logo which was bigger than the Benlida logo at that

22   place.  We had the Circuitronix logo -- a bigger

23   Circuitronix logo at the front gate relative to Benlida.

24   And that was the agreement Benlida and we had.  There's

25   no way we could have put that sign without Benlida

 1    knowing.

 2          And, actually, to show how this is just a

 3    promotional video, in one of the -- in one of those

 4    shots, you see Roger Wu in manufacturing, when he is not

 5    in manufacturing.  So who put him up there?  That's the

 6    way these videos are made.  They're promotional videos.

 7    Q.    Okay.  So they're promotional videos.

 8          Are you telling me that because they're

 9    promotional, they don't contain the truth?

10    A.    They contain the truth.  Benlida and

11    Circuitronix projected our sales as one single entity

12    when we were engaging with customers.

13    Q.    That's not Benlida's website.

14          It's your website; is that correct?

15    A.    This is our presentation -- the website is

16    ours.  So I'm sure you'll agree with me that we could

17    not -- all the employees inside, majority of the

18    employees, are Benlida employees.  I'm sure you would

19    agree with me that we could not make that video without

20    Benlida's participation and permission.

21          And, more importantly, if you'd like to see,

22    I've got an email where Tracy has written to me saying,

23    can we -- can you send us that video because we'd like to

24    use that video for our customers.  And we replied back

25    and said, Yeah, sure, and we've given her the video.

1      THE COURT:  So those -- those video -- the

2  parts that are showing manufacturing processes, those

3  were all in Benlida's factory?

4      THE WITNESS:  All in Benlida's factory.

5  BY MR. MAZZOLA:

6      Q.    But Benlida didn't produce the video, right?

7  Is that correct?

8      A.    They did not.  When we came up with the idea of

9  producing the video.  We went to Douglas and Tracy, but

10  this is what we -- because we paid close to -- I cannot

11  recollect, but 7,000 to $10,000 to make -- get that video

12  done.  There were -- there was a team of professionals

13  who came in, three to five people who flew in there.

14  They -- they made that video.  That's what they do.  They

15  were in the Benlida factory for, I think, between two to

16  three days.  There's no way for anybody to have gone

17  there without having Benlida's explicit approval.

18      Q.    And your video also says CTX has its

19  headquarters in Hong Kong; is that correct?

20      A.    So --

21      Q.    Does the video say that?

22      A.    So we -- While addressing certain customers, we

23  also tell them that the headquarters are in Hong Kong.

24      Q.    Well, wait a second.  Wait a second.

25      You've spent ten hours in this courtroom

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    telling everyone that the headquarters is right up the

2    road in Fort Lauderdale.  And I just think I heard you

3    say that when you speak to other people, you tell them

4    your headquarters is in Hong Kong.

5             Where's your headquarters?

6        A.    Our global headquarters are in Fort Lauderdale,

7    Florida.

8        Q.    And the website says they're in Hong Kong,

9    right?

10       A.    Does it say global headquarters?

11       Q.    You know the video.

12       A.    No, I'm asking -- I missed it.  I cannot --

13       Q.    Okay.

14       A.    We have a global headquarters out here and

15   Circuitronix Hong Kong is also a headquarter.

16            THE COURT:  All right.  It's past 6:00.

17            MR. MAZZOLA:  It's a good time for a break.

18   Thank you, Judge.

19            THE COURT:  Past 5 of 6.  All right.

20            I have hearings at 8:30 and 8:45.  I should be

21   done by 9:15.  So let's please be here at 9:15.  We'll

22   resume with the cross-examination of this witness at

23   9:15.

24            Have a good evening, everyone.

25            (Proceedings concluded at 6:05 p.m.)

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

594

**C E R T I F I C A T E**

1
2
3
4          I certify that the foregoing pages represent a
5     true and correct transcript of the above-styled
6     proceedings as reported on the date, time, and location
7     listed.
8          I further certify that I am neither counsel
9     for, related to, nor employed by any of the parties to
10    the action in which this hearing was reported, and
11    further that I am not financially nor otherwise
12    interested in the outcome of the above-entitled matter.
13
14
15
16    DATE: 2/19/24    /s/Mary Ann Casale, RDR, FPR-C, CLR, CSR-IL
                       Official Court Reporter
17                     United States District Court
                       Southern District of Florida
18                     400 North Miami Avenue
                       Miami, Florida 33128
19                     MaryAnn_Casale@flsd.uscourts.gov
20
21
22
23
24
25

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

## $

**$1** [1] - 370:10
**$1,161,258.46** [1] - 388:6
**$1.525** [1] - 446:1
**$10** [4] - 429:15, 429:16, 442:8, 442:11
**$10,000** [2] - 345:10, 592:11
**$100** [8] - 429:10, 429:12, 429:13, 429:15, 441:16, 441:17, 441:22, 539:10
**$100,000** [2] - 343:4, 525:19
**$11** [5] - 336:8, 336:10, 405:12, 548:17, 548:18
**$110** [1] - 539:10
**$116,000** [1] - 462:25
**$13** [1] - 441:23
**$135,000** [1] - 525:19
**$150,000** [2] - 518:6, 518:7
**$175** [1] - 350:16
**$2,477,529.10** [1] - 524:6
**$2,825,000** [3] - 432:10, 451:11, 548:11
**$2,994,050** [1] - 548:14
**$2.47** [1] - 537:4
**$2.56** [1] - 537:3
**$2.825** [1] - 509:22
**$200,000** [6] - 343:5, 381:3, 448:6, 448:10, 448:21, 449:10
**$201** [1] - 536:15
**$201.09** [2] - 536:14, 537:8
**$244,000** [1] - 534:11
**$25,000** [1] - 525:5
**$250,000** [3] - 505:15, 524:11, 566:24
**$273,550.91** [1] - 380:23
**$30** [1] - 414:15
**$30,000** [2] - 544:3, 544:4
**$300,000** [3] - 390:25, 436:11, 543:21
**$317,000** [3] - 540:24, 544:18, 550:11
**$317,539.48** [3] - 546:16, 548:8, 548:23
**$340,000** [2] - 525:20, 526:5
**$350,000** [2] - 340:5, 447:21
**$4,760,847** [1] - 548:2
**$40,022,497.85** [1] - 504:23
**$400,000** [2] - 391:3, 391:20

**$418,932.86** [1] - 519:21
**$5,314,868.81** [1] - 517:7
**$5,596.50** [2] - 474:9, 474:15
**$5,723,591.60** [3] - 509:19, 509:20, 513:9
**$50,000** [2] - 380:25, 566:24
**$500,000** [9] - 381:3, 381:23, 416:24, 417:1, 436:11, 436:12, 438:18, 447:7, 483:3
**$550,000** [2] - 400:15, 400:17
**$559.65** [1] - 474:15
**$590,000** [1] - 413:13
**$60,000** [2] - 543:21, 544:2
**$600,000** [1] - 413:13
**$7,900,000** [1] - 505:14
**$75,000** [2] - 447:11, 450:5
**$80,000** [2] - 525:11, 527:16
**$85,000** [1] - 571:8
**$89,000** [3] - 526:12, 570:24, 571:2
**$898,000** [1] - 521:10
**$90** [2] - 429:15, 442:4
**$90,000** [1] - 530:5

## '

**'12** [1] - 515:5
**'13** [1] - 519:21
**'14** [1] - 519:21
**'17** [2] - 487:23, 497:10
**'18** [1] - 364:3
**'97** [1] - 574:7

## /

**/s/Mary** [1] - 594:15

## 0

**0.5** [4] - 455:22, 455:23
**01** [1] - 377:9
**0902** [1] - 377:13

## 1

**1** [34] - 304:6, 343:3, 345:10, 372:10, 397:19, 399:16, 403:4, 403:23, 406:2, 415:6, 416:18, 416:21, 432:16, 434:20, 435:16, 440:12, 455:21, 455:22, 455:23, 456:2, 456:6, 475:17, 483:8, 484:4, 498:7, 499:5,

**509:11, 509:14, 527:3, 566:20, 566:23
**1,000** [9] - 372:8, 372:9, 385:17, 401:14, 456:4, 456:5, 589:22, 589:25
**1,161,258** [1] - 388:5
**1,161,528.46** [1] - 388:19
**1-1/2** [1] - 415:7
**1.3** [1] - 438:21
**1.5** [4] - 338:2, 404:14, 444:16, 503:8
**1.525** [1] - 446:2
**1/9** [3] - 384:6, 384:8, 384:23
**10** [23] - 311:21, 323:13, 349:2, 358:9, 385:16, 385:18, 456:22, 461:6, 461:11, 473:10, 473:13, 475:17, 478:2, 493:15, 539:8, 543:24, 544:3, 544:5, 544:19, 544:20, 550:15, 563:7, 576:20
**10,000** [4] - 338:16, 345:9, 363:13, 363:20
**10/20** [1] - 479:8
**100** [11] - 383:13, 383:21, 389:18, 390:17, 390:18, 489:21, 489:23, 499:17, 500:4, 518:6, 518:7
**100,000** [4] - 356:17, 356:18, 357:3, 357:4
**1006** [1] - 317:5
**10:00** [1] - 330:5
**10:03** [1] - 330:5
**10:04** [1] - 330:7
**10th** [1] - 447:21
**11** [7] - 325:7, 383:9, 387:7, 391:8, 472:7, 539:2, 548:18
**11:00** [1] - 411:8
**11:27** [2] - 391:7, 391:8
**11:28** [1] - 411:6
**12** [6] - 316:14, 349:2, 358:9, 360:11, 478:2, 567:1
**12-minute** [1] - 495:10
**12/31** [1] - 384:20
**120** [13] - 303:11, 319:3, 319:15, 327:14, 327:16, 327:20, 327:21, 329:13, 434:15, 434:24, 446:12, 448:12, 516:10
**121** [6] - 303:12, 326:9, 326:16, 327:16, 508:10, 511:5
**12:27** [1] - 428:18
**12:34** [1] - 433:8
**12:47** [1] - 433:9
**12th** [1] - 389:19
**13** [13] - 303:4, 309:23,

**310:1, 310:4, 316:14, 318:21, 319:17, 325:17, 345:20, 345:25, 349:23, 442:1, 442:2
**133** [6] - 303:12, 310:8, 310:9, 310:18, 311:2, 374:3
**13th** [3] - 314:19, 396:24, 478:3
**148** [4] - 303:13, 538:4, 538:12, 538:13
**14th** [7] - 377:16, 396:24, 436:11, 437:20, 438:20, 478:3, 518:16
**15** [4] - 447:6, 544:15, 544:16, 549:23
**15-minute** [1] - 549:22
**1500K** [1] - 444:14
**159** [11] - 303:13, 311:4, 311:5, 311:7, 323:10, 323:11, 386:1, 387:2, 387:3, 390:16, 462:3
**15th** [6] - 314:20, 354:3, 376:2, 378:19, 379:4, 461:6
**16** [3] - 356:9, 442:1, 498:10
**17** [1] - 443:23
**18** [2] - 328:7, 343:15
**182,344.61** [1] - 524:12
**18:27** [1] - 410:3
**18th** [1] - 553:22
**19** [1] - 415:20
**19th** [1] - 479:10
**1:45** [2] - 433:6, 433:7
**1:47** [1] - 433:8
**1st** [60] - 353:24, 354:4, 372:9, 372:25, 377:20, 380:22, 388:23, 389:1, 389:2, 389:24, 397:5, 401:18, 404:17, 404:25, 405:21, 413:14, 414:10, 414:21, 414:22, 414:25, 415:22, 435:3, 437:8, 448:3, 448:6, 448:10, 448:14, 448:15, 448:19, 448:20, 449:5, 457:7, 458:3, 458:7, 464:9, 482:8, 486:13, 486:15, 489:12, 497:7, 497:8, 497:22, 499:21, 499:25, 500:10, 502:2, 503:11, 507:12, 507:14, 507:16, 507:19, 512:24, 515:13, 516:8, 516:13, 526:6, 540:9, 540:10, 544:9

## 2

**2** [26] - 338:20, 354:18,

**354:22, 354:23, 389:3, 406:3, 410:6, 410:15, 410:17, 432:16, 435:16, 443:19, 445:23, 446:12, 455:22, 455:23, 464:15, 475:17, 481:11, 481:12, 481:23, 483:8, 491:2, 497:25, 511:5, 525:2
**2,477,000** [1] - 525:2
**2,477,539.10** [1] - 524:15
**2,565,000** [1] - 524:20
**2,569,000** [1] - 524:23
**2,569,925.52** [1] - 520:1
**2,990,000** [1] - 502:11
**2.47** [1] - 530:1
**2.477** [2] - 530:1, 571:6
**2.5** [5] - 414:17, 505:21, 505:22, 521:6, 529:23
**2.565** [1] - 571:5
**2.569,925** [1] - 529:24
**2.8** [2] - 509:22, 526:3
**2.825** [1] - 549:2
**2.9** [1] - 510:3
**2/19/24** [1] - 594:15
**20** [9] - 330:23, 361:2, 361:4, 361:5, 420:20, 543:17, 543:22, 543:24, 568:13
**200** [4] - 364:3, 381:17, 382:22, 533:22
**2002** [1] - 579:22
**2005** [1] - 408:15
**201** [1] - 537:6
**2011** [3] - 422:9, 514:19, 515:5
**2012** [16] - 332:6, 336:9, 355:21, 422:10, 453:2, 465:3, 513:15, 515:22, 516:1, 517:5, 519:11, 519:21, 529:13, 532:10, 532:17, 533:3
**2013** [18] - 355:23, 453:8, 453:9, 453:22, 454:1, 454:8, 457:6, 457:7, 458:3, 472:3, 475:12, 489:15, 500:2, 524:10, 532:19, 533:3, 553:22, 558:13
**2014** [9] - 465:3, 514:19, 524:11, 532:19, 532:20, 532:22, 533:2, 574:4
**2015** [37] - 337:4, 355:24, 375:11, 376:3, 377:3, 377:5, 377:18, 377:19, 377:20, 378:2, 378:13, 378:17, 380:22, 403:8, 413:14, 418:8, 462:6, 464:9, 503:23, 507:12, 507:14, 507:16, 507:19, 510:10, 510:19, 511:6,

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

511:21, 513:7, 514:17, 514:23, 515:14, 515:22, 574:4, 582:5, 585:6
**2016** [35] - 332:18, 332:22, 335:24, 337:10, 337:18, 386:12, 394:14, 397:1, 399:12, 399:13, 401:18, 404:17, 408:10, 409:2, 410:15, 412:13, 414:6, 414:10, 414:21, 415:5, 415:22, 462:9, 462:20, 464:1, 464:5, 465:5, 466:21, 498:8, 501:23, 503:11, 512:19, 527:7, 540:12, 585:7
**2017** [52] - 336:19, 355:25, 364:3, 414:22, 416:1, 420:7, 424:11, 425:22, 429:22, 431:3, 431:13, 432:2, 432:11, 432:17, 434:2, 435:4, 435:15, 437:9, 437:20, 438:20, 438:21, 440:17, 441:1, 449:15, 477:1, 477:13, 477:14, 478:20, 479:8, 482:1, 482:9, 484:20, 484:23, 485:16, 485:17, 486:13, 487:17, 491:2, 497:9, 497:22, 497:23, 499:15, 500:10, 501:23, 502:2, 502:3, 519:24, 527:1, 527:3, 567:16, 585:11
**2018** [27] - 325:4, 384:15, 416:1, 424:11, 432:7, 439:12, 439:17, 440:3, 445:13, 446:5, 447:7, 447:11, 448:3, 448:6, 448:14, 448:20, 449:3, 449:5, 449:9, 450:6, 494:25, 495:2, 496:9, 499:21, 499:25, 567:16, 585:11
**2019** [78] - 337:6, 337:7, 388:23, 389:4, 389:20, 389:24, 390:10, 390:25, 391:21, 403:8, 404:18, 404:25, 405:18, 405:21, 406:8, 415:14, 415:20, 416:1, 416:5, 416:19, 418:2, 418:8, 418:14, 418:18, 419:8, 420:21, 468:1, 468:2, 468:7, 470:1, 472:11, 502:23, 503:1, 503:4, 503:15, 503:23, 504:18, 507:14, 508:1, 508:8, 508:14, 510:10, 510:20, 510:23, 511:6, 511:22, 514:8, 514:21, 515:17, 516:8, 516:14, 518:16, 519:11,

522:3, 526:6, 528:19, 532:10, 532:25, 533:4, 535:7, 537:1, 538:20, 538:22, 539:7, 539:15, 539:24, 540:9, 540:10, 543:15, 544:10, 547:8, 547:19, 547:25, 567:16, 569:24, 570:4, 571:17
**2020** [3] - 511:22, 543:23, 567:16
**2021** [6] - 537:10, 537:11, 538:22, 538:24, 544:15, 544:17
**2022** [1] - 546:18
**2023** [4] - 336:9, 372:25, 546:18, 567:21
**20th** [8] - 478:20, 479:9, 479:11, 486:13, 487:17, 497:22, 502:3, 510:23
**21** [10] - 332:22, 410:15, 422:16, 425:22, 452:24, 456:23, 456:24, 473:12, 474:6, 478:9
**21st** [3] - 408:10, 429:19, 462:9
**22nd** [1] - 522:3
**235** [1] - 525:20
**23rd** [5] - 436:12, 440:3, 454:1, 454:8, 457:6
**24** [6] - 357:24, 359:3, 359:8, 360:11, 367:21, 476:9
**24/7** [1] - 358:2
**240** [1] - 525:20
**244** [1] - 519:20
**245.25** [1] - 519:20
**24th** [4] - 410:2, 411:6, 411:8, 504:18
**25** [2] - 357:2, 357:4
**250,000** [1] - 393:19
**256,939** [1] - 376:5
**256,939.15** [1] - 376:5
**258,000** [1] - 390:8
**260** [1] - 525:20
**269** [1] - 392:13
**2698** [1] - 392:13
**26th** [1] - 468:1
**27,300** [2] - 473:12, 474:2
**270-some** [1] - 381:22
**27th** [2] - 436:12, 438:20
**28** [6] - 358:4, 358:5, 358:12, 456:24, 458:5, 478:9
**28th** [3] - 409:2, 412:22, 414:10
**29** [1] - 418:18
**29th** [5] - 420:21, 449:3, 449:7, 508:14, 532:22

# 3

**3** [27] - 339:13, 356:9, 358:7, 358:19, 367:19, 397:10, 416:8, 416:12, 416:23, 432:16, 435:16, 443:24, 444:2, 455:23, 484:3, 485:19, 487:18, 502:13, 502:14, 514:4, 539:8, 543:25, 544:5, 544:18, 544:20, 550:16, 566:25
**3,000** [15] - 355:13, 355:15, 355:17, 355:20, 464:24, 465:1, 465:3, 482:4, 568:2, 568:4, 589:21, 589:23, 589:24, 590:3, 590:4
**3,100** [1] - 355:14
**3/23** [2] - 438:14, 438:16
**3/27** [2] - 438:14, 438:16
**30** [6] - 303:5, 309:12, 309:16, 340:19, 476:9, 568:13
**300** [1] - 456:6
**300,000** [6] - 390:8, 390:9, 393:19, 437:22
**303** [2] - 590:8, 590:11
**309** [1] - 303:5
**30th** [3] - 514:8, 514:21, 524:12
**31** [1] - 504:22
**310** [1] - 303:4
**311** [3] - 303:6, 303:12, 303:13
**3131** [1] - 346:7
**315** [1] - 303:5
**316** [2] - 303:8, 303:9
**317,000** [1] - 545:1
**319** [1] - 303:11
**31st** [16] - 355:24, 375:10, 376:3, 377:18, 377:19, 378:5, 378:10, 378:13, 378:17, 379:7, 384:15, 413:14, 437:8, 477:14, 480:10, 515:17
**32** [2] - 472:23, 473:2
**324** [4] - 303:6, 303:7, 303:7, 303:8
**32461** [1] - 309:18
**326** [1] - 303:12
**327** [1] - 303:9
**329** [1] - 303:10
**33128** [1] - 594:18
**35** [2] - 458:6, 461:5
**35,000** [1] - 447:14
**38** [1] - 391:8
**3:09** [2] - 495:11, 495:12
**3:20** [1] - 495:10
**3:23** [1] - 495:12

**3:24** [1] - 495:20
**3rd** [1] - 492:7

# 4

**4** [11] - 360:21, 361:8, 361:10, 439:3, 443:19, 445:25, 447:8, 447:9, 456:2, 475:17, 524:11
**4,200** [1] - 355:23, 465:4, 482:5
**4.7** [3] - 540:1, 540:2, 549:2
**40** [1] - 304:7, 332:14, 505:14
**400** [2] - 390:8, 594:17
**400,000** [2] - 392:25, 393:19
**42** [3] - 303:5, 315:13, 315:16, 412:15, 463:25
**428** [1] - 476:9
**42nd** [1] - 346:7
**45** [2] - 461:6, 579:23
**45th** [2] - 461:13
**46** [7] - 303:6, 311:9, 311:11, 311:12, 311:14, 396:4, 397:14
**47** [1] - 323:17
**47,900,000** [1] - 505:13
**47,908,702** [1] - 504:23
**48** [8] - 303:6, 323:24, 324:3, 324:5, 324:7, 478:24, 479:18
**486,938.73** [1] - 520:2
**49** [7] - 303:7, 323:24, 324:3, 324:5, 324:7, 479:17, 480:6
**4:40** [1] - 549:24
**4:57** [1] - 549:24
**4:58** [1] - 549:25
**4th** [9] - 384:9, 390:10, 390:25, 447:10, 450:8, 450:10, 451:7, 528:19, 535:6

# 5

**5** [21] - 321:7, 350:12, 357:2, 358:7, 358:9, 361:13, 361:16, 414:20, 415:2, 415:8, 453:25, 455:16, 456:2, 472:1, 526:2, 539:18, 563:7, 593:19
**5,000** [2] - 568:5, 568:6
**5,149** [1] - 484:22
**5,596** [1] - 473:13
**5,600** [5] - 355:24, 465:5, 465:6, 477:15, 482:4, 482:6, 484:21, 485:12

**5,633,757.51** [1] - 538:25
**5-31-2012** [1] - 532:17
**5.314** [1] - 518:7
**5.6** [1] - 539:19
**50** [4] - 465:25, 466:5, 466:10, 466:11
**500** [2] - 483:5, 483:6
**500,000** [1] - 483:4
**51** [5] - 303:7, 324:11, 324:12, 324:13, 490:24
**52** [3] - 303:8, 324:15, 324:18
**528** [1] - 303:11
**53** [1] - 439:14
**535** [1] - 303:10
**538** [1] - 303:13
**55** [1] - 578:4
**559.65** [1] - 473:13
**569** [1] - 529:24
**5th** [7] - 406:8, 447:14, 450:6, 450:11, 450:16, 451:7

# 6

**6** [6] - 356:9, 416:23, 447:23, 473:5, 475:17, 593:19
**6.2** [1] - 416:22
**60** [17] - 345:11, 371:14, 371:17, 378:17, 379:5, 388:9, 394:5, 394:12, 394:21, 395:2, 395:7, 402:3, 402:5, 404:6, 414:18, 505:20, 509:15
**60-day** [6] - 373:23, 377:19, 402:4, 404:13, 414:24, 482:14
**60th** [1] - 461:13
**64** [1] - 408:24
**6:00** [1] - 593:16
**6:05** [1] - 593:25
**6:30** [1] - 330:13

# 7

**7** [10] - 333:16, 357:24, 389:5, 394:22, 415:8, 448:9, 465:18, 465:19, 505:16
**7,000** [10] - 355:25, 481:19, 481:20, 482:2, 482:6, 489:17, 490:11, 497:13, 592:11
**7,487,963.50** [1] - 388:20
**7,487,963.59** [1] - 388:14
**7,576.435.13.and** [1] - 388:24
**7.15** [1] - 416:18
**7.5** [3] - 414:20, 415:2,

**KEYWORD INDEX**

549:3
**7.8** [1] - 526:3
**70** [5] - 303:8, 316:8,
316:11, 418:15, 522:22
**700** [1] - 456:7
**77** [6] - 303:9, 315:17,
315:18, 316:6, 316:7,
415:15
**78** [2] - 303:9, 326:20,
327:10, 327:12, 513:18
**79** [8] - 303:10, 329:10,
329:14, 329:15, 329:17,
518:10, 529:13, 534:1

**8**

**8** [7] - 348:22, 349:2,
356:9, 356:10, 448:23,
475:17
**8/19/2014** [1] - 346:8
**80** [4] - 499:22, 500:1,
571:8
**83** [2] - 349:20, 349:23
**87** [16] - 329:10, 329:18,
329:19, 330:4, 520:10,
520:11, 520:16, 522:19,
522:23, 523:3, 530:15,
531:2, 531:3, 531:7,
531:16, 531:21
**88** [8] - 303:10, 534:17,
534:18, 534:20, 534:22,
534:25, 535:2, 535:5
**89** [7] - 303:11, 527:21,
527:22, 527:24, 528:9,
528:11, 528:13
**8:30** [2] - 330:15, 593:20
**8:45** [1] - 593:20
**8th** [3] - 391:3, 391:21,
414:25

**9**

**9** [5] - 325:23, 350:12,
371:19, 439:3, 445:25
**9,900** [1] - 338:16
**90** [5] - 394:12, 394:22,
402:5, 404:6, 505:20
**945** [1] - 578:8
**955** [1] - 579:24
**9:15** [3] - 593:21, 593:23
**9:31** [1] - 304:3
**9th** [1] - 377:3

**A**

**a.m** [5] - 330:5, 330:7,
391:7, 391:8
**A.O** [1] - 584:22
**abbreviation** [3] -
346:16, 387:21, 468:15
**ability** [6] - 305:24,

421:25, 461:17, 469:1,
558:17
**able** [13] - 331:23,
342:16, 347:6, 390:11,
419:3, 452:15, 458:2,
491:19, 502:20, 558:23,
568:12, 570:14, 581:24
**above-entitled** [1] -
594:12
**above-styled** [1] - 594:5
**absolutely** [5] - 395:21,
408:22, 549:10, 568:2,
569:9
**accept** [7] - 370:19,
371:1, 398:18, 404:24,
405:7, 405:25, 539:11
**accepted** [2] - 497:11,
543:23
**accepting** [3] - 353:12,
405:24, 485:14
**access** [4] - 336:4,
368:20, 368:23, 368:24
**accidentally** [1] - 516:22
**accommodate** [1] -
542:9
**accommodation** [7] -
401:17, 402:6, 402:18,
404:6, 414:13, 414:14,
415:8
**accordance** [4] - 306:3,
306:16, 314:21, 333:18
**according** [8] - 357:10,
421:14, 421:15, 441:8,
444:19, 479:11, 499:15,
533:22
**accordingly** [1] - 339:19
**account** [8] - 366:15,
392:12, 392:13, 392:15,
437:5, 437:6, 514:13,
514:18
**accounted** [1] - 571:7
**accounting** [26] - 362:14,
362:18, 362:19, 362:20,
362:21, 365:7, 366:3,
366:13, 368:8, 368:20,
369:24, 370:4, 370:10,
371:10, 371:24, 380:18,
381:16, 381:20, 460:15,
460:17, 508:19, 518:15,
535:12, 544:6
**accounts** [13] - 367:4,
368:4, 368:10, 368:11,
368:13, 370:5, 371:13,
382:5, 400:20, 420:3,
420:23, 421:13, 583:25
**accrue** [1] - 546:18
**accumulated** [1] - 467:7
**accumulating** [1] - 407:8
**accurate** [3] - 401:7,
402:15, 547:22

**accurately** [1] - 546:9
**accused** [1] - 427:25
**achieve** [1] - 514:20
**achieved** [1] - 500:8
**acknowledge** [2] -
339:20, 418:10
**acknowledged** [1] -
540:17
**acknowledging** [2] -
412:9, 418:1
**acknowledgment** [1] -
485:11
**acting** [1] - 408:7
**action** [3] - 385:21,
415:1, 594:10
**actual** [2] - 366:22,
381:12, 395:2
**add** [7] - 357:5, 382:17,
388:22, 394:9, 548:16,
560:16, 560:20
**added** [6] - 391:16,
441:21, 477:5, 491:12,
492:22, 526:7
**adding** [2] - 455:24,
570:16
**addition** [4] - 388:16,
413:17, 555:20, 569:14
**additional** [11] - 312:19,
353:9, 353:12, 353:17,
382:8, 394:9, 412:12,
500:16, 517:4, 521:22,
539:12
**additionally** [1] - 457:5
**address** [10] - 313:24,
344:24, 346:13, 413:8,
425:11, 494:1, 518:15,
580:13, 580:16, 580:18
**addressed** [4] - 327:23,
481:23, 481:24, 522:5
**addressing** [1] - 592:22
**adds** [2] - 330:23, 446:2
**adjusted** [4] - 483:22,
524:21, 525:3, 526:5
**adjustment** [1] - 401:16
**adjustments** [2] - 458:9,
526:14
**admissibility** [1] - 322:23
**admissible** [6] - 315:10,
318:1, 318:2, 322:5,
322:23, 374:18
**admission** [1] - 307:14
**admit** [3] - 305:11,
449:18, 450:19
**admitted** [17] - 317:25,
324:4, 324:17, 326:6,
326:15, 327:9, 494:3,
504:14, 520:13, 520:20,
522:18, 527:20, 530:13,
531:22
**advance** [1] - 531:1

**advanced** [1] - 444:17
**advice** [1] - 526:13
**advise** [3] - 382:6,
521:21, 528:19
**advised** [2] - 361:7,
441:15
**affect** [1] - 360:9
**affects** [1] - 360:8
**affiliated** [2] - 574:19,
579:19
**afternoon** [7] - 305:7,
313:6, 425:20, 426:9,
495:9, 570:20, 577:9
**afterwards** [4] - 351:10,
355:22, 372:2, 395:19
**agent** [1] - 555:13
**ago** [15] - 304:4, 312:14,
312:15, 313:13, 313:16,
317:6, 383:6, 390:2,
430:8, 487:7, 491:23,
515:18, 569:4, 569:6,
584:21
**agree** [8] - 306:9, 339:7,
372:21, 397:20, 569:8,
569:10, 591:16, 591:19
**agreed** [26] - 306:8,
318:8, 333:16, 339:5,
339:11, 355:1, 355:13,
381:24, 395:6, 401:11,
458:6, 464:24, 465:25,
475:12, 478:5, 487:25,
488:23, 489:2, 490:19,
492:10, 492:12, 497:12,
497:23, 499:3, 499:16
**agreed-upon** [5] - 355:1,
355:13, 464:24, 478:5,
497:12
**agreeing** [2] - 335:21,
487:22
**agreement** [62] - 320:25,
322:5, 332:6, 332:10,
332:12, 332:24, 332:25,
333:19, 333:21, 335:25,
336:1, 336:25, 337:13,
337:21, 337:22, 338:21,
339:25, 341:6, 353:7,
357:8, 364:10, 364:13,
372:12, 373:7, 378:14,
395:1, 398:20, 398:21,
399:5, 399:6, 399:8,
399:9, 399:10, 404:5,
404:12, 404:13, 408:10,
408:11, 409:3, 410:16,
422:15, 422:20, 452:21,
453:3, 453:6, 453:16,
455:2, 455:7, 458:10,
458:15, 465:14, 490:8,
491:10, 491:13, 498:7,
540:11, 540:12, 590:24
**agreements** [3] - 369:19,

398:19, 399:4
**agrees** [1] - 365:13
**ahead** [16] - 323:9,
334:21, 342:13, 346:5,
375:1, 382:19, 384:1,
391:11, 421:20, 424:24,
425:7, 428:21, 433:14,
456:21, 484:19, 560:11
**air** [6] - 354:5, 354:6,
354:14, 369:15, 452:7,
488:2
**Akshay** [13] - 439:23,
439:24, 440:5, 572:15,
572:17, 572:20, 575:20,
576:2, 576:5, 581:14,
581:23, 582:6
**Akshay's** [1] - 575:18
**all-paid** [1] - 419:10
**allocated** [2] - 355:1,
355:2
**allotted** [2] - 474:12,
577:8
**allow** [7] - 310:25,
347:15, 370:19, 370:25,
371:2, 428:9, 568:16
**allowed** [9] - 355:15,
379:10, 428:3, 455:2,
475:15, 540:13, 540:16,
540:17, 559:15
**allows** [1] - 512:4
**almost** [2] - 502:22,
581:20
**almost-last** [1] - 502:22
**alongside** [1] - 439:14
**alternative** [1] - 383:4
**amended** [3] - 462:12,
490:8, 492:17
**amendment** [5] - 332:9,
332:11, 335:25, 458:14,
540:12
**amendments** [1] -
491:19
**amount** [39] - 336:11,
336:12, 364:17, 376:5,
376:16, 381:2, 392:23,
392:25, 397:8, 399:24,
403:11, 406:13, 410:21,
411:23, 413:19, 429:6,
430:5, 437:15, 443:18,
444:5, 451:8, 459:4,
474:8, 474:14, 475:15,
477:11, 477:13, 487:2,
497:12, 502:11, 513:7,
524:16, 538:24, 539:12,
544:8, 544:9, 564:20,
564:21, 567:14
**amounts** [2] - 427:10,
501:16
**AMS** [17] - 345:11,
371:14, 371:17, 371:21,

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

373:23, 377:19, 388:9,
394:5, 395:2, 395:7,
402:3, 402:4, 404:12,
414:18, 414:24, 482:14,
509:15
**analysis** [4] - 505:25,
518:21, 519:12, 529:14
**analyze** [1] - 385:20
**Ann** [1] - 594:15
**announcement** [1] -
305:17
**answer** [8] - 308:3,
308:4, 516:24, 532:12,
550:21, 551:5, 551:7,
560:17
**answered** [1] - 580:2
**anxiety** [1] - 427:6
**anyway** [1] - 540:21
**anyways** [1] - 348:16
**apiece** [1] - 350:17
**apologies** [2] - 359:18,
409:12
**apologize** [2] - 410:3,
514:5
**apology** [1] - 434:20
**appear** [5] - 434:5, 434:9,
435:15, 435:16, 500:23
**apple** [1] - 306:20
**applied** [4] - 474:14,
525:6, 525:21, 526:9
**apply** [3] - 388:21, 483:4,
525:16
**appointment** [1] - 330:16
**appreciate** [2] - 514:12,
542:6
**approach** [4] - 340:20,
352:13, 426:22, 566:9
**appropriate** [1] - 306:15
**approval** [3] - 383:2,
565:7, 592:17
**approve** [5] - 382:12,
382:13, 382:14, 382:17,
382:23
**approved** [3] - 466:25,
551:2, 551:8
**approximate** [2] -
332:17, 549:3
**April** [3] - 377:20,
378:19, 380:22, 389:2,
389:20, 389:24, 390:10,
390:24, 390:25, 407:7,
419:8, 431:13, 447:10,
447:14, 447:21, 450:6,
450:8, 450:10, 450:11,
451:7, 453:8, 453:22,
454:1, 454:8, 457:6,
468:2, 470:1, 472:11,
475:12, 500:2, 503:4,
503:12, 509:12, 524:12
**arbitration** [2] - 420:1,

514:20
**area** [4] - 356:17, 356:20,
484:20, 499:10
**argue** [1] - 526:4
**arose** [1] - 476:24
**arrangement** [2] - 364:8,
383:4
**arrive** [1] - 459:5
**arrow** [2] - 358:22, 512:4
**Arrow** [1] - 361:16
**art** [2] - 590:14, 590:15
**articles** [1] - 555:5
**ASAP** [1] - 398:17
**Asia** [8] - 572:22, 572:24,
572:25, 573:1, 573:3,
573:9, 573:10, 573:11
**Asia-Pac** [1] - 572:22,
572:24, 572:25, 573:1,
573:9
**Asia-Pacific** [2] - 573:3,
573:10
**Asian** [1] - 573:2
**aside** [1] - 386:13
**aspect** [4] - 363:9, 366:5,
398:19, 399:4
**assembled** [1] - 349:3
**assembly** [1] - 349:4
**assets** [1] - 340:4
**assist** [1] - 341:24
**associated** [1] - 561:9
**assume** [13] - 338:15,
355:12, 389:13, 402:8,
424:4, 441:22, 442:4,
456:4, 464:25, 539:9,
543:6, 577:19, 577:22
**assuming** [2] - 376:22,
541:16
**asterisks** [1] - 312:12
**attach** [2] - 353:3, 510:17
**attached** [12] - 389:14,
390:5, 393:21, 407:4,
436:18, 491:18, 506:25,
509:10, 510:16, 510:19,
510:20, 519:10
**attaching** [2] - 393:12,
479:3
**attachment** [33] - 311:9,
327:18, 332:20, 389:23,
392:1, 396:4, 397:14,
434:19, 434:20, 434:21,
440:8, 446:12, 469:13,
475:21, 479:16, 479:17,
480:14, 480:16, 506:2,
506:4, 506:20, 511:5,
522:19, 523:4, 523:12,
529:13, 530:16, 531:3,
531:6, 531:16, 531:21
**attachments** [7] -
389:22, 392:4, 468:11,
510:9, 517:11, 520:20,

522:9
**attempts** [1] - 314:24
**attention** [13] - 338:20,
339:10, 339:14, 381:6,
406:1, 418:22, 425:1,
426:3, 434:1, 435:8,
444:7, 454:13, 463:24
**attorney** [2] - 555:15,
555:17
**attorneys** [1] - 555:7
**attrition** [1] - 332:1
**audits** [1] - 344:1
**August** [9] - 404:25,
405:18, 405:21, 406:8,
449:5, 457:7, 458:7,
484:21, 513:24
**Australia** [1] - 573:6
**authorities** [8] - 338:9,
338:10, 425:2, 425:13,
426:4, 429:10, 442:10,
442:24
**authority** [4] - 558:1,
558:24, 559:11, 559:12
**authorization** [3] -
557:20, 558:4, 558:7
**authorize** [1] - 382:2
**authorized** [2] - 383:5,
445:20
**automatically** [6] -
305:13, 305:16, 306:4,
459:7, 471:2, 475:2
**automotive** [7] - 403:9,
403:23, 403:24, 405:10,
564:6, 564:9, 565:9
**Autumn** [1] - 358:1
**available** [1] - 559:13
**Avenue** [1] - 594:17
**average** [5] - 343:4,
394:12, 482:2, 484:22,
484:23
**avoid** [3] - 403:6, 567:5,
567:6
**award** [1] - 547:7
**aware** [5] - 305:22,
335:13, 557:18, 558:5,
558:15
**awful** [1] - 581:17

## B

**baby** [2] - 352:16, 565:20
**back-to-back** [1] - 403:9
**backlog** [1] - 478:4
**backup** [3] - 513:12,
516:1, 517:13
**backwards** [1] - 486:14
**bad** [2] - 385:18, 505:13
**badly** [1] - 570:6
**bag** [1] - 381:15
**bagels** [1] - 330:14

**balance** [9] - 388:24,
388:25, 389:1, 389:11,
483:5, 483:7, 539:2,
539:4, 544:4
**balanced** [1] - 527:15
**bank** [51] - 318:15,
318:17, 319:17, 319:21,
319:24, 320:1, 320:4,
320:19, 320:21, 320:25,
322:4, 322:6, 322:11,
322:13, 322:17, 322:19,
381:14, 382:2, 382:15,
382:16, 383:2, 390:6,
392:1, 392:5, 392:16,
392:19, 392:21, 393:2,
393:4, 393:6, 408:7,
417:3, 417:4, 417:7,
417:15, 417:21, 421:12,
436:14, 436:15, 436:20,
436:24, 437:5, 449:14,
449:22, 450:13, 450:18,
450:24, 451:6
**Bank** [1] - 393:5
**bank's** [1] - 438:4
**bankers** [1] - 383:2
**banking** [2] - 420:3,
420:23
**banks** [2] - 393:12,
420:7, 420:14, 425:2
**barbed** [1] - 359:23
**base** [1] - 350:11
**based** [19] - 309:11,
316:25, 317:16, 362:19,
368:11, 368:12, 368:13,
377:19, 379:2, 402:24,
424:4, 432:9, 471:4,
471:6, 481:18, 509:15,
536:5, 544:10, 573:15
**basic** [2] - 342:23,
399:23
**basis** [3] - 466:22,
467:10, 540:19
**batches** [1] - 476:16
**Bates** [1] - 545:12
**bearing** [1] - 501:9
**became** [8] - 355:23,
355:24, 355:25, 384:25,
482:4, 482:5, 482:6
**because..** [1] - 406:25
**become** [2] - 360:12,
500:3, 581:23
**becoming** [4] - 404:15,
405:2, 419:14, 467:2
**beg** [4] - 319:22, 446:13,
522:21, 531:15
**began** [2] - 419:17, 540:7
**begin** [1] - 418:24
**beginning** [3] - 342:23,
373:2, 383:11, 410:19,
425:19, 426:7, 429:22,

507:21, 507:24
**begins** [1] - 418:23
**begun** [1] - 537:12
**behalf** [2] - 436:4, 509:23
**behind** [6] - 333:2,
353:25, 429:16, 441:18,
456:3, 568:7
**belabor** [2] - 443:5,
450:17
**believes** [1] - 484:21
**belong** [3] - 533:8,
533:12, 533:13
**below** [7] - 339:17,
344:20, 345:3, 346:7,
456:14, 510:4, 512:7
**beneath** [1] - 521:16
**beneficiary** [2] - 392:24,
392:25
**benefit** [3] - 305:10,
499:2, 574:23
**benefited** [1] - 499:7
**benefits** [1] - 499:6
**Benlida** [221] - 329:1,
333:7, 335:14, 335:17,
335:23, 336:4, 339:9,
339:20, 340:11, 340:19,
341:3, 342:7, 344:22,
345:7, 351:16, 351:19,
352:2, 353:16, 354:7,
354:15, 354:17, 354:23,
358:25, 360:17, 360:25,
363:24, 367:18, 368:9,
368:11, 368:15, 370:8,
371:9, 371:14, 372:1,
373:15, 373:21, 375:13,
375:25, 382:3, 382:16,
384:19, 385:19, 385:20,
385:22, 386:20, 389:8,
389:23, 391:25, 393:1,
393:2, 394:9, 395:23,
396:25, 397:24, 397:25,
398:2, 398:17, 402:2,
404:3, 404:4, 404:9,
408:12, 408:14, 409:21,
413:8, 414:16, 419:1,
422:11, 423:9, 423:18,
423:25, 424:6, 424:9,
425:10, 430:6, 431:6,
431:8, 432:9, 432:10,
439:7, 439:8, 443:13,
443:25, 444:6, 444:9,
444:13, 445:16, 445:17,
451:9, 453:17, 456:10,
461:16, 462:1, 462:7,
462:8, 462:14, 462:17,
466:16, 468:14, 468:17,
475:22, 476:1, 476:6,
481:18, 481:24, 482:1,
482:16, 484:21, 484:22,
485:3, 490:16, 497:13,

497:16, 499:3, 499:4,
499:6, 499:7, 499:14,
503:5, 504:11, 507:2,
507:17, 508:19, 509:17,
509:18, 510:10, 511:13,
513:11, 513:12, 514:22,
516:7, 516:21, 516:24,
517:6, 517:9, 520:4,
521:2, 524:4, 525:7,
527:10, 528:19, 532:9,
533:1, 534:2, 534:10,
535:12, 536:4, 537:16,
537:22, 538:19, 539:7,
539:20, 539:24, 540:7,
540:9, 540:13, 541:5,
543:1, 543:15, 546:10,
547:2, 547:23, 548:20,
549:4, 549:8, 549:16,
549:19, 551:1, 551:2,
551:8, 551:10, 553:3,
553:7, 553:8, 553:13,
553:16, 555:20, 556:8,
557:6, 557:10, 557:11,
557:12, 557:13, 558:24,
561:1, 561:3, 561:5,
561:13, 561:18, 561:24,
562:7, 563:5, 563:7,
563:11, 567:9, 567:15,
567:18, 568:7, 568:12,
568:13, 568:14, 568:24,
569:19, 569:23, 575:2,
575:4, 577:1, 577:21,
589:17, 590:19, 590:20,
590:21, 590:23, 590:24,
590:25, 591:10, 591:18,
592:6, 592:15
   **benlida** [1] - 371:19
   **Benlida's** [18] - 337:20,
344:4, 384:4, 414:7,
421:12, 422:24, 436:3,
477:19, 513:6, 538:18,
550:24, 561:2, 563:10,
591:13, 591:20, 592:3,
592:4, 592:17
   **Benlida.com** [1] - 518:15
   **best** [5] - 305:24, 412:3,
469:14, 530:25, 546:9
   **better** [4] - 332:3, 374:1,
484:5, 509:7
   **between** [54] - 335:14,
338:9, 341:10, 343:4,
346:25, 358:3, 358:14,
359:13, 372:7, 379:24,
394:15, 395:6, 397:2,
401:9, 402:5, 402:7,
402:9, 403:8, 405:17,
409:7, 413:13, 413:24,
414:10, 414:20, 415:7,
429:14, 438:20, 439:23,
440:4, 442:24, 453:16,

461:13, 462:23, 464:8,
465:2, 489:21, 498:4,
499:2, 499:17, 500:5,
510:19, 514:13, 517:6,
526:12, 527:16, 533:4,
535:11, 536:14, 544:18,
557:23, 566:24, 571:4,
571:7, 592:15
   **beyond** [4] - 412:4,
412:9, 461:22, 464:25
   **big** [18] - 356:23, 401:6,
404:22, 405:2, 416:7,
430:1, 430:3, 439:15,
444:25, 478:3, 483:21,
486:22, 521:8, 521:9,
529:23, 530:6, 532:10,
533:21
   **bigger** [19] - 331:16,
339:1, 387:18, 404:15,
405:12, 405:13, 419:14,
419:15, 465:13, 465:15,
494:21, 511:12, 526:1,
526:3, 548:25, 561:3,
590:21, 590:22
   **biggest** [3] - 338:18,
359:17, 472:13
   **bill** [20] - 360:25, 366:17,
366:19, 366:21, 366:24,
367:6, 370:8, 370:20,
371:2, 371:3, 371:4,
371:6, 371:7, 384:4,
384:11, 384:20, 388:9
   **billing** [1] - 384:25
   **bills** [4] - 366:16, 387:16,
387:24, 387:25
   **bit** [11] - 304:19, 338:3,
380:24, 424:13, 434:22,
457:13, 460:20, 483:24,
521:16, 563:22, 574:11
   **bites** [1] - 306:19
   **black** [5] - 398:24,
399:16, 470:21, 474:20,
488:21, 501:3
   **blacked** [1] - 374:11
   **blacked-out** [1] - 374:11
   **blacklist** [2] - 426:12,
429:5
   **blacklisted** [1] - 452:13
   **blame** [1] - 419:6
   **blaming** [3] - 412:6,
430:21, 430:23
   **blank** [3] - 411:22,
420:22, 543:6
   **blanket** [2] - 312:21,
320:24
   **blankets** [1] - 306:19
   **BLD** [5] - 468:13, 506:5,
510:21, 532:5
   **BLD-ROK** [2] - 506:5,
510:21

   **BLD2015010901** [2] -
376:6, 377:1
   **blinded** [1] - 457:12
   **blindly** [1] - 497:13
   **blinds** [1] - 391:13
   **blow** [11] - 337:16,
390:21, 406:4, 455:12,
463:8, 496:7, 513:21,
514:2, 514:6, 519:13,
528:15
   **blown** [1] - 336:16
   **blue** [10] - 471:10,
472:24, 480:18, 481:2,
481:17, 488:19, 489:8,
505:8, 505:10, 590:20
   **bluffing** [2] - 407:2,
407:11
   **board** [13] - 348:14,
348:21, 350:11, 350:16,
350:25, 356:16, 357:20,
446:18, 565:11, 566:5,
567:1, 568:3, 569:22
   **boards** [7] - 347:25,
350:19, 421:5, 499:18,
568:12, 568:17, 568:19
   **bodies** [1] - 359:24
   **body** [1] - 345:3
   **book** [3] - 334:14, 507:4,
517:17
   **books** [6] - 337:20,
338:9, 432:20, 462:23,
462:24, 467:3
   **border** [8] - 359:5,
359:13, 359:15, 359:16,
359:17, 360:1, 360:5,
360:6
   **bore** [1] - 344:11
   **borrowing** [1] - 417:4
   **boss** [3] - 430:1, 430:3,
444:25
   **bottom** [32] - 333:15,
335:1, 335:18, 345:14,
352:21, 381:9, 385:4,
390:7, 390:21, 392:19,
406:2, 411:9, 413:6,
435:9, 444:7, 444:8,
463:6, 463:12, 468:24,
471:10, 481:17, 488:23,
489:3, 511:9, 511:16,
512:2, 512:5, 523:11,
523:16, 528:18, 532:4,
532:18
   **bottom-left** [1] - 532:4
   **box** [1] - 521:16
   **boxes** [3] - 361:3, 361:4,
361:5
   **boy** [4] - 321:5, 321:12,
321:18, 494:20
   **branded** [2] - 561:22,
561:24

   **branding** [2] - 562:15,
562:18
   **bravo** [2] - 321:25,
453:25
   **breach** [3] - 547:7, 562:9,
562:10
   **break** [19] - 349:6, 391:5,
391:15, 391:19, 428:20,
432:13, 433:16, 433:22,
434:5, 435:25, 440:7,
495:9, 495:10, 495:23,
549:23, 564:22, 570:16,
593:17
   **breakdown** [1] - 372:25
   **breaks** [1] - 357:25
   **bridge** [1] - 338:10
   **brief** [1] - 334:20
   **Brief** [2] - 493:3, 502:19
   **briefly** [2] - 499:8, 503:1
   **bring** [29] - 306:25,
329:24, 330:6, 332:13,
332:19, 358:21, 369:23,
371:18, 374:2, 380:14,
383:7, 383:13, 386:1,
393:7, 406:10, 415:15,
422:15, 425:15, 431:17,
434:15, 452:24, 453:24,
483:7, 528:1, 530:13,
535:23, 547:2, 547:9
   **bringing** [4] - 306:5,
402:25, 426:2, 546:11
   **broadly** [1] - 337:19
   **broken** [2] - 336:18,
545:1
   **brother** [1] - 573:22
   **brother's** [2] - 574:2,
574:7
   **brother-in-law** [1] -
573:22
   **brought** [4] - 349:14,
349:17, 402:24, 425:1
   **bucket** [1] - 519:19
   **buckets** [1] - 519:19
   **build** [4] - 352:1, 421:3,
566:4, 566:20
   **building** [2] - 406:20,
563:5
   **built** [1] - 566:19
   **bump** [1] - 511:1
   **bunch** [6] - 340:18,
373:16, 389:22, 413:18,
422:5, 488:10
   **burner** [2] - 336:13,
337:12
   **business** [40] - 315:7,
321:22, 331:20, 336:11,
341:2, 341:20, 380:12,
404:10, 407:20, 408:5,
408:7, 408:8, 414:16,
414:17, 423:2, 424:12,

476:7, 486:3, 505:20,
505:21, 537:16, 549:4,
549:16, 556:2, 559:17,
559:18, 559:20, 559:21,
560:5, 560:9, 561:11,
567:3, 567:5, 567:9,
567:14, 567:17, 567:19,
567:21, 574:20
   **businesses** [1] - 583:13
   **buy** [2] - 358:6, 568:13
   **BY** [160] - 331:8, 332:15,
332:21, 334:24, 339:3,
339:18, 342:18, 343:18,
344:9, 345:23, 347:17,
348:17, 352:19, 354:21,
356:22, 360:4, 361:15,
362:3, 367:15, 370:1,
375:3, 376:13, 380:9,
380:16, 383:15, 386:4,
387:5, 387:20, 389:21,
391:1, 391:14, 394:3,
396:9, 396:18, 397:18,
400:6, 401:25, 403:20,
406:6, 406:11, 407:17,
409:6, 409:13, 410:5,
410:14, 411:10, 412:16,
413:5, 415:17, 418:16,
419:24, 420:17, 421:23,
422:17, 423:16, 424:23,
425:6, 425:17, 429:1,
431:21, 433:21, 434:25,
435:12, 435:24, 437:1,
437:19, 438:11, 438:17,
438:25, 439:16, 440:13,
442:14, 442:19, 443:11,
444:3, 444:12, 444:24,
446:16, 447:3, 449:21,
450:3, 451:1, 453:1,
454:3, 455:14, 456:18,
458:8, 463:14, 464:17,
465:22, 466:13, 467:16,
467:23, 469:15, 469:20,
471:20, 479:1, 479:19,
480:7, 481:3, 481:15,
485:24, 487:21, 489:5,
492:5, 493:4, 496:4,
501:12, 502:24, 504:16,
505:7, 506:9, 508:12,
509:8, 510:8, 511:4,
512:9, 512:14, 513:3,
513:22, 514:7, 515:9,
516:12, 518:12, 519:15,
520:23, 521:17, 521:20,
524:3, 528:12, 528:17,
529:17, 531:25, 535:4,
536:24, 538:14, 540:6,
542:16, 542:23, 546:6,
547:18, 550:6, 555:4,
556:25, 557:9, 558:21,
559:8, 560:22, 561:21,
566:11, 572:3, 575:13,

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

600

575:25, 577:18, 579:4,
585:8, 585:21, 587:19,
590:12, 592:5

# C

**C-H-E-L-I-B-A-S-H-K-I**
[1] - 585:4
**calculate** [7] - 452:11,
459:8, 459:23, 461:12,
473:8, 478:10, 502:5
**calculated** [5] - 452:6,
467:9, 471:3, 472:8,
489:14
**calculates** [1] - 475:2
**calculating** [2] - 371:25,
456:7
**calculation** [4] - 453:13,
466:23, 467:9, 505:13
**calculations** [5] -
459:14, 467:6, 475:25,
476:21, 485:14
**calculator** [1] - 548:15
**calendar** [2] - 357:24,
358:3
**camera** [1] - 554:5
**canceled** [1] - 413:12
**cannot** [28] - 332:23,
354:4, 354:13, 363:15,
366:24, 367:1, 367:10,
404:16, 416:21, 430:13,
445:23, 476:18, 478:5,
503:9, 508:21, 508:23,
557:22, 558:13, 558:14,
559:1, 565:7, 569:5,
576:20, 583:22, 592:10,
593:12
**capability** [1] - 459:24
**capacity** [13] - 355:1,
355:2, 355:6, 355:13,
357:7, 464:21, 464:24,
465:12, 477:11, 477:13,
481:24, 489:16, 497:5
**capitalism** [2] - 331:25,
583:18
**capture** [2] - 343:22,
452:11
**car** [4] - 304:9, 350:17,
359:14, 566:18
**card** [1] - 561:11
**care** [2] - 339:23, 341:4
**careful** [1] - 494:4
**caret** [1] - 512:6
**cargo** [1] - 361:7
**Casale** [1] - 594:15
**case** [27] - 306:6, 322:20,
330:20, 330:24, 344:22,
345:7, 374:16, 427:13,
428:1, 451:13, 451:24,
458:14, 459:9, 461:16,

486:5, 501:18, 501:20,
502:6, 529:8, 539:21,
539:25, 545:2, 549:14,
553:3, 581:21, 586:23,
589:15
**cases** [6] - 338:14,
372:13, 378:23, 398:11,
398:13, 463:22
**cash** [22] - 380:25,
394:17, 395:9, 407:19,
407:21, 408:13, 408:14,
412:1, 412:6, 413:7,
414:7, 414:20, 415:3,
415:9, 416:2, 416:7,
416:9, 417:11, 419:2,
420:2, 420:22, 482:16
**catch** [2] - 406:10,
457:13
**category** [2] - 452:9,
474:9
**cattle** [7] - 351:1, 351:2,
351:3, 351:4, 351:5
**caused** [2] - 430:19,
570:15
**causes** [1] - 564:20
**causing** [1] - 455:1
**CBUSOL** [1] - 438:1
**CCT** [3] - 387:16, 387:19,
387:21
**cents** [3] - 349:20,
349:23, 474:6
**CEO** [8] - 409:20, 409:22,
409:23, 454:9, 547:1,
561:16, 581:24, 582:10
**certain** [21] - 316:25,
330:18, 336:20, 338:1,
338:14, 340:2, 359:23,
364:17, 368:10, 404:11,
407:23, 413:19, 425:9,
452:18, 459:6, 463:22,
501:16, 551:1, 551:7,
570:13, 592:22
**certification** [1] - 366:24
**certify** [2] - 594:4, 594:8
**cetera** [1] - 353:10
**chain** [3] - 458:2, 475:13,
492:6
**challenge** [2] - 317:20,
318:5
**challenging** [2] - 501:14,
567:22
**chance** [2] - 382:20,
478:1
**chances** [2] - 371:1,
489:21
**change** [9] - 398:12,
463:1, 464:22, 489:16,
492:20, 492:23, 502:11,
524:24, 565:7
**changed** [5] - 375:17,

405:6, 414:11, 489:13,
527:1
**changes** [5] - 398:12,
458:4, 480:21, 481:5,
576:20
**changing** [1] - 481:9
**characterization** [2] -
374:24, 377:24
**characterize** [2] -
341:10, 529:11
**characterizing** [1] -
391:24
**characters** [2] - 411:12,
508:17
**charge** [6] - 354:5, 354:6,
354:14, 364:19, 540:13,
566:23
**charged** [5] - 353:13,
385:21, 385:22, 544:19,
546:10
**charges** [1] - 541:5
**charging** [3] - 540:8,
541:6, 543:16
**chart** [22] - 354:20,
433:19, 435:15, 436:25,
437:24, 439:2, 445:24,
446:11, 447:4, 447:9,
448:8, 448:22, 451:3,
506:18, 546:4, 547:3,
547:4, 547:9, 547:12,
547:13, 548:4, 548:10
**charts** [1] - 561:14
**cheap** [3] - 350:8, 350:22
**cheaper** [1] - 568:14
**cheaply** [1] - 350:20
**check** [10] - 361:1,
381:14, 469:4, 502:17,
519:3, 519:6, 523:9,
530:14, 532:9, 585:20
**checked** [1] - 380:19
**checking** [2] - 392:15,
421:21
**Chelibashki** [1] - 584:25
**Chen** [1] - 508:18
**chief** [1] - 322:20
**China** [27] - 344:1, 344:3,
357:23, 358:3, 358:13,
358:18, 359:13, 360:10,
360:12, 360:13, 380:5,
382:3, 393:5, 393:6,
421:13, 429:9, 439:20,
462:24, 478:17, 550:25,
551:11, 560:2, 568:3,
573:10, 574:20, 574:21,
574:22
**Chinese** [18] - 338:8,
358:1, 359:9, 379:18,
379:20, 379:21, 411:11,
416:14, 425:2, 426:4,
429:10, 440:14, 441:15,

508:17, 508:22, 516:18,
569:22
**choice** [2] - 549:11,
565:4
**choose** [1] - 374:23
**chunk** [1] - 483:21
**circuit** [13] - 350:11,
350:16, 350:19, 350:25,
356:16, 357:20, 421:4,
446:18, 542:8, 566:4,
567:1, 568:2, 569:22
**Circuit** [1] - 422:20
**Circuitronix** [166] -
305:23, 310:16, 331:13,
333:24, 335:14, 335:21,
335:22, 335:24, 339:25,
340:10, 341:5, 342:7,
343:4, 344:13, 344:19,
346:7, 346:14, 346:22,
346:23, 351:16, 353:3,
353:13, 362:6, 364:10,
364:14, 367:17, 367:24,
368:7, 371:9, 371:11,
375:14, 375:25, 378:15,
379:9, 380:17, 381:13,
382:1, 382:15, 387:22,
388:11, 391:25, 392:6,
392:15, 393:2, 394:11,
397:24, 402:1, 402:25,
405:8, 410:22, 410:24,
417:14, 417:21, 423:1,
423:6, 423:17, 424:5,
427:19, 427:23, 427:25,
429:11, 432:21, 435:17,
437:20, 440:19, 442:6,
442:7, 443:25, 446:18,
449:22, 451:8, 451:12,
451:22, 452:4, 453:17,
454:10, 458:19, 460:5,
461:24, 462:8, 462:13,
463:3, 465:25, 466:15,
475:25, 477:16, 480:15,
486:4, 487:25, 488:23,
489:2, 499:2, 499:3,
502:10, 513:5, 513:11,
514:22, 517:6, 517:9,
517:20, 520:3, 520:4,
524:18, 526:8, 526:23,
530:10, 532:8, 532:14,
533:8, 533:12, 535:13,
535:15, 536:6, 537:15,
537:21, 538:20, 539:20,
539:23, 540:8, 540:14,
541:4, 543:1, 546:11,
546:25, 547:6, 547:22,
548:6, 548:21, 549:11,
561:1, 561:5, 561:7,
561:12, 562:23, 562:24,
563:4, 573:18, 574:17,
574:18, 574:19, 575:6,

577:25, 578:1, 578:15,
579:1, 579:7, 579:10,
580:9, 580:14, 581:8,
582:1, 584:5, 587:21,
588:11, 588:19, 589:4,
590:4, 590:18, 590:19,
590:22, 590:23, 591:11,
593:15
**Circuitronix's** [1] -
345:16, 366:7, 393:11,
432:18, 432:24, 434:11,
446:6, 451:5, 477:20,
477:21, 562:2
**Circuitronix.com** [1] -
587:2
**circumstance** [1] -
586:23
**circumstances** [1] -
491:8
**circumvent** [1] - 569:25
**Citibank** [4] - 383:3,
392:8, 392:18, 437:5
**Citibank's** [1] - 392:19
**city** [2] - 551:14, 551:21
**clad** [2] - 421:9, 421:10
**claim** [4] - 501:18,
501:20, 546:12, 546:19
**claimed** [4] - 333:8,
441:23, 502:6, 502:9
**claiming** [5] - 451:13,
451:23, 539:20, 539:23,
547:1
**claims** [1] - 515:4
**clarification** [2] - 453:13,
492:19
**clarified** [3] - 529:2,
529:3
**clarify** [2] - 417:20, 570:5
**clause** [3] - 455:10,
458:7, 458:11
**Clause** [3] - 455:11,
465:18, 481:23
**clauses** [2] - 405:10,
454:21
**clean** [4] - 307:18,
307:19, 328:12, 329:1
**clear** [8] - 312:23,
317:14, 353:20, 399:24,
426:7, 491:11, 497:20,
587:16
**clearly** [4] - 381:8,
403:12, 417:10, 458:24
**click** [3] - 471:23, 512:7,
513:1
**clicking** [1] - 512:4
**client** [1] - 544:12
**clock** [5] - 378:7, 384:22,
498:1, 498:5, 498:7
**close** [14] - 307:12,
414:15, 415:2, 495:9,

**KEYWORD INDEX**

505:6, 539:16, 541:21,
543:14, 543:20, 548:17,
548:18, 570:22, 592:10
  **closely** [1] - 570:23
  **closer** [1] - 393:7
  **CLR** [1] - 594:15
  **co** [1] - 409:22
  **Co** [2] - 409:23, 422:20
  **co,.i** [1] - 580:14
  **co-CEO** [1] - 409:22
  **Co-CEO** [1] - 409:23
  **code** [1] - 565:23
  **codes** [2] - 471:4, 471:6
  **coding** [2] - 377:4, 438:4
  **coin** [1] - 527:12
  **colleague** [1] - 454:9
  **colleagues** [5] - 396:7,
439:21, 493:1, 500:12,
502:17
  **collect** [3] - 411:23,
430:5, 443:2
  **color** [3] - 398:9, 398:13,
451:20
  **colored** [2] - 480:18,
548:12
  **colors** [2] - 398:8, 488:11
  **column** [13] - 384:11,
472:13, 472:25, 473:2,
496:19, 496:23, 529:19,
529:22, 529:23, 530:10,
532:16, 534:11, 536:3
  **Column** [6] - 472:13,
472:15, 472:20, 472:24,
474:18, 539:2
  **columns** [6] - 375:17,
470:22, 470:23, 519:17,
534:2, 536:3
  **com** [1] - 559:14
  **combination** [1] - 567:20
  **combine** [3] - 459:20,
459:21, 476:20
  **combined** [1] - 328:25
  **coming** [15] - 308:16,
308:18, 332:16, 338:4,
350:15, 388:14, 407:22,
408:1, 408:4, 425:8,
432:13, 513:4, 541:24,
541:25
  **comments** [3] - 480:2,
492:9, 492:22
  **commitment** [1] - 340:14
  **committed** [2] - 353:11,
481:25
  **committing** [2] - 333:10,
481:18
  **common** [2] - 339:22,
341:12
  **communicate** [1] -
349:20
  **communicated** [4] -

394:16, 431:5, 432:21,
445:1
  **communicating** [2] -
419:9, 481:22
  **communications** [1] -
394:8
  **companies** [21] - 341:5,
341:10, 341:12, 374:19,
395:18, 403:10, 403:23,
403:24, 405:10, 405:11,
413:25, 417:6, 421:1,
421:12, 422:12, 422:19,
443:15, 443:17, 514:13,
535:11, 561:10
  **company** [54] - 331:16,
331:23, 332:1, 344:5,
346:21, 348:24, 364:9,
365:3, 366:16, 370:14,
371:8, 382:4, 383:1,
401:9, 402:24, 403:10,
405:9, 422:8, 422:10,
439:9, 443:5, 445:21,
458:22, 460:7, 467:12,
547:1, 552:18, 553:3,
553:22, 559:24, 561:17,
561:19, 561:20, 561:23,
561:25, 569:19, 569:23,
571:5, 573:17, 574:19,
579:2, 579:19, 580:10,
581:7, 581:8, 582:24,
583:2, 584:13, 584:15,
584:19, 584:20, 584:21,
590:20
  **company's** [3] - 367:4,
402:22, 434:8
  **compare** [2] - 447:4,
524:16
  **comparison** [3] - 328:10,
427:15, 536:19
  **compelled** [1] - 551:3
  **competent** [1] - 313:24
  **complain** [1] - 486:14
  **complained** [2] - 507:20,
533:1
  **complete** [6] - 336:25,
424:15, 451:21, 461:17,
461:23, 514:15
  **completed** [4] - 337:5,
353:11, 357:22, 456:9
  **completely** [3] - 423:20,
485:17, 518:3
  **completing** [1] - 543:14
  **comply** [2] - 469:6,
493:22
  **complying** [2] - 471:19,
485:12
  **component** [2] - 550:15,
550:16, 552:15
  **components** [1] - 348:25
  **computer** [5] - 368:23,

392:9, 459:11, 460:1,
460:21
  **concept** [1] - 407:19
  **concern** [1] - 328:5
  **concerned** [3] - 317:9,
331:19, 418:10
  **concerns** [1] - 458:5
  **conclude** [1] - 546:24
  **concluded** [2] - 513:7,
593:25
  **conclusion** [1] - 451:2
  **condition** [1] - 404:10
  **conditions** [5] - 345:16,
353:4, 463:5, 491:15
  **confer** [1] - 396:7
  **conference** [3] - 562:21,
562:24, 562:25
  **confidently** [2] - 476:18,
569:24
  **confirm** [3] - 361:5,
361:6, 491:7
  **confirmation** [4] - 390:6,
392:5, 436:13, 436:18
  **confirmed** [1] - 492:2
  **confirms** [1] - 482:1
  **confusing** [1] - 372:15
  **confusion** [1] - 373:12
  **connected** [2] - 423:22,
574:8
  **connects** [1] - 363:9
  **consequential** [1] -
455:3
  **consider** [3] - 374:24,
499:24, 569:20
  **consideration** [4] -
339:5, 407:25, 478:6,
538:19
  **construction** [2] - 330:11
  **consumer** [1] - 564:7
  **contact** [1] - 343:13
  **contain** [6] - 305:23,
311:15, 453:3, 510:9,
591:9, 591:10
  **containing** [1] - 463:16
  **contemplated** [2] -
455:3, 489:15
  **content** [2] - 487:8,
487:9
  **context** [2] - 430:2,
538:15
  **contexts** [1] - 497:20
  **continue** [15] - 333:11,
333:17, 334:2, 335:22,
339:5, 399:10, 404:16,
433:12, 438:8, 490:19,
499:14, 503:9, 549:16,
549:18, 551:3
  **continued** [3] - 336:3,
543:22, 546:18
  **Continued** [1] - 331:7

  **Continuing** [6] - 305:13,
426:12, 481:16, 497:11,
522:9, 542:24
  **continuing** [1] - 394:17
  **contract** [23] - 332:7,
332:9, 346:25, 354:23,
360:23, 367:5, 367:7,
378:14, 394:5, 395:2,
402:3, 402:5, 405:6,
414:23, 456:22, 462:12,
462:15, 464:23, 465:3,
547:7, 562:4, 562:9,
562:10
  **contracted** [2] - 394:21,
394:24
  **contracts** [1] - 482:4
  **contractual** [11] -
339:22, 357:11, 362:16,
364:8, 395:7, 404:7,
451:25, 452:16, 499:22,
500:2, 540:19
  **contractually** [1] -
337:25
  **contribute** [2] - 487:15,
497:6
  **contributed** [1] - 518:6
  **control** [2] - 424:17,
513:1
  **controller** [1] - 584:5
  **controversy** [1] - 498:2
  **conversation** [11] -
405:18, 409:18, 411:6,
411:8, 432:2, 454:14,
454:19, 454:23, 457:5,
509:9, 557:25
  **conversations** [2] -
403:21, 403:22
  **conversion** [1] - 416:15
  **convert** [1] - 357:4
  **convince** [2] - 405:23,
583:23
  **cooperation** [2] - 514:18,
517:21
  **copied** [6] - 508:17,
516:16, 516:21, 518:17,
572:12, 572:15
  **copies** [1] - 527:5
  **copper** [3] - 421:9,
421:10
  **copper-clad** [2] - 421:9,
421:10
  **copy** [10] - 328:12,
335:10, 342:12, 367:19,
367:20, 367:22, 367:23,
411:16, 554:23, 563:12
  **copying** [6] - 410:7,
418:20, 454:5, 508:14,
516:14, 516:15
  **corner** [6] - 346:6,
437:10, 469:24, 496:7,

499:10, 532:4
  **corporate** [2] - 555:14,
555:17
  **correct** [120] - 313:7,
313:9, 317:22, 332:23,
333:22, 339:11, 377:23,
378:6, 383:24, 392:1,
394:9, 394:10, 405:18,
424:7, 433:24, 446:19,
457:13, 475:22, 479:3,
480:12, 489:9, 490:8,
490:14, 496:1, 513:25,
523:23, 526:19, 545:14,
546:19, 550:22, 550:23,
550:25, 551:6, 551:11,
551:14, 551:15, 551:17,
551:18, 551:25, 552:5,
552:9, 552:10, 552:15,
552:16, 553:7, 553:10,
553:15, 553:17, 553:18,
553:22, 553:23, 555:6,
555:9, 555:21, 555:22,
556:6, 556:10, 556:11,
557:3, 557:4, 557:12,
557:16, 557:21, 559:4,
559:9, 559:10, 560:9,
560:10, 560:13, 560:14,
562:11, 562:13, 562:14,
562:16, 562:17, 562:20,
563:19, 567:16, 568:8,
568:10, 568:22, 568:23,
570:24, 570:25, 571:2,
571:3, 571:13, 571:14,
571:18, 571:19, 572:10,
572:11, 572:18, 574:9,
577:24, 578:4, 578:5,
579:10, 579:15, 579:16,
579:25, 580:4, 581:18,
581:22, 582:8, 582:11,
585:16, 585:18, 586:24,
589:3, 589:5, 589:6,
589:7, 589:11, 589:18,
589:19, 591:14, 592:7,
592:19, 594:5
  **corrective** [1] - 385:20
  **correctly** [9] - 380:15,
391:25, 434:4, 473:23,
473:25, 474:16, 490:8,
504:6
  **corresponding** [2] -
370:10, 385:22
  **cost** [6] - 343:24, 354:6,
541:10, 543:2, 567:3,
567:5
  **costs** [16] - 334:7, 353:8,
353:12, 353:18, 452:4,
452:5, 452:6, 452:7,
452:9, 452:10, 452:15,
455:3, 488:3
  **counsel** [5] - 306:7,

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

365:19, 495:23, 544:11, 594:8

**Counsel** [1] - 426:20
**count** [3] - 470:13, 475:9, 546:23
**counting** [1] - 499:5
**countries** [2] - 573:2, 573:7
**Country** [1] - 330:12
**country** [1] - 574:25
**couple** [1] - 329:8, 383:6, 411:5, 413:22, 479:14, 483:22, 492:19, 500:25, 533:10, 572:4, 583:5
**course** [3] - 537:16, 552:6, 581:6
**court** [6] - 376:11, 398:23, 428:18, 484:24, 587:14, 587:18
**COURT** [227] - 304:1, 304:14, 304:25, 305:15, 305:18, 306:21, 306:24, 307:4, 307:6, 307:13, 307:17, 308:2, 308:12, 308:19, 308:23, 308:25, 309:7, 309:10, 309:14, 309:21, 309:24, 310:5, 310:9, 310:12, 310:18, 310:21, 310:25, 311:3, 311:5, 311:12, 311:17, 311:22, 312:11, 312:16, 312:24, 313:2, 313:5, 313:11, 313:18, 313:21, 313:25, 314:4, 314:9, 314:17, 315:11, 315:14, 315:18, 315:23, 316:5, 316:9, 316:16, 316:18, 316:20, 317:17, 318:6, 318:11, 318:14, 318:23, 318:25, 319:2, 319:5, 319:8, 319:13, 319:24, 320:6, 320:10, 320:14, 320:18, 320:22, 321:6, 321:10, 321:15, 321:18, 321:25, 322:2, 322:25, 323:7, 323:11, 323:14, 323:21, 324:3, 324:10, 324:12, 324:14, 324:16, 324:20, 324:23, 325:1, 325:3, 325:10, 325:13, 325:17, 325:20, 325:22, 325:24, 326:3, 326:6, 326:11, 326:14, 326:19, 326:23, 327:3, 327:5, 327:8, 327:11, 327:15, 327:17, 328:1, 328:17, 329:3, 329:4, 329:6, 329:9, 329:15, 329:19, 329:23, 330:1, 330:6,

330:8, 330:13, 334:13, 334:16, 334:18, 334:21, 342:13, 344:3, 344:8, 347:9, 347:16, 348:3, 352:6, 352:9, 352:15, 356:2, 356:9, 359:21, 360:3, 361:24, 362:1, 374:7, 376:7, 376:10, 380:8, 391:4, 391:9, 403:14, 403:19, 420:11, 420:15, 421:20, 424:22, 425:5, 426:18, 426:21, 426:25, 428:7, 428:15, 428:19, 431:20, 433:5, 433:10, 435:23, 467:21, 469:7, 485:21, 493:24, 494:14, 494:16, 495:8, 495:15, 495:18, 495:21, 496:3, 500:20, 500:25, 501:6, 501:11, 520:16, 520:18, 523:2, 527:23, 530:18, 531:20, 531:23, 534:25, 538:12, 541:17, 541:24, 542:1, 542:5, 542:13, 542:21, 545:8, 545:25, 549:22, 550:1, 554:9, 554:12, 554:18, 554:21, 555:1, 555:3, 556:16, 556:19, 556:24, 557:8, 558:18, 559:5, 559:7, 560:17, 560:24, 566:10, 575:12, 575:19, 575:22, 575:24, 577:16, 578:20, 578:22, 578:24, 585:3, 585:5, 587:17, 590:8, 592:1, 593:16, 593:19
**Court** [15] - 330:5, 351:9, 374:5, 374:16, 391:8, 421:22, 433:4, 433:8, 435:22, 450:18, 493:21, 495:12, 549:24, 594:16, 594:16
**Court's** [2] - 314:21, 471:19
**courtroom** [4] - 480:1, 577:12, 577:20, 592:25
**cousin** [2] - 573:20, 574:2
**cover** [3] - 416:6, 534:8, 534:10
**covered** [7] - 353:19, 357:13, 380:10, 529:19, 534:4, 534:12, 548:4
**COVID** [1] - 567:20
**cow** [1] - 351:2
**cows** [1] - 351:6
**create** [6] - 371:3, 371:4, 371:5, 371:12, 389:4, 460:18

**created** [7] - 370:17, 460:24, 477:24, 537:15, 543:1, 547:4, 576:15
**creating** [2] - 371:11, 371:13
**credibility** [1] - 556:23
**credit** [5] - 388:23, 388:25, 389:1, 417:7, 539:4
**criteria** [4] - 490:3, 490:20, 500:3, 500:4
**criterias** [1] - 366:25
**cross** [4] - 305:3, 317:20, 570:21, 593:22
**CROSS** [1] - 550:5
**cross-examination** [3] - 317:20, 570:21, 593:22
**CROSS-EXAMINATION** [1] - 550:5
**crosstalk** [4] - 317:2, 343:17, 347:21, 554:15
**crystal** [1] - 587:16
**CSR** [1] - 594:15
**CSR-IL** [1] - 594:15
**CTX** [69] - 310:19, 311:19, 315:21, 320:11, 328:20, 328:21, 329:21, 333:16, 333:20, 339:5, 339:7, 339:15, 339:20, 369:24, 397:20, 399:22, 416:4, 416:6, 430:4, 430:19, 444:13, 509:17, 510:10, 511:6, 522:10, 523:11, 523:24, 524:5, 524:18, 524:25, 528:20, 531:16, 532:5, 535:18, 574:13, 574:14, 575:2, 576:2, 576:6, 576:7, 576:8, 576:17, 576:22, 576:23, 577:1, 577:20, 577:23, 577:25, 578:8, 578:14, 579:6, 579:13, 579:14, 579:17, 579:21, 580:5, 581:3, 581:6, 581:12, 586:5, 586:6, 586:7, 586:10, 586:19, 592:18
**CTX-HK** [7] - 310:19, 311:19, 315:21, 328:20, 328:21, 329:21
**CTX-SZ** [2] - 574:13, 574:14
**CTX-US** [4] - 328:21, 510:10, 511:6, 532:5
**CTX-USA** [7] - 333:16, 333:20, 339:5, 339:7, 339:15, 339:20, 509:17
**cup** [7] - 355:3, 355:9, 355:10, 465:11, 465:13, 465:15, 477:18

**currency** [2] - 376:17, 416:14
**current** [3] - 366:8, 398:19, 399:4
**cursor** [1] - 512:6
**customer** [33] - 343:5, 343:7, 343:8, 343:9, 343:13, 343:15, 343:23, 344:1, 344:2, 344:4, 344:11, 353:14, 353:21, 353:22, 362:11, 362:12, 369:7, 385:16, 385:21, 426:13, 429:6, 452:12, 488:9, 561:4, 561:25, 562:4, 564:4, 567:7, 568:16, 588:19
**customer's** [1] - 363:10
**customers** [39] - 334:10, 336:5, 340:23, 349:18, 349:19, 353:22, 354:9, 369:8, 369:9, 369:13, 369:16, 369:20, 369:21, 403:25, 407:9, 408:1, 452:13, 561:9, 561:14, 561:22, 562:1, 562:2, 562:3, 562:8, 562:12, 562:15, 562:19, 564:4, 564:5, 565:1, 565:2, 565:8, 570:1, 591:12, 591:24, 592:22
**customs** [8] - 359:9, 359:10, 359:19, 359:20, 360:10, 360:12, 360:13, 429:9
**Customs'** [1] - 462:24
**cut** [4] - 338:3, 349:6, 465:25, 544:3
**cutoff** [2] - 502:4, 544:15
**cutter** [2] - 349:8

**D**

**D-10** [5] - 324:19, 324:21, 324:22, 324:23, 324:25
**D-D10** [9] - 324:19, 324:20, 324:22, 324:23, 325:5, 325:12, 493:11, 493:14, 494:20
**D-K7** [3] - 325:23, 326:8, 504:14
**D-Q13** [7] - 316:12, 316:17, 316:20, 316:21, 318:10, 431:17, 433:18
**D-R13** [6] - 319:16, 319:19, 320:6, 320:8, 449:19, 450:22
**D-S13** [5] - 319:19, 320:6, 320:8, 450:19, 450:22
**D-T13** [5] - 319:19,

320:6, 320:8, 450:19, 450:23
**D-U13** [7] - 318:13, 318:19, 318:20, 318:23, 319:1, 436:21, 571:24
**D-U7** [5] - 311:20, 311:25, 314:13, 315:12, 405:15
**D-V13** [7] - 319:20, 320:10, 320:17, 320:22, 320:23, 450:19, 450:23
**D-W11** [2] - 325:14, 325:21
**D-X13** [4] - 545:6, 545:25, 546:1, 546:3
**D-Y13** [6] - 541:9, 541:12, 541:16, 542:14, 545:19, 545:20
**D-Y7** [2] - 323:13, 323:14, 323:15, 323:21, 323:22, 467:15, 467:21, 469:13
**D10** [9] - 324:19, 324:20, 324:22, 324:23, 325:5, 325:12, 493:11, 493:14, 494:20
**Dallas** [1] - 584:24
**damage** [1] - 334:12
**damages** [3] - 486:4, 502:10, 539:21
**dark** [1] - 542:4
**data** [24] - 459:13, 459:15, 459:20, 459:21, 459:22, 459:23, 463:19, 463:20, 463:21, 463:23, 466:15, 470:9, 473:16, 475:4, 475:6, 504:7, 506:20, 506:24, 507:2, 513:12, 514:18, 517:10
**database** [1] - 460:21
**DATE** [1] - 594:15
**date** [76] - 332:17, 353:11, 363:7, 375:16, 375:17, 375:18, 375:19, 376:19, 376:20, 376:23, 376:24, 376:25, 377:13, 377:18, 378:10, 384:4, 384:20, 384:21, 384:23, 396:20, 409:7, 412:18, 415:18, 420:20, 431:9, 431:10, 437:6, 448:14, 448:17, 448:19, 449:2, 449:4, 450:14, 454:23, 458:25, 459:2, 462:7, 465:3, 470:11, 470:12, 478:18, 479:6, 482:7, 490:25, 492:16, 496:20, 496:21, 497:2, 497:13, 497:16, 497:17, 497:24, 497:25, 498:5, 498:18,

498:19, 498:20, 498:21, 498:23, 499:3, 507:15, 507:18, 509:13, 511:23, 515:16, 529:12, 537:9, 544:15, 553:20, 553:21, 594:6
**date's** [1] - 447:15
**dated** [2] - 418:17, 491:2
**dates** [4] - 497:15, 498:8, 506:6, 532:15
**dating** [1] - 533:2
**David** [1] - 584:4
**day-to-day** [1] - 586:1
**days** [64] - 330:17, 330:23, 345:11, 357:22, 357:23, 357:24, 358:4, 358:5, 358:7, 358:9, 358:12, 358:14, 358:16, 360:14, 360:19, 360:20, 371:14, 378:1, 378:15, 378:17, 379:5, 394:5, 394:13, 394:22, 395:3, 402:5, 402:8, 402:10, 404:6, 410:2, 455:17, 455:18, 456:22, 456:23, 456:24, 458:6, 461:5, 461:6, 472:22, 472:23, 473:2, 473:9, 474:12, 475:14, 477:5, 478:9, 478:10, 505:20, 509:15, 569:4, 569:6, 592:16
**DB** [5] - 321:4, 321:12, 321:25, 322:1, 453:24
**DD** [1] - 493:15
**de** [1] - 349:5
**de-panelized** [1] - 349:5
**deadline** [1] - 462:13
**deal** [2] - 406:23, 439:15
**dealing** [2] - 339:23, 341:4
**dealt** [1] - 569:22
**dear** [3] - 492:9, 522:4, 522:8
**debate** [1] - 487:4
**debit** [46] - 338:7, 385:5, 385:13, 385:22, 385:23, 386:7, 386:9, 386:11, 386:17, 386:22, 387:1, 387:11, 387:12, 388:1, 403:1, 413:13, 442:8, 461:25, 462:1, 462:9, 462:18, 463:2, 463:10, 463:13, 463:16, 464:8, 466:22, 467:1, 467:4, 467:5, 467:8, 476:8, 476:10, 476:11, 520:1, 534:7, 534:9, 536:2, 536:9, 536:11, 536:17, 537:5, 537:6, 537:7
**debited** [1] - 488:8

**debits** [1] - 388:1
**debt** [1] - 548:21
**debts** [1] - 549:9
**decade** [1] - 413:25
**December** [18] - 354:3, 384:15, 396:24, 397:5, 401:18, 404:17, 414:10, 414:21, 414:25, 415:1, 415:22, 503:11, 528:19, 532:22, 535:6, 539:7, 540:9, 544:9
**decided** [2] - 336:19, 394:19
**decides** [1] - 360:10
**decision** [3] - 549:15, 568:15, 583:21
**decisions** [1] - 586:2
**declares** [1] - 429:9
**decoration** [2] - 525:8, 525:9
**decrease** [1] - 463:11
**deducted** [1] - 386:20
**defendant** [1] - 310:15
**defense** [2] - 306:5, 319:5
**defines** [1] - 337:15
**definitely** [4] - 305:6, 307:3, 340:2, 515:25
**delay** [4] - 354:4, 369:6, 403:11, 488:11
**delayed** [1] - 334:5
**delaying** [2] - 334:10, 454:25
**delays** [4] - 404:1, 404:2, 404:3, 404:4
**Delgado** [1] - 585:12
**Delhi** [2] - 361:21, 361:22
**deliver** [2] - 353:23, 354:10, 354:11, 359:11
**delivered** [1] - 485:3
**delivery** [4] - 349:11, 353:11, 353:18, 356:15
**Delta** [1] - 493:15
**demonstrative** [5] - 341:25, 342:5, 347:5, 347:8, 367:12
**DEN** [1] - 385:8
**DEN-DM** [1] - 385:8
**department** [8] - 368:8, 369:24, 370:4, 371:10, 380:18, 426:8, 429:4, 430:13
**depleted** [1] - 483:23
**deposition** [1] - 558:6
**depositions** [1] - 553:2
**describe** [9] - 346:5, 348:13, 362:5, 364:9, 365:16, 365:18, 372:16, 373:20, 395:25
**described** [8] - 338:19,

345:18, 358:23, 365:19, 369:2, 370:2, 379:21, 548:1
**describing** [4] - 341:24, 373:22, 380:11, 519:5
**description** [4] - 345:5, 349:16, 351:13, 375:17
**designate** [1] - 398:9
**designing** [1] - 460:7
**desktops** [1] - 368:21
**detail** [50] - 337:8, 351:14, 381:10, 383:6, 383:10, 383:17, 383:23, 383:25, 386:15, 386:23, 387:6, 387:14, 388:15, 388:25, 389:8, 389:12, 390:10, 390:14, 391:19, 393:13, 393:15, 393:21, 397:8, 414:18, 432:24, 434:6, 434:9, 434:11, 435:3, 435:14, 435:16, 436:23, 446:17, 447:5, 447:6, 448:1, 448:2, 448:13, 449:1, 449:2, 449:4, 450:8, 463:13, 470:4, 488:14, 493:5, 512:16, 512:17, 531:17, 536:1
**detailed** [7] - 351:13, 363:3, 517:22, 517:24, 518:1, 536:1, 544:7
**details** [29] - 381:7, 381:8, 385:18, 389:4, 389:24, 400:13, 424:8, 432:23, 446:7, 446:8, 448:12, 451:5, 451:6, 457:25, 458:23, 509:10, 509:13, 510:10, 511:6, 511:20, 518:25, 519:6, 522:10, 522:12, 529:5, 529:6, 537:4, 538:18, 542:18
**determined** [2] - 374:17, 564:19
**developing** [3] - 343:5, 343:8, 343:9
**difference** [13] - 315:2, 356:14, 357:23, 358:3, 469:8, 498:4, 526:12, 527:16, 530:3, 530:4, 570:24, 571:2, 571:7
**differences** [2] - 481:6, 487:11
**different** [53] - 340:1, 341:23, 342:1, 352:4, 362:10, 364:15, 369:8, 369:9, 370:23, 376:4, 377:25, 378:1, 384:2, 390:16, 396:17, 398:8, 398:13, 407:18, 418:22,

423:9, 439:3, 439:9, 441:25, 447:15, 451:20, 457:15, 464:20, 470:18, 478:10, 481:23, 488:4, 496:12, 496:22, 496:23, 496:25, 497:20, 503:2, 507:7, 519:16, 523:8, 525:17, 526:9, 534:1, 538:18, 543:25, 564:4, 564:5, 576:19, 576:21, 581:6, 581:8
**differential** [3] - 354:14, 429:16, 429:17
**difficult** [1] - 334:11
**difficulty** [1] - 566:16
**digital** [1] - 367:23
**digitally** [1] - 352:7
**direct** [21] - 305:4, 305:6, 312:8, 338:20, 339:10, 339:13, 396:16, 397:10, 405:16, 406:1, 418:22, 419:23, 433:13, 434:1, 435:8, 444:7, 454:13, 463:24, 468:24, 541:22, 550:10
**DIRECT** [2] - 331:7, 433:20
**directed** [2] - 337:14, 435:13
**directing** [1] - 457:21
**direction** [2] - 359:7, 451:10
**directly** [5] - 369:14, 445:9, 488:9, 560:18, 589:12
**directors** [1] - 405:11
**disagree** [1] - 525:25
**disagreed** [1] - 526:1
**disagreeing** [1] - 336:21
**disagreement** [7] - 337:2, 476:24, 477:4, 478:7, 478:12, 487:6, 503:20
**disagreements** [2] - 336:20, 486:20
**disagrees** [1] - 365:22
**discount** [11] - 464:10, 466:5, 466:11, 471:7, 471:11, 471:22, 471:23, 472:7, 473:17, 473:19
**discounts** [1] - 338:1
**discover** [1] - 571:9
**discrepancies** [14] - 333:13, 337:12, 337:20, 338:13, 338:15, 338:18, 361:6, 364:5, 364:7, 401:5, 401:6, 401:15, 519:19, 529:22
**discrepancy** [22] - 333:18, 337:15, 337:18,

337:24, 338:3, 338:5, 338:6, 338:14, 339:7, 352:5, 372:7, 411:24, 412:5, 415:6, 429:14, 491:20, 519:22, 520:1, 520:2, 522:13, 534:5, 536:13
**discuss** [3] - 488:14, 488:16, 567:13
**discussed** [9] - 395:19, 472:2, 487:12, 488:14, 495:23, 510:3, 557:13, 557:17, 583:9
**discussion** [8] - 360:7, 371:19, 397:20, 469:19, 476:25, 500:24, 550:11, 557:23
**discussions** [3] - 486:20, 491:18, 544:13
**dishwashers** [1] - 564:18
**dispute** [1] - 335:13
**disputed** [2] - 498:13, 515:15
**disputing** [1] - 588:7
**distract** [1] - 348:18
**distress** [3] - 413:11, 417:11, 424:25
**District** [2] - 594:16, 594:17
**divert** [1] - 432:8
**diverted** [6] - 431:7, 431:13, 431:15, 439:2, 445:21, 548:9
**divide** [2] - 336:10, 350:13
**divided** [1] - 416:23
**DM** [1] - 385:8
**DM's** [1] - 518:25
**docket** [1] - 309:18
**document** [72] - 306:12, 314:7, 319:9, 335:1, 335:8, 335:15, 344:15, 344:17, 346:2, 374:23, 374:25, 375:5, 378:6, 384:2, 385:3, 386:5, 386:14, 386:16, 389:12, 390:23, 391:16, 392:7, 395:19, 396:1, 396:13, 397:11, 398:12, 407:16, 408:20, 423:14, 426:16, 428:3, 428:13, 428:23, 431:18, 431:22, 432:22, 433:3, 433:17, 435:2, 437:3, 438:24, 440:9, 445:19, 464:3, 464:11, 469:16, 469:24, 470:5, 470:9, 471:23, 476:3, 487:16, 490:23, 498:21, 499:8, 499:13, 506:10, 506:11, 508:5, 510:9,

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

528:4, 530:13, 532:8,
537:24, 543:1, 544:24,
544:25, 556:12, 571:20,
571:22

**documented** [4] -
395:10, 439:6, 453:20,
487:24

**documents** [23] - 305:23,
314:3, 314:12, 314:16,
314:19, 314:20, 316:25,
317:6, 317:9, 317:16,
317:18, 317:24, 318:6,
318:16, 328:10, 374:8,
374:21, 427:7, 435:22,
476:5, 500:19, 516:1,
516:2

**dollar** [5] - 350:9,
350:10, 372:10, 427:22,
427:23

**dollars** [13] - 376:18,
381:1, 381:22, 415:9,
417:1, 444:14, 482:19,
482:21, 483:3, 485:18,
487:1, 533:22, 549:1

**domestic** [1] - 441:11

**Donaldson** [2] - 583:24,
583:25

**done** [28] - 305:21,
305:24, 321:1, 323:2,
323:24, 327:22, 345:19,
374:6, 378:7, 379:19,
424:10, 453:14, 461:4,
503:12, 503:13, 503:15,
507:8, 515:13, 530:25,
539:16, 541:21, 557:2,
563:13, 569:24, 570:22,
592:12, 593:21

**Donovan** [1] - 584:14

**door** [4] - 306:4, 379:9,
427:25, 428:10

**dormitories** [1] - 380:4

**dotted** [2] - 366:2, 368:6

**double** [1] - 324:20,
357:19, 456:23, 489:22,
490:15, 499:17, 500:5,
523:8, 530:14, 585:20

**double-side** [4] - 357:19,
456:23, 489:22, 500:5

**double-sided** [3] -
489:22, 490:15, 499:17

**doubt** [1] - 450:13

**Doug** [1] - 411:14

**Douglas** [30] - 335:19,
394:15, 397:2, 409:15,
409:16, 409:17, 409:20,
410:7, 411:13, 412:22,
412:23, 412:24, 418:20,
419:9, 422:9, 429:21,
454:6, 463:23, 466:16,
508:14, 516:14, 516:25,

562:22, 569:10, 569:11,
569:20, 572:12, 572:13,
592:9

**down** [58] - 322:3, 333:3,
334:25, 338:3, 372:10,
375:12, 380:14, 385:1,
385:2, 386:23, 387:25,
393:25, 401:23, 403:1,
406:2, 409:5, 410:1,
425:8, 437:14, 438:8,
443:24, 447:24, 448:11,
449:24, 452:7, 465:25,
480:23, 480:25, 481:13,
483:7, 484:1, 484:2,
487:17, 488:3, 490:25,
512:7, 513:20, 514:4,
518:11, 521:16, 524:14,
532:18, 533:21, 534:19,
536:23, 540:5, 542:1,
543:10, 544:3, 545:2,
546:21, 553:24, 564:22,
567:19, 567:21, 568:20,
572:1, 574:11

**draft** [6] - 323:17, 479:3,
479:22, 479:23, 480:11,
480:21

**drafted** [2] - 397:22,
398:2

**drive** [1] - 359:4

**driving** [1] - 359:14

**drop** [1] - 543:24

**Dropbox** [1] - 313:10

**dropped** [4] - 307:11,
312:25, 313:4, 313:17

**DU3** [3] - 425:16, 428:24,
572:6

**due** [16] - 334:13, 372:1,
372:25, 375:16, 375:17,
375:19, 375:20, 376:20,
411:20, 416:8, 416:13,
417:1, 426:13, 429:5,
488:2, 539:2

**duh** [1] - 318:21

**duly** [1] - 331:5

**during** [16] - 307:23,
331:11, 341:9, 380:1,
394:19, 412:12, 413:10,
413:12, 464:4, 466:16,
482:18, 495:23, 550:10,
553:2, 558:6, 572:18

**duty** [2] - 339:22, 341:4

**dwell** [1] - 441:5

**dying** [1] - 557:7

**dynamic** [1] - 306:11

**dynamics** [2] - 354:12,
360:2

---

# E

**early** [1] - 455:6

**ease** [1] - 355:3

**easier** [1] - 319:18

**easily** [1] - 357:22

**easy** [2] - 539:19, 563:23

**educate** [1] - 384:1

**effect** [5] - 395:1, 406:5,
406:12, 414:19, 491:15

**effective** [1] - 553:21

**efficiency** [1] - 514:20

**efficient** [1] - 364:4

**efficiently** [1] - 304:11

**effort** [3] - 305:22,
520:25, 549:18

**efforts** [2] - 353:9,
514:12

**EIEMS** [2] - 582:25,
583:1

**eight** [11] - 304:4,
349:18, 473:8, 485:4,
485:17, 487:13, 489:23,
498:15, 499:19, 502:1,
518:8

**eight-year** [1] - 518:8

**either** [8] - 317:18,
322:18, 367:20, 400:10,
401:15, 449:25, 516:21,
517:1

**electronic** [1] - 352:8

**electronically** [1] -
352:11

**electronics** [3] - 349:9,
564:7, 567:22

**elephant** [2] - 472:15,
472:16

**ELMO** [1] - 554:3

**email** [117] - 311:23,
312:3, 312:10, 315:24,
321:7, 323:14, 325:24,
367:22, 367:24, 368:14,
368:16, 389:13, 389:14,
390:5, 392:1, 392:4,
404:14, 405:15, 405:17,
406:2, 407:3, 409:1,
409:17, 411:8, 411:11,
412:1, 412:5, 412:21,
413:7, 413:9, 415:13,
415:18, 417:18, 418:14,
418:17, 419:20, 420:21,
421:14, 425:21, 426:5,
430:23, 431:5, 431:9,
431:10, 434:21, 440:2,
440:8, 441:1, 453:12,
453:25, 454:5, 454:11,
454:24, 455:9, 456:13,
456:14, 457:18, 458:2,
467:25, 472:2, 472:3,
475:12, 475:21, 479:2,
480:8, 480:11, 480:17,
484:1, 484:12, 490:24,
491:1, 492:6, 492:10,

504:17, 505:8, 506:25,
508:13, 510:16, 513:23,
514:5, 514:21, 515:1,
515:8, 516:13, 516:16,
516:23, 518:13, 518:15,
518:18, 520:24, 522:2,
523:4, 524:18, 527:4,
528:5, 528:7, 528:18,
529:9, 533:17, 534:14,
535:6, 561:12, 561:13,
569:2, 569:5, 571:25,
572:5, 572:7, 576:9,
576:17, 580:13, 580:16,
580:18, 581:20, 591:22

**emailed** [2] - 466:18,
467:6

**emails** [20] - 408:19,
411:6, 412:3, 412:7,
412:12, 413:22, 413:24,
414:2, 414:4, 417:22,
453:21, 462:12, 468:9,
528:6, 536:11, 540:13,
581:17, 582:4, 589:14

**embedded** [1] - 587:4

**emphasize** [1] - 357:18

**employed** [1] - 594:9

**employee** [5] - 331:13,
365:20, 368:22, 583:6,
583:20

**employees** [26] - 331:17,
340:19, 343:13, 367:2,
577:6, 577:12, 577:23,
578:4, 578:8, 579:12,
579:20, 581:2, 581:11,
581:14, 583:11, 586:5,
586:6, 589:22, 589:23,
589:24, 589:25, 591:17,
591:18

**employs** [1] - 590:3

**enclosure** [1] - 349:13

**end** [24] - 316:13, 349:4,
377:9, 378:5, 379:18,
394:14, 399:25, 401:11,
402:21, 415:13, 443:4,
460:22, 478:11, 501:15,
512:22, 517:4, 535:8,
536:13, 537:1, 538:22,
568:17, 569:17, 570:19,
570:20

**endeavored** [1] - 306:6

**ending** [1] - 392:13

**enforce** [1] - 314:25

**engaging** [1] - 591:12

**engineer** [2] - 427:20,
428:3

**engineering** [1] - 427:24

**engineers** [1] - 589:22

**English** [5] - 399:18,
399:19, 440:15, 440:23,
441:7

**enlarge** [5] - 434:22,
437:17, 438:9, 440:12,
444:2

**enter** [4] - 362:14, 363:6,
366:24, 514:20

**entered** [1] - 314:25

**enterprise** [1] - 363:8

**enters** [4] - 330:7, 433:9,
495:20, 549:25

**entire** [13] - 305:2, 336:9,
341:1, 349:18, 349:21,
350:1, 364:6, 456:9,
474:25, 487:13, 490:3,
493:12, 528:3

**entirely** [1] - 451:16

**entities** [2] - 336:15,
579:1

**entitled** [1] - 594:12

**entity** [2] - 578:15,
591:11

**entrance** [2] - 561:6,
590:18

**entries** [2] - 372:9

**equipment** [3] - 340:8,
340:15, 340:16

**ERP** [16] - 363:7, 363:8,
366:7, 366:8, 368:20,
423:21, 458:24, 459:1,
470:12, 470:13, 470:14,
470:15, 470:17, 470:18,
527:1

**error** [2] - 375:15, 375:24

**errors** [2] - 517:23, 519:9

**essentially** [2] - 406:24,
507:4

**establish** [2] - 314:8,
315:5

**et** [1] - 353:10

**European** [1] - 588:19

**evening** [1] - 593:24

**event** [1] - 371:13

**eventually** [3] - 336:15,
543:23, 570:15

**evidence** [63] - 307:8,
308:16, 308:18, 309:16,
310:1, 311:2, 311:7,
311:14, 311:25, 315:16,
316:7, 316:11, 316:21,
317:15, 317:17, 317:19,
318:25, 319:1, 319:14,
319:15, 320:7, 320:9,
320:23, 322:1, 323:22,
324:5, 324:13, 324:18,
325:12, 325:21, 326:8,
326:16, 327:10, 329:17,
332:14, 341:22, 374:16,
383:14, 425:16, 426:17,
439:7, 449:18, 467:21,
493:13, 504:15, 528:10,
528:11, 530:16, 530:17,

534:25, 535:2, 538:12,
538:13, 542:14, 542:19,
545:25, 546:1, 555:1,
555:2, 571:24, 572:7,
590:7, 590:11

**evolving** [1] - 305:25
**exact** [4] - 381:2, 382:20,
459:2, 467:11
**exactly** [6] - 332:23,
427:17, 430:25, 459:2,
494:12, 546:15
**examination** [5] -
317:20, 433:13, 550:10,
570:21, 593:22
**EXAMINATION** [3] -
331:7, 433:20, 550:5
**examined** [1] - 331:6
**example** [6] - 338:1,
355:4, 385:23, 393:13,
468:8, 475:24
**examples** [2] - 374:20,
413:23
**exceed** [2] - 354:25,
549:7
**exceedance** [5] - 325:3,
325:15, 475:7, 476:6,
493:8
**exceedances** [7] -
468:18, 468:19, 468:22,
469:2, 494:24, 496:9,
496:24
**exceeding** [3] - 468:20,
477:17, 477:22
**Excel** [28] - 311:10,
459:6, 459:7, 459:10,
459:17, 459:18, 459:20,
459:24, 460:3, 460:7,
460:18, 466:19, 467:11,
469:9, 470:6, 471:5,
475:20, 493:7, 496:14,
501:5, 510:13, 510:14,
511:10, 523:15, 537:25
**except** [4] - 319:20,
451:7, 493:20, 554:5
**excess** [1] - 497:5
**exchange** [8] - 335:21,
335:25, 425:25, 426:13,
429:5, 429:7, 431:2,
441:10
**exclusive** [2] - 562:4,
562:8
**excuse** [1] - 396:6
**execution** [1] - 314:25
**executives** [1] - 395:17
**exercise** [1] - 506:1
**EXHIBIT** [1] - 303:4
**Exhibit** [94] - 309:12,
309:16, 309:23, 310:1,
310:4, 311:2, 311:7,
311:14, 311:25, 315:16,

316:7, 316:11, 316:21,
319:1, 319:15, 320:23,
322:1, 323:22, 324:13,
324:18, 325:12, 325:21,
326:8, 326:9, 326:16,
327:10, 329:17, 332:14,
345:20, 345:25, 349:23,
374:2, 383:13, 383:21,
386:1, 389:18, 396:4,
405:15, 408:24, 412:14,
415:15, 418:15, 422:16,
425:16, 428:24, 431:17,
433:18, 434:15, 434:24,
436:21, 439:14, 446:12,
448:12, 449:19, 452:24,
453:24, 462:3, 463:25,
467:15, 469:13, 478:24,
479:17, 480:6, 490:24,
508:10, 511:5, 513:18,
516:10, 518:10, 520:10,
520:11, 522:19, 522:21,
527:21, 527:22, 528:11,
528:13, 529:13, 530:15,
531:2, 531:3, 531:7,
534:17, 534:18, 534:22,
535:2, 538:4, 538:13,
541:9, 542:14, 545:6,
546:1, 555:2, 590:11
**exhibit** [47] - 305:11,
307:10, 307:14, 307:21,
308:8, 308:12, 308:15,
308:20, 309:19, 310:5,
310:6, 312:20, 313:14,
317:3, 317:14, 317:15,
320:4, 322:14, 328:6,
341:25, 342:5, 351:12,
354:16, 374:5, 374:8,
387:1, 390:15, 397:13,
432:16, 436:18, 446:24,
451:16, 493:10, 493:12,
496:23, 500:16, 504:13,
506:19, 531:5, 538:6,
542:18, 545:7, 545:13,
545:18, 554:10, 556:15
**Exhibits** [3] - 320:8,
324:5, 450:19
**EXHIBITS** [1] - 303:3
**exhibits** [17] - 304:13,
304:23, 305:9, 305:11,
306:25, 307:8, 307:9,
307:16, 308:6, 308:7,
308:20, 312:19, 312:25,
313:3, 313:17, 317:16,
323:1
**existed** [1] - 395:8
**existence** [1] - 374:25
**existing** [2] - 333:19,
333:21
**exists** [1] - 412:6
**exits** [2] - 391:7, 495:11

**expect** [3] - 362:13,
369:14, 565:11
**expecting** [4] - 373:17,
373:23, 551:5, 551:6
**expects** [1] - 568:16
**expedite** [1] - 394:18
**expedited** [1] - 452:7
**expense** [1] - 344:11
**expenses** [1] - 344:6
**expensive** [1] - 565:13
**experience** [2] - 405:9,
549:5
**experiences** [2] - 332:2,
360:1
**experiencing** [2] - 419:1,
425:12
**explain** [17] - 329:2,
374:5, 378:12, 383:18,
430:13, 430:14, 435:14,
440:23, 441:14, 455:15,
459:10, 462:4, 483:14,
519:16, 560:18, 560:24,
576:14
**explained** [2] - 394:6,
440:19
**explicit** [1] - 592:17
**explore** [1] - 447:17
**export** [1] - 574:24
**exported** [1] - 429:6
**exporting** [1] - 441:9
**extent** [1] - 490:9
**extra** [2] - 330:23, 477:5
**extremely** [5] - 356:21,
365:20, 464:9, 518:1,
565:13
**eyes** [2] - 541:23, 542:5

## F

**faced** [1] - 359:25
**faces** [1] - 360:1
**facilities** [2] - 590:14,
590:15
**facility** [2] - 423:4,
590:18
**facing** [3] - 366:16,
416:7, 416:9
**fact** [10] - 374:24, 394:4,
415:9, 417:9, 417:10,
430:14, 443:3, 485:3,
551:13, 586:22
**factories** [5] - 336:4,
345:17, 411:21, 561:1,
565:3
**factory** [49] - 340:5,
340:11, 345:6, 348:8,
353:11, 354:1, 354:3,
357:14, 357:21, 358:13,
358:17, 359:5, 363:15,
380:3, 380:4, 405:4,

405:22, 406:19, 422:23,
422:24, 441:15, 459:1,
478:17, 497:25, 499:5,
562:19, 563:7, 563:10,
563:23, 565:3, 565:4,
565:6, 565:11, 565:12,
565:13, 566:1, 566:4,
566:13, 566:19, 566:21,
566:25, 567:2, 572:23,
592:3, 592:4, 592:15
**factory's** [1] - 412:1
**fail** [1] - 452:3
**fair** [9] - 317:10, 322:8,
339:23, 341:4, 377:24,
498:3, 538:23, 567:14,
585:15
**fairly** [1] - 317:23
**faith** [2] - 339:23, 341:4
**Faith** [8] - 552:17,
552:18, 555:24, 556:2,
556:4, 556:10, 557:2,
559:19
**fall** [1] - 571:16
**falling** [1] - 582:12
**familiar** [5] - 347:12,
427:17, 459:10, 512:5,
543:3
**family** [2] - 574:6, 574:8
**far** [10] - 317:9, 322:3,
338:17, 349:11, 437:15,
489:13, 548:20, 549:7,
570:11, 581:21
**fast** [1] - 324:1
**father** [1] - 409:23
**favor** [4] - 401:15,
401:16, 483:5, 518:6
**feature** [1] - 481:5
**Feb** [5] - 388:23, 389:4,
429:23, 432:4, 466:21
**February** [9] - 379:13,
389:3, 432:7, 435:3,
439:12, 439:17, 440:3,
537:10, 537:11
**fee** [2] - 525:8, 525:9
**feedback** [9] - 480:15,
480:17, 491:6, 517:22,
517:24, 518:1, 518:2,
521:3, 570:14
**ferry** [4] - 360:18,
400:10, 400:25
**Festival** [1] - 358:1
**few** [12] - 308:8, 338:17,
409:5, 410:2, 412:11,
427:10, 430:7, 431:7,
431:12, 478:4, 492:22,
533:16
**field** [1] - 349:16
**fields** [1] - 499:9
**fight** [1] - 487:5
**file** [6] - 351:24, 352:3,

352:6, 352:8, 352:10,
553:21
**files** [2] - 351:20, 351:21
**fill** [1] - 355:10
**filter** [1] - 544:16
**filtered** [2] - 541:19,
541:20
**final** [7] - 458:1, 513:24,
537:9, 537:14, 538:17,
544:25, 570:10
**finalized** [1] - 337:5
**finally** [5] - 359:10,
360:22, 383:8, 405:25,
407:9
**finance** [1] - 585:17
**financial** [2] - 402:20,
413:11, 424:25
**financially** [1] - 594:11
**fine** [1] - 484:5
**finish** [5] - 346:19, 358:8,
428:22, 431:19, 433:13
**finished** [3] - 351:11,
352:13, 550:10
**fired** [2] - 582:16, 585:23
**first** [65] - 304:18, 305:9,
308:3, 309:12, 334:3,
336:19, 337:24, 342:6,
343:13, 343:14, 351:18,
361:16, 374:4, 377:11,
382:5, 382:6, 389:23,
396:11, 398:1, 398:3,
409:14, 410:17, 412:17,
418:25, 422:18, 426:10,
429:3, 431:24, 432:3,
432:4, 434:2, 443:10,
452:5, 454:14, 455:17,
455:18, 457:6, 464:19,
465:21, 465:23, 468:12,
472:23, 473:2, 473:4,
480:11, 482:4, 483:15,
484:4, 495:3, 495:7,
496:23, 504:4, 507:8,
514:3, 514:5, 515:3,
519:19, 529:19, 532:13,
533:7, 543:19, 543:20,
544:2, 560:17, 571:22
**Firstly** [1] - 569:14
**firstly** [4] - 413:8, 536:8,
558:3, 564:3
**fit** [2] - 484:10, 564:3
**five** [13] - 330:17, 330:18,
357:22, 360:14, 372:23,
402:8, 402:9, 428:20,
479:24, 490:16, 533:3,
537:7, 592:13
**fixing** [1] - 307:19
**flag** [2] - 493:23, 520:21
**flagged** [1] - 514:24
**flagging** [1] - 536:9
**flew** [1] - 592:13

**Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC**
**Case No. 21-cv-60125-RNS**

606

flip [2] - 305:13, 395:16
float [1] - 413:8
floor [1] - 356:24
Florida [20] - 366:3,
368:7, 368:11, 368:12,
368:13, 368:16, 368:19,
369:25, 370:5, 371:25,
556:9, 560:11, 578:4,
579:24, 586:11, 586:14,
593:7, 594:17, 594:18
flow [20] - 341:20,
380:25, 394:17, 395:9,
407:19, 407:21, 408:13,
408:14, 412:2, 412:6,
414:7, 414:21, 415:3,
415:9, 416:7, 416:9,
419:2, 420:2, 420:23,
482:16
fluent [1] - 399:20
FM6 [1] - 474:19
focus [1] - 337:10,
362:25, 385:4, 386:23,
399:2, 414:9, 420:19,
432:11, 432:13
focusing [1] - 509:5
folks [1] - 305:10
follow [6] - 378:25,
382:20, 399:23, 421:25,
453:7, 473:24
follow-up [1] - 453:7
followed [3] - 473:22,
473:23, 473:24
following [17] - 344:10,
355:14, 378:25, 379:4,
397:6, 397:20, 400:11,
400:16, 401:2, 427:1,
428:17, 454:20, 461:7,
482:14, 482:15, 492:10
follows [3] - 331:6,
339:7, 472:8
Fonseca [5] - 304:5,
304:16, 330:10, 334:13,
584:4
FONSECA [3] - 330:11,
334:15, 334:17
font [3] - 328:7, 398:9,
398:24
food [1] - 352:16
foot [4] - 356:4, 356:5,
357:7
footnote [2] - 345:14,
352:20
forced [1] - 405:7
foregoing [3] - 338:25,
339:4, 594:4
foreign [6] - 425:24,
426:13, 429:5, 429:7,
431:2, 441:9
forgetting [1] - 420:25
forgive [3] - 464:19,

469:5, 533:25
forgotten [2] - 502:17,
559:14
form [2] - 461:25, 476:8
forma [2] - 541:10, 543:2
formal [4] - 426:8, 429:4,
429:20, 510:12
formalize [1] - 455:4
formalized [1] - 397:7
formation [1] - 557:1
formed [5] - 553:16,
553:19, 555:21, 556:9,
557:11
forming [1] - 555:20,
556:22
formula [3] - 473:16,
474:20, 565:20
formulas [2] - 459:6,
459:21
Fort [8] - 346:11, 412:25,
413:4, 460:13, 584:1,
584:6, 593:2, 593:6
forth [12] - 333:19, 352:4,
380:20, 387:8, 452:8,
458:1, 479:24, 483:24,
497:4, 526:18, 533:17,
571:16
forward [14] - 336:21,
337:4, 343:23, 369:12,
369:19, 482:6, 482:7,
486:15, 489:19, 489:20,
490:1, 490:4, 497:7,
515:13
foundation [3] - 314:8,
315:5, 458:16
foundational [1] - 316:24
four [32] - 312:15,
333:15, 341:7, 341:8,
341:9, 350:13, 357:22,
360:14, 360:17, 360:19,
393:18, 393:20, 403:8,
403:11, 444:8, 450:20,
456:24, 479:24, 489:23,
490:15, 499:18, 500:6,
515:18, 519:18, 533:12,
536:3, 537:7, 588:10
four-layer [4] - 456:24,
489:23, 490:15, 500:6
fourth [7] - 469:12,
484:16, 484:17, 488:23,
489:1, 489:3
FPR [1] - 594:15
FPR-C [1] - 594:15
FR4TG170 [1] - 351:25
frame [5] - 359:9, 404:18,
412:19, 432:5, 466:1,
489:24, 503:4, 507:13,
585:11
frames [1] - 425:9
free [2] - 568:11, 568:15

freight [5] - 353:12,
353:18, 354:6, 452:7,
488:2
Friday [2] - 400:23, 408:2
friendly [1] - 522:7
fro [1] - 495:12
front [5] - 314:15,
553:24, 556:12, 562:22,
590:23
frozen [4] - 420:3,
420:24, 420:25, 421:12
Ft [1] - 362:20
full [5] - 336:16, 345:5,
360:10, 491:15, 546:23
full-blown [1] - 336:16
fully [1] - 411:19
funds [1] - 394:9
funny [1] - 564:16
future [2] - 452:14,
497:18

---

# G

game [2] - 317:10, 505:5
gap [5] - 338:9, 338:11,
442:24, 462:23, 505:6
gate [3] - 561:7, 561:8,
590:23
gates [1] - 561:4
gears [2] - 341:16,
451:16
General [1] - 403:16
general [11] - 337:18,
365:4, 409:20, 424:11,
424:12, 431:25, 433:24,
451:23, 458:22, 470:5,
526:19
generated [1] - 576:1
generates [2] - 575:15,
575:16, 575:17
generating [1] - 467:12
gent's [1] - 329:25
gentleman [1] - 365:9
Gentlemen [1] - 550:4
gentlemen [2] - 364:23,
588:3
Gerber [9] - 352:10,
352:16, 352:18, 565:15,
565:22, 565:25, 566:1,
566:6, 566:12
GERBER [1] - 565:18
gesture [1] - 487:11
gift [1] - 486:10
given [7] - 373:1, 474:24,
492:19, 542:22, 569:15,
588:25, 591:25
global [10] - 404:12,
418:8, 507:10, 586:7,
586:10, 586:13, 588:12,
593:6, 593:10, 593:14

Glory [8] - 552:17,
552:18, 555:24, 556:2,
556:4, 556:10, 557:1,
559:19
glove [1] - 564:3
GM [2] - 403:3, 403:4
GM's [1] - 403:1
goal [2] - 341:12, 515:21
goalpost [1] - 515:3
God [1] - 307:17
goods [1] - 564:17
gov [1] - 559:14
governed [2] - 345:15,
353:6
governing [1] - 428:6
Government [3] - 420:8,
420:14, 441:23
grace [1] - 378:20
Granada [1] - 304:6
grand [2] - 510:17, 517:5
graphic [1] - 366:1
gratitude [1] - 487:2
gray [1] - 470:14
great [7] - 341:11,
342:17, 397:8, 434:17,
439:15, 470:3, 583:15
greatly [1] - 514:12
green [18] - 432:16,
433:18, 435:15, 436:25,
439:1, 445:24, 446:10,
447:9, 448:8, 449:20,
451:3, 451:20, 470:16,
470:17, 499:10, 506:18,
548:10, 590:20
grew [1] - 579:21
grooming [2] - 454:9,
581:23, 582:9
ground [1] - 312:21
group [1] - 581:23
grouped [1] - 320:4
guarantee [1] - 564:24
guess [10] - 317:11,
347:24, 378:19, 379:2,
406:3, 417:6, 447:24,
513:17, 520:25, 574:5
guideline [2] - 397:6,
490:2
guidelines [1] - 454:20
Gurgaon [1] - 361:19
gurgaon [1] - 361:25
GURGAON [1] - 361:25
guys [10] - 360:23,
369:6, 395:15, 460:23,
468:15, 487:8, 551:24,
556:4, 582:12, 585:23

---

# H

half [7] - 313:13, 313:16,
330:22, 359:6, 415:9,

416:1, 416:10
hand [20] - 344:23,
346:6, 347:7, 347:14,
348:2, 348:22, 351:10,
352:13, 384:3, 385:14,
437:10, 461:17, 496:7,
499:10, 532:16, 534:11,
571:5, 571:6
handle [2] - 370:6,
388:11, 492:16
handy [3] - 520:8,
534:10, 547:17
hang [1] - 560:24
happy [3] - 466:4,
466:10, 487:3
hard [5] - 342:11, 367:18,
393:8, 531:1, 577:10
harder [1] - 469:10
harm [2] - 334:11, 455:1
headhunter [1] - 583:20
headquarter [1] - 593:15
headquartered [1] -
587:21
headquarters [13] -
586:7, 586:10, 586:13,
588:12, 588:20, 592:19,
592:23, 593:1, 593:4,
593:5, 593:6, 593:10,
593:14
hear [11] - 393:8, 413:2,
426:20, 466:7, 587:23,
587:24, 588:2, 588:3,
588:4, 588:6, 590:5
heard [11] - 490:8, 504:6,
515:3, 515:4, 545:23,
577:7, 586:3, 586:4,
587:20, 587:22, 593:2
hearing [3] - 330:15,
330:21, 594:10
hearings [1] - 593:20
hearsay [1] - 403:13
held [4] - 407:14, 467:4,
467:5, 478:16
help [12] - 341:21, 395:9,
402:19, 402:21, 413:16,
417:23, 417:24, 445:13,
483:8, 483:19, 578:7
helped [1] - 571:9
helping [4] - 323:6,
323:7, 323:8, 483:20
herd [1] - 351:7
herein [1] - 331:5
hide [1] - 571:12
high [1] - 464:9
higher [3] - 457:17,
504:25, 505:1
highlight [4] - 435:20,
444:10, 444:22, 488:25
highlighted [7] - 437:18,
443:4, 444:9, 449:25,

488:17, 488:20, 574:16
**highlighting** [2] - 352:24, 491:3
**himself** [1] - 573:21
**hire** [1] - 574:3
**hitting** [1] - 541:23
**HK** [7] - 310:19, 311:19, 315:21, 328:20, 328:21, 329:21
**HKG** [1] - 346:16
**hold** [9] - 324:1, 324:6, 420:11, 420:12, 462:18, 467:4, 483:13, 484:14, 531:12
**holding** [1] - 381:15
**hole** [2] - 404:15, 405:2
**holiday** [1] - 379:22
**honest** [9] - 569:7, 569:10, 569:13, 569:16, 570:2, 570:9, 570:11, 570:13
**Hong** [47] - 305:23, 310:16, 328:25, 346:14, 346:16, 346:22, 346:23, 353:23, 358:13, 358:18, 358:25, 359:5, 359:10, 359:11, 359:13, 360:19, 360:23, 363:6, 368:9, 369:5, 369:11, 369:13, 427:19, 427:24, 427:25, 439:21, 452:2, 459:3, 560:2, 573:15, 573:16, 573:17, 573:18, 576:6, 576:7, 576:8, 581:12, 586:5, 586:6, 587:21, 588:11, 588:19, 592:19, 592:23, 593:4, 593:8, 593:15
**Honor** [46] - 305:22, 308:10, 311:9, 311:11, 311:20, 312:1, 312:22, 313:17, 315:8, 316:3, 321:7, 321:14, 325:19, 330:3, 334:23, 342:4, 347:7, 347:14, 352:12, 374:4, 375:2, 391:12, 396:7, 433:15, 467:22, 469:5, 493:9, 494:11, 495:22, 520:13, 522:18, 527:22, 527:24, 531:24, 535:1, 535:3, 538:11, 541:8, 541:22, 542:20, 545:6, 545:22, 549:21, 554:11, 556:14, 587:15
**Honor's** [1] - 306:17
**hope** [2] - 323:24, 336:13
**hopefully** [1] - 433:12
**hoping** [2] - 305:2, 486:12
**hour** [2] - 330:23, 364:17

**hours** [11] - 330:19, 357:24, 359:3, 359:6, 359:8, 360:12, 367:21, 403:11, 403:22, 592:25
**house** [1] - 330:13
**housekeeping** [1] - 493:2
**Howard** [1] - 585:9
**HSBC** [1] - 383:4
**Huang** [25] - 335:19, 394:8, 394:15, 397:2, 399:18, 400:7, 409:20, 420:21, 422:8, 422:10, 430:1, 430:3, 439:19, 439:23, 439:25, 440:5, 443:16, 444:21, 444:25, 516:25, 561:15, 562:22, 569:11, 569:18
**hundred** [4] - 364:3, 370:9, 427:21, 427:22
**hundreds** [5] - 306:22, 307:9, 312:25, 313:3, 549:1

## I

**ID** [2] - 561:12, 561:13
**idea** [4] - 576:25, 577:3, 577:4, 592:8
**identification** [13] - 494:13, 494:19, 527:19, 527:21, 530:15, 531:4, 534:18, 534:19, 538:4, 541:9, 545:6, 553:25, 556:13
**identify** [3] - 347:24, 412:18, 506:3
**identifying** [2] - 309:5, 313:13
**ignore** [1] - 533:17
**IL** [1] - 594:15
**illustrate** [4] - 341:21, 354:19, 355:6, 386:14
**illustrated** [1] - 344:15
**illustrates** [1] - 361:16
**illustration** [4] - 343:21, 366:2, 371:19, 414:5
**image** [1] - 345:22
**images** [1] - 563:4
**immediately** [1] - 372:11
**immersion** [2] - 340:5, 525:12
**immigration** [1] - 359:20
**impact** [3] - 398:18, 399:3, 564:8
**impacted** [1] - 491:14
**impatient** [1] - 440:1
**impeachment** [7] - 322:21, 322:23, 554:16, 554:19, 556:18, 587:13,

587:15
**implement** [1] - 454:20
**important** [10] - 331:18, 331:19, 333:3, 336:6, 340:24, 353:2, 357:18, 367:8, 395:20, 457:25
**importantly** [3] - 376:10, 462:16, 591:21
**improper** [1] - 587:12
**improve** [1] - 414:7
**imputed** [2] - 589:17
**inadvertently** [2] - 306:2, 428:7
**inaudible** [1] - 403:7
**Inaudible** [2] - 426:19, 554:16
**inches** [5] - 350:12, 357:2, 357:3
**include** [6] - 384:19, 509:21, 510:2, 573:6, 581:2, 581:11
**included** [11] - 345:13, 351:21, 384:14, 509:23, 511:16, 511:18, 527:11, 581:15, 589:22, 589:25, 590:2
**includes** [1] - 358:5
**including** [7] - 353:8, 374:15, 398:19, 399:4, 561:1, 570:16, 573:2
**incoming** [1] - 353:9
**inconvenience** [1] - 564:21
**inconveniencing** [1] - 567:7
**incorporate** [1] - 559:16
**incorporation** [1] - 555:5
**incorrect** [2] - 365:24, 457:14
**incorrectly** [1] - 376:23
**increased** [4] - 456:25, 465:4, 465:5, 538:24
**increasing** [1] - 462:23
**increment** [1] - 539:6
**incumbent** [1] - 306:13
**incur** [2] - 334:7, 457:2
**incurred** [5] - 334:8, 343:4, 353:13, 353:18, 457:4
**incurring** [1] - 382:25
**incurs** [2] - 383:1, 452:4
**India** [18] - 361:12, 361:17, 361:18, 361:19, 362:7, 362:23, 362:24, 364:10, 364:21, 368:13, 573:2, 573:13, 576:22, 576:23, 579:17, 580:5, 580:25
**indicate** [1] - 358:22
**indirectly** [2] - 460:16,

589:12
**individual** [1] - 350:1
**individuals** [1] - 374:19
**industry** [11] - 349:9, 564:6, 564:7, 564:9, 564:17, 564:24, 565:9, 567:22, 570:7
**inform** [2] - 429:24, 558:11
**information** [38] - 317:24, 328:19, 351:17, 351:19, 351:20, 351:22, 361:9, 362:7, 362:9, 362:10, 362:15, 363:1, 364:20, 366:4, 366:6, 366:11, 368:8, 368:14, 370:18, 371:11, 372:20, 372:21, 374:10, 374:15, 374:17, 374:18, 374:22, 375:13, 375:24, 383:19, 384:2, 385:19, 437:23, 445:8, 461:8, 520:3, 537:1, 571:9
**initial** [1] - 452:21
**injected** [2] - 415:2, 417:11
**injecting** [1] - 416:1
**inputs** [1] - 566:4
**inside** [13] - 362:11, 363:20, 364:21, 364:22, 364:23, 365:6, 368:4, 563:8, 580:18, 580:22, 580:23, 580:25, 591:17
**insignificant** [1] - 336:11
**insofar** [1] - 570:9
**inspection** [2] - 353:9, 360:11
**installments** [1] - 525:12
**instead** [2] - 429:14, 451:9
**instructed** [1] - 544:6
**instruction** [5] - 367:2, 369:10, 431:15, 436:5, 436:6
**instructions** [2] - 432:8, 544:11
**intelligent** [1] - 365:20
**intend** [3] - 307:1, 308:19, 309:2
**interaction** [1] - 586:1
**interest** [6] - 344:12, 357:15, 393:24, 402:22, 402:23, 496:16
**interested** [2] - 362:9, 407:10, 594:12
**interesting** [1] - 351:9
**internal** [3] - 379:2, 382:1, 538:17
**internally** [1] - 467:12
**international** [2] - 438:1,

438:3
**interpret** [1] - 400:1
**interpretation** [1] - 351:25
**interrupt** [4] - 340:13, 362:17, 372:14, 473:21
**interrupted** [1] - 507:7
**intervened** [1] - 533:3
**intra** [1] - 574:25
**intra-country** [1] - 574:25
**introduce** [12] - 304:24, 307:1, 308:19, 309:2, 310:18, 312:9, 314:7, 315:4, 318:6, 554:18, 554:19, 554:20
**introduced** [2] - 328:5, 572:7
**introduction** [1] - 332:8
**INV** [1] - 522:10
**invariably** [1] - 381:19
**inventory** [2] - 541:10, 543:2
**investigated** [2] - 530:10, 536:6
**investigating** [3] - 520:5, 521:10, 556:8
**investigation** [1] - 536:7
**investment** [2] - 525:23, 525:24
**invisible** [2] - 359:15, 359:16
**invoice** [27] - 367:13, 367:16, 367:18, 367:19, 367:20, 372:23, 372:24, 372:25, 373:4, 376:6, 376:14, 377:1, 377:2, 377:4, 377:11, 380:10, 384:5, 386:19, 387:9, 387:13, 519:21, 522:12, 530:10, 531:17, 532:5
**invoices** [24] - 373:16, 377:11, 377:25, 378:15, 389:10, 389:24, 423:24, 423:25, 509:12, 519:3, 519:20, 524:19, 525:6, 525:16, 529:20, 532:9, 532:22, 533:2, 533:18, 533:21, 534:4, 534:10, 535:15
**involved** [7] - 340:18, 340:19, 427:23, 503:1, 515:24, 520:25, 532:15
**involving** [4] - 404:1, 404:2, 404:3, 404:4
**irrelevant** [2] - 327:5, 385:1
**irrespective** [2] - 333:17, 339:6
**irritating** [1] - 327:3

**is..** [1] - 545:9

**issue** [37] - 306:5, 306:24, 316:24, 322:25, 328:15, 329:21, 331:12, 374:6, 375:16, 375:18, 377:18, 379:7, 379:11, 385:20, 396:6, 400:18, 408:14, 417:25, 425:24, 427:12, 429:22, 431:2, 440:24, 441:3, 443:12, 451:2, 458:25, 469:3, 511:1, 536:2, 536:19, 540:4, 558:16, 575:5, 575:8

**issued** [11] - 375:10, 375:21, 376:20, 376:23, 376:24, 376:25, 378:1, 384:4, 386:8, 386:11, 577:1

**issues** [10] - 341:19, 353:8, 413:11, 424:20, 425:11, 425:13, 445:13, 491:19, 529:11, 575:6

**item** [9] - 361:5, 372:22, 372:23, 373:3, 470:13, 472:10, 472:12, 486:22

**Item** [2] - 481:12, 487:17

**items** [4] - 372:23, 386:16, 401:14, 544:19

**iterations** [1] - 479:24

**itself** [11] - 344:14, 357:17, 367:3, 389:13, 390:14, 408:8, 459:23, 459:24, 475:3, 479:18

**Ivonne** [1] - 584:16

---

**J**

**Jan** [14] - 375:11, 376:3, 377:18, 377:19, 378:17, 413:14, 429:23, 432:4, 464:8, 507:12, 507:14, 507:19, 515:13, 515:14

**January** [18] - 325:4, 376:3, 377:3, 378:2, 378:5, 378:10, 378:13, 379:18, 379:19, 384:9, 389:24, 461:15, 494:24, 495:2, 496:9, 507:16, 511:21, 553:22

**Japan** [1] - 573:10

**Jessica** [1] - 305:12

**Jiangmen** [6] - 339:9, 344:22, 353:16, 354:15, 360:18, 393:1

**job** [2] - 583:14, 583:15

**joined** [1] - 584:20

**JOINT** [1] - 303:3

**joint** [8] - 308:8, 308:12, 308:15, 308:20, 310:6,

312:19, 328:21, 538:6

**Joint** [1] - 534:22

**joke** [2] - 564:10, 564:12

**Judge** [37] - 304:10, 306:9, 308:1, 308:4, 313:10, 314:16, 316:23, 317:8, 318:24, 319:11, 320:12, 323:20, 325:5, 326:2, 326:18, 326:22, 327:24, 329:22, 330:3, 344:10, 351:10, 380:6, 403:12, 420:9, 425:3, 426:24, 427:2, 428:13, 431:18, 435:21, 471:17, 500:18, 501:15, 542:11, 550:2, 566:9, 593:18

**judge** [4] - 307:11, 314:18, 588:3, 590:6

**judgment** [1] - 314:22

**judicial** [1] - 428:5

**July** [36] - 332:18, 332:22, 335:24, 337:18, 399:13, 405:22, 407:7, 408:10, 412:22, 413:14, 414:10, 415:5, 418:18, 420:20, 420:21, 448:14, 448:15, 458:3, 464:1, 464:5, 464:9, 465:4, 475:12, 484:21, 503:13, 508:7, 508:8, 508:14, 509:11, 509:14, 510:23, 511:22, 514:8, 514:21, 515:17

**June** [16] - 407:7, 409:2, 410:1, 410:15, 410:19, 411:6, 411:8, 415:20, 416:5, 446:5, 448:3, 448:15, 448:19, 449:3, 449:6, 524:10

**JUROR** [3] - 330:11, 334:15, 334:17

**jurors** [6] - 304:4, 304:16, 305:14, 352:13, 520:22, 555:3

**jurors'** [1] - 314:11

**Jury** [8] - 330:7, 374:7, 391:7, 433:9, 495:11, 495:20, 549:25, 550:4

**jury** [25] - 314:15, 328:15, 329:24, 330:6, 334:16, 341:21, 341:25, 347:15, 348:2, 351:10, 365:17, 374:6, 376:8, 383:19, 434:23, 451:22, 488:14, 494:15, 496:1, 512:3, 538:5, 547:7, 549:15, 578:7, 588:3

**jury's** [2] - 421:25, 452:23

**justify** [1] - 570:12

---

**K**

**K7** [3] - 325:23, 326:8, 504:14

**Kapoor** [6] - 321:8, 454:6, 454:8, 582:2, 582:6, 582:9

**keep** [19] - 330:19, 330:24, 362:11, 372:10, 410:22, 410:24, 411:3, 411:22, 423:17, 446:10, 449:20, 520:8, 528:15, 539:19, 541:4, 544:6, 549:6, 583:22

**kept** [4] - 423:11, 423:12, 424:5, 458:19

**keys** [1] - 370:23

**kickback** [1] - 429:5

**kind** [9] - 363:4, 386:18, 427:12, 448:3, 463:1, 520:7, 542:3, 543:20, 562:22, 581:20

**kinda** [1] - 573:4

**kindly** [1] - 514:16

**kinds** [2] - 488:11, 507:8

**Kingboard** [8] - 552:6, 552:8, 552:18, 559:2, 559:3, 559:6, 559:17, 559:20

**Kinwong** [7] - 552:21, 560:3, 560:5, 560:8, 560:15, 561:6, 561:7

**knowing** [1] - 591:1

**knowledge** [1] - 546:10

**known** [2] - 318:21, 578:19

**Kong** [47] - 305:24, 310:16, 329:1, 346:15, 346:16, 346:22, 346:24, 353:23, 358:14, 358:18, 358:25, 359:5, 359:10, 359:11, 359:13, 360:19, 360:23, 363:6, 368:9, 369:5, 369:11, 369:13, 427:20, 427:24, 428:1, 439:21, 452:3, 459:3, 560:2, 573:15, 573:16, 573:17, 573:18, 576:6, 576:7, 576:8, 581:12, 586:5, 586:6, 587:21, 588:11, 588:19, 592:19, 592:23, 593:4, 593:8, 593:15

**Kong-Shenzhen** [1] - 359:5

**Korea** [1] - 573:10

**Kosoy** [1] - 585:9

**Koul** [9] - 439:23, 439:24, 572:15, 572:17, 572:20, 575:20, 576:5,

581:14, 581:23

**Koul's** [2] - 576:2, 582:6

**Kukreja** [71] - 304:24, 307:1, 309:6, 321:13, 331:9, 334:25, 342:20, 345:24, 347:13, 347:18, 358:23, 367:14, 369:1, 370:2, 375:4, 383:16, 386:5, 390:21, 391:18, 396:21, 397:19, 398:7, 410:15, 412:20, 418:18, 419:25, 420:12, 421:24, 425:18, 429:3, 433:22, 434:23, 435:1, 435:13, 437:2, 454:4, 457:23, 467:17, 467:24, 469:16, 469:23, 471:21, 479:2, 493:5, 496:5, 502:23, 504:17, 511:8, 512:10, 513:4, 515:10, 520:24, 524:4, 528:14, 529:18, 532:1, 535:5, 538:15, 539:17, 542:17, 544:21, 545:7, 546:7, 546:22, 547:19, 550:7, 555:23, 556:22, 571:20, 572:6, 589:1

**KUKREJA** [1] - 331:4

**Kukreja's** [3] - 312:8, 435:8, 541:22

---

**L**

**L2B** [1] - 471:1

**labor** [1] - 515:24

**Ladies** [1] - 550:4

**ladies** [1] - 588:3

**lady** [1] - 584:11

**laid** [1] - 316:25

**laminate** [9] - 358:7, 411:20, 421:7, 421:9, 421:10, 552:12, 552:13, 552:14

**landlord** [1] - 424:18

**language** [2] - 353:1, 397:23

**lapsed** [1] - 343:16

**larger** [4] - 386:3, 450:1, 465:20, 523:5

**last** [42] - 314:24, 319:23, 329:13, 333:14, 352:12, 358:15, 360:16, 378:24, 379:11, 379:12, 379:14, 379:17, 383:7, 383:8, 385:8, 387:7, 390:24, 399:24, 401:21, 411:20, 413:6, 415:23, 416:3, 416:7, 449:13, 458:4, 458:5, 485:6, 502:22, 504:7, 507:9, 510:22,

533:11, 533:12, 533:24, 545:7, 545:13, 545:17, 550:9, 576:20, 588:9

**late** [12] - 313:4, 349:11, 353:18, 452:11, 452:17, 455:18, 456:5, 456:7, 461:6, 472:23, 473:2, 474:12

**latest** [2] - 309:19, 508:11

**Lauderdale** [9] - 346:11, 362:20, 412:25, 413:4, 460:13, 584:1, 584:6, 593:2, 593:6

**launch** [1] - 565:10

**laundry** [1] - 564:18

**Law** [1] - 555:11

**law** [3] - 317:22, 339:22, 573:22

**law's** [1] - 573:20

**lawsuit** [6] - 374:20, 419:17, 420:6, 537:12, 546:12, 547:2

**lawyer** [1] - 544:12

**lawyer-client** [1] - 544:12

**lawyers** [2] - 304:2, 571:21

**layer** [10] - 456:24, 470:13, 475:8, 489:23, 490:15, 490:16, 499:18, 500:6

**layers** [4] - 357:20, 458:5, 475:18, 500:7

**lazy** [1] - 585:23

**leadtime** [102] - 321:8, 325:3, 325:14, 338:1, 349:10, 358:5, 386:6, 386:8, 413:14, 413:18, 451:17, 451:23, 451:25, 452:25, 454:20, 454:21, 456:8, 456:15, 456:19, 456:25, 457:2, 457:3, 457:7, 457:9, 458:13, 460:8, 460:9, 461:2, 461:5, 461:11, 461:24, 462:5, 462:13, 463:16, 464:4, 464:16, 468:1, 468:17, 468:20, 468:22, 469:2, 470:1, 474:12, 475:7, 475:11, 475:15, 475:24, 476:5, 476:22, 476:25, 477:5, 477:6, 477:7, 478:8, 478:10, 485:14, 485:16, 485:25, 486:21, 487:14, 487:23, 488:1, 488:5, 489:14, 489:25, 490:4, 490:12, 490:15, 490:17, 490:19, 491:17, 493:7, 493:18, 493:19, 494:24, 496:9,

496:24, 497:6, 497:7, 498:1, 499:5, 499:15, 499:19, 499:22, 499:24, 500:2, 501:13, 501:17, 501:21, 501:22, 502:5, 502:9, 510:2, 548:12, 548:13, 548:25

**leadtimes** [2] - 458:19, 460:9

**learn** [1] - 368:8

**learned** [1] - 445:12

**least** [3] - 395:20, 568:13, 570:9

**leave** [11] - 331:23, 354:16, 407:15, 421:17, 423:14, 451:3, 466:12, 476:3, 476:4, 502:16, 539:15

**leaving** [2] - 379:19, 483:5

**led** [2] - 364:23, 476:25

**left** [41] - 309:12, 330:3, 330:13, 332:4, 339:14, 346:6, 376:14, 385:8, 386:16, 386:24, 391:18, 393:17, 435:10, 445:19, 463:6, 469:24, 472:14, 475:10, 489:1, 489:3, 496:7, 511:9, 512:6, 512:25, 513:1, 520:13, 522:18, 532:4, 532:16, 534:11, 582:14, 582:17, 584:13, 584:19, 584:21, 584:23, 584:24, 585:2, 585:6, 585:10, 585:13

**left-hand** [4] - 346:6, 496:7, 532:16, 534:11

**lending** [1] - 408:6

**length** [1] - 305:3

**LERNER** [1] - 554:22

**less** [9] - 350:9, 350:10, 359:3, 359:5, 390:25, 394:22, 426:14, 429:6, 484:21

**lesser** [1] - 478:1

**letter** [8] - 332:11, 332:25, 335:25, 338:21, 339:25, 399:9, 408:10, 540:12

**letterhead** [1] - 443:13

**letting** [1] - 446:15

**liabilities** [2] - 334:7, 549:5

**liability** [3] - 383:1, 405:8, 553:21

**liable** [1] - 405:11

**license** [1] - 424:18

**LIDA** [1] - 553:11

**life** [5] - 455:6, 476:7, 564:8, 565:12, 568:17

**lifetime** [1] - 330:16

**light** [4] - 310:16, 338:24, 339:4, 494:11

**likely** [1] - 473:25

**limine** [2] - 314:22, 315:1

**limit** [2] - 487:14, 544:14

**limited** [4] - 398:20, 399:5, 441:10, 553:21

**limits** [1] - 568:9

**Lina** [2] - 460:10, 584:10

**Line** [3] - 410:17, 472:7, 539:2

**line** [33] - 322:4, 339:14, 340:5, 359:15, 361:5, 366:2, 368:6, 372:9, 372:22, 373:3, 386:16, 388:4, 399:3, 403:1, 406:3, 411:19, 411:22, 437:18, 452:7, 465:9, 473:5, 484:16, 484:17, 484:18, 488:3, 499:5, 501:3, 509:5, 525:12, 544:19, 569:17

**line-down** [1] - 488:3

**lines** [7] - 333:15, 385:8, 399:16, 417:7, 444:8, 549:6, 573:10

**list** [26] - 308:8, 308:13, 308:15, 308:20, 309:20, 310:6, 312:20, 316:13, 319:17, 320:4, 322:14, 322:18, 339:11, 387:9, 431:14, 433:24, 467:19, 479:16, 521:7, 524:14, 529:10, 532:23, 536:3, 562:5, 581:15

**listed** [16] - 308:15, 309:14, 312:17, 322:15, 377:25, 378:4, 378:16, 387:12, 393:14, 393:16, 393:18, 432:15, 434:2, 529:20, 556:17, 594:7

**listen** [1] - 305:12

**listening** [1] - 588:21

**lists** [6] - 373:16, 373:22, 375:13, 389:22, 448:6, 448:16

**literally** [1] - 469:21

**litigation** [3] - 537:19, 537:20, 537:21

**live** [4] - 304:7, 380:3, 469:9, 471:22

**lives** [1] - 330:25

**living** [1] - 544:21

**LL** [1] - 558:25

**LLC** [26] - 344:19, 533:8, 533:12, 553:4, 553:7, 553:13, 553:16, 553:19, 555:20, 555:21, 556:8, 556:9, 556:10, 557:2,

557:6, 557:10, 557:11, 558:25, 559:3, 559:25, 560:12, 577:25, 578:1, 579:9, 582:1

**LLC's** [1] - 555:21

**LLCs** [1] - 556:22

**loan** [8] - 416:8, 416:13, 417:1, 417:2, 417:3, 417:9, 417:10, 417:15

**local** [1] - 327:7

**located** [2] - 361:18, 362:18

**location** [2] - 346:14, 346:18, 594:6

**log** [1] - 544:7

**logistics** [1] - 460:17

**logo** [5] - 346:7, 590:21, 590:22, 590:23

**longest** [1] - 561:19

**look** [69] - 310:23, 314:3, 314:14, 320:3, 328:11, 330:16, 344:16, 347:22, 348:5, 348:21, 350:11, 364:6, 372:11, 377:1, 385:3, 385:10, 386:17, 391:2, 410:6, 411:18, 412:14, 414:3, 415:4, 419:19, 426:6, 428:15, 428:16, 434:18, 436:10, 440:8, 441:7, 443:3, 443:19, 445:19, 449:17, 449:19, 454:4, 462:3, 463:4, 467:14, 473:20, 475:4, 475:5, 479:15, 479:16, 480:5, 480:17, 481:11, 483:14, 484:7, 486:15, 500:13, 506:5, 510:24, 511:7, 513:2, 514:5, 515:6, 516:9, 519:6, 519:10, 523:3, 525:3, 527:6, 530:20, 532:16, 535:6, 564:23, 567:12

**looked** [14] - 348:12, 383:10, 399:10, 413:22, 414:5, 422:18, 427:2, 446:13, 452:22, 523:5, 529:10, 533:25, 576:17, 579:6

**looking** [36] - 308:2, 308:12, 309:17, 348:20, 349:15, 349:22, 372:20, 384:11, 387:6, 390:1, 391:19, 392:3, 398:15, 417:14, 423:22, 427:20, 434:19, 435:1, 436:1, 437:10, 445:24, 446:17, 462:25, 467:24, 469:23, 472:24, 491:5, 496:5, 506:19, 509:4, 511:9,

521:4, 522:21, 523:7, 532:1, 535:5

**looks** [4] - 316:13, 352:2, 373:21, 494:12

**loyalty** [2] - 339:23, 341:4

**LT** [1] - 475:14

**lunch** [6] - 428:20, 431:19, 432:13, 433:5, 433:22, 440:6

**M**

**M-A-Q-U-I-L-A** [1] - 578:21

**M6** [1] - 474:24

**machine** [3] - 525:13, 564:22, 564:23

**machines** [1] - 564:18

**main** [11] - 333:1, 365:5, 383:2, 385:9, 441:17, 456:3, 537:17, 561:6, 588:14, 588:17, 588:18

**Mainland** [1] - 359:13

**maintain** [2] - 490:16, 544:10

**major** [2] - 332:9, 332:11, 357:25, 403:9, 552:15

**majority** [5] - 477:23, 532:13, 583:3, 585:16, 591:17

**man** [2] - 365:10, 365:11

**manage** [1] - 365:6

**managed** [2] - 443:16, 443:17

**management** [2] - 541:10, 543:2

**manager** [4] - 331:20, 365:5, 409:21, 460:11

**manages** [2] - 576:7, 576:8

**managing** [2] - 365:6, 467:3

**manipulate** [2] - 459:13, 459:15

**manner** [2] - 349:4, 367:5

**manufacture** [1] - 565:11

**manufactured** [1] - 357:21

**manufacturer** [6] - 333:17, 339:7, 339:8, 339:20, 551:10, 551:14

**manufacturer's** [1] - 455:2

**manufacturers** [1] - 569:22

**manufactures** [1] - 568:3

**manufacturing** [27] - 332:6, 332:10, 332:25,

336:1, 337:13, 341:6, 351:20, 351:21, 353:6, 358:11, 378:14, 398:20, 399:5, 422:15, 422:20, 452:21, 453:3, 455:7, 458:15, 491:10, 491:13, 540:11, 566:3, 566:17, 591:4, 591:5, 592:2

**Maquila** [1] - 578:19, 578:22, 579:11

**maquila** [2] - 578:23, 579:1

**March** [12] - 372:9, 386:11, 388:25, 391:3, 391:21, 407:7, 414:22, 425:22, 429:19, 430:5, 431:2, 432:4, 436:11, 436:12, 437:8, 437:20, 438:20, 438:21, 440:25, 445:13, 446:5, 447:6, 462:9, 462:20, 468:6, 472:2, 472:3, 484:20, 485:16, 487:23, 488:1, 489:18, 498:8, 498:10, 499:21, 499:25, 501:23, 503:4, 527:1, 527:2, 543:23

**Marcia** [1] - 585:12

**mark** [2] - 527:19, 538:3

**marked** [4] - 405:14, 408:23, 527:21, 571:23

**marketing** [4] - 561:16, 563:11, 572:21, 588:8

**married** [3] - 574:5, 574:6, 574:7

**MARTINEZ** [2] - 309:19, 545:19

MaryAnn_Casale@flsd. uscourts.gov [1] - 594:18

**match** [10] - 363:17, 363:18, 367:7, 385:24, 435:20, 437:23, 438:12, 447:13, 448:22, 451:6

**matched** [2] - 449:11, 570:23

**matches** [2] - 366:20, 372:13

**material** [2] - 419:3, 421:3

**math** [4] - 356:21, 459:4, 472:23, 505:13

**mathematical** [3] - 459:13, 471:4, 471:6

**matrix** [6] - 471:8, 471:11, 471:22, 471:23, 473:17, 473:19

**matt** [1] - 323:16

**matter** [5] - 330:17, 356:12, 365:13, 549:12, 594:12

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

**maximum** [7] - 461:5, 461:10, 461:11, 473:9, 474:13, 564:20, 564:21
**Mazzola** [13] - 309:13, 313:8, 314:23, 320:19, 347:11, 365:9, 493:11, 496:1, 520:15, 545:23, 547:16, 550:1, 554:23
**MAZZOLA** [205] - 305:4, 306:9, 306:22, 307:11, 307:15, 307:25, 308:4, 308:17, 308:24, 309:17, 310:3, 310:23, 312:1, 312:9, 312:22, 312:25, 313:3, 313:6, 313:9, 313:15, 313:19, 313:22, 314:2, 314:7, 314:16, 315:3, 315:9, 316:2, 316:17, 316:19, 316:23, 317:3, 317:8, 317:13, 317:18, 318:4, 318:9, 318:17, 318:20, 318:24, 319:11, 319:22, 320:2, 320:20, 320:24, 321:3, 321:16, 321:20, 321:23, 322:3, 322:11, 322:17, 322:24, 323:15, 323:19, 324:1, 324:6, 324:22, 325:2, 325:5, 325:8, 325:16, 325:19, 326:2, 326:17, 326:22, 327:1, 327:4, 327:6, 327:20, 327:23, 328:2, 328:12, 329:12, 329:18, 329:22, 329:24, 342:8, 342:11, 342:14, 347:22, 348:4, 348:7, 352:16, 352:18, 380:6, 386:25, 387:3, 390:15, 390:18, 396:13, 396:15, 397:12, 397:16, 400:3, 403:12, 403:15, 410:9, 410:11, 413:2, 420:9, 420:13, 424:19, 425:3, 426:15, 426:19, 426:23, 427:2, 427:6, 427:12, 428:2, 428:11, 435:21, 442:13, 442:17, 446:13, 450:20, 466:7, 467:19, 469:18, 492:25, 493:14, 493:17, 493:25, 494:5, 494:9, 494:22, 495:2, 495:4, 495:7, 495:13, 495:17, 496:2, 500:18, 500:21, 501:2, 501:8, 522:20, 522:24, 523:1, 523:13, 523:18, 523:21, 523:25, 527:25, 528:3, 528:6, 530:19, 531:5, 531:8, 531:12, 531:14, 531:19, 534:20, 534:24, 538:6, 538:9,

541:12, 541:15, 541:18, 541:20, 542:11, 545:9, 545:12, 545:15, 545:21, 545:24, 547:13, 547:15, 550:2, 550:6, 554:7, 554:14, 554:20, 554:25, 555:4, 556:21, 556:25, 557:7, 557:9, 558:20, 558:21, 559:6, 559:8, 560:22, 561:21, 566:9, 566:11, 572:1, 572:3, 575:13, 575:25, 577:18, 579:4, 585:4, 585:8, 585:19, 585:21, 587:14, 587:19, 590:6, 590:9, 590:12, 592:5, 593:17
**Mazzola's** [1] - 331:11
**mean** [49] - 304:17, 306:10, 306:22, 308:4, 308:14, 310:24, 312:11, 316:25, 317:11, 322:9, 322:11, 323:3, 325:8, 326:23, 327:25, 328:3, 339:24, 346:2, 355:4, 370:13, 372:19, 376:24, 392:24, 394:24, 395:15, 407:19, 411:2, 413:24, 416:12, 428:4, 428:11, 438:2, 459:11, 459:16, 468:19, 472:9, 473:4, 485:21, 487:14, 497:3, 506:23, 511:19, 522:11, 538:5, 573:1, 573:4, 576:13, 583:19, 589:20
**meaning** [2] - 374:9, 432:3
**means** [16] - 307:19, 365:11, 365:15, 371:21, 394:6, 400:1, 403:7, 407:21, 423:24, 438:3, 441:12, 468:4, 468:20, 478:8, 535:22, 576:10
**meant** [2] - 340:1, 343:22
**meantime** [1] - 463:19
**measure** [4] - 332:2, 356:25, 395:9, 412:10
**measured** [1] - 357:8
**mechanics** [1] - 305:8
**mechanism** [2] - 483:9, 559:13
**medical** [1] - 564:8
**meet** [3] - 395:18, 439:20, 490:20
**meeting** [57] - 394:15, 394:19, 395:11, 395:13, 395:23, 396:2, 396:11, 396:20, 397:3, 397:4, 412:25, 413:3, 413:10, 413:12, 415:5, 430:3, 439:23, 440:4, 440:18,

440:20, 444:1, 444:20, 445:4, 445:5, 463:25, 464:5, 464:12, 465:19, 466:3, 478:11, 478:18, 478:21, 479:3, 479:6, 479:8, 479:16, 479:20, 480:11, 482:18, 482:22, 483:16, 484:2, 486:18, 486:23, 486:25, 487:17, 489:13, 491:5, 492:17, 497:23, 498:16, 499:16, 500:1, 502:3, 540:13
**meetings** [4] - 432:6, 453:7, 466:17, 479:14
**Melonnie** [3] - 584:11, 584:13, 585:22
**Members** [1] - 374:7
**memo** [10] - 386:7, 386:17, 386:22, 387:1, 443:10, 461:25, 462:1, 463:11, 476:8, 520:1
**memory** [5] - 345:19, 369:4, 424:14, 433:18, 503:3
**memos** [7] - 386:9, 386:11, 386:17, 387:11, 387:12, 536:2, 536:17
**mentioned** [18] - 322:9, 352:20, 359:4, 370:7, 371:17, 381:8, 383:6, 394:7, 401:17, 402:10, 431:4, 436:7, 466:14, 503:2, 507:6, 518:22, 549:2, 589:21
**mentions** [2] - 455:11, 589:21
**mentoring** [1] - 331:17
**mess** [1] - 424:15
**met** [3] - 366:25, 408:15, 463:22
**metal** [1] - 349:13
**meter** [3] - 356:2, 356:7
**meters** [30] - 355:18, 355:19, 355:20, 355:23, 355:24, 355:25, 356:6, 356:13, 357:4, 357:8, 357:9, 357:11, 464:24, 465:1, 465:3, 465:4, 465:5, 465:7, 477:15, 481:19, 481:20, 482:2, 482:3, 484:22, 484:23, 485:13, 489:17, 490:10, 497:13, 568:20
**Mexico** [1] - 578:12, 578:13, 578:14, 578:18, 578:18, 579:14, 579:24
**Miami** [3] - 412:25, 594:17, 594:18
**mic** [1] - 393:7
**Microsoft** [2] - 460:4,

481:5
**Mid** [1] - 358:1
**mid-2019** [2] - 414:8, 511:14
**Mid-Autumn** [1] - 358:1
**middle** [4] - 339:13, 491:1, 514:6, 518:14
**might** [6] - 304:12, 410:3, 424:19, 458:20, 473:24, 571:21
**million** [59] - 336:8, 336:10, 338:2, 381:1, 389:5, 404:14, 405:12, 414:2, 414:4, 414:15, 414:17, 414:20, 415:2, 415:7, 415:8, 415:9, 416:8, 416:12, 416:23, 438:21, 444:16, 445:23, 446:1, 482:19, 482:21, 483:2, 483:4, 483:8, 485:18, 487:1, 502:13, 502:14, 503:8, 505:14, 505:16, 505:21, 505:22, 509:22, 510:3, 521:6, 525:2, 526:2, 526:3, 530:1, 537:3, 537:4, 539:19, 540:1, 540:2, 548:17, 548:18, 549:2, 549:3, 571:5, 571:6
**mind** [1] - 309:9
**mine** [1] - 454:9
**minimize** [2] - 457:3, 521:15
**minimum** [4] - 343:25, 411:22, 481:19, 566:25
**minor** [1] - 401:6
**minus** [2] - 388:1, 505:14
**minute** [3] - 391:5, 465:20, 563:7
**minutes** [35] - 304:4, 304:7, 330:23, 383:6, 391:6, 396:2, 396:12, 397:3, 397:9, 415:5, 428:20, 430:8, 439:22, 440:4, 440:18, 444:20, 445:5, 463:25, 464:12, 478:21, 479:4, 479:8, 479:20, 479:22, 480:12, 483:16, 484:2, 487:17, 491:5, 491:14, 492:18, 499:16, 502:2, 540:13, 549:23
**misinterpretation** [1] - 351:23
**miss** [2] - 306:1, 306:3
**missed** [4] - 519:20, 527:7, 536:10, 593:12
**missing** [7] - 304:5, 519:20, 522:10, 522:12, 528:24, 529:6, 529:20,

530:9, 531:16, 532:5, 532:9, 533:15, 533:19, 534:11, 535:16, 535:19, 536:4
**mistake** [6] - 363:22, 363:23, 396:8, 446:21, 533:18, 535:17
**mistakes** [3] - 401:8, 518:5, 518:6
**misunderstand** [3] - 577:14, 577:15, 577:16
**misunderstanding** [1] - 582:19
**mixed** [1] - 516:22
**mode** [1] - 334:10
**modified** [1] - 490:9
**modify** [5] - 456:15, 490:5, 490:7, 490:12, 490:17
**module** [1] - 470:19
**moment** [8] - 335:1, 390:1, 441:6, 452:19, 471:17, 475:5, 491:23, 504:5
**Monday** [8] - 399:23, 400:9, 400:11, 400:14, 406:7, 407:25, 408:1, 492:18
**money** [62] - 333:7, 333:9, 333:11, 336:8, 336:12, 340:3, 380:24, 381:15, 386:19, 388:17, 388:18, 393:3, 406:20, 407:21, 407:25, 408:4, 408:5, 408:6, 408:16, 408:17, 408:18, 408:21, 410:24, 412:4, 412:8, 413:19, 415:2, 417:15, 418:11, 418:12, 420:22, 422:3, 430:9, 432:10, 439:8, 443:2, 444:15, 445:15, 445:16, 450:14, 481:18, 482:17, 482:20, 483:22, 483:24, 487:2, 501:17, 505:4, 505:17, 505:23, 505:24, 513:10, 513:11, 517:8, 517:9, 524:8, 524:16, 525:5, 525:15, 567:6
**moneys** [8] - 334:4, 382:8, 444:6, 445:16, 445:17, 503:20
**monitor** [1] - 543:5
**monitors** [1] - 320:17
**month** [54] - 317:6, 336:22, 336:23, 336:24, 336:25, 357:6, 373:2, 377:7, 378:5, 378:24, 379:1, 379:4, 379:7, 379:11, 379:13, 379:15,

**KEYWORD INDEX**

379:17, 381:9, 387:9,
388:3, 399:25, 401:12,
409:2, 410:16, 414:17,
457:6, 460:24, 461:2,
461:7, 461:15, 466:22,
467:10, 475:24, 476:13,
476:15, 476:16, 476:19,
487:3, 487:7, 489:25,
505:21, 511:17, 511:21,
512:17, 519:23, 524:10,
524:11, 584:20
 **month's** [3] - 388:24,
411:20, 461:1
 **month-by-month** [2] -
466:22, 467:10
 **month-to-month** [2] -
336:22, 336:23
 **monthly** [3] - 371:20,
371:22, 372:1, 372:3,
372:4, 372:6, 372:11,
372:16, 372:18, 373:1,
373:5, 373:6, 373:8,
373:14, 373:20, 375:8,
375:10, 375:15, 375:25,
378:1, 378:8, 378:9,
378:13, 378:16, 378:23,
378:24, 379:4, 379:7,
379:11, 380:18, 393:12,
401:12
 **months** [16] - 343:15,
417:18, 461:14, 461:23,
476:9, 476:19, 485:17,
487:4, 487:13, 498:15,
502:1, 549:4, 566:25,
567:1
 **mooted** [1] - 315:21
 **morning** [9] - 304:9,
313:4, 313:10, 314:23,
331:9, 331:10, 494:1,
520:14, 571:23
 **most** [11] - 331:19,
333:2, 372:12, 380:2,
419:1, 424:16, 457:25,
509:11, 516:10, 564:11,
564:18
 **mostly** [1] - 527:4
 **mother** [1] - 583:2
 **motherboard** [1] -
350:17
 **motion** [2] - 314:22,
315:1
 **motive** [1] - 556:23
 **Motor's** [1] - 403:16
 **mount** [1] - 350:11
 **move** [10] - 304:9,
358:12, 436:22, 451:15,
458:17, 469:11, 488:15,
502:20, 515:21, 581:25,
590:6
 **moved** [1] - 584:24

 **movement** [1] - 358:17
 **moves** [1] - 512:8
 **moving** [3] - 319:19,
330:24, 362:12
 **MR** [665] - 304:10,
304:22, 305:1, 305:4,
305:6, 305:16, 305:19,
306:9, 306:22, 306:25,
307:5, 307:11, 307:15,
307:25, 308:4, 308:17,
308:22, 308:24, 309:4,
309:8, 309:11, 309:17,
309:22, 310:2, 310:3,
310:4, 310:8, 310:10,
310:14, 310:20, 310:23,
311:4, 311:8, 311:15,
311:18, 312:1, 312:7,
312:9, 312:13, 312:18,
312:22, 312:25, 313:3,
313:6, 313:7, 313:9,
313:15, 313:19, 313:22,
314:2, 314:7, 314:16,
314:18, 315:3, 315:7,
315:9, 315:13, 315:17,
315:20, 316:2, 316:8,
316:12, 316:17, 316:19,
316:22, 316:23, 317:1,
317:3, 317:4, 317:8,
317:11, 317:13, 317:18,
317:21, 318:1, 318:2,
318:4, 318:8, 318:9,
318:10, 318:12, 318:15,
318:17, 318:19, 318:20,
318:21, 318:24, 319:3,
319:7, 319:10, 319:11,
319:16, 319:22, 320:2,
320:3, 320:12, 320:15,
320:20, 320:24, 321:1,
321:3, 321:4, 321:7,
321:12, 321:16, 321:20,
321:22, 321:23, 322:3,
322:6, 322:8, 322:11,
322:13, 322:17, 322:22,
322:24, 323:3, 323:10,
323:12, 323:15, 323:16,
323:17, 323:18, 323:19,
324:1, 324:6, 324:8,
324:11, 324:15, 324:19,
324:21, 324:22, 324:24,
325:2, 325:5, 325:7,
325:8, 325:14, 325:16,
325:19, 325:23, 326:2,
326:4, 326:9, 326:13,
326:17, 326:20, 326:22,
327:1, 327:4, 327:6,
327:12, 327:16, 327:18,
327:20, 327:21, 327:23,
328:2, 328:9, 328:12,
328:13, 328:19, 328:23,
329:8, 329:10, 329:12,
329:14, 329:18, 329:20,

329:22, 329:24, 330:2,
331:8, 332:13, 332:15,
332:19, 332:21, 334:23,
334:24, 339:1, 339:3,
339:16, 339:18, 342:3,
342:8, 342:10, 342:11,
342:14, 342:15, 342:18,
343:18, 344:9, 345:21,
345:23, 347:7, 347:10,
347:17, 347:22, 347:24,
348:4, 348:6, 348:7,
348:12, 348:17, 352:12,
352:16, 352:18, 352:19,
354:19, 354:21, 356:22,
360:4, 361:13, 361:15,
362:3, 367:12, 367:15,
369:23, 370:1, 374:2,
375:2, 375:3, 376:13,
380:6, 380:9, 380:13,
380:16, 383:12, 383:15,
385:25, 386:4, 386:22,
386:25, 387:2, 387:3,
387:4, 387:5, 387:17,
387:20, 389:17, 389:21,
390:13, 390:15, 390:17,
390:18, 390:19, 391:1,
391:12, 391:14, 393:25,
394:3, 396:5, 396:9,
396:13, 396:14, 396:15,
396:16, 396:18, 397:12,
397:14, 397:16, 397:17,
397:18, 400:3, 400:4,
400:6, 401:23, 401:25,
403:12, 403:15, 403:17,
403:20, 406:4, 406:6,
406:9, 406:11, 407:15,
407:17, 409:4, 409:6,
409:11, 409:13, 410:1,
410:5, 410:9, 410:10,
410:11, 410:13, 410:14,
411:5, 411:10, 412:14,
412:16, 413:2, 413:5,
415:15, 415:17, 418:15,
418:16, 419:21, 419:24,
420:9, 420:12, 420:13,
420:16, 420:17, 421:18,
421:21, 421:23, 422:14,
422:17, 423:14, 423:16,
424:19, 424:21, 424:23,
425:3, 425:6, 425:15,
425:17, 426:15, 426:17,
426:19, 426:22, 426:23,
427:2, 427:5, 427:6,
427:8, 427:12, 427:16,
428:2, 428:5, 428:11,
428:14, 428:22, 429:1,
431:17, 431:21, 433:2,
433:15, 433:21, 434:15,
434:25, 435:6, 435:12,
435:19, 435:21, 435:24,
436:17, 437:1, 437:13,

437:19, 438:7, 438:11,
438:15, 438:17, 438:23,
438:25, 439:13, 439:16,
440:11, 440:13, 442:13,
442:14, 442:17, 442:18,
442:19, 443:9, 443:11,
444:2, 444:3, 444:10,
444:12, 444:22, 444:24,
446:10, 446:13, 446:15,
446:16, 446:24, 447:3,
449:19, 449:21, 449:24,
450:3, 450:17, 450:20,
450:22, 451:1, 452:24,
453:1, 453:24, 454:3,
455:12, 455:14, 456:16,
456:18, 457:22, 458:8,
463:8, 463:14, 464:15,
464:17, 465:19, 465:22,
466:7, 466:12, 466:13,
467:15, 467:16, 467:19,
467:20, 467:22, 467:23,
469:1, 469:8, 469:15,
469:18, 469:20, 471:16,
471:20, 478:24, 479:1,
479:15, 479:19, 480:5,
480:7, 480:25, 481:3,
481:13, 481:15, 485:24,
487:19, 487:21, 488:25,
489:5, 492:3, 492:5,
492:25, 493:4, 493:9,
493:14, 493:15, 493:17,
493:19, 493:25, 494:2,
494:3, 494:5, 494:7,
494:9, 494:10, 494:15,
494:17, 494:22, 494:23,
495:2, 495:3, 495:4,
495:6, 495:7, 495:13,
495:17, 495:22, 496:2,
496:4, 500:12, 500:18,
500:21, 500:24, 501:2,
501:4, 501:8, 501:12,
502:16, 502:20, 502:24,
504:14, 504:16, 505:2,
505:7, 506:7, 506:9,
508:10, 508:12, 509:6,
509:8, 510:6, 510:8,
510:25, 511:3, 511:4,
512:1, 512:9, 512:12,
512:14, 512:24, 513:3,
513:20, 513:22, 514:2,
514:7, 515:6, 515:9,
516:9, 516:12, 518:11,
518:12, 519:13, 519:15,
520:7, 520:17, 520:19,
520:23, 521:15, 521:17,
521:19, 521:20, 522:17,
522:20, 522:23, 524:24,
522:25, 523:1, 523:3,
523:13, 523:15, 523:18,
523:19, 523:21, 523:23,
523:25, 524:1, 524:3,

527:18, 527:24, 527:25,
528:1, 528:3, 528:5,
528:6, 528:9, 528:12,
528:15, 528:17, 529:15,
529:17, 530:12, 530:19,
530:20, 530:23, 531:5,
531:6, 531:8, 531:10,
531:12, 531:13, 531:14,
531:18, 531:19, 531:21,
531:24, 531:25, 534:17,
534:20, 534:23, 534:24,
535:1, 535:3, 535:4,
536:23, 536:24, 538:3,
538:6, 538:8, 538:9,
538:14, 540:5, 540:6,
541:8, 541:12, 541:13,
541:15, 541:18, 541:19,
541:20, 541:21, 541:25,
542:3, 542:6, 542:11,
542:15, 542:16, 542:19,
542:22, 542:23, 545:5,
545:9, 545:11, 545:12,
545:14, 545:15, 545:17,
545:20, 545:21, 545:22,
545:24, 546:2, 546:6,
547:11, 547:13, 547:14,
547:15, 547:16, 547:18,
549:20, 550:2, 550:6,
554:5, 554:7, 554:8,
554:11, 554:13, 554:14,
554:16, 554:20, 554:22,
554:23, 554:25, 555:4,
556:14, 556:17, 556:21,
556:25, 557:7, 557:9,
558:20, 558:21, 559:6,
559:8, 560:22, 561:21,
566:9, 566:11, 572:1,
572:3, 575:11, 575:13,
575:25, 577:18, 579:4,
585:4, 585:8, 585:19,
585:21, 587:12, 587:14,
587:19, 590:6, 590:9,
590:10, 590:12, 592:5,
593:17
 **MS** [2] - 309:19, 545:19
 **multiple** [3] - 361:3,
377:11, 468:9
 **multiplied** [6] - 472:10,
472:12, 472:20, 472:22,
473:12, 474:5
 **multiply** [3] - 356:16,
356:17, 357:3
 **must** [6] - 379:3, 379:19,
427:23, 430:4, 490:16,
567:23

# N

 **name** [30] - 321:11,
335:6, 344:18, 344:19,
364:23, 366:7, 506:4,

508:16, 508:22, 516:18,
555:10, 558:25, 559:5,
559:15, 559:16, 559:25,
560:1, 560:2, 560:12,
561:2, 561:3, 561:7,
561:8, 576:20, 582:2,
582:4, 590:18, 590:19
  **named** [1] - 584:11
  **names** [1] - 561:9
  **nap** [1] - 314:6
  **narrow** [1] - 315:2
  **naturally** [1] - 567:23
  **nature** [1] - 310:11
  **near** [1] - 361:20
  **necessary** [1] - 374:14
  **need** [40] - 320:16,
334:13, 351:18, 354:5,
358:6, 362:11, 367:5,
375:12, 376:7, 380:24,
388:17, 388:18, 404:20,
405:24, 407:23, 410:20,
411:21, 411:23, 416:4,
416:6, 419:13, 420:2,
420:22, 430:19, 440:6,
446:20, 483:14, 500:4,
500:13, 500:14, 505:5,
511:1, 519:6, 544:24,
547:2, 570:4, 570:5,
585:19
  **needed** [11] - 333:9,
338:10, 381:3, 410:24,
413:7, 413:21, 431:6,
482:20, 505:4, 537:18,
566:18
  **needs** [2] - 383:1, 554:5
  **negative** [2] - 386:19,
463:2
  **negotiated** [2] - 355:20,
497:6
  **negotiating** [1] - 543:18,
543:22
  **net** [2] - 518:5
  **NetSuite** [1] - 527:2
  **never** [14] - 312:13,
313:11, 490:1, 498:13,
500:8, 500:9, 500:10,
514:24, 515:14, 557:11,
557:15, 557:19, 559:24,
570:6
  **new** [6] - 330:11, 421:19,
452:12, 566:24, 568:23,
568:25
  **New** [5] - 358:1, 361:22,
379:18, 379:20, 379:21
  **news** [1] - 529:4
  **next** [9] - 306:21,
306:24, 309:22, 310:7,
310:8, 311:3, 311:4,
311:8, 311:20, 315:11,
315:13, 315:17, 316:8,

316:12, 318:12, 319:2,
319:3, 319:16, 321:4,
322:2, 323:9, 323:10,
323:12, 323:23, 323:25,
324:10, 324:14, 324:19,
325:13, 325:22, 326:9,
326:20, 327:11, 329:18,
332:7, 332:9, 332:11,
336:25, 352:22, 367:13,
369:1, 369:2, 369:23,
371:18, 377:15, 380:14,
381:11, 388:24, 390:23,
394:21, 397:7, 398:5,
401:21, 404:8, 406:10,
414:12, 414:19, 418:4,
419:6, 419:12, 436:24,
443:3, 446:24, 447:24,
447:25, 448:11, 449:1,
454:9, 461:2, 465:2,
471:8, 478:4, 482:15,
483:3, 483:4, 483:5,
483:10, 483:11, 483:21,
493:10, 503:7, 503:14,
504:22, 506:7, 515:7,
520:19, 522:3, 522:17,
524:21, 524:25, 561:2,
567:2
  **Nicole** [2] - 583:24,
583:25
  **night** [3] - 305:25,
307:12, 314:24
  **nine** [1] - 304:16
  **no-pay** [2] - 381:6,
404:19
  **nobody** [2] - 423:21,
507:19
  **none** [2] - 395:4, 549:13
  **nonetheless** [1] - 334:2
  **north** [2] - 505:22, 526:2
  **North** [1] - 594:17
  **note** [2] - 330:3, 345:15,
385:22, 385:24, 403:1,
435:22, 463:13, 466:22,
467:1, 493:25, 537:5,
537:6
  **noted** [1] - 329:12
  **notes** [24] - 338:7,
347:18, 347:23, 348:10,
348:12, 385:6, 385:13,
388:1, 413:13, 442:8,
462:18, 463:16, 464:8,
467:5, 467:8, 476:10,
476:12, 534:7, 534:9,
536:9, 536:11, 537:7
  **nothing** [7] - 371:3,
371:4, 401:7, 407:14,
417:8, 480:9, 489:13
  **notice** [4] - 426:8, 429:4,
429:20, 462:9
  **noting** [1] - 347:2

**notwithstanding** [1] -
375:23
  **November** [28] - 337:3,
337:5, 353:24, 354:4,
394:14, 395:13, 462:5,
482:1, 482:8, 486:13,
486:15, 491:2, 492:7,
497:7, 497:8, 497:21,
497:22, 500:10, 502:2,
512:19, 516:8, 516:13,
518:16, 522:3, 526:6,
532:25, 540:10, 543:15
  **number** [79] - 318:9,
328:20, 330:18, 331:17,
333:2, 340:3, 345:3,
345:4, 345:5, 347:4,
348:13, 356:18, 361:2,
361:3, 364:6, 376:6,
376:14, 377:1, 377:2,
381:17, 382:22, 384:11,
384:17, 387:1, 388:19,
388:21, 389:9, 390:16,
392:20, 397:13, 399:23,
405:13, 410:15, 414:1,
418:5, 427:22, 427:23,
447:22, 448:8, 461:18,
463:1, 467:2, 472:22,
475:8, 478:10, 482:12,
484:7, 499:23, 509:21,
510:2, 513:17, 518:3,
521:8, 521:9, 527:23,
530:6, 530:7, 533:8,
533:10, 533:21, 534:1,
539:9, 539:18, 544:17,
545:12, 545:15, 547:21,
549:7, 554:12, 554:21,
558:22, 563:6, 566:18,
568:19, 570:13, 570:14,
590:8
  **Number** [2] - 447:9,
448:23
  **number's** [1] - 404:21
  **Numbered** [1] - 481:12
  **numbered** [1] - 554:13,
554:14
  **numbers** [30] - 312:20,
320:11, 328:24, 356:19,
357:6, 361:2, 373:11,
376:4, 387:16, 390:22,
401:7, 407:4, 427:18,
427:19, 435:9, 507:25,
532:14, 533:8, 533:11,
533:12, 536:20, 540:10,
547:5, 558:22, 570:22,
571:1, 571:17
  **Numbers** [2] - 439:3,
474:19

**O**

  **oath** [2] - 331:3, 586:24

**object** [2] - 306:14,
456:10
  **objected** [2] - 312:18,
571:5
  **objecting** [2] - 317:12,
317:13
  **objection** [86] - 308:15,
308:17, 308:21, 309:1,
309:14, 309:25, 310:6,
310:9, 310:15, 310:22,
311:5, 311:13, 311:22,
312:21, 315:3, 315:14,
315:18, 315:20, 315:22,
316:1, 316:3, 316:9,
316:18, 318:23, 318:24,
319:6, 319:25, 320:20,
323:19, 324:4, 324:12,
324:16, 325:18, 325:19,
326:1, 326:10, 326:11,
326:12, 326:17, 326:22,
326:24, 329:12, 329:16,
329:19, 329:22, 342:4,
342:14, 348:1, 380:6,
403:12, 420:9, 420:13,
424:19, 425:3, 426:15,
426:18, 429:2, 435:22,
493:25, 494:18, 495:13,
495:15, 500:19, 501:1,
501:7, 522:24, 531:4,
534:24, 538:11, 541:13,
541:17, 542:7, 542:10,
542:11, 545:8, 545:11,
545:24, 547:12, 547:15,
554:9, 556:15, 556:16,
557:24, 575:11, 587:12,
590:10
  **objections** [13] - 307:2,
308:9, 308:13, 312:12,
312:14, 312:17, 314:11,
319:12, 324:9, 327:24,
495:25, 528:8
  **objective** [1] - 452:6
  **obligated** [4] - 402:2,
429:11, 429:13, 429:15
  **obtain** [2] - 307:2,
514:15
  **obviously** [4] - 306:14,
312:1, 340:23, 441:8
  **occasions** [2] - 466:18,
557:13
  **ocean** [4] - 354:2, 354:5,
354:13, 369:15
  **Ochoa** [1] - 460:10
  **October** [21] - 355:24,
397:1, 461:15, 477:14,
478:20, 479:9, 480:10,
485:17, 486:13, 487:17,
487:23, 488:1, 489:12,
489:18, 497:22, 498:15,
499:15, 501:23, 502:3,

544:15, 544:16
  **OEM** [1] - 566:22
  **off-site** [1] - 516:3
  **offer** [2] - 312:3, 583:21
  **offering** [1] - 306:12
  **office** [21] - 346:10,
353:23, 361:11, 361:18,
362:6, 362:20, 362:22,
364:9, 369:11, 369:13,
370:5, 413:4, 439:22,
452:3, 459:3, 460:12,
460:13, 573:15, 573:16,
573:17, 584:1
  **OFFICER** [1] - 329:4
  **offices** [3] - 346:11,
413:1, 576:24
  **Official** [1] - 594:16
  **offset** [1] - 441:10
  **often** [2] - 394:8, 428:16
  **old** [2] - 527:8, 527:9
  **Old** [1] - 361:18
  **once** [17] - 334:9, 369:5,
370:7, 370:18, 370:23,
383:18, 388:13, 405:7,
405:16, 406:14, 485:15,
500:8, 565:5, 565:10,
566:3, 587:16, 588:9
  **one** [223] - 307:9, 307:13,
307:21, 309:12, 309:22,
310:7, 311:8, 311:20,
314:15, 315:13, 315:17,
316:8, 316:12, 318:12,
318:16, 319:2, 319:3,
319:16, 319:23, 321:4,
322:2, 323:9, 323:10,
323:12, 323:23, 324:6,
324:19, 325:5, 325:13,
326:9, 326:20, 327:22,
329:13, 329:14, 329:18,
331:17, 331:23, 334:3,
336:2, 336:6, 336:12,
336:24, 340:3, 341:12,
342:25, 343:12, 344:1,
347:14, 348:4, 348:23,
349:1, 351:7, 356:3,
356:5, 356:9, 356:10,
356:17, 358:14, 358:16,
363:22, 364:2, 369:24,
372:6, 373:15, 376:22,
377:15, 380:14, 382:17,
384:7, 384:10, 384:14,
384:17, 386:10, 386:18,
386:23, 388:22, 389:9,
391:3, 392:4, 393:10,
393:13, 393:14, 393:17,
396:6, 398:3, 399:12,
399:13, 399:18, 403:9,
410:9, 411:8, 412:13,
412:23, 416:6, 416:14,
420:6, 422:19, 422:23,

423:21, 424:20, 427:3,
427:13, 427:20, 430:7,
432:14, 438:10, 441:17,
443:8, 445:19, 445:21,
446:19, 446:20, 446:22,
446:25, 447:10, 448:6,
448:13, 448:24, 449:13,
449:17, 449:20, 449:25,
451:7, 452:11, 459:17,
459:18, 459:20, 460:17,
461:11, 462:25, 468:12,
468:24, 471:16, 473:21,
474:9, 475:5, 475:24,
478:16, 482:12, 486:21,
491:12, 492:19, 494:1,
494:22, 498:5, 501:8,
503:12, 503:13, 504:4,
505:25, 506:5, 506:7,
506:12, 507:9, 507:10,
509:11, 510:12, 510:21,
512:15, 513:20, 514:6,
517:1, 518:11, 520:20,
522:3, 522:17, 522:20,
523:13, 523:18, 523:19,
523:21, 523:22, 524:22,
525:11, 530:21, 530:22,
530:23, 533:9, 534:5,
534:20, 535:6, 537:6,
539:9, 541:16, 541:18,
545:9, 550:9, 551:20,
555:16, 561:5, 561:7,
561:10, 561:17, 561:19,
561:20, 561:23, 561:25,
562:8, 562:16, 563:6,
563:23, 564:3, 564:23,
565:2, 567:2, 571:5,
573:21, 576:23, 576:24,
579:22, 585:19, 590:17,
591:3, 591:11

**one's** [1] - 409:16
**ones** [17] - 309:1, 309:5,
322:9, 322:10, 322:15,
338:19, 385:7, 434:2,
449:15, 523:1, 525:4,
526:8, 526:10, 526:20,
526:22, 526:24, 580:5
**open** [10] - 363:14,
428:10, 428:17, 480:16,
491:19, 507:4, 517:17,
559:25, 571:17, 587:18
**opened** [6] - 306:4,
407:5, 427:25, 558:24,
559:3, 560:12
**opening** [7] - 331:11,
341:20, 365:9, 391:13,
422:2, 547:14, 577:7
**operation** [7] - 334:5,
362:6, 363:9, 365:5,
413:21, 415:10, 416:2
**operations** [7] - 333:9,

344:5, 365:7, 411:3,
417:8, 417:12, 460:10
**opinion** [2] - 333:6,
412:2
**opinions** [1] - 558:18
**opponent** [1] - 315:25
**opportunity** [2] - 306:14,
351:11
**option** [3] - 548:22,
550:21, 551:22
**options** [5] - 551:16,
551:19, 566:17, 568:8,
568:10
**orange** [2] - 506:18,
547:20
**order** [88] - 306:17,
309:23, 314:25, 342:7,
342:22, 343:1, 343:6,
343:14, 344:14, 344:17,
344:20, 344:21, 345:3,
345:4, 345:12, 345:15,
346:4, 347:3, 349:15,
349:22, 351:13, 351:16,
352:21, 353:3, 353:6,
353:10, 354:17, 354:24,
354:25, 358:6, 363:10,
363:11, 363:14, 363:15,
363:21, 366:18, 366:22,
370:11, 452:1, 456:4,
456:9, 458:25, 459:1,
461:17, 461:20, 461:23,
470:11, 470:12, 472:17,
472:23, 474:1, 481:19,
482:1, 484:18, 485:4,
496:20, 496:21, 497:2,
497:12, 497:14, 497:24,
498:19, 498:21, 514:15,
530:12, 539:10, 539:11,
543:17, 543:20, 544:2,
544:8, 565:2, 565:3,
575:2, 575:4, 575:5,
575:7, 575:8, 575:10,
575:14, 575:15, 576:1,
576:9, 576:11, 576:13,
576:16, 576:24
**ordered** [1] - 363:19
**ordering** [3] - 345:9,
356:17, 568:19
**orders** [37] - 353:12,
398:16, 404:24, 404:25,
405:24, 406:14, 406:16,
406:18, 407:6, 407:8,
407:12, 407:14, 423:7,
423:18, 423:19, 462:6,
464:25, 466:1, 470:2,
477:9, 481:20, 483:13,
484:20, 489:21, 489:24,
494:25, 497:5, 497:16,
497:17, 497:18, 499:17,
499:22, 500:2, 500:5,

541:2, 543:25, 576:25
**ordinary** [1] - 537:16
**organization** [4] -
331:18, 331:21, 561:5,
561:14
**organizations** [3] -
340:21, 347:1, 415:7
**organized** [2] - 314:13,
558:25
**orient** [1] - 422:14
**original** [4] - 453:2,
456:22, 464:23, 465:2
**originally** [1] - 488:21
**originated** [1] - 424:16
**OSP** [1] - 525:18
**otherwise** [3] - 318:21,
408:5, 594:11
**ourselves** [2] - 422:14,
430:19, 561:24
**out-of-court** [1] - 587:14
**outcome** [1] - 594:12
**outer** [1] - 359:8
**outside** [1] - 361:21
**overpaid** [8] - 333:12,
333:20, 333:23, 333:24,
335:23, 503:7, 503:21
**overpayment** [8] -
382:23, 388:21, 389:5,
418:2, 418:6, 505:6,
505:12, 540:18
**overpayments** [2] -
340:2, 381:8
**overrule** [4] - 316:5,
319:13, 382:7, 501:6
**overruled** [10] - 380:8,
403:14, 403:19, 424:21,
424:22, 425:5, 501:11,
542:13, 575:12, 587:17
**oversight** [1] - 460:16
**overspilling** [1] - 465:12
**overview** [1] - 451:21
**owe** [5] - 381:17, 386:20,
412:4, 463:11, 503:19
**owed** [19] - 333:8,
337:25, 340:3, 380:23,
382:6, 412:9, 418:11,
425:10, 431:7, 444:6,
445:17, 511:16, 513:8,
513:10, 513:11, 517:8,
517:9, 526:2, 538:19
**owes** [2] - 339:20,
509:18
**owing** [1] - 458:20
**own** [7] - 312:10, 315:4,
374:13, 521:23, 542:25,
579:1, 579:3
**owner** [2] - 331:20, 583:3
**owns** [2] - 579:8, 579:10
**Ozzie** [1] - 555:8, 555:14,
557:2

P

**P.A** [1] - 555:11
**p.m** [12] - 391:8, 428:18,
433:8, 433:9, 495:11,
495:12, 495:20, 549:24,
549:25, 593:25
**P302** [2] - 554:22, 555:2
**Pac** [5] - 572:22, 572:24,
572:25, 573:1, 573:9
**Pacific** [2] - 573:3,
573:10
**package** [1] - 361:8
**packing** [5] - 360:25,
361:1, 361:4, 361:10,
533:14
**Page** [17] - 311:21,
316:13, 319:17, 323:13,
323:17, 325:7, 325:23,
338:20, 397:10, 406:2,
406:3, 434:20, 443:19,
443:24, 446:12, 453:25,
514:4
**page** [23] - 321:6,
323:16, 325:16, 335:2,
335:20, 352:22, 396:8,
396:11, 396:17, 398:1,
398:5, 398:15, 398:16,
406:10, 409:12, 436:23,
446:25, 447:25, 448:12,
469:21, 491:1, 492:15,
495:7
**pages** [8] - 306:22,
335:4, 409:5, 493:11,
494:7, 495:4, 500:16,
594:4
**paid** [33] - 333:7, 362:15,
366:17, 381:3, 388:14,
397:7, 404:14, 408:16,
408:17, 414:21, 418:4,
419:10, 432:9, 436:9,
445:15, 445:16, 451:8,
451:9, 482:19, 503:14,
504:22, 504:23, 509:22,
510:22, 524:18, 525:7,
540:24, 541:2, 543:21,
544:2, 592:10
**painstaking** [1] - 536:1
**painted** [1] - 525:7
**panel** [8] - 349:2, 349:18,
349:21, 350:1, 350:5,
350:6, 350:12, 350:13
**panelized** [2] - 349:2,
349:3, 349:5
**panels** [1] - 356:23
**paper** [1] - 527:4
**paperwork** [1] - 387:8
**paragraph** [7] - 333:4,
333:10, 337:14, 418:23,
422:19, 464:11, 481:25

**Paragraph** [8] - 339:13,
397:19, 399:16, 444:2,
464:15, 465:19, 481:11,
485:19
**parallel** [1] - 337:3
**paraphrasing** [1] - 430:4
**pardon** [2] - 319:23,
446:13, 448:11, 522:21,
531:15, 552:3
**parent** [1] - 559:24
**parentheses** [1] - 489:9
**part** [48] - 304:17, 332:7,
345:4, 345:5, 345:10,
347:4, 348:13, 356:18,
356:19, 357:5, 358:15,
361:2, 368:14, 373:11,
376:4, 387:8, 390:21,
407:4, 418:23, 419:19,
432:11, 432:14, 435:9,
441:7, 443:10, 454:14,
461:18, 470:18, 475:8,
483:15, 486:4, 501:18,
501:20, 502:9, 513:21,
532:14, 533:7, 533:10,
533:11, 533:12, 539:24,
546:11, 546:18, 547:20,
547:25, 566:18
**Part** [5] - 361:4, 363:14,
363:15, 370:9, 372:10
**partially** [1] - 374:9
**participation** [1] - 591:20
**particular** [11] - 357:6,
377:10, 378:6, 382:6,
397:22, 427:22, 436:18,
461:18, 461:20, 474:2,
571:3
**parties** [10] - 304:2,
308:1, 372:7, 373:7,
374:19, 395:7, 397:20,
492:15, 557:23, 594:9
**partner** [5] - 417:23,
485:16, 527:10, 560:9,
579:2
**partnership** [5] - 487:15,
578:16, 578:17, 579:2,
579:15
**parts** [13] - 353:21,
353:23, 353:24, 354:10,
354:11, 385:18, 452:13,
498:9, 503:2, 532:21,
548:24, 592:2
**party** [3] - 315:24,
346:20, 346:21
**passing** [1] - 588:9
**past** [4] - 491:20, 527:2,
593:16, 593:19
**patience** [1] - 506:1
**Paul** [2] - 584:18, 584:19
**pause** [6] - 328:4,
334:20, 471:16, 493:3,

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

502:19, 503:24
  **pausing** [1] - 523:7
  **pay** [53] - 333:11, 344:5,
345:6, 345:7, 346:23,
349:18, 349:19, 364:17,
367:10, 378:15, 381:5,
381:6, 387:25, 388:9,
394:11, 394:13, 394:20,
399:11, 399:24, 401:21,
404:8, 404:16, 404:19,
411:20, 411:21, 414:11,
414:19, 414:22, 417:9,
417:15, 419:12, 430:9,
437:21, 441:18, 442:10,
443:5, 444:5, 444:13,
463:3, 482:15, 482:21,
483:2, 483:8, 483:11,
483:23, 503:7, 504:7,
507:9, 539:7, 539:10,
540:23, 550:17
  **payable** [10] - 367:4,
368:4, 368:10, 368:12,
368:13, 370:5, 371:13,
382:5, 400:20, 584:1
  **payables** [1] - 366:15
  **paychecks** [1] - 579:6
  **paying** [11] - 335:22,
389:10, 389:11, 402:2,
404:6, 408:8, 414:25,
415:22, 483:10, 483:20,
483:21
  **payment** [130] - 333:18,
345:11, 371:14, 371:15,
371:25, 373:17, 373:23,
377:19, 380:15, 380:21,
381:1, 381:7, 381:8,
381:10, 381:12, 381:13,
382:21, 383:6, 383:10,
383:17, 383:23, 383:25,
386:15, 386:23, 387:6,
387:13, 388:3, 388:12,
388:15, 388:25, 389:4,
389:7, 389:12, 389:23,
390:7, 390:10, 390:14,
390:25, 391:19, 391:20,
393:12, 393:15, 393:21,
394:5, 394:18, 394:21,
397:21, 399:22, 399:23,
400:14, 400:16, 401:4,
402:4, 402:6, 402:11,
404:13, 406:14, 406:17,
410:22, 411:20, 414:11,
414:18, 414:24, 419:11,
424:8, 429:12, 429:13,
430:6, 432:8, 432:23,
432:24, 434:6, 434:8,
434:11, 435:3, 435:13,
435:16, 436:13, 436:17,
436:22, 440:24, 444:17,
446:7, 446:8, 446:17,

447:4, 447:6, 447:19,
447:20, 447:25, 448:2,
448:12, 448:13, 448:16,
449:1, 449:2, 449:4,
449:6, 450:5, 450:7,
450:11, 451:5, 451:6,
463:13, 482:14, 491:17,
503:6, 506:14, 507:13,
509:10, 509:13, 510:10,
511:6, 511:20, 512:16,
512:17, 513:24, 514:17,
519:25, 522:12, 529:21,
534:4, 537:4, 539:13,
539:14, 544:9
  **payments** [58] - 316:14,
333:17, 333:20, 339:6,
382:13, 382:14, 382:16,
382:18, 388:22, 393:14,
393:16, 393:18, 400:19,
401:2, 404:21, 407:22,
408:2, 424:5, 424:6,
425:9, 431:6, 431:7,
431:13, 431:15, 432:15,
432:19, 435:15, 436:1,
436:3, 436:11, 437:24,
438:12, 439:2, 442:25,
446:4, 449:15, 451:3,
506:6, 506:17, 510:21,
519:3, 521:6, 521:11,
521:12, 521:13, 521:22,
524:6, 525:1, 526:6,
526:7, 526:17, 527:6,
529:6, 541:5, 544:17,
570:17, 571:4
  **payroll** [1] - 419:4
  **PCB** [15] - 349:1, 350:14,
357:19, 550:24, 551:1,
551:10, 551:13, 552:7,
552:9, 552:15, 552:24,
556:2, 566:2, 566:6,
566:12
  **PCBs** [6] - 347:5, 499:4,
552:19, 552:20, 552:22,
566:17
  **PDF** [8] - 389:25, 446:25,
469:9, 493:10, 494:7,
500:16, 519:10, 529:16
  **PDFs** [1] - 493:21
  **peers** [2] - 332:3
  **penalties** [14] - 386:8,
451:17, 451:23, 458:20,
459:7, 460:8, 460:9,
463:16, 485:25, 502:5,
502:9, 548:12, 548:13,
548:25
  **penalty** [65] - 321:8,
325:3, 338:2, 386:6,
413:14, 413:18, 453:4,
453:17, 454:21, 455:10,
455:16, 456:8, 456:10,

457:2, 457:3, 457:7,
458:6, 458:10, 458:13,
459:8, 461:2, 461:11,
461:25, 462:5, 462:13,
464:4, 464:16, 466:1,
468:2, 468:17, 470:1,
472:3, 473:9, 473:14,
474:13, 474:14, 475:7,
475:11, 475:25, 476:5,
476:22, 476:25, 477:5,
477:6, 485:14, 485:16,
486:22, 487:14, 487:23,
488:1, 489:14, 489:25,
490:4, 491:18, 493:7,
497:7, 499:15, 499:19,
499:24, 501:13, 501:17,
501:21, 501:22, 501:23,
510:3
  **pennies** [1] - 350:19
  **penny** [1] - 351:7
  **people** [21] - 331:22,
344:6, 368:7, 371:24,
421:6, 517:2, 518:14,
564:19, 570:7, 576:19,
576:21, 579:17, 579:22,
579:23, 580:22, 583:13,
585:17, 589:16, 592:13,
593:3
  **people's** [1] - 424:13,
433:18, 503:3
  **per** [21] - 354:23, 362:15,
364:4, 364:17, 414:16,
414:17, 454:14, 454:19,
455:16, 464:25, 465:1,
481:20, 482:2, 482:3,
484:23, 485:13, 499:22,
502:2, 505:21, 509:9
  **perceived** [2] - 507:22,
507:24
  **percent** [43] - 442:1,
442:2, 443:23, 455:16,
455:22, 455:23, 461:11,
465:25, 466:5, 466:10,
466:11, 472:1, 473:10,
473:13, 474:13, 474:14,
474:15, 489:21, 489:23,
499:17, 499:22, 500:1,
500:5, 539:8, 543:17,
543:22, 543:24, 543:25,
544:3, 544:5, 544:18,
544:19, 544:20, 550:15,
550:16, 568:13
  **percentage** [4] - 441:24,
443:22, 452:18, 453:4
  **percentages** [1] - 489:14
  **perfect** [1] - 448:5
  **perhaps** [2] - 307:2,
341:24, 351:9, 435:19
  **period** [21] - 375:9,
378:20, 379:23, 412:12,

414:8, 415:14, 418:13,
418:14, 419:16, 437:8,
439:4, 444:6, 460:22,
487:23, 496:12, 496:25,
514:19, 518:8, 538:20,
547:8, 547:23
  **periodically** [2] - 466:14,
476:18
  **permission** [7] - 557:12,
557:15, 557:17, 563:10,
563:14, 566:23, 591:20
  **person** [18] - 339:24,
381:15, 395:12, 395:13,
395:14, 395:18, 409:14,
478:14, 569:7, 569:10,
569:13, 569:16, 576:5,
579:22, 582:2, 587:20,
588:24
  **personal** [3] - 374:18,
405:11, 569:21
  **personnel** [4] - 360:24,
368:1, 368:3, 380:3
  **perspective** [2] - 560:16,
560:20
  **phone** [1] - 397:1
  **photograph** [1] - 562:21
  **photographers** [1] -
563:9
  **physical** [1] - 385:13
  **physically** [1] - 370:15
  **pick** [1] - 507:18
  **picked** [2] - 471:7,
507:15
  **picking** [1] - 468:8
  **picture** [2] - 364:6,
514:15
  **pie** [5] - 547:4, 547:9,
547:12, 547:13, 547:20
  **piece** [9] - 340:7, 347:5,
347:6, 349:19, 349:21,
350:1, 350:2, 350:3, 387:7
  **pieces** [20] - 338:16,
340:15, 345:10, 348:23,
349:5, 356:12, 357:3,
363:14, 363:21, 370:9,
372:10, 385:17, 456:5,
456:6, 456:7
  **pink** [1] - 499:10
  **pivot** [4] - 407:18,
421:18, 492:25, 542:8
  **pizza** [3] - 349:7, 349:8,
349:11
  **place** [12] - 328:6,
338:22, 350:18, 354:24,
363:11, 432:7, 452:1,
464:1, 544:7, 554:7,
559:13, 590:22
  **placed** [1] - 464:25
  **places** [1] - 380:5
  **plaintiff** [1] - 326:24

  **Plaintiff** [1] - 527:21
  **plan** [3] - 354:2, 354:13,
505:5
  **planning** [3] - 309:5,
322:20, 363:8
  **plans** [1] - 353:25
  **plastic** [1] - 349:12
  **play** [2] - 587:16, 587:25
  **played** [1] - 587:18
  **plus** [4] - 476:9, 506:5,
510:21, 526:3
  **PO** [3] - 470:11, 472:11,
472:17
  **POD** [1] - 496:19
  **Point** [5] - 440:12,
443:19, 455:11, 455:12,
456:17
  **point** [59] - 314:10,
322:8, 328:24, 332:5,
333:7, 338:6, 340:20,
341:3, 343:12, 343:19,
343:25, 344:12, 364:2,
366:23, 370:8, 370:19,
371:18, 373:13, 380:20,
386:10, 388:13, 400:21,
404:9, 404:11, 404:16,
404:23, 407:23, 414:16,
418:1, 422:10, 425:1,
456:13, 461:14, 462:16,
465:2, 465:13, 482:5,
482:13, 483:12, 483:18,
486:18, 487:12, 496:17,
497:21, 503:8, 503:22,
505:14, 505:20, 517:19,
522:7, 526:16, 537:21,
561:11, 566:16, 568:21,
581:24, 582:11
  **pointed** [1] - 518:4
  **pointing** [7] - 318:3,
484:15, 489:6, 489:7,
519:8, 519:17, 562:23
  **points** [3] - 370:24,
395:20, 491:14
  **poorly** [1] - 400:4
  **pop** [1] - 531:9
  **port** [2] - 360:18, 360:19
  **portal** [2] - 392:8, 392:9
  **portion** [3] - 443:1,
503:11, 539:20
  **position** [3] - 314:1,
365:2, 477:19
  **possible** [6] - 341:14,
341:15, 436:22, 514:15,
588:10, 588:12
  **post** [1] - 515:21
  **potential** [1] - 344:4
  **potentially** [1] - 551:16
  **PowerPoint** [1] - 342:9
  **practice** [3] - 393:11,
394:12, 395:18

**predecessor** [1] - 582:6
**predominantly** [1] - 403:24
**prefix** [1] - 324:25
**prejudicial** [1] - 310:13
**premium** [14] - 539:8, 539:13, 539:14, 540:4, 540:14, 541:5, 543:17, 543:21, 544:8, 544:17, 546:14, 550:12, 570:17
**premiums** [7] - 540:8, 544:4, 546:10, 546:17, 548:5, 548:7, 548:9
**prepaid** [2] - 404:24, 543:18
**prepared** [3] - 545:1, 555:6, 555:12
**prepay** [4] - 405:4, 405:24, 407:9, 539:9
**prepaying** [1] - 405:21
**prepayment** [4] - 405:25, 406:13, 481:17, 483:12
**prepayments** [1] - 404:10
**presentation** [2] - 589:1, 591:15
**presentations** [2] - 588:23, 588:24
**preserving** [1] - 495:24
**president** [1] - 561:16
**presume** [1] - 348:7
**presumption** [1] - 348:7
**pretrial** [1] - 307:6
**pretty** [3] - 401:7, 429:22, 493:6
**prevent** [1] - 334:8
**previous** [4] - 388:15, 524:17, 527:3, 535:17
**previously** [4] - 331:5, 374:17, 493:12, 571:23
**price** [8] - 345:6, 349:23, 366:21, 367:7, 472:10, 472:12, 472:21, 474:6
**prices** [2] - 337:1, 350:7
**pricing** [2] - 491:20, 540:14
**primary** [2] - 362:19, 362:21
**print** [3] - 350:16, 350:18, 350:25
**Printed** [1] - 422:20
**printed** [10] - 328:9, 350:11, 356:16, 357:20, 421:4, 446:18, 566:4, 567:1, 568:2, 569:22
**privilege** [1] - 544:13
**pro** [2] - 541:10, 543:2
**problem** [20] - 331:15, 331:16, 390:19, 405:2, 412:2, 412:6, 416:10,

419:2, 419:15, 420:1, 420:23, 426:3, 430:18, 430:21, 477:23, 482:16, 507:20, 507:22, 507:25, 535:21
**problems** [4] - 394:17, 416:8, 420:2, 424:16
**procedure** [1] - 382:1
**procedures** [1] - 382:21
**proceeding** [1] - 428:6
**Proceedings** [1] - 593:25
**proceedings** [3] - 427:1, 428:17, 594:6
**process** [19] - 341:24, 342:6, 343:23, 344:11, 349:4, 354:18, 357:16, 358:8, 358:20, 364:20, 380:11, 380:12, 383:8, 387:7, 460:19, 507:16, 515:24, 535:9, 547:25
**processed** [1] - 380:19
**processes** [2] - 336:19, 592:2
**processing** [1] - 481:6
**procure** [2] - 419:3, 568:12
**produce** [2] - 349:1, 592:6
**produced** [3] - 314:19, 529:7, 576:2
**producing** [1] - 592:9
**product** [37] - 334:5, 334:10, 346:19, 348:24, 358:17, 358:24, 359:11, 360:22, 362:12, 362:13, 363:11, 363:13, 363:24, 367:6, 367:9, 367:10, 368:9, 369:6, 369:17, 370:12, 371:5, 376:3, 377:3, 406:19, 421:4, 429:11, 441:16, 452:2, 452:18, 459:2, 459:5, 461:10, 525:21, 537:18, 575:2, 575:4
**production** [20] - 336:3, 340:7, 354:24, 356:24, 357:12, 357:16, 358:8, 398:17, 407:12, 423:4, 485:5, 497:24, 498:9, 498:19, 498:22, 498:23, 499:4, 549:6, 551:3
**products** [6] - 358:10, 373:9, 405:3, 405:4, 441:9, 540:15
**professional** [1] - 563:9
**professionals** [1] - 592:12
**profitable** [1] - 408:6
**program** [7] - 459:7, 459:11, 459:22, 460:1,

474:21, 481:6, 578:19
**programed** [1] - 370:25
**programmed** [5] - 471:5, 471:7, 474:11, 474:22, 475:1
**project** [10] - 452:12, 515:12, 565:5, 565:6, 565:10, 565:12, 568:18, 568:23, 569:3
**projected** [3] - 561:17, 561:18, 591:11
**projects** [4] - 551:2, 551:8, 568:12, 568:25
**prolonging** [1] - 336:13
**Promila** [1] - 583:3
**promise** [1] - 323:5
**promised** [2] - 341:3, 456:19
**promotional** [4] - 591:3, 591:6, 591:7, 591:9
**prompted** [1] - 359:16
**proper** [1] - 359:16
**properly** [1] - 311:1
**protect** [2] - 340:15, 374:18
**protecting** [1] - 311:18
**protest** [1] - 406:25
**protocol** [2] - 379:3, 469:6
**prove** [2] - 436:8, 436:10
**provide** [9] - 351:19, 364:14, 452:2, 504:11, 508:5, 514:16, 516:7, 518:25, 537:14
**provided** [8] - 314:21, 491:6, 497:15, 517:22, 518:1, 521:3, 536:8, 537:22
**providers** [1] - 421:2
**provides** [1] - 453:12
**providing** [2] - 452:13, 570:13
**provision** [5] - 453:2, 453:3, 453:18, 456:11, 458:21
**publish** [2] - 495:25, 520:14
**published** [1] - 305:16
**pull** [16] - 314:14, 314:17, 320:16, 320:17, 335:3, 393:25, 396:3, 436:21, 436:24, 439:13, 464:11, 464:15, 478:24, 509:6, 520:10, 530:24
**pulled** [2] - 419:22, 438:15
**pulling** [1] - 439:18
**pumping** [1] - 414:20
**purchase** [79] - 309:23, 342:6, 342:22, 343:1,

343:6, 343:14, 344:14, 344:17, 344:19, 344:20, 344:21, 345:3, 345:4, 345:12, 345:15, 346:4, 347:3, 349:15, 349:22, 351:13, 351:16, 352:21, 354:17, 354:24, 354:25, 363:10, 363:11, 363:14, 363:15, 363:21, 366:18, 366:21, 370:11, 404:24, 404:25, 407:6, 407:8, 423:6, 423:18, 452:1, 456:4, 456:9, 458:25, 459:1, 462:6, 470:2, 470:11, 470:12, 472:17, 474:1, 494:25, 496:20, 496:21, 497:2, 498:19, 498:20, 539:8, 539:10, 539:11, 541:2, 543:17, 543:19, 543:20, 544:2, 544:8, 575:5, 575:6, 575:8, 575:10, 575:14, 575:15, 576:1, 576:9, 576:11, 576:13, 576:16, 576:24, 576:25
**purchased** [2] - 340:9, 340:10
**purporting** [1] - 315:4
**purpose** [7] - 332:24, 389:7, 525:17, 587:13, 588:14, 588:18
**purposes** [11] - 311:10, 362:10, 414:4, 530:15, 531:4, 534:19, 538:4, 541:9, 545:2, 553:25, 556:18
**push** [2] - 365:21, 513:1
**pushed** [1] - 365:23
**put** [55] - 312:21, 317:15, 321:10, 336:12, 342:4, 345:19, 348:24, 349:1, 349:12, 351:1, 355:11, 356:24, 358:6, 359:8, 363:5, 366:6, 366:11, 370:23, 377:16, 377:17, 386:13, 405:3, 406:19, 415:8, 427:9, 428:3, 428:7, 428:24, 431:18, 431:22, 443:13, 452:22, 456:16, 461:24, 478:9, 483:13, 497:18, 497:24, 498:9, 499:4, 516:2, 516:23, 526:11, 537:4, 542:1, 544:15, 553:24, 556:12, 565:4, 565:5, 571:20, 587:11, 590:25, 591:5
**putting** [6] - 305:10, 306:11, 337:11, 494:5, 495:4, 495:6

343:6, 343:14, 344:14, 344:17, 344:19, 344:20, 344:21, 345:3, 345:4, 345:12, 345:15, 346:4, 347:3, 349:15, 349:22, 351:13, 351:16, 352:21, 354:17, 354:24, 354:25, 363:10, 363:11, 363:14, 363:15, 363:21, 366:18, 366:21, 370:11, 404:24, 404:25, 407:6, 407:8, 423:6, 423:18, 452:1, 456:4, 456:9, 458:25, 459:1, 462:6, 470:2, 470:11, 470:12, 472:17, 474:1, 494:25, 496:20, 496:21, 497:2, 498:19, 498:20, 539:8, 539:10, 539:11, 541:2, 543:17, 543:19, 543:20, 544:2, 544:8, 575:5, 575:6, 575:8, 575:10, 575:14, 575:15, 576:1, 576:9, 576:11, 576:13, 576:16, 576:24, 576:25

**Q**

**Q1** [2] - 432:2, 432:3
**Q13** [7] - 316:12, 316:17, 316:20, 316:21, 318:10, 431:17, 433:18
**quality** [2] - 353:8, 385:15
**quantities** [1] - 501:16
**quantity** [15] - 337:1, 345:5, 353:10, 366:19, 366:20, 366:21, 367:6, 472:10, 472:12, 472:17, 474:2, 478:1, 478:5, 481:19
**quarter** [2] - 432:3, 432:4
**query** [1] - 319:22
**questioned** [1] - 515:15
**questions** [6] - 422:6, 458:18, 549:20, 570:19, 572:4, 583:5
**quick** [3] - 364:1, 493:1, 523:9
**quickly** [6] - 320:16, 329:25, 394:11, 394:13, 402:1, 493:6
**quite** [2] - 328:2, 563:1
**quote** [1] - 522:9
**quoted** [1] - 350:16

**R**

**R13** [7] - 318:18, 319:16, 319:19, 320:6, 320:8, 449:19, 450:22
**raise** [2] - 314:8, 529:11
**raised** [5] - 545:21, 576:10, 576:11, 576:14, 576:16
**rate** [1] - 416:15
**rather** [7] - 321:20, 408:7, 454:17, 483:10, 483:20, 498:19, 499:25
**raw** [2] - 419:3, 421:3
**RDR** [1] - 594:15
**re** [2] - 321:8, 401:12
**reach** [3] - 380:23, 473:9, 478:3
**reached** [3] - 343:3, 395:1, 401:18
**react** [1] - 428:12
**reacting** [2] - 315:21, 328:7
**reaction** [2] - 326:7, 326:18
**reactions** [2] - 327:24, 328:14
**read** [6] - 386:3, 399:3, 410:18, 416:5, 434:23, 434:24, 454:17, 468:12

**ready** [4] - 329:6, 358:12, 397:15, 417:23
**real** [7] - 320:16, 329:25, 360:5, 360:6, 363:3, 364:1, 523:9
**realize** [1] - 427:9
**really** [15] - 315:1, 348:15, 353:2, 356:4, 378:22, 396:5, 404:21, 430:19, 492:23, 562:12, 565:24, 568:7, 579:13, 579:23, 580:5
**reason** [19] - 331:23, 333:1, 333:3, 348:21, 349:14, 349:17, 358:4, 359:8, 378:7, 381:5, 382:17, 415:4, 442:7, 442:9, 456:3, 521:23, 537:17, 539:6, 569:15
**reasonably** [1] - 330:19
**reasoning** [1] - 429:16
**reasons** [7] - 333:2, 334:3, 374:15, 420:6, 430:15, 441:17, 506:1
**rebought** [1] - 422:11
**receipt** [8] - 361:6, 362:7, 362:25, 363:7, 366:12, 366:22, 370:12, 441:17
**receivable** [3] - 370:17, 371:2, 440:24
**receive** [17] - 354:25, 360:24, 363:10, 363:12, 363:16, 363:19, 366:24, 367:9, 370:6, 372:8, 373:1, 384:22, 406:14, 408:19, 429:12, 521:7, 526:8
**RECEIVED** [1] - 303:4
**received** [69] - 309:16, 310:1, 311:2, 311:7, 311:14, 311:25, 313:9, 315:16, 316:7, 316:11, 316:21, 319:1, 319:15, 320:8, 320:23, 322:1, 323:22, 324:5, 324:13, 324:18, 325:12, 325:21, 326:8, 326:16, 327:10, 329:17, 338:16, 363:12, 363:13, 366:19, 367:8, 370:13, 370:15, 371:5, 371:15, 379:13, 380:17, 381:20, 384:22, 384:23, 400:23, 406:17, 406:20, 407:6, 426:8, 429:4, 429:12, 442:25, 445:8, 459:2, 506:13, 514:25, 520:3, 524:6, 524:9, 524:11, 524:12, 524:15, 525:15, 525:20, 528:11, 535:2, 538:13, 542:14,

546:1, 555:2, 571:6, 590:11
**receives** [2] - 354:17, 369:5
**receiving** [2] - 344:21, 364:20
**recent** [2] - 509:11, 516:10
**recently** [2] - 442:2, 476:14
**recess** [1] - 433:6
**recessed** [5] - 330:5, 391:8, 433:8, 495:12, 549:24
**recognize** [8] - 375:4, 383:23, 383:25, 409:1, 464:12, 479:20, 504:17, 526:25
**recollect** [8] - 334:6, 416:21, 482:13, 508:21, 558:14, 558:23, 559:1, 592:11
**recollection** [7] - 396:19, 443:21, 445:25, 508:24, 533:2, 536:6, 547:3
**reconcile** [2] - 336:24, 549:18
**reconciliation** [54] - 336:14, 336:16, 336:18, 336:22, 336:23, 337:4, 337:8, 372:17, 372:18, 372:19, 373:3, 401:13, 404:17, 418:3, 418:5, 418:8, 502:23, 503:1, 503:10, 503:23, 504:2, 504:10, 507:16, 508:1, 510:19, 513:5, 513:24, 514:13, 514:16, 514:18, 519:12, 519:23, 524:7, 526:10, 526:13, 529:12, 529:14, 532:10, 535:8, 537:9, 537:14, 538:17, 538:20, 538:22, 539:16, 539:24, 540:10, 543:15, 547:8, 547:20, 547:25, 570:10, 571:15
**reconciliations** [3] - 333:13, 507:8, 570:21
**record** [7] - 304:2, 314:18, 315:7, 317:14, 321:22, 412:8, 436:15, 436:24, 450:14, 450:24, 469:19, 493:23, 494:23, 525:3, 525:4, 549:17
**recorded** [2] - 535:15, 535:18
**records** [25] - 432:18, 436:20, 446:6, 449:14, 450:18, 451:5, 451:6, 485:4, 514:14, 514:17,

519:1, 520:2, 521:4, 523:11, 523:24, 524:5, 524:25, 526:7, 526:16, 526:18, 526:23, 527:4, 528:20, 533:14, 535:18
**recover** [1] - 334:12
**recruit** [1] - 364:16
**recuperate** [2] - 452:15, 455:3
**red** [13] - 390:22, 435:9, 488:17, 488:19, 488:20, 488:21, 488:22, 488:24, 489:2, 490:3, 510:4, 546:7, 548:4
**redact** [5] - 305:22, 306:6, 314:24, 427:11, 428:9
**redacted** [33] - 310:16, 310:23, 311:1, 319:9, 326:12, 326:21, 327:12, 328:17, 328:19, 374:5, 374:9, 374:12, 374:15, 374:21, 427:6, 427:18, 428:8, 434:20, 435:22, 437:15, 446:12, 446:14, 450:1, 494:19, 500:16, 500:22, 516:10, 519:12, 520:10, 529:16, 530:16, 541:18
**redacting** [5] - 326:4, 328:3, 328:22, 494:4
**redaction** [18] - 306:13, 306:15, 306:16, 316:2, 323:20, 325:11, 328:10, 328:15, 329:21, 374:13, 374:25, 396:6, 469:3, 469:6, 493:22, 508:11, 510:25
**redactions** [15] - 311:16, 319:12, 325:9, 326:2, 374:14, 436:19, 493:10, 495:14, 495:16, 495:25, 500:22, 501:2, 501:8, 501:9, 542:12
**reduce** [2] - 499:23
**reduced** [3] - 314:20, 518:7, 530:3
**reengaged** [1] - 408:15
**refer** [5] - 347:19, 371:7, 458:13, 470:20, 489:11
**reference** [8] - 310:19, 328:20, 355:3, 392:20, 465:6, 486:18, 520:9, 574:12
**referenced** [4] - 331:12, 433:23, 464:1, 471:21
**references** [3] - 305:23, 328:4, 430:7
**referencing** [2] - 429:8, 484:8

**referred** [4] - 365:9, 488:22, 493:12, 573:21
**referring** [20] - 314:23, 323:2, 333:14, 352:23, 398:24, 399:7, 421:1, 426:2, 426:4, 454:24, 459:6, 471:9, 485:6, 488:19, 512:11, 539:1, 563:15, 577:23, 579:23, 590:16
**refers** [1] - 412:5
**reflect** [1] - 546:9
**reflected** [4] - 382:23, 432:17, 446:6, 547:21
**reflects** [1] - 449:6
**refresh** [7] - 396:19, 424:13, 433:17, 443:21, 503:3, 508:24, 547:3
**refreshes** [1] - 445:25
**refunded** [1] - 441:8
**refused** [1] - 404:23
**regarding** [4] - 332:25, 453:17, 497:4, 513:24
**regardless** [1] - 549:14
**regards** [1] - 411:14
**region** [1] - 572:22
**registered** [1] - 555:13
**regular** [2] - 419:4, 555:14, 555:17
**regularly** [1] - 339:6
**reimburse** [1] - 443:1
**rejections** [1] - 385:15
**relate** [2] - 375:9, 439:3
**related** [11] - 308:11, 340:23, 443:6, 445:13, 461:18, 461:20, 466:1, 550:11, 573:19, 586:23, 594:9
**relating** [6] - 328:17, 328:20, 477:10, 491:4, 491:17, 491:20
**relationship** [9] - 336:9, 336:14, 341:2, 341:10, 341:11, 569:21, 569:25, 570:15, 577:21
**relative** [1] - 590:23
**relatively** [2] - 416:16, 530:7
**release** [15] - 369:20, 381:25, 400:14, 400:16, 406:13, 406:16, 406:18, 416:4, 416:6, 482:1, 497:19, 498:18, 498:22, 498:23, 541:2
**released** [11] - 356:19, 356:20, 398:16, 407:6, 482:23, 485:4, 497:14, 497:16, 497:17, 498:18, 543:17
**releases** [1] - 369:21

**releasing** [4] - 407:12, 481:19, 484:18, 497:12
**relevance** [7] - 310:12, 380:7, 420:13, 425:4, 556:19, 556:21, 575:11
**relevant** [1] - 360:7
**relied** [1] - 401:3
**rely** [1] - 529:4
**remaining** [1] - 450:20
**remember** [18] - 332:16, 332:23, 369:3, 373:20, 421:24, 422:18, 425:21, 433:22, 478:19, 524:17, 538:16, 550:13, 550:19, 553:5, 553:14, 563:25, 565:16, 583:7
**remembering** [1] - 369:2
**remind** [2] - 331:2, 358:21, 422:7, 434:8, 435:25, 454:6
**reminded** [1] - 452:23
**removed** [1] - 374:10
**removing** [1] - 509:4
**rent** [1] - 408:3
**repeat** [2] - 466:8, 548:6
**replaced** [1] - 510:3
**replied** [1] - 591:24
**report** [12] - 325:4, 325:15, 429:13, 429:15, 430:13, 442:9, 442:23, 460:24, 468:22, 469:2, 529:14, 585:25
**reported** [7] - 328:25, 445:3, 460:15, 496:9, 533:7, 594:6, 594:10
**Reporter** [1] - 594:16
**reporter** [3] - 376:11, 398:23, 484:24
**reporting** [4] - 338:7, 445:14, 561:15, 561:16
**reports** [1] - 493:8
**represent** [3] - 486:24, 528:20, 594:4
**represented** [4] - 402:12, 505:19, 549:3
**representing** [1] - 339:25
**reputational** [2] - 334:11, 455:1
**request** [13] - 354:9, 354:10, 364:16, 397:1, 397:4, 444:9, 444:19, 445:1, 445:12, 458:3, 511:14, 513:6, 513:13
**requested** [5] - 381:23, 400:20, 410:18, 410:19, 522:14
**requesting** [2] - 483:18, 547:7
**requests** [1] - 444:13
**require** [4] - 328:16,

362:9, 364:13, 404:9
**required** [8] - 351:24, 363:25, 421:11, 557:17, 558:4, 558:7, 559:13
**requirement** [2] - 462:11, 462:15
**requirements** [2] - 369:9, 493:22
**requires** [1] - 353:21
**resolve** [6] - 326:12, 328:15, 333:13, 352:4, 425:13, 491:19
**resolved** [5] - 363:22, 364:1, 364:5, 487:11, 535:21
**resource** [1] - 363:8
**respect** [10] - 326:17, 446:4, 451:23, 500:21, 526:19, 536:2, 542:12, 557:1, 557:5, 557:10
**respond** [7] - 313:19, 491:25, 492:6, 513:13, 514:25, 517:19, 528:22
**responded** [2] - 516:23, 536:25
**response** [13] - 397:16, 431:1, 440:21, 457:18, 480:10, 488:18, 488:19, 492:8, 511:14, 513:6, 513:13, 520:4, 530:11
**responsibility** [1] - 365:5
**responsible** [3] - 353:7, 366:15, 402:25
**rest** [2] - 358:1, 449:18
**restrictions** [1] - 568:9
**restroom** [2] - 321:13, 329:5
**result** [2] - 333:20, 478:11, 536:7
**resulted** [1] - 544:17
**results** [1] - 516:7
**resume** [1] - 593:22
**Resumed** [1] - 433:20
**retain** [1] - 331:23
**retake** [1] - 331:3
**retention** [3] - 331:13, 332:2, 583:6
**retract** [1] - 534:15
**retrieve** [1] - 516:3
**returning** [1] - 499:8
**reverse** [4] - 359:7, 427:20, 427:24, 428:3
**reverse-engineer** [2] - 427:20, 428:3
**reverse-engineering** [1] - 427:24
**reviewed** [2] - 484:13, 484:18
**reviewing** [1] - 538:15
**revised** [5] - 404:12,

404:13, 419:11, 503:5
**Rhoden** [2] - 584:11, 585:22
**Richi** [2] - 580:9, 580:10
**RICHI** [1] - 580:10
**rid** [6] - 304:17, 436:22, 438:23, 450:24, 451:16, 514:3
**right-hand** [5] - 344:23, 348:22, 384:3, 437:10, 499:10
**Rishi** [7] - 311:23, 312:3, 323:14, 325:25, 492:9, 514:12, 515:10
**RISHI** [1] - 331:4
**risk/benefit** [1] - 505:25
**rivers** [1] - 359:24
**RMB** [4] - 416:8, 416:12, 416:13, 416:14
**Road** [1] - 330:12
**road** [1] - 593:2
**Roger** [6] - 508:20, 509:2, 569:13, 569:14, 569:15, 591:4
**Roger's** [1] - 508:22
**ROK** [66] - 316:15, 325:3, 328:4, 328:5, 328:6, 328:8, 328:18, 328:23, 328:24, 335:17, 408:16, 422:3, 422:6, 422:7, 422:8, 422:20, 423:2, 423:7, 423:19, 423:20, 423:25, 424:6, 424:9, 424:12, 424:15, 425:10, 425:24, 426:12, 429:4, 429:9, 430:5, 430:9, 430:22, 431:2, 431:6, 431:8, 431:15, 432:9, 432:10, 432:22, 432:24, 434:12, 435:3, 435:14, 435:15, 435:17, 436:4, 438:21, 439:2, 439:7, 439:9, 443:12, 444:6, 445:16, 445:17, 446:8, 446:18, 451:3, 451:9, 506:5, 509:22, 509:24, 509:25, 510:21, 548:9
**ROK's** [6] - 430:6, 432:20, 432:23, 434:10, 440:24, 446:7
**room** [6] - 307:18, 307:20, 334:16, 562:21, 562:24, 562:25
**roots** [1] - 419:16
**ROSENTHAL** [449] - 304:10, 304:22, 305:1, 305:6, 305:16, 305:19, 306:25, 307:5, 308:22, 309:4, 309:8, 309:11, 309:22, 310:2, 310:4,

310:8, 310:10, 310:14, 310:20, 311:4, 311:8, 311:15, 311:18, 312:7, 312:13, 312:18, 313:7, 314:18, 315:7, 315:13, 315:17, 315:20, 316:8, 316:12, 316:22, 317:1, 317:4, 317:11, 317:21, 318:2, 318:8, 318:10, 318:12, 318:15, 318:19, 318:21, 319:3, 319:7, 319:10, 319:16, 320:3, 320:12, 320:15, 321:1, 321:4, 321:7, 321:12, 321:22, 322:8, 322:13, 322:22, 323:3, 323:10, 323:12, 323:16, 323:18, 323:23, 324:8, 324:11, 324:15, 324:19, 324:21, 324:24, 325:7, 325:14, 325:23, 326:4, 326:9, 326:13, 326:20, 327:12, 327:16, 327:18, 327:21, 328:23, 329:8, 329:10, 329:14, 329:20, 330:2, 331:8, 332:13, 332:15, 332:19, 332:21, 334:23, 334:24, 339:1, 339:3, 339:16, 339:18, 342:3, 342:10, 342:15, 342:18, 343:18, 344:9, 345:21, 345:23, 347:7, 347:10, 347:17, 347:24, 348:6, 348:12, 348:17, 352:12, 352:19, 354:19, 354:21, 356:22, 360:4, 361:13, 361:15, 362:3, 367:12, 367:15, 369:23, 370:1, 374:2, 375:2, 375:3, 376:13, 380:9, 380:13, 380:16, 383:12, 383:15, 385:25, 386:4, 386:22, 387:2, 387:4, 387:5, 387:17, 387:20, 389:17, 389:21, 390:13, 390:17, 390:19, 391:1, 391:12, 391:14, 393:25, 394:3, 396:5, 396:9, 396:14, 396:16, 396:18, 397:14, 397:17, 397:18, 400:4, 400:6, 401:23, 401:25, 403:17, 403:20, 406:4, 406:6, 406:9, 406:11, 407:15, 407:17, 409:4, 409:6, 409:11, 409:13, 410:1, 410:5, 410:10, 410:13, 410:14, 411:5, 411:10, 412:14, 412:16, 413:5, 415:15, 415:17, 418:15, 418:16, 419:21, 419:24, 420:12, 420:16,

420:17, 421:18, 421:21, 421:23, 422:14, 422:17, 423:14, 423:16, 424:21, 424:23, 425:6, 425:15, 425:17, 426:17, 426:22, 427:16, 428:5, 428:14, 428:22, 429:1, 431:17, 431:21, 433:2, 433:15, 433:21, 434:15, 434:25, 435:6, 435:12, 435:19, 435:24, 436:17, 437:1, 437:13, 437:19, 438:7, 438:11, 438:15, 438:17, 438:23, 438:25, 439:13, 439:16, 440:11, 440:13, 442:14, 442:18, 442:19, 443:9, 443:11, 444:2, 444:3, 444:10, 444:12, 444:22, 444:24, 446:10, 446:15, 446:16, 446:24, 447:3, 449:19, 449:21, 449:24, 450:3, 450:17, 450:22, 451:1, 452:24, 453:1, 453:24, 454:3, 455:12, 455:14, 456:16, 456:18, 457:22, 458:8, 463:8, 463:14, 464:15, 464:17, 465:19, 465:22, 466:12, 466:13, 467:15, 467:16, 467:20, 467:22, 467:23, 469:1, 469:8, 469:15, 469:20, 471:16, 471:20, 478:24, 479:1, 479:15, 479:19, 480:5, 480:7, 480:25, 481:3, 481:13, 481:15, 485:24, 487:19, 487:21, 488:25, 489:5, 492:3, 492:5, 493:4, 493:9, 493:15, 493:19, 494:3, 494:7, 494:10, 494:15, 494:17, 494:23, 495:3, 495:6, 495:22, 496:4, 500:12, 500:24, 501:4, 501:12, 502:16, 502:20, 502:24, 504:14, 504:16, 505:2, 505:7, 506:7, 506:9, 508:10, 508:12, 509:6, 509:8, 510:6, 510:8, 510:25, 511:4, 512:1, 512:9, 512:12, 512:14, 512:24, 513:3, 513:20, 513:22, 514:2, 514:7, 515:6, 515:9, 516:9, 516:12, 518:11, 518:12, 519:13, 519:15, 520:7, 520:17, 520:19, 520:23, 521:15, 521:17, 521:19, 521:20, 522:17, 522:23, 522:25, 523:3, 523:15, 523:19, 523:23, 524:1,

524:3, 527:18, 527:24, 528:1, 528:5, 528:9, 528:12, 528:15, 528:17, 529:15, 529:17, 530:12, 530:20, 530:23, 531:6, 531:10, 531:13, 531:18, 531:21, 531:24, 531:25, 534:17, 534:23, 535:1, 535:3, 535:4, 536:23, 536:24, 538:3, 538:8, 538:14, 540:5, 540:6, 541:8, 541:13, 541:21, 541:25, 542:3, 542:6, 542:15, 542:16, 542:19, 542:22, 542:23, 545:5, 545:11, 545:14, 545:17, 545:20, 545:22, 546:2, 546:6, 547:11, 547:14, 547:16, 547:18, 549:20, 554:5, 554:8, 554:11, 554:13, 554:16, 554:23, 556:14, 556:17, 575:11, 587:12, 590:10
**Rosenthal** [10] - 308:5, 313:23, 320:25, 334:22, 386:25, 410:9, 469:18, 550:3, 570:18, 583:5
**rosenthal** [4] - 390:15, 397:12, 426:21, 550:17
**roughly** [4] - 416:20, 419:17, 502:8, 548:16
**round** [1] - 453:7
**rounded** [1] - 381:3
**rounds** [1] - 533:16
**router** [1] - 349:7
**row** [2] - 473:4, 478:2
**rule** [1] - 429:7
**Rule** [1] - 317:4
**rules** [2] - 327:7, 441:8
**ruling** [5] - 306:3, 308:11, 310:17, 315:1, 315:21
**rulings** [4] - 307:2, 314:21, 428:6, 471:19
**run** [9] - 329:25, 334:4, 334:19, 357:24, 413:21, 417:7, 459:21, 568:17, 583:12
**running** [9] - 358:2, 408:16, 410:23, 410:25, 411:3, 411:22, 477:18, 498:1, 549:7
**runs** [4] - 532:19, 572:21, 576:5, 580:23

**S**

**S13** [5] - 319:19, 320:6, 320:8, 450:19, 450:22
**Sage** [7] - 366:9, 366:10,

366:11, 368:20, 370:21, 370:24, 527:2
**salary** [1] - 411:21
**sales** [21] - 362:11, 363:20, 364:21, 364:22, 364:23, 365:6, 366:4, 407:22, 441:11, 470:19, 561:16, 563:10, 572:21, 576:7, 576:8, 580:19, 580:22, 580:24, 580:25, 588:8, 591:11
**samples** [2] - 344:2, 565:6
**satellites** [1] - 351:6
**Saturday** [3] - 307:12, 313:6, 400:24
**save** [3] - 330:24, 450:23, 542:24
**saw** [10] - 390:7, 450:7, 496:13, 496:24, 533:6, 561:5, 569:2, 569:5, 590:17
**scale** [1] - 404:20
**scenes** [1] - 353:25
**schedule** [6] - 327:6, 330:20, 333:19, 373:24, 404:7, 452:25
**Schedule** [1] - 452:25
**scheduled** [1] - 339:6
**scheme** [4] - 336:8, 526:1, 526:4, 539:21
**Scola's** [1] - 344:10
**scope** [1] - 515:12
**scores** [1] - 308:13
**screen** [15] - 320:18, 321:11, 321:19, 337:15, 383:18, 391:16, 393:18, 410:10, 428:25, 433:17, 435:11, 436:23, 452:22, 496:6, 531:13
**scroll** [23] - 321:20, 333:3, 385:2, 406:2, 409:4, 410:1, 411:5, 437:14, 447:24, 449:24, 456:12, 457:22, 480:25, 481:13, 492:3, 514:4, 515:7, 521:16, 522:2, 532:18, 572:1, 574:11
**scrolling** [1] - 438:8
**scrolls** [1] - 406:3
**seated** [4] - 330:9, 391:10, 433:11, 495:21
**sec** [1] - 512:12
**second** [48] - 305:21, 309:12, 311:9, 324:6, 325:5, 333:3, 334:9, 337:13, 338:5, 338:6, 343:12, 348:4, 363:1, 366:2, 366:4, 384:7, 384:10, 396:4, 396:6,

397:14, 397:21, 410:9, 411:18, 411:19, 416:3, 426:23, 434:19, 446:12, 452:9, 465:9, 472:24, 473:21, 481:25, 494:22, 504:1, 506:5, 507:10, 522:20, 531:2, 531:5, 531:6, 531:16, 531:21, 534:20, 545:9, 585:19, 592:24
**second-to-last** [1] - 416:3
**secondary** [7] - 309:13, 398:20, 399:6, 399:7, 399:9, 491:10, 491:13
**secondly** [1] - 558:4
**section** [1] - 585:17
**Section** [1] - 333:16
**secured** [1] - 343:22
**SECURITY** [1] - 329:4
**see** [107] - 305:14, 307:7, 310:24, 317:8, 320:15, 320:16, 325:2, 327:8, 335:2, 335:5, 336:12, 337:16, 338:23, 338:24, 339:2, 342:19, 347:15, 350:24, 351:11, 360:3, 365:17, 372:12, 374:11, 382:24, 387:18, 388:25, 389:6, 389:16, 390:9, 390:11, 391:2, 391:5, 392:23, 396:5, 405:16, 406:2, 406:7, 406:12, 407:1, 407:5, 409:7, 410:10, 413:6, 418:17, 419:22, 428:13, 432:13, 433:6, 435:7, 435:10, 437:14, 437:16, 440:11, 440:22, 445:24, 446:11, 446:21, 447:10, 448:2, 448:24, 449:25, 454:13, 455:13, 456:17, 457:23, 458:2, 468:11, 474:19, 480:17, 480:24, 481:8, 492:3, 496:8, 499:9, 506:4, 508:10, 508:13, 509:7, 510:18, 511:8, 512:10, 513:23, 514:3, 518:13, 519:14, 522:9, 523:6, 524:21, 527:25, 530:20, 531:4, 531:10, 531:13, 532:18, 542:5, 543:8, 546:7, 549:23, 550:7, 550:8, 554:3, 555:11, 591:4, 591:21
**seeing** [9] - 340:21, 342:19, 425:21, 440:9, 469:16, 471:25, 543:5, 543:11, 543:12
**seeking** [5] - 486:4,

547:22, 548:2, 548:7, 548:8
**seldom** [1] - 338:13
**selected** [1] - 414:4
**selling** [1] - 343:5
**send** [37] - 352:11, 361:11, 367:16, 367:18, 367:20, 373:21, 381:14, 381:22, 382:2, 382:3, 385:19, 388:18, 391:25, 393:3, 417:22, 423:1, 423:6, 424:8, 439:8, 461:25, 462:13, 466:24, 468:9, 476:13, 476:15, 476:17, 476:20, 480:2, 491:4, 514:14, 518:2, 541:18, 568:24, 568:25, 591:23
**sending** [18] - 342:6, 344:19, 352:7, 375:14, 389:7, 462:17, 462:18, 462:21, 462:22, 463:15, 476:7, 476:10, 476:11, 480:11, 569:3, 576:18, 576:19, 576:24
**sends** [8] - 351:16, 367:18, 368:15, 371:20, 373:16, 375:25, 575:16, 575:17
**senior** [1] - 517:2
**sense** [6] - 348:25, 412:18, 441:2, 516:4, 577:5, 578:10
**sent** [42] - 368:9, 372:1, 381:7, 389:13, 389:19, 398:2, 412:21, 422:3, 423:9, 423:18, 423:19, 424:2, 425:10, 432:9, 434:11, 435:17, 439:8, 445:5, 445:17, 462:7, 462:8, 462:10, 467:25, 468:1, 468:6, 475:21, 476:6, 476:9, 476:15, 492:18, 504:18, 508:13, 513:12, 517:1, 519:10, 520:24, 526:11, 533:17, 572:10, 576:15, 576:21, 589:16
**sentence** [14] - 333:14, 410:18, 411:18, 416:3, 419:7, 426:6, 426:10, 429:3, 429:25, 430:11, 443:3, 465:23, 485:6, 488:23
**separate** [11] - 336:19, 362:8, 393:18, 393:20, 423:11, 423:12, 423:20, 423:23, 424:8, 443:15, 459:19
**separately** [6] - 317:25,

423:17, 423:25, 424:2, 424:5, 424:10
**September** [3] - 314:19, 468:1, 484:23
**series** [1] - 453:21
**served** [4] - 317:1, 317:4, 317:5, 317:6
**set** [6] - 333:19, 381:21, 381:23, 381:24, 432:6, 482:23
**sets** [5] - 338:18, 364:15, 364:17, 364:18, 443:16
**settle** [1] - 411:23
**seven** [5] - 489:21, 489:22, 499:18, 500:6, 533:3
**several** [7] - 335:4, 365:25, 376:4, 397:1, 420:2, 420:23, 557:13
**severe** [1] - 419:1
**shade** [1] - 542:1
**shall** [2] - 329:8, 553:22
**share** [4] - 397:13, 466:14, 466:19, 467:8
**shared** [3] - 463:22, 476:1, 561:14
**shares** [1] - 422:11
**sharing** [1] - 571:17
**Sharma** [4] - 364:24, 364:25, 365:10, 365:16
**sheet** [23] - 459:17, 459:18, 459:19, 459:20, 459:21, 460:18, 471:3, 472:11, 473:17, 473:18, 473:19, 475:6, 506:12, 506:14, 521:11, 526:11, 533:11, 533:23, 537:9, 537:15, 538:16, 544:10
**sheets** [2] - 459:23, 517:23
**Shen** [1] - 584:22
**Shenzhen** [12] - 359:5, 574:17, 574:18, 574:19, 575:2, 575:6, 576:2, 576:17, 577:1, 581:3, 581:6, 581:8
**shift** [1] - 460:20
**shifted** [1] - 567:1
**shifting** [1] - 515:2
**ship** [25] - 344:23, 346:14, 346:18, 354:4, 354:5, 354:13, 354:14, 357:3, 369:6, 369:10, 369:12, 369:14, 369:19, 372:9, 405:3, 421:4, 478:1, 483:3, 483:6, 489:21, 489:23, 499:21, 500:4
**ship-to** [2] - 344:23, 346:14

**shipment** [25] - 366:12, 367:19, 367:21, 370:6, 377:12, 379:12, 384:6, 384:14, 384:21, 384:22, 384:23, 399:24, 401:12, 402:9, 402:12, 416:7, 474:2, 482:3, 484:20, 488:1, 506:13, 506:21, 507:12, 514:16, 544:7
**shipments** [15] - 336:3, 363:1, 373:22, 384:6, 384:8, 384:9, 400:10, 404:3, 404:4, 442:24, 454:25, 506:5, 506:16, 510:21
**shipped** [40] - 336:24, 337:1, 338:15, 363:24, 369:15, 370:9, 372:7, 373:9, 376:3, 376:4, 377:3, 377:15, 385:17, 390:9, 394:20, 397:6, 400:15, 400:22, 400:23, 400:24, 401:14, 401:21, 402:12, 414:25, 415:23, 418:3, 429:10, 441:22, 456:6, 461:9, 484:22, 499:16, 503:6, 503:13, 504:22, 507:9, 510:22, 525:22
**shipper** [1] - 361:7
**shipping** [12] - 334:5, 357:1, 357:2, 358:16, 360:17, 477:23, 478:4, 481:20, 500:1, 533:14
**ships** [10] - 404:7, 414:11, 414:18, 419:12, 441:16, 482:15, 483:10, 483:11, 483:21, 504:7
**short** [6] - 326:24, 395:8, 491:18, 524:18, 524:24, 542:8
**short-circuit** [1] - 542:8
**short-term** [2] - 395:8, 491:18
**shortened** [1] - 394:24
**shorter** [1] - 305:2
**shots** [1] - 591:4
**show** [52] - 318:7, 344:4, 347:6, 347:10, 373:19, 373:25, 385:23, 390:23, 393:10, 393:13, 393:14, 405:14, 408:23, 412:11, 412:12, 415:13, 418:4, 418:14, 429:11, 431:24, 441:16, 457:20, 463:2, 463:12, 469:2, 481:6, 490:24, 494:8, 494:9, 494:19, 503:21, 504:13, 511:13, 512:3, 512:21, 513:18, 518:10, 522:18,

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

523:17, 527:18, 534:17, 538:3, 541:8, 542:17, 545:5, 545:7, 546:2, 547:12, 555:3, 556:22, 587:9, 591:2

**showed** [10] - 367:13, 368:6, 374:1, 404:18, 418:6, 503:19, 506:15, 506:16, 508:6, 526:17

**showing** [14] - 337:14, 342:1, 345:24, 376:2, 449:14, 450:14, 451:4, 451:6, 494:24, 504:20, 523:20, 524:1, 528:13, 592:2

**shown** [5] - 343:20, 494:2, 494:15, 517:6, 548:10

**shows** [10] - 363:13, 412:1, 415:10, 417:10, 432:1, 449:1, 450:4, 458:24, 459:1, 545:1

**shrinking** [1] - 414:18

**shrunk** [1] - 394:24

**sic** [2] - 388:19, 388:20

**sic]** [1] - 361:25

**side** [40] - 308:24, 328:16, 329:1, 339:14, 344:23, 348:22, 357:19, 365:7, 365:19, 366:13, 384:3, 391:18, 393:17, 427:15, 434:16, 435:10, 445:19, 447:14, 456:23, 457:12, 475:10, 485:12, 487:3, 489:1, 489:22, 500:5, 506:12, 506:14, 506:16, 509:24, 509:25, 517:22, 520:8, 527:7, 527:12, 561:7, 561:8

**side-by-side** [2] - 328:16, 427:15

**sidebar** [2] - 426:25, 427:1

**sided** [3] - 489:22, 490:15, 499:17

**sides** [2] - 372:19, 381:6

**sides'** [1] - 315:18

**sidetracking** [1] - 512:3

**sign** [4] - 335:8, 562:23, 562:24, 590:25

**signature** [1] - 335:1, 335:5, 335:10

**signed** [6] - 332:17, 335:15, 335:17, 409:3, 410:16, 411:14

**significant** [1] - 364:7

**significantly** [2] - 419:10, 568:20

**signify** [1] - 485:2

**silver** [1] - 421:11

**Silverthorn** [1] - 584:18

**similar** [5] - 360:1, 424:20, 432:8, 440:25, 496:13

**similarly** [1] - 377:15

**simple** [2] - 356:21, 459:4

**Simultaneous** [4] - 317:2, 343:17, 347:21, 554:15

**single** [5] - 349:1, 349:5, 349:21, 350:3, 591:11

**sister** [1] - 573:20

**sister's** [1] - 574:1

**sister-in-law's** [1] - 573:20

**site** [1] - 516:3

**sitting** [2] - 340:19, 487:8

**situation** [9] - 306:11, 333:12, 335:24, 381:7, 403:6, 404:19, 414:7, 419:10, 503:22

**situations** [1] - 360:13

**six** [8] - 330:17, 330:18, 343:15, 385:8, 458:5, 490:16, 499:18, 500:5

**six-layer** [2] - 490:16, 499:18

**size** [1] - 356:15

**skill** [3] - 364:15, 364:16, 364:18

**skilled** [5] - 589:21, 589:23, 589:24, 590:3, 590:4

**skin** [1] - 351:1

**skip** [2] - 334:25, 357:15

**skipped** [2] - 329:14

**slide** [3] - 344:15, 361:14, 466:12

**slightly** [2] - 505:22, 565:9

**slip** [6] - 360:25, 361:1, 361:4, 361:10, 392:1, 392:5

**slips** [6] - 390:6, 393:12, 393:21, 436:13, 436:18, 533:14

**slow** [1] - 484:24

**slowly** [2] - 376:7, 398:23

**small** [10] - 350:14, 350:22, 350:23, 385:15, 401:8, 448:3, 494:20, 502:11, 536:19, 537:7

**smaller** [1] - 530:7

**so-called** [1] - 541:4

**so..** [5] - 308:13, 321:21, 322:10, 330:15, 541:16

**soft** [2] - 367:20, 367:22

**sold** [1] - 562:7

**solve** [3] - 420:1, 420:2, 420:22

**someone** [4] - 403:16, 460:6, 466:24, 576:2

**sometime** [5] - 316:4, 337:5, 404:18, 405:22, 543:14

**sometimes** [13] - 363:22, 363:23, 377:10, 379:8, 398:8, 440:14, 461:22, 469:8, 531:1, 583:12, 583:13, 583:15

**somewhat** [1] - 560:8

**somewhere** [3] - 345:11, 352:21, 457:18

**soon** [4] - 329:6, 355:11, 411:20, 514:14

**sorry** [28] - 316:14, 323:12, 324:24, 327:13, 329:11, 340:13, 348:8, 355:15, 376:12, 382:19, 409:11, 413:2, 418:24, 427:2, 434:18, 439:2, 439:7, 440:6, 451:9, 469:13, 479:18, 508:21, 515:11, 520:12, 520:20, 531:14, 532:21, 534:6

**Sorry** [1] - 384:8

**sort** [28] - 333:10, 349:6, 349:12, 359:25, 364:11, 364:19, 370:23, 384:25, 412:6, 416:15, 419:16, 427:4, 436:15, 442:8, 445:21, 460:6, 460:24, 464:10, 483:12, 483:20, 487:4, 491:9, 497:25, 504:1, 527:15, 538:16, 564:25, 579:14

**sorting** [1] - 353:9

**sought** [2] - 546:14, 558:24

**sound** [1] - 323:5

**sounds** [4] - 332:23, 509:1, 555:9, 578:5

**Sourabh** [4] - 364:24, 364:25, 365:10, 580:23

**Sourabh's** [1] - 580:16

**source** [1] - 392:12

**southeast** [1] - 573:10

**southern** [2] - 358:18, 360:1

**Southern** [1] - 594:17

**Southwest** [1] - 346:7

**space** [1] - 436:23

**speaking** [3] - 337:19, 525:19, 573:23

**speaks** [1] - 399:18

**specific** [3] - 372:22, 460:21, 571:4

**specify** [2] - 455:9, 565:2

**speed** [4] - 304:12, 307:3, 400:19, 454:17

**speeding** [1] - 323:4

**spell** [3] - 361:24, 578:20, 585:3

**spelled** [1] - 553:8

**spend** [2] - 314:10, 498:14

**spent** [1] - 592:25

**spill** [1] - 465:1

**spilling** [1] - 355:12

**spoken** [2] - 334:6, 464:4

**spreadsheet** [32] - 407:3, 407:4, 407:5, 460:7, 468:22, 469:9, 470:6, 470:23, 471:5, 475:7, 475:21, 476:16, 493:18, 493:19, 496:13, 496:14, 496:24, 501:5, 510:14, 510:20, 511:10, 523:16, 524:5, 528:24, 529:25, 532:2, 537:15, 537:25, 541:11, 543:2, 543:13, 544:22

**spreadsheets** [8] - 306:23, 311:10, 427:21, 466:20, 467:11, 476:6, 493:7, 558:22

**square** [33] - 355:18, 355:19, 355:20, 355:23, 355:24, 355:25, 356:2, 356:5, 356:6, 356:13, 357:2, 357:4, 357:7, 357:9, 357:11, 464:24, 465:1, 465:3, 465:4, 465:5, 465:6, 477:15, 481:19, 481:20, 482:2, 482:3, 484:22, 484:23, 485:13, 489:17, 490:9, 497:13, 568:20

**stable** [1] - 416:16

**stage** [2] - 357:12, 358:11

**stages** [1] - 341:23

**stamp** [1] - 410:3

**stand** [4] - 331:3, 481:8, 486:9, 546:22

**standard** [3] - 345:16, 353:1, 490:15

**standing** [3] - 495:13, 495:15, 562:22

**stands** [2] - 363:8, 496:20

**start** [15] - 308:25, 319:24, 342:23, 358:8, 385:8, 389:5, 405:21, 406:20, 426:6, 458:7, 497:25, 503:23, 507:11, 507:15, 543:16

**started** [29] - 329:7, 330:21, 337:4, 343:23, 360:17, 396:25, 397:6, 399:15, 401:19, 415:22, 418:9, 419:8, 422:8, 422:9, 424:16, 440:16, 457:5, 461:14, 467:2, 475:20, 483:19, 483:20, 520:5, 521:4, 521:9, 539:7, 556:7, 570:20, 572:5

**starting** [15] - 330:20, 397:1, 397:5, 404:25, 415:21, 440:17, 453:8, 453:25, 486:13, 499:21, 499:25, 501:23, 502:2, 514:17, 519:23

**starts** [7] - 333:15, 339:14, 339:19, 355:12, 378:8, 384:22, 453:21

**state** [6] - 353:5, 476:18, 542:7, 570:5, 590:14, 590:15

**state-of-the-art** [2] - 590:14, 590:15

**statement** [45] - 315:5, 315:23, 315:24, 317:22, 318:15, 318:17, 319:18, 320:19, 322:17, 322:19, 331:12, 371:20, 371:22, 372:1, 372:6, 372:11, 373:1, 373:5, 373:6, 373:8, 373:15, 373:21, 375:8, 375:10, 375:15, 378:1, 378:8, 378:9, 378:13, 378:16, 378:23, 378:24, 379:4, 379:7, 379:11, 380:18, 401:13, 437:4, 437:7, 449:22, 547:14, 547:22, 571:3, 587:14, 587:15

**statements** [14] - 319:21, 319:25, 320:1, 320:4, 320:21, 320:25, 322:4, 322:7, 322:12, 322:13, 372:4, 376:1, 528:23, 577:7

**states** [1] - 370:11

**States** [8] - 354:3, 354:11, 369:14, 369:17, 369:18, 383:3, 581:25, 594:16

**stating** [2] - 312:21, 484:12

**statutory** [1] - 339:22

**stay** [4] - 381:12, 409:11, 418:13, 504:4

**stead** [1] - 439:24

**STENOGRAPHER** [1] - 426:20

**KEYWORD INDEX**

**Step** [12] - 343:3, 354:18, 354:22, 354:23, 358:19, 360:21, 361:8, 361:10, 361:13, 387:7, 497:25

**step** [7] - 321:13, 342:6, 367:13, 369:2, 381:11, 383:7, 383:8

**Stephen** [13] - 318:18, 322:4, 324:7, 325:16, 327:20, 342:8, 347:22, 348:4, 428:2, 523:22, 531:8, 531:14, 545:10

**steps** [1] - 342:1

**Steve** [2] - 309:17, 324:1

**stick** [1] - 322:25

**still** [24] - 308:13, 316:24, 330:14, 331:2, 334:2, 337:10, 340:4, 390:16, 395:7, 412:5, 415:10, 416:9, 417:11, 420:1, 456:7, 505:15, 529:15, 541:13, 542:2, 549:15, 566:7, 567:9, 583:15, 583:17

**stipulate** [2] - 307:9, 307:16

**stipulated** [6] - 307:8, 307:14, 307:21, 308:5, 308:6, 498:16

**stipulation** [2] - 307:7, 565:5

**stop** [18] - 330:2, 330:14, 336:20, 336:21, 397:21, 433:2, 437:15, 437:17, 452:19, 462:17, 462:21, 462:22, 463:15, 463:17, 463:20, 463:21, 476:10, 512:12

**stopped** [4] - 359:9, 418:1, 476:7, 476:11

**storage** [1] - 516:3

**story** [1] - 332:7

**straight** [1] - 549:19

**street** [2] - 422:24, 566:13

**Street** [1] - 346:8

**string** [2] - 453:25, 528:5

**stringent** [5] - 564:7, 564:9, 564:19, 565:8, 565:10

**studying** [1] - 541:14

**stuff** [5] - 359:24, 360:8, 360:13, 400:22, 488:10

**styled** [1] - 594:5

**Suarez** [1] - 584:16

**subject** [24] - 311:1, 312:2, 317:19, 317:20, 325:8, 325:10, 326:2, 326:7, 327:24, 353:3, 407:18, 421:17, 421:19,

422:2, 422:3, 422:6, 425:24, 451:17, 476:4, 501:13, 502:16, 523:1, 528:7, 539:15

**subjective** [1] - 452:10

**submit** [2] - 344:1, 565:6

**submitted** [1] - 312:19

**subsequent** [1] - 544:4

**subsidiary** [2] - 559:19, 559:21

**substance** [1] - 403:17

**substantial** [2] - 379:22, 560:9

**substantially** [1] - 492:20

**substantively** [1] - 304:18

**substitute** [1] - 493:21

**substrate** [1] - 421:7

**subtotal** [1] - 388:4

**subtract** [1] - 388:20

**successful** [2] - 341:13, 341:14, 341:15

**sudden** [1] - 306:5

**sufficient** [1] - 355:10

**suggested** [1] - 430:4

**suggesting** [1] - 428:12

**sum** [1] - 481:18

**summaries** [1] - 317:23

**summarizes** [1] - 317:23

**summary** [23] - 314:22, 316:14, 317:3, 317:12, 317:15, 318:7, 328:6, 419:23, 419:25, 437:24, 438:12, 493:17, 511:7, 511:9, 511:15, 511:16, 512:7, 512:24, 513:4, 538:16, 544:25, 546:7

**summer** [2] - 414:6, 571:16

**sums** [1] - 412:8

**sun's** [1] - 541:22

**Sunbiz** [2] - 553:20, 560:12

**Sunbiz.com** [1] - 559:14

**Sunday** [5] - 313:4, 400:9, 400:12, 400:14, 400:24

**sunlight** [2] - 391:13, 542:3

**Sunny** [6] - 321:8, 454:6, 454:8, 582:2, 582:6, 582:9

**super** [1] - 351:13

**super-detailed** [1] - 351:13

**superimpose** [2] - 345:21, 386:2

**Supertech** [6] - 551:20, 551:21, 551:24, 552:1, 552:2, 552:4

**supplemental** [4] - 338:21, 408:10, 409:2, 410:16

**supplier** [15] - 349:20, 353:7, 353:14, 353:15, 362:15, 366:17, 366:20, 423:20, 452:2, 452:17, 459:3, 461:5, 461:16, 552:12, 552:13

**suppliers** [8] - 368:10, 368:12, 403:23, 408:3, 420:3, 420:24, 421:1, 552:24

**supply** [3] - 363:11, 366:16, 421:6

**support** [1] - 430:20

**supports** [1] - 362:21

**supposed** [9] - 307:22, 314:5, 387:25, 395:8, 400:12, 400:13, 439:8, 441:16, 442:9

**supposing** [1] - 345:9

**surprise** [1] - 538:10

**surprised** [1] - 487:6

**surprises** [1] - 307:3

**surprising** [1] - 519:22

**suspect** [1] - 427:18

**sustain** [1] - 415:10

**sustained** [2] - 420:15, 556:24

**switch** [4] - 305:14, 341:16, 404:6, 451:15

**sworn** [4] - 331:6, 553:2, 577:11, 578:3

**system** [42] - 358:6, 363:4, 363:7, 363:17, 363:18, 366:7, 366:8, 366:18, 367:3, 368:20, 370:11, 370:19, 370:20, 370:21, 370:24, 371:2, 380:20, 423:21, 423:22, 458:24, 459:1, 470:12, 470:13, 470:14, 470:15, 470:17, 470:18, 497:14, 497:18, 521:22, 521:23, 526:5, 527:3, 527:8, 527:9, 528:23, 529:7, 529:25, 530:1, 530:2, 536:10, 541:2

**systems** [1] - 527:1

**SZ** [2] - 574:13, 574:14

---

# T

**T13** [5] - 319:19, 320:6, 320:8, 450:19, 450:23

**tab** [17] - 471:8, 471:22, 471:23, 475:4, 475:6, 494:24, 495:1, 495:3, 511:7, 511:9, 512:25,

513:4, 523:11, 523:17, 524:21, 524:25, 532:4

**table** [3] - 385:9, 459:6, 504:21

**tabs** [6] - 471:13, 471:15, 500:13, 512:2, 512:4, 523:16

**tail** [1] - 535:8

**tailor** [2] - 588:23, 588:24

**tailor-made** [2] - 588:23, 588:24

**tailored** [1] - 309:9

**tangent** [1] - 457:17

**tasked** [2] - 460:6

**tax** [11] - 425:2, 426:8, 429:4, 429:10, 430:13, 440:24, 441:3, 441:8, 441:21, 442:23, 445:14

**team** [41] - 362:11, 362:14, 362:18, 362:19, 362:21, 363:23, 364:22, 364:23, 365:6, 366:3, 366:4, 366:13, 366:14, 366:15, 367:4, 368:5, 368:11, 368:12, 368:13, 368:17, 368:19, 370:10, 382:5, 401:13, 460:15, 460:17, 466:24, 516:6, 544:6, 575:18, 575:21, 575:22, 576:3, 580:19, 580:22, 580:24, 580:25, 584:1, 592:12

**teams** [1] - 362:8

**technically** [2] - 505:19, 525:19

**technicians** [2] - 590:3, 590:4

**teenager** [1] - 307:19

**ten** [10] - 391:5, 391:6, 474:11, 474:12, 474:13, 474:14, 485:4, 564:24, 592:25

**ten-minute** [1] - 391:5

**ten-year** [1] - 564:24

**tenth** [1] - 351:7

**term** [11] - 337:15, 365:11, 394:5, 395:2, 395:8, 395:25, 414:11, 452:16, 474:24, 491:18, 515:21

**terminated** [1] - 584:10

**terms** [38] - 304:12, 305:8, 317:22, 337:1, 338:14, 345:11, 345:16, 353:3, 353:4, 355:3, 357:11, 357:13, 362:16, 371:14, 377:19, 393:11, 394:18, 394:21, 395:7, 402:3, 402:4, 402:20, 404:13, 414:23, 414:24,

416:17, 419:11, 463:4, 465:12, 482:14, 487:15, 489:14, 489:16, 491:15, 491:17, 503:6, 524:19, 571:15

**terrific** [1] - 547:17

**test** [2] - 407:1, 407:14

**testified** [16] - 331:6, 366:3, 371:21, 377:25, 394:4, 408:20, 415:21, 416:1, 434:5, 472:5, 485:25, 497:23, 502:25, 567:10, 577:11, 586:16

**testifying** [5] - 406:15, 464:18, 464:20, 487:22, 491:22

**testimony** [18] - 305:1, 337:11, 341:22, 348:19, 357:14, 383:11, 394:7, 425:20, 526:15, 536:5, 550:16, 553:2, 558:2, 570:19, 572:18, 577:13, 586:20, 588:22

**testing** [1] - 407:11

**text** [12] - 398:3, 398:4, 427:18, 480:18, 488:17, 488:19, 488:20, 488:24, 489:2, 489:7, 490:3, 509:7

**THE** [263] - 304:1, 304:14, 304:25, 305:15, 305:18, 306:21, 306:24, 307:4, 307:6, 307:13, 307:17, 308:2, 308:12, 308:19, 308:23, 308:25, 309:7, 309:10, 309:14, 309:21, 309:24, 310:5, 310:9, 310:12, 310:18, 310:21, 310:25, 311:3, 311:5, 311:12, 311:17, 311:22, 312:11, 312:16, 312:24, 313:2, 313:5, 313:11, 313:18, 313:21, 313:25, 314:4, 314:9, 314:17, 315:11, 315:14, 315:18, 315:23, 316:5, 316:9, 316:16, 316:18, 316:20, 317:17, 318:6, 318:11, 318:14, 318:18, 318:23, 318:25, 319:2, 319:5, 319:8, 319:13, 319:24, 320:6, 320:10, 320:14, 320:18, 320:22, 321:6, 321:10, 321:15, 321:18, 321:25, 322:2, 322:25, 323:7, 323:11, 323:14, 323:21, 324:3, 324:10, 324:12, 324:14, 324:16, 324:20, 324:23, 325:1, 325:3, 325:10, 325:13, 325:17, 325:20, 325:22,

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

325:24, 326:3, 326:6,
326:11, 326:14, 326:19,
326:23, 327:3, 327:5,
327:8, 327:11, 327:15,
327:17, 328:1, 328:17,
329:3, 329:6, 329:9,
329:15, 329:19, 329:23,
330:1, 330:6, 330:8,
330:13, 334:13, 334:16,
334:18, 334:21, 342:13,
344:3, 344:7, 344:8,
347:9, 347:16, 348:3,
348:10, 348:15, 352:6,
352:8, 352:9, 352:10,
352:15, 352:17, 356:2,
356:8, 356:9, 356:14,
359:21, 359:22, 360:3,
361:24, 361:25, 362:1,
374:7, 376:7, 376:9,
376:10, 376:12, 380:8,
387:19, 389:19, 390:24,
391:4, 391:9, 403:14,
403:19, 413:3, 420:10,
420:11, 420:15, 421:20,
424:22, 425:5, 426:18,
426:20, 426:21, 426:25,
428:7, 428:15, 428:19,
431:20, 433:5, 433:10,
435:23, 457:24, 463:10,
465:21, 466:9, 467:21,
469:7, 481:1, 485:21,
485:23, 493:24, 494:14,
494:16, 495:8, 495:15,
495:18, 495:21, 496:3,
500:20, 500:25, 501:6,
501:11, 505:4, 512:13,
520:16, 520:18, 523:2,
527:23, 530:18, 530:22,
531:20, 531:23, 534:25,
538:12, 541:17, 541:24,
542:1, 542:5, 542:13,
542:21, 545:8, 545:25,
549:22, 550:1, 554:9,
554:12, 554:18, 554:21,
555:1, 555:3, 556:16,
556:19, 556:24, 557:8,
558:18, 559:5, 559:7,
560:17, 560:19, 560:24,
560:25, 566:10, 575:12,
575:19, 575:20, 575:22,
575:23, 575:24, 577:16,
577:17, 578:20, 578:21,
578:22, 578:23, 578:24,
578:25, 585:3, 585:5,
585:6, 587:17, 590:8,
592:1, 592:4, 593:16,
593:19

**the..** [1] - 545:10

**themselves** [5] - 427:19,
430:24, 436:21, 466:20,
477:24

**there's..** [1] - 421:11

**therefore** [1] - 411:21

**they've** [6] - 328:6,
358:9, 359:23, 359:24,
373:22, 378:7

**thinking** [1] - 573:9

**thinks** [1] - 365:23

**third** [10] - 346:20,
346:21, 384:10, 398:16,
469:13, 522:19, 523:4,
529:22, 530:15, 531:7

**third-party** [2] - 346:20,
346:21

**thousand** [13] - 427:21,
427:23, 533:22, 577:12,
577:23, 579:12, 579:20,
579:22, 581:1, 581:2,
581:10, 581:11, 581:14

**thousands** [2] - 381:22,
549:1

**thread** [1] - 528:7

**threaten** [1] - 483:13

**three** [44] - 304:4,
312:14, 343:25, 347:14,
358:14, 358:16, 360:14,
360:17, 360:19, 366:23,
366:25, 370:8, 370:24,
379:24, 380:20, 384:6,
400:21, 403:8, 403:10,
414:8, 417:18, 432:15,
434:2, 435:20, 436:1,
436:3, 456:23, 461:14,
461:23, 476:19, 481:23,
493:11, 493:21, 494:7,
516:2, 525:4, 549:3,
565:3, 569:4, 569:6,
588:10, 592:13, 592:16

**three-point** [5] - 366:23,
370:8, 380:20, 400:21

**throughout** [2] - 358:2,
581:21

**ticket** [1] - 486:22

**Tier** [5] - 403:4, 403:23,
566:20, 566:23

**tighter** [1] - 500:3

**tin** [2] - 340:5, 525:12

**tiny..** [1] - 351:8

**title** [3] - 365:2, 469:24,
496:8

**to..** [1] - 382:9

**today** [19] - 304:13,
304:24, 309:6, 313:14,
346:9, 408:20, 411:20,
416:6, 416:18, 419:17,
515:14, 542:2, 544:10,
546:23, 563:20, 563:21,
568:13, 568:14, 584:15

**Todor** [2] - 584:25, 585:6

**together** [7] - 320:5,
336:15, 340:22, 341:6,

413:20, 431:22, 438:9,
561:18

**tomorrow** [7] - 365:17,
416:8, 416:13, 417:1,
426:5, 430:12

**took** [15] - 379:8, 402:14,
432:7, 433:16, 435:25,
459:5, 464:1, 526:5,
526:6, 526:9, 537:2,
537:5, 537:8, 544:7,
544:16

**top** [37] - 325:17, 328:7,
338:22, 344:18, 345:2,
345:12, 346:1, 346:6,
378:10, 387:8, 388:19,
396:11, 406:3, 406:10,
409:11, 434:23, 434:24,
440:22, 448:2, 448:13,
454:15, 464:16, 469:24,
470:23, 480:8, 487:19,
492:4, 496:7, 504:24,
505:8, 506:15, 513:21,
515:11, 535:6, 540:14,
590:19

**top-left** [1] - 469:24

**topic** [1] - 502:22

**Torres** [4] - 555:8,
555:11, 555:14, 557:2

**total** [21] - 336:10, 345:8,
345:10, 353:10, 356:20,
357:7, 384:5, 388:9,
406:13, 451:8, 474:8,
501:10, 506:15, 506:16,
510:17, 513:7, 517:5,
538:16, 538:19, 539:1,
546:14

**totaled** [1] - 537:7

**totals** [1] - 506:24

**touch** [1] - 484:4

**tow** [2] - 569:17, 569:18

**towards** [3] - 316:13,
570:19, 571:16

**track** [11] - 351:1, 351:3,
398:12, 423:17, 424:5,
458:19, 460:8, 481:4,
541:4

**tracked** [3] - 458:22,
460:23, 543:13

**tracking** [5] - 456:8,
463:20, 463:21, 466:15,
466:16

**Tracy** [90] - 311:23,
312:3, 312:5, 315:24,
321:8, 323:14, 325:25,
348:5, 380:23, 381:20,
381:23, 388:16, 394:8,
394:15, 397:2, 398:2,
399:18, 400:7, 402:15,
402:16, 402:17, 404:15,
405:17, 406:7, 408:19,

409:1, 409:8, 409:17,
410:7, 410:17, 411:16,
412:21, 412:22, 412:24,
415:18, 418:20, 419:9,
419:25, 420:21, 422:9,
425:1, 425:22, 429:19,
429:20, 429:21, 440:2,
440:5, 440:19, 440:22,
443:16, 445:5, 454:5,
454:25, 463:23, 466:16,
466:24, 479:2, 479:11,
479:23, 480:20, 480:21,
480:22, 485:8, 485:9,
488:18, 491:4, 491:6,
491:25, 504:18, 508:14,
513:23, 514:9, 516:14,
516:15, 516:16, 516:20,
516:21, 516:23, 516:24,
518:17, 561:11, 569:7,
569:11, 569:20, 572:7,
591:22, 592:9

**Tracy's** [1] - 516:18

**trade** [1] - 462:23

**transact** [1] - 574:20

**transacted** [1] - 571:4

**transaction** [1] - 516:20

**transactions** [5] - 364:4,
401:9, 423:23, 433:24,
441:10

**transcript** [1] - 594:5

**transfer** [6] - 382:3,
482:24, 529:5, 529:6,
563:23, 574:25

**transfers** [1] - 526:23

**transitioned** [1] - 527:2

**translates** [1] - 414:17

**transmitted** [1] - 536:11

**transmitting** [1] - 576:17

**transport** [2] - 358:24,
359:1

**treated** [1] - 441:11

**treatment** [1] - 424:17

**trial** [11] - 304:2, 304:12,
304:18, 307:22, 307:23,
313:24, 313:25, 314:5,
330:19, 485:21, 537:21

**tried** [6] - 427:11, 516:3,
516:4, 543:18, 569:25,
570:16

**trips** [1] - 343:25

**trouble** [1] - 420:7

**troubles** [1] - 402:20

**truck** [5] - 359:2, 359:3,
359:6, 359:14, 400:10

**trucks** [1] - 360:8

**true** [2] - 557:10, 594:5

**trust** [3] - 402:16,
402:17, 549:8

**trusted** [1] - 401:3

**truth** [2] - 591:9, 591:10

**try** [9] - 371:1, 390:20,
412:17, 450:23, 530:25,
542:9, 553:19, 578:11,
583:23

**trying** [26] - 304:8, 307:7,
315:2, 330:24, 337:25,
358:22, 371:5, 386:15,
395:19, 403:6, 405:23,
410:11, 413:20, 425:12,
460:25, 461:1, 469:5,
487:15, 505:25, 530:24,
532:7, 565:12, 570:12,
577:10

**Tuesday** [2] - 400:11,
400:25

**turn** [4] - 311:21, 502:22,
538:5, 540:4

**two** [58] - 306:19, 312:11,
323:25, 334:3, 336:18,
337:19, 337:20, 338:12,
338:18, 341:5, 343:25,
346:21, 347:1, 357:19,
357:25, 359:5, 359:6,
362:8, 372:4, 378:20,
378:25, 379:24, 384:8,
384:9, 395:17, 399:2,
414:5, 415:7, 416:10,
417:18, 429:14, 438:8,
452:4, 455:17, 455:18,
458:4, 476:19, 487:3,
490:3, 497:20, 500:13,
500:15, 503:2, 507:7,
516:2, 523:16, 524:21,
527:16, 533:10, 533:11,
535:11, 565:1, 565:3,
569:24, 571:7, 578:25,
592:15

**two-and-a-half** [2] -
359:6, 416:10

**type** [6] - 337:24, 338:5,
338:6, 347:4, 350:6, 452:5

**types** [6] - 337:20,
338:12, 372:4, 375:24,
452:4, 565:1

**typical** [1] - 350:7

**typically** [6] - 352:21,
358:24, 359:1, 359:2,
367:16, 394:12

**typographical** [1] -
375:23

**U**

**U.S** [10] - 304:6, 328:25,
329:1, 346:23, 364:10,
376:18, 444:13, 517:6,
532:14, 578:25

**U13** [7] - 318:13, 318:19,
318:20, 318:23, 319:1,
436:21, 571:24

**U7** [5] - 311:20, 311:25,

314:13, 315:12, 405:15
**ultimate** [1] - 501:9
**ultimately** [1] - 335:8
**unable** [2] - 439:20, 452:10
**uncanny** [2] - 558:16, 558:17
**uncertainty** [1] - 494:11
**under** [27] - 317:4, 331:2, 333:6, 333:20, 341:6, 351:1, 351:2, 375:16, 378:14, 402:2, 402:4, 402:6, 404:12, 404:13, 406:3, 406:25, 414:23, 414:24, 463:4, 478:6, 491:8, 502:13, 502:14, 548:18, 586:24
**underlying** [1] - 317:6, 317:9, 317:24, 318:16, 506:24
**understood** [2] - 428:14, 429:8
**unduly** [1] - 310:12
**unit** [9] - 345:6, 347:4, 349:23, 350:5, 367:7, 460:23, 472:21, 474:5, 516:3
**United** [8] - 354:3, 354:10, 369:14, 369:17, 369:18, 383:3, 581:25, 594:16
**unless** [9] - 342:3, 354:25, 405:4, 406:16, 433:3, 510:25, 541:2, 547:11, 565:7
**unmanageable** [1] - 467:2
**unredacted** [7] - 328:11, 374:22, 427:3, 427:9, 427:10, 427:13, 501:10
**unrelated** [1] - 374:16
**up** [141] - 304:12, 305:10, 306:12, 306:25, 307:3, 320:16, 320:17, 321:10, 323:4, 330:23, 331:3, 332:13, 332:16, 332:19, 333:15, 335:3, 337:16, 338:4, 339:17, 342:4, 344:10, 345:19, 349:14, 349:17, 351:10, 352:14, 357:5, 358:21, 369:4, 369:23, 371:18, 374:2, 379:25, 380:14, 381:21, 381:23, 381:24, 383:7, 383:13, 383:18, 386:1, 387:15, 390:21, 391:15, 396:3, 401:16, 405:16, 406:4, 407:14, 408:25, 411:5, 411:7, 415:15, 419:22, 422:15, 425:15,

427:9, 428:3, 428:8, 430:14, 431:17, 431:18, 432:13, 433:13, 434:15, 436:21, 436:24, 438:16, 439:13, 439:18, 444:8, 446:2, 446:11, 447:13, 448:22, 449:11, 449:20, 451:3, 452:24, 453:7, 453:24, 455:12, 456:12, 456:16, 457:13, 457:17, 457:22, 458:3, 463:2, 463:8, 463:12, 464:11, 464:15, 467:17, 471:7, 474:24, 478:11, 478:24, 481:1, 482:23, 485:4, 495:19, 496:7, 501:13, 504:25, 505:1, 505:5, 509:6, 513:21, 514:3, 514:6, 515:7, 516:22, 517:5, 519:13, 520:10, 520:22, 522:2, 523:13, 528:1, 528:16, 530:13, 530:24, 535:23, 537:7, 537:8, 544:16, 547:2, 548:15, 548:16, 550:10, 558:24, 559:3, 559:25, 560:12, 571:20, 587:11, 591:5, 592:8, 593:1
**UP** [1] - 310:12
**updated** [3] - 362:12, 510:22, 535:14
**upfront** [3] - 408:16, 408:17, 408:18
**upper** [2] - 437:10, 499:10
**urgent** [4] - 407:4, 425:24, 430:3, 431:2
**US** [5] - 328:21, 402:24, 510:10, 511:6, 532:5
**US-based** [1] - 402:24
**USA** [8] - 333:16, 333:20, 339:5, 339:7, 339:15, 339:20, 339:25, 509:17
**useful** [1] - 307:5
**uses** [2] - 362:6, 382:15

**V**

**V13** [8] - 319:20, 320:10, 320:13, 320:17, 320:22, 320:23, 450:19, 450:23
**validate** [2] - 565:13, 566:24
**value** [4] - 416:7, 441:21, 452:18, 544:8
**variety** [1] - 374:14
**vary** [1] - 372:2
**VAT** [8] - 441:18, 441:20, 441:23, 442:10, 443:1, 443:6, 443:22, 445:13

**VAT-related** [1] - 445:13
**Vega** [65] - 305:10, 321:10, 321:21, 332:14, 335:2, 337:16, 339:2, 339:17, 341:17, 342:5, 342:16, 352:23, 354:20, 358:21, 361:14, 367:13, 369:24, 371:18, 380:14, 383:7, 383:12, 385:25, 386:24, 387:18, 389:17, 390:13, 390:20, 394:1, 396:3, 401:24, 406:4, 411:7, 419:21, 425:15, 428:24, 433:16, 435:6, 435:19, 437:13, 438:16, 444:11, 444:23, 446:11, 450:25, 457:22, 467:15, 471:23, 487:20, 489:1, 491:3, 492:4, 496:7, 506:7, 509:7, 510:6, 511:12, 512:1, 514:2, 515:7, 520:7, 528:2, 528:3, 529:16, 546:4, 547:17
**vendor** [7] - 346:13, 550:24, 551:1, 552:7, 552:9, 556:4, 568:21
**vendors** [2] - 567:24, 568:1
**verbally** [1] - 431:5
**verification** [2] - 370:8, 400:21
**version** [8] - 310:24, 427:9, 427:10, 494:20, 501:10, 510:22, 516:11, 526:13
**versions** [1] - 510:12
**versus** [2] - 372:8, 571:1
**vice** [1] - 561:15
**Video** [1] - 587:18
**video** [34] - 563:7, 563:11, 563:12, 563:15, 563:17, 587:4, 587:7, 587:9, 587:16, 588:15, 588:16, 588:18, 588:22, 589:2, 589:4, 589:20, 589:21, 590:7, 590:13, 591:3, 591:19, 591:23, 591:24, 591:25, 592:1, 592:6, 592:9, 592:11, 592:14, 592:18, 592:21, 593:11
**videos** [5] - 588:8, 591:6, 591:7
**view** [2] - 443:4, 486:23
**violation** [1] - 321:9
**violations** [1] - 454:21
**virtue** [2] - 385:14, 564:5
**visit** [1] - 439:22
**voluminous** [1] - 317:23

**W**

**W11** [2] - 325:14, 325:21
**wait** [9] - 324:20, 324:23, 334:19, 338:22, 394:12, 397:15, 417:20, 592:24
**Waite** [1] - 584:14
**waiting** [1] - 304:15
**waive** [6] - 487:22, 487:25, 489:20, 489:25, 499:14, 499:19
**waived** [15] - 310:7, 413:18, 485:16, 485:17, 486:1, 486:3, 486:7, 487:2, 487:13, 498:15, 500:9, 500:10, 501:16, 501:24, 549:1
**waiver** [4] - 486:23, 486:24, 489:17, 491:9
**waiving** [5] - 465:17, 490:4, 490:19, 499:24, 500:4
**walk** [2] - 392:11, 563:5
**walked** [2] - 561:4, 561:8
**wall** [2] - 359:21, 359:22
**wants** [4] - 304:17, 360:12, 426:22, 433:4
**warehouse** [18] - 344:25, 345:1, 346:20, 346:22, 346:24, 358:13, 358:18, 358:25, 360:23, 360:24, 363:6, 363:12, 363:19, 367:8, 367:9, 367:25, 368:3, 369:5
**warehouses** [3] - 346:21, 369:17, 369:18
**warranty** [1] - 564:25
**was..** [1] - 586:4
**washing** [1] - 564:23
**waste** [1] - 500:14
**wasted** [1] - 304:8
**wastewater** [1] - 424:17
**wasting** [1] - 314:10
**water** [8] - 355:4, 355:7, 355:9, 355:10, 355:11, 359:24, 424:20, 465:11
**Wattera** [2] - 579:7, 579:9
**website** [24] - 563:2, 563:4, 563:6, 563:7, 563:16, 563:18, 563:20, 563:21, 586:16, 586:19, 586:22, 587:1, 587:2, 587:3, 587:5, 589:2, 589:4, 589:6, 589:7, 590:13, 591:13, 591:14, 591:15, 593:8
**weeds** [1] - 572:9
**week** [65] - 344:1, 355:13, 355:15, 355:16,

356:19, 357:24, 378:25, 394:20, 394:21, 397:7, 399:24, 400:11, 400:16, 401:2, 401:21, 404:7, 404:8, 407:24, 407:25, 408:2, 414:11, 414:12, 414:19, 415:22, 415:23, 418:3, 418:4, 419:12, 464:25, 465:1, 465:2, 478:3, 481:20, 481:21, 482:2, 482:3, 482:15, 483:3, 483:4, 483:6, 483:10, 483:11, 483:21, 484:23, 485:13, 503:7, 503:13, 503:14, 504:7, 504:8, 504:22, 507:9, 510:22, 510:23
**week-audits** [1] - 344:1
**weekends** [1] - 380:1
**weekly** [2] - 397:21, 399:23
**weeks** [24] - 312:14, 312:15, 330:18, 378:20, 378:25, 379:24, 456:23, 477:22, 478:2, 478:4, 478:6, 483:23, 485:4, 489:22, 489:23, 490:16, 499:18, 499:19, 499:23, 500:5, 500:6
**weight** [1] - 374:23
**WEINSHALL** [11] - 318:1, 322:6, 323:17, 328:9, 328:13, 328:19, 427:5, 427:8, 494:2, 511:3, 541:19
**Weinshall** [2] - 318:3, 511:1
**welcome** [4] - 330:8, 391:9, 433:10, 495:21
**whereas** [2] - 329:1, 373:2
**whichever** [1] - 565:4
**white** [2] - 474:9, 564:17
**whited** [1] - 374:11
**whited-out** [1] - 374:11
**whole** [1] - 306:5, 308:8, 314:9, 340:18, 373:16, 385:3, 413:18, 435:7, 494:5, 509:6, 528:16
**wide** [1] - 374:14
**wife's** [1] - 574:2
**willing** [1] - 549:15
**wire** [11] - 359:23, 381:14, 381:21, 382:2, 382:3, 383:5, 416:6, 430:5, 438:1, 438:3, 482:24, 526:23, 529:5
**wired** [2] - 438:21, 450:15, 450:16, 505:5, 505:15

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

**withdrawing** [1] - 319:8
**WITNESS** [36] - 344:7,
348:10, 348:15, 352:8,
352:10, 352:17, 356:8,
356:14, 359:22, 361:25,
376:9, 376:12, 387:19,
389:19, 390:24, 413:3,
420:10, 457:24, 463:10,
465:21, 466:9, 481:1,
485:23, 505:4, 512:13,
530:22, 560:19, 560:25,
575:20, 575:23, 577:17,
578:21, 578:23, 578:25,
585:6, 592:4
**witness** [5] - 318:5,
323:1, 331:5, 347:8,
593:22
**word** [5] - 402:14, 486:9,
487:5, 497:19, 588:1
**Word** [2] - 481:5
**words** [6] - 379:6,
397:23, 455:24, 498:17,
501:1, 574:9
**workers** [1] - 379:22
**works** [5] - 367:4,
474:25, 554:4, 584:15,
590:4
**worksheets** [4] - 459:19,
471:14, 471:15, 517:15
**world's** [1] - 359:17
**worth** [8] - 347:2,
413:13, 414:15, 429:10,
441:16, 441:17, 521:6,
521:10
**wrap** [1] - 501:13
**write** [7] - 351:22, 372:8,
381:14, 405:10, 410:17,
430:12, 481:17
**writes** [1] - 399:19
**writing** [4] - 398:9,
406:7, 453:20, 505:10
**written** [20] - 315:4,
328:7, 351:24, 378:19,
393:4, 397:8, 397:23,
398:4, 398:17, 398:18,
398:21, 399:21, 464:23,
488:18, 489:8, 490:25,
510:4, 589:15, 591:22
**wrote** [24] - 399:17,
399:22, 404:14, 454:5,
454:11, 454:24, 479:11,
479:22, 479:23, 480:19,
480:21, 481:17, 485:8,
485:9, 488:2, 491:7,
491:8, 491:11, 491:16,
492:9, 515:16, 515:18,
521:18, 528:18
**Wu** [4] - 508:25, 509:2,
591:4

**X**

**X13** [4] - 545:6, 545:25,
546:1, 546:3
**xlsx** [2] - 510:10, 510:11

**Y**

**Y13** [6] - 541:9, 541:12,
541:16, 542:14, 545:19,
545:20
**Y7** [8] - 323:13, 323:14,
323:15, 323:21, 323:22,
467:15, 467:21, 469:13
**year** [15] - 313:13,
313:16, 336:17, 358:2,
377:5, 380:1, 407:7,
414:16, 487:13, 497:8,
511:19, 511:20, 518:8,
564:24, 567:22
**Year** [4] - 358:1, 379:18,
379:20, 379:21
**years** [18] - 338:8, 341:7,
341:8, 341:9, 360:17,
403:8, 414:8, 416:10,
442:11, 442:18, 442:20,
442:22, 515:18, 516:2,
533:3, 576:20, 588:10
**yellow** [1] - 548:13
**yesterday** [17] - 304:9,
305:22, 314:25, 331:2,
331:12, 332:5, 334:6,
342:9, 383:11, 424:20,
425:20, 427:3, 542:4,
546:23, 569:2, 569:5,
571:22
**yourself** [2] - 561:22,
562:18
**Yukun** [1] - 508:25

**Z**

**zero** [3] - 402:7, 402:9,
483:7
**zoom** [9] - 419:21, 435:7,
438:7, 443:9, 505:2,
510:6, 515:7, 521:19,
546:4