624

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 21-cv-60125-RNS

JIANGMEN BENLIDA PRINTED          Miami, Florida
CIRCUIT CO., LTD.,

                Plaintiff,        October 18, 2023

     vs.                          9:21 a.m. - 5:35 p.m.

CIRCUITRONIX, LLC,                Volume III

                Defendant.        Pages 624 to 929

                        TRIAL
     BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:          RICHARD E. LERNER, ESQ.
                            JEAN-CLAUDE MAZZOLA, ESQ.
                            MAZZOLA LINDSTROM LLP
                            1350 Avenue of the Americas
                            Second Floor
                            New York, New York 10019

FOR THE DEFENDANT:          STEPHEN F. ROSENTHAL, ESQ.
                            MATTHEW P. WEINSHALL, ESQ.
                            CHRISTINA H. MARTINEZ, ESQ.
                            PODHURST ORSECK, P.A.
                            One SE 3rd Avenue
                            Suite 2300
                            Miami, Florida 33131


                *STENOGRAPHICALLY REPORTED BY:*
        *MARY ANN CASALE, RDR, FPR-C, CLR, CSR-IL*
                *Official Court Reporter*
              *United States District Court*
               *Southern District of Florida*
                *400 North Miami Avenue*
                  *Miami, Florida 33128*
             *MaryAnn_Casale@flsd.uscourts.gov*


STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

625

1

2

<u>I N D E X</u>

3

| <u>WITNESS</u> | <u>PAGE</u> |
|---|---|
| RISHI KUKREJA | |
| Cross-Examination by Mr. Mazzola | 626,743 |
| Redirect Examination by Mr. Rosenthal | 779 |
| | |
| LINA OCHOA | |
| Direct Examination by Ms. Martinez | 792 |
| Cross-Examination by Mr. Mazzola | 818 |
| Redirect Examination by Ms. Martinez | 894 |

4

5

6

7

8

9

<u>PLAINTIFF'S EXHIBITS</u>

10

| <u>EXHIBIT</u> | <u>RECEIVED</u> |
|---|---|
| P255 | 718 |
| P283 | 728 |

11

12

13

<u>DEFENDANT'S EXHIBITS</u>

14

| <u>EXHIBIT</u> | <u>RECEIVED</u> |
|---|---|
| 308 | 739 |
| 309 | 752 |
| 310 | 859 |

15

16

17

18

<u>JOINT EXHIBITS</u>

19

| <u>EXHIBIT</u> | <u>RECEIVED</u> |
|---|---|
| 79 | 898 |
| 153 | 854 |

20

21

22

23

24

25

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

 1              (Call to the Order of the Court.)

 2              (Jury enters at 9:21 a.m.)

 3         THE COURT:  Mr. Kukreja, if you can take the

 4   witness stand.  I'll remind you're still under oath from

 5   Monday.

 6                    RISHI KUKREJA,

 7   called as a witness herein, having been previously duly

 8   sworn, was examined and testified further as follows:

 9              CROSS-EXAMINATION (Continued)

10   BY MR. MAZZOLA:

11        Q.   Good morning, Mr. Kukreja.

12        A.   Good morning.

13        Q.   I don't know if -- the Judge did not have an

14   opportunity yesterday to admonish you, but I know that --

15   last night you didn't do anything to -- as far as looking

16   at documents about this case; isn't that correct?

17        A.   I did not.

18        Q.   And I would also assume, as we go forward with

19   this morning, that you didn't speak to any of your

20   employees about this case?

21        A.   I did not.

22        Q.   Because you know you weren't supposed to do

23   that.

24              And I know Mr. Rosenthal would have told you

25   that, right?

1      A.    He did not tell me anything, but --

2            MR. ROSENTHAL:  Objection, your Honor; calls

3    for attorney-client privilege.

4            THE COURT:  Sustained.

5    BY MR. MAZZOLA:

6      Q.    Okay.  So yesterday we were talking about your

7    business and you were talking generally about how it was

8    running.

9            And I do recall you saying that 2023 has been a

10   challenging year; is that correct?

11     A.    That is correct.

12     Q.    Why was it a challenging year?  Can you talk a

13   little bit about that?

14     A.    In 2022, 2021, as a result of COVID, a lot of

15   U.S. customers ordered a lot of parts to stock up their

16   warehouses.  So there's a lot of inventory in the United

17   States which is being held by our customers.  And as

18   they're depleting that inventory, they're not necessarily

19   placing new orders.  And so there has been a reduction in

20   business.

21     Q.    So business has been down, right?

22     A.    That is correct.

23     Q.    Now, here's the question I have relating to

24   that.  So we know in 2023 business has been down.

25            So business wasn't growing, right?

CROSS-EXAMINATION OF RISHI KUKREJA

1      A.    So the Circuitronix business specific to

2   printed circuit boards from China has not been growing.

3      Q.    So your business has been down this year?

4      A.    Yes.

5      Q.    So here's the question I have.  Because you

6   testified yesterday that you have a thousand employees.

7            Remember we talked about that?

8      A.    That is correct.

9      Q.    And do you recall giving sworn testimony in

10  this case during another setting, and during that sworn

11  testimony I believe your testimony was that you had

12  around 300, 315 employees worldwide.

13           So if business was down this year, can you

14  explain to me how it was that you had 300 employees and

15  now you have a thousand employees?

16           MR. ROSENTHAL:  Can I just get a page and line,

17  Mr. Mazzola?

18           THE COURT:  Yes.  What page, line, date?

19           MR. MAZZOLA:  That was on January 13th, 2023.

20           THE COURT:  Page?

21           MR. MAZZOLA:  A transcript --

22           THE COURT:  Just tell us the page and line.

23           MR. MAZZOLA:  And the page is 176, Line 23.

24           MR. ROSENTHAL:  Thank you.

25

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

CROSS-EXAMINATION OF RISHI KUKREJA

| | |
|---|---|
| 1 | BY MR. MAZZOLA: |
| 2 | Q.    And I can read it to you. |
| 3 | A.    Or I can answer your question? |
| 4 | Q.    Okay. |
| 5 | A.    So, as I mentioned, I did specify that the |
| 6 | Circuitronix business relative to printed circuit boards |
| 7 | from China is down.  I did not say Circuitronix's |
| 8 | business from its Mexican factories is down.  And -- |
| 9 | Q.    Did you distinguish that when you [sic] asked |
| 10 | those questions in January of 2023? |
| 11 | A.    I mean, I cannot recollect.  I may not have. |
| 12 | Q.    So then what I'm hearing then, and what I think |
| 13 | everybody else in this room is hearing, is your testimony |
| 14 | today is that, although your business from China was |
| 15 | down, your Mexican business is up, and from January |
| 16 | 2023 -- so in nine months, you've acquired 700 more |
| 17 | employees? |
| 18 | A.    That's not correct. |
| 19 | Q.    How is that not correct?  You said yesterday |
| 20 | you had a thousand employees. |
| 21 | A.    Yes. |
| 22 | Q.    In January, you said you had 300 employees. |
| 23 | And now you're -- so where did the 700 come from?  They |
| 24 | came... |
| 25 | A.    So now I would need a little bit of help as to |

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    what the specific question was in 2023 -- in January

2    2023.  But just to add, in the last three to four months,

3    we actually built another factory in Mexico, and we've

4    recruited a lot of people for that factory.  So things

5    are a little -- things are not static.  They are dynamic.

6    They move.

7         Q.    And then these people in Mexico, realize they

8    work for Wattera, right?

9         A.    So they're different companies.  We've got one

10   maquila which is owned by Circuitronix and Chrome (ph.)

11   as a partnership.  We've got one maquila which is owned

12   by Circuitronix and Wattera.  And we've got one maquila

13   which is owned by Circuitronix MC USA.  So they're

14   different organizations.

15        Q.    Do you want me to read you what you said?

16        A.    Sure, if you'd like --

17        Q.    Line 23:  And how many employees does the

18   company have?

19              Answer:  In Florida?

20              Question:  Yes.

21              In Florida we have 55 employees.

22              And what about around the world?

23              MR. MAZZOLA:  Line 2 on Page 177.

24   BY MR. MAZZOLA:

25        Q.    Around the world we have 300, 315 employees.

1          Do you recall those questions and those

2    answers?

3       A.    Sure, that was -- yes, I do.

4       Q.    And so your explanation is that over the last

5    eight months you've acquired an additional 700 employees

6    through your Mexican operations.

7          Is that your answer?

8       A.    Nope.  My answer is maybe at that point in time

9    I was not including one of the operations, one of the

10   partnerships in the answer to the question.

11         Because we have not acquired 700 employees in

12   the last -- if I have to -- the latest maquila is MC USA.

13   and we've added around 315 employees to that operation.

14      Q.    So back in January when you were asked those

15   questions, did you have 300 to 315 employees?  I'm not

16   following you, Mr. Kukreja.

17      A.    As you can see, we have a lot more employees

18   than 300, 315 employees within the different partnerships

19   that Circuitronix is involved with.  And that is what I'm

20   representing as I sit here today.

21      Q.    And in January you actually had more than 300,

22   315 employees.

23         Is that what you're saying?

24      A.    If the question was about all Circuitronix

25   partnerships, yes, we had more than 300, 315 employees.

1      Q.    Okay.  So back then you were asked this

2   question.  And, remember, you were asked this question by

3   your lawyer.

4           Did you remember that?

5      A.    I cannot recollect.  If you refresh my memory

6   as to what the exact question was.

7      Q.    Well, the direct examination started on

8   Page 174 by a gentleman named Mr. Cole.

9           You know who he is, right?

10     A.    Yes.

11     Q.    That was Chauncey Cole, right?

12     A.    That's correct.

13     Q.    And he was your attorney, right?

14     A.    That's right.

15     Q.    And he starts off on Line 15:  Good afternoon,

16   Mr. Kukreja.  How are you, sir?

17          And that's where his direct examination began?

18     A.    Sure.

19     Q.    And then by Line -- by Page 176, Line 21, he

20   asks you:

21          Question:  All right.  And where is

22   Circuitronix headquartered today?

23          He asks you that question.  And you told him

24   here in Florida up 95 in Ft. Lauderdale.

25          Do you remember that?

1      A.    That sounds correct.

2      Q.    And then he asked you how many employees does

3    the company have.  He said in Florida.

4            You said 55; is that correct?

5      A.    Sounds correct.

6      Q.    And then he said:  Around the world?

7            And you said:  Around the world, we have --

8            MR. MAZZOLA:  This is Page 177, Line 3.

9    BY MR. MAZZOLA:

10     Q.    Around the world, we have around 300, 315

11   employees?

12     A.    Sure.

13     Q.    So what I'm trying to understand -- because it

14   sounds to me like you're saying, well, it really depends

15   on what the question was?  Is that what you're saying?

16     A.    So Circuitronix --

17     Q.    Is that what you're saying, it depends on what

18   the question was?

19     A.    So Circuitronix manufactures printed circuit

20   boards.  It manufactures plastic injection molded parts.

21   It manufactures decorated plastic parts.  It manufactures

22   injection molding tools.  It manufactures -- so it

23   depends which part of the business you're talking about.

24            And I may have interpreted that it was related

25   to the printed circuit board side of the business.

CROSS-EXAMINATION OF RISHI KUKREJA

1      Q.     So -- go ahead.  Go ahead.

2      A.     But when I answered the question to you, I may

3  have answered for all the Circuitronix companies.

4      Q.     Okay.  So when you were asked the question back

5  in January, you thought they were just talking about

6  Circuitronix PCP.

7            Is that what you're saying?

8            MR. ROSENTHAL:  Objection; misstates testimony.

9            THE COURT:  Overruled.

10           THE WITNESS:  I cannot recollect what I thought

11 because it was quite a few months ago.  But if I have to

12 try to make sense out of it, that would be a good answer.

13 That's right.

14 BY MR. MAZZOLA:

15     Q.     And when you were asked a similar question --

16 maybe it was yesterday, maybe it was the day before --

17 you understood it to mean everything, and so you answered

18 a thousand employees; is that correct?

19     A.     That's right.

20     Q.     Okay.  I want to pull up another -- a document

21 that we used yesterday and it was used by your lawyers.

22           MR. MAZZOLA:  It's DU3, Mr. Rosenthal.

23           THE COURT:  You want it on your computer?

24           MR. MAZZOLA:  It's been introduced.

25           THE COURT:  I know, but it is --

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1        MR. MAZZOLA:  Yeah, they're going to pop it up,

2  Judge.  Are we using the redacted one?

3        (No response.)

4  BY MR. MAZZOLA:

5    Q.    You may recall, this was the first document

6  that Mr. Rosenthal used with you.

7    A.    I cannot see the document.

8    Q.    Yeah, we're going to put it up in a second.

9        So the document is up before you.  And so in

10 this document -- do you know about the Chinese concept of

11 saving face?

12   A.    I think it's a global concept.

13   Q.    Okay.  So it's the idea where someone blames

14 themselves so they don't have to blame another person?

15   A.    Not necessarily.

16   Q.    Did you understand, looking at this email, that

17 this is what Tracy was trying to do?

18   A.    I didn't need to read between the lines.  Tracy

19 told me what she was trying to do.

20   Q.    You've known Tracy for a long time, right?

21   A.    Long time.

22   Q.    And you know her as an honest person, right?

23   A.    She's an honest person who works within -- at

24 the directions of what her managers ask her to do.

25   Q.    And she's a modest person, right?

1          A.    She's a modest person.

2          Q.    And she's a humble person, right?

3          A.    She's a humble person.

4          Q.    And she's a kind person, right?

5          A.    She's a kind person.

6          Q.    And so in this email that was written to you,

7   you didn't understand her to -- trying to be humble and

8   kind and to try to take some of the blame for, really,

9   something that wasn't her fault?

10         A.    She told me -- This was not the first time we

11  spoke about this issue.  In March of 2017, Tracy and I

12  used to speak seven days a week, Saturday and Sunday

13  included.  She would tell me about any and every

14  situation which was going on, and this was just one of

15  the situations.  So I didn't need to read between the

16  lines what she was trying to convey.  She had conveyed

17  what she conveyed to me.

18              And in addition to this email, there are

19  several other emails like this.

20         Q.    Maybe we'll look at those.  Let's take this one

21  down.

22              But you will agree that Tracy is a kind,

23  honest, and humble person, right?

24         A.    All of the above.

25         Q.    Do you recall talking about lies when we took

1    your deposition?

2         A.    I cannot -- I recall some of it.

3               It was about white lies to customers?

4         Q.    Mm-hmm.

5         A.    Yeah, I recall that this -- I recollect that.

6         Q.    And do you recall that --

7               MR. MAZZOLA:  And we're looking at Page 39 of

8    Mr. Kukreja's deposition.

9    BY MR. MAZZOLA:

10        Q.    Do you recall being asked at Page 39 of your

11   deposition, Line 6 --

12              MR. ROSENTHAL:  Your Honor, may I just object

13   before Mr. Mazzola finishes his question.  If it's

14   impeachment, it's improper.  There's no foundation.

15   BY MR. MAZZOLA:

16        Q.    Let me ask you this question then.

17              Isn't it true that you've acknowledged making

18   misleading statements to customers?

19        A.    We have made misleading statements to customers

20   to cover up misleading statements Benlida made to us.

21   Shipment is on the truck to Hong Kong where the shipment

22   has not even left China.  And so we take that

23   information, we pass that information to the customer.

24              In a couple of days when the shipment does not

25   arrive in Hong Kong, we realize that they misrepresented

1   to us.  They misrepresented to us, and now we --

2   unfortunately, we have said something to the customer

3   which we should not have in the first place and now we

4   have to sort of continue and defend that position we

5   took.

6        Q.   Do you recall saying every sales organization

7   has to lie to sugarcoat?

8        A.   I -- I stand behind that statement.  Every

9   sales -- every organization, to a certain degree, needs

10  to sugarcoat feedback being given to the customer.

11       Q.   Would it surprise you to know that that isn't

12  really your testimony on that day, June 1, 2023?  Do you

13  want me to read it back to you?

14       A.   Sure.

15       Q.   On Page 39, you were asked:  Did you ever lie

16  to any of your upstream customers?

17            And you answered:  Every sales organization has

18  to lie to sugarcoat.  When are these parts going to get

19  delivered?  They are in route to Hong Kong.  They are

20  stuck in China customers.  They are in the last stages of

21  production.  So they may have been white lies like that,

22  yes.

23            Question:  Misleading?

24            Answer:  Yes.

25            Question:  To customers?

1      Answer:  It's part of sales.  There is no

2  organization which can say they did not sugarcoat stuff

3  when presenting information to a customer.

4      A.   I just said the same thing.

5      Q.   So let me ask you this question.

6           Are you sugarcoating anything today or

7  yesterday?

8      A.   So I do not need to sugarcoat anything today.

9  Numbers speak for themselves.  Emails speak for

10  themselves.  So I'm not relying -- when I'm here today,

11  I'm not -- I'm obviously asking the jury to believe what

12  I'm saying, but I'm asking them to just look at the

13  numbers and what the other side has said.

14      Q.   So today you don't need to sugarcoat, right?

15  Is that what you're saying?

16      A.   I do not.

17      Q.   Because there are emails and numbers.

18           That's why you don't need to sugarcoat?

19      A.   Yes.  It's -- it was purely transactional.

20  This -- they were just based on numbers, that's correct.

21      Q.   There's no sugarcoating, there's no misleading

22  going on, right?

23      A.   So there is no misleading going on, but I do

24  think that this is the right opportunity for me to

25  correct a mistake, which I found myself in my testimony

1    yesterday.

2             The leadtime penalty number of 2.99 --

3        Q.    There's no question posed right now, okay,

4    so --

5             THE COURT:  Hold on.  Let him finish his

6    answer.

7             MR. MAZZOLA:  Okay.

8             THE WITNESS:  2.99.  So basically on a chart we

9    had the leadtime penalty -- total leadtime penalty, and

10   the leadtime penalty for the orders we spoke about.  The

11   2.99 represents without -- the waivers it has to be

12   reduced by around $500,000.  I picked up the wrong number

13   on the chart.  And so at some point in time, we were

14   going to --

15       Q.    I don't know that, Mr. Kukreja.

16       A.    Sure.  But --

17       Q.    Okay.

18       A.    I caught that, and I didn't want you to go back

19   and say that I misled anybody.

20       Q.    Okay.

21       A.    It was a mistake which was made.

22       Q.    Okay.  Perhaps that will get discussed later

23   on.

24             But let me ask you this question because about

25   ten minutes ago I asked you, did you look at anything

1    last night, talk to anything -- anyone last night, and

2    you answered no?

3         A.   That's correct.

4         Q.   So I guess lying in bed last night you just

5    remembered those numbers; is that correct?

6         A.   So what happened is --

7         Q.   Was that correct?

8         A.   That is correct.

9         Q.   So lying in bed you just remembered those

10   numbers?

11        A.   Not by lying in bed.  I just had -- I had my

12   emails with me.  I was answering my emails.  And there

13   was a document on my laptop, and I saw the document.

14        Q.   Okay.  And that was the document that was used

15   yesterday?

16        A.   No.

17        Q.   It was another document, right?

18        A.   It was an email -- again, it's -- it's a prior

19   email which the experts had sent and it was open.

20        Q.   I don't understand.  So there is going to be an

21   expert in this case I think.  I don't know.

22             So did you just say last night you were looking

23   at emails that the experts had sent?

24        A.   No.  So --

25        Q.   What did you say?  I think you just said that.

CROSS-EXAMINATION OF RISHI KUKREJA

1    A.    Okay.  Let me -- so last night I was answering

2  my work emails, and one of the emails which was open was

3  a prior email which I had received from an expert.

4    Q.    In this case?

5    A.    In this case.

6    Q.    Okay.

7    A.    And I saw that number out there.  And when I

8  saw that number, I realized that there was a mistake

9  which was made.

10   Q.    So last night you were looking at your emails

11 and just by chance there was another email that was

12 opened that came from your expert and you looked at that

13 expert and you said, Gosh, the numbers I had yesterday

14 were wrong because they don't match what the expert's

15 going to say when he gets on the witness stand in a

16 couple of days.

17         Is that what you just said?

18   A.    No.

19   Q.    Is that what you just said?

20   A.    No, I realized there was a mistake which was

21 made, so the way things happened yesterday was that I

22 read that number from a pie chart which my attorneys had

23 shown.  And when I saw that the number was different, I

24 realized that I had to at some point correct it.

25   Q.    Okay.  Mr. Kukreja, I was up late last night,

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    and I made this binder of some questions that we want to

2    ask.

3              So before we go down that road, would you

4    please tell everyone today if you made any other mistakes

5    yesterday that you want to correct?

6        A.    None.

7        Q.    That was it?  So everything you said yesterday

8    was true, correct, and accurate?

9        A.    That's correct.

10       Q.    And everything you said the day before was

11   true, correct, and accurate?

12       A.    That is correct.

13       Q.    So if I ask you a question about something you

14   said -- what's today?  Wednesday -- on Monday, you're not

15   going to say, it wasn't correct; is that correct?

16       A.    I mean --

17       Q.    You'd have to wait for the question?

18       A.    I need to wait for the question.

19       Q.    And the same thing goes for your testimony from

20   yesterday?

21       A.    Yeah.

22       Q.    Okay.  Deal?

23       A.    What?

24       Q.    Is that a deal?  You're not going to say

25   something else is incorrect from yesterday's testimony or

1   the day before?

2       A.   Well, what I'm telling you is if I have made a

3   mistake, I'll be the first one to admit it.

4       Q.   Okay.  Do you think Tracy and the team at

5   Benlida understand and read English properly?

6       A.   Tracy does, but I cannot say the same thing

7   about the entire team.

8       Q.   Now, you've been doing business with them for

9   years, right?

10      A.   That is correct.

11      Q.   And you've been doing business in China for

12  years; is that correct?

13      A.   That is correct.

14      Q.   So you've traveled back and forth to China over

15  a hundred times, I can imagine, right?

16      A.   That is correct.

17      Q.   And so you know the culture very well?

18      A.   I do.

19      Q.   And you know that when you're doing business

20  across borders, that sometimes there might be a language

21  difficulty, right?

22      A.   That is correct.

23      Q.   And so you're careful with the communications;

24  is that correct?

25      A.   I'm careful with the communications whether I'm

CROSS-EXAMINATION OF RISHI KUKREJA

1  communicating with somebody in China or whether I'm

2  communicating with somebody out here.

3       Q.     And do you understand that when you're doing

4  cross-border business with people that don't have English

5  as their native language, that it's important to be

6  respectful of them; is that correct?

7       A.     (No response.)

8       Q.     Is that correct?

9       A.     Irrespective of whether English is the primary

10  language, I think --

11       Q.     About the language, right?

12       A.     I believe everybody should be respectful to

13  each other.

14       Q.     So isn't it true that you made a comment that

15  anybody who can speak English will decide or

16  understanding English will decide, that is besides the

17  point?  Do you recall making such a statement?

18       A.     I cannot recollect.

19              What context?

20       Q.     Well, it was asked in your deposition.  It was

21  on Page 32 of the June 2023 deposition.  And we were

22  talking about a price increase at Page 32.

23       A.     Now I'm able to recollect.

24       Q.     Okay.  The question was on Line 4:  So that was

25  your understanding of the price increase?

1          And you answered:  That was not my

2   understanding.  This is the minutes from the meeting.

3          You were referring to meeting minutes that we

4   talked about yesterday.

5          You got the minutes of meeting, right?

6          And my answer was, as a question:  It's not for

7   me to decide.

8          And then you said:  Yes.  Anybody who can speak

9   English will decide, anybody that can understand English

10  will decide.  That is besides the point.

11         What did you mean by that statement?

12     A.   Could you -- could you just repeat that because

13  that doesn't make sense to me, actually.

14         MR. ROSENTHAL:  Could we perhaps show the

15  witness on the screen so he can see it?

16         MR. MAZZOLA:  I can.  Do we have a clean copy

17  of this?

18         THE COURT:  Just show it to him.

19         MR. MAZZOLA:  May I show him my marked up

20  version, Judge?

21         THE COURT:  Sure.

22         MR. MAZZOLA:  May I approach?

23  BY MR. MAZZOLA:

24     Q.   It's highlighted, Mr. Kukreja, with red magic

25  marker around it, so it should be easy for you to see the

1   context of it.  I'm -- and I beg your pardon.  We're on

2   Page 32 and it starts at Line -- you can read it.

3           Do you want to read it out loud?

4       A.   (No response.)

5       Q.   Are you reading it, Mr. Kukreja?

6       A.   Yes, I am.

7       Q.   What did you mean when you said:  Anybody who

8   can read English and understand English is going to

9   decide?  What did you mean by that?

10      A.   May I just...

11          Yes, so I meant that the language was

12  completely clear and anybody who understood English or

13  comprehended English well would be able to agree with my

14  interpretation of the language of what was written.

15      Q.   Did you mean only people who have English as

16  their native language will be able to understand and

17  decide?  Is that what you meant?

18      A.   English is not my native language.  I'm able to

19  under- --

20      Q.   That wasn't the question I asked.

21          Did you mean only people that have English as

22  their native language will be able to understand and

23  decide?  Is that what you meant?

24      A.   No.  And the reason is English is not my native

25  language.  I could understand.

1      Q.    So the answer is no, that's not what you meant?

2      A.    That's not what I meant.

3            MR. MAZZOLA:  May I approach, Judge.

4            THE COURT:  Yes.

5   BY MR. MAZZOLA:

6      Q.    That wasn't the only time you talked about the

7   ability to understand English.  And to save a little

8   time, I'm going to read from your transcript again.

9            Is that okay, Mr. Kukreja?

10     A.    As long as you can give me the entire context.

11     Q.    I will give you the entire context.  I will

12  start at Page 35 -- I beg your pardon.  I'll start at

13  Page 34, Line 23:  So when you say yes, I think you said,

14  but because it shows in the calculations, what do you

15  mean by that?

16           Answer:  As I explained to you, they do not

17  follow the guidelines in the December 2016 meeting.

18           As you understand those guidelines, as you.

19           Answer:  As any English speaking person should

20  understand.

21           What did you mean by that?

22     A.    Anybody who had a grasp of the English language

23  would be able to understand what was written.

24     Q.    Were you suggesting Tracy doesn't have a grasp

25  of the English language?

1      A.    Tracy has a grasp of English language, but

2  Tracy on several occasions when I asked Tracy whether she

3  actually agreed with some of the things she was writing,

4  she did tell me that she was writing on the instructions

5  of Mr. Huang, and that's what she was doing.

6      Q.    Are you suggesting that other people she worked

7  with didn't have a grasp of the English language?

8      A.    Most of them did not.

9      Q.    Okay.  But you have a grasp of the English

10 language, right?

11     A.    I believe so.

12     Q.    Okay.  And are you also saying that only people

13 that have a grasp of the English language should decide

14 this issue?  Is that what you're saying?

15     A.    The contract is written in English so it has to

16 be -- it has to be interpreted as it's written in that

17 language.

18     Q.    No one's challenging that.  It is an English

19 language contract.  I just wanted to understand the

20 context of the statements you made.

21           I have another question for you.

22     A.    Sure.

23     Q.    And this relates to the video we watched

24 yesterday.

25           Do you remember the video?

CROSS-EXAMINATION OF RISHI KUKREJA

1    A.    Yes, I do.

2    Q.    This was a video that was on your website that

3  we ran for the jury yesterday.

4          Do you remember that?

5    A.    Yes.

6    Q.    And you were talking about -- you said that you

7  saw Roger in the video.

8          Do you remember saying that?

9    A.    Yes.

10   Q.    And you said he was dressed up like an engineer

11  in a factory suit.

12          Do you remember saying that?

13   A.    Not in a factory suit.  He was working on the

14  factory floor.

15   Q.    Okay.  As an engineer, something to that

16  effect?

17   A.    As a technician or something of that sort,

18  yeah.

19   Q.    Are you sure it was Roger?

20   A.    I believe it was Roger.

21   Q.    You're sure of that?

22   A.    I'm not 100 percent sure, but I believe that it

23  was Roger.

24   Q.    You're sure?

25          MR. ROSENTHAL:  Your Honor, objection.

1         THE COURT:  Sustained.

2   BY MR. MAZZOLA:

3         Q.   Do you think all people from China look alike?

4              MR. ROSENTHAL:  Objection.

5              THE COURT:  Overruled.

6   BY MR. MAZZOLA:

7         Q.   Do you think that?

8         A.   I don't think that, that all people from China

9   look alike; but it's possible to get confused between two

10  people from any place, China, Japan, any place, India,

11  any place.

12        Q.   But you were very clear yesterday.  You said

13  this was a video that was done with Benlida, and there's

14  Roger in the video.  You were very clear when you said

15  that.

16        A.   So --

17        Q.   I don't mean to be difficult or rude, but

18  that's what you said.

19        A.   That's correct.  And I was not trying to be

20  rude when I said Roger is in video.  And he's not one

21  Benlida person in that video.  There are 50 Benlida

22  people in that video.  So if I made a mistake and that

23  was not Roger, there are 50 other Benlida personnel in

24  that video, not just one person.

25        Q.   Let's -- I'm going to show you something, okay?

1          Your lawyer in opening statement used a

2     PowerPoint.

3          Do you remember that?

4     A.    Yes.

5     Q.    And I'm pretty certain -- I beg your pardon.

6          Your lawyer yesterday during opening statement

7     used a PowerPoint, and he put that up on the screens

8     everywhere and we watched the PowerPoint?

9     A.    Yes.

10    Q.    And I'm pretty sure your lawyer also used that

11    PowerPoint with you during your direct examination; is

12    that correct?

13    A.    I think --

14    Q.    There might have been one or two parts of it?

15    A.    Yes.

16    Q.    Now, if your lawyer put that PowerPoint up,

17    right, we've got to assume everything in that PowerPoint

18    is correct and accurate, right?

19    A.    I would think so, yes.

20    Q.    I assume you saw it before he did it?

21    A.    (No response.)

22    Q.    You don't have to tell me.

23          MR. ROSENTHAL:  Your Honor --

24    BY MR. MAZZOLA:

25    Q.    But if he put it up, we can assume it's correct

 1   and accurate; is that correct?

 2        A.   I think that there's a pie chart on that which

 3   is not correct which I just spoke about earlier.

 4        Q.   Okay.  Other than the pie chart, you saw it,

 5   was everything correct?

 6        A.   Based upon what I could see, it looked correct.

 7        Q.   I'm going to use the ELMO.

 8             Now, we talked about this yesterday.  We talked

 9   about CTX being headquartered in Fort Lauderdale.  After

10   we looked at the video yesterday, is that still true and

11   is that still correct?

12        A.   It's still correct.  The headquarters are where

13   I sit.

14        Q.   I beg your pardon?

15        A.   The headquarters are -- is where I sit.

16        Q.   Okay.  It's where you sit?

17        A.   Where I sit.

18        Q.   Do you ever sit in Hong Kong?

19        A.   I did in 2012.

20        Q.   Okay.  You did?

21        A.   (Nodding.)

22        Q.   How long did you sit in Hong Kong in 2012 for?

23        A.   Three months -- 2013 for two to three months.

24        Q.   So when you're sitting in Hong Kong, the

25   headquarters of the company is in Hong Kong?

1    A.    The -- in today's world, the headquarters is

2    where the CEO sits.

3    Q.    Okay.  And if you're sitting in Shenzhen --

4    remember we talked about that yesterday, Circuitronix

5    Shenzhen?

6    A.    Yes.

7    Q.    Okay.  If you're sitting in Shenzhen, the

8    headquarters is in Shenzhen, right?

9    A.    No.  Hong Kong Circuitronix LLC's headquarter,

10   you need to understand the different companies.

11   Q.    I'm asking you a question.

12         The question was:  If you're sitting in

13   Shenzhen, is that where CTX is headquartered?  Because

14   you said earlier wherever I sit is the headquarters.

15   A.    Wherever I sit is the headquarters for

16   Circuitronix LLC.

17   Q.    Okay.  So if you're sitting in Shenzhen, that's

18   the headquarters of Circuitronix LLC.

19         Is that what you're saying?

20   A.    Yes.  If I sit permanently out there, that

21   would be the headquarters of Circuitronix LLC.

22   Q.    Okay.  So let's look at this document.  Your

23   lawyer used this yesterday.

24         Do you see this document?

25   A.    Yes, I do.

CROSS-EXAMINATION OF RISHI KUKREJA

1    Q.    Now, this is the illustration of the business

2    process.

3          Do you see that?

4    A.    Yes.

5    Q.    And it shows CTX sends purchase orders to

6    Benlida, right?

7    A.    That's correct.

8    Q.    And that's correct.

9          Is that your testimony?

10   A.    That's correct.  The purchase orders can go

11   from CTX there or it can go from the back office in

12   India, either of the two.

13   Q.    Okay.  So what's true then is the purchase

14   orders come from America or do they come from India?

15   A.    It could happen both ways.

16   Q.    So this is not true then, is what you're

17   saying?

18   A.    No, it's true.

19   Q.    If it can happen both ways, how is that true?

20   A.    Because it -- it can happen that way, too.

21   Q.    Why didn't you have another line from India?

22         MR. ROSENTHAL:  Your Honor, Mr. Kukreja didn't

23   make the PowerPoint presentation.

24         THE COURT:  Overruled.

25

BY MR. MAZZOLA:

  Q.   Why isn't there another line from India?

  A.   It's not really required because at the end of
the day, the legal entity which was sending the purchase
order is -- even if it comes from the United States, the
legal entity which was sending it is Circuitronix LLC.

  Q.   Okay.  So if it says -- if the purchase order
says Circuitronix LLC, you know in the upper left-hand
corner under the green writing, if it says that, it's
coming from Circuitronix LLC?  Is that what you're
saying?

  A.   For the purpose of this illustration, yes --

  Q.   Okay.  So let's --

       (Simultaneous crosstalk.)

       THE WITNESS:  -- what we're trying to achieve
with this illustration.

BY MR. MAZZOLA:

  Q.   And they don't come from India.

       Is that what you're saying?

  A.   No.  I didn't say that.  I said it comes from
India, too.

  Q.   It comes from India, too?

  A.   But with the Circuitronix LLC -- on behalf of
Circuitronix LLC.  The purchase order says Circuitronix
LLC.  It says it -- the address on the purchase order is

| | |
|---|---|
| 1 | 3131 Southwest 42nd Street, Fort Lauderdale, Florida, |
| 2 | 33312, even on purchase orders which come from India. |
| 3 | Q.   Let me ask you this question. |
| 4 | If the purchase order comes from India and it's |
| 5 | sent from the Circuitronix.co.in, I-N, website or email |
| 6 | address, that would be a communication that would be |
| 7 | authorized by you; is that correct? |
| 8 | A.   It's authorized by me through the business |
| 9 | contract we have between Circuitronix LLC and |
| 10 | Circuitronix India to perform certain operations for us. |
| 11 | Q.   So if the email comes from Circuitronix India, |
| 12 | irrespective of what the business arrangement is -- |
| 13 | A.   Yes. |
| 14 | Q.   -- it's an email that's sent by someone |
| 15 | authorized by Circuitronix; is that correct? |
| 16 | A.   Yes. |
| 17 | Q.   Let's look at this document over here. |
| 18 | MR. MAZZOLA:  Can you put it up on the screen? |
| 19 | THE COURT:  What exhibit number is this? |
| 20 | MR. MAZZOLA:  It's going to get a new one, |
| 21 | Judge.  P305. |
| 22 | THE COURT:  What is it? |
| 23 | MR. ROSENTHAL:  Yeah, what is it? |
| 24 | MR. MAZZOLA:  It's a -- |
| 25 | THE COURT:  Did you give them a copy of it? |

1          MR. ROSENTHAL:  So, your Honor, this has not

2   been listed as an exhibit.  This is part of a -- they've

3   listed Mr. Kukreja as a witness, so I understand.  But if

4   this is not on the exhibit list, we object for that

5   reason.

6          THE COURT:  What is it?

7          MR. MAZZOLA:  It's a statement by a party

8   opponent.  It's an email sent by Circuitronix India.

9   He's just testified that Circuitronix India is

10  authorized --

11         THE COURT:  But why wasn't it on your exhibit

12  list?

13         MR. MAZZOLA:  Because we didn't -- well,

14  it's -- at this point, it relates to the impeachment in

15  connection with their statement that all purchase orders

16  came from the United States.

17         THE COURT:  What statement that all the

18  purchase orders came from the United States?  His opening

19  statement, which is not in evidence?

20         MR. MAZZOLA:  Their PowerPoint statement.

21         THE COURT:  Okay.

22         MR. MAZZOLA:  May I go ahead?

23         THE COURT:  Go ahead.  Go ahead.

24  BY MR. MAZZOLA:

25     Q.   So in front of you is an email, Mr. Kukreja.

CROSS-EXAMINATION OF RISHI KUKREJA

1          Do you see this email?

2     A.   I'm seeing it.

3          Are you asking have I seen it?

4     Q.   Mm-hmm.

5     A.   I'm seeing it for the first time.

6     Q.   Okay.  But this is an email sent from

7 Circuitronix India; is that correct?

8     A.   Yes.

9     Q.   And it's addressed to a person named Alice.

10         Do you know who that is?

11    A.   I met Alice.

12    Q.   And Tracy is copied on it as well, right?

13    A.   That's right.

14    Q.   And so this would be an email transmitting a

15 purchase order; is that correct?

16    A.   That's right.

17    Q.   And it's signed by a person named Hemant Joshi.

18         Do you know who that person is?

19    A.   I do not.

20    Q.   Do you know who Brandon Spryer (ph.) is?

21    A.   Yes.

22    Q.   He's a salesman here in the U.S., right?

23    A.   He was.  He -- his last job was not in the

24 United States.

25    Q.   Oh, he was working in India?

1      A.   No.  In Germany.

2      Q.   In Germany.

3           What's in Germany?

4      A.   We have an office in Germany -- we had an

5  office in Germany, in Cologne, Germany.

6      Q.   So that's CTX Germany?

7      A.   That's CTX Germany.

8      Q.   So you've got CTX Shenzhen, right?

9      A.   We've got CTX Tokyo.  We've got CTX Hong Kong.

10  We've got CTX Shenzhen.  We've got CTX Philippines.

11  We've got CTX India.  We've got CTX Mexico.  We've got

12  CTX-USA, CTX Canada.  We've got CTX Germany, CTX

13  Netherlands.

14      Q.   Okay.

15           MR. MAZZOLA:  Let's scroll down through this to

16  the next page.

17  BY MR. MAZZOLA:

18      Q.   And this is a purchase order, right?

19      A.   That's correct.

20      Q.   Now, it says from Circuitronix.

21           Do you see that?

22      A.   Yes.

23      Q.   LLC.  It's addressed to Benlida.  And then it

24  says shipped to CTX address Circuitronix LLC in Hong

25  Kong, right?

1     A.    Yes.

2     Q.    And when these go to Hong Kong, you talked

3 about that yesterday, they go to either CTX Hong Kong's

4 warehouse --

5          Is that correct?

6     A.    Yes.  Or --

7     Q.    I'll get there.

8          (Continuing) -- or a third-party vendor

9 warehouse; is that correct?

10     A.    That's correct.

11     Q.    And when they go to CTX Hong Kong, the actual

12 warehouse for CTX Hong Kong, CTX Hong Kong employees log

13 it in, they check it, and they enter it into the Sage

14 system and do all that good stuff in connection with

15 determining leadtime penalties; is that correct?

16     A.    That's correct.

17     Q.    But when it goes to the third-party warehouse,

18 the third-party warehouse sends a notification to CTX

19 Hong Kong, the people sitting at CTX Hong Kong, and they

20 enter it into the Sage system; is that correct?

21     A.    That's correct.

22     Q.    So this is an example of the purchase order.

23          Now, what about CTX Shenzhen?  I think you

24 testified yesterday that they sometimes issue purchase

25 orders; is that correct?

 1        A.    They do.

 2        Q.    Okay.  And when CTX Shenzhen issues purchase

 3   orders, those purchase orders also come from India; isn't

 4   that correct?

 5        A.    They may or may not.

 6        Q.    Do you want to see an example of when they do?

 7        A.    No.  I'm saying that -- I'm agreeing with you

 8   that at times they do.

 9        Q.    Okay.  So at times Circuitronix Shenzhen

10   purchase orders come from India?

11        A.    That's right.

12        Q.    Or they come from Shenzhen?

13        A.    Yes.

14        Q.    On a percentage basis -- let's talk about

15   American purchase orders.

16              On a percentage basis, if you had 100 purchase

17   orders in a year, what percentage of those purchase

18   orders come from CTX India?

19        A.    I cannot give you the percentage because I do

20   not have it handy.  But the second thing is it does keep

21   changing with time.  There's certain accounts which are

22   being handled in the U.S.  Those purchase orders will be

23   hand- -- the inside sales is in the United States, so

24   they will issue the purchase orders.  So it's -- it's not

25   static again.  It's dynamic.

1      Q.   I thought all the purchase orders came out of

2  the inside sales team?

3      A.   And we have inside salespeople even in the

4  United States.

5      Q.   I didn't even ask you a question, and you

6  volunteer that, but that's okay.

7          MR. ROSENTHAL:  Objection, your Honor.  That

8  misstates --

9          THE COURT:  Sustained.

10        MR. ROSENTHAL:  -- what happened.

11  BY MR. MAZZOLA:

12      Q.   But you also have inside sales teams in India;

13  isn't that correct?

14      A.   We contract -- We have contract --

15      Q.   Isn't it correct that you have inside sales

16  teams in India?  Isn't that correct?

17      A.   That is correct.

18      Q.   Isn't it also correct that Sourabh is head of

19  the inside sales team in India?  Isn't that correct?

20      A.   That is correct.

21      Q.   And isn't it also correct that Sourabh, who

22  sits in India, is head of all the inside sales teams?

23  Isn't that correct?

24      A.   That is incorrect.

25      Q.   That is incorrect.  So Sourabh, who sits in

1  India, is not the head of all inside sales teams.

2          Is that your testimony?

3      A.   He is head of all inside sales teams in India,

4  not in Fort Lauderdale or other places.

5      Q.   But does he have supervisory authority over the

6  people at Fort Lauderdale?

7      A.   He does not.

8      Q.   You were present at all the depositions;

9  weren't you?

10     A.   I was not present for -- I was not there all

11  the time, and I actually missed some depositions

12  altogether.

13     Q.   You were present for Lina Ochoa's deposition,

14  right?

15     A.   I cannot recollect -- I'm unable to recollect.

16     Q.   You don't recollect?

17     A.   I was there for the deposition, but I cannot

18  recollect whether I was there all the time.

19     Q.   Do you have any recollection of that deposition

20  of Lina Ochoa saying that Sourabh was the head of all

21  sales, inside sales?

22     A.   Again, you have to --

23          MR. ROSENTHAL:  Your Honor, objection; improper

24  impeachment.

25          THE COURT:  Sustained.

1    BY MR. MAZZOLA:

2        Q.    So your testimony is Sourabh is not head of all

3    inside sales?

4        A.    All inside sales in India.  He's the head of

5    all inside sales in India.

6        Q.    India only?

7        A.    Yes.

8        Q.    Now, we talked about CTX Shenzhen issuing

9    purchase orders.

10            Do you remember that?

11       A.    Yes.

12       Q.    And when they issued these purchase orders,

13   they would have been, I assumed, delivered to Benlida?

14       A.    What could be delivered to Benlida?

15       Q.    The purchase orders.

16       A.    They would be emailed to Benlida.

17       Q.    Emailed to Benlida.

18            And I assume Benlida would have performed under

19   those purchase orders; is that correct?

20       A.    Yes, they did.

21       Q.    And when they performed -- when they performed,

22   generally speaking -- when they performed, generally

23   speaking, they did good quality work; didn't they?

24       A.    Benlida was an above-average manufacturer as

25   far as quality was concerned.  What differentiated

CROSS-EXAMINATION OF RISHI KUKREJA

1  Benlida from other suppliers is if there was a problem

2  reported to them, everybody jumped and tried their level

3  best to resolve the issue.

4          So can I say that they were the best in class

5  in quality?  They were not.  But they were the best in

6  class as far as taking the initiative to solve the

7  problem.  And they tried solving the problem and they

8  tried doing the right thing and rebuilding boards and

9  shipping to the customer.  So, yeah, they were a good

10  company to work with.

11      Q.    Okay.  And so when they delivered, if there was

12  an issue, they would work with you and fix it, right?

13      A.    Yes.

14      Q.    And when they delivered product on the CTX

15  Shenzhen purchase orders and they delivered it, I assume

16  they got paid; is that correct?

17      A.    They did.

18      Q.    And it was the same process -- or it wasn't for

19  Shenzhen.

20          If it was a Shenzhen order, it was sent

21  directly to Shenzhen; is that correct?

22      A.    Until yesterday -- until before yesterday,

23  Shenzhen was also different where they did not require

24  prepayment.

25      Q.    Excuse me?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1       A.    For all orders from Circuitronix LLC, they

2  required prepayment.  Until day before yesterday, they

3  were excepting Shenzhen purchase orders without

4  prepayment.  And two days ago they refused to accept the

5  Circuitronix Shenzhen PO without prepayment too.

6            So they put the demand of prepayment also from

7  the -- on the Shenzhen purchase orders now.

8       Q.    Why are they asking for prepayment?

9       A.    If I could understand what they're thinking, I

10 don't think we would be here.

11      Q.    Okay.  Is it because they think that they don't

12 trust their bills to get paid?

13      A.    I do not -- I cannot speak to that.

14      Q.    Is it because they had an experience with their

15 bills not getting paid?

16      A.    I do not know.

17      Q.    You do not know if they ever had an experience

18 with their bills not getting paid.

19            Is that what you're saying?

20            MR. ROSENTHAL:  Objection; misstates the

21 testimony.

22            THE COURT:  All right.  Sustained.

23 BY MR. MAZZOLA:

24      Q.    Do you know if Benlida ever had any experience

25 with CTX Shenzhen not getting their bills paid?

1     A.   I do, but I cannot speak about it because we

2  are not allowed to speak with that specific issue.

3     Q.   You can speak about anything until the Judge --

4  until they object and the Judge sustains the objection.

5         MR. ROSENTHAL:  Your Honor --

6         THE COURT:  All right.  Members of the jury, we

7  talked in vague terms about the fact that there's

8  documents in here that have matters that are redacted,

9  okay.  And, you know, you've heard that there's all these

10  different entities, okay.

11         I have made legal decisions relating to some

12  other transactions relating to other entities, and the

13  only case we're in trial for is this specific case, okay,

14  between Benlida and CTX-USA.  So I've already ruled that

15  these other financial transactions with these other

16  companies -- and, yeah, I'm not telling you who won or

17  lost in those other transactions.  All I'm saying is I

18  have already made those legal decisions, okay.

19         So let's focus, Mr. Mazzola, on the dispute

20  that the jury is allowed and must decide, which is the

21  financial transactions in this case.

22  BY MR. MAZZOLA:

23     Q.   Okay.  Let's talk about the agreements.

24         There's a manufacturing agreement in place; is

25  that correct?

CROSS-EXAMINATION OF RISHI KUKREJA

669

```
 1       A.   Yes.
 2       Q.   That was the 2012 manufacturing agreement.
 3            Did I get the date right?
 4       A.   20?
 5       Q.   2012, right?
 6       A.   2012, that's right.
 7       Q.   And that's in evidence.
 8            And no one disputes what that agreement says;
 9   is that correct?
10       A.   That's correct.
11       Q.   And then there was a second agreement.
12            Do you recall that?
13       A.   Yes.
14            MR. MAZZOLA:  Can you put that up.
15            I think this is the agreement that was up
16   yesterday, Mr. Rosenthal?
17            MR. ROSENTHAL:  Yes.
18   BY MR. MAZZOLA:
19       Q.   And this is the agreement that you recall?
20            MR. MAZZOLA:  If we can scroll down a little
21   bit.
22            THE COURT:  And what exhibit number is this in
23   case the jurors want to find it some day?
24            MR. MAZZOLA:  40.
25            MR. ROSENTHAL:  I believe it's 40, yeah.
```

```
 1              THE COURT:  Okay.
 2   BY MR. MAZZOLA:
 3       Q.    And this was the second -- I think people are
 4   calling it the letter agreement; is that right,
 5   Mr. Kukreja?
 6       A.    Yes.
 7       Q.    And this was signed in 2016?
 8       A.    Yes.
 9       Q.    And you signed it; is that correct?
10              Well, the one we have here is not signed.
11              MR. MAZZOLA:  Can you scroll up.
12              THE WITNESS:  Okay.  Yes.
13   BY MR. MAZZOLA:
14       Q.    And this is the agreement?
15       A.    Yes.
16       Q.    Oh, this is a signed one, okay.  Okay.
17              And you signed on behalf of CTX-US and CTX Hong
18   Kong.
19              And that's what the document says, right?
20       A.    Right.
21       Q.    And you talked a little bit yesterday about the
22   purpose of the agreement and all of that, right?
23       A.    Right.
24       Q.    With respect to the relationship -- you can
25   take that down -- between CTX and Benlida, and I think
```

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1  you testified to this yesterday, that you approve all

2  payments; is that correct?

3      A.    The -- that's correct.

4      Q.    Were you thinking?  Did you want to say

5  something else?

6      A.    No.

7      Q.    And what about purchase orders?  You approve

8  all the purchase orders; isn't that also correct?

9      A.    Incorrect.

10     Q.    That's incorrect?

11     A.    (No response.)

12     Q.    That's incorrect, you do not approve all the

13  purchase orders?

14     A.    It's incorrect.

15     Q.    So if we heard from someone else that said you

16  did approve all the purchase orders, that person would be

17  incorrect?

18     A.    That is correct from -- I have not approved a

19  single purchase order since March 2017 onwards.

20     Q.    Okay.

21          MR. MAZZOLA:  I want to put a document again,

22  DU3.  Let's put up DU3.

23  BY MR. MAZZOLA:

24     Q.    And this was a document that was used with you

25  yesterday, Mr. Kukreja.

1          MR. MAZZOLA:  Can you make it smaller so it
2    can, sort of, fit on the screen.
3    BY MR. MAZZOLA:
4          Q.    And you, of course, remember this document,
5    right?
6          A.    I do.
7          Q.    Now, when it was used with you, it was -- I
8    think it was the first document that was used; is that
9    correct?
10         A.    I think so, too.
11         Q.    And I think it was really early on in the
12    testimony when you first got up on the witness stand; is
13    that correct?
14         A.    Yes.
15         Q.    And when you were talking about this document,
16    do you remember talking about the circumstances of this
17    document and that was the genesis of the number gap
18    between Benlida and CTX?  Do you remember that?
19         A.    Can you refresh my memory?
20         Q.    Well, I believe you were talking about the
21    discount.
22               Do you remember that?  Does that refresh your
23    recollection?
24         A.    What would you state -- If you tell me -- I
25    missed the first part of your --

CROSS-EXAMINATION OF RISHI KUKREJA

1    Q.    All right.  I believe when this went up in

2    the -- and you were talking about it, your lawyer asked

3    you questions which tended -- which elicited testimony

4    from you that brought you back as you talked about the

5    beginning between Benlida and CTX, about how the gap, the

6    discrepancy began.

7          Do you remember that?

8    A.    No.

9    Q.    You don't remember testifying that that gap

10   started off because there was something called a discount

11   contained within the contract?

12   A.    What I said was that this is when Benlida's

13   house of cards started falling.

14   Q.    On the 17th, 2017?

15   A.    In the -- In beginning of 2017 when they

16   started getting investigated by the tax authorities and

17   financial and the banks and so on and so forth, and that

18   was communicated to me by Douglas and Tracy.

19   Q.    And when you -- you called it a house of cards,

20   but I think you described that problem is because they

21   would issue an invoice, say, for $100, but there was a

22   7 percent discount applicable to it, so they would send

23   you an invoice for $100, you would send them $93, right?

24   A.    7 percent discount which was one of the

25   discounts.  There were other debit notes because of poor

1    quality.  There was leadtime penalty.  There was a whole

2    bunch of things built into the contract, so the -- so it

3    could be lower than $93.

4        Q.    Okay.  So they would issue an invoice for 100,

5    they would get less, and then that created that problem

6    you talked about earlier, right?

7        A.    Yes.

8        Q.    And it was because of that problem that you

9    talked about earlier they came back to you hat in hand

10   and said, We need money, and you gave it to them; is that

11   correct?

12       A.    No.  It means -- it's not that I give it to

13   them in one lump sum.  They were asking money as the

14   operations were going.  And so as they needed the money,

15   I kept giving them money periodically.

16       Q.    But the discount was a basis that began to

17   cause the gap; is that correct?

18       A.    Any -- Anything which caused them not to

19   receive $100, which $100 against $100 of shipments, which

20   were made by them to us, caused the gap.

21       Q.    Okay.

22            MR. MAZZOLA:  Let's put the contract up.  Maybe

23   this will be a little bit easier.  Can we put the

24   contract up, manufacturing agreement?

25            THE COURT:  And what exhibit number is that?

1          MR. MAZZOLA:  We're going to take this down.

2          I believe it's 21, right?  21.

3          And let's scroll down to the schedule that

4    relates to the discount structure.  You passed it.

5    That's the discount structure, right?  Okay.

6    BY MR. MAZZOLA:

7     Q.    You recall looking at this yesterday, right,

8    Mr. Kukreja?

9     A.    I do.

10    Q.    And you, of course, understand the discount

11   structure, right?

12    A.    Yes.

13    Q.    And on this discount structure, there's

14   different lines over here.  At the top, there's a monthly

15   order value.  And if it's between 300 and $400,000,

16   there's an applicable discount of 2 percent; is that

17   correct?

18    A.    Yes.

19    Q.    So what that means is if I guess you order

20   300,000, you get a 2 percent discount; is that correct?

21   Loosely.

22    A.    Based upon what I can recollect until Feb 1st

23   of 2015, if in a particular month we -- in the month of

24   January if we ordered 300,000 and then they shipped

25   during the same month of January $1 million to us, we

1    would get a 2 percent discount on the $1 million of

2    shipments which they made to us.

3         Q.   The $1 million.

4              But the $1 million gets you a 5.5 percent

5    discount?

6         A.   So the criteria for percentage was the orders

7    we released in the month.

8         Q.   Oh, okay, okay, okay.

9         A.   And what the percentage was applied on was the

10   shipments which they made to us in that month.

11        Q.   So there was a little bit of lag time, but

12   eventually it would catch up; is that correct?

13        A.   No.  On the 1st of the following month, we knew

14   what orders we had placed the preceding month.  So let's

15   assume it was 300,000 on the 1st of the following month.

16   We knew what all was shipped to us in that month.  Let's

17   assume it was $1 million.  So we would get a discount of

18   2 percent on $1 million.

19        Q.   Okay.  So give me -- let's try to do an

20   example.  Let's take $1 million because it's easy.

21             In January if you order $1 million --

22        A.   Yes.

23        Q.   -- and then in February they ship you

24   $1 million --

25        A.   Not in February, in January.

1    Q.    You order 1 million in January and they ship 1

2    million in January.

3    A.    Because they're shipping from the previous

4    month.

5    Q.    Okay.

6    A.    They're shipping from orders which they got

7    before.

8    Q.    But at some point you get to enjoy a 6

9    percent -- I beg your pardon, a 5.5 percent discount on

10   the $1 million; is that correct?

11   A.    This was in place until Feb. 1st, 2015.

12   Q.    Okay.  But at some point -- I'm just trying to

13   understand this, all right.

14        So that's how this discount structure worked,

15   right?

16   A.    Yes.

17   Q.    So I -- say the relationship begins on

18   January 1.  You had no relationship back here.  You order

19   $1 million worth of goods on January 1, and they take

20   some time to build them.  And on February 1 they ship a

21   million.

22   A.    It doesn't make a difference.  It depends on

23   what they ship in January.

24   Q.    Okay.

25   A.    If they ship zero dollars in January, they --

1   we would get -- we would not get that 5.5 percent

2   discount.

3       Q.   But the next month when they ship that million,

4   you get the 5 percent discount?

5       A.   We would not get the 5.5 percent.  It would

6   depend on the orders we placed in the month of February.

7       Q.   That's right.

8       A.   February is out of the picture.

9       Q.   So the month of February you order a million as

10  well and they ship a million?

11      A.   Yes.

12      Q.   5.5 percent discount?

13      A.   Yes.

14      Q.   And when that happens, they would issue the

15  invoices for a million dollars, and because of the

16  discount, you would send something (inaudible) something

17  less than a million.

18           (Court reporter clarification.)

19      Q.   They issue invoices for a millions dollars.

20  Because of the discount you would send something back

21  less.

22           That was part of the deal, right?

23      A.   We would issue a debit note for $55,000.

24      Q.   Okay.

25      A.   Prior to that, a calculation would go to Tracy.

1   Tracy would reply back, accept.  The debit note would be

2   created, and it would be sent back to them.

3       Q.   So you were issuing a debit note to them?

4       A.   Yes.

5       Q.   And that was part of the problem that created

6   all these issues with the tax people, as you talked about

7   yesterday, right?

8       A.   So what Benlida should have done was they

9   should have gotten -- gone back to the tax authorities

10  and said -- say that we got $55,000 less.  Because

11  according to our contract -- they didn't do that, and I

12  guess they didn't do that because they would have to

13  return VAT also, which they didn't return.

14      Q.   Okay.

15      A.   And so that accumulated and accumulated over

16  several years and became a huge number.  And that

17  resulted in what happened in 2017.

18      Q.   So -- but what I'm trying to understand now,

19  right, is what the order value is what it says at the

20  top, right, how much you order, right?  Is that what that

21  means?

22      A.   For that month.

23      Q.   For that month?

24      A.   Yes.

25      Q.   How much you order for that month?

1      A.    Yes.

2      Q.    And then you've got -- you can go up as high as

3  1.2 million to 1.399 million, right?

4      A.    No, we can go up to 1.4 million, and above

5  that's a 10 percent discount.

6      Q.    Oh, 1.4 million and above that.

7            And then you get a 7 percent discount, right?

8      A.    Yes.  And we achieved that.  We achieved that

9  by 2015.

10      Q.    You did?

11      A.    Yes, we did.

12      Q.    So when you add up your order values -- this is

13  what I've been trying to understand.  I'm having a hard

14  time figuring this out.

15            So when you add up your order value, it's like

16  a bucket, right?  Orders go into the bucket, and it fills

17  up, right?

18      A.    (No response.)

19      Q.    How many hands are putting orders into that

20  bucket?

21      A.    Different salespeople, different inside

22  salespeople.

23      Q.    Different inside salespeople.

24            CTX-US LLC, they got hands going into that

25  bucket, right?

1       A.    Yes.

2       Q.    Does anyone else have hands going into that

3   bucket?

4       A.    Until --

5       Q.    Yes or no?  Does anyone else have hands going

6   into that bucket?

7       A.    Yes.

8       Q.    Who else has hands going into that bucket?

9       A.    A related company.

10       Q.    Okay.  A related company.

11             Is that what you said?

12       A.    Yes.

13             THE COURT:  While he's looking, let's take our

14   morning recess.  Everybody be back in 15 minutes.

15             MR. MAZZOLA:  Thank you, your Honor.

16             (Court recessed from 10:40 a.m. to 10:57 a.m.)

17             (Jury enters at 10:57 a.m.)

18             THE COURT:  Go ahead.

19             MR. MAZZOLA:  Thank you, Judge.

20   BY MR. MAZZOLA:

21       Q.    Okay.  Mr. Kukreja, just before the break, we

22   were talking about the discount structure pursuant to the

23   contract.  And I want to clarify something because I'm

24   not sure I understood it well.

25             When discounts were applicable, debit memos

1  were issued; is that correct?

2      A.    That is correct.

3      Q.    And you talked about these debit memos

4  yesterday -- I think it was yesterday; is that correct?

5      A.    That is correct.

6      Q.    And these debit memos with respect to these

7  discount structures that you talked about yesterday,

8  those debit memos get factored into the overall numbers

9  that you talked about yesterday; is that correct?

10     A.    That is correct.

11     Q.    And then before we -- again, before we took the

12 break, I was talking about the bucket, the bucket that

13 adds up to the 1.4 million.

14           Do you remember that?

15     A.    I do.

16     Q.    And I asked you about what hands were going

17 into the bucket.  And I think you said, of course, CTX is

18 going into the bucket.  And then I asked you, Are there

19 any other ones.

20           Do you remember that?

21     A.    Yes.

22     Q.    And you said a related company.

23           Do you remember that?

24     A.    An affiliated company.

25     Q.    An affiliated company.

1          Was CTX Shenzhen, did they have a hand going

2     into the bucket, dropping things into it?

3     A.    No.

4     Q.    Okay.  Just CTX and a related company?

5     A.    Yes.

6     Q.    Who was the related company?

7     A.    Circuitronix Hong Kong.

8     Q.    So the debit memos you talked about yesterday

9     that get you the discount, that get factored into the big

10    number, to get to the debit memos that relate to this off

11    of these screens, right, you've got to look at everything

12    that's going into the bucket; is that correct?  And

13    that's things from CTX-US and CTX Hong Kong, right?

14          MR. ROSENTHAL:  Your Honor, I object based upon

15    the Court's rulings.

16          THE COURT:  Overruled.  Let me make sure I

17    understand this.

18          So if CTX-US in one month orders 250,000 and

19    CTX Hong Kong in the same month orders 200,000, is the

20    discount to CTX-USA based upon 250 or based upon 500?

21          THE WITNESS:  So the first thing, your Honor,

22    is that this discontinued on 1st Feb 2015.  It stopped,

23    all of this.

24          THE COURT:  Okay.

25          THE WITNESS:  The second thing is the discount

CROSS-EXAMINATION OF RISHI KUKREJA

1  for both the companies is on the combined, the $450,000.

2  But the debit notes issued were separate.  The debit

3  notes issued were from -- the U.S. was based upon the

4  U.S. purchase orders, U.S. shipments; and they were

5  completely separate.  They were not combined.

6           THE COURT:  All right.  So the purchase orders

7  were combined in order to get the discount, but in terms

8  of debiting and collecting and owing, that's separate?

9           THE WITNESS:  Separate.

10           THE COURT:  Okay.

11  BY MR. MAZZOLA:

12      Q.   I think you said just now when the Judge was

13  asking you questions that the debit memos were separate.

14           Is that what you said?

15      A.   The debit memos for volume discount were

16  separate.

17      Q.   They were separate?

18      A.   Yes.

19      Q.   They were separate?

20      A.   Yes.

21      Q.   So if I had a debit memo or a volume discount

22  and I looked at said debit memo, I would see them

23  separate, I wouldn't see HK and U.S. on it; is that what

24  you're telling me?

25           MR. ROSENTHAL:  Objection, your Honor.  This

1   leads to the issue that I raised before.  And if I may be

2   heard on this, I can explain in greater detail --

3             THE COURT:  No.  Overruled.

4             MR. ROSENTHAL:  Okay.

5   BY MR. MAZZOLA:

6        Q.   Is that what you're saying?

7        A.   What I'm saying is that they were calculated

8   separately for both the companies and applied separately

9   for both the companies.

10             MR. MAZZOLA:  Okay.  I'd like to put a document

11   in front of you we're going to mark for identification.

12   Only, Judge.

13             THE COURT:  Okay.

14             MR. MAZZOLA:  P306.  Can you put it up on the

15   screen for the Judge.

16             Judge, we're putting it up on the screen for

17   identification.

18             THE COURT:  This is 305?

19             MR. MAZZOLA:  306.

20             THE COURT:  306?  What was 305?

21             MR. LERNER:  305 was the email from Hemant

22   Joshi.  304 was the video.

23             MR. ROSENTHAL:  Your Honor, I do have an

24   objection to this in addition to having seen it.  And I'm

25   happy to articulate that if the Court wants.

1          THE COURT:  Can you scroll down?

2          Okay.  You can see this?

3          THE WITNESS:  I can.

4          THE COURT:  Okay.  So this is just what we

5    talked about.  This is -- you're combining the purchase

6    orders, getting the discount to both of the entities, and

7    that's the total.

8          But when there was a debit memo, was the debit

9    memo 58,000 or was it split between the two entities?

10         THE WITNESS:  So, your Honor, the first thing

11   that this is not for Benlida.  This is for ROK.  The

12   debit note is not for Benlida.  It's not for the company.

13         THE COURT:  Okay.

14         THE WITNESS:  So ROK transaction -- they will

15   not be able to show something like this for Benlida

16   because in Benlida it was being split between the two

17   entities.

18         THE COURT:  All right.  Sustained.

19         MR. MAZZOLA:  So we won't be able to show

20   anything like that, okay.

21   BY MR. MAZZOLA:

22      Q.   So let's put up -- I think yesterday -- before

23   I go to that, let me ask you this question.  Yesterday

24   there was a -- talk about ROK.

25         Do you remember that?

1      A.    Yes.

2      Q.    And ROK is a party to the contract, right?

3      A.    Yes.

4      Q.    And I think you put up a spreadsheet that talks

5  about moneys that were paid to ROK that you want back

6  from Benlida; isn't that correct?

7      A.    That's correct.

8      Q.    So insofar as you were concerned, you were

9  treating the two as the same; isn't that correct?

10     A.    Not us.

11     Q.    I beg your pardon?

12     A.    Not us.

13     Q.    Let me ask you about air freight.

14           THE COURT:  About what?  I didn't hear the

15  word.

16           MR. MAZZOLA:  Air freight.  Air freight.

17  BY MR. MAZZOLA:

18     Q.    You talked about air freight yesterday; is that

19  correct?

20     A.    Did we speak about air freight?  I cannot

21  recollect.

22     Q.    Okay.  Air freight was something you did

23  discuss.

24           You remember you were talking about you didn't

25  want a line to go down at General Motors, right, because

CROSS-EXAMINATION OF RISHI KUKREJA

1    if it went down at General Motors, they would charge you

2    $50,000 a second, and, in fact, General Motors actually

3    sometimes makes the CEO of the company pay that line down

4    penalty?  Do you remember you said that?

5         A.    I spoke about director liability.

6         Q.    Okay.  And do you remember in the context of

7    you talking about how you didn't want to get hit for

8    $50,000 from General Motors or Lear or Hella, any of

9    these companies, sometimes things would have to get

10   shipped by air freight?  Do you remember saying that?

11        A.    Yes, I do.

12        Q.    And isn't it also true that when things had to

13   get shipped by air freight, that a debit memo would get

14   issued; isn't that correct?

15        A.    That is correct.

16        Q.    And those debit memos, they would be charged

17   against Benlida, and they would all add up, and that

18   would form part of the credit you had; isn't that

19   correct?

20        A.    That's correct.

21        Q.    So before -- this -- two parts to this.

22              MR. MAZZOLA:  I just want to put something up.

23   This is a PowerPoint that was used by your lawyer

24   yesterday.  And I'm going to put that down.

25              Is that up?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1        And we're going to get to the air freight in a

2   moment.  They're going to be connected.

3   BY MR. MAZZOLA:

4        Q.    But if you look at this PowerPoint at Item

5   No. 7, do you see it's off to the right?  You've got a

6   factory up at the top.  It looks like a warehouse

7   underneath it.  In the middle, you see a middle ship and

8   there's a seven shooter off to the right.

9        Do you see that?

10       A.    Yes.

11       Q.    And because the globe is round, it's got to

12  come around the other side.

13       And you see it goes -- CTX ships product to

14  customers in North America, right?

15       A.    Yes.

16       Q.    So for all these transactions that we're here

17  talking about today, all the product was shipped to North

18  America; is that correct?

19       A.    That's correct.

20       Q.    All of it, right?

21       A.    All of it.

22       Q.    It wasn't shipped to Germany; was it?

23       A.    No.

24       Q.    It wasn't shipped to Czechoslovakia; was it?

25       A.    No.

CROSS-EXAMINATION OF RISHI KUKREJA

1    Q.    That ain't America; is it?

2    A.    Pardon me?

3    Q.    That's not America, Czechoslovakia?

4    A.    Not that I know of.

5    Q.    So Czech Republic.

6          THE COURT:  It's not anywhere now.

7  BY MR. MAZZOLA:

8    Q.    I'm sorry, Mr. Kukreja.  That's why I paused.

9          Mexico, you wouldn't have shipped to Mexico;

10 would you?

11   A.    Yes.

12   Q.    Okay.  Mexico would have been considered --

13 yeah.

14         Great Britain, that's not America, right?

15   A.    No.

16   Q.    So if you had to use air freight in connection

17 with this contract, the stuff we're talking about at this

18 trial, that air freight would go, naturally, to North

19 America; isn't that correct?

20   A.    There are certain exceptions where not-American

21 customer drop-ships into another country.  The purchase

22 order originates in the United States, but they

23 drop-ship -- they tell us -- especially if we're running

24 late.  They tell us, send the shipment -- we don't have

25 time for it to come here, and -- in the U.S., get

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    consolidated, ship it ahead.  Just ship it directly by

2    air because we don't have any additional time.

3        Q.    So -- but this drawing says it all goes to the

4    U.S., North America?

5        A.    So that -- I think that this drawing -- this

6    illustration was supposed to represent majority, 99.9 --

7    99 percent of the transactions or a very high percentage

8    of transactions.

9        Q.    99 percent of the transactions?

10       A.    It was not meant to illustrate exceptions.

11   There are exceptions which happen to the business.  In

12   every business, depending upon the circumstances.

13       Q.    So if something was air shipped to the Czech

14   Republic, that would have been an exception, right?  Is

15   that what you're saying?

16       A.    Yes.

17       Q.    Okay.  And if something was air shipped to

18   Germany, that would have been an exception; is that what

19   you're saying?

20       A.    Yes.

21       Q.    And if something were air shipped to Great

22   Britain, that would have been an exception?

23       A.    If it's -- Yeah.

24       Q.    Do you want to talk about some exceptions?

25       A.    I didn't even know about -- I cannot even

1    recollect any exceptions.  But if there are, they

2    would -- it would be an exception.

3            One needs to understand that between 2012 and

4    2000- -- today, we must have made more than 3,000 to

5    4,000 shipments per year.  So you're talking about a

6    really, really big number of shipments.  And there may be

7    a handful of transactions where the customers told us to

8    ship -- drop-ship to other locations.

9        Q.    Okay.

10            MR. MAZZOLA:  One second.  One second, your

11   Honor.  Not very exciting when you can't find the

12   document.  Let's move on while they're trying to find

13   that document.

14            MR. LERNER:  I think we've got it.

15            MR. MAZZOLA:  I want the full redacted one.

16            I think we found it.  Let's put it up for

17   identification only, okay.

18   BY MR. MAZZOLA:

19       Q.    Do you see this document, Mr. Kukreja?

20       A.    Yes.

21       Q.    This is a document from a gentleman named

22   Alfredo M. Mora (ph.).

23            Do you see that?

24       A.    Yes.

25       Q.    Now, if Alfredo Mora -- I guess he works for

CROSS-EXAMINATION OF RISHI KUKREJA

693

1    you, right?

2        A.    He used to work.

3        Q.    Oh, he used to work.

4              What happened to him?

5        A.    I do not know.

6              MR. ROSENTHAL:  Your Honor, can I just

7    interrupt to get a copy perhaps.

8              THE COURT:  Yes.

9              MR. ROSENTHAL:  Sorry, JC, I'm just having

10   trouble seeing it.

11             THE COURT:  If you have a folder, can't you

12   give --

13             MR. MAZZOLA:  We have them electronically, yes,

14   but we loaded them up last night, Judge, so...

15             THE COURT:  Send him electronically every

16   document that you're going to be using today.  I don't

17   want to have these delays every time there's a document.

18             MR. ROSENTHAL:  I will look, your Honor.  I

19   don't mean to delay.

20   BY MR. MAZZOLA:

21       Q.    And this is a -- it has an attached air freight

22   debit memo.

23             Do you see that document?

24       A.    Yes.

25       Q.    Now, this is a document that's sent by your

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    people; is that correct?

2        A.    It -- it has been sent by somebody who works at

3    Circuitronix LLC.

4        Q.    And then if we scroll down through, you'll see

5    that there's a list of debit memos.

6              Do you see those debit memos?

7        A.    I do.

8        Q.    And these debit memos relate to air freight

9    charges; is that correct?

10       A.    Yes.

11             MR. ROSENTHAL:  Your Honor, I have an objection

12   to this document, having seen it just now.

13             It's the --

14             MR. MAZZOLA:  We were --

15             MR. ROSENTHAL:  -- redaction issue that we've

16   discussed and the Court's ruled on.

17             THE COURT:  Do these relate to CTX-US?

18             MR. ROSENTHAL:  These are CTX-US debit memos.

19             THE COURT:  Are they?

20             THE WITNESS:  I cannot make that out by just

21   looking at the -- just by looking at the -- this sheet.

22             MR. MAZZOLA:  We'll pass on this then.

23             THE COURT:  Okay.

24   BY MR. MAZZOLA:

25       Q.    But your testimony is then that although,

1   although, it's a purchase order issued by U.S.,

2   sometimes, as you testified earlier, deliveries did not

3   go to the -- North America, they would go outside to the

4   rest of the world.

5           Is that your testimony?

6           MR. ROSENTHAL:  Sorry, objection.  This is a

7   debit memo, I believe, not a purchase order.  And I can't

8   see the top of it right now, but I think that's what's

9   been represented.

10          MR. MAZZOLA:  The whole thing is a debit

11  memo -- no, it's a spreadsheet from Alfredo Mora.

12          MR. ROSENTHAL:  I just don't know if it's a

13  purchase order --

14          THE COURT:  Okay.  Well, the question is

15  unrelated to what's on the piece of paper.

16  BY MR. MAZZOLA:

17      Q.   Then we can scroll down.  You'll see attached

18  here FedEx invoices and DHL invoices.

19      A.   I can tell you what this was.

20      Q.   Can you?

21      A.   Yes.

22          At some point in time Tracy had requested me --

23  she picked up random debit notes, and she asked for

24  freight backup.  Some were with other companies,

25  affiliated companies.  Some were with LLC.  And I had

1    somebody on my team collect that information, and we sent

2    it over to her.

3        Q.    Okay.

4        A.    So it did not -- what she picked up was not

5    only debit memos for Circuitronix LLC.  She just picked

6    up random debit notes, and can you -- said can you send

7    us the backup information.  And that's what we did.

8        Q.    So if we look at the top of this page in front

9    of us, you'll see a reference to a debit note at the top.

10            Do you see that?

11       A.    Which one?

12       Q.    It says BNDN2017.

13            Do you see that?

14       A.    Yes.

15       Q.    And then there's a code beneath it.  It says

16   KSR at 5052.

17            Do you see that?

18       A.    Yes.

19       Q.    And do you understand that KSR5052 to relate to

20   the debit memo as well, such that what you're seeing on

21   this invoice are invoices that relate to the debit memo?

22       A.    Which -- what on the invoice?

23       Q.    Well, if we go back to the first page --

24       A.    No, no, no.

25            But what on this sheet?

1    Q.    These bills.

2    A.    Yeah, but --

3    Q.    These were charges for freight.

4          Do you see them?

5    A.    Yes, but if you scroll down, the one for KSR is

6    the one in the middle, this one which he's put a

7    rectangle around.

8    Q.    Oh, the one from KSR, that's the one that goes

9    to --

10   A.    To that debit note.  It does not apply to the

11   first one or the third one.  It's only applies to the one

12   in the middle.

13   Q.    And then where is that one going to?

14   A.    It goes to the -- that's going to United

15   Kingdom because the purchase order came from KSR

16   Michigan.

17   Q.    So the purchase order came from the United

18   States.  It was issued by the United States.  And

19   although you said things get shipped back to the U.S.,

20   this one was sent off to Great Britain?

21   A.    Yes.

22   Q.    Okay.  That's fine.

23         MR. MAZZOLA:  We'll take this document down.

24         Let's put up Exhibit 100 that was previously

25   marked into evidence yesterday.

698

1          THE WITNESS:  Do you see the screen's on.

2          MR. MAZZOLA:  It's on for you, but not for

3  the --

4          THE WITNESS:  Okay.

5          MR. MAZZOLA:  -- not for everyone.

6          THE COURT:  But isn't this an exhibit that's in

7  evidence?

8          MR. MAZZOLA:  It's in evidence.

9          THE COURT:  Okay.

10 BY MR. MAZZOLA:

11     Q.   So this is a document, a payment detail, that

12 was put into evidence yesterday.

13          Do you see this one?  This is from Melonnie

14 Rhoden; is that correct?

15          THE COURT:  Can you blow that up because the

16 jurors that are sharing the screen --

17          MR. MAZZOLA:  You need to take the same class

18 Mr. Vega took.

19          MR. ROSENTHAL:  I know.  He's got all the moves

20 over there.

21          MR. MAZZOLA:  Maybe he'll give you an inservice

22 later on.

23 BY MR. MAZZOLA:

24     Q.   So we're looking at this -- the email from

25 Melonnie Rhoden.  This was put in yesterday.

1          Do you see that?

2          But what I really want to talk about is the

3  payment detail that's attached to it, okay, Mr. Kukreja?

4      A.   Sure.

5          MR. MAZZOLA:  Let's pull that up.  And let's

6  make this bigger towards the bottom, if you will.

7  BY MR. MAZZOLA:

8      Q.   You remember seeing this yesterday,

9  Mr. Kukreja, right?

10     A.   I do.

11     Q.   And on this one, there is a credit, it looks

12  like, of $7.576.

13          Do you see that?

14     A.   Yes.

15     Q.   Now, yesterday, you remember talking about

16  this, right?

17     A.   I do.

18     Q.   And one of the things I recall you saying was

19  this wasn't all a big -- not that much of a big deal.

20          Because 7.5 million's a lot, right?

21     A.   (No response.)

22     Q.   It's a lot of money, right?

23     A.   It's a lot of money.

24     Q.   But, as I recall, you said to the effect that

25  it sounds like a lot, but at the time, you were ordering

1    $2.5 million per month?

2         A.    In that neighborhood -- around that time, yes.

3         Q.    Yeah.  About $2.5 million per month, right?

4    You did say that, right?

5         A.    Yes.

6         Q.    Now you're good at math.  $2.5 million a month,

7    that's about $30 million a year; is that correct,

8    Mr. Kukreja?

9         A.    That's correct.

10        Q.    And about that time period would have been,

11   what, 2018, 2019?

12        A.    2018.

13        Q.    So about 30 million per year, 2018 and 2019,

14   right?

15        A.    Orders, yes.

16        Q.    Orders.

17              What do you mean "orders"?

18        A.    It does not mean that's what they shipped.

19        Q.    Okay.  But it's going to catch up eventually,

20   right?  So if you ordered 30 million in Year One, and

21   they don't ship 30 million in that year, it's going to

22   catch up eventually, right?

23        A.    Not necessarily.

24        Q.    Okay.  Let's look at -- so 30 million a year of

25   orders, right?

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    A.    That's correct.

2    Q.    Let's look at -- there was a document.  It was

3  Exhibit 148.  It was admitted into evidence yesterday.

4         MR. MAZZOLA:  It would have been the one they

5  used.

6         Right, Stephen?

7         MR. ROSENTHAL:  Yes.

8         MR. MAZZOLA:  Was it 148 or 148R?

9         MR. ROSENTHAL:  I don't recall what the 148 is,

10  but it's the one you guys have, the same one.

11         MR. MAZZOLA:  Okay.

12         MR. TOLL:  I think that was just an Excel

13  spreadsheet.  There's no redaction.

14         THE COURT:  Mr. Vega, do you have that on your

15  computer, 148?  We can just switch over.  Do you have it?

16         MR. ROSENTHAL:  Do you have it, Mr. Vega?

17         MR. MAZZOLA:  It was the Benlida payment

18  details 2012 to 2019.

19         THE WITNESS:  148 is 2012 to 2021.

20         MR. MAZZOLA:  2012 to 2021, okay.

21         THE WITNESS:  This one.  148 is -- there's

22  another one which --

23         THE COURT:  He's got -- leave that there.

24         MR. MAZZOLA:  Do you have it up?

25         THE COURT:  Yes.  Mr. Vega has it up.

 1              MR. ROSENTHAL:  The Judge asked Mr. Vega to
 2    pull it up.
 3              MR. MAZZOLA:  Okay.
 4              THE COURT:  Isn't that it?  Is that what you're
 5    looking for?
 6              MR. MAZZOLA:  Yep.
 7    BY MR. MAZZOLA:
 8         Q.   So this is just the summary of the entire
 9    relationship that your lawyers used yesterday that
10    everyone looked at.
11              Do you see it in front of you?
12         A.   I do.
13         Q.   It's got years 2012 to 2021.
14              Do you see that?
15         A.   Yes, sir.
16         Q.   Now, you just testified that you did 2 point --
17    you -- I think you said yesterday we were doing
18    $2.5 million per month.
19              $2.5 million per month adds up to $30 million
20    per year, right?
21         A.   This does not take into consideration the
22    affiliated companies.
23         Q.   Excuse me?
24         A.   This is LLC.
25         Q.   But yesterday you said we were doing

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

CROSS-EXAMINATION OF RISHI KUKREJA

1    $2.5 million per month.

2        A.    When we -- when I had to do a cost benefit

3    analysis, I had to do a cost benefit analysis of the

4    entire organization.

5        Q.    What does that mean?

6        A.    So with the total business transaction we were

7    doing with Benlida.  And that's how I did my cost benefit

8    analysis.

9        Q.    So on the one hand you looked at the total

10   business relationship.  Let's talk about the total.

11        You want to talk about the total business

12   relationship?

13        A.    No, not really.  I want to speak about LLC.

14        MR. ROSENTHAL:  Your Honor, I'd like to object

15   to this line.

16        THE COURT:  Sustained.

17   BY MR. MAZZOLA:

18        Q.    So when you said "we," you meant me and the

19   affiliated companies?

20        A.    Yes.

21        MR. MAZZOLA:  Mr. Vega, would you take that

22   down, please.

23   BY MR. MAZZOLA:

24        Q.    Let's talk a little bit about -- one of the

25   things you consider in leadtime penalties is capacity,

1    right?

2        A.    Yes.

3        Q.    And you talked about this yesterday, but the

4    way the capacity works is -- and it changed over the

5    years.

6              MR. MAZZOLA:  Let's pull up the contract that

7    talks about capacity.

8    BY MR. MAZZOLA:

9        Q.    When you hit certain levels -- and it changed

10   over the years.

11             It started off as 3,000 square meters?

12       A.    Per week.

13       Q.    Per week.

14             And then it went up as high as 7,000 square

15   meters per week?

16       A.    Yes.

17       Q.    And when you talk about capacity, you're

18   talking about how much is getting ordered; is that

19   correct?

20       A.    Yes.

21       Q.    And how much is being produced --

22       A.    Yes.

23       Q.    -- right?

24             And, of course, because the way it operates is

25   that if the factory is running at capacity, it's more

 1   difficult for them to meet their leadtime obligations,

 2   right?

 3        A.   That's correct.

 4        Q.   And you understood that?

 5        A.   Yes.

 6        Q.   And in talking about this capacity -- but it's

 7   the capacity number that's crucial for determining

 8   leadtime penalties because if they're already at

 9   capacity, they get basically a break, if you will, in

10   terms of leadtime penalty, right?

11        A.   If the problem is not caused by them.

12        Q.   Okay.  If it's caused by you because you're

13   ordering too much, right?

14        A.   Or if it's caused -- so basically, they could

15   have -- as an example, ROK shut down in May of 2018.

16   They moved all that business from ROK into this factory.

17        Q.   Okay.  Let me clarify something.  You keep

18   saying ROK shut down.

19             They closed themselves, right?

20        A.   I've heard different stories, so I could not --

21        Q.   Okay.  So you just say they're shut down.

22             They closed, right?

23        A.   Okay, they closed.

24        Q.   Okay.

25        A.   So a lot of the problems Benlida experienced

1    were -- a lot of delays which they experienced were

2    caused by themselves, payment problems with suppliers,

3    payment problems with subcontractors, ROK shutting down,

4    and lots of stuff.  So when delays happen because of

5    that, that did not have a role in capacity or for them

6    getting a break.

7        Q.    Well, what had a role in capacity was the

8    amount of orders that you were sending over, right?

9        A.    Yes.

10       Q.    Okay.  And yesterday when you were talking

11   about capacity, you talked about a cup or a glass of

12   water, I think.

13             Do you remember that?

14       A.    Yes.

15       Q.    And I think you said you look at the glass of

16   water and as it fills, things spill over to the next

17   glass and then they can -- it moves on, so on and so

18   forth, right?

19       A.    Yes.

20       Q.    And then my question for you is:  How many

21   faucets fill this glass?

22       A.    Once again, similar to -- similar to the

23   discount.  Several faucets -- three faucets fill --

24       Q.    Three faucets?

25       A.    Yes.

1       Q.      And what are those three faucets?

2       A.      Circuitronix LLC, Circuitronix Hong Kong, and

3    Circuitronix Shenzhen.

4       Q.      So these three faucets go in to fill?

5       A.      Yes.

6       Q.      And as that capacity rises, it spills over?

7       A.      Right.

8       Q.      And capacity is a -- is a -- a data point for

9    something that gets figured into leadtime penalties;

10   isn't that correct?

11      A.      That is correct.

12      Q.      So you just said it, right, that CTX Hong Kong

13   was one of the faucets filling that glass, right?

14      A.      Yes.

15      Q.      You said that, right?

16      A.      (No response.)

17      Q.      The only way CTX Hong Kong would be filling

18   that glass would be if CTX Hong Kong issued purchase

19   orders, right?

20      A.      That is correct.  But post-October,

21   post-November 1st 2000- --

22      Q.      Is that correct, yes or no?

23      A.      Yes.

24              THE COURT:  And you can explain once you've

25   answered.

1         THE WITNESS:  Yes.

2    BY MR. MAZZOLA:

3         Q.    Okay.

4         A.    And post-November 1st, 2017, capacity did not

5    play a role because between November 1st, 2017 and July

6    31st, 2018, we agreed that we would just accept not our

7    order date when the penalty starts, when Benlida signals

8    to us that they're releasing a new production, that order

9    date.

10         So we blindly followed the date, gave them the

11   benefit of doubt, eliminated any sort of confusion as to

12   what the contractual start date should be until

13   July 31st, 2018, because in -- during those months, we

14   were around the negotiated capacity of around 7,000

15   square meters.  And post August 1st, 2018 until today, we

16   have always been below the 7,000 square meters, so there

17   was no reason that the purchase order date is not the

18   start date.

19         Q.    But even so, it was always those three faucets

20   filling the glass; isn't that correct?

21         A.    Yes.

22         Q.    And now because you said this, so if CTX Hong

23   Kong -- well, purchase orders issued by CTX Hong Kong

24   were filling the glass, that's got to suppose that

25   purchase orders were issued from Hong Kong to Benlida;

CROSS-EXAMINATION OF RISHI KUKREJA

1  isn't that correct?

2       A.    That's right.

3       Q.    And if those purchase orders were issued by CTX

4  Hong Kong to Benlida, I would have assumed Benlida would

5  have performed; isn't that correct?

6       A.    They performed with delays.

7       Q.    Okay, with delays.

8             But they performed, right?

9       A.    Yes.

10      Q.    You're still doing business with Benlida,

11 right?

12      A.    Yes, we are.

13      Q.    In fact, I think you -- there was some new

14 piece of business.  And we talked about it maybe

15 yesterday or three days ago.  I think it was Husqvarna.

16      A.    That's correct.

17      Q.    And those are the guys, they make motorcycles

18 and chainsaws and stuff?

19      A.    Yeah, I think so.

20      Q.    And that's a brand-new piece of business,

21 right?

22      A.    It's brand-new in terms of a new part number,

23 but this customer ordered at Benlida two, three years

24 ago.

25      Q.    So, in any event, they do good enough work that

1   you're still bringing them new business, right?

2      A.   If I had a choice, I would -- they would be my

3   primary suppliers.

4      Q.   So if the purchase orders were issued from CTX

5   Hong Kong to Benlida, they would have performed as well

6   as they always do; is that correct?

7          MR. ROSENTHAL:  Objection; asked and answered,

8   relevance.

9          THE COURT:  Sustained.

10   BY MR. MAZZOLA:

11      Q.   And if they performed on a purchase order that

12   was issued by CTX Hong Kong, would you have performed?

13          MR. ROSENTHAL:  Same objection.

14          THE COURT:  Sustained.

15          MR. MAZZOLA:  Let's look at the contract again.

16   Would you put the contract back up?  Can you scroll --

17   BY MR. MAZZOLA:

18      Q.   We're looking at the contract.  It's up in

19   front of you.

20          MR. MAZZOLA:  If you scroll down, let's look

21   to -- it's Page 7 of the contract.  And let's go up to

22   the first paragraph.

23   BY MR. MAZZOLA:

24      Q.   And this was the provision that we talked about

25   yesterday about good-faith efforts to resolve a dispute.

1         You recall that, right?

2     A.    Yes.

3     Q.    And throughout yesterday, I got the impression
4  that you were saying that Benlida had been in breach of
5  their contract; is that correct?

6     A.    Yes.

7     Q.    Do you recall there being a provision in this
8  contract for notice of breach?

9     A.    Yes.

10    Q.    And it's right there at B -- at A, right?

11    A.    Yes.

12    Q.    How come you never issued a notice of breach to
13 Benlida?

14    A.    How come we did not issue a notice of breach?
15 There are several notices of breach issued to them.

16    Q.    You sent them notices of breach?

17    A.    Yes.

18    Q.    Did they ever send you one?

19    A.    Yes.

20    Q.    And when was the one they sent you?  Do you
21 recall?

22    A.    I do.  They sent several notice of breaches
23 during -- in 2019.

24    Q.    Do you recall them sending you a notice of
25 breach in March of 2017?

1   A.   Yes, I do.

2   Q.   And do you recall writing back that you were

3   absolutely shocked and surprised to receive their notice

4   of breach or their letter?

5   A.   Yes.  And Tracy also told me she was shocked of

6   that.

7   Q.   It looks like Tracy sent it.  Why would she

8   have been shocked?

9   A.   Because she was forced to send it.

10   Q.   And on this one -- what were they asking for?

11   Why were they saying you were in breach?

12   A.   I cannot recollect the exact -- they were

13   always asking for money.  This was four months after

14   moving the payment terms from AMS 60 to what ships this

15   week, next week and pumping close to 6 to $7 million into

16   their cash flow.  I was just shocked that they were even

17   complaining because everything which I did to help them

18   out.

19   Q.   You said 6 or $7 million they were looking for

20   from you?

21   A.   No, no.  I pumped 6 or $7 million into their

22   cash flow by accepting for a temporary period to pay for

23   what ships this week next week.  And for the longest

24   time, they seemed to be happy about it.  And so I was

25   shocked that they were complaining.

1      Q.    That they were complaining?

2      A.    Yes.

3      Q.    But you did send them written notices of

4   breach?

5      A.    Not as letters as they did, but in emails.

6      Q.    In emails, that you are in breach of contract.

7            You did say that?

8      A.    I said -- Yeah, I absolutely did.

9            MR. MAZZOLA:  Let's scroll further down the

10   contract.  Let's go to Schedule A.

11   BY MR. MAZZOLA:

12      Q.    This is Schedule A.

13            Do you see this?

14      A.    Yes.

15      Q.    This is the list of exclusive customers, right?

16      A.    Yes.

17      Q.    Now, it says potential customers and

18   Circuitronix customers. .

19            But it was understood between all the parties

20   that this was the list of exclusive customers, right?

21      A.    Yes.  This is the list of exclusive customers.

22      Q.    Well, it was the list as of 2012?

23      A.    Oh, this was a list -- but, yeah, we've an

24   updated list now, yeah.

25      Q.    You do have an updated list.  There's a list

CROSS-EXAMINATION OF RISHI KUKREJA

1   from March of 2020, I think it is.

2        A.    There's a list from last month.

3        Q.    But the list gets periodically updated; is that

4   right?

5        A.    Yes.

6        Q.    And as the list gets periodically updated,

7   you'll ask to add companies to the list, right?

8        A.    Yes.

9        Q.    And in the times that you've asked to have

10  companies added to the list, did Benlida ever say no?

11       A.    Yes.

12       Q.    In times that Benlida would ask you to remove

13  people from the list, did you ever say yes?

14       A.    No.

15       Q.    You never said yes?

16       A.    I actually said yes, but recently I said no

17  because I've asked them how can they -- how can they

18  expect me to perform under -- what's required under this

19  clause in the agreement if they don't support me.

20       Q.    What do you mean if they don't support you?

21  What does that mean?

22       A.    That they don't -- whether the payment terms

23  are prepayment payment terms, they -- there's just no --

24  there's not any sense of cooperation with them today.

25       Q.    Okay.  And over the years, this list would get

CROSS-EXAMINATION OF RISHI KUKREJA

1    added to; is that correct?

2         A.    Yes.

3         Q.    And about how many companies are on the list

4    now?

5              MR. MAZZOLA:  Can you scroll down and show the

6    full list.

7    BY MR. MAZZOLA:

8         Q.    It goes to CC.

9              So what is that, 29?

10        A.    Yeah, but now it's -- actually, it should have

11   gone into four letters.

12        Q.    Yeah.  It's over 100 now, right?

13        A.    It should be.

14        Q.    And what would prompt you to add a company to

15   the list?

16        A.    Exactly as defined by the agreement.

17             MR. MAZZOLA:  Let's, if we have it available --

18   do we have the available list?  I believe it's

19   Exhibit 255.

20   BY MR. MAZZOLA:

21        Q.    I'm going to put up a list and have you have a

22   look at it.

23        A.    There should be one from two weeks ago.

24        Q.    I don't think we have that, Mr. Kukreja.

25             And I believe this is the list.  This has a

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1  date of March 7, 2020.

2          Do you see that?

3      A.   Yes, but as I've just mentioned, it's not the

4  latest list.

5      Q.   Was the latest list shared with everyone?

6      A.   Yes.

7      Q.   And by "everyone," I mean the people at

8  Benlida?

9      A.   Yes.

10          MR. MAZZOLA:  Can you zoom out of this so

11  people can see it, like make it narrower?

12  BY MR. MAZZOLA:

13      Q.   And when they're exclusive customers, what that

14  means is Benlida can't sell to any of these customers

15  unless they go through you, right?

16      A.   That's right.

17      Q.   And in going through you, that would be CTX-US,

18  right?

19      A.   Yes.

20      Q.   I presume one of the affiliated companies,

21  right?

22      A.   It could be.

23      Q.   Or Shenzhen, right?

24      A.   Could be.

25      Q.   But if they sold to one of these companies

1    through another vendor, if you will, they would be in

2    breach of contract, right?

3         A.    Yes.

4         Q.    So all of your affiliated companies enjoy the

5    benefit of the exclusive customer list; is that correct?

6         A.    That's correct.

7         Q.    Now, from time to time you talked about them

8    asking -- and so from time to time you would ask to add

9    and Benlida would ask to remove, right?

10        A.    Benlida used to -- has asked to remove in the

11   past, yes.

12        Q.    Okay.  And there was a rule about removing, as

13   I recall, right?  There was a marketing period and then

14   there was a period when you were actually doing business

15   with them and issuing purchase orders for these entities,

16   right?

17        A.    Yes.

18        Q.    And what was that, it was one year, two years?

19        A.    I, again, have to look at the -- because it was

20   changed also at one point in time.

21        Q.    Okay.  So you -- so this is -- this is -- this

22   was the list as of March --

23        A.    2020.

24        Q.    -- 2020?

25             MR. MAZZOLA:  Any objection to moving this into

CROSS-EXAMINATION OF RISHI KUKREJA

718

```
 1   evidence?
 2           MR. ROSENTHAL:  No.  But I -- does it have a
 3   number or anything, or no?
 4           MR. MAZZOLA:  It was Exhibit 255.  It was the
 5   one that related to the thing the other night, yes.
 6           MR. ROSENTHAL:  Yes, no objection.
 7   BY MR. MAZZOLA:
 8       Q.   So let's look at the list.
 9           THE COURT:  Wait, 255?
10           MR. MAZZOLA:  P255.
11           THE COURT:  This says interrogatories.
12           MR. MAZZOLA:  These were attached to the
13   interrogatories.  And there was an exchange with
14   Mr. Rosenthal the other evening.
15           THE COURT:  Okay.  So out of that exhibit we're
16   only introducing the customer list?
17           MR. MAZZOLA:  Yes.
18           THE COURT:  All right.  So that part of P255 is
19   in evidence.
20           (Exhibit P255 received in evidence.)
21           MR. MAZZOLA:  And so if we scroll to the top of
22   the list.
23   BY MR. MAZZOLA:
24       Q.   There was an understanding that if you hadn't
25   issued any purchase order for, say --
```

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

```
 1              MR. MAZZOLA:  Zoom up on the top so I can read
 2    this and the jury can read it.
 3    BY MR. MAZZOLA:
 4         Q.   (Continuing) -- so if you hadn't issued any
 5    purchase orders for Preco Electronics for -- what was it,
 6    a year?
 7         A.   I've forgotten if it's a year or two years.
 8         Q.   A year or two years.  But there was a time
 9    period.
10              And if you hadn't issued any, then Benlida
11    could ask to remove it off of the list, right?
12         A.   Yes.
13         Q.   And by issuing purchase orders, those could be
14    purchase orders that came from CTX Shenzhen, right?  That
15    would count, right?
16         A.   So they would count for each one of their
17    contracts.  Circuitronix LLC has its -- would have its
18    own breach condition, Circuitronix.  The other entities
19    would have their own condition for breach.
20         Q.   The other entities?
21         A.   Yes.
22         Q.   What were the other --
23         A.   The other affiliated entities.
24         Q.   They had separate contracts?
25         A.   They didn't have separate contracts, but
```

1     they -- they could -- they would -- so --

2         Q.   Did Shenzhen -- CTX Shenzhen have a separate

3     contract --

4         A.   Yes.

5         Q.   -- with Benlida?

6              They had a separate contract?

7         A.   Yes.

8         Q.   Manufacturing agreement, everything?

9         A.   No.  It was a different type of agreement.

10        Q.   Since it's been out there, what about CTX Hong

11    Kong?  Did they have a different type of agreement?

12        A.   No.  They're a part of the same agreement.

13        Q.   The same agreement as what?

14        A.   As Circuitronix LLC.

15        Q.   The one we're looking at -- that we looked at

16    today, right?

17        A.   The -- yes.

18        Q.   So I guess I should clarify then.

19             So if an order -- purchase order was issued by

20    CTX-US for Preco Electronics, then that sort of tags it,

21    right, it tags that company and they get to stay on the

22    list for another year or whatever the time period was,

23    right?

24        A.   Yes.

25        Q.   And if CTX Hong Kong issued a purchase order

1   for Preco Electronics, that tags it as well and they get

2   to stay on it for another year, right?

3       A.   Yes.

4       Q.   And if they tag it, if CTX Hong Kong tags Preco

5   Electronics and they have to stay on the list for a year,

6   Benlida can't take it off the list, right?

7       A.   They cannot take it off the list.

8       Q.   And if they take it off the list and they go to

9   sell -- I've just got a lot of corrections over here, but

10   we'll get to that -- and if they go to sell to Preco

11   Electronics, they're in breach of the contract, right?

12       A.   So Circuitronix LLC and Circuitronix's

13   affiliates do not sell to the same customer.  They had

14   different customers.  And let me clarify that.

15       Q.   They don't sell to the same customers?

16       A.   Yeah, but let -- give me a chance to clarify

17   that.

18            MR. ROSENTHAL:  Can he clarify?

19            THE COURT:  Yes.

20            THE WITNESS:  So let's assume that there is a

21   customer Lear.  Circuitronix USA's customer is Lear USA,

22   where Circuitronix Hong Kong's customer would be Lear

23   Philippines.  Lear USA will never sell it to Lear

24   Philippines.  Circuitronix Hong Kong would never sell to

25   Lear USA.  They're separate entities.  They're selling it

1  to separate legal entities.  But just by the virtue of

2  the contract, Benlida cannot sell into any Lear location.

3  BY MR. MAZZOLA:

4      Q.   No Lear location, it doesn't matter where they

5  are?

6      A.   Yes.  But, if by chances -- each entity would

7  enforce their aspect of the contract.

8      Q.   But there was something called X numbers,

9  right?

10     A.   X numbers?

11     Q.   When a purchase order would be issued, on the

12  purchase order there would be an X number, X72, X57,

13  numbers like that, right?  You remember that, right?

14     A.   Absolutely.

15     Q.   And the X number would relate to a particular

16  potential customer; is that correct?

17     A.   So --

18     Q.   Is that correct?

19     A.   That is correct.

20          But the logic is not -- the logic behind that

21  was not to identify a customer for this purpose.  The

22  logic was if a customer has a similar packaging and

23  inspection criteria, it was our way of communicating that

24  X72 -- two purchase orders which have X72 on them would

25  mean that that's -- they have the same packaging and

1    exceptions criteria.  It has got nothing to do with

2    exclusivity.  It had to do with how the orders were

3    running through the factory.

4         Q.   But you would enjoy the benefit of them either

5    way.

6              So if the purchase order was issued by CTX Hong

7    Kong, that tagged them and they couldn't take them off

8    the list, right?

9         A.   They could not take them off the list.  Yes.

10        Q.   They couldn't sell to anyone else that was

11   going to be selling to Preco Electronics, right?

12        A.   They could not sell, yes.

13        Q.   They couldn't?  Yeah, they couldn't.

14        A.   Yes.

15        Q.   So regardless of where the order came from --

16        A.   But the order --

17        Q.   Regardless of where the order came from,

18   Benlida would have been foreclosed from selling to that

19   end user through any other company like yourself, right?

20        A.   But the affiliates do not -- we do not have

21   different -- we do not ship to the same customer.  Every

22   entity ships to different customers.  We have no common

23   customers.

24        Q.   What do you mean you "have no common

25   customers"?

1    A.    I gave the example of Lear.  The U.S. ships

2    into Lear North America, and Hong Kong would ship into,

3    say, Lear Philippines.  The U.S. would never ship into

4    Philippines.

5    Q.    Does that say that on the purchase order?

6    A.    I cannot recollect, but it's communicated to

7    them as to where the parts are going for sure.

8    Q.    Well, they're going to know if one purchase

9    order comes from CTX LLC or if the other one comes from

10   CTX Hong Kong, right?  That's one way they'll know,

11   right, according to you?

12   A.    That's one way.  We're in constant -- I believe

13   that one should not try to minimize the relationship

14   Benlida and Circuitronix enjoyed for a long time.  We

15   were talking about everything.  They knew which location

16   the parts were going to.  They knew everything.

17         Obviously, they knew which entity ordered the

18   parts.

19   Q.    But it is true that if you order either CTX

20   U.S. or CTX Hong Kong orders for a customer on the

21   exclusive list, that Benlida is precluded from selling to

22   them; isn't that correct?

23   A.    That is correct.

24   Q.    And let's look at -- if there's a purchase

25   order, and, of course, it's issued by Circuitronix Fort

```
 1    Lauderdale, here --
 2         A.    Yes.
 3         Q.    -- that would be a purchase order that would
 4    have been authorized by you for issuance, right?
 5         A.    Yes.
 6               MR. ROSENTHAL:  By whom?
 7               MR. MAZZOLA:  Authorized by him.
 8               THE WITNESS:  But what's your definition of
 9    authorized by me?
10    BY MR. MAZZOLA:
11         Q.    It's your purchase order, right?
12         A.    Yeah, it's a purchase order --
13         Q.    I mean, they're not saying it's not you?
14         A.    -- a final purchase order, yes.
15         Q.    And even Circuitronix Hong Kong, those purchase
16    orders, it's an affiliated company.
17               You're the director of that company, right?
18         A.    Yes, but I'm removed from it for sure.
19         Q.    Okay.  But you're the director of the company?
20         A.    I'm a director of the company.
21         Q.    And as a director of the company, you're a
22    decisionmaker at that company, right?
23         A.    There's different levels -- yes.  If I step in
24    and make a decision, it will -- they will hear me out for
25    sure.
```

1      Q.    Yes.  And I know your mother's connected to

2   that company, too, right?

3      A.    Yes.

4            MR. ROSENTHAL:  Your Honor, I object to this

5   line on relevance on 403 grounds.

6            THE COURT:  Sustained.

7            MR. MAZZOLA:  So let's look at a purchase

8   order.  We'll mark it for identification for now, okay.

9   I'm going to use it on this, okay?  Can you get this one

10  up?

11  BY MR. MAZZOLA:

12     Q.    And I'm going to show you the top of it,

13  Mr. Kukreja.

14           Do you see this?

15     A.    Yes.

16           MR. ROSENTHAL:  Can we have a -- is this just

17  look at the video thing?

18           MR. MAZZOLA:  Yeah, I'll --

19           MR. ROSENTHAL:  Do we have a copy?

20           MR. MAZZOLA:  What's that?

21           MR. ROSENTHAL:  Sorry, I just -- is it a

22  numbered exhibit?  Do we have a copy?

23           MR. MAZZOLA:  It's brand-new right now.

24           Do we have a number on it?

25           MR. TOLL:  P283.

```
 1              MR. ROSENTHAL:  Okay.  This is one that's on

 2    the exhibit list?

 3              MR. MAZZOLA:  It's on the exhibit list.

 4              MR. ROSENTHAL:  Thank you.

 5              MR. MAZZOLA:  Do you have it in electronic?

 6              MR. ROSENTHAL:  Yeah.

 7              MR. MAZZOLA:  Oh, put it up on the screen.

 8              For identification only, please, guys.  Can you

 9    make it a little bit narrower so Mr. Kukreja can see the

10    whole thing.

11    BY MR. MAZZOLA:

12         Q.   Can you see that, Mr. Kukreja?

13         A.   Yes.

14         Q.   And this is a purchase order that would have

15    been issued by Circuitronix here in Fort Lauderdale,

16    right?

17         A.   Yes.

18         Q.   And there's an X number on it.

19              Do you see that, the X70?

20         A.   Yes.

21         Q.   Do you know what that relates to?

22         A.   This means that this part number is being

23    controlled by a customer called Kimball Electronics.

24         Q.   Kimball, right?

25         A.   Yes.
```

1           It's controlled by Kimball Electronics general

2   specifications.

3           THE COURT:  Do you have an objection?

4           MR. ROSENTHAL:  I believe the objection was the

5   one that we stated, which is relevance and 403 under the

6   prior set of issues.

7           THE COURT:  Who was the org in this, which

8   company?

9           THE WITNESS:  Circuitronix LLC.  It's on the

10  top-left corner.

11          MR. ROSENTHAL:  If that's the case, no

12  objection then.

13          THE COURT:  Okay.  So 283 will be received in

14  evidence.

15          (Exhibit 283 received in evidence.)

16  BY MR. MAZZOLA:

17      Q.   So on a purchase order like this with the K70

18  indication on it --

19          THE COURT:  You said K70.  It says X70.

20          MR. MAZZOLA:  I beg your pardon, Judge.

21  BY MR. MAZZOLA:

22      Q.   -- X70 on it, that means it's for Kimball; is

23  that correct?

24      A.   It means that this purchase order is governed

25  by Kimball general specifications for both acceptance and

1   packaging.

2       Q.   But it also means that once you've done this,

3   you've sent this on November 28th, 2018, that for a

4   period of time after you've sent this, Benlida is

5   prohibited from selling anything that's going to find its

6   way to Kimball; isn't that correct?

7       A.   (No response.)

8       Q.   Isn't that correct?

9       A.   An unrelated part of the contract, not related

10  to X70.

11      Q.   Okay.  What do you mean unrelated part of the

12  contract?

13      A.   Tracy initiated -- Tracy came to us and said,

14  there's so many different part numbers from so many

15  different customers in the production line, how do we

16  know what specifications to apply to what customers.

17      Q.   You just --

18      A.   And so she came up with this methodology

19  with -- I think with Sourabh Sharma where they said that

20  they would come up with X70 -- all part numbers with X70

21  would indicate that -- that Kimball specifications would

22  be used on that part number.  That was the only criteria

23  for introducing that X number.

24      Q.   I understand what you're saying, okay.  It's

25  the packaging.  It's the color.  It's the certain

 1    specifications for the customer.  I understand that.

 2         A.    The controlling specifications.

 3         Q.    Yeah, I think everyone understands that.

 4               But when it's an X70 reference for Kimball

 5    Electronics and you use your purchase order, like we

 6    talked earlier, you've effectively tagged them on the

 7    list and Benlida can't sell to them; isn't that correct?

 8         A.    That's correct.  But X70 is not used for that.

 9    That's what I'm trying to tell you.

10         Q.    It doesn't matter.  It could have said Kimball

11    over there.

12         A.    If it said Kimball, that's the cue for --

13         Q.    So that's the cue?  The X70 is not the cue --

14    Let me ask you this question.

15               Does any other customer on your list have

16    X70 --

17         A.    Absolutely.  There are some customers who ask

18    us to ship their product to another EMS company.  We --

19    the customer places the purchase order.  They say, we're

20    not going to assemble those parts or EMS is going to

21    purchase those parts, so ship those parts to that -- this

22    other company.  And -- but the X number will be the

23    specification of the customer controlling that part

24    number.

25         Q.    So Preco Electric will issue a purchase order

1    and say, do it just like Kimball does it?

2         A.    If they do that, yeah.

3         Q.    That's your testimony.  So the X70 does not

4    mean this is for this exclusive customer.  Is that your

5    testimony?

6         A.    That's my testimony.  We've got the emails

7    where they determine why that X number is being --

8    Tracy's got the emails.

9         Q.    Okay, okay.  I can't make you say anything.

10             That's your testimony, right?

11        A.    That's my testimony, and that's truthful

12   testimony.

13        Q.    And then we were talking about if a purchase

14   order were issued by Circuitronix Hong Kong and it had

15   the same X70 on it, right, the same X70 was on one issued

16   by Circuitronix Hong Kong, that would also mean that

17   Tracy could not sell to Kimball for a period of time;

18   isn't that correct?

19        A.    That's correct, but we're not here to talk

20   about any affiliated companies.

21        Q.    I'm just saying.

22             I mean, you're having it on both sides, right?

23        A.    Sure.

24        Q.    And there were other X numbers; isn't that

25   correct?

1      A.    Lots of X numbers.

2      Q.    What's that?

3      A.    Lots of X numbers.

4      Q.    And the X numbers followed the list.

5            MR. MAZZOLA:  Let's put the list back up, 255.

6            And if you can scroll down to the bottom of the

7      list.  Oh, let's -- can you zoom in over here where

8      there's dates, anywhere.

9      BY MR. MAZZOLA:

10      Q.    What are those dates, Mr. Kukreja?  Do you know

11      what those are?

12      A.    The date when the customer was introduced --

13      put on this list.

14      Q.    Okay.  On what basis did you add a customer to

15      the list?

16      A.    It's -- we'd have to go back and look at the

17      contract, but it's spelled out in the --

18      Q.    There was a marketing period,

19      potential-customer period?

20      A.    Yes.

21      Q.    And that was great because it was in both

22      sides' interest, of course, right?  If you bring a new

23      company to meet with the Benlida people and we're hoping

24      they're going to issue -- they're going to order 100,000

25      parts, 100,000 square meters a year, it's in everyone's

733

1    interest to add them to the list, right?

2        A.    Yes.  And everybody realizes nothing happens --

3    happens overnight in this industry.

4        Q.    Oh, Husqvarna's on it.

5              Do you see that, at 177?

6        A.    Yes.

7        Q.    So 6/21 is the -- June 2021 is when they were

8    added to the list, right?

9        A.    Yes.

10       Q.    Is this Husqvarna thing that we were talking

11   about earlier, was that the first time they ordered

12   anything from you?

13       A.    I cannot recollect.

14       Q.    Because the marketing period is two years,

15   right?

16       A.    Again, I believe you're right, but I need to

17   refer to the contract.

18             MR. MAZZOLA:  Do we have the contract?

19   BY MR. MAZZOLA:

20       Q.    Do you know where it is in the contract?

21       A.    Yeah.  There, 1.4A.

22             MR. MAZZOLA:  Let's make it clear for

23   Mr. Kukreja.

24   BY MR. MAZZOLA:

25       Q.    So there's the identified potential customers.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1        Do you see that?

2    A.    Yes.

3    Q.    And I understand there's -- they talk about a

4 Schedule A as identified potential customer, but

5 everybody's been treating that as the exclusive list; is

6 that correct?

7    A.    I'm sorry, repeat that again.

8    Q.    Everyone treats -- you have all been treating

9 this Schedule A as the exclusive list; isn't that

10 correct?

11    A.    Yes.

12    Q.    So you have 12 months --

13    A.    From the date it's identified.

14    Q.    -- for the marketing period.

15        And then what happens if after that 12 months

16 if there's been no orders done?  Do they fall off the

17 list?

18    A.    I would need to look at the letter agreement

19 because I think the letter agreement has a tolling

20 provision.

21    Q.    Okay.  But what I'm trying to understand is if

22 you looked at the Husqvarna item and in the Husqvarna it

23 talked about they were added to the list in June of 2021,

24 right?

25    A.    Sure.

1    Q.    And my question is:  From June of 2021 to

2  October 12th of 2023, did either you or CTX Hong Kong or

3  any other of your affiliated companies make any orders

4  for Husqvarna during that period?

5    A.    I cannot recollect.

6    Q.    Because if they didn't, it would have been

7  appropriate to take them off the list, right?

8    A.    Not if there was a breach in contract -- breach

9  of contract.  That clause would get tolled.

10    Q.    If there was a breach of contract.

11         Did you give them notice of breach of contract

12  that would have tolled that clause?

13    A.    I gave them -- I've written to Tracy on several

14  occasions.

15    Q.    When was the last time you sent one?

16    A.    Last month.

17    Q.    And that tolls the clause?

18    A.    I --

19    Q.    Last month you sent one?

20    A.    In the last 60 days for sure.

21    Q.    Last 60 days?

22    A.    Again, I'm speaking from memory.

23    Q.    I don't know.  I mean, you're very good at

24  remembering stuff.  I'm just trying to understand when

25  you sent Tracy a notice of breach.

CROSS-EXAMINATION OF RISHI KUKREJA

736

1      A.    I believe it's in the last 60 days.

2      Q.    Was Akshay Koul authorized to add and subtract

3  customers from the exclusive customer list?

4      A.    Not subtract; add.

5      Q.    He could add, but he wasn't authorized to?

6      A.    He could add, but he could not subtract.

7      Q.    Okay.  But he was authorized to speak on your

8  behalf, right?

9      A.    It's not a blanket authorization.  He was

10  authorized in certain -- for certain things.

11      Q.    But if Akshay wrote an email and you were

12  copied on the email, presumably he would have been

13  authorized to write it and speak on behalf of CTX-US and

14  the affiliated companies, right?

15      A.    Yes.

16            MR. ROSENTHAL:  Sorry.  Was that question he

17  was authorized to speak on behalf of CTX-US and the

18  affiliate --

19            MR. MAZZOLA:  And the affiliate companies,

20  yeah.

21            MR. ROSENTHAL:  And -- okay.

22            MR. MAZZOLA:  I'm going to try to get an email

23  up in front of you.

24            We'll give you a number in a moment,

25  Mr. Rosenthal.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1          I have been having a few technical

2     difficulties, Mr. Kukreja.

3               THE WITNESS:  No problems.

4               THE COURT:  If you have a hard copy, you can

5     put it on the ELMO.

6               MR. MAZZOLA:  I do have a hard copy.  I'm going

7     to start with the hard copy for now, and Anita is going

8     to find a number for us.

9               MR. ROSENTHAL:  I'm sorry, what's the number of

10    this?

11              MR. MAZZOLA:  We're going to find it for you,

12    Stephen.

13              MR. ROSENTHAL:  Oh, okay.

14    BY MR. MAZZOLA:

15         Q.    Mr. Kukreja, do you see this?

16         A.    Yes.

17         Q.    We'll go through the thing, but this is a -- an

18    email exchange, so --

19              THE COURT:  Does this relate to CTX-US?

20              THE WITNESS:  It covers both, yes.

21              THE COURT:  All right.  Do you have any

22    objection?

23              MR. ROSENTHAL:  I've never seen this.  I don't

24    know what number we're talking about.

25              THE COURT:  Can't you see it?

1          MR. ROSENTHAL:  I'm sorry?

2          THE COURT:  Isn't it on your screen?

3          MR. ROSENTHAL:  Yeah, but I mean, I'm seeing a

4    fraction of a multi-page document, and I'm actually just

5    trying to see what it says right now.  I don't know what

6    number it is.  And I'm happy to look at it.  If they gave

7    me a copy, it would be easier.

8          MR. MAZZOLA:  MR. Rosenthal, I think you'll be

9    fine.  I can assure there's no issues with it.

10          MR. ROSENTHAL:  Well, that's fine.  I just have

11   no idea -- I'm not in a position to be able to say, your

12   Honor.

13          THE COURT:  Okay.

14          MR. ROSENTHAL:  Obviously, I can't see the

15   whole thing.  I'll look at what they're showing him and

16   happily --

17          MR. MAZZOLA:  Okay.  We'll go through it.

18          Do you have the digital version up?

19          THE COURT:  Do you want the computer on?

20          MR. TOLL:  Yes, please, sir, your Honor.

21   BY MR. MAZZOLA:

22     Q.   This is an email --

23          MR. ROSENTHAL:  Wait.  Can you just wait one

24   second?

25          MR. MAZZOLA:  Okay.  You can have that,

 1   Stephen.

 2          MR. ROSENTHAL:  No, I just need a second.

 3          MR. MAZZOLA:  Okay.  This will be 308.

 4          MR. ROSENTHAL:  If it's not on the exhibit

 5   list, I do have an objection to it being admitted into

 6   evidence because of the Court's rules.  However, on the

 7   substance for cross purposes, I don't have an objection.

 8          THE COURT:  All right.  So that will be

 9   received.  And that's 307 or 308?

10          MR. MAZZOLA:  308.

11          THE COURT:  308.

12          (Exhibit 308 received in evidence.)

13          MR. MAZZOLA:  Erik, if you could scroll down --

14   scroll down to the middle because that's where Akshay is.

15   BY MR. MAZZOLA:

16      Q.   Do you see that on the video -- that's an email

17   from Akshay, Mr. Kukreja, right?

18      A.   Yes.

19      Q.   And Akshay is saying:  This email is to advise

20   you that we have not accepted any customers to be removed

21   from the list.

22          Do you see that?

23      A.   Yes.

24      Q.   Please also be advised that we have added MLS

25   in the list already.  Please double-check to confirm no

 1  conflicts.

 2          What's MLS?

 3      A.   I think it's a customer.

 4      Q.   Another customer?

 5      A.   (Nodding.)

 6      Q.   And then if you scroll down further, you will

 7  see another email from Akshay:  Please discuss this list

 8  with Mr. Rishi for text in red.  I cannot confirm to you

 9  if these are invalid or not.

10      A.   Yes.

11      Q.   So that's consistent with what you said before,

12  that Akshay is authorized to speak on your behalf and

13  he's authorized to speak on your behalf with respect to

14  this -- the exclusive customers.

15          But he's got to run things past you, right?

16      A.   Yes.

17      Q.   Did he have to run everything past you?

18      A.   No.

19      Q.   But something like this he has to run past you,

20  right?

21      A.   Yes.

22          THE COURT:  All right.  Let's take our lunch

23  and recess.  See you back at 1:35.

24          MR. MAZZOLA:  Judge, I'll be --

25          THE COURT:  You'll be?

741

1          MR. MAZZOLA:  I might only be like 3 more

2    minutes with this document or -- it's -- you know what,

3    let's take the break.

4          THE COURT:  Okay.  1:35.

5          (Jury exits at 12:20 p.m.)

6          MR. MAZZOLA:  The last time I ask that question

7    I got blasted.

8          THE COURT:  What question?

9          MR. MAZZOLA:  The last time I said, Judge, let

10   me do on my schedule, then I got blasted, so...

11         THE COURT:  Okay.  If you said there's three

12   more minutes left of your entire cross, then I would have

13   let you.

14         So speaking of that, how much more do you

15   anticipate your cross is going to be?

16         MR. MAZZOLA:  I spoke to Mr. Rosenthal earlier.

17   I did tell him it was going to go past lunch.  I thought

18   you were going to go to 1:00, Judge.  I would figure

19   another -- Mr. Kukreja is a great gentleman, but he talks

20   a lot, so another hour and a half or so maybe.

21         THE COURT:  And are we still on schedule to

22   finish this trial in the time we told the jurors?

23         MR. ROSENTHAL:  I think so.  I think if --

24   we'll have a limited redirect.  So if he said an hour and

25   a half.  You said we'd go to lunch until when?

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

742

```
 1              MS. MARTINEZ:  1:35.

 2              MR. ROSENTHAL:  1:35?  Okay.

 3              THE COURT:  What is it, one person out of all

 4  of you that listened to me.  Okay.  So only one voice.

 5  Okay.  I got 1:35.

 6              MR. ROSENTHAL:  Okay.  I just -- I'm keeping

 7  track.  So then let's say we go another hour and a half

 8  would be at --

 9              THE COURT:  Yeah, 3:00.

10              MR. ROSENTHAL:  3:00-ish.  And then we have --

11              THE COURT:  Take a break for 15 minutes.

12              MR. ROSENTHAL:  We have the videos, very

13  limited redirect, okay, with Mr. Kukreja.  We'll be done

14  with Mr. Kukreja at --

15              THE COURT:  Whatever, 3:30.

16              MR. ROSENTHAL:  Yeah.  So we'll call our next

17  witness.

18              THE COURT:  Live?

19              MR. ROSENTHAL:  Yes, live.

20              THE COURT:  And how long are the video

21  depositions that you're going to play?

22              MR. ROSENTHAL:  So we had three total.  We

23  think we don't need to play one of them, which was kind

24  of long and boring.

25              THE COURT:  Okay.
```

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

```
 1            MR. ROSENTHAL:  And that leaves two -- go

 2    ahead.

 3            MR. WEINSHALL:  We've cut -- one of them is

 4    just, I think, 17 minutes.  The other one was 49, but I

 5    think we're going to cut it down to 30.  So about 48

 6    minutes total.

 7            MR. ROSENTHAL:  If they agree, yeah.

 8            We have two live witnesses today.  If we can't

 9    fit one in, you know, I suppose we could fill that time

10    with video.

11            MR. WEINSHALL:  And then tomorrow's our

12    experts, and I think that would be our --

13            THE COURT:  And how long is the experts?

14            MR. WEINSHALL:  Not long.  Maybe an hour, hour

15    and a half.

16            THE COURT:  On direct?

17            MR. WEINSHALL:  On direct, yes.

18            THE COURT:  All right.  We'll see everybody at

19    1:35.

20            (Court recessed from 12:22 p.m. to 1:36 p.m.)

21            (Jury enters at 1:37 p.m.)

22            MR. MAZZOLA:  Thank you, Judge.

23                CROSS-EXAMINATION (Resumed)

24    BY MR. MAZZOLA:

25       Q.   So, Mr. Kukreja, there's a document in front of
```

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    you that we were talking about that was marked for

2    identification.

3            MR. MAZZOLA:  But I understand, Mr. Rosenthal,

4    this may have already been admitted?

5            MR. ROSENTHAL:  Yes, I think the Judge admitted

6    this.

7            MR. MAZZOLA:  I didn't see it up there.  And I

8    think it may have been admitted yesterday.  Is it --

9            MR. ROSENTHAL:  No, no, we didn't use -- isn't

10   this what you marked as the last exhibit?

11           THE COURT:  308.  I admitted this before lunch.

12           MR. MAZZOLA:  I didn't see it up there, Judge,

13   that's why --

14           THE COURT:  Up where?

15           MR. ROSENTHAL:  He's pointing to the back

16   monitors, I think.

17           THE COURT:  Okay.

18           MR. MAZZOLA:  Usually it goes up to everyone.

19   That's usually my cue.  Thank you, Judge.

20           THE COURT:  Okay.  So now the jurors can see it.

21   BY MR. MAZZOLA:

22       Q.   So if we can scroll down, we were talking about

23   this document which was an email.  And it started from --

24   it started with Akshay at the very bottom.  It's right

25   there.

 1            Do you see this portion written by Akshay?

 2       A.   Yes.

 3       Q.   And Akshay is -- he's not copying you on it.

 4            And so my query is:  Would he normally

 5  communicate with Tracy about such things as the customers

 6  and exclusive customer lists?

 7       A.   He does once in a while.

 8       Q.   And then the customer here is Creation Tech.

 9            Who are they?

10       A.   They're an EMS company, electronic

11  manufacturing services.

12       Q.   And would he do something like this without

13  discussing it with you first, sometimes?

14       A.   No.

15       Q.   No.  He would have discussed it with you first?

16       A.   Yes.

17       Q.   And the idea was they wanted to add that

18  customer to the exclusive customer list, right?

19       A.   Yes.

20       Q.   And now when customers were added to the

21  exclusive customer list -- just to recap what we talked

22  about earlier before lunch -- if it was Akshay at CTX

23  Hong Kong ordering or issuing purchase orders for this

24  exclusive customer, that would keep them on the list; is

25  that correct?

1      A.      Could you repeat the question?

2      Q.      Do you recall how before lunch we talked about

3   how this exclusive customer list, it had a period of time

4   where, for lack of a better terminology, the customers

5   would expire off the list; is that correct?

6      A.      Yes.

7      Q.      And what I want to clarify is that if during

8   that time before the expiration date a purchase order was

9   issued from CTX Hong Kong, that would stop or toll the

10  expiration; is that correct?

11     A.      Yes, it would -- that's correct.

12     Q.      And they would remain the exclusive customer,

13  and thereby Benlida would not be able to sell to them

14  without being in breach of their contract, right?

15     A.      That's correct.

16     Q.      Now, it looks like Tracy is having a

17  discussion, right?

18     A.      (No response.)

19     Q.      And if you see -- if you roll up further,

20  you'll see this over here.  This is Tracy writing back to

21  Akshay and she's talking about how they were on the list

22  before and there's been no orders for at least three

23  years.

24          And I put it in red and remove.  Please let me

25  know the update so that we can make further decision.

1      So that's an example where there were no orders

2   for that particular exclusive customer and Tracy asked

3   them to be removed; is that correct?

4      A.   She asked him to remove it as per that email.

5      Q.   And then she writes back again and she talks

6   about -- if you scroll up a little further, right

7   there -- and she writes back again and she says:  Red

8   ones are invalid.

9      What do you think -- what is Tracy trying to

10   communicate to you there, if you know?

11      A.   I do not.

12      Q.   Do you think she was trying to say that if

13   they're red, they shouldn't be on the list?

14          MR. ROSENTHAL:  Objection; speculation.

15          THE COURT:  Overruled.

16          THE WITNESS:  Maybe.

17   BY MR. MAZZOLA:

18      Q.   Let's scroll back down to the list.  There's a

19   lot of red ones in there.

20          Do you see that?

21      A.   Yes.

22          MR. MAZZOLA:  Let's go up a little bit.  I'll

23   tell you when to stop.

24          Right there is good.

25

1    BY MR. MAZZOLA:

2        Q.    Do you see No. 59?

3        A.    Yes.

4        Q.    That's Hella.

5              Those are headlight people, right?

6        A.    Yes.

7        Q.    We were talking about them yesterday, right?

8        A.    Yes.

9        Q.    So as of the date of this email, wasn't it true

10   that Tracy was saying to you that you hadn't ordered

11   anything from any of these exclusive customers?

12       A.    That was her position.

13       Q.    What was your position?

14       A.    My position is that they were in breach of the

15   contract so everything -- they could not remove anything

16   from the customer list.

17       Q.    And we talked about that earlier and you said

18   you had given them notice of the breach; is that right?

19       A.    Yes.

20       Q.    And you said you had recently given them notice

21   of the breach of contract, I think you said, 60 days ago,

22   but you didn't really remember.

23              60 days ago from today's date, right?

24       A.    It was specific to this exclusive customer

25   list, another -- there was another discussion which

1  happened.

2         And, by the way, even in this email chain, you

3  have not copied -- after the last email from Akshay,

4  there is another email from me, which you guys have not

5  included, where I reiterated our position that we do not

6  accept with any customers because it's their breach which

7  has caused us not to be able to develop any business.

8  That was in 2020.  And 60 days ago we had a similar email

9  exchange where Tracy was copied on -- which I wrote to

10 Tracy.

11    Q.    We will get to the email I think you're talking

12 about, okay.

13         But insofar as this one, this is you refusing

14 to remove these names from the list, right?

15    A.    Yes.

16    Q.    And this email was dated April 20th, 2020,

17 right?

18    A.    Yes.

19    Q.    And you're saying prior to that you were told

20 that she was in breach, and that's why you wouldn't

21 remove them, right?

22    A.    Yes.

23    Q.    And they were in breach of what?

24    A.    Everything.

25    Q.    Okay.  And you gave them notice, right?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

| | |
|---|---|
| 1 | A.    Yes. |
| 2 | MR. MAZZOLA:  We can take that one down. |
| 3 | Actually, I'm going to put another email up for you.  I |
| 4 | understand it's P259?  No?  To move things along, I'll |
| 5 | put it for you right now in identification only. |
| 6 | MR. ROSENTHAL:  Mr. Mazzola, is that a group |
| 7 | exhibit? |
| 8 | MR. MAZZOLA:  I'll show you, Mr. Rosenthal.  I |
| 9 | think it is a group exhibit. |
| 10 | MR. ROSENTHAL:  Your Honor, we object that it's |
| 11 | not disclosed prior to this date. |
| 12 | THE COURT:  Is this Exhibit P259? |
| 13 | MR. MAZZOLA:  It is not P259.  We had the |
| 14 | number wrong, Judge. |
| 15 | MR. ROSENTHAL:  It's apparently not 259. |
| 16 | THE COURT:  What is it?  What number is it? |
| 17 | MR. MAZZOLA:  It does not have an exhibit |
| 18 | number.  Mr. Kukreja was talking about circumstances |
| 19 | where he said that they were in breach, and this document |
| 20 | I think addresses that. |
| 21 | MR. ROSENTHAL:  It's a different conversation. |
| 22 | MR. MAZZOLA:  Different document, different |
| 23 | thread. |
| 24 | THE COURT:  So this is going to be 309? |
| 25 | MR. ROSENTHAL:  Yes. |

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1        THE COURT:  You can see it so you can ask him

2   about it.

3        MR. ROSENTHAL:  Is it for impeachment purposes

4   or for publishing to the jury?

5        THE COURT:  It's not being published now.  So

6   you can ask him some questions, and I'll decide.

7   BY MR. MAZZOLA:

8   Q.   Let's look at this document, Mr. Kukreja.

9        Do you see it?

10  A.   Yes.

11  Q.   You were talking earlier about how you talked

12  about there being a breach.  And I'll put my finger down

13  there.

14       Do you see that?

15  A.   Yes.

16  Q.   Is that what you were referring to?

17  A.   Yes.

18  Q.   You were saying that the fact that Benlida is

19  not getting orders is since they have changed the terms

20  and conditions and asking for prepayment on purchase

21  orders.

22       MR. ROSENTHAL:  I'm sorry.  May I -- I don't

23  mean to interrupt, but can you just show him the next

24  page so he's familiar with what the email conversation is

25  that he's being asked about.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

```
 1              MR. MAZZOLA:  Oh, yes.

 2              MR. ROSENTHAL:  Right there.  Thank you.

 3   BY MR. MAZZOLA:

 4       Q.   Do you see that, Mr. Kukreja?

 5       A.   Yes.

 6       Q.   Do you want me to go through the whole document

 7   with you?

 8       A.   No.

 9       Q.   It starts off with Akshay; is that correct?

10       A.   Yes.

11       Q.   And, again, Akshay, in this instance, I

12   presume, would have been authorized to speak on your

13   behalf, right?

14       A.   Yes.

15       Q.   You were copied on that communication, right?

16       A.   Yes.

17              THE COURT:  All right.  I'll allow that into

18   evidence.

19              (Exhibit 309 received in evidence.)

20   BY MR. MAZZOLA:

21       Q.   And then you see Akshay --

22              MR. MAZZOLA:  309, Judge?

23              THE COURT:  What?

24              MR. MAZZOLA:  It was 309?

25              THE COURT:  Yes.
```

1          MR. MAZZOLA:  Do you have that on the screen?

2          MR. TOLL:  Yep, we've got it on the screen.

3          MR. MAZZOLA:  I don't see it.

4          THE COURT:  Well, I have to have time to

5     switch --

6          MR. MAZZOLA:  Oh, I beg your pardon, Judge.

7     I'm sorry about that.

8          Let's scroll down to the start of the email

9     thread.

10    BY MR. MAZZOLA:

11    Q.   So here it starts with Akshay looking to add

12    another customer to the exclusive customer list.

13         Do you see that?

14    A.   Yes.

15    Q.   And this is MinebeaMitsumi?

16    A.   Yes, MinebeaMitsumi.

17    Q.   What do they do?

18    A.   I do not know.

19    Q.   And then, of course, it's the -- there's

20    another list attached to it.  And if you scroll down.

21    It's seemingly not attached.

22         But in any event, Akshay Koul is following up;

23    is that correct?

24    A.   Yes.

25    Q.   And then Tracy writes back:  Again, for those

754

1    customers are not active, red writing in the attachment,

2    CTX must remove.

3            And then she writes:  This is not fair when

4    orders are -- aren't building in Benlida but they are

5    still on the list.

6            MR. ROSENTHAL:  Your Honor, objection.  I'm not

7    quite sure what this is impeaching.

8            THE COURT:  Overruled.

9    BY MR. MAZZOLA:

10       Q.   Do you see that?

11       A.   Yes.

12       Q.   And so you write back to her --

13            THE COURT:  I think this means not building.

14            MR. MAZZOLA:  I think so, yes.

15   BY MR. MAZZOLA:

16       Q.   And you write back, and you write it in big

17   bold red.

18            Why did you write back in big bold red like

19   that?

20       A.   It stands out.

21       Q.   Excuse me?

22       A.   It stands out.

23       Q.   It does stand out, right?

24            And what are you cautioning Benlida to not do?

25       A.   Not to approach our customers.

1  Q. In any manner, directly or indirectly or

2 otherwise, it will be a breach of our agreements, right?

3  A. Yes.

4  Q. Okay.  And then what's the breach of the

5 agreement that you were talking about earlier?  Is it

6 contained in this email?

7  A. It's written up there in the first paragraph.

8 The fact that Benlida is not getting orders is since they

9 have changed the terms and conditions and asking for

10 prepayment of -- on orders, on purchase orders.

11  Q. But you had agreed to make those prepayments,

12 right?

13  A. I agreed to make it for limited purpose to keep

14 existing projects running.

15  Q. Did you think writing in bold all caps, stay

16 away from our customers, is a nice way to treat your

17 business partners?

18  A. It's not about nice or bad.  It's about please

19 take this seriously.

20  Q. And so you wouldn't remove them, even though

21 you hadn't placed any orders with these companies since

22 2016?

23  A. I cannot -- I'm unable to advise since when we

24 had not placed orders for these customers.

25  Q. But you held on to them and told Tracy they had

1    to stay on the list?

2         A.   Yes.

3         Q.   Was there ever an instance where you told Tracy

4    they had to stay on the list and Tracy took them off the

5    list?

6         A.   (No response.)

7         Q.   That never happened; did it?

8         A.   Tracy keeps requesting to take them off the

9    list and I -- actually, this -- you brought up the email

10   from 7th of May.  There is a more recent email in the

11   last 30 to 60 days, too.

12        Q.   There is a more recent one?

13        A.   Yes.

14        Q.   Recent in what respect?

15        A.   Same discussion.

16        Q.   Okay.  Let's move on to another item over here.

17             MR. MAZZOLA:  Let's pull up Exhibit 48 that was

18   admitted into evidence.  48, 4-8.  It was a set of

19   minutes.

20   BY MR. MAZZOLA:

21        Q.   This is a set of meeting minutes, Mr. Kukreja,

22   and it was discussed yesterday.

23             Do you remember that?

24        A.   This was discussed yesterday, that's correct.

25        Q.   And in the context of discussing this

1    document -- I really put it up here to somewhat refresh

2    your recollection.

3           In the context of discussing this document

4    yesterday, do you remember talking about providing a

5    $1 million waiver to the leadtime penalty?

6       A.   I remember seeing a waiver of greater than

7    $1 million.

8       Q.   And that was round about the time of this

9    meeting; is that right?

10      A.   Yes.

11      Q.   So that would have been round about 2017,

12   right?

13      A.   Yes.

14      Q.   And do you remember saying that the waiver, the

15   $1 million leadtime waiver related to a period of time

16   between March 2017 and October 2017?

17      A.   Yes.

18      Q.   Now, one of the things we learned about the

19   leadtime penalties --

20           MR. MAZZOLA:  And you can take the screen down.

21   BY MR. MAZZOLA:

22      Q.   One of the things we learned about leadtime

23   penalties -- we learned this from you, and I don't think

24   there's any dispute over this -- is it's, sort of, a

25   graduated system, 2 percent, 3 percent.

1      But the highest it ever gets to is 10 percent,

2  right?

3      A.    Yes.

4      Q.    So if something is 100 days late, 200 days

5  late, 50 days late, it all gets hit with 10 percent?

6      A.    Yes.

7      Q.    And so you talked about waiving a million

8  dollars worth of leadtime penalty, right?

9      A.    Greater than a million dollars.

10      Q.    Greater than a million dollars.

11      So if you're going to waive greater than a

12  million dollars of leadtime penalty for a period of

13  8 months, that's got to mean for the year that we're

14  talking about the amount of payments, orders, deliveries

15  has got to be well greater than $10 million, right?

16      A.    (No response.)

17      Q.    That's simple math, right?

18      A.    Sure.

19      Q.    Okay.  Now, the period of time we're talking

20  about is March 2017 to October 2017.

21      So that would embrace the year 2017, right?

22      A.    Correct.

23      Q.    And using your math of the $1 million leadtime

24  penalty -- over $1 million in leadtime penalties being

25  waived, for that year, the purchases or the deliveries or

1  the payments would have to be well greater than

2  $10 million, right?  Right?

3      A.    Should be.

4          MR. MAZZOLA:  So there was a document that was

5  used yesterday, there was a spreadsheet.  I have it as

6  Exhibit 148, it was admitted.  It was a payment detail.

7  Can we pull that up?  Just pull up the summary for the

8  year.

9          MR. ROSENTHAL:  Mr. Mazzola, I think this is

10  the native.

11          MR. MAZZOLA:  Oh, okay.  Do we have it?

12          MR. ROSENTHAL:  I think the one we used was the

13  native, but it doesn't matter.

14  BY MR. MAZZOLA:

15      Q.    Do you see that?

16          MR. MAZZOLA:  Mr. Rosenthal -- oh, it's already

17  been published?  Okay.

18  BY MR. MAZZOLA:

19      Q.    So let's look at this.

20          For 2017, do you see that, Mr. Kukreja?

21      A.    I do.

22      Q.    The total amount of invoices is $9.1 million?

23      A.    For Circuitronix USA.

24      Q.    So when you waived and gave them that gracious

25  benefit, you were thinking about a much bigger number, a

```
 1    bigger pot, right?

 2         A.    That's what we gave them.

 3         Q.    It was a bigger pot, right?

 4         A.    That's right.

 5         Q.    So back to that pot again.

 6               So that pot included CTX-USA, CTX Shenzhen and

 7    the affiliated CTX Hong Kong in that big pot, right?

 8         A.    Yes.

 9         Q.    But then why yesterday did you say it was a

10    million when we were talking about these numbers over

11    here?  Why did you say that?

12         A.    So this is the same subject which I spoke about

13    earlier today where I said that there was this $500,000

14    waiver which I had not included in the numbers I

15    disclosed yesterday, the 2.9 million leadtime penalty.

16    Out of the 1.3 million only $500,000 was attributable to

17    Circuitronix LLC.

18               So in the 2.9 million, we took out -- when we

19    calculated the leadtime penalty, we only calculated what

20    was owed to Circuitronix LLC.  We did not -- we did not

21    take anything else into account.

22         Q.    So you remembered that last night, and you

23    corrected yourself this morning, and now that's the

24    answer to this question here; is that correct?

25         A.    Yes.
```

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1   Q.   Okay.

2        MR. MAZZOLA:  You can take that down.

3   BY MR. MAZZOLA:

4   Q.   Do you know what trade credit insurance is?

5   A.   I do.

6   Q.   Because I think you talked about it earlier.

7        Do you remember that?  You were taking about

8   Sinosure?

9   A.   Today?

10  Q.   Maybe yesterday.

11  A.   No.

12  Q.   Maybe the day before?

13  A.   No.

14  Q.   But you know they're a trade credit insurer,

15  right?

16  A.   Yes.

17  Q.   And the way trade credit works is trade credit

18  provides insurance to the seller in the event the buyer

19  defaults.

20       Is that one way it works?

21  A.   Yes.

22  Q.   And in the case of you, CTX, you would be the

23  buyer, right?

24  A.   Yes.

25  Q.   And Benlida would be the seller, right?

1    A.    Yes.

2    Q.    Did you ever hear anything about your trade --

3  about trade credit insurance for you for risks being --

4  for product being sold to you being an uninsurable risk?

5  Did you ever hear anything about that?

6    A.    I did.

7    Q.    And so you're aware that a trade credit

8  insurance company that evaluated everything, CTX, the

9  whole CTX, decided that CTX was not a risk worthy of

10  insuring?  Are you aware of that?

11    A.    That's an incorrect statement.

12          Firstly, they reviewed every entity by itself.

13  That's number one.  So Circuitronix LLC had its own

14  credit insurance.  The other entity had their own credit

15  insurance.

16          Number two, Circuitronix LLC had trade

17  insurance of $3.5 million.  That's number two.

18          Number three, when Douglas and Mr. Huang and

19  Tracy took back Benlida in 2012, I brought to their

20  attention that they are the ones who contributed to our

21  credit -- our credit history to be bad and there was --

22  there was a conversation as well as documentation that

23  the terms and conditions do not depend upon any insurance

24  from anybody.

25    Q.    And so the question for you is:  At any time

1    was CTX an uninsurable credit risk?  Yes or no?

2         A.    According to me -- according to what Benlida

3    had communicated to me, that limited it to $3.5 million.

4         Q.    So that meant the insurance company had reduced

5    what the -- what the risk could be for you?  They've

6    reduced your policy limits effectively, right?

7         A.    Not our policy limit; their policy limit.

8         Q.    But they did that by reviewing your company,

9    right?

10        A.    I do not know how they work, what -- how they

11   work inside.

12        Q.    But there came a time when they reduced the

13   number; is that right?

14        A.    That's what they informed me.  I was not -- I

15   was -- I was not in touch with Sinosure until Tracy

16   requested me to speak with them and provide them with

17   some information, which I did.  And -- but otherwise,

18   they were the ones talking with Sinosure.

19        Q.    What did they require from you?

20        A.    I cannot recollect.  It was a long time ago.

21        Q.    Were they looking for information from you or

22   one of your affiliate companies?

23        A.    I cannot recollect.

24        Q.    Let's talk a little bit about leadtime

25   penalties, okay?

1      A.     Sure.

2      Q.     There's a whole slew of leadtime penalty

3  reports.  Actually -- yeah, let's do that.

4           And you understand that at some point in time

5  you stopped sending these leadtime penalty reports; is

6  that correct?

7      A.     Yes, based upon Benlida's request.

8      Q.     And then there was a period of time when you

9  sent them a whole load of them at one time; is that

10  correct?

11      A.     That's correct.

12      Q.     And I think that might have been in 2018,

13  right?

14      A.     I cannot recollect, but that sounds correct.

15      Q.     And what prompted you to start sending them

16  again?

17      A.     There came a time when I told Tracy and other

18  Benlida team members that I cannot continue to hold.

19      Q.     "I cannot" what?

20      A.     I cannot continue to hold the -- the leadtime

21  penalty reports.

22      Q.     Was it around -- I beg your pardon.

23           Was it around July 2019 that you sent them?

24      A.     That must have been another round, but I think

25  I did send them in 2018, too.

1   Q.   And you sent a whole big bunch, right?  It was

2   20, 25, 30 at the same time?

3   A.   You're talking about in 2018?

4   Q.   2019.

5   A.   2019.  No, by 2019 we were caught up.

6   Q.   Okay.  So these leadtime penalty reports, we

7   saw them yesterday.

8            MR. MAZZOLA:  Can we put one up.

9   BY MR. MAZZOLA:

10   Q.   These leadtime penalty reports, over that

11   period of time when you were not sending them, was CTX

12   always generating them in-house?

13   A.   Yes.

14   Q.   So this wasn't a situation where all of the

15   sudden you've got everyone scrambling to create years'

16   worth of leadtime penalty reports; is that correct?

17   A.   I'm trying to recollect, but I do not think

18   that that's correct.

19            MR. MAZZOLA:  What exhibit is this?

20            MR. ROSENTHAL:  I was going to ask you the same

21   question.

22            MR. TOLL:  Redacted DO6.

23            MR. MAZZOLA:  Is this their document?

24            This is the one you used?

25            MR. ROSENTHAL:  This has not been utilized or

 1    admitted yet, so.

 2              MR. MAZZOLA:  Was it on your list?  I wanted to

 3    use one that you guys used yesterday.

 4              MR. ROSENTHAL:  That's fine, but just -- now

 5    that we know what you're talking about, can you give us

 6    one second?

 7              MR. MAZZOLA:  Okay, sure.

 8              Your Honor, this is published to the jury and

 9    Mr. Rosenthal is looking at it.

10              THE COURT:  If they can see it, then they're --

11    they have a lot better vision than I do.

12              MR. ROSENTHAL:  Your Honor, the issue is a

13    question of complying with your Honor's redaction

14    instructions.

15              THE COURT:  Yes.

16              MR. ROSENTHAL:  And one of the reasons that we

17    have not used certain documents is because we haven't

18    been able to go through them.

19              THE COURT:  He just wants to have a sample one,

20    so which one is in evidence that they can pull up?

21              MR. ROSENTHAL:  D-D10 would be the one that

22    we've used.

23              THE COURT:  Do you have that?

24              MR. MAZZOLA:  We have that.

25              MR. ROSENTHAL:  Thank you.

 1          MR. MAZZOLA:  D-D10 or D -- DD?

 2          MR. ROSENTHAL:  Yeah, DD.

 3          MR. MAZZOLA:  I just wanted to put this one up

 4    in front of you.  These were the -- can you make it a

 5    little -- actually, slide across so Mr. Kukreja can see

 6    the whole thing.

 7    BY MR. MAZZOLA:

 8      Q.    This one has an order release area on the side.

 9            Do you see that?

10      A.    Yes.

11      Q.    But before I get to that, so these are the

12    leadtime penalties.  It's not a surprise to anyone.

13            So my question is:  These are not things that

14    you just all of a sudden created round about I think it

15    was in 2019, you think it was in 2018, and just sent them

16    all over to us.  You were doing these on a monthly basis

17    with your team, right?

18      A.    That's correct.

19          MR. MAZZOLA:  I think I'm going to control

20    this.  Is that okay?

21            I want to scroll down to one of the lines over

22    here, and unfortunately, our version is not numbered.

23            Do you know where these are numbered over here?

24          MR. ROSENTHAL:  Week three?  And we're going to

25    the date January 16.  So up a little bit.  And right

768

 1    there.

 2    BY MR. MAZZOLA:

 3         Q.    So we're at Line 232.  And I just noticed this

 4    the other day, and I want to talk a little bit about

 5    that.

 6               The spreadsheet, it's done in U.S. dollars,

 7    right?

 8         A.    It's done in U.S. dollars, but by the purchase

 9    order number you can make out that this is a Shenzhen

10    transaction.

11         Q.    All right.  So there's an amount column.  So if

12    we scroll on over, right, we have an amount of $45,250.

13               Do you see that?

14         A.    I do.

15         Q.    So all of these numbers over here would be in

16    RMB, I assume, right?

17         A.    That is correct.

18               THE COURT:  I didn't hear it.

19               All the numbers would be what?

20               MR. MAZZOLA:  In RMB.

21    BY MR. MAZZOLA:

22         Q.    The Chinese currency; is that correct?

23         A.    That's correct.

24         Q.    And if you scroll on over, there's a leadtime

25    penalty number.

1          Do you see them?

2    A.    Yes.

3    Q.    Now, this one over here you say is 37 days

4  late, right?

5    A.    Yes.

6    Q.    And I think 37 days got them 10 percent, right?

7    A.    Yes.

8    Q.    And can you explain to me, because I -- I'd

9  like you to explain this.

10         You have 224,000 RMB, right?

11   A.    Could you go to the right?  Because I want to

12 just check whether that part number we're looking at is

13 RMB PO, Row 239.

14   Q.    I beg your pardon, 239?

15   A.    Yes, just go to the part number please.

16         That's a -- no, that's a U.S. dollar PO.

17   Q.    That's a U.S. dollar paid one?  It says S --

18 Shenzhen on it?

19         THE COURT:  Where does it say that?

20         MR. MAZZOLA:  Well, it has it an S-Z on it.

21         MR. ROSENTHAL:  Can you just tell us --

22         THE COURT:  What column?

23         MR. MAZZOLA:  Line 239, Column C.

24         THE COURT:  Thank you.

25         MR. MAZZOLA:  I beg your pardon.  You don't see

```
 1    the cursor over it.

 2              MR. ROSENTHAL:  It's hard to see.

 3    BY MR. MAZZOLA:

 4         Q.    Do you see that, Mr. Kukreja?

 5         A.    Yes.

 6         Q.    So is that a Shenzhen purchase order?

 7         A.    It is.

 8         Q.    So 224,000 RMB?

 9         A.    Yes.

10         Q.    10 days late --

11              THE COURT:  That's in Column J.  Why don't you

12    just -- every time you give a number, give a column so

13    that everybody here can easily follow and we don't have

14    to --

15    BY MR. MAZZOLA:

16         Q.    So we're at Line 239, Column Q.

17              Do you see that, Mr. Kukreja?

18         A.    I do.

19         Q.    And there you're applying a penalty of $22,405.

20              Do you see that?

21         A.    Yes.

22         Q.    But so that wouldn't be correct, right, because

23    you're applying the 10 percent to 224,000 RMB.  You

24    should have been converting the 224,000 RMB to U.S.

25    dollars; is that right?
```

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1       A.    That is correct, with the exception that when

2  we calculated the leadtime penalty for this case, we

3  removed any transactions that belonged to any other

4  company.  So all these transactions were taken out.

5            The 2.4 -- 2.4 -- $5 million which I stand

6  behind does not have transactions from any other company

7  in it.

8       Q.    Okay.  But it looks like, Mr. Kukreja -- I'm at

9  Line 232, Column J.

10      A.    Yes.

11      Q.    Do you see that?   And I'll scroll on over to

12 show you.

13            Now I'm at Line 232, Column C.  Do you see

14 that, Mr. Kukreja?

15      A.    Yes.

16      Q.    And the S-Z, that denotes that as a Shenzhen

17 PO, right?

18      A.    Yes.

19      Q.    45,250 RMB.

20            MR. ROSENTHAL:  If you use the mouse, we might

21 be able to see where you're pointing to with that little

22 plus.

23            MR. MAZZOLA:  There you go.  Stephen, you know

24 I'm not as good as you at this.

25

CROSS-EXAMINATION OF RISHI KUKREJA

772

BY MR. MAZZOLA:

Q.   Now, I'm scrolling over to the right.  I'm
going to move the mouse.

And here you've got a $4,525 penalty.

Do you see that, Mr. Kukreja?

A.   (Nodding.)

Q.   So that's not correct, right?

A.   That's not correct, but it's been taken out of
our calculations.

Q.   I understand that.

But these are the calculations that your team
did and that your team provided to Benlida; is that
correct?

A.   That's correct.

Q.   And it looks to me like, insofar as all of
these Shenzhen purchase orders, that the leadtime penalty
amount applied is wrong in all instances?

A.   Until March of 2016, all leadtime penalties
were being done separately for each entity.

After August 1st, 2018, all leadtime penalties
were being done separately.  And between March 1st, 2016
and October 31st, 2017, any discrepancies in leadtime
penalty was resolved by the 8 months -- whatever I gave
and 1st November 2017 to July 31st 2018.

Q.   Okay.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1        A.    We removed all transactions which had nothing

2   to do with the U.S. entity in our -- when we calculated

3   the numbers we presented in this case.

4        Q.    The numbers you presented in this case.

5              But this leadtime penalty report, your folks

6   prepared it, your folks sent it to Benlida; is that

7   correct?

8        A.    Yes.  I sent it to Benlida.

9        Q.    You sent it to them, and it wasn't correct?

10  That's all I'm saying.

11       A.    That's correct.

12       Q.    What's that?

13       A.    That is correct.

14       Q.    Are you aware of any instances where you sent

15  duplicate leadtime penalty reports?

16       A.    Duplicate reports?

17       Q.    And what I'm getting at is you said -- sent two

18  leadtime penalty reports.  Looking at the one on the

19  screen, same exact dates, same exact period of time, but

20  for different amounts.

21             That ever happen?

22       A.    No, it -- yes, it may have happened if by

23  chances after we sent it and we received feedback from

24  Benlida.  We amended the leadtime penalty -- we amended

25  it and then sent a revised one to them.

1      Q.    How often did that happen?

2      A.    I cannot -- I do not recollect.

3      Q.    But in the instances when it happened, Benlida

4  was looking through these and identifying mistakes and

5  errors and reporting them back to you, right?

6      A.    Yes.

7      Q.    Because one of the allegations that's been made

8  against Benlida was that their number keeping and their

9  bookkeeping was sloppy.

10           Have you heard that?

11     A.    Who made that allegation?

12     Q.    Sourabh did.

13     A.    That's his personal opinion.  I think -- I'm of

14 the opinion that Benlida is no worse or no better than

15 Circuitronix, which is no worse or no better than any

16 other company which is out there.

17     Q.    Lina said it too.  Lina said they were sloppy,

18 as well.

19     A.    That's their personal opinion.  My opinion is

20 that there were mistakes, there were mistakes on our side

21 too, and we worked together and rectified the mistakes.

22     Q.    And you are still ordering from Benlida, right?

23     A.    Yes, a little bit.

24     Q.    In August of 2023, you did approximately 85 --

25 not 85, 200,000 in orders?

1      A.   I cannot recollect.  I don't have that number.

2      Q.   Okay.  In September, the number went down to

3  50,000.

4           Do you recollect that?

5      A.   No, I do not.  I'm not...

6      Q.   How about for October?  To date, you've done

7  80,000 in orders from them.

8      A.   I do not recollect.  I do not keep track of

9  those numbers.

10     Q.   But you are still doing business with them?

11     A.   Yes.

12     Q.   When Benlida would issue -- when you would

13  issue purchase orders to Benlida, Benlida would do the

14  work and they would ship off the goods.

15          That's established, right?

16     A.   Yes.

17     Q.   Other than you talked earlier that sometimes

18  there were problems and you all worked them out on the

19  quality, right?

20     A.   There were -- There were problems, just --

21  there were lots of different types of problems, but

22  nothing -- nothing extremely alarming or anything of that

23  sort on either side.

24          Sometimes they would ship 500 box cartons, and

25  their freight ferry would deliver 497.  Then we worked

776

1    together to find out what happened to the 3.  Sometimes

2    we found the 3, sometimes we didn't find the 3; and we

3    worked it out.

4         Q.    And Benlida would issue invoices to your

5    company through the appropriate channels, right?

6         A.    Yes.

7         Q.    Did Benlida ever not send you an invoice?

8         A.    (No response.)

9         Q.    I mean, I know there's instances.

10             But generally they would send all the invoices

11   over, right?

12        A.    So Benlida always sent the invoices.  They

13   were -- sometimes they were slightly delayed, but, once

14   again, nothing out of the ordinary.  Like, it's nothing

15   endemic or -- it was fine.  Like, there was nothing wrong

16   with what they were doing.

17        Q.    Did you ever reject any of their invoices?

18        A.    The invoices did get -- I don't want to use the

19   word rejection, but I do want to say that we -- sometimes

20   we found errors in the invoices, told them, and then they

21   revised the invoices.

22        Q.    So there was never a situation where they would

23   send you an invoice and you'd send it back and say, no,

24   we never got it, we ain't paying it, send it back.

25             Is wasn't like that, right?

1    A.    If something like that happened, it was

2  absolutely minimal.  There could be instances over a

3  12-year period where they claim that they've sent a part,

4  and then we did not get it.  There have been instances

5  when we opened the box, and what's inside the box is

6  different part number than what they said.

7         But, once again, nothing out of the ordinary.

8  Like, it was not something -- I cannot sit here and say

9  that it was something disastrous.  It was not.

10         MR. MAZZOLA:  Okay.  Judge, could I have two

11  minutes with my colleagues?

12         THE COURT:  Yes.

13         MR. MAZZOLA:  60 seconds, probably.

14         Thank you, Judge.

15  BY MR. MAZZOLA:

16    Q.    What is this --

17         MR. MAZZOLA:  You can take the screen down.

18  BY MR. MAZZOLA:

19    Q.    There was some talk about premiums.

20         Do you remember that?

21    A.    I do.

22    Q.    And isn't it true that the premiums were things

23  that were required by the trade credit insurer because

24  CTX wasn't paying its bills?

25    A.    I do not know, but that is what was represented

1  to us by Benlida.

2      Q.    And isn't it also true that these premiums were

3  also required to pay down the money that was owed by CTX

4  to Benlida?

5      A.    Once again, I do not know.  That is what

6  Benlida represented to us.

7      Q.    And do you understand that as Benlida received

8  money from CTX, that they were using it internally to pay

9  down their oldest invoices to you?

10     A.    Absolutely not.

11     Q.    You didn't know that?

12     A.    They didn't know that.  I didn't know that.

13  They did not know that.

14     Q.    So no one at CTX knew that?

15     A.    And nobody at Benlida knew that.

16     Q.    Okay.  And you know with respect to the

17  premiums that we just talked about earlier, I think you

18  know the trade credit insurer is a state-owned entity,

19  right, Sinosure?

20     A.    I'm aware of that.

21     Q.    And so you know if they tell Benlida to do

22  something, they have to follow the rules, right?

23     A.    I do not know that, but what I can tell you is

24  that the number of times Benlida changed what was

25  required by the -- by Sinosure, I cannot really believe

REDIRECT EXAMINATION OF RISHI KUKREJA

779

1    anything which they were saying.  But they kept telling

2    me different things.

3              At one point they said that they were mandating

4    a 20 percent premium.  Another time they said 10 percent.

5    Then there was a set of purchase orders we did at

6    3 percent.  And then there was a set of purchase orders

7    we did at zero percent.

8              Even today we shipped -- we issued three types

9    of purchase orders to them:  One with a 10 percent

10   premium, one with a 3 percent premium, one with a 0

11   percent premium.  We don't know what the logic is.  We

12   don't understand it.

13             MR. MAZZOLA:  Thank you, Mr. Kukreja.

14             THE WITNESS:  Thank you.

15             MR. ROSENTHAL:  Your Honor, do you want to

16   break or do you want to start right up?

17             THE COURT:  No.

18             MR. ROSENTHAL:  Okay.  I'm just going to have

19   to get one of those microphones, please.

20                       REDIRECT EXAMINATION

21   BY MR. ROSENTHAL:

22        Q.   Mr. Kukreja, I'm going to make this brief.

23             THE COURT:  Is that a blank pad that you are

24   going to write notes to yourself?

25             THE WITNESS:  Sure, yes.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

REDIRECT EXAMINATION OF RISHI KUKREJA

 1           THE COURT:  Okay.

 2    BY MR. ROSENTHAL:

 3       Q.    Ready, Mr. Kukreja?

 4       A.    Yes.

 5       Q.    I promise this will be a lot shorter than the

 6    last time I was asking you questions.

 7           Mr. Kukreja, when you volunteered to

 8    Mr. Mazzola earlier today about the mistake you had made

 9    in your testimony that you realized you had made

10    regarding the leadtime penalty amount --

11       A.    Yes.

12       Q.    -- you had relied, I think you said, on the pie

13    chart that I had showed you with the colors and the

14    damage numbers?

15       A.    Yes.

16       Q.    Okay.  I'm going to ask you a question about

17    that.

18           MR. ROSENTHAL:  I'm going to ask Mr. Vega if he

19    wouldn't mind putting that pie chart up just so that

20    we're clear.

21    BY MR. ROSENTHAL:

22       Q.    Do you have it?

23       A.    Yes.

24       Q.    Okay.  So just to be clear, when you were

25    making sure that you were correct in your testimony, you

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    were talking about what color wedge or piece of this pie

2    chart?

3        A.    Leadtime penalties, which is in yellow.

4        Q.    Okay.  And so that number there, that

5    $2,994,050 is it your testimony that that is incorrect?

6        A.    That is incorrect.

7        Q.    Okay.  What should that number be lowered by,

8    approximately?

9        A.    Approximately $500,000.

10       Q.    And what does that $500,000 represent?

11       A.    It represents the waivers which we had given to

12   them and which I had said we were not asking them -- we

13   were not claiming those waivers from them.

14       Q.    Okay.  So this pie chart that I showed to you

15   has a mistake in it that I made, right?

16       A.    I believe so.

17       Q.    Okay.  So you stand behind your waiver that you

18   gave to Tracy Huang, Douglas Huang, and Mr. Huang when

19   you were in face-to-face meetings with them, correct?

20       A.    Yes.

21       Q.    And Mr. Mazzola just asked you recently

22   something about, Well, wasn't that like a million or more

23   than a million dollars.  And you testified to that.

24             Do you remember that?

25       A.    Yes.

1    Q.    And you said, I believe, that the only portion

2   of that waiver that you're seeking to -- you're only

3   getting rid of the portion of the waiver in this case

4   that does not relate to Circuitronix United States; is

5   that right?  In other words, Circuitronix U.S. is the

6   only company that you're focusing on leadtime penalties

7   on?

8    A.    That number is only for Circuitronix LLC.

9         THE COURT:  The 500,000 something?

10        THE WITNESS:  The 500,000 something.

11        THE COURT:  When you said earlier that there

12   was more than a million dollars that you forgave, that

13   included other affiliated entities?

14        THE WITNESS:  So, your Honor, the -- that is

15   correct, but the other fact is that we gave a waiver

16   three different times.  So even on the U.S. side prior to

17   this $500,000, we had given waivers, too, but that was

18   returned back to them in 2015, 2016.

19   BY MR. ROSENTHAL:

20    Q.    Okay.  So just so we're like perfectly clear,

21   the only money that's shown in this whole pie chart

22   that's being -- that's Circuitronix U.S., which is also

23   called Circuitronix LLC, which is the plaintiff in this

24   lawsuit, is seeking all that relates only to Circuitronix

25   LLC?

1     A.     That is correct.

2     Q.     And so the leadtime penalty amount, once we do

3  a corrected pie chart, will have a lower or a higher

4  amount?

5     A.     It will be a lower amount than that.

6     Q.     So the arrow that you pointed out voluntarily

7  to Mr. Mazzola today was in which company's favor?

8     A.     In Benlida's favor.

9     Q.     So that lowers the amount of damages that we're

10  seeking in this case?

11     A.     That is correct.

12     Q.     I'm going to have to come up with a -- do some

13  math and come up with a smaller number for the total?

14     A.     That's right.

15     Q.     That reflects the waiver that you're standing

16  behind?

17     A.     That's right.

18     Q.     Okay.  Also on the subject of being super

19  precise in testimony, I have a question.

20            Do you remember at the very beginning of the

21  day today Mr. Mazzola asked you whether you had spoken to

22  anybody last night about this case.  Do you recall that?

23     A.     Yes.

24     Q.     And did you answer him -- were you mindful when

25  you answered him that when you have a conversation with

1    your lawyers, myself, Ms. Martinez, Mr. Weinshall, that

2    those conversations are privileged and you're not to

3    speak about those?

4         A.   Yes.

5         Q.   And I want you to answer yes or no to this

6    question.

7              Did you have a conversation last night with me,

8    us, your lawyers about this case?

9         A.   Yes.

10        Q.   Okay.  And then I don't want you to talk about

11   anything else, but answer this as well.

12             During the conversation you had with your

13   lawyers, did you -- were there other people in this case

14   that your lawyers also represent as attorneys?

15        A.   Yes.

16        Q.   Okay.  Just wanted to be completely transparent

17   to the Court.

18             Mr. Mazzola asked you a question about --

19             MR. ROSENTHAL:  If we can bring up, Mr. Vega,

20   please, Exhibit 21, the manufacturing agreement, at

21   Page 7 -- actually, I guess it's page -- well, yeah,

22   let's start on Page 7.

23   BY MR. ROSENTHAL:

24        Q.   Mr. Kukreja, do you recall Mr. Mazzola asking

25   you about this Paragraph A at the top, and he had

785

1  highlighted this notice of default, the last --

2  second-to-last line on the right says:  Following notice

3  of default.

4       A.   Yes.

5       Q.   I think he asked you a series of questions like

6  did you send notices of default to Benlida?

7       A.   Yes.

8       Q.   Okay.  Are you aware that the section that he

9  was pointing you to, 10A, 10.2A, relates to termination

10  of this agreement --

11       A.   Yes.

12       Q.   -- not just breach?

13            MR. ROSENTHAL:  Mr. Vega, if you can back out

14  of that and go to the previous page, Page 6.

15  BY MR. ROSENTHAL:

16       Q.   Do you see the bottom says:  10.2, termination,

17  all the way at the bottom?

18       A.   So we have never given a termination.  We have

19  provided them with notice of breach, but not a notice of

20  termination.

21       Q.   Okay.  So when he was directing you to this

22  section and saying, have you given a notice of breach,

23  it's not about termination, right?

24       A.   His question was about breach.

25       Q.   Right.  But he was pointing you to the

786

1  termination section?

2      A.    I did not see the previous page, so...

3      Q.    He didn't show you the previous page?

4      A.    Yes.

5      Q.    Okay.  Let me ask you about the Section 10.4,

6  which is on Page 7, dispute resolution.

7           Since there's a little confusion about the

8  questioning with Mr. Mazzola on notices and breach and

9  whatnot, let's just be clear.  We talked about this a

10 little bit in our direct examination.

11          Is this the provision of the contract, the

12 manufacturing agreement, that governs how you go about

13 dispute resolution?

14     A.    Yes.

15     Q.    And did you do all the things that it requires?

16     A.    Yes.

17     Q.    Okay.  So let's look at A:  In the spirit of

18 continued cooperation, the parties use this dispute

19 resolution procedure.

20          I'm summarizing, right?

21     A.    Yes.

22     Q.    Okay.  And then B then goes to what you're

23 supposed to do; is that correct?

24     A.    Yes.

25     Q.    Okay.  So it say, first -- and I'm

1   summarizing -- resolve the dispute informally through

2   good faith negotiation between manufacturer and

3   Circuitronix?

4       A.    Yes.

5       Q.    Did you engage in good faith negotiations with

6   Benlida when disputes arose?

7       A.    Absolutely.

8       Q.    Did anybody -- the next sentence here, it says:

9   Either party may initiate negotiation proceedings by

10  written notice to the other party setting forth the

11  particulars of the dispute.

12          Do you see that?

13      A.    Yes.

14      Q.    That may have been what Mr. Mazzola was

15  referring to.

16          Did you or Benlida do that, send each other

17  some email or written notice saying, Hey, we got this

18  dispute, let's use the good-faith dispute resolution

19  proceedings?

20      A.    Yes.

21      Q.    Okay.  And did Circuitronix do that?

22      A.    Both sides did that.

23      Q.    Okay.  And then it says, you have to meet --

24  the next sentence:  Agree to meet in good faith to

25  jointly define the scope and method to remedy the

**REDIRECT EXAMINATION OF RISHI KUKREJA**

788

```
 1   dispute.

 2           Did you both agree to meet to try to do that?

 3       A.   Yes.

 4       Q.   Did you do that?

 5       A.   Yes.

 6       Q.   Okay.  And then it says:  If these proceedings

 7   are not productive of a resolution, then senior

 8   management of manufacturer in Circuitronix are authorized

 9   to and will meet personally to confer in a bona fide

10   attempt to resolve the matter.

11           Who, first of all, are the senior management --

12   well, let me ask it this way.

13           Did that happen?

14       A.   Yes.

15       Q.   There was a meeting personally?

16       A.   There were a series of meetings.

17       Q.   Okay.  Were you personally in attendance?

18       A.   Yes.

19       Q.   Okay.  Who from Benlida was involved?

20       A.   The July, August, 2019 email at Benlida had --

21       Q.   You said email or meeting?

22       A.   I'm sorry, meeting.  Sorry.  I had Tracy,

23   Mr. Huang, Douglas Huang, Ms. Chen, Mr. Leow (ph.).

24       Q.   Mr. Leow?

25       A.   Yes.
```

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

REDIRECT EXAMINATION OF RISHI KUKREJA

1    Q.    Okay.

2    A.    It was a pretty tense meeting.

3    Q.    Okay.  And look at the last section, C.  It

4  says -- Well, let me ask you this.

5        In that pretty tense meeting, did you guys

6  resolve this dispute?

7    A.    No.

8    Q.    So that's why we're here today?

9    A.    Yes.

10   Q.    Okay.  So Section C says:  Should any disputes

11 remain existent between the parties after the completion

12 of this two-step resolution process set forth above,

13 which is legal sounding language for once you do the two

14 other meetings in good faith, you still didn't resolve

15 your differences, then what?

16   A.    It's submitted to mediation.

17   Q.    Okay.  Let me stop you there for a sec.

18       It says:  Submit any dispute to mediation.

19       I don't want you to talk about anything in

20 mediation because mediation is generally considered

21 privileged, okay.

22       So was there a mediation?

23   A.    Yes.

24   Q.    Okay.  So check, you did that, correct?

25   A.    Yes.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

REDIRECT EXAMINATION OF RISHI KUKREJA

790

1     Q.   All right.  And then it says:  In the event

2  mediation is not successful in resolving the dispute, the

3  parties may agree to submit the dispute to arbitration as

4  provided by their respective jurisdiction.

5         It says:  The parties may agree to submit.

6         Did the parties agree -- reach an agreement on

7  submitting this dispute to arbitration?

8     A.   We did.

9     Q.   You did?

10     A.   But it did not move forward.

11     Q.   Okay.  So I'll conclude with this.

12         You had this dispute with Benlida, both parties

13  engaged in the necessary dispute resolution process,

14  correct?

15     A.   Yes.

16     Q.   So you've done what the contract requires, and

17  now you're here to try to enforce your rights under the

18  contract?

19     A.   That is correct.

20         MR. ROSENTHAL:  Let me just have one moment,

21  your Honor, to confer with my colleagues to make sure

22  that we are done.

23         We are done.

24         THE COURT:  All right.  Thank you, sir.  You

25  can step down.

791

1              (Witness excused.)

2              THE COURT:  Let's take a 10-minute break before

3    we come up with the next witness.  All right.  See

4    everybody in 10 minutes.

5              (Court recessed from 2:43 p.m. to 2:55 p.m.)

6              (Jury enters at 2:55 p.m.)

7              THE COURT:  Who is the plaintiff's next

8    witness?

9              MS. MARTINEZ:  It's Lina Ochoa.

10             THE COURT:  All right.  Please raise your right

11   hand to be sworn.

12             (Witness duly sworn.)

13             THE COURT:  All right.  Please have a seat.

14   Pull yourself up close to the microphone, and pull the

15   microphone close to you.  And when you're ready, please

16   tell us your name and spell your last name.

17             THE WITNESS:  My name is Lina Ochoa.  My last

18   name is spelled O-C-H-O-A.

19             THE COURT:  Thank you.

20             THE WITNESS:  Is that good the volume?

21             THE COURT:  Yes.

22             MS. MARTINEZ:  Thank you.

23

24

25

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

DIRECT EXAMINATION OF LINA OCHOA

792

1                          LINA OCHOA,

2    called as a witness herein, having been first duly sworn,

3    was examined and testified as follows:

4                        DIRECT EXAMINATION

5    BY MS. MARTINEZ:

6        Q.    How are you feeling today, Ms. Ochoa?  Good

7    afternoon.

8        A.    Good afternoon.

9              A little nervous.

10       Q.    Why are you nervous?

11       A.    I'm not really used to this setting, but I'll

12   get comfortable soon.

13       Q.    We'll get comfortable together.

14             Where do you live, Ms. Ochoa?

15       A.    Miramar, here in Florida.

16       Q.    And were you born here in Florida?

17       A.    No, I was born in Columbia.

18       Q.    Did you move here after Columbia?

19       A.    I moved to Boston.  I was there for ten years,

20   and then I moved to Florida almost 16 years ago.

21       Q.    In terms of your educational background, what's

22   the highest degree you've obtained?

23       A.    I went to college.  I have a bachelor's.

24       Q.    What was your degree in?

25       A.    International business.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

 1      Q.    And where do you work now, Ms. Ochoa?

 2      A.    At Circuitronix.

 3      Q.    Circuitronix...

 4      A.    LLC.

 5      Q.    When did you first start working at

 6   Circuitronix?

 7      A.    February 5th, 2008.

 8      Q.    When -- so it was about 16 years ago?

 9      A.    Almost 16 years, yeah.

10      Q.    So when you moved to Florida, did you also --

11      A.    Yeah, I moved, and I started at Circuitronix

12   the day after.

13      Q.    What is your current position at Circuitronix?

14      A.    I am the operations manager/global operations

15   manager.

16      Q.    And was that always your position?

17      A.    Yes.  I started as an operations manager when I

18   joined the company.

19      Q.    In the role of operations manager or global

20   operations manager, what Circuitronix functions do you

21   oversee?

22      A.    So I oversee the warehouse department, IT,

23   logistics, HR, and accounting.

24      Q.    And of those functions, what -- are you

25   supervising people in Circuitronix LLC in Fort Lauderdale

794

 1    or --

 2         A.    Yes.

 3         Q.    -- elsewhere?

 4         A.    In Circuitronix LLC in Fort Lauderdale.

 5               On the global side, I work with -- in HR in

 6    other countries.

 7         Q.    And what other countries?

 8         A.    Mexico, Germany, Hong Kong, India.

 9         Q.    And what do you do in your supervisory role of

10    the HR across these different locations?

11         A.    So because we hire them to provide us services

12    on different back-office supports, and the HR is a key

13    component.  So it's important that we align, you know,

14    job descriptions, the requirements that we have, the

15    trainings, how the interviewing needs to be conducted so

16    that the right people with the right skills are hired to

17    do the tasks that we are hiring those entities to do for

18    us.

19         Q.    So are you yourself involved with hiring as

20    part of that global supervisory role?

21         A.    No.  The head of the departments are because

22    they need to ensure that they have the right skills to

23    conduct the functions that we are giving these companies

24    to do for us.  But it's more on aligning the process and

25    the selection and making sure that the right skills are

1    being sourced.

2         Q.    Are you yourself a member of these departments?

3         A.    No.  I oversee the functions, but I don't see

4    the day to day.  The day to day, there's teams that

5    handle it.  Each department has its own head.  But I

6    orchestrate or coordinate functions, make sure that they

7    deliver the task on time.  And, you know, that's more of

8    my high level overview of the departments.

9         Q.    So the head of accounting, for example, would

10   report to you?

11        A.    Correct.

12        Q.    And that's the head of accounting at

13   Circuitronix LLC?

14        A.    Yes.

15        Q.    Does the head any other department --

16        A.    Yeah, correct.

17        Q.    So like logistics, IT, the other departments

18   you referenced?

19        A.    Yes.

20        Q.    So you mentioned you have been at CTX for

21   almost 16 years, and you oversee several departments,

22   including accounting.

23        A.    Mm-hmm.

24        Q.    So can you tell me a little bit about the

25   accounting team and the different responsibilities that

1    are taken care of within that team?

2        A.    So accounting team takes care of -- from

3    inventory receiving, to billing, to making payments,

4    invoicing the customers, collecting money from the

5    customers, making sure that the banks in our system

6    matches the transactions in the bank.

7             So they are the ones that take care of

8    everything after receiving an inventory all the way to

9    collecting the money from the customers.

10       Q.    You said collecting the money from the

11   customers?

12       A.    Yes.

13       Q.    Okay.  And right now in the accounting team

14   that reports to you, about how many people are in the

15   accounting department?

16       A.    So here in Fort Lauderdale we have five people.

17       Q.    Five people.

18             And is that more or less the size -- has the

19   size of the team changed over time?

20       A.    Yeah, it's been five to seven.

21       Q.    And how are there -- you mentioned different

22   functions that accounting takes care of.

23             Is that true of every single member of the

24   accounting team?  I can explain.

25             So does every member of the accounting team,

1    are they responsible for all of the different functions

2    that you mentioned?

3        A.    No, it's divided.  So everybody is specialized

4    in one part.  So we have an accounts payable for overhead

5    bills.  For example, we have accounts payable that only

6    takes care of inventory receiving and billing.  And then

7    we have another accountant that takes care of bank

8    reconciliations.  And then you have a senior accountant

9    that's more like making sure that everything is being

10   posted in the correct accounts and your financials are

11   being produced, in compliances, and things like that.

12        So everybody is specializing in something

13   different.

14       Q.    Are the team members divided at all by customer

15   or by supplier?

16       A.    No.

17       Q.    What's your opinion of the people in accounting

18   who report up to you?

19       A.    So I believe we have a good recruiting and

20   selection.  We make sure we select people that have the

21   skills and have the degrees, that have the knowledge,

22   they're very proficient with Excel.  So -- and they're

23   all very good and hard working.  So I think the team is

24   pretty good.

25       Q.    And in Circuitronix LLC and specific to the

1   accounting department, how would you describe attorney --

2   employee retention?  Excuse me.

3        A.   So I think employee retention is not different

4   from other entities.  I've seen, you know, like after

5   COVID, there was a big retention issue with all the

6   companies because the employees didn't like, you know,

7   coming back to work and things like that.  So I think

8   it's pretty in line with what the market conditions are,

9   and I believe they're pretty normal attrition rates.

10       Q.   When people have separated from Circuitronix

11  LLC, what are the general reasons, if you know, that they

12  leave the company?

13       A.   So different circumstances with people that

14  move out of state.  We have people that have had children

15  and decided to stay home.  We had people that retired.

16  We had people that decided to change their jobs and went

17  into Government jobs.  And we had people that we had to

18  separate as well.

19       Q.   And when you say "that we had to separate," you

20  mean that we had to fire?

21       A.   Yes.

22       Q.   Okay.  Before I move on to that subject, I want

23  to ask you.

24            When you discussed those different reasons why

25  people leave, was that limited to the accounting

1    department?

2         A.    No, that's typical of every company.  And

3    you'll have some people that you have to separate.

4         Q.    Okay.  No, I meant -- sorry.

5              To be clear, when I was asking different

6    reasons why people leave, that's across different

7    departments at the company, not just accounting?

8         A.    Yes, different departments.

9         Q.    Okay.  So going to the topic of firing people

10   and having to terminate someone, have you ever had to do

11   that at Circuitronix LLC?

12        A.    Yes.

13        Q.    How is that process handled, generally?

14        A.    Well, when somebody needs to be separated, HR

15   needs to be involved because there has to be a process

16   where the person is being given counseling or warnings,

17   written warnings.  Sometimes these employees are put into

18   our, what we call, a performance improvement plan, where

19   we align what is the employee failing, what is the

20   expectation, and how we want to bridge the gap.

21              So once we do all those things, then -- then

22   HR, kind of, gives the go-ahead that we've tried

23   everything in our power to ensure the employee improves,

24   and if he doesn't, then there's nothing we do at that

25   point.

1    Q.    And since you are the person that HR reports

2    to, I understand, do you have to approve of these

3    recommendations and decisions before any action is taken?

4    A.    So HR reviews them.  I have to review them and

5    approve, and then Rishi also has to get involved.

6    Q.    Get involved in what way?

7    A.    To approve it.

8    Q.    Okay.

9    A.    We don't terminate anybody since we are all of

10   the three, HR head, operations head, and the CEO,

11   agreeing to it.

12   Q.    Okay.  Now, when you -- kind of the opposite

13   side of the coin.

14        When you're onboarding a new person, what does

15   that process look like?  And I'll focus you on accounting

16   department, if I may.

17   A.    Okay.  So first day is always an HR onboarding

18   experience.  So it's more of the policies and procedures

19   of the company, the rules and regulations, you know, our

20   office hours, what's expected from you, some company

21   trainings like harassment and things of that nature.

22        Then the employee goes to lunch with the

23   department that the employees is going to work, in this

24   case accounting, so they go out for lunch.  And then the

25   manager plans the first week of trainings depending on

1    what the function is, who that person is going to sit

2    with and learn the function.

3              One thing in accounting is that it's

4    cross-functional, meaning everybody -- every role has to

5    be known by two people.  So if somebody leaves, the other

6    person is able to teach the new person that comes on.  So

7    that's an important part of the onboarding.

8              Now, what happens is the -- the way they learn

9    the first few weeks is they sit and watch the other

10   person work, and then when they do it, the other person

11   watches.  And then there's, you know, extra oversight and

12   help for the employees to make sure that we are

13   addressing questions and maybe highlighting things that

14   they're not going to notice which are not common in the

15   occurring day to day.  So that's the onboarding process.

16        Q.    Are you involved in that process?

17        A.    The head of the department coordinates that.

18   If there is any topics that require me training, I will

19   be part of the process.  I treat everybody like a family

20   group, so I like to go and check on people say, Hey, do

21   you have any questions.  And if they come to me with any

22   questions, then I try to teach them the whys and the hows

23   so they can understand when they face a similar situation

24   as to where to get the answer or I know about this story

25   so they can relate, so...

1    Q.    So kind of on that point, how would you

2  describe your professional relationship or social

3  relationship with the people who report up to you?

4    A.    I think it's very good.  I work on a

5  collaborating mode.  I like people to come into my office

6  even though I'm on a phone call or a Zoom call or things

7  like that because I like to -- I believe that my role is

8  to remove people's obstacles and help them get the job

9  done.

10         So I am -- they're very close.  They come to me

11  all the time.  I go to them and try to keep a tab with

12  everybody to ensure I don't forgot a task, or maybe

13  something is pending for me.  And I, you know, truly care

14  about those people on a personal level, so I like to

15  check on so and so's son and how's he doing and that kind

16  of stuff.  So I think we're very close.

17    Q.    Do you see each other outside of work?

18    A.    Not anymore.  I have two kids, and one of them

19  is a teenager so I'm pretty busy.  But before kids, we

20  used to go to happy hours and things like that.  But not

21  anymore.  I don't have time.

22    Q.    Are you familiar, Ms. Ochoa, switching gears,

23  with a company called Jiangmen Benlida Printed Circuit

24  Co.?

25    A.    Yes.

803

1    Q.    How are you familiar with them?  What do you

2   know about them?

3    A.    They are one of our suppliers.

4    Q.    And were you supervising any work that was done

5   on that account with Benlida?

6    A.    So it's just a regular supplier, so there is

7   the receiving of the inventory, the billing of inventory,

8   the, you know, preparation of payment details, making

9   payments to the supplier, dealing with, you know, issues.

10   Q.    Okay.

11   A.    So it's just as a regular supplier.

12   Q.    Okay.  Now, to some of the comments you just

13  made about the process that at this point the jury has

14  heard a lot about, about the process of ordering a

15  printed circuit board, of having that delivered, of

16  paying, sending invoices, sending purchase orders, what

17  role in that process does the accounting department in

18  Fort Lauderdale play right now?

19   A.    To place a purchase order?

20   Q.    Well, of the whole life of the process, placing

21  the purchase order, receiving shipment.

22   A.    Yeah.

23   Q.    What, if any, role does accounting play in that

24  role?

25   A.    So the accounting team is only responsible to

1  receive the inventory and then bill that inventory.  So

2  the purchase -- once the purchase order is sent, it's a

3  document that is kind of locked in our system, and you

4  receive against that document.  So that's how you receive

5  inventory in, and that's the inventory that once shipped

6  to the customer, it could be invoiced.

7        Q.    So when you say receiving, what exactly does

8  that look like from the accounting perspective?

9        A.    It's a transaction in the system that you

10  select a PO that has been placed to a supplier.  And

11  that's going to show you the supplier, the part number,

12  the quantity on the PO.  And then you receive, meaning,

13  okay, on today's date, I'm receiving against this PO.

14  You can only select from the products on the PO.  And you

15  can only select up to the number of the quantity on the

16  PO.  And that's -- once you save that transaction, then

17  your inventory in your system has increased.  So

18  that's -- it's a transaction.

19        Q.    It's a transaction.

20              And when you refer to the system, what are you

21  referring to?

22        A.    It's our ERP system called Sage.

23        Q.    Called Sage.  I'm going to ask you a little

24  more questions about that, but before I get to that, I

25  want to talk about the payment process or things that

 1   accounting does in relationship to the payment.

 2           So what, if any, role does accounting have in

 3   that payment --

 4       A.    So once inventory is received, then the

 5   accounting team goes and creates a bill against that

 6   receipt.  So, again, it's a transaction that is linked

 7   together.  So I can only pick that receipt that it's with

 8   that supplier for that part number for that quantity that

 9   I just received.

10           So that bill goes into what's called an

11   accounts payable account.  So those are the bills that in

12   your system are available to be paid.  So accounting will

13   prepare payment details based on payment terms with

14   different suppliers.

15           So it's just a presentation of, here is our

16   bills that are due for such date, and then once approved,

17   then a payment is set up.  And once the payment is

18   released, then the payment is applied in the system.

19           So all that is housed within the accounting

20   team.

21       Q.    Okay.  I heard you mention payment details.

22       A.    Mm-hmm.

23       Q.    What is a payment detail?

24           MS. MARTINEZ:  And if I may, I'd ask Mr. Vega

25   to pull up, just to look at, I think it's an attachment

 1    to Exhibit 100.  It was already admitted into evidence.

 2    It's the payment detail.

 3    BY MS. MARTINEZ:

 4         Q.    Is this what you're referring to, Ms. Ochoa?

 5         A.    Yes.  It is a payment details of presentation

 6    of the bills that are due to that supplier.

 7         Q.    And who from the accounting department would

 8    create this?

 9         A.    Accounts payable.

10         Q.    And would they use a specific program?  Is it

11    automatically generated?

12         A.    It comes from Sage, the bills from your system.

13    It's -- you just download how much you owe and that comes

14    up.

15         Q.    Okay.  And what do you do -- what do you do at

16    the --

17               MS. MARTINEZ:  If -- Mr. Vega, if you can focus

18    on the bottom, please.  Yep.

19    BY MS. MARTINEZ:

20         Q.    What is the accounts payable team kind of doing

21    here, if you could break it down?

22         A.    So it's listing the bills for that particular

23    month based on a payment term and then list the debit

24    memos up to that period.  Debit memos are credits due to

25    different reasons.  And then it gives you a subtotal.

807

1           And then from there, it is listing what your

2   prior balance from the prior payment detail was and then

3   listing all the additional payments that were made to

4   that account until that period, which gives you your

5   total carrying balance as of that month.

6       Q.   Okay.  Thank you.

7            MS. MARTINEZ:  You can take it down.  Thank

8   you, Mr. Vega.

9   BY MS. MARTINEZ:

10      Q.   Were the payment details transmitted outside of

11  CTX?

12      A.   The payment details are sent to the suppliers.

13      Q.   What role --

14      A.   Via email.

15      Q.   Via email.

16           Who sent them to the supplier?

17      A.   Accounting, accounts payable.

18      Q.   Did you ever send a payment detail --

19      A.   No.

20      Q.   -- to a supplier?

21           But you -- did it -- is it something that would

22  have crossed by your desk, or did anyone have to ask for

23  your approval before it was sent out?

24      A.   No.

25      Q.   So I want to go back to what I had told you I

 1    would ask you a couple questions about, about the Sage

 2    system.

 3         A.    Mm-hmm.

 4         Q.    We've heard a lot about it, but I think -- I

 5    want to break down some of the information the jury has

 6    heard over the last couple of days.

 7               Has CTX always used Sage?

 8         A.    No.

 9         Q.    When did you start using it?

10         A.    March 1st, 2017.

11         Q.    And what did you use before that?

12         A.    NetSuite.

13         Q.    What is the difference between the two of them?

14         A.    There's no difference.  It's two different

15    products that address the same thing, but the

16    functionality within it, you know, could be more

17    beneficial for certain businesses.  But it's the same --

18    it's an ERP system.

19         Q.    What made CTX -- what prompted CTX to switch

20    from NetSuite to Sage?

21         A.    So we were looking for -- to add efficiencies

22    within our organization.  So we looked at different

23    systems, including NetSuite.  We revisited NetSuite and

24    see its capabilities, and we saw a few more.

25               So Sage offered a lot of more features, they

1   added more value to us, so that's why we thought it was

2   the best solution.

3       Q.    Who was involved in that decision?

4       A.    I was the main person.  And then we presented

5   the end result to CEO, to Rishi, and then he gave us the

6   go-ahead.

7       Q.    What was the process like for you, it sounds

8   like as the point person, of choosing and helping to

9   implement Sage?

10      A.    It's a very intense work.  You hear consultants

11  that specialize in the system.  And they guide you

12  through -- there is a project manager, and then you

13  assemble your own team.

14          So what you have to do is you have to evaluate

15  every process you have, from how you quote, how do you

16  place a PO, how do you manage your vendors, everything.

17  So they're going through every single process.

18          So what we do is we have something called

19  subject matter experts.  So every department has one

20  person that gave the experts, and then they're going to

21  talk about the process that we have.  Then consultants

22  are going to kind of document all that and configure the

23  system to do what you want it to do.

24          Along with consultants, which are

25  knowledgeable, they would also give you ideas of, you

810

1    know, industries -- best industry standards of how to do

2    that process best.

3        Q.    And you mentioned that one of the goals was

4    improved efficiency.

5        A.    Yes.

6        Q.    What did you mean by that?

7        A.    So efficiency, it's to do the same tasks in

8    less time with more accuracy.  That would be what

9    efficiency is.

10       Q.    When you say more accuracy, does that mean

11   NetSuite was inaccurate?

12       A.    No, it wasn't inaccurate.  It just took more

13   time.  So it was a lot more labor intensive.

14       Q.    And remind me, when did Sage go live?

15       A.    March 1st, 2017.

16       Q.    And what was the process of it going live at

17   CTX?

18       A.    So the implementation took about nine months.

19   And again, it was long hours.  And we wanted to be very

20   detailed.  There is a lot of documentation that goes with

21   doing this, a lot of testing.

22            But it's a difficult process because people

23   don't like to change.  And that required not only, Hey,

24   your screen is going to look different, but perhaps

25   certain departments have to do three steps, they used to

 1   do two.  But it's going to say you need two, three more

 2   for the next department.

 3           So, you know, having people to change was

 4   difficult, but once they started seeing the outcome, then

 5   they were less resistant to do that.  And then the other

 6   issue is people don't want to let go of their own, you

 7   know, side processes that they had so they made it harder

 8   for themselves.  So I think that was the hardest part.

 9      Q.    And after this nine-month period, how do you

10   feel like NetSuite stacks up to Sage?

11      A.    I think Sage is doing what we intended it to

12   do, to create efficiencies.  So I'm glad we did that

13   change.

14      Q.    Does any other entity affiliated with

15   Circuitronix LLC have access to Sage?

16      A.    Yes.

17      Q.    Does it look different?  What are the -- what's

18   different about Sage in Richi Circuitronix in India

19   versus Circuitronix LLC in Fort Lauderdale?

20      A.    So it's set up separate.  Each one has its own

21   chart of accounts.  Each one has its own entity with its

22   own financials.  And we create users with certain

23   security.  So we decide who has access to what.  Not

24   everybody has access to everything.

25           So accounting only has access to the

812

1    accounting.  A salesperson wouldn't have access to

2    accounting.  So it allows us to create that separation

3    between entities and functions, all -- so it's a pretty

4    well-secure system where having only one login.

5        Q.    Okay.  I'm going to shift gears a little bit to

6    talk again about something the jury has heard a little

7    bit about -- or a lot about, leadtime penalties.

8        A.    Mm-hmm.

9        Q.    Are you at all involved in calculating the

10   leadtime penalties for Circuitronix LLC?

11       A.    So I don't calculate them myself, but it was a

12   process put for the accounting department to have a

13   monthly process to get it done.

14       Q.    And was there a document or a -- is it on the

15   system?

16       A.    It is a report that is put together on a

17   monthly basis.

18       Q.    And what's that report called?  Does it have a

19   name within the company?

20       A.    The leadtime penalty report.

21       Q.    Okay.  What's the format -- well, I'm going to

22   skip over some of these questions.

23            You mentioned right now accounting takes care

24   of generating the leadtime penalty report; is that

25   correct?

DIRECT EXAMINATION OF LINA OCHOA

1    A.    That is correct.

2    Q.    Was that always the case?

3    A.    No.  It was done by the sales team before.

4         MR. MAZZOLA:  I beg your pardon?  I didn't get

5    that answer.

6         MS. MARTINEZ:  The sales team before.

7         THE WITNESS:  It was done by the salespeople

8    before.

9    BY MS. MARTINEZ:

10    Q.    And where is that sales team located?

11    A.    Currently?

12    Q.    Currently, yes.

13    A.    In India.

14    Q.    And is that part of Circuitronix LLC?

15    A.    No.  These are a third-party contract where we

16   contract Richi Circuitronix to provide services for the

17   sales.

18         MS. MARTINEZ:  Mr. Vega, can you pull up -- I

19   think it's the third attachment to Exhibit D-Y7.  This is

20   already in evidence.

21   BY MS. MARTINEZ:

22    Q.    So, Ms. Ochoa, you mentioned you didn't have a

23   role in generating the leadtime penalty report.

24         What oversight, if any, did you have of its

25   creation or of the process of creating it?

1    A.    So we're working on creating a process that

2 minimize human interaction by generating a report in the

3 system that could be automatically downloaded, copy, and

4 pasted into a format that had formulas in it so that

5 eliminated -- almost eliminated the human interaction of

6 the report.  And I'm making sure that we had timelines of

7 producing such a report.

8    Q.    And when you say "human interaction," what are

9 you referring to?

10    A.    Not having to type the information or change

11 formulas.

12    Q.    Okay.

13    A.    So if it's a download copy and paste, then

14 there is less chances for error.

15    Q.    Could you -- Using the column headings that you

16 see in front of you, could you tell me what columns are

17 downloaded from the internal system here?

18    A.    So from A to J, so the gray heading -- although

19 mine is white -- so from A to J is downloaded from the

20 system.  And L to P, it's formulas formulated.

21    Q.    And who created those formulas?

22    A.    It was a collaboration of the accounting team

23 and the sales team.

24    Q.    Okay.  If I could break that down.  Let's look

25 at Column M.  That's -- is that one of the columns that

1   contains a formula?

2       A.   Yes.

3       Q.   What is the formula, if you can tell us in

4   plain English, and not Excel speak?  Try to walk us

5   through that.

6       A.   So what the formula is is that it looks at the

7   layers of that product and it determines, based on the

8   matrix, when we should have received it.

9       Q.   So what matrix are you referring to?

10      A.   You'll have to go to the data.

11      Q.   Okay.  So are you referring to the tabs at the

12  bottom --

13      A.   The tabs at the bottom will have the matrix.  I

14  don't know is the data -- yep.  So G and H.

15      Q.   Columns G and H?

16      A.   Yes, have the layers and the number of days

17  that each should take.

18      Q.   So the more layers, the more leadtime?

19      A.   The more time they have to take, yeah.

20      Q.   At the top of top of Column H, is LT leadtime,

21  is that what that stands for?

22      A.   LT stands for leadtime, yeah.

23      Q.   Okay.

24           MS. MARTINEZ:  Can we go back to the April 2019

25  tab.

816

1   BY MS. MARTINEZ:

2       Q.    The top of Column N, the timeliness column, how

3   do you determine if something is late or timely?

4       A.    So you compare M to J.  So M is when we should

5   have received it based on the leadtime, and J is when we

6   actually received it.

7       Q.    Okay.  And --

8       A.    So that's what N compares.

9       Q.    And then what does O do with days late?

10      A.    It calculates the difference between M and J.

11  So if we should have received it in the green date and we

12  received it on the date under the J column, then you

13  calculate the number of days, that difference.

14      Q.    So if I'm looking at Column J6 -- Row 6 and

15  Column N, Row 6, the difference between that in this case

16  in Row 6 is 32 days?

17      A.    Correct.

18      Q.    Okay.  How do you calculate the formula, or

19  what is the formula again in plain English, if you can,

20  in Column P?

21      A.    In Column P.  So Column P calculates the

22  percentage based on the number of days that it was late.

23  So, again, it looks at the tabs on the bottom.

24      Q.    Which tabs?

25      A.    The discount matrix.

DIRECT EXAMINATION OF LINA OCHOA

817

1          So in here it's saying if it's one day late,

2     it's a half a percent, if it's two days late, it's

3     one percent, and so forth all the way up to eight days.

4     That would be the next one, so if anything is eight days

5     or more, the maximum is 10 percent.

6               MS. MARTINEZ:  I think you can take that down,

7     Mr. Vega.  Thank you.

8     BY MS. MARTINEZ:

9          Q.   And you mentioned -- if you could remind me,

10    how often was the report created?

11         A.   Monthly.

12         Q.   Could the formulas in the report be changed?

13         A.   Yes, but this was handled by skilled accounting

14    people only, and they are the only ones that had access

15    to it.  And the way that it was set up was so nobody had

16    to type anything on it.

17         Q.   What checks, if any, existed to catch if there

18    was an error or someone accidentally typed something?

19         A.   So, usually, somebody prepares it, and a

20    supervisor will review it, so.

21         Q.   And after the accounting team was done

22    generating the report, what happened to it?

23         A.   It was sent to the -- to Rishi.

24         Q.   To Rishi.

25               Do you know if the report got sent to

1   suppliers?

2       A.   Sometimes.   Under the directive of Rishi,

3   accounting will send it or not send it.

4       Q.   But is that a decision that you made or were

5   involved in?

6       A.   No.

7            MS. MARTINEZ:   I have no further questions for

8   now, your Honor.

9            THE COURT:   All right.   Cross-examination?

10                       CROSS-EXAMINATION

11  BY MR. MAZZOLA:

12      Q.   Good afternoon, Ms. Ochoa.

13      A.   Good afternoon.

14      Q.   Hi, good to see you again.

15      A.   Nice to see you.

16      Q.   Let me gather up a few things.

17           We took your deposition. Do you remember?

18      A.   Yes.

19      Q.   It was a while back.

20      A.   Yes.

21      Q.   Now, well, your position, it's global --

22  global, I think, manager?  Is that what it is?

23      A.   Operations manager.

24      Q.   Operations manager.

25           And as the operations manager, some of your

819

1    roles involve managing, well, what we know, the

2    accounting department here in Florida, right?

3        A.    Correct.

4        Q.    And you're in charge of managing the HR

5    department as well, right?

6        A.    Correct.

7        Q.    And your management, it spreads across all the

8    various CTX operations, right?

9        A.    On the HR side.

10       Q.    On the HR site.

11             So that would include Germany and Mexico and

12   the like, right?

13       A.    On the HR side, yes.

14       Q.    On the HR side.

15             One of the things I want to try to understand

16   is the relationship between CTX India and CTX here as it

17   relates to inside sales.

18             Do you understand what I mean when I say inside

19   sales?

20       A.    No.

21       Q.    So inside salesmen, these are the people that

22   sort of liaise between the -- Benlida, on the one hand,

23   and your customer, right?

24       A.    Yes.

25       Q.    And your customer might be, like, Hella.

820

1          Those are the people that make the headlights,

2     right?

3          A.   Okay.

4          Q.   Do you know any of the customer's names?

5          A.   I do.

6          Q.   You do.

7               Well, do you know what I mean when I say

8     customers?  The people that are purchasing the PCBs,

9     right?

10         A.   Yes.

11         Q.   And these inside salespeople, they're all in

12    India; is that correct?

13         A.   We have some here and some in India.

14         Q.   But in the main, they're mostly in India; is

15    that correct?

16         A.   They're mainly in India, yes.

17         Q.   And these inside salespeople, they're the ones

18    that would be issuing the purchase orders --

19         A.   Yes.

20         Q.   -- to Benlida, right?

21         A.   Correct.

22         Q.   Now, the inside salespeople, I think Sourabh

23    Sharma is the boss; is that correct?

24         A.   Sourabh Sharma is the inside sales manager in

25    India, yes.

CROSS-EXAMINATION OF LINA OCHOA

1     Q.    He's only the inside sales manager in India?

2     A.    As far as I know, yes.

3     Q.    Isn't Sourabh responsible for all inside sales?

4     A.    For PCBs?

5     Q.    Mm-hmm.

6     A.    Yes.

7     Q.    So that would be all inside sales.

8          So inside salespeople in India and inside

9  salespeople in the U.S., right?

10    A.    He -- not really.  The inside salespeople in

11  the U.S. report to Rishi.

12    Q.    Do you remember taking that deposition?

13    A.    Yes.

14    Q.    And you may be right, and I may be wrong.

15  But -- so I'll check, Ms. Ochoa.

16         You were asked -- do you remember taking the a

17  deposition, right?

18    A.    I do.

19    Q.    And during that deposition at Page 27, at Line

20  21:  How was inside sales structured --

21    A.    Mm-hmm.

22    Q.    -- who was the boss of that?

23         Do you remember being asked that question?  You

24  may not.

25    A.    No.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

CROSS-EXAMINATION OF LINA OCHOA

1      Q.   And your answer was -- I'll tell you in a

2    second:  So for the PCB, Sourabh is the --

3            Question:  Sourabh, yes?

4            And you answered:  -- the manager.

5            So I'm trying to understand now, was Sourabh

6    the boss of all the inside salespeople or was he not?

7      A.   So there's a difference between you being the

8    boss, reporting boss, and then you having leading

9    functions.

10           So as -- like the structure, how to put the

11   leadtime penalty, Sourabh would be the head of that.  So

12   he will need to consolidate all the PCBs in sales to

13   operate the same way.  But Sourabh wouldn't hire or fire

14   anybody in the U.S. because he doesn't have the authority

15   to do that.

16     Q.   But we're not talking about hiring and

17   firing --

18     A.   Right, but there's a difference on being the

19   reporting boss.

20     Q.   Well, I asked who is the boss of that, and you

21   said:  So for the PCB, Sourabh is.

22     A.   Right.  So, functionally speaking, he is the

23   one that leads, you know, how they are going to operate

24   and if they have to consolidate a report like the one for

25   Benlida, for example, the leadtime penalty, or if they

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

823

1    are -- I don't know, if there's any function that

2    encompasses how they're going to change the way they do

3    things, then he will be the one that will dictate how

4    that goes.

5         Q.    You just said a few moments ago that the

6    duties -- one of the duties of inside sales was to liaise

7    from your customers --

8         A.    Mm-hmm.

9         Q.    -- to Benlida; that's correct, right?  That's

10   inside sales job, right?

11        A.    Right.  We get orders from the customer.  We

12   place the order with suppliers.

13        Q.    And the inside sales people place the orders

14   with suppliers like Benlida, right?

15        A.    Yes.

16        Q.    And so I'm just trying to understand.

17              Who's the boss of all the people that get the

18   orders and place the inside sales?  That's Sourabh; is

19   that correct?

20        A.    In India, yes.

21        Q.    In India -- isn't it true that in India the

22   India team issues purchase orders on behalf of CTX-US?

23        A.    Yes.

24        Q.    And isn't it true they issue purchase orders on

25   behalf of all the CTX operations?

1        A.    I don't know -- Hong Kong, Hong Kong, yeah.

2        Q.    I beg your pardon?  What did you say?

3        A.    They do.  They do.

4        Q.    Okay.  And who is the boss of all the

5    salespeople?  Ultimately, it's Rishi, right?

6        A.    So Richi Circuitronix is a third-party --

7        Q.    I'm talking generally, the whole global

8    operations.

9        A.    Right, so I'm trying to explain to you.

10           We don't have a hire and fire authority over

11   anybody in India.  They have their own operation, right.

12   They run their own operation and what they do is they

13   give us services for back office and certain

14   administrative functions.

15           So one of them is sales.  Sourabh is the head

16   of the inside sales for PCBs, and he gathers the

17   processes of what they have to follow.  He's Richi

18   Circuitronix -- or in this case, it's a Richi

19   Circuitronix India employee, and he has a hire and fire

20   for his team in India, not for any other personnel under

21   an inside sales role in any other country.

22       Q.    So because they can't fire them, in your

23   opinion, that means they're not in charge of them?

24       A.    So there is a functional and --

25       Q.    If they can't fire them, they're not in charge

 1     of them.

 2                Is that your opinion?

 3         A.   I can oversee the work, but I don't have

 4     firing -- hire and fire authority.

 5         Q.   So I want to understand who oversees all the

 6     inside sales for CTX globally.

 7                Is it Sourabh or not?

 8         A.   Sourabh oversee their functions for PCB inside

 9     sales.

10         Q.   He oversees their functions for PCB inside

11     sales?

12         A.   Yes.

13         Q.   And the inside salespeople, they issue the

14     purchase orders, right?

15         A.   Yes.

16         Q.   And I thought -- I want to clarify this.

17                So I was trying to understand who the boss of

18     the inside salespeople in the U.S. is.

19                MS. MARTINEZ:  Objection, your Honor; asked and

20     answered.

21                MR. MAZZOLA:  Let me try this then.

22                THE COURT:  It's not a question.

23     BY MR. MAZZOLA:

24         Q.   Do you recall in your deposition you were asked

25     at Page 31 --

1    A.    I recall I was in a deposition.  I don't

2  remember every question.

3    Q.    You were asked a question -- I started off with

4  commission.

5          Where are the sales teams typically located?

6          And your answer was:  There's a few in the U.S.

7  office, and there are some in the India office.

8          And then I asked you again, presumably because

9  I was trying to understand who the boss of the

10  salespeople were:  Who was the boss of the salespeople in

11  the U.S. office?

12          Your answer was:  Sourabh.  For PCB, Sourabh.

13    A.    So Sourabh is the functional supervisor of the

14  inside sales for PCB.

15    Q.    So now I think I clarified.  I beg your pardon

16  because I had gone to the wrong page of the transcript.

17          So the record's clear, Sourabh is the boss of

18  the salespeople here in the U.S.; is that correct?

19    A.    He oversee their functions.

20    Q.    I asked you who was --

21    A.    -- but they report to the CEO in the U.S.

22    Q.    I asked that next question:  Who is -- you said

23  Rishi is the upper boss.  But I was trying to understand

24  functionally, as you've said, who is the boss of the

25  inside salespeople.  And your --

1     A.    So I might have not understood your question at

2  the deposition.  So this is the right structure.

3          So functionally --

4     Q.    I beg your pardon.

5          Okay.  I understand you said you did not

6  understand my question at the deposition.

7     A.    I'm trying to say the same thing.

8     Q.    I beg your pardon.

9          But then the question was:  Who is the boss of

10  the salespeople in the U.S. office?

11     A.    Mm-hmm.

12     Q.    And so I don't know what it is you didn't

13  understand about that question.

14     A.    So there is a difference between supervising

15  the functions of somebody and being their hiring and

16  firing manager on your reporting.

17     Q.    We all have jobs.

18     A.    Yes.

19     Q.    We all know what it means to say "boss."

20          So my question is:  When I asked you who is the

21  boss of the salespeople in the U.S. office, I just want

22  to know what was confusing about the question?

23     A.    Because they have a head that oversees

24  functions, how do they operate, how do they put this

25  report together.  I need everybody to send me this

1  information on Fridays at 3:00 p.m. in this format.

2  That's Sourabh's role.

3          If somebody needs to be hired or fired, it's

4  the CEO because they report to him.

5      Q.    Okay.  So in your --

6      A.    There's the difference.

7      Q.    In your opinion, it's only the person that can

8  fire you that's your boss, right?

9      A.    In my opinion, yes.

10     Q.    Okay.  Because I asked you another question

11 about this, Page 30.  And I think here we were talking

12 about the salespeople at CTX Hong Kong.

13          At Page 30 of your deposition, Line 12:  And

14 the person in charge of the salespeople was Akshay?

15          And I said:  No, Sourabh.

16          And you answered:  Sourabh.

17     A.    Mm-hmm.

18     Q.    So now I've used the person in charge of the

19 salespeople and you said it was Sourabh.  And I used the

20 person that is the boss of the salespeople, and you said

21 Sourabh.

22     A.    There is no inside salespeople in Hong Kong.

23     Q.    I'm just trying to understand, you know, where

24 the confusion was.  That's all.

25     A.    Right.  Inside salespeople aren't in Hong Kong.

1  They're in India.

2       Q.   Let's talk a little bit about -- because you

3  said Rishi is the overall boss, right?

4       A.   Yes.  He's the CEO.

5       Q.   And there were two systems -- and we'll talk

6  about that a little bit later.  There was the NetSuite

7  system, which was the ERP system that you had in place

8  prior to 2017 --

9       A.   Correct.

10       Q.   -- right?

11       A.   Mm-hmm.

12       Q.   And after 2017, you went over to the Sage

13  system, right?

14       A.   Yes.

15       Q.   Now, each of these systems work slightly

16  different, right?

17       A.   They're configured differently, but they have

18  the same function.

19       Q.   They work differently in connection with a

20  couple of items.  We're going to talk about POs to start

21  with.

22       A.   Mm-hmm.

23       Q.   Under the NetSuite system, when a PO was

24  created, each and every PO had to be approved by Rishi;

25  is that correct?

1    A.    That's correct.

2    Q.    And that's how it operated prior to 2017?  Each

3    and every PO was operated by -- was approved by Rishi?

4    A.    Yes.

5    Q.    When I asked you that:  And no one helped

6    Rishi?  He did it all by himself, right?

7    A.    Right.

8    Q.    Do you remember that?

9          And that was for the whole operation, right?

10   A.    Correct.

11   Q.    That would have been CTX Shenzhen, CTX Hong

12   Kong, CTX-US, right?

13   A.    CTX-US.

14   Q.    You didn't do it for CTX Hong Kong?

15   A.    That, I'm not sure.

16   Q.    Or CTX Shenzhen, you don't know that?

17   A.    CTX Shenzhen didn't have NetSuite.

18   Q.    But what you do know is he approved them all?

19   A.    I know if he approved them all.

20   Q.    Because I asked you at Page 81:  Does Rishi --

21   Does Rishi have any assistants that help with the

22   approval of the purchase orders?

23         And you answered:  No.

24         So he did it all by himself, right?

25   A.    Correct.

1      Q.     And I think you just said not for Hong Kong.

2             Is that what you just said?

3      A.     I said I don't know.

4      Q.     Okay.  You don't know now, right?

5      A.     I don't know.

6      Q.     You don't know now?

7      A.     The Hong Kong PO's approval.

8      Q.     I mean, you don't know now is what I'm asking

9   you, today as you sit here, you don't know?

10     A.     I don't know.

11     Q.     Because I asked you at Page 81 of that

12  deposition:  Who approved the Circuitronix Hong Kong

13  purchase orders?

14            That was Page 81, Line 22?

15            And your answer was:  Rishi.

16            So when the NetSuite system was in place --

17     A.     Mm-hmm.

18     Q.     -- Rishi approved everything?

19     A.     Yes.

20     Q.     Okay.  Is that clear now?  He approved all U.S.

21  with no help, and he approved all Hong Kong with no help?

22     A.     Okay.

23     Q.     And because he was approving these purchase

24  orders, it was Rishi that would control the price that

25  was going into it; isn't that correct?

1    A.    The inside sales will enter the price.

2    Q.    Okay.  But Rishi had to approve it?

3    A.    But Rishi had to approve it, yeah.

4    Q.    And because Rishi's approving them and he's on

5    the system, he could change it, right?

6    A.    He wouldn't change it.

7    Q.    He could?

8    A.    He would either approve it or disapprove it.

9    Somebody needs to --

10    Q.    But he could change it because he was doing it?

11        (Court reporter clarification.)

12        (Record read.)

13        THE WITNESS:  (Continuing) -- change it.

14    BY MR. MAZZOLA:

15    Q.    But he could also change it, too?

16    A.    He could also change it.

17    Q.    And he could change anything on it because he's

18    entering it?  I'm not saying he did.  I'm just trying to

19    understand if that -- he had the authority to do

20    anything.

21    A.    I don't recall if the authority would allow him

22    to change the PO, but he can just deny it.

23    Q.    I thought we were dealing with NetSuite prior

24    to 2017.

25    A.    Mm-hmm.

833

 1      Q.    Rishi would have to look at everything and

 2   approve it?

 3      A.    Yes, the PO.  So you approve/deny.  I don't

 4   recall that you could go in and change it.

 5      Q.    Okay.  And also payments.

 6            The payment details during the NetSuite period

 7   of time, they were -- they were all also approved by

 8   Rishi; isn't that correct?

 9      A.    Correct.

10      Q.    And then you switched over to the Sage system?

11      A.    Mm-hmm.

12      Q.    And the Sage system, I think you testified

13   earlier, took out some of the risk of human or manual

14   error, right?

15      A.    For the leadtime penalty report download, yes.

16      Q.    It's just for that.

17            But --

18      A.    Many other issues.

19      Q.    -- did it improve as well?

20      A.    It improved a lot of efficiencies.

21      Q.    Now, when you switched over to the Sage system,

22   the process was a little different on the back end,

23   right?

24      A.    What do you mean "on the back end"?

25      Q.    With the creation of the purchase orders,

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

834

1    right?

2         A.    The process changed, yes.

3         Q.    But still, nothing really changed because Rishi

4    would still have to approve the purchase order, right?

5         A.    In Sage?

6         Q.    In Sage.

7         A.    No.

8         Q.    Well, as I understand the way it worked is you

9    would create a purchase order?

10        A.    Mm-hmm.

11        Q.    You'd have a purchase order number, right?

12        A.    Mm-hmm.

13        Q.    There's a part number.  And a part number is a

14   distinct thing.  It could be part No. 123, which means

15   it's a PCB that's going to -- for a headlight for a car,

16   and it's being manufactured by Benlida on a regular basis

17   over and over, right?

18        A.    Correct.

19        Q.    Example.

20        A.    That's the part number.

21        Q.    And when that part number is created, there's

22   going to be some pricing data that's being created for

23   that, right?  Correct?

24        A.    Meaning on the part number, there's a price?

25        Q.    Correct.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    A.    Yes.

2    Q.    So the part number gets created and the price

3    gets created and then that gets locked into Sage; is that

4    correct?

5    A.    Yes.

6    Q.    Now, although it's a locked system -- and I'm

7    not suggesting anything.  I'm just trying to understand

8    how the operation went.

9         Although it was a locked system, there was only

10   one login for it, really, and that was Rishi's; isn't

11   that correct?

12   A.    I don't understand your question.

13   Q.    I think you said earlier that there was only

14   one log -- one person could log in and change things in

15   Sage?

16   A.    No.  What I've tried to say is it's a single

17   login to access different things.

18   Q.    Okay.

19   A.    So you don't have to log in to different

20   places.

21   Q.    But nonetheless, when that purchase order is

22   created the first time, it's Rishi that approves it,

23   right?

24   A.    In Sage?

25   Q.    In Sage.

CROSS-EXAMINATION OF LINA OCHOA

836

1       A.   No.

2       Q.   He approves the first purchase, the details,

3   and then it gets locked in?

4       A.   He approves the price for the part.

5       Q.   And then it gets locked into the system so --

6       A.   The price and the part gets locked into the

7   system and only until that happens you can generate a PO.

8       Q.   And subsequent purchase orders all generate off

9   that price and part number, right?

10      A.   Yes.

11      Q.   But Rishi still approves the price?

12      A.   Rishi approves the price, yes.

13      Q.   In fact, Rishi approves everything, right?

14      A.   When you say "everything," that's pretty wide.

15      Q.   He approves -- he would approve price?

16      A.   He approves price, yes.

17      Q.   He would approve things like leadtime matrixes,

18  right?

19      A.   He provides the leadtime matrix, yes.

20      Q.   He provides it?

21      A.   Yes.

22      Q.   So he tells you what it is?

23      A.   Yes.

24      Q.   Does he tell you if something's late or on

25  time?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    A.    Well, the system or the report will tell us if

2  something is late or on time based on the matrix he

3  provided.

4    Q.    Did Rishi ever talk to you about how the

5  leadtime matrix worked?

6    A.    The one that we just went over?

7    Q.    Did he ever talk to you about that?  Yes, the

8  one we went over.

9    A.    Yes.  That's the reason why he put it together.

10  He told us --

11    Q.    Did he talk to you about things like capacity?

12    A.    That I'm not aware.

13    Q.    Did he talk to you about things like breaks,

14  like Chinese New Year?  Did he talk to you about things

15  like that?

16    A.    I'm aware of Chinese New Year.

17    Q.    Did he talk to you about -- I think it's the

18  fall break in October -- Golden Week?  Did he talk to you

19  about that?

20    A.    I know that break, also.

21    Q.    But did he talk to you about how that affects

22  the leadtime matrix?

23    A.    No.

24    Q.    You do know that Rishi would attend various

25  meetings with the Benlida people, right?

1    A.    Yes.

2    Q.    And you understand at those meetings he would

3  discuss such things as pricing, right?

4    A.    I don't know what was discussed.

5    Q.    You don't know what he discussed?

6    A.    No.  I was --

7          (Simultaneous crosstalk.)

8  BY MR. MAZZOLA:

9    Q.    Leadtime penalties?

10          (Reporter clarification.)

11          THE WITNESS:  I was not part of the meetings.

12  BY MR. MAZZOLA:

13    Q.    Timing of shipments?

14          THE COURT:  She said she was not part of the

15  meetings.

16  BY MR. MAZZOLA:

17    Q.    I'm just asking if she knows anything about

18  what he would discuss with the customers.

19    A.    No, I don't.

20          You mean the suppliers.

21    Q.    Suppliers, yes.

22          So let's go back to those meeting minutes, the

23  minutes, the meetings.

24    A.    Mm-hmm.

25          MS. MARTINEZ:  Objection; foundation, your

```
 1   Honor.

 2              THE COURT:  I think the minutes of meetings

 3   that she did not --

 4              MR. MAZZOLA:  Your Honor, I beg your pardon.  I

 5   misread what was in the transcript, Judge.  The notes I'm

 6   following over here.

 7              THE COURT:  Okay.

 8   BY MR. MAZZOLA:

 9       Q.   We were talking about -- I want to understand

10   meetings.

11       A.   Mm-hmm.

12       Q.   You know that Rishi would from time to time

13   have meetings with Benlida?

14       A.   I'm sure they did.

15       Q.   We know you had some meetings with them, right?

16       A.   I had a couple, yeah.

17       Q.   You went over to, I believe, China and visited

18   them at their operation; isn't that correct?

19       A.   Yes.

20       Q.   So you know Rishi would from time to time have

21   meetings with them?

22       A.   Mm-hmm.

23       Q.   And what I'm trying to understand is if at any

24   of those meetings something was discussed that needed to

25   be implemented on a companywide basis, such as a change
```

1    in the leadtime penalty or a change in the pricing matrix

2    or a change in the discount matrix, how would you learn

3    that?

4         A.    So Rishi -- If there is any change that

5    required to be done, that Rishi would just inform us.

6         Q.    Did he send you emails, memos?

7         A.    He would either do via email or just call me

8    into his office if he was around.

9         Q.    Now, if there are any issues with pricing,

10   Rishi would deal with it, right?

11        A.    Yes.

12        Q.    If there were any issues that had to deal with

13   capacity, Rishi would deal with it, right?

14        A.    Yes.

15        Q.    If there were any issues that had to do with

16   delivery delays, Rishi would deal with it, right?

17        A.    Yes.

18        Q.    If there were any issues that had to deal with

19   leadtimes, Rishi would deal with it, right?

20        A.    Yes.

21        Q.    And if there were any issues that related to

22   quality issues, Rishi would deal with it, right?

23        A.    I'm not -- Yeah, I don't know who would deal

24   with it.

25        Q.    So Rishi did pretty much everything, right?

1        A.    He still does.

2        Q.    I asked you a little bit about capacity.

3        A.    Mm-hmm.

4        Q.    One second.  Excuse me, Ms. Ochoa.

5        A.    Sure.

6        Q.    They're going to put up a document for you,

7   Ms. Ochoa.

8        A.    Okay.

9        Q.    But my guys aren't as smooth as Mr. Vega.  Oh,

10   they're getting better.

11              This was previously marked, previously

12   admitted.

13              MR. ROSENTHAL:  Right, but what's its number?

14              MR. MAZZOLA:  What's the number, gentlemen?

15              MS. MARTINEZ:  I don't think this was

16   previously admitted.  I think this is the one you pulled

17   up and then you switched to the one that we talked about

18   yesterday, D-D10.

19              MR. ROSENTHAL:  This is not D-D10?

20              MS. MARTINEZ:  This is not D-D10.

21              MR. MAZZOLA:  Was this not the one we used with

22   Mr. Kukreja?

23              MS. MARTINEZ:  No -- Well, I -- this is not

24   admitted into evidence.  This is the one that you pulled

25   up, I think, in Mr. Kukreja's cross, and then you

1    switched to another one which was D-D10.

2              MR. MAZZOLA:  Okay.  Let's put up D-D10.

3    BY MR. MAZZOLA:

4         Q.   How many employees does CTX have in Hong Kong?

5         A.   Circuitronix Hong Kong, I believe, has like

6    eight.

7         Q.   How many employees does CTX have, the whole

8    company?

9         A.   Each company is independently set up.

10             So which one are you talking about.

11        Q.   The whole operation.

12        A.   Circuitronix U.S. has about 50 to 60 employees.

13        Q.   If you added up all the CTX family companies?

14        A.   We have factories in Mexico, which are over a

15   thousand employees.

16        Q.   Over 1,000 in Mexico?

17        A.   Yes.

18        Q.   How many thousand?

19        A.   It will be close to 1,000, 1,100.

20        Q.   1,100 in Mexico?

21        A.   Mm-hmm.

22        Q.   You have 55 in the U.S.?

23        A.   Around.

24        Q.   How many do you have in Japan?

25        A.   There's nobody in Japan.

1      Q.    There is no CTX Japan?

2      A.    There is a CTX Japan, but there's nobody in

3  Japan.

4      Q.    How many do you have in Shenzhen?

5      A.    There is about 100.

6      Q.    How many do you have in Germany?

7      A.    Nobody.

8      Q.    How many do you have in -- I'm trying to

9  remember -- India?

10      A.    I think India employs about 150, 100.

11      Q.    Okay.  So that's about 1,500?

12      A.    I guess, more or less.

13      Q.    So we've got a spreadsheet up in front of you.

14            MR. MAZZOLA:  Can you scroll over to the

15  right-hand column and show Ms. Ochoa.

16  BY MR. MAZZOLA:

17      Q.    What is this column that relates to -- if you

18  put the cursor over it -- order of release area?

19      A.    I don't know what that is.

20      Q.    And if you can scroll over to the date of this

21  document.

22            So this is a leadtime penalty report, right?

23      A.    Correct.

24      Q.    And it was produced in January of 2018, right?

25      A.    That's the date listed there.

844

 1      Q.    That's the dates that's there.

 2            When was it produced?

 3      A.    I don't know.

 4      Q.    You don't know when it was produced?

 5            Let me ask you this.

 6      A.    That's the date that it composes.  When it was

 7   created, I don't know.

 8      Q.    Do you know anything about there being a period

 9   of time starting, I think, March of 2017 --

10      A.    Mm-hmm.

11      Q.    -- when they weren't doing leadtime penalty

12   reports?

13      A.    I don't know the dates.

14      Q.    I'm going to tell you.  Well, let me put it

15   this way.

16      A.    Mm-hmm.

17      Q.    Did your team prepare leadtime penalty reports

18   every single month, or was there ever a period of time

19   when you didn't make them?

20      A.    So accounting team started preparing the

21   leadtime penalty reports since August 2018, every month.

22      Q.    Since August of 2018, every month.

23            So that was done on a monthly basis every

24   month?

25      A.    Yes.

 1        Q.    And were you always caught up or was there ever

 2   a period of time when you had to go back and look back a

 3   few months?

 4        A.    It was pretty on time.

 5        Q.    I beg your pardon?

 6        A.    It was pretty on time.

 7        Q.    Okay.  There was never a situation where Rishi

 8   said, oh, gosh, go back and do these leadtime penalty

 9   reports?

10        A.    Since the accounting team took over, no.

11        Q.    So this leadtime penalty report, this one would

12   have been prepared by your team, right?

13        A.    They don't.

14        Q.    It would not have.

15              Why not?

16        A.    Because it's from January 2018.

17        Q.    So January you guys weren't doing them?

18        A.    It was inside sales who prepared --

19        Q.    Inside sales.  And you started -- I beg your

20   pardon.  You just told me, Ms. Ochoa.

21        A.    August 2018.

22        Q.    August of 2018.

23              So you don't know what far column that

24   addresses capacity is about?

25        A.    No.  I don't know what that means.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

846

1       Q.    Do you know why that column is not on the one

2   that you guys produced?

3       A.    I don't know.

4       Q.    Who designed this matrix for you, with the

5   spreadsheet for you to use?

6       A.    The one that accounting was using after August

7   2018 or the one that you're showing on the screen?

8       Q.    The one that I'm showing on the screen?

9       A.    I don't know.

10      Q.    And then the one that accounting was using?

11      A.    So accounting and inside sales collaborated to

12  create the one after August 2018.

13      Q.    Now, you know, though, I think you know, maybe

14  you don't know, do you know that the capacity, the amount

15  of square meters produced had a bearing on leadtime

16  penalty?

17      A.    I don't know.

18      Q.    The one that you made -- can we put that one

19  up.

20            The one that you made, did it have a formula

21  that addressed capacity?

22      A.    No.

23            MR. MAZZOLA:  Is this the one, gentlemen?  Take

24  it down until you can find it, okay.

25

BY MR. MAZZOLA:

    Q.   Let me ask you another question.  And I want to get into this because I did start this issue.

        I raised the issue about employee retention, and Ms. Martinez asked you some questions about that?

    A.   Mm-hmm.

    Q.   And you might remember when I was taking your deposition, we were going through a number of employees that had left.  And I'm trying to understand that.

        What happened to Todor?

    A.   He decided to go into a government job.

    Q.   Okay.  He left.

        What happened to A.O. Shen?

    A.   She moved to Texas.

    Q.   And then there was Nicole Donaldson.

    A.   Yes.

    Q.   What's that?

    A.   What are you asking me?

    Q.   Nicole Donaldson?

    A.   Yes.  She was separated last year.

    Q.   She was fired last year?

    A.   Yes.

    Q.   Why was she fired?

    A.   Because, despite our efforts to improve her attendance and tardiness, she did not improve.

848

1    Q.    Melonnie Rhoden, she was fired, too, right?

2    A.    No.  She resigned.

3    Q.    Who's the one that was lazy?

4    A.    You mean, Melonnie?  Maybe needed a little bit

5  more hand-holding.

6    Q.    Okay.  But she left?

7    A.    She left.

8    Q.    What about Howard Kosoy?

9    A.    He was close to retirement and he wanted

10  something that required less effort.

11   Q.    What about Donovan Waite?

12   A.    Donovan is with us.

13   Q.    He's still -- he's with you?

14   A.    Yes.

15   Q.    Paul Silverthorn?

16   A.    He moved to LA.

17   Q.    He left.

18         These are people in the finance?

19   A.    Yes.

20         Remember, I have been 16 years.  I have seen a

21  lot of people.

22   Q.    16 years you've been there?

23   A.    Almost.

24   Q.    Did you ever work anywhere else in Florida?

25   A.    No, not in Florida.

849

1    Q.   How did you -- you moved down here, and you

2    said the day you got here you got the job?

3    A.   The next day.

4    Q.   The next day?

5    A.   Well, I found it in the internet before my

6    moving from Boston.  The whole process took me about two

7    months.  So in the interim -- and remember, this was

8    16 years ago.  I didn't have any responsibilities.  So I

9    just thought I'd move to Florida and figure it out, and

10   then I found it along the way.

11   Q.   So let's look at this DY3.

12        MS. MARTINEZ:  D-Y7?

13        MR. MAZZOLA:  D-Y7, third attachment.

14   BY MR. MAZZOLA:

15   Q.   So this leadtime spreadsheet you would have

16   prepared, right?

17   A.   Accounting team would have prepared, yes.

18   Q.   And so if you scroll all the way over to the

19   right, there's no -- there's no reference to capacity,

20   right?

21   A.   Right.

22   Q.   And who told you to take that out?

23   A.   I didn't know what was there.  I don't know.

24   Q.   So in terms of accounting -- scratch that.

25        In 2017, the Sage system came into place, and

 1     the idea of the Sage system was to take human error out.

 2          A.   To create efficiencies in the company.

 3          Q.   Create efficiencies.

 4               And I'm -- we did put up a leadtime penalty

 5     report that was from January 2018, and you said that

 6     wasn't your team that did it?

 7          A.   Correct.

 8          Q.   Was that Sourabh's team that did it?

 9          A.   That was Sourabh's.

10          Q.   So who was doing the accounting?  Who was doing

11     the data entry?  Who was doing all that information?

12          A.   Depending on the function, right.  So we had

13     accounting -- we had an accounting team that did the

14     receiving and billing and then another one that did

15     payment details.  And so different people did different

16     functions in the accounting team.

17          Q.   But the leadtime penalty reports, they were

18     prepared by Sourabh, right?

19          A.   Correct.

20          Q.   And all that other information was done by your

21     team here in the U.S., right?

22          A.   Yes.  The receiving and the billing, the

23     billing payments, yes.

24          Q.   One of the things you recall saying in your

25     deposition -- you can take this down -- was that you

CROSS-EXAMINATION OF LINA OCHOA

851

 1    thought the Benlida accounting team were sloppy.

 2            Do you remember saying that?

 3        A.    I remember saying that.

 4        Q.    And you know Tracy, right?

 5        A.    Yes.

 6        Q.    And you know Tracy's been with Benlida for as

 7    long as you've known them, right?

 8        A.    Yes.

 9        Q.    And you know Ms. Chen, right?

10        A.    (No response.)

11        Q.    Maybe you don't know her that way?

12        A.    No.  Tracy was the main contact.

13        Q.    And Tracy's been there the whole time?

14        A.    Yes.

15        Q.    But you still thought Benlida's work was

16    sloppy, right?

17        A.    I just thought that they had way too many

18    revisions of everything.

19        Q.    Let's take a look at -- and the work that you

20    guys do, of course, is not sloppy, right?

21        A.    I think everybody can make mistakes, but I

22    think we had processes in place that would catch them.

23        Q.    You guys never made any mistakes such as double

24    payments or things like that?

25        A.    We made mistakes but we will catch them later

852

1  on.

2      Q.    You'll catch them later on.

3      A.    So the important thing of the process is to

4  make sure that you have enough sequences in the process

5  that you eventually will catch a mistake.

6      Q.    So, for example, a duplicate payment, you would

7  catch that payment?

8      A.    Yes.

9      Q.    How do you know that?

10     A.    You will catch it through a bank

11 reconciliation.

12     Q.    But you did make duplicate payments at times,

13 right?

14     A.    I think it could happen.

15     Q.    And you did miss payments at time, right?

16     A.    What do you mean, "miss payments"?

17     Q.    You would have a record of a payment that you

18 don't record on your information, right?

19     A.    I don't understand that.

20     Q.    Well, you paid money out to someone, and you

21 don't record it, that you paid it to them.

22     A.    That's not possible because your bank

23 reconciliation wouldn't work.

24     Q.    The bank -- I'm talking about things like

25 payment details, for example.

853

1       A.    So what about the payment detail?

2       Q.    Well, the payment details were done by your

3   team, right?

4       A.    Yes.

5       Q.    And from time to time, there would be errors on

6   the payment details, right?

7       A.    What do you mean by that, there was errors on

8   the payment details?

9       Q.    I can show you one.

10      A.    Okay.

11      Q.    Is that okay?

12      A.    Yeah, sure.

13      Q.    When did the Sage system come into place?

14      A.    March 1st, 2017.

15      Q.    That was the new system, right?

16      A.    Sage was the new ERP system.

17      Q.    So by July 2017, you would have had it in

18  place?

19      A.    Yes.  It went live March 1st.

20      Q.    So we're putting up in front of you a document.

21  It's a Circuitronix document.

22      A.    Mm-hmm.

23      Q.    It was produced by Circuitronix.  And it's a

24  payment detail for July 1, 2017.

25      A.    Okay.

CROSS-EXAMINATION OF LINA OCHOA

1    Q.    And we're using Exhibit 153.

2          MR. MAZZOLA:  Christina, that was admitted?

3          MS. MARTINEZ:  Let me check.  I'm not sure.

4          It's not admitted yet.

5          MR. MAZZOLA:  Do you have any objection?

6          MS. MARTINEZ:  Give me one moment.

7          MR. MAZZOLA:  Okay.

8          MS. MARTINEZ:  No, no objection, JC.

9          MR. MAZZOLA:  Okay.  Thanks, Christina.

10         THE COURT:  So 153 is in evidence.

11         (Exhibit 153 received in evidence.)

12         MR. MAZZOLA:  It's a payment detail.

13         Can you make it smaller so the whole -- it will

14   fit on the screen, or do the zooming thing.  Maybe go

15   down to the bottom and zoom the bottom up.

16   BY MR. MAZZOLA:

17    Q.    So there there's two payments for July 21,

18   2017.

19    A.    Mm-hmm.

20    Q.    Do you see that?

21    A.    Yeah, I see that.

22    Q.    And they're both $250,000.

23    A.    Okay.  Yeah.

24    Q.    So the effect of this, insofar as this payment

25   detail goes, is it adds another $250,000 to what you say

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1  is owed by Benlida, right?

2      A.    Yes.

3      Q.    And because this payment detail was something

4  that was created after the actual payment detail was

5  sent, is that an indication of something you caught, did

6  not catch, or could have caught?

7      A.    So, first of all, I don't know where you're

8  looking at on the original, so I have nothing to compare

9  it to.  And what you're showing is not the regular

10 payment detail presentation.  This was an effort to

11 recreate all the payment details all the way to 2013 --

12     Q.    But that looks like --

13     A.    -- to align the numbers.

14     Q.    Okay.  But that looks like, in my view --

15 Mrs. Ochoa, that looks like, in my view, that that's

16 $250,000 in your favor, right?

17     A.    Are you saying that one of those payments, they

18 didn't happen?

19     Q.    We could look at -- you just talked about bank

20 records, right, those that you would use to reconcile,

21 right?

22     A.    Yes.

23           MR. MAZZOLA:  Christina, I don't know if you

24 have this one.  They're all in the bank records that you

25 guys gave us.

1           MS. MARTINEZ:  Okay.  But we didn't ask her

2    about these bank records.

3           MR. MAZZOLA:  What's that?

4           MS. MARTINEZ:  We didn't ask about these bank

5    records.

6           MR. MAZZOLA:  You gave them to me.

7           MS. MARTINEZ:  Are those already admitted?

8           MR. MAZZOLA:  No.

9           MS. MARTINEZ:  But I didn't ask Lina about

10   these bank records.

11          MR. MAZZOLA:  I know but you asked her about

12   some bank records.  Well, I'm using it to impeach her.

13          And you have a copy, right?

14          MS. MARTINEZ:  I do not.

15          MR. MAZZOLA:  You take this then.

16          MR. ROSENTHAL:  What number is it?

17          MR. MAZZOLA:  It's the one that had everything.

18          MS. MARTINEZ:  I see.

19          MR. MAZZOLA:  I think that's what it is.

20          MR. ROSENTHAL:  We didn't have one that had

21   everything.  Each one has its own.

22   BY MR. MAZZOLA:

23      Q.   So, Ms. Ochoa, to confirm whether this was, in

24   fact, a duplicate payment or a missed payment or a

25   -mistake, you'd want to look at the bank records.

CROSS-EXAMINATION OF LINA OCHOA

857

```
 1            MR. MAZZOLA:  Don't scroll down yet.
 2   BY MR. MAZZOLA:
 3       Q.    Are you familiar with what these bank forms
 4   look like?
 5       A.    Yes.
 6            MS. MARTINEZ:  Objection, your Honor, this is
 7   improper impeachment.  We haven't asked Ms. Ochoa
 8   anything about these bank records.  It exceeds the scope
 9   of --
10            THE COURT:  Are these bank records in evidence?
11   I know there was some statement about you agreed to all
12   the bank records, but is this one of the ones that's in
13   evidence?
14            MS. MARTINEZ:  I'm not sure --
15            MR. MAZZOLA:  I don't know, Judge.  I thought --
16            MS. MARTINEZ:  And we were specific that the
17   specific bank records I can give you the exhibit numbers,
18   but not all bank records were admitted into evidence.
19            That one might be, right.  Exactly.  I need to
20   check.
21            MR. ROSENTHAL:  If he tells us the number, we
22   can check, but we're not positive.
23            MR. MAZZOLA:  Okay.  You can take it down.
24            THE COURT:  Do you know what exhibit it's from?
25            MR. MAZZOLA:  My understanding, your Honor, it
```

1   was all the bank records that came to us in one set,

2   so -- and sent from CTX.  So I don't see the surprise.

3   Ms. Ochoa has asked to see the bank records.  There's no

4   dispute as to the authenticity of them.  They're not

5   hearsay.

6               THE COURT:  I don't need argument.  I just want

7   to know if it's in evidence and what exhibit number it is.

8               MR. MAZZOLA:  It's not in evidence.

9               THE COURT:  All right.  This is a Citibank

10  account for Circuitronix from July of 2017.  This is not

11  part of the bank records you introduced?

12              MS. MARTINEZ:  I don't believe so, your Honor,

13  based on the date.

14              THE COURT:  Do you have any objection to it

15  coming in?

16              MS. MARTINEZ:  Yes, because I didn't -- it's

17  not been introduced in evidence, and I don't know what

18  the relation is to what he's going to ask Ms. Ochoa.

19              THE COURT:  I assume it has to do with whether

20  there was two $250,000 payments on July 21st.

21              MS. MARTINEZ:  Okay.

22              THE COURT:  All right.  Okay.  So what exhibit

23  number is this going to be.

24              MR. TOLL:  Your Honor, 310.

25              THE COURT:  Okay.  So 310 is in evidence.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1              (Exhibit 310 received in evidence.)

2              MR. MAZZOLA:  And that's why he's the Judge.

3    He's smarter than all of us.

4              THE COURT:  Not really.  I just get more

5    annoyed than other people.

6              All right.  Go ahead.

7    BY MR. MAZZOLA:

8        Q.    And then that's exactly -- Mr. Ochoa, what we

9    were trying to understand was, we looked at this first

10   document which seemed to show two payments on that day.

11   And then the bank records, which are in front of you, if

12   you want to scroll down, I just want to confirm that

13   there were, in fact, not two payments on that day.

14       A.    Okay.

15       Q.    So the date was, if you recall, July 21, 2017.

16   So there's the $250,000 payment.

17             MR. MAZZOLA:  Maybe you can do, like, a thing

18   with it.

19   BY MR. MAZZOLA:

20       Q.    Do you see it, Ms. Ochoa?

21       A.    Yes.

22       Q.    And that's the only one there, right?

23       A.    Yes.

24       Q.    And I don't mean to be, you know, petty, but

25   you did say that our clients were sloppy with their

860

1    bookkeeping and things of that nature.

2              So if there was a mistake on the earlier

3    document we showed you, is that something you would

4    consider as a sloppy mistake?

5        A.    There is a mistake.

6        Q.    What?

7        A.    That is a mistake.

8        Q.    Okay.  Would you consider that sloppy?

9        A.    It depends on how many times you make the same

10   mistake.

11       Q.    Let's look at another document.

12             We're going to put another document in front of

13   you, Ms. Ochoa.

14       A.    Mm-hmm.

15       Q.    This is a document --

16             MR. MAZZOLA:  It's D-D10.  We used it before.

17             MS. MARTINEZ:  Mm-hmm.

18   BY MR. MAZZOLA:

19       Q.    Now, this is a leadtime exceedance report.

20             Do you see it?

21             MR. MAZZOLA:  Scroll up to the top so Ms. Ochoa

22   can see the date.

23   BY MR. MAZZOLA:

24       Q.    It's for 2018.

25             Do you see that?

CROSS-EXAMINATION OF LINA OCHOA

1      A.    Yeah, January 2018.

2      Q.    January 2018.

3      A.    Mm-hmm.

4      Q.    So admittedly this wasn't your team that did

5  it?

6      A.    Right.

7      Q.    But it was someone that does accounting work on

8  the CTX side, right?

9      A.    No.

10      Q.    No?

11      A.    It was the inside sales.

12      Q.    Inside sales did it?

13      A.    Yes.

14      Q.    So it's not your fault, it's their fault,

15  right?

16      A.    Fault of what?

17      Q.    Well, if there's a mistake in it.

18      A.    I guess.

19      Q.    If there is a mistake in it, it's not your

20  fault, it's their fault; is that correct?

21      A.    I would presume, yeah.

22      Q.    Let's look at the Column J, the J column.

23            Do you see that, Ms. Ochoa?

24      A.    Yes.

25      Q.    J column relates to amount.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

CROSS-EXAMINATION OF LINA OCHOA

```
 1              Do you see that?

 2       A.    Mm-hmm.

 3       Q.    But there's no -- there's no currency in there,

 4   right?

 5              THE COURT:  There's no what?

 6              MR. MAZZOLA:  Currency.

 7   BY MR. MAZZOLA:

 8       Q.    So there's no distinction between U.S. dollars,

 9   Chinese RMB; is that right?

10              MS. MARTINEZ:  Objection, your Honor.  She's

11   already said she didn't prepare this report or wasn't

12   involved in the --

13              THE COURT:  Sustained.

14              MS. MARTINEZ:  -- preparation of this report.

15              THE COURT:  Sustained.

16              MR. MAZZOLA:  Well, let's scroll on over.  If

17   you go on over --

18   BY MR. MAZZOLA:

19       Q.    Is that correct, Ms. Ochoa?

20       A.    No.

21              THE COURT:  I sustained the objection.

22              MR. MAZZOLA:  I beg your pardon, Judge.

23              Let's scroll over to the far right-hand side.

24   BY MR. MAZZOLA:

25       Q.    Do you see that there are penalties there?
```

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

863

1      A.   Are you referring to Column Q?

2      Q.   Yep.

3      A.   Yes.

4      Q.   And so, Ms. Ochoa, your testimony is you had

5  nothing to do with this document?

6      A.   No.

7      Q.   And no one on your team had anything to do with

8  this document?

9      A.   I don't think so.

10     Q.   And even though your testimony remains that the

11 Benlida people did sloppy work -- that's your testimony,

12 right?

13     A.   I think there was a lot of revisions on a lot

14 of documents.

15     Q.   Okay.  And your position is you had nothing to

16 do with this and no involvement with this one?

17     A.   No.

18     Q.   Okay.

19          MR. MAZZOLA:  I guess we'll take it down.

20          THE COURT:  All right.  Let's take our last

21 recess.  See everybody in 15 minutes.  And when we come

22 back, we won't go past quarter to 6:00.

23          (Court recessed from 4:26 p.m. to 4:42 p.m.)

24          (Jury enters at 4:42 p.m.)

25

CROSS-EXAMINATION OF LINA OCHOA

864

```
 1   BY MR. MAZZOLA:

 2        Q.   Before we took that break, we were talking

 3   about sloppiness and how you thought that the Benlida

 4   people were sloppy.  And I want to put something up in

 5   front of you.

 6             But before I do it, I want to ask:  Back in

 7   2015, Todor worked for CTX?

 8        A.   I don't recall the exact date.

 9        Q.   When Todor did work for CTX, what department

10   was he in?

11        A.   Accounting.

12        Q.   And accounting would have been a department

13   that you oversaw?

14        A.   Yes.

15        Q.   And Todor would have been one of your direct

16   reports?

17        A.   No.  He had an accounting manager he reported

18   to.

19        Q.   And who was that?

20        A.   Back in that time, I want to say Howard.

21        Q.   Now, ultimately, I know you may not like the

22   word boss, but at the end of the day, you would have been

23   Todor's boss, right?

24        A.   So Todor reports to his manager, and his

25   manager reports to me.
```

CROSS-EXAMINATION OF LINA OCHOA

1       Q.    You would have been his big boss, right?

2       A.    I guess.

3       Q.    And Todor, from time to time, would send

4    payment details to Tracy and other people at Benlida,

5    right?

6       A.    Yes.  He had an accounts payable function at

7    the beginning part of his job.

8       Q.    He was a staff accountant there?

9       A.    Yes.

10          MR. MAZZOLA:  I want to put up a document for

11   you to take a look at for identification purposes.

12          THE COURT:  Is it in evidence?

13          MR. MAZZOLA:  It is not in evidence yet.  It's

14   Joint Exhibit 123.

15          MS. MARTINEZ:  Give me a chance to see if there

16   is need for redaction.

17          MR. MAZZOLA:  I think we looked at it carefully,

18   but --

19          MS. MARTINEZ:  Oh.  Okay.

20          No objection.

21          MR. MAZZOLA:  Thank you, Christina.

22   BY MR. MAZZOLA:

23      Q.    Okay.  So this is an email that was written by

24   Todor.

25          Do you see this?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1      A.    Yes.

2      Q.    And he's making a reference to, January 1,

3  2015, October invoices payment detail, right?

4      A.    He has a payment detail for June 1, 2015, for

5  October invoice.

6      Q.    I know there was a bit of lag time between when

7  the payment detail would come out, and we talked about

8  that before -- well, for example, this is a detail dated

9  February 2nd, 2015.

10          Do you see that?

11     A.    I do see it.  On the body of the email.

12     Q.    Did you see on the top where it says sent?

13     A.    The day it was sent?

14     Q.    The date it was sent, February 2, 2015.

15     A.    Okay, correct.

16     Q.    And the payment detail was for January 1, 2015.

17          Do you see that?

18     A.    Okay.

19     Q.    And it makes reference to October invoices.

20          Do you see that?

21     A.    Yes.

22     Q.    And then beneath that, there's another payment

23  detail of February 1, 2015.

24          Do you see that?

25     A.    I don't see the payment detail.  I just see

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

**CROSS-EXAMINATION OF LINA OCHOA**

1    the...

2            MR. MAZZOLA:  Let's scroll down so Ms. Ochoa

3    can see them.

4    BY MR. MAZZOLA:

5        Q.   So there's two payment details.

6            Do you see them?  There's one dated January 1,

7    2015?

8            Do you see that?

9        A.   Yes.

10       Q.   And then there's another one dated February 1,

11   2015.

12       A.   Yes, I see that.

13       Q.   And these would have been produced under your

14   supervision, right?

15       A.   I supervise the accounting team.

16       Q.   So your overall supervision, right?

17       A.   Mm-hmm.

18       Q.   And now both of these show, of course, an

19   amount due, but if we look at the February 1 -- do you

20   see that?

21       A.   Yes.

22       Q.   The February 1 detail shows a payment of

23   $500,000.

24            Do you see that?

25       A.   Yes.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

868

```
 1              MR. MAZZOLA:  Could you make that bigger so the

 2   jury can see it?  Because I can hardly see it.

 3   BY MR. MAZZOLA:

 4        Q.   And that's got a January 21, 2015 date.

 5             Do you see that?

 6        A.   Yes, I see that.

 7        Q.   Now, if we look at -- I want to put that off to

 8   the side.

 9              MR. MAZZOLA:  Can you bring up Exhibit 121.

10   This is the CTX-US 2015 to 2019 payment detail.

11              MS. MARTINEZ:  I think there are some

12   redactions in this one as well.

13              MR. MAZZOLA:  Okay.  Let's be careful then.

14   That's not it.  You sure you're using the one that

15   Jessica gave you?  You got that, Eric.  So if you go to

16   the tab, Eric.

17   BY MR. MAZZOLA:

18        Q.   Give us a lag time, while they find this one.

19   There was a lag time between when the payments were made

20   and when the payment details were sent.

21             Why was that?

22        A.   I don't know.

23        Q.   Sometimes there was as much as a month, maybe

24   two months sometimes.  Why was that?

25        A.   I don't know.
```

1        MR. MAZZOLA:  So what you want to look at is

2   you want to look at the January 2015 tab.

3        Do you have the January 2015 tab up?

4        MR. TOLL:  Right here, yes.

5        MR. MAZZOLA:  And if you scroll down here.

6        THE WITNESS:  But this is for January invoices,

7   not for October invoices.

8   BY MR. MAZZOLA:

9        Q.    But you see a $500,000 payment made on

10  January 21.

11        Do you see that?

12       A.    On Line 41?

13       Q.    Yep.

14       A.    Yeah, I see that.

15       Q.    And my question is:  We're looking at a

16  different payment detail, and I'm trying to understand

17  why that $500,000 payment appears twice.

18       A.    But why are you saying twice?  I only see it

19  once.

20       Q.    Well, it appears once on the detail for

21  February 1, 2015, and then it also appears on the payment

22  detail for January 2015?

23       A.    This is not a payment detail for January 15.

24       Q.    If you scroll up?

25       A.    This is an effort to align the numbers.  What

1    we did is we went back to all the months and recreated

2    everything so that realigned how payments were placed,

3    but it's not a duplication of a payment.

4        Q.    I'm not suggesting that.  We're looking at -- I

5    beg your pardon.

6            This is an April 1 payment detail.

7            Do you see that?

8        A.    Yes.

9        Q.    And the April 1 payment detail -- can you make

10   it a little clearer -- it reflects a $500,000 payment

11   made on January 21, 2015.

12           Do you see that?

13       A.    Right.

14       Q.    And if you go back to the February 1, 2015

15   payment detail that was produced by Todor --

16       A.    You will have to go to the same period in the

17   same spreadsheet so that you can see that it wasn't a

18   duplicate.  It was just reallocated to another month.

19       Q.    It was moved?

20       A.    It was moved.

21       Q.    So this spreadsheet that we have up here, this

22   is where it belongs then is what you're saying, in April?

23       A.    It is a recreation all the way to -- I don't

24   know.  2015 is the spreadsheet?  So it started with the

25   invoices, with the payments, so things got moved, in

871

1  effect, in the same month, but it's not a duplication of

2  payment.

3      Q.   I'm not suggesting it's a duplication of

4  payment.  I'm just suggesting that it's in the wrong

5  place.

6           Is that what you're saying?

7      A.   It was reallocated to a different month.  These

8  are time frames that were used during this reconciliation

9  period versus when it was created when the payment was

10  done.

11     Q.   When Todor sent his email on February 2nd,

12  2015 --

13     A.   Yes.

14     Q.   -- he attached the payment detail --

15     A.   Mm-hmm.

16     Q.   -- for February 1, 2015; is that correct?

17     A.   That's what I saw in the email, yeah.

18     Q.   And when Todor sent that email on February 2nd,

19  2015 with the February 2015 payment detail attached, it

20  had a payment reference of $500,000 from January 21,

21  2015.

22           That we know, right?

23     A.   Yes.

24     Q.   And then when this document was subsequently

25  prepared sometime later, that same January 21, 2015,

1  $500,000 payment appears on the April 2015 payment

2  detail; is that correct?

3       A.   Because it was moved.

4       Q.   And why was it moved?

5       A.   Because it was a different criteria being

6  followed to make sure everybody was on the same page and

7  it was clear.

8       Q.   My question is then:  Did Todor make a mistake

9  when he sent it out originally in 2015?

10      A.   No.

11      Q.   He didn't make a mistake?

12      A.   No.

13      Q.   Did whoever prepared the spreadsheet make a

14 mistake?

15      A.   No.  It's the same amount of money in the same

16 bucket.  It's how you reorganize it, but the total is the

17 same.

18      Q.   But it's not on the same month; is it?

19      A.   That is a different criteria.

20      Q.   I don't know what that means.  It's not on --

21      A.   So when you prepare a payment detail, you

22 follow the invoices from a particular month, and then you

23 follow debit amounts and payments up to that period.

24           When we did the reconciliation, we tried to

25 organize the payment periods to match, so that was -- it

873

1   was very clear as to how it was being applied.

2        Q.   So --

3        A.   So you just move it from one month to the next,

4   but the end result is the same.

5        Q.   So when Todor put that payment down --

6        A.   He was following the criteria of the payment

7   details.

8        Q.   And it was correct when he did it then?

9        A.   Yes.

10       Q.   So the $500,000 payment on January 21, 2015,

11  showing on a payment detail of February 1, 2015, was

12  correct when Todor sent it, right?

13       A.   Because that was the criteria, 2 percent of the

14  payment details.

15       Q.   Okay.  So that was correct then, right?

16       A.   Yes.

17       Q.   And then when you prepared the spreadsheet,

18  which is up on the screen --

19            Sometime later, right?

20       A.   In 2019.

21       Q.   (Continuing) -- in 2019, and the January 21,

22  2015, $500,000 payment moved into an April 1, 2015,

23  payment detail, that wasn't a mistake?

24       A.   No.  It was just following a different criteria.

25       Q.   So they're both right, then?

1      A.    They're two different things.

2      Q.    Are they both right?

3      A.    It's the way you look at it.  I think they're

4    both right.  It would be wrong if it was a duplicate.

5           MR. MAZZOLA:  Let's scroll down on the April 1.

6    BY MR. MAZZOLA:

7      Q.    So on the April 1, you're saying there's a

8    $937,000 due; is that right -- oh, I beg your pardon.

9           That's a credit; is that correct?

10     A.    That's correct.

11     Q.    Okay.  Let's look at -- and if you go back to

12   the email from Todor -- and I know it's a different

13   month.  We're looking at the February 1, 2015 one --

14   you'll see that there's a total amount due to Benlida of

15   $189,000, right?

16     A.    That's for November invoices.

17     Q.    That's for -- that's right, for these --

18     A.    And the one you showed was for a different

19   period of invoices.

20          MR. MAZZOLA:  So let's look at -- there's

21   another document.  It's CTX 153.  And I believe that was

22   admitted?

23          MS. MARTINEZ:  I'm sorry.  What number was

24   that?

25          MR. MAZZOLA:  153.  It was a spreadsheet.

1          MS. MARTINEZ:  Yeah, I think so.

2          MR. MAZZOLA:  153.

3          THE COURT:  No.  I don't have 153 in.

4          Any objection?

5          MS. MARTINEZ:  I think it's duplicative of

6    what's already been admitted as Exhibit 120 because it's

7    an attachment, but --

8          MR. MAZZOLA:  Can I use this?

9          MS. MARTINEZ:  There's no objection.  I'm just

10   letting you know.

11         MR. MAZZOLA:  Okay.  There's no objection to

12   this, Judge.

13         THE COURT:  Okay.  So 153 is in evidence.

14   BY MR. MAZZOLA:

15      Q.   Now, this is a payment detail as well?

16      A.   Mm-hmm.

17      Q.   Is that correct?

18      A.   This is the reconciliation of the payment

19   details.

20      Q.   Okay.  But it includes payment details, right?

21      A.   It's the recreation of all of the payment

22   details.

23      Q.   So this was the one that was prepared in 20- --

24      A.   19.

25      Q.   2019.  And your department would have been

1    involved and would have been responsible for this?

2        A.    Yes.

3              MR. MAZZOLA:  Now, let's look again to try to

4    find that January 21, 2015, $500,000 payment.  So if you

5    go to the November 2014 tab and pull it out a little bit

6    so Ms. Ochoa can see the whole page.

7    BY MR. MAZZOLA:

8        Q.    You see the same February 1, 2015, payment

9    detail; is that correct?

10       A.    Yes.

11       Q.    And now we're seeing --

12       A.    It's different.

13       Q.    -- the $500,000 payment right there, right?

14       A.    Yes.

15       Q.    But if you look at this one, now it's changed

16   again.  Now it says $848,000 is owed, and on the earlier

17   one from Todor --

18       A.    The earlier one is the single payment detail

19   presentation of 2015.

20       Q.    Okay.  So the one -- so I'm trying to

21   understand what's the correct one.

22       A.    But --

23       Q.    What's the one --

24       A.    -- when you say the earlier one, you mean the

25   single one?

1      Q.    From Todor.

2      A.    From Todor for 2015, yes.

3            So what is your question?

4      Q.    So what's the correct one?  We've seen three

5  different ones now.

6      A.    I don't --

7      Q.    What's correct?

8      A.    -- know the difference between the two that I'm

9  looking at.

10      Q.    Well, the one that you're looking at now on the

11  right of the screen -- I beg your pardon -- the left side

12  of your screen doesn't have a carry-forward balance.

13            MR. MAZZOLA:  Scroll down, please. 2.

14  BY MR. MAZZOLA:

15      Q.    It has a different total amount due.

16            Do you see that?

17      A.    Yeah.

18      Q.    And then --

19      A.    Because it's different periods.  So even

20  though -- it's different periods of time.

21      Q.    Why then was Todor's reporting, the

22  contemporaneous reporting back in February of 2015,

23  different from the two other ones that we've looked at?

24      A.    Because Todor had to follow a timeline to

25  realize the payments, which included every payment that

878

1   was done up to that point.  So that's the presentation

2   time frame criteria that he was following.

3          When this exercise was done, it was the

4   recreation of all the payment details, trying to follow a

5   different timeframe criteria to allocate the payments to

6   the -- to the payment details.

7      Q.    So you don't consider any of this as

8   sloppiness?

9      A.    No.  I think we were trying to recreate

10  everything going many, many years to make sure we were

11  very clear and able to reconcile the numbers to show that

12  there was not moneys owed.

13     Q.    So that's not sloppy?  It's just Benlida that's

14  sloppy, right?

15     A.    That's a lot of work that went into this.

16     Q.    Benlida helped you, right?

17     A.    Benlida provided feedback from the information

18  that we gave them.

19     Q.    They put in a lot of work, too; didn't they?

20     A.    Yeah, I bet they did, yeah.

21     Q.    One second, Ms. Ochoa.

22          And Todor, he left?

23     A.    He did.

24     Q.    And why did he leave?  He quit?

25     A.    He wanted to have a Government job.

1          MR. MAZZOLA:  Can you put the screen down,

2    please.

3    BY MR. MAZZOLA:

4        Q.    Are you familiar with the saying, you know,

5    garbage in, garbage out?

6        A.    Could you repeat the question?

7        Q.    Garbage in, garbage out.

8        A.    What about that?

9        Q.    In terms of accounting and spreadsheets, if the

10   information going into the spreadsheet is not any good,

11   what comes out of it's not going to be any good?

12       A.    Yeah.

13       Q.    Do you have any reason to believe the

14   information that was going into your spreadsheets was

15   inaccurate or missing information?

16       A.    I don't think so.

17       Q.    Do you recall talking about that if Benlida

18   missed something or made a mistake, they were so sorry,

19   so sad?  Do you recall that?

20       A.    I don't -- can you repeat that?

21       Q.    Do you recall talking during your deposition

22   that if Benlida made a mistake or something and they

23   didn't have their numbers right --

24       A.    Uh-huh.

25       Q.    -- that that would be too bad for them, so

880

 1    sorry, so sad?

 2              Do you recall that?

 3        A.    No.  I don't even understand.

 4        Q.    Well, it was at your deposition, and it started

 5    at Page 225 and at Line 23.  And your answer was:  I

 6    think they were just sloppy on the process.

 7              And then I asked you:  Do you think they were

 8    sloppy?  So that you think that when a purchase order is

 9    issued with the wrong price on it and Benlida misses

10    that, that that's just too bad, tough luck?

11              And your answer was that:  That's the

12    beginning.

13              What did you mean by that's the beginning?  Do

14    you remember?

15              MS. MARTINEZ:  Objection, your Honor.  That's

16    incomplete testimony from the deposition.

17              THE WITNESS:  I don't know.

18              THE COURT:  Did you read the whole answer?

19    BY MR. MAZZOLA:

20        Q.    And then I said:  So sorry, so sad.

21              And then you said:  Wrong records.  That was

22    just the beginning of wrong records.

23              What did you mean by that?

24        A.    I have no idea.

25              MS. MARTINEZ:  Can you keep reading, JC.

1          MR. MAZZOLA:  I will.

2    BY MR. MAZZOLA:

3      Q.    And then I went on and I said:  And if that

4    were, in fact, the case, would your response to -- be to

5    Benlida, a $70 million partner, so sorry, so sad, you

6    missed it, sayonara sucker, would that be your response?

7               And your answer is:  I will put those words.

8               And then I asked you:  Okay.  But it sounds

9    like that what you're saying, you're saying they're

10   sloppy, they've got the purchase order, they accepted it,

11   they delivered it, they got the goods.  Is that your

12   suggestion?  And then they are addressing these

13   discrepancies.

14              And then I ask:  Do you think --

15              And then you said:  We cannot address

16   discrepancies after the fact.

17              Even though you got the goods for less than the

18   contract price?

19              And your answer was:  The PO is the contracted

20   price.

21              Do you remember any of that?

22     A.    I don't remember that, and I didn't quite --

23   understood.  But, yes, the PO's a contracted price.

24     Q.    Okay.  But were you suggesting then if the

25   price between the invoice and the PO was wrong, that

1    that's just too bad for Benlida?

2         A.    So I just have to follow our process.  The PO

3    is a contracted price.  That's what we agreed to buy it

4    at.

5         Q.    And so that was it, if it was -- if the numbers

6    just didn't match up and they didn't match up on

7    Benlida's side, that was their problem?

8         A.    I...

9         Q.    Is that right?

10        A.    I don't know.  I guess.

11        Q.    You guess so?

12        A.    (No response.)

13        Q.    They're a $70 million partner, right?

14        A.    Our biggest partner.

15        Q.    Do you think it's appropriate for you guys to

16   treat them that way?

17        A.    I'm not treating any way.  I'm just following

18   the company process.

19        Q.    The company process.

20              What does that mean?

21        A.    You have a PO that has a contractual price

22   that's been accepted into production.  You receive your

23   goods, and you pay for them.  That's what you do.

24        Q.    The company process is set by Rishi, right?

25        A.    But that's -- but that's very standard company

883

1    process with any.

2         Q.   You said the company, not a company process.

3              So the company process is set by Rishi; is that

4    correct?

5         A.   That's a very standard accounting process.

6    It's not set by Rishi.  It's a normal process.

7         Q.   There is a company policy?

8         A.   Which is which one?

9         Q.   Which is Rishi's policy, right?

10        A.   And what is Rishi's policy --

11        Q.   I don't know, but you said that is the company

12   policy.

13             And my question to you is:  The company policy

14   is always Rishi's policies?

15        A.   Not always.

16        Q.   Not always?

17        A.   There is standard accounting processes that are

18   followed with -- Rishi has nothing to do with it.  That's

19   why we have experts in different areas, so they can tell

20   us what's the right way to do things.

21        Q.   Rishi approves all the purchase orders, right?

22        A.   Yes.

23        Q.   He approves all the payments, right?

24        A.   Yes.

25        Q.   He approves any changes to pricing; is that

884

1   correct?

2       A.    I don't know.  I have nothing to do with it, so

3   I don't know.

4       Q.    He approves everything basically, right?

5       A.    Everything is allowed because in a company,

6   it's not just PO.

7       Q.    Yeah, but he's the big boss, he calls all --

8       A.    He is the CEO, of course.

9       Q.    Okay.  But you know what that means, right, he

10   calls the shots?

11       A.    That's why he's the CEO.

12       Q.    Okay.  You never saw the contract, right?

13       A.    No.

14       Q.    You never saw any addendums to the contract?

15       A.    No.

16       Q.    You never saw any modifications to the

17   contract?

18       A.    No.

19       Q.    You never saw the -- what they call the letter

20   agreement?  Did you ever see that?

21       A.    No.

22       Q.    So all the information you got regarding the

23   relationship between Benlida and CTX would have come from

24   Rishi; is that correct?

25       A.    Correct.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

CROSS-EXAMINATION OF LINA OCHOA

| | |
|---|---|
| 1 | Q.    Information regarding leadtime penalties, that |
| 2 | came from Rishi, right? |
| 3 | A.    Yes. |
| 4 | Q.    Information regarding payments, that came from |
| 5 | Rishi? |
| 6 | A.    Payments in what sense?  Payment terms? |
| 7 | Q.    The payment terms, yes. |
| 8 | A.    Yeah, he would tell us what's the payment |
| 9 | terms. |
| 10 | Q.    And the decision to make a payment came from |
| 11 | Rishi? |
| 12 | A.    We would present the payments that are due, and |
| 13 | then he'll approve them and decide -- releases the |
| 14 | payment. |
| 15 | Q.    Let me ask you this question. |
| 16 | On those payment details, you see a lot of |
| 17 | these big numbers with lots of zeros on them.  We were |
| 18 | just looking at one from January, I think it was, 2015, |
| 19 | and it was for $500,000. |
| 20 | A.    The payment that was in the payment detail? |
| 21 | Q.    Yeah. |
| 22 | A.    Mm-hmm. |
| 23 | Q.    Who was approving those large payments? |
| 24 | A.    When you say "approving," you mean releasing? |
| 25 | Q.    Yeah. |

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    A.    Rishi.

2    Q.    He was approving them.

3    A.    So --

4    Q.    Saying they were okay to pay.

5    A.    So a payment detail is a presentation of the

6    bills.  And then there is an approval to say, okay,

7    they're okay to pay.  So that would be Rishi.  And then

8    there is a payment set up in the bank, and then Rishi

9    will release the payment.

10    Q.    On some of these payment details, there's a

11    massive credit on them, right?

12    A.    Yes.

13    Q.    Do you have any idea why Rishi was paying more

14    money where there was a credit?

15    A.    So I never discussed it, but they are our

16    largest partner -- or they were our largest partner.  I

17    knew they had cash flow issues, and a lot of times they

18    had to make their payroll.  But I also knew they were

19    expanding their operations.  So I just assumed it was a

20    strategic decision to do that to make sure they kept

21    running.  They're our largest partner and we have a

22    really good relationship with them, so it was important

23    for us to keep them running so we could have product for

24    our customers.

25    Q.    Regarding their cash flow situation --

1      A.    Mm-hmm.

2      Q.    -- you said they had cash flow problems, right?

3      A.    Yeah.

4      Q.    That's what you heard, right?

5      A.    That's what I heard, yeah.

6      Q.    Do you know if those cash flow problems were

7   caused by CTX because CTX was behind in paying bills?

8      A.    We were in an overpay situation.

9      Q.    So why would you keep paying if you were in an

10  overpay situation?

11     A.    I just explained that.

12     Q.    But why?  Who does that?  Why not just apply

13  some of that credit rather than paying them for goods?

14     A.    We -- it was our main supplier.  If they don't

15  make payroll, the employees won't come, there is no

16  production, we have no product.

17     Q.    So you just keep paying them more money?

18     A.    That's the CEO's strategy and decision to make.

19  And, again, our largest supplier with cash flow issues to

20  pay payroll, there's a strategic decision for that.

21          MR. MAZZOLA:  I'm almost done, Judge.

22  BY MR. MAZZOLA:

23     Q.    There's a situation where they're making these

24  overpayments and they're paying these numbers, this

25  500,000 that we talked about earlier.

```
 1        A.    Mm-hmm.

 2        Q.    Where you had a credit balance, right?

 3        A.    Yes.

 4        Q.    By looking at those debit -- the payment

 5   details, you'd be unable to know what invoices are paid

 6   and which ones are not paid; isn't that correct?

 7        A.    I don't think so.

 8        Q.    You don't think so?  Because I asked you on

 9   Page 97.  And I'll start at Line 13.

10             MR. MAZZOLA:  Christina, you got it?

11             MS. MARTINEZ:  Give me one second.

12             Yep.

13   BY MR. MAZZOLA:

14        Q.    I started with that Line 13 question:  It was

15   all paid?

16             And you answered yes because you have a credit

17   balance.

18             Question:  Okay.  And then in this month over

19   here, what's paid and what's not?

20             Answer:  It was partially paid.

21             But do you know what invoices -- question:  Do

22   you know what invoices are paid and which ones are not?

23             And your answer was:  Not by looking at it.

24             So in terms of looking at these payment

25   details, if you look at them one after another, you're
```

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1  not able to determine what invoices were actually being

2  paid, right?

3      A.    So what payment detail does is it tells the

4  supplier how you want the bills to get paid.  So you list

5  the payments, and you're saying this payments are paying

6  for this invoices.

7          So on a partially paid payment detail, then you

8  wouldn't have paid all the invoices.  But when you have

9  carrying balances, there are credits.  Then you pay

10  everything.

11     Q.    So then I carried on with my questioning.

12         I said:  So then presumably, if we looked at

13  the next month, there may be no credit balance, and then

14  it would presume to be paid, right -- to be paid then; is

15  that right?

16         And you answered:  Yes, right.

17         Question:  So it sounds then from your

18  perspective then, the normal procedure is then you're

19  constantly paying -- but the idea is you're constantly

20  paying -- you're always -- you're not leaving invoices in

21  the past that are not paid for.  Those are always being

22  paid; is that correct?

23         And you answered:  Right.

24         Do you remember saying that?

25     A.    I guess.  I don't remember, but yeah.

1      Q.    So do you remember saying that -- I asked you,

2   and I'll paraphrase at Line 3:  You're not leaving

3   invoices in the past that are not paid for, those are

4   always being paid; is that correct?

5           And you answered:  Right.

6      A.    Right.  I mean, there is payment details that

7   shows how we are paying.

8      Q.    And then I asked:  I think I've heard it like

9   first in first out.  Is that --

10          And then you answered:  We don't have that

11  terminology.

12          And I said:  Okay.

13          And then I asked again:  But the older invoices

14  are getting paid; is that correct?

15          And you answered:  Yes.

16     A.    What do you mean by "the older invoices are

17  getting paid"?

18     Q.    I don't know.  That was the question I asked

19  you.  We had spent hours during the deposition looking at

20  these payment details, looking at all sorts of numbers.

21     A.    Mm-hmm.

22     Q.    And the question I asked you was:  But the

23  older invoices are getting paid; is that correct?

24          And you answered:  Yes.

25     A.    The payment details show -- yeah.

1        MS. MARTINEZ:  Objection, your Honor; improper

2   impeachment, and also at this point well beyond the scope

3   of the direct examination.

4        THE COURT:  Overruled.

5        THE WITNESS:  I believe I answer?

6        MS. MARTINEZ:  Yes.

7        THE WITNESS:  Okay.  Sorry.

8        All right.  So there is no first in, first out

9   in payment -- accounts payable, okay.  Payment details

10  are meant to show how your payment is allocated to your

11  invoices, okay?  It doesn't mean the old ones and the new

12  ones.  It just means the ones that you're showing.

13       You present payment details based on your

14  payment terms, and that's how you allocate payments in

15  your system.  And the whole idea of payment details is to

16  synchronize what you're doing in your system so that your

17  supplier can do the same.  And that is the process we

18  follow with all our suppliers.  And all our customers do

19  the same with us as their supplier.

20       Q.   So what did you mean when you answered that

21  question?

22       A.   I don't know if you were asking me if the prior

23  payment detail was done and then, therefore, the carry

24  balance, that was a credit paid for those bills, perhaps.

25       Q.   I don't know, but I did say at Line 7, Page 98:

 1   I think I heard it like first in, first out.  Is that --

 2             We don't have that terminology.

 3             And I asked you at Line 14:  But the older

 4   invoices are getting paid; is that correct?

 5             And your answer was:  Yes.

 6        A.   So perhaps what I meant is there's always

 7   payment detail being presented and paid so all of them

 8   are getting paid.

 9        Q.   So when Benlida received --

10             MR. MAZZOLA:  123?  I'm going to put up a

11   document that we've already looked at.  It's Exhibit 123.

12   BY MR. MAZZOLA:

13        Q.   When Benlida received these payment details on

14   February 2, 2015 --

15             Do you see that?

16        A.   Yes.

17        Q.   (Continuing) -- he writes:  Here is the payment

18   detail for January 1, 2015, for October invoices.

19             Do you see that?

20        A.   Mm-hmm.

21        Q.   And then he attaches one -- he attaches a

22   January and a February 2015 payment detail.

23        A.   Mm-hmm.

24        Q.   And they're both paying the February -- January

25   1, 2015, payment detail is purported to pay invoices from

CROSS-EXAMINATION OF LINA OCHOA

1    October; is that correct?

2         A.   Can you repeat that last part?

3         Q.   The January 21, 2015 payment detail, which was

4    received on February 2nd, is purported to pay invoices

5    from September 2014 through October 30th, 2014?

6         A.   October invoices.  Should be paying October

7    invoices, yeah.

8         Q.   Why so late?

9         A.   Because of the payment terms, AMS 60.  It's not

10   late.  It's right on time.

11        Q.   Now, when these payments would get sent, the

12   January -- just talking about the January 21st, 2015

13   payment, it would just get wired over, right?

14        A.   Yeah.  It's a wire.

15        Q.   And would you agree that if -- when a payment

16   is made, that CTX does not identify the invoices when the

17   payment is made, and a supplier could properly apply that

18   payment to older invoices or the oldest invoice?

19        A.   No.

20        Q.   Why do you say that?

21        A.   Because the supplier will need payment details

22   to know how it needs to be applied.

23        Q.   And you did say earlier in your deposition,

24   when we were talking about first in, first out:  The

25   older invoices are getting paid; is that correct?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1          And you answered:  Yes.

2     A.    So I said there is no first out -- first in,

3  first out in accounts payable; that what I probably meant

4  with that statement was that if we were paying this

5  month's payment details, I'm sure there was a prior

6  month's payment details being presented.

7          MR. MAZZOLA:  Okay.  Thank you so much,

8  Ms. Ochoa.

9          THE WITNESS:  Thank you.

10         I'm done?

11         THE COURT:  Do you have any redirect?

12         MR. MAZZOLA:  The Judge tells you when you're

13 done.

14         MS. MARTINEZ:  Just a brief redirect, your

15 Honor.

16         THE COURT:  Okay.

17                 REDIRECT EXAMINATION

18 BY MS. MARTINEZ:

19    Q.    Can you explain the difference between -- or

20 what the function is of a payment detail?  We heard it

21 many times, but just -- kind of just sum it up for the

22 jury.

23    A.    So payment detail is a presentation of invoices

24 that are due based on payment terms.  And once approval

25 in pay, it shows your supplier how you're allocating that

1  payment, which invoices are you paying.  And that's what

2  a payment detail does.

3       Q.    And that's done how -- with what frequency?

4       A.    Monthly.

5       Q.    Monthly.

6             MS. MARTINEZ:  Mr. Vega, can you pull up

7  Exhibit 153, please.

8  BY MS. MARTINEZ:

9       Q.    This is one of the exhibits you were just

10  discussing, I think, with Mr. Mazzola.

11            Can you tell me what this document is that

12  we're looking at now?

13       A.    So this document is -- it is an effort to

14  consolidate everything and go back in time to recreate

15  every payment detail and allocate the payments so that we

16  have kind of a clear understanding of where the numbers

17  were to try to bridge the gap of what Benlida's claims

18  were.

19       Q.    And when you say it was an effort, was it

20  solely a CTX effort?

21       A.    No.  Benlida also participated.  This document

22  was solely done by Circuitronix.  And then we send it to

23  Benlida so that they can give us their feedback.

24       Q.    Okay.

25       A.    So it was a collaborated effort.

1    Q.    And what's the time period of this particular

2    document that it's looking at from beginning to end?

3    A.    This one is 2012 to 2019.

4    Q.    Do you know when -- well, first, was this

5    document shared with Benlida?  Do you know?

6    A.    There was a -- the first one was shared with

7    Benlida in November 2019.

8    Q.    Okay.

9    A.    Which was a consolidation and re-creation of

10   all the payment details and payments done.

11   Q.    And so can you confirm, if we look at the very

12   bottom of the spreadsheet at all these different tabs,

13   what is the function -- what is that doing, I guess?

14   A.    It is recreating every month for every year

15   since 2012.

16   Q.    So are the payment details that are reflected

17   in each of these tabs the same as the payment details

18   that would have been done in 2012 or 2015?

19   A.    Yes.  It was the recreation of all the payment

20   details.

21   Q.    Might there be some differences?

22   A.    There were because there were mistakes that

23   were surfaced, and Benlida gave us feedback on some items

24   so we went back and made the modifications.

25   Q.    How did you find the mistakes?

REDIRECT EXAMINATION OF LINA OCHOA

1    A.    There might have been a double payment.  And we

2  will go back and take it out, so that will change the

3  balance on the consequent ones.

4    Q.    Did you -- Well, my question was more:  How did

5  you find out that there was a double payment?  Was it --

6  yeah, how did you find out about it?

7    A.    So Benlida will give us a list of feedback and

8  we will go back to check records.  We'll go back to bank

9  statements, emails, receipts, invoices, all kinds of

10  stuff to make sure we -- we were able to support that

11  difference.

12         MS. MARTINEZ:  I'd like to open up, if I can,

13  Mr. Vega, Exhibit 79.  I'm not sure if that's been

14  admitted into evidence yet -- it has, I'm being told.

15         MR. MAZZOLA:  Did we use that document?

16         MS. MARTINEZ:  You did not use 79.  You used

17  153, I believe.

18         MR. MAZZOLA:  It might be beyond the scope, I

19  don't --

20         MS. MARTINEZ:  She just answered about Benlida

21  feedback, and it's continuing what you're discussing

22  about the reconciliations.

23         MR. MAZZOLA:  Okay.  I just think it's beyond

24  the scope.

25         THE COURT:  All right.  79 is in evidence.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

REDIRECT EXAMINATION OF LINA OCHOA

```
 1              (Exhibit 79 received in evidence.)

 2              MS. MARTINEZ:  Sorry, I think it's -- well.

 3    BY MS. MARTINEZ:

 4         Q.   Do you recognize this document, Ms. Ochoa?

 5         A.   It's an email.  I have to review the data.

 6              So after -- this was in November, okay.  So

 7    after the compiled re-creation of payment details from

 8    2012 to 2019, it was shared with Benlida.  And so Benlida

 9    responded with some questions and some supporting

10    documents that they needed.

11         Q.   Now, did you receive this email?

12         A.   I don't know if I'm there.

13              I am not in that email communication.

14         Q.   Did you learn, though, that Benlida had

15    responded to your reconciliation spreadsheet?

16         A.   Yes, yes.

17              MS. MARTINEZ:  Can we open up the attachment to

18    79.

19    BY MS. MARTINEZ:

20         Q.   Is this Benlida's response?

21         A.   Yes.

22         Q.   Did you ever see this document?

23         A.   I did.

24         Q.   And what did you --

25              MS. MARTINEZ:  Well, I guess before I move to
```

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

```
 1   that, I'd also like to see Exhibit 87, the third
 2   attachment.  Has that been put into evidence?
 3              THE COURT:  Yes.
 4              THE WITNESS:  Is that it?
 5              MS. MARTINEZ:  I believe so.
 6              MR. MAZZOLA:  Can we see that?  What number is
 7   that again?
 8              MS. MARTINEZ:  This is 87.
 9              MR. MAZZOLA:  Oh, 87, okay.  Thank you.
10              And this is 87, too, Christina?
11              MS. MARTINEZ:  This is the attachment to 87,
12   the third attachment.
13   BY MS. MARTINEZ:
14        Q.   Do you recognize this document?
15        A.   It's not really refreshing my memory.
16              This was a part of the feedback, back and
17   forth, on the discrepancies that were identified in
18   the -- the reconciliation back to 2012.
19        Q.   So that is something that came from Benlida or
20   CTX?
21        A.   (No response.)
22        Q.   We can go back to the email if --
23        A.   Benlida.  The email is from Benlida.
24        Q.   So between this email and the attachment that
25   we just looked at and Exhibit 79 and the attachment that
```

1    we looked at before that, the two Benlida feedback

2    communications, what did you do with that information?

3        A.    So we went back and looked at each one of the

4    feedbacks and provided supported documentation that

5    either supported our numbers or we rectified it in the

6    payment details if there was anything that we didn't

7    have.

8        Q.    And what was the culmination of that -- sorry.

9    Excuse me.

10           Before I continue, was that at that point an

11   internal effort or still back and forth with Benlida?

12       A.    The back and forth was trying to address the

13   questions that they had.  And then we would answer, you

14   know, quite a bit of number of questions.  And then

15   they'll have more.

16           And then we internally finished the adjustments

17   and provided all of the evidence and backup we had for

18   some of the questions that had.  And we internally

19   completed the process.

20       Q.    When you --

21           MS. MARTINEZ:  Could I pull up Exhibit 148,

22   please.

23   BY MS. MARTINEZ:

24       Q.    Do you recognize this document, Ms. Ochoa?

25       A.    Yes.

 1    Q.    What is it?

 2    A.    This is the summary page of the reconciliation

 3  which shows the total numbers.

 4    Q.    And what time period does this cover?

 5    A.    2012 to 2021.

 6    Q.    So is this the final internal CTX

 7  reconciliation that you were just referring to?

 8    A.    Correct.

 9        MS. MARTINEZ:  Now, I'm going -- I apologize in

10  advance, Mr. Vega, I'm going to ask you to toggle between

11  Exhibits 153 and 148.

12  BY MS. MARTINEZ:

13    Q.    So between -- what -- were there any changes

14  between the 2019 reconciliation that you sent to Benlida

15  and then you received feedback and then you had the final

16  reconciliation in Exhibit 148.  Is that -- am I

17  summarizing correctly?

18    A.    Yeah, you're correct.

19        So some of the items that Benlida highlighted,

20  as I said, we provided evidence that proved that we made

21  the payment and we had the correct invoice, et cetera,

22  et cetera.  But there were also corrections that we had

23  to do on our side.  So there will be differences.

24    Q.    So, for example, if we go to one of the

25  examples of changes that Mr. Mazzola focused on in the

REDIRECT EXAMINATION OF LINA OCHOA

1   April 2017 tab of Exhibit 153, the 2019 recon --

2       MS. MARTINEZ:  And I'll give you, Mr. Vega, a

3   chance to do that.

4   BY MS. MARTINEZ:

5       Q.   Do you recall, Ms. Ochoa, how Mr. Mazzola was

6   talking to you about this exhibit and the duplicated

7   payment?

8       A.   Yes, the one from July 21st.

9       MS. MARTINEZ:  Can we look at the April 2017

10  tab of Exhibit 148, the final reconciliation.

11      MR. ROSENTHAL:  Is that the one on the left?

12  Sorry.  Just trying to follow.

13      MS. MARTINEZ:  Yes.  That's correct.

14      THE WITNESS:  You have to keep going.  Yeah.

15  BY MS. MARTINEZ:

16      Q.   Do you see two payments in the final

17  reconciliation, Exhibit 148, on the left, Ms. Ochoa?

18      A.   No.  That was rectified and removed.

19      Q.   What was the process of rectifying and removing

20  it?

21      A.   Confirming with the bank statements.

22      Q.   Confirming with the bank statements.

23          And did you utilize, if you recall, Benlida's

24  feedback to make this adjustment?

25      A.   Yes.

**REDIRECT EXAMINATION OF LINA OCHOA**

903

1        MS. MARTINEZ:  No further questions, your

2   Honor.

3        THE COURT:  All right.  Thank you, ma'am.  You

4   can step down.

5        (Witness excused.)

6        THE COURT:  I told you we wouldn't go past

7   5:45, so we're going to break right now.  I do not have

8   any other matters tomorrow other than this trial, so I'd

9   like to start, if we can, at 8:45.

10        There's 26 people so it doesn't make sense to

11   have 25 people here if somebody can't get here.  So first

12   of all, can everybody get here at 8:45?  Yes?  No?

13        Yes.  Okay.  So we'll see everybody at 8:45.

14   All right.  Have a good evening.

15        (Proceedings concluded at 5:35 p.m.)

16

17

18

19

20

21

22

23

24

25

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1        C E R T I F I C A T E

2

3            I certify that the foregoing pages represent a

4    true and correct transcript of the above-styled

5    proceedings as reported on the date, time, and location

6    listed.

7

8            I further certify that I am neither counsel

9    for, related to, nor employed by any of the parties to

10   the action in which this hearing was reported, and

11   further that I am not financially nor otherwise

12   interested in the outcome of the above-entitled matter.

13

14

15

16

17   DATE: 2/19/24    /s/Mary Ann Casale, RDR, FPR-C, CLR, CSR-IL
                      Official Court Reporter
18                    United States District Court
                      Southern District of Florida
19                    400 North Miami Avenue
                      Miami, Florida 33128
20                    MaryAnn_Casale@flsd.uscourts.gov

21

22

23

24

25

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

## $

**$10** [2] - 758:15, 759:2
**$100** [5] - 673:21, 673:23, 674:19
**$189,000** [1] - 874:15
**$2,994,050** [1] - 781:5
**$22,405** [1] - 770:19
**$250,000** [5] - 854:22, 854:25, 855:16, 858:20, 859:16
**$30** [2] - 700:7, 702:19
**$4,525** [1] - 772:4
**$400,000** [1] - 675:15
**$45,250** [1] - 768:12
**$450,000** [1] - 684:1
**$50,000** [2] - 688:2, 688:8
**$500,000** [17] - 640:12, 760:13, 760:16, 781:9, 781:10, 782:17, 867:23, 869:9, 869:17, 870:10, 871:20, 872:1, 873:10, 873:22, 876:4, 876:13, 885:19
**$55,000** [2] - 678:23, 679:10
**$7.576** [1] - 699:12
**$70** [2] - 881:5, 882:13
**$848,000** [1] - 876:16
**$93** [2] - 673:23, 674:3
**$937,000** [1] - 874:8

## /

**/s/Mary** [1] - 904:16

## 0

**0** [1] - 779:10

## 1

**1** [44] - 638:12, 675:25, 676:1, 676:3, 676:4, 676:17, 676:18, 676:20, 676:21, 676:24, 677:1, 677:10, 677:18, 677:19, 677:20, 757:5, 757:7, 757:15, 758:23, 758:24, 853:24, 866:2, 866:4, 866:16, 866:23, 867:6, 867:10, 867:19, 867:22, 869:21, 870:6, 870:9, 870:14, 871:16, 873:11, 873:22, 874:5, 874:7, 874:13, 876:8, 892:18, 892:25
**1,000** [2] - 842:16, 842:19
**1,100** [2] - 842:19,

842:20
**1,500** [1] - 843:11
**1.2** [1] - 680:3
**1.3** [1] - 760:16
**1.399** [1] - 680:3
**1.4** [3] - 680:4, 680:6, 682:13
**1.4A** [1] - 733:21
**10** [10] - 680:5, 758:1, 758:5, 769:6, 770:10, 770:23, 779:4, 779:9, 791:4, 817:5
**10-minute** [1] - 791:2
**10.2** [1] - 785:16
**10.2A** [1] - 785:9
**10.4** [1] - 786:5
**100** [9] - 650:22, 662:16, 674:4, 697:24, 715:12, 758:4, 806:1, 843:5, 843:10
**100,000** [2] - 732:24, 732:25
**10:40** [1] - 681:16
**10:57** [2] - 681:16, 681:17
**10A** [1] - 785:9
**12** [3] - 734:12, 734:15, 828:13
**12-year** [1] - 777:3
**120** [1] - 875:6
**121** [1] - 868:9
**123** [4] - 834:14, 865:14, 892:10, 892:11
**12:20** [1] - 741:5
**12:22** [1] - 743:20
**12th** [1] - 735:2
**13** [2] - 888:9, 888:14
**13th** [1] - 628:19
**14** [1] - 892:3
**148** [12] - 701:3, 701:8, 701:9, 701:15, 701:19, 701:21, 759:6, 900:21, 901:11, 901:16, 902:10, 902:17
**148R** [1] - 701:8
**15** [5] - 632:15, 681:14, 742:11, 863:21, 869:23
**150** [1] - 843:10
**153** [12] - 854:1, 854:10, 854:11, 874:21, 874:25, 875:2, 875:3, 875:13, 895:7, 897:17, 901:11, 902:1
**16** [8] - 767:25, 792:20, 793:8, 793:9, 795:21, 848:20, 848:22, 849:8
**17** [1] - 743:4
**174** [1] - 632:8
**176** [2] - 628:23, 632:19
**177** [3] - 630:23, 633:8,

733:5
**17th** [1] - 673:14
**19** [1] - 875:24
**1:00** [1] - 741:18
**1:35** [6] - 740:23, 741:4, 742:1, 742:2, 742:5, 743:19
**1:36** [1] - 743:20
**1:37** [1] - 743:21
**1st** [16] - 675:22, 676:13, 676:15, 677:11, 683:22, 707:21, 708:4, 708:5, 708:15, 772:20, 772:21, 772:24, 808:10, 810:15, 853:14, 853:19

## 2

**2** [11] - 630:23, 675:16, 675:20, 676:1, 676:18, 702:16, 757:25, 866:14, 873:13, 877:13, 892:14
**2.4** [2] - 771:5
**2.5** [6] - 700:1, 700:3, 700:6, 702:18, 702:19, 703:1
**2.9** [2] - 760:15, 760:18
**2.99** [3] - 640:2, 640:8, 640:11
**2/19/24** [1] - 904:16
**20** [4] - 669:4, 765:2, 779:4, 875:23
**200** [1] - 758:4
**200,000** [2] - 683:19, 774:25
**2000** [2] - 692:4, 707:21
**2008** [1] - 793:7
**2012** [18] - 653:19, 653:22, 669:2, 669:5, 669:6, 692:3, 701:18, 701:19, 701:20, 702:13, 713:22, 762:19, 896:3, 896:15, 896:18, 898:8, 899:18, 901:5
**2013** [2] - 653:23, 855:11
**2014** [3] - 876:5, 893:5
**2015** [49] - 675:23, 677:11, 680:9, 683:22, 782:18, 864:7, 866:3, 866:4, 866:9, 866:14, 866:16, 866:23, 867:7, 867:11, 868:4, 868:10, 869:2, 869:3, 869:21, 869:22, 870:11, 870:14, 870:24, 871:12, 871:16, 871:19, 871:21, 871:25, 872:1, 872:9, 873:10, 873:11, 873:22, 874:13, 876:4, 876:8, 876:19, 877:22, 877:22, 885:18,

892:14, 892:18, 892:22, 892:25, 893:3, 893:12, 896:18
**2016** [6] - 648:17, 670:7, 755:22, 772:18, 772:21, 782:18
**2017** [33] - 636:11, 671:19, 673:14, 673:15, 679:17, 708:4, 708:5, 711:25, 757:11, 757:16, 758:20, 758:21, 759:20, 772:22, 772:24, 808:10, 810:15, 829:8, 829:12, 830:2, 832:24, 844:9, 849:25, 853:14, 853:17, 853:24, 854:18, 858:10, 859:15, 902:1, 902:9
**2018** [26] - 700:11, 700:12, 700:13, 705:15, 708:6, 708:13, 708:15, 729:3, 764:12, 764:25, 765:3, 767:15, 772:20, 772:24, 843:24, 844:21, 844:22, 845:16, 845:21, 845:22, 846:7, 846:12, 850:5, 860:24, 861:1, 861:2
**2019** [20] - 700:11, 700:13, 701:18, 711:23, 764:23, 765:4, 765:5, 767:15, 788:20, 815:24, 868:10, 873:20, 873:21, 875:25, 896:3, 896:7, 898:8, 901:14, 902:1
**2020** [6] - 714:1, 716:1, 717:23, 717:24, 749:8, 749:16
**2021** [8] - 627:14, 701:19, 701:20, 702:13, 733:7, 734:23, 735:1, 901:5
**2022** [1] - 627:14
**2023** [11] - 627:9, 627:24, 628:19, 629:10, 629:16, 630:1, 630:2, 638:12, 645:21, 735:2, 774:24
**20th** [1] - 749:16
**21** [16] - 632:19, 675:2, 784:20, 821:20, 854:17, 859:15, 868:4, 869:10, 870:11, 871:20, 871:25, 873:10, 873:21, 876:4, 893:3
**21st** [2] - 858:20, 893:12, 902:8
**22** [1] - 831:14
**224,000** [1] - 769:10, 770:8, 770:23, 770:24
**225** [1] - 880:5
**23** [4] - 628:23, 630:17,

648:13, 880:5
**232** [3] - 768:3, 771:9, 771:13
**239** [4] - 769:13, 769:14, 769:23, 770:16
**25** [2] - 765:2, 903:11
**250** [1] - 683:20
**250,000** [1] - 683:18
**255** [4] - 715:19, 718:4, 718:9, 732:5
**259** [1] - 750:15
**26** [1] - 903:10
**27** [1] - 821:19
**283** [2] - 728:13, 728:15
**28th** [1] - 729:3
**29** [1] - 715:9
**2:43** [1] - 791:5
**2:55** [2] - 791:5, 791:6
**2nd** [4] - 866:9, 871:11, 871:18, 893:4

## 3

**3** [9] - 633:8, 741:1, 757:25, 776:1, 776:2, 779:6, 779:10, 890:2
**3,000** [2] - 692:4, 704:11
**3.5** [2] - 762:17, 763:3
**30** [9] - 700:13, 700:20, 700:21, 700:24, 743:5, 756:11, 765:2, 828:11, 828:13
**300** [10] - 628:12, 628:14, 629:22, 630:25, 631:15, 631:18, 631:21, 631:25, 633:10, 675:15
**300,000** [3] - 675:20, 675:24, 676:15
**304** [1] - 685:22
**305** [3] - 685:18, 685:20, 685:21
**306** [2] - 685:19, 685:20
**307** [1] - 739:9
**308** [6] - 739:3, 739:9, 739:10, 739:11, 739:12, 744:11
**309** [4] - 750:24, 752:19, 752:22, 752:24
**30th** [1] - 893:5
**31** [1] - 825:25
**310** [3] - 858:24, 858:25, 859:1
**3131** [1] - 657:1
**315** [8] - 628:12, 630:25, 631:13, 631:15, 631:18, 631:22, 631:25, 633:10
**31st** [4] - 708:6, 708:13, 772:22, 772:24
**32** [4] - 645:21, 645:22, 647:2, 816:16

**33128** [1] - 904:19
**33312** [1] - 657:2
**34** [1] - 648:13
**35** [1] - 648:12
**37** [2] - 769:3, 769:6
**39** [3] - 637:7, 637:10, 638:15
**3:00** [2] - 742:9, 828:1
**3:00-ish** [1] - 742:10
**3:30** [1] - 742:15

**4**

**4** [1] - 645:24
**4,000** [1] - 692:5
**4-8** [1] - 756:18
**40** [2] - 669:24, 669:25
**400** [1] - 904:18
**403** [2] - 726:5, 728:5
**41** [1] - 869:12
**42nd** [1] - 657:1
**45,250** [1] - 771:19
**48** [3] - 743:5, 756:17, 756:18
**49** [1] - 743:4
**497** [1] - 775:25
**4:26** [1] - 863:23
**4:42** [2] - 863:23, 863:24

**5**

**5** [2] - 678:4, 771:5
**5.5** [5] - 676:4, 677:9, 678:1, 678:5, 678:12
**50** [4] - 651:21, 651:23, 758:5, 842:12
**50,000** [1] - 775:3
**500** [2] - 683:20, 775:24
**500,000** [3] - 782:9, 782:10, 887:25
**5052** [1] - 696:16
**55** [3] - 630:21, 633:4, 842:22
**58,000** [1] - 686:9
**59** [1] - 748:2
**5:35** [1] - 903:15
**5:45** [1] - 903:7
**5th** [1] - 793:7

**6**

**6** [9] - 637:11, 677:8, 712:15, 712:19, 712:21, 785:14, 816:14, 816:15, 816:16
**6/21** [1] - 733:7
**60** [11] - 712:14, 735:20, 735:21, 736:1, 748:21, 748:23, 749:8, 756:11, 777:13, 842:12, 893:9

**6:00** [1] - 863:22

**7**

**7** [13] - 673:22, 673:24, 680:7, 689:5, 710:21, 712:15, 712:19, 712:21, 716:1, 784:21, 784:22, 786:6, 891:25
**7,000** [3] - 704:14, 708:14, 708:16
**7.5** [1] - 699:20
**700** [4] - 629:16, 629:23, 631:5, 631:11
**79** [6] - 897:13, 897:16, 897:25, 898:1, 898:18, 899:25
**7th** [1] - 756:10

**8**

**8** [2] - 758:13, 772:23
**80,000** [1] - 775:7
**81** [3] - 830:20, 831:11, 831:14
**85** [2] - 774:24, 774:25
**87** [5] - 899:1, 899:8, 899:9, 899:10, 899:11
**8:45** [3] - 903:9, 903:12, 903:13

**9**

**9.1** [1] - 759:22
**95** [1] - 632:24
**97** [1] - 888:9
**98** [1] - 891:25
**99** [2] - 691:7, 691:9
**99.9** [1] - 691:6
**9:21** [1] - 626:2

**A**

**a.m** [4] - 626:2, 681:16, 681:17
**A.O** [1] - 847:13
**ability** [1] - 648:7
**able** [17] - 645:23, 647:13, 647:16, 647:18, 647:22, 648:23, 686:15, 686:19, 738:11, 746:13, 749:7, 766:18, 771:21, 801:6, 878:11, 889:1, 897:10
**above-average** [1] - 665:24
**above-entitled** [1] - 904:12
**above-styled** [1] - 904:4
**absolutely** [7] - 712:3, 713:8, 722:14, 730:17,

777:2, 778:10, 787:7
**accept** [4] - 667:4, 679:1, 708:6, 749:6
**acceptance** [1] - 728:25
**accepted** [3] - 739:20, 881:10, 882:22
**accepting** [1] - 712:22
**access** [7] - 811:15, 811:23, 811:24, 811:25, 812:1, 817:14, 835:17
**accidentally** [1] - 817:18
**according** [4] - 679:11, 724:11, 763:2
**account** [5] - 760:21, 803:5, 805:11, 807:4, 858:10
**accountant** [3] - 797:7, 797:8, 865:8
**accounting** [59] - 793:23, 795:9, 795:12, 795:22, 795:25, 796:2, 796:13, 796:15, 796:22, 796:24, 796:25, 797:17, 798:1, 798:25, 799:7, 800:15, 800:24, 801:3, 803:17, 803:23, 803:25, 804:8, 805:1, 805:2, 805:5, 805:12, 805:19, 806:7, 807:17, 811:25, 812:1, 812:2, 812:12, 812:23, 814:22, 817:13, 817:21, 818:3, 819:2, 844:20, 845:10, 846:6, 846:10, 846:11, 849:17, 849:24, 850:10, 850:13, 850:16, 851:1, 861:7, 864:11, 864:12, 864:17, 867:15, 879:9, 883:5, 883:17
**accounts** [12] - 662:21, 797:4, 797:5, 797:10, 805:11, 806:9, 806:20, 807:17, 811:21, 865:6, 891:9, 894:3
**accumulated** [2] - 679:15
**accuracy** [2] - 810:8, 810:10
**accurate** [4] - 643:8, 643:11, 652:18, 653:1
**achieve** [1] - 656:15
**achieved** [2] - 680:8
**acknowledged** [1] - 637:17
**acquired** [3] - 629:16, 631:5, 631:11
**action** [2] - 800:3, 904:10
**active** [1] - 754:1
**actual** [2] - 661:11, 855:4
**add** [16] - 630:2, 680:12, 680:15, 688:17, 714:7,

715:14, 717:8, 732:14, 733:1, 736:2, 736:4, 736:5, 736:6, 745:17, 753:11, 808:21
**added** [9] - 631:13, 714:10, 715:1, 733:8, 734:23, 739:24, 745:20, 809:1, 842:13
**addendums** [1] - 884:14
**addition** [2] - 636:18, 685:24
**additional** [3] - 631:5, 691:2, 807:3
**address** [6] - 656:25, 657:6, 660:24, 808:15, 881:15, 900:12
**addressed** [2] - 659:9, 660:23, 846:21
**addresses** [2] - 750:20, 845:24
**addressing** [2] - 801:13, 881:12
**adds** [3] - 682:13, 702:19, 854:25
**adjustment** [1] - 902:24
**adjustments** [1] - 900:16
**administrative** [1] - 824:14
**admit** [1] - 644:3
**admitted** [20] - 701:3, 739:5, 744:4, 744:5, 744:8, 744:11, 756:18, 759:6, 766:1, 806:1, 841:12, 841:16, 841:24, 854:2, 854:4, 856:7, 857:18, 874:22, 875:6, 897:14
**admittedly** [1] - 861:4
**admonish** [1] - 626:14
**advance** [1] - 901:10
**advise** [2] - 739:19, 755:23
**advised** [1] - 739:24
**affects** [1] - 837:21
**affiliate** [3] - 736:18, 736:19, 763:22
**affiliated** [15] - 682:24, 682:25, 695:25, 702:22, 703:19, 716:20, 717:4, 719:23, 725:16, 731:20, 735:3, 736:14, 760:7, 782:13, 811:14
**affiliates** [2] - 721:13, 723:20
**afternoon** [5] - 632:15, 792:7, 792:8, 818:12, 818:13
**ago** [14] - 634:11, 640:25, 667:4, 709:15, 709:24, 715:23, 748:21,

715:14, 717:8, 732:14,
748:23, 749:8, 763:20, 792:20, 793:8, 823:5, 849:8
**agree** [9] - 636:22, 647:13, 743:7, 787:24, 788:2, 790:3, 790:5, 790:6, 893:15
**agreed** [6] - 649:3, 708:6, 755:11, 755:13, 857:11, 882:3
**agreeing** [2] - 662:7, 800:11
**agreement** [25] - 668:24, 669:2, 669:8, 669:11, 669:15, 669:19, 670:4, 670:14, 670:22, 674:24, 714:19, 715:16, 720:8, 720:9, 720:11, 720:12, 720:13, 734:18, 734:19, 755:5, 784:20, 785:10, 786:12, 790:6, 884:20
**agreements** [2] - 668:23, 755:2
**ahead** [11] - 634:1, 658:22, 658:23, 681:18, 691:1, 743:2, 799:22, 809:6, 859:6
**ain't** [2] - 690:1, 776:24
**air** [17] - 687:13, 687:16, 687:18, 687:20, 687:22, 688:10, 688:13, 689:1, 690:16, 690:18, 691:2, 691:13, 691:17, 691:21, 693:21, 694:8
**Akshay** [19] - 736:2, 736:11, 739:14, 739:17, 739:19, 740:7, 740:12, 744:24, 745:1, 745:3, 745:22, 746:21, 749:3, 752:9, 752:11, 752:21, 753:11, 753:22, 828:14
**alarming** [1] - 775:22
**Alfredo** [3] - 692:22, 692:25, 695:11
**Alice** [2] - 659:9, 659:11
**align** [4] - 794:13, 799:19, 855:13, 869:25
**aligning** [1] - 794:24
**alike** [2] - 651:3, 651:9
**allegation** [1] - 774:11
**allegations** [1] - 774:7
**allocate** [3] - 878:5, 891:14, 895:15
**allocated** [1] - 891:10
**allocating** [1] - 894:25
**allow** [2] - 752:17, 832:21
**allowed** [3] - 668:2, 668:20, 884:5
**allows** [1] - 812:2

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

**almost** [6] - 792:20, 793:9, 795:21, 814:5, 848:23, 887:21
**altogether** [1] - 664:12
**amended** [2] - 773:24
**America** [10] - 655:14, 689:14, 689:18, 690:1, 690:3, 690:14, 690:19, 691:4, 695:3, 724:2
**American** [2] - 662:15, 690:20
**amount** [17] - 706:8, 758:14, 759:22, 768:11, 768:12, 772:17, 780:10, 783:2, 783:4, 783:5, 783:9, 846:14, 861:25, 867:19, 872:15, 874:14, 877:15
**amounts** [2] - 773:20, 872:23
**AMS** [2] - 712:14, 893:9
**analysis** [3] - 703:3, 703:8
**Anita** [1] - 737:7
**Ann** [1] - 904:16
**annoyed** [1] - 859:5
**answer** [33] - 629:3, 630:19, 631:7, 631:8, 631:10, 634:12, 638:24, 639:1, 640:6, 646:6, 648:1, 648:16, 648:19, 760:24, 783:24, 784:5, 784:11, 801:24, 813:5, 822:1, 826:6, 826:12, 831:15, 880:5, 880:11, 880:18, 881:7, 881:19, 888:20, 888:23, 891:5, 892:5, 900:13
**answered** [23] - 634:2, 634:3, 634:17, 638:17, 641:2, 646:1, 707:25, 710:7, 783:25, 822:4, 825:20, 828:16, 830:23, 888:16, 889:16, 889:23, 890:5, 890:10, 890:15, 890:24, 891:20, 894:1, 897:20
**answering** [2] - 641:12, 642:1
**answers** [1] - 631:2
**anticipate** [1] - 741:15
**apologize** [1] - 901:9
**applicable** [3] - 673:22, 675:16, 681:25
**applied** [6] - 676:9, 685:8, 772:17, 805:18, 873:1, 893:22
**applies** [1] - 697:11
**apply** [4] - 697:10, 729:16, 887:12, 893:17

**applying** [2] - 770:19, 770:23
**approach** [3] - 646:22, 648:3, 754:25
**appropriate** [3] - 735:7, 776:5, 882:15
**approval** [5] - 807:23, 830:22, 831:7, 886:6, 894:24
**approve** [15] - 671:1, 671:7, 671:12, 671:16, 800:2, 800:5, 800:7, 832:2, 832:3, 832:8, 833:2, 834:4, 836:15, 836:17, 885:13
**approve/deny** [1] - 833:3
**approved** [11] - 671:18, 805:16, 829:24, 830:3, 830:18, 830:19, 831:12, 831:18, 831:20, 831:21, 833:7
**approves** [12] - 835:22, 836:2, 836:4, 836:11, 836:12, 836:13, 836:15, 836:16, 883:21, 883:23, 883:25, 884:4
**approving** [5] - 831:23, 832:4, 885:23, 885:24, 886:2
**April** [11] - 749:16, 815:24, 870:6, 870:9, 870:22, 872:1, 873:22, 874:5, 874:7, 902:1, 902:9
**arbitration** [2] - 790:3, 790:7
**area** [2] - 767:8, 843:18
**areas** [1] - 883:19
**argument** [1] - 858:6
**arose** [1] - 787:6
**arrangement** [1] - 657:12
**arrive** [1] - 637:25
**arrow** [1] - 783:6
**articulate** [1] - 685:25
**aspect** [1] - 722:7
**assemble** [2] - 730:20, 809:13
**assistants** [1] - 830:21
**assume** [11] - 626:18, 652:17, 652:20, 652:25, 665:18, 666:15, 676:15, 676:17, 721:20, 768:16, 858:19
**assumed** [3] - 665:13, 709:4, 886:19
**assure** [1] - 738:9
**attached** [6] - 693:21, 695:17, 699:3, 718:12, 753:20, 753:21, 871:14, 871:19
**attaches** [2] - 892:21

**attachment** [11] - 754:1, 805:25, 813:19, 849:13, 875:7, 898:17, 899:2, 899:11, 899:12, 899:24, 899:25
**attempt** [1] - 788:10
**attend** [1] - 837:24
**attendance** [2] - 788:17, 847:25
**attention** [1] - 762:20
**attorney** [3] - 627:3, 632:13, 798:1
**attorney-client** [1] - 627:3
**attorneys** [2] - 642:22, 784:14
**attributable** [1] - 760:16
**attrition** [1] - 798:9
**August** [10] - 708:15, 772:20, 774:24, 788:20, 844:21, 844:22, 845:21, 845:22, 846:6, 846:12
**authenticity** [1] - 858:4
**authorities** [2] - 673:16, 679:9
**authority** [6] - 664:5, 822:14, 824:10, 825:4, 832:19, 832:21
**authorization** [1] - 736:9
**authorized** [17] - 657:7, 657:8, 657:15, 658:10, 725:4, 725:7, 725:9, 736:2, 736:5, 736:7, 736:10, 736:13, 736:17, 740:12, 740:13, 752:12, 788:8
**automatically** [2] - 806:11, 814:3
**available** [3] - 715:17, 715:18, 805:12
**Avenue** [1] - 904:18
**average** [1] - 665:24
**aware** [7] - 762:7, 762:10, 773:14, 778:20, 785:8, 837:12, 837:16

## B

**bachelor's** [1] - 792:23
**back-office** [1] - 794:12
**background** [1] - 792:21
**backup** [3] - 695:24, 696:7, 900:17
**bad** [5] - 755:18, 762:21, 879:25, 880:10, 882:1
**balance** [8] - 807:2, 807:5, 877:12, 888:2, 888:17, 889:13, 891:24, 897:3
**balances** [1] - 889:9

**bank** [26] - 796:6, 797:7, 852:10, 852:22, 852:24, 855:19, 855:24, 856:2, 856:4, 856:10, 856:12, 856:25, 857:3, 857:8, 857:10, 857:12, 857:17, 857:18, 858:1, 858:3, 858:11, 859:11, 886:8, 897:8, 902:21, 902:22
**banks** [2] - 673:17, 796:5
**based** [17] - 639:20, 653:6, 675:22, 683:14, 683:20, 684:3, 764:7, 805:13, 806:23, 815:7, 816:5, 816:22, 837:2, 858:13, 891:13, 894:24
**basis** [9] - 662:14, 662:16, 674:16, 732:14, 767:16, 812:17, 834:16, 839:25, 844:23
**bearing** [1] - 846:15
**became** [1] - 679:16
**bed** [3] - 641:4, 641:9, 641:11
**beg** [23] - 647:1, 648:12, 652:5, 653:14, 677:9, 687:11, 728:20, 753:6, 764:22, 769:14, 769:25, 813:4, 824:2, 826:15, 827:4, 827:8, 839:4, 845:5, 845:19, 862:22, 870:5, 874:8, 877:11
**began** [3] - 632:17, 673:6, 674:16
**beginning** [8] - 673:5, 673:15, 783:20, 865:7, 880:12, 880:13, 880:22, 896:2
**begins** [1] - 677:17
**behalf** [10] - 656:23, 670:17, 736:8, 736:13, 736:17, 740:12, 740:13, 752:13, 823:22, 823:25
**behind** [6] - 638:8, 722:20, 771:6, 781:17, 783:16, 887:7
**belonged** [1] - 771:3
**belongs** [1] - 870:22
**below** [1] - 708:16
**beneath** [2] - 696:15, 866:22
**beneficial** [1] - 808:17
**benefit** [7] - 703:2, 703:3, 703:7, 708:11, 717:5, 723:4, 759:25
**Benlida** [136] - 637:20, 644:5, 651:13, 651:21, 651:23, 655:6, 660:23, 665:13, 665:14, 665:16, 665:17, 665:18, 665:24,

666:1, 667:24, 668:14, 670:25, 672:18, 673:5, 679:8, 686:11, 686:12, 686:15, 686:16, 687:6, 688:17, 701:17, 703:7, 705:25, 708:7, 708:25, 709:4, 709:10, 709:23, 710:5, 711:4, 711:13, 714:10, 714:12, 716:8, 716:14, 717:9, 717:10, 719:10, 720:5, 721:6, 722:2, 723:18, 724:14, 724:21, 729:4, 730:7, 732:23, 746:13, 751:18, 754:4, 754:24, 755:8, 761:25, 762:19, 763:2, 764:18, 772:12, 773:6, 773:8, 773:24, 774:3, 774:8, 774:14, 774:22, 775:12, 775:13, 776:4, 776:7, 776:12, 778:1, 778:4, 778:6, 778:7, 778:15, 778:21, 778:24, 785:6, 787:6, 787:16, 788:19, 788:20, 790:12, 802:23, 803:5, 819:22, 820:20, 822:25, 823:9, 823:14, 834:16, 837:25, 839:13, 851:1, 851:6, 855:1, 863:11, 864:3, 865:4, 874:14, 878:13, 878:16, 878:17, 879:17, 879:22, 880:9, 881:5, 882:1, 884:23, 892:9, 892:13, 895:21, 895:23, 896:5, 896:7, 896:23, 897:7, 897:20, 898:8, 898:14, 899:19, 899:23, 900:1, 900:11, 901:14, 901:19
**Benlida's** [8] - 673:12, 764:7, 783:8, 851:15, 882:7, 895:17, 898:20, 902:23
**best** [6] - 666:3, 666:4, 666:5, 809:2, 810:1, 810:2
**bet** [1] - 878:20
**better** [5] - 746:4, 766:11, 774:14, 774:15, 841:10
**between** [37] - 635:18, 636:15, 651:9, 657:9, 668:14, 670:25, 672:18, 673:5, 675:15, 686:9, 686:16, 692:3, 708:5, 713:19, 757:16, 772:21, 787:2, 789:11, 808:13, 812:3, 816:10, 816:15, 819:16, 819:22, 822:7, 827:14, 862:8, 866:6,

**KEYWORD INDEX**

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

868:19, 877:8, 881:25,
884:23, 894:19, 899:24,
901:10, 901:13, 901:14
**beyond** [3] - 891:2,
897:18, 897:23
**big** [12] - 683:9, 692:6,
699:19, 754:16, 754:18,
760:7, 765:1, 798:5,
865:1, 884:7, 885:17
**bigger** [5] - 699:6,
759:25, 760:1, 760:3,
868:1
**biggest** [1] - 882:14
**bill** [3] - 804:1, 805:5,
805:10
**billing** [6] - 796:3, 797:6,
803:7, 850:14, 850:22,
850:23
**bills** [16] - 667:12,
667:15, 667:18, 667:25,
697:1, 777:24, 797:5,
805:11, 805:16, 806:6,
806:12, 806:22, 886:6,
887:7, 889:4, 891:24
**binder** [1] - 643:1
**bit** [24] - 627:13, 629:25,
669:21, 670:21, 674:23,
676:11, 703:24, 727:9,
747:22, 763:24, 767:25,
768:4, 774:23, 786:10,
795:24, 812:5, 812:7,
829:2, 829:6, 841:2,
848:4, 866:6, 876:5,
900:14
**blame** [2] - 635:14, 636:8
**blames** [1] - 635:13
**blank** [1] - 779:23
**blanket** [1] - 736:9
**blasted** [2] - 741:7,
741:10
**blindly** [1] - 708:10
**blow** [1] - 698:15
**BNDN2017** [1] - 696:12
**board** [2] - 633:25,
803:15
**boards** [4] - 628:2,
629:6, 633:20, 666:8
**body** [1] - 866:11
**bold** [3] - 754:17, 754:18,
755:15
**bona** [1] - 788:9
**bookkeeping** [2] - 774:9,
860:1
**border** [1] - 645:4
**borders** [1] - 644:20
**boring** [1] - 742:24
**born** [2] - 792:16, 792:17
**boss** [5] - 820:23,
821:22, 822:6, 822:8,
822:19, 822:20, 823:17,

824:4, 825:17, 826:9,
826:10, 826:17, 826:23,
826:24, 827:9, 827:19,
827:21, 828:8, 828:20,
829:3, 864:22, 864:23,
865:1, 884:7
**Boston** [2] - 792:19,
849:6
**bottom** [12] - 699:6,
732:6, 744:24, 785:16,
785:17, 806:18, 815:12,
815:13, 816:23, 854:15,
896:12
**box** [3] - 775:24, 777:5
**brand** [3] - 709:20,
709:22, 726:23
**brand-new** [3] - 709:20,
709:22, 726:23
**Brandon** [1] - 659:20
**breach** [36] - 711:4,
711:8, 711:12, 711:14,
711:15, 711:16, 711:25,
712:4, 712:11, 713:4,
713:6, 717:2, 719:18,
719:19, 721:11, 735:8,
735:10, 735:11, 735:25,
746:14, 748:14, 748:18,
748:21, 749:6, 749:20,
749:23, 750:19, 751:12,
755:2, 755:4, 785:12,
785:19, 785:22, 785:24,
786:8
**breaches** [1] - 711:22
**break** [15] - 681:21,
682:12, 705:9, 706:6,
741:3, 742:11, 779:16,
791:2, 806:21, 808:5,
814:24, 837:18, 837:20,
864:2, 903:7
**breaks** [1] - 837:13
**bridge** [2] - 799:20,
895:17
**brief** [2] - 779:22, 894:14
**bring** [3] - 732:22,
784:19, 868:9
**bringing** [1] - 710:1
**Britain** [3] - 690:14,
691:22, 697:20
**brought** [3] - 673:4,
756:9, 762:19
**bucket** [14] - 680:16,
680:20, 680:25, 681:3,
681:6, 681:8, 682:12,
682:17, 682:18, 683:2,
683:12, 872:16
**build** [1] - 677:20
**building** [2] - 754:4,
754:13
**built** [2] - 630:3, 674:2
**bunch** [2] - 674:2, 765:1

**business** [36] - 627:7,
627:20, 627:21, 627:24,
627:25, 628:1, 628:3,
628:13, 629:6, 629:8,
629:14, 629:15, 633:23,
633:25, 644:8, 644:11,
644:19, 645:4, 655:1,
657:8, 657:12, 691:11,
691:12, 703:6, 703:10,
703:11, 705:16, 709:10,
709:14, 709:20, 710:1,
717:14, 749:7, 755:17,
775:10, 792:25
**businesses** [1] - 808:17
**busy** [1] - 802:19
**buy** [1] - 882:3
**buyer** [2] - 761:18,
761:23
**BY** [153] - 626:10, 627:5,
629:1, 630:24, 633:9,
634:14, 635:4, 637:9,
637:15, 646:23, 648:5,
651:2, 651:6, 652:24,
656:1, 656:17, 658:24,
660:17, 663:11, 665:1,
667:23, 668:22, 669:18,
670:2, 670:13, 671:23,
672:3, 675:6, 681:20,
684:11, 685:5, 686:21,
687:17, 689:3, 690:7,
692:18, 693:20, 694:24,
695:16, 698:10, 698:23,
699:7, 702:7, 703:17,
703:23, 704:8, 708:2,
710:10, 710:17, 710:23,
713:11, 715:7, 715:20,
716:12, 718:7, 718:23,
719:3, 722:3, 725:10,
726:11, 727:11, 728:16,
728:21, 732:9, 733:19,
733:24, 737:14, 738:21,
739:15, 743:24, 744:21,
747:17, 748:1, 751:7,
752:3, 752:20, 753:10,
754:9, 754:15, 756:20,
757:21, 759:14, 759:18,
761:3, 765:9, 767:7,
768:2, 768:21, 770:3,
770:15, 772:1, 777:15,
777:18, 779:21, 780:2,
780:21, 782:19, 784:23,
785:15, 792:5, 806:3,
806:19, 807:9, 813:9,
813:21, 816:1, 817:8,
818:11, 825:23, 832:14,
838:8, 838:12, 838:16,
839:8, 842:3, 843:16,
847:1, 849:14, 854:16,
856:22, 857:2, 859:7,
859:19, 860:18, 860:23,

862:7, 862:18, 862:24,
864:1, 865:22, 867:4,
868:3, 868:17, 869:8,
874:6, 875:14, 876:7,
877:14, 879:3, 880:19,
881:2, 887:22, 888:13,
892:12, 894:18, 895:8,
898:3, 898:19, 899:13,
900:23, 901:12, 902:4,
902:15

**C**

**calculate** [3] - 812:11,
816:13, 816:18
**calculated** [5] - 685:7,
760:19, 771:2, 773:2
**calculates** [2] - 816:10,
816:21
**calculating** [1] - 812:9
**calculation** [1] - 678:25
**calculations** [3] -
648:14, 772:9, 772:11
**came..** [1] - 629:24
**Canada** [1] - 660:12
**cannot** [34] - 629:11,
632:5, 634:10, 635:7,
637:2, 644:6, 645:18,
662:19, 664:15, 664:17,
667:13, 668:1, 687:20,
691:25, 694:20, 712:12,
721:7, 722:2, 724:6,
733:13, 735:5, 740:8,
755:23, 763:20, 763:23,
764:14, 764:18, 764:19,
764:20, 774:2, 775:1,
777:8, 778:25, 881:15
**capabilities** [1] - 808:24
**capacity** [22] - 703:25,
704:4, 704:7, 704:17,
704:25, 705:6, 705:7,
705:9, 706:5, 706:7,
706:11, 707:6, 707:8,
708:4, 708:14, 837:11,
840:13, 841:2, 845:24,
846:14, 846:21, 849:19
**caps** [1] - 755:15
**car** [1] - 834:15
**cards** [2] - 673:13,
673:19
**care** [8] - 796:1, 796:2,
796:7, 796:22, 797:6,
797:7, 802:13, 812:23
**careful** [3] - 644:23,
644:25, 868:13
**carefully** [1] - 865:17
**carried** [1] - 889:11
**carry** [2] - 877:12, 891:23
**carry-forward** [1] -
877:12

**carrying** [2] - 807:5,
889:9
**cartons** [1] - 775:24
**Casale** [1] - 904:16
**case** [25] - 626:16,
626:20, 628:10, 641:21,
642:4, 642:5, 668:13,
668:21, 669:23, 728:11,
761:22, 771:2, 773:3,
773:4, 782:3, 783:10,
783:22, 784:8, 784:13,
800:24, 813:2, 816:15,
824:18, 881:4
**cash** [7] - 712:16,
712:22, 886:17, 886:25,
887:2, 887:6, 887:19
**catch** [11] - 676:12,
700:19, 700:22, 817:17,
851:22, 851:25, 852:2,
852:5, 852:7, 852:10,
855:6
**caught** [5] - 640:18,
765:5, 845:1, 855:5, 855:6
**caused** [6] - 674:18,
674:20, 705:11, 705:12,
705:14, 706:2, 749:7,
887:7
**cautioning** [1] - 754:24
**CC** [1] - 715:8
**CEO** [9] - 654:2, 688:3,
800:10, 809:5, 826:21,
828:4, 829:4, 884:8,
884:11
**CEO's** [1] - 887:18
**certain** [14] - 638:9,
652:5, 657:10, 662:21,
690:20, 704:9, 729:25,
736:10, 766:17, 808:17,
810:25, 811:22, 824:13
**certify** [2] - 904:3, 904:8
**cetera** [2] - 901:21,
901:22
**chain** [1] - 749:2
**chainsaws** [1] - 709:18
**challenging** [3] - 627:10,
627:12, 649:18
**chance** [4] - 642:11,
721:16, 865:15, 902:3
**chances** [3] - 722:6,
773:23, 814:14
**change** [21] - 798:16,
810:23, 811:3, 811:13,
814:10, 823:2, 832:5,
832:6, 832:10, 832:13,
832:15, 832:16, 832:17,
832:22, 833:4, 835:14,
839:25, 840:1, 840:2,
840:4, 897:2
**changed** [1] - 704:4,
704:9, 717:20, 751:19,

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

755:9, 778:24, 796:19, 817:12, 834:2, 834:3, 876:15

**changes** [3] - 883:25, 901:13, 901:25

**changing** [1] - 662:21
**channels** [1] - 776:5
**charge** [6] - 688:1, 819:4, 824:23, 824:25, 828:14, 828:18

**charged** [1] - 688:16
**charges** [2] - 694:9, 697:3

**chart** [12] - 640:8, 640:13, 642:22, 653:2, 653:4, 780:13, 780:19, 781:2, 781:14, 782:21, 783:3, 811:21

**Chauncey** [1] - 632:11
**check** [11] - 661:13, 739:25, 769:12, 789:24, 801:20, 802:15, 821:15, 854:3, 857:20, 857:22, 897:8

**checks** [1] - 817:17
**Chen** [2] - 788:23, 851:9
**children** [1] - 798:14
**China** [12] - 628:2, 629:7, 629:14, 637:22, 638:20, 644:11, 644:14, 645:1, 651:3, 651:8, 651:10, 839:17

**Chinese** [5] - 635:10, 768:22, 837:14, 837:16, 862:9

**choice** [1] - 710:2
**choosing** [1] - 809:8
**Christina** [6] - 854:2, 854:9, 855:23, 865:21, 888:10, 899:10

**Chrome** [1] - 630:10
**Circuit** [1] - 802:23
**circuit** [5] - 628:2, 629:6, 633:19, 633:25, 803:15

**Circuitronix** [98] - 628:1, 629:6, 630:10, 630:12, 630:13, 631:19, 631:24, 632:22, 633:16, 633:19, 634:3, 634:6, 654:4, 654:9, 654:16, 654:18, 654:21, 656:6, 656:8, 656:10, 656:23, 656:24, 657:9, 657:10, 657:11, 657:15, 658:8, 658:9, 659:7, 660:20, 660:24, 662:9, 667:1, 667:5, 683:7, 694:3, 696:5, 707:2, 707:3, 713:18, 719:17, 719:18, 720:14, 721:12, 721:21, 721:22,

721:24, 724:14, 724:25, 725:15, 727:15, 728:9, 731:14, 731:16, 759:23, 760:17, 760:20, 762:13, 762:16, 774:15, 782:4, 782:5, 782:8, 782:22, 782:23, 782:24, 787:3, 787:21, 788:8, 793:2, 793:6, 793:11, 793:13, 793:20, 793:25, 794:4, 795:13, 797:25, 798:10, 799:11, 811:15, 811:18, 811:19, 812:10, 813:14, 813:16, 824:6, 824:18, 824:19, 831:12, 842:5, 842:12, 853:21, 853:23, 858:10, 895:22

**Circuitronix's** [2] - 629:7, 721:12
**Circuitronix..** [1] - 793:3
**Circuitronix.co.in** [1] - 657:5

**circumstances** [4] - 672:16, 691:12, 750:18, 798:13

**Citibank** [1] - 858:9
**claim** [1] - 777:3
**claiming** [1] - 781:13
**claims** [1] - 895:17
**clarification** [3] - 678:18, 832:11, 838:10

**clarified** [1] - 826:15
**clarify** [6] - 681:23, 705:17, 720:18, 721:14, 721:16, 721:18, 746:7, 825:16

**class** [3] - 666:4, 666:6, 698:17

**clause** [4] - 714:19, 735:9, 735:12, 735:17
**clean** [1] - 646:16
**clear** [15] - 647:12, 651:12, 651:14, 733:22, 780:20, 780:24, 782:20, 786:9, 799:5, 826:17, 831:20, 872:7, 873:1, 878:11, 895:16

**clearer** [1] - 870:10
**client** [1] - 627:3
**clients** [1] - 859:25
**close** [7] - 712:15, 791:14, 791:15, 802:10, 802:16, 842:19, 848:9

**closed** [2] - 705:19, 705:22, 705:23
**CLR** [1] - 904:16
**Co** [1] - 802:24
**code** [1] - 696:15
**coin** [1] - 800:13
**Cole** [2] - 632:8, 632:11

**collaborated** [2] - 846:11, 895:25
**collaborating** [1] - 802:5
**collaboration** [1] - 814:22

**colleagues** [2] - 777:11, 790:21
**collect** [1] - 696:1
**collecting** [4] - 684:8, 796:4, 796:9, 796:10
**college** [1] - 792:23
**Cologne** [1] - 660:5
**color** [2] - 729:25, 781:1
**colors** [1] - 780:13
**Columbia** [2] - 792:17, 792:18

**column** [12] - 768:11, 769:22, 770:12, 814:15, 816:2, 816:12, 843:15, 843:17, 845:23, 846:1, 861:22, 861:25

**Column** [15] - 769:23, 770:11, 770:16, 771:9, 771:13, 814:25, 815:20, 816:2, 816:14, 816:15, 816:20, 816:21, 861:22, 863:1

**columns** [3] - 814:16, 814:25, 815:15
**combined** [3] - 684:1, 684:5, 684:7

**combining** [1] - 686:5
**comfortable** [2] - 792:12, 792:13

**coming** [3] - 656:10, 798:7, 858:15
**comment** [1] - 645:14
**comments** [1] - 803:12
**commission** [1] - 826:4
**common** [3] - 723:22, 723:24, 801:14
**communicate** [2] - 745:5, 747:10
**communicated** [3] - 673:18, 724:6, 763:3
**communicating** [3] - 645:1, 645:2, 722:23
**communication** [3] - 657:6, 752:15, 898:13
**communications** [3] - 644:23, 644:25, 900:2
**companies** [27] - 630:9, 634:3, 654:10, 668:16, 684:1, 685:8, 685:9, 688:9, 695:24, 695:25, 702:22, 703:19, 714:7, 714:10, 715:3, 716:20, 716:25, 717:4, 731:20, 735:3, 736:14, 736:19, 755:21, 763:22, 794:23,

798:6, 842:13
**company** [58] - 630:18, 633:3, 653:25, 666:10, 681:9, 681:10, 682:22, 682:24, 682:25, 683:4, 683:6, 686:12, 688:3, 715:14, 720:21, 723:19, 725:16, 725:17, 725:19, 725:20, 725:21, 725:22, 726:2, 728:8, 730:18, 730:22, 732:23, 745:10, 762:8, 763:4, 763:8, 771:4, 771:6, 774:16, 776:5, 782:6, 793:18, 798:12, 799:2, 799:7, 800:19, 800:20, 802:23, 812:19, 842:8, 842:9, 850:2, 882:18, 882:19, 882:24, 882:25, 883:2, 883:3, 883:7, 883:11, 883:13, 884:5

**company's** [1] - 783:7
**companywide** [1] - 839:25

**compare** [2] - 816:4, 855:8
**compares** [1] - 816:8
**compiled** [1] - 898:7
**complaining** [3] - 712:17, 712:25, 713:1
**completed** [1] - 900:19
**completely** [3] - 647:12, 684:5, 784:16
**completion** [1] - 789:11
**compliances** [1] - 797:11
**complying** [1] - 766:13
**component** [1] - 794:13
**composes** [1] - 844:6
**comprehended** [1] - 647:13
**computer** [3] - 634:23, 701:15, 738:19
**concept** [2] - 635:10, 635:12
**concerned** [2] - 665:25, 687:8
**conclude** [1] - 790:11
**concluded** [1] - 903:15
**condition** [2] - 719:18, 719:19
**conditions** [4] - 751:20, 755:9, 762:23, 798:8
**conduct** [1] - 794:23
**conducted** [1] - 794:15
**confer** [2] - 788:9, 790:21
**configure** [1] - 809:22
**configured** [1] - 829:17
**confirm** [5] - 739:25, 740:8, 856:23, 859:12,

896:11
**confirming** [2] - 902:21, 902:22
**conflicts** [1] - 740:1
**confused** [1] - 651:9
**confusing** [1] - 827:22
**confusion** [3] - 708:11, 786:7, 828:24
**connected** [2] - 689:2, 726:1
**connection** [4] - 658:15, 661:14, 690:16, 829:19
**consequent** [1] - 897:3
**consider** [4] - 703:25, 860:4, 860:8, 878:7
**consideration** [1] - 702:21
**considered** [2] - 690:12, 789:20
**consistent** [1] - 740:11
**consolidate** [3] - 822:12, 822:24, 895:14
**consolidated** [1] - 691:1
**consolidation** [1] - 896:9
**constant** [1] - 724:12
**constantly** [1] - 889:19
**consultants** [3] - 809:10, 809:21, 809:24
**contact** [1] - 851:12
**contained** [2] - 673:11, 755:6
**contains** [1] - 815:1
**contemporaneous** [1] - 877:22
**context** [8] - 645:19, 647:1, 648:10, 648:11, 649:20, 688:6, 756:25, 757:3
**continue** [1] - 638:4, 764:18, 764:20, 900:10
**Continued** [1] - 626:9
**continued** [1] - 786:18
**Continuing** [5] - 661:8, 719:4, 832:13, 873:21, 892:17
**continuing** [1] - 897:21
**contract** [50] - 649:15, 649:19, 657:9, 663:14, 673:11, 674:2, 674:22, 674:24, 679:11, 681:23, 687:2, 690:17, 704:6, 710:15, 710:16, 710:18, 710:21, 711:5, 711:8, 713:6, 713:10, 717:2, 720:3, 720:6, 721:11, 722:2, 722:7, 729:9, 729:12, 732:17, 733:17, 733:18, 733:20, 735:8, 735:9, 735:10, 735:11, 746:14, 748:15, 748:21,

786:11, 790:16, 790:18, 813:15, 813:16, 881:18, 884:12, 884:14, 884:17
**contracted** [3] - 881:19, 881:23, 882:3
**contracts** [3] - 719:17, 719:24, 719:25
**contractual** [2] - 708:12, 882:21
**contributed** [1] - 762:20
**control** [2] - 767:19, 831:24
**controlled** [2] - 727:23, 728:1
**controlling** [2] - 730:2, 730:23
**conversation** [6] - 750:21, 751:24, 762:22, 783:25, 784:7, 784:12
**conversations** [1] - 784:2
**converting** [1] - 770:24
**convey** [1] - 636:16
**conveyed** [2] - 636:16, 636:17
**cooperation** [2] - 714:24, 786:18
**coordinate** [1] - 795:6
**coordinates** [1] - 801:17
**copied** [5] - 659:12, 736:12, 749:3, 749:9, 752:15
**copy** [12] - 646:16, 657:25, 693:7, 726:19, 726:22, 737:4, 737:6, 737:7, 738:7, 814:3, 814:13, 856:13
**copying** [1] - 745:3
**corner** [2] - 656:9, 728:10
**correct** [247] - 626:16, 627:10, 627:11, 627:22, 628:8, 629:18, 629:19, 632:12, 633:1, 633:4, 633:5, 634:18, 639:20, 639:25, 641:3, 641:5, 641:7, 641:8, 642:24, 643:5, 643:8, 643:9, 643:11, 643:12, 643:15, 644:10, 644:12, 644:13, 644:16, 644:22, 644:24, 645:6, 645:8, 651:19, 652:12, 652:18, 652:25, 653:1, 653:3, 653:5, 653:6, 653:11, 653:12, 655:7, 655:8, 655:10, 657:7, 657:15, 659:7, 659:15, 660:19, 661:5, 661:9, 661:10, 661:15, 661:16, 661:20, 661:21,

661:25, 662:4, 663:13, 663:15, 663:16, 663:17, 663:18, 663:19, 663:20, 663:21, 663:23, 665:19, 666:16, 666:21, 668:25, 669:9, 669:10, 670:9, 671:2, 671:3, 671:8, 671:18, 672:9, 672:13, 674:11, 674:17, 675:17, 675:20, 676:12, 677:10, 682:1, 682:2, 682:4, 682:5, 682:9, 682:10, 683:12, 687:6, 687:7, 687:9, 687:19, 688:14, 688:15, 688:19, 688:20, 689:18, 689:19, 690:19, 694:1, 694:9, 698:14, 700:7, 700:9, 701:1, 704:19, 705:3, 707:10, 707:11, 707:20, 707:22, 708:20, 709:1, 709:5, 709:16, 710:6, 711:5, 715:1, 717:5, 717:6, 722:16, 722:18, 722:19, 724:22, 724:23, 728:23, 729:6, 729:8, 730:7, 730:8, 731:18, 731:19, 731:25, 734:6, 734:10, 745:25, 746:5, 746:10, 746:11, 746:15, 747:3, 752:9, 753:23, 756:24, 758:22, 760:24, 764:6, 764:10, 764:11, 764:14, 765:16, 765:18, 767:18, 768:17, 768:22, 768:23, 770:22, 771:1, 772:7, 772:8, 772:13, 772:14, 773:7, 773:9, 773:11, 773:13, 780:25, 781:19, 782:15, 783:1, 783:11, 786:23, 789:24, 790:14, 790:19, 795:11, 795:16, 797:10, 812:25, 813:1, 816:17, 819:3, 819:6, 820:12, 820:15, 820:21, 820:23, 823:9, 823:19, 826:18, 829:9, 829:25, 830:1, 830:10, 830:25, 831:25, 833:8, 833:9, 834:18, 834:23, 834:25, 835:4, 835:11, 839:18, 843:23, 850:7, 850:19, 861:20, 862:19, 866:15, 871:16, 872:2, 873:8, 873:12, 873:15, 874:9, 874:10, 875:17, 876:9, 876:21, 877:4, 877:7, 883:4, 884:1, 884:24, 884:25, 888:6, 889:22, 890:4, 890:14, 890:23, 892:4, 893:1, 893:25,

901:8, 901:18, 901:21, 902:13, 904:4
**corrected** [2] - 760:23, 783:3
**corrections** [2] - 721:9, 901:22
**correctly** [1] - 901:17
**cost** [3] - 703:2, 703:3, 703:7
**counsel** [1] - 904:8
**counseling** [1] - 799:16
**count** [2] - 719:15, 719:16
**countries** [1] - 794:6, 794:7
**country** [2] - 690:21, 824:21
**couple** [6] - 637:24, 642:16, 808:1, 808:6, 829:20, 839:16
**course** [10] - 672:4, 675:10, 682:17, 704:24, 724:25, 732:22, 753:19, 851:20, 867:18, 884:8
**Court** [11] - 626:1, 678:18, 681:16, 685:25, 743:20, 784:17, 791:5, 832:11, 863:23, 904:17, 904:17
**COURT** [168] - 626:3, 627:4, 628:18, 628:20, 628:22, 634:9, 634:23, 634:25, 640:5, 646:18, 646:21, 648:4, 651:1, 651:5, 655:24, 657:19, 657:22, 657:25, 658:6, 658:11, 658:17, 658:21, 658:23, 663:9, 664:25, 667:22, 668:6, 669:22, 670:1, 674:25, 681:13, 681:18, 683:16, 683:24, 684:6, 684:10, 685:3, 685:13, 685:18, 685:20, 686:1, 686:4, 686:13, 686:18, 687:14, 690:6, 693:8, 693:11, 693:15, 694:17, 694:19, 694:23, 695:14, 698:6, 698:9, 698:15, 701:14, 701:23, 701:25, 702:4, 703:16, 707:24, 710:9, 710:14, 718:9, 718:11, 718:15, 718:18, 721:19, 726:6, 728:3, 728:7, 728:13, 728:19, 737:4, 737:19, 737:21, 737:25, 738:2, 738:13, 738:19, 739:8, 739:11, 740:22, 740:25, 741:4, 741:8, 741:11, 741:21, 742:3, 742:9,

742:11, 742:15, 742:18, 742:20, 742:25, 743:13, 743:16, 743:18, 744:11, 744:14, 744:17, 744:20, 747:15, 750:12, 750:16, 750:24, 751:1, 751:5, 752:17, 752:23, 752:25, 753:4, 754:8, 754:13, 766:10, 766:15, 766:19, 766:23, 768:18, 769:19, 769:22, 769:24, 770:11, 777:12, 779:17, 779:23, 780:1, 782:9, 782:11, 790:24, 791:2, 791:7, 791:10, 791:13, 791:19, 791:21, 818:9, 825:22, 838:14, 839:2, 839:7, 854:10, 857:10, 857:24, 858:6, 858:9, 858:14, 858:19, 858:22, 858:25, 859:4, 862:5, 862:13, 862:15, 862:21, 863:20, 865:12, 875:3, 875:13, 880:18, 891:4, 894:11, 894:16, 897:25, 899:3, 903:3, 903:6
**Court's** [3] - 683:15, 694:16, 739:6
**cover** [2] - 637:20, 901:4
**covers** [1] - 737:20
**COVID** [2] - 627:14, 798:5
**create** [9] - 765:15, 806:8, 811:12, 811:22, 812:2, 834:9, 846:12, 850:2, 850:3
**created** [15] - 674:5, 679:2, 679:5, 767:14, 814:21, 817:10, 829:24, 834:21, 834:22, 835:2, 835:3, 835:22, 844:7, 855:4, 871:9
**creates** [1] - 805:5
**creating** [2] - 813:25, 814:1
**Creation** [1] - 745:8
**creation** [4] - 813:25, 833:25, 896:9, 898:7
**credit** [23] - 688:18, 699:11, 761:4, 761:14, 761:17, 762:3, 762:7, 762:14, 762:21, 763:1, 777:23, 778:18, 874:9, 886:11, 886:14, 887:13, 888:2, 888:16, 889:13, 891:24
**credits** [2] - 806:24, 889:9
**criteria** [11] - 676:6, 722:23, 723:1, 729:22,

872:5, 872:19, 873:6, 873:13, 873:24, 878:2, 878:5
**cross** [7] - 645:4, 739:7, 741:12, 741:15, 801:4, 818:9, 841:25
**CROSS** [2] - 626:9, 743:23, 818:10
**cross-border** [1] - 645:4
**cross-examination** [1] - 818:9
**CROSS-EXAMINATION** [3] - 626:9, 743:23, 818:10
**cross-functional** [1] - 801:4
**crossed** [1] - 807:22
**crosstalk** [2] - 656:14, 838:7
**crucial** [1] - 705:7
**CSR** [1] - 904:16
**CSR-IL** [1] - 904:16
**CTX** [126] - 653:9, 654:13, 655:5, 655:11, 660:6, 660:7, 660:8, 660:9, 660:10, 660:11, 660:12, 660:24, 661:3, 661:11, 661:12, 661:18, 661:19, 661:23, 662:2, 662:18, 665:8, 666:14, 667:25, 668:14, 670:17, 670:25, 672:18, 673:5, 680:24, 682:17, 683:1, 683:4, 683:13, 683:18, 683:19, 683:20, 689:13, 694:17, 694:18, 707:12, 707:17, 707:18, 708:22, 708:23, 709:3, 710:4, 710:12, 716:17, 719:14, 720:2, 720:10, 720:20, 720:25, 721:4, 723:6, 724:9, 724:10, 724:19, 724:20, 735:2, 736:13, 736:17, 737:19, 745:22, 746:9, 754:2, 760:6, 760:7, 761:22, 762:8, 762:9, 763:1, 765:11, 777:24, 778:3, 778:8, 778:14, 795:20, 807:11, 808:7, 808:19, 810:17, 819:8, 819:16, 823:22, 823:25, 825:6, 828:12, 830:11, 830:12, 830:13, 830:14, 830:16, 830:17, 842:4, 842:7, 842:13, 843:1, 843:2, 858:2, 861:8, 864:7, 864:9, 868:10, 874:21, 884:23, 887:7, 893:16, 895:20, 899:20, 901:6
**CTX-US** [15] - 670:17,

680:24, 683:13, 683:18,
694:17, 694:18, 716:17,
720:20, 736:13, 736:17,
737:19, 823:22, 830:12,
830:13, 868:10

**CTX-USA** [4] - 660:12,
668:14, 683:20, 760:6

**cue** [4] - 730:12, 730:13,
744:19

**culmination** [1] - 900:8

**culture** [1] - 644:17

**cup** [1] - 706:11

**currency** [3] - 768:22,
862:3, 862:6

**current** [1] - 793:13

**cursor** [2] - 770:1,
843:18

**customer** [44] - 637:23,
638:2, 638:10, 639:3,
666:9, 690:21, 709:23,
717:5, 718:16, 721:13,
721:21, 721:22, 722:16,
722:21, 722:22, 723:21,
724:20, 727:23, 730:1,
730:15, 730:19, 730:23,
731:4, 732:12, 732:14,
732:19, 734:4, 736:3,
740:3, 740:4, 745:6,
745:8, 745:18, 745:21,
745:24, 746:3, 746:12,
747:2, 748:16, 748:24,
753:12, 797:14, 804:6,
819:23, 819:25, 823:11

**customer's** [1] - 820:4

**customers** [47] - 627:15,
627:17, 637:3, 637:18,
637:19, 638:16, 638:20,
638:25, 689:14, 692:7,
713:15, 713:17, 713:18,
713:20, 713:21, 716:13,
716:14, 721:14, 721:15,
723:22, 723:23, 723:25,
729:15, 729:16, 730:17,
733:25, 736:3, 739:20,
740:14, 745:5, 745:20,
746:4, 748:11, 749:6,
754:1, 754:25, 755:16,
755:24, 796:4, 796:5,
796:9, 796:11, 820:8,
823:7, 838:18, 886:24,
891:18

**cut** [2] - 743:3, 743:5

**Czech** [2] - 690:5, 691:13

**Czechoslovakia** [2] -
689:24, 690:3

# D

**D-D10** [8] - 766:21,
767:1, 841:18, 841:19,

841:20, 842:1, 842:2,
860:16

**D-Y7** [3] - 813:19,
849:12, 849:13

**D10** [8] - 766:21, 767:1,
841:18, 841:19, 841:20,
842:1, 842:2, 860:16

**damage** [1] - 780:14

**damages** [1] - 783:9

**data** [6] - 707:8, 815:10,
815:14, 834:22, 850:11,
898:5

**DATE** [1] - 904:16

**date** [31] - 628:18, 669:3,
708:7, 708:9, 708:10,
708:12, 708:17, 708:18,
716:1, 732:12, 734:13,
746:8, 748:9, 748:23,
750:11, 767:25, 775:6,
804:13, 805:16, 816:11,
816:12, 843:20, 843:25,
844:6, 858:13, 859:15,
860:22, 864:8, 866:14,
868:4, 904:5

**dated** [4] - 749:16, 866:8,
867:6, 867:10

**dates** [5] - 732:8, 732:10,
773:19, 844:1, 844:13

**days** [27] - 636:12,
637:24, 642:16, 667:4,
709:15, 735:20, 735:21,
736:1, 748:21, 748:23,
749:8, 756:11, 758:4,
758:5, 769:3, 769:6,
770:10, 808:6, 815:16,
816:9, 816:13, 816:16,
816:22, 817:2, 817:3,
817:4

**DD** [2] - 767:1, 767:2

**deal** [12] - 643:22,
643:24, 678:22, 699:19,
840:10, 840:12, 840:13,
840:16, 840:18, 840:19,
840:22, 840:23

**dealing** [2] - 803:9,
832:23

**debit** [39] - 673:25,
678:23, 679:1, 679:3,
681:25, 682:3, 682:6,
682:8, 683:8, 683:10,
684:2, 684:13, 684:15,
684:21, 684:22, 686:8,
686:12, 688:13, 688:16,
693:22, 694:5, 694:6,
694:8, 694:18, 695:7,
695:10, 695:23, 696:5,
696:6, 696:9, 696:20,
696:21, 697:10, 806:23,
806:24, 872:23, 888:4

**debiting** [1] - 684:8

**December** [1] - 648:17

**decide** [13] - 645:15,
645:16, 646:7, 646:9,
646:10, 647:9, 647:17,
647:23, 649:13, 668:20,
751:6, 811:23, 885:13

**decided** [4] - 762:9,
798:15, 798:16, 847:11

**decision** [4] - 725:24,
746:25, 809:3, 818:4,
885:10, 886:20, 887:18,
887:20

**decisionmaker** [1] -
725:22

**decisions** [3] - 668:11,
668:18, 800:3

**decorated** [1] - 633:21

**default** [3] - 785:1,
785:3, 785:6

**defaults** [1] - 761:19

**defend** [1] - 638:4

**define** [1] - 787:25

**defined** [1] - 715:16

**definition** [1] - 725:8

**degree** [3] - 638:9,
792:22, 792:24

**degrees** [1] - 797:21

**delay** [1] - 693:19

**delayed** [1] - 776:13

**delays** [6] - 693:17,
706:1, 706:4, 709:6,
709:7, 840:16

**deliver** [2] - 775:25,
795:7

**delivered** [8] - 638:19,
665:13, 665:14, 666:11,
666:14, 666:15, 803:15,
881:11

**deliveries** [3] - 695:2,
758:14, 758:25

**delivery** [1] - 840:16

**demand** [1] - 667:6

**denotes** [1] - 771:16

**deny** [1] - 832:22

**department** [19] -
793:22, 795:5, 795:15,
796:15, 798:1, 799:1,
800:16, 800:23, 801:17,
803:17, 806:7, 809:19,
811:2, 812:12, 819:2,
819:5, 864:9, 864:12,
875:25

**departments** [1] -
794:21, 795:2, 795:8,
795:17, 795:21, 799:7,
799:8, 810:25

**depleting** [1] - 627:18

**deposition** [25] - 637:1,
637:8, 637:11, 645:20,
645:21, 664:13, 664:17,

664:19, 818:17, 821:12,
821:17, 821:19, 825:24,
826:1, 827:2, 827:6,
828:13, 831:12, 847:8,
850:25, 879:21, 880:4,
880:16, 890:19, 893:23

**depositions** [3] - 664:8,
664:11, 742:21

**describe** [2] - 798:1,
802:2

**described** [1] - 673:20

**descriptions** [1] - 794:14

**designed** [1] - 846:4

**desk** [1] - 807:22

**despite** [1] - 847:24

**detail** [54] - 685:2,
698:11, 699:3, 759:6,
805:23, 806:2, 807:2,
807:18, 853:1, 853:24,
854:12, 854:25, 855:3,
855:4, 855:10, 866:3,
866:4, 866:7, 866:8,
866:16, 866:23, 866:25,
867:22, 868:10, 869:16,
869:20, 869:22, 869:23,
870:6, 870:9, 870:15,
871:14, 871:19, 872:2,
872:21, 873:11, 873:23,
875:15, 876:9, 876:18,
885:20, 886:5, 889:3,
889:7, 891:23, 892:7,
892:18, 892:22, 892:25,
893:3, 894:20, 894:23,
895:2, 895:15

**detailed** [1] - 810:20

**details** [45] - 701:18,
803:8, 805:13, 805:21,
806:5, 807:10, 807:12,
833:6, 836:2, 850:15,
852:25, 853:2, 853:6,
853:8, 855:11, 865:4,
867:5, 868:20, 873:7,
873:14, 875:19, 875:20,
875:22, 878:4, 878:6,
885:16, 886:10, 888:5,
888:25, 890:6, 890:20,
890:25, 891:9, 891:13,
891:15, 892:13, 893:21,
894:5, 894:6, 896:10,
896:16, 896:17, 896:20,
898:7, 900:6

**determine** [3] - 731:7,
816:3, 889:1

**determines** [1] - 815:7

**determining** [2] - 661:15,
705:7

**develop** [1] - 749:7

**DHL** [1] - 695:18

**dictate** [1] - 823:3

**difference** [13] - 677:22,

808:13, 808:14, 816:10,
816:13, 816:15, 822:7,
822:18, 827:14, 828:6,
877:8, 894:19, 897:11

**differences** [3] - 789:15,
896:21, 901:23

**different** [70] - 630:9,
630:14, 631:18, 642:23,
654:10, 666:23, 668:10,
675:14, 680:21, 680:23,
705:20, 720:9, 720:11,
721:14, 723:21, 723:22,
725:23, 729:14, 729:15,
750:21, 750:22, 773:20,
775:21, 777:6, 779:2,
782:16, 794:10, 794:12,
795:25, 796:21, 797:1,
797:13, 798:3, 798:13,
798:24, 799:5, 799:6,
799:8, 805:14, 806:25,
808:14, 808:22, 810:24,
811:17, 811:18, 829:16,
833:22, 835:17, 835:19,
850:15, 869:16, 871:7,
872:5, 872:19, 873:24,
874:1, 874:12, 874:18,
876:12, 877:5, 877:15,
877:19, 877:20, 877:23,
878:5, 883:19, 896:12

**differentiated** [1] -
665:25

**differently** [2] - 829:17,
829:19

**difficult** [4] - 651:17,
705:1, 810:22, 811:4

**difficulties** [1] - 737:2

**difficulty** [1] - 644:21

**digital** [1] - 738:18

**DIRECT** [1] - 792:4

**direct** [8] - 632:7, 632:17,
652:11, 743:16, 743:17,
786:10, 864:15, 891:3

**directing** [1] - 785:21

**directions** [1] - 635:24

**directive** [1] - 818:2

**directly** [3] - 666:21,
691:1, 755:1

**director** [5] - 688:5,
725:17, 725:19, 725:20,
725:21

**disapprove** [1] - 832:8

**disastrous** [1] - 777:9

**disclosed** [2] - 750:11,
760:15

**discontinued** [1] -
683:22

**discount** [35] - 672:21,
673:10, 673:22, 673:24,
674:16, 675:4, 675:5,
675:10, 675:13, 675:16,

675:20, 676:1, 676:5, 676:17, 677:9, 677:14, 678:2, 678:4, 678:12, 678:16, 678:20, 680:5, 680:7, 681:22, 682:7, 683:9, 683:20, 683:25, 684:7, 684:15, 684:21, 686:6, 706:23, 816:25, 840:2

**discounts** [2] - 673:25, 681:25

**discrepancies** [4] - 772:22, 881:13, 881:16, 899:17

**discrepancy** [1] - 673:6

**discuss** [4] - 687:23, 740:7, 838:3, 838:18

**discussed** [10] - 640:22, 694:16, 745:15, 756:22, 756:24, 798:24, 838:4, 838:5, 839:24, 886:15

**discussing** [5] - 745:13, 756:25, 757:3, 895:10, 897:21

**discussion** [3] - 746:17, 748:25, 756:15

**dispute** [19] - 668:19, 710:25, 757:24, 786:6, 786:13, 786:18, 787:1, 787:11, 787:18, 788:1, 789:6, 789:18, 790:2, 790:3, 790:7, 790:12, 790:13, 858:4

**disputes** [3] - 669:8, 787:6, 789:10

**distinct** [1] - 834:14

**distinction** [1] - 862:8

**distinguish** [1] - 629:9

**District** [2] - 904:17, 904:18

**divided** [2] - 797:3, 797:14

**DO6** [1] - 765:22

**document** [73] - 634:20, 635:5, 635:7, 635:9, 635:10, 641:13, 641:14, 641:17, 654:22, 654:24, 657:17, 670:19, 671:21, 671:24, 672:4, 672:8, 672:15, 672:17, 685:10, 692:12, 692:13, 692:19, 692:21, 693:16, 693:17, 693:23, 693:25, 694:12, 697:23, 698:11, 701:2, 738:4, 741:2, 743:25, 744:23, 750:19, 750:22, 751:8, 752:6, 757:1, 757:3, 759:4, 765:23, 804:3, 804:4, 809:22, 812:14, 841:6, 843:21,

853:20, 853:21, 859:10, 860:3, 860:11, 860:12, 860:15, 863:5, 863:8, 865:10, 871:24, 874:21, 892:11, 895:11, 895:13, 895:21, 896:2, 896:5, 897:15, 898:4, 898:22, 899:14, 900:24

**documentation** [3] - 762:22, 810:20, 900:4

**documents** [5] - 626:16, 668:8, 766:17, 863:14, 898:10

**dollar** [2] - 769:16, 769:17

**dollars** [13] - 677:25, 678:15, 678:19, 758:8, 758:9, 758:10, 758:12, 768:6, 768:8, 770:25, 781:23, 782:12, 862:8

**Donaldson** [2] - 847:15, 847:19

**done** [34] - 651:13, 679:8, 729:2, 734:16, 742:13, 768:6, 768:8, 772:19, 772:21, 775:6, 790:16, 790:22, 790:23, 802:9, 803:4, 812:13, 813:3, 813:7, 817:21, 840:5, 844:23, 850:20, 853:2, 871:10, 878:1, 878:3, 887:21, 891:23, 894:10, 894:13, 895:3, 895:22, 896:10, 896:18

**Donovan** [2] - 848:11, 848:12

**double** [4] - 739:25, 851:23, 897:1, 897:5

**double-check** [1] - 739:25

**doubt** [1] - 708:11

**Douglas** [4] - 673:18, 762:18, 781:18, 788:23

**down** [70] - 627:21, 627:24, 628:3, 628:13, 629:7, 629:8, 629:15, 636:21, 643:3, 660:15, 669:20, 670:25, 675:1, 675:3, 686:1, 687:25, 688:1, 688:3, 688:24, 694:4, 695:17, 697:5, 697:23, 703:22, 705:15, 705:18, 705:21, 706:3, 710:20, 713:9, 715:5, 732:6, 739:13, 739:14, 740:6, 743:5, 744:22, 747:18, 750:2, 751:12, 753:8, 753:20, 757:20, 761:2, 767:21, 775:2, 777:17, 778:3, 778:9,

790:25, 806:21, 807:7, 808:5, 814:24, 817:6, 846:24, 849:1, 850:25, 854:15, 857:1, 857:23, 859:12, 863:19, 867:2, 869:5, 873:5, 874:5, 877:13, 879:1, 903:4

**download** [3] - 806:13, 814:13, 833:15

**downloaded** [3] - 814:3, 814:17, 814:19

**drawing** [2] - 691:3, 691:5

**dressed** [1] - 650:10

**drop** [3] - 690:21, 690:23, 692:8

**drop-ship** [2] - 690:23, 692:8

**drop-ships** [1] - 690:21

**dropping** [1] - 683:2

**DU3** [3] - 634:22, 671:22, 894:24

**due** [9] - 805:16, 806:6, 806:24, 867:19, 874:8, 874:14, 877:15, 885:12, 894:24

**duly** [3] - 626:7, 791:12, 792:2

**duplicate** [7] - 773:15, 773:16, 852:6, 852:12, 856:24, 870:18, 874:4

**duplicated** [1] - 902:6

**duplication** [3] - 870:3, 871:1, 871:3

**duplicative** [1] - 875:5

**during** [15] - 628:10, 652:6, 652:11, 675:25, 708:13, 711:23, 735:4, 746:7, 784:12, 821:19, 833:6, 871:8, 879:21, 890:19

**duties** [2] - 823:6

**DY3** [1] - 849:11

**dynamic** [2] - 630:5, 662:25

**E**

**early** [1] - 672:11

**easier** [2] - 674:23, 738:7

**easily** [1] - 770:13

**easy** [2] - 646:25, 676:20

**educational** [1] - 792:21

**effect** [4] - 650:16, 699:24, 854:24, 871:1

**effectively** [2] - 730:6, 763:6

**efficiencies** [5] - 808:21, 811:12, 833:20, 850:2, 850:3

**efficiency** [3] - 810:4,

810:7, 810:9

**effort** [8] - 848:10, 855:10, 869:25, 895:13, 895:19, 895:20, 895:25, 900:11

**efforts** [2] - 710:25, 847:24

**eight** [4] - 631:5, 817:3, 817:4, 842:6

**either** [10] - 655:12, 661:3, 723:4, 724:19, 735:2, 775:23, 787:9, 832:8, 840:7, 900:5

**Electric** [1] - 730:25

**electronic** [2] - 727:5, 745:10

**electronically** [2] - 693:13, 693:15

**Electronics** [9] - 719:5, 720:20, 721:1, 721:5, 721:11, 723:11, 727:23, 728:1, 730:5

**elicited** [1] - 673:3

**eliminated** [2] - 708:11, 814:5

**ELMO** [2] - 653:7, 737:5

**elsewhere** [1] - 794:3

**email** [35] - 635:16, 636:6, 636:18, 641:18, 641:19, 642:3, 642:11, 657:5, 657:11, 657:14, 658:8, 658:25, 659:1, 659:6, 659:14, 685:21, 698:24, 736:11, 736:12, 736:22, 737:18, 738:22, 739:16, 739:19, 740:7, 744:23, 747:4, 748:9, 749:2, 749:3, 749:4, 749:8, 749:11, 749:16, 750:3, 751:24, 753:8, 755:6, 756:9, 756:10, 787:17, 788:20, 788:21, 807:14, 807:15, 840:7, 865:23, 866:11, 871:11, 871:17, 871:18, 874:12, 898:5, 898:11, 898:13, 899:22, 899:23, 899:24

**emailed** [2] - 665:16, 665:17

**emails** [15] - 636:19, 639:9, 639:17, 641:12, 641:23, 642:2, 642:10, 713:5, 713:6, 731:6, 731:8, 840:6, 897:9

**embrace** [1] - 758:21

**employed** [1] - 904:9

**employee** [7] - 798:2, 798:3, 799:19, 799:23, 800:22, 824:19, 847:4

**employees** [33] - 626:20,

628:6, 628:12, 628:14, 628:15, 629:17, 629:20, 629:22, 630:17, 630:21, 630:25, 631:5, 631:11, 631:13, 631:15, 631:17, 631:18, 631:22, 631:25, 633:2, 633:11, 634:18, 661:12, 798:6, 799:17, 800:23, 801:12, 842:4, 842:7, 842:12, 842:15, 847:8, 887:15

**employs** [1] - 843:10

**EMS** [3] - 730:18, 730:20, 745:10

**encompasses** [1] - 823:2

**end** [8] - 656:3, 723:19, 809:5, 833:22, 833:24, 864:22, 873:4, 896:2

**endemic** [1] - 776:15

**enforce** [2] - 722:7, 790:17

**engage** [1] - 787:5

**engaged** [1] - 790:13

**engineer** [2] - 650:10, 650:15

**English** [27] - 644:5, 645:4, 645:9, 645:15, 645:16, 646:9, 647:8, 647:12, 647:13, 647:15, 647:18, 647:21, 647:24, 648:7, 648:19, 648:22, 648:25, 649:1, 649:7, 649:9, 649:13, 649:15, 649:18, 815:4, 816:19

**enjoy** [3] - 677:8, 717:4, 723:4

**enjoyed** [1] - 724:14

**ensure** [3] - 794:22, 799:23, 802:12

**enter** [3] - 661:13, 661:20, 832:1

**entering** [1] - 832:18

**enters** [5] - 626:2, 681:17, 743:21, 791:6, 863:24

**entire** [6] - 644:7, 648:10, 648:11, 702:8, 703:4, 741:12

**entities** [15] - 668:10, 668:12, 686:6, 686:9, 686:17, 717:15, 719:18, 719:20, 719:23, 721:25, 722:1, 782:13, 794:17, 798:4, 812:3

**entitled** [1] - 904:12

**entity** [12] - 656:4, 656:6, 722:6, 723:22, 724:17, 762:12, 762:14, 772:19, 773:2, 778:18, 811:14, 811:21

Case 0:21-cv-60125-RNS   Document 321   Entered on FLSD Docket 02/28/2024   Page 290 of
306
Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

913

entry [1] - 850:11
Eric [2] - 868:15, 868:16
Erik [1] - 739:13
ERP [4] - 804:22, 808:18,
829:7, 853:16
error [4] - 814:14,
817:18, 833:14, 850:1
errors [4] - 774:5,
776:20, 853:5, 853:7
especially [1] - 690:23
established [1] - 775:15
et [2] - 901:21, 901:22
evaluate [1] - 809:14
evaluated [1] - 762:8
evening [2] - 718:14,
903:14
event [4] - 709:25,
753:22, 761:18, 790:1
eventually [4] - 676:12,
700:19, 700:22, 852:5
everywhere [1] - 652:8
evidence [40] - 658:19,
669:7, 697:25, 698:7,
698:8, 698:12, 701:3,
718:1, 718:19, 718:20,
728:14, 728:15, 739:6,
739:12, 752:18, 752:19,
756:18, 766:20, 806:1,
813:20, 841:24, 854:10,
854:11, 857:10, 857:13,
857:18, 858:7, 858:8,
858:17, 858:25, 859:1,
865:12, 865:13, 875:13,
897:14, 897:25, 898:1,
899:2, 900:17, 901:20
exact [5] - 632:6, 712:12,
773:19, 864:8
exactly [4] - 715:16,
804:7, 857:19, 859:8
EXAMINATION [6] -
626:9, 743:23, 779:20,
792:4, 818:10, 894:17
examination [6] - 632:7,
632:17, 652:11, 786:10,
818:9, 891:3
examined [2] - 626:8,
792:3
example [14] - 661:22,
662:6, 676:20, 705:15,
724:1, 747:1, 795:9,
797:5, 822:25, 834:19,
852:6, 852:25, 866:8,
901:24
examples [1] - 901:25
exceedance [1] - 860:19
exceeds [1] - 857:8
Excel [3] - 701:12,
797:22, 815:4
excepting [1] - 667:3
exception [5] - 691:14,

691:18, 691:22, 692:2,
771:1
exceptions [6] - 690:20,
691:10, 691:11, 691:24,
692:1, 723:1
exchange [3] - 718:13,
737:18, 749:9
exciting [1] - 692:11
exclusive [21] - 713:15,
713:20, 713:21, 716:13,
717:5, 724:21, 731:4,
734:5, 734:9, 736:3,
740:14, 745:6, 745:18,
745:21, 745:24, 746:3,
746:12, 747:2, 748:11,
748:24, 753:12
exclusivity [1] - 723:2
excuse [6] - 666:25,
702:23, 754:21, 798:2,
841:4, 900:9
excused [2] - 791:1,
903:5
exercise [1] - 878:3
exhibit [22] - 657:19,
658:2, 658:4, 658:11,
669:22, 674:25, 698:6,
718:15, 726:22, 727:2,
727:3, 739:4, 744:10,
750:7, 750:9, 750:17,
765:19, 857:17, 857:24,
858:7, 858:22, 902:6
Exhibit [31] - 697:24,
701:3, 715:19, 718:4,
718:20, 728:15, 739:12,
750:12, 752:19, 756:17,
759:6, 784:20, 806:1,
813:19, 854:1, 854:11,
859:1, 865:14, 868:9,
875:6, 892:11, 895:7,
897:13, 898:1, 899:1,
899:25, 900:21, 901:16,
902:1, 902:10, 902:17
exhibits [1] - 895:9
Exhibits [1] - 901:11
existed [1] - 817:17
existent [1] - 789:11
existing [1] - 755:14
exits [1] - 741:5
expanding [1] - 886:19
expect [1] - 714:18
expectation [1] - 799:20
expected [1] - 800:20
experience [4] - 667:14,
667:17, 667:24, 800:18
experienced [2] -
705:25, 706:1
expert [4] - 641:21,
642:3, 642:12, 642:13
expert's [1] - 642:14
experts [7] - 641:19,

641:23, 743:12, 743:13,
809:19, 809:20, 883:19
expiration [2] - 746:8,
746:10
expire [1] - 746:5
explain [8] - 628:14,
685:2, 707:24, 769:8,
769:9, 796:24, 824:9,
894:19
explained [2] - 648:16,
887:11
explanation [1] - 631:4
extra [1] - 801:11
extremely [1] - 775:22

F

face [4] - 635:11, 781:19,
801:23
face-to-face [1] - 781:19
fact [11] - 668:7, 688:2,
709:13, 751:18, 755:8,
782:15, 836:13, 856:24,
859:13, 881:4, 881:16
factored [2] - 682:8,
683:9
factories [2] - 629:8,
842:14
factory [9] - 630:3,
630:4, 650:11, 650:13,
650:14, 689:6, 704:25,
705:16, 723:3
failing [1] - 799:19
fair [1] - 754:3
faith [6] - 710:25, 787:2,
787:5, 787:18, 787:24,
789:14
fall [2] - 734:16, 837:18
falling [1] - 673:13
familiar [3] - 751:24,
802:22, 803:1, 857:3,
879:4
family [2] - 801:19,
842:13
far [4] - 626:15, 665:25,
666:6, 821:2, 845:23,
862:23
faucets [8] - 706:21,
706:23, 706:24, 707:1,
707:4, 707:13, 708:19
fault [6] - 636:9, 861:14,
861:16, 861:20
favor [2] - 783:7, 783:8,
855:16
features [1] - 808:25
Feb [3] - 675:22, 677:11,
683:22
February [27] - 676:23,
676:25, 677:20, 678:6,
678:8, 678:9, 793:7,

866:9, 866:14, 866:23,
867:10, 867:19, 867:22,
869:21, 870:14, 871:11,
871:16, 871:18, 871:19,
873:11, 874:13, 876:8,
877:22, 892:14, 892:22,
892:24, 893:4
FedEx [1] - 695:18
feedback [11] - 638:10,
773:23, 878:17, 895:23,
896:23, 897:7, 897:21,
899:16, 900:1, 901:15,
902:24
feedbacks [1] - 900:4
ferry [1] - 775:25
few [8] - 634:11, 737:1,
801:9, 808:24, 818:16,
823:5, 826:6, 845:3
fide [1] - 788:9
figure [2] - 741:18, 849:9
figured [1] - 707:9
figuring [1] - 680:14
fill [4] - 706:21, 706:23,
707:4, 743:9
filling [4] - 707:13,
707:17, 708:20, 708:24
fills [2] - 680:16, 706:16
final [5] - 725:14, 901:6,
901:15, 902:10, 902:16
finance [1] - 848:18
financial [3] - 668:15,
668:21, 673:17
financially [1] - 904:11
financials [2] - 797:10,
811:22
fine [5] - 697:22, 738:9,
738:10, 766:4, 776:15
finger [1] - 751:12
finish [2] - 640:5, 741:22
finished [1] - 900:16
finishes [1] - 637:13
fire [8] - 798:20, 822:13,
824:10, 824:19, 824:22,
824:25, 825:4, 828:8
fired [4] - 828:3, 847:21,
847:23, 848:1
firing [4] - 799:9, 822:17,
825:4, 827:16
first [42] - 635:5, 636:10,
638:3, 644:3, 659:5,
672:8, 672:12, 672:25,
683:21, 686:10, 696:23,
697:11, 710:22, 733:11,
745:13, 745:15, 755:7,
786:25, 788:11, 792:2,
793:5, 800:17, 800:25,
801:9, 835:22, 836:2,
855:7, 859:9, 890:9,
891:8, 892:1, 893:24,
894:2, 894:3, 896:4,

896:6, 903:11
firstly [1] - 762:12
fit [3] - 672:2, 743:9,
854:14
five [3] - 796:16, 796:17,
796:20
fix [1] - 666:12
floor [1] - 650:14
Florida [15] - 630:19,
630:21, 632:24, 633:3,
657:1, 792:15, 792:16,
792:20, 793:10, 819:2,
848:24, 848:25, 849:9,
904:18, 904:19
flow [7] - 712:16, 712:22,
886:17, 886:25, 887:2,
887:6, 887:19
focus [3] - 668:19,
800:15, 806:17
focused [1] - 901:25
focusing [1] - 782:6
folder [1] - 693:11
folks [2] - 773:5, 773:6
follow [1] - 648:17,
770:13, 778:22, 824:17,
872:22, 872:23, 877:24,
878:4, 882:2, 891:18,
902:12
followed [4] - 708:10,
732:4, 872:6, 883:18
following [10] - 631:16,
676:13, 676:15, 753:22,
785:2, 839:6, 873:6,
873:24, 878:2, 882:17
follows [2] - 626:8, 792:3
forced [1] - 712:9
foreclosed [1] - 723:18
foregoing [1] - 904:3
forgave [1] - 782:12
forgot [1] - 802:12
forgotten [1] - 719:7
form [1] - 688:18
format [3] - 812:21,
814:4, 828:1
forms [1] - 857:3
formula [6] - 815:1,
815:3, 815:6, 816:18,
816:19, 846:20
formulas [5] - 814:4,
814:11, 814:20, 814:21,
817:12
formulated [1] - 814:20
Fort [11] - 653:9, 657:1,
664:4, 664:6, 724:25,
727:15, 793:25, 794:4,
796:16, 803:18, 811:19
forth [9] - 644:14,
673:17, 706:18, 787:10,
789:12, 817:3, 899:17,
900:11, 900:12

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

914

**forward** [3] - 626:18,
790:10, 877:12
**foundation** [2] - 637:14,
838:25
**four** [3] - 630:2, 712:13,
715:11
**FPR** [1] - 904:16
**FPR-C** [1] - 904:16
**fraction** [1] - 738:4
**frame** [1] - 878:2
**frames** [1] - 871:8
**freight** [16] - 687:13,
687:16, 687:18, 687:20,
687:22, 688:10, 688:13,
689:1, 690:16, 690:18,
693:21, 694:8, 695:24,
697:3, 775:25
**frequency** [1] - 895:3
**Fridays** [1] - 828:1
**front** [14] - 658:25,
685:11, 696:8, 702:11,
710:19, 736:23, 743:25,
767:4, 814:16, 843:13,
853:20, 859:11, 860:12,
864:5
**Ft** [1] - 632:24
**full** [2] - 692:15, 715:6
**function** [8] - 801:1,
801:2, 823:1, 829:18,
850:12, 865:6, 894:20,
896:13
**functional** [1] - 801:4,
824:24, 826:13
**functionality** [1] - 808:16
**functionally** [3] - 822:22,
826:24, 827:3
**functions** [16] - 793:20,
793:24, 794:23, 795:3,
795:6, 796:22, 797:1,
812:3, 822:9, 824:14,
825:8, 825:10, 826:19,
827:15, 827:24, 850:16

**G**

**gap** [7] - 672:17, 673:5,
673:9, 674:17, 674:20,
799:20, 895:17
**garbage** [4] - 879:5,
879:7
**gather** [1] - 818:16
**gathers** [1] - 824:16
**gears** [2] - 802:22, 812:5
**General** [4] - 687:25,
688:1, 688:2, 688:8
**general** [3] - 728:1,
728:25, 798:11
**generally** [7] - 627:7,
665:22, 776:10, 789:20,
799:13, 824:7

**generate** [2] - 836:7,
836:8
**generated** [1] - 806:11
**generating** [5] - 765:12,
812:24, 813:23, 814:2,
817:22
**genesis** [1] - 672:17
**gentleman** [2] - 632:8,
692:21, 741:19
**gentlemen** [2] - 841:14,
846:23
**Germany** [14] - 660:1,
660:2, 660:3, 660:4,
660:5, 660:6, 660:7,
660:12, 689:22, 691:18,
794:8, 819:11, 843:6
**given** [8] - 638:10,
748:18, 748:20, 781:11,
782:17, 785:18, 785:22,
799:16
**glad** [1] - 811:12
**glass** [8] - 706:11,
706:15, 706:17, 706:21,
707:13, 707:18, 708:20,
708:24
**global** [7] - 635:12,
793:19, 794:5, 794:20,
818:21, 818:22, 824:7
**globally** [1] - 825:6
**globe** [1] - 689:11
**go-ahead** [2] - 799:22,
809:6
**goals** [1] - 810:3
**Golden** [1] - 837:18
**good-faith** [2] - 710:25,
787:18
**goods** [6] - 677:19,
775:14, 881:11, 881:17,
882:23, 887:13
**Gosh** [1] - 642:13
**gosh** [1] - 845:8
**governed** [1] - 728:24
**government** [1] - 847:11
**Government** [2] -
798:17, 878:25
**governs** [1] - 786:12
**gracious** [1] - 759:24
**graduated** [1] - 757:25
**grasp** [6] - 648:22,
648:24, 649:1, 649:7,
649:9, 649:13
**gray** [1] - 814:18
**Great** [3] - 690:14,
691:21, 697:20
**great** [2] - 732:21, 741:19
**greater** [7] - 685:2,
757:6, 758:9, 758:10,
758:11, 758:15, 759:1
**green** [2] - 656:9, 816:11
**grounds** [1] - 726:5

**group** [3] - 750:6, 750:9,
801:20
**growing** [2] - 627:25,
628:2
**guess** [15] - 641:4,
675:19, 679:12, 692:25,
720:18, 784:21, 843:12,
861:18, 863:19, 865:2,
882:10, 882:11, 889:25,
896:13, 898:25
**guide** [1] - 809:11
**guidelines** [2] - 648:17,
648:18
**guys** [13] - 701:10,
709:17, 727:8, 749:4,
766:3, 789:5, 841:9,
845:17, 846:2, 851:20,
851:23, 855:25, 882:15

**H**

**half** [5] - 741:20, 741:25,
742:7, 743:15, 817:2
**hand** [10] - 656:8,
662:23, 674:9, 683:1,
703:9, 791:11, 819:22,
843:15, 848:5, 862:23
**hand-holding** [1] - 848:5
**handful** [1] - 692:7
**handle** [1] - 795:5
**handled** [3] - 662:22,
799:13, 817:13
**hands** [6] - 680:19,
680:24, 681:2, 681:5,
681:8, 682:16
**handy** [1] - 662:20
**happily** [1] - 738:16
**happy** [4] - 685:25,
712:24, 738:6, 802:20
**harassment** [1] - 800:21
**hard** [6] - 680:13, 737:4,
737:6, 737:7, 770:2,
797:23
**harder** [1] - 811:7
**hardest** [1] - 811:8
**hardly** [1] - 868:2
**hat** [1] - 674:9
**head** [18] - 663:18,
663:22, 664:1, 664:3,
664:20, 665:2, 665:4,
794:21, 795:5, 795:9,
795:12, 795:15, 800:10,
801:17, 822:11, 824:15,
827:23
**heading** [1] - 814:18
**headings** [1] - 814:15
**headlight** [2] - 748:5,
834:15
**headlights** [1] - 820:1
**headquarter** [1] - 654:9

**headquartered** [3] -
632:22, 653:9, 654:13
**headquarters** [9] -
653:12, 653:15, 653:25,
654:1, 654:8, 654:14,
654:15, 654:18, 654:21
**hear** [6] - 687:14, 725:24,
762:2, 762:5, 768:18,
809:10
**heard** [15] - 668:9,
671:15, 685:2, 705:20,
774:10, 803:14, 805:21,
808:4, 808:6, 812:6,
887:4, 887:5, 890:8,
892:1, 894:20
**hearing** [2] - 629:12,
629:13, 904:10
**hearsay** [1] - 858:5
**held** [2] - 627:17, 755:25
**Hella** [3] - 688:8, 748:4,
819:25
**help** [7] - 629:25, 712:17,
801:12, 802:8, 830:21,
831:21
**helped** [2] - 830:5,
878:16
**helping** [1] - 809:8
**Hemant** [2] - 659:17,
685:21
**herein** [2] - 626:7, 792:2
**hi** [1] - 818:14
**high** [4] - 680:2, 691:7,
704:14, 795:8
**higher** [1] - 783:3
**highest** [2] - 758:1,
792:22
**highlighted** [3] - 646:24,
785:1, 901:19
**highlighting** [1] - 801:13
**himself** [2] - 830:6,
830:24
**hire** [5] - 794:11, 822:13,
824:10, 824:19, 825:4
**hired** [2] - 794:16, 828:3
**hiring** [4] - 794:17,
794:19, 822:16, 827:15
**history** [1] - 762:21
**hit** [3] - 688:7, 704:9,
758:5
**HK** [1] - 684:23
**hmm** [41] - 637:4, 659:4,
795:23, 805:22, 808:3,
812:8, 821:5, 821:21,
823:8, 827:11, 828:17,
829:11, 829:22, 831:17,
832:25, 833:11, 834:10,
834:12, 838:24, 839:11,
839:22, 841:3, 842:21,
844:10, 844:16, 847:6,
853:22, 854:19, 860:14,

860:17, 861:3, 862:2,
867:17, 871:15, 875:16,
885:22, 887:1, 888:1,
890:21, 892:20, 892:23
**hold** [3] - 640:5, 764:18,
764:20
**holding** [1] - 848:5
**home** [1] - 798:15
**honest** [3] - 635:22,
635:23, 636:23
**Hong** [61] - 637:21,
637:25, 638:19, 653:18,
653:22, 653:24, 653:25,
654:9, 660:9, 660:24,
661:2, 661:3, 661:11,
661:12, 661:19, 670:17,
683:7, 683:13, 683:19,
707:2, 707:12, 707:17,
707:18, 708:22, 708:23,
708:25, 709:4, 710:5,
710:12, 720:10, 720:25,
721:4, 721:22, 721:24,
723:6, 724:2, 724:10,
724:20, 725:15, 731:14,
731:16, 735:2, 745:23,
746:9, 760:7, 794:8,
824:1, 828:12, 828:22,
828:25, 830:11, 830:14,
831:1, 831:7, 831:12,
831:21, 842:4, 842:5
**Honor** [4] - 627:2,
637:12, 650:25, 652:23,
655:22, 658:1, 663:7,
664:23, 668:5, 681:15,
683:14, 683:21, 684:25,
685:23, 686:10, 692:11,
693:6, 693:18, 694:11,
703:14, 726:4, 738:12,
738:20, 750:10, 754:6,
766:8, 766:12, 779:15,
782:14, 790:21, 818:8,
825:19, 839:1, 839:4,
857:6, 857:25, 858:12,
858:24, 862:10, 880:15,
891:1, 894:15, 903:2
**Honor's** [1] - 766:13
**hoping** [1] - 732:23
**hour** [5] - 741:20,
741:24, 742:7, 743:14
**hours** [4] - 800:20,
802:20, 810:19, 890:19
**house** [3] - 673:13,
673:19, 765:12
**housed** [1] - 805:19
**Howard** [2] - 848:8,
864:20
**HR** [15] - 793:23, 794:5,
794:10, 794:12, 799:14,
799:22, 800:1, 800:4,
800:10, 800:17, 819:4,

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

819:9, 819:10, 819:13, 819:14
**Huang** [7] - 649:5, 762:18, 781:18, 788:23
**huge** [1] - 679:16
**human** [5] - 814:2, 814:5, 814:8, 833:13, 850:1
**humble** [4] - 636:2, 636:3, 636:7, 636:23
**hundred** [1] - 644:15
**Husqvarna** [5] - 709:15, 733:10, 734:22, 735:4
**Husqvarna's** [1] - 733:4

**I**

**I..** [1] - 882:8
**idea** [8] - 635:13, 738:11, 745:17, 850:1, 880:24, 886:13, 889:19, 891:15
**ideas** [1] - 809:25
**identification** [8] - 685:11, 685:17, 692:17, 726:8, 727:8, 744:2, 750:5, 865:11
**identified** [4] - 733:25, 734:4, 734:13, 899:17
**identify** [2] - 722:21, 893:16
**identifying** [1] - 774:4
**IL** [1] - 904:16
**illustrate** [1] - 691:10
**illustration** [4] - 655:1, 656:12, 656:16, 691:6
**imagine** [1] - 644:15
**impeach** [1] - 856:12
**impeaching** [1] - 754:7
**impeachment** [6] - 637:14, 658:14, 664:24, 751:3, 857:7, 891:2
**implement** [1] - 809:9
**implementation** [1] - 810:18
**implemented** [1] - 839:25
**important** [5] - 645:5, 794:13, 801:7, 852:3, 886:22
**impression** [1] - 711:3
**improper** [4] - 637:14, 664:23, 857:7, 891:1
**improve** [3] - 833:19, 847:24, 847:25
**improved** [2] - 810:4, 833:20
**improvement** [1] - 799:18
**improves** [1] - 799:23
**IN** [1] - 657:5

**in-house** [1] - 765:12
**inaccurate** [3] - 810:11, 810:12, 879:15
**inaudible** [1] - 678:16
**include** [1] - 819:11
**included** [6] - 636:13, 749:5, 760:6, 760:14, 782:13, 877:25
**includes** [1] - 875:20
**including** [3] - 631:9, 795:22, 808:23
**incomplete** [1] - 880:16
**incorrect** [11] - 643:25, 663:24, 663:25, 671:9, 671:10, 671:12, 671:14, 671:17, 762:11, 781:5, 781:6
**increase** [2] - 645:22, 645:25
**increased** [1] - 804:17
**independently** [1] - 842:9
**India** [51] - 651:10, 655:12, 655:14, 655:21, 656:2, 656:18, 656:21, 656:22, 657:2, 657:4, 657:10, 657:11, 658:8, 658:9, 659:7, 659:25, 660:11, 662:3, 662:10, 662:18, 663:12, 663:16, 663:19, 663:22, 664:1, 664:3, 664:4, 665:5, 665:6, 794:8, 811:18, 813:13, 819:16, 820:12, 820:13, 820:14, 820:16, 820:25, 821:1, 821:8, 823:20, 823:21, 823:22, 824:11, 824:19, 824:20, 826:7, 829:1, 843:9, 843:10
**indicate** [1] - 729:21
**indication** [2] - 728:18, 855:5
**indirectly** [1] - 755:1
**industries** [1] - 810:1
**industry** [2] - 733:3, 810:1
**inform** [1] - 840:5
**informally** [1] - 787:1
**information** [21] - 637:23, 639:3, 696:1, 696:7, 763:17, 763:21, 808:5, 814:10, 828:1, 850:11, 850:20, 852:18, 878:17, 879:10, 879:14, 879:15, 884:22, 885:1, 885:4, 900:2
**informed** [1] - 763:14
**initiate** [1] - 787:9
**initiated** [1] - 729:13

**initiative** [1] - 666:6
**injection** [2] - 633:20, 633:22
**inservice** [1] - 698:21
**inside** [53] - 662:23, 663:2, 663:3, 663:12, 663:15, 663:19, 663:22, 664:1, 664:3, 664:21, 665:3, 665:4, 665:5, 680:21, 680:23, 763:11, 777:5, 819:17, 819:18, 819:21, 820:11, 820:17, 820:22, 820:24, 821:1, 821:3, 821:7, 821:8, 821:10, 821:20, 822:6, 823:6, 823:10, 823:13, 823:18, 824:16, 824:21, 825:6, 825:8, 825:10, 825:13, 825:18, 826:14, 826:25, 828:22, 828:25, 832:1, 845:18, 845:19, 846:11, 861:11, 861:12
**insofar** [4] - 687:8, 749:13, 772:15, 854:24
**inspection** [1] - 722:23
**instance** [2] - 752:11, 756:3
**instances** [6] - 772:17, 773:14, 774:3, 776:9, 777:2, 777:4
**instructions** [2] - 649:4, 766:14
**insurance** [9] - 761:4, 761:18, 762:3, 762:8, 762:14, 762:15, 762:17, 762:23, 763:4
**insurer** [3] - 761:14, 777:23, 778:18
**insuring** [1] - 762:10
**intended** [1] - 811:11
**intense** [1] - 809:10
**intensive** [1] - 810:13
**interaction** [3] - 814:2, 814:5, 814:8
**interest** [2] - 732:22, 733:1
**interested** [1] - 904:12
**interim** [1] - 849:7
**internal** [3] - 814:17, 900:11, 901:6
**internally** [1] - 778:8, 900:16, 900:18
**international** [1] - 792:25
**internet** [1] - 849:5
**interpretation** [1] - 647:14
**interpreted** [2] - 633:24, 649:16
**interrogatories** [2] - 718:11, 718:13

**interrupt** [2] - 693:7, 751:23
**interviewing** [1] - 794:15
**introduced** [4] - 634:24, 732:12, 858:11, 858:17
**introducing** [2] - 718:16, 729:23
**invalid** [2] - 740:9, 747:8
**inventory** [13] - 627:16, 627:18, 796:3, 796:8, 797:6, 803:7, 804:1, 804:5, 804:17, 805:4
**investigated** [1] - 673:16
**invoice** [11] - 673:21, 673:23, 674:4, 696:21, 696:22, 776:7, 776:23, 866:5, 881:25, 893:18, 901:21
**invoiced** [1] - 804:6
**invoices** [47] - 678:15, 678:19, 695:18, 696:21, 759:22, 776:4, 776:10, 776:12, 776:17, 776:18, 776:20, 776:21, 778:9, 803:16, 866:3, 866:19, 869:6, 869:7, 870:25, 872:22, 874:16, 874:19, 888:5, 888:21, 888:22, 889:1, 889:6, 889:8, 889:20, 890:3, 890:13, 890:16, 890:23, 891:11, 892:4, 892:18, 892:25, 893:4, 893:6, 893:7, 893:16, 893:18, 893:25, 894:23, 895:1, 897:9
**invoicing** [1] - 796:4
**involve** [1] - 819:1
**involved** [12] - 631:19, 788:19, 794:19, 799:15, 800:5, 800:6, 801:16, 809:3, 812:9, 818:5, 862:12, 876:1
**involvement** [1] - 863:16
**irrespective** [2] - 645:9, 657:12
**issuance** [1] - 725:4
**issue** [27] - 636:11, 649:14, 661:24, 662:24, 666:3, 666:12, 668:2, 673:21, 674:4, 678:14, 678:19, 678:23, 685:1, 694:15, 711:14, 730:25, 732:24, 766:12, 775:12, 775:13, 776:4, 798:5, 811:6, 823:24, 825:13, 847:3, 847:4
**issued** [29] - 665:12, 682:1, 684:2, 684:3, 688:14, 695:1, 697:18, 707:18, 708:23, 708:25,

709:3, 710:4, 710:12, 711:12, 711:15, 718:25, 719:4, 719:10, 720:19, 720:25, 722:11, 723:6, 724:25, 727:15, 731:14, 731:15, 746:9, 779:8, 880:9
**issues** [16] - 662:2, 679:6, 728:6, 738:9, 803:9, 823:22, 833:18, 840:9, 840:12, 840:15, 840:18, 840:21, 840:22, 886:17, 887:19
**issuing** [2] - 665:8, 679:3, 717:15, 719:13, 745:23, 820:18
**IT** [2] - 793:22, 795:17
**item** [2] - 734:22, 756:16
**Item** [1] - 689:4
**items** [3] - 829:20, 896:23, 901:19
**itself** [1] - 762:12

**J**

**J6** [1] - 816:14
**January** [48] - 628:19, 629:10, 629:15, 629:22, 630:1, 631:14, 631:21, 634:5, 675:24, 675:25, 676:21, 676:25, 677:1, 677:2, 677:18, 677:19, 677:23, 677:25, 767:25, 843:24, 845:16, 845:17, 850:5, 861:1, 861:2, 866:2, 866:16, 867:6, 868:4, 869:2, 869:3, 869:6, 869:10, 869:22, 869:23, 870:11, 871:20, 871:25, 873:10, 873:21, 876:4, 885:18, 892:18, 892:22, 892:24, 893:3, 893:12
**Japan** [6] - 651:10, 842:24, 842:25, 843:1, 843:2, 843:3
**JC** [3] - 693:9, 854:8, 880:25
**Jessica** [1] - 868:15
**Jiangmen** [1] - 802:23
**job** [8] - 659:23, 794:14, 802:8, 823:10, 847:11, 849:2, 865:7, 878:25
**jobs** [3] - 798:16, 798:17, 827:17
**joined** [1] - 793:18
**Joint** [1] - 865:14
**jointly** [1] - 787:25
**Joshi** [2] - 659:17, 685:22

**KEYWORD INDEX**

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

judge [3] - 685:16, 740:24, 777:10
Judge [31] - 626:13, 635:2, 646:20, 648:3, 657:21, 668:3, 668:4, 681:19, 684:12, 685:12, 685:15, 693:14, 702:1, 728:20, 741:9, 741:18, 743:22, 744:5, 744:12, 744:19, 750:14, 752:22, 753:6, 777:14, 839:5, 857:15, 859:2, 862:22, 875:12, 887:21, 894:12
July [12] - 708:5, 708:13, 764:23, 772:24, 788:20, 853:17, 853:24, 854:17, 858:10, 858:20, 859:15, 902:8
jumped [1] - 666:2
June [6] - 638:12, 645:21, 733:7, 734:23, 735:1, 866:4
jurisdiction [1] - 790:4
jurors [4] - 669:23, 698:16, 741:22, 744:20
Jury [6] - 626:2, 681:17, 741:5, 743:21, 791:6, 863:24
jury [12] - 639:11, 650:3, 668:6, 668:20, 719:2, 751:4, 766:8, 803:13, 808:5, 812:6, 868:2, 894:22
just.. [1] - 647:10

**K**

K70 [2] - 728:17, 728:19
keep [11] - 662:20, 705:17, 745:24, 755:13, 775:8, 802:11, 880:25, 886:23, 887:9, 887:17, 902:14
keeping [2] - 742:6, 774:8
keeps [1] - 756:8
kept [3] - 674:15, 779:1, 886:20
key [1] - 794:12
kids [2] - 802:18, 802:19
Kimball [12] - 727:23, 727:24, 728:1, 728:22, 728:25, 729:6, 729:21, 730:4, 730:10, 730:12, 731:1, 731:17
kind [14] - 636:4, 636:5, 636:8, 636:22, 742:23, 799:22, 800:12, 802:1, 802:15, 804:3, 806:20, 809:22, 894:21, 895:16

kinds [1] - 897:9
Kingdom [1] - 697:15
knowledge [1] - 797:21
knowledgeable [1] - 809:25
known [3] - 635:20, 801:5, 851:7
knows [1] - 838:17
Kong [59] - 637:21, 637:25, 638:19, 653:18, 653:22, 653:24, 653:25, 654:9, 660:9, 660:25, 661:2, 661:11, 661:12, 661:19, 670:18, 683:7, 683:13, 683:19, 707:2, 707:12, 707:17, 707:18, 708:23, 708:25, 709:4, 710:5, 710:12, 720:11, 720:25, 721:4, 721:24, 723:7, 724:2, 724:10, 724:20, 725:15, 731:14, 731:16, 735:2, 745:23, 746:9, 760:7, 794:8, 824:1, 828:12, 828:22, 828:25, 830:12, 830:14, 831:1, 831:7, 831:12, 831:21, 842:4, 842:5
Kong's [2] - 661:3, 721:22
Kosoy [1] - 848:8
Koul [2] - 736:2, 753:22
KSR [4] - 696:16, 697:5, 697:8, 697:15
KSR5052 [1] - 696:19
Kukreja [51] - 626:3, 626:11, 631:16, 632:16, 640:15, 642:25, 646:24, 647:5, 648:9, 655:22, 658:3, 658:25, 670:5, 671:25, 675:8, 681:21, 690:8, 692:19, 699:3, 699:9, 700:8, 715:24, 726:13, 727:9, 727:12, 732:10, 733:23, 737:2, 737:15, 739:17, 741:19, 742:13, 742:14, 743:25, 750:18, 751:8, 752:4, 756:21, 759:20, 767:5, 770:4, 770:17, 771:8, 771:14, 772:5, 779:13, 779:22, 780:3, 780:7, 784:24, 841:22
KUKREJA [1] - 626:6
Kukreja's [2] - 637:8, 841:25

**L**

LA [1] - 848:16
labor [1] - 810:13

lack [1] - 746:4
lag [4] - 676:11, 866:6, 868:18, 868:19
language [19] - 644:20, 645:5, 645:10, 645:11, 647:11, 647:14, 647:16, 647:18, 647:22, 647:25, 648:22, 648:25, 649:1, 649:7, 649:10, 649:13, 649:17, 649:19, 789:13
laptop [1] - 641:13
large [1] - 885:23
largest [2] - 886:16, 886:21, 887:19
last [40] - 626:15, 630:2, 631:4, 631:12, 638:20, 641:1, 641:4, 641:22, 642:1, 642:10, 642:25, 659:23, 693:14, 714:2, 735:15, 735:16, 735:19, 735:20, 735:21, 736:1, 741:6, 741:9, 744:10, 749:3, 756:11, 760:22, 780:6, 783:22, 784:7, 785:1, 785:2, 789:3, 791:16, 791:17, 808:6, 847:20, 847:21, 863:20, 893:2
late [16] - 642:25, 690:24, 758:4, 758:5, 769:4, 770:10, 816:3, 816:9, 816:22, 817:1, 817:2, 836:24, 837:2, 893:8, 893:10
latest [3] - 631:12, 716:4, 716:5
Lauderdale [12] - 632:24, 653:9, 657:1, 664:4, 664:6, 725:1, 727:15, 793:25, 794:4, 796:16, 803:18, 811:19
lawsuit [1] - 782:24
lawyer [8] - 632:3, 652:1, 652:6, 652:10, 652:16, 654:23, 673:2, 688:23
lawyers [6] - 634:21, 702:9, 784:1, 784:8, 784:13, 784:14
layers [3] - 815:7, 815:16, 815:18
lazy [1] - 848:3
leading [1] - 822:8
leads [2] - 685:1, 822:23
leadtime [73] - 640:2, 640:9, 640:10, 661:15, 674:1, 703:25, 705:1, 705:8, 705:10, 707:9, 757:5, 757:15, 757:19, 757:22, 758:8, 758:12, 758:23, 758:24, 760:15,

760:19, 763:24, 764:2, 764:5, 764:20, 765:6, 765:10, 765:16, 767:12, 768:24, 771:2, 772:16, 772:18, 772:20, 772:22, 773:5, 773:15, 773:18, 773:24, 780:10, 781:3, 782:6, 783:2, 812:7, 812:10, 812:20, 812:24, 813:23, 815:18, 815:20, 815:22, 816:5, 822:11, 822:25, 833:15, 836:17, 836:19, 837:5, 837:22, 838:9, 840:1, 843:22, 844:11, 844:17, 844:21, 845:8, 845:11, 846:15, 849:15, 850:4, 850:17, 860:19, 885:1
leadtimes [1] - 840:19
Lear [12] - 688:8, 721:21, 721:22, 721:23, 721:25, 722:2, 722:4, 724:1, 724:2, 724:3
learn [4] - 801:2, 801:8, 840:2, 898:14
learned [3] - 757:18, 757:22, 757:23
least [1] - 746:22
leave [5] - 701:23, 798:12, 798:25, 799:6, 878:24
leaves [2] - 743:1, 801:5
leaving [2] - 889:20, 890:2
left [13] - 637:22, 656:8, 728:10, 741:12, 847:9, 847:12, 848:6, 848:7, 848:17, 877:11, 878:22, 902:11, 902:17
left-hand [1] - 656:8
legal [6] - 656:4, 656:6, 668:11, 668:18, 722:1, 789:13
Leow [2] - 788:23, 788:24
LERNER [2] - 685:21, 692:14
less [11] - 674:5, 678:17, 678:21, 679:10, 796:18, 810:8, 811:5, 814:14, 843:12, 848:10, 881:17
letter [5] - 670:4, 712:4, 734:18, 734:19, 884:19
letters [2] - 713:5, 715:11
letting [1] - 875:10
level [3] - 666:2, 795:8, 802:14
levels [2] - 704:9, 725:23
liability [1] - 688:5
liaise [2] - 819:22, 823:6

lie [3] - 638:7, 638:15, 638:18
lies [3] - 636:25, 637:3, 638:21
life [1] - 803:20
limit [2] - 763:7
limited [5] - 741:24, 742:13, 755:13, 763:3, 798:25
limits [2] - 763:6
Lina [7] - 664:13, 664:20, 774:17, 791:9, 791:17, 856:9
LINA [1] - 792:1
line [15] - 628:16, 628:18, 628:22, 630:17, 630:23, 655:21, 656:2, 687:25, 688:3, 703:15, 726:5, 729:15, 769:23, 785:2, 798:8
Line [23] - 628:23, 632:15, 632:19, 633:8, 637:11, 645:24, 647:2, 648:13, 768:3, 770:16, 771:9, 771:13, 821:19, 828:13, 831:14, 869:12, 880:5, 888:9, 888:14, 890:2, 891:25, 892:3
lines [2] - 635:18, 636:16, 675:14, 767:21
linked [1] - 805:6
list [83] - 658:4, 658:12, 694:5, 713:15, 713:20, 713:21, 713:22, 713:23, 713:24, 713:25, 714:2, 714:3, 714:6, 714:7, 714:10, 714:13, 714:25, 715:3, 715:6, 715:15, 715:18, 715:21, 715:25, 716:4, 716:5, 717:5, 717:22, 718:8, 718:16, 718:22, 719:11, 720:22, 721:5, 721:6, 721:7, 721:8, 723:8, 723:9, 724:21, 727:2, 727:3, 730:7, 730:15, 732:4, 732:5, 732:7, 732:13, 732:15, 733:1, 733:8, 734:5, 734:9, 734:17, 734:23, 735:7, 736:3, 739:5, 739:21, 739:25, 740:7, 745:18, 745:21, 745:24, 746:3, 746:5, 746:21, 747:13, 747:18, 748:16, 748:25, 749:14, 753:12, 753:20, 754:5, 756:1, 756:4, 756:5, 756:9, 766:2, 806:23, 889:4, 897:7
listed [4] - 658:2, 658:3,

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

843:25, 904:6
**listened** [1] - 742:4
**listing** [1] - 806:22,
807:1, 807:3
**lists** [1] - 745:6
**live** [7] - 742:18, 742:19,
743:8, 792:14, 810:14,
810:16, 853:19
**LLC** [43] - 654:16,
654:18, 654:21, 656:6,
656:8, 656:10, 656:23,
656:24, 656:25, 657:9,
660:23, 660:24, 667:1,
680:24, 694:3, 695:25,
696:5, 702:24, 703:13,
707:2, 719:17, 720:14,
721:12, 724:9, 728:9,
760:17, 760:20, 762:13,
762:16, 782:3, 782:23,
782:25, 793:4, 793:25,
794:4, 795:13, 797:25,
798:11, 799:11, 811:15,
811:19, 812:10, 813:14
**LLC's** [1] - 654:9
**load** [1] - 764:9
**loaded** [1] - 693:14
**located** [2] - 813:10,
826:5
**location** [4] - 722:2,
722:4, 724:15, 904:5
**locations** [2] - 692:8,
794:10
**locked** [7] - 804:3, 835:3,
835:6, 835:9, 836:3,
836:5, 836:6
**log** [4] - 661:12, 835:14,
835:19
**logic** [4] - 722:20,
722:22, 779:11
**login** [2] - 812:4, 835:10,
835:17
**logistics** [2] - 793:23,
795:17
**longest** [1] - 712:23
**look** [58] - 636:20,
639:12, 640:25, 651:3,
651:9, 654:22, 657:17,
683:11, 689:4, 693:18,
696:8, 700:24, 701:2,
706:15, 710:15, 710:20,
715:22, 717:19, 718:8,
724:24, 726:7, 726:17,
732:16, 734:18, 738:6,
738:15, 751:8, 759:19,
786:17, 789:3, 800:15,
804:8, 805:25, 810:24,
811:17, 814:24, 833:1,
845:2, 849:11, 851:19,
855:19, 856:25, 857:4,
860:11, 861:22, 865:11,

867:19, 868:7, 869:1,
869:2, 874:3, 874:11,
874:20, 876:3, 876:15,
888:25, 896:11, 902:9
**looked** [17] - 642:12,
653:6, 653:10, 684:22,
702:10, 703:9, 720:15,
734:22, 808:22, 859:9,
865:17, 877:23, 889:12,
892:11, 899:25, 900:1,
900:3
**looking** [36] - 626:15,
635:16, 637:7, 641:22,
642:10, 675:7, 681:13,
694:21, 698:24, 702:5,
710:18, 712:19, 720:15,
753:11, 763:21, 766:9,
769:12, 773:18, 774:4,
808:21, 816:14, 855:8,
869:15, 870:4, 874:13,
877:9, 877:10, 885:18,
888:4, 888:23, 888:24,
890:19, 890:20, 895:12,
896:2
**looks** [11] - 689:6,
699:11, 712:7, 746:16,
771:8, 772:15, 815:6,
816:23, 855:12, 855:14,
855:15
**loosely** [1] - 675:21
**lost** [1] - 668:17
**loud** [1] - 647:3
**lower** [3] - 674:3, 783:3,
783:5
**lowered** [1] - 781:7
**lowers** [1] - 783:9
**LT** [2] - 815:20, 815:22
**luck** [1] - 880:10
**lump** [1] - 674:13
**lunch** [8] - 740:22,
741:17, 741:25, 744:11,
745:22, 746:2, 800:22,
800:24
**lying** [3] - 641:4, 641:9,
641:11

**M**

**ma'am** [1] - 903:3
**magic** [1] - 646:24
**main** [4] - 809:4, 820:14,
851:12, 887:14
**majority** [1] - 691:6
**manage** [1] - 809:16
**management** [3] - 788:8,
788:11, 819:7
**manager** [1] - 793:15,
793:17, 793:19, 793:20,
800:25, 809:12, 818:22,
818:23, 818:24, 818:25,

820:24, 821:1, 822:4,
827:16, 864:17, 864:24,
864:25
**manager/global** [1] -
793:14
**managers** [1] - 635:24
**managing** [2] - 819:1,
819:4
**mandating** [1] - 779:3
**manner** [1] - 755:1
**manual** [1] - 833:13
**manufactured** [1] -
834:16
**manufacturer** [3] -
665:24, 787:2, 788:8
**manufactures** [1] -
633:19, 633:20, 633:21,
633:22
**manufacturing** [7] -
668:24, 669:2, 674:24,
720:8, 745:11, 784:20,
786:12
**maquila** [4] - 630:10,
630:11, 630:12, 631:12
**March** [15] - 636:11,
671:19, 711:25, 714:1,
716:1, 717:22, 757:16,
758:20, 772:18, 772:21,
808:10, 810:15, 844:9,
853:14, 853:19
**mark** [2] - 685:11, 726:8
**marked** [5] - 646:19,
697:25, 744:1, 744:10,
841:11
**marker** [1] - 646:25
**market** [1] - 798:8
**marketing** [4] - 717:13,
732:18, 733:14, 734:14
**Martinez** [2] - 784:1,
847:5
**MARTINEZ** [81] - 742:1,
791:9, 791:22, 792:5,
805:24, 806:3, 806:17,
806:19, 807:7, 807:9,
813:6, 813:9, 813:18,
813:21, 815:24, 816:1,
817:6, 817:8, 818:7,
825:19, 838:25, 841:15,
841:20, 841:23, 849:12,
854:3, 854:6, 854:8,
856:1, 856:4, 856:7,
856:9, 856:14, 856:18,
857:6, 857:14, 857:16,
858:12, 858:16, 858:21,
860:17, 862:10, 862:14,
865:15, 865:19, 868:11,
874:23, 875:1, 875:5,
875:9, 880:15, 880:25,
888:11, 891:1, 891:6,
894:14, 894:18, 895:6,

895:8, 897:12, 897:16,
897:20, 898:2, 898:3,
898:17, 898:19, 898:25,
899:5, 899:8, 899:11,
899:13, 900:21, 900:23,
901:9, 901:12, 902:2,
902:4, 902:9, 902:13,
902:15, 903:1
**MaryAnn_Casale@flsd.**
**uscourts.gov** [1] - 904:19
**massive** [1] - 886:11
**match** [4] - 642:14,
872:25, 882:6
**matches** [1] - 796:6
**math** [4] - 700:6, 758:17,
758:23, 783:13
**matrix** [11] - 815:8,
815:9, 815:13, 816:25,
836:19, 837:2, 837:5,
837:22, 840:1, 840:2,
846:4
**matrixes** [1] - 836:17
**matter** [6] - 722:4,
730:10, 759:13, 788:10,
809:19, 904:12
**matters** [2] - 668:8,
903:8
**maximum** [1] - 817:5
**MAZZOLA** [338] - 626:10,
627:5, 628:19, 628:21,
628:23, 629:1, 630:23,
630:24, 633:8, 633:9,
634:14, 634:22, 634:24,
635:1, 635:4, 637:7,
637:9, 637:15, 640:7,
646:16, 646:19, 646:22,
646:23, 648:3, 648:5,
651:2, 651:6, 652:24,
656:1, 656:17, 657:18,
657:20, 657:24, 658:7,
658:13, 658:20, 658:22,
658:24, 660:15, 660:17,
663:11, 665:1, 667:23,
668:22, 669:14, 669:18,
669:20, 669:24, 670:2,
670:11, 670:13, 671:21,
671:23, 672:1, 672:3,
674:22, 675:1, 675:6,
681:15, 681:19, 681:20,
684:11, 685:5, 685:10,
685:14, 685:19, 686:19,
686:21, 687:16, 687:17,
688:22, 689:3, 690:7,
692:10, 692:15, 692:18,
693:13, 693:20, 694:14,
694:22, 694:24, 695:10,
695:16, 697:23, 698:2,
698:5, 698:8, 698:10,
698:17, 698:21, 698:23,
699:5, 699:7, 701:4,

701:8, 701:11, 701:17,
701:20, 701:24, 702:3,
702:6, 702:7, 703:17,
703:21, 703:23, 704:6,
704:8, 708:2, 710:10,
710:15, 710:17, 710:20,
710:23, 713:9, 713:11,
715:5, 715:7, 715:17,
715:20, 716:10, 716:12,
717:25, 718:4, 718:7,
718:10, 718:12, 718:17,
718:21, 718:23, 719:1,
719:3, 722:3, 725:7,
725:10, 726:7, 726:11,
726:18, 726:20, 726:23,
727:3, 727:5, 727:7,
727:11, 728:16, 728:20,
728:21, 732:5, 732:9,
733:18, 733:19, 733:22,
733:24, 736:19, 736:22,
737:6, 737:11, 737:14,
738:8, 738:17, 738:21,
738:25, 739:3, 739:10,
739:13, 739:15, 740:24,
741:1, 741:6, 741:9,
741:16, 743:22, 743:24,
744:3, 744:7, 744:12,
744:18, 744:21, 747:17,
747:22, 748:1, 750:2,
750:8, 750:13, 750:17,
750:22, 751:7, 752:1,
752:3, 752:20, 752:22,
752:24, 753:1, 753:3,
753:6, 753:10, 754:9,
754:14, 754:15, 756:17,
756:20, 757:20, 757:21,
759:4, 759:11, 759:14,
759:16, 759:18, 761:2,
761:3, 765:8, 765:9,
765:19, 765:23, 766:2,
766:7, 766:24, 767:1,
767:3, 767:7, 767:19,
768:2, 768:20, 768:21,
769:20, 769:23, 769:25,
770:3, 770:15, 771:23,
772:1, 777:10, 777:13,
777:15, 777:17, 777:18,
779:13, 813:4, 818:11,
825:21, 825:23, 832:14,
838:8, 838:12, 838:16,
839:4, 839:8, 841:14,
841:21, 842:2, 842:3,
843:14, 843:16, 846:23,
847:1, 849:13, 849:14,
854:2, 854:5, 854:7,
854:9, 854:12, 854:16,
855:23, 856:3, 856:6,
856:8, 856:11, 856:15,
856:17, 856:19, 856:22,
857:1, 857:2, 857:15,
857:23, 857:25, 858:8,

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

859:2, 859:7, 859:17, 859:19, 860:16, 860:18, 860:21, 860:23, 862:6, 862:7, 862:16, 862:18, 862:22, 862:24, 863:19, 864:1, 865:10, 865:13, 865:17, 865:21, 865:22, 867:2, 867:4, 868:1, 868:3, 868:9, 868:13, 868:17, 869:1, 869:5, 869:8, 874:5, 874:6, 874:20, 874:25, 875:2, 875:8, 875:11, 875:14, 876:3, 876:7, 877:13, 877:14, 879:1, 879:3, 880:19, 881:1, 881:2, 887:21, 887:22, 888:10, 888:13, 892:10, 892:12, 894:7, 894:12, 897:15, 897:18, 897:23, 899:6, 899:9

**Mazzola** [16] - 628:17, 637:13, 668:19, 750:6, 759:9, 780:8, 781:21, 783:7, 783:21, 784:18, 784:24, 786:8, 787:14, 895:10, 901:25, 902:5

**MC** [2] - 630:13, 631:12

**mean** [51] - 629:11, 634:17, 643:16, 646:11, 647:7, 647:9, 647:15, 647:21, 648:15, 648:21, 651:17, 693:19, 700:17, 700:18, 703:5, 714:20, 714:21, 716:7, 722:25, 723:24, 725:13, 729:11, 731:4, 731:16, 731:22, 735:23, 738:3, 751:23, 758:13, 776:9, 798:20, 810:6, 810:10, 819:18, 820:7, 831:8, 833:24, 838:20, 848:4, 852:16, 853:7, 859:24, 876:24, 880:13, 880:23, 882:20, 885:24, 890:6, 890:16, 891:11, 891:20

**meaning** [3] - 801:4, 804:12, 834:24

**means** [16] - 674:12, 675:19, 679:21, 716:14, 727:22, 728:22, 728:24, 729:2, 754:13, 824:23, 827:19, 834:14, 845:25, 872:20, 884:9, 891:12

**meant** [12] - 647:11, 647:17, 647:23, 648:1, 648:2, 691:10, 703:18, 763:4, 799:4, 891:10, 892:6, 894:3

**mediation** [6] - 789:16,

789:18, 789:20, 789:22, 790:2

**meet** [6] - 705:1, 732:23, 787:23, 787:24, 788:2, 788:9

**meeting** [12] - 646:2, 646:3, 646:5, 648:17, 756:21, 757:9, 788:15, 788:21, 788:22, 789:2, 789:5, 838:22

**meetings** [14] - 781:19, 788:16, 789:14, 837:25, 838:2, 838:11, 838:15, 838:23, 839:2, 839:10, 839:13, 839:15, 839:21, 839:24

**Melonnie** [4] - 698:13, 698:25, 848:1, 848:4

**member** [3] - 795:2, 796:23, 796:25

**members** [3] - 668:6, 764:18, 797:14

**memo** [10] - 684:21, 684:22, 686:8, 686:9, 688:13, 693:22, 695:7, 695:11, 696:20, 696:21

**memory** [4] - 632:5, 672:19, 735:22, 899:15

**memos** [17] - 681:25, 682:3, 682:6, 682:8, 683:8, 683:10, 684:13, 684:15, 688:16, 694:5, 694:6, 694:8, 694:18, 696:5, 806:24, 840:6

**mention** [1] - 805:21

**mentioned** [9] - 629:5, 716:3, 795:20, 796:21, 797:2, 810:3, 812:23, 813:22, 817:9

**met** [1] - 659:11

**meters** [4] - 704:11, 704:15, 708:15, 708:16, 732:25, 846:15

**method** [1] - 787:25

**methodology** [1] - 729:18

**Mexican** [3] - 629:8, 629:15, 631:6

**Mexico** [11] - 630:3, 630:7, 660:11, 690:9, 690:12, 794:8, 819:11, 842:14, 842:16, 842:20

**Miami** [2] - 904:18, 904:19

**Michigan** [1] - 697:16

**microphone** [2] - 791:14, 791:15

**microphones** [1] - 779:19

**middle** [5] - 689:7, 697:6,

697:12, 739:14

**might** [12] - 644:20, 652:14, 741:1, 764:12, 771:20, 819:25, 827:1, 847:7, 857:19, 896:21, 897:1, 897:18

**million** [63] - 675:25, 676:1, 676:3, 676:4, 676:17, 676:18, 676:20, 676:21, 676:24, 677:1, 677:2, 677:10, 677:19, 677:21, 678:3, 678:9, 678:10, 678:15, 678:17, 680:3, 680:4, 680:6, 682:13, 700:1, 700:3, 700:6, 700:7, 700:13, 700:20, 700:21, 700:24, 702:18, 702:19, 703:1, 712:15, 712:19, 712:21, 757:5, 757:7, 757:15, 758:7, 758:9, 758:10, 758:12, 758:15, 758:23, 758:24, 759:2, 759:22, 760:10, 760:15, 760:16, 760:18, 762:17, 763:3, 771:5, 781:22, 781:23, 782:12, 881:5, 882:13

**million's** [1] - 699:20

**millions** [1] - 678:19

**mind** [1] - 780:19

**mindful** [1] - 783:24

**mine** [1] - 814:19

**MinebeaMitsumi** [2] - 753:15, 753:16

**minimal** [1] - 777:2

**minimize** [2] - 724:13, 814:2

**minutes** [18] - 640:25, 646:2, 646:3, 646:5, 681:14, 741:2, 741:12, 742:11, 743:4, 743:6, 756:19, 756:21, 777:11, 791:4, 838:22, 838:23, 839:2, 863:21

**Miramar** [1] - 792:15

**misleading** [6] - 637:18, 637:19, 637:20, 638:23, 639:21, 639:23

**misled** [1] - 640:19

**misread** [1] - 839:5

**misrepresented** [2] - 637:25, 638:1

**miss** [2] - 852:15, 852:16

**missed** [5] - 664:11, 672:25, 856:24, 879:18, 881:6

**misses** [1] - 880:9

**missing** [1] - 879:15

**misstates** [1] - 634:8, 663:8, 667:20

**mistake** [23] - 639:25, 640:21, 642:8, 642:20, 644:3, 651:22, 780:8, 781:15, 852:5, 856:25, 860:2, 860:4, 860:5, 860:7, 860:10, 861:17, 861:19, 872:8, 872:11, 872:14, 873:23, 879:18, 879:22

**mistakes** [10] - 643:4, 774:4, 774:20, 774:21, 851:21, 851:23, 851:25, 896:22, 896:25

**MLS** [2] - 739:24, 740:2

**mode** [1] - 802:5

**modest** [2] - 635:25, 636:1

**modifications** [2] - 884:16, 896:24

**molded** [1] - 633:20

**molding** [1] - 633:22

**moment** [4] - 689:2, 736:24, 790:20, 854:6

**moments** [1] - 823:5

**Monday** [2] - 626:5, 643:14

**money** [17] - 674:10, 674:13, 674:14, 674:15, 699:22, 699:23, 712:13, 778:3, 778:8, 782:21, 796:4, 796:9, 796:10, 852:20, 872:15, 886:14, 887:17

**moneys** [2] - 687:5, 878:12

**monitors** [1] - 744:16

**month** [45] - 675:23, 675:25, 676:7, 676:10, 676:13, 676:14, 676:15, 676:16, 677:4, 678:3, 678:6, 678:9, 679:22, 679:23, 679:25, 683:18, 683:19, 700:1, 700:3, 700:6, 702:18, 702:19, 703:1, 714:2, 735:16, 735:19, 806:23, 807:5, 811:9, 844:18, 844:21, 844:22, 844:24, 868:23, 870:18, 871:1, 871:7, 872:18, 872:22, 873:3, 874:13, 888:18, 889:13, 896:14

**month's** [1] - 894:5, 894:6

**monthly** [8] - 675:14, 767:16, 812:13, 812:17, 817:11, 844:23, 895:4, 895:5

**months** [17] - 629:16, 630:2, 631:5, 634:11,

653:23, 708:13, 712:13, 734:12, 734:15, 758:13, 772:23, 810:18, 845:3, 849:7, 868:24, 870:1

**Mora** [3] - 692:22, 692:25, 695:11

**morning** [5] - 626:11, 626:12, 626:19, 681:14, 760:23

**most** [1] - 649:8

**mostly** [1] - 820:14

**mother's** [1] - 726:1

**motorcycles** [1] - 709:17

**Motors** [4] - 687:25, 688:1, 688:2, 688:8

**mouse** [2] - 771:20, 772:3

**move** [12] - 630:6, 692:12, 750:4, 756:16, 772:3, 790:10, 792:18, 798:14, 798:22, 849:9, 873:3, 898:25

**moved** [14] - 705:16, 792:19, 792:20, 793:10, 793:11, 847:14, 848:16, 849:1, 870:19, 870:20, 870:25, 872:3, 872:4, 873:22

**moves** [2] - 698:19, 706:17

**moving** [3] - 712:14, 717:25, 849:6

**MR** [471] - 626:10, 627:2, 627:5, 628:16, 628:19, 628:21, 628:23, 628:24, 629:1, 630:23, 630:24, 633:8, 633:9, 634:8, 634:14, 634:22, 634:24, 635:1, 635:4, 637:7, 637:9, 637:12, 637:15, 640:7, 646:14, 646:16, 646:19, 646:22, 646:23, 648:3, 648:5, 650:25, 651:2, 651:4, 651:6, 652:23, 652:24, 655:22, 656:1, 656:17, 657:18, 657:20, 657:23, 657:24, 658:1, 658:7, 658:13, 658:20, 658:22, 658:24, 660:15, 660:17, 663:7, 663:10, 663:11, 664:23, 665:1, 667:20, 667:23, 668:5, 668:22, 669:14, 669:17, 669:18, 669:20, 669:24, 669:25, 670:2, 670:11, 670:13, 671:21, 671:23, 672:1, 672:3, 674:22, 675:1, 675:6, 681:15, 681:19, 681:20, 683:14, 684:11, 684:25,

685:4, 685:5, 685:10,
685:14, 685:19, 685:21,
685:23, 686:19, 686:21,
687:16, 687:17, 688:22,
689:3, 690:7, 692:10,
692:14, 692:15, 692:18,
693:6, 693:9, 693:13,
693:18, 693:20, 694:11,
694:14, 694:15, 694:18,
694:22, 694:24, 695:6,
695:10, 695:12, 695:16,
697:23, 698:2, 698:5,
698:8, 698:10, 698:17,
698:19, 698:21, 698:23,
699:5, 699:7, 701:4,
701:7, 701:8, 701:9,
701:11, 701:12, 701:16,
701:17, 701:20, 701:24,
702:1, 702:3, 702:6,
702:7, 703:14, 703:17,
703:21, 703:23, 704:6,
704:8, 708:2, 710:7,
710:10, 710:13, 710:15,
710:17, 710:20, 710:23,
713:9, 713:11, 715:5,
715:7, 715:17, 715:20,
716:10, 716:12, 717:25,
718:2, 718:4, 718:6,
718:7, 718:10, 718:12,
718:17, 718:21, 718:23,
719:1, 719:3, 721:18,
722:3, 725:6, 725:7,
725:10, 726:4, 726:7,
726:11, 726:16, 726:18,
726:19, 726:20, 726:21,
726:23, 726:25, 727:1,
727:3, 727:4, 727:5,
727:6, 727:7, 727:11,
728:4, 728:11, 728:16,
728:20, 728:21, 732:5,
732:9, 733:18, 733:19,
733:22, 733:24, 736:16,
736:19, 736:21, 736:22,
737:6, 737:9, 737:11,
737:13, 737:14, 737:23,
738:1, 738:3, 738:8,
738:10, 738:14, 738:17,
738:20, 738:21, 738:23,
738:25, 739:2, 739:3,
739:4, 739:10, 739:13,
739:15, 740:24, 741:1,
741:6, 741:9, 741:16,
741:23, 742:2, 742:6,
742:10, 742:12, 742:16,
742:19, 742:22, 743:1,
743:3, 743:7, 743:11,
743:14, 743:17, 743:22,
743:24, 744:3, 744:5,
744:7, 744:9, 744:12,
744:15, 744:18, 744:21,
747:14, 747:17, 747:22,

748:1, 750:2, 750:6,
750:8, 750:10, 750:13,
750:15, 750:17, 750:21,
750:22, 750:25, 751:3,
751:7, 751:22, 752:1,
752:2, 752:3, 752:20,
752:22, 752:24, 753:1,
753:2, 753:3, 753:6,
753:10, 754:6, 754:9,
754:14, 754:15, 756:17,
756:20, 757:20, 757:21,
759:4, 759:9, 759:11,
759:12, 759:14, 759:16,
759:18, 761:2, 761:3,
765:8, 765:9, 765:19,
765:20, 765:22, 765:23,
765:25, 766:2, 766:4,
766:7, 766:12, 766:16,
766:21, 766:24, 766:25,
767:1, 767:2, 767:3,
767:7, 767:19, 767:24,
768:2, 768:20, 768:21,
769:20, 769:21, 769:23,
769:25, 770:2, 770:3,
770:15, 771:20, 771:23,
772:1, 777:10, 777:13,
777:15, 777:17, 777:18,
779:13, 779:15, 779:18,
779:21, 780:2, 780:18,
780:21, 782:19, 784:19,
784:23, 785:13, 785:15,
790:20, 813:4, 818:11,
825:21, 825:23, 832:14,
838:8, 838:12, 838:16,
839:4, 839:8, 841:13,
841:14, 841:19, 841:21,
842:2, 842:3, 843:14,
843:16, 846:23, 847:1,
849:13, 849:14, 854:2,
854:5, 854:7, 854:9,
854:12, 854:16, 855:23,
856:3, 856:6, 856:8,
856:11, 856:15, 856:16,
856:17, 856:19, 856:20,
856:22, 857:1, 857:2,
857:15, 857:21, 857:23,
857:25, 858:8, 858:24,
859:2, 859:7, 859:17,
859:19, 860:16, 860:18,
860:21, 860:23, 862:6,
862:7, 862:16, 862:18,
862:22, 862:24, 863:19,
864:1, 865:10, 865:13,
865:17, 865:21, 865:22,
867:2, 867:4, 868:1,
868:3, 868:9, 868:13,
868:17, 869:1, 869:4,
869:5, 869:8, 874:5,
874:6, 874:20, 874:25,
875:2, 875:8, 875:11,
875:14, 876:3, 876:7,

877:13, 877:14, 879:1,
879:3, 880:19, 881:1,
881:2, 887:21, 887:22,
888:10, 888:13, 892:10,
892:12, 894:7, 894:12,
897:15, 897:18, 897:23,
899:6, 899:9, 902:11
    **MS** [81] - 742:1, 791:9,
791:22, 792:5, 805:24,
806:3, 806:17, 806:19,
807:7, 807:9, 813:6,
813:9, 813:18, 813:21,
815:24, 816:1, 817:6,
817:8, 818:7, 825:19,
838:25, 841:15, 841:20,
841:23, 849:12, 854:3,
854:6, 854:8, 856:1,
856:4, 856:7, 856:9,
856:14, 856:18, 857:6,
857:14, 857:16, 858:12,
858:16, 858:21, 860:17,
862:10, 862:14, 865:15,
865:19, 868:11, 874:23,
875:1, 875:5, 875:9,
880:15, 880:25, 888:11,
891:1, 891:6, 894:14,
894:18, 895:6, 895:8,
897:12, 897:16, 897:20,
898:2, 898:3, 898:17,
898:19, 898:25, 899:5,
899:8, 899:11, 899:13,
900:21, 900:23, 901:9,
901:12, 902:2, 902:4,
902:9, 902:13, 902:15,
903:1
    **multi** [1] - 738:4
    **multi-page** [1] - 738:4
    **must** [4] - 668:20, 692:4,
754:2, 764:24

**N**

    **name** [5] - 791:16,
791:17, 791:18, 812:19
    **named** [4] - 632:8, 659:9,
659:17, 692:21
    **names** [2] - 749:14,
820:4
    **narrower** [2] - 716:11,
727:9
    **native** [7] - 645:5,
647:16, 647:18, 647:22,
647:24, 759:10, 759:13
    **naturally** [1] - 690:18
    **nature** [2] - 800:21,
860:1
    **necessarily** [1] - 627:18,
635:15, 700:23
    **necessary** [1] - 790:13
    **need** [22] - 629:25,
635:18, 636:15, 639:8,

639:14, 639:18, 643:18,
654:10, 674:10, 698:17,
733:16, 734:18, 739:2,
742:23, 794:22, 811:1,
822:12, 827:25, 857:19,
858:6, 865:16, 893:21
    **needed** [4] - 674:14,
839:24, 848:4, 898:10
    **needs** [8] - 638:9, 692:3,
794:15, 799:14, 799:15,
828:3, 832:9, 893:22
    **negotiated** [1] - 708:14
    **negotiation** [2] - 787:2,
787:9
    **negotiations** [1] - 787:5
    **neighborhood** [1] -
700:2
    **nervous** [2] - 792:9,
792:10
    **Netherlands** [1] - 660:13
    **NetSuite** [12] - 808:12,
808:20, 808:23, 810:11,
811:10, 829:6, 829:23,
830:17, 831:16, 832:23,
833:6
    **never** [17] - 711:12,
714:15, 721:23, 721:24,
724:3, 737:23, 756:7,
776:22, 776:24, 785:18,
845:7, 851:23, 884:12,
884:14, 884:16, 884:19,
886:15
    **New** [2] - 837:14, 837:16
    **new** [15] - 627:19,
657:20, 708:8, 709:13,
709:20, 709:22, 710:1,
726:23, 732:22, 800:14,
801:6, 853:15, 853:16,
891:11
    **next** [18] - 660:16, 678:3,
706:16, 712:15, 712:23,
742:16, 751:23, 787:8,
787:24, 791:3, 791:7,
811:2, 817:4, 826:22,
849:3, 849:4, 873:3,
889:13
    **nice** [3] - 755:16, 755:18,
818:15
    **Nicole** [2] - 847:15,
847:19
    **night** [13] - 626:15,
641:1, 641:4, 641:22,
642:1, 642:10, 642:25,
693:14, 718:5, 760:22,
783:22, 784:7
    **nine** [3] - 629:16, 810:18,
811:9
    **nine-month** [1] - 811:9
    **nobody** [5] - 778:15,
817:15, 842:25, 843:2,

843:7
    **none** [1] - 643:6
    **nonetheless** [1] - 835:21
    **normal** [3] - 798:9,
883:6, 889:18
    **normally** [1] - 745:4
    **North** [7] - 689:14,
689:17, 690:18, 691:4,
695:3, 724:2, 904:18
    **not-American** [1] -
690:20
    **not..** [1] - 775:5
    **note** [6] - 678:23, 679:1,
679:3, 686:12, 696:9,
697:10
    **notes** [7] - 673:25, 684:2,
684:3, 695:23, 696:6,
779:24, 839:5
    **nothing** [16] - 723:1,
733:2, 773:1, 775:22,
776:14, 776:15, 777:7,
799:24, 834:3, 855:8,
863:5, 863:15, 883:18,
884:2
    **notice** [19] - 711:8,
711:12, 711:14, 711:22,
711:24, 712:3, 735:11,
735:25, 748:18, 748:20,
749:25, 785:1, 785:2,
785:19, 785:22, 787:10,
787:17, 801:14
    **noticed** [1] - 768:3
    **notices** [5] - 711:15,
711:16, 713:3, 785:6,
786:8
    **notification** [1] - 661:18
    **November** [9] - 707:21,
708:4, 708:5, 729:3,
772:24, 874:16, 876:5,
896:7, 898:6
    **number** [78] - 640:2,
640:12, 642:7, 642:8,
642:22, 642:23, 657:19,
669:22, 672:17, 674:25,
679:16, 683:10, 692:6,
705:7, 709:22, 718:3,
722:12, 722:15, 726:24,
727:18, 727:22, 729:22,
729:23, 730:22, 730:24,
731:7, 736:24, 737:8,
737:9, 737:24, 738:6,
750:14, 750:16, 750:18,
759:25, 762:13, 762:16,
762:17, 762:18, 763:13,
768:9, 768:25, 769:12,
769:15, 770:12, 774:8,
775:1, 775:2, 777:6,
778:24, 781:4, 781:7,
782:8, 783:13, 804:11,
804:15, 805:8, 815:16,

816:13, 816:22, 834:11, 834:13, 834:20, 834:21, 834:24, 835:2, 836:9, 841:13, 841:14, 847:8, 856:16, 857:21, 858:7, 858:23, 874:23, 899:6, 900:14

**numbered** [3] - 726:22, 767:22, 767:23

**numbers** [37] - 639:9, 639:13, 639:17, 639:20, 641:5, 641:10, 642:13, 682:8, 722:8, 722:10, 722:13, 729:14, 729:20, 731:24, 732:1, 732:3, 732:4, 760:10, 760:14, 768:15, 768:19, 773:3, 773:4, 775:9, 780:14, 855:13, 857:17, 869:25, 878:11, 879:23, 882:5, 885:17, 887:24, 890:20, 895:16, 900:5, 901:3

**O**

**O-C-H-O-A** [1] - 791:18
**oath** [1] - 626:4
**object** [7] - 637:12, 658:4, 668:4, 683:14, 703:14, 726:4, 750:10
**objection** [38] - 627:2, 634:8, 650:25, 651:4, 663:7, 664:23, 667:20, 668:4, 684:25, 685:24, 694:11, 695:6, 710:7, 710:13, 717:25, 718:6, 728:3, 728:4, 728:12, 737:22, 739:5, 739:7, 747:14, 754:6, 825:19, 838:25, 854:5, 854:8, 857:6, 858:14, 862:10, 862:21, 865:20, 875:4, 875:9, 875:11, 880:15, 891:1
**obligations** [1] - 705:1
**obstacles** [1] - 802:8
**obtained** [1] - 792:22
**obviously** [3] - 639:11, 724:17, 738:14
**occasions** [2] - 649:2, 735:14
**occurring** [1] - 801:15
**OCHOA** [1] - 792:1
**Ochoa** [35] - 664:20, 791:9, 791:17, 792:6, 792:14, 793:1, 802:22, 806:4, 813:22, 818:12, 821:15, 841:4, 841:7, 843:15, 845:20, 855:15, 856:23, 857:7, 858:3, 858:18, 859:8, 859:20,

860:13, 860:21, 861:23, 862:19, 863:4, 867:2, 876:6, 878:21, 894:8, 898:4, 900:24, 902:5, 902:17
**Ochoa's** [1] - 664:13
**October** [16] - 707:20, 735:2, 757:16, 758:20, 772:22, 775:6, 837:18, 866:3, 866:5, 866:19, 869:7, 892:18, 893:1, 893:5, 893:6
**offered** [1] - 808:25
**office** [13] - 655:11, 660:4, 660:5, 794:12, 800:20, 802:5, 824:13, 826:7, 826:11, 827:10, 827:21, 840:8
**Official** [1] - 904:17
**often** [2] - 774:1, 817:10
**old** [1] - 891:11
**older** [4] - 890:13, 890:16, 890:23, 892:3, 893:18, 893:25
**oldest** [2] - 778:9, 893:18
**onboarding** [4] - 800:14, 800:17, 801:7, 801:15
**once** [20] - 706:22, 707:24, 729:2, 745:7, 776:13, 777:7, 778:5, 783:2, 789:13, 799:21, 804:2, 804:5, 804:16, 805:4, 805:16, 805:17, 811:4, 869:19, 869:20, 894:24
**one** [201] - 630:9, 630:11, 630:12, 631:9, 635:2, 636:14, 636:20, 642:2, 644:3, 651:20, 651:24, 652:14, 657:20, 669:8, 670:10, 670:16, 673:24, 674:13, 683:18, 692:3, 692:10, 692:15, 696:11, 697:5, 697:6, 697:8, 697:11, 697:13, 697:20, 698:13, 699:11, 699:18, 701:4, 701:10, 701:21, 701:22, 703:9, 703:24, 707:13, 711:18, 711:20, 712:10, 715:23, 716:20, 716:25, 717:18, 717:20, 718:5, 719:16, 720:15, 724:8, 724:9, 724:10, 724:12, 724:13, 726:9, 727:1, 728:5, 731:15, 735:15, 735:19, 738:23, 742:3, 742:4, 742:23, 743:3, 743:4, 743:9, 749:13, 750:2, 756:12, 757:18, 757:22, 759:12,

761:20, 762:13, 763:22, 764:9, 765:8, 765:24, 766:3, 766:6, 766:16, 766:19, 766:20, 766:21, 767:3, 767:8, 767:21, 769:3, 769:17, 773:18, 773:25, 774:7, 778:14, 779:3, 779:9, 779:10, 779:19, 790:20, 797:4, 801:3, 802:18, 803:3, 809:19, 810:3, 811:20, 811:21, 812:4, 814:25, 817:1, 817:3, 817:4, 819:15, 819:22, 822:23, 822:24, 823:3, 823:6, 824:15, 830:5, 835:10, 835:14, 837:6, 837:8, 841:4, 841:16, 841:17, 841:21, 841:24, 842:1, 842:10, 845:11, 846:1, 846:6, 846:7, 846:8, 846:10, 846:12, 846:18, 846:20, 846:23, 848:3, 850:14, 850:24, 853:9, 854:6, 855:17, 855:24, 856:17, 856:20, 856:21, 857:12, 857:19, 858:1, 859:22, 863:7, 863:16, 864:15, 867:6, 867:10, 868:12, 868:14, 868:18, 873:3, 874:13, 874:18, 875:23, 876:15, 876:17, 876:18, 876:20, 876:21, 876:23, 876:24, 876:25, 877:4, 877:10, 878:21, 883:8, 885:18, 888:11, 888:25, 892:21, 895:9, 896:3, 896:6, 900:3, 901:24, 902:8, 902:11
**One** [1] - 700:20
**one's** [1] - 649:18
**ones** [17] - 682:19, 747:8, 747:19, 762:20, 763:18, 796:7, 817:14, 820:17, 857:12, 877:5, 877:23, 888:6, 888:22, 891:11, 891:12, 897:3
**onwards** [1] - 671:19
**open** [4] - 641:19, 642:2, 897:12, 898:17
**opened** [1] - 642:12, 777:5
**opening** [3] - 652:1, 652:6, 658:18
**operate** [2] - 822:13, 822:23, 827:24
**operated** [2] - 830:2, 830:3
**operates** [1] - 704:24
**operation** [7] - 631:13,

824:11, 824:12, 830:9, 835:8, 839:18, 842:11
**operations** [17] - 631:6, 631:9, 657:10, 674:14, 793:14, 793:17, 793:19, 793:20, 800:10, 818:23, 818:24, 818:25, 819:8, 823:25, 824:8, 886:19
**opinion** [9] - 774:13, 774:14, 774:19, 797:17, 824:23, 825:2, 828:7, 828:9
**opponent** [1] - 658:8
**opportunity** [2] - 626:14, 639:24
**opposite** [1] - 800:12
**orchestrate** [1] - 795:6
**Order** [1] - 626:1
**order** [74] - 656:5, 656:7, 656:24, 656:25, 657:4, 659:15, 660:18, 661:22, 666:20, 671:19, 675:15, 675:19, 676:21, 677:1, 677:18, 678:9, 679:19, 679:20, 679:25, 680:12, 680:15, 684:7, 690:22, 695:1, 695:7, 695:13, 697:15, 697:17, 708:7, 708:8, 708:17, 710:11, 718:25, 720:19, 720:25, 722:11, 722:12, 723:6, 723:15, 723:16, 723:17, 724:5, 724:9, 724:19, 724:25, 725:3, 725:11, 725:12, 725:14, 726:8, 727:14, 728:17, 728:24, 730:5, 730:19, 730:25, 731:14, 732:24, 746:8, 767:8, 768:9, 770:6, 803:19, 803:21, 804:2, 823:12, 834:4, 834:9, 834:11, 835:21, 843:18, 880:8, 881:10
**ordered** [8] - 627:15, 675:24, 700:20, 704:18, 709:23, 724:17, 733:11, 748:10
**ordering** [5] - 699:25, 705:13, 745:23, 774:22, 803:14
**orders** [94] - 627:19, 640:10, 655:5, 655:10, 655:14, 657:2, 658:15, 658:18, 661:25, 662:3, 662:10, 662:15, 662:17, 662:18, 662:22, 662:24, 663:1, 665:9, 665:12, 665:15, 665:19, 666:15, 667:1, 667:3, 667:7, 671:7, 671:8, 671:13,

671:16, 676:6, 676:14, 677:6, 678:6, 680:16, 680:19, 683:18, 683:19, 684:4, 684:6, 686:6, 700:15, 700:16, 700:17, 700:25, 706:8, 707:19, 708:23, 708:25, 709:3, 710:4, 717:15, 719:5, 719:13, 719:14, 722:24, 723:2, 724:20, 725:16, 734:16, 735:3, 745:23, 746:22, 747:1, 751:19, 751:21, 754:4, 755:8, 755:10, 755:21, 755:24, 758:14, 772:16, 774:25, 775:7, 775:13, 779:5, 779:6, 779:9, 803:16, 820:18, 823:11, 823:13, 823:18, 823:22, 823:24, 825:14, 830:22, 831:13, 831:24, 833:25, 836:8, 883:21
**ordinary** [2] - 776:14, 777:7
**org** [1] - 728:7
**organization** [6] - 638:6, 638:9, 638:17, 639:2, 703:4, 808:22
**organizations** [1] - 630:14
**organize** [1] - 872:25
**original** [1] - 855:8
**originally** [1] - 872:9
**originates** [1] - 690:22
**otherwise** [3] - 755:2, 763:17, 904:11
**outcome** [2] - 811:4, 904:12
**outside** [3] - 695:3, 802:17, 807:10
**overall** [3] - 682:8, 829:3, 867:16
**overhead** [1] - 797:4
**overnight** [1] - 733:3
**overpay** [2] - 887:8, 887:10
**overpayments** [1] - 887:24
**overruled** [4] - 634:9, 651:5, 655:24, 683:16, 685:3, 747:15, 754:8, 891:4
**oversaw** [1] - 864:13
**oversee** [7] - 793:21, 793:22, 795:3, 795:21, 825:3, 825:8, 826:19
**oversees** [3] - 825:5, 825:10, 827:23
**oversight** [2] - 801:11, 813:24

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

**overview** [1] - 795:8
**owe** [1] - 806:13
**owed** [5] - 760:20, 778:3, 855:1, 876:16, 878:12
**owing** [1] - 684:8
**own** [13] - 719:18, 719:19, 762:13, 762:14, 795:5, 809:13, 811:6, 811:20, 811:21, 811:22, 824:11, 824:12, 856:21
**owned** [4] - 630:10, 630:11, 630:13, 778:18

**P**

**p.m** [12] - 741:5, 743:20, 743:21, 791:5, 791:6, 828:1, 863:23, 863:24, 903:15
**P255** [3] - 718:10, 718:18, 718:20
**P259** [3] - 750:4, 750:12, 750:13
**P283** [1] - 726:25
**P305** [1] - 657:21
**P306** [1] - 685:14
**packaging** [4] - 722:22, 722:25, 729:1, 729:25
**pad** [1] - 779:23
**page** [17] - 628:16, 628:18, 628:22, 628:23, 660:16, 696:8, 696:23, 738:4, 751:24, 784:21, 785:14, 786:2, 786:3, 826:16, 872:6, 876:6, 901:2
**Page** [28] - 628:20, 630:23, 632:8, 632:19, 633:8, 637:7, 637:10, 638:15, 645:21, 645:22, 647:2, 648:12, 648:13, 710:21, 784:21, 784:22, 785:14, 786:6, 821:19, 825:25, 828:11, 828:13, 830:20, 831:11, 831:14, 880:5, 888:9, 891:25
**pages** [1] - 904:3
**paid** [34] - 666:16, 667:12, 667:15, 667:18, 667:25, 687:5, 769:17, 805:12, 852:20, 852:21, 888:5, 888:6, 888:15, 888:19, 888:20, 888:22, 889:2, 889:4, 889:7, 889:8, 889:14, 889:21, 889:22, 890:3, 890:4, 890:14, 890:17, 890:23, 891:24, 892:4, 892:7, 892:8, 893:25
**paper** [1] - 695:15

**paragraph** [2] - 710:22, 755:7
**Paragraph** [1] - 784:25
**paraphrase** [1] - 890:2
**pardon** [24] - 647:1, 648:12, 652:5, 653:14, 677:9, 687:11, 690:2, 728:20, 753:6, 764:22, 769:14, 769:25, 813:4, 824:2, 826:15, 827:4, 827:8, 839:4, 845:5, 845:20, 862:22, 870:5, 874:8, 877:11
**part** [45] - 633:23, 639:1, 658:2, 672:25, 678:22, 679:5, 688:18, 709:22, 718:18, 720:12, 727:22, 729:9, 729:11, 729:14, 729:20, 729:22, 730:23, 769:12, 769:15, 777:3, 777:6, 794:20, 797:4, 801:7, 801:19, 804:11, 805:8, 811:8, 813:14, 834:13, 834:14, 834:20, 834:21, 834:24, 835:2, 836:4, 836:6, 836:9, 838:11, 838:14, 858:11, 865:7, 893:2, 899:16
**partially** [2] - 888:20, 889:7
**participated** [1] - 895:21
**particular** [6] - 675:23, 722:15, 747:2, 806:22, 872:22, 896:1
**particulars** [1] - 787:11
**parties** [8] - 713:19, 786:18, 789:11, 790:3, 790:5, 790:6, 790:12, 904:9
**partner** [6] - 881:5, 882:13, 882:14, 886:16, 886:21
**partners** [1] - 755:17
**partnership** [1] - 630:11
**partnerships** [3] - 631:10, 631:18, 631:25
**parts** [13] - 627:15, 633:20, 633:21, 638:18, 652:14, 688:21, 724:7, 724:16, 724:18, 730:20, 730:21, 732:25
**party** [9] - 658:7, 661:8, 661:17, 661:18, 687:2, 787:9, 787:10, 813:15, 824:6
**pass** [2] - 637:23, 694:22
**passed** [1] - 675:4
**past** [9] - 717:11, 740:15, 740:17, 740:19, 741:17, 863:22, 889:21, 890:3,

903:6
**paste** [1] - 814:13
**pasted** [1] - 814:4
**Paul** [1] - 848:15
**paused** [1] - 690:8
**pay** [12] - 688:3, 712:22, 778:3, 778:8, 882:23, 886:4, 886:7, 887:20, 889:9, 892:25, 893:4, 894:25
**payable** [9] - 797:4, 797:5, 805:11, 806:9, 806:20, 807:17, 865:6, 891:9, 894:3
**paying** [17] - 776:24, 777:24, 803:16, 886:13, 887:7, 887:9, 887:13, 887:17, 887:24, 889:5, 889:19, 889:20, 890:7, 892:24, 893:6, 894:4, 895:1
**payment** [152] - 698:11, 699:3, 701:17, 706:2, 706:3, 712:14, 714:22, 714:23, 759:6, 803:8, 804:25, 805:1, 805:3, 805:13, 805:17, 805:18, 805:21, 805:23, 806:2, 806:5, 806:23, 807:2, 807:10, 807:12, 807:18, 833:6, 850:15, 852:6, 852:7, 852:17, 852:25, 853:1, 853:2, 853:6, 853:8, 853:24, 854:12, 854:24, 855:3, 855:4, 855:10, 855:11, 856:24, 859:16, 865:4, 866:3, 866:4, 866:7, 866:16, 866:22, 866:25, 867:5, 867:22, 868:10, 868:20, 869:9, 869:16, 869:17, 869:21, 869:23, 870:3, 870:6, 870:9, 870:10, 870:15, 871:2, 871:4, 871:9, 871:14, 871:19, 871:20, 872:1, 872:21, 872:25, 873:5, 873:6, 873:10, 873:11, 873:14, 873:22, 873:23, 873:25, 875:18, 875:20, 875:21, 876:4, 876:8, 876:13, 876:18, 877:25, 878:4, 878:6, 885:6, 885:7, 885:8, 885:10, 885:14, 885:16, 885:20, 886:5, 886:8, 886:9, 886:10, 888:4, 888:24, 889:3, 889:7, 890:6, 890:20, 890:25, 891:9, 891:10, 891:13, 891:14, 891:15,

891:23, 892:7, 892:13, 892:17, 892:22, 892:25, 893:3, 893:9, 893:13, 893:15, 893:17, 893:18, 893:21, 894:5, 894:6, 894:20, 894:23, 894:24, 895:1, 895:2, 895:15, 896:10, 896:16, 896:17, 896:19, 897:1, 897:5, 898:7, 900:6, 901:21, 902:7
**payments** [35] - 671:2, 758:14, 759:1, 796:3, 803:9, 807:3, 833:5, 850:23, 851:24, 852:12, 852:15, 852:16, 854:17, 855:17, 858:20, 859:10, 859:13, 868:19, 870:2, 870:25, 872:23, 877:25, 878:5, 883:23, 885:4, 885:6, 885:12, 885:23, 889:5, 891:14, 893:11, 895:15, 896:10, 902:16
**payroll** [3] - 886:18, 887:15, 887:20
**PCB** [7] - 822:2, 822:21, 825:8, 825:10, 826:12, 826:14, 834:15
**PCBs** [4] - 820:8, 821:4, 822:12, 824:16
**PCP** [1] - 634:6
**penalties** [18] - 661:15, 703:25, 705:8, 707:9, 757:19, 757:23, 758:24, 763:25, 767:12, 772:18, 772:20, 781:3, 782:6, 812:7, 812:10, 838:9, 862:25, 885:1
**penalty** [48] - 640:2, 640:9, 640:10, 674:1, 688:4, 705:10, 708:7, 757:5, 758:8, 758:12, 758:24, 760:15, 760:19, 764:2, 764:5, 764:21, 765:6, 765:10, 765:16, 768:25, 770:19, 771:2, 772:4, 772:16, 772:23, 773:5, 773:15, 773:18, 773:24, 780:10, 783:2, 812:20, 812:24, 813:23, 822:11, 822:25, 833:15, 840:1, 843:22, 844:11, 844:17, 844:21, 845:8, 845:11, 846:16, 850:4, 850:17
**pending** [1] - 802:13
**people** [63] - 630:4, 630:7, 645:4, 647:15, 647:21, 649:6, 649:12, 651:3, 651:8, 651:10,

651:22, 661:19, 664:6, 670:3, 679:6, 694:1, 714:13, 716:7, 716:11, 732:23, 748:5, 784:13, 793:25, 794:16, 796:14, 796:16, 796:17, 797:17, 797:20, 798:10, 798:13, 798:14, 798:15, 798:16, 798:17, 798:25, 799:3, 799:6, 799:9, 801:5, 801:20, 802:3, 802:5, 802:14, 810:22, 811:3, 811:6, 817:14, 819:21, 820:1, 820:8, 823:13, 823:17, 837:25, 848:18, 848:21, 850:15, 859:5, 863:11, 864:4, 865:4, 903:10, 903:11
**people's** [1] - 802:8
**per** [12] - 692:5, 700:1, 700:3, 700:13, 702:18, 702:19, 702:20, 703:1, 704:12, 704:13, 704:15, 747:4
**percent** [35] - 650:22, 673:22, 673:24, 675:16, 675:20, 676:1, 676:4, 676:18, 677:9, 678:1, 678:4, 678:5, 678:12, 680:5, 680:7, 691:7, 691:9, 757:25, 758:1, 758:5, 769:6, 770:23, 779:4, 779:6, 779:7, 779:9, 779:10, 779:11, 817:2, 817:3, 817:5, 873:13
**percentage** [8] - 662:14, 662:16, 662:17, 662:19, 676:6, 676:9, 691:7, 816:22
**perfectly** [1] - 782:20
**perform** [2] - 657:10, 714:18
**performance** [1] - 799:18
**performed** [10] - 665:18, 665:21, 665:22, 709:5, 709:6, 709:8, 710:5, 710:11, 710:12
**perhaps** [6] - 640:22, 646:14, 693:7, 810:24, 891:24, 892:6
**period** [34] - 700:10, 712:22, 717:13, 717:14, 719:9, 720:22, 729:4, 731:17, 732:18, 732:19, 733:14, 734:14, 735:4, 746:3, 757:15, 758:12, 758:19, 764:8, 765:11, 773:19, 777:3, 806:24, 807:4, 811:9, 833:6,

844:8, 844:18, 845:2, 870:16, 871:9, 872:23, 874:19, 896:1, 901:4
  **periodically** [3] - 674:15, 714:3, 714:6
  **periods** [3] - 872:25, 877:19, 877:20
  **permanently** [1] - 654:20
  **person** [34] - 635:14, 635:22, 635:23, 635:25, 636:1, 636:2, 636:3, 636:4, 636:5, 636:23, 648:19, 651:21, 651:24, 659:9, 659:17, 659:18, 671:16, 742:3, 799:16, 800:1, 800:14, 801:1, 801:6, 801:10, 809:4, 809:8, 809:20, 828:7, 828:14, 828:18, 828:20, 835:14
  **personal** [3] - 774:13, 774:19, 802:14
  **personally** [3] - 788:9, 788:15, 788:17
  **personnel** [2] - 651:23, 824:20
  **perspective** [2] - 804:8, 889:18
  **petty** [1] - 859:24
  **ph** [2] - 630:10, 659:20
  **ph.)** [2] - 692:22, 788:23
  **Philippines** [5] - 660:10, 721:23, 721:24, 724:3, 724:4
  **phone** [1] - 802:6
  **pick** [1] - 805:7
  **picked** [4] - 640:12, 695:23, 696:4, 696:5
  **picture** [1] - 678:8
  **pie** [9] - 642:22, 653:2, 653:4, 780:12, 780:19, 781:1, 781:14, 782:21, 783:3
  **piece** [4] - 695:15, 709:14, 709:20, 781:1
  **place** [6] - 638:3, 651:10, 651:11, 668:24, 677:11, 803:19, 809:16, 823:12, 823:13, 823:18, 829:7, 831:16, 849:25, 851:22, 853:13, 853:18, 871:5
  **placed** [6] - 676:14, 678:6, 755:21, 755:24, 804:10, 870:2
  **places** [3] - 664:4, 730:19, 835:20
  **placing** [2] - 627:19, 803:20
  **plain** [2] - 815:4, 816:19

  **plaintiff** [1] - 782:23
  **plaintiff's** [1] - 791:7
  **plan** [1] - 799:18
  **plans** [1] - 800:25
  **plastic** [2] - 633:20, 633:21
  **play** [5] - 708:5, 742:21, 742:23, 803:18, 803:23
  **plus** [1] - 771:22
  **PO** [21] - 667:5, 769:13, 769:16, 771:17, 804:10, 804:12, 804:13, 804:14, 804:16, 809:16, 829:23, 829:24, 830:3, 832:22, 833:3, 836:7, 881:19, 881:25, 882:2, 882:21, 884:6
  **PO's** [2] - 831:7, 881:23
  **point** [21] - 631:8, 640:13, 642:24, 645:17, 646:10, 658:14, 677:8, 677:12, 695:22, 702:16, 707:8, 717:20, 764:4, 779:3, 799:25, 802:1, 803:13, 809:8, 878:1, 891:2, 900:10
  **pointed** [1] - 783:6
  **pointing** [4] - 744:15, 771:21, 785:9, 785:25
  **policies** [2] - 800:18, 883:14
  **policy** [8] - 763:6, 763:7, 883:7, 883:9, 883:10, 883:12, 883:13
  **poor** [1] - 673:25
  **pop** [1] - 635:1
  **portion** [2] - 745:1, 782:1, 782:3
  **POs** [1] - 829:20
  **posed** [1] - 640:3
  **position** [10] - 638:4, 738:11, 748:12, 748:13, 748:14, 749:5, 793:13, 793:16, 818:21, 863:15
  **positive** [1] - 857:22
  **possible** [2] - 651:9, 852:22
  **post** [4] - 707:20, 707:21, 708:4, 708:15
  **post-November** [2] - 707:21, 708:4
  **post-October** [1] - 707:20
  **posted** [1] - 797:10
  **pot** [5] - 760:1, 760:3, 760:5, 760:6, 760:7
  **potential** [2] - 713:17, 722:16, 732:19, 733:25, 734:4
  **potential-customer** [1] -

732:19
  **power** [1] - 799:23
  **PowerPoint** [10] - 652:2, 652:7, 652:8, 652:11, 652:16, 652:17, 655:23, 658:20, 688:23, 689:4
  **preceding** [1] - 676:14
  **precise** [1] - 783:19
  **precluded** [1] - 724:21
  **Preco** [7] - 719:5, 720:20, 721:1, 721:4, 721:10, 723:11, 730:25
  **premium** [4] - 779:4, 779:10, 779:11
  **premiums** [4] - 777:19, 777:22, 778:2, 778:17
  **preparation** [2] - 803:8, 862:14
  **prepare** [4] - 805:13, 844:17, 862:11, 872:21
  **prepared** [10] - 773:6, 845:12, 845:18, 849:16, 849:17, 850:18, 871:25, 872:13, 873:17, 875:23
  **prepares** [1] - 817:19
  **preparing** [1] - 844:20
  **prepayment** [2] - 666:24, 667:2, 667:4, 667:5, 667:6, 667:8, 714:23, 751:20, 755:10
  **prepayments** [1] - 755:11
  **present** [5] - 664:8, 664:10, 664:13, 885:12, 891:13
  **presentation** [8] - 655:23, 805:15, 806:5, 855:10, 876:19, 878:1, 886:5, 894:23
  **presented** [5] - 773:3, 773:4, 809:4, 892:7, 894:6
  **presenting** [1] - 639:3
  **presumably** [3] - 736:12, 826:8, 889:12
  **presume** [4] - 716:20, 752:12, 861:21, 889:14
  **pretty** [13] - 652:5, 652:10, 789:2, 789:5, 797:24, 798:8, 798:9, 802:19, 812:3, 836:14, 840:25, 845:4, 845:6
  **previous** [4] - 677:3, 785:14, 786:2, 786:3
  **previously** [5] - 626:7, 697:24, 841:11, 841:16
  **price** [20] - 645:22, 645:25, 831:24, 832:1, 834:24, 835:2, 836:4, 836:6, 836:9, 836:11, 836:12, 836:15, 836:16,

880:9, 881:18, 881:20, 881:23, 881:25, 882:3, 882:21
  **pricing** [5] - 834:22, 838:3, 840:1, 840:9, 883:25
  **primary** [2] - 645:9, 710:3
  **printed** [5] - 628:2, 629:6, 633:19, 633:25, 803:15
  **Printed** [1] - 802:23
  **privilege** [1] - 627:3
  **privileged** [2] - 784:2, 789:21
  **problem** [9] - 666:1, 666:7, 673:20, 674:5, 674:8, 679:5, 705:11, 882:7
  **problems** [9] - 705:25, 706:2, 706:3, 737:3, 775:18, 775:20, 775:21, 887:2, 887:6
  **procedure** [2] - 786:19, 889:18
  **procedures** [1] - 800:18
  **Proceedings** [1] - 903:15
  **proceedings** [4] - 787:9, 787:19, 788:6, 904:5
  **process** [45] - 655:2, 666:18, 789:12, 790:13, 794:24, 799:13, 799:15, 800:15, 801:15, 801:16, 801:19, 803:13, 803:14, 803:17, 803:20, 804:25, 809:7, 809:15, 809:17, 809:21, 810:2, 810:16, 810:22, 812:12, 812:13, 813:25, 814:1, 833:22, 834:2, 849:6, 852:3, 852:4, 880:6, 882:2, 882:18, 882:19, 884:24, 883:1, 883:2, 883:3, 883:5, 883:6, 891:17, 900:19, 902:19
  **processes** [4] - 811:7, 824:17, 851:22, 883:17
  **produced** [10] - 704:21, 797:11, 843:24, 844:2, 844:4, 846:2, 846:15, 853:23, 867:13, 870:15
  **producing** [1] - 814:7
  **product** [8] - 666:14, 689:13, 689:17, 730:18, 762:4, 815:7, 886:23, 887:16
  **production** [5] - 638:21, 708:8, 729:15, 882:22, 887:16
  **productive** [1] - 788:7

  **products** [2] - 804:14, 808:15
  **professional** [1] - 802:2
  **proficient** [1] - 797:22
  **program** [1] - 806:10
  **prohibited** [1] - 729:5
  **project** [1] - 809:12
  **projects** [1] - 755:14
  **promise** [1] - 780:5
  **prompt** [1] - 715:14
  **prompted** [2] - 764:15, 808:19
  **properly** [2] - 644:5, 893:17
  **proved** [1] - 901:20
  **provide** [3] - 763:16, 794:11, 813:16
  **provided** [8] - 772:12, 785:19, 790:4, 837:3, 878:17, 900:4, 900:17, 901:20
  **provides** [3] - 761:18, 836:19, 836:20
  **providing** [1] - 757:4
  **provision** [4] - 710:24, 711:7, 734:20, 786:11
  **published** [3] - 751:5, 759:17, 766:8
  **publishing** [1] - 751:4
  **pull** [15] - 634:20, 699:5, 702:2, 704:6, 756:17, 759:7, 766:20, 791:14, 805:25, 813:18, 876:5, 895:6, 900:21
  **pulled** [2] - 841:16, 841:24
  **pumped** [1] - 712:21
  **pumping** [1] - 712:15
  **purchase** [113] - 655:5, 655:10, 655:13, 656:4, 656:7, 656:24, 656:25, 657:2, 657:4, 658:15, 658:18, 659:15, 660:18, 661:22, 661:24, 662:2, 662:3, 662:10, 662:15, 662:16, 662:17, 662:22, 662:24, 663:1, 665:9, 665:12, 665:15, 665:19, 666:15, 667:3, 667:7, 671:7, 671:8, 671:13, 671:16, 671:19, 684:4, 684:6, 686:5, 690:21, 695:1, 695:7, 695:13, 697:15, 697:17, 707:18, 708:17, 708:23, 708:25, 709:3, 710:4, 710:11, 717:15, 718:25, 719:5, 719:13, 719:14, 720:19, 720:25, 722:11, 722:12, 722:24, 723:6, 724:5,

724:8, 724:24, 725:3, 725:11, 725:12, 725:14, 725:15, 726:7, 727:14, 728:17, 728:24, 730:5, 730:19, 730:21, 730:25, 731:13, 745:23, 746:8, 751:20, 755:10, 768:8, 770:6, 772:16, 775:13, 779:5, 779:6, 779:9, 803:16, 803:19, 803:21, 804:2, 820:18, 823:22, 823:24, 825:14, 830:22, 831:13, 831:23, 833:25, 834:4, 834:9, 834:11, 835:21, 836:2, 836:8, 880:8, 881:10, 883:21

**purchases** [1] - 758:25
**purchasing** [1] - 820:8
**purely** [1] - 639:19
**purported** [2] - 892:25, 893:4
**purpose** [4] - 656:12, 670:22, 722:21, 755:13
**purposes** [3] - 739:7, 751:3, 865:11
**pursuant** [1] - 681:22
**put** [57] - 635:8, 652:7, 652:16, 652:25, 657:18, 667:6, 669:14, 671:21, 671:22, 674:22, 674:23, 685:10, 685:14, 686:22, 687:4, 688:22, 688:24, 692:16, 697:6, 697:24, 698:12, 698:25, 710:16, 715:21, 727:7, 732:5, 732:13, 737:5, 746:24, 750:3, 750:5, 751:12, 757:1, 765:8, 767:3, 799:17, 812:12, 812:16, 822:10, 827:24, 837:9, 841:6, 842:2, 843:18, 844:14, 846:18, 850:4, 860:12, 864:4, 865:10, 868:7, 873:5, 878:19, 879:1, 881:7, 892:10, 899:2
**putting** [4] - 680:19, 685:16, 780:19, 853:20

## Q

**quality** [6] - 665:23, 665:25, 666:5, 674:1, 775:19, 840:22
**quantity** [3] - 804:12, 804:15, 805:8
**quarter** [1] - 863:22
**query** [1] - 745:4
**questioning** [2] - 786:8, 889:11

**questions** [22] - 629:10, 631:1, 631:15, 643:1, 673:3, 684:13, 751:6, 780:6, 785:5, 801:13, 801:21, 801:22, 804:24, 808:1, 812:22, 818:7, 847:5, 898:9, 900:13, 900:14, 900:18, 903:1
**quit** [1] - 878:24
**quite** [4] - 634:11, 754:7, 881:22, 900:14
**quote** [1] - 809:15

## R

**raise** [1] - 791:10
**raised** [2] - 685:1, 847:4
**ran** [1] - 650:3
**random** [2] - 695:23, 696:6
**rates** [1] - 798:9
**rather** [1] - 887:13
**RDR** [1] - 904:16
**re** [2] - 896:9, 898:7
**re-creation** [2] - 896:9, 898:7
**reach** [1] - 790:6
**read** [15] - 629:2, 630:15, 635:18, 636:15, 638:13, 642:22, 644:5, 647:2, 647:3, 647:8, 648:8, 719:1, 719:2, 832:12, 880:18
**reading** [2] - 647:5, 880:25
**ready** [2] - 780:3, 791:15
**realigned** [1] - 870:2
**realize** [3] - 630:7, 637:25, 877:25
**realized** [4] - 642:8, 642:20, 642:24, 780:9
**realizes** [1] - 733:2
**reallocated** [2] - 870:18, 871:7
**really** [11] - 633:14, 636:8, 638:12, 656:3, 672:11, 692:6, 699:2, 703:13, 748:22, 757:1, 778:25, 792:11, 821:10, 834:3, 835:10, 859:4, 886:22, 899:15
**reason** [5] - 647:24, 658:5, 708:17, 837:9, 879:13
**reasons** [5] - 766:16, 798:11, 798:24, 799:6, 806:25
**rebuilding** [1] - 666:8
**recap** [1] - 745:21
**receipt** [2] - 805:6, 805:7

**receipts** [1] - 897:9
**receive** [8] - 674:19, 712:3, 804:1, 804:4, 804:12, 882:22, 898:11
**received** [23] - 642:3, 718:20, 728:13, 728:15, 739:9, 739:12, 752:19, 773:23, 778:7, 805:4, 805:9, 815:8, 816:5, 816:6, 816:11, 816:12, 854:11, 859:1, 892:9, 892:13, 893:4, 898:1, 901:15
**receiving** [9] - 796:3, 796:8, 797:6, 803:7, 803:21, 804:7, 804:13, 850:14, 850:22
**recent** [3] - 756:10, 756:12, 756:14
**recently** [3] - 714:16, 748:20, 781:21
**recess** [1] - 681:14, 740:23, 863:21
**recessed** [4] - 681:16, 743:20, 791:5, 863:23
**recognize** [3] - 898:4, 899:14, 900:24
**recollect** [25] - 629:11, 632:5, 634:10, 637:5, 645:18, 645:23, 664:15, 664:16, 664:18, 665:22, 687:21, 692:1, 712:12, 724:6, 733:13, 735:5, 763:20, 763:23, 764:14, 765:17, 774:2, 775:1, 775:4, 775:8
**recollection** [3] - 664:19, 672:23, 757:2
**recommendations** [1] - 800:3
**recon** [1] - 902:1
**reconcile** [2] - 855:20, 878:11
**reconciliation** [13] - 852:11, 852:23, 871:8, 872:24, 875:18, 898:15, 899:18, 901:2, 901:7, 901:14, 901:16, 902:10, 902:17
**reconciliations** [2] - 797:8, 897:22
**Record** [1] - 832:12
**record** [3] - 852:17, 852:18, 852:21
**record's** [1] - 857:21
**records** [19] - 855:20, 855:24, 856:2, 856:5, 856:10, 856:12, 856:25, 857:8, 857:10, 857:12, 857:17, 857:18, 858:1,

858:3, 858:11, 859:11, 880:21, 880:22, 898:8
**recreate** [3] - 855:11, 878:9, 895:14
**recreated** [1] - 870:1
**recreating** [1] - 896:14
**recreation** [4] - 870:23, 875:21, 878:4, 896:19
**recruited** [1] - 630:4
**recruiting** [1] - 797:19
**rectangle** [1] - 697:7
**rectified** [3] - 774:21, 900:5, 902:18
**rectifying** [1] - 902:19
**red** [9] - 646:24, 740:8, 746:24, 747:7, 747:13, 747:19, 754:1, 754:17, 754:18
**redacted** [4] - 635:2, 668:8, 692:15, 765:22
**redaction** [4] - 694:15, 701:13, 766:13, 865:16
**redactions** [1] - 868:12
**redirect** [4] - 741:24, 742:13, 894:11, 894:14
**REDIRECT** [2] - 779:20, 894:17
**reduced** [4] - 640:12, 763:4, 763:6, 763:12
**reduction** [1] - 627:19
**refer** [2] - 733:17, 804:20
**reference** [6] - 696:9, 730:4, 849:19, 866:2, 866:19, 871:20
**referenced** [1] - 795:18
**referring** [10] - 646:3, 751:16, 787:15, 804:21, 806:4, 814:9, 815:9, 815:11, 863:1, 901:7
**reflected** [1] - 896:16
**reflects** [2] - 783:15, 870:10
**refresh** [4] - 632:5, 672:19, 672:22, 757:1
**refreshing** [1] - 899:15
**refused** [1] - 667:4
**refusing** [1] - 749:13
**regarding** [5] - 780:10, 884:22, 885:1, 885:4, 886:25
**regardless** [2] - 723:15, 723:17
**regular** [4] - 803:6, 803:11, 834:16, 855:9
**regulations** [1] - 800:19
**reiterated** [1] - 749:5
**reject** [1] - 776:17
**rejection** [1] - 776:19
**relate** [9] - 683:10, 694:8, 694:17, 696:19, 696:21,

722:15, 737:19, 782:4, 801:25
**related** [11] - 633:24, 681:9, 681:10, 682:22, 683:4, 683:6, 718:5, 729:9, 757:15, 840:21, 904:9
**relates** [9] - 649:23, 658:14, 675:4, 727:21, 782:24, 785:9, 819:17, 843:17, 861:25
**relating** [3] - 627:23, 668:11, 668:12
**relation** [1] - 858:18
**relationship** [13] - 670:24, 677:17, 677:18, 702:9, 703:10, 703:12, 724:13, 802:2, 802:3, 805:1, 819:16, 884:23, 886:22
**relative** [1] - 629:6
**release** [3] - 767:8, 843:18, 886:9
**released** [2] - 676:7, 805:18
**releases** [1] - 885:13
**releasing** [2] - 708:8, 885:24
**relevance** [2] - 710:8, 726:5, 728:5
**relied** [1] - 780:12
**relying** [1] - 639:10
**remain** [2] - 746:12, 789:11
**remains** [1] - 863:10
**remedy** [1] - 787:25
**remember** [56] - 628:7, 632:2, 632:4, 632:25, 649:25, 650:4, 650:8, 650:12, 652:3, 654:4, 665:10, 672:4, 672:16, 672:18, 672:22, 673:7, 673:9, 682:14, 682:20, 682:23, 686:25, 687:24, 688:4, 688:6, 688:10, 699:8, 699:15, 706:13, 722:13, 748:22, 756:23, 757:4, 757:6, 757:14, 761:7, 777:20, 781:24, 783:20, 818:17, 821:12, 821:16, 821:23, 826:2, 830:8, 843:9, 847:7, 848:20, 849:7, 851:2, 851:3, 880:14, 881:21, 881:22, 889:24, 889:25, 890:1
**remembered** [3] - 641:5, 641:9, 760:22
**remembering** [1] - 735:24

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

**remind** [3] - 626:4, 810:14, 817:9

**remove** [12] - 714:12, 717:9, 717:10, 719:11, 746:24, 747:4, 748:15, 749:14, 749:21, 754:2, 755:20, 802:8

**removed** [6] - 725:18, 739:20, 747:3, 771:3, 773:1, 902:18

**removing** [2] - 717:12, 902:19

**reorganize** [1] - 872:16

**repeat** [6] - 646:12, 734:7, 746:1, 879:6, 879:20, 893:2

**reply** [1] - 679:1

**report** [29] - 773:5, 795:10, 797:18, 802:3, 812:16, 812:18, 812:20, 812:24, 813:23, 814:2, 814:6, 814:7, 817:10, 817:12, 817:22, 817:25, 821:11, 822:24, 826:21, 827:25, 828:4, 833:15, 837:1, 843:22, 845:11, 850:5, 860:19, 862:11, 862:14

**reported** [4] - 666:2, 864:17, 904:5, 904:10

**Reporter** [1] - 904:17

**reporter** [3] - 678:18, 832:11, 838:10

**reporting** [6] - 774:5, 822:8, 822:19, 827:16, 877:21, 877:22

**reports** [19] - 764:3, 764:5, 764:21, 765:6, 765:10, 765:16, 773:15, 773:16, 773:18, 796:14, 800:1, 844:12, 844:17, 844:21, 845:9, 850:17, 864:16, 864:24, 864:25

**represent** [4] - 691:6, 781:10, 784:14, 904:3

**represented** [3] - 695:9, 777:25, 778:6

**representing** [1] - 631:20

**represents** [2] - 640:11, 781:11

**Republic** [2] - 690:5, 691:14

**request** [1] - 764:7

**requested** [2] - 695:22, 763:16

**requesting** [1] - 756:8

**require** [3] - 666:23, 763:19, 801:18

**required** [6] - 656:3, 667:2, 714:18, 777:23,

778:3, 778:25, 810:23, 840:5, 848:10

**requirements** [1] - 794:14

**requires** [2] - 786:15, 790:16

**resigned** [1] - 848:2

**resistant** [1] - 811:5

**resolution** [7] - 786:6, 786:13, 786:19, 787:18, 788:7, 789:12, 790:13

**resolve** [6] - 666:3, 710:25, 787:1, 788:10, 789:6, 789:14

**resolved** [1] - 772:23

**resolving** [1] - 790:2

**respect** [5] - 670:24, 682:6, 740:13, 756:14, 778:16

**respectful** [2] - 645:6, 645:12

**respective** [1] - 790:4

**responded** [2] - 898:9, 898:15

**response** [19] - 635:3, 645:7, 647:4, 652:21, 671:11, 680:18, 699:21, 707:16, 729:7, 746:18, 756:6, 758:16, 776:8, 851:10, 881:4, 881:6, 882:12, 898:20, 899:21

**responsibilities** [2] - 795:25, 849:8

**responsible** [4] - 797:1, 803:25, 821:3, 876:1

**rest** [1] - 695:4

**result** [3] - 627:14, 809:5, 873:4

**resulted** [1] - 679:17

**Resumed** [1] - 743:23

**retention** [4] - 798:2, 798:3, 798:5, 847:4

**retired** [1] - 798:15

**retirement** [1] - 848:9

**return** [2] - 679:13

**returned** [1] - 782:18

**review** [3] - 800:4, 817:20, 898:5

**reviewed** [1] - 762:12

**reviewing** [1] - 763:8

**reviews** [1] - 800:4

**revised** [2] - 773:25, 776:21

**revisions** [2] - 851:18, 863:13

**revisited** [1] - 808:23

**Rhoden** [3] - 698:14, 698:25, 848:1

**Richi** [5] - 811:18, 813:16, 824:6, 824:17,

824:18

**rid** [1] - 782:3

**right-hand** [2] - 843:15, 862:23

**rights** [1] - 790:17

**rises** [1] - 707:6

**Rishi** [53] - 740:8, 800:5, 809:5, 817:23, 817:24, 818:2, 821:11, 824:5, 826:23, 829:3, 829:24, 830:3, 830:6, 830:20, 830:21, 831:15, 831:18, 831:24, 832:2, 832:3, 833:1, 833:8, 834:3, 835:22, 836:11, 836:12, 836:13, 837:4, 837:24, 839:12, 839:20, 840:4, 840:5, 840:10, 840:13, 840:16, 840:19, 840:22, 840:25, 845:7, 882:24, 883:3, 883:6, 883:18, 883:21, 884:24, 885:2, 885:5, 885:11, 886:1, 886:7, 886:8, 886:13

**RISHI** [1] - 626:6

**Rishi's** [5] - 832:4, 835:10, 883:9, 883:10, 883:14

**risk** [5] - 762:4, 762:9, 763:1, 763:5, 833:13

**risks** [1] - 762:3

**RMB** [9] - 768:16, 768:20, 769:10, 769:13, 770:8, 770:23, 770:24, 771:19, 862:9

**road** [1] - 643:3

**Roger** [7] - 650:7, 650:19, 650:20, 650:23, 651:14, 651:20, 651:23

**ROK** [9] - 686:11, 686:14, 686:24, 687:2, 687:5, 705:15, 705:16, 705:18, 706:3

**role** [16] - 706:5, 706:7, 708:5, 793:19, 794:9, 794:20, 801:4, 802:7, 803:17, 803:23, 803:24, 805:2, 807:13, 813:23, 824:21, 828:2

**roles** [1] - 819:1

**roll** [1] - 746:19

**room** [1] - 629:13

**rosenthal** [1] - 626:24

**Rosenthal** [11] - 634:22, 635:6, 669:16, 714:18, 736:25, 738:8, 741:16, 744:3, 750:8, 759:16, 766:9

**ROSENTHAL** [119] - 627:2, 628:16, 628:24,

634:8, 637:12, 646:14, 650:25, 651:4, 652:23, 655:22, 657:23, 658:1, 663:7, 663:10, 664:23, 667:20, 668:5, 669:17, 669:25, 683:14, 684:25, 685:4, 685:23, 693:6, 693:9, 693:18, 694:11, 694:15, 694:18, 695:6, 695:12, 698:19, 701:7, 701:9, 701:16, 702:1, 703:14, 710:7, 710:13, 718:2, 718:6, 721:18, 725:6, 726:4, 726:16, 726:19, 726:21, 727:1, 727:4, 727:6, 728:4, 728:11, 736:16, 736:21, 737:9, 737:13, 737:23, 738:1, 738:3, 738:10, 738:14, 738:23, 739:2, 739:4, 741:23, 742:2, 742:6, 742:10, 742:12, 742:16, 742:19, 742:22, 743:1, 743:7, 744:5, 744:9, 744:15, 747:14, 750:6, 750:10, 750:15, 750:21, 750:25, 751:3, 751:22, 752:2, 754:6, 759:9, 759:12, 765:20, 765:25, 766:4, 766:12, 766:16, 766:21, 766:25, 767:2, 767:24, 769:21, 770:2, 771:20, 779:15, 779:18, 779:21, 780:2, 780:18, 780:21, 782:19, 784:19, 784:23, 785:13, 785:15, 790:20, 841:13, 841:19, 856:16, 856:20, 857:21, 902:11

**round** [5] - 669:11, 757:8, 757:11, 764:24, 767:14

**route** [1] - 638:19

**Row** [4] - 769:13, 816:14, 816:15, 816:16

**rude** [2] - 651:17, 651:20

**rule** [1] - 717:12

**ruled** [2] - 668:14, 694:16

**rules** [2] - 739:6, 778:22, 800:19

**rulings** [1] - 683:15

**run** [4] - 740:15, 740:17, 740:19, 824:12

**running** [7] - 627:8, 690:23, 704:25, 723:3, 755:14, 886:21, 886:23

**S**

**sad** [4] - 879:19, 880:1, 880:20, 881:5

**Sage** [29] - 661:13, 661:20, 804:22, 804:23, 806:12, 808:1, 808:7, 808:20, 808:25, 809:9, 810:14, 811:10, 811:11, 811:15, 811:18, 829:12, 833:10, 833:12, 833:21, 834:5, 834:6, 835:3, 835:15, 835:24, 835:25, 849:25, 850:1, 853:13, 853:16

**sales** [48] - 638:6, 638:9, 638:17, 639:1, 662:23, 663:2, 663:12, 663:15, 663:19, 663:22, 664:1, 664:3, 664:21, 665:3, 665:4, 665:5, 813:3, 813:6, 813:10, 813:17, 814:23, 819:17, 819:19, 820:24, 821:1, 821:3, 821:7, 821:20, 822:12, 823:6, 823:10, 823:13, 823:18, 824:15, 824:16, 824:21, 825:6, 825:9, 825:11, 826:5, 826:14, 832:1, 845:18, 845:19, 846:11, 861:11, 861:12

**salesman** [1] - 659:22

**salesmen** [1] - 819:21

**salespeople** [27] - 663:3, 680:21, 680:22, 680:23, 813:7, 820:11, 820:17, 820:22, 821:8, 821:9, 821:10, 822:6, 824:5, 825:13, 825:18, 826:10, 826:18, 826:25, 827:10, 827:21, 828:12, 828:14, 828:19, 828:20, 828:22, 828:25

**salesperson** [1] - 812:1

**sample** [1] - 766:19

**Saturday** [1] - 636:12

**save** [2] - 648:7, 804:16

**saving** [1] - 635:11

**saw** [14] - 641:13, 642:7, 642:8, 642:23, 650:7, 652:20, 653:4, 765:7, 808:24, 871:17, 884:12, 884:14, 884:16, 884:19

**sayonara** [1] - 881:6

**schedule** [3] - 675:3, 741:10, 741:21

**Schedule** [4] - 713:10, 713:12, 734:4, 734:9

**scope** [5] - 787:25, 857:8, 891:2, 897:18, 897:24

**scrambling** [1] - 765:15

**scratch** [1] - 849:24

**screen** [21] - 646:15,

657:18, 672:2, 685:15,
685:16, 698:16, 727:7,
738:2, 753:1, 753:2,
757:20, 773:19, 777:17,
810:24, 846:7, 846:8,
854:14, 873:18, 877:11,
877:12, 879:1

**screen's** [1] - 698:1

**screens** [2] - 652:7,
683:11

**scroll** [39] - 660:15,
669:20, 670:11, 675:3,
686:1, 694:4, 695:17,
697:5, 710:16, 710:20,
713:9, 715:5, 718:21,
732:6, 739:13, 739:14,
740:6, 744:22, 747:6,
747:18, 753:8, 753:20,
767:21, 768:12, 768:24,
771:11, 843:14, 843:20,
849:18, 857:1, 859:12,
860:21, 862:16, 862:23,
867:2, 869:5, 869:24,
874:5, 877:13

**scrolling** [1] - 772:2

**seat** [1] - 791:13

**sec** [1] - 789:17

**second** [16] - 635:8,
662:20, 669:11, 670:3,
683:25, 688:2, 692:10,
738:24, 739:2, 766:6,
785:2, 822:2, 841:4,
878:21, 888:11

**second-to-last** [1] -
785:2

**seconds** [1] - 777:13

**section** [4] - 785:8,
785:22, 786:1, 789:3

**Section** [2] - 786:5,
789:10

**secure** [1] - 812:4

**security** [1] - 811:23

**see** [148] - 631:17, 635:7,
646:15, 646:25, 653:6,
654:24, 655:3, 659:1,
660:21, 662:6, 684:22,
684:23, 686:2, 689:5,
689:7, 689:9, 689:13,
692:19, 692:23, 693:23,
694:4, 694:6, 695:8,
695:17, 696:9, 696:10,
696:13, 696:17, 697:4,
698:1, 698:13, 699:1,
699:13, 702:11, 702:14,
713:13, 716:2, 716:11,
726:14, 727:9, 727:12,
727:19, 733:5, 734:1,
737:15, 737:25, 738:5,
738:14, 739:16, 739:22,
740:7, 740:23, 743:18,

744:7, 744:12, 744:20,
745:1, 746:19, 746:20,
747:20, 748:2, 751:1,
751:9, 751:14, 752:4,
752:21, 753:3, 753:13,
754:10, 759:15, 759:20,
766:10, 767:5, 767:9,
768:13, 769:1, 769:25,
770:2, 770:4, 770:17,
770:20, 771:11, 771:13,
771:21, 772:5, 785:16,
786:2, 787:12, 791:3,
795:3, 802:17, 808:24,
814:16, 818:14, 818:15,
854:20, 854:21, 856:18,
858:2, 858:3, 859:20,
860:20, 860:22, 860:25,
861:23, 862:1, 862:25,
863:21, 865:15, 865:25,
866:10, 866:11, 866:12,
866:17, 866:20, 866:24,
866:25, 867:3, 867:6,
867:8, 867:12, 867:20,
867:24, 868:2, 868:5,
868:6, 869:9, 869:11,
869:14, 869:18, 870:7,
870:12, 870:17, 874:14,
876:6, 876:8, 877:16,
884:20, 885:16, 892:15,
892:19, 898:22, 899:1,
899:6, 902:16, 903:13

**seeing** [9] - 659:2, 659:5,
693:10, 696:20, 699:8,
738:3, 757:6, 811:4,
876:11

**seeking** [3] - 782:2,
782:24, 783:10

**seemingly** [1] - 753:21

**select** [4] - 797:20,
804:10, 804:14, 804:15

**selection** [2] - 794:25,
797:20

**sell** [13] - 716:14, 721:9,
721:10, 721:13, 721:15,
721:23, 721:24, 722:2,
723:10, 723:12, 730:7,
731:17, 746:13

**seller** [2] - 761:18,
761:25

**selling** [5] - 721:25,
723:11, 723:18, 724:21,
729:5

**send** [25] - 673:22,
673:23, 678:16, 678:20,
690:24, 693:15, 696:6,
711:18, 712:9, 713:3,
764:25, 776:7, 776:10,
776:23, 776:24, 785:6,
787:16, 807:18, 818:3,
827:25, 840:6, 865:3,

895:22

**sending** [9] - 656:4,
656:6, 706:8, 711:24,
764:5, 764:15, 765:11,
803:16

**sends** [2] - 655:5, 661:18

**senior** [3] - 788:7,
788:11, 797:8

**sense** [5] - 634:12,
646:13, 714:24, 885:6,
903:10

**sent** [52] - 641:19,
641:23, 657:5, 657:14,
658:8, 659:6, 666:20,
679:2, 693:25, 694:2,
696:1, 697:20, 711:16,
711:20, 711:22, 712:7,
729:3, 729:4, 735:15,
735:19, 735:25, 764:9,
764:23, 765:1, 767:15,
773:6, 773:8, 773:9,
773:14, 773:17, 773:23,
773:25, 776:12, 777:3,
804:2, 807:12, 807:16,
807:23, 817:23, 817:25,
855:5, 858:2, 866:12,
866:13, 866:14, 868:20,
871:11, 871:18, 872:9,
873:12, 893:11, 901:14

**sentence** [2] - 787:8,
787:24

**separate** [19] - 684:2,
684:5, 684:8, 684:9,
684:13, 684:16, 684:17,
684:19, 684:23, 719:24,
719:25, 720:2, 720:6,
721:25, 722:1, 798:18,
798:19, 799:3, 811:20

**separated** [2] - 798:10,
799:14, 847:20

**separately** [4] - 685:8,
772:19, 772:21

**separation** [1] - 812:2

**September** [2] - 775:2,
893:5

**sequences** [1] - 852:4

**series** [2] - 785:5, 788:16

**seriously** [1] - 755:19

**services** [4] - 745:11,
794:11, 813:16, 824:13

**set** [15] - 728:6, 756:18,
756:21, 779:5, 779:6,
789:12, 805:17, 811:20,
817:15, 842:9, 858:1,
882:24, 883:3, 883:6,
886:8

**setting** [3] - 628:10,
787:10, 792:11

**seven** [3] - 636:12,
689:8, 796:20

**several** [8] - 636:19,
649:2, 679:16, 706:23,
711:15, 711:22, 735:13,
795:21

**shared** [4] - 716:5, 896:5,
896:6, 898:8

**sharing** [1] - 698:16

**Sharma** [3] - 729:19,
820:23, 820:24

**sheet** [2] - 694:21,
696:25

**Shen** [1] - 847:13

**Shenzhen** [38] - 654:3,
654:5, 654:7, 654:8,
654:13, 654:17, 660:8,
660:10, 661:23, 662:2,
662:9, 662:12, 665:8,
666:15, 666:19, 666:20,
666:21, 666:23, 667:3,
667:5, 667:7, 667:25,
683:1, 707:3, 716:23,
719:14, 720:2, 760:6,
768:9, 769:18, 770:6,
771:16, 772:16, 830:11,
830:16, 830:17, 843:4

**shift** [1] - 812:5

**ship** [21] - 676:23, 677:1,
677:20, 677:23, 677:25,
678:3, 678:10, 689:7,
690:23, 691:1, 692:8,
700:21, 723:21, 724:2,
724:3, 730:18, 730:21,
775:14, 775:24

**shipment** [5] - 637:21,
637:24, 690:24, 803:21

**shipments** [7] - 674:19,
676:2, 676:10, 684:4,
692:5, 692:6, 838:13

**shipped** [16] - 660:24,
675:24, 676:16, 688:10,
688:13, 689:17, 689:22,
689:24, 690:9, 691:13,
691:17, 691:21, 697:19,
700:18, 779:8, 804:5

**shipping** [3] - 666:9,
677:3, 677:6

**ships** [6] - 689:13,
690:21, 712:14, 712:23,
723:22, 724:1

**shocked** [5] - 712:3,
712:5, 712:8, 712:16,
712:25

**shooter** [1] - 689:8

**shorter** [1] - 780:5

**shots** [1] - 884:10

**show** [20] - 646:14,
646:18, 646:19, 651:25,
686:15, 686:19, 715:5,
726:12, 750:8, 751:23,
771:12, 786:3, 804:11,

843:15, 853:9, 859:10,
867:18, 878:11, 890:25,
891:10

**showed** [4] - 780:13,
781:14, 860:3, 874:18

**showing** [6] - 738:15,
846:7, 846:8, 855:9,
873:11, 891:12

**shown** [2] - 642:23,
782:21

**shows** [6] - 648:14,
655:5, 867:22, 890:7,
894:25, 901:3

**shut** [3] - 705:15, 705:18,
705:21

**shutting** [1] - 706:3

**sic** [1] - 629:9

**side** [19] - 633:25,
639:13, 689:12, 767:8,
774:20, 775:23, 782:16,
794:5, 800:13, 811:7,
819:9, 819:13, 819:14,
861:8, 862:23, 868:8,
877:11, 882:7, 901:23

**sides** [2] - 731:22,
787:22

**sides'** [1] - 732:22

**signals** [1] - 708:7

**signed** [6] - 659:17,
670:7, 670:9, 670:10,
670:16, 670:17

**Silverthorn** [1] - 848:15

**similar** [6] - 634:15,
706:22, 722:22, 749:8,
801:23

**simple** [1] - 758:17

**Simultaneous** [2] -
656:14, 838:7

**single** [7] - 671:19,
796:23, 809:17, 835:16,
844:18, 876:18, 876:25

**Sinosure** [2] - 761:8,
763:15, 763:18, 778:19,
778:25

**sit** [14] - 631:20, 653:13,
653:15, 653:16, 653:17,
653:18, 653:22, 654:14,
654:15, 654:20, 777:8,
801:1, 801:9, 831:9

**site** [1] - 819:10

**sits** [3] - 654:2, 663:22,
663:25

**sitting** [6] - 653:24,
654:3, 654:7, 654:12,
654:17, 661:19

**situation** [9] - 636:14,
765:14, 776:22, 801:23,
845:7, 886:25, 887:8,
887:10, 887:23

**situations** [1] - 636:15

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

**size** [2] - 796:18, 796:19
**skilled** [1] - 817:13
**skills** [4] - 794:16, 794:22, 794:25, 797:21
**skip** [1] - 812:22
**slew** [1] - 764:2
**slide** [1] - 767:5
**slightly** [2] - 776:13, 829:15
**sloppiness** [2] - 864:3, 878:8
**sloppy** [15] - 774:9, 774:17, 851:1, 851:16, 851:20, 859:25, 860:4, 860:8, 863:11, 864:4, 878:13, 878:14, 880:6, 880:8, 881:10
**smaller** [3] - 672:1, 783:13, 854:13
**smarter** [1] - 859:3
**smooth** [1] - 841:9
**so's** [1] - 802:15
**so..** [4] - 693:14, 741:10, 786:2, 801:25
**social** [1] - 802:2
**sold** [2] - 716:25, 762:4
**solely** [2] - 895:20, 895:22
**solution** [1] - 809:2
**solve** [1] - 666:6
**solving** [1] - 666:7
**someone** [7] - 635:13, 657:14, 671:15, 799:10, 817:18, 852:20, 861:7
**something's** [1] - 836:24
**sometime** [2] - 871:25, 873:19
**sometimes** [16] - 644:20, 661:24, 688:3, 688:9, 695:2, 745:13, 775:17, 775:24, 776:1, 776:2, 776:13, 776:19, 799:17, 818:2, 868:23, 868:24
**somewhat** [1] - 757:1
**son** [1] - 802:15
**soon** [1] - 792:12
**Sorry** [1] - 726:21
**sorry** [21] - 690:8, 693:9, 695:6, 734:7, 736:16, 737:9, 738:1, 751:22, 753:7, 788:22, 799:4, 874:23, 879:18, 880:1, 880:20, 881:5, 891:7, 898:2, 900:8, 902:12
**sort** [8] - 638:4, 650:17, 672:2, 708:11, 720:20, 757:24, 775:23, 819:22
**sorts** [1] - 890:20
**sounding** [1] - 789:13
**sounds** [8] - 633:1,

633:5, 633:14, 699:25, 764:14, 809:7, 881:8, 889:17
**Sourabh** [22] - 663:18, 663:21, 663:25, 664:20, 665:2, 729:19, 774:12, 820:22, 820:24, 821:3, 822:2, 822:3, 822:5, 822:11, 822:13, 822:21, 823:18, 824:15, 825:7, 825:8, 826:12, 826:13, 826:17, 828:15, 828:16, 828:19, 828:21, 850:1
**Sourabh's** [3] - 828:2, 850:8, 850:9
**sourced** [1] - 795:1
**Southern** [1] - 904:18
**Southwest** [1] - 657:1
**speaking** [6] - 648:19, 665:22, 665:23, 735:22, 741:14, 822:22
**specialize** [1] - 809:11
**specialized** [1] - 797:3
**specializing** [1] - 797:12
**specific** [9] - 628:1, 630:1, 668:2, 668:13, 748:24, 797:25, 806:10, 857:16, 857:17
**specification** [1] - 730:23
**specifications** [6] - 728:2, 728:25, 729:16, 729:21, 730:1, 730:2
**specify** [1] - 629:5
**speculation** [1] - 747:14
**spell** [1] - 791:16
**spelled** [2] - 732:17, 791:18
**spent** [1] - 890:19
**spill** [1] - 706:16
**spills** [1] - 707:6
**spirit** [1] - 786:17
**split** [2] - 686:9, 686:16
**spoken** [1] - 783:21
**spreads** [1] - 819:7
**spreadsheet** [17] - 687:4, 695:11, 701:13, 759:5, 768:6, 843:13, 846:5, 849:15, 870:17, 870:21, 870:24, 872:13, 873:17, 874:25, 879:10, 896:12, 898:15
**spreadsheets** [2] - 879:9, 879:14
**Spryer** [1] - 659:20
**square** [6] - 704:11, 704:14, 708:15, 708:16, 732:25, 846:15
**stacks** [1] - 811:10
**staff** [1] - 865:8

**stages** [1] - 638:20
**stand** [7] - 626:4, 638:8, 642:15, 672:12, 754:23, 771:5, 781:17
**standard** [3] - 882:25, 883:5, 883:17
**standards** [1] - 810:1
**standing** [1] - 783:15
**stands** [4] - 754:20, 754:22, 815:21, 815:22
**start** [15] - 648:12, 708:12, 708:18, 737:7, 753:8, 764:15, 779:16, 784:22, 793:5, 808:9, 829:20, 847:3, 888:9, 903:9
**started** [16] - 632:7, 673:10, 673:13, 673:16, 704:11, 744:23, 744:24, 793:11, 793:17, 811:4, 826:3, 844:20, 845:19, 870:24, 880:4, 888:14
**starting** [1] - 844:9
**starts** [5] - 632:15, 647:2, 708:7, 752:9, 753:11
**state** [3] - 672:24, 778:18, 798:14
**state-owned** [1] - 778:18
**statement** [13] - 638:8, 645:17, 646:11, 652:1, 652:6, 658:7, 658:15, 658:17, 658:19, 658:20, 762:11, 857:11, 894:4
**statements** [7] - 637:18, 637:19, 637:20, 649:20, 897:9, 902:21, 902:22
**States** [12] - 627:17, 656:5, 658:16, 658:18, 659:24, 662:23, 663:4, 690:22, 697:18, 782:4, 904:17
**static** [2] - 630:5, 662:25
**stay** [7] - 720:21, 721:2, 721:5, 755:15, 756:1, 756:4, 798:15
**step** [4] - 725:23, 789:12, 790:25, 903:4
**Stephen** [4] - 701:6, 737:12, 739:1, 771:23
**steps** [1] - 810:25
**still** [18] - 626:4, 653:10, 653:11, 653:12, 709:10, 710:1, 741:21, 754:5, 774:22, 775:10, 789:14, 834:3, 834:4, 836:11, 841:1, 848:13, 851:15, 900:11
**stock** [1] - 627:15
**stop** [3] - 746:9, 747:23, 789:17

**stopped** [2] - 683:22, 764:5
**stories** [1] - 705:20
**story** [1] - 801:24
**strategic** [2] - 886:20, 887:20
**strategy** [1] - 887:18
**Street** [1] - 657:1
**structure** [8] - 675:4, 675:5, 675:11, 675:13, 677:14, 681:22, 822:10, 827:2
**structured** [1] - 821:20
**structures** [1] - 682:7
**stuck** [1] - 638:20
**stuff** [8] - 639:2, 661:14, 690:17, 706:4, 709:18, 735:24, 802:16, 897:10
**styled** [1] - 904:4
**subcontractors** [1] - 706:3
**subject** [4] - 760:12, 783:18, 798:22, 809:19
**submit** [3] - 789:18, 790:3, 790:5
**submitted** [1] - 789:16
**submitting** [1] - 790:7
**subsequent** [1] - 836:8
**subsequently** [1] - 871:24
**substance** [1] - 739:7
**subtotal** [1] - 806:25
**subtract** [3] - 736:2, 736:4, 736:6
**successful** [1] - 790:2
**sucker** [1] - 881:6
**sudden** [2] - 765:15, 767:14
**sugarcoat** [7] - 638:7, 638:10, 638:18, 639:2, 639:8, 639:14, 639:18
**sugarcoating** [2] - 639:6, 639:21
**suggesting** [7] - 648:24, 649:6, 835:7, 870:4, 871:3, 871:4, 881:24
**suggestion** [1] - 881:12
**suit** [2] - 650:11, 650:13
**sum** [2] - 674:13, 894:21
**summarizing** [3] - 786:20, 787:1, 901:17
**summary** [2] - 702:8, 759:7, 901:2
**Sunday** [1] - 636:12
**super** [1] - 783:18
**supervise** [1] - 867:15
**supervising** [2] - 793:25, 803:4, 827:14
**supervision** [2] - 867:14, 867:16

**supervisor** [2] - 817:20, 826:13
**supervisory** [3] - 664:5, 794:9, 794:20
**supplier** [18] - 797:15, 803:6, 803:9, 803:11, 804:10, 804:11, 805:8, 806:6, 807:16, 807:20, 887:14, 887:19, 889:4, 891:17, 891:19, 893:17, 893:21, 894:25
**suppliers** [12] - 666:1, 706:2, 710:3, 803:3, 805:14, 807:12, 818:1, 823:12, 823:14, 838:20, 838:21, 891:18
**support** [2] - 714:19, 714:20, 897:10
**supported** [2] - 900:4, 900:5
**supporting** [1] - 898:9
**supports** [1] - 794:12
**suppose** [2] - 708:24, 743:9
**supposed** [3] - 626:22, 691:6, 786:23
**surfaced** [1] - 896:23
**surprise** [3] - 638:11, 767:12, 858:2
**surprised** [1] - 712:3
**sustained** [13] - 627:4, 651:1, 663:9, 664:25, 667:22, 686:18, 703:16, 710:9, 710:14, 726:6, 862:13, 862:15, 862:21
**sustains** [1] - 668:4
**switch** [3] - 701:15, 753:5, 808:19
**switched** [4] - 833:10, 833:21, 841:17, 842:1
**switching** [1] - 802:22
**sworn** [6] - 626:8, 628:9, 628:10, 791:11, 791:12, 792:2
**synchronize** [1] - 891:16
**system** [42] - 661:14, 661:20, 757:25, 796:5, 804:3, 804:9, 804:17, 804:20, 804:22, 805:12, 805:18, 806:12, 808:2, 808:18, 809:11, 809:23, 812:4, 812:15, 814:3, 814:17, 814:20, 829:7, 829:13, 829:23, 831:16, 832:5, 833:10, 833:12, 833:21, 835:6, 835:9, 836:5, 836:7, 837:1, 849:25, 850:1, 853:13, 853:15, 853:16, 891:15, 891:16

**KEYWORD INDEX**

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

**systems** [3] - 808:23, 829:5, 829:15

**SZ** [2] - 769:20, 771:16

# T

**tab** [8] - 802:11, 815:25, 868:16, 869:2, 869:3, 876:5, 902:1, 902:10

**tabs** [6] - 815:11, 815:13, 816:23, 816:24, 896:12, 896:17

**tag** [1] - 721:4

**tagged** [2] - 723:7, 730:6

**tags** [4] - 720:20, 720:21, 721:1, 721:4

**talks** [4] - 687:4, 704:7, 741:19, 747:5

**tardiness** [1] - 847:25

**task** [2] - 795:7, 802:12

**tasks** [2] - 794:17, 810:7

**tax** [3] - 673:16, 679:6, 679:9

**teach** [2] - 801:6, 801:22

**team** [46] - 644:4, 644:7, 663:2, 663:19, 696:1, 764:18, 767:17, 772:11, 772:12, 795:25, 796:1, 796:2, 796:13, 796:19, 796:24, 796:25, 797:14, 797:23, 803:25, 805:5, 805:20, 806:20, 809:13, 813:3, 813:6, 813:10, 814:22, 814:23, 817:21, 823:22, 824:20, 844:17, 844:20, 845:10, 845:12, 849:17, 850:6, 850:8, 850:13, 850:16, 850:21, 851:1, 853:3, 861:4, 863:7, 867:15

**teams** [7] - 663:12, 663:16, 663:22, 664:1, 664:3, 795:4, 826:5

**Tech** [1] - 745:8

**technical** [1] - 737:1

**technician** [1] - 650:17

**teenager** [1] - 802:19

**temporary** [1] - 712:22

**ten** [2] - 640:25, 792:19

**tended** [1] - 673:3

**tense** [2] - 789:2, 789:5

**term** [1] - 806:23

**terminate** [2] - 799:10, 800:9

**termination** [6] - 785:9, 785:16, 785:18, 785:20, 785:23, 786:1

**terminology** [3] - 746:4, 890:11, 892:2

**terms** [21] - 668:7, 684:7,

705:10, 709:22, 712:14, 714:22, 714:23, 751:19, 755:9, 762:23, 792:21, 805:13, 849:24, 879:9, 885:6, 885:7, 885:9, 888:24, 891:14, 893:9, 894:24

**testified** [10] - 626:8, 628:6, 658:9, 661:24, 671:1, 695:2, 702:16, 781:23, 792:3, 833:12

**testifying** [1] - 673:9

**testimony** [31] - 628:9, 628:11, 629:13, 634:8, 638:12, 639:25, 643:19, 643:25, 655:9, 664:2, 665:2, 667:21, 672:12, 673:3, 694:25, 695:5, 731:3, 731:5, 731:6, 731:10, 731:11, 731:12, 780:9, 780:25, 781:5, 783:19, 863:4, 863:10, 863:11, 880:16

**testing** [1] - 810:21

**Texas** [1] - 847:14

**text** [1] - 740:8

**THE** [206] - 626:3, 627:4, 628:18, 628:20, 628:22, 634:9, 634:10, 634:23, 634:25, 640:5, 640:8, 646:18, 646:21, 648:4, 651:1, 651:5, 655:24, 656:15, 657:19, 657:22, 657:25, 658:6, 658:11, 658:17, 658:21, 658:23, 663:9, 664:25, 667:22, 668:6, 669:22, 670:1, 670:12, 674:25, 681:13, 681:18, 683:16, 683:21, 683:24, 683:25, 684:6, 684:9, 684:10, 685:3, 685:13, 685:18, 685:20, 686:1, 686:3, 686:4, 686:10, 686:13, 686:14, 686:18, 687:14, 690:6, 693:8, 693:11, 693:15, 694:17, 694:19, 694:20, 694:23, 695:14, 698:1, 698:4, 698:6, 698:9, 698:15, 701:14, 701:19, 701:21, 701:23, 701:25, 702:4, 703:16, 707:24, 708:1, 710:9, 710:14, 718:9, 718:11, 718:15, 718:18, 721:19, 721:20, 725:8, 726:6, 728:3, 728:7, 728:9, 728:13, 728:19, 737:3, 737:4, 737:19, 737:20, 737:21, 737:25, 738:2, 738:13,

738:19, 739:8, 739:11, 740:22, 740:25, 741:4, 741:8, 741:11, 741:21, 742:3, 742:9, 742:11, 742:15, 742:18, 742:20, 742:25, 743:13, 743:16, 743:18, 744:11, 744:14, 744:17, 744:20, 747:15, 747:16, 750:12, 750:16, 750:24, 751:1, 751:5, 752:17, 752:23, 752:25, 753:4, 754:8, 754:13, 766:10, 766:15, 766:19, 766:23, 768:18, 769:19, 769:22, 769:24, 770:11, 777:12, 779:14, 779:17, 779:23, 779:25, 780:1, 782:9, 782:10, 782:11, 782:14, 790:24, 791:2, 791:7, 791:10, 791:13, 791:17, 791:19, 791:20, 791:21, 813:7, 818:9, 825:22, 832:13, 838:11, 838:14, 839:2, 839:7, 854:10, 857:10, 857:24, 858:6, 858:9, 858:14, 858:19, 858:22, 858:25, 859:4, 862:5, 862:13, 862:15, 862:21, 863:20, 865:12, 869:6, 875:3, 875:13, 880:17, 880:18, 891:4, 891:5, 891:7, 894:9, 894:11, 894:16, 897:25, 899:3, 899:4, 902:14, 903:3, 903:6

**the..** [1] - 867:1

**themselves** [6] - 635:14, 639:9, 639:10, 705:19, 706:2, 811:8

**thereby** [1] - 746:13

**therefore** [1] - 891:23

**they've** [4] - 658:2, 763:5, 777:3, 881:10

**thinking** [3] - 667:9, 671:4, 759:25

**third** [10] - 661:8, 661:17, 661:18, 697:11, 813:15, 813:19, 824:6, 849:13, 899:1, 899:12

**third-party** [5] - 661:8, 661:17, 661:18, 813:15, 824:6

**thousand** [6] - 628:6, 628:15, 629:20, 634:18, 842:15, 842:18

**thread** [2] - 750:23, 753:9

**three** [21] - 630:2, 653:23, 706:23, 706:24, 707:1, 707:4, 708:19,

709:15, 709:23, 741:11, 742:22, 746:22, 762:18, 767:24, 779:8, 782:16, 800:10, 810:25, 811:1, 877:4

**throughout** [1] - 711:3

**timeframe** [1] - 878:5

**timeline** [1] - 877:24

**timelines** [1] - 814:6

**timeliness** [1] - 816:2

**timely** [1] - 816:3

**timing** [1] - 838:13

**today** [25] - 629:14, 631:20, 632:22, 639:6, 639:8, 639:10, 639:14, 643:4, 643:14, 689:17, 692:4, 693:16, 708:15, 714:24, 720:16, 743:8, 760:13, 761:9, 779:8, 780:8, 783:7, 783:21, 789:8, 792:6, 831:9

**today's** [3] - 654:1, 748:23, 804:13

**Todor** [19] - 847:10, 864:7, 864:9, 864:15, 864:24, 865:3, 865:24, 870:15, 871:11, 871:18, 872:8, 873:5, 873:12, 874:12, 876:17, 877:1, 877:2, 877:24, 878:22

**Todor's** [2] - 864:23, 877:21

**together** [7] - 774:21, 776:1, 792:13, 805:7, 812:16, 827:25, 837:9

**toggle** [1] - 901:10

**Tokyo** [1] - 660:9

**TOLL** [7] - 701:12, 726:25, 738:20, 753:2, 765:22, 858:24, 869:4

**toll** [1] - 746:9

**tolled** [2] - 735:9, 735:12

**tolling** [1] - 734:19

**tolls** [1] - 735:17

**tomorrow** [1] - 903:8

**tomorrow's** [1] - 743:11

**took** [14] - 636:25, 638:5, 682:11, 698:18, 756:4, 760:18, 762:19, 810:12, 810:18, 818:17, 833:13, 845:10, 849:6, 864:2

**tools** [1] - 633:22

**top** [16] - 675:14, 679:20, 689:6, 695:8, 696:8, 696:9, 718:21, 719:1, 726:12, 728:10, 784:25, 815:20, 816:2, 860:21, 866:12

**top-left** [1] - 728:10

**topic** [1] - 799:9

**topics** [1] - 801:18

**total** [15] - 640:9, 686:7, 703:6, 703:9, 703:10, 703:11, 742:22, 743:6, 759:22, 783:13, 807:5, 872:16, 874:14, 877:15, 901:3

**touch** [1] - 763:15

**tough** [1] - 880:10

**towards** [1] - 699:6

**track** [2] - 742:7, 775:8

**Tracy** [44] - 635:17, 635:18, 635:20, 636:11, 636:22, 644:4, 644:6, 648:24, 649:1, 649:2, 659:12, 673:18, 678:25, 679:1, 695:22, 712:5, 712:7, 729:13, 731:17, 735:13, 735:25, 745:5, 746:16, 746:20, 747:2, 747:9, 748:10, 749:9, 749:10, 753:25, 755:25, 756:3, 756:4, 756:8, 762:19, 763:15, 764:17, 781:18, 788:22, 851:4, 851:12, 865:4

**Tracy's** [3] - 731:8, 851:6, 851:13

**trade** [10] - 761:4, 761:14, 761:17, 762:2, 762:3, 762:7, 762:16, 777:23, 778:18

**training** [1] - 801:18

**trainings** [3] - 794:15, 800:21, 800:25

**transaction** [8] - 686:14, 703:6, 768:10, 804:9, 804:16, 804:18, 804:19, 805:6

**transactional** [1] - 639:19

**transactions** [14] - 668:12, 668:15, 668:17, 668:21, 689:16, 691:7, 691:8, 691:9, 692:7, 771:3, 771:4, 771:6, 773:1, 796:6

**transcript** [5] - 628:21, 648:8, 826:16, 839:5, 904:4

**transmitted** [1] - 807:10

**transmitting** [1] - 659:14

**transparent** [1] - 784:16

**traveled** [1] - 644:14

**treat** [2] - 755:16, 801:19, 882:16

**treating** [4] - 687:9, 734:5, 734:8, 882:17

**treats** [1] - 734:8

**trial** [4] - 668:13, 690:18,

Jiangmen Benlida Printed Circuit Co., Ltd. Vs. Circuitronix, LLC
Case No. 21-cv-60125-RNS

741:22, 903:8
  **tried** [6] - 666:2, 666:7, 666:8, 799:22, 835:16, 872:24
  **trouble** [1] - 693:10
  **truck** [1] - 637:21
  **true** [18] - 637:17, 643:8, 643:11, 645:14, 653:10, 655:13, 655:16, 655:18, 655:19, 688:12, 724:19, 748:9, 777:22, 778:2, 796:23, 823:21, 823:24, 904:4
  **truly** [1] - 802:13
  **trust** [1] - 667:12
  **truthful** [1] - 731:11
  **try** [14] - 634:12, 636:8, 676:19, 724:13, 736:22, 788:2, 790:17, 801:22, 802:11, 815:4, 819:15, 825:21, 876:3, 895:17
  **trying** [38] - 633:13, 635:17, 635:19, 636:7, 636:16, 651:19, 656:15, 677:12, 679:18, 680:13, 692:12, 730:9, 734:21, 735:24, 738:5, 747:9, 747:12, 765:17, 822:5, 823:16, 824:9, 825:17, 826:9, 826:23, 827:7, 828:23, 832:18, 835:7, 839:23, 843:8, 847:9, 859:9, 869:16, 876:20, 878:4, 878:9, 900:12, 902:12
  **twice** [2] - 869:17, 869:18
  **two** [44] - 651:9, 652:14, 653:23, 655:12, 667:4, 686:9, 686:16, 687:9, 688:21, 709:23, 715:23, 717:18, 719:7, 719:8, 722:24, 733:14, 743:1, 743:8, 762:16, 762:17, 773:17, 777:10, 789:12, 789:13, 801:5, 802:18, 808:13, 808:14, 811:1, 817:2, 829:5, 849:6, 854:17, 858:20, 859:10, 859:13, 867:5, 868:24, 874:1, 877:8, 877:23, 900:1, 902:16
  **two-step** [1] - 789:12
  **type** [4] - 720:9, 720:11, 814:10, 817:16
  **typed** [1] - 817:18
  **types** [2] - 775:21, 779:8
  **typical** [1] - 799:2
  **typically** [1] - 826:5

**U**

  **U.S** [38] - 627:15, 659:22, 662:22, 684:3, 684:4, 684:23, 690:25, 691:4, 695:1, 697:19, 724:1, 724:3, 724:20, 768:6, 768:8, 769:16, 769:17, 770:24, 773:2, 782:5, 782:16, 782:22, 821:9, 821:11, 822:14, 825:18, 826:6, 826:11, 826:18, 826:21, 827:10, 827:21, 831:20, 842:12, 842:22, 850:21, 862:8
  **ultimately** [2] - 824:5, 864:21
  **unable** [3] - 664:15, 755:23, 888:5
  **under** [13] - 626:4, 647:19, 656:9, 665:18, 714:18, 728:5, 790:17, 816:12, 818:2, 824:20, 829:23, 867:13
  **underneath** [1] - 689:7
  **understood** [7] - 634:17, 647:12, 681:24, 705:4, 713:19, 827:1, 881:23
  **unfortunately** [2] - 638:2, 767:22
  **uninsurable** [2] - 762:4, 763:1
  **United** [13] - 627:16, 656:5, 658:16, 658:18, 659:24, 662:23, 663:4, 690:22, 697:14, 697:17, 697:18, 782:4, 904:17
  **unless** [1] - 716:15
  **unrelated** [3] - 695:15, 729:9, 729:11
  **up** [138] - 627:15, 629:15, 632:24, 634:20, 635:1, 635:8, 635:9, 637:20, 640:12, 642:25, 646:19, 650:10, 652:7, 652:16, 652:25, 657:18, 669:14, 669:15, 670:11, 671:22, 672:12, 673:1, 674:22, 674:24, 676:12, 680:2, 680:4, 680:12, 680:15, 680:17, 682:13, 685:14, 685:16, 686:22, 687:4, 688:17, 688:22, 688:25, 689:6, 692:16, 693:14, 695:23, 696:4, 696:6, 697:24, 698:15, 699:5, 700:19, 700:22, 701:24, 701:25, 702:2, 702:19, 704:6, 704:14, 710:16, 710:18, 710:21, 715:21,

719:1, 726:10, 727:7, 729:18, 729:20, 732:5, 736:23, 738:18, 744:7, 744:12, 744:14, 744:18, 746:19, 747:6, 747:22, 750:3, 753:22, 755:7, 756:9, 756:17, 757:1, 759:7, 765:5, 765:8, 766:20, 767:3, 767:25, 779:16, 780:19, 783:12, 783:13, 784:19, 791:3, 791:14, 797:18, 802:3, 804:15, 805:17, 805:25, 806:14, 806:24, 811:10, 811:20, 813:18, 817:3, 817:15, 818:16, 841:6, 841:17, 841:25, 842:2, 842:9, 842:13, 843:13, 845:1, 846:19, 850:4, 853:20, 854:15, 860:21, 864:4, 865:10, 868:9, 869:3, 869:24, 870:21, 872:23, 873:18, 878:1, 882:6, 886:8, 892:10, 894:21, 895:6, 897:12, 898:17, 900:21
  **update** [1] - 746:25
  **updated** [4] - 713:24, 713:25, 714:3, 714:6
  **upper** [2] - 656:8, 826:23
  **upstream** [1] - 638:16
  **US** [15] - 670:17, 680:24, 683:13, 683:18, 694:17, 694:18, 716:17, 720:20, 736:13, 736:17, 737:19, 823:22, 830:12, 830:13, 868:10
  **USA** [10] - 630:13, 631:12, 660:12, 668:14, 683:20, 721:21, 721:23, 721:25, 759:23, 760:6
  **USA's** [1] - 721:21
  **user** [1] - 723:19
  **users** [1] - 811:22
  **utilize** [1] - 902:23
  **utilized** [1] - 765:25

**V**

  **vague** [1] - 668:7
  **value** [4] - 675:15, 679:19, 680:15, 809:1
  **values** [1] - 680:12
  **various** [2] - 819:8, 837:24
  **VAT** [1] - 679:13
  **Vega** [19] - 698:18, 701:14, 701:16, 701:25, 702:1, 703:21, 780:18, 784:19, 785:13, 805:24,

806:17, 807:8, 813:18, 817:7, 841:9, 895:6, 897:13, 901:10, 902:2
  **vendor** [2] - 661:8, 717:1
  **vendors** [1] - 809:16
  **version** [2] - 646:20, 738:18, 767:22
  **versus** [2] - 811:19, 871:9
  **via** [3] - 807:14, 807:15, 840:7
  **video** [16] - 649:23, 649:25, 650:2, 650:7, 651:13, 651:14, 651:20, 651:21, 651:22, 651:24, 653:10, 685:22, 726:17, 739:16, 742:20, 743:10
  **videos** [1] - 742:12
  **view** [2] - 855:14, 855:15
  **virtue** [1] - 722:1
  **vision** [1] - 766:11
  **visited** [1] - 839:17
  **voice** [1] - 742:4
  **volume** [3] - 684:15, 684:21, 791:20
  **voluntarily** [1] - 783:6
  **volunteer** [1] - 663:6
  **volunteered** [1] - 780:7

**W**

  **wait** [5] - 643:17, 643:18, 718:9, 738:23
  **Waite** [1] - 848:11
  **waive** [1] - 758:11
  **waived** [2] - 758:25, 759:24
  **waiver** [10] - 757:5, 757:6, 757:14, 757:15, 760:14, 781:17, 782:2, 782:3, 782:15, 783:15
  **waivers** [4] - 640:11, 781:11, 781:13, 782:17
  **waiving** [1] - 758:7
  **walk** [1] - 815:4
  **wants** [2] - 685:25, 766:19
  **warehouse** [7] - 661:4, 661:9, 661:12, 661:17, 661:18, 689:6, 793:22
  **warehouses** [1] - 627:16
  **warnings** [2] - 799:16, 799:17
  **watch** [1] - 801:9
  **watched** [2] - 649:23, 652:8
  **watches** [1] - 801:11
  **water** [2] - 706:12, 706:16
  **Wattera** [2] - 630:8,

630:12
  **ways** [2] - 655:15, 655:19
  **website** [2] - 650:2, 657:5
  **wedge** [1] - 781:1
  **Wednesday** [1] - 643:14
  **Week** [1] - 837:18
  **week** [10] - 636:12, 704:12, 704:13, 704:15, 712:15, 712:23, 767:24, 800:25
  **weeks** [2] - 715:23, 801:9
  **Weinshall** [1] - 784:1
  **WEINSHALL** [4] - 743:3, 743:11, 743:14, 743:17
  **well-secure** [1] - 812:4
  **whatnot** [1] - 786:9
  **white** [3] - 637:3, 638:21, 814:19
  **whole** [22] - 674:1, 695:10, 727:10, 738:15, 752:6, 762:9, 764:2, 764:9, 765:1, 767:6, 782:21, 803:20, 824:7, 830:9, 842:7, 842:11, 849:6, 851:13, 854:13, 876:6, 880:18, 891:15
  **whys** [1] - 801:22
  **wide** [1] - 836:14
  **wire** [1] - 893:14
  **wired** [1] - 893:13
  **WITNESS** [38] - 634:10, 640:8, 656:15, 670:12, 683:21, 683:25, 684:9, 686:3, 686:10, 686:14, 694:20, 698:1, 698:4, 701:19, 701:21, 708:1, 721:20, 725:8, 728:9, 737:3, 737:20, 747:16, 779:14, 779:25, 782:10, 782:14, 791:17, 791:20, 813:7, 832:13, 838:11, 869:6, 880:17, 891:5, 891:7, 894:9, 899:4, 902:14
  **witness** [10] - 626:4, 626:7, 642:15, 646:15, 658:3, 672:12, 742:17, 791:3, 791:8, 792:2
  **Witness** [3] - 791:1, 791:12, 903:5
  **witnesses** [1] - 743:8
  **won** [1] - 668:16
  **word** [3] - 687:15, 776:19, 864:22
  **words** [2] - 782:5, 881:7
  **works** [6] - 635:23, 692:25, 694:2, 704:4, 761:17, 761:20
  **world** [7] - 630:22,

630:25, 633:6, 633:7, 633:10, 654:1, 695:4

**worldwide** [1] - 628:12

**worse** [2] - 774:14, 774:15

**worth** [3] - 677:19, 758:8, 765:16

**worthy** [1] - 762:9

**write** [6] - 736:13, 754:12, 754:16, 754:18, 779:24

**writes** [5] - 747:5, 747:7, 753:25, 754:3, 892:17

**writing** [7] - 649:3, 649:4, 656:9, 712:2, 746:20, 754:1, 755:15

**written** [13] - 636:6, 647:14, 648:23, 649:15, 649:16, 713:3, 735:13, 745:1, 755:7, 787:10, 787:17, 799:17, 865:23

**wrote** [2] - 736:11, 749:9

## X

**X57** [1] - 722:12

**X70** [13] - 727:19, 728:19, 728:22, 729:10, 729:20, 730:4, 730:8, 730:13, 730:16, 731:3, 731:15

**X72** [3] - 722:12, 722:24

## Y

**Y7** [3] - 813:19, 849:12, 849:13

**Year** [3] - 700:20, 837:14, 837:16

**year** [26] - 627:10, 627:12, 628:3, 628:13, 662:17, 692:5, 700:7, 700:13, 700:21, 700:24, 702:20, 717:18, 719:6, 719:7, 719:8, 720:22, 721:2, 721:5, 732:25, 758:13, 758:21, 758:25, 759:8, 847:20, 847:21, 896:14

**years** [22] - 644:9, 644:12, 679:16, 702:13, 704:5, 704:10, 709:23, 714:25, 717:18, 719:7, 719:8, 733:14, 746:23, 792:19, 792:20, 793:8, 793:9, 795:21, 848:20, 848:22, 849:8, 878:10

**years'** [1] - 765:15

**yellow** [1] - 781:3

**yesterday** [69] - 626:14, 627:6, 628:6, 629:19,

634:16, 634:21, 639:7, 640:1, 641:15, 642:13, 642:21, 643:5, 643:7, 643:20, 646:4, 649:24, 650:3, 651:12, 652:6, 653:8, 653:10, 654:4, 654:23, 661:3, 661:24, 666:22, 667:2, 669:16, 670:21, 671:1, 671:25, 675:7, 679:7, 682:4, 682:7, 682:9, 683:8, 686:22, 686:23, 687:18, 688:24, 697:25, 698:12, 698:25, 699:8, 699:15, 701:3, 702:9, 702:17, 702:25, 704:3, 706:10, 709:15, 710:25, 711:3, 744:8, 748:7, 756:22, 756:24, 757:4, 759:5, 760:9, 760:15, 761:10, 765:7, 766:3, 841:18

**yesterday's** [1] - 643:25

**yourself** [6] - 723:19, 760:23, 779:24, 791:14, 794:19, 795:2

## Z

**zero** [2] - 677:25, 779:7

**zeros** [1] - 885:17

**Zoom** [1] - 802:6

**zoom** [4] - 716:10, 719:1, 732:7, 854:15

**zooming** [1] - 854:14