UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-60125-CIV-SCOLA/GOODMAN

JIANGMEN BENLIDA PRINTED
CIRCUIT CO., LTD.,

    Counter-Defendant,

CIRCUITRONIX, LLC,

    Counter-Plaintiff.
_____/

### Benlida's Opposition to Circuitronix's Renewed
### Motion for a Directed Verdict

Counter-defendant Jiangmen Benlida Printed Circuit Co., Ltd. respectfully submits this memorandum in opposition to Circuitronix's renewed motion for judgment as a matter of law with respect to $317,539 that was paid by CTX-US to reduce its debt to Benlida for circuit boards that were ordered for CTX-US's exclusive customers by CTX-HK. For the reasons that follow, CTX-US's motion must again be denied.

### CTX-US Had the Burden of Proof, and Consequently the Jury
### Had the Right to Reject Benlida's Position. The Jury Also Had the
### Right to Credit Benlida's Testimony and Evidence.

CTX-US argues that the jury should have found in its favor because the so-called "premiums" that were added on to orders for its exclusive customers were "one-sided." Nonetheless, the jury was entitled to conclude that these premiums were indeed intended to bring down the overall CTX-US debt which included its debt for orders placed for CTX-US's exclusive customers by CTX-HK.

1

For the sake of analysis, we can consider that: (a) Benlida demanded the payment of "premiums" to bring down the overall debt by virtue of CTX-US's own orders and the orders placed for CTX-US's exclusive customers by CTX-HK; (b) CTX-US paid such premiums; (c) Tracy Huang and Rishi Kukreja agreed that the premiums were paid; and (d) they agreed that the Manufacturing Agreement as it existed in 2012 did not allow for premiums to be charged in the manner in which they were charged. Nonetheless, rational business people, such as Mr. Kukreja, do not pay additional moneys if they don't actually owe the money, or, at least, if they don't believe that there is some reasonable basis for which the moneys are being requested. Indeed the Manufacturing Agreement had been modified because of the issue of mounting debts, as acknowledged by the letter agreement (DE 281-3) that was introduced into evidence as a joint exhibit:[1]

> Due to discrepancies between CTX USA and Manufacturer with respect to the balance of certain accounts under the Existing Agreement (the "Discrepancy"), CTX USA, CTX HK, and Manufacturer have agreed to negotiate in good faith a new manufacturing and representation agreement (the "Secondary Manufacturing Agreement"). However, until such time as CTX USA, CTX HK and Manufacturer enter into the Secondary Manufacturing Agreement or this Agreement otherwise terminates pursuant to Section 7 hereof, CTX USA has agreed to continue to make payments to Manufacturer, irrespective of the Discrepancy, in accordance with the payment schedule set forth in the Existing Agreement (even if the payments would result in CTX USA having overpaid under the Existing Agreement) ("Regularly Scheduled Payments.")

The modification did not say that both CTX-US *and* CTX-HK agreed to continue to make payments. Rather, it was CTX-US that agreed to make payments. The jury thus had a right to conclude that CTX-US's payments were indeed voluntary, and not made under duress. That is, the demand for the premium payments comported with the modified contract. And the jury could have

---

[1] The court charged the jury as follows: "A contract in writing may be modified by a subsequent oral agreement between the parties or by the parties' subsequent conduct if the modified agreement has been accepted and acted on by the parties in such a manner as would work a fraud on either party to refuse to enforce it." (Tr. 1645).

reasonably so found. At most, CTX-US presented a claim at trial, which was obviously rejected by the jury, that it was coerced into paying premiums. The claim of coercion is belied by the fact that the parties acknowledged a discrepancy due to orders placed for CTX-US's exclusive customers by CTX-HK.

In support of its claim for repayment of the premiums, CTX-US relied on the 2012 Manufacturing Agreement, but that was not dispositive because it was amended in 2016. In any event, even if the 2012 Manufacturing Agreement did not allow for premiums, contracts can be modified by performance, even if the agreement says only a signed writing can modify the contract, such being the law merchant which is implicit in agreements for the sale of goods, and codified under Florida's Uniform Commercial Code:

> 671.103 **Supplementary general principles of law applicable.** – Unless displaced by the particular provisions of this code, the principles of law and equity, ***including the law merchant*** and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.
>
> 671.205 **Course of performance; course of dealing; usage of trade.** –
>
> (1) A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if:
>
> (a) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and
>
> (b) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.
>
> (2) A "course of dealing" is a sequence of conduct concerning previous transactions between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.
>
> (3) A "usage of trade" is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar record, the interpretation of the record is a question of law.
>
> (4) A course of performance or a course of dealing between the parties or usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware is

relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement. A usage of trade applicable in the place in which part of the performance under the agreement is to occur may be so utilized as to that part of the performance.

(5) Except as otherwise provided in subsection (6), the express terms of an agreement and any applicable course of performance, course of dealing, or usage of trade must be construed whenever reasonable as consistent with each other. If such a construction is unreasonable:

(a) Express terms prevail over course of performance, course of dealing, and usage of trade;

(b) Course of performance prevails over course of dealing and usage of trade; and

(c) Course of dealing prevails over usage of trade.

(6) A course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance.

(7) Evidence of a relevant usage of trade offered by one party is not admissible unless that party has given the other party notice that the court finds sufficient to prevent unfair surprise to the other party.

Here, the course of performance itself – the payment of the premiums – was a modification of the agreement by performance, irrespective of the written modification by virtue of the 2016 letter agreement, as the construction of the 2012 agreement to allow for payment of debt arising out of CTX-HK's purchase of circuit boards for CTX-US's exclusive customers is not inconsistent with the original 2012 agreement, as written. Any restrictions in the 2012 agreement on Benlida's changing the price, such as a four-month waiting period, are of no use to CTX-US if CTX-US agreed to waive these provisions, by its own voluntary conduct.

CTX-US, to support its claim for repayment of premiums, provided to the jury the 2012 Manufacturing Agreement, Exhibit D-Y13, and Exhibit D-X13. Exhibit D-Y13, a spreadsheet, did no more than show the jury that CTX-US was tracking how much was paid in premiums. Exhibit D-X13 did no more than total the numbers of premiums. D-Y13 and D-X13 did nothing to establish that CTX-US did not actually owe money to Benlida. It cannot be that CTX-US's payments of debts owed to Benlida for circuit boards purchased by CTX-HK for CTX-US's exclusive customers constituted a breach of contract by Benlida.

The issue then was whether Benlida and CTX-US had mutually assented to have CTX-US pay premiums for the debts arising out of CTX-US's and CTX-HK's purchases of circuit boards for CTX-US's exclusive customers. The testimony on the premiums came from Ms. Huang and Mr. Kukreja. To the extent that expert Barry Mukamal offered testimony on the issue, it was to confirm that the Kapila Mukamal expert report had not provided an opinion on the premiums. (Trial Transcript, p. 1052).

> Q. Without seeing it, just tell us what that spreadsheet [Ex. D-Y13] tracked?
>
> A. **[Kukreja]** So sometime after we were close to completing the November 2019 reconciliation, Benlida came back to us and told us they're going to start charging us a 20 percent premium on every purchase order we released to them and it has to be prepaid. So we tried negotiating it. We could not get out of it. So the first purchase order of close to -- the first purchase order close to $300,000 we paid them a $60,000 premium. That's 20 percent. And we continued negotiating with them. And eventually, in March of 2020, they accepted to drop that -- the 20 percent to 10 percent and 3 percent, depending on different orders. And another thing which they did was they went back and said that the $60,000 which you paid for the first purchase order, you can cut that down to 10 percent, that's $30,000, and use the balance $30,000 for subsequent premiums, like the 10 percent or the 3 percent." (pp. 543–544).

The jury could have reasonably understood from this that Benlida made a demand to CTX-US for the Manufacturing Agreement to be modified, and CTX-US voluntarily acceded to this demand. The jury could, further, have reasonably understood from this that Benlida did not *impose* a premium amount on CTX-US, but that CTX-US negotiated with Benlida until the two sides agreed upon a premium amount to go towards paying down the debt arising from CTX-US and CTX-HK's orders of circuit boards for CTX-US's exclusive customers. In any event, the jury simply could have determined that CTX-US failed to meet its burden of proving, by a preponderance of the evidence, that Benlida breached the contract. Indeed, Mr. Kukreja further testified that, "[e]ven today we shipped – we issued three types of purchase orders to them: One with a 10 percent premium, one with a 3 percent premium, one with a 0 percent premium." (p. 779).

The jury therefore could have reasonably understood that CTX-US was satisfied and at peace with paying premiums, and the jury could thus have discounted and disbelieved Mr. Kukreja's self-serving protestations that CTX-US had been coerced into paying premiums, and that CTX-US's paying of premiums was extracontractual and not seen by CTX-US as an operating obligation owed by CTX-US to Benlida. The jury also had the right to credit the testimony of Ms. Huang:

> Q. What's this talk about premium? . . .
>
> [A.] [**Tracy Huang**] Premium is because since we still had the dispute pending, and I think end of 2019 we come to agreement to accept their order by prepayment, but since we have such dispute and it shows overdue payment in the credit insurance company records. So the credit insurance company requests us if we need to continue to do business with them, besides prepayment, they also request premium. So we discuss with the credit insurance company about the percentage again and again. So, firstly, they request 10 percent. And then after two or three months, and then we request to deduct to 3 percent, and then they accept. So that's why it's -- 10 percent or 3 percent premium came out.
>
> Q. And why did the credit company -- the credit insurance company require that?
>
> A. Because Circuitronix owe us money already show in their system. So they blacklist Circuitronix's account. And then all the premium we collect, we need to apply to the old … invoice. (pp. 1370–1371).
>
> \*\*\*
>
> Q. ... I want to talk about premiums, premium charges. So this is connected to Sinosure because, if I understand your testimony correctly, once Benlida made an insurance claim to Sinosure, Sinosure told Benlida, We're going to charge some premiums and you need to pass those on to CTX-US, your customer, right?
>
> A. Yes.
>
> Q. And so Benlida did that, right?
>
> A. Yeah. (pp. 1518–1519).
>
> \*\*\*
>
> Q. … You said, we made an insurance claim with Sinosure, they're charging us premiums, we're passing it on to you tomorrow, right?
>
> A. Because there's a big amount overdue payment pending, so all the premium is to cover the old debt. (p. 1520).
>
> \*\*\*
>
> Q. When Sinosure looked at CTX, did they look at all CTX operations?
>
> A. Yes. When Sinosure look at if it's Circuitronix U.S. and Hong Kong, excluding Circuitronix Shenzhen.

> Q. And I think you mentioned yesterday there was a blacklist. What did you mean by that?
>
> A. Blacklist means that Sinosure canceled their credit limits. And then if the buyer still want to do business with this customer, this customer cannot be in one part of the contract or protected under the insurance policy.
>
> Q. And why did Sinosure cancel their credit limit?
>
> A. Because we report a late payment as the fact. (pp. 1601–1602).

The jury could reasonably have understood from the foregoing that CTX-US, when it decided to pay premiums, understood that the demand for premiums was not an attempt by Benlida to coerce payment from CTX-US, but was rather a requirement by Sinosure, upon which CTX-US depended, and which looked at CTX-US's debts and CTX-HK's debts together. The jury could reasonably have understood that Mr. Kukreja knew that there was a large receivable due to CTX-HK's having placed orders for CTX-US's exclusive customers and that Mr. Kukreja, without there having been any unlawful coercion, agreed to reduce the amount owed.

The jury could reasonably have understood that regardless of what the 2012 Manufacturing Agreement said, CTX-US understood that Sinosure, a government entity, would put CTX-US on the blacklist, denying it any possibility of obtaining trade credit, until it reduced its debt to Benlida, the payment of premiums being one vehicle among other options to reduce the debt. The jury had the right to disbelieve Mr. Kukreja's claim that he didn't understand that the premiums were required by Sinosure:

> Q. There was some talk about premiums. Do you remember that?
>
> A. [**Kukreja**] I do.
>
> Q. And isn't it true that the premiums were things that were required by the trade credit insurer because CTX wasn't paying its bills?
>
> A. I do not know, but that is what was represented to us by Benlida.
>
> Q. And isn't it also true that these premiums were also required to pay down the money that was owed by CTX to Benlida?
>
> A. Once again, I do not know. That is what Benlida represented to us.

> Q. And do you understand that as Benlida received money from CTX, that they were using it internally to pay down their oldest invoices to you?
>
> A. Absolutely not.
>
> Q. You didn't know that?
>
> A. They didn't know that. I didn't know that. They did not know that.
>
> Q. So no one at CTX knew that?
>
> A. And nobody at Benlida knew that.
>
> Q. Okay. And you know with respect to the premiums that we just talked about earlier, I think you know the trade credit insurer is a state-owned entity, right, Sinosure?
>
> A. I'm aware of that.
>
> Q. And so you know if they tell Benlida to do something, they have to follow the rules, right?
>
> A. I do not know that, but what I can tell you is that the number of times Benlida changed what was required by the -- by Sinosure, I cannot really believe anything which they were saying. (pp. 777–779).

The jury could reasonably have declined to give weight to Mr. Kukreja's testimony that he did not understand Sinosure's involvement in Benlida's demand for payment of a "premium." As well, the jury could have reasonably found that there was no undue coercion on the part of Benlida. Accordingly, as the jury had the right to disbelieve Mr. Kukreja, it cannot be found that the denial of CTX-US's claim for return of premiums was a breach of contract.

A court cannot set aside a jury's determination "[w]hen there is some support for a jury's verdict, it is irrelevant what [the Court] would have concluded." *Redd v. City of Phenix*, 934 F.2d 1211, 1215 (11th Cir. 1991). While Circuitronix may feel aggrieved that it has not obtained all that it sought, we again observe, as has the Supreme Court in *McDonough Power v. Greenwood*, 464 U.S. 548, 553 (1984), that:

> This Court has long held that "'[a litigant] is entitled to a fair trial but not a perfect one,' for there are no perfect trials." *Brown v. United States*, 411 U. S. 223, 231-232 (1973), quoting *Bruton v. United States*, 391 U. S. 123, 135 (1968), and *Lutwak v. United States*, 344 U. S. 604, 619 (1953). Trials are costly, not only for the parties, but also for the jurors performing their civic duty and for society which pays the

judges and support personnel who manage the trials. It seems doubtful that our judicial system would have the resources to provide litigants with perfect trials, were they possible, and still keep abreast of its constantly increasing caseload.

## Conclusion

Counter-defendant Jiangmen Benlida Printed Circuit Co., Ltd., respectfully submits that the motion for a directed verdict, and renewed motion for judgment notwithstanding the verdict, should be denied.

Dated: New York, New York
　　　　March 11, 2024　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　　**MAZZOLA LINDSTROM LLP**
　　　　　　　　　　　　　　　　　　　　　　　　*Attorneys for Counter-Defendant Benlida*

　　　　　　　　　　　　　　　　　　　　　　　　By: */s/ Jean-Claude Mazzola*
　　　　　　　　　　　　　　　　　　　　　　　　Jean-Claude Mazzola
　　　　　　　　　　　　　　　　　　　　　　　　Richard E. Lerner
　　　　　　　　　　　　　　　　　　　　　　　　1350 Avenue of the Americas, 2nd Floor
　　　　　　　　　　　　　　　　　　　　　　　　New York, NY 10019
　　　　　　　　　　　　　　　　　　　　　　　　646.250.6666
　　　　　　　　　　　　　　　　　　　　　　　　jeanclaude@mazzolalindstrom.com

**Service via ECF**