**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-60125-CIV-SCOLA/GOODMAN**

JIANGMEN BENLIDA PRINTED
CIRCUIT CO., LTD.,

    Counter-Defendant,

v.

CIRCUITRONIX LLC,

    Counter-Plaintiff,
_____/

**REPLY IN SUPPORT OF COUNTER-PLAINTIFF'S AMENDED RENEWED MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW UNDER RULE 50(b)**

    Circuitronix, LLC ("CTX-US") replies to Benlida's response to CTX-US's renewed motion for partial judgment as a matter of law (ECF No. 328).

    CTX-US has carried its burden of showing that the evidence on every element of its claim for breach of contract based on Benlida's premium-payment demands points so strongly in CTX-US's favor that the jury could not reach a contrary result.  Benlida does not dispute the existence and validity of the agreement between the parties which contained provisions governing pricing terms and the circumstances under which Benlida could demand price increases, as well as provisions requiring Benlida to treat CTX-US fairly and in good faith. Further, the evidence presented at trial overwhelmingly points to the fact that Benlida demanded premium payments on invoices beginning in late 2019, in violation of the contemplated contractual bases for price increases and its good-faith obligations.  CTX-US also provided the jury with evidence—uncontradicted by Benlida—regarding the calculation of and the dollar amount of damages ($317,539.48) resulting from Benlida's breach.

    Scattered throughout Benlida's response are essentially three arguments as to why, according to Benlida, the jury could nevertheless have rejected CTX-US's claim for premium payments.  Those arguments are that the jury could have decided:

        (A)    that CTX-US owed money to Benlida for invoices for products
                for Circuitronix (Hong Kong) Ltd. ("CTX-HK");

  (B) that Benlida was authorized to charge CTX-US premium under the parties' contract and that CTX-US had agreed to pay those charges, so it could not claim them as a breach; and

  (D) that Mr. Kukreja's testimony was not credible.

None of these arguments is even remotely persuasive. It bears mention that some of these arguments are surfacing now, for the very first time, months after trial. When Benlida responded back on November 7, 2023 to CTX-US's argument concerning the premium payments in its motion for judgment as a matter of law, all Benlida mustered was that:

> [i]t cannot either be deduced or inferred what portion of Circuitronix's evidence the jury disbelieved . . . . One cannot say whether the jury accepted that some portion of payments made by Circuitronix to Benlida were properly given FIFO treatment, or found that some or all of Circuitronix's witnesses were not entirely credible and that it was therefore not entitled to every dime that it sought.

ECF No. 290 at 2.

## I. Benlida Fails to Raise Even a Plausible Basis for the Jury's Decision

Judgment as a matter of law is appropriate—even when the movant is the claimant and bears the burden of proof—if the evidence in its favor "is so one-sided as to be of overwhelming effect." *Handley v. Werner Enterprises Inc.*, No. 23-10587, 2023 WL 6628921, at *3 (11th Cir. Oct. 11, 2023). Courts have declined to enter judgment as a matter of law under this standard in cases where, for example, the movant fails to prove the elements of a claim or affirmative defense, cites a solitary piece of evidence in support of its claim or defense, or when there is conflicting evidence. *Id.* (affirming denial of judgment as a matter of law on an "avoidable consequences" defense where the defendant used the phrase but never stated or proved its elements and where the defendant merely repeatedly referred to a single statement by the plaintiff as the only piece of evidence supporting its "avoidable consequences" defense); *United States EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1250 (11th Cir. 1997) (concluding judgment as a matter of law was not appropriate based on conflicting evidence on the "fact-bound" question of whether an ADEA violation was "willful," and on different possible inferences jury could draw).

That is not the situation here. As discussed below, CTX-US carried its burden of proving its claim for premium damages at trial, and satisfies its burden for correcting the judgment to reflect those damages through this "overwhelming" and "one-sided" evidence in its favor which the jury was not at liberty to disbelieve.

### A. The Jury Was Not at Liberty to Consider CTX-HK Debts as a Justification for Benlida's Demand for Premiums

Benlida paradoxically argues, in passing and throughout its response, that "the jury was entitled to conclude that these premiums were … intended to bring down the overall CTX-US debt which included its debt for orders … by CTX-HK." Resp. at 1; *see also id.* at 4, 5. But the jury could not reasonably have decided the issue on this ground because the Court repeatedly instructed the jury that CTX-HK was not a part of the case.

The Court's order granting CTX-US's motion for summary judgment narrowed and framed the issues for trial, making clear that CTX-HK had no place at trial as there were "no genuinely disputed issues of material fact regarding [Benlida's] new theories and grounds for relief (based on either [CTX-US's] vicarious liability for CTX-HK's debts or Benlida's first-in/first-out accounting policy)." ECF No. 221 at 13. The Court reaffirmed that exclusion of CTX-HK argument and evidence at trial at least two more times before opening argument. *See* ECF No. 237 at 1, § 1 (order on omnibus motion *in limine* ruling that "Benlida is precluded from presenting evidence of CTX-HK's debts or [CTX-US's] responsibility therefore"); ECF No. 256 (granting CTX-US's motion to enforce a pre-trial ruling excluding certain evidence regarding CTX-HK). Throughout the trial, the Court repeatedly admonished the jury that it was not to consider evidence regarding supposed debts owed to CTX-HK, or CTX-US's responsibility for CTX-HK debts. *See, e.g.*, ECF No. 324 ("Trial Tr. (Vol. VI)") at 1492:11-1493:7 (curative instruction to jury explaining that "when reaching your verdict in this case, you *should not consider [CTX-HK's] supposed debt in any way* in determining whether or not any money is owed between" CTX-US and Benlida) (emphasis added); ECF No. 321 ("Trial Tr. (Vol. III)") at 668:12-14 (Court advising the jury that "the only case we're in trial for is this specific case … between Benlida and CTX-USA"); *see also* ECF No. 322 ("Trial Tr. (Vol. IV)") at 1148:17-22 (warning Benlida's counsel that if they put forward certain evidence related to CTX-HK "I'm going to instruct the jurors that I have already made a legal finding that CTX-USA … is not responsible for CTX Hong Kong's debts …. And they're not to consider that").

Benlida's own counsel represented to the Court at the start of trial that he was "not going to get up here and say, We don't owe any money because CTX Hong Kong owes us 8-1/2 million, 10 million on the other side." ECF No. 321 ("Trial Tr. (Vol. I)") at 122:14-123:5. Yet Benlida now argues that judgment as a matter of law is not appropriate because the jury could

3

dismiss CTX-US's claim for premiums by considering the exact arguments and evidence about CTX-HK that Benlida assured the Court it would not make and that the Court prohibited it from making. The thread of this impermissible CTX-HK–based argument runs through Benlida's response and is cause to reject entirely the defense Benlida presents in it.

### B. The Jury Was Not at Liberty to Believe That the Parties' Agreements Authorized Benlida to Charge Premiums

Benlida claims that "the demand for premium payments comported with the modified contract." Resp. at 2. In making this argument, it is unclear if Benlida concedes that the 2012 Manufacturing Agreement did not authorize premium charges (*see id.* at 2-3), but it does argue the 2016 letter agreement authorized premiums and, regardless, that the parties' "course of performance" after Benlida started charging premiums in 2019 modified the contract such that they were authorized. None of these contractual arguments can withstand the slightest scrutiny, and had Benlida ever attempted to articulate any of these theories before the jury during trial (which it did not), the Court surely would have shut that down because the arguments are legally flawed.

The Manufacturing Agreement says nothing about any right of Benlida to charge CTX-US premiums on products. And the notion that it could runs smack into the wall of provisions that specify how prices for products will be set and can be changed. The agreement provides that "the Manufacturer [Benlida] will not increase pricing without first providing no less than four (4) months prior written notice to Circuitronix" and that "[a]ny proposed price increases must be adequately justified by demonstrating a price increase in the parameters which form the base of the Pricing Matrix." ECF No. 281-2 (Manufacturing Agreement) at § 2.2. Precluding any exceptions, it adds: "All business will be conducted as per the pricing matrix" in Schedule B, which would "clearly state the assumptions which will constitute the base of the pricing including but not limited to" the price for various raw materials, the exchange rate, and labor costs. *Id.* at § 2.1. The Pricing Matrix in Schedule B sets forth the base pricing of circuit boards based on layer count (*id.* at 11), pricing adders, including, for example those related to finishes and thickness of the boards (*id.* at 11-12), and the discount structure based on the monthly order value (*id.* at 13). The Manufacturing Agreement does not provide any other basis for increasing prices—even in the case of demands from a third-party credit insurer like Sinosure—nor does it provide exceptions to the four-month mandatory notice period.

4

In its response, Benlida appears to concede that "the Manufacturing Agreement as it existed in 2012 did not allow for premiums to be charged in the manner in which they were charged." Resp. at 2. Small wonder, since Benlida's witness admitted at trial that "the manufacturing agreement doesn't have any requirement for paying premiums." Trial Tr. (Vol. VI) at 1519:11-15 (Tracy Huang).

Benlida claims, however, that 2016 Letter Agreement modified the Manufacturing Agreement in a way that authorized Benlida to charge premiums. Resp. at 2. The provision Benlida points to is the one in which "CTX-USA … agreed to continue to make payments to [Benlida], irrespective of the Discrepancy, *in accordance with the payment schedule set forth in the Existing [Manufacturing] Agreement* (even if the payments would result in CTX USA having overpaid under the Existing Agreement[.]" ECF No. 281-3 (2016 Letter Agreement) at 1 (emphasis added). The italicized phrase unambiguously purports to do no more than reaffirm the "payment schedule" in the Manufacturing Agreement. That schedule was "AMS 60 days from the date of invoice." ECF No. 281-2, § 4.1. Nothing in this provision (or any other) of the 2016 Letter Agreement modified the pricing matrix or provision addressing price increases.

Benlida does not even argue that it did. Instead, it makes the amorphous argument that the jury could infer from CTX-US's promise in 2016 to continue making regularly scheduled payments (pursuant to the contract) that somehow its payment in 2019 of extracontractual premiums Benlida was demanding to release CTX-US's purchase orders into production in its factory were "voluntary, and not made under duress." Resp. at 2. If this strikes the Court as making no sense, that's because it does not make any sense. Nothing in the language of the 2016 Letter Agreement authorized Benlida to charge premiums on top of the agreed pricing methodology.

Not surprisingly, Benlida's argument slides down a notch to rely, alternatively, on something other than the written terms of the parties' contract. It claims that the parties' course of performance authorized the premiums. Resp. at 3-4. Specially, Benlida points to the fact that CTX-US *paid* the premiums, and that by having done so, it modified the terms of the contract to allow for such charges. *Id*. at 4.

There are multiple flaws in this argument. *First*, Benlida has *never* before raised this legal theory (which constitutes a new legal defense to the breach-of-contract counterclaim

5

directed at the premium charges)—neither before trial, during trial, or even in response to CTX-US's Rule 50(a) motion for judgment as a matter of law.

*Second*, the Uniform Commercial Code provision on which this new defense theory depends expressly makes modifications to a contract through course of performance contingent on the absence of any "objection" to that course of performance.  § 671.205(1)(b), Fla. Stat.  Had Benlida raised this theory before or even during trial, CTX-US would have had the opportunity to introduce evidence specifically demonstrating that it was paying the premiums under protest.  But because Benlida never raised that defense theory, no evidence was introduced directly addressing this point.

But the evidence that was introduced during trial lends itself to the fair inference that CTX-US did pay those premiums under protest.  When Benlida began insisting on prepayments in August 2019, instead of the prior AMS 60 day payment term (whereby CTX-US effectively had 90 days to pay for a shipment), Mr. Kukreja testified that CTX-US acceded to that demand by Benlida "[u]nder a protest."  ECF No. 320 ("Trial Tr. (Vol. II)") at 406:25.  CTX-US was forced to accede because Benlida "would not put the product into their factory and start building it until they received the money for it."  *Id*. at 406:18-22.

The exact same thing happened when Benlida began insisting on premiums along with the prepayment of a purchase order.  The only evidence on this subject, from any witness, was Mr. Kukreja's testimony that Benlida *forced* CTX to pay the premiums in order to manufacture its PCBs:

> Q. Where in the manufacturing agreement, the 2016 letter agreement, or any amendment through emails or meeting minutes was Benlida allowed to charge Circuitronix a premium on top of the pricing for the products?
>
> A. They're not allowed.  And, actually, not only are they not allowed, they have acknowledged that this is an overpayment.
>
> Q. So they had not contractual basis to do this?
>
> A. No.
>
> Q. But they did it anyway?
>
> A.  Yes.
>
> Q. And did you pay it?
>
> A. Yes, we paid $317,000.
>
> Q. *Why?*

>   A.   *Because they would not – they would not release purchase orders into the system unless we paid them that.*

Trial Tr. (Vol. II) at 540:11-541:3 (emphasis added).  Just as CTX-US paid the prepayments under protest, it also did so with respect to the premiums Benlida tacked onto the price.  As Mr. Kukreja put it (in the passage Benlida block quotes (Resp. at 5)), CTX-US "tried negotiating" with Benlida on the premiums it was insisting upon, but *"[w]e could not get out of it*." *Id*. at 543:18-19 (emphasis added).  This testimony—which is the only evidence either party introduced at trial bearing on whether or not CTX-US's payment of the premiums was voluntary or coerced—certainly does not reasonably support the interpretation Benlida espouses, that "CTX' payments were … voluntary, and not made under duress."  Resp. at 2.[1]  Nor was there any evidence at trial from which "[t]he jury … could have reasonably understood that CTX-US was satisfied and at peace with paying premiums[.]" *Id*. at 6.  Aside from the absence of any evidence reasonably supporting that spin, Benlida did not even suggest this perspective to the jury during closing argument.

*Fourth*, even if this new defense theory could be asserted at this time, it would fail because it is not reasonable.  The U.C.C. only allows course of performance to become part of a contract when it can be harmonized with the express terms of the contract; "when such construction is unreasonable, express terms shall control course of performance[.]" § 672.208(2), Fla. Stat.  Benlida's position that the parties agreed to a premium pricing structure conflicts with the pricing provision of the Manufacturing Agreement which states unambiguously that "[a]ll business will be conducted as per the pricing matrix as outlined in Schedule B[.]" DE 281-2, § 2.1.  An unreasonable change to pricing through alleged course of performance cannot be recognized in the face of a conflicting contract provision. *See Aliagas Corp. v. Marathon Ashland Petroleum LLC*, No. 05-22705-GOLD/TURNOFF, 2007 WL 9701170, at *8-9 (S.D. Fla. Feb. 5, 2007).

Benlida also argues that the alleged course of performance "was a modification of the agreement" (Resp. at 4), as opposed to merely a reflection of the actual agreement.  But the

---

[1] Had Benlida raised this theory prior to its response to this post-trial motion, CTX-US would have been sure to elicit a line of testimony from Mr. Kukreja more explicitly that the premium payments were also paid under protest.  The absence of that precise testimony is solely due to Benlida's failure to raise this defense theory in a timely fashion when CTX-US had a fair opportunity to address it.

7

U.C.C. prohibits a modification through course of performance where the contract "excludes modification … except by a signed writing." § 672.209(2), Fla. Stat. And the Manufacturing Agreement, as modified by the 2016 Letter Agreement, contains just such a provision. ECF No. 281-3, § 11 ("Any modification to this Agreement shall only bind the parties if it is in writing and signed by the parties."); *Aliagas Corp.*, 2007 WL 9701170, at *10. Benlida has not pointed to any such writing by CTX-US that modified the contract such that premium payments were accepted, and Benlida certainly did not introduce any at trial.

For all of these reasons, Benlida's argument that the jury could have found that Benlida's practice of charging premiums to CTX-US was consistent with the contract must be rejected.

### C. Benlida's Argument That the Jury Could Disbelieve Mr. Kukreja's Testimony About Premiums Is at Odds With the Jury's Verdict Awarding CTX-US Damages

Benlida's suggestion that the jury could have "discounted and disbelieved" Mr. Kukreja's testimony about the premium payments is fundamentally incompatible with a jury verdict that plainly found Mr. Kukreja to be a credible witness by awarding the precise dollar amount he testified as corresponding to CTX-US's claims for overpayments on invoices from the 2019 reconciliation ($4,760,847), and payments that Benlida diverted to ROK Printed Circuit Co. but failed to credit in its CTX-US ledger ($2,825,000).

Mr. Kukreja was CTX-US's primary witness, and its only witness on the issue of premium payments. Benlida made his credibility one of the centerpieces of its defense, and devoted a significant portion of its closing statement to attacking his credibility and honesty. *E.g.*, Trial Tr. (Vol. VI) at 1684:2-11 (Benlida closing argument stating the jury was "able to judge his credibility" and "determine if he was truthful and honest," before stressing he is "the type of guy … that doesn't overpay"); *see also id.* at 1688:18-1690:21 (arguing Mr. Kukreja tried to "wiggle his way out of" and "lie" about CTX-US's true headquarters and the number of employees); *id.* at 1691:17-1692:25 (characterizing Mr. Kukreja's testimony about the location of air freight shipments for CTX-US orders as "another wiggle" and asserting that "he was pivoting and wiggling" "[e]very chance he could get"); *id.* at 1693:1-15 (insinuating Mr. Kukreja's testimony regarding his presence at depositions, with occasional absence to step out of the deposition, was an attempt to "give himself the wiggle room" because he is "a guy that wiggles and pivots"). Despite Benlida's efforts, the jury awarded damages that depended almost

entirely on crediting Mr. Kukreja's testimony on reconciliation overpayments and diverted payments to ROK.[2] That verdict dispels any possibility that Mr. Kukreja's credibility was or could have been a basis for the jury to have declined to award the premium payment damages.[3]

## CONCLUSION

Because the evidence at trial indisputably and overwhelmingly demonstrated that CTX-US has been damaged as result of Benlida's contractual breaches in demanding unauthorized premiums, and because Benlida's response fails to persuade to the contrary, the motion should be granted. The $317,539.48 figure should be added to the overall damages awarded in the jury's verdict and the judgment modified accordingly.

---

[2] The jury's rejection of CTX-US's claim for damages for lead-time penalties is in no way inconsistent with its having credited Mr. Kukreja on the aspects of damages it awarded to CTX-US. The lead-time penalty claim was far and away the most complex, plus the jury received evidence permitting an inference that that the lead-time penalties CTX asserted and the separate price increases Benlida negotiated amounted to roughly a wash.

[3] Additionally, the supposed *reason* for Benlida's unauthorized imposition of a premium (i.e., that it was merely passing on the premium demanded by its credit reinsurer, Sinosure, to CTX-US)—and any testimony by Mr. Kukreja about his understanding of Sinosure's supposed "involvement in Benlida's demand for payment of a 'premium'" (Resp. 8)—is irrelevant to this issue as it does not change the *fact* of Benlida's breach in making the premiums demands that were not permitted under the parties' agreement.

DATED this 18th day of March, 2024.

Respectfully submitted,

*/s/  Christina H. Martinez       .*
Stephen F. Rosenthal
Florida Bar No. 0131458
srosenthal@podhurst.com
Matthew P. Weinshall
Florida Bar No. 84783
mweinshall@podhurst.com
Christina H. Martinez
Florida Bar No. 1029432
cmartinez@podhurst.com
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
Tel.: 305-358-2800
*Counsel for Circuitronix, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been served via transmission of Notices of Electronic Filing generated by CM/ECF on March 18, 2024 as filed with the Clerk of the Court using CM/ECF.

By:  */s/ Christina H. Martinez    .*
Christina H. Martinez
